**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **CUMULUS MEDIA INC.**, *et al.*, | : | **Case No. 17-_____ (___)** |
| | : | |
| Debtors.[1] | : | **(Joint Administration Pending)** |
| | : | |

------------------------------------------------------------------x

### DECLARATION OF JOHN F. ABBOT IN SUPPORT OF
### CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, John F. Abbot, do hereby declare, under penalty of perjury, that:

1.      I serve as the Executive Vice President, Treasurer, and Chief Financial Officer of the above captioned debtors and debtors in possession (each a "Debtor" and collectively, the "Debtors" and together with their non-debtor affiliates and subsidiaries, the "Company" or "Cumulus Media").   I joined Cumulus Media in July 2016, having most recently served as Executive Vice President and Chief Financial Officer of Telx Holdings Inc., a leading provider of connectivity, co-location and cloud services in the data center industry, from January 2014 through December 2015.

2.      Prior to my service at Telx, which was sold to Digital Realty Trust in October 2015, I served as Chief Financial Officer of Insight Communications Company, Inc., a cable television business, for eight years.   During the prior nine years, I worked in the Global Media and Communications Group of the Investment Banking Division at Morgan Stanley, where I was a Managing Director when I left to join Insight Communications Company, Inc.

---

[1]     The last four digits of Cumulus Media Inc.'s tax identification number are 9663.  Because of the large number of Debtors in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/cumulus.  The location of the Debtors' service address is:  3280 Peachtree Road, N.W., Suite 2200, Atlanta, Georgia 30305.

3.      I began my financial career as an associate at Goldman, Sachs & Co., and prior to that served as a Surface Warfare Officer in the U.S. Navy for six years.  I received a bachelor's degree in Systems Engineering from the U.S. Naval Academy, a Master of Engineering in Industrial Engineering from The Pennsylvania State University, and a Masters in Business Administration from Harvard Business School.

4.      I submit this Declaration pursuant to rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), and I am authorized to do so on behalf of the Debtors.

5.      No one individual, including myself, has personal knowledge of all of the facts set forth in this Declaration.  Except as otherwise set forth herein, all facts included herein are based upon (i) my personal knowledge of the Debtors' operations and finances; (ii) information learned from review of relevant documents; and/or (iii) information supplied to me by members of the Debtors' management team and our advisors.  If called upon to testify, I would endeavor to testify competently to the facts set forth herein on that basis.

6.      To minimize any adverse effects that filing for bankruptcy protection may have on their business (the above captioned cases, the "Chapter 11 Cases"), the Debtors have requested various types of "first day" relief (collectively, the "First Day Motions") contemporaneously herewith.   A list of First Day Motions is attached as **Exhibit A**.  The First Day Motions seek to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors-in-possession.  I am familiar with the contents of each First Day Motion (including the exhibits thereto), and believe that the relief sought in each First Day Motion:  ( a )  is necessary to enable the Debtors to operate in Chapter 11 with minimum disruption or loss of productivity or value; ( b )  constitutes a critical element in achieving a

2

successful restructuring of the Debtors; (c) best serves the Debtors' estates; and (d) is, in those instances where the relief seeks immediate payment of prepetition amounts, necessary to avoid immediate and irreparable harm.

## COMPANY BACKGROUND

### I.    Overview of Cumulus Media's Businesses

7.    The Debtors comprise the operating business of Cumulus Media. Cumulus Media is a leader in the radio broadcasting industry, reaching 245 million people each week through their owned-and-operated stations, Westwood One network affiliates and numerous digital channels, with a combination of local programming and nationally syndicated sports, news and entertainment content.

8.    The Company divides its business operations into two segments: (i) the radio station segment ("Radio Station Group"), which owns and operates 446 radio stations across the country; and (ii) the radio network segment ("Westwood One"), which syndicates content and services to approximately 8,000 other radio stations (the "Station Affiliates").[2]

9.    The Radio Station Group's radio stations serve 90 different "markets" (*i.e.*, geographical areas that typically include a city or combination of cities). These markets are located across 36 states and the District of Columbia.

10.    Westwood One is one of the largest radio networks in the country by number of Station Affiliates. Westwood One produces, syndicates and distributes owned content and services, as well as content and services produced in partnership with third parties to the radio market, including to competitors of the Debtors' owned and operated radio stations. Westwood One sells its content to the Station Affiliates in exchange for which it receives primarily

---

[2]    Though called "station affiliates," the vast majority of Station Affiliates are third party entities unrelated to the Debtors.

commercial air time from the Station Affiliates, which Westwood One then aggregates to sell to national advertisers. To a lesser extent, Westwood One receives cash in exchange for syndicated content. Westwood One also purchases advertising inventory on radio stations for cash compensation ("Station Compensation"), which it then aggregates with other advertising inventory for sale to national advertisers.

### A.    The Radio Industry

11.    Radio broadcasting companies derive their primary revenue from the sale of advertising time to local, regional and national spot advertisers, and radio networks derive their primary revenue from the sale of advertising time to national network advertisers. Given the size and variety of its audiences, and low advertising rates compared to many other media, radio is considered an efficient, cost-effective means of reaching specifically identified demographic groups. Radio broadcasting companies and network radio companies also sell endorsements, where on-air talent serves as the voice for, and lends credibility to, a particular advertiser.

12.    Stations are typically classified by their on-air format, such as country, rock, adult contemporary, oldies and news/talk. A station's format and style of presentation allows it to attract specific listener segments sharing certain demographic features and, then, market its broadcasting time to advertisers seeking to reach that audience. Generally, content broadcast on a radio station is either generated locally or comes from a radio network, where such content is generated centrally and syndicated to that radio station. Advertisers and their agencies use data published by audience measuring services, such as Nielsen Audio, to estimate how many people within particular geographical markets and demographics listen to specific stations.

13.    The format of a particular station and the competitive environment generally dictates the type and amount of advertisements that a station can broadcast without jeopardizing listening levels and the resulting ratings. Although the number of advertisements broadcast

during a given time period may vary, the total number of advertisements broadcast on a particular station generally does not vary significantly from year to year unless there is a specific strategy implemented to change that approach.

14.     A station's local sales staff generates the majority of its local and regional advertising sales through direct solicitations of advertising agencies and local businesses.  To generate national advertising sales, a station usually will engage a firm that specializes in soliciting radio-advertising sales on a national level.  Stations may also engage directly with an internal national sales team that supports the efforts of third-party sales representatives and generates new business.  National network sales representatives generally sell spots that have been received as payment for the syndication of content to a network affiliate or that have been otherwise acquired for Station Compensation.

### B.    Cumulus Media

#### a.    Reportable Segments

15.     Cumulus Media operates in two reportable segments, the Radio Station Group and Westwood One.    The Company centralizes the management of its overall executive, administrative and support functions, including finance and administration, legal, human resources, marketing and information technology functions.

#### i.    The Radio Station Group

16.     The Radio Station Group comprises Cumulus Media's 446 owned and operated radio stations.  It provides advertisers with extensive reach to a broad set of consumers within and across 90 markets in 34 states.  The Radio Station Group reaches one in five Americans weekly, hosts 440 local and national websites along with 90 digital and mobile distribution platforms and has 6.4 million Facebook followers and 1.0 million Twitter followers.    Its individual stations collectively run or participate in numerous events each year, including

concerts, job fairs and talent competitions, most of which include opportunities for advertiser participation.  The Radio Station Group also sells an array of digital products and services to enhance its advertisers' digital presence and access to customers.

ii.        <em>Westwood One</em>

17.    Westwood One offers iconic, nationally syndicated sports, news and entertainment content across an audio network of approximately 8,000 affiliated broadcast radio stations and media partners.  Westwood One is one of the largest radio broadcast networks in America by number of affiliates, and is home to premium content, including the NFL, the NCAA, the Masters, the Olympics, Westwood One Backstage, the GRAMMYs, the Academy of Country Music Awards, and the Billboard Music Awards.  In addition, Westwood One's podcast network delivers popular network and industry personalities and programs to a rapidly growing listener base.  Westwood One recently announced important data partnerships, under the OneWay brand, to increase targeting and attribution  measurement, and launched the Westwood One ROI Guarantee, the first ever "return on investment" guarantee in the radio industry.

18.    In addition to syndicating content and services in exchange for advertising time, Westwood One buys radio advertising inventory from the radio station market and seeks to re-sell it for a profit.  Westwood One aggregates the advertising inventory that it purchases from the radio station market with inventory that it has received from Station Affiliates, and bundles that inventory in sales to advertisers who are typically, but not always, national in reach.  As a result, at any given time, Westwood One (a) owes radio stations (mostly third parties unaffiliated with the Debtors) compensation for advertising space it purchased (with the intent to re-sell), and (b) is liable to the advertisers who purchased the advertising space for make-good obligations in the event radio stations do not air the advertising during the contracted time or achieve the reach that Westwood One sold to advertisers.

19.     From time to time, Westwood One also pays Station Affiliates to carry certain of its programming content and services pursuant to syndication arrangements (the "Syndication Payments" and together with the advertising inventory obligations, the "Station Compensation Obligations").  Westwood One makes Syndication Payments in situations where it believes it can re-sell the advertising space it receives from the Station Affiliate for such syndicated content or services for more than the cost of the Syndication Payment.

b.      Revenue

20.     The sale of advertising time is the Company's primary source of revenue.  Local, regional and national advertiser demand affects the Company's sales of advertising time and the advertising rates it charges.  Advertising demand and rates are based primarily on the ability to attract audiences in the demographic groups targeted by such advertising, as measured principally by various ratings agencies on a periodic basis.

21.     The Company owns and operates a diverse platform in terms of format, listener base, geography, advertiser base and revenue stream.  As a result, there is limited revenue dependence on any single demographic, region or industry.  However, as a result of the high fixed cost nature of the Company's business, relatively small changes to the Company's revenue can have a more significant relative impact on the Company's earnings.

22.     The Company's advertising contracts are generally short-term.  It generates most of its revenue from local and regional advertising, which is sold primarily by a station's sales staff.  In addition to local and regional advertising revenues, the Company monetizes its available inventory in both national spot and national network sales marketplaces using its national platform.

23.     Advertising revenues vary by quarter throughout the year.  As is typical with advertising-revenue-supported businesses, the first calendar quarter typically produces the lowest

revenues of any quarter during the year, as advertising generally declines following the winter holidays.  The second and fourth calendar quarters typically produce the highest revenues for the year.  In addition, the Company's revenues tend to fluctuate between years, consistent with, among other things, increased advertising expenditures in even-numbered years by political candidates, political parties and special interest groups.  This political spending typically is heaviest during the fourth quarter.

24.     In addition to selling advertising for cash, the Company sometimes utilizes trade or barter agreements to exchange advertising time for goods or services such as travel or lodging, instead of cash.  The station then uses these bartered goods or services in normal course operations or as products to give away to listeners.

25.     The Company also generates non-broadcast revenues from a variety of other sources, including revenues generated by events and digital sources, which includes advertising revenues generated from the digital streaming of Cumulus programming, website ads and podcast ads as well as the sale of third-party digital products and services to improve clients' digital presence and access to customers.

c.      Sales

26.     At the Radio Station Group, each station's local sales staff solicits advertising either directly from a local advertiser or indirectly through an advertising agency.  Cumulus Media generally uses a tiered commission structure to focus its sales staff on new business development.  Cumulus Media's national sales are made by an outside firm specializing in radio advertising sales on the national level, in exchange for a commission that is based on the cash receipts from net revenue from the advertising generated.  Regional sales, which the Company defines as sales in regions surrounding its markets to buyers that advertise in its markets, are generally made by the Company's local sales staff and market managers.  The stations' local

sales staffs also sell non-broadcast radio products, such as sponsorships in connection with local events and digital products and services, including streaming advertising, email targeting, search engine optimization services and social media management, sometimes with sales support from white label vendors of those digital offerings.  At Westwood One, network sales are made by an internal sales staff to agencies, working on behalf of their clients, or to advertisers directly.

        d.     <u>Employees</u>

27.   At December 31, 2016, Cumulus Media employed 5,479 people, 3,646 of whom were employed full time.  Of these employees, approximately 250 employees were covered by collective bargaining agreements.  In order to protect its interests in valuable relationships and content, Cumulus Media enters into contracts with many of its on-air personalities including in certain instances, contracts to syndicate their content on an exclusive, or semi-exclusive, basis.

### C.    Local Marketing Agreements

28.    A number of radio stations, including certain of the Company's stations, have entered into local marketing agreements ("<u>LMA</u>").  In a typical LMA, the licensee of a station makes available, for a fee and reimbursement of its expenses, airtime on its station to a party which supplies programming to be broadcast during that airtime, and collects revenues from advertising aired during such programming.

### D.    Significant Ratings Materials and Advertising Sales Contracts

29.    The radio broadcast industry's principal ratings service is Nielsen Audio, which publishes surveys for domestic radio markets.  Certain of the Debtors are parties to agreements with the Nielsen Company (US) LLC ("<u>Nielsen Audio</u>") under which they receive programming ratings data for a majority of their respective markets.

30.    The Company also engages Katz Media Group, Inc. ("<u>Katz</u>") as its national advertising sales agent.  The national advertising agency contract with Katz contains termination

provisions that, if exercised by the Company during the term of the contract, would obligate the Company to pay a termination fee to Katz, calculated based upon a formula set forth in the contract.

## II.   Corporate Structure

31.     Debtor Cumulus Media Inc. is the Debtors' ultimate parent company and issuer of the publicly traded equity securities.  Cumulus Media Inc. owns Cumulus Media Holdings Inc., which is also a Debtor and the issuer of the 7.75% Senior Notes (defined below) and the borrower under the Credit Agreement (defined below).  Like its parent company, Cumulus Media Holdings Inc. is a holding company and directly or indirectly owns the Debtors' operating subsidiaries.  **Exhibit B** attached hereto sets forth the Company's organizational structure.

32.     The legal entities within the Company's corporate family are generally organized along the local markets in which the Company operates. (*e.g.*, NY Radio Assets, LLC operates in the New York region; Chicago Radio Assets LLC operates in the Chicago region and so on). Substantially all of the Debtors are obligors or guarantors of the prepetition funded debt.  CMI Receivables Funding LLC was an obligor under the Securitization Facility (defined below).  The Company terminated the Securitization Facility on November 28, 2017.

33.     NY Radio Assets LLC has its principal place of business at 2 Pennsylvania Plaza, Suite 1701, New York, New York 10121, and holds the Radio Station Group's New York station assets.  Excelsior Radio Networks LLC was merged into Westwood One, Inc. in 2013.  Its principal place of business is 220 W. 42nd Street, New York, NY 10036, which serves as the headquarters for Westwood One.

### A.   Non-Debtor Affiliates

34.     Certain direct and indirect subsidiaries of Cumulus Media Inc. did not file for Chapter 11 relief (the "FCC License Holders").  These include eight companies who hold

Federal Communications Commission (the "FCC") licenses (each FCC license, an "FCC License"). None of the FCC License Holders conduct any material business operations or have any employees. Moreover, even though two of the Debtors who are obligors under the Credit Agreement also hold FCC Licenses, none of the FCC License Holders are obligors on the Debtors' prepetition funded debt, nor have any of the FCC License Holders pledged any assets in favor of the prepetition secured lenders. The FCC License Holders' direct parents are Debtors, however, who have pledged their equity interests in the FCC License Holders as collateral under the Term Loan and Revolving Credit Facility (each as defined below).

35.    In addition, the Debtors are beneficiaries of two trusts that hold for divestiture certain radio assets with *de minimis* value in accordance with and pursuant to a consent decree that Cumulus Media Inc. entered into with the Securities and Exchange Commission ("SEC").

**B.    Joint Ventures and Partnerships**

36.    The Debtors also own interests in various joint ventures and partnerships, none of which filed for Chapter 11 protection. Most of the joint ventures and partnerships were created for the purposes of owning and operating physical radio assets, such as towers, antenna systems or combiner systems.

[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*]

### III.     Overview of Cumulus Media's Financial Position and Prepetition Debt Structure

37.     In 2016, Cumulus Media generated total consolidated operating revenues of $1.141 billion.   As of the Petition Date, in addition to $170,000 in accrued and unpaid commitment fees under the Revolving Credit Facility, Cumulus Media had the following outstanding funded debt obligations:

| ($000s) | Term Loan | 7.75% Senior Notes |
|---|---|---|
| Principal | $1,728,614 | $610,000 |
| Accrued and Unpaid Interest (as of 11/29/17 excluding default interest) | 6,379 | 27,314 |
| Total Amounts Outstanding as of Petition Date: | $1,734,993 | $637,314 |

38.     The Company is also a party to a revolving credit facility and Securitization Facility (defined below), under which no amounts are outstanding as of the Petition Date.   The Securitization Facility (defined below) was terminated on November 28, 2017.

### A.     Amended and Restated Credit Agreement

39.     On December 23, 2013, the Company entered into an Amended and Restated Credit Agreement (the "Credit Agreement"), among Cumulus Media Inc., Cumulus Media Holdings Inc., a direct wholly-owned subsidiary of Cumulus Media Inc. ("Cumulus Holdings"), as borrower, and certain lenders and agents.   The Credit Agreement originally consisted of a $2.025 billion term loan (the "Term Loan") maturing in December 2020 and a revolving credit facility (the "Revolving Credit Facility") that matures in December 2018 under which $200.0 million in revolving loans was available.

40.     Term Loan borrowings and borrowings under the Revolving Credit Facility bear interest, at the option of Cumulus Holdings, based on the Base Rate (as defined below) or the London Interbank Offered Rate ("LIBOR"), plus 3.25% on LIBOR-based borrowings and 2.25% on Base Rate based borrowings.   LIBOR-based borrowings are subject to a LIBOR floor of 1.0%

12

under the Term Loan.  Base Rate-based borrowings are subject to a Base Rate floor of 2.0% under the Term Loan.  Base Rate is defined, for any day, as the rate per annum equal to the highest of (i) the Federal Funds Rate, as published by the Federal Reserve Bank of New York, plus 1/2 of 1.0%, (ii) the prime commercial lending rate of JPMorgan Chase Bank, N.A., as established from time to time, and (iii) 30 day LIBOR plus 1.0%. At December 31, 2016, the Term Loan bore interest at 4.25% per annum.

41.    Amounts outstanding under the Term Loan amortize at a rate of 1.0% per annum of the original principal amount of the Term Loan, payable quarterly, with the balance payable on the maturity date.  The Company's 7.75% Senior Notes (defined below) mature on May 1, 2019.  If 91 days prior to the stated maturity date of the 7.75% Senior Notes (the "Springing Maturity Date") the aggregate principal amount of 7.75% Senior Notes outstanding exceeds $200.0 million, the Term Loan maturity date shall be accelerated to the Springing Maturity Date.

42.    Cumulus Media Inc.'s, Cumulus Holdings' and their respective restricted subsidiaries' obligations under the Credit Agreement are collateralized by a first priority lien on substantially all of Cumulus Media Inc.'s, Cumulus Holdings' and their respective restricted subsidiaries' assets (other than certain real property assets as permitted under the Credit Agreement) in which a security interest may lawfully be granted, including, without limitation, intellectual property and substantially all of the capital stock of the Company's direct and indirect domestic wholly-owned subsidiaries and 66% of the capital stock of any future first-tier foreign subsidiaries.

43.    In addition, Cumulus Holdings' obligations under the Credit Agreement are guaranteed by Cumulus Media Inc. and substantially all of its restricted subsidiaries, other than

Cumulus Holdings and the FCC License Holders.    In December 2016, Cumulus Media completed a discounted prepayment of $28.7 million of face value of the Term Loan for $20.0 million, a discount to par value of 30%.

44.    As of the Petition Date, approximately $1.729 billion was outstanding under the Term Loan and no amounts were outstanding under the Revolving Credit Facility.

**B.    The 7.75% Senior Notes**

45.    On May 13, 2011, Cumulus Media Inc. issued $610.0 million aggregate principal amount of 7.75% senior unsecured notes due 2019 (the "7.75% Senior Notes").    Proceeds from the sale of the 7.75% Senior Notes were used to, among other things, repay the $575.8 million outstanding under the term loan facility under the Company's prior credit agreement.

46.    On September 16, 2011, Cumulus Media Inc. and Cumulus Holdings entered into a supplemental indenture with the trustee under the indenture governing the 7.75% Senior Notes which provided for, among other things, the (i) assumption by Cumulus Holdings of all obligations of Cumulus Media Inc.; (ii) substitution of Cumulus Holdings for Cumulus Media Inc. as issuer; (iii) release of Cumulus Media Inc. from all obligations as original issuer; and (iv) guarantee by Cumulus Media Inc. of all of Cumulus Holdings' obligations, in each case under the indenture and the 7.75% Senior Notes.

47.    Interest on the 7.75% Senior Notes is payable on May 1 and November 1 of each year.    The 7.75% Senior Notes mature on May 1, 2019.

48.    In connection with the substitution of Cumulus Holdings as the issuer of the 7.75% Senior Notes, Cumulus Media Inc. also guaranteed the 7.75% Senior Notes.    In addition, each existing and future domestic restricted subsidiary that guarantees Cumulus Media Inc.'s indebtedness, Cumulus Holdings' indebtedness or indebtedness of Cumulus Media Inc.'s

subsidiary guarantors (other than Cumulus Media Inc.'s subsidiaries that hold the licenses for the radio stations) guarantees the 7.75% Senior Notes.

49.  On October 30, 2017, the Restructuring Committee of the Board of Directors authorized the Company to forgo the scheduled interest payment on the 7.75% Senior Notes on November 1, 2017 of approximately $23.6 million and thus enter into the applicable 30-day grace period under the terms of the indenture governing such notes.

### C.  Accounts Receivable Securitization Facility

50.  In 2013, CMI Receivable Funding LLC had entered into the $50.0 million securitization facility with Wells Fargo Capital Finance ("Wells Fargo" and the facility, the "Securitization Facility").  At December 31, 2016 and 2015 there were no amounts outstanding under the Securitization Facility and the facility was terminated on November 28, 2017.

### D.  Equity Interests

#### a.  Common Stock

51.  As of November 13, 2017, there were 1,027 holders of record of Cumulus Media Inc.'s Class A common stock and one holder of record of its Class C common stock.  The number of holders of Cumulus Media Inc.'s Class A common stock does not include any estimate of the number of beneficial holders whose shares may be held of record by brokerage firms or clearing agencies.  No Class B common stock has been issued or is outstanding.

52.  On October 12, 2016, Cumulus Media Inc. effected a one-for-eight (1:8) reverse stock split (the "Reverse Stock Split").  As a result of the Reverse Stock Split, every eight shares of each class of Cumulus Media Inc.'s outstanding common stock were combined into one share of the same class of common stock and the authorized shares of each class of its common stock were reduced by the same ratio.  No fractional shares were issued in connection with the Reverse

Stock Split.  The number and strike price of Cumulus Media Inc.'s outstanding stock options and warrants were adjusted proportionally, as appropriate.

53.       As of the Petition Date, Cumulus Media Inc. had the following issued and outstanding shares:

|  | Common Class A | Common Class C | Treasury Stock | Total |
|---|---|---|---|---|
| Issued | 32,031,952 | 80,609 | (2,806,187) | 29,306,374 |
| Outstanding | 29,225,765 | 80,609 | 0 | 29,306,374 |

### b.    2009 Warrants

54.        In June 2009, in connection with the execution of an amendment to the Company's then-existing credit agreement, Cumulus Media Inc. issued warrants to the lenders thereunder that allow them to acquire up to 156,250 shares of Class A common stock at an exercise price of $1.17 per share (the "2009 Warrants").   The 2009 Warrants expire on June 29, 2019.  The number of shares of Class A common stock issuable upon exercise of the 2009 Warrants is subject to adjustment in certain circumstances, including upon the payment of a dividend in shares of Class A common stock.  None of the 2009 warrants were converted during the year ended December 31, 2016, there were 40,057 of the 2009 Warrants outstanding.

### c.    Company Warrants

55.        Pursuant to the agreement governing the Company's acquisition of Citadel Broadcasting Company ("Citadel") on September 16, 2011 (the "Citadel Merger"), warrants and the related financing transactions, Cumulus Media Inc. issued warrants to purchase an aggregate of 9.0 million shares of Class A common stock (the "Company Warrants") under a warrant agreement dated September 16, 2011 (the "Warrant Agreement").  The Company Warrants are exercisable at any time prior to June 3, 2030, at an exercise price of $0.01 per share with each Company Warrant providing the right to purchase one share.  Pursuant to the terms and conditions of the Warrant Agreement, upon the request of a holder, the Company has the

discretion to issue, upon exercise of the Company Warrants, shares of Class B common stock in lieu of an equal number of shares of Class A common stock and, upon request of a holder and at the Company's discretion, the Company has the right to exchange such warrants to purchase an equivalent number of shares of Class B common stock for outstanding warrants to purchase shares of Class A common stock.

