Page 1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of:

CUMULUS MEDIA INC.,                    Case No. 17-13381-scc

                Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


                        U.S. Bankruptcy Court

                        One Bowling Green

                        New York, New York 10004-1408


                        February 1, 2018

                        10:06 AM


B E F O R E :

HON SHELLY C. CHAPMAN

U.S. BANKRUPTCY JUDGE

Page 2

Hearing re:  Doc #298 Debtors First Omnibus Motion to Reject

Certain Executory Contracts

Hearing re:  Doc #183 Debtors Application for an Order

Authorizing the Employment and Retention of KPMG LLP as Tax

Compliance and Tax Consultants for the Debtors and Debtors-

in-Possession Nunc Pro Tunc to the Petition Date

Hearing re:  Doc #200 Debtors Application for an Order

Authorizing the Retention and Employment of Young Conaway

Stargatt & Taylor, LLP as Counsel for the Review Committee

of Cumulus Media Inc., Nunc Pro Tunc to the Petition Date

Hearing re:  Doc #201 Application of the Official Committee

of Unsecured Creditors of Cumulus Media Inc., et al., to

Retain and Employ Akin Gump Strauss Hauer & Feld LLP as

Counsel

Hearing re:  Doc #203 Application of the Official Committee

of Unsecured Creditors of Cumulus Media Inc., et al., to

Retain and Employ Moelis & Company LLC as Financial Advisor

Hearing re:  Doc #299 Debtors Motion for Authority to Reject

the Merlin Agreements

Page 3

Hearing re:  Doc #176 Debtors Motion For Entry of an Order Approving (A) the Adequacy of the Disclosure Statement; (B) Solicitation and Notice Procedures with Respect to Confirmation of the Joint Plan of Reorganization of Cumulus Media Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code; (C) the Form of Ballots and Notice in Connection Therewith; (D) the Scheduling of Certain Dates with Respect Thereto; and (E) Related Relief

Transcribed by:  Dawn South

Page 4

A P P E A R A N C E S :

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

        Attorneys for the Debtor

        1285 Avenue of the Americas

        New York, NY 10019-6064


BY:   JACOB A. ADLERSTEIN, ESQ.

        MARK W. NIXDORF, ESQ.


PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

        Attorney for the Debtor

        2001 K Street, NW

        Washington, DC 20006-1047


BY:   CLAUDIA R. TOBLER, ESQ.


LATHAM & WATKINS LLP

        Attorney for Merlin Media

        53rd at Third

        885 Third Avenue

        New York, NY 10022-4834


BY:   ROGER G. SCHWARTZ, ESQ.

Page 5

MILBANK, TWEED, HADLEY & MCCLOY LLP

Attorneys for Ad Hoc Cross-Holder Committee

28 Liberty Street

New York, NY 10005-1413


BY:   DENNIS F. DUNNE, ESQ.

ANDREW M. LEBLANC, ESQ.


AKIN GUMP STRAUSS HAUER & FELD LLP

Attorneys for the Committee

Robert S. Strauss Building

1333 New Hampshire Avenue, N.W.

Washington, DC 20036-1564


BY:   KATE DOORLEY, ESQ.

ABID QURESHI, ESQ.

MEREDITH LAHAIE, ESQ.


KELLEY DRYE & Warren LLP

Attorney for U.S. Bank, as Indenture Trustee

101 Park Avenue

New York, NY 10178


BY:   BENJAMIN D. FEDER, ESQ.

Page 6

ARNOLD & PORTER KAYE SCHOLER LLP

Attorneys for Ad Hoc Group of Term Lenders

70 West Madison Street

Suite 4200

Chicago, IL 60602-4231


BY:  MICHAEL MESSERSMITH, ESQ.

SETH J. KLEINMAN, ESQ.

SARAH GRYLL, ESQ.


ALSO PRESENT:

PATRICIA SCHRAGE

MR. SCHWARTZBERG

Page 7

P R O C E E D I N G S

THE COURT:  Hello.  Good morning.  Please have a seat.  How's everyone today?  Good morning.

MR. ADLERSTEIN:  Good morning, Your Honor.

THE COURT:  Ready when you are.

MR. ADLERSTEIN:  Jacob Adlerstein, Paul, Weiss, Rifkind, Wharton & Garrison, counsel for the debtors.

THE COURT:  Okay.  I was just handed an amended agenda, so I have that.

MR. ADLERSTEIN:  Oh, good.  Is this the one that we filed at 4:40 yesterday?

THE COURT:  I don't know.

MR. ADLERSTEIN:  Okay.  Okay, great.  So yeah, I would propose that we use that as our kind of --

THE COURT:  Fine.

MR. ADLERSTEIN:  -- guidepost.

THE COURT:  Sure.

MR. ADLERSTEIN:  And so we are here this morning on a handful of matters.  Most prominently we have obviously the motion to approve the disclosure statement for the debtor's Chapter 11 plan as well as a number of matters for which we filed certificates of no objection.

THE COURT:  Yes.

MR. ADLERSTEIN:  And then matter was listed on the agenda as contested, but for which I believe we have a

Page 8

consensual resolution that I'll walk through.

THE COURT:  Merlin?

MR. ADLERSTEIN:  That's the Merlin motion, exactly.

THE COURT:  Great.  Okay.

MR. ADLERSTEIN:  So, Your Honor, unless you have another way you want to handle the hearing what I would propose is that we start with the disclosure statement.

THE COURT:  Start with the disclosure statement, sure.

MR. ADLERSTEIN:  If that's --

THE COURT:  That's fine.

MR. ADLERSTEIN:  -- works for Your Honor.

THE COURT:  Yes.

MR. ADLERSTEIN:  And then we would move forward with the Merlin description of where we are, and then the remainder of the agenda.

THE COURT:  Okay.  Great.  Just for the record there are a number of parties on the phone that appear all being in listen only mode.

MR. ADLERSTEIN:  Okay.  Great.

THE COURT:  Okay.  The disclosure statement.

MR. ADLERSTEIN:  The disclosure statement, Your Honor.  So what I would propose is, so we received four responses to the disclosure statement.

Page 9

THE COURT:  Right.

MR. ADLERSTEIN:  And I'm happy to report that after working through with those parties and taking guidance from Your Honor in terms of past cases in the way in which you want disclosure statement hearings to be held we worked constructively with those parties to --

THE COURT:  And that's why you're talking fast because you're trying to get in under the five-minute limit, right?

(Laughter)

MR. ADLERSTEIN:  I didn't -- five minutes is going to be a challenge, but I'm going to get as close as I can.

THE COURT:  Okay.

MR. ADLERSTEIN:  We've worked constructively with those parties --

THE COURT:  Great.

MR. ADLERSTEIN:  -- to include as much additional disclosure as we thought was appropriate --

THE COURT:  Okay.

MR. ADLERSTEIN:  -- and that we could include, and I'm happy to report that I believe with all but one of those parties we've resolved their objections to the disclosure statement.

THE COURT:  Okay.

MR. ADLERSTEIN:  And so I can walk through each of

Page 10

the four responses, how we propose to address them and --

THE COURT:  Sure.

MR. ADLERSTEIN:  -- the manner in which we resolved them.

THE COURT:  And I think it was from yesterday, I have a blackline.

MR. ADLERSTEIN:  Great.

THE COURT:  So I don't know if that's been superseded by something else, but I do have a blackline version.

MR. ADLERSTEIN:  Yeah, that's correct, Your Honor. That is the version which we're working off of.

THE COURT:  Right.

MR. ADLERSTEIN:  There's one additional change that I'll get through, we'll hand up a -- I'll explain the change --

THE COURT:  Okay.

MR. ADLERSTEIN:  -- and we'll hand up a changed page, but that is the version of the disclosure statement --

THE COURT:  Okay.