56.    Company Warrants to purchase 43,192 shares of Class A common stock were exercised during the year ended December 31, 2016.  As of December 31, 2017, there were 31,955 of Company Warrants outstanding.

d.    <u>Crestview Warrants</u>

57.    Also on September 16, 2011, pursuant to a warrant agreement separate from the Warrant Agreement, Cumulus Media Inc. issued to Crestview Radio Investors, LLC ("<u>Crestview</u>") warrants to purchase 1.0 million shares of Class A common stock with an exercise price, as adjusted to date, of $34.56 per share (the "<u>Crestview Warrants</u>").  The Crestview Warrants are exercisable until September 16, 2021, and the per share exercise price is subject to standard weighted average adjustments in the event that Cumulus Media Inc. issues additional shares of common stock or common stock derivatives for less than the fair market value per share, as defined in the Crestview Warrants, as of the date of such issuance.  As of the Petition Date, all 1.0 million Crestview Warrants remained outstanding.  As of December 31, 2016, Crestview was Cumulus Media Inc.'s largest shareholder and, based on its most recent filing on Schedule 13D/A, beneficially owned shares representing approximately 30.2% of the outstanding Class A common stock on a fully converted basis.

## EVENTS LEADING TO THE
## COMMENCEMENT OF THE CHAPTER 11 CASES

58.     Between 1998 and 2013, Cumulus Media completed approximately $5 billion worth of acquisitions to grow its network and station businesses, with the largest being the acquisition of Citadel Broadcasting in 2011.    The Company struggled to develop the management and technology infrastructure required to integrate the acquired assets and to support and manage its expanding portfolio.    Additionally, certain of the acquisition projections proved erroneous and a number of subsequent management decisions failed to achieve their desired results.    The Company was thus unable to achieve the cash flow projections it had made to support the prices paid for those acquisitions, particularly the Citadel Broadcasting acquisition in 2011 and the Dial Global (n/k/a Westwood One) acquisition in 2013, with the underperformance resulting in leverage levels significantly in excess of original projections. Additionally, those factors, in concert with industry pressures, also caused its performance to falter such that from 2012 forward the Company experienced declining year-over-year performance in ratings, revenue and Earnings Before Interest Taxes Depreciation and Amortization ("EBITDA").

59.     During the year ended December 31, 2015, because of the sustained declines in its operating results, the Company recorded impairment charges related to goodwill and indefinite-lived intangible assets (FCC Licenses) of $549.7 million and $15.9 million, respectively.    During the year ended December 31, 2016, the Company recorded additional impairment charges related to goodwill and indefinite-lived intangible assets of $568.1 million and $36.9 million, respectively.

60.     In addition to the Company's historical underperformance, advertiser and listener demand for radio overall has been negatively impacted by the availability of content and

advertising opportunities in growing digital streaming and web-based digital formats, resulting in declines in radio industry revenue and listenership. As a result of these general industry pressures, high acquisition prices and subsequent poor performance, Cumulus Media found itself with an excessive level of debt relative to its earnings and rapidly approaching maturities on its funded debt.

61.     In 2015, the Company began to consider balance sheet restructuring options to address the upcoming maturities under the Credit Agreement and the Indenture. In particular, under the Credit Agreement, the Springing Maturity feature of the Term Loan would cause it to mature on January 30, 2019 if over $200 million of 7.75% Senior Notes remain outstanding on that date. The Term Loan would otherwise mature in December 2020. The 7.75% Senior Notes mature in May 2019.

62.     On December 7, 2016, the Company announced that it entered into a refinancing support agreement with holders of approximately 57.3% of the aggregate principal amount of the then outstanding 7.75% Senior Notes in contemplation of a private exchange offer. The purpose of this exchange offer was to refinance the outstanding 7.75% Senior Notes, reduce the outstanding principal amount of the Company's total funded indebtedness, and address the Springing Maturity, all of which the Company believed would improve its long-term financial health.

63.     The Company launched the private exchange offer on December 12, 2016. Contemporaneously with the launch of the private exchange offer, the Company filed a complaint in the United States District Court for the Southern District of New York against the administrative agent under the Credit Agreement seeking a declaratory judgment that the Company was authorized under the Credit Agreement to proceed with the refinancing

contemplated by the private exchange offer and an order of specific performance requiring the administrative agent to comply with its contractual obligations to consent to the Company's proposed refinancing. On February 24, 2017, the Company's motion for summary judgment in the District Court proceeding was denied. The Company subsequently terminated the private exchange offer and the related refinancing support agreement on March 10, 2017.

64.     Following the termination of the private exchange offer, the Company began negotiations regarding potential consensual restructuring transactions with advisors to (and following execution of the non-disclosure agreements described below, principals of) ad hoc groups of certain of the largest Term Loan lenders and holders of the 7.75% Senior Notes (the "Ad Hoc Lender Group" and the "Ad Hoc Senior Noteholder Group" respectively, and together, the "Ad Hoc Groups").

65.     In September 2017, the Company executed non-disclosure agreements with members of the Ad Hoc Groups to further restructuring negotiations with both of the Company's major creditor constituencies. On September 26, 2017, the Company and its restructuring advisors held separate meetings with (1) certain of its holders of 7.75% Senior Notes and their advisors and (2) certain of its Term Loan lenders and their advisors. At those meetings, the Company presented the framework for what it hoped could serve as a fully-consensual restructuring proposal and sought to build consensus among these constituencies regarding a restructuring transaction.

66.     In response to the Company's proposal, each of the Ad Hoc Groups presented the Company with its own initial restructuring proposal during the first week of October 2017. The Company continued to negotiate the terms of potential restructuring transactions with each of

these creditor constituencies throughout October 2017 in an effort to reach consensus on, and build support for, a restructuring transaction.

67.     On October 20, 2017, the board of directors of Cumulus Media Inc. (the "Board") appointed D.J. (Jan) Baker to the Board.  Mr. Baker retired as a partner from the international law firm of Latham & Watkins, LLP in July 2017, most recently serving as that firm's Global Co-Chair of the Corporate Restructuring Practice Group.

68.     By October 30, 2017, the Company's negotiations with the Ad Hoc Senior Noteholder Group had produced a general alignment regarding material terms of a potential out-of-court restructuring transaction and, in the alternative, a potential in-court restructuring transaction both of which transactions included a reinstatement of the Term Loan and a full equitization of the 7.75% Senior Notes.  At the same time, the Company was also making progress with the Ad Hoc Lender Group on the negotiation of an alternative to the proposed transactions with the Ad Hoc Senior Noteholder Group.

69.     In furtherance of the Company's negotiations with both Ad Hoc Groups, on October 30, 2017, the Restructuring Committee of the Board of Directors authorized the Company to forgo the scheduled interest payment on the 7.75% Senior Notes on November 1, 2017 of approximately $23.6 million and thus entered  into the applicable 30-day grace period under the terms of the indenture governing such notes.

70.     On November 29, 2017, the Company executed a restructuring support agreement (the "Restructuring Support Agreement") with consenting Term Loan lenders that hold approximately 69% of the Term Loans and Crestview.  A copy of the Restructuring Support Agreement is attached as **Exhibit D** hereto.

71.    The Restructuring Support Agreement contemplates consummation of a restructuring that provides the following treatment to creditors and equityholders:[3]

- **Term Loans.**  Holders of Term Loan claims will receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Term Loan claim, their *pro rata* share and interest in:

  - $1.3 billion in principal amount of first lien term loans (the "New First Lien Debt"), to be deemed borrowed by Reorganized Cumulus pursuant to the Chapter 11 Plan on the Effective Date.

  - 83.5% of the issued and outstanding amount of the sole class of equity to be issued by Reorganized Cumulus (the "Reorganized Common Equity"), subject to dilution on account of the Post-Emergence Equity Incentive Program.

- **7.75% Senior Notes and Other General Unsecured Claims**.  Each holder of an allowed 7.75% Senior Notes Claim and General Unsecured Claim will receive its *pro rata* share and interest (calculated based on the aggregate amount of allowed Senior Notes Claims and allowed General Unsecured Claims) in 16.5% of the Reorganized Common Equity, subject to dilution on account of the Post-Emergence Equity Incentive Program (the "Unsecured Equity Recovery Pool").

- **Equity Interests in Cumulus Media Inc.**  On the Effective Date, each holder of an allowed equity interest in Cumulus Media Inc. shall receive no distribution on account thereof and each such interest will be cancelled.

72.    The Restructuring Support Agreement obligates the parties to work expeditiously to consummate the Restructuring within 180 days of the Petition Date, or May 27, 2018. Towards that end, the Debtors have agreed to certain milestones (the "Milestones"), including the following key Milestones in these Chapter 11 Cases:

- to file a Chapter 11 Plan and disclosure statement that are consistent with the Term Sheet and the Restructuring Support Agreement within 10 days post petition, or by December 8, 2017;

- to obtain an order approving the disclosure statement within 90 days post petition, or by February 28, 2018;

---

[3]    Capitalized terms used but not defined in this summary have the meaning ascribed to them in the Restructuring Support Agreement and the Term Sheet.  The narrative provided herein is for descriptive purposes only.  In the event of a discrepancy between this description and the transaction documents, the terms of the Restructuring Support Agreement and the Term Sheet govern.

- to obtain an order confirming the Chapter 11 Plan within 150 days post petition, or by April 27, 2018; and

- to consummate the chapter 11 plan and go effective within 180 days post petition, or by May 29, 2018.

### FIRST DAY FILINGS[4]

**I.      First Day Motions and Pleadings**

73.     As a result of my first-hand experience, and through my review of various materials and information, discussions with members of the Debtors' management, and discussions with the Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Motions described below, and (b) the immediate and irreparable harm to which the Debtors and their businesses will be exposed unless the relief requested in the First Day Motions is granted without delay.

74.     I submit this Declaration in support of the Petitions and the First Day Motions filed with the Court in these cases and as described below.

75.     The relief sought in the First Day Motions is critical to a smooth transition into Chapter 11 to minimize the adverse effects of the Chapter 11 Cases on the Debtors' business and on their employees and creditors.  Collectively, the First Day Motions maximize value for the Debtors' estates and stakeholders by reducing unnecessary disruption and minimizing any negative impact of the Chapter 11 Cases on the Debtors' businesses and operations.  As described more fully below, the Debtors, in consultation with their professionals, have carefully tailored the relief requested in the First Day Motions to ensure the Debtors' immediate operational needs are met, and that the Debtors suffer no immediate and irreparable harm.  For

---

[4]     Capitalized terms used but not defined in this part of the Declaration shall have the meaning ascribed to such term in the applicable First Day Motion.

the reasons identified immediately below, I believe that the relief requested in each of the First Day Motions is appropriate under the circumstances and should be granted by the Court.

### A.      Motion for Joint Administration of Related Chapter 11 Cases

76.      By this motion, the Debtors seek authorization to jointly administer these Chapter 11 Cases for procedural purposes only.  Many of the motions, applications, hearings and orders that will arise in these Chapter 11 Cases will jointly affect each Debtor.  Thus, the Debtors believe the interests of the various Debtors, their estates, their creditors and other parties in interest would be best served by the joint administration of these Chapter 11 Cases for procedural purposes.  Joint administration of these Chapter 11 Cases will reduce fees and costs, avoid needless duplicative filings and enable a more efficient and economical administration of the Chapter 11 Cases.  Joint administration also relieves the Court from the burden of entering duplicative orders and maintaining duplicative files.  Furthermore, I understand that creditors' rights will not be adversely affected as this motion seeks only administrative, not substantive, consolidation of the estates.  Creditors thus maintain their ability to file claims against specific Debtor estates.

### B.      Creditor Matrix Motion

77.      By this motion, the Debtors seek entry of an order (a) waiving the requirement to file a list of creditors, (b) authorizing the Debtors to file a single consolidated list of the Debtors' 20 largest unsecured creditors, (c) authorizing the Debtors to redact certain personal identification information for individual creditors, and (d) approving the form and manner of notifying creditors of commencement of these Chapter 11 Cases and of the meeting of creditors to be held.

78.      There are 37 entities that are Debtors in the Chapter 11 Cases.  As of the Petition Date, the Debtors have borrowed or issued approximately $2.4 billion in aggregate principal

amount of funded indebtedness in addition to other obligations arising in the ordinary course of their business operations.  The Debtors estimate that there are upwards of 30,000 creditors (on a consolidated basis) in these Chapter 11 Cases.  As such, requiring the Debtors to comply with the matrix requirements would be an exceptionally burdensome task and would greatly increase the risk and recurrence of error of information already on computer systems maintained by the Debtors or their agents.

79.     The Debtors therefore submit that the preparation and maintenance of a single consolidated creditor list is warranted under the facts and circumstances present in these Chapter 11 Cases.

## C.     Motion for Extension of Time to File Schedules, Statements and Rule 2015.3 Report

80.     By this motion, the Debtors seek entry of the Proposed Order:  (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs by 30 days, for a total of 44 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions; and (b) extending the deadline by which the Debtors must (I) file their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Federal Rule of Bankruptcy Procedure 2015.3 (the "2015.3 Reports") to the later of: (i) 30 days after the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code (the "341 Meeting"); or (ii) 44 days from the Petition Date, or (II) file a motion with the Court seeking a modification of such reporting requirements for cause, without prejudice to the Debtors' ability to request additional extensions.

81.     The Debtors are part of a complex, integrated business with multiple business lines involving worldwide operations.  While the Debtors have filed a consolidated list of creditors holding the largest 20 unsecured claims against the Debtors, the Debtors estimate that, as of the Petition Date, they have approximately 30,000 creditors in the aggregate.  In the ordinary course of their businesses, the Debtors have entered into hundreds, if not thousands, of contracts and other commercial relationships.  Because of the size and scope of the Debtors' businesses, the complexity of their financial affairs and the numerous business matters incident to the commencement of the Chapter 11 Cases, the Debtors do not anticipate they will be able to complete the schedules of assets and liabilities, schedules of current income and expenditures, statements of executory contracts and unexpired leases and statements of financial affairs, as well as the Rule 2015.3 Report, within the time frame that the applicable Bankruptcy Rules require.  Moreover, the Debtors and their advisors will need to address numerous critical operational matters in the early days of these Chapter 11 Cases to effect a smooth transition into the Chapter 11 process, thereby maximizing estate value.  The requested extension sought in this motion will allow the Debtors and their advisors to focus on these operating exigencies for the benefit of all creditors and parties in interest.

### D.     Case Management Motion

82.     By this motion, the Debtors seek entry of an order implementing certain case management procedures (the "Case Management Procedures") which:  (a) establish requirements for the filing and service of notices, motions, applications, documents filed in support thereof, and objections and responses thereto, (b) delineate standards for notices of hearing and agendas, (c) articulate mandatory guidelines for the scheduling of hearings and objection deadlines, (d) limit matters that are required to be heard by the Court and (e) authorize the Debtors to (i) schedule, in cooperation with the Court, periodic omnibus hearing dates, (ii) serve documents

by e-mail on certain parties in interest, (iii) establish a website administered by Epiq Bankruptcy Solutions, LLC, the Debtors' claims and noticing agent (the "Claims and Noticing Agent"), to provide interested parties with access to certain documents filed in the Chapter 11 Cases (the "Case Website") and (iv) utilize the Claims and Noticing Agent to maintain and distribute documents.

83.    I understand that the Case Management Procedures are necessary to help scheduling and noticing matters in these Chapter 11 Cases with consistency and predictability, thereby increasing their administrative efficiency and reducing costs.

> **E.    Application to Appoint Epiq as Claims and Noticing Agent for Purposes of 28 U.S.C. § 156(c).**

84.    By this application, the Debtors seek entry of an order authorizing the appointment of Epiq Bankruptcy Solutions, LLC ("Epiq") as the Claims and Noticing Agent in these Chapter 11 Cases for purposes of 28 U.S.C. § 156(c).  I understand, upon information and belief, that Epiq is an experienced claims agent and is frequently used by debtors in large Chapter 11 cases, and I believe that Epiq is well qualified to serve as the Claims and Noticing Agent in these Chapter 11 Cases.  The retention of Epiq will provide the Clerk of the Court and the Debtors with efficient management of the claims and noticing processes in these Chapter 11 Cases, which will allow the Debtors' management and professionals to focus their attention more closely on the Debtors' overall chapter 11 efforts.

> **F.    Motion for Use of Cash Collateral.**

85.    By this motion (the "Cash Collateral Motion"), the Debtors seek authority to use cash collateral, as I understand that term is defined in section 363 of the Bankruptcy Code, and to grant adequate protection to the Debtors' prepetition secured lenders.  The relief requested in the Cash Collateral Motion reflects an agreement between the Debtors and the affected Term Loan

lenders and is, therefore, consensual. In connection with the extensive negotiations among the parties concerning the overall terms of the Company's financial restructuring, the Company engaged in substantial, arm's-length, good faith negotiations with the Ad Hoc Lender Group and the Administrative Agent to ensure that the filing companies had sufficient funding for the Chapter 11 Cases. These negotiations culminated in an agreement with the Ad Hoc Lender Group and the Administrative Agent regarding the terms on which the Debtors would be authorized to use their cash collateral during the pendency of these Chapter 11 Cases.

86.    In the normal course of business, the Debtors use cash on hand and cash flow from operations and other sources to fund working capital and capital expenditures and to operate and maintain their business and properties. Specifically, the Debtors require access to cash collateral to, among other things, satisfy payroll, pay trade vendors, pay on-air talent, pay programming providers, meet overhead, pay utility expenses, make adequate protection payments, and pay professionals. Absent access to this cash collateral, the Debtors will not have adequate unencumbered cash on hand to pay these necessary expenses. In exchange for the use of cash collateral and to ensure that the Secured Lenders are adequately protected, the Debtors propose granting the adequate protection package described in the Cash Collateral Motion, which includes, in each case solely to the extent of any diminution in value of the Term Loan lenders' interest in their collateral, replacement liens, superpriority administrative expense claims against the Debtors under section 507(b) of the Bankruptcy Code, and certain adequate protection payments, comprised of current pay cash interest at the non-default contract rate under the Credit Agreement and the reimbursement of certain professional fees.

87.    The Debtors' ability to access and use cash is essential to ensuring continued operations during these Chapter 11 Cases. As of the Petition Date, the aggregate balance of

unrestricted cash in the Debtors' bank accounts was approximately $77 million. It is my understanding that all or substantially all of this cash constitutes cash collateral of the Secured Parties. Ensuring the Debtors have sufficient working capital will allow the Debtors to preserve and maintain the going concern value of the business, thus enhancing the prospects for a successful reorganization. Accordingly, the relief requested in the Cash Collateral Motion is intended to prevent any disruption or damage to the Debtors and their estates, while providing adequate protection to the Term Lenders. Absent the ability to continue to utilize cash collateral during the Chapter 11 Cases, the Debtors would not be able to sufficiently fund ongoing business operations and move expeditiously to a successful conclusion of these Chapter 11 Cases.

### G.    Motion to Approve Continued Use of Cash Management System.

88.    By this motion (the "Cash Management Motion"), the Debtors seek entry of an interim and final order: (i) authorizing the Debtors (a) to continue to operate the Cash Management System; (b) to honor certain prepetition obligations related to the Cash Management System; (c) to continue to invest excess funds in the Investment Account; (d) to maintain existing business forms; and (e) to receive administrative priority for intercompany claims and continue intercompany transfers in the ordinary course. In connection with this relief, the Debtors also respectfully request that the Court schedule a final hearing within approximately 25 days of the Petition Date to consider approval of this motion on a final basis.

89.    In the ordinary course of business, as is typical with large and complex businesses, the Debtors maintain the integrated Cash Management System, which provides well-established mechanisms for the collection, concentration, management, disbursement, and investment of funds used in their operations. The Cash Management System facilitates the Debtors' cash monitoring, forecasting and reporting, and enables the Debtors to maintain control over the bank accounts (collectively, the "Bank Accounts"). The Cash Management System

enables the Debtors to streamline use of their cash and invested funds, and to facilitate tracking between certain business units. The Debtors' treasury department maintains daily oversight over their Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with intercompany transactions. Additionally, the Debtors' corporate accounting, cash forecasting, and internal audit departments regularly reconcile the Debtors' books and records to ensure that all transfers are properly accounted for.

90.    The Debtors' Cash Management System facilitates the timely and efficient collection, management, and disbursement of funds used in the Debtors' business. The Debtors estimate that cash collections will range between approximately $88.0 million and $91.0 million per month during these Chapter 11 Cases. In addition, the Debtors estimate that total disbursements will range between approximately $83 million and $96 million per month during these Chapter 11 Cases. On average, approximately $180 million will flow through the Cash Management System on a monthly basis. Because of the nature of the Debtors' business and the disruption to the business that would result if they were forced to close their existing bank accounts, it is critical that the existing Cash Management System remain in place.

a.    The Cash Management System

91.    The Cash Management System comprises 36 Bank Accounts, each of which is identified in the Cash Management Motion. The Bank Accounts are primarily held at Fifth Third Bank ("Fifth Third"). The Cash Management System is based around a general concentration account maintained by Fifth Third (the "CMI Concentration Account") and a second concentration account, used exclusively by and for the benefit of Debtors Incentrev LLC and

Incentrev, Radio Half Off, LLC (the "Incentrev Concentration Account," and, collectively with

the CMI Concentration Account, the "Concentration Accounts")and includes:

- Concentration Accounts.  The Debtors maintain the two Concentration Accounts at Fifth Third.  As part of the Debtors' collection process, funds received by the various Debtors are generally swept into the relevant Concentration Account from the Debtors' depository accounts on a daily basis.  Similarly, the Debtors' disbursements are ultimately funded by the relevant Concentration Account.  As part of the Debtors' disbursement process, each Debtor's operating expenses are paid out of disbursement accounts that are, in turn, funded by the relevant Concentration Account.  Additionally, the Debtors' fund their various payroll, benefits, and certain other accounts (as further described below) from the relevant Concentration Account.

- Dormant Concentration Account.   The Debtors maintain one dormant concentration account at US Bank.  No activity flows through this account.

- Lockbox, Merchant and other Depository Accounts.  The Debtors maintain seven general depository accounts at Fifth Third, two lockbox depository accounts at Fifth Third,[5] one merchant account at Fifth Third, and one general depository account at The Brand Banking Company, Inc. ("Brand Bank") (collectively, the "Depository Accounts").   Customer payments are remitted to these eleven accounts and then swept into the Debtors' Concentration Accounts.

- Accounts Payable Accounts.  The Debtors maintain three payables accounts at Fifth Third (collectively, the "AP Accounts").   The accounts are used to pay vendors in the ordinary course.  The AP Accounts are generally funded through transfers from the Debtors' Concentration Accounts.

- Payroll Accounts.  The Debtors maintain five payroll accounts at Fifth Third to fund payroll and payroll taxes for the Debtors' various business units (collectively, the "Payroll Accounts").   The Payroll Accounts are generally funded through transfers from the Debtors' Concentration Accounts.

- Money Network Accounts.  The Debtors maintain two money network accounts at MetaBank (the "Money Network Account").  Payroll related payments placed on employee money network cards are funded from such accounts.  The Money Network Account is generally funded through transfers from the Debtors' Concentration Accounts.

- Escrow Accounts.  The Debtors maintain five escrow accounts. One escrow account is held with Wells Fargo Bank, N.A. and serves as collateral for a Zurich

---

[5]    The Debtors' lockbox accounts receive payments processed from physical checks collected from approximately 90 separate lockboxes located in various strategic, business centric locations around the United States.

Insurance policy.  A second escrow account is held at JPMorgan Chase, N.A. and serves as its cash collateral securing the Debtors' reimbursement obligations related to letters of credit issued in connection with an Ace Insurance policy.  The third account is held with US Bank and serves as collateral for the Debtors' credit card processor.  The other two escrow accounts are held at Brand Bank and serve as collateral for letters of credit issued to secure the Debtors' lease obligations for their Atlanta radio market office and Westwood One office in New York.