MR. ADLERSTEIN:  -- we're working off of.

THE COURT:  Great.  So let's walk through that, that'll be very helpful.

MR. ADLERSTEIN:  Okay.  So what I'm going to do is -- although if you'd like I'm happy to do a page turn, but

Page 11

what I would propose is by response party I'm going

explain --

THE COURT:  Much better.

MR. ADLERSTEIN:  -- to you how we resolved those.

THE COURT:  Yes.

MR. ADLERSTEIN:  Okay.  Perfect.

So, Your Honor, the official committee of

unsecured creditors filed a response to the disclosure

statement in which they identified a number of issues which

they acknowledge are confirmation issues in which they

intend to -- unless there's a consensual resolution reached

in the case -- they intend to object to in the context of

confirmation.  They also included a number of riders and

proposed disclosure items to be added to the disclosure

statement.

We worked with counsel to the creditors' committee

and we appreciate the constructive and collaborative nature

of those conversations, and we were able to address all of

their proposed riders and additional disclosure, which if

you look through the redline in a number of places they've

made very clear their position on the plan --

THE COURT:  Yes.

MR. ADLERSTEIN:  -- and the issues upon which they

intend to object.  And so those language edits, which are

scattered throughout the disclosure statement --

Page 12

THE COURT: Yes.

MR. ADLERSTEIN: -- are -- have been included.

And my understanding, though I'm sure counsel will -- may want to supplement this or have a statement on their own -- I think we have resolved all of their issues with respect to approval of the disclosure statement.

THE COURT: All right. Should I hear from someone from the creditors' committee? Mr. Qureshi?

MR. QURESHI: Your Honor, I'm going to hand it over to my colleague, Kate Doorley, who will handle it for the committee.

THE COURT: Very good. Thank you.

MS. DOORLEY: Good morning, Your Honor.

THE COURT: Good morning.

MS. DOORLEY: Kate Doorley, Akin Gump Strauss Hauer & Feld, for the committee.

Your Honor, as Mr. Adlerstein mentioned, we did file a statement concerning the disclosure statement, and in reviewing and responding to the disclosure statement we also, you know, acknowledged Your Honor's preferences and worked constructively with the debtors to get those --

THE COURT: Wonderful.

MS. DOORLEY: -- inserts in.

We believe that the inserts and additional disclosures make clear our position on the disclosure

Page 13

statement to creditors and parties in interest.

The committee continues to have serious concerns about the transaction that's being proposed to be implemented through the plan, and particularly as it concerns the debtor's proposed valuation.  We understand that this is not the time or place to get into those issues, but we continue to believe that the plan is unconfirmable on its face and nothing we've seen thus far changes our view that the plan significantly over compensates the term loan lenders to the detriment of unsecured creditors.

And so we just reserve our rights on those points and will raise them at the appropriate time in connection with the confirmation hearing.

THE COURT:  All right.  Thank you very much.

MS. DOORLEY:  Thank you.

THE COURT:  Okay.

MR. ADLERSTEIN:  Your Honor, the other response that the debtors received was from the ad hoc committee of cross-holders.

THE COURT:  Yes.

MR. ADLERSTEIN:  Which is a committee comprised of two holders of both -- or as they represent holders of both senior notes and term loans.  They -- that committee raised two issues to the disclosure in addition to previewing its confirmation related issues on valuation.

Page 14

One was related to their view that the plan effectuates a substantive consolidation of the debtor's estates. We have addressed that disclosure issue by including language -- and it's found at pages 78 and 79 of the disclosure statement -- that outlines both the debtor's position that the plan does not reflect a substantive consolidation or effectuate a substantive consolidation of the estates. We outline some of the reasons for that.

We obviously believe that ultimately is a confirmation issue and we will address the merits of that issue, to the extent it's necessary, with additional briefing in the context of confirmation.

THE COURT: Okay.

MR. ADLERSTEIN: The other issue that the -- and we've included in addition a statement by the cross-holder committee in that same paragraph that identifies why they disagree with that position and the arguments they may raise in the context of confirmation.

THE COURT: Okay. And as well the cross-holder committee has issues with the valuation.

MR. ADLERSTEIN: That's correct. And they make that clear in their response.

The other issue that the cross-holder committee had identified was their view that the valuation analysis that's attached to the disclosure statement did not include

Page 15

certain granular information that they thought would be

necessary to satisfy the adequate information standard.  We

disagree with that position.  We thought that the valuation

analysis is consistent with market practice and other

disclosure statements have been approved.

We've worked with the cross-holder committee and

what we've agreed with them is that to the extent there are

holders of senior notes that between now and through when

the confirmation discovery process gets under way and expert

reports are produced if there are additional holders of

senior notes that want to sign onto the protective order and

ultimately in the context of confirmation discovery receive

a copy of the expert report that'll be made available by the

debtor's valuation expert, PJT, subject to the terms of that

protective order, we would be fine allowing those parties to

receive that report.

And my understanding is that with the addition of

the sub prime rider and our commitment to make that

available, subject to the provisions of the protective

order, that that has resolved the cross-holder committee's

response.

THE COURT:  And Mr. Dunne?

MR. DUNNE:  Yes.  Good morning, Your Honor.

THE COURT:  Good morning.

MR. DUNNE:  Dennis Dunne from Milbank, Tweed,

Page 16

together with my partner, Andrew LeBlanc, on behalf of the ad hoc group of cross-holders.

I just want to spend a minute to just say who we are.

THE COURT:  Please.  I mean I've read your 2019, but I'm happy to hear what you have to say.

MR. DUNNE:  Yes.  We have a committee of two large holders.  They have significant positions in both the term loan debt, approximately 220 million.  That term loan debt is also held by the plan supporters who are -- have signed the restructuring support agreement and support the plan.

THE COURT:  Right.

MR. DUNNE:  We also hold almost 230 million of the unsecured notes.

THE COURT:  Uh-huh.

MR. DUNNE:  And they're principally represented by the creditors' committee and oppose the deal that the term lenders have put together with the debtors.  And that puts us in a somewhat singular position in the sense that some of our position in the term debt is on the side of those debts are on this side of the courtroom that support it and the other side is with the unsecureds.  And we're looking for a deal that makes sense with that prism, which is different than either side.  And right now we don't believe it does principally because of valuation issues.

Page 17

We also have a block, the 230 million

approximately in the unsecureds, is more than a third of

Class 5.  So we believe that, you know, in order to get to

consensus people will have to talk to us and we hope that

that happens between today and the confirmation hearing.

And so let me turn to --

THE COURT:  But we're going to -- when we get

through this and the entire agenda, since I'm glad that you

all are here today, I would like to spend some time talking

about what's going to happen next, because you have

identified the single most important issue that's looming

out there.

MR. DUNNE:  We welcome that, Your Honor, and we

think that's a good suggestion.

So quickly, because counsel for the debtor is

correct that we're not prosecuting any objection to the

disclosure statement today.  With respect to valuation there

was one disclosure related point.

Before I get to that I think this is different

than most cases in the sense that in many of the cases I'm

involved in, I'm sure Your Honor presides over, you have

more broader consensus with respect -- at least among the

debt for borrowed money creditor classes.  When you have a

plan that only has the top of the capital structure, the

term lenders, the secured debt on board that results in a

Page 18

need for precision with respect to valuation that you might

not need had you had the junior class accepting the plan

within a -- in a larger band or range of valuation.

Said another way if they err significantly on the

low side and Your Honor determines that it's -- all of a

sudden we have a Section 1129(b) issue because the term

lenders may be receiving distributions that result in

payment greater than in full.

With respect to the disclosure issue --

THE COURT:  I'm sewer that issue has occurred to

Mr. Bossa (ph).