- <u>Benefits Accounts</u>.  The Debtors maintain three benefits accounts with Fifth Third for the Debtors' various business units (collectively, the "<u>Benefits Accounts</u>").  Funds are transferred into these accounts from the Debtors' Concentration Accounts to fund benefits-related expenditures, including 401(K), HSA and healthcare expenditures for the Debtors' employees.

- <u>Investment Accounts</u>.  The Debtors maintain one investment account at US Bank (the "<u>Investment Account</u>").  The Investment Account formerly received funds swept from the Dormant Concentration Account at the end of each business day and invested such funds in commercial paper.  On the following business day, funds from the maturing commercial paper were returned to, and available in, the Dormant Concentration Account.  While the Investment Account remains open, and continues to generate funds for the Debtors on a periodic basis, it no longer plays a central role in the Cash Management System and rarely contains funds in excess of $50,000.

- <u>Tax Accounts</u>.  The Debtors maintain two accounts with Fifth Third to fund payments for the Debtors' non-payroll tax liabilities (collectively, the "<u>Tax Accounts</u>").  Funds are transferred into these accounts from the Debtors' Concentration Account.

- <u>Bob and Tom Account</u>.  The Debtors maintain one account with Fifth Third to fund payments related to the Bob and Tom radio show the ("<u>Bob and Tom Account</u>").  Funds are transferred into this account from one of the Debtors' Concentration Accounts for expenditures related to the show.

    b.    <u>Collection Process</u>

92.    Substantially all of the Debtors' collections are received in the Debtors' Depository Accounts.  Funds held in such accounts are generally swept into the Concentration Account on a daily basis.

c.      Disbursement Process.

93.      Substantially all[6] of the Debtors' disbursements are made out of the Debtors' (i) AP Accounts, (ii) Payroll Accounts, (ii) Benefits Accounts, (iv) Money Network Account, (v) Tax Accounts, and (vi) Bob and Tom Account (collectively, the "Disbursement Accounts").  As described above, the Disbursement Accounts are funded by the Debtors' relevant Concentration Account.  The Disbursements Accounts fund payments to the Debtors' trade vendors, on-air talent, programming providers, employees, Independent Contractors, third-party administrators of various employee benefits programs as well other goods and service providers upon which the Debtors depend to operate.

c.      Intercompany Transfers

94.      In the ordinary course of business, the Debtors engage in routine business relationships with each other and, to a lessor extent, certain of their non-Debtor subsidiaries and affiliates (the "Intercompany Transactions") resulting in intercompany receivables and payables (the "Intercompany Claims").  Accordingly, at any given time there may be Intercompany Claims owing by one Debtor to another Debtor.

95.      For example, in the normal course of business, certain of the Debtors' wholly owned subsidiaries collect money from customers, primarily from the sale of radio advertising. Those funds are initially deposited into subsidiary controlled bank accounts and then swept into the Concentration Account on a periodic basis.  Specifically, as described above, the CMI Concentration Account is maintained by Debtor Cumulus Media Holdings Inc. ("Cumulus

---

[6]      As described below, certain banks and financial institutions charge the Debtors nominal fees, which are disbursed from the Concentration Account or directly from the Bank Account responsible for the incurrence of such fees.

Holdings")[7]  Cumulus Holdings uses funds swept from its subsidiaries' bank accounts to fund relevant payroll, income taxes, benefits, capital expenditures and operating expenses of those subsidiary entities.  As a result, intercompany balances in favor of Cumulus Holdings from certain subsidiaries are typically outstanding at any given time.

96.    The Intercompany Claims are reflected as assets and liabilities, as applicable, in the respective Debtors' accounting systems.  The Debtors track all fund transfers in their respective accounting system and can ascertain, trace, and account for all Intercompany Transactions.

*    *    *    *    *    *    *    *    *

97.    To lessen the impact of the Chapter 11 filings on the Debtors' business and thereby maximize the value of the Debtors' estates, it is vital that the Debtors keep their existing cash management system in place and be authorized to pay outstanding fees owed in relation to the Debtors' bank accounts, such as payments to third-party vendors whose services are critical for the uninterrupted operation of the cash management system, including the authority to continue engaging in Intercompany Transfers.  As described above, the Company operates a comprehensive cash management system: any disruption to that system (except for those changes that are necessary in light of the Chapter 11 Cases, each as described in the Cash Management Motion) would severely impair the operations of the Debtors and their non-Debtor affiliates and ability of those parties to optimize their business performance to the detriment of all parties in interest.  Accordingly, the Debtors request approval of the relief requested in the Cash Management Motion.

---

[7]    The Incentrev Concentration Account is maintained by, and used exclusively for the benefit of, Incentrev, LLC and its parent Incentrev, Radio Half Off, LLC and, therefore, the only Intercompany Transactions related to such account are between those two Debtor entities.

**H.      Motion for Authority to Pay Prepetition Wages and Continue Benefits.**

98.      By this motion (the "Wages Motion"), the Debtors seek entry of the Interim and

Final Orders authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries,

other compensation, and reimbursable employee expenses and (b) continue employee benefits

programs in the ordinary course, including payment of certain prepetition obligations related

thereto.

99.      As described in detail in the Wages Motion, the Debtors have a substantial

workforce of more than 5,200 employees (the "Workforce").  The Debtors' Workforce generally

relies exclusively on the compensation and benefits provided by or funded by the Debtors to

continue to pay their daily living expenses, and may be exposed to significant financial

difficulties if the Debtors are not permitted to pay these obligations.  The Debtors believe that if

they are unable to honor all such obligations immediately, morale and loyalty will be jeopardized

at a time when the support of these individuals is crucial.

100.      Moreover, a stable Workforce is critical to the uninterrupted continuation of the

Debtors' business and the preservation and maximization of the value of the Debtors' estates

during these Chapter 11 Cases.  Particularly in this instance, the Debtors' business relies heavily

on its experienced and knowledgeable Workforce.  Any significant number of departures or

deterioration in morale among the Debtors' Workforce at this time will immediately and

substantially adversely impact the Debtors' efforts in Chapter 11 and result in immediate and

irreparable harm to the Debtors' estates and creditors.  There is a real, immediate risk that if the

Debtors are not authorized to continue to honor their prepetition obligations to these parties in

the ordinary course, the employees and independent contractors would no longer support and

maintain the operations of the Debtors, thereby crippling them.  Consequently, the Debtors

strongly believe it is critical that they be permitted to pay prepetition wages and continue with

their ordinary course personnel policies, programs and procedures, including, but not limited to, maintenance of workers' compensation programs and health care programs, that were in effect prior to the Petition Date.

### I.    Talent  Motion

101.    By this Motion (the "Talent Motion") the Debtors seek entry of an interim and final order:  (i) authorizing, but not directing, the Debtors to pay or otherwise honor pre-petition (a) claims and obligations due to their On-Air Talent and (b) Station Compensation obligations in the ordinary course of business.   As further described in the Talent Motion and the *Declaration of Collin Jones in Support of Debtors' Motion for Entry of Interim and Final Order Authorizing the Debtors to Pay and Honor Prepetition (a) Claims and Obligations of On-Air Talent and (b) Station Compensation Obligations* filed contemporaneously therewith, honoring these obligations is critical and necessary for their business operations.

### J.    Motion for Authority to Honor Customer Program Obligations

102.    By this motion (the "Customer Programs Motion"), the Debtors seek authority to maintain and administer their customer-related programs (collectively, the "Customer Programs") and honor certain prepetition obligations related thereto.  The Debtors estimate that, as of the Petition Date, they have approximately $4.0 million and $17.4 million in cash and non-cash Customer Program Obligations, respectively, accrued and outstanding.   These include obligations related to cash in advance ad sales, certain trade obligations, unclaimed prizes and prepaid events.  The Debtors also maintain a number of advertiser incentive programs designed to incent either new advertisers to purchase advertising time or existing advertisers to increase their advertising spend with the Debtors.   Upon meeting certain thresholds of new and/or increased spending, eligible advertisers may choose from a variety of incentives, including travel packages, sporting event tickets, and music and entertainment packages.  The Debtors then fulfill

the selected incentive package either directly with the Advertising Customer or through third-party fulfillment companies.

103.    Continuing to administer the Customer Programs without interruption during the pendency of these Chapter 11 Cases is critical to preserve the value of the Debtors' assets by, most importantly, preserving customer goodwill and market share.  This value will inure to the benefit of the Debtors' estates and their creditors.

**K.    Motion for Authority to Continue Insurance and Pay Prepetition Claims Related Thereto.**

104.    By this motion, the Debtors seek authority to (a) pay prepetition obligations incurred in the ordinary course of business in connection with their insurance programs, including payment of policy premiums and workers' compensation insurance obligations (b) pay prepetition brokerage and administrative fees related thereto, and (c) continue, renew, supplement, modify or purchase insurance coverage in the ordinary course.  Any lapse or disruption in insurance coverage could result in immediate and severe consequences for the business, as well as the value of the Secured Lenders' collateral.  Absent sufficient and continuing insurance coverage, the Debtors may also be exposed to substantial liability and may be unable to operate in certain key jurisdictions.  Similarly, the nonpayment of any premiums, related fees, deductibles, claims or other obligations under any of the insurance programs could result in one or more of the insurance carriers terminating their insurance coverage, increasing future insurance premiums, declining to renew the insurance programs or refusing to enter into new insurance policies to the immediate detriment of the Debtors and their estates.

**L.    Motion for Authority to Pay Utilities and Provide Adequate Assurance Protection.**

105.    By this motion, the Debtors seek entry of orders: (a) prohibiting utility providers from altering, refusing, or discontinuing services; (b) determining adequate assurance of

payment for future utility services; and (c) establishing procedures for determining adequate assurance of payment for future utility services.  I understand that the Bankruptcy Code entitles utility providers to request adequate assurance of future payment in the absence of which, the utility providers may stop providing services to the Debtors.

106.     Preserving utility services on an uninterrupted basis is essential to the Debtors' operations.  The Debtors' business includes numerous radio stations, radio tower locations, and corporate offices.    These locations require water, sewer, electricity, waste disposal, telecommunications, internet, natural gas, and other similar services to operate.

107.     To provide the utilities with additional assurance of payment, the Debtors propose to deposit $1,200,000 (the "Adequate Assurance Deposit") into a segregated account, which represents an amount equal to approximately one-half of the Debtors' average monthly cost of utility services, calculated based on the Debtors' average utility expenses over the twelve months ended September 30, 2017.  I understand that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future utility services in accordance with their prepetition practices, constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of section 366 of the Bankruptcy Code.

**M.     Motion for Authority to Pay Prepetition Taxes.**

108.     By this motion, the Debtors seek authority to remit and pay certain accrued and outstanding prepetition taxes, including sales taxes, use taxes, annual report and licensing fees, income taxes, real and personal property taxes, franchise taxes and fees, and various other governmental taxes, fees, and assessments.  The Debtors' failure to pay certain taxes and fees when due may adversely affect their business operations.  Tax authorities may attempt to suspend the Debtors' operations, seek to lift the automatic stay, or even seek to impose penalties on the Debtors' directors, officers, or employees, thereby distracting them from the

administration of the Debtors' Chapter 11 Cases. Moreover, I understand that certain taxes and fees may give rise to tax liens and some or all may be entitled to priority. Accordingly, for such amounts, the relief requested by this motion affects only the timing of the payments, and not the amounts that ultimately would be received by the applicable tax authorities.

### N.    Tax Attribute Preservation Motion

109.    By this motion, the Debtors seek entry of each of the Interim Order and the Final Order (a) approving certain notification and hearing procedures related to certain transfers of Debtor Cumulus Media Inc.'s existing common stock or any Beneficial Ownership[8] thereof (any such record or Beneficial Ownership of existing common stock, the "Common Stock")[9]; and (b) directing that any purchase, sale, or other transfer of or declaration of worthlessness with respect to Beneficial Ownership of Common Stock in violation of the Procedures shall be null and void *ab initio*.

110.    At December 31, 2016, the Company had federal net operating loss carry forwards, which were available to offset future taxable income, of approximately $271.4 million which will expire in the years 2030 through 2032. At December 31, 2016, the Company had

---

[8]    "Beneficial Ownership" will be determined in accordance with the applicable rules of section 382 of the Internal Revenue Code of 1986, as amended (the "IRC"), and the U.S. Treasury regulations (the "Treasury Regulations") promulgated thereunder (other than Treasury Regulations Section 1.382-2T(h)(2)(i)(A)) and includes direct, indirect, and constructive ownership (*e.g.*, (1) a holding company would be considered to beneficially own all equity securities owned by its subsidiaries, (2) a partner in a partnership (or a member of or other investor in any other entity or arrangement that is classified as a partnership for federal income tax purposes) would be considered to beneficially own its proportionate share of any equity securities owned by such partnership (or other entity or arrangement), (3) an individual and such individual's family members may be treated as one individual, (4) persons and entities acting in concert to make a coordinated acquisition of equity securities may be treated as a single entity, and (5) a holder would be considered to beneficially own equity securities that such holder has an Option (as defined herein) to acquire). An "Option" to acquire stock includes all interests described in Treasury Regulations Section 1.382-4(d)(9), including any contingent purchase right, warrant, convertible debt, put, call, stock subject to risk of forfeiture, contract to acquire stock, or similar interest, regardless of whether it is contingent or otherwise not currently exercisable.

[9]    For the avoidance of doubt, the definition of Common Stock shall not include any securities issued in connection with a chapter 11 plan of the Debtors.

state net operating loss carry forwards available to offset future income of approximately $1.2 billion which, if not utilized, will expire in the years 2017 through 2036.

111.   These Tax Attributes provide the potential for material future tax savings or other tax structuring possibilities in these Chapter 11 Cases.  The Tax Attributes are of significant value to the Debtors and their estates because the Debtors may be able to carry forward their Tax Attributes to offset their future taxable income for as long as 20 years, thereby reducing their future aggregate tax obligations.  In addition, such Tax Attributes may be utilized by the Debtors to offset any taxable income generated by transactions consummated during these Chapter 11 Cases.  The value of the Tax Attributes will inure to the benefit of all of the Debtors' creditors.

## II.     Information Required by Local Rule 1007-2

112.   In accordance with Local Rule 1007-2, **Exhibit C** and the schedules attached thereto provide certain information related to the Debtors.

113.   Pursuant to Local Rule 1007-2(a)(3), **Exhibit C,** Schedule 1 hereto lists the names and addresses of the members of, and attorneys for, any committee organized prior to the Petition Date.

114.   Pursuant to Local Rule 1007-2(a)(4), **Exhibit C,** Schedule 2 hereto lists the holders of the Debtors' 20 largest unsecured claims on a consolidated basis, excluding claims of insiders.

115.   Pursuant to Local Rule 1008-2(a)(5), **Exhibit C,** Schedule 3 hereto lists the holders of the four largest secured claims against the Debtors on a consolidated basis.

116.   Pursuant to Local Rule 1007-2(a)(6), **Exhibit C,** Schedule 4 hereto provides a summary of the (unaudited) consolidated assets and liabilities for the Debtors.

117.    Pursuant to Local Rule 1007-2(a)(7), **Exhibit C,** Schedule 5 hereto provides information regarding the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held.

118.    Pursuant to Local Rule 1007-2(a)(8), **Exhibit C,** Schedule 6 hereto provides a list of all of the Debtors' property not in the Debtors' possession.

119.    Pursuant to Local Rule 1007-2(a)(9), **Exhibit C,** Schedule 7 hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

120.    Pursuant to Local Rule 1007(a)(10), **Exhibit C,** Schedule 8 hereto provides the location of the Debtors' substantial assets and their books and records.

121.    Pursuant to Local Rule 1007-2(a)(11), **Exhibit C,** Schedule 9 hereto provides information regarding each action or proceeding against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

122.    Pursuant to Local Rule 1007-2(a)(12), **Exhibit C,** Schedule 10 hereto provides information regarding the Debtors' senior management.

123.    Pursuant to Local Rule 1007-2(b)(1)-(2)(a), **Exhibit C,** Schedule 11 hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officer, directors, stockholders, and partners) and the estimated amount to be paid to officers, stockholders, directors, members of any partnerships, and financial and business consultants retained by the Debtors for the 30-day period following the filing of these Chapter 11 Cases as the Debtors intend to continue to operate their business.

124.    Pursuant to Local Rule 1007-2(b)(3), **Exhibit C,** Schedule 12 hereto provides, for the 30-day period following the filing of these Chapter 11 Cases, a list of estimated cash receipts

and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid, other than professional fees.

[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*]

## CONCLUSION

125.    In conclusion, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these cases, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

 /s/ John F. Abbot
John F. Abbot
Executive Vice President and
Chief Financial Officer
Cumulus Media Inc.

## EXHIBIT A

### List of First Day Motions

**II. Administrative and Case Management Pleadings**

**Joint Administration Motion**. *Debtors' Motion Pursuant to Fed. R. Bankr. P. 1015(b) for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases.*

**Creditor List Motion**. *Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 107(c), 342(a) and 521(a)(1), Fed. R. Bankr. P. 1007(a) and 2002, and Local Rule 1007-1 for Entry of an Order (I) Waiving the Requirement to File a List of Creditors on the Petition Date; (II) Authorizing the Debtors to File a Single Consolidated List of the Debtors' 20 Largest Unsecured Creditors; (III) Authorizing the Debtors to Redact Certain Personal Identification Information for Individual Creditors and (IV) Approving the Form and Manner of Notice.*

**Schedules Extension Motion**. *Debtors' Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports.*

**Equity Holders Motion**. *Motion of Debtors Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1007(a) for Entry of Order Waiving The Requirement to File a List of Equity Holders.*

**Case Management Motion**. *Debtors' Motion Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 Implementing Certain Notice and Case Management Procedures.*

**Claims Agent Retention Application**. *Application of Debtors for Authority to Retain and Employ Epiq Bankruptcy Solutions, LLC as Notice and Claims Agent for Purposes of 28 U.S.C. 156(c).*

**III. Financial Motions**

**Cash Collateral Motion**. *Debtors Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief.*

**Cash Management Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (I) Continue to Operate Their Cash Management System, (II) Honor Certain Prepetition Obligations Related Thereto, (III) Maintain Existing Business Forms and (IV) Continue Intercompany Transactions.*

## IV.  Business and Operations Motions

**Wages Motion**. *Debtors' Motion for Entry of Interim and Final Orders Authorizing, but not Directing, the Debtors to (I) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (II) Continue Employee Benefits Programs*

**Talent Motion**. *Debtors' Motion for Entry of an Order Authorizing the Debtors to Pay or Honor Prepetition (A) Claims and Obligations of On-Air Talent and (B) Station Compensation Obligations.*

**Customer Program Motion**. *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto.*

**Insurance Motion**. *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Pay Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance Programs, Including Payment of Policy Premiums and Workers Compensation Insurance Obligations, (II) Pay Brokerage and Administrative Fees Related Thereto, and (III) Continue, Renew, Supplement, Modify, or Purchase Insurance Coverage.*

**Tax Motion**. *Debtors' Motion for Entry of Interim and Final Orders Authorizing, but not Directing, the Payment of Certain Prepetition Taxes and Fees.*

**NOL Motion**. *Debtors' Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock.*

## **EXHIBIT B**

**Organizational Chart**



Cumulus Media Inc.
Structure Chart

## Schedule 1

### Committees

Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, the following committees have been formed prior to the Petition Date:

| Type of Committee | Committee Members[1] | Counsel for Committee |
|---|---|---|
| Ad Hoc Lender Group | Eaton Vance Management and Boston Management & Research<br>Franklin Mutual Advisers<br>Highland Capital Management, L.P.<br>JPMorgan Chase Bank, N.A.<br>Silver Point Finance, LLC<br>Symphony Asset Management LLC and Nuveen Fund Advisors<br>Voya Investment Management Co. LLC<br>Beach Point Capital Management L.P. | Arnold & Porter Kaye Scholer LLP<br>250 West 55th Street<br>New York, NY 10019-9710P:<br>T +1 212.836.8000<br>F +1 212.836.8689 |
| Ad Hoc Senior Noteholder Group | Angelo, Gordon & Co., LLP<br>Brigade Capital Management<br>Capital Research and Management Co.<br>Greywolf Capital Management LP<br>Waddell & Reed Investment Management Co. | Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>Bank of America Tower<br>New York, NY 10036-6745<br>T+1 212.872.1000<br>F+1 212.872.1002 |

---

[1] The members of the committees set forth herein are to the best of the Debtors' knowledge and are based on information provided to the Debtors by counsel to the various committees.

**Schedule 2**

# CONSOLIDATED LIST OF 20 LARGEST UNSECURED CREDITORS
## (EXCLUDING INSIDERS)[1]

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | U.S. BANK NATIONAL ASSOCIATION ACCOUNT MANAGER — CUMULUS MEDIA 1349 WEST PEACHTREE STREET SUITE 1050 ATLANTA, GA 30309 | WILLIAM ECHOLS Fax: (404) 898-8844 Email: WILLIAM.ECHOLS@USBANK.COM | 7.75% Senior Notes | | | | $637,314,000 |
| 2 | NIELSEN AUDIO, INC. 9705 PATUXENT WOODS DRIVE COLUMBIA, MD 21046 | SEAN R. CREAMER CEO Phone: (410) 312-8000 Fax: (410) 312-8607 | Trade Debt | | | | $6,653,543 |
| 3 | BROADCASTERS GENERAL STORE INC 2480 SE 52ND STREET OCALA, FL 34480 | KERSTIN KERRY CEO Phone: (352) 622-7700 Fax: (352) 629-7000 | Trade Debt | | | | $967,596 |
| 4 | BROADCAST MUSIC, INC. 10 MUSIC SQUARE EAST NASHVILLE, TN 37203-4399 | MICHAEL O'NEILL PRESIDENT & CEO Phone: (615) 401-2000 Email: NASHVILLE@BMI.COM | Trade Debt | | | | $789,812 |
| 5 | IGT MEDIA HOLDINGS, INC. 21 SE 1ST AVENUE MIAMI, FL 33131 | MARK MECHANIC COO Phone: (305) 573-2800 Fax: (305) 573-2120 | Trade Debt | | | | $286,299 |
| 6 | KESN OPERATING, LTD. 400 E. LAS COLINAS BLVD. STE 1033 IRVING, TX 75039 | JOHN HARE PRESIDENT | Trade Debt | | | | $273,333 |
| 7 | LIVE NATION 9348 CIVIC CENTER DR. BEVERLY HILLS, CA 90210 | MICHAEL RAPINO PRESIDENT, CEO & DIR. Phone: (310) 867-7000 Fax: (302) 636-5454 | Trade Debt | | | | $238,652 |