(Laughter)

MR. DUNNE:  With respect to the disclosure I'd say

that counsel for the debtors is correct, that you often see

the level of disclosure that they have in the disclosure

statement.

THE COURT:  Uh-huh.

MR. DUNNE:  Our point was that when we're talking

about a case like this one where precision on valuation

really is the crux of the issue we should have more than a

narrative that's in the Exhibit C to the disclosure

statement with respect to DCF --

THE COURT:  But let's be -- let's talk about what

we actually have.  Okay?  We have your holders, incredibly

sophisticated, ably represented by you and Mr. LeBlanc.

Page 19

Okay?  So you're going to get the information.  And the notion that there would need to be kind of litigation level preconfirmation hearing granularity on weighted average cost of capital and things like that given who you actually are is just not that compelling.

If the debtor were standing here telling me they're never going to -- it's going to be their surprise at confirmation we would have something different.  But I fully believe, and I will tell them that sooner rather than later, they need to get you the detailed information that you need to challenge the valuation or preferably work with the valuation so that you can get to a consensual deal.

Frankly my larger concern in the case is the lack of -- the apparent lack of alignment between the position of your group and the position of the unsecured creditors.  And it's obviously no secret that I think I'm safe in assuming that your holders did not acquire their positions entirely at par.  You don't have to answer one way or the another, but I mean that's what makes this -- that's what's going to make this very challenging.

MR. DUNNE:  And, Your Honor, I agree with you, but the reason we're not objecting is that we're going to get this information, right?

THE COURT:  Right.

MR. DUNNE:  We're not aggrieved in that sense

Page 20

because we'll get it under the protective order.  I just want to make Your Honor aware of our position on that in case you felt, you know, otherwise.  But vis-à-vis us we're getting it.

THE COURT:  We're good.

MR. DUNNE:  Yeah.

THE COURT:  Okay.  Okay.  Great.

MR. DUNNE:  So last point, and this is a point that the creditors' committee is not raising, is the equity allocation, which again principally is a confirmation issue --

THE COURT:  Yeah.

MR. DUNNE:  -- where the unsecured bondholders have multiple obligors within the debtor family.  There are a number of other creditors that only have a single obligor.  Everybody is treated as if for equity allocation purposes they only had one obligor.

We believe that there was nothing in the disclosure statement that proved up the substantive consolidation elements.  The debtors added some language.  I believe they're position is they don't need to because you're out of the money and everything is a gift.  I unfortunately lost that argument in front of the Second Circuit of DVSD, so I had some sympathy to it, but the law is what it is, and that's a confirmation issue and we can

Page 21

argue about DVSD when we get there.

THE COURT:  If we have to.

MR. DUNNE:  Yes.  Thank you.

THE COURT:  Okay.  All right.  Thank you, Mr. Dunne.

Okay.  Mr. Adlerstein, next?

MR. ADLERSTEIN:  All right.  Thank you, Your Honor.

Just so the record is clear that's not our only or really our real characterization of our position, I don't want that to be left unsaid --

THE COURT:  Understood.

MR. ADLERSTEIN:  -- because we have other reasons why we think the plan is completely confirmable.

THE COURT:  Sure.

MR. ADLERSTEIN:  Going on -- so that is -- we've covered now the official committee and the cross-holder committee.  The third response we received was from the U.S. Trustee.

THE COURT:  Yes.

MR. ADLERSTEIN:  They raised a number of issues, some disclosure, some I think more plan confirmation issues relating to the scope of the third-party releases, exculpation, and the like.

We have resolved that objection in two principal

Page 22

ways.  One, as you'll see through the disclosure statement

-- and to be clear when I say we've resolved the objection,

we've resolved their objection at the disclosure statement

stage, they are obviously reserving their rights in the

context of confirmation.

But we've resolved their disclosure statement

objection through the inclusion of additional language in

the disclosure statement that identifies the issue that they

believe has presented at confirmation with respect to the

approval of the third-party releases and exculpation of non-

estate fiduciaries.  The cases upon which they rely and the

standard that we will have to satisfy to ultimately have

those releases and exculpations approves in the context of

confirmation.

THE COURT:  Okay.  So we need to talk about this a

little more.  I agree that it's a confirmation issue, but I

also have a concern that at the disclosure statement phase

we do whatever minimizes the issue or maximizes the

likelihood that at confirmation, assuming in a scenario in

which the plan is going to be confirmed, that we don't have

an issue with the releases that could have been cured by

having done the balloting in a different way.

So I need to understand exactly what everyone --

exactly what you're going to do --

MR. ADLERSTEIN:  Uh-huh.

Page 23

THE COURT: -- and exactly what the U.S. Trustee's position is about that.

This entire issue -- virtually this entire issue was just before Judge Lane in Aeropostale or whatever the liquidation entity is. I've had this issue before, and frankly I think -- and we're not going to talk about jurisdiction. Everybody agrees that for non-consensual you have to satisfy the standard, we're good. What I'm talking about is the whole issue of opt in and opt out and language and that.

So if you weren't proposing to make any changes to the documents that are going out to the stakeholders we ought to talk about that, because I don't want to be in a situation where had we done something else today we would be in a different place.

I also would like to note, and I see Mr. Schwartzberg sitting back there in his usual fourth row position, and I know the SEC had similar concerns, there is a lot of imprecision around these arguments. There's a lot of bandying about of arguments related to impairment and non-impairment, and I'm not interested in turning this into a class, but we have to follow the Code, and the linking of and the explanation of impairment as it relates to the releases is in my mind incorrect. It's simply -- it incorrectly interprets -- reads the Code.

Page 24

So I don't think I have to go into why I think that's so, but I would like to talk about the balloting process both in terms of the voting and the non-voting and what it is that you're going to do, because I believe there are some pretty easy fixes that I know would make me more comfortable on the whole opt in, opt out debate.

MR. ADLERSTEIN:  Okay.

THE COURT:  So what --

MR. ADLERSTEIN:  I appreciate that, and so I was actually going identify one change we had made to the --

THE COURT:  Okay.

MR. ADLERSTEIN:  -- set of ballots that resulted in the resolution we were able to reach with --

THE COURT:  Okay.

MR. ADLERSTEIN:  -- the U.S. Trustee's Office, which is that we are going to -- for purposes of balloting -- we're going to provide the unimpaired creditors that are deemed to accept, we're going provide them with the same opt out --

THE COURT:  Conclusively presumed.

MR. ADLERSTEIN:  That are conclusively presumed. Exactly.  We're going to provide them with the same opt out form that we are providing to those creditors that have -- that are deemed to reject as well as those creditors that are receiving ballots and have an ability to opt out on

Page 25

their ballots.

And so the way that the balloting process will work is that every holder of a claim or interest is going to receive either a ballot or an opt out form.  Those --

THE COURT:  Every single one, whether they're unimpaired?

MR. ADLERSTEIN:  Correct.  Every holder of a claim or interest is going to receive --

THE COURT:  Whether they're receiving a distribution --

MR. ADLERSTEIN:  Correct.

THE COURT:  -- or whether they're deemed to reject and not receive a distribution.

MR. ADLERSTEIN:  Correct.  And so the holders that are deemed unimpaired and denied an entitlement to vote, they will receive an opt out form.  The holders that are deemed to reject and not entitled to vote, they will also receive an opt out form, and there will be an opt out box on every ballot that goes to a holder of a claim that's entitled to vote.

The way the third-party release categories work is that those holders that are unimpaired and do not return the opt out form are presumed to grant the third-party releases.

THE COURT:  Uh-huh.

MR. ADLERSTEIN:  For holders that are entitled to

Page 26

vote on the plan if they vote to accept they are granting the third-party releases.  If they vote to reject and do not check the opt out form they are granting the third-party releases.  And if they abstain from voting and do not check the opt out form they are granting the third-party releases.