---

[1] The information provided herein shall not constitute an admission of liability by, nor is it binding on, any of the Debtors. All claims are subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected on this Schedule.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 8 | ENTICENT, LLC DBA TRITON DIGITAL 15303 VENTURA BLVD., STE 1500 SHERMAN OAKS, CA 91403 | NEAL SCHORE CEO Phone: (514) 448-4037 Email: HELP@TRITONDIGITAL.COM | Trade Debt | | | | $198,255 |
| 9 | OAKLAND RAIDERS 1220 HARBOR BAY PKWY ALAMEDA, CA 94502 | MARK DAVIS OWNER Phone: (510) 864-5000 Email: FEEDBACK@RAIDERS.COM | Trade Debt | | | | $190,000 |
| 10 | CNN, INC. 1 CNN CENTER ATLANTA, GA 30348 | JEFF ZUCKER PRESIDENT Phone: (404) 827-1700 | Trade Debt | | | | $161,057 |
| 11 | MERLIN MEDIA, LLC 222 MERCHANDISE MART PLZ SUITE 230 CHICAGO, IL 60654 | RANDY MICHAELS CEO Phone: (312) 245-1200 | Trade Debt | | | | $144,772 |
| 12 | BAKER INTERACTIVE SERVICES, LLC 2195 N. NORCROSS TUCKER ROAD NORCROSS, GA 30071 | KEITH HICKS III MEMBER Phone: (770) 441-2000 Fax: (770) 449-7719 Email: SALES@BAKERAUDIOVISUAL.COM | Trade Debt | | | | $102,831 |
| 13 | NAVINT PARTNERS, LLC 104 WEST 40TH STREET 4TH FLOOR NEW YORK, NY 10018 | MR. JIM MARTINDALE MANAGING PARTNER AND CEO Phone: (914) 393-3397 | Trade Debt | | | | $87,040 |
| 14 | MICHAEL CRONIN ACOUSTIC CONSTRUCTION LLC 2500 BARTON AVENUE NASHVILLE, TN 37212 | MICHAEL CRONIN OWNER Phone: (615) 473-7778 | Trade Debt | | | | $60,961 |
| 15 | MUSICTOGO LLC ONE STAMFORD PLACE 263 TRESSER BLVD 9TH FLOOR STAMFORD, CT 06901 | | Trade Debt | | | | $58,889 |
| 16 | COURTSIDE, LLC 335 N MAPLE DR. BEVERLY HILLS, CA 90210 | NORMAN PATTIZ CEO Phone: (310) 858-0888 Fax: (310) 858-9710 | Trade Debt | | | | $56,090 |
| 17 | ALSTON & BIRD LLP ONE ATLANTIC CENTER 1201 WEST PEACHTREE STREET ATLANTA, GA 30309-3424 | BRENDA C. MARTIN DIRECTOR OF CLIENT FINANCIAL SERVICES Phone: (404) 881-7000 Fax: (404) 253-8689 Email: BRENDA.MARTIN@ALSTON.COM | Trade Debt | | | | $52,817 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 18 | ACT 1 SYSTEMS, INC. 21031 VENTURA BLVD SUITE 1020 WOODLAND HILLS, CA 91364 | ROBERT FITE & ERIC ROSENBERG Phone: (818) 347-6400 Fax: (818) 346-2023 Email: RFITE@ACT1SYSTEMS.COM; ERIC@ACT1SYSTEMS.COM | Trade Debt | | | | $45,728 |
| 19 | GATESAIR, INC. 5300 KINGS ISLAND DR SUITE 101 MASON, OH 45040 | BRUDE SWAIL CEO Phone: (800) 622-0022 Fax: (513) 459-3796 Email: INFORMATION@GATESAIR.COM | Trade Debt | | | | $45,596 |
| 20 | CAITLIN FERRARI, ALYSSA U., MARIA P., AND MELISSA M. ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED Index No. 804125/2014 JACLYN S. AND GINA B. Index No. 804088/2014 C/O DOLCE PANEPINTO, P.C. 1260 DELAWARE AVENUE BUFFALO, NEW YORK 14209 C/O THE MARLBOROUGH LAW FIRM, P.C. 445 BROAD HOLLOW ROAD, SUITE 400 MELVILLE, NY 11747 C/O LEVI & KORSINSKY, LLP 30 BROAD STREET, 24TH FLOOR NEW YORK, NY 10004 | ATTN: SEAN E. COONEY, ESQ. Phone: (716) 852-1888 ATTN: CHRISTOPHER MARLBOROUGH, ESQ. Phone: (212) 991-8960 Phone: (212) 363-7500 | Litigation | Contingent, Unliquidated & Disputed | | | Undetermined |

## Schedule 3

### Holders of Four Largest Secured Claims Against the Debtors on a Consolidated Basis[1]

Pursuant to Local Rule 1007-2(a)(5), to the best of the Debtors' knowledge and belief, the following is a list of creditors holding the four (4) largest secured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| Pursuant to Local Rule 1007-2(a)(5), to the best of the Debtors' knowledge, belief, and understanding, the following chart lists the creditor holding, as of the Commencement Date the largest secured, non-contingent claims again the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101. Other than the secured creditor identified below, the Debtors do not have material secured creditors. | | | | |
|---|---|---|---|---|
| **No.** | **Creditor** | **Contact, Mailing Address, Telephone Number/Fax No.** | **Amount of Claim** | **Collateral Description and Value** |
| 1 | JPMorgan Chase Bank, N.A. | Attn:  Jonathan Krepol Loan and Agency Services Group 500 Stanton Christina Road OPS 2, Floor 2 Newark, DE  19713-2108 Fax:  (302) 634-3301 | $1,728,614,100 | Substantially all property (subject to certain exceptions) |

---

[1]    The information contained herein shall not constitute an admission of liability, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

## Schedule 4

### Summary of the Debtors' Assets and Liabilities as of September 30, 2017

The amounts reflected below were derived by totaling the indicated amounts reflected in each Debtor's books and records. No adjustments have been included for elimination or consolidation items. Readers are referred to the notes to the unaudited condensed consolidated financial statements in the most recent quarterly report filed by Cumulus Media Inc. with the SEC available at http://sec.gov/.

**CUMULUS MEDIA INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Dollars in thousands, except share data)**
**(Unaudited)**

| | September 30, 2017 | December 31, 2016 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 69,431 | $ 131,259 |
| Restricted cash | 7,680 | 8,025 |
| Accounts receivable, less allowance for doubtful accounts of $5,922 and $4,691 at September 30, 2017 and December 31, 2016, respectively | 231,630 | 231,585 |
| Trade receivable | 4,679 | 4,985 |
| Assets held for sale | 30,150 | 30,150 |
| Prepaid expenses and other current assets | 58,140 | 33,923 |
| Total current assets | 401,710 | 439,927 |
| Property and equipment, net | 157,507 | 162,063 |
| Broadcast licenses | 1,539,718 | 1,540,183 |
| Other intangible assets, net | 90,369 | 116,499 |
| Goodwill | 135,214 | 135,214 |
| Other assets | 17,856 | 18,805 |
| Total assets | $ 2,342,374 | $ 2,412,691 |
| **Liabilities and Stockholders' (Deficit)** | | |
| Current liabilities: | | |
| Accounts payable and accrued expenses | $ 96,526 | $ 96,241 |
| Trade payable | 3,640 | 4,550 |
| Total current liabilities | 100,166 | 100,791 |
| Term loan, net of debt issuance costs/discounts of $23,054 and $29,909 at September 30, 2017 and December 31, 2016, respectively | 1,705,560 | 1,780,357 |
| 7.75% senior notes, net of debt issuance costs of $4,335 and $6,200 at September 30, 2017 and December 31, 2016, respectively | 605,665 | 603,800 |
| Other liabilities | 27,235 | 31,431 |
| Deferred income taxes | 393,939 | 388,050 |
| Total liabilities | 2,832,565 | 2,904,429 |
| Commitments and Contingencies (Note 10) | | |
| Stockholders' deficit: | | |
| Class A common stock, par value $0.01 per share; 93,750,000 shares authorized; 32,031,952 shares issued, and 29,225,765 shares outstanding, at both September 30, 2017 and December 31, 2016 | 320 | 320 |
| Class C common stock, par value $0.01 per share; 80,609 shares authorized, issued and outstanding at both September 30, 2017 and December 31, 2016 | 1 | 1 |
| Treasury stock, at cost, 2,806,187 shares at both September 30, 2017 and December 31, 2016 | (229,310) | (229,310) |
| Additional paid-in-capital | 1,626,237 | 1,624,815 |
| Accumulated deficit | (1,887,439) | (1,887,564) |
| Total stockholders' deficit | (490,191) | (491,738) |
| Total liabilities and stockholders' deficit | $ 2,342,374 | $ 2,412,691 |

## Schedule 5

### The Debtors' Securities

Pursuant to Local Rule 1007-2(a)(7), the Debtors publicly traded stock, debentures, or securities are set forth below.

As of August 7, 2017, the following shares of Cumulus Media Inc. were issued and outstanding:

|  | Common Class A | Common Class C | Treasury Stock | Total |
|---|---|---|---|---|
| Issued | 32,031,952 | 80,609 | (2,806,187) | 29,306,374 |
| Outstanding | 29,225,765 | 80,609 | 0 | 29,306,374 |

As of the Petition Date, in addition to $170,000 in accrued and unpaid commitment fees under the Revolving Credit Facility, Cumulus Media Inc. had the following amounts outstanding under its Credit Agreement and 7.75% Senior Notes:

| *($000s)* | **Term Loan** | **7.75% Senior Notes** |
|---|---|---|
| Principal | $1,728,614 | $610,000 |
| Accrued and Unpaid Interest (as of 11/29/17 excluding default interest) | 6,379 | 27,314 |
| Total Amounts Outstanding as of Petition Date: | $1,734,993 | $637,314 |

## <u>Schedule 6</u>

**Debtors' Property Not in the Debtors' Possession**

Local Rule 1007-2(a)(8) requires the Debtors to list property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

None of the Debtors' material property is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

In the ordinary course of business, on any given day, property of the Debtors (including security deposits or other collateral with counterparties to certain commercial relationships) is likely to be in the possession of various third parties, including, vendors, shippers, common carriers, materialmen, distributors, warehousemen, service providers or custodians, where the Debtors' ownership interest is not affected.  Because of the constant movement of this property, providing a comprehensive list of the persons or entities in possession of the property and their addresses and telephone numbers would be impractical.

## Schedule 7

### Debtors' Premises

Pursuant to Local Rule 1007-2(a)(9), the following lists the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

Property owned, leased or otherwise held

| Reporting Category | Count | States |
|---|---|---|
| Active Expense Lease | 398 | AL, AR, AZ, CA, CO, CT, DC, FL, GA, IA, ID, IL, IN, KS, KY, LA, MA, MD, MI, MN, MO, MS, NC, NY, NJ, NM, NV, OH, OK, OR, PA, RI, SC, TN, TX, UT, VA, WI |
| Easement Agreement | 4 | MO, NM, PA, VA |
| Owned Real Property | 272 | AL, AR, AZ, CA, CO, CT, FL, GA, IA, ID, IL, IN, KS, KY, LA, MD, MI, MN, MO, MS, NC, NJ, NM, NV, NY, OH, OK, PA, RI, SC, TN, TX, UT, WI |

In the ordinary course of business, on any given day, property of the Debtors (including security deposits or other collateral with counterparties to certain commercial relationships) is likely to be in the possession of various third parties, including, vendors, shippers, common carriers, materialmen, distributors, warehousemen, service providers or custodians, where the Debtors' ownership interest is not affected. Because of the constant movement of this property, providing a comprehensive list of the persons or entities in possession of the property and their addresses and telephone numbers would be impractical.

## **Schedule 8**

### **Location of Debtors' Assets, Books, and Records**

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### **Location of Debtors' Substantial Assets**

Other than as set forth in Schedule 7, the Debtors' substantial physical assets are located in their Corporate Offices at 3280 Peachtree Road, N.W., Suite 2200, Atlanta, Georgia 30305 or in the headquarters for Westwood One at 220 West 42nd Street, New York, NY 10036

### **Books and Records**

The Debtors maintain their books and records on the following information technology systems.  Microsoft Great Plains.

Physical records are also maintained at the Corporate Offices and Westwood One headquarters referenced above.

**<u>Schedule 9</u>**

**Litigation**

Pursuant to Local Rule 1007-2(a)(11), to the best of the Debtors' knowledge, belief, and understanding, there are no actions or proceedings pending or threatened against the Debtors or their property, as of the Petition Date, where a judgment against the Debtors or a seizure of their property may be imminent.

## Schedule 10

### Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following table sets forth information regarding the Debtors' senior management as of March 9, 2017:

**Name Age Position(s):**

| Name | Age | Position |
|------|-----|----------|
| Mary G. Berner | 57 | President and Chief Executive Officer |
| John Abbot | 54 | Executive Vice President, Treasurer and Chief Financial Officer |
| Richard S. Denning | 50 | Senior Vice President, Secretary and General Counsel |
| Suzanne M. Grimes | 58 | Executive Vice President of Corporate Marketing and President of Westwood One |

**Mary G. Berner** is the Company's President and Chief Executive Officer. Ms. Berner was initially elected to the Board of Directors at the 2015 annual meeting of stockholders. Prior to being appointed as Chief Executive Officer in October 2015, Ms. Berner served as President and Chief Executive Officer of MPA - The Association of Magazine Media since September 2012. From 2007 to 2011, she served as Chief Executive Officer of Reader's Digest Association. Before that, from November 1999 until January 2006, she led Fairchild Publications, Inc., first as President and Chief Executive Officer and then as President of Fairchild and as an officer of Condé Nast. She has also held leadership roles at Glamour, TV Guide, W, Women's Wear Daily, Every Day with Rachael Ray and Allrecipes.com. Ms. Berner has served on numerous industry and not-for-profit boards. Ms. Berner received her Bachelor of Arts degree in History from the College of Holy Cross (Massachusetts).

**John Abbot** is the Company's Executive Vice President, Treasurer, and Chief Financial Officer. Mr. Abbot joined Cumulus Media in July 2016, having most recently served as Executive Vice President and Chief Financial Officer of Telx Holdings Inc., a leading provider of connectivity, co-location and cloud services in the data center industry, from 2014 to 2015. Prior to his service at Telx, which was sold to Digital Realty Trust in October 2015, Mr. Abbot served as Chief Financial Officer of Insight Communications Company, Inc., a cable television business, for eight years. During the prior nine years, he worked in the Global Media and Communications Group of the Investment Banking Division at Morgan Stanley, where he was a Managing Director. Mr. Abbot began his financial career as an associate at Goldman, Sachs & Co., and prior to that served as a Surface Warfare Officer in the U.S. Navy. He received a bachelor's degree in Systems Engineering from the U.S. Naval Academy, an ME in Industrial Engineering from The Pennsylvania State University, and an MBA from Harvard Business School.

**Richard S. Denning** is the Company's Senior Vice President, Secretary and General Counsel. Prior to joining the Company, Mr. Denning was an attorney with Dow, Lohnes & Albertson, PLLC ("DL&A") within DL&A's corporate practice group in Atlanta, advising a number of media and communications companies on a variety of corporate and transactional matters. Mr. Denning also spent four years in DL&A's Washington, D.C. office and has extensive experience

in regulatory proceedings before the FCC. Mr. Denning has been a member of the Pennsylvania Bar since 1991, the District of Columbia Bar since 1993, and the Georgia Bar since 2000. He is a graduate of The National Law Center, George Washington University.

**Suzanne M. Grimes** is the Company's Executive Vice President of Corporate Marketing and President of Westwood One. Prior to joining the Company in January 2016, Ms. Grimes served as Founder and Chief Executive Officer of Jott LLC since January 2015. From December 2012 to September 2014, Ms. Grimes served as President and Chief Operating Officer of Clear Channel Outdoor North America. Prior to that, Ms. Grimes founded SMG Advisors, a consultancy for media and technology start-ups. Ms. Grimes has also held leadership roles at News Corp, Condé Nast and Reader's Digest and previously served on the Board of the Outdoor Advertising Association of America and MPA - The Association of Magazine Media. Ms. Grimes earned a Bachelor of Science degree in Business Administration from Georgetown University.

## **Schedule 11**

**Payroll**

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of payroll to the Debtors' employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors for the 30-day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| **Payments to Employees** | $21.8 million |
| **Payments to Officers, Directors and Stockholders** | $0.3 |
| **Payments to Financial and Business Consultants** | None within 30-days of filing |

## **Schedule 12**

**Cash Receipts and Disbursements, Net Cash Gain or Loss**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the chapter 11 petitions, the estimated cash receipts and disbursements, and net cash gain or loss (other than professional fees):

| | |
|---|---|
| Cash Receipts | $80.3 Million |
| Cash Disbursements | <u><$93.1 Million></u> |
| **Net Cash Loss** | **<$12.8 Million>** |

## **EXHIBIT D**

**Restructuring Support Agreement**

**Execution Version**

<u>**RESTRUCTURING SUPPORT AGREEMENT**</u>

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY OR A SOLICITATION OF VOTES WITH RESPECT TO A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  NOTHING HEREIN SHALL BE DEEMED TO BE THE SOLICITATION OF AN ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  THIS RESTRUCTURING SUPPORT AGREEMENT IS ONLY BEING DISTRIBUTED (I) TO PERSONS OUTSIDE THE UNITED STATES AND (II) IN THE UNITED STATES TO PERSONS THAT ARE "ACCREDITED INVESTORS" WITHIN THE MEANING OF REGULATION D UNDER THE SECURITIES ACT OF 1933.**

This RESTRUCTURING SUPPORT AGREEMENT (together with any Exhibits hereto, this "<u>Agreement</u>") is made and entered into as of November 29, 2017, by and among:

(a)    The undersigned holders of, or nominees, investment managers, advisors or subadvisors to funds that hold, (together with any holders that accede to this Agreement in accordance with <u>Section 12</u>, the "<u>Consenting Term Loan Lenders</u>") the outstanding term loans (the "<u>Term Loans</u>") under that certain Amended and Restated Credit Agreement, dated as of December 21, 2013 (the "<u>Credit Agreement</u>"), by and among Cumulus Media Inc., Cumulus Media Holdings Inc., as borrower, JPMorgan Chase Bank, N.A., as administrative agent (the "<u>Administrative Agent</u>"), and the lenders party thereto from time to time (the "<u>Lenders</u>");

(b)    the undersigned holders of, or nominees, investment managers, advisors or subadvisors to funds that hold, (together with any holders that accede to this Agreement in accordance with <u>Section 12</u>, the "<u>Consenting Equityholders</u>") as applicable, equity interests in Cumulus Media Inc., warrants, options, calls or other rights to purchase or subscribe for common stock or voting securities of Cumulus Media Inc. or other securities, or interests exercisable, exchangeable, or convertible into any equity interests or voting securities of Cumulus Media Inc. (collectively, the "<u>Equity Interests</u>"); and

(c)    Cumulus Media Inc., on behalf of itself and each of its subsidiaries listed on Annex A to the Term Sheet (the "<u>Company</u>").

"<u>Parties</u>" is defined collectively to include the Consenting Term Loan Lenders, the Consenting Equityholders, and the Company.

As of the execution date of this Agreement, the Company has not commenced a case under title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). The Restructuring (as defined below) contemplated in this Agreement, which is supported by the Consenting Term Loan Lenders and the Consenting Equityholders, shall be implemented through a chapter 11 plan

process involving the Company consistent with the Restructuring (as defined below) as described in the Term Sheet (as defined below).

RECITALS

**WHEREAS,** the Parties have engaged in good faith and arm's-length negotiations regarding a restructuring of the Company;

**WHEREAS,** on the date hereof, (i) the Company, and (ii) the steering committee of certain direct or beneficial owners holding in excess of 50% in the aggregate of the outstanding principal amount of the Term Loans and represented by Arnold & Porter Kaye Scholer LLP (the "Term Loan Lender Steering Committee") agreed to a summary term sheet, attached hereto as Exhibit A (the "Term Sheet")[1] relating to a proposed financial restructuring of the Company (the "Restructuring") to be implemented through a plan of reorganization (the "Chapter 11 Plan") to be filed by the Company in connection with cases (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under chapter 11 of the Bankruptcy Code;

**WHEREAS**, the Consenting Equityholders own shares of common stock and/or other equity interests of Cumulus Media Inc.;

**WHEREAS,** the Parties have agreed to support the Restructuring subject to and in accordance with the terms of this Agreement and desire to work together to complete the negotiation of the terms of the documents and completion of each of the actions necessary or desirable to effect the Restructuring; and

**NOW, THEREFORE,** in consideration of the promises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

The Term Sheet and each of the other exhibits hereto are fully incorporated by reference herein and are made part of this Agreement as if fully set forth herein and all references to this Agreement shall include and incorporate such exhibits, including the Term Sheet. The general terms and conditions of the Restructuring are set forth in the Term Sheet; provided however, that (i) the Term Sheet is supplemented by the terms and conditions of this Agreement, (ii) to the extent there is a conflict between the Term Sheet and this Agreement, the terms and provisions of this Agreement will govern, and (iii) to the extent there is a conflict between the Term Sheet or this Agreement, on the one hand, and the Restructuring Documents (as defined below), on the other hand, the terms and provisions of the Restructuring Documents shall govern.

In this Agreement, unless the context otherwise requires:

(a)   words importing the singular also include the plural, and references to one gender include all genders;

---

[1] Any terms used but not defined herein shall have the meaning ascribed to such term in the Term Sheet.

(b)  the headings in this Agreement are inserted for convenience only and do not affect the construction of this Agreement and shall not be taken into consideration in its interpretation;

(c)  the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

(d)  the words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "or" is not exclusive; and

(e)  references to any governmental entity or any governmental department, commission, board, bureau, agency, regulatory authority, instrumentality, or judicial or administrative body, in any jurisdiction shall include any successor to such entity.

**Section 1.     Conditions to Effectiveness of this Agreement**

This Agreement shall become effective and binding on each of the Parties upon satisfaction of each of the following conditions (the "RSA Effective Date"):

(a)  the execution and delivery of this Agreement by holders of Term Loans that hold, in the aggregate, at least 66.67% in amount of the aggregate outstanding principal amount of the Term Loans;

(b)  the execution and delivery of this Agreement by the Company; and

(c)  payment by the Company of all Transaction Expenses as set forth in invoices delivered to the Company on or before November 28, 2017.

*provided*, *however*, that it shall be a condition to the effectiveness of this Agreement with respect to any Consenting Equityholder that it shall have executed and delivered this Agreement to the Company.

**Section 2.     Timeline.**

Until the earlier of the Termination Date and the Effective Date (as defined herein), the Parties agree to take any and all reasonably necessary or appropriate actions in furtherance of the Restructuring contemplated by this Agreement and the Term Sheet, including the occurrence of the following milestones (the "Milestones"):

(a)  The RSA Effective Date shall have occurred by November 30, 2017;

(b)  The Company shall have filed the Chapter 11 Cases no later than November 30, 2017 (the "Petition Date");

(c)  The Bankruptcy Court shall have entered the order approving the motion seeking authority to use cash collateral and grant adequate protection to the Lenders (the "Cash Collateral Order") on an interim basis within three (3) business days of

3

the Petition Date, or such later date to which the Company and the Term Loan Lender Steering Committee agree in writing;

(d) The Company shall have filed the Chapter 11 Plan and the disclosure statement with respect to the Chapter 11 Plan (the "<u>Disclosure Statement</u>") within ten (10) days of the Petition Date, or such later date to which the Company and the Term Loan Lender Steering Committee agree in writing;

(e) The Bankruptcy Court shall have entered the Cash Collateral Order on a final basis within thirty (30) days of the Petition Date, or such later date to which the Company and the Term Loan Lender Steering Committee agree in writing;

(f) The Bankruptcy Court shall have approved the Disclosure Statement within ninety (90) days of the Petition Date, or such later date to which the Company and the Term Loan Lender Steering Committee agree in writing;

(g) The Bankruptcy Court shall have entered the order confirming the Chapter 11 Plan within one hundred fifty (150) days of the Petition Date, or such other date to which the Company and the Term Loan Lender Steering Committee agree in writing; and

(h) The effective date of the Chapter 11 Plan (the "<u>Effective Date</u>") shall have occurred within one-hundred eighty (180) days of the Petition Date, or such other date to which the Company and the Term Loan Lender Steering Committee agree in writing.