And then for those holders that are deemed to reject and therefore are not returning a ballot, if they fail to return the opt out form they will also grant the third-party releases.

THE COURT:  Okay.  So that's great, and my assumption is that the U.S. Trustee may still elect to argue for the necessity of an opt in as opposed to an opt out at confirmation.  Is that true, Mr. Schwartzberg?  Hello.

MR. SCHWARTZBERG:  Thank you, Your Honor.  Good morning.

I think with the change today and your comments five minutes ago the concerns that were left were the two buckets, the people that reject that need to opt out and the people that don't vote and have not opted out, those would be the two concerning classes that we believe the opt outs are, you know, traps or there's just no -- jurisdiction is decided in the Sun Edison case -- whether Your Honor follows it or not.

THE COURT:  Okay.  Jurisdiction and opt in, opt out are not -- that's -- with utmost respect to my most

Page 27

senior in charge colleague, Judge Bernstein, and to Judge

Wiles, I don't believe I have to resolve differences between

the way I might think about those and the way they thought

about those in Sun Edison or in Chassix, because every case

is different.

I do disagree with your characterization of a

trap.  Inaction is action under appropriate circumstances.

When someone is clearly and squarely told if you fail to act

your rights will be affected.  That person is then given

information that puts them on notice that they need to do

something or else.  That's not a trap.  That's not sending

someone a ten-page document where at the very end in the

fine print, for example, like on a used car auto loan the

poor unsuspecting consumer doesn't understand that after all

these payments at the end there's a balloon of $5,000.

That's a trap.  Okay?

Not a trap is a ballot or an opt out -- so-called

opt out release form that says on the front page, as I'm

about to tell Mr. Adlerstein this needs to say, your rights

will be affected if you fail to act, please see page X for

optional release opt out election rights.

If someone chooses not to open an envelope that's

not a trap.  If somebody gets a piece of paper that says,

Dear Cumulus equity holder, you're not getting a

distribution, why is it anymore of a trap to expect that

Page 28

someone who just received the bad news that their stock is

worthless would affirmatively bother to opt in?  That is at

odds with human nature.

There are examples in many other areas of the law

in which inaction has a severe consequence and someone who

does not act is deemed to be in one class or another class

action context.

Default judgments.  Judge Glenn held that a

default judgment can be deemed to imply consent for purposes

of Stern.

So obviously I'm interested in this, we could talk

about it a lot, but we're not going to, but I just am

encouraging everyone to be -- to not just be rolling out the

same arguments.  It's important to think about it and to

kind of pull away some of the stuff that's attached to this

rock as it keeps being rolled along and to really think

about, you know, due process and what's right, vis-à-vis the

folks who are either granting the release or not.

And here's the big point, it's also important to

think about the reorganizing entity.  Because in my view a

reorganization is supposed to be exactly that, a

reorganization and a fresh start for the debtor.  Who's the

debtor?  The debtors are some of the stakeholders.

So when releases aren't granted there's an

implication for the reorganized debtor.  There remains a

possibility, however remote, that something could happen.

So I think, you know, we live in a world of people talking about false choices, I think it's a false choice that we have to sacrifice any rights of equity holders who in this case appear to not be getting a distribution and certainly with respect to unimpaired holders who are getting everything that they can conceivably bargain for.

So thank you for listening to my comments.  I hope between now and confirmation everyone can do a little more thinking around the issue so that we could minimize what we have to talk about at that point.

MR. SCHWARTZBERG:  I do have a comment but I hesitate to bring it.

THE COURT:  I promise not to yell at you.

MR. SCHWARTZBERG:  All right.  The only thought, Your Honor, in terms of thinking about the consequences, thinking about the way people act specifically with equity --

THE COURT:  Uh-huh.

MR. SCHWARTZBERG:  -- who's going to get nothing --

THE COURT:  Uh-huh.

MR. SCHWARTZBERG:  -- probably won't turn to page 8, and that was the concern on that.

THE COURT:  It's a choice.  If I tell them on page

Page 30

1, which I'm going to tell the debtors they have to do, if they're told in bold in a big font on page 1 if you fail to act your rights will be affected and they don't turn the page that's a choice.

MR. SCHWARTZBERG:  I would then just ask, Your Honor, in that notice -- and hopefully obviously it'll get circulated to me -- such as the releases on page whatever page where everything is bold and everything is -- they -- if that's Your Honor's ruling I'd prefer that that bold and that larger type not encompass the entire page and make it clear, because sometimes these notices get so --

THE COURT:  Right here.  Three lines of bold type. It's going to just pop out.  They could even put it in some sort of a silly font like Comic Sans, which is something that only people like me use.

MR. SCHWARTZBERG:  Never heard of it, Your Honor, but thank you.

THE COURT:  I mean the whole point is it's supposed to effective, notice is supposed to be effective, and once you effectively give someone notice if they choose not the act that's a choice, that's not inaction, that is action.  That's my philosophical view of this issue, at least at the moment.

MR. SCHWARTZBERG:  Then I just -- and I implore the debtor --

Page 31

THE COURT:  I'm not asking you to waive your argument at confirmation.

MR. SCHWARTZBERG:  And I'll take this back, you know, we have nothing set in stone.

THE COURT:  Right.  And the whole issue of jurisdiction is a whole different thing.

MR. SCHWARTZBERG:  Yeah.  I've looked at their -- you know, their opt out and it's a small -- the smallest box on the ballot on page 5 or 6.  It's difficult to find.  I would just ask that they make that more obvious it's the box that you need to check as opposed to making it the smallest font on the fifth page amongst 50 other boxes.

THE COURT:  All right.  Thank you, Mr. Schwartzberg.

MR. SCHWARTZBERG:  Thank you, Your Honor.

THE COURT:  So, Mr. Adlerstein, talk to me a little bit about this equity holders.  Am I understanding correctly that the consenting equity holder holds 30 percent of the equity or am I misunderstanding that?

MR. ADLERSTEIN:  You know, I don't know the exact percent, but it's a significant number.  I want to say between 20 and 30 percent.

THE COURT:  I think I read 30 percent somewhere. So the consenting equity holder is a releasee, right?

MR. ADLERSTEIN:  It is both granting release and

Page 32

getting release.

THE COURT:  A release and getting release.

MR. ADLERSTEIN:  Correct.

THE COURT:  Okay.  But that takes out a big chuck

of the pool of equity holders, right?

MR. ADLERSTEIN:  Absolutely.

THE COURT:  Okay.  So what I would like with

respect to all of this is literally on the first page in

bold a two-line statement that says your rights will be

affected if you fail to act.  Please see, and give the

reference, page whatever for optional release opt out

election form.  Something along those lines.  But the most

important point is the minute you open that envelope it

jumps out from the page, the recipient is being told your

rights will be affected if you fail to act in response to

this notice.

MR. ADLERSTEIN:  Yeah.

THE COURT:  And then --

MR. ADLERSTEIN:  That's fine, Your Honor.  Our

expectation and intent is certainly giving effective notice

so we're happy to add that.

THE COURT:  Okay.  I mean I don't want to

micromanage beyond that, but that will satisfy my concern

that we don't get to confirmation and have an issue.  You

could also -- I'm not a graphic designer -- but you could

Page 33

also put a box, you know, around the whole opt out section

when you get to it so that people are, you know, more drawn

to it.  If you're just simply someone who's going to read

that and then try to flip to the page and lose steam because

there's so many words on the page you could put a box around

it.