**Section 3.** <u>**Commitment of the Consenting Term Loan Lenders.**</u>

Subject to the terms and conditions of this Agreement and the Term Sheet, each of the Consenting Term Loan Lenders agrees (severally and not jointly) with the Company that it shall and it shall use its commercially reasonable efforts to cause each of its respective affiliates that are Lenders and/or holders of Senior Notes during the term of this Agreement to:

(a) use commercially reasonable efforts to consummate and complete the Restructuring, including taking reasonably necessary actions in furtherance of the Restructuring and this Agreement (it being understood that the Consenting Term Loan Lenders shall not be required to undertake any cost or expense in furtherance of the foregoing that is not paid by the Company pursuant to <u>Section 19</u> hereof);

(b) negotiate in good faith all documentation relating to the Restructuring, including, without limitation, those documents specifically contemplated in the Term Sheet, the Chapter 11 Plan and any documents relating thereto or contemplated thereby, including, without limitation, (i) the Disclosure Statement, (ii) the Chapter 11 Plan, (iii) any supplement to the Chapter 11 Plan, (iv) the New First Lien Credit Agreement, (v) all organizational and constitutional documents of Reorganized Cumulus, (vi) any documents ancillary to any of the foregoing, and (vii) any amendments or modifications to any of the foregoing (each of (i)-(vii) together with any other definitive documentation relating to the Restructuring, the "<u>Restructuring Documents</u>").    Each of the Restructuring Documents shall contain provisions

4

consistent in all material respects with the Term Sheet;

(c) not take, nor encourage any other person or entity to take, any action that directly or indirectly interferes with or delays the acceptance or implementation of the transactions contemplated by the Restructuring and this Agreement, including the Releases, including, without limitation, initiating or joining any legal proceeding, objecting, directly or indirectly, to the Chapter 11 Plan or the Restructuring Documents, or directly or indirectly negotiating or soliciting any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, or restructuring of the Company or any of its subsidiaries that is inconsistent with or that would be reasonably likely to prevent, delay, or impede the consummation of the Restructuring (an "Alternative Restructuring");

(d) timely vote all of its claims against the Company (including, without limitation and as applicable, its Term Loans) (together, the "Covered Claims"), to accept the Chapter 11 Plan in accordance with the applicable procedures set forth in the Disclosure Statement and any other solicitation materials, and timely return a duly-executed ballot in connection therewith (it being understood that such votes will be irrevocable during the term of this Agreement, except as otherwise provided herein);

(e) not withdraw, amend, or revoke (or cause to be withdrawn, amended or revoked) its vote with respect to the Covered Claims with respect to the Chapter 11 Plan; provided, however, that such vote shall, without any further action by the applicable Consenting Term Loan Lender, be deemed automatically revoked (and, upon such revocation, deemed void *ab initio*) by the applicable Consenting Term Loan Lender upon the Termination Date;

(f) consistent with Section 24, of this Agreement, consent to the Releases (as defined below) and not object to (or support any party's objection to) or make an election to opt-out of any such Releases; provided, however, that consent by a Consenting Term Loan Lender to the Releases shall, without any further action by the applicable Consenting Term Loan Lender, be deemed automatically revoked (and, upon such revocation, deemed void *ab initio*) by the applicable Consenting Term Loan Lender upon the Termination Date;

(g) to the extent that a legal or structural impediment to consummation of the Chapter 11 Plan arises outside of the jurisdiction of the Bankruptcy Court, and such legal or structural impediment does not otherwise provide the Consenting Term Loan Lenders with a right to terminate this Agreement, negotiate in good faith to address any such impediment;

(h) provide prompt written notice to the Company between the date hereof and the Effective Date of the Chapter 11 Plan of (i) the occurrence, or failure to occur, of any event of which the occurrence or failure to occur would be reasonably likely to cause (A) any representation or warranty of such Consenting Term Loan Lender contained in this Agreement to be untrue or inaccurate in any material respect, (B) any material covenant of such Consenting Term Loan Lender contained in this Agreement not to

5

be satisfied in any material respect, or (C) any condition precedent contained in the Chapter 11 Plan or this Agreement not to occur or become impossible to satisfy, (ii) receipt of any written notice from any third party alleging that the consent of such party is or may be required as a condition precedent to consummation of the transactions contemplated by the Restructuring, (iii) receipt of any written notice from any governmental body that is material to the consummation of the transactions contemplated by the Restructuring, (iv) receipt of any written notice of any proceeding commenced or threatened against any Party that would otherwise affect in any material respect the transactions contemplated by the Restructuring, and (v) any failure of such Consenting Term Loan Lender to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by them hereunder as a condition precedent to the consummation of the transactions contemplated by the Restructuring; and

(i)   permit the disclosure of this Agreement, and the aggregate amount of Covered Claims held by the Consenting Term Loan Lenders; provided, however, that the Company shall not disclose (i) individual Covered Claims amounts held by any Consenting Term Loan Lenders to any other party (including to other Consenting Term Loan Lenders), or (ii) the identity of any Consenting Term Loan Lender to any other party (including to other Consenting Term Loan Lenders) without the prior written consent of such Consenting Term Loan Lender.

Notwithstanding anything contained in this Agreement, no Consenting Term Loan Lender shall be:

(a)   obligated to deliver a consent or vote to accept the Chapter 11 Plan, or prohibited from withdrawing such consent or vote, in each case, upon the termination of this Agreement as to such Consenting Term Loan Lender (provided that the Consenting Term Loan Lender is not then in material breach of its own obligations under this Agreement);

(b)   prohibited, limited, or restricted from contesting (in a proceeding or otherwise) whether any matter, fact or thing, is a breach of, or inconsistent with, this Agreement;

(c)   prohibited, limited, or restricted from asserting or raising any objection expressly permitted under this Agreement in connection with any hearing in the Bankruptcy Court, including, without limitation, any hearing on confirmation of the Chapter 11 Plan;

(d)   prohibited, limited, or restricted from asserting any rights, claims, and/or defenses under the Credit Agreement, the Security Agreement (as defined in the Credit Agreement), and any related documents or agreements;

(e)   prohibited, limited or restricted from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases or asserting or raising any objection permitted under this Agreement in connection with any hearing on confirmation of

6

the Chapter 11 Plan or any other matter so long as such appearance, objection, and the positions advocated in connection therewith are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring in a manner inconsistent with this Agreement; or

(f) prohibited, limited or restricted from engaging in discussions with or among any or all of the Company, officers, representatives, or advisors, any other Lender or its affiliates, or any of their respective officers, representatives or advisors, or any other party; provided, however, that such discussions shall not be for the purpose of hindering, delaying, or preventing the consummation of the Restructuring in a manner inconsistent with this Agreement.

**Section 4.** **Commitment of the Consenting Equityholders.**

Subject to the terms and conditions of this Agreement and the Term Sheet, each of the Consenting Equityholders agrees (severally and not jointly) with the Company that it shall and it shall cause each of its respective affiliates during the period beginning on the RSA Effective Date and ending on the earlier of the Equityholder-Only Termination Date (as defined below) applicable to such Consenting Equityholder and the Termination Date (as defined below):

(a) not to (and direct any applicable custodian or prime broker, not to) (i) sell, assign, hypothecate, pledge, or otherwise transfer, including by the declaration of a worthless stock deduction for any tax year ending on or prior to the Effective Date (as defined in the Term Sheet), grant a participation interest in or otherwise dispose of, directly or indirectly, its right, title or interest (including, for the avoidance of doubt, certain transfers of and declarations of worthlessness with respect to equity securities in the Company) in respect of any of such Consenting Equityholder's Equity Interests, as applicable, in whole or in part, or (ii) grant any proxies, deposit any of such Consenting Equityholder's Interests against the Company, as applicable, into a voting trust, or enter into a voting agreement with respect to any such Equity Interests, in the case of (i) or (ii), other than transfers of interests in Consenting Equityholders and transfers among affiliates of Consenting Equityholders that are or become parties to this Agreement prior to the effectiveness of such transfer, in each case, provided that such transfers do not impair any of the Company's tax attributes or its ability to consummate the Restructuring. By executing this Agreement, each Consenting Equityholder agrees that any action taken in violation of this Section 4(a) shall be deemed null and void *ab initio* and of no force and effect without further action by any party;

(b) cooperate in terminating and/or waiving the provisions of any shareholders' agreement with the Company to which it is a party provided that all other parties to any such agreement also so terminate and/or waive;

(c) consistent with Section 24, of this Agreement, consent to the Releases (as defined below) and not object to (or support any party's objection to) or make an election to opt-out of any such Releases; provided, however, that consent by a Consenting Equityholder to the Releases shall, without any further action by the applicable

7

Consenting Equityholder, be deemed automatically revoked (and, upon such revocation, deemed void ab initio) by the applicable Consenting Equityholder upon the earlier of the Equityholder-Only Termination Date and the Termination Date;

(d) not take, nor encourage any other person or entity to take, any action that directly or indirectly interferes with or delays the acceptance or implementation of the transactions contemplated by the Restructuring or this Agreement, including the Releases, including, without limitation, initiating or joining any legal proceeding, objecting, directly or indirectly, to the Chapter 11 Plan or the Restructuring Documents, or directly or indirectly negotiating or soliciting any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, or restructuring of the Company or any of its subsidiaries that is inconsistent with or that would be reasonably likely to prevent, delay, or impede the consummation of the Restructuring;

(e) support, and use reasonable best efforts to take all actions necessary or reasonably requested by the Company to facilitate the confirmation and consummation of the Chapter 11 Plan and the Restructuring;

(f) not assert any claims or any kind of priority against the Company in the Chapter 11 Cases (provided, that each Consenting Equityholder and its respective affiliates shall have the right to file a proof of claim in the Chapter 11 Cases in compliance with the bar date to preserve its right to assert its claims if this Agreement terminates in accordance with its terms);

(g) provide prompt written notice to the Company between the date hereof and the Effective Date of the Chapter 11 Plan of the occurrence, or failure to occur, of any event of which the occurrence or failure to occur would be reasonably likely to cause (i) any representation or warranty of such Consenting Equityholder contained in this Agreement to be untrue or inaccurate in any material respect, or (ii) any material covenant of such Consenting Equityholder contained in this Agreement not to be satisfied in any material respect; and

(h) permit the disclosure of this Agreement, and the aggregate amount of Equity Interests held by the Consenting Equityholders.

**Section 5.      Commitment of the Company.**

Subject to the terms hereof, the Company shall, jointly and severally:

(a) use commercially reasonable efforts to consummate and complete the Restructuring, including taking all necessary and appropriate actions in furtherance of the Restructuring, the Chapter 11 Plan, the Releases, and this Agreement;

(b) use commercially reasonable efforts to meet all Milestones;

(c) use commercially reasonable efforts to obtain any and all required regulatory

8

approvals for the Restructuring embodied in the Restructuring Documents, including the Chapter 11 Plan;

(d)    provide draft copies of the Chapter 11 Plan, Chapter 11 plan supplement, Disclosure Statement, motion to approve solicitation of the Chapter 11 Plan, the form of ballots, any proposed Confirmation Order, any motion to approve the use of cash collateral, any Cash Collateral Order, any proposed amended version of the Chapter 11 Plan or the Disclosure Statement, all "first day" and "second day" pleadings (including forms of orders thereof), and any other material motions, draft orders, pleadings or briefs (collectively, the "Two-Day Review Motions") the Company intends to file with the Bankruptcy Court to the Term Loan Lender Steering Committee (via email to counsel Arnold & Porter Kaye Scholer LLP) at least two (2) days prior to filing with the Bankruptcy Court, with all other motions, applications, pleadings and briefs (the "Other Motions") the Company intends to file with the Bankruptcy Court to be provided to counsel to the Term Loan Lender Steering Committee as soon as reasonably practicable prior to filing with the Bankruptcy Court, but in any event no fewer than twelve (12) hours prior to filing with the Bankruptcy Court, and in each case consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court; provided that (i) the Debtors shall not be required to provide draft copies of any retention applications, any fee statements, or any fee applications to the Term Loan Lender Steering Committee, and (ii) if the notice required by this Section 5(d) with respect to Other Motions is not reasonably practicable with respect to any document, the Debtors may provide notice, prior to the expiration of such deadline, that such deadline cannot be met to the Term Loan Lender Steering Committee (via email to counsel Arnold & Porter Kaye Scholer LLP) and, if such document is provided to the Term Loan Lender Steering Committee as soon as reasonably practicable, no Termination Event shall occur as a result of such failure to comply with the terms of this Section 5(d) with respect to Other Motions;

(e)    file the Two-Day Review Motions and the Other Motions (other than those set forth in Sections 5(d)(i) and 5(d)(ii)) in form and substance reasonably acceptable to the Term Loan Lender Steering Committee (unless such document is subject to a higher standard of review and approval by the Term Loan Lender Steering Committee, in which case such higher standard of review and approval shall apply) and the Company, and seek interim and final (to the extent applicable and/or necessary) orders, in form and substance reasonably acceptable to the Term Loan Lender Steering Committee and the Company, from the Bankruptcy Court approving the relief requested in such documents;

(f)    provide draft copies of any motion for interim and final orders approving procedures regarding equity trading (and related proposed order), Chapter 11 Plan, Chapter 11 plan supplement, Disclosure Statement, motion to approve solicitation of the Chapter 11 Plan, the form of ballots, any proposed Confirmation Order, any proposed amended version of the Chapter 11 Plan or the Disclosure Statement to the Consenting Equityholders at least two (2) days prior to filing with the Bankruptcy

Court;

(g) file a customary "first day" motion for interim and final order approving procedures regarding equity trading that provides that, among other things, upon termination of this Agreement with respect to a Consenting Equityholder such Consenting Equityholder shall have the right to move the Bankruptcy Court for an order permitting the Consenting Equityholder to take any actions set forth in <u>Section 4(a)</u> hereof (and all other parties shall have the right to oppose such motion) and which shall be otherwise reasonably acceptable to the Consenting Equityholders and the Term Loan Lender Steering Committee, the approval of which the Company shall seek as soon as reasonably practicable after the Petition Date;

(h) permit the disclosure of this Agreement, the aggregate amount of Equity Interests held by the Consenting Equityholders, and the aggregate amount of Covered Claims held by the Consenting Term Loan Lenders; <u>provided</u>, <u>however</u>, that the Company shall not disclose (i) individual Covered Claims amounts held by any Consenting Term Loan Lenders or (ii) the identity of any Consenting Term Loan Lender to any other party (including to other Consenting Term Loan Lenders) without the prior written consent of such Consenting Term Loan Lender;

(i) to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated herein, negotiate in good faith appropriate additional or alternative provisions to address any such impediment; <u>provided</u> that the economic outcome for the Parties and other material terms of this Agreement are preserved in any such provisions;

(j) subject to <u>Section 14</u> of this Agreement, not directly or indirectly (A) join in or support any alternative plan or transaction other than the Chapter 11 Plan; or (B) take any action to alter in any material respect, unreasonably delay, interfere with, or impede the approval or ratification, as applicable, of the Restructuring, the Disclosure Statement, the solicitation and solicitation procedures, the Releases, and confirmation and consummation of the Chapter 11 Plan;

(k) subject to <u>Section 14</u> of this Agreement, not, nor encourage any other person or entity to, take any action that would, or would reasonably be expected to, breach or be inconsistent with this Agreement or, directly or indirectly, interfere with the acceptance, confirmation or consummation of the Plan, approval of the Releases, or implementation of the Restructuring;

(l) continue to operate the Company's business in the ordinary course in accordance with its reasonable business judgment and, subject to applicable laws, use commercially reasonable efforts to, consistent with the pursuit and consummation of the Restructuring and the transactions contemplated thereby, preserve intact in all material respects the current business operations of the Company and its subsidiaries;

(m) not commence an avoidance action or other legal proceeding that challenges the

10

validity, enforceability, or priority of the Term Loans or obligations under the Credit Agreement, or any liens securing the same;

(n)  pay all Transaction Expenses consistent with the terms of <u>Section 19</u> hereof;

(o)  not take any action inconsistent with, or omit to take any action required by the Credit Agreement, except to the extent that any such action or inaction is expressly contemplated or permitted by this Agreement, the Chapter 11 Plan or any of the other Restructuring Documents; and

(p)  provide prompt written notice to the Consenting Term Loan Lenders and the Consenting Equityholders between the date hereof and the Effective Date of the Chapter 11 Plan of (i) the occurrence, or failure to occur, of any event of which the occurrence or failure to occur would be reasonably likely to cause (A) any representation or warranty of the Company contained in this Agreement to be untrue or inaccurate in any material respect, (B) any material covenant of the Company contained in this Agreement not to be satisfied in any material respect, or (C) any condition precedent contained in the Chapter 11 Plan or this Agreement not to occur or become impossible to satisfy, (ii) receipt of any written notice from any third party alleging that the consent of such party is or may be required as a condition precedent to consummation of the transactions contemplated by the Restructuring and this Agreement, including the Releases, (iii) receipt of any written notice from any governmental body that is material to the consummation of the transactions contemplated by the Restructuring, (iv) receipt of any written notice of any proceeding commenced or threatened against the Company that would otherwise affect in any material respect the transactions contemplated by the Restructuring and this Agreement, including the Releases, and (v) any failure of the Company to comply, in any material respect, with or satisfy any covenant, condition, or agreement to be complied with or satisfied by them hereunder as a condition precedent to the consummation of the transactions contemplated by the Restructuring.

The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice); <u>provided</u> that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

Notwithstanding anything to the contrary in <u>Sections 4</u> or <u>5</u> of this Agreement, each of the Company's officers and directors, in such capacities, is not, by virtue of the Company's or the Consenting Equityholders' obligations under this Agreement, prohibited from taking, or from refraining to take, any actions that are consistent with, and not in violation of, <u>Section 14</u> of this Agreement, and neither the Company nor any Consenting Equityholder that is affiliated with such officer or director shall be in violation of this Agreement by virtue of such individual taking, or refraining from taking, any such action, so long as any such action is consistent with

11

the fiduciary obligations of the Company under applicable law (as reasonably determined by the Company after consultation with counsel).

**Section 6.**    **Lender Termination Event.**

This Agreement and the obligations hereunder may be terminated by the Majority Consenting Term Loan Lenders (as defined below) upon the giving of notice thereof to the Company (except as otherwise expressly provided herein with respect to a Lender Termination Event of the type specified in clauses (d), (e) or (t) of this <u>Section 6</u>), at any time after the occurrence, and during the continuation of, any of the following events (each, a "<u>Lender Termination Event</u>"):

(a)    the breach in any material respect by the Company, of any of the material undertakings or covenants of the Company set forth herein and, to the extent such breach is susceptible to cure, such breach remains uncured for a period of five (5) business days after the receipt of notice of such breach;

(b)    any representation or warranty in this Agreement made by the Company shall have been untrue in any material respect when made or shall have become untrue in any material respect and, if such breach is susceptible to cure, such breach remains uncured for a period of five (5) business days following the Company's receipt of notice thereof;

(c)    the failure of the Company to meet any Milestone;

(d)    the Restructuring Documents and any amendments, modifications, or supplements thereto filed by the Company include terms that are materially inconsistent with the Term Sheet and are not otherwise reasonably acceptable in all respects to the Requisite Consenting Term Loan Lenders (as defined below), and such event remains uncured for a period of five (5) business days following the Company's receipt of notice thereof;

(e)    a Restructuring Document materially alters the treatment of the Lenders specified in the Term Sheet (including, without limitation, any material term of the New First Lien Credit Agreement) and the Requisite Consenting Term Loan Lenders have not consented to such material alteration, and such breach remains uncured for a period of two (2) business days following the Company's receipt of notice thereof;

(f)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring, and such ruling, judgment or order has not been stayed, reversed, or vacated within twenty-five (25) calendar days after such issuance;

(g)    the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(h)  the dismissal of one or more of the Chapter 11 Cases;

(i)  the appointment of a trustee, receiver, or examiner with expanded powers in one or more of the Chapter 11 Cases;

(j)  the commencement of an involuntary bankruptcy case against the Company under the Bankruptcy Code, if such involuntary case is not dismissed within sixty (60) calendar days after the filing thereof, or if a court order grants the relief sought in such involuntary case;

(k)  the preparation and/or filing of a motion to the Bankruptcy Court seeking to reject or otherwise not perform under this Agreement;

(l)  the Bankruptcy Court enters an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization, *provided*, that if such order is subject to appeal, a Lender Termination Event shall result if such breach remains uncured or unappealed for a period of five (5) business days following the Company's receipt of notice thereof;

(m)  denial by the Bankruptcy Court of confirmation of the Chapter 11 Plan;

(n)  the order confirming the Chapter 11 Plan is reversed, vacated, or otherwise modified in a manner materially inconsistent with this Agreement;

(o)  any court of competent jurisdiction has entered a judgment or order declaring the Restructuring, this Agreement or any material portion hereof to be unenforceable or illegal and such judgment or order is not stayed, dismissed, vacated or modified within twenty-five (25) calendar days following the entry thereof;

(p)  the Company (A) publicly announces its intention not to support the Restructuring, (B) files a motion with the Bankruptcy Court seeking the approval of an Alternative Restructuring, or (C) agrees to pursue or publicly announces its intent to pursue an Alternative Restructuring;

(q)  if either (i) the Company files a motion, application or adversary proceeding (or supports or fails to timely object to such a filing) (A) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization or subordination of, the obligations or Covered Claims arising under or relating to the Credit Agreement, or (2) challenging the seniority of the obligations or Covered Claims arising under or relating to the Credit Agreement, or (ii) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief against the interests of the Consenting Term Loan Lenders with respect to any of the foregoing causes of action or proceedings, including, but not limited to, invalidating, avoiding, disallowing, recharacterizing, subordinating, or limiting the enforceability of any of the obligations or Covered Claims arising under or related to the Credit Agreement;

13

(r)   the Company makes an assignment for the benefit of creditors;

(s)   on or after the RSA Effective Date, the Company engages in any merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside the ordinary course of business, other than: (i) the commencement of the Chapter 11 Cases or other bankruptcy or similar proceeding; or (ii) as permitted or contemplated by the Restructuring; provided, however, the Company may settle the Merlin Claims subject to the consent of the Term Loan Lender Steering Committee, which consent shall not be unreasonably withheld;

(t)   on the date that is two-hundred and seventy (270) days after the Petition Date (the "Outside Date"); and

(u)   the terms of any entered Cash Collateral Order are not reasonably acceptable to the Term Loan Lender Steering Committee;

provided, that notwithstanding the foregoing, unless waived by the Requisite Consenting Term Loan Lenders, if a Lender Termination Event of the type specified in clauses (d), (e) or (t) of this Section 6 occurs, this Agreement and the obligations hereunder shall be terminated automatically and without the need for any notice thereof.

This Agreement shall automatically terminate solely as to any Consenting Term Loan Lender on the date, which shall be deemed a Termination Date solely with respect to such Consenting Term Loan Lender (and not, for the avoidance of doubt, as to any other Consenting Term Loan Lender), on which such Consenting Term Loan Lender has transferred all (but not less than all) of its claims in accordance with Section 11 of this Agreement.

**Section 7.    Equityholder Termination Events.**

This Agreement and the obligations hereunder, solely with respect to Consenting Equityholders, may be terminated as to any Consenting Equityholder upon the giving of notice thereof by such Consenting Equityholder to the Company at any time after the occurrence, and during the continuation of, any of the following events (each, an "Equityholder Termination Event"); provided, however, that if such Equityholder Termination Event is susceptible to cure, this Agreement and the obligations hereunder may only be terminated five (5) business days after written notice of such Equityholder Termination Event is delivered to the Company if such Equityholder Termination Event has not been cured by such date:

(a)   the breach in any material respect by the Company, of any of the material undertakings or covenants of the Company set forth herein and, to the extent such breach is susceptible to cure, such breach remains uncured for a period of five (5) business days after the receipt of notice of such breach;

(b)   the breach in any material respect by one or more of the Consenting Term Loan Lenders, of any of the undertakings, representations, warranties, or covenants of the Consenting Term Loan Lenders set forth herein that (x) remains uncured for a period

14

of three (3) business days after the receipt by the Company of written notice by a Consenting Equityholder of such breach; and (y) could reasonably be expected to impair the ability to consummate the Restructuring in accordance with the terms of the Term Sheet;

(c)   any representation or warranty in this Agreement made by the Company shall have been untrue in any material respect when made or shall have become untrue in any material respect and, if such breach is susceptible to cure, such breach remains uncured for a period of five (5) business days following the Company's receipt of notice thereof;

(d)   the Restructuring Documents and any amendments, modifications, or supplements thereto filed by the Company or approved by the Bankruptcy Court do not include the Releases or are in any way inconsistent with <u>Section 24</u> of this Agreement;

(e)   the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring or this Agreement or any material portion hereof, including the Releases, and such ruling, judgment or order has not been stayed, reversed, or vacated within twenty-five (25) calendar days after such issuance;

(f)   the Bankruptcy Court enters an order or issues a ruling or decision, whether in connection with the approval of any disclosure statement or chapter 11 plan or otherwise, that it will not approve the Releases;

(g)   the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(h)   the dismissal of one or more of the Chapter 11 Cases;

(i)   the appointment of a trustee, receiver, or examiner with expanded powers in one or more of the Chapter 11 Cases;

(j)   the commencement of an involuntary bankruptcy case against the Company under the Bankruptcy Code, if such involuntary case is not dismissed within sixty (60) calendar days after the filing thereof, or if a court order grants the relief sought in such involuntary case;

(k)   the preparation and/or filing of a motion to the Bankruptcy Court seeking to reject or otherwise not perform under this Agreement;

(l)   the Bankruptcy Court enters an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a chapter 11 plan, *provided*, that if such order is subject to appeal, an Equityholder Termination Event shall result if such breach remains uncured or unappealed for a period of five (5) business days following the Company's receipt of notice thereof;

15

(m) denial by the Bankruptcy Court of confirmation of the Chapter 11 Plan;

(n) the order confirming the Chapter 11 Plan is reversed, vacated, or otherwise modified in a manner materially inconsistent with this Agreement, including if such order is in anyway inconsistent with <u>Section 24</u> of this Agreement;

(o) any court of competent jurisdiction has entered a judgment or order declaring the Restructuring, this Agreement or any material portion hereof, including the Releases, to be unenforceable or illegal and such judgment or order is not stayed, dismissed, vacated or modified within twenty-five (25) calendar days following the entry thereof;

(p) the Company (A) publicly announces its intention not to support the Restructuring or the Releases, (B) files a motion with the Bankruptcy Court seeking the approval of an Alternative Restructuring, or (C) agrees to pursue or publicly announces its intent to pursue an Alternative Restructuring;

(q) the Company files a motion, application or adversary proceeding (or supports or fails to timely object to such a filing) seeking to avoid, recover, recharacterize or otherwise challenge any transfer made to any Consenting Equityholder, or (the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief against the interests of any Consenting Equityholder with respect to any of the foregoing causes of action or proceedings; and

(r) the Company makes an assignment for the benefit of creditors.