MR. ADLERSTEIN:  Yeah, Your Honor, there's a --

THE COURT:  And mind you I think that in the

context of a case where there are all sorts of folks

investigating all sorts of causes of action and the concept

that an equity holder would have a claim against the

creditors' committee which was formed after the filing of

the case, I mean we're talking about angels not even near

the head of a pin here.  That's part of what makes this

issue kind of -- well makes this issue what it is.

MR. ADLERSTEIN:  Thank you, Your Honor, we

appreciate that guidance.  And actually we were just talking

about counsel table.  There's a form of a box that we often

use on the front page of a motion to reject contracts where

we identify to the counterparties that their rights can be

affected, so we would propose to use something along those

lines --

THE COURT:  Great --

MR. ADLERSTEIN:  -- consistent with the message.

THE COURT:  Great example.

Page 34

MR. ADLERSTEIN:  Okay.  Perfect.

THE COURT:  Okay.  All right.  Someone else wanted to be heard.

MS. SCHRAGE:  Your Honor, I just --

THE COURT:  Yes.

MS. SCHRAGE:  -- it seems this is the appropriate time if we're talking about issue -- Patricia Schrage, U.S. Securities and Exchange Commission.

THE COURT:  Yes, could you come up to the microphone --

MS. SCHRAGE:  Sure, of course.

THE COURT:  -- so we can get you recorded?

MS. SCHRAGE:  Your Honor, I just -- I did want to raise -- I'm not going to belabor the point, Your Honor has spoken, she wants an opt out that's clear, but we did raise the issue and we will reserve the right to raise it again at confirmation.

THE COURT:  Sure.

MS. SCHRAGE:  And again, you know, I had asked that -- I think counsel was going to get to the fact that I asked for some more disclosure, but we had discussed this point on consensual and non-consensual.  As you saw in our objection it is the SEC's position that these are non-consensual releases, that there is an opt out form but there may be a non-incentive to even open the envelope.

Page 35

But, Your Honor, I hear you, you've given counsel the direction on how to improve the form, so we'll defer that issue to confirmation. But I did want to stand and let you know that that was our position.

THE COURT: Okay. I mean the -- there was a suggestion in your pleading that your concern was that this would have the effect of leading to somebody releasing securities fraud claims. I don't believe that anybody thinks that that is at all remotely anything what these releases are intended to or would accomplish. That --

MS. SCHRAGE: Your Honor, they're very broad provisions.

THE COURT: Right. But they're not -- remember, they're not releases that provide a release for everything in the world that every happened from the beginning of time to the end of time. They are in most instances related to the subject matter of this case. There's a reality to the notion that if there are -- if there were derivative claims, if there were securities claims someone would show up. And what the debtor ought to not be saddled with is after the fact.

I mean it's America, anybody can sue anybody for anything and they do that every day, but in a reorganization I think the value maximization and the fresh start proposition includes tying up as many loose ends as

Page 36

possible.

That being said, I'm a huge fan of due process, I'm totally with you, I don't want anybody to inadvertently relinquish rights that they have and that might be meaningful to them.  So I'm happy to continue the discussion at confirmation.

This does at least in my cases I think it's the first time that the SEC has appeared.  Perhaps it's the first time that this issue has occurred with respect to publicly traded securities, I'm just not sure.

MS. SCHRAGE:  Your Honor, it doesn't come up that often when the shareholders are deemed to reject, they're getting nothing and they're not voting, so we're here, Your Honor.

THE COURT:  Fair enough.

MS. SCHRAGE:  And the other point I just would address just very briefly is since it is our position that these would be non-consensual releases there's a high burden and there's really no factual support of these documents.

THE COURT:  Well --

MS. SCHRAGE:  I understand that may be a confirmation issue --

THE COURT:  That is a confirmation issue.  At confirmation to the extent that these would be still characterized as non-consensual releases they have to

Page 37

satisfy Metro Media.  So that's -- everyone acknowledges that.

MS. SCHRAGE:  Thank you, Your Honor.

THE COURT:  Okay?  Thank you.  Okay.

MR. ADLERSTEIN:  Okay.  Jacob Adlerstein, Paul, Weiss --

THE COURT:  Yep.

MR. ADLERSTEIN:  -- for the debtors again.

So, Your Honor, I think that addresses all of the responses we've received --

THE COURT:  Okay.

MR. ADLERSTEIN:  -- and the manner in which we propose to address them.  We obviously understand and we'll adopt the Court's position on the notice that's provided.  And so I think that may require us to do some slight tweaks to the exhibits to the disclosure statement.

THE COURT:  Right.  Okay.  And you'll circulate them to parties who are interested.

MR. ADLERSTEIN:  We absolutely will.

THE COURT:  Okay.

MR. ADLERSTEIN:  And so what I would propose, unless you --

THE COURT:  Just to be clear, those are my suggestions to avoid certain issues later, but it's not any sort of a preruling at confirmation, and everybody's rights

Page 38

are reserved to continue to make whatever arguments they want.  All right?

MR. ADLERSTEIN:  Absolutely.

THE COURT:  Okay?

MR. ADLERSTEIN:  So, Your Honor, unless you have any other questions what I would propose is my colleague, Claudia Tobler, can come up and she would just address the actual exhibits in the order if you have any questions on that, and if not then I think that we would ask that the Court approve the disclosure statement motion.

THE COURT:  Sure.  Why don't we do that.

MS. TOBLER:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. TOBLER:  Claudia Tobler on behalf of the debtors with Paul, Weiss, Rifkind, Wharton & Garrison.

We have a disclosure statement order that has substantially not changed.  There have been some clean up edits.  What I would propose is handing up the revised form of order.

THE COURT:  Okay.

MS. TOBLER:  Per your discussions just now we will have to --

THE COURT:  Thank you.

MS. TOBLER:  -- reform the exhibits.

THE COURT:  Okay.

Page 39

MS. TOBLER:  So if I may approach the bench?

THE COURT:  Please.

MS. TOBLER:  Your Honor, what I handed up is a redline of the current form of disclosure statement order against the form of disclosure statement order that we filed with the motion, which was at Docket No. 176-1.  You will note, Your Honor, that the changes are very minimal.  They are mostly in the nature of clean up to address the change in the title of the plan, and then in addition, as Mr. Adlerstein just mentioned, the change in the opt out provision for the deemed accepting or consenting classes.

THE COURT:  Okay.

MS. TOBLER:  So that is the language in the disclosure statement order that affects those changes.

The exhibits will need to be updated for the same classes.

THE COURT:  Okay.

MS. TOBLER:  There are a number of exhibits.  The disclosure statement attaches as exhibits the five flavors of notices that go with this process.

THE COURT:  Okay.

MS. TOBLER:  All of which otherwise haven't changed except for the changes to the definition of the leased parties in the plan.

Towards that end, Your Honor, I also have

Page 40

incremental changes from the form of disclosure statement

and plan that was filed yesterday --

THE COURT:  Okay.

MS. TOBLER:  -- to reflect the same transaction --

THE COURT:  Okay.

MS. TOBLER:  -- that we agreed to.

THE COURT:  So no need to specifically walk

through that.

MS. TOBLER:  Okay.  They're conforming, it's all

the same language.

THE COURT:  Very good.  Okay.

MS. TOBLER:  And so, Your Honor, what I would

propose is that we circulate the revised order.  We have

circulated last night to parties so parties have seen it --

THE COURT:  Okay.

MS. TOBLER:  -- and we have some copies in court,

that we circulate that again once we're done with this

hearing --

THE COURT:  Great.

MS. TOBLER:  -- with the revised exhibits.

THE COURT:  Very good.  Okay.  And then you'll

send it to us with the representation that everyone has

signed off and then we'll enter it after that.

MS. TOBLER:  Yes.

THE COURT:  Okay.  Great.  Thank you.

Page 41

MS. TOBLER:  Thank you, Your Honor.