**Section 8.** **Company Termination Events.**

This Agreement and the obligations hereunder may be terminated by the Company upon the giving of notice thereof to the Consenting Term Loan Lenders and the Consenting Equityholders upon the occurrence of any of the following events (each, a "<u>Company Termination Event</u>"):

(a) the breach in any material respect by one or more of the Consenting Term Loan Lenders, of any of the undertakings, representations, warranties, or covenants of the Consenting Term Loan Lenders set forth herein in any material respect which (x) remains uncured for a period of five (5) business days after the receipt of written notice of such breach by all Consenting Term Loan Lenders; and (y) could reasonably be expected to impair the ability to consummate the Restructuring in accordance with the terms of the Term Sheet;

(b) the breach in any material respect by one or more of the Consenting Equityholders, of any of the undertakings, representations, warranties, or covenants of the Consenting Equityholders set forth herein in any material respect which remains uncured for a period of three (3) business days after the receipt of written notice of such breach; <u>provided</u> that any such termination by the Company pursuant to this <u>Section 8(b)</u> shall be solely with respect to the breaching Consenting Equityholder

16

and shall not otherwise affect the rights and obligations of the non-breaching Consenting Equityholders, the Consenting Term Loan Lenders and the Company under this Agreement;

(c)   receipt by the Consenting Term Loan Lenders and the Consenting Equityholders of the Company's Fiduciary Decision (as defined herein) made in accordance with <u>Section 14</u> herein; and

(d)   the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring, and such ruling, judgment or order has not been not stayed, reversed or vacated within twenty-five (25) calendar days after such issuance.

### Section 9.      Mutual Termination.

This Agreement, and the obligations of all Parties hereunder may be terminated by a mutual written agreement among the Majority Consenting Term Loan Lenders, on the one hand, and the Company, on the other hand.

### Section 10.      Effect of Termination.

The date on which this Agreement is terminated in accordance with <u>Sections 6</u>, <u>8</u> (other than any termination pursuant to <u>Section 8(b)</u>), or <u>9</u> of this Agreement shall be referred to as the "<u>Termination Date</u>".  Upon the earlier to occur of the Termination Date or the Effective Date, termination of this Agreement shall be effective immediately and all obligations hereunder (other than obligations that expressly survive pursuant to <u>Section 16</u>) shall terminate, each Party hereto shall be released from its commitments, undertakings, and agreements, and this Agreement shall be of no further force and effect and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Credit Agreement and any ancillary documents or agreements thereto; <u>provided</u>, <u>however</u>, that (i) any claim for breach of this Agreement that occurs prior to the Termination Date and (ii) the rights and obligations of the Parties under <u>Section 19</u>, if applicable, with respect to the payment of fees and expenses incurred up to such date of termination shall survive such termination and all rights and remedies with respect to such claims shall not be prejudiced in any way. Upon the termination of this Agreement, each vote or any consents given by any Consenting Term Loan Lenders prior to such termination shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement, in each case, without further confirmation or other action by such Consenting Term Loan Lenders. If this Agreement has been terminated as to any Consenting Term Loan Lender at a time when permission of the Bankruptcy Court shall be required for a Consenting Term Loan Lender to change or withdraw (or cause to change or withdraw) its vote to accept the Chapter 11 Plan, the Company shall not oppose any attempt by such Consenting Term Loan Lender to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to the Company at law, equity, or otherwise, including

17

those remedies set forth in <u>Section 20</u> hereof; <u>provided</u> that nothing herein shall prevent the Company from contesting whether or not the applicable Lender Termination Events have actually occurred.  Such Consenting Term Loan Lender shall have no liability to the Company or any other Term Loan Lender in respect of any termination of this Agreement in accordance with the terms of this <u>Section 10</u> and <u>Sections 6</u> and <u>27</u> hereof (unless such termination is determined by a court of competent jurisdiction to have been invalid); <u>provided</u>, <u>that</u>, under no circumstance shall a Consenting Term Loan Lender have any liability to any Consenting Equityholder as a result of any action, or any failure to take any action, by any Consenting Term Loan Lender, in connection with this Agreement; <u>provided further</u>, <u>that</u>, under no circumstance shall a Consenting Equityholder have any liability to any Consenting Term Loan Lender as a result of any action, or any failure to take any action, by any Consenting Equityholder, in connection with this Agreement.

Upon the occurrence of the termination of this Agreement pursuant to <u>Section 7</u> or <u>8(b)</u> with respect to any Consenting Equityholder (an "<u>Equityholder-Only Termination Event</u>" and the date of such termination the "<u>Equityholder-Only Termination Date</u>"), this Agreement shall terminate solely with respect to such terminating Consenting Equityholder and all of its obligations hereunder (and not, for the avoidance of doubt, as to any other Consenting Equityholder or its obligations hereunder), and such Consenting Equityholder shall be released from its commitments, undertakings, and agreements hereunder, and this Agreement shall be of no further force and effect solely with respect to such Consenting Equityholder and such Consenting Equityholder shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had they not entered into this Agreement, including all rights and remedies available to it under applicable law; <u>provided</u>, <u>however</u>, that any claim for breach of this Agreement that occurs prior to such Equityholder-Only Termination Date shall survive such termination and all rights and remedies with respect to such claims shall not be prejudiced in any way.

### Section 11.    <u>Transfers of Claims</u>.

During the period beginning on the RSA Effective Date and ending on the Termination Date, each Consenting Term Loan Lender agrees not to (and agrees to use commercially reasonable efforts to cause any affiliates that are Lenders or holders of Senior Notes not to) (a) sell, transfer, assign, hypothecate, pledge, grant a participation interest in or otherwise dispose of, directly or indirectly, its right, title or interest in respect of any of such Consenting Term Loan Lender's Covered Claims against the Company as applicable, in whole or in part, or (b) grant any proxies, deposit any of such Consenting Term Loan Lender's Covered Claims against the Company, as applicable, into a voting trust, or enter into a voting agreement with respect to any such Covered Claims (the actions described in clauses (a) and (b) are collectively referred to herein as a "<u>Transfer</u>"), unless:  (x) such Transfer is to another Consenting Term Loan Lender or any other person or entity that first agrees in writing to be bound by the terms of this Agreement by executing <u>Exhibit B</u> to this Agreement, and (y) notice of such Transfer and such executed <u>Exhibit B</u>, if applicable, is delivered by email to counsel to the Consenting Term Loan Lenders (as provided in <u>Section 27</u> herein) and the Company by no later than two (2) business days before such Transfer is consummated and settled (each, a "<u>Permitted Transferee</u>").  With

respect to Covered Claims against the Company held by a Permitted Transferee upon consummation of a Transfer, such Permitted Transferee (x) shall make and shall be deemed to make all of the representations and warranties of a Consenting Term Loan Lender under this Agreement and (y) shall agree and shall be deemed to agree to be bound by all of terms applicable to a Consenting Term Loan Lender under this Agreement.  Upon compliance with the foregoing, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent such rights and obligations are assumed by a Permitted Transferee.

By executing this Agreement, each of the Consenting Term Loan Lenders agree that any Transfer made in violation of this Section 11 shall be deemed null and void *ab initio* and of no force or effect without further action by any Party or the intended transferee, regardless of any prior notice provided to the Company or counsel to the Consenting Term Loan Lenders, and shall not create any obligation or liability of the Company to the intended transferee.  Each Consenting Term Loan Lender agrees not to create any subsidiary, affiliate, or other vehicle or device for the purpose of acquiring claims of the Company without first causing such subsidiary, affiliate, vehicle, or device to be bound by and subject to this Agreement.  The transfer restrictions set forth herein shall be in addition to any transfer restrictions set forth in the Credit Agreement.

This Agreement shall in no way be construed to preclude the Consenting Term Loan Lenders from acquiring additional Covered Claims; provided that (i) any Consenting Term Loan Lender that acquires additional Covered Claims during the term of this Agreement shall promptly notify the Company and counsel to the Term Loan Lender Steering Committee, of such acquisition, including the amount of such acquisition, and (ii) such acquired Covered Claims shall automatically and immediately upon acquisition by a Consenting Term Loan Lender be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given).

As used herein, the term "Qualified Marketmaker" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Covered Claims (or enter with customers into long and short positions in Covered Claims), in its capacity as a dealer or market maker in Covered Claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).  Notwithstanding anything to the contrary herein, a Qualified Marketmaker that acquires any of the Covered Claims with the purpose and intent of acting as a Qualified Marketmaker for such Covered Claims shall not be required to agree in writing to be bound by the terms of this Agreement by executing Exhibit B to this Agreement if such Qualified Marketmaker transfers such Covered Claims within five (5) Business Days of its acquisition to a Permitted Transferee, provided that (i) such exception will only be available in transactions where the Qualified Marketmaker is acting in such capacity, and (ii) the notice provisions set forth in the first paragraph of this Section 11 shall continue to apply to any transfer to or by a Qualified Marketmaker.

### Section 12.    Accession

After the date hereof, additional holders of the Term Loans or Equity Interests may become Consenting Term Loan Lenders or Consenting Equityholders, as applicable, by agreeing in writing to be bound by the terms of this Agreement by executing a counterpart signature page to this Agreement and delivering such signature page in accordance with <u>Section 27</u> herein.

### Section 13.    Acknowledgment.

This Agreement is not and shall not be deemed to be a solicitation for consents to the Chapter 11 Plan or an offer of New First Lien Credit Agreement debt or equity in Reorganized Cumulus. The acceptance of the Chapter 11 Plan by each of the Consenting Term Loan Lenders will be subject to proper solicitation pursuant to sections 1125, 1126, and 1127 of the Bankruptcy Code. The undersigned Consenting Term Loan Lenders understand that the equity in Reorganized Cumulus will be distributed only (a) in the United States to holders of Term Loans who are "accredited investors" (as defined in Rule 501(a) of Regulation D under the Securities Act) in reliance on section 4(a)(2) of the Securities Act, (b) outside the United States to holders of the Term Loans in reliance on Regulation S under the Securities Act, or (c) pursuant to section 1145 of the Bankruptcy Code. The undersigned confirms that it is eligible to acquire New First Lien Credit Agreement debt and/or the equity in Reorganized Cumulus pursuant to the conditions set forth in the foregoing sentence.

The Company acknowledges and agrees that the Company's entry into, and performance under, this Agreement does not constitute or trigger a termination event under any of the employment agreements between the Company, on the one hand, and its Chief Executive Officer, Chief Financial Officer, General Counsel, or any executive vice president of either Cumulus Media Inc., or Cumulus Media Holdings Inc., on the other hand.

### Section 14.    Fiduciary Duties.

Nothing in the Term Sheet or this Agreement shall require the Company to take any action, or to refrain from taking any action, if doing so would be inconsistent with its fiduciary obligations under applicable law (as reasonably determined by it after consultation with counsel) (any such determination, a "<u>Fiduciary Decision</u>"); <u>provided</u>, that the Company shall provide notice of any such Fiduciary Decision to counsel to the Term Loan Lender Steering Committee via email within one (1) day of the date of such determination.

### Section 15.    Representations and Warranties.

(a)    (i) Each of the Consenting Term Loan Lenders, on the one hand, and the Company, on the other hand, and (ii) each of the Consenting Equityholders, on the one hand, and the Company on the other hand, hereby represents and warrants to such counterparty, on a several and not joint basis for itself and not any other person or entity that the following statements are true, correct, and complete as of the date hereof:

(1)    it has the requisite corporate or other organizational power and authority to

20

enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(2) the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(3) the execution, delivery, and performance by it of this Agreement does not and shall not (i) violate any provision of law, rule, or regulation applicable to it, or its certificate of incorporation or bylaws or other organizational documents or those of any of its affiliates, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party;

(4) the execution, delivery, and performance by it of this Agreement does not and shall not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body;

(5) subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability; and

(6) it is (i) the sole beneficial owner and/or the nominee, investment manager, advisor, or subadvisor for the beneficial holder of its Covered Claims or Equity Interests, as applicable, set forth under its signature and in the amounts set forth therein and (ii) exclusively entitled (for its own accounts or for the accounts of such other beneficial owners) to all of the rights and economic benefits of such Covered Claims or Equity Interests, as applicable.

(b) The Company hereby represents and warrants for itself and not any other person or entity that the following statements are true, correct, and complete as of the date hereof:

(1) it has the requisite corporate power and authority to enter into this Agreement and (upon entry of an order of the Bankruptcy Court) to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(2) the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(3) the execution, delivery, and, subject to Bankruptcy Court approval,

performance of this Agreement and the consummation of the transactions contemplated hereby did not and will not (a) result in any violation of its certificate of incorporation or bylaws (or equivalent governing documents) or those of the Company's subsidiaries, (b) (other than any proceedings in a Bankruptcy Court) conflict with, result in the breach or violation of, or constitute a breach or violation of any material contractual obligations of it or any of the Company's subsidiaries, or (c) result in the violation of any law (statutory or common), statute, Order, ruling, rule or regulation, code, ordinance, writ, assessment, award, injunction, judgment, or decree enacted, adopted, issued, or promulgated by any government or governmental court, agency, or body, having jurisdiction over it or any of the Company's subsidiaries; and

(4)   subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability.

**Section 16.    Survival of Agreement.**

Notwithstanding (i) any sale of the Term Loans in accordance with Section 11 or (ii) the termination of this Agreement in accordance with its terms, the agreements, and obligations of the Parties in Section 19 (solely to the extent of fees and expenses accrued before termination) and Sections 10, 14, 16, 17, 21, 22, 23, 25, 26, 27, 28, 31, 32 and 33 shall survive such sale and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

**Section 17.    Waiver.**

This Agreement is part of a proposed settlement of a dispute among the Parties. If the transactions contemplated herein are not consummated following the occurrence of the Termination Date, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

**Section 18.    Relationship Among Parties.**

Notwithstanding anything herein to the contrary, the respective duties and obligations of the Consenting Term Loan Lenders and the Consenting Equityholders under this Agreement shall be several, not joint. No Consenting Term Loan Lender or Consenting Equityholder shall have any responsibility for any trading by any other entity by virtue of this Agreement. No prior history, pattern, or practice of sharing confidences among or between Consenting Term Loan Lenders or Consenting Equityholders shall in any way affect or negate this understanding and

22

agreement.  The Consenting Term Loan Lenders and the Consenting Equityholders have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Company and do not constitute a "group" within the meaning of Rule 13d-5 under the Exchange Act.

**Section 19.**     **Payment of Fees.**

To the extent not paid pursuant to the Cash Collateral Order or the Credit Agreement, the Company shall pay, within ten (10) days following receipt of an invoice, any Transaction Expenses (defined below), without the need for any party to file a fee application or otherwise seek Bankruptcy Court approval of such Transaction Expenses (whether incurred prior to, on or after the Petition Date), but subject to any procedural requirements set forth in the Cash Collateral Order.  All such Transaction Expenses incurred and invoiced up to the Petition Date shall be paid in full prior to the Petition Date (without deducting any retainers).  As used herein, "Transaction Expenses" means all reasonable and documented fees and out-of-pocket expenses incurred by (i) the Administrative Agent (which fees and expenses in respect of professionals shall be limited to the fees and expenses of one counsel), and (ii) the Term Loan Lender Steering Committee (which fees and expenses in respect of professionals shall be limited to the fees and expenses of Arnold & Porter Kaye Scholer LLP, FTI Consulting Inc., Fortgang Consulting, LLC and Aloise & Associates, LLC; *provided, that,* except with respect to the fees and expenses of Arnold & Porter Kaye Scholer LLP and FTI Consulting Inc., in no event shall the fees and expenses of Term Loan Lender Steering Committee (i) incurred prior to the RSA Effective Date exceed $75,000 in the aggregate and (ii) incurred between the RSA Effective Date and the Effective Date exceed $150,000 in the aggregate, or such higher amount that shall be subject to the prior written consent of the Company, such consent not to be unreasonably withheld, in connection with this Agreement, the Term Sheet, the Restructuring Documents, and the transactions contemplated hereby and thereby.

**Section 20.**     **Specific Performance.**

It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder without the requirement to post a bond or other security.

**Section 21.**     **Governing Law.**

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.  By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought in the courts of the state of New York, and by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such

23

action, suit, or proceeding. Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement.

### Section 22.    **Waiver of Right to Trial by Jury.**

Each of the Parties waives any right to have a jury participate in resolving any dispute, whether sounding in contract, tort, or otherwise, between any of them arising out of, connected with, relating to or incidental to the relationship established between any of them in connection with this Agreement.  Instead, any disputes resolved in court shall be resolved in a bench trial without a jury.

### Section 23.    **Personal Jurisdiction.**

By execution and delivery of this Agreement, and for purposes of any action, suit or proceeding or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of (a) the courts of the state of New York, or (b) the Bankruptcy Court, if such Bankruptcy Court has jurisdiction.

### Section 24.    **Releases.**

Notwithstanding anything to the contrary in the Term Sheet, the Chapter 11 Plan and the order confirming the Chapter 11 Plan will provide full releases (including Debtor and third-party releases) (the "Releases") and exculpation provisions for the benefit of the Company, Reorganized Cumulus, the Agent, the Consenting Term Loan Lenders, the Consenting Equityholders, the manager, management company or investment advisor of any of the foregoing, and, each of such entities' respective current and former affiliates, and such entities' and their current and former affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, independent contractors, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

### Section 25.    **Successors and Assigns.**

Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective successors, assigns, heirs, executors, administrators and representatives.

### Section 26.    **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

**Section 27.**      <u>Notices</u>.

All notices (including, without limitation, any notice of termination) and other communications from any Party hereunder shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger, or facsimile to the other Parties at the applicable addresses below, or such other addresses as may be furnished hereafter by notice in writing:

(a)   If to the Term Loan Lender Steering Committee:

> Arnold & Porter Kaye Scholer LLP
> 70 West Madison Street
> Chicago, Illinois 60602
> Attn: Michael D. Messersmith
>        Michael B. Solow
>        Seth J. Kleinman
> Email: michael.messersmith@apks.com
>        michael.solow@apks.com
>        seth.kleinman@apks.com

(b)   If to the Consenting Term Loan Lenders, to the address set forth on such Consenting Term Loan Lender's signature page hereto.

(c)   If to the Consenting Equityholders, to the address set forth on such Consenting Equityholder's signature page hereto.

(d)   If to the Company:

> Cumulus Media Inc.
> 3280 Peachtree Road NW, Suite 2300
> Atlanta, Georgia 30305
> Attention: Richard S. Denning
> Email: richard.denning@cumulus.com

> With a copy to:

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York, 10022
> Attention: Nicole L. Greenblatt, P.C.
>        Alice Nofzinger
> E-mail: nicole.greenblatt@kirkland.com
>        alice.nofzinger@kirkland.com

> -and-

> Kirkland & Ellis LLP

300 North LaSalle
Chicago, Illinois 60654
Attention:  Robert A. Britton, Esq.
              Benjamin M. Rhode, Esq.
E-mail:  robert.britton@kirkland.com
         benjamin.rhode@kirkland.com

-and-

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention:  Paul M. Basta,
E-mail:  pbasta@paulweiss.com

### Section 28.    **Entire Agreement**.

This Agreement, including the exhibits, schedules, and annexes hereto constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all other prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

### Section 29.    **Amendments**.

Except as otherwise provided herein, this Agreement may not be modified, amended or supplemented without prior written consent of the Requisite Consenting Term Loan Lenders and the Company; provided that Sections 4, 7 and 24 of this Agreement may not be modified, amended or supplemented without the prior written consent of the Consenting Equityholders that hold, in the aggregate, a majority in aggregate amount of Equity Interests held by all of the Consenting Equityholders (the "Majority Consenting Equityholders").  No waiver of any term or provision of this Agreement or of the Chapter 11 Plan or of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Requisite Consenting Term Loan Lenders (except in the case of a Company Termination Event, the waiver of which shall be in a writing signed by the Company), nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation, or breach of warranty or covenant.  The failure of any Party to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other Party with its obligations hereunder shall not constitute a waiver by such Party of its right to exercise any such or other right, power or remedy or to demand such compliance.  As used in this Agreement, (a) "Requisite Consenting Term Loan Lenders" shall mean, (i) in the case of a Material Amendment/Waiver (as defined below), Consenting Term Loan Lenders holding, in the aggregate, more than seventy-five percent (75%) of the outstanding principal amount of the Term Loans that are held by all of the Consenting Term Loan Lenders, and (ii) in the case of any other amendment or waiver of any term or provision of this Agreement

26

or the Chapter 11 Plan, Consenting Term Loan Lenders holding, in the aggregate, more than fifty percent (50%) of the outstanding principal amount of the Term Loans that are held by all Consenting Term Loan Lenders (the "Majority Consenting Term Loan Lenders"); (b) "Material Amendment/Waiver" shall mean any amendment or waiver of (i) any term or provision of this Agreement, the Term Sheet or the Chapter 11 Plan, the effect of which is to modify the form of, or decrease the amount or percentage of, the recovery (or any component thereof) to be paid, issued, or distributed to the Lenders (as defined in the Credit Agreement) (or any one of them) pursuant to the terms of the Chapter 11 Plan set forth in the Term Sheet; *provided*, *however*, no Material Amendment/Waiver shall have the effect of altering the *pro rata* treatment of the Lenders under the New First Lien Credit Agreement, (ii) any waiver or extension of, or amendment to, the Outside Date, or (iii) any of the provisions of this Section 29.

**Section 30.    Counterparts.**

This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

**Section 31.    Public Disclosure.**

At all times prior to the Effective Date or the earlier termination of this Agreement in accordance with its terms, (i) the Company, on the one hand, and the Consenting Term Loan Lender Steering Committee, on the other hand, and (ii) the Company, on the one hand, and the Consenting Equityholders, on the other hand, shall consult with such counterparty prior to issuing any press releases or other public notices with respect to the transactions contemplated hereby or the Chapter 11 Plan, and shall provide such counterparty with an opportunity to review and comment on any such press release or other notice a reasonable amount of time (and not less than one day, unless otherwise agreed) before it is made and shall consider in good faith any comments made by such reviewing party, and the Company is expressly permitted to disclose this Agreement or its terms in accordance with any applicable law, rule, or regulation. Notwithstanding the foregoing, any press releases, public documents, or any filings required by applicable state or federal law in each case disclosed by the Company shall be in form and substance reasonably acceptable in all material respects to the Majority Consenting Term Loan Lenders and the Consenting Equityholders.

Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Term Loan Lender, no Party or its advisors shall disclose to any person, other than advisors to the Company, the principal amount of the Term Loans held by such Consenting Term Loan Lender, without such Consenting Term Loan Lender's prior written consent; provided, however, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Term Loan Lender a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant Consenting Term Loan Lender) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate outstanding principal amount of the Term Loans held by all the Consenting Term Loan Lenders collectively.

27

**Section 32.**     **Confidentiality.**

The information in this Agreement is confidential ("Confidential Information").  Each of the Company, the Consenting Term Loan Lenders, and the Consenting Equityholders agrees to only use such Confidential Information for consideration of the transactions contemplated by this Agreement and to keep such information confidential until the earlier of (i) the Petition Date or (ii) the termination of this Agreement. Notwithstanding the foregoing, Consenting Term Loan Lenders and Consenting Equityholders that are fund entities are expressly permitted to share this Agreement with their affiliates and their respective investment advisers.  In all cases, each of the Company, the Consenting Term Loan Lenders and the Consenting Equityholders is expressly permitted to share this Agreement with its managers, directors, officers, members, partners, associates, employees, attorneys, subcontractors, consultants, accountants, auditors, advisors, or agents (collectively, its "Representatives").