THE COURT:  Okay.  So that takes care of the disclosure statement, which will be approved subject to my reviewing the final revised version.

MR. ADLERSTEIN:  Great.  Thank you, Your Honor.

THE COURT:  Okay.  So what shall we do next?

MR. ADLERSTEIN:  So the next item we'd like to go to, Your Honor, is the Merlin motion.

THE COURT:  Okay.

MR. ADLERSTEIN:  So just to give some background here, Your Honor.  We filed a motion on -- it's found at Docket No. 299, to reject certain agreements that we characterize as the Merlin agreements that are associated with the debtor's operation of two radio stations in Chicago, and then there was a related talent agreement associated with those stations included within the rejection motion.

After filing that motion on January 18th we had -- we obviously prior to the filing of that motion and also after filing it sought consensus on how to resolve the issues implicated with the operation of the stations and the associated agreements, and those negotiations ultimately I'm happy to report bore fruit, and so we've been able to reach a settlement in principle on the manner in which we're going to move forward on the Merlin stations and the Merlin

Page 42

agreements.

THE COURT:  Okay.

MR. ADLERSTEIN:  We are currently documenting the terms of that settlement and stipulation.  And so what I would like to do is read -- tell Your Honor, apprise the Court and other parties as to how we're proposing to settle that.

Our objective would be to file a stipulation this afternoon that effectuates that relief.  To the extent we continue to have it -- if there are any issues on documentation and we're not able to get there by this afternoon we may be back to Your Honor to seek a conference call of some sort to get guidance tomorrow.  But my hope is and my expectation is that we'll finish the documentation today and be able to submit something to you that reflects consensus both among the debtors, the Merlin parties, but also the official committee of unsecured creditors as well as the term lender group.

THE COURT:  Okay.

MR. ADLERSTEIN:  So if I may, Your Honor, what I would like to do is just explain to you how we have proposed in principle to settle the issues set forth in the motion to reject.

THE COURT:  Okay.

MR. ADLERSTEIN:  So first and foremost the

Page 43

settlement would address the two agreements that are between

the debtors and Merlin, so that's the put and call

agreements and the LMA.  The talent agreement that was also

addressed in the rejection motion we are going to adjourn

the relief sought in connection with that agreement to the

February 8th hearing.

Now, as between the debtors and Merlin the basic

terms of the stipulation and settlement would be as follows.

The put and call agreement would be terminated, and there'd

be a mutual agreement among the parties to terminate that

agreement.  Neither party would have liability under the

agreement.  Critically that includes a release of the

debtor's obligation to pay the put price that Merlin had

required as a result of putting those stations to the

debtors prepetition.  And so that would be a complete waiver

of that claim against the debtor's estates.

The LMA agreement, which is the agreement by which

the debtors are permitted to operate the stations that

Merlin owns, that would be amended to accomplish a handful

of things, most importantly the LMA fee, which is the

monthly fee that the debtors pay, that would be removed as

an ongoing obligation for the debtors to pay.  There would

be a cap on the debtor's obligation to pay certain

reimbursement obligations under that agreement.  And the

debtors would continue to otherwise operate the stations

Page 44

under that agreement for an initial term that would extent to April 30th, subject to the possibility that if Merlin were able to sell the stations and otherwise wanted to terminate the LMA there's a possibility that that term could end before April 30th, but at a minimum absent some earlier termination of the term it would go to April 30th with the ability for either side, on mutual agreement of both parties, to have certain three month -- two three-month extensions of that agreement.

THE COURT:  Okay.

MR. ADLERSTEIN:  The debtors have agreed in the context of the amended LMA to provide certain limited financial information to Merlin to facilitate the process that it's going to pursue, and there would be a mutual release of liability between the debtors and Merlin associated with those agreements, including as I mentioned, the $50 million put price has been -- that Merlin has asserted against the estates.

THE COURT:  So just as a technical matter you said stipulation, you mean stipulation and not under cover of a 9019 motion?

MR. ADLERSTEIN:  Your Honor --

THE COURT:  I haven't heard anything so far --

MR. ADLERSTEIN:  Yeah.

THE COURT:  -- that suggests to me that a 9019

Page 45

would be required, but I'm just asking the question.

MR. ADLERSTEIN:  Our view of the manner in which this could be addressed procedurally is that to resolve the issues associated with the motion to reject and consistent with the parties' ability to terminate the put call agreement and to amend those agreements pursuant to those terms we'd be asking for a stipulation that would be approved by the Court pursuant to which the put call agreement is terminated, the LMA is modified in the way I just reflected, and there's a mutual release of claims by -- between the debtors and Merlin, and that's something that we'd ask to be done through a stipulation and approved order.

THE COURT:  Right, but not a 9019 settlement.

MR. ADLERSTEIN:  Correct.

THE COURT:  Okay.  Okay, that sounds good.

MR. ADLERSTEIN:  So, Your Honor, and then as I mentioned that stipulation and approved order, that would not be addressing relief in respect of the talent agreement, which would get adjourned --

THE COURT:  Okay.

MR. ADLERSTEIN:  -- to the February 8th hearing.

THE COURT:  All right.  But the stip would still be on notice of presentment.

MR. ADLERSTEIN:  I think -- yeah.  So we -- I mean

Page 46

what we have, Your Honor, is that we have previewed the terms of that stipulation and we are working through with the U.S. Trustee -- with the official committee of unsecured creditors, the term lender group, obviously the debtors and Merlin.  Given the level of stakeholder support our request should be that it could get entered immediately.  If Your Honor would require some short period of presentment we'd be happy to abide by that, but given the amount of stakeholder support for that settlement our hope is to be able to do that immediately.

There is some time sensitively associated with what Merlin is trying to do with the stations, and our desire to move quickly on a settlement.

THE COURT:  Well let me -- Mr. Schwartz has risen, so let me hear from him.  If it wouldn't royal the timing I wouldn't mind three days notice of presentment.

Mr. Schwartz, how are you?

MR. SCHWARTZ:  Good morning, Your Honor.  Thank you, Your Honor.  Roger Schwartz --

THE COURT:  Sure.

MR. SCHWARTZ:  -- Latham & Watkins for Merlin.

I wanted to thank the Court and chambers first for giving us the flexibility to work through this issue --

THE COURT:  Absolutely.

MR. SCHWARTZ:  -- until this morning.  Also wanted

Page 47

to thank the debtors for being constructive in terms of reaching our overall settlement, which we think is value add for all constituencies here, and also for as much fun as confirmation may have been for us being involved, we're glad not to be part of that.

THE COURT:  You're welcome to come any way.

MR. SCHWARTZ:  Thank you, Your Honor.

On the timing issue --

THE COURT:  Yeah.

MR. SCHWARTZ:  -- so Your Honor can understand Merlin's perspective.  The goal here is not the jam anyone, but time is important from Merlin's perspective, because from the commencement of the case Merlin has been seeking to mitigate --

THE COURT:  Sure.

MR. SCHWARTZ:  -- the claim here that it's taking in terms of the loss up front, and the Merlin agreements themselves have no shop provisions, which at the beginning of the case we asked to be waived but in the course of discussions --

THE COURT:  Right.

MR. SCHWARTZ:  -- of course they weren't, and as we tried to work through our resolution the no shop provisions now go away as part of this settlement agreement.

And as I imagine Your Honor could appreciate and

Page 48

understand, notice of the rejection motion put the market on notice that the stations are now up for sale.

THE COURT:  In play, right.

MR. SCHWARTZ:  And you know, Merlin has received many inbound calls that it's fielding, but in the spirit of trying to reach settlement and getting to a final resolution has not actively gone to contract with anybody on these stations, et cetera.