**Section 33.**     **No Liability**.

Each of the Company and the Consenting Equityholders acknowledges and agrees that none of the Consenting Term Loan Lenders shall have any liability to any of the Consenting Equityholders as a result of a breach by any Consenting Term Loan Lender of any term of this Agreement, or by any action or failure to take any action by or on behalf of any Consenting Term Loan Lender in connection with this Agreement.

Each of the Company and the Consenting Term Loan Lenders acknowledges and agrees that none of the Consenting Equityholders shall have any liability to any of the Consenting Term Loan Lenders as a result of a breach by any Consenting Equityholder of any term of this Agreement, or by any action or failure to take any action by or on behalf of any Consenting Equityholder in connection with this Agreement.

For the avoidance of doubt, the provisions of this Section 33 only address the rights and obligations as between the Consenting Term Loan Lenders, on the one hand, and the Consenting Equityholders, on the other hand, and nothing in this Section 33 shall limit, impair or release any liability of the Consenting Term Loan Lenders or the Consenting Equityholders, as applicable, to the Company as a result of a breach by any Consenting Term Loan Lender or Consenting Equityholder, as applicable, of any term of this Agreement, or by any action or failure to take any action by or on behalf of any Consenting Term Loan Lender or Consenting Equityholder, as applicable, in connection with this Agreement, and all such rights and remedies of the Company are fully reserved.

**Section 34.**     **Independent Analysis.**

Each of the Company, the Consenting Term Loan Lenders, and the Consenting Equityholders hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

**Section 35.**     **Representation by Counsel.**

Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel, shall have no application and is expressly waived.

**Section 36.**     **No Admissions.**

This Agreement shall in no event be construed as, or deemed to be evidence of, an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims and defenses which it has asserted or could assert.  No Party shall have, by reason of this Agreement, a fiduciary relationship in respect of any other Party or any person or entity, or the Company, and nothing in this Agreement, expressed or implied, is intended to, or shall be construed as to, impose upon any Party any obligation in respect of this Agreement except as expressly set forth herein.

**Section 37.**     **Headings.**

The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

**Section 38.**     **Interpretation.**

This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof.

[SIGNATURE PAGES FOLLOW]

29

**EXHIBIT A TO THE RESTRUCTURING SUPPORT AGREEMENT**

**<u>Term Sheet</u>**

Execution Version

_____

**CUMULUS MEDIA INC., ET AL.**

**RESTRUCTURING TERM SHEET**

**November 29, 2017**

_____

**THIS TERM SHEET AND THE EXHIBITS ATTACHED HERETO (THE "TERM SHEET") DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY EXCHANGE OR PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL BE MADE ONLY IN COMPLIANCE WITH SECTION 4(A)(2) OF THE SECURITIES ACT OF 1933 AND APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE STATUTES, RULES, AND LAWS.**

**THIS TERM SHEET DOES NOT ADDRESS ALL MATERIAL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL RESTRUCTURING AND ANY AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET.[1]**

This Term Sheet sets forth the principal terms of a proposed restructuring (the "Restructuring") of the existing debt of the Company (as defined below) under the Credit Agreement (as defined below), the Senior Notes (as defined below), and certain other obligations of, and existing equity interests in, the Company through a "pre-negotiated" plan of reorganization (the "Chapter 11 Plan") and disclosure statement (the "Disclosure Statement") to be filed by the Company in connection with commencing cases (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Following consummation of the Restructuring, Cumulus (as defined below) shall be referred to herein as "Reorganized Cumulus".

---

[1]    The "Term Lender Group" means the group of Consenting Term Loan Lenders (as defined herein) represented by Arnold & Porter Kaye Scholer LLP on the date hereof, and, in each case, to the extent each such Consenting Term Loan Lender continues to hold Term Loan Claims.  The "Term Lender Group Professionals" consist of Arnold & Porter Kaye Scholer LLP, FTI Consulting, Inc., Fortgang Consulting, LLC and Aloise & Associates, LLC.

| Restructuring Support Parties | |
|---|---|
| Company | Cumulus Media Inc. ("Cumulus") on behalf of itself and certain of its subsidiaries listed on **Annex A** hereto (collectively with Cumulus, the "Company"). |
| Consenting Term Loan Lenders | Certain beneficial holders of, or the investment advisor or the investment manager to certain beneficial holders of, Term Loan Claims (as defined below) representing at least two-thirds of the aggregate amount of all outstanding Term Loan Claims (which shall include, for the avoidance of doubt, the Term Lender Group) (collectively, the "Consenting Term Loan Lenders"), each of whom will execute one or more restructuring support agreements (each an "RSA") binding them to take or refrain from taking certain actions in support of the Restructuring of the Company on terms and conditions materially consistent with this Term Sheet. |
| Consenting Shareholders | Crestview Radio Investors, LLC ("Crestview"), Lewis W. Dickey, Jr., John W. Dickey, Michael W. Dickey, Lewis W. Dickey, Sr., and DDBC, LLC (collectively, the "Dickey Group Stockholders"), and any other stockholder may execute an RSA binding them to take or refrain from taking certain actions in support of the Restructuring and to preserve the value of the Company's tax attributes on terms and conditions materially consistent with this Term Sheet. Any stockholders that have executed such an RSA shall be collectively referred to as the "Consenting Equityholders" and, together with the Company and the Consenting Term Loan Lenders, the "Restructuring Support Parties". For the avoidance of doubt, execution of an RSA or other support for the Restructuring by Crestview, the Dickey Group Stockholders, or any other existing shareholder shall not be a condition of the Restructuring. |
| Proposed Treatment of Claims and Interests Under the Chapter 11 Plan | |
| Administrative, Priority Tax, and Other Priority Claims, Other Secured Claims | Unless a holder of an allowed administrative, priority tax, other priority claim, or other secured claim agrees to a lesser treatment, on the Effective Date (as defined below) or as soon as reasonably practicable thereafter, each holder of such an administrative, priority tax, other priority claim, or other secured claim will, at the option of the Company (with the reasonable consent of the Term Lender Group), (a) be reinstated, (b) receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such claim, cash equal to the full amount of its claim, or (c) with respect to other secured claims, delivery of the collateral security any such claim and payment of any interest required under section 506(b) of the Bankruptcy Code. |
| Term Loan Claims | Unless a holder of a Term Loan Claim (as defined herein) agrees to a lesser treatment, on the Effective Date (as defined below) or as soon as reasonably practicable thereafter, each holder of an allowed Term Loan Claim will receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Term Loan Claim, its *pro rata* share and interest in: <br><br> (a) $1,300 million in principal amount of first lien term loans (the "New First Lien Debt"), the material terms of which are set forth on **Annex B** hereto, to be deemed borrowed by Reorganized Cumulus pursuant to |

2

|  | the Chapter 11 Plan on the Effective Date. |
|  | (b) 83.5% of the issued and outstanding amount of the sole class of equity to be issued by Reorganized Cumulus (the "Reorganized Common Equity"), subject to dilution on account of the Post-Emergence Equity Incentive Program (as defined below).<br><br>As used in this Term Sheet, "Term Loan Claims" means all claims (as defined in section 101(5) of the Bankruptcy Code) against the Company arising under, relating to, or in connection with that certain Amended and Restated Credit Agreement, dated as of December 23, 2013, among Cumulus and Cumulus Media Holdings Inc., as borrower, certain lenders party thereto (the "Term Lenders"), and JPMorgan Chase Bank, N.A., as administrative agent (the "Agent") (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement"). As of the date hereof, the total outstanding principal amount of the Company's obligations under the Credit Agreement is approximately $1,729 million (the "Term Loans"). The Term Loan Claims will continue to accrue interest at the non-default rate on the terms set forth in the Credit Agreement and payments shall be made in cash, as adequate protection, on a current basis on the terms set forth in the Cash Collateral Order; *provided*, that the Consenting Term Loan Lenders reserve the right to assert the imposition of default interest if the Consenting Term Loan Lender RSAs are terminated in accordance with their terms.<br><br>Notwithstanding the foregoing, the Company and the Term Lender Group may determine, in their reasonable discretion, to provide the Term Lenders an alternative bundling of the New First Lien Debt and the Reorganized Common Equity contemplated herein, through a restricted issuance of the Reorganized Common Equity to be issued to electing Term Lenders that may be collateralized loan obligation funds (the "CLO Holders") to address, among other things, certain structural limitations and requirements of the CLO Holders in holding equity securities; provided that, the imposition of such an alternative structure or restricted issuance shall not adversely affect the proposed treatment of the Term Loan Claims as set forth herein, the Company, the CLO Holders or the Term Lenders. |
| Convenience Claims | Unless a holder of an allowed Convenience Claim (as defined below) agrees to lesser treatment, on or as soon as reasonably practicable following the Effective Date, each holder of an allowed Convenience Claim will receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such allowed Convenience Claim, cash in an amount equal to 100% of the allowed Convenience Claim; *provided* that cash distributions to holders of allowed Convenience Claims shall not exceed $2 million in the aggregate without the prior written consent of the Term Lender Group.<br><br>As used in this Term Sheet, a "Convenience Claim" means a general unsecured claim that is either (a) equal to or less than $20,000 or (b) greater than $20,000, but with respect to which the holder thereof voluntarily reduces the aggregate amount of such claim to $20,000 pursuant to an election by the claimholder made on the ballot provided for voting on the Chapter 11 Plan by the voting deadline. |
| Senior Notes Claims | Unless a holder of an allowed Senior Notes Claim (as defined below) agrees to a lesser treatment, on or as soon as reasonably practicable following the Effective Date, each holder of an allowed Senior Notes Claim will receive, |

3

| | |
|---|---|
| | in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such allowed Senior Notes Claim, its *pro rata* share and interest (calculated based on the aggregate amount of allowed Senior Notes Claims and allowed General Unsecured Claims, in each case, as defined below) in 16.5% of the Reorganized Common Equity, subject to dilution on account of the Post-Emergence Equity Incentive Program (as defined below) (the "Unsecured Equity Recovery Pool"). |
| | As used in this Term Sheet, "Senior Notes Claims" means all claims (as defined in section 101(5) of the Bankruptcy Code) against the Company arising under, relating to, or in connection with the Company's 7.75% Senior Notes due 2019 (the "Senior Notes") issued pursuant to that certain Indenture, dated as of May 13, 2011, by and between the Company, the guarantors named therein, and U.S. Bank National Association, as trustee, transfer agent, registrar, authentication agent, and paying agent (as amended, restated, supplemented, or otherwise modified from time to time, the "Senior Notes Indenture").  As of the date hereof, the total outstanding principal amount of the Company's obligations under the Senior Notes Indenture is $610 million. |
| General Unsecured Claims[2] | Unless a holder of an allowed General Unsecured Claim (as defined below) agrees to a lesser treatment, on or as soon as reasonably practicable following the Effective Date, each holder of an allowed General Unsecured Claim will receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such allowed General Unsecured Claim, its *pro rata* share and interest (calculated based on the aggregate amount of allowed Senior Notes Claims and allowed General Unsecured Claims) in the Unsecured Equity Recovery Pool. |
| | As used in this Term Sheet, "General Unsecured Claims" means all non-priority unsecured claims of the Company other than Senior Notes Claims and Convenience Claims. |
| Section 510(b) Claims | The Section 510(b) Claims (as defined below) shall be subordinated to all other claims against the Company. |
| | On the Effective Date, each holder of a Section 510(b) Claim shall receive no distribution on account thereof and each Section 510(b) Claim shall be discharged. |
| | As used in this Term Sheet, "Section 510(b) Claims" means all claims (as defined in section 101(5) of the Bankruptcy Code) against the Company that are described in section 510(b) of the Bankruptcy Code.  Pursuant to section 510(b) of the Bankruptcy Code, the Merlin Claims (as defined below) will be classified as Section 510(b) Claims. |
| | As used in this Term Sheet, "Merlin Claims" means all claims (as defined in section 101(5) of the Bankruptcy Code) against the Company arising under, relating to, or in connection with that certain Put and Call Agreement, dated as of January 2, 2014, by and among Merlin Media, LLC, Merlin Media License, LLC, Chicago FM Radio Assets, LLC, and Radio License |

---

[2]    The Company reserves the right to preserve ongoing trade / landlord / on-air talent relations through (i) critical vendor relief, (ii) on-air talent relief, and/or (iii) contract and lease assumption, with any motions or other Bankruptcy Court pleadings seeking authority to make payments on account of prepetition unsecured claims to entities identified in (i) - (iii) subject to the prior consent of the Term Lender Group (which consent shall not be unreasonably withheld).

| | |
|---|---|
| | Holdings LLC for WLUP-FM and WIQI(FM) (the "Put/Call Agreement"). |
| Cumulus Interests | On the Effective Date, each holder of an allowed Cumulus Interest shall receive no distribution on account thereof and each Cumulus Interest shall be cancelled. |
| | As used in this Term Sheet, "Cumulus Interest" means any common stock, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interest, unit, or share in Cumulus (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in Cumulus), whether or not arising under or in connection with any employment agreement and whether or not certificated, vested, transferable, preferred, common, voting, or denominated "stock" or a similar security. |
| Intercompany Claims | All claims held by one Company entity against any other Company entity will be, at the option of the Company (with the reasonable consent of the Term Lender Group), either (a) reinstated, or (b) discharged without any distribution on account of such claims. |
| Intercompany Interests | All interests held by one Company entity in any other Company entity will be, at the option of the Company (with the reasonable consent of the Term Lender Group), either (a) reinstated or (b) cancelled without any distribution on account of such interests. |
| **Implementation** | |
| Claims Resolution Matters | Prior to the Effective Date of the Chapter 11 Plan, the Company shall not enter into any agreements with holders of claims or interests relating to the allowance, estimation, validity, extent or priority of such claims or interests, or the classification and treatment of such claims or interests under the Chapter 11 Plan, without the reasonable consent of the Term Lender Group, except for (i) claims which the Company is authorized to pay pursuant to an applicable first day order; (ii) undisputed administrative claims arising postpetition in the ordinary course of business; and (iii) claims for which the allowed amount is less than $1.0 million. |
| Use of Cash Collateral | In connection with the Chapter 11 Cases, the Consenting Term Loan Lenders shall consent to the use of cash collateral (as such term is defined in the Bankruptcy Code) (including the proceeds of collateral), subject to customary terms and conditions. |
| Definitive Documentation | As soon as reasonably practicable, the Restructuring Support Parties will execute definitive documentation implementing the Restructuring in form and substance materially consistent with this Term Sheet. |
| ABL/Revolving Facility | On the Effective Date, Reorganized Cumulus shall have the option, in its sole discretion, to enter into (i) a new revolving credit facility (which may or may not be an ABL) or a receivable securitization facility, subject to a borrowing base consisting of accounts receivable, or (ii) a new revolving loan facility secured by substantially all of the Reorganized Cumulus's assets on a *pari passu* basis with the New First Lien Debt, in either case providing commitments of up to $50 million in the aggregate (the "New Revolving Facility"). If the Company elects to exercise this option, the |

| | |
|---|---|
| | New Revolving Facility shall be undrawn on the Effective Date. For the avoidance of doubt, (i) on the Petition Date, the revolving credit facility under the existing Credit Agreement shall be terminated and cancelled, and (ii) on the Effective Date, any outstanding Obligations (as defined in the Credit Agreement) as of the Effective Date with respect to the revolving credit facility under the existing Credit Agreement shall be paid in full in cash. |
| Conditions Precedent to Effectiveness of Plan | The court order confirming the Chapter 11 Plan (the "Confirmation Order") shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in or contemplated by, or necessary to effectuate the Chapter 11 Plan, including the borrowings by Reorganized Cumulus under the New First Lien Debt and the New Revolving Facility, and the issuance of all securities, instruments, certificates and other documents required to be issued pursuant to the Restructuring.<br><br>The "Effective Date" shall occur upon the satisfaction or waiver by the Company and the Term Lender Group of the following conditions precedent:<br><br>(1) the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance satisfactory to the Term Lender Group and the Company;<br><br>(2) the Company shall have obtained all authorizations, consents, regulatory approvals, rulings, waivers or other documents that are necessary to implement and effectuate the Chapter 11 Plan and evidence thereof shall have been delivered to the Term Lender Group;<br><br>(3) the payment by the Company of (a) all reasonable and documented fees and out-of-pocket expenses payable to the Agent (including one counsel to the Agent), and (b) all reasonable and documented fees and out-of-pocket expenses of Arnold & Porter Kaye Scholer LLP, FTI Consulting Inc., Fortgang Consulting, LLC and Aloise & Associates, LLC, in either case incurred in connection with the preparation, negotiation, or execution of the Restructuring, this Term Sheet, the Chapter 11 Plan, and other matters relating to the Credit Agreement; *provided, that,* except with respect to the fees and expenses of Arnold & Porter Kaye Scholer LLP and FTI Consulting Inc., in no event shall the fees and expenses of Term Lender Group Professionals (i) incurred prior to the RSA Effective Date exceed $75,000 in the aggregate and (ii) incurred between the RSA Effective Date (as defined in the RSA) and the Effective Date exceed $150,000 in the aggregate, or such higher amount that shall be subject to the prior written consent of the Company, such consent not to be unreasonably withheld; and<br><br>(4) the Company shall have satisfied all conditions precedent set forth in the credit agreement evidencing the New First Lien Debt. |

**Corporate Governance and Management Incentive Plans**

| | |
|---|---|
| Board of Directors | The Board of Directors of Reorganized Cumulus (the "New Board") shall consist of Mary Berner, as President and Chief Executive Officer of the |

| | Company, and six (6) directors chosen by the Term Lender Group. Prior to the filing of the Chapter 11 Cases, the Term Lender Group shall appoint a committee responsible for interviewing and selecting the six additional directors (the "<u>Selection Committee</u>"). The Chief Executive Officer of the Company shall have the right to interview potential director candidates selected by the Term Lender Group and consult with the Term Lender Group regarding such candidates. The Selection Committee may take recommendations for potential directors from the Chief Executive Officer, a qualified search firm, or any Consenting Term Loan Lender.<br><br>The initial term of the New Board will be through the date of the 2019 annual meeting. The members of the New Board will be identified at or prior to the Effective Date. |
|---|---|
| Corporate Governance Documents | In connection with the consummation of the Chapter 11 Plan, and consistent with section 1123(a)(6) of the Bankruptcy Code, Reorganized Cumulus shall adopt customary corporate governance documents, including an amended and restated certificate of incorporation, bylaws, and a shareholders' agreement, the terms of which shall be satisfactory in all respects to the Term Lender Group and the Company (collectively, the "<u>Corporate Governance Documents</u>").<br><br>Existing corporate governance documents will be amended and restated or terminated, as necessary, to, among other things, set forth the rights and obligations of the parties (consistent with this Term Sheet), the terms of which shall be satisfactory in all respects to the Term Lender Group and the Company. The Corporate Governance Documents shall provide, among other things, (i) that the Chief Executive Officer of the Company shall at all times be a member of the Board of Directors, (ii) for ordinary and customary indemnification obligations of the Company, and (iii) to the extent the Reorganized Common Equity is not traded on a public exchange, the Company shall provide shareholders with quarterly and annual reports similar in form to SEC forms 10-Q and 10-K, respectively, through a portal accessible to shareholders.<br><br>Notwithstanding anything to the contrary in this Term Sheet, the Company's indemnification obligations in place as of the date hereof, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the benefit of the Company's current and former directors and officers, shall be assumed on the Effective Date. |
| Existing Management Employment Agreements | All employment and compensation-related agreements of the Company as of the Petition Date, including any indemnification and severance obligations, and incentive compensation plans related thereto, shall be assumed. Each Restructuring Support Party shall support any motion the Company files seeking authority to assume any management employment agreements, management consulting agreements, and other employee compensation-related agreements that are existing and effective as of the Petition Date (and which, for the avoidance of doubt, are not entered into by the Company on or after the Petition Date). |
| Issuance of Reorganized Common | It is the intent of the parties that any "securities" as defined in section 2(a)(1) |

7

| Equity Under the Chapter 11 Plan | of the Securities Act of 1933 issued under the Chapter 11 Plan, except with respect to any entity that is an underwriter, shall be exempt from registration under U.S. state and federal securities laws pursuant to section 1145 of the Bankruptcy Code and Reorganized Cumulus will utilize section 1145 of the Bankruptcy Code, or to the extent that such exemption is unavailable, shall utilize any other available exemptions from registration, as applicable. |
|---|---|
| Management Incentive Plans | The material terms of the management equity incentive program (the "Post-Emergence Incentive Equity Program") are set forth on **Annex C**. |

| **Regulatory** | |
|---|---|
| Regulatory Requirements | All parties shall abide by, and use their commercially reasonable efforts to obtain, any regulatory and licensing requirements or approvals to consummate the Restructuring as promptly as practicable including, but not limited to requirements or approvals that may arise as a result of such party's equity holdings in Reorganized Cumulus. |

| **Miscellaneous Provisions** | |
|---|---|
| Additional Plan Provisions and Documentation | The Chapter 11 Plan shall contain other customary provisions for chapter 11 plans of this type.  The Chapter 11 Plan, plan supplement, Disclosure Statement, form of Chapter 11 Plan ballots, Confirmation Order and Corporate Governance Documents shall be in form and substance satisfactory to the Term Lender Group and the Company in all respects. |
| Fiduciary Duties | Nothing in this Term Sheet or any RSA shall require the Company to take any action, or to refrain from taking any action, if doing so would be inconsistent with its fiduciary obligations under applicable law (as reasonably determined by it) (any such determination, a "Fiduciary Decision"); *provided*, that the Company shall provide notice of any such Fiduciary Decision to counsel to the Term Lender Group via email within one (1) day of the date of such determination. |
| Releases/Exculpation | The Chapter 11 Plan and the Confirmation Order will provide full releases (including debtor and third-party releases) and exculpation provisions for the benefit of the Company, Reorganized Cumulus, the Agent, the Consenting Term Loan Lenders, the Consenting Equityholders, the manager, management company or investment advisor of any of the foregoing, and, each of such entities' respective current and former affiliates, and such entities' and their current and former affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, independent contractors, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such. |

| | |
|---|---|
| Tax Issues | To the extent possible, the Restructuring contemplated by this Term Sheet shall be structured so as to obtain the most beneficial tax structure for Reorganized Cumulus and the holders of the Reorganized Common Equity as reasonably determined by the Company and the Term Lender Group including, without limitation, with respect to the sale of the Company's property in Bethesda, Maryland, during the Chapter 11 Cases. |
| Professional Fees | As adequate protection against the diminution in value of the Term Lenders' Collateral (as defined in the Credit Agreement) during the pendency of the Chapter 11 Cases, the Company shall pay the reasonable and documented fees and out-of-pocket expenses of (i) the Term Lender Group Professionals (to the extent set forth in the Cash Collateral Order), and (ii) the Agent, including one primary counsel to the Agent, in each case on a current basis during the Chapter 11 Cases. |

### Annex A

## Cumulus Subsidiaries

- Cumulus Media Inc.
- Cumulus Media Holdings Inc.
- Consolidated IP Company LLC
- Broadcast Software International
- Incentrev-Radio Half Off, LLC
- Cumulus Intermediate Holdings Inc.
- Incentrev LLC
- Cumulus Network Holdings Inc.
- Cumulus Radio Corporation
- LA Radio, LLC
- KLOS-FM Radio Assets, LLC
- Detroit Radio, LLC
- DC Radio Assets, LLC
- Chicago FM Radio Assets, LLC
- Chicago Radio Assets, LLC
- Atlanta Radio, LLC
- Minneapolis Radio Assets, LLC
- NY Radio Assets, LLC
- Radio Assets LLC
- San Francisco Radio Assets, LLC
- WBAP-KSCS Assets, LLC
- WPLJ Radio, LLC
- Westwood One, Inc.
- CMP Susquehanna Radio Holdings Corp.
- Cumulus Broadcasting LLC
- Dial Communications Global Media, LLC
- Radio Networks, LLC
- Westwood One Radio Networks, Inc.
- CMP Susquehanna Corp.
- Catalyst Media, Inc.
- CMI Receivables Funding LLC
- Susquehanna Pfaltzgraff Co.
- CMP KC Corp.
- Susquehanna Media Corp.
- Susquehanna Radio Corp.
- KLIF Broadcasting, Inc.
- Radio Metroplex, Inc.