And so from Merlin's perspective further delay on a sale process where we'd like to get moving and where also we're going to need FCC approval for any subsequent transaction here --

THE COURT:  I see.

MR. SCHWARTZ:  -- further delay --

THE COURT:  Right.

MR. SCHWARTZ:  -- from our perspective is troublesome or at least more burdensome and each day there's a value issue for us.

THE COURT:  Okay.

MR. SCHWARTZ:  Now --

THE COURT:  Well you just said the magic word, so. I mean because to the extent that each day does affect value, and I think that you -- both sides have made a clear case that no one else's rights would be negatively affected -- whereby I'm shifting in my mind in thinking about this as

Page 49

really a simple stipulation that just consensually resolves a rejection motion --

MR. SCHWARTZ:  Right.

THE COURT:  -- it seems a little more complicated than that, but fundamentally that's what it is.

So I will allow you to have changed my mind, and because you're also going to have some lead time I imagine in finalizing the documentation.

So as long as the committee has no issue then I'm okay with going ahead with entering it upon receipt without a presentment period.

MR. SCHWARTZ:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

MS. LAHAIE:  Good morning, Your Honor.

THE COURT:  Hello.

MS. LAHAIE:  Meredith Lahaie, Akin Gump, proposed counsel to the creditors' committee.

The debtors did preview, just so Your Honor is aware, we did receive a presentation from them last week. We convened the committee, the committee considered the settlement.  We have no objection, and we've actually seen the proposed documentation that will be submitted to you.

THE COURT:  Okay.

MS. LAHAIE:  And we have no issue.  So we're fine proceeding that way.

Page 50

THE COURT:  All right.  Very good.  And then the talent motion is going to be adjourned without date, Mr. Adlerstein?

MR. ADLERSTEIN:  I'm sorry, Your Honor?

THE COURT:  The talent -- the third contract.

MR. ADLERSTEIN:  So we are adjourning that to the February 8th hearing date that we --

THE COURT:  February 8th date.  Okay.

MR. ADLERSTEIN:  And our hope and expectation is that that can be consensually resolved as well.

THE COURT:  Okay.

MR. ADLERSTEIN:  Your Honor, so I think in terms of process and then just to follow on one thing that counsel for Merlin mentioned that there is going to be the sale process, just to apprise the Court, that's something that the company -- the debtors may themselves seek to participate in and it's something that we're not foreclosing, and that's another element of the timing process.

THE COURT:  Okay.  All right.

MR. ADLERSTEIN:  In terms of next steps.  So I think we have as I just outlined an agreement in principle we obviously have to finalize the documentation and make sure that all of the necessary stakeholders have signed off on it.  And so our hope and expectation is to submit

Page 51

something to Your Honor by this afternoon.  And in the event we are unable to do that and we need some help we may come back to you tomorrow morning if there's anything questions or issues.

THE COURT:  Okay.  Sounds good.

All right.  So that gets us to -- I think the remaining matters are all -- have all -- there have been CNOs filed with respect to all of them.

MR. ADLERSTEIN:  That's correct, Your Honor.  My colleague, Ms. Tobler, is available to the extent you want to walk through any of those items.

THE COURT:  Okay.  Ms. Tobler, why don't we do that just for the record.

MS. TOBLER:  Yes, Your Honor.

THE COURT:  So we can start with the omnibus rejection motion, and there was the filing of a corrected rejected contracts list, yes?

MS. TOBLER:  Yes, Your Honor.

THE COURT:  Okay.

MS. TOBLER:  We failed to have included a contract that was in a suite of contracts.  We did contact the counterparty, they were amenable to adding that to the notice of rejected contracts because it is part and parcel of the suite of contracts.

THE COURT:  Okay.

Page 52

MS. TOBLER:  And we did adjourn with respect to

one contract, the relief asked for in the motion, and we did

revise the order accordingly.

So with the certificate of no objection we did --

THE COURT:  Okay.

MS. TOBLER:  -- attach a revised order, and we did

ask for an adjournment with respect to that contract.  We

don't need a date right now, we believe that will be

resolved consensually as well.

THE COURT:  Okay.  So I think the way I'm reading

it is CNBC is being carved out.

MS. TOBLER:  Correct, Your Honor.

THE COURT:  Okay.  Does anyone wish to be heard

with respect to the debtor's omnibus rejection motion?

Okay.  We'll enter that one.

And then that gets us to the retention

applications.

MS. TOBLER:  Yes, Your Honor.  The debtors have

two retention applications again, that were filed, and we

did file a certificate of no objection.

The first one, Your Honor, is Item No. 2 on the

agenda, it is the retention application for KPMG to assist

with certain tax advice that the debtors --

THE COURT:  Right.

MS. TOBLER:  -- are seeking in connection with the

Page 53

restructuring.

Your Honor, we did file a certificate of no objection, that's Docket No. 378, and we -- nothing has change with respect to the order, so the order that was attached to the original application, Docket No. 183, is the one that we would ask Your Honor to enter.

THE COURT:  Okay.  And in addition we have Young Conaway.

MS. TOBLER:  Yes.

THE COURT:  Okay.

MS. TOBLER:  The same, Your Honor.  Again, Young Conaway was retained by Mr. Jan Baker who was the director --

THE COURT:  Yes.

MS. TOBLER:  -- who did some of the investigations that are now in the disclosure statement.  Your Honor, that was -- the application is Docket No. 200.  We did file a certificate of no objection.  We did not receive any replies.  That is Docket No. 379.  And we would ask that the order that was submitted with the application be entered.  There have been no changes to that as well.

THE COURT:  Okay.  Does anyone wish to be heard with respect to either the debtor's motion to retain KPMG or the debtor's application authorizing the retention of Young Conaway?

Page 54

Okay.  So those will be entered.

MS. TOBLER:  And with that, Your Honor, there are two more retention --

THE COURT:  Yes.

MS. TOBLER:  -- applications.  They are the committees', so we would cede the podium to the committee.

THE COURT:  Sure.  Thank you.

MS. DOORLEY:  Hello again, Your Honor.

THE COURT:  Hello again.

MS. DOORLEY:  Kate Doorley from Akin Gump, proposed counsel to the committee.

The next item on the agenda is it the committees' application to retain Akin Gump --

THE COURT:  Yes.

MS. DOORLEY:  -- as counsel, none pro tunc to December 11th.

THE COURT:  Okay.

MS. DOORLEY:  We did receive some comments and requests for additional information from the U.S. Trustee. We filed an amended proposed form of order at Docket 296 and a supplemental declaration from Mike Stamer (ph).  We received no additional responses or objections, and we filed a CNO on that.

THE COURT:  Okay.

MS. DOORLEY:  So unless Your Honor has any

Page 55

questions we would request entry of that order.

THE COURT:  Okay.  Does anyone wish to be heard with respect to the retention by the official committee of the Akin Gump firm?

Okay.  That'll be approved.

MS. DOORLEY:  Excellent.  Thank you, Your Honor.

And the next item is Akin Gump's -- or not -- the committees' application to retain Moelis as financial advisor nunc pro tunc to December 12th.  We received no responses or objections to that application, and we filed a CNO.

THE COURT:  Okay.  Very good.  Anyone wish to be heard with respect to the application by the committee to retain Moelis as financial advisor?

Okay.  Very good.  So that will be entered.

MS. DOORLEY:  Wonderful.  Thank you, Your Honor.

THE COURT:  Okay.  I think, Mr. Bossa (ph), that completes the agenda, yes?

MR. BOSSA:  Yes, Your Honor.  You wanted to talk next steps.

THE COURT:  Please.  So you are currently scheduled to start confirmation on April 12th.

MR. BOSSA:  Correct.  And experts were due -- reports are due the first week in March.  And so what we've done here, Your Honor, just as an approach to the case,

Page 56

we've tried to settle all issues that we can settle, obviously the big issue here is valuation, and I think the good news is that there's not a lot of issues -- we don't think there's a lot of issues other than valuation.

One of the approaches we've taken here is we didn't want Moelis to get their information just through the discovery process, and so, you know, we've facilitated and Moelis has had a number of due diligence calls, and there's I believe a meeting next week, in-person meeting --

THE COURT:  Right.

MR. BOSSA:  -- on diligence.  We had an in-person meeting with the entire creditors' committee yesterday where management and PJT gave a detailed background of the company and updated on recent financial performance, and PJT walked the committee and its professionals through how they were thinking about valuation.  And I think really everybody has been I believe pretty -- very professional in terms of this valuation fight.

I think there's going to be a time in which we're going to sit down and actually try to exchange settlement proposals and see if we can settle it.  I think the key to that is people have to have the information, and people have to have their various professionals' approaches to valuation so some of the detailed matters that Mr. Dunne was referring to, you know, those kind of get crystallized, and so that

Page 57

when you sit down and you negotiate what's the right outcome and how you settle it you're not doing it -- you're doing it with real information and real approaches.

And so certainly my client has said to me, why can't we get the settlement stuff going sooner rather than later to avoid the expense of the process?  And we very much would like that to happen, but we believe that more information has to be exchanged and the expert reports need to be more developed before that happens, and I think we're going to have, you know, an opportunity here between now and confirmation, and luckily we have a good, efficient confirmation schedule, and we'll sit down and try to get the case resolved.

THE COURT:  So this is I guess a question more directed towards Mr. Dunne and Mr. LeBlanc.  The cross-holder group is not retaining its own financial advisor?  Mr. LeBlanc, you play one on TV, I know.

MR. LEBLANC:  Your Honor, at this time we are not.  We are well aligned with the creditors' committee, we've been talking with them a lot.

At the end of the day what I anticipate is I'll spend a reasonable amount of time with PJT in cross-examination, to the extent that we don't have a settlement if we get to that point, but I don't -- at this point you're likely going to see -- we've seen the conflicting valuation

Page 58

experts on all sides, we think that can be counter productive, but we think that we'll likely be supportive of a Moelis valuation and opposing a PJT evaluation, if we get to that point in time without a resolution.

THE COURT:  Okay.  But your group is amenable to engaging in settlement discussions I assume?

MR. LEBLANC:  We are, Your Honor.  Absolutely.

THE COURT:  Thank you.

MR. LEBLANC:  Thank you.

MR. BOSSA:  So that's what we see as the next steps, Your Honor.

THE COURT:  Okay.  So with all deliberate speed, I mean I think your point is well taken about there needing to be information so that those discussions can be well informed, but -- as soon as possible to save fees and --

MR. BOSSA:  And get it done.  We understand, Your Honor.

THE COURT:  -- and get it done.

MR. BOSSA:  Yeah.

THE COURT:  Okay.  Do you need anything else from me today?

I just wanted to in the interest of full disclosure clarify or I don't know if it's a change or a clarification, but you're starting on April 12th, then we have you down for the 13th and then over to the following

Page 59

week the 16th, the 17th, and the 18th.  And then I need to go to Washington for the 19th.  And I think I had given you Friday the 20th as a clean-up day.  I'm taking that back, because I have to go somewhere else to do something else. So I'm telling you affirmatively right now (indiscernible) was for the (indiscernible).

MR. BOSSA:  Well I'm sure with Milbank's arrival it'll make it go much faster, so we --

(Laughter)

MR. BOSSA:  -- we're happy to lose that date, Your Honor.

UNIDENTIFIED SPEAKER:  I'm not even sure how to react to that.

(Laughter)

THE COURT:  I don't either, but I just wanted to let you know that the 20th is off the table and indeed the entire following week is off the table as well --

MR. BOSSA:  So we'll have to get it down, Your Honor.

THE COURT:  -- so you're going to have to get it done.

MR. BOSSA:  Right.

THE COURT:  Okay?  All right.  Thank you all very much.

MR. BOSSA:  Thank you, Your Honor.

Page 60

THE COURT:  It's nice to see you, and we'll --

MR. ADLERSTEIN:  Your Honor, sorry, just one additional housekeeping --

THE COURT:  -- look for your documents.  Yes, Mr. Adlerstein?

MR. ADLERSTEIN:  -- matter in the way of confirmation scheduling.  I believe we are currently scheduled to have our final pretrial conference on April 5th, and --

THE COURT:  Yes.

MR. ADLERSTEIN:  -- our request, and we've run it by counsel for the official committee as well as the term lender group, I haven't had a chance to speak with the Milbank team yet, but to see if your court has availability on the date prior, Wednesday, April 4th at 10 a.m. to have that as the final pretrial conference.

THE COURT:  I think probably yes.  Can you -- I have something in the morning, can you come at noon or 1 o'clock?

MR. ADLERSTEIN:  I'm sure that's fine.  I think one of your litigators is unavailable on the 5th, but I think the 4th was fine, so we will confirm that.

THE COURT:  Okay.  So we can do the 4th strong preference for no earlier than noon or even at 2:00 if you don't want to come down during your lunch hour.

Page 61

MR. ADLERSTEIN:  Perfect, Your Honor.  We'll obviously confirm with chambers if that solves the scheduling issue we had.  And then what I'd propose is we could file a notice to update the scheduling order --

THE COURT:  Right.

MR. ADLERSTEIN:  -- to reflect that.

THE COURT:  Okay.  Very good.  Thank you everyone, have a good day.

MR. ADLERSTEIN:  Thank you.

(Whereupon these proceedings were concluded at 11:05 AM)

Page 62

INDEX

RULINGS

PAGE

Doc #176 Debtors Motion For Entry of an Order

Approving (A) the Adequacy of the Disclosure

Statement; (B) Solicitation and Notice Procedures

with Respect to Confirmation of the Joint Plan of

Reorganization of Cumulus Media Inc. and Its Debtor

Affiliates Pursuant to Chapter 11 of the Bankruptcy

Code; (C) the Form of Ballots and Notice in

Connection Therewith; (D) the Scheduling of Certain

Dates with Respect Thereto; and (E) Related Relief      41

Doc #299 Debtors Motion for Authority to Reject the

Merlin Agreements                                       49

Doc #298 Debtors First Omnibus Motion to Reject

Certain Executory Contracts                             52

Doc #183 Debtors Application for an Order Authorizing

the Employment and Retention of KPMG LLP as Tax

Compliance and Tax Consultants for the Debtors and

Debtors-in-Possession Nunc Pro Tunc to the Petition

Date                                                    54

Page 63

Doc #200 Debtors Application for an Order Authorizing

the Retention and Employment of Young Conaway

Stargatt & Taylor, LLP as Counsel for the Review

Committee of Cumulus Media Inc., Nunc Pro Tunc to

the Petition Date                                              54


Doc #201 Application of the Official Committee of

Unsecured Creditors of Cumulus Media Inc., et al.,

to Retain and Employ Akin Gump Strauss Hauer &

Feld LLP as Counsel                                            55


Doc #203 Application of the Official Committee of

Unsecured Creditors of Cumulus Media Inc., et al.,

to Retain and Employ Moelis & Company LLC as

Financial Advisor                                              55

Page 64

**C E R T I F I C A T I O N**

I, Dawn South, certify that the foregoing transcript is a true and accurate record of the proceedings.

Dawn South

Digitally signed by Dawn South
DN: cn=Dawn South, o, ou,
email=digital1@veritext.com, c=US
Date: 2018.02.05 14:59:34 -05'00'

_____

Dawn South

Certified Electronic Transcriber

Date:  February 6, 2018

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501