## Annex B

### CUMULUS NEW FIRST LIEN DEBT

### PRINCIPAL TERMS AND CONDITIONS[1]

| | |
|---|---|
| **BORROWER:** | Reorganized Cumulus |
| **GUARANTORS:** | The direct parent of Reorganized Cumulus (the "Parent") and all present and future wholly-owned subsidiaries of the Parent (subject to exceptions that are substantially consistent with those set forth in the Existing Credit Agreement, excluding any exception for Unrestricted Subsidiaries) (collectively, the "Guarantors"). |
| **AMOUNT OF NEW FIRST LIEN DEBT:** | $1.3 billion.<br><br>There will no ability for the Borrower or its Subsidiaries to incur or obtain any incremental term or revolving loans (or commitments) under the documentation evidencing the New First Lien Debt. |
| **ADMINISTRATIVE AGENT:** | JPMorgan Chase Bank, N.A. (or, to the extent JPMorgan Chase Bank, N.A. does not serve in such capacity, another institution selected by the Term Lender Group and reasonably acceptable to the Borrower) (the "Agent") |
| **INTEREST RATE:** | LIBOR *plus* 4.50% per annum., subject to a  LIBOR floor of 1.00% (the "LIBOR Loans") or, at the Borrower's option, ABR *plus* 3.50% per annum, subject to a ABR floor of 2.00%. |
| **MATURITY DATE:** | May 15, 2022 |
| **AMORTIZATION:** | One percent (1%) of the aggregate outstanding principal amount of the New First Lien Debt as of the Effective Date shall be payable annually to be repaid in equal quarterly installments.  The remainder of the aggregate outstanding principal amount of the New First Lien Debt shall be payable at maturity.  Scheduled amortization payments to be reduced by all optional prepayments and mandatory prepayments (e.g., prepayments made with asset sale proceeds) in inverse order of maturity. |

---

[1] Capitalized terms used herein and not defined herein shall have the meanings set forth in the Term Sheet to which this Annex B is attached, or if not defined in the Term Sheet, in the Credit Agreement referred to in the Term Sheet (such Credit Agreement, the "Existing Credit Agreement").

**SECURITY:**    The New First Lien Debt will be secured by first priority security interests in all the assets of the Borrower and the Guarantors in a manner substantially consistent with the Existing Credit Agreement; _provided_, that (i) the Borrower and Guarantors shall not be required to grant a lien on any real property that is not owned US real property, (ii) any real property assets having a value of less than $500,000 shall either be (x) subject to a mortgage in favor of the Administrative Agent or (y) excluded from any requirement to obtain a mortgage; provided that the aggregate value of all real properties not subject to a mortgage in favor of the Administrative Agent in reliance of this clause (y) shall not exceed $25.0 million and (iii) if applicable, the New First Lien Debt will be secured by a second priority security interest in accounts receivable and other customary collateral for a receivables-based asset-based credit facility of the Borrower and Guarantors and the proceeds thereof (collectively, "ABL Priority Collateral") to the extent securing a Permitted Revolver (as defined below), and (to the extent there is a Permitted Revolver) the New First Lien Debt will otherwise be subject to customary cross-lien provisions with such Permitted Revolver. Within 60 days after the Effective Date (or such later date as reasonably agreed by the Agent), the Borrower and Guarantors will enter into control agreements in favor of the Agent on all deposit accounts (other than certain customary exceptions to be agreed, including tax, payroll and trust accounts, zero balance accounts, sweep accounts and accounts with a value equal to or lower than an average monthly balance of $500,000 (subject to an aggregate exclusion of $5.0 million for such accounts with an average monthly balance that is equal to or lower than $500,000)).

The Borrower and Guarantors shall have up to 180 days after the Effective Date (or such later date as agreed by the Agent), to execute and deliver any mortgages or other related documentation to perfect any liens required to be granted over any real property.

The priority of the security interests and related creditor rights between the New First Lien Debt and a Permitted Revolver will be set forth in an intercreditor agreement customary for facilities of this type and otherwise on terms and conditions reasonably satisfactory to the Term Lender Group and the Borrower.

**MANDATORY PREPAYMENTS**    The New First Lien Debt will be subject to mandatory prepayment on substantially similar terms as are set forth in the Existing Credit Agreement; _provided that_

(i) all of the cash proceeds of the sale of the Baltimore property, net of actual out of pocket closing costs and applicable taxes required to be paid in cash (and other customary reductions consistent with the definition of "Net Proceeds" in the Existing Credit Agreement), shall be applied to repay the New First Lien Debt;

(ii) all of the cash proceeds of the sale of (x) other real estate or (y) other assets not used in the normal course of business, in each case net of

2

actual out of pocket closing costs and applicable taxes required to be paid in cash (and other customary reductions consistent with the definition of "Net Proceeds" in the Existing Credit Agreement), shall be applied to repay the New First Lien Debt;

(iii) Net Cash Proceeds (as defined in the Existing Credit Agreement) of the sale of operating assets used in the ordinary course of business may, at the option of the Borrower, be either (x) reinvested solely during the 12 month period following such sale in other assets that are useful in the business of the Borrower and Guarantors, but only to the extent such assets are (or will become) Collateral or (y) applied to repay the First Lien Debt;

(iv) any rights to reinvest asset sale proceeds will not include the right to apply such proceeds to maintenance operating expenses; but will, for the avoidance of doubt, include the right to apply such proceeds to maintenance or other capital expenditures;

(v) unrestricted cash of the Borrower and its Subsidiaries above $35 million on the Effective Date will be swept to repay the New First Lien Debt on the Effective Date, which amount will be calculated on the Effective Date net of any payments made or to be made in satisfaction of the Put/Call Agreement that are reasonably acceptable to the Term Lender Group;

(vi) commencing with the fiscal year of Borrower ending on or about December 31, 2018, 75% of Excess Cash Flow, with a reduction to 50% based upon achievement of Consolidated Total Net Leverage Ratio not exceeding 4.5 to 1.0; provided that any voluntary par prepayments of the New First Lien Debt or permitted repurchases of the New First Lien Debt (as set forth below under the section of this term sheet entitled "Optional Prepayments") shall be credited against Excess Cash Flow prepayment obligations on a dollar-for-dollar basis (and, in the case of the New First Lien Debt prepaid or repurchased at a discount to par, with such reduction of the amount of Excess Cash Flow prepayments being equal to the amount of cash spent to make such prepayment or repurchase (as opposed to the face amount of loans so prepaid)) to the extent such prepayment is financed with Internally Generated Cash (as defined below).

**OPTIONAL PREPAYMENTS:**  For a period of 6 months following issuance of the New First Lien Debt (the "Call Protection Period"), the New First Lien Debt may be voluntarily prepaid in whole or in part only if such voluntary prepayment is accompanied by a premium equal to 1% of the principal amount of the outstanding New First Lien Debt so prepaid. Upon expiration of the Call Protection Period, the New First Lien Debt may be voluntarily prepaid in whole or in part without premium or penalty, except for any breakage costs associated with LIBOR Loans. In addition, the New First Lien Debt shall be permitted to be prepaid or repurchased at a discount to par consistent with the Existing Credit Agreement, except that (x) such prepayments and repurchases shall be

3

|  | limited to $50 million per year, (y) after giving effect to any such prepayment or repurchase, the Borrower and its Subsidiaries shall have cash and availability under a Permitted Revolver of at least $25 million in the aggregate and (z) any such prepaid or repurchased First Lien Debt shall be automatically cancelled. |
|---|---|
| **REPRESENTATIONS AND WARRANTIES:** | Substantially similar to those set forth in the Existing Credit Agreement, with such changes as are agreed to by the Borrower and the Term Lender Group. |
| **AFFIRMATIVE COVENANTS:** | Substantially similar to those set forth in the Existing Credit Agreement, with such changes as are set forth below under the section of this term sheet entitled "Certain Specified Exceptions" or as are otherwise agreed to by the Borrower and the Term Lender Group. |
| **NEGATIVE COVENANTS:** | Substantially similar to those set forth in the Existing Credit Agreement, with such changes as are set forth below under the section of this term sheet entitled "Certain Specified Exceptions" or as are otherwise agreed to by the Borrower and the Term Lender Group.  For the avoidance of doubt, the affirmative covenant set forth in Section 7.13 of the Existing Credit Agreement shall continue to apply to the New First Lien Debt, including the provisions thereof requiring that the Borrower use commercially reasonable efforts to obtain and maintain ratings from Moody's and Standard & Poor's for the New First Lien Debt. |
| **FINANCIAL COVENANTS:** | No maintenance financial covenants. |
| **CERTAIN SPECIFIED EXCEPTIONS** | The documentation evidencing the New First Lien Debt will contain terms and provisions that are substantially consistent with those set forth in the Existing Credit Agreement, except (w) as otherwise set forth in this term sheet, (x) as otherwise agreed to by the Borrower and the Term Lender Group, (y) to remove provisions that are no longer relevant for the New First Lien Debt and (z) for the revisions listed on <u>Schedule I</u> to this Annex B. |
| **EVENTS OF DEFAULT:** | Substantially similar to those set forth in the Existing Credit Agreement, with such changes as are agreed to by the Borrower and the Term Lender Group. |
| **CONDITIONS PRECEDENT:** | Substantially similar to those set forth in the Existing Credit Agreement, with such changes as are agreed to by the Borrower and the Term Lender Group. |

| | |
|---|---|
| **ASSIGNMENTS:** | Substantially similar to those set forth in the Existing Credit Agreement, with the removal of assignments to Affiliated Lenders (except for, the avoidance of doubt, repurchases at a discount as and to the extent provided under the section of this term sheet entitled Optional Prepayments) and such other changes as are agreed to by the Borrower and the Term Lender Group. |
| **AMENDMENTS, WAIVERS AND CONSENTS:** | Substantially similar to those set forth in the Existing Credit Agreement, with such changes as are agreed to by the Borrower and the Term Lender Group. |
| **GOVERNING LAW:** | New York. |

**SCHEDULE I to ANNEX B**

| PROVISION IN EXISTING CREDIT AGREEMENT | CHANGE TO BE MADE |
|---|---|
| Provisions relating to the revolving credit facility provided in the Existing Credit Agreement | Provisions removed. <br><br> Borrower and the Guarantors will be permitted to obtain a new revolving credit facility (which may or may not be an ABL) or a receivable securitization facility (but not both) secured by some or all of the collateral securing the New First Lien Debt; provided, that (i) the aggregate principal amount of such revolving credit facility or securitization facility (including the commitments thereunder) shall not at any time exceed $50 million, (ii) any cash-flow revolving credit facility may be secured by the Collateral on a pari passu basis with the New First Lien Debt, (iii) in the case of a revolving credit facility in the form of an ABL, except for liens on ABL Priority Collateral (which liens on such ABL Priority Collateral securing the ABL may be senior to the liens on such ABL Priority Collateral securing the New First Lien Debt), the liens securing the New First Lien Debt shall be senior to the liens securing such new revolving credit facility and (iv) in the case of a revolving credit facility (other than a securitization facility), such liens shall be subject to an intercreditor agreement, which shall be customary for transactions of this type and otherwise on terms and conditions reasonably satisfactory to the Required Lenders (such revolving facility or securitization facility satisfying the requirements herein being referred to herein as a "Permitted Revolver"). Except as provided above, the terms and provisions regarding a securitization facility in the documentation evidencing the New First Lien Debt shall be substantially consistent with those set forth in the Existing Credit Agreement. |
| Available Amount (and related uses throughout Existing Credit Agreement) | Provisions remain with removal of parts of the definition that are no longer relevant except that (i) the starting amount (clause (a) of the definition of Available Amount) shall be $50 million and (ii) the Available Amount shall only be permitted to be used to increase the amount of Investments by the Borrower and its Restricted Subsidiaries (and not for Restricted Payments or any other purpose) |
| Change in Control | Clause (a) of the definition revised to provide as follows: <br><br> "(a) the acquisition of ownership, directly or indirectly, |

| | |
|---|---|
| | beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the Restatement Effective Date), of Capital Stock representing more than 50% of the aggregate ordinary active voting power represented by the issued and outstanding Capital Stock of Parent". |
| | Clause (b) of the definition revised to provide as follows: |
| | "(b) [reserved]." |
| | This provision would relate to whether the acquisition of voting Capital Stock is as a result of a merger transaction with the Parent or otherwise. |
| Consolidated EBITDA | Addback in clause (iii) for extraordinary cash losses capped at $20 million in the aggregate for any applicable four (4) fiscal quarter period |
| | Addback in clause (m) for cost savings and synergies capped at $20 million in the aggregate for any applicable four (4) fiscal quarter period |
| | Addback in clause (n) for monitoring fees, management fees or similar fees paid to Affiliates removed |
| | Addback to be included with respect to Restructuring Related Expenses (as defined below). |
| Provisions in the definitions of Consolidated First Lien Net Leverage Ratio, Consolidated Senior Secured Net Leverage Ratio and Consolidated Total Net Leverage Ratio relating to unrestricted cash and Cash Equivalents that can be netted against applicable debt | Requirement added that the cash and Cash Equivalents netted has to be subject to a first priority perfected Lien in favor of the Administrative Agent or, in the case of Cash and Cash Equivalents constituting ABL Priority Collateral,  a second priority perfected lien. |
| Excess Cash Flow | Deductions listed in clauses (b)(ii), (b)(iii), (b)(vi) and (b)(vii) of the definition of Excess Cash Flow permitted only to the extent financed with Internally Generated Cash. |
| | "Internally Generated Cash" to be defined as cash generated from the operations of the business of Borrower and its Restricted Subsidiaries; *provided* that, notwithstanding the forgoing, "Internally Generated Cash" shall not include (i) the proceeds of any long-term Indebtedness (other than revolving indebtedness), (ii) the proceeds of the issuance of any Capital Stock, (iii) the proceeds of any Reinvestment Deferred Amount or (iv) solely to the extent not increasing consolidated net income of the Borrower during the applicable period, the |

| | proceeds of any insurance, indemnification or other payments from non-Loan Party Affiliates. |
|---|---|
| | Excess Cash Flow to also contain a deduction in clause (b) of the definition thereof for, to the extent not reducing consolidated net income of the Borrower for the applicable period, the amount of unpaid administrative costs and unpaid professional fees in connection with the Restructuring (the "Restructuring Related Expenses") that have not been deducted from Excess Cash Flow (or otherwise reduced Excess Cash Flow or consolidated net income) in a prior period. |
| Permitted Refinancing | The definition of Permitted Refinancing to add a requirement that to the extent the Indebtedness being refinanced is unsecured, the refinancing Indebtedness shall be unsecured |
| Unrestricted Subsidiaries | All provisions relating to Unrestricted Subsidiaries (including, without limitation, the ability of the Borrower to designate Unrestricted Subsidiaries) to be removed |
| Incremental Facilities | All provisions relating to Incremental Facilities (including, without limitation, the provisions of Section 4.25 of the Credit Agreement permitting the Borrower to obtain an Incremental Facility) to be removed |
| Section 7.10 [Pledges of Capital Stock of joint ventures] | Add requirement, solely with respect to new joint ventures formed after the Effective Date, to have the Capital Stock of such joint venture pledged to the Administrative Agent to secure the Obligations (or, to the extent not permitted under the applicable organizations documents of the applicable joint venture, the Borrower or applicable Subsidiary shall use commercially reasonable efforts to have such Capital Stock held by a Subsidiary Guarantor that does not have (x) any other assets (other than the Capital Stock of other such joint ventures) and (y) any other Indebtedness or material liabilities, other than the New First Lien Debt) |
| Section 8.2(f) [Indebtedness assumed or acquired in a Permitted Acquisition by a non-Loan Party] | Reduce basket from $75 million to $25 million |
| Section 8.2(g) [Letters of credit basket] | Increase basket for letters of credit from $10 million to $20 million (and allow cash to be deposited with the applicable letter of credit issuers up to 105% of the face amount of such letters of credit to backstop or cash collateralize such letters of credit) |
| Section 8.2(j) [Purchase money indebtedness and capital leases] | Decrease basket from $100 million to $25 million |
| Section 8.2(o) [Unlimited incurrences of Indebtedness if Consolidated Total Net Leverage Ratio is less than or equal to 6.25 to 1.00] | Delete in its entirety, and instead provide a $10 million basket for incurrences of debt secured on a junior lien basis. |
| Section 8.2(p) [General debt basket for unsecured debt] | Revise to provide a basket for unsecured Indebtedness at any time outstanding in an amount not to exceed the |

| | greater of (x) $50 million and (y) such amount that would not cause the Consolidated Total Leverage Ratio to exceed 5.5x |
|---|---|
| Section 8.2(q) [Basket for junior lien secured or unsecured notes] | Delete in its entirety |
| Section 8.3(p) [General basket for liens incurred in the ordinary course of business] | Replace with a $10 million basket |
| Section 8.3(z) [General basket for liens that are pari passu or junior to the Obligations] | Delete in its entirety |
| Section 8.3(bb) [Basket for liens securing junior lien secured or unsecured notes] | Delete in its entirety |
| Section 8.5 [Restriction on transfers of all or substantially all of the assets of the Borrower or any Restricted Subsidiary to any Unrestricted Subsidiary or Foreign Subsidiary] | Replace this provision with a restriction on transfers of all or substantially all of the assets of the Borrower or any Restricted Subsidiary to any Person that is not the Borrower or a Subsidiary Guarantor |
| Section 8.6(c) [Sales, leases or transfers to the Borrower or a wholly-owned Restricted Subsidiary that is a Domestic Subsidiary] | Revise this provision to just allow a Restricted Subsidiary to consummate sales, leases and transfers to the Borrower or to a wholly-owned Restricted Subsidiary that is a Domestic Subsidiary of the Borrower and a Guarantor |
| Section 8.7(b) [Investments in Subsidiaries that are not Subsidiary Guarantors] | Decrease basket from $25 million to $10 million |
| Section 8.7(k) [Permitted Acquisitions] | Limitation on acquisitions of Persons that do not become Subsidiaries Guarantors deleted and replaced with an overall cap on Permitted Acquisitions of $75 million. Ratio test in clause (ii) remains the same. |
| Section 8.7(u) [General investment basket] | Reduce basket to $50 million |
| Section 8.8(c) and (d) [Management stock buybacks and payments under employee benefit plans] | Combine into a single basket of $5 million per year, with a carryforward of unused amounts up to a $10 million maximum amount in any year |
| Section 8.8(b) [General basket for Restricted Payments] | Basket changed to be a $10 million per fiscal year basket for dividends and distributions and stock repurchases |

**<u>Annex C</u>**

**CUMULUS MEDIA INC.**

**MANAGEMENT INCENTIVE PLAN**

# CUMULUS MEDIA INC.

## MANAGEMENT INCENTIVE PLAN

The following term sheet (this "Term Sheet") summarizes the principal terms of an Management Incentive Plan (the "Plan") to be sponsored by Cumulus Media Inc. (the "Company") and its subsidiaries (collectively, the "Company Group") and of grants to be made under the Plan upon the effectiveness of the Company's confirmed plan of reorganization ("Emergence").

| | |
|---|---|
| *Overview:* | • **Incentive Equity Pool.** There will be reserved, exclusively for members of the Company's board of directors and senior management employees, a pool of equity equal to 10% of the Company's common stock outstanding at Emergence on a fully diluted and fully distributed basis (such reserve, the "EIP Pool"), with 9.25% of the EIP Pool allocated for senior management employees (the "Management Pool") and 0.75% of the EIP Pool (the "Board Pool") allocated for members of the new Board of Directors of the Company (the "New Board"). The precise amount of equity and number of shares to be reserved will be determined in a manner consistent with the intended effect of this Term Sheet. |
| | • **Emergence Grants.** Fifty-five percent (55%) of the Management Pool will be allocated at Emergence (the "Emergence Grants") in accordance with this Term Sheet and the allocations set forth on Appendix A. Each Emergence Grant will be 50% in the form of restricted stock units ("RSUs") and 50% in the form of five (5) year stock options ("Options") priced at a per share value equating to $513.77 million equity value. |
| | • **Other Awards.** The forty-five percent (45%) remaining balance of the Management Pool (the "Other Awards") will be granted to the Company's senior management after Emergence in the form of equity-based awards as determined by the New Board, after consultation with the Compensation Committee and taking into consideration the then prevailing practices of the Company's publicly traded peer group. |
| | • **Board Pool.** The Board Pool will be issued as RSUs and/or Options allocated evenly among the non-executive members of the New Board at Emergence, except that a non-executive Chairman may receive up to a double allocation with the approval of the Steering Committee. |
| | • **2018 Incentive Cash Compensation.** Management agrees to tie target 2018 incentive cash compensation to $236 million of EBITDA for 2018. |
| *Vesting:* | • **Normal Vesting.** Subject to an Executive's continued employment through each applicable vesting date, the Emergence Grants will vest as follows: |
| |     • 50% of the RSUs will vest in ratable installments on 12/31/18, 12/31/19 and 12/31/20 based upon achieving the target EBITDA of $236 million, $246 million, and $270 million, respectively, with 50% of each installment vesting on such date based upon achieving between 90% and 100% of the target EBITDA for such year (with linear interpolation between achieving 90% to 100% of the respective target EBITDA above) |
| |     • 50% of the RSUs and 100% of the Options will vest in ratable installments on the first four (4) anniversaries of the Emergence Date on the following schedule: |

| | 30%/30%/20%/20%. |
|---|---|
| | • <u>Accelerated Vesting Upon Termination Without Cause, for Good Reason or Due to Death or Disability</u>. If an Executive is terminated without Cause, terminates for Good Reason or is terminated due to death or disability (any such termination, a "<u>Qualifying Termination</u>"), the Executive will become vested in an additional tranche of the Executive's unvested Emergence Grant as if the Executive's employment continued for one additional year following the Qualifying Termination date; provided that with respect to the Senior Executives listed on Appendix A, (i) an amount equal to 50% of the unvested components of the Emergence Grant will accelerate and vest (75% if such termination occurs on or before the first anniversary of Emergence) and (ii) vested Options will remain outstanding until the expiration date of the Option. |
| | • <u>Accelerated Vesting Upon a Change in Control</u>.  If an Executive' employment is terminated by the Company without Cause or by the Executive for Good Reason, in either case, within 3 months prior to, or within twelve (12) months following, a Change in Control, 100% of the Executive's unvested RSUs and Options will accelerate and vest. For the sake of clarity, Options may be terminated in connection with a Change in Control upon payment of an amount equal to the intrinsic value thereof (as opposed to Black Scholes value). |
| *Final Documentation:* | The final documentation related to Emergence Grants shall not contain any material restrictions, limitations or additional obligations that are not set forth in this Term Sheet or in an Executive's existing employment agreement. |

**Appendix A**

| Position | Emergence Grant:<br>% of Emergence Pool |
|---|---|
| President & CEO* | 30% |
| CFO* | 15% |
| Members of Key Leadership** | 25% |
| Other Leaders** | 20% |
| Other Employees** | 10% |
|  | **100.00%** |

\*       Senior Executive

\*\*      Amounts within these bands to be allocated by the CEO in consultation with the New Board.  To the extent not fully allocated, the CEO may allocate within other groups (for the avoidance of doubt, the CEO cannot allocate additional equity to the CEO or the CFO).

**EXHIBIT B TO THE RESTRUCTURING SUPPORT AGREEMENT**

**Agreement to be Bound by RSA**

## Agreement to be Bound by RSA

**This Joinder Agreement to that certain Restructuring Support Agreement entered into as of [_____], 2017 by and among the Consenting Term Loan Lenders, the Consenting Equityholders, and the Company, attached hereto as <u>Exhibit 1</u> (as amended, modified, restated, or amended and restated from time to time in accordance with its terms, the "<u>Restructuring Support Agreement</u>"), is hereby executed and delivered by [●] (the "<u>Joining Party</u>") as of [●], 201[_].**

**Capitalized terms used herein but not otherwise defined shall have the meaning set forth in the Restructuring Support Agreement.**

<u>Agreement to be Bound</u>.  The Joining Party hereby agrees, on a several, but not joint, basis, to be bound by the Restructuring Support Agreement in accordance its terms.  The Joining Party shall hereafter be deemed to be a Consenting Term Loan Lender for any and all purposes under the Restructuring Support Agreement.  In the event of any inconsistency between this Joinder Agreement and the Restructuring Support Agreement, the Restructuring Support Agreement shall control in all respects.

<u>Representations and Warranties</u>.  The Joining Party hereby makes the representations and warranties of the Consenting Term Loan Lenders set forth in <u>Section 15</u> of the Restructuring Support Agreement to each other Party to the Restructuring Support Agreement.

<u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York.

**Date executed:  [_____], 201[_]**

[NAME OF TRANSFEREE]

By: _____
Name:
Title: