PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Tel: 212-373-3000
Fax: 212-757-3990
Paul M. Basta
Lewis R. Clayton
Jacob A. Adlerstein
Claudia R. Tobler

*Counsel for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **CUMULUS MEDIA INC.,** *et al.*, | : | **Case No. 17-13381 (SCC)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |
| | : | |

----------------------------------------------------------------x

### NOTICE OF FILING OF PLAN SUPPLEMENT

PLEASE TAKE NOTICE that on February 2, 2018, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered the order [ECF No. 416] (the "Disclosure Statement Order"): (a) authorizing Cumulus Media Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *First Amended Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 418] (as the same may be updated, supplemented, amended and/or otherwise modified from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the First Amended Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 419] (as the same may be updated, supplemented, amended and/or otherwise modified from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the

---

[1] The last four digits of Cumulus Media Inc.'s tax identification number are 9663. Because of the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/cumulus. The location of the Debtors' service address is: 3280 Peachtree Road, N.W., Suite 2200, Atlanta, Georgia 30305.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE** that, as contemplated by the Plan and the Disclosure Statement Order, the Plan Supplement contains the following attached documents (each as defined in the Plan): (a) the New Corporate Governance Documents for the Reorganized Debtors; (b) the Schedule of Rejected Executory Contracts and Unexpired Leases; (c) the list of retained Causes of Action; (d) the members of the New Cumulus Board and Officers of the Reorganized Debtors; (e) the Description of Transaction Steps; (f) the Reorganized Debtors' Management Incentive Plan; (g) the First Lien Exit Credit Agreement; (h) the Warrant Agreement; and (i) the Equity Allocation Mechanism.

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider the confirmation of the Plan (and in conjunction therewith, approval of the Plan Supplement) (the "Confirmation Hearing") shall begin on **April 12, 2018 at 10:00 a.m. (prevailing Eastern Time)** before the Honorable Judge Shelley E. Chapman, United States Bankruptcy Judge of the United States Bankruptcy Court for the Southern District of New York, at One Bowling Green, Room 623, New York, New York 10004 (the "Court"). The Confirmation Hearing may be continued from time to time without further notice other than the announcement by the Debtors in open court of the adjournment date(s) at the Confirmation Hearing or any continued hearing.

**PLEASE TAKE FURTHER NOTICE** that the deadline for filing objections to the Plan is **March 23, 2018 at 4:00 p.m. (prevailing Eastern Time)** (the "Plan Objection Deadline"). Any objection to confirmation of the Plan must: (a) be in writing; (b) comply with the Bankruptcy Rules, the Local Rules, Chambers' procedures and the Case Management Procedures in these Chapter 11 Cases; (c) state the name and address of the objecting party and the nature and amount of the of the Claim against or Interest in the Estates or property of the Debtors; and (d) state with particularity the legal and factual basis for such objection and, to the extent practicable, a proposed modification to the Plan that would resolve such objection. Responses or objections, if any, also must be filed with the Clerk of the United States Bankruptcy Court for the Southern District of New York, together with proof of service thereon and served upon each of the following parties:

(a)     Counsel to the Debtors, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019, attention: Paul M. Basta (pbasta@paulweiss.com), Jacob A. Adlerstein (jadlerstein@paulweiss.com), Lewis R. Clayton (lclayton@paulweiss.com), and Claudia R. Tobler (ctobler@paulweiss.com);

(b)     Office of the U.S. Trustee for Region 2, U.S. Federal Office Building 201 Varick Street, Suite 1006 New York, NY 10014, attention: Paul K. Schwartzberg (Paul.Schwartzberg@usdoj.gov) and Greg Zipes (Greg.Zipes@usdoj.gov);

2

(c)     Counsel to the Term Lender Group, Arnold & Porter Kaye Scholer
        LLP 70 West Madison Street, Suite 4200, Chicago, IL 60602,
        attention: Michael B. Solow (michael.solow@apks.com), Michael
        D. Messersmith (michael.messersmith@apks.com), and Seth J.
        Kleinman (seth.kleinman@apks.com);

(d)     Counsel to the Creditors' Committee, Akin Gump Strauss Hauer &
        Feld LLP, Bank of America Tower, 1 Bryant Park, New York, NY
        10036, attention: Michael S. Stamer (mstamer@akingump.com),
        Abid Qureshi (aqureshi@akingump.com), and Meredith A. Lahaie
        (mlahaie@akingump.com); and

(e)     Those parties who have formally appeared and requested service in
        these cases pursuant to Bankruptcy Rule 2002 and any other
        parties required to be served pursuant to the Case Management
        Procedures in these Chapter 11 Cases.

        **PLEASE TAKE FURTHER NOTICE** that copies of the Plan Supplement as well as
copies of all documents filed in these chapter 11 cases are available free of charge by visiting
http://dm.epiq11.com/cumulus or by calling (844) 429-1668 within the United States or Canada
or, outside of the United States or Canada, by calling +1 (503) 597-5529.  You may also obtain
copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in
accordance with the procedures and fees set forth therein.

---

**Certain documents, or portions thereof, contained in the Plan Supplement remain subject
to continuing negotiations among the Debtors and interested parties with respect thereto.
The Debtors reserve all rights with respect to the Plan Supplement and the documents
contained therein which are subject to continuing negotiations. The Debtors reserve all
rights to amend, modify, or supplement the Plan Supplement and any of the documents
contained therein, subject to the terms of the Plan and the Restructuring Support
Agreement. To the extent material amendments or modifications are made to any of the
Plan Supplement documents, the Debtors will file a blackline with the Bankruptcy Court
prior to the Confirmation Hearing marked to reflect same.**

3

Dated: March 16, 2018
New York, New York

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

*/s/ Paul M. Basta*
Paul M. Basta
Lewis R. Clayton
Jacob A. Adlerstein
Claudia R. Tobler

1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
pbasta@paulweiss.com
lclayton@paulweiss.com
jadlerstein@paulweiss.com
ctobler@paulweiss.com

*Counsel for Debtors and
Debtors in Possession*

4

## Exhibits to the Plan Supplement

**Exhibit A:**       **New Corporate Governance Documents for Reorganized Debtors**

**Exhibit B:**       **Schedule of Rejected Executory Contracts and Unexpired Leases**

**Exhibit C:**       **List of Retained Causes of Action**

**Exhibit D:**       **Identities of the Members of the New Cumulus Board and Officers of the Reorganized Debtors**

**Exhibit E:**       **Description of Transaction Steps**

**Exhibit F:**       **Reorganized Debtors' Management Incentive Plan**

**Exhibit G:**       **First Lien Exit Credit Agreement**

**Exhibit H:**       **Warrant Agreement**

**Exhibit I:**       **Equity Allocation Mechanism**

## EXHIBIT A

**New Corporate Governance Documents for Reorganized Debtors**

This Exhibit A includes the following organizational documents for the Reorganized Debtors:

1. Exhibit A-1 Amended and Restated Certificate of Incorporation of Reorganized Cumulus

2. Exhibit A-2 Bylaws of Reorganized Cumulus

3. Exhibit A-3 Form of Delaware Limited Liability Company Agreement for Reorganized Debtor Subsidiaries

4. Exhibit A-4 Form of Nevada Limited Liability Company Agreement for Reorganized Debtor Subsidiaries

5. Exhibit A-5 Form of Pennsylvania Limited Liability Company Agreement for Reorganized Debtor Subsidiaries

6. Exhibit A-6 Form of Amended and Restated Certificate of Incorporation for Reorganized Debtor Subsidiaries that are Delaware corporations

7. Exhibit A-7 Form of Amended and Restated Bylaws for Reorganized Debtor Subsidiaries that are Delaware corporations

8. Exhibit A-8 Form of Amended and Restated Articles of Incorporation for Reorganized Debtor Subsidiaries that are Nevada corporations

9. Exhibit A-9 Form of Amended and Restated Bylaws for Reorganized Debtor Subsidiaries that are Nevada corporations

10. Exhibit A-10 Form of Amended and Restated Articles of Incorporation for Reorganized Debtor Subsidiaries that are Pennsylvania corporations

11. Exhibit A-11 Form of Amended and Restated Bylaws for Reorganized Debtor Subsidiaries that are Pennsylvania corporations

**<u>Exhibit A-1</u>**

**Amended and Restated Certificate of Incorporation of Reorganized Cumulus**

**AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**
**OF**
**[REORGANIZED CUMULUS MEDIA INC.]**

[Reorganized Cumulus Media Inc.], a corporation organized and existing under the laws of the state of Delaware, hereby certifies as follows:

1.      The name of the corporation is "[Reorganized Cumulus Media Inc.]" (referred to herein as the "Company").

2.      The Certificate of Incorporation of the Company originally was filed with the Secretary of State of the State of Delaware on April [__], 2018.

3.      This Amended and Restated Certificate of Incorporation amends and restates the provisions of the certificate of incorporation of the Company as heretofore amended (the "Certificate of Incorporation"), and been duly adopted in accordance with the provisions of Sections 242, 245 and 303 of the DGCL.

4.      The text of the Certificate of Incorporation of the Company is hereby amended and restated to read in its entirety as follows:

## ARTICLE I.

### NAME

The name of the Company is [Reorganized Cumulus Media Inc.]

## ARTICLE II.

### REGISTERED AGENT AND REGISTERED OFFICE

The registered agent of the Company is The Corporation Trust Company and the registered office of the Company is located at Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

## ARTICLE III.

### PURPOSE

The purpose or purposes for which the Company is organized is the transaction of any or all lawful business for which corporations may be incorporated under the DGCL.  The Company shall have perpetual existence.

## ARTICLE IV.

### AUTHORIZED SHARES

The aggregate number of shares which the Company is authorized to issue is [_____], consisting of:  (i) [_____] shares designated as Class A Common Stock, $.001 par value per share (hereinafter referred to as the "Class A Common Stock"); (ii) [_____] shares designated as Class B Common

Stock, $.001 par value per share (hereinafter referred to as the "Class B Common Stock"); and (iii) [_____] shares of Preferred Stock, $.001 par value per share (hereinafter referred to as the "Preferred Stock"). The Class A Common Stock and Class B Common Stock shall be referred to collectively herein as the "Common Stock".

## ARTICLE V.

## TERMS OF COMMON STOCK

Except with regard to voting and conversion rights, shares of Class A Common Stock and Class B Common Stock are identical in all respects. The preferences, qualifications, limitations, restrictions, and the special or relative rights in respect of the Common Stock and the various classes of Common Stock shall be as follows:

SECTION 1.        VOTING RIGHTS.

(a)        General Rights.

(i)        The holders of shares of Class A Common Stock shall be entitled to one vote for each share of Class A Common Stock held on the record date therefor on any matter submitted to a vote of the stockholders of the Company. Except as may be required by law or by Section 1(a)(ii) or Section 1(a)(iii) of this Article V, the holders of shares of Class B Common Stock shall not be entitled to vote on any matter submitted to a vote of the stockholders of the Company.

(ii)        Notwithstanding Section 1(a)(i) of this Article V, holders of Class B Common Stock shall be entitled to a separate class vote on any amendment or modification of any specific rights or obligations of the holders of Class B Common Stock that does not similarly affect the rights or obligations of the holders of Class A Common Stock.

(iii)        If and only if any of the following actions are submitted to a vote of the holders of Common Stock, each share of Class B Common Stock shall be entitled to vote with the Class A Common Stock, with each share of Common Stock having one vote and voting together as a single class (provided, that, for the avoidance of doubt, nothing contained in this Section 1(a)(iii) shall be construed to prohibit the Company from taking any action set forth in the following clauses (a) through (f) without a vote of the stockholders of the Company to the extent permitted by applicable law):

(a)        the retention or dismissal of outside auditors by the Company;

(b)        any dividends or distributions to the stockholders of the Company;

(c)        any material sale of assets, recapitalization, merger, business combination, consolidation, exchange of stock or other similar reorganization involving the Company or any of its subsidiaries;

(d)        the adoption of any new or amended Certificate of Incorporation;

(e)        other than in connection with any management equity or similar plan adopted by the Board of Directors of the Company, any authorization or issuance of equity interests, or any security or instrument convertible into or exchangeable for equity interests, in the Company or any of its subsidiaries; and

2

(f)      the liquidation of the Company or any of its subsidiaries.

(b)      <u>No Action by Stockholders Without a Meeting</u>.  All actions of the stockholders of the Company must be taken at an annual or special meeting of the stockholders of the Company and may not be taken by written consent without a meeting.

(c)      <u>Special Meeting of Stockholders</u>.  Special meetings of stockholders of the Company may be called (i) pursuant to a resolution adopted by the Board of Directors or (ii) by the Board of Directors upon the demand, in accordance with procedures in Section 2.3 of the bylaws of the Company, of the holders of record of shares representing at least [__][1]% of all the votes entitled to be cast on any issue proposed to be considered at the special meeting.

SECTION 2.      DIVIDENDS.

Subject to the rights, if any, of the holders of any outstanding Preferred Stock provided for or fixed pursuant to a resolution or resolutions designating such series in accordance with Article VI hereof, the holders of Common Stock shall be entitled to receive when, as and if declared by the Board of Directors of the Company, from funds lawfully available therefor, such dividends as may be declared by the Board of Directors of the Company from time to time.  When and as dividends are declared on Common Stock, the holders of shares of each class of Common Stock will be entitled to share ratably in such dividend according to the number of shares of Common Stock held by them; <u>provided</u>, <u>however</u>, that in the case of dividends payable on Common Stock in shares of Common Stock, only Class A Common Stock will be issued with respect to dividends paid on Class A Common Stock and only Class B Common Stock will be issued with respect to dividends paid on Class B Common Stock.  In the event any class of Common Stock is split, divided or combined, each other class of Common Stock simultaneously shall be proportionately split, divided or combined.  The holders of shares of Common Stock and, to the extent required by the warrant agreement or agreements, entered into between the Company and the warrant agent thereunder on or about [_____], 2018 (as amended, modified or otherwise restated from to time to time, collectively, the "<u>Warrant Agreements</u>"), the holders of warrants issued pursuant to the Warrant Agreements (the "<u>Warrants</u>") shall be entitled to participate in such dividends ratably on a per share basis (in the case of holders of Warrants, based upon their ownership of Class A or Class B Common Stock, as the case may be, underlying their Warrants on an as-exercised basis); provided, that no such distribution shall be made to holders of Warrants, Class A Common Stock or Class B Common Stock if (i) a Federal Communications Commission ("<u>FCC</u>") ruling, regulation or policy prohibits such distribution to holders of Warrants or (ii) the Company's FCC counsel opines that such distribution is reasonably likely to cause (a) the Company to violate any applicable FCC rules or regulations or (b) any such holder of Warrants to be deemed to hold an attributable interest in the Company.

SECTION 3.      LIQUIDATION, DISSOLUTION OR WINDING-UP.

In the event of any liquidation, dissolution or winding up of the Company, whether voluntarily or involuntarily, after payment or provision for payment of the debts and other liabilities of the Company and the preferential amounts to which the holders of any shares ranking prior to the Common Stock in the distribution of assets shall be entitled upon liquidation, the holders of shares of the Class A Common Stock and the Class B Common Stock shall be entitled to share pro rata in the remaining assets of the Company in proportion to the respective number of shares of Common Stock held by each holder compared to the aggregate number of shares of Common Stock outstanding.

---

[1]      **Note to Draft**: Threshold to be confirmed.

3

SECTION 4.      MERGER OR CONSOLIDATION.

In the event of a merger or consolidation of the Company, shares of Class A Common Stock and Class B Common Stock shall be treated identically, except with respect to voting and conversion rights as specifically described in this Article V; provided, however, that, except where the Class A Common Stock and the Class B Common Stock are to remain outstanding, the consideration received for each share of Class A Common Stock and Class B Common Stock as part of any such merger or consolidation shall be identical.

SECTION 5.      CONVERTIBILITY, TRANSFERS.

(a)      Conversion of Class B Common Stock.  Each holder of Class B Common Stock is entitled to convert at any time or times all or any of such holder's whole shares of Class B Common Stock into an equal number of shares of Class A Common Stock; provided, however, that to the extent that such conversion would result in the holder holding more than 4.99% of the outstanding shares of Class A Common Stock following such conversion, the holder shall first deliver to the Company an ownership certification in form and substance reasonably satisfactory to the Company for the purpose of enabling the Company (a) to determine that such holder does not have an attributable interest in another entity that would cause the Company to violate the Communications Act or FCC Regulations, and (b) to obtain any necessary approvals from the FCC or the United States Department of Justice.  For the avoidance of doubt, the conversion rights provided by this Article V, Section 5 shall apply to whole shares of Class B Common Stock only, and the Company shall have no obligation to honor a request for conversion of a fraction of a share of Class B Common Stock. Notwithstanding anything to the contrary contained herein, the Company shall not be required to convert any share of Class B Common Stock if the Company reasonably and in good faith determines that such conversion would result in a violation of the Communications Act, the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, or the rules and regulations promulgated under either such Act.

(b)      Condition Precedent to Conversion.  As a condition precedent to any conversion of any shares of Class B Common Stock, the holder shall give the Company not less than five (5) business days' prior written notice of any intended conversion and the identity of the Person who will hold the converted shares, and shall promptly provide the Company, in addition to the information required by Section 5(a), with any information reasonably requested by the Company to ensure compliance with applicable law.

(c)      Conversion.

(i)      Effective Time and Deliveries upon Conversion.  Upon delivery of a notice of conversion in conformity with the foregoing provisions, the Company shall thereupon, as promptly as reasonably practicable, and in any event within five business days after receipt by the Company of such notice of conversion, make or cause to be made a book entry into the stock ledger of the Company for the aggregate number of shares of Class A Common Stock issuable upon such conversion (based upon the aggregate number of shares of Class B Common Stock so converted).  Any share of Class B Common Stock converted hereunder shall, to the extent (A) such shares are properly converted in accordance with the terms hereof, (B) the Company has made a reasonable and good faith determination that such conversion does not violate the Communications Act or FCC Regulations and (C) subject to Section 5(a) of this Article V and Section 6 of this Article V, below, be deemed to have been effected immediately prior to the close of business on the day on which the notice of conversion shall have been delivered to the Company.  At such time, the book entry into the stock ledger of the Company for the shares of Class A Common Stock issuable upon such conversion shall be deemed to have been made, and the holder thereof shall be deemed to be and entitled to all rights of the holder of record of such Class A Common Stock.

4

(ii)    <u>No Adverse Action</u>.  The Company will, subject to the provisions of this Section 5 and Section 6, below, (i) not close its books against the transfer of Class A Common Stock issued or issuable upon conversion of Class B Common Stock in any manner which interferes with the timely conversion of Class B Common Stock, and (ii) take all such actions as are reasonably necessary in order to ensure that the Class A Common Stock issued or issuable with respect to such conversion will be validly issued, fully paid and non-assessable.

(iii)    <u>Sufficient Shares</u>.  The Company shall at all times have authorized, reserved and set aside a sufficient number of shares of Class A Common Stock for the conversion of all shares of Class B Common Stock then outstanding.

(d)    <u>Condition Precedent to Transfers</u>.  As a condition precedent to any transfers of record or beneficial ownership of any Capital Stock which would cause a transferee and its Affiliates to, solely as a result of such transfer, together hold of record or beneficially, in excess of 4.99% of any class of the Company's Capital Stock, the transferor shall give the Company not less than five (5) business days' prior written notice of any intended transfer and the identity of the Person who will be the transferee, and shall promptly provide the Company with any information reasonably requested by the Company to ensure compliance with applicable law.

(e)    <u>Automatic Conversion upon exercise or exchange of Warrants</u>.  Upon (i) the exercise of any warrants (the "<u>Initial Warrants</u>") issued pursuant to that certain Warrant Agreement, dated as of [__], 2018, by and between the Company and [__], as warrant agent, (the "<u>Initial Warrant Agreement</u>"), for shares of Class A Common Stock or (ii) the exchange of any Initial Warrants for shares of Class A Common Stock, in each case in accordance with Section 9.16 of the Initial Warrant Agreement, an equal number of shares of Class B Common Stock shall first be issued to the exercising or exchanging holder, clauses (a) through (d) of this Section 5 shall be deemed to be complied with by virtue of exercising or exchanging the Initial Warrant in accordance with the provisions of the Initial Warrant Agreement and such shares of Class B Common Stock shall immediately and automatically convert into an equal number of shares of Class A Common Stock without any further action by the holder of the Initial Warrant.

SECTION 6.    FCC MATTERS.

To the extent necessary to comply with the Communications Act and FCC Regulations, the Board of Directors may (i) take any action it believes necessary to prohibit the ownership or voting of more than 22.50% (or such higher number as may be approved by the FCC after the date of this Amended and Restated Certificate of Incorporation) of the Company's outstanding Capital Stock by or for the account of aliens or their representatives or by a foreign government or representative thereof or by any entity organized under the laws of a foreign country (collectively "<u>Aliens</u>"), or by any other entity (a) that is subject to or deemed to be subject to control by Aliens on *a de jure or de facto* basis or (b) owned by, or held for the benefit of, Aliens in a manner that would cause the Company to be in violation of the Communications Act or FCC Regulations; (ii) prohibit any transfer of the Company's stock which the Company believes could cause more than 22.50% (or such higher number as may be approved by the FCC after the date of this Amended and Restated Certificate of Incorporation) of the Company's outstanding Capital Stock to be owned or voted by or for any person or entity identified in the foregoing clause (i); (iii) prohibit the ownership, voting or transfer of any portion of its outstanding Capital Stock to the extent the ownership, voting or transfer of such portion would cause the Company to violate or would otherwise result in violation of any provision of the Communications Act or FCC Regulations; and (iv) redeem Capital Stock to the extent necessary to bring the Company into compliance with the Communications Act or FCC Regulations or to prevent the loss or impairment of any of the Company's FCC licenses.

5

SECTION 7.    LEGEND.

Shares of Common Stock, to the extent certificated, shall bear a legend setting forth the restrictions on transfer and ownership which apply to such shares.

SECTION 8.    DEFINITIONS.

For the purposes of this certificate of incorporation, the following capitalized terms shall have the meanings set forth below:

"Advancement of Expenses" shall be defined as set forth in Article XI.

"Affiliate" shall be defined as set forth in Rule 144 promulgated under the Securities Act.

"Aliens" shall be defined as set forth in Section 6 of this Article V.

"Capital Stock" means all shares now or hereafter authorized of any class or series of capital stock of the Company which has the right to participate in the distribution of the assets and earnings of the Company, including Common Stock and any shares of capital stock into which Common Stock may be converted (as a result of recapitalization, share exchange or similar event) or are issued with respect to Common Stock, including, without limitation, with respect to any stock split or stock dividend, or a successor security.

"Class A Common Stock" shall be defined as set forth in Article IV.

"Class B Common Stock" shall be defined as set forth in Article IV.

"Common Stock" shall be defined as set forth in Article IV.

"Communications Act" shall mean the Communications Act of 1934, as amended.

"Director" shall mean a current or former member of the Board of Directors of the Company or Cumulus Media, Inc. (the "Predecessor Company").

"DGCL" shall mean General Corporation Law of Delaware, as amended from time to time.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"FCC" shall mean the Federal Communications Commission.

"FCC Regulations" shall mean the rules, regulations or policies promulgated by the FCC and in effect from time to time.

"Final Adjudication" shall be defined as set forth in Article XI.

"Indemnitee" shall be defined as set forth in Article XI.

"Person" shall include any individual, entity, or group within the meaning of Section 13(d)(3) of the Exchange Act.

"Preferred Stock" shall be defined as set forth in Article IV.

"Proceeding" shall be defined as set forth in Article XI.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Undertaking" shall be defined as set forth in Article XI.

"Voting Securities" means the Common Stock and any other securities of the Company of any kind or class having power generally to vote for the election of Directors.

"Warrants" shall be as defined in Section 2 of this Article V.

"Warrant Agreements" shall be as defined in Section 2 of this Article V.

## ARTICLE VI.

### TERMS OF PREFERRED STOCK

The Board of Directors is hereby expressly authorized to provide, out of the unissued shares of Preferred Stock, for one or more series of Preferred Stock and, with respect to each such series, to fix the number of shares constituting such series and the designation of such series, the voting powers, if any, of the shares of such series, and the preferences and relative, participating, optional or other special rights, if any, and any qualifications, limitations or restrictions thereof, of the shares of such series.  The powers, preferences and relative, participating, optional and other special rights of each series of Preferred Stock, and the qualifications, limitations or restrictions thereof, if any, may differ from those of any and all other series at any time outstanding.  Except to the extent otherwise provided in any resolution or resolutions providing for the issue of any series of Preferred Stock, the number of authorized shares of Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the outstanding shares of Common Stock.[2]

## ARTICLE VII.

### NO CUMULATIVE VOTING

No holder of any shares of any class of stock of the Company shall be entitled to cumulative voting rights in any circumstances.

## ARTICLE VIII.

### NO PRE-EMPTIVE RIGHTS

No stockholders shall have any pre-emptive rights to acquire unissued shares of the Company or securities of the Company convertible into or carrying a right to subscribe to or acquire shares.

---

[2] **Note to Draft**: Issuance of preferred stock in the context of a shareholder rights plan to be discussed.

## ARTICLE IX.

### ELECTION BY WRITTEN BALLOT NOT REQUIRED

Elections of Directors need not be by written ballot except and to the extent provided in the bylaws of the Company.

## ARTICLE X.

### LIMITATION OF LIABILITY OF DIRECTORS

To the full extent permitted by the DGCL or any other applicable law currently or hereafter in effect, no Director will be personally liable to the Company or its stockholders for or with respect to any acts or omissions in the performance of his or her duties as a Director. Any repeal or modification of this Article X will not adversely affect any right or protection of a Director existing prior to such repeal or modification. If the DGCL is hereafter amended to permit further elimination or limitation of the personal liability of directors, then the liability of a Director shall be eliminated or limited to the fullest extent permitted by the DGCL as so amended. Any repeal or modification of this Article TENTH by the stockholders of the Company, adoption of any provision inconsistent herewith or otherwise shall not adversely affect any right or protection of a Director existing at the time of such repeal, alteration, amendment, adoption or modification. The provisions of this Article TENTH shall continue as to a person who has ceased to be a Director and shall inure to his heirs, executors, administrators and personal and legal representatives.

## ARTICLE XI.

### INDEMNIFICATION

(a)      Right to Indemnification. Each person who was or is a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding") by reason of the fact that the person is or was a director or officer of the Company or the Predecessor Company, or while a director or officer of the Company or the Predecessor Company is or was serving at the request of the Company or the Predecessor Company as a director, officer, manager, employee or agent (including attorneys and other professionals) of another corporation, partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan, and such current and former director, officer or manager's Affiliates (an "Indemnitee"), whether the basis of such Proceeding is alleged action in an official capacity as a director, officer, employee or agent or in any other capacity while serving as a director, officer, manager, employee or agent, shall be indemnified and held harmless by the Company to the fullest extent permitted or required by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than such law permitted the Company to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such Indemnitee in connection therewith if such person acted in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such person's conduct was unlawful. The termination of any claim, action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Company, and with respect to any criminal action or

8

proceeding, had reasonable cause to believe that such person's conduct was unlawful. Such indemnification shall continue to a person who has ceased to serve in the capacity which initially entitled such person to indemnity hereunder, and such indemnification shall inure to the benefit of such person's heirs, executors and administrators. Notwithstanding the foregoing, except as provided in paragraph (c) of this Article XI with respect to Proceedings to enforce rights to indemnification, the Company shall indemnify any such Indemnitee in connection with a Proceeding (or part thereof) initiated by such Indemnitee only if such Proceeding (or part thereof) was authorized by the Board of Directors of the Company.

(b)    Right to Advancement of Expenses. The right to indemnification conferred in paragraph (a) of this Article XI shall include the right to be paid by the Company the expenses (including, without limitation, attorneys' fees and expenses) incurred in defending any such Proceeding in advance of its final disposition (an "Advancement of Expenses"); provided, however, that, if the DGCL so requires, an Advancement of Expenses incurred by an Indemnitee in such person's capacity as a director or officer shall be made only upon delivery to the Company of an undertaking (an "Undertaking"), by or on behalf of such Indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (a "Final Adjudication") that such Indemnitee is not entitled to be indemnified for such expenses under this paragraph (b) or otherwise. The rights to indemnification and to the Advancement of Expenses conferred in paragraphs (a) and (b) of this Article XI shall be contract rights and such rights shall continue as to an Indemnitee who has ceased to be a director, officer, manager, employee or agent and shall inure to the benefit of the Indemnitee's heirs, executors and administrators.

(c)    Right of Indemnitee to Bring Suit. If a claim under paragraphs (a) and (b) of this Article XI is not paid in full by the Company within 60 calendar days after a written claim has been received by the Company, except in the case of a claim for an Advancement of Expenses, in which case the applicable period shall be 20 calendar days, the Indemnitee may at any time thereafter bring suit against the Company to recover the unpaid amount of the claim. If successful in whole or in part in any such suit, or in a suit brought by the Company to recover an Advancement of Expenses pursuant to the terms of an Undertaking, the Indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit. In (i) any suit brought by the Indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the Indemnitee to enforce a right to an Advancement of Expenses) it shall be a defense that, and (ii) any suit brought by the Company to recover an Advancement of Expenses pursuant to the terms of an Undertaking, the Company shall be entitled to recover such expenses upon a Final Adjudication that, the Indemnitee has not met any applicable standard for indemnification set forth in the DGCL. Neither the failure of the Company (including its Board of Directors, independent legal counsel or stockholders) to have made a determination prior to the commencement of such suit that indemnification of the Indemnitee is proper in the circumstances because the Indemnitee has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Company (including its Board of Directors, independent legal counsel or stockholders) that the Indemnitee has not met such applicable standard of conduct, shall create a presumption that the Indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the Indemnitee, be a defense to such suit. In any suit brought by the Indemnitee to enforce a right to indemnification or to an Advancement of Expenses hereunder, or brought by the Company to recover an Advancement of Expenses pursuant to the terms of an Undertaking, the burden of proving that the Indemnitee is not entitled to be indemnified, or to such Advancement of Expenses, under this Article XI or otherwise shall be on the Company.

(d)    Non-Exclusivity of Rights. The rights to indemnification and to the Advancement of Expenses conferred in this Article XI shall not be exclusive of any other right which any person may have

9

or hereafter acquire under any statute, the Company's certificate of incorporation, bylaws, any agreement, vote of stockholders or disinterested directors or otherwise.

(e)     Insurance.  The Company may maintain insurance, at its expense, to protect itself and any person who is or was a director, officer, employee or agent of the Company or the Predecessor Company, or is or was serving at the request of the Company or the Predecessor Company as a director, officer, manager, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, or any of such director's, officer's or manager's Affiliates, against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Company would have the power to indemnify such person against such liability under the DGCL.

(f)     Indemnification of Employees and Agents of the Company.  The Company may, to the extent authorized from time to time by the Board of Directors, grant rights to indemnification and to the Advancement of Expenses to any employee or agent of the Company or the Predecessor Company to the fullest extent of the provisions of this Article XI with respect to the indemnification and Advancement of Expenses of directors and officers of the Company or the Predecessor Company.

## ARTICLE XII.

## BOARD OF DIRECTORS

(a)     Composition of the Board of Directors.  The business and affairs of the Company shall be managed by or under the direction of the Board of Directors.  In addition to the powers and authority expressly conferred upon them by statute or by this Certificate of Incorporation or the bylaws of the Company then in effect, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Company, subject, nevertheless, to the DGCL, this Certificate of Incorporation, and the bylaws of the Company. Subject to the rights, if any, of the holders of any outstanding Preferred Stock provided for or fixed pursuant to a resolution or resolutions designating such series in accordance with Article VI hereof, the Board of Directors shall consist of seven members, one of whom shall at all times be the Chief Executive Officer of the Company.  At each annual meeting of stockholders, directors shall be elected for a term of office to expire at the succeeding annual meeting of stockholders.  Directors shall be of one class and each director shall serve until his or her successor shall have been duly elected and qualified or, if earlier, until his or her death, resignation or removal. Subject to the rights, if any, of the holders of any outstanding Preferred Stock provided for or fixed pursuant to a resolution or resolutions designating such series in accordance with Article VI hereof, the holders of the issued and outstanding shares of Class A Common Stock shall have the right and power to elect all the directors of the Company by [vote of holders of a majority of the votes of the issued and outstanding Class A Common Stock present in person or represented by proxy at any meeting at which a quorum is present called for the purpose of electing directors.][3]

(b)     Term of Office.  The term of the initial Board of Directors shall be through the 2019 annual meeting of the Company.

(c)     Removal.  Subject to the rights, if any, of the holders of any outstanding Preferred Stock provided for or fixed pursuant to a resolution or resolutions designating such series in accordance with Article VI hereof, any director or the entire Board of Directors may be removed from office, with or without cause, by the affirmative vote of no less than a majority of the total voting power of the

---

[3]     **Note to Draft**: Voting standard for election of directors to be discussed.

outstanding shares of the Capital Stock of the Company entitled to vote in any annual election of directors, voting together as a single class.

## ARTICLE XIII.

## AMENDMENT OF THE BYLAWS

In furtherance and not in limitation of the rights, powers, privileges, and discretionary authority granted or conferred by the DGCL or other statutes or laws of the State of Delaware, the Board of Directors is expressly authorized to make, alter, amend or repeal the bylaws of the Company, without any action on the part of the stockholders, but the stockholders may make additional by-laws and may alter, amend or repeal any bylaw whether adopted by them or otherwise.  The Company may in its bylaws confer powers upon the Board of Directors in addition to the foregoing and in addition to the powers and authorities expressly conferred upon the Board of Directors by applicable law.

## ARTICLE XIV.

## SECTION 203 OF THE DGCL

The Company expressly elects not to be governed by Section 203 of the DGCL.

## ARTICLE XV.

## EXCLUSIVE FORUM

Unless the Company consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware (the "Court of Chancery") shall be the sole and exclusive forum for any stockholder of the Company (including a beneficial owner of stock) to bring (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Company to the Company or the Company's stockholders, (iii) any action asserting a claim against the Company, its directors, officers or employees arising pursuant to any provision of the DGCL or this Certificate of Incorporation or the bylaws of the Company, or (iv) any action asserting a claim against the Company, its directors, officers or employees governed by the internal affairs doctrine, except as to each of (i) through (iv) above, for any claim as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction.

## ARTICLE XVI.

## MISCELLANEOUS

Subject to further amendments of this Certificate of Incorporation, as provided by applicable law, the Company shall not issue any non-voting equity securities in violation of Section 1123(a)(6) of Title 11 of the Bankruptcy Code, as in effect on the date of filing of this Certificate of Incorporation with the Secretary of State of the State of Delaware; provided, however, that the foregoing restriction (i) shall have such force and effect only for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Company, (ii) shall not have any further force or effect beyond that required under Section

11

1123(a)(6), and (iii) may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

IN WITNESS WHEREOF, the Company has caused this Amended and Restated Certificate of Incorporation to be executed by a duly authorized officer as of the [●] day of [●], 2018.


[REORGANIZED CUMULUS MEDIA INC.]


By: _____
Name:
Title:

Doc#: US1:11940291v7

**<u>Exhibit A-2</u>**
**Bylaws of Reorganized Cumulus**

AS AMENDED
THROUGH [●], 2018

**BYLAWS**
**OF**
**[REORGANIZED CUMULUS MEDIA INC.]**

**ARTICLE I**
**OFFICES; BOOKS AND RECORDS**

SECTION 1.1 REGISTERED OFFICE AND AGENT. [Reorganized Cumulus Media Inc.] (hereinafter called the "Corporation") shall at all times maintain a registered office in the state of Delaware and a registered agent at that address, as required by the Delaware General Corporation Law (the "DGCL"), but may have such other offices located in or outside the State of Delaware as the Board of Directors of the Corporation may from time to time determine. The registered agent may be changed from time to time by the Board of Directors.

SECTION 1.2 BOOKS AND RECORDS.  Any records maintained by the Corporation in the regular course of its business, including its stock ledger, books of account and minute books, may be maintained on any information storage device or method; provided that the records so kept can be converted into clearly legible paper form within a reasonable time. The Corporation shall so convert any records so kept upon the request of any person entitled to inspect such records pursuant to applicable law. Every Director shall have the absolute right at any reasonable time to inspect all books, records, and documents of every kind and the physical properties of the Corporation and each of its subsidiary corporations.  This inspection by a Director may be made in person or by an agent or attorney, and the right of inspections includes the right to copy and make extracts of documents.

**ARTICLE II**
**STOCKHOLDERS' MEETINGS**

SECTION 2.1 PLACE OF MEETINGS.  Meetings of the stockholders of the Corporation may be held at such place, either within or without the State of Delaware, as may be determined by the Board of Directors.  The Board of Directors may, in its sole discretion, determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication as provided under the DGCL.

SECTION 2.2  ANNUAL MEETING.

(a)  The annual meeting of the stockholders of the Corporation shall be held on such date and at such time and place, if any, as may be fixed by resolution of the Board of Directors, for the purpose of electing Directors and transacting such other business as may properly come before the meeting. Nominations of persons for election to the Board of Directors and the proposal of business to be considered by the stockholders may be made at an annual meeting of stockholders:  (i) pursuant to the Corporation's notice of meeting of stockholders; (ii) by or at the direction of the Board of Directors; or (iii) by any stockholder of the Corporation who was a stockholder of record at the time of the giving of notice required by the following paragraph, who is entitled to vote at the meeting and who has complied with the procedures set forth in this Section 2.2.  Subject to the rights, if any, of holders of any outstanding shares of Preferred Stock to elect additional directors, only persons who are nominated in accordance with the procedures set forth in this Section 2.2 shall be eligible for election as Directors.

(b)      At an annual meeting of the stockholders, only such business shall be conducted as shall have been properly brought before the meeting.  For nominations or other business to be properly brought before an annual meeting by a stockholder pursuant to clause (iii) of Section 2.2(a) of these Bylaws, (i) the stockholder must have given timely notice thereof in writing to the Secretary of the Corporation and (ii) such other business must be a proper matter for stockholder action under the DGCL. To be timely, a stockholder's notice shall be delivered to the Secretary at the principal executive offices of the Corporation not later than the close of business on the ninetieth (90th) day nor earlier than the close of business on the one hundred twentieth (120th) day prior to the first anniversary of the preceding year's annual meeting; provided that if the date of the annual meeting is advanced more than thirty (30) days prior to or delayed by more than thirty (30) days after the anniversary of the preceding year's annual meeting, notice by the stockholder to be timely must be so delivered not earlier than the close of business on the one hundred twentieth (120th) day prior to such annual meeting and not later than the close of business on the later of the ninetieth (90th) day prior to such annual meeting and the tenth (10th) day following the day on which public announcement of the date of such meeting is first made.  In no event shall the public announcement of or postponement or adjournment of an annual meeting commence a new time period for the giving of a stockholder's notice as described above.  Such stockholder's notice shall set forth:  (A) as to each person whom the stockholder proposed to nominate for election or reelection as a Director, all information relating to such person that is required to be disclosed in solicitations of proxies for election of Directors in an election contest, or is otherwise required, in each case pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended (the "Exchange Act") and Rule 14a-4(d) thereunder (including such person's written consent to being named in a proxy statement as a nominee and to serving as a Director if elected, the address and principal occupation or employment of each nominee, a description of all arrangements or understandings between the stockholder and each nominee and any person or persons (naming such person or persons) pursuant to which the nomination or nominations are to be made by the stockholder); (B) as to any other business that the stockholder proposes to bring before the meeting, a brief description of the business desired to be brought before the meeting, the reasons for conducting such business at the meeting and any material interest in such business of such stockholder and the beneficial owner, if any, on whose behalf the proposal is made; and (C) as to the stockholder giving the notice and the beneficial owner, if any, on whose behalf the nomination or proposal is made (i) the name and address of such stockholder, as they appear on the Corporation's books, and of such beneficial owner and (ii) the class and number of shares of the Corporation which are owned beneficially and of record by such stockholder and such beneficial owner. The person providing the notice shall also be required to provide such further information as may be requested by the Corporation to comply with federal securities laws, rules and regulations.

(c)      Except as otherwise provided by law, the chairman of the meeting shall have the power and duty to determine whether a nomination or any business proposed to be brought before the meeting was made or proposed in accordance with the procedures set forth in these Bylaws and, if any proposed nomination or business is not in compliance with these Bylaws, to declare that such defective proposal or nomination shall not be presented for stockholder action at the meeting and shall be disregarded.

SECTION 2.3 SPECIAL MEETINGS.

(a)      A special meeting of the stockholders (a "Special Meeting")  may be called only (i) pursuant to a resolution approved by the Board of Directors, or (ii) the Board of Directors upon the demand of the holders of record of shares representing at least [__][1]% of all the votes entitled to be cast on any issue proposed to be considered at the Special Meeting.

---

[1]      **Note to Draft**: Threshold to be confirmed.

2

(b)      In order that the Corporation may determine the stockholders entitled to demand a Special Meeting, the Board of Directors may fix a record date to determine the stockholders entitled to make such a demand (the "Demand Record Date"). The Demand Record Date shall not precede the date upon which the resolution fixing the Demand Record Date is adopted by the Board of Directors. Any stockholder of record seeking to have stockholders demand a Special Meeting shall, by sending written notice to the Secretary of the Corporation, by hand or by certified or registered mail, return receipt requested, request the Board of Directors to fix a Demand Record Date. The Board of Directors shall promptly, but in all events within thirty (30) days after the date on which a valid request to fix a Demand Record Date is received, adopt a resolution fixing the Demand Record Date and shall make a public announcement of such Demand Record Date. If no Demand Record Date has been fixed by the Board of Directors within thirty (30) days after the date on which such request is received by the Secretary, the Demand Record Date shall be the 30th day after the first day on which a valid written request to set a Demand Record Date is received by the Secretary.  To be valid, such written request from a stockholder entitled to demand a Special Meeting (a "Demand Request") shall set forth the purpose or purposes for which the Special Meeting is to be held, shall be signed by one or more stockholders of record (or their duly authorized proxies or other representatives), shall bear the date of signature of each such stockholder (or proxy or other representative) and shall set forth all information about each such stockholder and about the beneficial owner or owners, if any, on whose behalf the request is made that would be required to be set forth in a stockholder's notice described in Section 2.2(b). No Special Meeting shall be required to be called pursuant to clause (ii) of Section 2.3(a) unless, within thirty (30) days after the Demand Record Date, stockholders of record representing at least [__][2]% of all the votes entitled to be cast on any issue proposed to be considered at the Special Meeting as set forth in the Demand Request (such percentage of stockholders, the "Required Percent") shall have delivered to the Secretary of the Corporation, in the same manner required for Demand Requests, written requests or requests (each, a "Meeting Request") to hold a Special Meeting.  Nothing herein shall prohibit the Board of Directors from including in the Corporation's notice of any Special Meeting additional matters to be submitted to the stockholders at such meeting not included in the Demand Request. Subject to the following sentence, the date, time and place, if any, of such Special Meeting, shall be not less than thirty-five (35) nor more than one hundred twenty (120) days after the date of the receipt by the Secretary of Meeting Requests from the Required Percent. Notwithstanding anything to the contrary in this Section 2.3, a Special Meeting requested by the stockholders (A) shall not be required to be held if (i) the Board of Directors has called or calls for an annual meeting of stockholders, (ii) the date designated by the Board of Directors for such annual meeting is within one hundred twenty (120) days after the date of receipt by the Secretary of Meeting Requests from the Required Percent and (iii) the purpose of such annual meeting includes or is amended to include (among any other matters properly brought before the annual meeting) the purposes specified in the Demand Request and (B) shall not be required to be held prior to [__][3] days after the last annual meeting of stockholders of the Corporation.

SECTION 2.4 NOTICES TO STOCKHOLDERS.

(a)      Required Notice.  Written notice stating the place, day and hour of any meeting of the stockholders and, in case of a Special Meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) days (twenty (20) days in the case of a merger, consolidation, share exchange, dissolution or sale, lease or exchange of material assets) nor more than sixty (60) days before the date of the meeting (unless a different time is provided by the DGCL or the Corporation's Certificate of Incorporation), by or at the direction of the Chairman, the Chief Executive Officer, or the Secretary, to each stockholder of record entitled to vote at such meeting and to any other

---

[2]      **Note to Draft**: Threshold to be confirmed.
[3]      **Note to Draft**: Number of days to be confirmed.

3

stockholder entitled by the DGCL or the Corporation's Certificate of Incorporation to receive notice of such meeting.  If mailed, such notice is effective when deposited in the United States mail, and shall be addressed to the stockholder's address shown in the current record of stockholders of the Corporation, with postage thereon prepaid.  Without limiting the manner by which notice otherwise may be given effectively to stockholders, notice of meetings may be given to stockholders by means of electronic transmission in accordance with applicable law.

(b)   Adjourned Meeting. Except as provided in the next sentence, if any stockholder meeting is adjourned to a different date, time, or place, notice need not be given of the new date, time, and place, if the new date, time, and place is announced at the meeting before adjournment. If a new record date for the adjourned meeting is or must be fixed, then notice must be given pursuant to the requirements of paragraph (a) of this Section 2.4, to those persons who are stockholders as of the new record date.

(c)   Waiver of Notice.  A stockholder may waive notice in accordance with Section 2.12 of these Bylaws.

(d)   Contents of Notice. The notice of each Special Meeting shall include a description of the purpose or purposes for which the meeting is called.  Except as otherwise provided in these Bylaws, in the Corporation's Certificate of Incorporation, or in the DGCL, the notice of an annual stockholder meeting need not include a description of the purpose or purposes for which the meeting is called. If the purpose of the meeting, or one of its purposes, is to consider a proposed reduction of stated capital without amendment to the Certificate of Incorporation, or voluntary dissolution or revocation of a voluntary dissolution by act of the Corporation, or a proposed disposition of all (or substantially all) of the assets of the Corporation outside of the ordinary course of business, the notice of the meeting shall state such purpose. If the purpose of the meeting, or one of its purposes, is to consider a proposed amendment to the Certificate of Incorporation, the notice shall set forth the proposed amendment or a summary of the changes to be effected thereby; and if the purpose of the meeting, or one of its purposes, is to consider a proposed merger or consolidation, a copy or a summary of the plan of merger or plan of consolidation, as the case may be, shall be included in or enclosed with the notice of the meeting.

SECTION 2.5 FIXING OF RECORD DATE.

(a)   The Board of Directors may fix a date as the record date for any determination of stockholders entitled to notice of, and to vote at, a stockholders' meeting, such date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors and shall not be less than ten (10) days nor more than sixty (60) days prior to the meeting.  In the case of any Special Meeting called by the stockholders in accordance with the provisions of Section 2.3 of these Bylaws, if the Board of Directors fails to fix the Demand Record Date within thirty (30) days after the Secretary received a valid written request from the stockholders to set a Demand Record Date,  then the close of business on such 30th day shall be the Demand Record Date. When a determination of stockholders entitled to vote at any meeting of stockholders has been made as provided in these Bylaws, such determination shall be applied to any adjournment thereof unless the Board of Directors fixes a new record date and except as otherwise required by law. A new record date must be set if a meeting is adjourned to a date more than one hundred twenty (120) days after the date fixed for the original meeting.

(b)   The Board of Directors may fix a date as the record date for determining stockholders entitled to receive a dividend or distribution, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall not be more than sixty (60) days prior to such payment. If no record date is fixed for the determination of stockholders entitled to receive a dividend or distribution (other than a distribution involving a purchase, redemption or

4

other acquisition of the Corporation's shares), the close of business on the day on which the resolution of the Board of Directors is adopted declaring the dividend or distribution shall be the record date.

SECTION 2.6 STOCKHOLDER LIST. The officer or agent having charge of the stock transfer books for shares of the Corporation shall, by the earlier of (a) twenty (20) days after the record date, or (b) ten (10) days before the meeting date, for any meeting of stockholders, make a complete record of the stockholders entitled to vote at such meeting, arranged alphabetically by class or series of shares and showing the address of and the number of shares held by each stockholder. The stockholder list shall be available at the meeting and may be inspected by any stockholder or his or her agent or attorney at any time during the meeting or any adjournment. Any stockholder or his or her agent or attorney may inspect the stockholder list beginning ten (10) business days before the meeting date and continuing until the meeting date, at the Corporation's registered office and, subject to the DGCL, may copy the list, during regular business hours and at his or her expense, during the period that it is available for inspection hereunder. If the meeting is held solely by means of remote communication, the list shall also be open for inspection by any stockholder during the whole time of the meeting as provided by applicable law.  The stock ledger of the Corporation (if any) shall be prima facie evidence as to the stockholders entitled to inspect the stockholder list or to vote at any meeting of stockholders. Failure to comply with the requirements of this section shall not affect the validity of any action taken at such meeting.

SECTION 2.7 QUORUM AND VOTING. Except as otherwise provided in the Corporation's Certificate of Incorporation, these Bylaws or the DGCL, a majority of the aggregate voting power of the issued and outstanding stock entitled to vote, represented in person or by proxy, shall constitute a quorum. Once a share is represented for any purpose at a meeting, other than for the sole purpose of objecting to holding the meeting or transacting business at the meeting, it is considered present for purposes of determining whether a quorum exists for the remainder of the meeting and for any adjournment of that meeting unless a new record date is or must be set for that meeting. If a quorum is present, the affirmative vote of a majority of the shares present in person or represented by proxy and entitled to vote on the subject matter shall be the act of the stockholders unless the vote of a greater number is required by the DGCL or the Corporation's Certificate of Incorporation.[4]  In the absence of a quorum, any meeting of stockholders may be adjourned, from time to time, either by the chairman of the meeting or by vote of the holders of a majority of the shares represented thereat and entitled to vote at the meeting, but no other business shall be transacted until a quorum is present.  Where a separate vote by a class or series or classes or series is required, a majority of the outstanding shares of such class or series or classes or series, present in person or represented by proxy, shall constitute a quorum entitled to take action with respect to that vote on that matter and the affirmative vote of the majority of shares of such class or classes or series present in person or represented by proxy at the meeting shall be the act of such class or classes or series.

SECTION 2.8 CONDUCT OF MEETINGS.

(a)      At every meeting of stockholders, the Chairman of the Board of Directors, or, if a Chairman has not been appointed or is absent, the Chief Executive Officer, or, if the Chief Executive Officer is absent, such person as the Chief Executive Officer shall appoint, shall act as chairman of, and preside at, the meeting.  The Secretary, or, in his absence, an Assistant Secretary directed to do so by the Chief Executive Officer, shall act as secretary of the meeting.

(b)      The Board of Directors and (to the extent consistent therewith) the chairman of the meeting shall be entitled to make such rules or regulations for the conduct of meetings of stockholders as they shall deem necessary or appropriate.  Such rules, regulations or procedures, whether adopted by

---

[4]      **Note to Draft**: Voting standard for election of directors to be confirmed.

5

the Board of Directors or prescribed by the chairman of the meeting, may include, without limitation, the following (i) the establishment of an agenda or order of business for the meeting; (ii) the determination of when the polls shall open and close for any given matter to be voted on at the meeting; (c) rules and procedures for maintaining order at the meeting and the safety of those present; (d) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chairman of the meeting shall determine; (e) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (f) limitations on the time allotted to questions or comments by participants.

SECTION 2.9 PROXIES.  Each stockholder entitled to vote at a meeting of stockholders may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary of the Corporation a revocation of the proxy or a new proxy bearing a later date. Voting at meetings of stockholders need not be by written ballot.

SECTION 2.10 VOTING OF SHARES. Each outstanding share shall be entitled to that number of votes specified in the Corporation's Certificate of Incorporation; provided, however, that if no such vote is specified, each outstanding share shall be entitled to one (1) vote on each matter submitted to a vote at a meeting of stockholders, except to the extent that the voting rights of the shares are enlarged, limited or denied by the DGCL. Shares of the Corporation standing in the name of another corporation, whether domestic or foreign, may be voted by such officer, agent, or proxy as the by-laws of such corporation may provide or, in the absence of any such provision, as the board of directors of such corporation may determine; and any shares voted by an officer, agent, or proxy of such corporation shall be presumed to be voted with due authority in the absence of express notice to the contrary given in writing to the Secretary or other officer of the Corporation.  Shares of the Corporation belonging to the Corporation itself shall not be voted, directly or indirectly, at any meeting of the stockholders and shall not be considered in determining the total number of outstanding shares at any given time. The voting rights of fiduciaries, beneficiaries, pledgors, pledgees and joint, common and other multiple owners of shares of stock shall be as provided from time to time by the DGCL and any other applicable law.

SECTION 2.11 NO CUMULATIVE VOTING.  In all elections for Directors, no stockholder shall have the right to cumulate their votes for the Directors to be elected except as otherwise specifically provided in the Corporation's Certificate of Incorporation.

SECTION 2.12 WAIVER OF NOTICE. Whenever any notice is required to be given to any stockholder under the DGCL, the Corporation's Certificate of Incorporation, or these Bylaws, a waiver thereof in writing by the stockholder entitled to such notice, signed at any time before, at or after the time of the meeting, shall be deemed equivalent to the giving of such notice. A stockholder's attendance at a meeting, in person or by proxy, waives objection to both of the following:

(a)     Lack of notice or defective notice of the meeting, unless the stockholder at the beginning of the meeting or promptly upon arrival objects to holding the meeting or transacting business at the meeting.

(b)     Consideration of a particular matter at the meeting that is not within the purpose described in the meeting notice, unless the stockholder objects to considering the matter when it is presented.

6

SECTION 2.13 INSPECTORS OF ELECTION.  This Corporation may, and shall if required by law, in advance of any meeting of stockholders, appoint one or more inspectors of election, who may be employees of the Corporation, to act at the meeting or any adjournment thereof and to make a written report thereof.  The Corporation may designate one or more persons as alternate inspectors to replace any inspector who fails to act.  If no inspector so appointment or designated is able to act at a meeting of stockholders, the person presiding at the meeting shall appoint one or more inspectors to act at the meeting.  Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath to execute faithfully the duties of inspector with strict impartiality and according to the best of his or her ability.  The inspector or inspectors so appointed or designated shall (i) ascertain the number of shares of capital stock of the Corporation outstanding and the voting power of each such share, (ii) determine the shares of capital stock of the Corporation represented at the meeting and the validity of proxies and ballots, (iii) count all votes and ballots, (iv) determine and retain for a reasonable period a record of the disposition of any  challenges made to any determination by the inspectors, and (v) certify their determination of the number of shares of capital stock of the Corporation represented at the meeting and such inspectors' count of all votes and ballots.  Such certification and report shall specify such other information as may be required by law.  In determining the validity and counting of proxies and ballots cast at any meeting of stockholders of the Corporation, the inspectors may consider such information as is permitted by applicable law.  No person who is a candidate for an office at an election may serve as an inspector at such election.

## ARTICLE III
## BOARD OF DIRECTORS

SECTION 3.1 GENERAL POWERS.  Subject to any limitations imposed by the DGCL or the Corporation's Certificate of Incorporation, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. The Board of Directors may adopt such rules and procedures, not inconsistent with the Corporation's Certificate of Incorporation, these Bylaws or applicable law, as it may deem proper for the conduct of its meetings and the management of the Corporation.

SECTION 3.2 NUMBER, TENURE, AND QUALIFICATIONS.  The number of Directors of the Corporation shall be seven (7).  The number of Directors may be changed from time to time in accordance with the provisions of the Corporation's Certificate of Incorporation. Furthermore, the Chief Executive Officer of the Corporation shall at all times be a member of the Board of Directors.

SECTION 3.3 TERM. Each Director shall hold office until the expiration of the term to which he or she has been elected or appointed and a successor is duly elected and qualified or until the director's earlier death, resignation, disqualification or removal. A Director may resign at any time by delivering a written resignation to the Board of Directors, to the Chairman, or to the Corporation through the Secretary or otherwise.  Directors need not be residents of the State of Delaware or stockholders of the Corporation. Directors may be re-elected any number of times.

SECTION 3.4 REGULAR MEETINGS. A regular meeting of the Board of Directors shall be held, without other notice than this Bylaw, immediately after, and at the same place as, the annual meeting of the stockholders. The Board of Directors may provide, by resolution, for the holding of additional regular meetings of the Board of Directors, either within or without the State of Delaware, without other notice than such resolution.

SECTION 3.5  SPECIAL MEETINGS. Special meetings of the Board of Directors may be called by or at the request of the Chairman of the Corporation or any two (2) Directors. The person or persons authorized to call special meetings of the Board of Directors may fix any place, either within or without

7

the State of Delaware, as the place for holding any special meeting of the Board of Directors called by them.

SECTION 3.6 MEETINGS BY TELEPHONE OR OTHER COMMUNICATION TECHNOLOGY.

(a)      Any or all Directors may participate in a regular or special meeting or in a committee meeting of the Board of Directors by, or conduct the meeting through the use of, telephone or any other means of communication by which all participating Directors may simultaneously hear each other during the meeting.

(b)      If a meeting will be conducted through the use of any means described in paragraph (a), all participating Directors shall be informed that a meeting is taking place at which official business may be transacted. A Director participating in a meeting by any means described in paragraph (A) is deemed to be present in person at the meeting.

SECTION 3.7 NOTICE OF MEETINGS. Except as otherwise provided in the Certificate of Incorporation or the DGCL, notice of the date, time and place of any special meeting of the Board of Directors and of any special meeting of a committee of the Board shall be given orally or in writing to each Director or committee member at least twenty-four (24) hours prior to the meeting. The notice need not describe the purpose of the meeting. Notice may be communicated in person, by telephone, telegraph or facsimile, by mail or private carrier or by e-mail or by other means of electronic transmission. Whenever any notice is required to be given to any Director of the Corporation under the DGCL, the Corporation's Certificate of Incorporation, or these Bylaws, a waiver thereof in writing signed by, or by electronic transmission by, the Director entitled to such notice, signed at any time before, at or after the time of meeting, shall be deemed equivalent to the giving of such notice. If waiver of notice is given by electronic transmission, such electronic transmission must either set forth or be submitted with information from which is can be determined that the electronic transmission was authorized by the Director.  The attendance of a Director at any meeting of the Board of Directors shall constitute a waiver of notice of the meeting, except where a Director attends for the express purpose of objecting to the transaction of any business at the meeting on the grounds that the meeting was not lawfully called or convened.

SECTION 3.8 QUORUM. A majority of the total number of Directors fixed by or in the manner provided by these Bylaws shall constitute a quorum for the transaction of business at any meeting of the Board of Directors; provided, however, that if less than a majority of such number of Directors are present, a majority of the Directors present may adjourn the meeting from time to time without further notice. A majority of the number of Directors appointed to serve on a committee shall constitute a quorum of the committee.

SECTION 3.9 MAJORITY ACTION. The act of a majority of the Directors present at a meeting of the Board of Directors at which a quorum is present shall be the act of the Board of Directors (unless the act of a greater number of Directors is required by the Corporation's Certificate of Incorporation, these Bylaws or applicable law). A Director of the Corporation who is present at a meeting of the Board of Directors at which action is taken shall be conclusively presumed to have assented to the action so taken unless his dissent to such action is entered in the minutes of the meeting, or he files a written dissent to such action with the person acting as the secretary of the meeting before the adjournment thereof, or he forwards his dissent, by registered or certified mail, to the Secretary of the Corporation not later than two (2) days after the adjournment of the meeting. This right to dissent may not be exercised by any Director who voted in favor of such action.

8

SECTION 3.10 CONDUCT OF MEETINGS. The Chairman, or in his or her absence, any Director chosen by the Directors present, shall call meetings of the Board of Directors to order and shall chair the meeting. The Secretary of the Corporation shall act as secretary of all meetings of the Board of Directors, but in the absence of the Secretary, the presiding officer may appoint any assistant secretary or any Director or other person present to act as secretary of the meeting.

SECTION 3.11 VACANCIES. Except as otherwise provided in the Corporation's Certificate of Incorporation, any vacancy occurring in the Board of Directors, and any directorship to be filled by reason of an increase in the number of Directors, may be filled (i) by a majority vote of the Directors then in office, even if less than a quorum is then in office, or by the sole remaining Director or (ii) by election at the annual meeting of the stockholders or at a special meeting of the stockholders called for such purpose. A Director elected to fill a vacancy shall serve for the unexpired term of his predecessor in office and until his successor is elected and qualified or until such Director's earlier death, resignation, disqualification or removal.

SECTION 3.12 COMPENSATION. By resolution adopted by the affirmative vote of a majority of the Directors then in office, and regardless of the personal interest of any Director, the Board of Directors may establish reasonable compensation of all Directors for services rendered to the Corporation as Directors, officers, or otherwise. By a like resolution, the Board of Directors may authorize the payment to all Directors of their respective expenses, if any, reasonably incurred in attending any regular or special meeting of the Board of Directors.

SECTION 3.13 COMMITTEES. By resolution adopted by the affirmative vote of a majority of Directors then in office, the Board of Directors may designate one or more committees, each committee to consist of one (1) or more Directors designated by the Board of Directors, which, to the extent provided in such resolution (as initially adopted and as thereafter supplemented or amended by further resolution adopted by a like vote) shall have and may exercise (when the Board of Directors is not in session) all of the authority and powers of the Board of Directors in the management of the business and affairs of the Corporation provided, however, that no such committee shall have or exercise the authority or powers of the Board of Directors with respect to the following: (i) approving or adopting, or recommending to the stockholders, any action or matter expressly required by the DGCL to be submitted to stockholders for approval or (ii) adopting, amending, or repealing any bylaw of the Corporation. Each such committee shall fix its own rules governing the conduct of its activities and shall make such reports of its activities to the Board of Directors as the Board of Directors may request.

SECTION 3.14 ACTION BY UNANIMOUS WRITTEN CONSENT OF DIRECTORS OR COMMITTEES. Unless otherwise restricted by the Certificate of Incorporation or these By-laws, any action required or permitted by the DGCL, the Corporation's Certificate of Incorporation, or these Bylaws to be taken at a meeting of the Board of Directors or any committee thereof, or any other action which may be taken at a meeting of the Board of Directors or any committee thereof, may be taken without a meeting if a consent in writing or by electronic transmission, setting forth the action so taken, shall be signed by all of the Directors or committee members, as the case may be, entitled to vote with respect to the subject matter thereof. Such consent shall have the same force and effect as a unanimous vote of all of the members of the Board of Directors or committee thereof, as the case may be, and may be stated as such in any document filed with the Secretary of State under the DGCL.

**ARTICLE IV**
**OFFICERS.**

SECTION 4.1 PRINCIPAL OFFICERS. The principal officers of the Corporation may include a Chairman, a President, one or more Vice-Presidents (the number of which shall be determined by the Board of Directors), a Secretary, and a Treasurer, each of whom shall be elected by the Board of Directors. The Board of Directors may elect or appoint such other officers and assistant officers as may be deemed necessary or desirable. One person may hold any two or more offices.

SECTION 4.2 ELECTION AND TERM OF OFFICE. Subject to Section 4.4, below, the officers of the Corporation shall be elected annually by the Board of Directors at the regular meeting of the Board of Directors held after the annual meeting of the stockholders; and each officer shall hold office until his successor is elected and qualified or until his earlier death or his resignation or removal in the manner provided in Section 4.3, below. If the election of officers is not held at such regular meeting of the Board of Directors, the election shall be held as soon thereafter as may be convenient. Election or appointment of an officer shall not of itself create any contract rights.

SECTION 4.3 REMOVAL. Any officer elected or appointed by the Board of Directors may be removed by the Board of Directors, with or without cause, but such removal shall be without prejudice to the contract rights, if any, or the person so removed. Any officer may resign at any time by giving written notice to the Board of Directors or to the Chairman, President or Secretary of the Corporation. The resignation shall take effect on the date of receipt of the notice of resignation or at any later time specified therein; and unless the notice of resignation specifies otherwise, the resignation shall become effective without the necessity of acceptance by the Board of Directors.

SECTION 4.4 VACANCIES. If any office becomes vacant by reason of the death, resignation, or removal of the incumbent, the Board of Directors shall elect a successor who shall hold office for the unexpired term of his predecessor and until his successor is elected and qualified.

SECTION 4.5 CHAIRMAN. The Chairman shall be a Director and, when present, preside at all meetings of the stockholders and of the Board of Directors. The Chairman shall have and such other duties as may be prescribed by the Board of Directors from time to time.

SECTION 4.6 PRESIDENT. The President shall be the chief executive officer of the Corporation and, subject to the control of the Board of Directors, shall in general supervise and control all of the business and affairs of the Corporation. The President shall have the authority to sign certificates for shares of the Corporation's capital stock and deeds, mortgages, bonds, contracts, or other instruments necessary or proper to be executed in the course of the Corporation's regular business or which the Board of Directors has authorized to be executed, except in cases where the signing and execution thereof shall be expressly delegated by the Board of Directors or by these Bylaws to some other officer or agent of the Corporation, or shall be required by law to be otherwise signed or executed; and in general shall perform all duties incident to the office of president and such other duties as may be prescribed by the Board of Directors from time to time. Except as otherwise provided by the DGCL or the Board of Directors, the President may authorize any Vice-President or other officer or agent of the Corporation to sign, execute and acknowledge such documents or instruments in his place and stead.

SECTION 4.7 ABSENCE OF THE CHAIRMAN. The President shall, in the absence of the Chairman, preside at all meetings of the stockholders and of the Board of Directors. In the absence of the Chairman or in the event of his death, inability or refusal to act, the President shall perform the duties of the Chairman, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Chairman.

10

SECTION 4.8 VICE-PRESIDENTS. The Board of Directors may appoint Vice-Presidents which may be designated as Executive Vice Presidents or Vice-Presidents. In the absence of the President or in the event of his death, inability or refusal to act, the Vice-President, if one has been elected (or in the event that there is more than one Vice-President, the Vice-Presidents in the order designated at the time of their appointment, or in the absence of any designation, then in the order of their appointment), shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President. Any Vice-President may sign certificates for shares of the Corporation's capital stock, the issuance of which have been authorized by resolution of the Board of Directors; and shall perform such other duties as from time to time may be assigned to him by the Chairman or by the Board of Directors.

SECTION 4.9 THE SECRETARY. The Secretary shall: (a) keep the minutes of the proceedings of the stockholders and of the Board of Directors in one or more books provided for that purpose; (b) see that all notices are duly given in accordance with the provisions of these Bylaws or as required by the DGCL; (c) be custodian of the corporate records and of any seal of the Corporation and, if there is a seal of the Corporation, see that it is affixed to all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; (d) when requested or required, authenticate any records of the Corporation; (e) keep a register of the post office address of each stockholder which shall be furnished to the Secretary by such stockholder or delegate that responsibility to a stock transfer agent approved by the Board of Directors; (f) sign, with the President or a Vice-President, certificates for shares of the Corporation's capital stock, the issuance of which has been authorized by resolution of the Board of Directors; (g) have general charge of the stock transfer books of the Corporation; and (h) in general perform all duties incident to the office of secretary and such other duties as from time to time may be assigned to him by the President or by the Board of Directors.

SECTION 4.10 TREASURER. The Treasurer shall: (a) have charge and custody of and be responsible for all funds and securities of the Corporation; (b) receive and give receipts for moneys due and payable to the Corporation from any source whatsoever, and deposit all such moneys in the name of the Corporation in such banks, trust companies, or other depositories as shall be selected by the Board of Directors; and (c) in general perform all of the duties incident to the office of treasurer and such other duties as from time to time may be assigned to him by the President or by the Board of Directors. If required by the Board of Directors, the Treasurer shall give a bond for the faithful discharge of his duties in such sum and with such surety or sureties as the Board of Directors shall require.

SECTION 4.11 ASSISTANT SECRETARIES AND ASSISTANT TREASURERS. The Assistant Secretaries, when authorized by the Board of Directors, may sign with the President or a Vice-President certificates for shares of the Corporation the issuance of which shall have been authorized by a resolution of the Board of Directors. The Assistant Treasurers shall respectively, if required by the Board of Directors, give bonds for the faithful discharge of their duties in such sums and with such sureties as the Board of Directors shall determine. The Assistant Secretaries and Assistant Treasurers, in general, shall perform such duties as shall be assigned to them by the Secretary or the Treasurer, respectively, or by the President or the Board of Directors.

SECTION 4.12 ASSISTANTS AND ACTING OFFICERS. The Board of Directors and the President shall each have the power to appoint any person to act as assistant to any officer, or as agent for the Corporation in the officer's stead, or to perform the duties of such officer whenever for any reason it is impracticable for such officer to act personally, and such assistant or acting officer or other agent so appointed shall have the power to perform all the duties of the office to which that person is so appointed

11

to be assistant, or as to which he is so appointed to act, except as such power may be otherwise defined or restricted by the Board of Directors or President.

SECTION 4.13 SALARIES. The salaries of officers of the Corporation shall be fixed from time to time by the Board of Directors, and no officer shall be prevented from receiving a salary by reason of the fact that he is also a Director of the Corporation.

SECTION 4.14 ACTIONS WITH RESPECT TO SECURITIES OF OTHER ENTITIES. All stock and other securities of other entities owned or held by the Corporation for itself, or for other parties in any capacity, shall be voted (including by written consent), and all proxies with respect thereto shall be executed, by the person or persons authorized to do so by resolution of the Board of Directors or, in the absence of such authorization, by the Chairman, the President, the Secretary or the Treasurer.

**ARTICLE V**
**CERTIFICATES FOR SHARES AND THEIR TRANSFER**

SECTION 5.1 CERTIFICATES FOR SHARES. The shares of capital stock of the Corporation shall be represented by certificates, in such form as may be determined by the Board of Directors; provided, that the Board of Directors may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares and evidenced by a book-entry system maintained by the registrar of such stock. Every holder of stock represented by certificates shall be entitled to have a certificate signed by, or in the name of, the Corporation by any two authorized officers of the Corporation.  Any or all such signatures may be facsimiles.  The name and post office address of the person to whom shares are issued (whether represented by a certificate or uncertificated), with the number of shares and date of issuance, shall be entered on the stock transfer books of the Corporation. All certificates surrendered to the Corporation for transfer shall be canceled and no new certificates shall be issued (whether represented by a certificate or uncertificated) until the former certificate for a like number of shares has been surrendered and canceled, except that in the case of a lost, destroyed, or mutilated certificate, a new certificate may be issued therefor upon such terms and indemnity to the Corporation as the Board of Directors may prescribe.

SECTION 5.2 TRANSFER OF SHARES. Shares of the Corporation shall be transferable in the manner prescribed by applicable law, the Corporation's Certificate of Incorporation and in these Bylaws. Transfers of stock shall be made on the books of the Corporation, and in the case of certificated shares of stock, only by the person named in the certificate or by such person's attorney lawfully constituted in writing and upon the surrender of the certificate therefor, properly endorsed for transfer and payment of all necessary transfer taxes; or, in the case of uncertificated shares of stock, upon receipt of proper transfer instructions from the registered holder of the shares or by such person's attorney lawfully constituted in writing, and upon payment of all necessary transfer taxes and compliance with appropriate procedures for transferring shares in uncertificated form; provided, however, that such surrender and endorsement, compliance or payment of taxes shall not be required in any case in which an executive officer of the Corporation shall determine to waive such requirement.  Where a certificate for shares is presented to the Corporation with a request to register for transfer, the Corporation shall not be liable to the owner or any other person suffering loss as a result of such registration of transfer if there were on or with the certificate the necessary endorsements and if the Corporation had no duty to inquire into adverse claims or had discharged any such duty. The Corporation may require reasonable assurance that the endorsements are genuine and effective and in compliance with such other regulations as may be prescribed by the Board of Directors.

With respect to certificated shares of stock, every certificate exchanged, returned or surrendered to the Corporation shall be destroyed or marked "Cancelled," with the date of cancellation, by the Secretary or Assistant Secretary of the Corporation or the transfer agent thereof. No transfer of stock shall be valid as against the Corporation for any purpose until it shall have been entered in the stock records of the Corporation by an entry showing from and to whom transferred.

SECTION 5.3 RESTRICTIONS ON TRANSFER. The face or reverse side of each certificate representing shares shall bear a conspicuous notation of any restriction upon the transfer of such shares imposed by the Corporation.

SECTION 5.4 LOST, DESTROYED OR STOLEN CERTIFICATES. Where the owner claims that his or her certificate for shares has been lost, destroyed or wrongfully taken, a new certificate shall be issued in place thereof if the owner (a) so requests before the Corporation has notice that such shares have been acquired by a bona fide purchaser; and (b) if required by the Corporation, files with the Corporation a sufficient indemnity bond; and (c) satisfies such other reasonable requirements as may be prescribed by or under the authority of the Board of Directors.

SECTION 5.5 CONSIDERATION FOR SHARES. The consideration for subscriptions to or the purchase of capital stock to be issued by the Corporation shall be fixed from time to time and determined to be adequate by the Board of Directors, provided that any shares having a par value shall not be issued for a consideration less than the par value thereof. The consideration may consist of any tangible or intangible property or benefit to the Corporation, including cash, promissory notes, services performed, contracts for services to be performed, or other securities of the Corporation. When the Corporation receives the consideration for which the Board of Directors authorized the issuance of shares as provided above, such shares shall be deemed to be fully paid and nonassessable.

SECTION 5.6 STOCK REGULATIONS. The Board of Directors shall have the power and authority to make all such rules and regulations not inconsistent with the statutes of the State of Delaware as it may deem expedient concerning the issue, transfer and registration of shares of the Corporation, including the appointment or designation of one or more stock transfer
agents and one or more registrars.

**ARTICLE VI**
**AMENDMENTS**

SECTION 6.1 AMENDMENT BY DIRECTORS OR STOCKHOLDERS. These Bylaws may be altered, amended, or repealed and new Bylaws may be adopted in whole or in part by holders of a majority of the aggregate voting power of the issued and outstanding stock entitled to vote. These Bylaws may be altered, amended, or repealed, and new Bylaws may be adopted in whole or in part by the Board of Directors. The Bylaws may contain any provisions for the regulation and management of the Corporation's affairs not inconsistent with law or the Corporation's Certificate of Incorporation.

SECTION 6.2 IMPLIED AMENDMENTS. Any action taken or authorized by the stockholders of the Corporation by the affirmative vote of the holders of the majority of the outstanding shares of each class of the Corporation entitled to vote thereon, or by the Board of Directors, shall be given the same effect as though these Bylaws had been temporarily amended so far as is necessary to permit the specific action so taken or authorized.

13

**<u>Exhibit A-3</u>**
**Form of Delaware Limited Liability Company**
**Agreement for Reorganized Debtor Subsidiaries**

**[*NAME OF REORGANIZED DEBTOR*][1]**

**[AMENDED AND RESTATED]**

**LIMITED LIABILITY COMPANY AGREEMENT**


THIS [AMENDED AND RESTATED] LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement"), dated as of [____], 2018, of [*Name of Reorganized Debtor*], a Delaware limited liability company (the "Company"), is adopted and entered into by [*Name of Sole Member of the Company*], a [____] [____] (the "Sole Member"), as its sole member, pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.), as amended from time to time (the "Act"), and the terms of this Agreement.

[WHEREAS, the Sole Member has caused a limited liability company to be formed pursuant to and in accordance with the Act, effective as of the filing of its certificate of formation on [___] (as amended, restated, modified or supplemented from time to time, the "Certificate of Formation");

WHEREAS, the Sole Member entered into that certain Limited Liability Company Agreement, dated as of [___] (the "Original Agreement")];[2]

[WHEREAS, the Company was formed on [*original formation date as a corporation*] as [*Name of Reorganized Debtor prior to conversion from a corporation to a limited liability company*], a Delaware corporation (the "Predecessor Company"), and converted into a Delaware limited liability company pursuant to and in accordance with the applicable provisions of the Delaware General Corporation Law and the Act, effective as of the effectiveness of the filing of its certificate of conversion and certificate of formation on [___] (as amended, restated, modified or supplemented from time to time, the "Certificate of Formation")];[3] and

---

[1]  Note to Draft: This form to be used by (1) Consolidated IP Company LLC, (2) Incentrev-Radio Half Off, LLC, (3) Incentrev LLC, (4) LA Radio, LLC, (5) KLOS-FM Radio Assets, LLC, (6) Detroit Radio, LLC, (7) DC Radio Assets, LLC, (8) Radio License Holdings LLC, (9) Minneapolis Radio Assets, LLC, (10) NY Radio Assets, LLC, (11) Radio Assets, LLC, (12) San Francisco Radio Assets, LLC, (13) WBAP-KSCS Assets, LLC, (14) WPLJ Radio, LLC, (15) Dial Communications Global Media, LLC, (16) Radio Networks, LLC, (17) NASH Country, LLC, (18) Westwood One Radio Networks, Inc., (19) Chicago FM Radio Assets, LLC, (20) Chicago Radio Assets, LLC, (21) Atlanta Radio, LLC, (22) Radio License Holding CBC, LLC, (23) Radio License Holding SRC LLC, (24) CMP Houston-KC LLC, (25) The Last Bastion Trust, LLC, (26) Wasatch Radio, LLC and (27) CMI Receivables Funding LLC, as well as any Delaware corporation and any non-Delaware Debtor subsidiary that is converting into a Delaware LLC in accordance with the Description of Transaction Steps.

[2]  Note to Draft: Applicable if the Reorganized Debtor was previously a Delaware LLC and will remain as such through the Effective Date of the Plan.

[3]  Note to Draft: Applicable if the Reorganized Debtor was previously a Delaware corporation and will be converted to a Delaware LLC prior to the Effective Date of the Plan.

WHEREAS, Cumulus Media Inc. and its debtor affiliates, as debtors and debtors in possession, including the [Predecessor] Company, filed that certain Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code on December 9, 2017 (the "Plan"), and this Agreement is being entered into pursuant to and in accordance with the terms of Plan.

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Sole Member hereby agrees to [set forth the limited liability company agreement of the Company] [amend and restate the Original Agreement] as follows:

1.      Name.  The name of the Company is "[*Name of the Company*]".

2.      Formation.    The Company was [formed] [converted to a Delaware limited liability company] upon the effectiveness of the filing of the Certificate of Formation of the Company by [*Name of individual who signed original certificate of formation*] and the filing of such Certificate of Formation on [___] with the Office of the Secretary of State of the State of Delaware, such person being authorized to take such actions.  As used in this Agreement, unless the context otherwise requires, the term "person" means an individual or a corporation, limited liability company, partnership, limited partnership, joint venture, trust, unincorporated organization, association, governmental authority or political subdivision thereof or other entity.

3.      Purpose.  The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act and engaging in any and all activities necessary or incidental to the foregoing.  The Company shall have the authority to take all actions necessary or convenient to accomplish its purposes and operate its business as described in this Section 3.

4.      Registered Office and Registered Agent.  The registered office of the Company in the State of Delaware is [____], and the Company's registered agent at such address for service of process is [____].  The Sole Member may change the registered office and registered agent of the Company from time to time.

5.      Principal Place of Business.  The principal place of business of the Company is [____].  The Sole Member may change the office locations of the Company from time to time.

6.      Sole Member.  The name and business address of the Sole Member is [____], [____].  The Sole Member owns 100% of the membership interests in the Company.  Unless otherwise determined by the Sole Member, the Company will not issue any certificates to evidence ownership of the membership interests.

7.      Management.

(a)      Except as otherwise expressly provided in this Agreement, the Company shall be managed by the Sole Member.  The Sole Member shall be deemed to be a "manager" for the purposes of applying the Act, unless the context otherwise

requires, and shall have and be subject to all of the duties and liabilities of a "manager" provided in the Act and, except as otherwise limited herein, have all powers, statutory or otherwise, possessed by a manager under the laws of the State of Delaware.  Except as otherwise provided in this Agreement, any action to be taken in the name and on behalf of the Company shall require the prior approval of the Sole Member and the actions of the Sole Member shall bind the Company.  The Sole Member may take any and all actions (including, without limitation, executing, delivering and performing on behalf of the Company any and all contracts, agreements, certificates, undertakings or other documents or instruments) and do any and all things necessary, desirable, convenient or incidental to carry on the business and purposes of the Company.  The Sole Member may execute any contract, agreement, certificate, undertaking or other document or instrument approved by the Sole Member as a "Managing Member", a "Sole Member", a "Member", a "Manager" or an "Authorized Person".  The Sole Member may delegate any responsibility or authority to any officer, employee or agent of the Company or other person authorized by the Sole Member.

(b)      The Sole Member may from time to time, in its discretion, appoint any person as an officer of the Company, holding such titles and having such duties as determined by the Sole Member.  Each officer of the Company shall be subject to removal with or without cause at any time by the Sole Member.  Each of the individuals set forth on Schedule 1 hereto shall serve in the offices set forth opposite the name of such individual until the earlier of his or her retirement, removal, death or disability.  Schedule 1 shall be amended to reflect any changes to any officers of the Company.  Except as otherwise provided in this Agreement, the action of any officer (including, without limitation, the execution and delivery by any officer, on behalf of the Company, of any and all contracts, agreements, certificates, undertakings or other documents or instruments) pursuant to authority granted by Sole Member shall bind the Company.  In addition, the Sole Member may from time to time, in its discretion, appoint, employ, contract with or designate other persons to act in the name of or on behalf of the Company, and the Sole Member may delegate to any such person (who may but need not be designated an officer, agent or attorney-in-fact of the Company) such authority, which may be general or confined to specific instances, exclusive or non-exclusive, to act on behalf of the Company (including, for avoidance of doubt, any authority otherwise vested in the Sole Member or any officer appointed by the Sole Member) as the Sole Member may from time to time deem appropriate.  Any such person shall act pursuant to such delegated authority (as it may be modified from time to time by the Sole Member) until terminated by the Sole Member.  Any action taken by any person pursuant to authority delegated to such person by the Sole Member shall constitute the act of and serve to bind the Company.

(c)      Notwithstanding anything to the contrary contained in Sections 7(a) and 7(b), any officer of the Company is empowered and authorized to take actions in the name and on behalf of the Company that are purely ministerial and administrative in nature, including, without limitation, to execute, file and record or cause to be executed, filed and recorded all such certificates and documents, including amendments to the Certificate of Formation, and to do or cause to be done such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of a limited liability company, the ownership of property, and the conduct of business under the laws of the State of Delaware and any other jurisdiction in which the Company may own property or conduct business.

(d)      Any person dealing with the Company may rely upon a certificate signed by the Sole Member or any officer of the Company as to: (i) the identity of the Sole Member or any officer of the Company; and (ii) the person or persons who are authorized to execute and deliver any contract, agreement, certificate, undertaking or other document or  instrument on behalf of the Company.

(e)      The Sole Member shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements to the Company by any of its other members (if any) or its officers, employees or committees, or by any other person, as to matters the Sole Member reasonably believes are within such other person's professional or expert competence (including, without limitation, information, opinions, reports or statements as to the value and the amount of the assets, liabilities, profits, or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to the Sole Member might properly be paid).   In addition, the Sole Member may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisors, and any opinion of any such person as to matters which the Sole Member reasonably believes to be within such person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the Sole Member hereunder in good faith and in accordance with such opinion

8.      Capital Contributions.   The Sole Member may make an initial capital contribution to the Company, in such amount and at such time as determined by Sole Member in its sole discretion.  The Sole Member may make additional contributions that such Sole Member, in its sole discretion, deems necessary or appropriate.

9.      Distributions.  Distributions shall be made to the Sole Member at the times and in the aggregate amounts determined by the Sole Member.

10.      Admission of Additional or Substitute Members.  Additional members and a substitute Sole Member may be admitted to the Company at any time with the consent of the Sole Member.  Notwithstanding anything in this Agreement to the contrary, in the event of a transfer of all of a member's membership interests in the Company and such member is, at the time of such transfer, the sole member of the Company, the transferee of such membership interests shall be deemed admitted as a member of the Company upon such transfer and the Company shall continue without dissolution.

11.      Limited Liability of Sole Member.  Except as otherwise required in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and none of the Sole Member, any officer of the Company or any of their respective affiliates (as defined in Rule 12b-2 promulgated under the Securities Exchange Act of 1934, as amended, and used herein, "Affiliates") shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member, officer or such Affiliate, as applicable or byparticipating in the management of the Company..

12.    <u>Indemnification</u>.

(a)    *Indemnification of Protected Persons*.  To the fullest extent permitted by law as it presently exists or may hereafter be amended, the Company shall indemnify, defend, reimburse, exculpate, limit the liability of, hold harmless and protect the Sole Member, each officer of the Company, each other person who was or is made or is threatened to be made a party or is otherwise involved in any proceeding, action, claim (including, but not limited to, any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured), cause of action, controversy, demand, right, right of setoff, cross claim, counterclaim, recoupment, claim for breach of duty imposed by law or in equity, action, charge against or interest in property to secure payment of a debt or performance of an obligation, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured, or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the date hereof, in contract or in tort, in law or in equity, under applicable law, or pursuant to any other theory of law, whether civil, criminal, administrative or investigative (a "<u>Proceeding</u>"), by reason of the fact that he or she, or a person for whom he or she is an Affiliate or legal representative, is or was a director, officer, employee, agent, manager, attorney or other professional of the Company [(including the Predecessor Company)], and any of their respective Affiliates (each, a "<u>Protected Person</u>"), against any losses, claims, damages or liabilities, including legal fees and expenses incurred in investigating or defending against any such losses, claims, damages or liabilities, and any amounts expended in settlement of any claims (collectively, "<u>Liabilities</u>"); <u>provided</u>, <u>however</u>, that the Company shall not indemnify any Protected Person for Liabilities arising out of or related to any act or omission of such Protected Person that is a criminal act or constitutes actual fraud, gross negligence or willful misconduct or for which indemnification is not permissible under law.  Notwithstanding anything to the contrary in this Agreement, any indemnification or advancement of expenses under this <u>Section 12(a)</u> or <u>Sections 12(b)</u> or <u>12(c)</u> shall be provided out of and to the extent of Company assets only, and neither the Sole Member nor any other person shall have any personal liability on account thereof.

(b)    *Reimbursement and Advancement of Expenses*.  The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Protected Person for reasonable legal or other expenses (as incurred) of each Protected Person in connection with investigating, preparing to defend or defending any Proceeding relating to any Liabilities for which the Protected Person may be indemnified pursuant to this <u>Section 12</u>; <u>provided</u>, that such Protected Person executes a written undertaking to repay the Company for such reimbursed or advanced expenses if it is finally judicially determined that such Protected Person is not entitled to the indemnification provided by this <u>Section 12</u>.

(c)   *Claims*.  If a claim for indemnification or advancement of expenses under this <u>Section 12</u> is not paid in full within 30 days after a written claim therefor by the Protected Person has been received by the Company, the Protected Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim.  In any such action the Company shall have the burden of proving that the Protected Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

(d)   *Nonexclusivity of Rights*.   The rights conferred on any Protected Person by this <u>Section 12</u> shall not be exclusive of any other rights that such Protected Person may have or hereafter acquire under any statute, provision of this Agreement, the Certificate of Formation, agreement or vote of members or otherwise.

(e)   *Other Sources*.   The Company's obligation, if any, to indemnify or to advance expenses to any Protected Person who was or is serving at its request as a director, officer, employee, agent, manager, attorney or other professional of another entity or enterprise shall be reduced by any amount such Protected Person may collect as indemnification or advancement of expenses from such other entity or enterprise.

(f)   *Survival of Protection*.   The provisions of this <u>Section 12</u> shall continue to afford protection to each Protected Person regardless of whether such Protected Person remains in the position or capacity pursuant to which such Protected Person became entitled to indemnification under this <u>Section 12</u> and regardless of any subsequent amendment, restatement or repeal of or modification or supplement to this Agreement; <u>provided</u>, that no such amendment, restatement, repeal, modification or supplement shall reduce or restrict the extent to which these indemnification provisions apply to actions taken or omissions made prior to the date of such amendment, restatement, repeal, modification or supplement.  For avoidance of doubt, the indemnities provided under this <u>Section 12</u> shall survive termination of the Company and this Agreement.

(g)   *Other Indemnification and Prepayment of Expenses*.  This <u>Section 12</u> shall not limit the right of the Company, to the extent and in the manner permitted by applicable law, to indemnify and to advance expenses to persons other than Protected Persons when and as authorized by appropriate limited liability company action.

(h)   *No Fiduciary Duties*. To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or any other agreement contemplated herein or applicable provisions of law or equity or otherwise, the Sole Member and the Company hereby agree that, pursuant to the authority of Section 18-1101 of the Act, the Sole Member and the Company hereby eliminate any and all fiduciary duties the Sole Member may have to any member of the Company or the Company.

(i)   *Insurance*. The Company may maintain insurance, at its expense, to protect itself and any member of the Company (including the Sole Member) and any current or former director, officer, employee, agent, manager, attorney or other professional of the Company[, the Predecessor Company] or another limited liability company, corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under the Act.

Doc#: US1:11865920v9

(j)      *Severability*. The provisions of this <u>Section 12</u> shall be applicable to situations of every type and shall be deemed to be severable, so that if this <u>Section 12</u> shall be adjudged invalid or unenforceable in a situation of a particular type or if any of the provisions of this <u>Section 12</u> shall be adjudged to be invalid or unenforceable, such invalidity or unenforceability shall not preclude application of this <u>Section 12</u> to any other situation or affect any other provision thereof.

13.      <u>Dissolution; Liquidation</u>.

(a)      The Company shall be dissolved and its affairs wound up and terminated upon the first to occur of the following: (i) the written consent of the Sole Member or (ii) the occurrence of any other event or circumstance giving rise to the dissolution of the Company under Section 18-801 of the Act, unless the Company's existence is continued pursuant to the Act.

(b)      The bankruptcy (as defined in Sections 18-101(1) and 18-304 of the Act) of the Sole Member shall not cause the Sole Member to cease to be a member of the Company and, upon the occurrence of such an event, the business of the Company shall continue without dissolution.

(c)      Upon dissolution of the Company, the Sole Member (or a liquidator appointed by the Sole Member), shall proceed to wind up the business and affairs of the Company in accordance with the Act.  A reasonable amount of time shall be allowed for the period of winding up in light of prevailing market conditions and so as to avoid undue loss in connection with any sale of Company assets.  During the period of winding up the Company's affairs, this Agreement shall remain in full force and effect and continue to govern the rights and obligations of the Sole Member and the conduct of the Company.

(d)      In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied as follows: (i) first, to creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company (whether by payment, the establishment of reserves of cash or other assets of the Company or the making of other reasonable provision for payment thereof); and (ii) thereafter, to the Sole Member.

(e)      Upon the completion of the distribution of the assets of the Company as provided in this <u>Section 13</u>, the Company shall be terminated and the Sole Member (or liquidator appointed by the Sole Member) shall  file a Certificate of Cancellation in accordance with the Act and cause the cancellation of all qualifications of the Company as a foreign limited liability company, if any, and shall take such other actions as may be necessary to terminate the Company.

14.      <u>Tax Status; Income and Deductions</u>.   Subject to the following sentence, it is the intention of the Company and the Sole Member that the Company be treated as a disregarded entity for United States federal and, where applicable, all state, local and foreign income tax purposes and all items of income, gain, loss, deduction or credit of the Company shall be treated as items of income, gain, loss, deduction or credit of

the Sole Member. If the Sole Member determines to cause the Company to elect to be treated as an association taxable as a corporation for all United States federal and all relevant state and local tax purposes, the Company shall make all available elections to be so treated and the Company will be treated as an association taxable as a corporation for all United States federal and all relevant state and local tax purposes. Neither the Company nor the Sole Member shall take any action or make any election which is inconsistent with such intended tax treatment.  All provisions of this Agreement are to be construed so as to preserve the Company's intended tax status.

15.     Membership Interest Certificates.

(a)     The Membership Interests shall constitute and shall remain a "security" within the meaning of the Uniform Commercial Code of Delaware.

(b)     *Membership Interest Certificates*. Notwithstanding anything in this Agreement which may (or may be construed to be) to the contrary:  (a) the Membership Interest in the Company may be evidenced by a certificate or certificates the form of which is attached to this Agreement as Exhibit A (the "Membership Interest Certificates"); (b) if issued, the Membership Interest Certificates shall (and hereby do) provide that the Membership Interests represented by them are securities governed by the Uniform Commercial Code as in effect in Delaware (and shall be treated as such for all purposes, including, without limitation, perfection of a security interest therein under the Uniform Commercial Code as in effect in Delaware); (c) transfer of any Membership Interest in the Company can be effected only upon and by presentation to the Company of the Membership Interest Certificate evidencing such Membership Interest, together with a proper and effective endorsement thereof; (d) exchange of any Membership Interest Certificate for one or more new Membership Interest Certificates evidencing (in the aggregate) the same Membership Interests in the Company can only be effected upon and by presentation to the Company of such Membership Interest Certificates, together with proper and effective endorsements thereof; and (e) if there shall be delivered to the Company evidence (satisfactory to the Company) of the ownership of, and the destruction, loss or theft of, any Membership Interest Certificate, together with such security or indemnity as may be reasonably required by the Company to hold the Company harmless against loss, cost, damage or expense resulting to the Company therefrom, the Company shall issue, in lieu of such destroyed, lost or stolen Membership Interest Certificate, one or more new Membership Interest Certificates evidencing (in the aggregate) the same Membership Interests in the Company as were evidenced by such destroyed, lost or stolen membership Interest Certificate.

16.     Amendments.  This Agreement may be amended only with the consent of the Sole Member

17.     Governing Law.  This Agreement shall be governed by, and construed under, the laws of the State of Delaware without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

18.     <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Sole Member with respect to the subject matter hereof and supersedes all prior written or oral agreements, and all contemporaneous oral agreements, in respect thereof, and shall not be amended, modified, or supplemented, nor any provision hereof waived, except in accordance with the terms of this Agreement.

19.     <u>Severability</u>.  In the event that any provision of this Agreement shall be declared to be invalid, illegal or unenforceable, such provision shall survive to the extent it is not so declared, and the validity, legality and enforceability of the other provisions hereof shall not in any way be affected or impaired thereby, unless such action would substantially impair the benefits to any party of the remaining provisions of this Agreement.

*[Remainder of Page Intentionally Left Blank]*

Doc#: US1:11865920v9

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Agreement as of the date first above written.

SOLE MEMBER:

[_____]

By:_____
    Name:
    Title:

*[Signature Page to Limited Liability Company Agreement of
[Name of Reorganized Debtor]]*

**SCHEDULE 1**

**OFFICERS**

**(as of [____], 2018)**

| Name | Title |
|------|-------|
| [____] | [____] |
| [____] | [____] |
| [____] | [____] |
| [____] | [____] |

**<u>EXHIBIT A</u>**

This Certificate evidences interests in [*Name of Reorganized Debtor*], a Delaware limited liability company, which constitute securities governed by the Uniform Commercial Code as in effect in Delaware (and shall be treated as such for all purposes, including, without limitation, perfection of a security interest therein under the Uniform Commercial Code as in effect in Delaware).

CERTIFICATE OF MEMBERSHIP INTERESTS
IN
[*NAME OF REORGANIZED DEBTOR*]
No. R-1

This Certificate of Membership Interests certifies that [_____], a [___] [____], is the owner of a Membership Interest (as hereinafter defined) in [*Name of Reorganized Debtor*], a Delaware limited liability company (the "<u>Company</u>"), representing [__] units (100%) of the aggregate of all Membership Interests in the Company.

As used herein, the term "Membership Interests" has the meaning set forth in the [Amended and Restated] Limited Liability Company Agreement of the Company as in effect from time-to-time (the "<u>Agreement</u>").  Reference is made to the Agreement for a description of the terms of the Membership Interests evidenced hereby and the definitions of terms used herein but not defined herein.

Transfer or exchange of any or all of the Membership Interests evidenced by this Certificate (other than transfer as a pledge or security interest) can be effected only upon presentation of this Certificate, properly endorsed, to the Company.

IN WITNESS WHEREOF, the Company has executed and delivered this Certificate of Membership Interests by its sole member thereunto duly authorized as of the _____ ___, _____.

[_____]

By: _____

Name:
Title:

Doc#: US1:11865920v9

**Exhibit A-4**
**Form of Nevada Limited Liability Company**
**Agreement for Reorganized Debtor Subsidiaries**

**[AMENDED AND RESTATED] LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**[NAME OF REORGANIZED DEBTOR][1]**

This [AMENDED AND RESTATED] LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of [*Name of Reorganized Debtor*] (the "Company"), dated as of [____], 2018, is entered into by [*Name of Sole Member of the Company*], a [____] [____], as sole member of the Company (the "Initial Member").

[WHEREAS, the Company was formed on [____] by the filing of Articles of Organization with the Secretary of State of the State of Nevada pursuant to and in accordance with Chapter 86 (the "Act") of the Nevada Revised Statutes ("NRS");

WHEREAS, the Initial Member entered into that certain Limited Liability Company Agreement, dated as of [____] (the "Original Agreement");][2]

[WHEREAS, the Company was formed on [____] as part of the conversion of [*Name of Reorganized Debtor prior to conversion from a corporation to a limited liability company*], a Nevada corporation (the "Predecessor Company") into the Company pursuant to and in accordance with Chapter 86 (the "Act") of the Nevada Revised Statutes ("NRS") and the Nevada Mergers and Exchanges of Interest Act];[3] and

WHEREAS, Cumulus Media Inc. and its debtor affiliates, as debtors and debtors in possession, including the [Predecessor] Company, filed that certain Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code on December 9, 2017 (the "Plan"), and this Agreement is being entered into pursuant to and in accordance with the terms of Plan.

NOW, THEREFORE, the Initial Member and the Company hereby [set forth the limited liability company agreement of the Company] [amend and restate the Original Agreement] as follows:

**ARTICLE I**

**General**

Section 1.1    Name.  The name of the Company is "[*Name of Reorganized Debtor*]".

---

[1] Note to Draft: This form to be used by: (1) Cumulus Broadcasting LLC and (2) Cumulus Licensing LLC, as well as any Nevada Debtor subsidiary corporation that is being converted into a Nevada LLC in accordance with the Description of Transaction Steps.

[2] Note to Draft: Applicable if the Reorganized Debtor was previously a Nevada LLC and will remain as such through the Effective Date of the Plan.

[3] Note to Draft: Applicable if the Reorganized Debtor was previously a Nevada corporation and will be converted to a Nevada LLC prior to the Effective Date of the Plan.

Section 1.2     Business Purpose.  The Company is organized for the purpose of carrying on any lawful business, purpose or activity permitted it under NRS 86.141 or any successor provision and all necessary or incidental activities  conducive to such purpose.

Section 1.3     Powers.  The Company shall have all the powers necessary or convenient to carry out the purposes for which it is organized, including the powers granted by NRS 86.281.

## ARTICLE II

### The Member; Management by the Member

Section 2.1     Initial Member.  The Member owns 100% of the member's interests of the Company.  The name and the business residence, or mailing address of the member are as follows:

[_____] and [_____]

Section 2.2     Management. Except as may be otherwise provided by law or in this Agreement, the business and affairs of the Company shall be managed by or under the direction of the Member.  The Member shall manage the Company in accordance with this Agreement.

Section 2.3     Authority; Powers and Duties of the Member. The Member shall have exclusive and complete authority and discretion to manage the operations and affairs of the Company and to make all decisions regarding the business of the Company. Any action taken by the Member shall constitute the act of and serve to bind the Company. Persons (as defined herein) dealing with the Company are entitled to rely conclusively on the power and authority of the Member as set forth in this Agreement. The Member shall have all rights and powers of a manager under the Act, and shall have such authority, rights and powers in the management of the Company to do any and all other acts and things necessary, proper, convenient or advisable to effectuate the purposes of this Agreement.

## ARTICLE III

### Certificates of Limited Liability Company Interests

Section 3.1     The Membership Interests shall constitute and shall remain a "security" within the meaning of the Uniform Commercial Code of Nevada.

Section 3.2     Membership Interest Certificates.  Notwithstanding anything in this Agreement which may (or may be construed to be) to the contrary:  (a) the Membership Interest in the Company may be evidenced by a certificate or certificates the form of which is attached to this Agreement as Exhibit A (the "Membership Interest Certificates"); (b) if issued, the Membership Interest Certificates shall (and hereby do) provide that the Membership Interests

2

represented by them are securities governed by the Uniform Commercial Code as in effect in Nevada (and shall be treated as such for all purposes, including, without limitation, perfection of a security interest therein under the Uniform Commercial Code as in effect in Nevada); (c) transfer of any Membership Interest in the Company can be effected only upon and by presentation to the Company of the Membership Interest Certificate evidencing such Membership Interest, together with a proper and effective endorsement thereof; (d) exchange of any Membership Interest Certificate for one or more new Membership Interest Certificates evidencing (in the aggregate) the same Membership Interests in the Company can only be effected upon and by presentation to the Company of such Membership Interest Certificates, together with proper and effective endorsements thereof; and (e) if there shall be delivered to the Company evidence (satisfactory to the Company) of the ownership of, and the destruction, loss or theft of, any Membership Interest Certificate, together with such security or indemnity as may be reasonably required by the Company to hold the Company harmless against loss, cost, damage or expense resulting to the Company therefrom, the Company shall issue, in lieu of such destroyed, lost or stolen Membership Interest Certificate, one or more new Membership Interest Certificates evidencing (in the aggregate) the same Membership Interests in the Company as were evidenced by such destroyed, lost or stolen membership Interest Certificate.

Section 3.3    The provisions of this Article III and the Membership Interest Certificates shall not be amended, and any purported amendment of such provisions shall not be or become effective, unless and until all outstanding Membership Interest Certificates have been surrendered for cancellation or for exchange and cancellation.

## ARTICLE IV

## Ownership and Contributions

Section 4.1    Ownership.

(i)  The Member shall own all of the limited liability company interests of the Company.

(ii)    The Company shall be the owner of all capital and property (whether real, tangible or intangible) and rights conveyed to it. The Member has no interest in specific capital or property of the Company, including capital or property sold, transferred or otherwise conveyed by the Member to the Company. Notwithstanding the foregoing, the Company will be disregarded for United States Federal income tax purposes, subject to the provisions of Section 5.1 of this Agreement.

Section 4.2    Contributions.  The valuation of any contributions of capital or property by the Member shall be agreed upon as of the date such property is accepted by the Company.

Section 4.3    Interest on Capital Contributions.  The Member shall be entitled to interest on its capital contributions.

3

## ARTICLE V

### Tax Status; Income and Deductions; Distributions

Section 5.1    Tax Status; Income and Deductions. Subject to the following sentence, it is the intention of the Company and the Member that the Company be treated as a disregarded entity for United States federal and, where applicable, all state, local and foreign income tax purposes and all items of income, gain, loss, deduction or credit of the Company shall be treated as items of income, gain, loss, deduction or credit of the Member. If the Member determines to cause the Company to elect to be treated as an association taxable as a corporation for all United States federal and all relevant state and local tax purposes, the Company shall make all available elections to be so treated and the Company will be treated as an association taxable as a corporation for all United States federal and all relevant state and local tax purposes. Neither the Company nor the Member shall take any action or make any election which is inconsistent with such intended tax treatment.  All provisions of this Agreement are to be construed so as to preserve the Company's intended tax status.

Section 5.2    Distributions.  All distributions of cash or other assets of the Company shall be made to the Member in accordance with aggregate capital contributions, in such amount and at such time as may be determined by the Member in its sole discretion. Notwithstanding provisions to the contrary contained in this Agreement, the Company shall not make a distribution to the Member on account of its limited liability company interests in the Company if such distribution would violate the NRS or other applicable law.

## ARTICLE VI

### Dissolution and Winding Up

Section 6.1    Dissolution.  The Company shall be dissolved and its affairs wound up upon the occurrence of any one of the following events:

(i)      a written consent of the Member or; and

(ii)     any other event or circumstance giving rise to the dissolution of the Company under the Act, unless the Company's existence is continued pursuant to the  Act.

Section 6.2    Winding Up.

(i)   On dissolution of the Company, the Company shall immediately commence to wind up its affairs and the Member (or a liquidator appointed by the Member) shall promptly liquidate the business of the Company.  During the period of the winding up of the affairs of the Company, the rights and obligations of the Member under this Agreement shall continue.

(ii)   In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied as follows: (i) first, to creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof) and (ii) second, to the Member.

4

(iii)  As soon as practicable after the Company is dissolved, the Member shall file articles of dissolution in accordance with the Act.

## ARTICLE VII

### Transfers of Limited Liability Company Interests

Notwithstanding anything in this Agreement to the contrary, in the event of a transfer of all of a member's membership interests in the Company and such member is, at the time of such transfer, the sole member of the Company, the transferee of such membership interests shall be deemed admitted as a member of the Company upon such transfer and the Company shall continue without dissolution.

## ARTICLE VIII

### Admission of Members

No Person may be admitted as an additional member of the Company without the consent of the Member. Prior to the admission of any such additional members to the Company, the Member shall amend this Agreement to make such changes as the Member shall determine to reflect the fact that the Company shall have such additional members. Each additional member shall execute and deliver a supplement or counterpart to this Agreement, as necessary.

## ARTICLE IX

### Cessation of Membership; Bankruptcy of Member

The Member shall cease to be a member only by the transfer by the Member of all of its limited liability company interests in the Company. The bankruptcy of the Member shall not cause the Member to cease to be a member of the Company and, upon the occurrence of such an event, the business of the Company shall continue without dissolution.

## ARTICLE X

### Liability and Indemnification

Section 10.1   Liability. No Member shall have any liability under this Agreement or under the Act except as required by the Act and all the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or acting as the manager of the Company. A Member shall be liable to the Company for any additional capital contributions as may be required pursuant to the Act. No Member shall be liable for any debts, obligations and liabilities, whether arising in contract, tort or otherwise, of any other Member of the Company. No Member shall be required by this Agreement to loan the Company any funds.

Section 10.2   Indemnification.

<div align="center">5</div>

Doc#: US1:11865953v6

(i)      *Indemnification of Protected Persons*.  To the fullest extent permitted by law as it presently exists or may hereafter be amended, the Company shall indemnify, defend, reimburse, exculpate, limit the liability of, hold harmless and protect each Member, each officer of the Company, each other person who was or is made or is threatened to be made a party or is otherwise involved in any proceeding, action, claim (including, but not limited to, any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured), cause of action, controversy, demand, right, right of setoff, cross claim, counterclaim, recoupment, claim for breach of duty imposed by law or in equity, action, charge against or interest in property to secure payment of a debt or performance of an obligation, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured, or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the date hereof, in contract or in tort, in law or in equity, under applicable law, or pursuant to any other theory of law, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that he or she, or a person for whom he or she is an Affiliate or legal representative, is or was a director, officer, employee, agent, manager, attorney or other professional of the Company [(including the Predecessor Company)], and any of their respective Affiliates (each a "Protected Person"), against any losses, claims, damages or liabilities, including legal fees and expenses incurred in investigating or defending against any such losses, claims, damages or liabilities, and any amounts expended in settlement of any claims (collectively, "Liabilities"); provided, however, that the Company shall not indemnify any Protected Person for Liabilities arising out of or related to any act or omission of such Protected Person that is a criminal act or constitutes actual fraud, gross negligence or willful misconduct or for which indemnification is not permissible under law. Notwithstanding anything to the contrary in this Agreement, any indemnification or advancement of expenses under this Section 10.2(i) or Section 10.2(ii) or Section 10.2(iii) shall be provided out of and to the extent of Company assets only, and neither the Sole Member nor any other person shall have any personal liability on account thereof.

(ii)      *Reimbursement and Advancement of Expenses*.  The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Protected Person for reasonable legal or other expenses (as incurred) of each Protected Person in connection with investigating, preparing to defend or defending any Proceeding relating to any Liabilities for which the Protected Person may be indemnified pursuant to this Section 10.2; provided, that such Protected Person executes a written undertaking to repay the Company for such reimbursed or advanced expenses if it is finally judicially determined that such Protected Person is not entitled to the indemnification provided by this Section 10.2.

(iii)      *Claims*.  If a claim for indemnification or advancement of expenses under this Section 10.2 is not paid in full within 30 days after a written claim therefor by the Protected Person has been received by the Company, the Protected Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to

6

be paid the expense of prosecuting such claim.  In any such action the Company shall have the burden of proving that the Protected Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

(iv) *Nonexclusivity of Rights*.  The rights conferred on any Protected Person by this Section 10.2 shall not be exclusive of any other rights that such Protected Person may have or hereafter acquire under any statute, provision of this Agreement, the Articles of Organization, agreement or vote of members or otherwise.

(v) *Other Sources*.  The Company's obligation, if any, to indemnify or to advance expenses to any Protected Person who was or is serving at its request as a director, officer, employee, agent, manager, attorney or other professional of another entity or enterprise shall be reduced by any amount such Protected Person may collect as indemnification or advancement of expenses from such other entity or enterprise.

(vi) *Survival of Protection*.  The provisions of this Section 10.2 shall continue to afford protection to each Protected Person regardless of whether such Protected Person remains in the position or capacity pursuant to which such Protected Person became entitled to indemnification under this Section 10.2 and regardless of any subsequent amendment, restatement or repeal of or modification or supplement to this Agreement; provided, that no such amendment, restatement, repeal, modification or supplement shall reduce or restrict the extent to which these indemnification provisions apply to actions taken or omissions made prior to the date of such amendment, restatement, repeal, modification or supplement. For avoidance of doubt, the indemnities provided under this Section 10.2 shall survive termination of the Company and this Agreement.

(vii) *Other Indemnification and Prepayment of Expenses*.  This Section 10.2 shall not limit the right of the Company, to the extent and in the manner permitted by applicable law, to indemnify and to advance expenses to persons other than Protected Persons when and as authorized by appropriate limited liability company action.

(viii) *No Fiduciary Duties*. To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or any other agreement contemplated herein or applicable provisions of law or equity or otherwise, the Member and the Company hereby agree that, pursuant to the authority of the NRS, the Member and the Company hereby eliminate any and all fiduciary duties the Member may have to any member of the Company or the Company.

(ix) *Insurance*. The Company may maintain insurance, at its expense, to protect itself and any member of the Company (including the Member) and any current or former director, officer, employee, agent, manager, attorney or other professional of the Company[, the Predecessor Company] or another limited liability company, corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under the Act.

<div align="center">7</div>

(x)    *Severability*. The provisions of this <u>Section 10.2</u> shall be applicable to situations of every type and shall be deemed to be severable, so that if this <u>Section 10.2</u> shall be adjudged invalid or unenforceable in a situation of a particular type or if any of the provisions of this <u>Section 10.2</u> shall be adjudged to be invalid or unenforceable, such invalidity or unenforceability shall not preclude application of this <u>Section 10.2</u> to any other situation or affect any other provision thereof.

## ARTICLE XI

## <u>Miscellaneous</u>

Section 11.1    <u>Fiscal Year</u>. Except as otherwise determined by the Member, the fiscal year of the Company (the "<u>Fiscal Year</u>") shall be the fiscal year of the Member.

Section 11.2    <u>Seal</u>. The Company may have a seal which shall have the name of the Company inscribed thereon and shall be in such form as may be approved from time to time by the Member. The Company seal may be used by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

Section 11.3    <u>Waiver of Notice</u>.  Whenever notice is required to be given by law or under any provision of this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a Person at a meeting shall constitute a waiver of notice of such meeting, except when the Person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting need be specified in any written notice or waiver of notice of meeting.

Section 11.4    <u>Fiduciary Duties</u>.  To the extent that, at law or in equity, the Member has duties (including fiduciary duties) and liabilities relating thereto to the Company or to another Member of the Company, such Person acting under this Agreement shall not be liable to the Company or to any other Person as a consequence of such Person's good faith reliance on the provisions of this Agreement.

Section 11.5    <u>Amendment of this Agreement</u>. This Agreement may not be amended, supplemented or repealed other than by the approval of the Member.

Section 11.6    <u>Governing Law</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEVADA WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.

Section 11.7    <u>Severability</u>. In the event that any provision of this Agreement shall be declared to be invalid, illegal or unenforceable, such provision shall survive to the extent it is not so declared, and the validity, legality and enforceability of the other provisions hereof shall not in any way be affected or impaired thereby, unless such action would substantially impair the benefits to any party of the remaining provisions of this Agreement.

<div align="center">8</div>

Section 11.8   Certain Definitions. For purposes of this Agreement, the following terms shall have the following meanings:

"Member" shall mean the Initial Member, any substitute member therefor appointed in accordance with the provisions of this Agreement and any additional member of the Company appointed in accordance with the provisions of this Agreement, each in its capacity as a member of the Company and, if the context requires, collectively, all current members of the Company appointed in accordance with the provisions of this Agreement.

"Person" shall mean a natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity.

"Transfer" shall mean any sale, exchange, transfer, assignment (including those by operation of or succession by law), pledge, hypothecation, creation of any lien, security interest or other encumbrance or other disposition.

9

IN WITNESS WHEREOF, this Agreement has been executed as of the date first above written.

**[NAME OF SOLE MEMBER]**

By: _____
Name:
Title:

Doc#: US1:11865953v6

## Exhibit A

This Certificate evidences interests in [*Name of Reorganized Debtor*], a Nevada limited liability company, which constitute securities governed by the Uniform Commercial Code as in effect in Nevada (and shall be treated as such for all purposes, including, without limitation, perfection of a security interest therein under the Uniform Commercial Code as in effect in Nevada).

CERTIFICATE OF MEMBERSHIP INTERESTS
IN
[*NAME OF REORGANIZED DEBTOR*]
No. R-1

This Certificate of Membership Interests certifies that [_____], a [____] [____], is the owner of a Membership Interest (as hereinafter defined) in [*Name of Reorganized Debtor*], a Nevada limited liability company (the "Company"), representing [__] units (100%) of the aggregate of all Membership Interests in the Company.

As used herein, the term "Membership Interests" has the meaning set forth in the [Amended and Restated] Limited Liability Company Agreement of the Company as in effect from time-to-time (the "Agreement"). Reference is made to the Agreement for a description of the terms of the Membership Interests evidenced hereby and the definitions of terms used herein but not defined herein.

Transfer or exchange of any or all of the Membership Interests evidenced by this Certificate (other than transfer as a pledge or security interest) can be effected only upon presentation of this Certificate, properly endorsed, to the Company.

IN WITNESS WHEREOF, the Company has executed and delivered this Certificate of Membership Interests by its sole member thereunto duly authorized as of the _____ ___, _____.

[_____]

By: _____

Name:
Title:

## Exhibit A-5
**Form of Pennsylvania Limited Liability Company
Agreement for Reorganized Debtor Subsidiaries**

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## OF

### [*NAME OR REORGANIZED DEBTOR*][1]

### A PENNSYLVANIA LIMITED LIABILITY COMPANY

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement") of [*Reorganized Debtor*], a limited liability company under the laws of the Commonwealth of Pennsylvania (the "Company"), is entered into as of [____], by [*Name of Sole Member of the Company*], a [_____] [_____] (the "Member").

## RECITALS

A.      The Company was formed on [*original formation date as a corporation*] as [*Name of Reorganized Debtor prior to conversion from a corporation to a limited liability company*], a Pennsylvania corporation (the "Predecessor Company"), and converted into a Pennsylvania limited liability company pursuant to and in accordance with the Title 15 of the Pennsylvania Consolidated Statutes (specifically, the Pennsylvania Entity Transactions Law) and the Act (as defined below), effective as of the effectiveness of the filing of a statement of conversion (the "Statement of Conversion") with the Offices of the Secretary of Commonwealth of Pennsylvania.

B.      The Company is currently a wholly-owned subsidiary of the Member, as set forth in Exhibit A.

C.      The Certificate of Organization for the Company have previously been filed with the Offices of the Secretary of Commonwealth of Pennsylvania.

D.      Cumulus Media Inc. and its debtor affiliates, as debtors and debtors in possession, including the Predecessor Company, filed that certain Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code on December 9, 2017 (the "Plan"), and this Agreement is being entered into pursuant to and in accordance with the terms of Plan.

E.      The Member desires to adopt and approve this Limited Liability Company Operating Agreement for the Company pursuant to the terms and conditions set forth below.

## PROVISIONS

NOW, THEREFORE, in consideration of the covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Member hereby agrees as follows:

---

[1] Note to Draft: This form to be used by Susquehanna Radio Corp. if it is to be converted into a Pennsylvania LLC in accordance with the Description of Transaction Steps.

1.        **Definitions**.    When used herein, the following terms shall have the meanings set forth below (applicable to both the singular and plural) unless the context otherwise requires:

1.1      "Act" means the Pennsylvania Limited Liability Company Act of 2016 as now adopted or as may be hereafter amended from time-to-time.

1.2      "Affiliate" means, when used with reference to a specified Person:  (i) any Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with the specified Person; (ii) any Person that is an officer of, director of, partner in, member of, manager of or trustee of, or serves in a similar capacity with respect to the specified Person or of which the specified Person is an officer, director, partner, member, manager or trustee, or with respect to which the specified Person serves in a similar capacity; (iii) any Person that, directly or indirectly, is the beneficial owner of 10% or more of any class of equity securities of, or otherwise has a substantial beneficial interest (10% or more) in, the specified Person, or of which the specified Person is directly or indirectly the owner of 10% or more of any class of equity securities, or in which the specified Person has a substantial beneficial interest (10% or more); and (iv) any relative or spouse of the specified Person.

1.3      "Agreement" shall have the meaning ascribed to it in the preamble of this Agreement.

1.4      "Capital Contribution" means the cash or the deemed value of in-kind contributions contributed by the Member to the capital of the Company.

1.5      "Certificate" means the Certificate of Organization of the Company executed and filed pursuant to Section 2.3, and as amended thereafter pursuant to the Act and the terms of this Agreement.

1.6      "Company" shall have the meaning ascribed to it in the preamble of this Agreement.

1.7      "Company Expenses" means, collectively, (i) any costs, fees or expenses incurred or payable by the Company or the Member (or their respective Affiliates) in connection with the operation of the Company's business or the maintenance of the Company's assets and (ii) any amounts which the Company is obligated to pay to or on behalf of a Protected Person pursuant to Section 15.

1.8      "Member" shall have the meaning ascribed to it in the preamble of this Agreement.

1.9      "Membership Interest" means the Member's limited liability company interest in the Company and includes the entire ownership interest in the Company of the Member.

1.10     "Organization Expenses" mean the fees, costs, and expenses of and incidental to organizing and funding the Company.

2

1.11    "Person" includes any natural person, corporation, trust, association, joint stock company, partnership, limited liability company, limited liability partnership, joint venture and other entity and any government or agency, instrumentality or political subdivision thereof.

1.12    "Plan" shall have the meaning ascribed to it in the recitals of this Agreement.

1.13    "Predecessor Company" shall have the meaning ascribed to it in the recitals of this Agreement.

1.14    "Section" means, except as otherwise indicated, the applicable section or subsection of this Agreement.

1.15    "Statement of Conversion" shall have the meaning ascribed to it in the recitals of this Agreement.

1.16    "Terminating Dissolution" shall have the meaning assigned to such term in Section 12.1.

1.17    "Transfer" means, with respect to the Membership Interest, any sale, assignment, conveyance or other transfer of such Membership Interest (or any interest therein), whether voluntary or involuntary, including a transfer by operation of law, and also including the grant of a security interest, pledge or other encumbrance.

2.  **Organization**

2.1    Formation.  The Company was converted from a corporation to a limited liability company pursuant to the provisions of the Pennsylvania Entity Transactions Law and the Act upon the filing of the Statement of Conversion with the Pennsylvania Department of State. The Member agrees to continue the Company as a limited liability company under the Act, subject to the conditions set forth in this Agreement.

2.2    Name.  The name of the Company is "[*Name of Reorganized Debtor*]".

2.3    Certificate of Organization.  An authorized person has executed the Certificate, which have been filed in the Office of the Secretary of Commonwealth of Pennsylvania.  The Member shall execute or cause to be executed all other instruments, certificates, notices and documents, and shall do or cause to be done all such filings, recordings, publications and other acts as may be necessary or appropriate from time-to-time to comply with all applicable requirements for the formation and operation and, when appropriate, termination of a limited liability company in the Commonwealth of Pennsylvania.

3

3.       **Registered Office; Registered Agent**.  The Company will continuously maintain a registered office and registered agent in the Commonwealth of Pennsylvania as may be required by the Act.

4.       **Principal Place of Business**.  The principal place of business of the Company shall be located at such place or places as may be determined by the member from time-to-time.

5.       **Purpose**.  The purpose of the Company is to conduct any lawful business that the Member reasonably deems necessary or desirable.  In connection with the foregoing purposes, the Company shall have, and may exercise, all of the rights and powers now or hereafter conferred by the laws of the Commonwealth of Pennsylvania on limited liability companies formed thereunder.

6.       **Term**.  The term of the Company will be indefinite unless sooner terminated.

7.       **Member and Capital Contributions**.

7.1      Member.  The name and address of the Member is as follows: [_____].

7.2      Additional Members.  Additional Persons may be admitted as members with the consent of the Member upon the execution of this Agreement by such Person, except as otherwise provided in Section 11 of this Agreement.

7.3      Initial Contributions.  The Member made the initial Capital Contribution to the Company of One Hundred Dollars and 00/100 ($100.00), and, as of the date of this Agreement, and is the only member of the Company.  The Member and any subsequent members will keep a list of the current members of the Company attached to this Agreement as Exhibit A.

7.4      Additional Contributions; Return of Distributions.  Except as provided in Section 7.3 hereof or the Act or other applicable law, the Member shall not be required to make any contribution to the capital of the Company or to return any distribution made by the Company to it.  The Member may make additional Capital Contributions in such amounts and at such times as the Member shall determine.

7.5      Deficit Capital Accounts.  Notwithstanding anything in this Agreement to the contrary and notwithstanding any custom or rule or law to the contrary, the deficit, if any, in the capital account of the Member upon the dissolution of the Company shall not be an asset of the Company, and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's capital account to zero.

7.6      Limited Liability.  Except to the extent provided by law, the Member shall not be bound by, or personally liable for, the expenses, liabilities or obligations of the Company.

7.7      Rights of Creditors and Third Parties.  This Agreement is entered into by the Member for the exclusive benefit of the Company, the Member, and their respective successors and assignees.  This Agreement is expressly not intended for the benefit of any

4

creditor of the Company or any other Person, except as otherwise expressly provided herein. Except and only to the extent provided by the Act or other applicable statute, or as otherwise expressly provided herein, no such creditor or third party shall have any rights under this Agreement or any agreement between the Company and the Member with respect to any capital contribution or otherwise.

8.  **Tax Status; Income and Deductions**. Subject to the following sentence, it is the intention of the Company and the Member that the Company be treated as a disregarded entity for United States federal and, where applicable, all state, local and foreign income tax purposes and all items of income, gain, loss, deduction or credit of the Company shall be treated as items of income, gain, loss, deduction or credit of the Member. If the Member determines to cause the Company to elect to be treated as an association taxable as a corporation for all United States federal and all relevant state and local tax purposes, the Company shall make all available elections to be so treated and the Company will be treated as an association taxable as a corporation for all United States federal and all relevant state and local tax purposes. Neither the Company nor the Member shall take any action or make any election which is inconsistent with such intended tax treatment. All provisions of this Agreement are to be construed so as to preserve the Company's intended tax status.

9.  **Distributions**.

9.1  Distributions.  All distributions shall be made to the Member.

9.2  Limitation on Distributions.  No distribution shall be made to the extent that such distribution would violate any portion of the Act or any other applicable law.

10.  **Management of the Company**.

10.1  Management.  The business and affairs of the Company shall be managed by or under the authority of the Member, which shall have all of the rights and powers which may be possessed by a member of a member-managed limited liability company under the Act, and such rights and powers as are otherwise conferred by law or by this Agreement or are necessary, advisable or convenient to the management of the business and affairs of the Company.

10.2  Expenses.  The Company shall pay all Organization Expenses and Company Expenses.

10.3  Officers.

10.3.1 Appointment of Officers.  The Member may appoint a Chairman, Chief Executive Officer, President, Secretary, Treasurer, one or more Vice Presidents, one or more Assistant Secretaries, one or more Assistant Treasurers and such other officers as may be appointed in accordance with the provisions of this Section 10.3.1.  Any number of offices may be held by the same person.  Any such officers shall serve at the pleasure of the Member, subject to the rights, if any, of an officer under any contract of employment or other agreement.  Each

5

such appointed officer shall have the power and authority as would normally be vested in a person holding such title or such lesser or greater as the Member may establish from time-to-time.  The initial officers shall be [_____], as [_____], [. . .], all until further action of the Member.

        10.3.2  <u>Removal and Resignation</u>.  Subject to the rights, if any, of an officer under any contract of employment or other agreement, any officer may be removed, either with or without cause, by the Member at any time upon written notice.  Any officer may resign at any time by giving written notice to the Company.  Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective.  Any resignation is without prejudice to the rights, if any, of the Company under any contract to which the officer is a party.

        11.      **<u>Transfer of Membership Interest</u>**.

        11.1    The Member may Transfer all or any portion of its Membership Interest.

        11.2    If the Member Transfers all of its Membership Interest in the Company, other than as a pledge or security interest, the transferee in such Transfer shall be admitted to the Company as a member of the Company automatically upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement.  Such admission shall be deemed effective immediately prior to the Transfer and, immediately following such admission, the transferor Member shall cease to be a member of the Company.  Notwithstanding anything in this Agreement to the contrary, any successor to the Member by merger or consolidation shall, without further act, be the Member hereunder, and such merger or consolidation shall not constitute a Transfer for purposes of this Agreement and the Company shall continue without dissolution.

        11.3    Upon the Transfer of a portion, but not all, of the Member's Membership Interest, other than a Transfer as a pledge or security interest, the transferee in such Transfer shall become an additional member of the Company.  In such case, this Agreement and all other relevant documents shall be amended to reflect the change in the number of members and other applicable changes and needed provisions.

        11.4    Upon the Transfer of all or any portion of the Member's Membership Interest (referred to in this <u>Section 11.4</u> as "<u>Collateral</u>") as a pledge or security interest, (i) the purchaser(s) of all or any portion of such Collateral at foreclosure of such pledge or security interest, and/or (ii) the transferee(s) or assignee(s) of all or any portion of such Collateral in lieu of foreclosure of such pledge or security interest, shall be admitted as a member(s) automatically, without any consent by the Member, of the Company upon its execution of an instrument(s) signifying its (their) agreement to be bound by the terms and conditions of this Agreement, which instrument(s) may be a counterpart(s) signature to this Agreement.  Such admission shall be deemed effective immediately prior to the Transfer and, immediately following such admission, the transferring Member shall cease to be a member of the Company.  If, as a result of such foreclosure or such transfer in lieu of foreclosure, there is more than one member of the

<div align="center">6</div>

Company, this Agreement and all other relevant documents, including the Certificate, if required, shall be amended to reflect such change in the number of members of the Company and other applicable changes and needed provisions.

11.5   Upon the Transfer of all or any portion of the Member's Membership Interest as collateral, the Member and/or the pledgee of such pledge or the secured party to which such security interest is granted shall provide written notice to the Company of such Transfer.  Each such notice shall identify the applicable pledgee or secured party and set forth its address for purposes of consents and other matters described in this Agreement that pertain to such Transfer or to the applicable pledgee or secured party.  From the date the Company receives any such notice until the date the Company receives evidence that such pledge or security interest has been released by the applicable pledgee or secured party, the Company shall be bound by such notice for such purposes.

11.6   So long as any Transfer of any Membership Interests as collateral is in effect, this Section 11 shall inure to the benefit of such transferee and its successors and assigns, as an intended third-party beneficiary, and no amendment, modification or waiver of, or consent with respect to this Section 11 shall in any event be effective without the prior written consent of such transferee.

12. **Dissolution and Winding Up of the Company; Bankruptcy of the Member**.

12.1   Dissolution of the Company.  The Company shall be dissolved upon the first to occur of any of the following events (each a "Terminating Dissolution"):

12.1.1  a determination by the Member to dissolve the Company;

12.1.2   the entry of a decree of judicial dissolution pursuant to the Act; or

12.1.3  Any other events set forth in the Act.

12.2   Winding Up of the Company.  Upon a Terminating Dissolution of the Company, the Member shall wind up the business and affairs of the Company in an orderly manner.  Company assets not previously distributed to the Member, or the proceeds therefrom to the extent the Member elects to liquidate the same, to the extent sufficient therefor, shall be applied and distributed in accordance with the Act or any successor provision thereto.

12.3   Bankruptcy of the Member.  The bankruptcy of the Member shall not cause the Member to cease to be a member of the Company and, upon the occurrence of such an event, the business of the Company shall continue without dissolution.

13. **Books of Account and Accounting; Reports; Banking**.

13.1   Books of Account and Accounting.  The Company's books and records shall be maintained at the principal place of business of the Company or at the offices of any provider of administrative or similar services to the Company as the Member may select.  The

<div align="center">7</div>

financial and accounting books and records of the Company may be maintained in accordance with such accounting procedures and principles as the Member may deem appropriate.

13.2   Banking.   The Member may open and thereafter maintain one or more separate bank accounts in the name of the Company in which there shall be deposited all the funds of the Company.  No funds of any other Person shall be deposited in such account, and the funds in such account shall be used solely for the business of the Company.

14. **Membership Interest Certificates**.

14.1   The Membership Interests shall constitute and shall remain a "security" within the meaning of the Uniform Commercial Code of Pennsylvania.

14.2   Membership Interest Certificates.   Notwithstanding anything in this Agreement which may (or may be construed to be) to the contrary:  (a) the Membership Interest in the Company may be evidenced by a certificate or certificates the form of which is attached to this Agreement as Exhibit B (the "Membership Interest Certificates"); (b) if issued, the Membership Interest Certificates shall (and hereby do) provide that the Membership Interests represented by them are securities governed by the Uniform Commercial Code as in effect in Pennsylvania (and shall be treated as such for all purposes, including, without limitation, perfection of a security interest therein under the Uniform Commercial Code as in effect in Pennsylvania); (c) transfer of any Membership Interest in the Company can be effected only upon and by presentation to the Company of the Membership Interest Certificate evidencing such Membership Interest, together with a proper and effective endorsement thereof; (d) exchange of any Membership Interest Certificate for one or more new Membership Interest Certificates evidencing (in the aggregate) the same Membership Interests in the Company can only be effected upon and by presentation to the Company of such Membership Interest Certificates, together with proper and effective endorsements thereof; and (e) if there shall be delivered to the Company evidence (satisfactory to the Company) of the ownership of, and the destruction, loss or theft of, any Membership Interest Certificate, together with such security or indemnity as may be reasonably required by the Company to hold the Company harmless against loss, cost, damage or expense resulting to the Company therefrom, the Company shall issue, in lieu of such destroyed, lost or stolen Membership Interest Certificate, one or more new Membership Interest Certificates evidencing (in the aggregate) the same Membership Interests in the Company as were evidenced by such destroyed, lost or stolen membership Interest Certificate.

14.3   The provisions of this Section 14 and the Membership Interest Certificates shall not be amended, and any purported amendment of such provisions shall not be or become effective, unless and until all outstanding Membership Interest Certificates have been surrendered for cancellation or for exchange and cancellation.

15. **Exculpation and Indemnification.**

15.1   Exculpation.   Except to the extent of any non-waivable provision of any applicable law, no Protected Person (as defined below) shall have any liability or obligation to

<div align="center">8</div>

Doc#: US1:11866180v9

the Company or any Member arising out of or relating to any act or omission of such Protected Person (or of any other Protected Person), except for liabilities or obligations directly arising out of acts or omissions with respect to the Company's business that are finally determined by a court of competent jurisdiction (which determination is not successfully overturned on timely appeal) to constitute actual fraud or willful malfeasance.

15.2    Indemnification of Protected Persons.  To the fullest extent permitted by law as it presently exists or may hereafter be amended, the Company shall indemnify, defend, reimburse, exculpate, limit the liability of, hold harmless and protect the Member, each officer of the Company, each other person who was or is made or is threatened to be made a party or is otherwise involved in any proceeding, action, claim (including, but not limited to, any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured), cause of action, controversy, demand, right, right of setoff, cross claim, counterclaim, recoupment, claim for breach of duty imposed by law or in equity, action, charge against or interest in property to secure payment of a debt or performance of an obligation, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured, or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the date hereof, in contract or in tort, in law or in equity, under applicable law, or pursuant to any other theory of law, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that he or she, or a person for whom he or she is an Affiliate or legal representative, is or was a director, officer, employee, agent, manager, attorney or other professional of the Company (including the  Predecessor Company), and any of their respective Affiliates (each a "Protected Person"), against any losses, claims, damages or liabilities, including legal fees and expenses incurred in investigating or defending against any such losses, claims, damages or liabilities, and any amounts expended in settlement of any claims (collectively, "Liabilities"), provided, however, that the Company shall not indemnify any Protected Person for Liabilities arising out of or related to any act or omission of such Protected Person that is a criminal act or constitutes actual fraud, gross negligence or willful misconduct or for which indemnification is not permissible under law. Notwithstanding anything to the contrary in this Agreement, any indemnification or advancement of expenses under this Section 15.2 or Section 15.3 or Section 15.4 shall be provided out of and to the extent of Company assets only, and neither the Member nor any other person shall have any personal liability on account thereof.

15.3    Reimbursement and Advancement of Expenses.  The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Protected Person for reasonable legal or other expenses (as incurred) of each Protected Person in connection with investigating, preparing to defend or defending any Proceeding relating to any Liabilities for which the Protected Person may be indemnified pursuant to this Section 15; provided, that such Protected Person executes a written undertaking to repay the Company for such reimbursed or advanced expenses if it is finally judicially determined that such Protected Person is not entitled to the indemnification provided by this Section 15.

9

15.4    Claims.  If a claim for indemnification or advancement of expenses under this Section 15 is not paid in full within 30 days after a written claim therefor by the Protected Person has been received by the Company, the Protected Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim.  In any such action the Company shall have the burden of proving that the Protected Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

15.5    Nonexclusivity of Rights.  The rights conferred on any Protected Person by this Section 15 shall not be exclusive of any other rights that such Protected Person may have or hereafter acquire under any statute, provision of this Agreement, the Certificate of Formation, agreement or vote of members or otherwise.

15.6    Other Sources.  The Company's obligation, if any, to indemnify or to advance expenses to any Protected Person who was or is serving at its request as a director, officer, employee, agent, manager, attorney or other professional of another entity or enterprise shall be reduced by any amount such Protected Person may collect as indemnification or advancement of expenses from such other entity or enterprise.

15.7    Survival of Protection.  The provisions of this Section 15 shall continue to afford protection to each Protected Person regardless of whether such Protected Person remains in the position or capacity pursuant to which such Protected Person became entitled to indemnification under this Section 15 and regardless of any subsequent amendment, restatement or repeal of or modification or supplement to this Agreement; provided, that no such amendment, restatement, repeal, modification or supplement shall reduce or restrict the extent to which these indemnification provisions apply to actions taken or omissions made prior to the date of such amendment, restatement, repeal, modification or supplement. For avoidance of doubt, the indemnities provided under this Section 15 shall survive termination of the Company and this Agreement.

15.8    Other Indemnification and Prepayment of Expenses.  This Section 15 shall not limit the right of the Company, to the extent and in the manner permitted by applicable law, to indemnify and to advance expenses to persons other than Protected Persons when and as authorized by appropriate limited liability company action.

15.9    Elimination of Fiduciary Duties. To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or any other agreement contemplated herein or applicable provisions of law or equity or otherwise, the Member and the Company hereby agree that, pursuant to the authority of the Act (and to the fullest extent allowed by the Act), the Member and the Company hereby eliminate any and all fiduciary duties that may be eliminated under the Act that the Member may have to any other member of the Company or the Company.

15.10   Insurance. The Company may maintain insurance, at its expense, to protect itself and any member of the Company (including the Member) and any current or former director, officer, employee, agent, manager, attorney or other professional of the Company, the Predecessor Company or another limited liability company, corporation, partnership, joint

10

venture, trust or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under the Act.

15.11   Severability. The provisions of this Section 15 shall be applicable to situations of every type and shall be deemed to be severable, so that if this Section 15 shall be adjudged invalid or unenforceable in a situation of a particular type or if any of the provisions of this Section 15 shall be adjudged to be invalid or unenforceable, such invalidity or unenforceability shall not preclude application of this Section 15 to any other situation or affect any other provision thereof.

16. **Miscellaneous**.

16.1   Section Headings.   Section and other headings contained in this Agreement are for reference purposes only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

16.2   Severability.   Each provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

16.3   Amendment of Operating Agreement.  This Agreement may be amended from time-to-time only by a written instrument adopted by the Member and executed by the Member; provided, however, that, so long as any pledge or security interest is in effect with respect to all or any portion of the Member's Membership Interest, no amendment of Sections 11 and 14 shall be effective without the prior written consent of the pledgee of such pledge or the secured party to which such security interest is granted; and provided, further, however, that Exhibit A and Exhibit B hereto may be amended from time-to-time by the Member to the extent required to accurately reflect the then current status of the information contained thereon.

16.4   Governing Law.  Notwithstanding the place where this Agreement may be executed, all the terms and provisions hereof shall be construed under the laws of the Commonwealth of Pennsylvania.

16.5   Interpretation.  Masculine, feminine and neuter pronouns used herein shall each include the other, and the use of the singular or plural includes the other unless the context clearly otherwise requires.  In addition, "or" is not exclusive unless the context clearly otherwise requires.

16.6   Benefit of Member.  This Agreement is entered into by the Member for the benefit of the Member and its successors and assigns.  Except as provided in Sections 11 and 14 and by applicable statute, this Agreement is expressly not intended for the benefit of any creditor of the Company or the Member, or any other Person (other than the Company and the Member) and no such creditor or other third-party shall have any rights under this Agreement or any agreement between the Company and the Member with respect to any Capital Contributions or otherwise.

11

Doc#: US1:11866180v9

16.7    Notices.  All notices required or permitted by this Agreement shall be in writing and shall be mailed (certified mail, postage pre-paid and return receipt requested), telecopied, electronically communicated by facsimile transmission or delivered by hand or by a reputable overnight courier.  Notice to the Company shall be given to its principal office or to the Member or other custodian of the Company's records.  Notice to a member or a pledgee or secured party shall be given to such Person at the address reflected in the Company's records unless such Person has notified the Company in writing of a different address.

[Signature Page Follows]

12

Doc#: US1:11866180v9

IN WITNESS WHEREOF, this Agreement has been executed as of the date first above written.

**[NAME OF SOLE MEMBER]**

By: _____
Name:
Title:

13

**Exhibit A**

| **Name and Address of Member** | **Membership Interest** |
| --- | --- |
| [_____] | [____] Units (100%)[2] |

---

[2] Note to Draft:  If the Member has already contributed to the Company, the value of that contribution will be set forth in this schedule.

14

Doc#: US1:11866180v9

**Exhibit B**

This Certificate evidences interests in [*Name of Reorganized Debtor*], a Pennsylvania limited liability company, which constitute securities governed by the Uniform Commercial Code as in effect in Pennsylvania (and shall be treated as such for all purposes, including, without limitation, perfection of a security interest therein under the Uniform Commercial Code as in effect in Pennsylvania).

CERTIFICATE OF MEMBERSHIP INTERESTS
IN
[*NAME OF REORGANIZED DEBTOR*]
No. R-1

This Certificate of Membership Interests certifies that [____], a [___] [___], is the owner of a Membership Interest (as hereinafter defined) in [*Name of Reorganized Debtor*], a Pennsylvania limited liability company (the "Company"), representing 100 units (100%) of the aggregate of all Membership Interests in the Company.

As used herein, the term "Membership Interests" has the meaning set forth in the Limited Liability Company Operating Agreement of the Company as in effect from time-to-time (the "Agreement").  Reference is made to the Agreement for a description of the terms of the Membership Interests evidenced hereby and the definitions of terms used herein but not defined herein.

Transfer or exchange of any or all of the Membership Interests evidenced by this Certificate (other than transfer as a pledge or security interest) can be effected only upon presentation of this Certificate, properly endorsed, to the Company.

IN WITNESS WHEREOF, the Company has executed and delivered this Certificate of Membership Interests by its sole member thereunto duly authorized as of the _____ ___, _____.

[_____]

By: _____

Name:

Title:

Doc#: US1:11866180v9

**Exhibit A-6**
**Form of Amended and Restated Certificate of Incorporation for**
**Reorganized Debtor subsidiaries that are Delaware corporations**

# AMENDED AND RESTATED

# CERTIFICATE OF INCORPORATION

# OF

# [*NAME OF REORGANIZED DEBTOR*][1]

[*Name of Reorganized Debtor*], a corporation organized and existing under the General Corporation Law of the State of Delaware (the "DGCL"), hereby certifies as follows:

1.      The name of the corporation is "[*Name of Reorganized Debtor*]" (referred to herein as the "Corporation").

2.      The Certificate of Incorporation of the Company originally was filed with the Secretary of State of the State of Delaware on [_____].[2]

3.      This Amended and Restated Certificate of Corporation amends and restates the provisions of the certificate of incorporation of the Corporation as heretofore amended (the "Certificate of Incorporation"), and been duly adopted in accordance with the provisions of Sections 242, 245 and 303 of the DGCL.

4.      The text of the Certificate of Incorporation of the Corporation is hereby amended and restated to read in its entirety as follows:

## ARTICLE I

Name

The name of the Corporation is "[*Name of Reorganized Debtor*]".

## ARTICLE II

Address; Registered Office and Agent

The address of the Corporation's registered office in the State of Delaware is [_____]; and the name of its registered agent at such address is [_____].[3]

---

[1]   Note to Draft: This form to be used by (1) Cumulus Media Holdings Inc., (2) Cumulus Intermediate Holdings Inc., (3) Cumulus Network Holdings Inc., (4) Westwood One, Inc., (5) CMP Susquehanna Radio Holdings Corp., (6) CMP Susquehanna Corp., (7) Susquehanna Pfaltzgraff Co., (8) Susquehanna Media Corp., (9) CMP KC Corp. and (10) Catalyst Media, Inc., unless such entities are otherwise converted into LLCs in accordance with the Description of Transaction Steps.

[2]   Note to Draft: Also include the original name of the Corporation if changed since its original date of incorporation.

[3]   Note to Draft: Address must include the county as well

2

## ARTICLE III

### Purposes

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

## ARTICLE IV

### Number of Shares

The total number of shares of stock that the Corporation shall have authority to issue is [_____], all of which shall be shares of Common Stock with the par value of $[___] per share.

## ARTICLE V

### Election of Directors

Unless and except to the extent that the By-laws of the Corporation (the "By-laws") shall so require, the election of directors of the Corporation need not be by written ballot.

## ARTICLE VI

### Limitation of Liability

To the fullest extent permitted under the DGCL, as amended from time to time, no director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.  Any amendment or repeal of this Article VI shall not adversely affect any right or protection of a director of the Corporation hereunder in respect of any act or omission occurring prior to the time of such amendment or repeal.

## ARTICLE VII

### Adoption, Amendment or Repeal of By-Laws

The Board is authorized to adopt, amend or repeal the By-laws.

## ARTICLE VIII

### Certificate Amendments

The Corporation reserves the right at any time, and from time to time, to amend or repeal any provision contained in this Amended and Restated Certificate of Incorporation, and add other provisions authorized by the laws of the State of Delaware at the time in force, in the manner now or hereafter prescribed by applicable law; and all rights, preferences and privileges of whatsoever nature conferred upon stockholders, directors or any other persons whomsoever by and pursuant to this Amended and

3

Restated Certificate of Incorporation (as amended) are granted subject to the rights reserved in this Article.

WITNESS the signature of this Amended and Restated Certificate of Incorporation this___ day of _____ 20__.

_____

[_____]

Name:

Title:

**Exhibit A-7**
**Form of Amended and Restated Bylaws for**
**Reorganized Debtor subsidiaries that are Delaware corporations**

**AMENDED & RESTATED BY-LAWS**

**of**

**[*NAME OF REORGANIZED DEBTOR*][1]**

**(A Delaware Corporation)**

ARTICLE 1

<u>DEFINITIONS</u>

As used in these By-laws, unless the context otherwise requires, the term:

1.1   "Affiliate" has the meaning set forth in Rule 12b-2 promulgated under the Securities Exchange Act of 1934, as amended.

1.2   "Assistant Secretary" means an Assistant Secretary of the Corporation.

1.3   "Assistant Treasurer" means an Assistant Treasurer of the Corporation.

1.4   "Board" means the Board of Directors of the Corporation.

1.5   "By-laws" means the By-laws of the Corporation, as amended.

1.6   "Certificate of Incorporation" means the Certificate of Incorporation of the Corporation, as amended, supplemented or restated from time to time.

1.7   "Chairman" means the Chairman of the Board of Directors of the Corporation.

1.8   "Corporation" means [*Name of Reorganized Debtor*].

1.9   "DGCL" means the General Corporation Law of the State of Delaware, as amended.

1.10   "Directors" means the directors of the Corporation.

---

[1]   <u>Note to Draft</u>: This form to be used by (1) Cumulus Media Holdings Inc., (2) Cumulus Intermediate Holdings Inc., (3) Cumulus Network Holdings Inc., (4) Westwood One, Inc., (5) CMP Susquehanna Radio Holdings Corp., (6) CMP Susquehanna Corp., (7) Susquehanna Pfaltzgraff Co., (8) Susquehanna Media Corp., (9) CMP KC Corp. and (10) Catalyst Media, Inc., unless such entities are otherwise converted into LLCs in accordance with the Description of Transaction Steps.

2

1.11   "law" means any U.S. or non-U.S., federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated or applied by a governmental authority (including any department, court, agency or official, or non-governmental self-regulatory organization, agency or authority and any political subdivision or instrumentality thereof).

1.12   "Office of the Corporation" means the executive office of the Corporation, anything in Section 131 of the DGCL to the contrary notwithstanding.

1.13   "President" means any President of the Corporation.

1.14   "Secretary" means the Secretary of the Corporation.

1.15   "Stockholders" means the stockholders of the Corporation.

1.16   "Treasurer" means the Treasurer of the Corporation.

1.17   "Vice President" means any Vice President of the Corporation.


ARTICLE 2

STOCKHOLDERS

2.1   Place of Meetings.  Meetings of Stockholders may be held at such place or solely by means of remote communication or otherwise, as may be designated by the Board from time to time.

2.2   Annual Meeting.  A meeting of Stockholders for the election of Directors and other business shall be held annually at such date and time as may be designated by the Board from time to time.

2.3   Special Meetings.  Special meetings of Stockholders may be called at any time by the Board and may not be called by any other person or persons.  Business transacted at any special meeting of Stockholders shall be limited to the purposes stated in the notice.

2.4   Record Date.

(A)   For the purpose of determining the Stockholders entitled to notice of any meeting of Stockholders or any adjournment thereof, unless otherwise required by the Certificate of Incorporation or applicable law, the Board may fix a record date (the "Notice Record Date"), which record date shall not precede the date on which the resolution fixing the record date was adopted by the Board and shall not be more than 60 or less than ten days before the date of such meeting.  The Notice Record Date shall also be the record date for determining the Stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such Notice Record Date, that a later date

Doc#: US1:11865930v6

on or before the date of the meeting shall be the date for making such determination (the "Voting Record Date").  For the purposes of determining the Stockholders entitled to express consent to corporate action in writing without a meeting, unless otherwise required by the Certificate of Incorporation or applicable law, the Board may fix a record date, which record date shall not precede the date on which the resolution fixing the record date was adopted by the Board and shall not be more than ten days after the date on which the record date was fixed by the Board.  For the purposes of determining the Stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights, exercise any rights in respect of any change, conversion or exchange of stock or take any other lawful action, unless otherwise required by the Certificate of Incorporation or applicable law, the Board may fix a record date, which record date shall not precede the date on which the resolution fixing the record date was adopted by the Board and shall not be more than 60 days prior to such action.

        (B)     If no such record date is fixed:

        (i)     The record date for determining Stockholders entitled to notice of and to vote at a meeting of Stockholders shall be at the close of business on the day next preceding the day on which notice is given or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held;

        (ii)     The record date for determining Stockholders entitled to express consent to corporate action in writing without a meeting (unless otherwise provided in the Certificate of Incorporation), when no prior action by the Board is required by applicable law, shall be the first day on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation in accordance with applicable law; and when prior action by the Board is required by applicable law, the record date for determining Stockholders entitled to express consent to corporate action in writing without a meeting shall be at the close of business on the date on which the Board takes such prior action;

        (iii)     The record date for the purposes of determining the Stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights, exercise any rights in respect of any change, conversion or exchange of stock or take any other lawful action shall be at the close of business on the day on which the board of directors adopts the resolution relating thereto; and

        (iv)     When a determination of Stockholders of record entitled to notice of or to vote at any meeting of Stockholders has been made as provided in this Section 2.4, such determination shall apply to any adjournment thereof, unless the Board fixes a new Voting Record Date for the adjourned meeting, in which case the Board shall also fix such Voting Record Date or a date earlier than such date as the new Notice Record Date for the adjourned meeting.

        2.5     Notice of Meetings of Stockholders.  Whenever under the provisions of applicable law, the Certificate of Incorporation or these By-laws, Stockholders are required or permitted to take any action at a meeting, notice shall be

given stating the place, if any, date and hour of the meeting, the means of remote communication, if any, by which Stockholders and proxy holders may be deemed to be present in person and vote at such meeting, the Voting Record Date, if such date is different from the Notice Record Date, and, in the case of a special meeting, the purposes for which the meeting is called. Unless otherwise provided by these By-laws or applicable law, notice of any meeting shall be given, not less than ten nor more than 60 days before the date of the meeting, to each Stockholder entitled to vote at such meeting as of the Notice Record Date. If mailed, such notice shall be deemed to be given when deposited in the U.S. mail, with postage prepaid, directed to the Stockholder at his or her address as it appears on the records of the Corporation. An affidavit of the Secretary, an Assistant Secretary or the transfer agent of the Corporation that the notice required by this Section 2.5 has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein. If a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. Any business that might have been transacted at the meeting as originally called may be transacted at the adjourned meeting. If, however, the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each Stockholder of record entitled to vote at the meeting. If, after the adjournment, a new Voting Record Date is fixed for the adjourned meeting, the Board shall fix a new Notice Record Date in accordance with Section 2.4(B)(iv) hereof and shall give notice of such adjourned meeting to each Stockholder entitled to vote at such meeting as of the Notice Record Date.

2.6     Waivers of Notice. Whenever the giving of any notice to Stockholders is required by applicable law, the Certificate of Incorporation or these By-laws, a waiver thereof, given by the person entitled to said notice, whether before or after the event as to which such notice is required, shall be deemed equivalent to notice. Attendance by a Stockholder at a meeting shall constitute a waiver of notice of such meeting except when the Stockholder attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting has not been lawfully called or convened. Neither the business to be transacted at, nor the purposes of, any regular or special meeting of the Stockholders need be specified in any waiver of notice.

2.7     List of Stockholders. The Secretary shall prepare and make, at least ten days before every meeting of Stockholders, a complete, alphabetical list of the Stockholders entitled to vote at the meeting, and showing the address of each Stockholder and the number of shares registered in the name of each Stockholder. Such list may be examined by any Stockholder for any purpose germane to the meeting, for a period of at least ten days prior to the meeting, during ordinary business hours at the principal place of business of the Corporation or on a reasonably accessible electronic network as provided by applicable law. If the meeting is to be held at a place, the list shall also be produced and kept at the time and place of the meeting during the whole time thereof and may be inspected by any Stockholder who is present. If the meeting is held solely by means of remote communication, the list shall also be open for inspection as provided by applicable law. Except as provided by applicable law, the stock ledger shall be the only

5

evidence as to the identity of the Stockholders entitled to examine the list of Stockholders or to vote in person or by proxy at any meeting of Stockholders.

2.8     Quorum of Stockholders; Adjournment.  Except as otherwise provided by these By-laws, at each meeting of Stockholders, the presence in person or by proxy of the holders of a majority of the voting power of all outstanding shares of stock entitled to vote at the meeting of Stockholders shall constitute a quorum for the transaction of any business at such meeting.  In the absence of a quorum, the person presiding over the meeting in accordance with Section 2.11 or, in the absence of such person, the holders of a majority in voting power of the shares of stock present in person or represented by proxy at any meeting of Stockholders, including an adjourned meeting, may adjourn such meeting to another time and place.  Shares of its own stock belonging to the Corporation or to another corporation, if a majority of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the Corporation, shall neither be entitled to vote nor be counted for quorum purposes; provided, however, that the foregoing shall not limit the right of the Corporation to vote stock, including but not limited to its own stock, held by it in a fiduciary capacity.

2.9     Voting; Proxies.  At any meeting of Stockholders at which a quorum is present, all matters other than the election of directors, except as otherwise provided by the Certificate of Incorporation, these By-laws or any applicable law, shall be decided by the affirmative vote of a majority in voting power of shares of stock present in person or represented by proxy and entitled to vote thereon.  At all meetings of Stockholders for the election of Directors at which a quorum is present, a plurality of the votes cast shall be sufficient to elect a Director.  Each Stockholder entitled to vote at a meeting of Stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such Stockholder by proxy but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  A proxy shall be irrevocable if it states that it is irrevocable and if, and only so long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A Stockholder may revoke any proxy that is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary a revocation of the proxy or by delivering a new proxy bearing a later date.

2.10    Voting Procedures and Inspectors at Meetings of Stockholders. The Board, in advance of any meeting of Stockholders, may appoint one or more inspectors, who may be employees of the Corporation, to act at the meeting and make a written report thereof.  The Board may designate one or more persons as alternate inspectors to replace any inspector who fails to act.  If no inspector or alternate is able to act at a meeting, the person presiding at the meeting may appoint one or more inspectors to act at the meeting. Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.  The inspectors shall (A) ascertain the number of shares outstanding and the voting power of each, (B) determine the shares represented at the meeting and the validity of proxies and ballots, (C) count all votes and ballots, (D) determine and retain for a reasonable period a record

of the disposition of any challenges made to any determination by the inspectors and (E) certify their determination of the number of shares represented at the meeting and their count of all votes and ballots.  The inspectors may appoint or retain other persons or entities to assist the inspectors in the performance of their duties.  Unless otherwise provided by the Board, the date and time of the opening and the closing of the polls for each matter upon which the Stockholders will vote at a meeting shall be determined by the person presiding at the meeting and shall be announced at the meeting.  No ballot, proxies, votes or any revocation thereof or change thereto shall be accepted by the inspectors after the closing of the polls unless the Court of Chancery of the State of Delaware upon application by a Stockholder shall determine otherwise.  In determining the validity and counting of proxies and ballots cast at any meeting of Stockholders, the inspectors may consider such information as is permitted by applicable law.  No person who is a candidate for office at an election may serve as an inspector at such election.

2.11   Conduct of Meetings; Adjournment.  The Board may adopt such rules and procedures for the conduct of Stockholder meetings as it deems appropriate.  At each meeting of Stockholders, the President or, in the absence of the President, the Chairman or, if there is no Chairman or if there be one and the Chairman is absent, a Vice President and, in case more than one Vice President shall be present, that Vice President designated by the Board (or in the absence of any such designation, the most senior Vice President present), shall preside over the meeting.  Except to the extent inconsistent with the rules and procedures as adopted by the Board, the person presiding over the meeting of Stockholders shall have the right and authority to convene, adjourn and reconvene the meeting from time to time, to prescribe such additional rules and procedures and to do all such acts as, in the judgment of such person, are appropriate for the proper conduct of the meeting.  Such rules and procedures, whether adopted by the Board or prescribed by the person presiding over the meeting, may include, (A) the establishment of an agenda or order of business for the meeting, (B) rules and procedures for maintaining order at the meeting and the safety of those present, (C) limitations on attendance at or participation in the meeting to Stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the person presiding over the meeting shall determine, (D) restrictions on entry to the meeting after the time fixed for the commencement thereof and (E) limitations on the time allotted to questions or comments by participants.  The person presiding over any meeting of Stockholders, in addition to making any other determinations that may be appropriate to the conduct of the meeting, may determine and declare to the meeting that a matter or business was not properly brought before the meeting and, if such presiding person should so determine, he or she shall so declare to the meeting and any such matter or business not properly brought before the meeting shall not be transacted or considered.  Unless and to the extent determined by the Board or the person presiding over the meeting, meetings of Stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.  The Secretary or, in his or her absence, one of the Assistant Secretaries, shall act as secretary of the meeting.  If none of the officers above designated to act as the person presiding over the meeting or as secretary of the meeting shall be present, a person presiding over the meeting or a secretary of the meeting, as the case may be, shall be designated by the Board and, if the Board has not so acted, in the case of

7

the designation of a person to act as secretary of the meeting, designated by the person presiding over the meeting.

2.12    Order of Business.  The order of business at all meetings of Stockholders shall be as determined by the person presiding over the meeting.

2.13    Written Consent of Stockholders Without a Meeting. Any action to be taken at any annual or special meeting of Stockholders may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action to be so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered (by hand or by certified or registered mail, return receipt requested) to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of Stockholders are recorded.  No written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the first date on which a written consent is delivered to the Corporation in the manner required by this Section 2.13, written consents signed by a sufficient number of holders to take action are delivered to the Corporation as aforesaid.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall, to the extent required by applicable law, be given to those Stockholders who have not consented in writing, and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of holders to take the action were delivered to the Corporation.

ARTICLE 3

DIRECTORS

3.1    General Powers.  The business and affairs of the Corporation shall be managed by or under the direction of the Board.  The Board may adopt such rules and procedures, not inconsistent with the Certificate of Incorporation, these By-laws or applicable law, as it may deem proper for the conduct of its meetings and the management of the Corporation.

3.2    Number; Term of Office.  The Board shall consist of one or more members, the number thereof to be determined from time to time by the Board.  Each Director shall hold office until a successor is duly elected and qualified or until the Director's earlier death, resignation, disqualification or removal.

3.3    Newly Created Directorships and Vacancies.  Any newly created directorships resulting from an increase in the authorized number of Directors and any vacancies occurring in the Board may be filled by the affirmative vote of a majority of the remaining members of the Board, although less than a quorum.  A Director so elected

shall be elected to hold office until the earlier of the expiration of the term of office of the Director whom he or she has replaced and a successor is elected and qualified or the Director's earlier death, resignation, disqualification or removal.

3.4     Resignation. Any Director may resign at any time by notice given in writing or by electronic transmission to the Corporation. Such resignation shall take effect at the time of receipt of such notice or at such later time or such later time determined upon the happening of an event as is therein specified.

3.5     Removal. Any director may be removed from office with or without cause by the affirmative vote of the holders of not less than a majority of the voting power of the issued and outstanding stock of the Corporation entitled to vote generally in the election of directors (voting as a single class), excluding stock entitled to vote only upon the happening of a fact or event unless such fact or event shall have occurred.

3.6     Regular Meetings. Regular meetings of the Board may be held without notice at such times and at such places, if any, as may be determined from time to time by the Board or its Chairman.

3.7     Special Meetings. Special meetings of the Board may be held at such times and at such places, if any, as may be determined by the Chairman or the President on at least 24 hours' notice to each Director given by one of the means specified in Section 3.10 hereof other than by mail or on at least three days' notice if given by mail. Special meetings shall be called by the Chairman, President or Secretary in like manner and on like notice on the written request of any two or more Directors.

3.8     Telephone Meetings. Board or Board committee meetings may be held by means of telephone conference or other communications equipment by means of which all persons participating in the meeting can hear each other. Participation by a Director in a meeting pursuant to this Section 3.8 shall constitute presence in person at such meeting.

3.9     Adjourned Meetings. A majority of the Directors present at any meeting of the Board, including an adjourned meeting, whether or not a quorum is present, may adjourn and reconvene such meeting to another time and place, if any. At least 24 hours' notice of any adjourned meeting of the Board shall be given to each Director whether or not present at the time of the adjournment, if such notice shall be given by one of the means specified in Section 3.10 hereof other than by mail, or at least three days' notice if by mail; provided, however, that notice of the adjourned meeting need not be given if (a) the adjournment is for 24 hours or less and (b) the time, place, if any, and means of remote communication, if any, are announced at the meeting at which the adjournment is taken. Any business may be transacted at an adjourned meeting that might have been transacted at the meeting as originally called.

3.10    Notice Procedure. Subject to Sections 3.7 and 3.11 hereof, whenever notice is required to be given to any Director by applicable law, the Certificate

9

of Incorporation or these By-laws, such notice shall be deemed given effectively if given in person or by telephone, mail addressed to such Director at such Director's address as it appears on the records of the Corporation, telecopy or by other means of electronic transmission.

3.11    Waiver of Notice.  Whenever the giving of any notice to Directors is required by applicable law, the Certificate of Incorporation or these By-laws, a waiver thereof, given by the Director entitled to the notice, whether before or after such notice is required, shall be deemed equivalent to notice.  Attendance by a Director at a meeting shall constitute a waiver of notice of such meeting except when the Director attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special Board or committee meeting need be specified in any waiver of notice.

3.12    Organization.  At each meeting of the Board, the Chairman or, in his or her absence, another Director selected by the Board shall preside.  The Secretary shall act as secretary at each meeting of the Board.  If the Secretary is absent from any meeting of the Board, an Assistant Secretary shall perform the duties of secretary at such meeting; and in the absence from any such meeting of the Secretary and all Assistant Secretaries, the person presiding at the meeting may appoint any person to act as secretary of the meeting.

3.13    Quorum of Directors.  The presence of a majority of the total number of Directors then in office shall be necessary and sufficient to constitute a quorum for the transaction of business at any meeting of the Board; provided, however, that in no case shall a quorum consist of less than one-third of the total number of Directors that the Corporation would have if there were no vacancies on the Board.

3.14    Action by Majority Vote.  Except as otherwise expressly required by these By-laws or the Certificate of Incorporation, the vote of a majority of the directors at any meeting of the Board at which a quorum is present shall be the act of the Board.

3.15    Action Without Meeting.  Unless otherwise restricted by these By-laws, any action required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting if all Directors or members of such committee, as the case may be, consent thereto in writing or by electronic transmission, and the writings or electronic transmissions are filed with the minutes of proceedings of the Board or committee.

10

ARTICLE 4

COMMITTEES OF THE BOARD

The Board may designate one or more committees, each committee to consist of one or more of the Directors of the Corporation.  The Board may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee.  If a member of a committee shall be absent from any meeting, or disqualified from voting thereat, the remaining member or members present at the meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may, by a unanimous vote, appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member.  Any such committee, to the extent permitted by applicable law, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation and may authorize the seal of the Corporation to be affixed to all papers that may require it to the extent so authorized by the Board.  Unless the Board provides otherwise, at all meetings of such committee, a majority of the then authorized members of the committee shall constitute a quorum for the transaction of business, and the vote of a majority of the members of the committee present at any meeting at which there is a quorum shall be the act of the committee.  Each committee shall keep regular minutes of its meetings.  Unless the Board provides otherwise, each committee designated by the Board may make, alter and repeal rules and procedures for the conduct of its business.  In the absence of such rules and procedures each committee shall conduct its business in the same manner as the Board conducts its business pursuant to ARTICLE 3.

ARTICLE 5

OFFICERS

5.1     Positions; Election.  The Board shall elect officers of the Corporation which may include a Chairman, President, a Secretary, a Treasurer and any other officers as the Board may elect from time to time, and these officers shall exercise such powers and perform such duties as shall be determined by the Board from time to time.  Any number of offices may be held by the same person.

5.2     Term of Office.  Each officer of the Corporation shall hold office until such officer's successor is elected and qualifies or until such officer's earlier death, resignation or removal.  Any officer may resign at any time upon written notice to the Corporation.  Such resignation shall take effect at the time of receipt of such notice or at such later time or such later time determined upon the happening of an event as is therein specified.  The resignation of an officer shall be without prejudice to the contract rights of the Corporation, if any.  Any officer may be removed at any time with or without cause by the Board.  Any vacancy occurring in any office of the Corporation may be filled by

the Board.  The election or appointment of an officer shall not of itself create contract rights.

5.3     Chairman.  The Chairman, who shall be a Director, shall preside at all meetings of the Board and shall exercise such powers and perform such other duties as shall be determined from time to time by the Board.

5.4     President.  The President shall have general supervision over the business of the Corporation and other duties incident to the office of President, and any other duties as may from time to time be assigned to the President by the Board and subject to the control of the Board in each case.  The President may sign and execute in the name of the Corporation deeds, mortgages, bonds, contracts and other instruments, except in cases in which the signing and execution thereof shall be expressly delegated by the Board or by these By-laws to some other officer or agent of the Corporation, or shall be required by applicable law otherwise to be signed or executed.

5.5     Vice Presidents.  Vice Presidents shall have the duties incident to the office of Vice President and any other duties that may from time to time be assigned to the Vice President by the President or the Board.  Any Vice President may sign and execute in the name of the Corporation deeds, mortgages, bonds, contracts or other instruments, except in cases in which the signing and execution thereof shall be expressly delegated by the Board or by these By-laws to some other officer or agent of the Corporation, or shall be required by applicable law otherwise to be signed or executed.

5.6     Secretary.  The Secretary shall attend all meetings of the Board and of the Stockholders, record all the proceedings of the meetings of the Board and of the Stockholders in a book to be kept for that purpose and perform like duties for committees of the Board, when required.  The Secretary shall give, or cause to be given, notice of all special meetings of the Board and all meetings of the Stockholders and perform such other duties as may be prescribed by the Board or by the President.  The Secretary shall have custody of the corporate seal of the Corporation, if any, and the Secretary or an Assistant Secretary shall have authority to affix the same on any instrument that may require it, and when so affixed, the seal may be attested by the signature of the Secretary or by the signature of such Assistant Secretary.  The Board may give general authority to any other officer to affix the seal of the Corporation, if any, and to attest the same by such officer's signature.  The Secretary or an Assistant Secretary may also attest all instruments signed by the President or any Vice President.  The Secretary shall have charge of all the books, records and papers of the Corporation relating to its organization and management, see that the reports, statements and other documents required by applicable law are properly kept and filed and, in general, perform all duties incident to the office of secretary of a corporation and such other duties as may from time to time be assigned to the Secretary by the Board or the President.

5.7     Treasurer.  The Treasurer shall have charge and custody of, and be responsible for, all funds, securities and notes of the Corporation, receive and give receipts for moneys due and payable to the Corporation from any sources whatsoever; deposit all such moneys and valuable effects in the name and to the credit of the

12

Corporation in such depositaries as may be designated by the Board or the President, against proper vouchers, cause such funds to be disbursed by checks or drafts on the authorized depositaries of the Corporation signed in such manner as shall be determined by the Board or the President and be responsible for the accuracy of the amounts of all moneys so disbursed, regularly enter or cause to be entered in books or other records maintained for the purpose full and adequate account of all moneys received or paid for the account of the Corporation, have the right to require from time to time reports or statements giving such information as the Treasurer may desire with respect to any and all financial transactions of the Corporation from the officers or agents transacting the same, render to the President or the Board, whenever the President or the Board shall require the Treasurer so to do, an account of the financial condition of the Corporation and of all financial transactions of the Corporation, disburse the funds of the Corporation as ordered by the Board or the President and, in general, perform all duties incident to the office of Treasurer of a corporation and such other duties as may from time to time be assigned to the Treasurer by the Board or the President.

5.8     Assistant Secretaries and Assistant Treasurers.  Assistant Secretaries and Assistant Treasurers shall perform such duties as shall be assigned to them by the Secretary or by the Treasurer, respectively, or by the Board or the President.

5.9     Actions with Respect to Securities of Other Entities.  All stock and other securities of other entities owned or held by the Corporation for itself, or for other parties in any capacity, may be voted (including by written consent), and all proxies with respect thereto may be executed, by the person or persons authorized to do so by resolution of the Board or, in the absence of such authorization, by the Chairman, the President, the Secretary or the Treasurer.

ARTICLE 6

INDEMNIFICATION

6.1     Right to Indemnification.  To the fullest extent permitted by law as it presently exists or may hereafter be amended, the Corporation shall indemnify, defend, reimburse, exculpate, limit the liability of, hold harmless and protect each officer of the Corporation, each Director, each other person who was or is made or is threatened to be made a party or is otherwise involved in any proceeding, action, claim (including, but not limited to, any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured), cause of action, controversy, demand, right, right of setoff, cross claim, counterclaim, recoupment, claim for breach of duty imposed by law or in equity, action, charge against or interest in property to secure payment of a debt or performance of an obligation, indemnity, guaranty, suit, obligation, liability,

damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured, or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the date hereof, in contract or in tort, in law or in equity, under applicable law, or pursuant to any other theory of law, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that he or she, or a person for whom he or she is an Affiliate or legal representative, is or was a director, officer, employee, agent, manager, attorney or other professional of the Corporation, and any of their respective Affiliates (each a "Protected Person"), against any losses, claims, damages or liabilities, including legal fees and expenses incurred in investigating or defending against any such losses, claims, damages or liabilities, and any amounts expended in settlement of any claims (collectively, "Liabilities"); provided, however, that the Corporation shall not indemnify any Protected Person for Liabilities arising out of or related to any act or omission of such Protected Person that is a criminal act or constitutes actual fraud, gross negligence or willful misconduct or for which indemnification is not permissible under law.

6.2     Reimbursement and Advancement of Expenses. The Corporation shall promptly reimburse (and/or advance to the extent reasonably required) each Protected Person for reasonable legal or other expenses (as incurred) of each Protected Person in connection with investigating, preparing to defend or defending any Proceeding relating to any Liabilities for which the Protected Person may be indemnified pursuant to this ARTICLE 6; provided, that such Protected Person executes a written undertaking to repay the Corporation for such reimbursed or advanced expenses if it is finally judicially determined that such Protected Person is not entitled to the indemnification provided by this ARTICLE 6.

6.3     Claims.  If a claim for indemnification (following the final disposition of such Proceeding) or advancement of expenses under this ARTICLE 6 is not paid in full within 30 days after a written claim therefor by the Protected Person has been received by the Corporation, the Protected Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim.  In any such action the Corporation shall have the burden of proving that the Protected Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

6.4     Nonexclusivity of Rights.  The rights conferred on any Protected Person by this ARTICLE 6 shall not be exclusive of any other rights that such Protected Person may have or hereafter acquire under any statute, provision of these By-laws, the Certificate of Incorporation, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his, her or its official capacity and as to action in another capacity while holding office. The Corporation is specifically authorized to enter into individual contracts with any or all of its directors, officers, employees or agents respecting indemnification and advancement of expenses, to the fullest extent not prohibited by the DGCL, or by any other applicable law.

14

6.5     Other Sources.  The Corporation's obligation, if any, to indemnify or to advance expenses to any Protected Person who was or is serving at its request as a director, officer, employee or agent of another entity or enterprise shall be reduced by any amount such Protected Person may collect as indemnification or advancement of expenses from such other entity or enterprise.

6.6     Survival of Protection; Amendment or Repeal.  The rights conferred on any Protected Person by this ARTICLE 6 shall continue as to any person or entity who has ceased to be a Protected Person and shall inure to the benefit of the heirs, executors and administrators of such person or to the successors of such entity, as applicable.  The foregoing provisions of this ARTICLE 6 shall be contract rights, and no amendment, modification, supplement, restatement or repeal of any portion of this ARTICLE 6, without the consent of the applicable Protected Person, shall adversely affect any right or protection hereunder of any Protected Person in respect of any act or omission occurring prior to the time of such amendment, modification, supplement, restatement or repeal.

6.7     Other Indemnification and Prepayment of Expenses.  This ARTICLE 6 shall not limit the right of the Corporation, to the extent and in the manner permitted by applicable law, to indemnify and to advance expenses to persons other than Protected Persons when and as authorized by appropriate corporate action.

6.8     Insurance. The Corporation may maintain insurance, at its expense, to protect itself, any director, officer, employee or agent of the Corporation and any person serving at the request of the Corporation as a director, officer, employee or agent of another corporation or enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the DGCL.

6.9     Severability. The provisions of this ARTICLE 6 shall be applicable to situations of every type and shall be deemed to be severable, so that if this ARTICLE 6 shall be adjudged invalid or unenforceable in a situation of a particular type or if any of the provisions of this ARTICLE 6 shall be adjudged to be invalid or unenforceable, such invalidity or unenforceability shall not preclude application of this ARTICLE 6 to any other situation or affect any other provision thereof.

ARTICLE 7

GENERAL PROVISIONS

7.1     Certificates Representing Shares. The shares of stock of the Corporation shall be represented by certificates; provided that the Board may provide by resolution or restructuring that some or all of any or all Classes or series of its stock shall be uncertificated shares. If shares are represented by certificates (if any) such certificates shall be in the form approved by the Board. Every holder of stock represented by certificates shall be entitled to have a certificate signed by, or in the name of, the

Doc#: US1:11865930v6

Corporation by any two authorized officers of the Corporation. Any or all such signatures may be facsimiles. Although any officer, transfer agent or registrar whose manual or facsimile signature is affixed to such a certificate ceases to be such officer, transfer agent or registrar before such certificate has been issued, it may nevertheless be issued by the Corporation with the same effect as if such officer, transfer agent or registrar were still such at the date of its issue.

7.2     Transfer and Registry Agents.  The Corporation may from time to time maintain one or more transfer offices or agents and registry offices or agents at such place or places as may be determined from time to time by the Board.

7.3     Lost, Stolen or Destroyed Certificates.  The Corporation may issue a new certificate of stock in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate or his legal representative to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

7.4     Form of Records.  Any records administered by or on behalf of the Corporation in the regular course of its business, including its stock ledger, books of account, and minute books, may be kept on, or by means of, or be in the form of, any information storage device, method, or one or more electronic networks or databases (including one or more distributed electronic networks or databases); provided that the records so kept can be converted into clearly legible paper form within a reasonable time, and, with respect to the stock ledger, that the records so kept (i) can be used to prepare the list of stockholders specified in Sections 219 and 220 of the DGCL, (ii) record the information specified in Sections 156, 159, 217(a) and 218 of the DGCL and (iii) record transfers of stock as governed by Article 8 of the Uniform Commercial Code as enacted in the State of Delaware, 6 Del. C. §§8-101 et seq.  The Corporation shall convert any records so kept into clearly legible paper form upon the request of any person entitled to inspect such records pursuant to any provision of the DGCL.

7.5     Seal.  The Corporation may have a corporate seal, which shall be in such form as may be approved from time to time by the Board.  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or otherwise reproduced.

7.6     Fiscal Year.  The fiscal year of the Corporation shall be determined by the Board.

7.7     Amendments.  These By-laws may be amended or repealed and new By-laws may be adopted by the Board, but the Stockholders may make additional By-laws and may alter and repeal any By-laws whether such By-laws were originally adopted by them or otherwise.

7.8     Conflict with Applicable Law or Certificate of Incorporation.  These By-laws are adopted subject to any applicable law and the Certificate of

16

Incorporation.  Whenever these By-laws may conflict with any applicable law or the Certificate of Incorporation, such conflict shall be resolved in favor of such law or the Certificate of Incorporation.

Doc#: US1:11865930v6

**Exhibit A-8**
**Form of  Amended and Restated Articles of Incorporation**
**for Reorganized Debtor subsidiaries that are Nevada corporations**

## AMENDED AND RESTATED

## ARTICLES OF INCORPORATION

### of

### [*NAME OF REORGANIZED DEBTOR*][1]

The undersigned, in order to amend and restate the Articles of Incorporation of the Corporation (as defined below) in its entirety in accordance with the Nevada Revised Statutes 78.385 and 78.390 (the "NRS"), certifies as follows:

1.      Name.  The name of the corporation is [*Name of Reorganized Debtor*] (the "Corporation").

2.      Address; Registered Office and Agent.  The address of the Corporation's registered office is [_____]; and the name of its registered agent at such address is [_____].

3.      Number of Shares.  The total number of shares of stock that the Corporation shall have authority to issue is [____] all of which shall be shares of Common Stock with the par value of $[____] per share.

4.      Board of Directors.  The name and mailing address of the members of the board of directors of the Corporation are:

[_____], [_____]

[_____], [_____]

[_____], [_____].

---

[1]    Note to Draft: This form to be used by (1) Broadcast Software International, (2) Cumulus Radio Corporation, (3) KLIF Broadcasting, Inc., (4) KLIF Lico, Inc., (5) Radio Metroplex, Inc. and (6) KPLX Lico, Inc., unless such entities are otherwise converted into LLCs in accordance with the Description of Transaction Steps.

Doc#: US1:11942390v2

2

WITNESS the signature of these Amended and Restated Articles of Incorporation

this _____ day of _____, 2018.

_____
[_____]
[Officer/Director]

Doc#: US1:11942390v2

**<u>Exhibit A-9</u>**
**Form of Amended and Restated Bylaws**
**for Reorganized Debtor subsidiaries that are Nevada corporations**

AMENDED AND RESTATED BYLAWS
OF
[*NAME OF REORGANIZED DEBTOR*][1]
a Nevada corporation

ARTICLE I
OFFICES

Section 1.1    Principal Office.  The principal office and place of business of [*Name of Reorganized Debtor*], a Nevada corporation (the "Corporation"), shall be established from time to time by resolution of the board of directors of the Corporation (the "Board of Directors").

Section 1.2    Other Offices.  Other offices and places of business either within or without the State of Nevada may be established from time to time by resolution of the Board of Directors or as the business of the Corporation may require.  The street address of the Corporation's registered agent is the registered office of the Corporation in Nevada.

ARTICLE II
STOCKHOLDERS

Section 2.1    Annual Meeting.  The annual meeting of the stockholders of the Corporation shall be held on such date and at such time as may be designated from time to time by the Board of Directors.  At the annual meeting, directors shall be elected and any other business may be transacted as may be properly brought before the meeting pursuant to these Amended and Restated Bylaws (as further amended from time to time, these "Bylaws").

Section 2.2    Special Meetings.

(a)    Subject to any rights of stockholders set forth in the articles of incorporation of the Corporation (as amended from time to time, the "Articles of Incorporation"), special meetings of the stockholders may be called only by the chairman of the Board of Directors or the chief executive officer, or, if there be no chairman of the Board of Directors and no chief executive officer, by the president, and shall be called by the secretary upon the written request of at least a majority of the Board of Directors or the holders of not less than a majority of the voting power of the Corporation's stock entitled to vote.  Such request shall state the purpose or purposes of the meeting.

(b)    No business shall be acted upon at a special meeting of stockholders except as set forth in the notice of the meeting.

Section 2.3    Place of Meetings.  Any meeting of the stockholders of the Corporation may be held at the Corporation's registered office in the State of Nevada or at such other place in or out of the State of Nevada and the United States as may be designated in the notice of

---

[1] Note to Draft: This form to be used by (1) Broadcast Software International, (2) Cumulus Radio Corporation, (3) KLIF Broadcasting, Inc., (4) KLIF Lico, Inc., (5) Radio Metroplex, Inc. and (6) KPLX Lico, Inc., unless such entities are otherwise converted into LLCs in accordance with the Description of Transaction Steps.

meeting.  A waiver of notice signed by all stockholders entitled to vote thereat may designate any place for the holding of such meeting.

Section 2.4   Notice of Meetings; Waiver of Notice.

(a)   The chief executive officer, if any, the president, any vice president, the secretary, an assistant secretary or any other individual designated by the Board of Directors shall sign and deliver or cause to be delivered to the stockholders written notice of any stockholders' meeting not less than ten (10) days, but not more than sixty (60) days, before the date of such meeting.  The notice shall state the place, date and time of the meeting, the means of electronic communication, if any, by which the stockholders or the proxies thereof shall be deemed to be present and vote and, in the case of a special meeting, the purpose or purposes for which the meeting is called.  The notice shall be delivered in accordance with, and shall contain or be accompanied by such additional information as may be required by, the Nevada Revised Statutes ("NRS"), including, without limitation, NRS 78.379, 92A.120 or 92A.410.

(b)   In the case of an annual meeting, any proper business may be presented for action, except that (i) if a proposed plan of merger, conversion or exchange is submitted to a vote, the notice of the meeting must state that the purpose, or one of the purposes, of the meeting is to consider the plan of merger, conversion or exchange and must contain or be accompanied by a copy or summary of the plan; and (ii) if a proposed action creating dissenters' rights is to be submitted to a vote, the notice of the meeting must state that the stockholders are or may be entitled to assert dissenters' rights under NRS 92A.300 to 92A.500, inclusive, and be accompanied by a copy of those sections.

(c)   A copy of the notice shall be personally delivered or mailed postage prepaid to each stockholder of record entitled to vote at the meeting (unless the NRS requires delivery to all stockholders of record, in which case such notice shall be delivered to all such stockholders) at the address appearing on the records of the Corporation.  Upon mailing, service of the notice is complete, and the time of the notice begins to run from the date upon which the notice is deposited in the mail.  If the address of any stockholder does not appear upon the records of the Corporation or is incomplete, it will be sufficient to address any notice to such stockholder at the registered office of the Corporation.  Notwithstanding the foregoing and in addition thereto, any notice to stockholders given by the Corporation pursuant to Chapters 78 or 92A of the NRS, the Articles of Incorporation or these Bylaws, may be given pursuant to the forms of electronic transmission listed herein, if such forms of transmission are consented to in writing by the stockholder receiving such electronically transmitted notice and such consent is filed by the secretary in the corporate records.  Notice shall be deemed given (i) by facsimile when directed to a number consented to by the stockholder to receive notice, (ii) by electronic mail when directed to an e-mail address consented to by the stockholder to receive notice, (iii) by posting on an electronic network together with a separate notice to the stockholder of the specific posting on the later of the specific posting or the giving of the separate notice or (iv) by any other electronic transmission as consented to by and when directed to the stockholder.  The stockholder consent necessary to permit electronic transmission to such stockholder shall be deemed revoked and of no force and effect if (A) the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with the stockholder's consent and (B) the inability to deliver by electronic transmission becomes known

Doc#: US1:11865933v4

to the secretary, assistant secretary, transfer agent or other agent of the Corporation responsible for the giving of notice.

(d)     The written certificate of an individual signing a notice of meeting, setting forth the substance of the notice or having a copy thereof attached thereto, the date the notice was mailed or personally delivered to the stockholders and the addresses to which the notice was mailed, shall be prima facie evidence of the manner and fact of giving such notice and, in the absence of fraud, an affidavit of the individual signing a notice of a meeting that the notice thereof has been given by a form of electronic transmission shall be prima facie evidence of the facts stated in the affidavit.

(e)     Any stockholder may waive notice of any meeting by a signed writing or by transmission of an electronic record, either before or after the meeting.  Such waiver of notice shall be deemed the equivalent of the giving of such notice.

Section 2.5     Determination of Stockholders of Record.

(a)     For the purpose of determining the stockholders entitled to (i) notice of and to vote at any meeting of stockholders or any adjournment thereof, (ii) receive payment of any distribution or the allotment of any rights, or (iii) exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix, in advance, a record date, which shall not be more than sixty (60) days nor less than ten (10) days before the date of such meeting, if applicable.

(b)     The Board of Directors may adopt a resolution prescribing a date upon which the stockholders of record entitled to give written consent must be determined.  The date set by the Board of Directors must not precede or be more than ten (10) days after the date the resolution setting such date is adopted by the Board of Directors.  If the Board of Directors does not adopt a resolution setting a date upon which the stockholders of record entitled to give written consent must be determined and

(i)     no prior action by the Board of Directors is required by the NRS, then the date shall be the first date on which a valid written consent is delivered to the Corporation in accordance with the NRS and these Bylaws; or

(ii)     prior action by the Board of Directors is required by the NRS, then the date shall be the close of business on the date that the Board of Directors adopts the resolution.

(c)     If no record date is fixed pursuant to Section 2.5(a) or Section 2.5(b), the record date for determining stockholders: (i) entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held; and (ii) for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.  A determination of stockholders of record entitled to notice of or to vote at any meeting of stockholders shall apply to any postponement of any meeting of stockholders to a date not more than sixty (60) days after the record date or to any adjournment of the meeting; provided that the Board of Directors may

3

fix a new record date for the adjourned meeting and must fix a new record date if the meeting is adjourned to a date more than 60 days later than the date set for the original meeting.

Section 2.6    Quorum; Adjourned Meetings.

(a)    Unless the Articles of Incorporation provide for a different proportion, stockholders holding at least a majority of the voting power of the Corporation's capital stock, represented in person or by proxy (regardless of whether the proxy has authority to vote on all matters), are necessary to constitute a quorum for the transaction of business at any meeting.  If, on any issue, voting by classes or series is required by the laws of the State of Nevada, the Articles of Incorporation or these Bylaws, at least a majority of the voting power, represented in person or by proxy (regardless of whether the proxy has authority to vote on all matters), within each such class or series is necessary to constitute a quorum of each such class or series.

(b)    If a quorum is not represented, a majority of the voting power represented or the person presiding at the meeting may adjourn the meeting from time to time until a quorum is represented.  At any such adjourned meeting at which a quorum is represented, any business may be transacted which might otherwise have been transacted at the adjourned meeting as originally called.  When a stockholders' meeting is adjourned to another time or place hereunder, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.  However, if a new record date is fixed for the adjourned meeting, notice of the adjourned meeting must be given to each stockholder of record as of the new record date.  The stockholders present at a duly convened meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the departure of enough stockholders to leave less than a quorum of the voting power.

Section 2.7    Voting.

(a)    Unless otherwise provided in the NRS, the Articles of Incorporation or any resolution providing for the issuance of preferred stock adopted by the Board of Directors pursuant to authority expressly vested in it by the provisions of the Articles of Incorporation, each stockholder of record, or such stockholder's duly authorized proxy, shall be entitled to one (1) vote for each share of voting stock standing registered in such stockholder's name at the close of business on the record date or the date established by the Board of Directors in connection with stockholder action by written consent.

(b)    Except as otherwise provided herein, all votes with respect to shares standing in the name of an individual at the close of business on the record date or the date established by the Board of Directors in connection with stockholder action by written consent (including pledged shares) shall be cast only by that individual or such individual's duly authorized proxy.  With respect to shares held by a representative of the estate of a deceased stockholder, or a guardian, conservator, custodian or trustee, even though the shares do not stand in the name of such holder, votes may be cast by such holder upon proof of such representative capacity.  In the case of shares under the control of a receiver, the receiver may vote such shares even though the shares do not stand of record in the name of the receiver but only if and to the extent that the order of a court of competent jurisdiction which appoints the receiver contains the authority to vote such shares.  If shares stand of record in the name of a minor, votes may be cast

<div align="center">4</div>

by the duly appointed guardian of the estate of such minor only if such guardian has provided the Corporation with written proof of such appointment.

(c)      With respect to shares standing of record in the name of another corporation, partnership, limited liability company or other legal entity on the record date, votes may be cast: (i) in the case of a corporation, by such individual as the bylaws of such other corporation prescribe, by such individual as may be appointed by resolution of the board of directors of such other corporation or by such individual (including, without limitation, the officer making the authorization) authorized in writing to do so by the chairman of the board, if any, the chief executive officer, if any, the president or any vice president of such corporation; and (ii) in the case of a partnership, limited liability company or other legal entity, by an individual representing such stockholder upon presentation to the Corporation of satisfactory evidence of his or her authority to do so.

(d)      Notwithstanding anything to the contrary contained herein and except for the Corporation's shares held in a fiduciary capacity, the Corporation shall not vote, directly or indirectly, shares of its own stock owned or held by it, and such shares shall not be counted in determining the total number of outstanding shares entitled to vote.

(e)      Any holder of shares entitled to vote on any matter may cast a portion of the votes in favor of such matter and refrain from casting the remaining votes or cast the same against the proposal, except in the case of elections of directors.  If such holder entitled to vote does vote any of such stockholder's shares affirmatively and fails to specify the number of affirmative votes, it will be conclusively presumed that the holder is casting affirmative votes with respect to all shares held.

(f)      With respect to shares standing of record in the name of two (2) or more persons, whether fiduciaries, members of a partnership, joint tenants, tenants in common, husband and wife as community property, tenants by the entirety, voting trustees or otherwise and shares held by two (2) or more persons (including proxy holders) having the same fiduciary relationship in respect to the same shares, votes may be cast in the following manner:

(i)      If only one (1) person votes, the vote of such person binds all.

(ii)      If more than one (1) person casts votes, the act of the majority so voting binds all.

(iii)      If more than one (1) person casts votes, but the vote is evenly split on a particular matter, the votes shall be deemed cast proportionately, as split.

(g)      If a quorum is present, unless the Articles of Incorporation, these Bylaws, the NRS, or other applicable law provide for a different proportion, action by the stockholders entitled to vote on a matter, other than the election of directors, is approved by and is the act of the stockholders if the number of votes cast in favor of the action exceeds the number of votes cast in opposition to the action, unless voting by classes or series is required for any action of the stockholders by the laws of the State of Nevada, the Articles of Incorporation or these Bylaws, in which case the number of votes cast in favor of the action by the voting power of each such class

5

or series must exceed the number of votes cast in opposition to the action by the voting power of each such class or series.

(h)      If a quorum is present, directors shall be elected by a plurality of the votes cast.

Section 2.8      Actions at Meetings Not Regularly Called; Ratification and Approval.

(a)      Whenever all persons entitled to vote at any meeting consent, either by: (i) a writing on the records of the meeting or filed with the secretary, (ii) presence at such meeting and oral consent entered on the minutes, or (iii) taking part in the deliberations at such meeting without objection, such meeting shall be as valid as if a meeting were regularly called and noticed.

(b)      At such meeting any business may be transacted which is not excepted from the written consent or to the consideration of which no objection for want of notice is made at the time.

(c)      If any meeting be irregular for want of notice or of such consent, provided a quorum was present at such meeting, the proceedings of the meeting may be ratified and approved and rendered likewise valid and the irregularity or defect therein waived by a writing signed by all parties having the right to vote at such meeting.

(d)      Such consent or approval may be by proxy or power of attorney, but all such proxies and powers of attorney must be in writing.

Section 2.9      Proxies.  At any meeting of stockholders, any holder of shares entitled to vote may designate, in a manner permitted by the laws of the State of Nevada, another person or persons to act as a proxy or proxies.  If a stockholder designates two (2) or more persons to act as proxies, then a majority of those persons present at a meeting has and may exercise all of the powers conferred by the stockholder or, if only one (1) is present, then that one has and may exercise all of the powers conferred by the stockholder, unless the stockholder's designation of proxy provides otherwise.  Every proxy shall continue in full force and effect until its expiration or revocation in a manner permitted by the laws of the State of Nevada.

Section 2.10      Meetings Through Electronic Communications.      Stockholders may participate in a meeting of the stockholders by any means of electronic communications, videoconferencing, teleconferencing or other available technology permitted under the NRS (including, without limitation, a telephone conference or similar method of communication by which all individuals participating in the meeting can hear each other).  Participation in a meeting pursuant to this Section 2.10 constitutes presence in person at the meeting.

Section 2.11      Action Without a Meeting.  Any action required or permitted to be taken at a meeting of the stockholders may be taken without a meeting if, before or after the action, a written consent thereto is signed by the holders of the voting power that would be required to approve such action at a meeting.  A meeting of the stockholders need not be called or noticed whenever action is taken by written consent.  The written consent may be signed in multiple

6

counterparts, including, without limitation, facsimile counterparts, and shall be filed with the minutes of the proceedings of the stockholders.

Section 2.12   Organization.

(a)   Meetings of stockholders shall be presided over by the chairman of the board, or, in the absence of the chairman, by the vice chairman of the board, if any, or if there be no vice chairman or in the absence of the vice chairman, by the chief executive officer, if any, or if there be no chief executive officer or in the absence of the chief executive officer, by the president, or, in the absence of the president, or, in the absence of any of the foregoing persons, by a chairman designated by the Board of Directors, or, in the absence of such designation by the Board of Directors, by a chairman chosen at the meeting by the stockholders entitled to cast a majority of the votes which all stockholders present in person or by proxy are entitled to cast. The secretary, or in the absence of the secretary an assistant secretary, shall act as secretary of the meeting, but in the absence of the secretary and any assistant secretary the chairman of the meeting may appoint any person to act as secretary of the meeting. The order of business at each such meeting shall be as determined by the chairman of the meeting. The chairman of the meeting shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts and things as are necessary or desirable for the proper conduct of the meeting, including, without limitation, (i) the establishment of procedures for the maintenance of order and safety, (ii) limitation on participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies and such other persons as the chairman of the meeting shall permit, (iii) limitation on the time allotted for consideration of each agenda item and for questions or comments by meeting participants, (iv) restrictions on entry to such meeting after the time prescribed for the commencement thereof and (v) the opening and closing of the voting polls. The Board of Directors, in its discretion, or the chairman of the meeting, in his or her discretion, may require that any votes cast at such meeting shall be cast by written ballot.

(b)   The chairman of the meeting may appoint one or more inspectors of elections. The inspector or inspectors may (i) ascertain the number of shares outstanding and the voting power of each; (ii) determine the number of shares represented at a meeting and the validity of proxies or ballots; (iii) count all votes and ballots; (iv) determine any challenges made to any determination made by the inspector(s); and (v) certify the determination of the number of shares represented at the meeting and the count of all votes and ballots.

Section 2.13   Absentees' Consent to Meetings. Transactions of any meeting of the stockholders are as valid as though had at a meeting duly held after regular call and notice if a quorum is represented, either in person or by proxy, and if, either before or after the meeting, each of the persons entitled to vote, not represented in person or by proxy (and those who, although present, either object at the beginning of the meeting to the transaction of any business because the meeting has not been lawfully called or convened or expressly object at the meeting to the consideration of matters not included in the notice which are legally or by the terms of these Bylaws required to be included therein), signs a written waiver of notice and/or consent to the holding of the meeting or an approval of the minutes thereof. All such waivers, consents, and approvals shall be filed with the corporate records and made a part of the minutes of the meeting. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except

7

when the person objects at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called, noticed or convened and except that attendance at a meeting is not a waiver of any right to object to the consideration of matters not properly included in the notice, to the extent such notice is required, if such objection is expressly made at the time any such matters are presented at the meeting.  Neither the business to be transacted at nor the purpose of any regular or special meeting of stockholders need be specified in any written waiver of notice or consent, except as otherwise provided in these Bylaws.

## ARTICLE III
## DIRECTORS

Section 3.1    General Powers; Performance of Duties.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, except as otherwise provided in Chapter 78 of the NRS or the Articles of Incorporation.

Section 3.2    Number, Tenure, and Qualifications.  The Board of Directors shall consist of at least one (1) individual and not more than ten (10) individuals.  The number of directors within the foregoing fixed minimum and maximum may be established and changed from time to time by resolution adopted by the Board of Directors or the stockholders without amendment to these Bylaws or the Articles of Incorporation.  Each director shall hold office until his or her successor shall be elected or appointed and qualified or until his or her earlier death, retirement, disqualification, resignation or removal.  No reduction of the number of directors shall have the effect of removing any director prior to the expiration of his or her term of office.  No provision of this Section 3.2 shall restrict the right of the Board of Directors to fill vacancies or the right of the stockholders to remove directors as is hereinafter provided.

Section 3.3    Chairman of the Board.  The Board of Directors may elect a chairman of the board from the members of the Board of Directors, who shall preside at all meetings of the Board of Directors and stockholders at which he or she shall be present and shall have and may exercise such powers as may, from time to time, be assigned to him or her by the Board of Directors, these Bylaws or as provided by law.  If no chairman of the board is appointed or if the chairman is absent from a Board meeting, then the Board of Directors may appoint a chairman for the sole purpose of presiding at any such meeting.  If no chairman of the board is appointed or if the chairman is absent from any stockholder meeting, then the president shall preside at such stockholder meeting.  If the president is absent from any stockholder meeting, the stockholders may appoint a substitute chairman solely for the purpose of presiding over such stockholder meeting.

Section 3.4    Removal and Resignation of Directors.  Subject to any rights of the holders of preferred stock, if any, and except as otherwise provided in the NRS, any director may be removed from office with or without cause by the affirmative vote of the holders of not less than two-thirds (2/3) of the voting power of the issued and outstanding stock of the Corporation entitled to vote generally in the election of directors (voting as a single class), excluding stock entitled to vote only upon the happening of a fact or event unless such fact or event shall have occurred.  Any director may resign effective upon giving written notice, unless the notice specifies a later time for effectiveness of such resignation, to the chairman of the board, if any,

8

the president or the secretary, or in the absence of all of them, any other officer of the Corporation.

Section 3.5    Vacancies; Newly Created Directorships.  Subject to any rights of the holders of preferred stock, if any, any vacancies on the Board of Directors resulting from death, resignation, retirement, disqualification, removal from office, or other cause, and newly created directorships resulting from any increase in the authorized number of directors, may be filled by a majority vote of the directors then in office or by a sole remaining director, in either case though less than a quorum, and the director(s) so chosen shall hold office for a term expiring at the next annual meeting of stockholders and when their successors are elected or appointed, at which the term of the class to which he or she has been elected expires, or until his or her earlier resignation or removal.  No decrease in the number of directors constituting the Board of Directors shall shorten the term of any incumbent directors.

Section 3.6    Annual and Regular Meetings.  Immediately following the adjournment of, and at the same place as, the annual or any special meeting of the stockholders at which directors are elected, the Board of Directors, including directors newly elected, shall hold its annual meeting without call or notice, other than this provision, to elect officers and to transact such further business as may be necessary or appropriate.  The Board of Directors may provide by resolution the place, date, and hour for holding regular meetings between annual meetings, and if the Board of Directors so provides with respect to a regular meeting, notice of such regular meeting shall not be required.

Section 3.7    Special Meetings.  Subject to any rights of the holders of preferred stock, if any, and except as otherwise required by law, special meetings of the Board of Directors may be called only by the chairman of the board, if any, or if there be no chairman of the board, by the chief executive officer, if any, or by the president or the secretary, and shall be called by the chairman of the board, if any, the chief executive officer, if any, the president, or the secretary upon the request of at least a majority of the Board of Directors.  If the chairman of the board, or if there be no chairman of the board, each of the chief executive officer, the president, and the secretary, fails for any reason to call such special meeting, a special meeting may be called by a notice signed by at least a majority of the Board of Directors.

Section 3.8    Place of Meetings.  Any regular or special meeting of the Board of Directors may be held at such place as the Board of Directors, or in the absence of such designation, as the notice calling such meeting, may designate.  A waiver of notice signed by the directors may designate any place for the holding of such meeting.

Section 3.9    Notice of Meetings.  Except as otherwise provided in Section 3.6, there shall be delivered to each director at the address appearing for him or her on the records of the Corporation, at least twenty-four (24) hours before the time of such meeting, a copy of a written notice of any meeting (a) by delivery of such notice personally, (b) by mailing such notice postage prepaid, (c) by facsimile, (d) by overnight courier, (e) by telegram, or (f) by electronic transmission or electronic writing, including, without limitation, e-mail.  If mailed to an address inside the United States, the notice shall be deemed delivered two (2) business days following the date the same is deposited in the United States mail, postage prepaid.  If mailed to an address outside the United States, the notice shall be deemed delivered four (4) business days following

9

the date the same is deposited in the United States mail, postage prepaid.  If sent via facsimile, by electronic transmission or electronic writing, including, without limitation, e-mail, the notice shall be deemed delivered upon sender's receipt of confirmation of the successful transmission.  If sent via overnight courier, the notice shall be deemed delivered the business day following the delivery of such notice to the courier.  If the address of any director is incomplete or does not appear upon the records of the Corporation it will be sufficient to address any notice to such director at the registered office of the Corporation.  Any director may waive notice of any meeting, and the attendance of a director at a meeting and oral consent entered on the minutes of such meeting shall constitute waiver of notice of the meeting unless such director objects, prior to the transaction of any business, that the meeting was not lawfully called, noticed or convened.  Attendance for the express purpose of objecting to the transaction of business thereat because the meeting was not properly called or convened shall not constitute presence or a waiver of notice for purposes hereof.

Section 3.10    Quorum; Adjourned Meetings.

(a)    A majority of the directors in office, at a meeting duly assembled, is necessary to constitute a quorum for the transaction of business.

(b)    At any meeting of the Board of Directors where a quorum is not present, a majority of those present may adjourn, from time to time, until a quorum is present, and no notice of such adjournment shall be required.  At any adjourned meeting where a quorum is present, any business may be transacted which could have been transacted at the meeting originally called.

Section 3.11    Manner of Acting.  Except as provided in Section 3.13, the affirmative vote of a majority of the directors present at a meeting at which a quorum is present is the act of the Board of Directors.

Section 3.12    Meetings Through Electronic Communications.  Members of the Board of Directors or of any committee designated by the Board of Directors may participate in a meeting of the Board of Directors or such committee by any means of electronic communications, videoconferencing, teleconferencing or other available technology permitted under the NRS (including, without limitation, a telephone conference or similar method of communication by which all individuals participating in the meeting can hear each other).  Participation in a meeting pursuant to this Section 3.12 constitutes presence in person at the meeting

Section 3.13    Action Without Meeting.  Any action required or permitted to be taken at a meeting of the Board of Directors or of a committee thereof may be taken without a meeting if, before or after the action, a written consent thereto is signed by all of the members of the Board of Directors or the committee.  The written consent may be signed manually or electronically (or by any other means then permitted under the NRS), and may be so signed in counterparts, including, without limitation, facsimile or email counterparts, and shall be filed with the minutes of the proceedings of the Board of Directors or committee.

Section 3.14    Powers and Duties.

10

(a)    Except as otherwise restricted by Chapter 78 of the NRS or the Articles of Incorporation, the Board of Directors has full control over the business and affairs of the Corporation.  The Board of Directors may delegate any of its authority to manage, control or conduct the business of the Corporation to any standing or special committee, or to any officer or agent, and to appoint any persons to be agents of the Corporation with such powers, including the power to subdelegate, and upon such terms as it deems fit.

(b)    The Board of Directors, in its discretion, or the officer of the Corporation presiding at a meeting of stockholders, in his or her discretion, may submit any contract or act for approval or ratification at any annual meeting of the stockholders or any special meeting properly called and noticed for the purpose of considering any such contract or act, provided a quorum is present.

(c)    The Board of Directors may, by resolution passed by at least a majority of the Board of Directors, designate one or more committees, each committee to consist of one or more of the directors of the Corporation.  The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he, she or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.  Subject to applicable law and to the extent provided in the resolution of the Board of Directors, any such committee shall have and may exercise all the powers of the Board of Directors in the management of the business and affairs of the Corporation.  Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the Board of Directors.  The committees shall keep regular minutes of their proceedings and report the same to the Board of Directors when required.

Section 3.15    <u>Compensation</u>.    The Board of Directors, without regard to personal interest, may establish the compensation of directors for services in any capacity.  If the Board of Directors establishes the compensation of directors pursuant to this <u>Section 3.15</u>, such compensation is presumed to be fair to the Corporation unless proven unfair by a preponderance of the evidence.

Section 3.16    <u>Organization</u>.  Meetings of the Board of Directors shall be presided over by the chairman of the Board of Directors, or in the absence of the chairman of the Board of Directors by the vice chairman, if any, or in his or her absence by a chairman chosen at the meeting.  The secretary, or in the absence, of the secretary an assistant secretary, shall act as secretary of the meeting, but in the absence of the secretary and any assistant secretary, the chairman of the meeting may appoint any person to act as secretary of the meeting.  The order of business at each such meeting shall be as determined by the chairman of the meeting.

<div align="center">

ARTICLE IV
<u>OFFICERS</u>

</div>

Section 4.1    <u>Election</u>.  The Board of Directors shall elect or appoint a president, a secretary and a treasurer or the equivalents of such officers.  Such officers shall serve until their

<div align="center">11</div>

respective successors are elected and appointed and shall qualify or until their earlier resignation or removal. The Board of Directors may from time to time, by resolution, elect or appoint such other officers and agents as it may deem advisable, who shall hold office at the pleasure of the Board of Directors, and shall have such powers and duties and be paid such compensation as may be directed by the Board of Directors. Any individual may hold two (2) or more offices.

Section 4.2    Removal; Resignation. Any officer or agent elected or appointed by the Board of Directors may be removed by the Board of Directors with or without cause. Any officer may resign at any time upon written notice to the Corporation. Any such removal or resignation shall be subject to the rights, if any, of the respective parties under any contract between the Corporation and such officer or agent.

Section 4.3    Vacancies. Any vacancy in any office because of death, resignation, removal or otherwise may be filled by the Board of Directors for the unexpired portion of the term of such office.

Section 4.4    Chief Executive Officer. The Board of Directors may elect a chief executive officer who, subject to the supervision and control of the Board of Directors, shall have the ultimate responsibility for the management and control of the business and affairs of the Corporation and perform such other duties and have such other powers which are delegated to him or her by the Board of Directors, these Bylaws or as provided by law.

Section 4.5    President. The president, subject to the supervision and control of the Board of Directors, shall in general actively supervise and control the business and affairs of the Corporation. The president shall keep the Board of Directors fully informed as the Board of Directors may request and shall consult the Board of Directors concerning the business of the Corporation. The president shall perform such other duties and have such other powers which are delegated and assigned to him or her by the Board of Directors, the chief executive officer, if any, these Bylaws or as provided by law. The president shall be the chief executive officer of the Corporation unless the Board of Directors shall elect or appoint different individuals to hold such positions.

Section 4.6    Vice Presidents. The Board of Directors may elect one or more vice presidents. In the absence or disability of the president, or at the president's request, the vice president or vice presidents, in order of their rank as fixed by the Board of Directors, and if not ranked, the vice presidents in the order designated by the Board of Directors, or in the absence of such designation, in the order designated by the president, shall perform all of the duties of the president, and when so acting, shall have all the powers of, and be subject to all the restrictions on the president. Each vice president shall perform such other duties and have such other powers which are delegated and assigned to him or her by the Board of Directors, the president, these Bylaws or as provided by law.

Section 4.7    Secretary. The secretary shall attend all meetings of the stockholders, the Board of Directors and any committees thereof, and shall keep, or cause to be kept, the minutes of proceedings thereof in books provided for that purpose. He or she shall keep, or cause to be kept, a register of the stockholders of the Corporation and shall be responsible for the giving of notice of meetings of the stockholders, the Board of Directors and any committees, and shall see

12

that all notices are duly given in accordance with the provisions of these Bylaws or as required by law.  The secretary shall be custodian of the corporate seal, if any, the records of the Corporation, the stock certificate books, transfer books and stock ledgers, and such other books and papers as the Board of Directors or any appropriate committee may direct.  The secretary shall perform all other duties commonly incident to his or her office and shall perform such other duties which are assigned to him or her by the Board of Directors, the chief executive officer, if any, the president, these Bylaws or as provided by law.

Section 4.8    Assistant Secretaries.  An assistant secretary shall, at the request of the secretary, or in the absence or disability of the secretary, perform all the duties of the secretary. He or she shall perform such other duties as are assigned to him or her by the Board of Directors, the chief executive officer, if any, the president, these Bylaws or as provided by law.

Section 4.9    Treasurer.  The treasurer, subject to the order of the Board of Directors, shall have the care and custody of, and be responsible for, all of the money, funds, securities, receipts and valuable papers, documents and instruments of the Corporation, and all books and records relating thereto.  The treasurer shall keep, or cause to be kept, full and accurate books of accounts of the Corporation's transactions, which shall be the property of the Corporation, and shall render financial reports and statements of condition of the Corporation when so requested by the Board of Directors, the chairman of the board, if any, the chief executive officer, if any, or the president.  The treasurer shall perform all other duties commonly incident to his or her office and such other duties as may, from time to time, be assigned to him or her by the Board of Directors, the chief executive officer, if any, the president, these Bylaws or as provided by law. The treasurer shall, if required by the Board of Directors, give bond to the Corporation in such sum and with such security as shall be approved by the Board of Directors for the faithful performance of all the duties of the treasurer and for restoration to the Corporation, in the event of the treasurer's death, resignation, retirement or removal from office, of all books, records, papers, vouchers, money and other property in the treasurer's custody or control and belonging to the Corporation.  The expense of such bond shall be borne by the Corporation.  If a chief financial officer of the Corporation has not been appointed, the treasurer may be deemed the chief financial officer of the Corporation.

Section 4.10   Assistant Treasurers.  An assistant treasurer shall, at the request of the treasurer, or in the absence or disability of the treasurer, perform all the duties of the treasurer. He or she shall perform such other duties which are assigned to him or her by the Board of Directors, the chief executive officer, if any, the president, the treasurer, these Bylaws or as provided by law.  The Board of Directors may require an assistant treasurer to give a bond to the Corporation in such sum and with such security as it may approve, for the faithful performance of the duties of the assistant treasurer, and for restoration to the Corporation, in the event of the assistant treasurer's death, resignation, retirement or removal from office, of all books, records, papers, vouchers, money and other property in the assistant treasurer's custody or control and belonging to the Corporation.  The expense of such bond shall be borne by the Corporation.

Section 4.11   Execution of Negotiable Instruments, Deeds and Contracts.  All (a) checks, drafts, notes, bonds, bills of exchange, and orders for the payment of money of the Corporation, (b) deeds, mortgages, proxies, powers of attorney and other written contracts, documents, instruments and agreements to which the Corporation shall be a party and (c)

13

assignments or endorsements of stock certificates, registered bonds or other securities owned by the Corporation shall be signed in the name of the Corporation by such officers or other persons as the Board of Directors may from time to time designate. The Board of Directors may authorize the use of the facsimile signatures of any such persons. Any officer of the Corporation shall be authorized to attend, act and vote, or designate another officer or an agent of the Corporation to attend, act and vote, at any meeting of the owners of any entity in which the Corporation may own an interest or to take action by written consent in lieu thereof. Such officer or agent, at any such meeting or by such written action, shall possess and may exercise on behalf of the Corporation any and all rights and powers incident to the ownership of such interest.

<div align="center">ARTICLE V<br>CAPITAL STOCK</div>

Section 5.1    Issuance.    Shares of the Corporation's authorized capital stock shall, subject to any provisions or limitations of the laws of the State of Nevada, the Articles of Incorporation or any contracts or agreements to which the Corporation may be a party, be issued in such manner, at such times, upon such conditions and for such consideration as shall be prescribed by the Board of Directors.

Section 5.2    Stock Certificates and Uncertificated Shares.

(a)    Every holder of stock in the Corporation shall be entitled to have a certificate signed by or in the name of the Corporation by (i) the chief executive officer, if any, the president or a vice president, and (ii) the secretary, an assistant secretary, the treasurer or the chief financial officer, if any, of the Corporation (or any other two officers or agents so authorized by the Board of Directors), certifying the number of shares of stock owned by him, her or it in the Corporation; provided that the Board of Directors may authorize the issuance of uncertificated shares of some or all of any or all classes or series of the Corporation's stock. Any such issuance of uncertificated shares shall have no effect on existing certificates for shares until such certificates are surrendered to the Corporation, or on the respective rights and obligations of the stockholders. Whenever any such certificate is countersigned or otherwise authenticated by a transfer agent or a transfer clerk and by a registrar (other than the Corporation), then a facsimile of the signatures of any corporate officers or agents, the transfer agent, transfer clerk or the registrar of the Corporation may be printed or lithographed upon the certificate in lieu of the actual signatures. In the event that any officer or officers who have signed, or whose facsimile signatures have been used on any certificate or certificates for stock cease to be an officer or officers because of death, resignation or other reason, before the certificate or certificates for stock have been delivered by the Corporation, the certificate or certificates may nevertheless be adopted by the Corporation and be issued and delivered as though the person or persons who signed the certificate or certificates, or whose facsimile signature or signatures have been used thereon, had not ceased to be an officer or officers of the Corporation.

(b)    Within a reasonable time after the issuance or transfer of uncertificated shares, the Corporation shall send to the registered owner thereof a written statement certifying the number and class (and the designation of the series, if any) of the shares owned by such stockholder in the Corporation and any restrictions on the transfer or registration of such shares

<div align="center">14</div>

Doc#: US1:11865933v4

imposed by the Articles of Incorporation, these Bylaws, any agreement among stockholders or any agreement between the stockholders and the Corporation, and, at least annually thereafter, the Corporation shall provide to such stockholders of record holding uncertificated shares, a written statement confirming the information contained in such written statement previously sent.  Except as otherwise expressly provided by the NRS, the rights and obligations of the stockholders of the Corporation shall be identical whether or not their shares of stock are represented by certificates.

(c)    Each certificate representing shares shall state the following upon the face thereof: the name of the state of the Corporation's organization; the name of the person to whom issued; the number and class of shares and the designation of the series, if any, which such certificate represents; the par value of each share, if any, represented by such certificate or a statement that the shares are without par value.  Certificates of stock shall be in such form consistent with law as shall be prescribed by the Board of Directors.  No certificate shall be issued until the shares represented thereby are fully paid.  In addition to the foregoing, all certificates evidencing shares of the Corporation's stock or other securities issued by the Corporation shall contain such legend or legends as may from time to time be required by the NRS or such other federal, state or local laws or regulations then in effect.

Section 5.3    Surrendered; Lost or Destroyed Certificates.  All certificates surrendered to the Corporation, except those representing shares of treasury stock, shall be canceled and no new certificate shall be issued until the former certificate for a like number of shares shall have been canceled, except that in case of a lost, stolen, destroyed or mutilated certificate, a new one may be issued therefor.  However, any stockholder applying for the issuance of a stock certificate in lieu of one alleged to have been lost, stolen, destroyed or mutilated shall, prior to the issuance of a replacement, provide the Corporation with his, her or its affidavit of the facts surrounding the loss, theft, destruction or mutilation and, if required by the Board of Directors, an indemnity bond in an amount not less than twice the current market value of the stock, and upon such terms as the treasurer or the Board of Directors shall require which shall indemnify the Corporation against any loss, damage, cost or inconvenience arising as a consequence of the issuance of a replacement certificate.

Section 5.4    Replacement Certificate.  When the Articles of Incorporation are amended in any way affecting the statements contained in the certificates for outstanding shares of capital stock of the Corporation or it becomes desirable for any reason, in the discretion of the Board of Directors, including, without limitation, the merger of the Corporation with another Corporation or the conversion or reorganization of the Corporation, to cancel any outstanding certificate for shares and issue a new certificate therefor conforming to the rights of the holder, the Board of Directors may order any holders of outstanding certificates for shares to surrender and exchange the same for new certificates within a reasonable time to be fixed by the Board of Directors.  The order may provide that a holder of any certificate(s) ordered to be surrendered shall not be entitled to vote, receive distributions or exercise any other rights of stockholders of record until the holder has complied with the order, but the order operates to suspend such rights only after notice and until compliance.

Section 5.5    Transfer of Shares.  No transfer of stock shall be valid as against the Corporation except on surrender and cancellation of any certificate(s) therefor accompanied by

<div align="center">15</div>

an assignment or transfer by the registered owner made either in person or under assignment. Upon receipt of proper transfer instructions from the registered owner of uncertificated shares, such uncertificated shares shall be cancelled and issuance of new, equivalent uncertificated shares or certificated shares shall be made to the stockholder entitled thereto and the transaction shall be recorded on the transfer books of the Corporation. Whenever any transfer shall be expressly made for collateral security and not absolutely, the collateral nature of the transfer shall be reflected in the entry of transfer in the records of the Corporation.

Section 5.6    Transfer Agent; Registrars. The Board of Directors may appoint one or more transfer agents, transfer clerks and registrars of transfer and may require all certificates for shares of stock to bear the signature of such transfer agents, transfer clerks and/or registrars of transfer.

Section 5.7    Miscellaneous. The Board of Directors shall have the power and authority to make such rules and regulations not inconsistent herewith as it may deem expedient concerning the issue, transfer, and registration of certificates for shares of the Corporation's stock.

## ARTICLE VI
## DISTRIBUTIONS

Distributions may be declared, subject to the provisions of the laws of the State of Nevada and the Articles of Incorporation, by the Board of Directors and may be paid in cash, property, shares of corporate stock, or any other medium. The Board of Directors may fix in advance a record date, in accordance with and as provided in Section 2.5, prior to the distribution for the purpose of determining stockholders entitled to receive any distribution.

## ARTICLE VII
## RECORDS; REPORTS; SEAL; AND FINANCIAL MATTERS

Section 7.1    Records. All original records of the Corporation, shall be kept at the principal office of the Corporation by or under the direction of the secretary or at such other place or by such other person as may be prescribed by these Bylaws or the Board of Directors.

Section 7.2    Corporate Seal. The Board of Directors may, by resolution, authorize a seal, and the seal may be used by causing it, or a facsimile, to be impressed or affixed or reproduced or otherwise. Except when otherwise specifically provided herein, any officer of the Corporation shall have the authority to affix the seal to any document requiring it.

Section 7.3    Fiscal Year-End. The fiscal year-end of the Corporation shall be such date as may be fixed from time to time by resolution of the Board of Directors.

Section 7.4    Reserves. The Board of Directors may create, by resolution, such reserves as the directors may, from time to time, in their discretion, deem proper to provide for contingencies, to equalize distributions or to repair or maintain any property of the Corporation, or for such other purpose as the Board of Directors may deem beneficial to the Corporation, and the Board of Directors may modify or abolish any such reserves in the manner in which they were created.

16

ARTICLE VIII
INDEMNIFICATION

Section 8.1    Right to Indemnification.  To the fullest extent permitted by law as it presently exists or may hereafter be amended, the Corporation shall indemnify, defend, reimburse, exculpate, limit the liability of, hold harmless and protect each officer of the Corporation, each director, each other person who was or is made or is threatened to be made a party or is otherwise involved in any proceeding, action, claim (including, but not limited to, any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured), cause of action, controversy, demand, right, right of setoff, cross claim, counterclaim, recoupment, claim for breach of duty imposed by law or in equity, action, charge against or interest in property to secure payment of a debt or performance of an obligation, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured, or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the date hereof, in contract or in tort, in law or in equity, under applicable law, or pursuant to any other theory of law, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that he or she, or a person for whom he or she is an Affiliate or legal representative, is or was a director, officer, employee, agent, manager, attorney or other professional of the Corporation, and any of their respective Affiliates (each a "Protected Person"), against any losses, claims, damages or liabilities, including legal fees and expenses incurred in investigating or defending against any such losses, claims, damages or liabilities, and any amounts expended in settlement of any claims (collectively, "Liabilities"); provided, however, that the Corporation shall not indemnify any Protected Person for Liabilities arising out of or related to any act or omission of such Protected Person that is a criminal act or constitutes actual fraud, gross negligence or willful misconduct or for which indemnification is not permissible under law.

Section 8.2    Reimbursement and Advancement of Expenses. The Corporation shall promptly reimburse (and/or advance to the extent reasonably required) each Protected Person for reasonable legal or other expenses (as incurred) of each Protected Person in connection with investigating, preparing to defend or defending any Proceeding relating to any Liabilities for which the Protected Person may be indemnified pursuant to this Article VIII; provided, that such Protected Person executes a written undertaking to repay the Corporation for such reimbursed or advanced expenses if it is finally judicially determined that such Protected Person is not entitled to the indemnification provided by this Article VIII.

Section 8.3    Claims.  If a claim for indemnification (following the final disposition of such Proceeding) or advancement of expenses under this Article VIII is not paid in full within thirty (30) days after a written claim therefor by the Protected Person has been received by the Corporation, the Protected Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such

17

Doc#: US1:11865933v4

claim.  In any such action the Corporation shall have the burden of proving that the Protected Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

Section 8.4    Nonexclusivity of Rights.  The rights conferred on any Protected Person by this Article VIII shall not be exclusive of any other rights that such Protected Person may have or hereafter acquire under any statute, provision of these Bylaws, the Articles of Incorporation, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his, her or its official capacity and as to action in another capacity while holding office.  The Corporation is specifically authorized to enter into individual contracts with any or all of its directors, officers, employees or agents respecting indemnification and advancement of expenses, to the fullest extent not prohibited by the NRS, or by any other applicable law.

Section 8.5    Other Sources.  The Corporation's obligation, if any, to indemnify or to advance expenses to any Protected Person who was or is serving at its request as a director, officer, employee or agent, manager of another entity or enterprise shall be reduced by any amount such Protected Person may collect as indemnification or advancement of expenses from such other entity or enterprise.

Section 8.6    Survival of Protection; Amendment or Repeal.  The rights conferred on any Protected Person by this Article VIII shall continue as to any person or entity who has ceased to be a Protected Person and shall inure to the benefit of the heirs, executors and administrators of such person or to the successors of such entity, as applicable.  The foregoing provisions of this Article VIII shall be contract rights, and no amendment, modification, supplement, restatement or repeal of any portion of this Article VIII, without the consent of the applicable Protected Person, shall adversely affect any right or protection hereunder of any Protected Person in respect of any act or omission occurring prior to the time of such amendment, modification, supplement, restatement or repeal.

Section 8.7    Other Indemnification and Prepayment of Expenses.  This Article VIII shall not limit the right of the Corporation, to the extent and in the manner permitted by applicable law, to indemnify and to advance expenses to persons other than Protected Persons when and as authorized by appropriate corporate action.

Section 8.8    Insurance.  The Corporation may maintain insurance, at its expense, to protect itself, any director, officer, employee or agent of the Corporation and any person serving at the request of the Corporation as a director, officer, employee or agent of another corporation or enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the NRS.

Section 8.9    Severability. The provisions of this Article VIII shall be applicable to situations of every type and shall be deemed to be severable, so that if this Article VIII shall be adjudged invalid or unenforceable in a situation of a particular type or if any of the provisions of this Article VIII shall be adjudged to be invalid or unenforceable, such invalidity or unenforceability shall not preclude application of this Article VIII to any other situation or affect any other provision thereof.

18

ARTICLE IX
CHANGES IN NEVADA LAW

References in these Bylaws to the laws of the State of Nevada or the NRS or to any provision thereof shall be to such law as it existed on the date these Bylaws were adopted or as such law thereafter may be changed; provided that (i) in the case of any change which expands the liability of directors or officers or limits the indemnification rights or the rights to advancement of expenses which the Corporation may provide in Article VIII, the rights to limited liability, to indemnification and to the advancement of expenses provided in the Articles of Incorporation and/or these Bylaws shall continue as theretofore to the extent permitted by law and (ii) if such change permits the Corporation, without the requirement of any further action by stockholders or directors, to limit further the liability of directors or limit the liability of officers or to provide broader indemnification rights or rights to the advancement of expenses than the Corporation was permitted to provide prior to such change, then liability thereupon shall be so limited and the rights to indemnification and the advancement of expenses shall be so broadened to the extent permitted by law.

ARTICLE X
AMENDMENT OR REPEAL

Section 10.1   Amendment of Bylaws.

(a)   Board of Directors.   In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to amend or repeal these Bylaws or to adopt new bylaws.

(b)   Stockholders.   Notwithstanding Section 10.1(a), these Bylaws may be amended or repealed in any respect, and new bylaws may be adopted, in each case by the affirmative vote of the holders of at least a majority of the outstanding voting power of the Corporation, voting together as a single class.

*****

19

CERTIFICATION

The undersigned, as the duly elected Secretary of [*Name of Reorganized Debtor*], a Nevada corporation (the "Corporation"), does hereby certify that the foregoing Amended and Restated Bylaws were adopted as the bylaws of the Corporation by the Board of Directors of the Corporation as of [_____], 2018.

_____

[_____], Secretary

[A&R Bylaws — [*Name of Reorganized Debtor*]]

**<u>Exhibit A-10</u>**
**Form of Amended and Restated Articles of Incorporation**
**for Reorganized Debtor subsidiaries that are Pennsylvania corporations**

**AMENDED AND RESTATED**

**ARTICLES OF INCORPORATION**

**of**

**[*NAME OF REORGANIZED DEBTOR*]**[1]

In compliance with the requirements of the applicable provisions (relating to articles of amendment) of Title 15 of the Pennsylvania Consolidated Statutes, the undersigned, desiring to amend and restate the Articles of Incorporation of the Corporation, hereby state that:

1.    Name.  The name of the corporation is Susquehanna Radio Corp. (the "Corporation").

2.    Address; Registered Office and Agent.  The address of the Corporation's registered office is [_____]; and the name of its registered agent at such address is [_____].

3.    Statute.  The statute by or under which the Corporation was incorporated is the Business Corporation Law of 1988.

4.    Date of Incorporation.  The date of incorporation of the Corporation was November 26, 1985.

5.    Effectiveness. These Amended and Restated Articles of Incorporation shall be effective upon their filing in the Department of State of the State of Pennsylvania.

6.    Adoption.  These Articles of Amendment to the Articles of Incorporation were adopted by the sole shareholder pursuant to 15 Pa. C.S. § 1914(a) and (b) or §

---

[1]    Note to Draft: This form to be used by Susquehanna Radio Corp. unless it is otherwise converted into an LLC in accordance with the Description of Transaction Steps.

2

5914(a), and the board of directors pursuant to 15 Pa. C.S. § 1914(c) and (b) or §

5914(b).

       7.       Number of Shares.  The total number of shares of stock that the

Corporation shall have authority to issue is [_____], all of which shall be shares of

Common Stock with the par value of $[___] per share.

       8.       Existence.  The Corporation shall have perpetual existence.

       9.       Restatement. These Articles of Amendment to the Articles of

Incorporation supersede the original Articles of Incorporation of the Corporation and all

amendments thereto.

       WITNESS the signature of these Amended and Restated Articles of Incorporation

this _____ day of _____, 2018.

                         _____

                         [_____]
                         [Officer/Director]

**<u>Exhibit A-11</u>**
**Form of Amended and Restated Bylaws**
**for Reorganized Debtor subsidiaries that are Pennsylvania corporations**

[*NAME OF REORGANIZED DEBTOR*]

AMENDED AND RESTATED BY-LAWS[1]

## ARTICLE I

### OFFICES

1.     The principal office shall be in the City of York, County of York, State of Pennsylvania.

2.     The Corporation may also have offices at such other places as the board of directors of the Corporation (the "Board of Directors") may from time to time appoint or the business of the Corporation may require.

## ARTICLE II

### SEAL

3.     The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Pennsylvania". Said seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

## ARTICLE III

### STOCKHOLDERS' MEETING

1.     Meetings of the stockholders for the election of directors shall be held at the office of the Corporation in York, Pennsylvania.  Special meetings of stockholders for any other purpose may be held at such place and time as shall be stated in the notice of the meeting.

---

[1]   Note to Draft: This form to be used by Susquehanna Radio Corp. unless it is otherwise converted into an LLC in accordance with the Description of Transaction Steps.

Doc#: US1:11865936v7

2.      The annual meeting of stockholders shall be held on the second

Monday of January in each year if not a legal holiday, and if a legal holiday, then on the

next secular day following, at 10:00 o'clock A.M.  This annual meeting shall elect a

Board of Directors and transact such other business as may properly be brought before

the meeting.  If the annual meeting shall not be called and held during any calendar year,

any shareholder may call such meeting at any time thereafter.

3.      The presence, in person or by proxy, of shareholders entitled to

cast at least a majority of the votes which all shareholders are entitled to cast on the

particular matter shall constitute a quorum for the purpose of considering such matter.

Unless otherwise provided by statute, the acts at a duly organized meeting of the

shareholders who are present in person or by proxy who are entitled to cast at least a

majority of the votes which all shareholders present are entitled to cast, shall be the acts

of the shareholders.  The shareholders present at a duly organized meeting can continue

to do business until adjournment, notwithstanding the withdrawal of enough shareholders

to leave less than a quorum.  Adjournment or adjournments of any annual or special

meeting may be taken, however, and any meeting at which directors are to be elected

shall be adjourned only from day to day or for such longer periods, not in excess of

fifteen days, as the quorum of shareholders entitled to vote at the election of directors

may decide until such directors have been elected.  If a meeting cannot be organized

because a quorum has not attended, those present may, except as otherwise provided by

statute, adjourn the meeting to such time and place as they may determine.  However, in

the case of any meeting called for the election of directors, those who attend the second

2

of such adjourned meetings, although less than a quorum shall nevertheless constitute a quorum for the purpose of electing directors.

4.      Every shareholder entitled to vote at a meeting of shareholders, or to express consent or dissent to corporate action in writing without a meeting, may authorize another person or persons to act for him by proxy.  Every proxy shall be executed in writing by the shareholders, or by his duly authorized attorney in fact, and filed with the Secretary of the Corporation.  A proxy, unless coupled with an interest, shall be revocable at will, notwithstanding any other agreement or any provision in the proxy to the contrary.  The revocation of a proxy shall not be effective until notice thereof has been given to the Secretary of the Corporation.  No revoked proxy shall be valid after eleven months from the date of its execution, unless a longer time is expressly provided therein.  In no event shall any proxy, unless coupled with an interest, be voted after three years from the date of its execution.  A proxy shall not be revoked by the death or incapacity of the maker unless, before the vote is counted or the authority is exercised, written notice of such death or incapacity is given to the Secretary of the Corporation.  A shareholder shall not sell his vote or execute a proxy to any person for a sum of money or anything of value.  A proxy coupled with an interest shall include an unrevoked proxy in favor of a creditor of a shareholder and such proxy shall be valid so long as the debt owed by him to the creditor remains unpaid.  Elections for directors need not be by ballot, except upon demand made by shareholder at the election and before the voting begins.  Except as otherwise provided in the Amended and Restated Articles of Incorporation of the Corporation (the "Articles"), in each election of directors, no cumulative voting shall

3

Doc#: US1:11865936v7

be allowed. No share shall be voted at any meeting upon which any installment is due and unpaid.

5.     Written notice of the annual meeting shall be given to each shareholder entitled to vote thereat, at least fifteen (15) days prior to the meeting.

6.     In advance of any meeting of shareholders, the Board of Directors may appoint judges of election, who need not be shareholders, to act at such meeting or any adjournment thereof. If judges of election be not so appointed, the chairman of any such meeting may, and on the request of any shareholder or his proxy shall, make such appointment at the meeting. The number of judges shall be one or three. If appointed at a meeting on the request of one or more shareholders or proxies, the majority of shares present and entitled to vote shall determine whether one or three judges are to be appointed. On request of the chairman of the meeting, or of any shareholder or his proxy, the judges shall make a report in writing of any challenge or question or matter determined by them, and execute a certificate of any fact found by them. No person who is a candidate for office shall act as a judge.

7.     Special meetings of the shareholders may be called at any time by the President, or the Board of Directors, or shareholders entitled to cast at least one-fifth of the votes which all shareholders are entitled to cast at the particular meeting. At any time, upon written request of any person or persons who have duly called a special meeting, it shall be the duty of the Secretary to fix the date of the meeting, to be held not more than sixty days after the receipt of the request, and to give due notice thereof. If the Secretary shall neglect or refuse to fix the date of the meeting and give notice thereof, the person or persons calling the meeting may do so.

4

8.     Business transacted at all special meetings shall be confined to the objects stated in the call and matters germane thereto, unless all shareholders entitled to vote are present and consent.

9.     Written notice of a special meeting of shareholders stating the time and place and object thereof, shall be given to each shareholder entitled to vote thereat at least five (5) days before such meeting, unless a greater period of notice is required by statute in a particular case.

10.    The officer or agent having charge of the transfer books shall make, at least five (5) days before each meeting of shareholders, a complete list of the shareholders entitled to vote at the meeting, arranged in alphabetical order, with the address of and the number of shares held by each, which list shall be subject to inspection by any shareholder at any time during usual business hours.  Such list shall also be produced and kept open at the time and place of the meeting, and shall be subject to the inspection of any shareholder during the whole time of the meeting.  The original share ledger or transfer book, or a duplicate thereof kept in this Commonwealth, shall be prima facie evidence as to who are the shareholders entitled to examine such list or share ledger or transfer book, or to vote in person or by proxy, at any meeting of shareholders.

ARTICLE IV

DIRECTORS

1.     The business of this corporation shall be managed by its Board of Directors, which shall be not more than seven (7) and not fewer than three (3) in number. The directors need not be residents of this Commonwealth or shareholders in the Corporation.  They shall be elected by the shareholders, at the annual meeting of shareholders of the Corporation, and each director, shall be elected for the term of one (1)

5

year, and until his successor shall be elected and shall qualify.  Whenever all the shares of the Corporation are owned beneficially and of record by either one (1) or two (2) shareholders, the number of directors may be less than three (3) but not less than the number of shareholders.  Whenever there are three (3) or more shareholders, there must be at least three (3) directors.

2.    In addition to the powers and authorities by these By-Laws expressly conferred upon them, the Board may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Articles or by these By-Laws directed or required to be exercised or done by the shareholders.

3.    The meetings of the Board of Directors may be held at such place within this Commonwealth, or elsewhere, as a majority of the directors may from time to time appoint, or as may be designated in the notice calling the meeting.

4.    Each newly elected Board may meet at such place and time as shall be fixed by the shareholders at the meeting at which such directors are elected and no notice shall be necessary to the newly elected directors in order legally to constitute the meeting, or they may meet at such place and time as may be fixed by the consent in writing of all the directors.

5.    Regular Meeting Dates of the Board shall be set by the Board with adequate notice to all members.

6.    Special meetings of the Board may be called by the President on five (5) days' notice to each director, either personally or by mail or by telegram; special meetings shall be called by the President or Secretary in like manner and on like notice on the written request of a majority of the directors in office.

6

Doc#: US1:11865936v7

7.     A majority of the directors in office shall be necessary to constitute a quorum for the transaction of business, and the acts of a majority of the directors present at a meeting at which a quorum is present shall be the acts of the Board of Directors.  Any action which may be taken at a meeting of the directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, shall be signed by all of the directors and shall be filed with the Secretary of the Corporation.

8.     Directors as such, shall not receive any stated salary for their services, but by resolution of the Board, a fixed sum and expenses of attendance, if any, may be allowed for attendance at each regular or special meeting of the Board PROVIDED, that nothing herein contained shall be construed to preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.

9.     Any director may be removed from office with or without cause by the affirmative vote of the holders of not less than a majority of the voting power of the issued and outstanding stock of the Corporation entitled to vote generally in the election of directors (voting as a single class), excluding stock entitled to vote only upon the happening of a fact or event unless such fact or event shall have occurred.  Any director may resign effective upon giving written notice, unless the notice specifies a later time for effectiveness of such resignation, to the chairman of the board, if any, the president or the secretary, or in the absence of all of them, any other officer of the Corporation.

7

Doc#: US1:11865936v7

ARTICLE V

OFFICERS

1.      The executive officers of the Corporation shall be chosen by the directors and shall be a Chairman of the Board, President, Vice President, Secretary and Treasurer.  The Board of Directors may also choose such other officers and agents as it shall deem necessary who shall hold their offices for such terms and shall have such authority and shall perform such duties as from time to time shall be prescribed by the Board.  Any number of offices may be held by the same person unless otherwise prohibited by statute.  It shall not be necessary for the officers to be directors.

2.      The salaries of all officers and agents of the Corporation shall be fixed by the Board of Directors.

3.      The executive officers of the Corporation shall hold office for one year and until their successors are chosen and have qualified.  Any executive officer, or any other officer or agent elected or appointed by the Board of Directors may be removed by the Board whenever in its judgment the best interests of the Corporation will be served thereby.

4.      The Chairman of the Board shall be the chief executive officer of the Corporation; he shall preside at all meetings of the shareholders and directors and he shall be ex officio a member of all committees and he shall have such general powers and duties as usually vested in the Chairman of the Board of a corporation.

5.      The President shall be the chief operating officer of the Corporation; he shall have general and active management of the business of the Corporation; he shall see that all orders and resolutions of the Board are carried into effect, subject, however, to the rights of directors to delegate any specific powers, except

8

Doc#: US1:11865936v7

such as may be by statute exclusively conferred on the President, to any other officer or officers of the Corporation.  He shall execute bonds, mortgages and other contracts requiring seal under the seal of the Corporation.  He shall be ex officio a member of all committees, and shall have the general powers and duties of supervision and management usually vested in the office of President of a corporation.

6.    The Vice President, or if there shall be more than one, the Vice Presidents in the order determined by the Board of Directors, shall, in the absence or disability of the President, perform the duties and exercise the powers of the President and shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

7.    The Secretary shall attend all sessions of the Board and all meetings of the shareholders and act as clerk thereof, and record all the votes of the Corporation and the minutes of all its transactions in a book to be kept for that purpose; and shall perform like duties for all committees of the Board of Directors when required. He shall give, or cause to be given, notice of all meetings of the shareholders and of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors, Chairman of the Board, or President, and under whose supervision he shall be.  He shall keep in safe custody the corporate seal of the Corporation, and when authorized by the Board, affix the same to any instrument requiring it.

8.    The Treasurer shall have custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation, and shall keep the moneys of the Corporation in a separate account to the credit of the Corporation.  He shall disburse the funds of the

9

Corporation as may be ordered by the Board, taking proper vouchers for such disbursements, and shall render to the President and directors, at the regular meetings of the Board, or whenever they may require it, an account of all his transactions as Treasurer and of the financial condition of the Corporation.

## ARTICLE VI

## VACANCIES

1.      If the office of any officer or agent, one or more, becomes vacant for any reason, the Board of Directors may choose a successor or successors, who shall hold office for the unexpired term in respect of which such vacancy occurred.

2.      Vacancies in the Board of Directors, including vacancies resulting from an increase in the number of directors, shall be filled by a majority of the remaining members of the Board though less than a quorum, and each person so elected shall be a director until his successor is elected by the shareholders, who may make such election at the next annual meeting of the shareholders or at any special meeting duly called for that purpose and held prior thereto.

## ARTICLE VII

## CORPORATE RECORDS

1.      There shall be kept at the registered office or principal place of business of the Corporation an original or duplicate record of the proceedings of the shareholders and of the directors, and the original or a duplication of its By-Laws, including all amendments or alterations thereto to date, certified by the Secretary of the Corporation.  An original or duplicate share register shall also be kept at the registered office or principal place of business or at the office of a transfer agent or registrar, giving

10

the names of the shareholders, their respective addresses and the number and classes of shares held by each.

2.  Every shareholder shall, upon written demand under oath stating the purpose thereof, have a right to examine, in person or by agent or attorney, during the usual hours for business for any proper purpose, the share register, books or records of account, and records of the proceedings of the shareholders and directors, and make copies or extracts therefrom.  A proper purpose shall mean a purpose reasonably related to such person's interest as a shareholder.  In every instance where an attorney or other agent shall be the person who seeks the right to inspection, the demand under oath shall be accompanied by a power of attorney or such other writing which authorizes the attorney or other agent to so act on behalf of the shareholder.  The demand under oath shall be directed to the Corporation at its registered office in this Commonwealth or at its principal place of business.

## ARTICLE VIII

## SHARE CERTIFICATES, DIVIDENDS, ETC.

1.  The share certificates of the Corporation shall be numbered and registered in the share ledger and transfer books of the Corporation, as they are issued, and shall state (a) the name of the Corporation and that it is organized under the laws of the Commonwealth, and (b) the name of the person to whom issued.  They shall be signed by the President or Vice President and Secretary or Assistant Secretary and shall bear the corporate seal.

2.  Transfers of shares shall be made on the books of the Corporation upon surrender of the certificates therefor, endorsed by the person named in the

11

Doc#: US1:11865936v7

certificate or by attorney, lawfully constituted in writing.  No transfer shall be made which is inconsistent with law.

3.    The Board of Directors may fix a time, not more than fifty (50) days prior to the date of any meeting of shareholders, of the date fixed for the payment of any dividend or distribution, of the date for the allotment of rights, or of the date when any change or conversion or exchange of shares will be made or go into effect, as a record date for the termination of the shareholders entitled to notice of, or to vote at, any such meeting, or entitled to receive payment of any such dividend or distribution, or to receive any such allotment of rights, or to exercise the rights in respect to any such change, conversion, or exchange of shares.  In such case, only such shareholders as shall be shareholders of record on the date so fixed shall be entitled to notice of, or to vote at, such meeting or to receive payment of such dividend, or to receive such allotment of rights, or to exercise such rights, as the case may be, notwithstanding any transfer of any shares on the books of the Corporation after any record date fixed as aforesaid.  The Board of Directors may close the books of the Corporation against transfers of shares during the whole or any part of such period, and in such case, written or printed notice thereof shall be mailed at least ten days before the closing thereof to each shareholder of record at the address appearing on the records of the Corporation or supplied by him to the Corporation for the purpose of notice.  While the stock transfer books of the Corporation are closed, no transfer of shares shall be made thereon.  If no record date is fixed for the determination of shareholders entitled to receive notice of, or vote at, a shareholders' meeting, transferees of shares which are transferred on the books of the

12

Corporation within ten days next preceding the date of such meeting shall not be entitled to notice of or vote at such meeting.

4.      In the event that a share certificate shall be lost, destroyed or mutilated, a new certificate may be issued therefor upon such terms and indemnity to the Corporation as the Board of Directors may prescribe.

5.      The Board of Directors may declare and pay dividends upon the outstanding shares of the Corporation, from time to time and to such extent as they deem advisable, in the manner and upon the terms and conditions provided by statute and the Articles.

6.      Before payment of any dividend, there may be set aside out of the net profits of the Corporation such sum or sums as the Board of Directors, from time to time, in its absolute discretion, deems proper as a reserve fund to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for such other purpose as the Board of Directors shall think conducive to the interests of the Corporation, and the Board of Directors may abolish any such reserve in the manner in which it was created.

## ARTICLE IX

### MISCELLANEOUS PROVISIONS

1.      All checks or demands for money and notes of the Corporation shall be signed by such officer or officers as the Board of Directors may from time to time designate.

2.      The fiscal year shall begin on the first day of each year.

3.      Whenever written notice is required to be given to any person, it may be given to such person, either personally or by sending a copy thereof through the

13

Doc#: US1:11865936v7

mail, or by telegram, charges prepaid, to his address appearing on the books of the Corporation, or supplied by him to the Corporation for the purpose of notice. If the notice is sent by mail or by telegraph, it shall be deemed to have been given to the person entitled thereto when deposited in the United States mail or with a telegraph office for transmission to such person. Such notice shall specify the place, day and hour of the meeting and, in the case of a special meeting of shareholders, the general nature of the business to be transacted.

4.     Whenever any written notice is required by statute, or by the Articles or By-Laws of this corporation, a waiver thereof in writing, signed by the persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. Except in the case of a special meeting of shareholders, neither the business to be transacted at nor the purpose of the meeting need be specified in the waiver of notice of such meeting. Attendance of a person, either in person or by proxy, at any meeting shall constitute a waiver of notice of such meeting, except where a person attends a meeting for the express purpose of objecting to the transaction of any business because the meeting was not lawfully called or convened.

5.     One or more directors or shareholders may participate in a meeting of the Board, of a committee of the Board or of the shareholders, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other.

6.     Except as otherwise provided in the Articles or By-Laws of this corporation, any action which may be taken at a meeting of the shareholders or of a class of shareholders may be taken without a meeting, if a consent or consents in writing,

14

Doc#: US1:11865936v7

setting forth the action so taken, shall be signed by all of the shareholders who would be entitled to vote at a meeting for such purpose and shall be filed with the Secretary of the Corporation.

## ARTICLE X

## ANNUAL STATEMENT

1.      The President and Board of Directors shall present at each annual meeting a full and complete statement of the business and affairs of the Corporation for the preceding year.  Such statement shall be prepared and presented in whatever manner the Board of Directors shall deem advisable and need not be verified by a certified public accountant.

## ARTICLE XI

## INDEMNIFICATION

1.      To the fullest extent permitted by law as it presently exists or may hereafter be amended, the Corporation shall indemnify, defend, reimburse, exculpate, limit the liability of, hold harmless and protect each officer of the Corporation, each director, each other person who was or is made or is threatened to be made a party or is otherwise involved in any proceeding, action, claim (including, but not limited to, any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured), cause of action, controversy, demand, right, right of setoff, cross claim, counterclaim, recoupment, claim for breach of duty imposed

15

Doc#: US1:11865936v7

by law or in equity, action, charge against or interest in property to secure payment of a debt or performance of an obligation, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured, or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the date hereof, in contract or in tort, in law or in equity, under applicable law, or pursuant to any other theory of law, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that he or she, or a person for whom he or she is an affiliate (as defined in Rule 12b-2 promulgated under the Securities Exchange Act of 1934, as amended, and used herein, "Affiliate") or legal representative, is or was a director, officer, employee, agent, manager, attorney or other professional of the Corporation, and any of their respective Affiliates (each a "Protected Person"), against any losses, claims, damages or liabilities, including legal fees and expenses incurred in investigating or defending against any such losses, claims, damages or liabilities, and any amounts expended in settlement of any claims (collectively, "Liabilities"); provided, however, that the Corporation shall not indemnify any Protected Person for Liabilities arising out of or related to any act or omission of such Protected Person that is a criminal act or constitutes actual fraud, gross negligence or willful misconduct or for which indemnification is not permissible under law.

2.      The Corporation shall promptly reimburse (and/or advance to the extent reasonably required) each Protected Person for reasonable legal or other expenses (as incurred) of each Protected Person in connection with investigating, preparing to

16

defend or defending any Proceeding relating to any Liabilities for which the Protected

Person may be indemnified pursuant to this Article XI; provided, that such Protected

Person executes a written undertaking to repay the Corporation for such reimbursed or

advanced expenses if it is finally judicially determined that such Protected Person is not

entitled to the indemnification provided by this Article XI.

3.      If a claim for indemnification (following the final disposition of

such Proceeding) or advancement of expenses under this Article XI is not paid in full

within 30 days after a written claim therefor by the Protected Person has been received by

the Corporation, the Protected Person may file suit to recover the unpaid amount of such

claim and, if successful in whole or in part, shall be entitled to be paid the expense of

prosecuting such claim.  In any such action the Corporation shall have the burden of

proving that the Protected Person is not entitled to the requested indemnification or

advancement of expenses under applicable law.

4.      The rights conferred on any Protected Person by this Article XI

shall not be exclusive of any other rights that such Protected Person may have or

hereafter acquire under any statute, provision of these By-laws, the Articles, agreement,

vote of stockholders or disinterested directors or otherwise, both as to action in his, her or

its official capacity and as to action in another capacity while holding office. The

Corporation is specifically authorized to enter into individual contracts with any or all of

its directors, officers, employees or agents respecting indemnification and advancement

of expenses, to the fullest extent not prohibited by Title 15 of the Pennsylvania

Consolidated Statutes, or by any other applicable law.

17

5.      The Corporation's obligation, if any, to indemnify or to advance expenses to any Protected Person who was or is serving at its request as a director, officer, employee or agent of another entity or enterprise shall be reduced by any amount such Protected Person may collect as indemnification or advancement of expenses from such other entity or enterprise.

6.      The rights conferred on any Protected Person by this Article XI shall continue as to any person or entity who has ceased to be a Protected Person and shall inure to the benefit of the heirs, executors and administrators of such person or to the successors of such entity, as applicable.  The foregoing provisions of this Article XI shall be contract rights, and no amendment, modification, supplement, restatement or repeal of any portion of this Article XI, without the consent of the applicable Protected Person, shall adversely affect any right or protection hereunder of any Protected Person in respect of any act or omission occurring prior to the time of such amendment, modification, supplement, restatement or repeal.

7.      This Article XI shall not limit the right of the Corporation, to the extent and in the manner permitted by applicable law, to indemnify and to advance expenses to persons other than Protected Persons when and as authorized by appropriate corporate action.

8.      The Corporation may maintain insurance, at its expense, to protect itself, any director, officer, employee or agent of the Corporation and any person serving at the request of the Corporation as a director, officer, employee or agent of another corporation or enterprise against any expense, liability or loss, whether or not the

18

Corporation would have the power to indemnify such person against such expense, liability or loss under Title 15 of the Pennsylvania Consolidated Statutes.

9.      The provisions of this By-Law shall be applicable to situations of every type and shall be deemed to be severable, so that if this By-Law shall be adjudged invalid or unenforceable in a situation of a particular type or if any of the provisions of this By-Law shall be adjudged to be invalid or unenforceable, such invalidity or unenforceability shall not preclude application of this By-Law to any other situation or affect any other provision thereof.

## ARTICLE XII

### REPURCHASE OF SHARES

1.      Notwithstanding any provisions to the contrary contained in these By-Laws, the Corporation shall not purchase all or any part of the shares of the voting common stock of any stockholder unless such action is approved in advance at a meeting of stockholders called for such purpose by the affirmative vote of two-thirds of the then issued and outstanding share of voting common stock.

## ARTICLE XIII

### AMENDMENTS

1.      These By-Laws may be amended or repealed by the vote of shareholders entitled to cast at least a majority of the votes which all shareholders are entitled to cast thereon, at any regular or special meeting of the shareholders, duly convened after notice to the shareholders of that purpose.

Doc#: US1:11865936v7

## EXHIBIT B

**Schedule of Rejected Executory Contracts and Unexpired Leases**

**Schedule of Rejected Executory Contracts and Unexpired Leases**

The following is a schedule of contracts and leases between the Debtors and the third party set forth in the chart below that will be rejected effective as of the Effective Date pursuant to section 365 of the Bankruptcy Code and pursuant to the Plan.  On the Effective Date, all Executory Contracts or Unexpired Leases will be deemed assumed as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that: (1) previously were assumed or rejected by the Debtors; (2) are identified on this Schedule of Rejected Executory Contracts and Unexpired Leases; or (3) are the subject of a notice of rejection or motion to reject such Executory Contracts or Unexpired Leases, as applicable, that is pending on the Effective Date, regardless of whether the requested effective date of such rejection is on or after the Effective Date.

Nothing herein shall be construed as a concession or evidence that any of the contracts and leases identified herein: (i) constitutes an "executory contract" within the meaning of 11 U.S.C. § 365 and other applicable law; or (ii) has not expired, been terminated or otherwise currently is in full force and effect.  Rather, the Debtors expressly reserve all of their rights with respect thereto, including their right to seek a later determination of these issues and their right to dispute the validity, status, characterization or enforceability of any contracts, agreements or leases set forth herein.  Certain of these contracts, agreements and leases may have expired or may have been modified, amended or supplemented from time to time by various amendments, restatements, waivers, estoppel certificates, letters and other documents, instruments and agreements that may not be listed herein, but are nonetheless incorporated herein by this reference.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement this Schedule of Rejected Executory Contracts and Unexpired Leases, including by way of adding or removing a particular Executory Contract or Unexpired Lease from this Schedule of Rejected Executory Contracts and Unexpired Leases, at any time through and including forty-five (45) calendar days after the Effective Date.

| Debtor | Contract Counterparty | Description |
|---|---|---|
| Cumulus Broadcasting LLC | TradeFirst.com, Inc. | Vendor Agreement |
| Cumulus Broadcasting LLC | Alternative Networking Inc. | Lease: Land and Building |
| Cumulus Media, Inc. | Houlihan Lokey Capital, Inc. | Engagement Letter |
| Cumulus Media, Inc. | Millstein & Co. | Engagement Letter |
| Cumulus Media, Inc. | Akin Gump Strauss Hauer & Feld LLP | Engagement Letter |
| Cumulus Media, Inc. | Alston & Bird LLP | Engagement Letter |
| Cumulus Media, Inc. | Blackstone FC Communications Partners L.P.; Blackstone FC Capital Partners IV L.P.; Blackstone FC Capital Partners IV-A L.P.; Blackstone Family FCC L.L.C.; Blackstone Participation FCC L.L.C.; Blackstone Communications FCC L.L.C.; Bain Capital (SQ) VIII, L.P.; BCIP Associates III, LLC; BCIP Associates III-B, LLC; BCIP T Associates III, LLC; BCIP T Associates III-B, LLC; BCIP Associates-G; Thomas H. Lee Equity Fund V, L.P.; Thomas H. Lee Parallel Fund V, L.P.; Thomas H. Lee Equity (Cayman) Fund V, L.P.; Thomas H. Lee Investors Limited Partnership; Putnam Investments Holdings, LLC; Putnam Investments Employees' Securities Company I, LLC; Putnam Investments Employees' Securities Company II, LLC; Lewis W. Dickey, Jr.; John W. Dickey; David W. Dickey; Michael W. Dickey; Lewis W. Dickey, Sr.; DBBC, L.L.C.; BA Capital Company, L.P.; Banc of America Capital Investors SBIC, L.P. | Registration Rights Agreement, dated August 1, 2011 |

| Cumulus Media, Inc. | Crestview Radio Investors, LLC and UBS Securities LLC | Registration Rights Agreement, dated September 16, 2011 |
|---|---|---|
| Cumulus Media, Inc. | BA Capital Company, L.P.; Banc of America Capital Investors SBIC, L.P.; Blackstone FC Communications Partners L.P.; Lewis W. Dickey, Jr.; John W. Dickey; David W. Dickey; Michael W. Dickey; Lewis W. Dickey; Sr. and DBBC, L.L.C.; Crestview Radio Investors, LLC; MIHI LLC; UBS Securities LLC | Stockholders' Agreement, dated September 16, 2011 (as amended April 27, 2015) |
| Westwood One, Inc. | SecurAmerica LLC | Lease: Land and Building |
| Westwood One Radio Networks, Inc. | Breof Castleton Park Reo, LLC | Lease: Land and Building |
| Radio Networks LLC | 260-261 Madison Avenue LLC | Lease: Land and Building |
| Radio Networks LLC | Canon Business Process Services, Inc. | Lease: Land and Building |

# EXHIBIT C

## List of Retained Causes of Action

**List of Retained Causes of Action**

Article IV.S. of the Plan provides as follows:

> In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of this Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. For the avoidance of doubt, the preservation of Causes of Action described in the preceding sentence includes, but is not limited to, the Debtors' (1) right to object to Administrative Claims, (2) right to object to other Claims, and (3) right to subordinate Claims. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors in their respective discretion. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in Article VIII of the Plan.

> The Reorganized Debtors reserve and shall retain the applicable Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action except as otherwise expressly provided in the Plan and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court

Except where a Claim or Cause of Action has been waived, relinquished, exculpated, released, compromised or settled under the Plan, and without limiting the generality of Article IV.S. of the Plan, the following **Exhibit C-1** through **Exhibit C-4** include specific types of Causes of Actions expressly preserved by the Debtors and the Reorganized Debtors, including: (1) claims related to insurance policies; (2) claims, defenses, cross-claims, and counter-claims related to litigation and possible litigation; (3) claims related to accounts receivable and accounts payable; and (4) claims related to tax refunds which are attached hereto as **Exhibit C-1**, **Exhibit C-2**, **Exhibit C-3**, and **Exhibit C-4**, respectively.[1] Each of **Exhibit C-1**, **Exhibit C-2**, **Exhibit C-3**, and **Exhibit C-4** is

---

[1] **Exhibit C-1, Exhibit C-2, Exhibit C-3, and Exhibit C-4** attached hereto and each of the other documents filed as part of the Plan Supplement are subject to continuing review and revision by the Debtors.

2

subject to the information provided in this **Exhibit C**. <u>**The Debtors reserve the right to modify, supplement, or amend this Exhibit C from time to time in accordance with the Plan.**</u>

 In addition, the Debtors expressly retain Claims and Causes of Action against any Entity listed in the single consolidated list of creditors filed in lieu of separate creditor matrices for each Debtor (the "<u>Creditor Matrix</u>"), regardless of whether such Entity is listed in the following **Exhibit C-1** through **Exhibit C-4**, to the extent such Entities owe or may in the future owe money to the Debtors or the Reorganized Debtors, except to the extent Claims and Causes of Action against an entity listed in the Creditor Matrix has been released through the Plan.

 **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the Debtors and Reorganized Debtors expressly reserve all Causes of Action for later adjudication.

<div align="center">3</div>

**Exhibit C-1**

**Claims Related to Insurance Policies**

The following **Exhibit C-1** includes insurance contracts and policies to which one or more Debtors are a party. Unless otherwise released by the Plan, the Debtors expressly reserve all Claims or Causes of Action based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, regardless of whether such contract or policy is included on **Exhibit C-1**, including Claims or Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.

4

| Insurance Company | Address |
|---|---|
| (f/k/a Fireman's Fund Insurance Co.) Allianz SE | 777 San Marin Drive<br>Novato, CA 94998 |
| ACE American Insurance Company | 436 Walnut Street<br>Philadelphia, PA 19106 |
| AIG Specialty Insurance | 175 Water Street<br>New York, NY 10038 |
| All State Insurance Company | Allstate Insurance Company<br>P.O. Box 660598<br>Dallas, TX 75266-0598 |
| Allianz Global Risk Insurance Co. | 225 West Washington Street, Suite 1800<br>Chicago, IL 60606 |
| Allied World National Assurance Company | 1690 New Britain Ave.<br>Farmington, CT 06032 |
| Endurance American Insurance Company | 750 Third Avenue<br>18th Floor<br>New York, NY 10017 |
| Everest Indemnity Insurance Company (75%)<br><br>General Security Indemnity of Arizona (25%) | 477 Martinsville Rd, P.O. Box<br>Liberty Corner, NJ 07938<br><br>2338 West Royal Palm Road Suite J<br>Phoenix, AZ 85021 |
| EyeMed Vision Insurance Company | PO Box 8504<br>Cincinnati, OH 45040-7111 |
| Federal Insurance Company | 202B Hall's Mill Road<br>Whitehouse Station, NJ 08889 |
| Federal Insurance Company<br>Attn: Underwriting<br>Chubb Group of Insurance Companies | 82 Hopmeadow Street<br>Simbury, CT 06070 |
| Federal Insurance Company<br>Executive Protection Practice<br>Chubb Group of Insurance Companies | 202B Hall's Mill Road<br>Whitehouse Station, NJ 08889 |
| Great American Insurance Company of New York | 301 E. 4th Street<br>Cincinnati, OH 45202 |
| Illinois National Insurance Company | 175 Water Street, 18th Fl<br>New York, NY 10038 |
| Insurance Company of the State of Pennsylvania | 175 Water Street, 18th Floor<br>New York, NY 10038 |

5

| Insurance Company | Address |
|---|---|
| Principal Life Insurance Company | 711 High Street<br>Des Moines, IA, 50392 |
| QBE Insurance Corporation<br>Attn: Underwriting | Wall Street Plaza<br>88 Pine Street, 18th Floor<br>New York, NY 10005 |
| Sun Life Insurance Company | Sun Life Financial<br>One Sun Life Executive Park<br>Wellesley Hills, MA 02481 |
| Tokyo Marine HCC | 13403 Northwest Freeway<br>Houston, TX 77040 |
| Zurich American Insurance Company | 1299 Zurich Way<br>Schaumburg, IL 60196 |

6

Doc#: US1:11898394v11

## Exhibit C-2

### Claims, Defenses, Cross-Claims, and
### Counter-Claims Related to Litigation or Possible Litigation

The following **Exhibit C-2** includes Entities that are party to or that the Debtors believe may become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial. Unless otherwise released by the Plan, the Debtors expressly reserve all Claims or Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial, regardless of whether such Entity is included on **Exhibit C-2**.

The following **Exhibit C-2** also includes contracts and leases to which one or more Debtors are a party. Unless otherwise released by the Plan, the Debtors expressly reserve the Claims and Causes of Actions, based in whole or in part upon any and all contracts and leases to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, regardless of whether such contract or lease is included on **Exhibit C-2**. The Claims and Causes of Actions reserved include, without limitation, claims or Causes of Action against vendors, suppliers of goods or services, customers or any other parties, unless such Claims or Causes of Action are released through the Plan or were previously released by separate written agreement executed by the Debtors: (a) for overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) for payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) for any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by any one or more of the Debtors; (f) for environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies, or suppliers of environmental services or goods; (g) for counter-claims and defenses related to any contractual obligations; (h) for any turnover actions arising under section 542 or 543 of the Bankruptcy Code; and (i) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims.

Doc#: US1:11898394v11

| Debtor | Litigation Party | Address | Caption of Suit, Case Number, and Jurisdiction (if Applicable) |
|---|---|---|---|
| Radio Networks, LLC | Baisden Enterprises | c/o The Pittman Law Firm, P.C.<br>Attn: Aubrey "Nick" Pittman<br>100 Crescent Court, Suite 700<br>Dallas, Texas, 75201-2112<br><br>c/o Guajardo & Marks, LLP<br>Attn: J. Gregory Marks<br>Three Forest Plaza<br>12221 Merit Drive, Suite 945<br>Dallas, Texas, 75251<br><br>C/O Guajardo & Marks, LLP<br>Attn: Michael G. Guajardo<br>Three Forest Plaza<br>12221 Merit Drive, Suite 945<br>Dallas, Texas, 75251 | *Radio Networks, LLC* v. *Baisden Enters., Inc.*, Case No. 3:14-CV-1860-L (N.D. Tex. filed May 21, 2014) |
| Susquehanna Radio Corp. | Forte Interactive, Inc. D/B/A Racepartner | Attn: Kirk St. Johns, President<br>313 Datura Street, Suite 300<br>West Palm Beach, Fl 33401<br><br>c/o Jones Foster, Llc<br>505 South Flagler Drive<br>Suite 110<br>West Palm Beach, Fl 33401 | N/A |

8

Doc#: US1:11898394v11

| Debtor | Litigation Party | Address | Caption of Suit, Case Number, and Jurisdiction (if Applicable) |
|---|---|---|---|
| Cumulus Radio Corporation f/k/a Citadel Broadcasting Company & Citadel Communications Company, Ltd. | Caitlin Ferrari, Alyssa U., Maria P., and Melissa M. on Behalf of Themselves and All Others Similarly Situated | c/o Dolce Panepinto, P.C. Attn: Sean E. Cooney, Esq. 1260 Delaware Avenue Buffalo, NY, 14209<br><br>c/o The Marlborough Law Firm, P.C. Attn: Christopher Marlborough, Esq. 445 Broad Hollow Road, Suite 400 Melville, NY, 11747<br><br>c/o Levi & Korsinsky, LLP 30 Broad Street, 24th Floor New York, NY, 10004 | *Caitlin Ferrari ex rel.* v. *National Football League*, No. 804125/2014 (Sup. Ct. Erie County N.Y. filed Feb. 13, 2016) |
| Cumulus Radio Corporation f/k/a Citadel Broadcasting Company & Citadel Communications Company, Ltd. | The National Football League | c/o Lipsitz Green Scime Cambria LLP Attn: Jeffrey F. Reina, Esq. 42 Delaware Avenue, Suite 120 Buffalo, NY, 14202 | *Caitlin Ferrari ex rel.* v. *National Football League*, No. 804125/2014 (Sup. Ct. Erie County N.Y. filed Feb. 13, 2016) |

Doc#: US1:11898394v11

| Debtor | Litigation Party | Address | Caption of Suit, Case Number, and Jurisdiction (if Applicable) |
|---|---|---|---|
| Cumulus Radio Corporation f/k/a Citadel Broadcasting Company & Citadel Communications Company, Ltd. | Buffalo Bills, Inc. | c/o Lipsitz Green Scime Cambria LLP<br>Attn: Jeffrey F. Reina, Esq.<br>42 Delaware Avenue, Suite 120<br>Buffalo, NY, 14202 | *Caitlin Ferrari ex rel.* v. *National Football League*, No. 804125/2014 (Sup. Ct. Erie County N.Y. filed Feb. 13, 2016) |
| Cumulus Radio Corporation f/k/a Citadel Broadcasting Company & Citadel Communications Company, Ltd. | Stejon Productions Corporation | c/o Lippes Mathias Wexler Friedman LLP<br>Attn: Dennis C. Vacco, Esq.<br>665 Main Street, Suite 300<br>Buffalo, NY, 14203<br><br>c/o Lippes Mathias Wexler Friedman LLP<br>Attn: Stacey L. Moar, Esq.<br>665 Main Street, Suite 300<br>Buffalo, NY, 14203 | *Caitlin Ferrari ex rel.* v. *National Football League*, No. 804125/2014 (Sup. Ct. Erie County N.Y. filed Feb. 13, 2016) |

10

Doc#: US1:11898394v11

| Debtor | Litigation Party | Address | Caption of Suit, Case Number, and Jurisdiction (if Applicable) |
|---|---|---|---|
| Cumulus Radio Corporation f/k/a Citadel Broadcasting Company & Citadel Communications Company, Ltd. | Stephanie Mateczun | c/o Lippes Mathias Wexler Friedman LLP Attn: Dennis C. Vacco, Esq. 665 Main Street, Suite 300 Buffalo, NY, 14203<br><br>c/o Lippes Mathias Wexler Friedman LLP Attn: Stacey L. Moar, Esq. 665 Main Street, Suite 300 Buffalo, NY, 14203 | *Caitlin Ferrari ex rel.* v. *National Football League*, No. 804125/2014 (Sup. Ct. Erie County N.Y. filed Feb. 13, 2016) |
| Cumulus Radio Corporation f/k/a Citadel Broadcasting Company & Citadel Communications Company, Ltd. | Jaclyn S. and Gina B. | c/o Dolce Panepinto, P.C. Attn: Sean E. Cooney, Esq. 1260 Delaware Avenue Buffalo, NY, 14209<br><br>c/o The Marlborough Law Firm, P.C. Attn: Christopher Marlborough, Esq. 445 Broad Hollow Road, Suite 400 Melville, NY, 11747<br><br>c/o Levi & Korsinsky, LLP 30 Broad Street, 24th Floor New York, NY, 10004 | *Jaclyn S.* v. *National Football League*, No. 804088/2014 (Sup. Ct. Erie County N.Y. filed May 18, 2017) |

11

Doc#: US1:11898394v11

| Debtor | Litigation Party | Address | Caption of Suit, Case Number, and Jurisdiction (if Applicable) |
|---|---|---|---|
| Cumulus Radio Corporation f/k/a Citadel Broadcasting Company & Citadel Communications Company, Ltd. | The National Football League | c/o Lipsitz Green Scime Cambria LLP Attn: Jeffrey F. Reina, Esq. 42 Delaware Avenue, Suite 120 Buffalo, NY, 14202 | *Jaclyn S.* v. *National Football League*, No. 804088/2014 (Sup. Ct. Erie County N.Y. filed May 18, 2017) |
| Cumulus Radio Corporation f/k/a Citadel Broadcasting Company & Citadel Communications Company, Ltd. | Buffalo Bills, Inc. | c/o Lipsitz Green Scime Cambria LLP Attn: Jeffrey F. Reina, Esq. 42 Delaware Avenue, Suite 120 Buffalo, NY, 14202 | *Jaclyn S.* v. *National Football League*, No. 804088/2014 (Sup. Ct. Erie County N.Y. filed May 18, 2017) |

12

| Debtor | Litigation Party | Address | Caption of Suit, Case Number, and Jurisdiction (if Applicable) |
|---|---|---|---|
| Cumulus Radio Corporation f/k/a Citadel Broadcasting Company & Citadel Communications Company, Ltd. | Stejon Productions Corporation | c/o Lippes Mathias Wexler Friedman LLP Attn: Dennis C. Vacco, Esq. 665 Main Street, Suite 300 Buffalo, NY, 14203  c/o Lippes Mathias Wexler Friedman LLP Attn: Stacey L. Moar, Esq. 665 Main Street, Suite 300 Buffalo, NY, 14203 | *Jaclyn S.* v. *National Football League*, No. 804088/2014 (Sup. Ct. Erie County N.Y. filed May 18, 2017) |
| Cumulus Radio Corporation f/k/a Citadel Broadcasting Company & Citadel Communications Company, Ltd. | Stephanie Mateczun | c/o Lippes Mathias Wexler Friedman LLP Attn: Dennis C. Vacco, Esq. 665 Main Street, Suite 300 Buffalo, NY, 14203  c/o Lippes Mathias Wexler Friedman LLP Attn: Stacey L. Moar, Esq. 665 Main Street, Suite 300 Buffalo, NY, 14203 | *Jaclyn S.* v. *National Football League*, No. 804088/2014 (Sup. Ct. Erie County N.Y. filed May 18, 2017) |
| Cumulus Media Inc. | Gary L. Pizzati | | N/A |

13

**Exhibit C-3**

**Claims Related to Accounts Receivable and Accounts Payable**

Unless otherwise released by the Plan, the Debtors expressly reserve all of their rights with respect to Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors or Reorganized Debtors, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto. Furthermore, the Debtors expressly reserve all of their rights with respect to Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors, as applicable, owe money to them.

Doc#: US1:11898394v11

## Exhibit C-4

### Claims Related to Tax Refunds

The following **Exhibit C-4** includes Entities that have recently or that currently owe money to the Debtors for or related to taxes paid. Unless otherwise released by the Plan, the Debtors expressly reserve all Claims or Causes of Action against or related to all Entities that owe or that may in the future owe money related to tax refunds to the Debtors or Reorganized Debtors, regardless of whether such Entity is included on **Exhibit C-4**. Furthermore, the Debtors expressly reserve all Claims or Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors owe taxes to them.

| Taxing Authority | Address |
|---|---|
| A. DENNIS ADAMS CPA, TREASURER | BERKS COUNTY SERVICES CENTER, 633 COURT ST FL 2, READING, PA, 19601-4318 |
| ABILENE INDEPENDENT SCHOOL DISTRICT | 241 PINE ST, ABILENE, TX, 79604 |
| ACADEMY SCHOOL DISTRICT 20 | 1110 CHAPEL HILLS DRIVE, ATTN: KATHY NAMEIKA, COLORADO SPRINGS, CO, 80920 |
| ACADIA PARISH TAX COLLECTOR | 500 NE COURT CIR, COURTHOUSE, 2ND FL, #213, CROWLEY, LA, 70527-1329 |
| ADA COUNTY ASSESSOR | 190 E FRONT ST STE 107, BOISE, ID, 83702 |
| ADA COUNTY TREASURER | 200 W FRONT ST, BOISE, ID, 83701 |
| AFFILIATED CHAMBERS OF COMMERCE OF | GREATER SPRINGFIELD, 1441 MAIN ST STE 136, SPRINGFIELD, MA, 01103-1449 |
| ALABAMA DEPARTMENT OF LABOR | 649 MONROE STREET, ATTN: CENTRAL CASHIER, MONTGOMERY, AL, 36131 |
| ALABAMA DEPARTMENT OF REVENUE | 50 N RIPLEY ST, MONTGOMERY, AL, 36104 |
| ALBANY AREA CHAMBER OF COMMERCE | 225 WEST BROAD AVE, ALBANY, GA, 31701 |
| ALIEF INDEPENDENT SCHOOL DISTRICT | 14051 BELLAIRE BLVD, STE 100, HOUSTON, TX, 77083 |
| ALLEN MORGAN TAX COLLECTOR | 101 E MAIN STREET, SUITE 103, STARKVILLE, MS, 39759 |
| ANDERSON COUNTY TRUSTEE | 100 NORTH MAIN STREET, RM 203, CLINTON, TN, 37716 |
| ANDREWS COUNTY TAX OFFICE | 600 N MAIN, ANDREWS, TX, 79714 |
| ANGELA WOOD TAX COLLECTOR | 280 N COLLEGE, STE 202, FAYETTEVILLE, AR, 727014 |
| ANGIE LANGSTON TAX ASSESSOR | COLLECTOR BIBB CO, 8 COURT SQ W STE B, CENTREVILLE, AL, 35042 |
| ARAPAHOE COUNTY TREASURER | 5334 S PRINCE ST, LITTLETON, CO, 80120 |
| ARENA DISTRICT | 15 IONIA SUITE 130, GRAND RAPIDS, MI, 49503 |
| ARIZONA CORPORATION COMMISSION | ANNUAL REPORTS - CORP DIVISION, 1200 WEST WASHINGTON, PHOENIX, AZ, 85007-2929 |
| ARIZONA DEPT OF REVENUE | 1600 WEST MONROE ST, PHOENIX, AZ, 85007 |
| ARKANSAS CORPORATE INCOME TAX SECTION | LEDBETTER BLDG, 1816 W 7TH ST, RM 2250, LITTLE ROCK, AR, 72201 |
| ARKANSAS STATE CHAMBER OF COMMERCE | 1200 W CAPITOL AVENUE, ATTN: MARCUS TURLEY, LITTLE ROCK, AR, 72201 |
| ARLINGTON COUNTY VIRGINIA | 2100 CLARENDON BLVD STE 215, ARLINGTON, VA, 22201 |

16

Doc#: US1:11898394v11

| Taxing Authority | Address |
|---|---|
| ARTHUR E. FERDINAND | FULTON COUNTY TAX COMMISSIONER, 141 PRYOR STREET SW, SUITE 1106, ATLANTA, GA, 30303-3446 |
| ASHWORTH AWARDS | 41 RICHARDS AVE, NORTH ATTLEBORO, MA, 02760 |
| BALDWIN COUNTY | 22070 HWY 59, ROBERTSDALE, AL, 36567 |
| BAY AREA CHAMBER OF COMMERCE | 901 SAGINAW ST, BAY CITY, MI, 48708 |
| BDH PAYROLL | 1295 JOANN DR, SOUTHAVEN, MS, 38671 |
| BENTON COUNTY TAX COLLECTOR | PO BOX 428, WARSAW, MO, 65355 |
| BERKHEIMER TAX ADMINISTRATOR | 41 MACEK DR, WALLACE BLDG, RM 109, PITTSBURGH, PA, 15227 |
| BERNALILLO COUNTY TREASURER | ONE CIVIC PLAZA NW, ALBUQUERQUE, NM, 87102 |
| BIBB COUNTY TAX COMMISSIONER | MACON-BIBB COUNTY TAX COMMISSIONER, SERVICE CENTER, 188 THIRD ST,, 31201 |
| BLOUNT COUNTY CHAMBER OF COMMERCE | 201 S. WASHINGTON STREET, MARYVILLE, TN, 37804 |
| BOARD OF EQUALIZATION | 450 N ST RM 2322, MIC 73, SACRAMENTO, CA, 95814 |
| BOISE COUNTY TAX COLLECTOR | 383 HWY 5, HORSESHOE BEND, ID, 83629 |
| BOISE KUNA IRRIGATION DISTRICT | 129 N SCHOOL AVE, KUNA, ID, 83634 |
| BOISE METRO CHAMBER OF COMMERCE | 250 S 5TH ST STE 300, BOISE, ID, 83702 |
| BOONE COUNTY COLLECTOR | 801 E WALNUT, ROOM 118, COLUMBIA, MO, 65201-4890 |
| BOROUGH OF LODI | 1 MEMORIAL DR, LODI, NJ, 07644 |
| BOSSIER CHAMBER OF COMMERCE | 710 BENTON ROAD, BOSSIER CITY, LA, 71111 |
| BRETT STASSI SR. SHERIFF & | 58050 MERIAM ST, PLAQUEMINE, LA, 70764 |
| BREVARD COUNTY TAX COLLECTOR | 400 SOUTH ST, 6TH FL, TITUSVILLE, FL, 32780 |
| BROWN COUNTY TREASURER | 305 E WALNUT ST, GREEN BAY, WI, 54301 |
| BRUNSWICK COUNTY REVENUE DEPT. | BRUNSWICK COUNTY GOV'T COMPLEX, 30 GOVERNMENT CENTER DR NE, BOLIVIA, NC, 28422 |
| BUENA VISTA TWP TREASURER | 1160 S OUTER DR, SAGINAW, MI, 48601-6506 |
| BUREAU OF MOTOR VEHICLES | 309 WEST SOUTH STREET, WINCHESTER, IN, 47394-2029 |
| BURTON CHAMBER OF COMMERCE | G 4454 S. SAGINAW STREET, BURTON, MI, 48529 |

17

Doc#: US1:11898394v11

| Taxing Authority | Address |
|---|---|
| CADDO PARISH SHERIFFS OFFICE | 501 TEXAS ST RM 101, SHREVEPORT, LA, 71101 |
| CALDWELL CHAMBER OF COMMERCE | 704 BLAINE ST, CALDWELL, ID, 83605 |
| CALIFORNIA CHAMBER OF COMMERCE | 1215 K ST STE 1400, SACRAMENTO, CA, 95814 |
| CANNON TOWNSHIP | 8565 WINTER FRST, ROCKFORD, MI, 49341 |
| CAROLE JEAN JORDAN-TAX COLLECTOR | COUNTY ADMIN COMPLEX, 1800 27TH ST, BLDG B, VERO BEACH, FL, 32960 |
| CARROLLTON-FARMERS BRANCH ISD | 1445 N PERRY RD, CARROLLTON, TX, 75006 |
| CEDAR COUNTY COLLECTOR | 113 SOUTH ST, STOCKTON, MO, 65785 |
| CEDAR COUNTY TREASURER | GARY JEDLICKA, 400 CEDAR ST, TIPTON, IA, 52772 |
| CEDAR CREEK TOWNSHIP | 6556 SWEETER RD, TWIN LAKE, MI, 49457 |
| CENTRAL APPRAISAL DISTRICT OF TAYLOR COUNTY | 1534 S TREADAWAY, ABILENE , TX, 79602 |
| CHAMBER OF COMMERCE OF EASTERN CT INC | 914 HARTFORD TPKE, WATERFORD, CT, 6385 |
| CHAMBER OF COMMERCE OF GREATER KANSAS CITY | 30 W PERSHING RD STE 301, KANSAS CITY, MO, 64108-2423 |
| CHAMBER OF COMMERCE-MELBOURNE/PALM BAY | 1005 E STRAWBRIDGE AVE, MELBOURNE, FL, 32901 |
| CHARLESTON COUNTY REVENUE C OLLECTIONS DEPARTMENT | 4045 BRIDGE VIEW DEPARTMENT, NORTH CHARLESTON, SC, 29405-7464 |
| CHARLESTON COUNTY TREASURER | 101 MEETING STREET, SUITE 240, CHARLESTON, SC, 29401 |
| CHARLESTON METRO CHAMBER OF COMMERCE | 4500 LEEDS AVE, CHARLESTON, SC, 29405 |
| CHARTER TOWNSHIP OF MUNDY | 3478 MUNDY AVE, SWARTZ CREEK, MI, 48473 |
| CHARTER TOWNSHIP OF ROYAL OAK | 21131 GARDEN LN STE 205, FERNDALE, MI, 48220 |
| CHARTER TOWNSHIP OF YORK | 11560 STONY CREEK ROAD, MILAN, MI, 48160 |
| CHATHAM COUNTY TAX COMMISSIONER | 222 W OGLETHORPE AVE, #107, SAVANNAH, GA, 31401 |
| CHATTANOOGA AREA CHAMBER OF COMMERCE | 811 BROAD ST STE 100, CHATTANOOGA, TN, 37402 |
| CINCINNATI FIRE DEPARTMENT | 430 CENTRAL AVE, CINCINNATI, OH, 45202 |
| CINCINNATI USA REGIONAL CHAMBER | 3 EAST 4TH ST, STE 200, CINCINNATI, OH, 45202 |
| CITY OF ALBANY | 225 W BROAD AVE, ALBANY, GA, 31701 |

18

| Taxing Authority | Address |
|---|---|
| CITY OF ALBUQUERQUE | 1 CIVIC PLAZA NW, CITY-COUNTY BUILDING, 11TH FLOOR, ALBUQUERQUE, NM, 87102 |
| CITY OF ALBUQUERQUE ENVIRONMENTAL HEALTH DEPARTMENT AIR QUALITY | 1 CIVIC PLAZA NW, CITY-COUNTY BUILDING, 3RD FLOOR, ALBUQUERQUE, NM, 87102 |
| CITY OF ALLEN | 305 CENTURY PARKWAY, ALLEN, TX, 75013 |
| CITY OF ANN ARBOR | 301 E HURON ST, ANN ARBOR, MI, 48104 |
| CITY OF ATHENS | 508 EAST TYLER ST, ATHENS, TX, 75751 |
| CITY OF ATLANTA | BUSINESS TAX DIVISION, 55 TRINITY AVENUE, SUITE 1350, ATLANTA, GA, 30303 |
| CITY OF AUBURN | 144 TICHENOR AVENUE, SUITE 6, AUBURN, AL, 36830 |
| CITY OF BAKER SCHOOL BOARD | 14750 PLANK ROAD, BAKER, LA, 70714 |
| CITY OF BATON ROUGE-PARISH OF EAST BATON ROUGE | 222 SAINT LOUIS ST, ROOM 439, BATON ROUGE, LA, 70821 |
| CITY OF BEAUMONT-BMT CIVIC CENTER | 801 MAIN, SUITE 320, BEAUMONT, TX, 77701 |
| CITY OF BETHLEHEM | 10 EAST CHURCH STREET, BETHLEHEM, PA, 18018 |
| CITY OF BIRMINGHAM | 710 NORTH 20TH STREET, BIRMINGHAM CITY HALL - THIRD FLOOR, BIRMINGHAM, AL, 35203 |
| CITY OF BLOOMINGTON | 401 N MORTON ST, SUITE 240, BLOOMINGTON, IN, 47404 |
| CITY OF BOSSIER CITY | 620 BENTON ROAD, BOSSIER CITY, LA, 71171-1313 |
| CITY OF BRIDGEPORT TAX COLLECTOR | 45 LYON TERRACE, ROOM 123, BRIDGEPORT, CT, 06604 |
| CITY OF BUFFALO | 101 CITY HALL, BUFFALO, NY, 14202-3385 |
| CITY OF BURTON | 4093 MANOR DR, BURTON, MI, 48519 |
| CITY OF CHATTANOOGA | CHATTANOOGA CITY TREASURER, 101 E 11TH STREET, ROOM 100, CHATTANOOGA, TN, 37402 |
| CITY OF CINCINNATI | 805 CENTRAL AVENUE, 6TH FLOOR, CINCINNATI, OH, 45202 |
| CITY OF COLUMBIA | 1136 WASHINGTON ST, COLUMBIA, SC, 29201 |
| CITY OF CULVER | FINANCE DEPT, 9770 CULVER BLVD, CULVER CITY, CA, 90232 |
| CITY OF EAST PROVIDENCE RI | 145 TAUNTON AVE, 1ST FLOOR, EAST PROVIDENCE, RI, 2914 |

19

Doc#: US1:11898394v11

| Taxing Authority | Address |
|---|---|
| CITY OF EUGENE | 100 W 10TH AVE, SUITE 400, EUGENE, OR, 97401 |
| CITY OF FAYETTEVILLE | 113 W. MOUNTAIN ST., FAYETTEVILLE, AR, 72701 |
| CITY OF FLINT TREASURER | 1101 S. SAGINAW ST. ROOM 102, FLINT, MI, 48502 |
| CITY OF FORNEY | 101 E. MAIN ST., FORNEY, TX, 75126 |
| CITY OF FORT WALTON BEACH | 107 MIRACLE STRIP PKWY SW, FT WALTON BEACH, FL, 32548 |
| CITY OF FREEPORT | 200 W. 2ND STREET, FREEPORT, TX, 77541 |
| CITY OF FRESNO - DEPARTMENT OF PUBLIC HEALTH | 1221 FULTON STREET, FRESNO, CA, 93721 |
| CITY OF FRESNO BUS &TAX PERMITS ATTN TT | 2600 FRESNO STREET, ROOM 2156, FRESNO, CA, 93721 |
| CITY OF FRESNO/CONVENTION CENTER | 1515 E DIVISADERO, FRESNO, CA, 93710 |
| CITY OF GRAND RAPIDS | 50 OTTAWA AVENUE, GRAND RAPIDS, MI, 49503 |
| CITY OF HOLLISTER | 375 FIFTH STREET, HOLLISTER, CA, 95023 |
| CITY OF HOMEWOOD | CITY HALL, 2850, 19TH STREET SOUTH, 2ND FLOOR, HOMEWOOD, AL, 35209 |
| CITY OF JOHNSON CITY | MUNICIPAL & SAFETY BUILDING, 601 E MAIN STREET, JOHNSON CITY, TN, 37601 |
| CITY OF KANSAS CITY, MISSOURI | 414 EAST 12TH STREET, KANSAS CITY, MO, 64106 |
| CITY OF KAUKAUNA | 144 W SECOND STREET, KAUKAUNA, WI, 54130 |
| CITY OF KINGSPORT | 225 W CENTER ST, KINGSPORT, TN, 37660 |
| CITY OF KNOXVILLE | 400 MAIN ST, ROOM 685, KNOXVILLE, TN, 37902 |
| CITY OF LEOMINSTER | 25 WEST ST, LEOMINSTER, MA, 1453 |
| CITY OF LITTLE ROCK | 500 W MARKHAM ST, CITY HALL RM 338, LITTLE ROCK, AR, 72201 |
| CITY OF LOS ANGELES | 200 N SPRING STREET, LOS ANGELES, CA, 90012 |
| CITY OF MACON | 653 SECOND ST,, 31201 |
| CITY OF MELBOURNE | REVENUE DIVISION, 900 E STRAWBRIDGE AVE., MELBOURNE, FL, 32901 |
| CITY OF MEMPHIS | 125 N MAIN ST, MEMPHIS, TN, 38103 |
| CITY OF MISSION | CITY HALL, 6090 WOODSON RD, MISSION, KS, 66202 |
| CITY OF MOBILE | 205 GOVERNMENT STREET, MOBILE, AL, 36602-0001 |

20

| Taxing Authority | Address |
|---|---|
| CITY OF MONROE | 120 EAST FIRST STREET, MONROE, MI, 48161 |
| CITY OF MONTGOMERY | 103 NORTH PERRY ST, MONTGOMERY, AL, 36104 |
| CITY OF MUSKEGON HEIGHTS | CITY OF TREASURER/ASSESSORS OFFICE, 2724 PECK STREET, MUSKEGON HEIGHTS, MI, 49444 |
| CITY OF NEENAH | C/O FINANCE DEPARTMENT, 211 WALNUT ST, NEENAH, WI, 54956 |
| CITY OF NEENAH-CITY TREASURER | C/O FINANCE DEPARTMENT, 211 WALNUT ST, NEENAH, WI, 54956 |
| CITY OF NEW LONDON | 15 MASONIC STREET, PO BOX 1305, NEW LONDON, CT, 06320 |
| CITY OF NEW ORLEANS | 1300 PERDIDO ST STE 4W07, NEW ORLEANS, LA, 70112-2125 |
| CITY OF NEW ORLEANSEPT OF REVENUE | 1300 PERDIDOSTREET ROOM 1W15, NEW ORLEANS, LA, 70112 |
| CITY OF OAK PARK TREASURER | 14000 OAK PARK BLVD, OKA PARK, MI, 48237 |
| CITY OF OREGON TAX DEPARTMENT | 5330 SEAMAN ROAD, OREGON, OH, 43616-2608 |
| CITY OF OSHKOSH | 215 CHURCH AVENUE, OSHKOSH, WI, 54903 |
| CITY OF OXNARD | LICENSE SERVICES, 214 SOUTH C ST, OXNARD, CA, 93030-5790 |
| CITY OF PEORIA - DEPARTMENT OF FINANCE | CITY HALL BUILDING, 419 FULTON STREET, PEORIA, IL, 61602 |
| CITY OF PLANO/PLANO CENTRE | 1520 K AVENUE, PLANO, TX, 75074 |
| CITY OF RENO | RENO CITY HALL, BUSINESS LICENSE DIVISION, 1 EAST FIRST STREET 2ND FL, RENO, NV, 89501 |
| CITY OF RIVERVIEW | 14100 CIVIC PARK DR, RIVERVIEW, MI, 48192 |
| CITY OF SALEM, OHIO - INCOME TAX | 231 S BROADWAY AVENUE, SALEM, OH, 44460 |
| CITY OF SAVANNAH PUBLIC FACILITIES EVENT | 1 WARING DRIVE, SAVANNAH, GA, 31401 |
| CITY OF SAVANNAH-REVENUE DEPT. | 132 E BROUGHTON ST, SAVANNAH, GA, 31402 |
| CITY OF SHREVEPORT | 505 TRAVIS STREET, SHREVEPORT, LA, 71101 |
| CITY OF SPRINGFIELD | TREASURER, CITY HALL ROOM 112, 36 COURT STREET, SPRINGFIELD, MA, 01103 |

21

| Taxing Authority | Address |
|---|---|
| CITY OF STOCKTON | CITY CLERK'S OFFICE, 425 N EL DORADO STREET, 1ST FLOOR, STOCKTON, CA, 95202 |
| CITY OF SUMTER | 21 N MAIN STREET, SUMTER, SC, 29151 |
| CITY OF TALLAHASSEE | REVEBUE DIVISION, 300 S ADAMS ST, TALLAHASSEE, FL, 32301 |
| CITY OF TOLEDO | DIVIDION OF TAXATION, ONE GOVERNMENT CENTER, #2070, TOLEDO, OH, 43604-2280 |
| CITY OF TOPEKA | 215 SE 7TH ST ROOM 358, TOPEKA, KS, 66603 |
| CITY OF TUCSON | CLERK'S OFFICE, CITY HALL 9TH FLOOR, 255 WEST ALAMEDA, TUSCON, AZ, 85701 |
| CITY OF TURLOCK | 144 S BROADWAY, TURLOCK, CA, 95380 |
| CITY OF TUSCALOOSA | 2201 UNIVERSITY BLVD, TUSCALOOSA, AL, 35401 |
| CITY OF WEST POINT | 580 COMMERCE STREET, WEST POINT, MS, 39773 |
| CITY OF WILLIAMSBURG | 522 MAIN STREET, WILLIAMSBURG, KY, 40769 |
| CITY OF WILMINGTON | COLLECTIONS DIVISION, 102 NORTH THIRD STREET, WILMINGTON, NC, 28402 |
| CITY OF WORCESTER | TREASURERS OFFICE, 455 MAIN ST, WORCESTER, MA, 1608 |
| CITY TREASURER | 10 N 2ND ST, SUITE 103, HARRISBURG, PA, 17101 |
| CITY VIEW ISD | TAX COLLECTOR, 1025 CITY VIEW DRIVE, WICHITA FALLS, TX, 76306 |
| CLARENDON COUNTY TREASURER | 411 SUNSET DRIVE, MANNING, SC, 29102 |
| CLARK COUNTY TREASURER | CLARK COUNTY GOVERNMENT BUILDING, 501 E COURT AVENUE, ROOM 125, JEFFERSONVILLE, IN, 47130 |
| CLAY COUNTY COLLECTOR | ADMINISTRATIVE BUILDING/1 COURTHOUSE SQUARE, LIBERTY, MO, 64068-2368 |
| CLAY COUNTY TAX COLLECTOR(CLAY COUNTY MISSISSIPPI) | 205 COURT STREET, WEST POINT, MS, 39773 |
| CLEVELAND COUNTY TREASURER | SAUNDER DESELMS, 201 S JONES STE 100, NORMAN, OK, 73069 |
| COLE COUNTY COLLECTORS | 311 EAST HIGH STREET, JEFFERSON CITY, MO, 65101 |
| COLUMBIA CHAMBER OF COMMERCE | 300 S PROVIDENCE RD, COLUMBIA, MO, 65203 |

22

Doc#: US1:11898394v11

| Taxing Authority | Address |
|---|---|
| COLUMBIANA COUNTY TREASURER | COLUMBIANA COUNTY TREASURER, 105 SOUTH MARKET STREET, SUITE 8, LISBON, OH, 44432-1234 |
| COMMERCIAL COLLECTION CORP OF NY | 34 SEYMOUR STREET, TONAWANDA, NY, 14151 |
| COMMISSIONER OF FINANCE | ROOM 128, CITY HALL, SYRACUSE, NY, 13202 |
| COMMONWEALTH OF MASSACHUSETTS | 1101 S FRONT ST, HARRISBURG, PA, 17104 |
| COMMONWEALTH OF PENNSYLVANIA | BUREAU OF MOTOR VEHICLES, HARRISBURG, PA, 17104-2516 |
| CONNECTICUT SECRETARY OF THE STATE | COMMERCIAL RECORDING DIVISION, P O BOX 150470, HARTFORD, CT, 06115-0470 |
| CONTRA COSTA COUNTY TAX COLLECTOR | FINANCE BUILDING, SUITE 100, 625 COURT ST, MARTINEZ, CA, 94553 |
| COOKE COUNTY APPRAISAL DISTRICT | 201 NORTH DIXON, GAINESVILLE, TX, 76240 |
| CORPORATION SERVICE COMPANY | 2711 CENTERVILLE ROAD, WILMINGTON, DE, 19808 |
| COUNTY OF ALLEGHENY | 104 COURTHOUSE, 436 GRANT STREET, PITTSBURGH, PA, 15219 |
| COUNTY OF BERGEN | ONE BERGEN COUNTY PLAZA, ADMIN BLD, HACKENSACK, NJ, 07601 |
| COUNTY OF FAIRFAX | 12000 GOVERNMENT CENTER PARKWAY, FAIRFAX, VA, 22035 |
| COUNTY OF LEHIGH | FISCAL OFFICE RM 119, 17 S. SEVENTH ST., ALLENTOWN, PA, 18101-2401 |
| COUNTY OF LEXINGTON, SC TREASURER | 212 SOUTH LAKE DRIVE, SUITE 101, LEXINGTON, SC, 29072 |
| COUNTY OF LOS ANGELES | C/O DEPT OF PARKS AND REC, 1200 VIA VERDE DR, SAN DIMAS, CA, 91773 |
| COUNTY OF MONTGOMERY | 755 ROANOKE ST, SUITE 1B, CHRISTIANSBURG, VA, 24073-3171 |
| COUNTY OF PULASKI | 52 W MAIN ST, SUITE200, PULAKSI, VA, 24301 |
| COUNTY OF VENTURA, GSA FLEET SRVCS | 800 S VICTORIA AVENUE, VENTURA, CA, 93009 |
| COUNTY RECORDER, COUNTY OF ALAMEDA | 1106 MADISON STREET, OAKLAND, CA, 94607 |
| CRAWFORD COUNTY TAX COLLECTOR | KEVIN PIXLEY, 300 MAIN ST RM 2, VAN BUREN, AR, 72956 |
| CT CORPORATION | 921 SOUTH ORCHARD STREET, SUITE G, BOISE, ID, 83705 |

Doc#: US1:11898394v11

| Taxing Authority | Address |
|---|---|
| CUMBERLAND COUNTY TAX COLLECTOR | COUNTY COURTHOUSE, 117 DICK STREET, ROOM 530, FAYETTEVILLE, NC, 28301 |
| DADE COUNTY COLLECTOR AND TREASURER | DADE COUNTY COURTHOUSE, GREENFIELD, MO, 65661 |
| DAKOTA COUNTY PT&R | 1590 HWY 55, HASTINGS, MN, 55033-2392 |
| DALLAS CNTY TAX ASSESSOR-COL | 1201 ELM STREET, SUITE 2600, DALLAS, TX, 75270 |
| DALLAS INDEPENDENT SCHOOL DISTRICT | ATTN: MARTIN LUTHER KING LEARNING CTR.-PRINCIPAL MARIA FREEM, 3700 ROSS AVENUE, DALLAS, TX, 75204-5491 |
| DARLINGTON COUNTY TREASURER | ONE PUBLIC SQUARE, ROOM 203, DARLINGTON, SC, 29532-3213 |
| DAUPHIN COUNTY TREASURER | COURTHOUSE ROOM 105, 101 MARKET ST., HARRISBURG, PA, 17101-2078 |
| DAVID A RUFF TAX COLLECTOR | WASHINGTON COUNTY ARKANSAS, 280 N COLLEGE STE 202, FAYETTEVILLE, AR, 72701 |
| DAVIDSON COUNTY CLERK | HOWARD OFFICE BLDG., 700 2ND AVE.S., NASHVILLE, TN, 37210-2006 |
| DAVISON CHAMBER OF COMMERCE | 410 WEST FLINT ST, DAVISON, MI, 48423 |
| DC TREASURER | 1101 4TH STREET, SW, SUITE 270 WEST, WASHINGTON, DC, 20024 |
| DEAN FOWLER, JR | 180 NORTH IRBY STREET, FLORENCE, SC, 29501 |
| DEKALB COUNTY TAX COMMISSIONER | 4380 MEMORIAL DRIVE, DECATUR, GA, 30032 |
| DELAWARE SECRETARY OF STATE | 401 FEDERAL STREET #4, DOVER, DE, 19901 |
| DELAWARE TOWNSHIP TAX COLLECTOR | DEBRA A. RODEMOYER, 147 ONIONTOWN ROAD, GREENVILLE, PA, 16125 |
| DENTON COUNTY TAX OFFICE | 1505 E. MCKINNEY STREET, DENTON, TX, 76209-4525 |
| DEPARTMENT OF ASSESSMENTS AND TAXATION | PERSONAL PROPERTY DIVISION, 301 WEST PRESTON STREET, ROOM 801, BALITIMORE, MD, 21201 |
| DEPARTMENT OF ENVIRONMENTAL PROTECTION-STORAGE TANK REGISTRATION | 3900 COMMONWEALTH BLVD, TALLAHASSEE, FL, 32399-3000 |
| DEPARTMENT OF FINANCE & ADMINISTRATION | 1509 WEST 7TH STREET, LITTLE ROCK, AR, 72201 |
| DEPARTMENT OF MOTOR VEHICLES-CA | 915 CAPITOL MALL, SUITE 350B, SACRAMENTO, CA, 95814 |

24

| Taxing Authority | Address |
|---|---|
| DEPARTMENT OF PERMITTING SERVICES DBA DIVISION OF FIRE PREVENTIO | 255 ROCKVILLE PIKE 2ND FLOOR, 2ND FLOOR, ROCKVILLE, MD, 20850 |
| DEPARTMENT OF PUBLIC HEALTH | 1390 MARKET ST. #210, SAN FRANCISCO, CA, 94102 |
| DEPARTMENT OF REVENUE | 9301 CHAPEK RD BLDG 1458, ATTN: DEIDRA JOHNSON, FT BELVOIR, VA, 22060-5527 |
| DEPARTMENT OF REVENUE SERVICES | 450 COLUMBUS BLVD, SUITE 1, HARTFORD, CT, 06103 |
| DESOTO COUNTY TAX COLLECTOR | 365 LOSHER STREET, SUITE 110, CAROL STREAM, MS, 38632 |
| DESTIN AREA CHAMBER OF COMMERCE | 4484 LEGENDARY DRIVE, SUITE A, DESTIN, FL, 32541-5342 |
| DILLON COUNTY TREASURER/JAMIE CALHOUN ESTES | 401 W MAIN ST, ROOM 204, DILLON, SC, 29536 |
| DISTRICT OF COLUMBIA OFFICE OF TAX AND REVENUE | 1101 4TH STREET, SW, SUITE 270 WEST, WASHINGTON, DC, 20024 |
| DOI BUREAU OF LAND MANAGEMENT | 2850 YOUNGFIELD ST, LAKEWOOD, CO, 80215 |
| DON BLEVINS/FAYETTE CO. CLERK | 162 E MAIN ST., LEXINGTON, KY, 40507 |
| DONALD R WHITE TAX COLLECTOR,ALAMEDA COUNTY | 1221 OAK ST, OAKLAND, CA, 94612-4285 |
| DORIS MALOY TAX COLLECTOR | 1276 METROPOLITAIN BLVD, SUITE 102, TALLAHASSEE, FL, 32312 |
| DOUGHERTY COUNTY TAX DEPARTMENT | 240 PINE AVE SUITE 100, ALBANY, GA, 31702 |
| DOWNTOWN LEXINGTON CORPORATION | 316 WEST HIGH STREET, LEXINGTON, KY, 40507 |
| DOWNTOWN TOPEKA INC. | 515 S KANSAS, SUTE A, TOPEKA, KS, 66603 |
| EAST BATON ROUGE PARISH SCHOOL SYSTEM | 1050 SOUTH FOSTER DRIVE, BATON ROUGE, LA, 70806 |
| EAST FELICIANA PARISH POLICE JURY | 12064 MARSTON STREET, CLINTON, LA, 70722 |
| EAST FELICIANA SHERIFFS OFFICE | 11315 BANK STREET, CLINTON, LA, 70722 |
| EL PASO COUNTY CLERK & RECORDER | CHUCK BROERMAN, DEPT 223344, DENVER, CO, 80256-0001 |
| EL PASO COUNTY TREASURER | 1675 CARDEN OF THE GODS ROAD, SUITE 2100, COLORADO SPRINGS, CO, 80907 |
| ELIZABETH ADCOCK | 4900 PLEASANT VALLEY RD, YORK, PA, 17406 |
| ELIZABETHTOWN AREA SCHOOL DISTRICT | 600 E HIGH ST, ELIZABETHTOWN, PA, 17022 |

Doc#: US1:11898394v11

| Taxing Authority | Address |
|---|---|
| ERIE COUNTY TAX | 95 FRANKLIN ST RM 100, BUFFALO, NY, 14202 |
| ERIE REGIONAL CHAMBER & GROWTH PARTNERSHIP | 208 E BAYFRONT PKWY STE 100, ERIE, PA, 16507 |
| ESCAMBIA COUNTY TAX COLLECTOR | 213 PALAFOX PLACE, PENSACOLA, FL, 32502 |
| FARRAGUT WEST KNOX CHAMBER OF COMMERCE | 11826 KINGSTON PIKE STE 110, FARRAGUT, TN, 37934 |
| FAYETTEVILLE C.O.C. | 21 W MOUNTAIN STE 300, FAYETTEVILLE, AR, 72702-4216 |
| FEDERAL COMMUNICATIONS COMMISSION | 445 12TH STREET AW, WASHINGTON, DC, 20554 |
| FENTON REGIONAL CHAMBER OF COMMERCE | 104 S ADELAIDE STREET, FENTON, MI, 48430 |
| FLINT GENESEE CHAMBER OF COMMERCE | 519 S. SAGINAW ST. SUITE 200, FLINT, MI, 48502 |
| FLORENCE, CITY OF | BUSINESS LIC DEPT CITY CO COMPLEX KK, 180 N. IRBY STREET, FLORENCE, SC, 29501 |
| FLORIDA DEPARTMENT OF REVENUE | OUT OF STATE/CENTRAL COLLECTIO, NS UNIT, 5050 W. TENNESSEE STREET, TALLAHASSEE, FL, 32399-6586 |
| FLORIDA DEPARTMENT OF STATE | R.A. GRAY BUILDING, 500 SOUTH BRONOUGH STREET, TALLAHASSEE, FL, 32399-0250 |
| FLORIDA DEPT OF STATE | 5050 W TENNESSEE STREET, TALLAHASSEE, FL, 32399-0135 |
| FORT SMITH REGIONAL CHAMBER OF COMMERCE | 612 GARRISON AVE, FT SMITH, AR, 72901 |
| FOX CITIES CHAMBER OF COMMERCE | 125 N SUPERIOR STREET, APPLETON, WI, 54911 |
| FRANCHISE TAX BOARD | 3321 POWER INN RD., SUITE 250, SACRAMENTO, CA, 95826-3893 |
| FRESNO COUNTY CHAMBER OF COMMERCE | 2331 FRESNO ST, FRESNO, CA, 93721 |
| FRESNO COUNTY TAX COLLECTOR | 2281 TULARE STREET, HALL OF RECORDS ROOM 105, FRESNO, CA, 93721 |
| FRESNO POLICE DEPARTMENT | 2323 MARIPOSA ST., FRESNO, CA, 93721 |
| FRESNO/CLOVIS CONVENTION & VISITORS BUREAU | 1180 E SHAW AVE, STE 201, FRESNO, CA, 93710 |
| FRUITLAND TOWNSHIP | 4545 NESTROM RD, WHITEHALL, MI, 49461 |
| FULTON COUNTY TAX COMMISSIONER | SUITE 1106, 141 PRYOR STREET SW, ATLANTA, GA, 30303-3446 |

26

Doc#: US1:11898394v11

| Taxing Authority | Address |
|---|---|
| FULTON COUNTY TREASURER | 152 S. FULTON ST., SUITE 155, ATTN: BEV SCHLOSSER, WAUSEON, OH, 43567 |
| G. BRIAN PATTERSON, | REVENUE COMMISSIONER, 100 S. CLINTON STREET, STE A, ATHENS, AL, 35611 |
| GALVESTON COUNTY TAX OFFICE | 722 MOODY AVENUE, GALVESTON, TX, 77550 |
| GENESEE COUNTY TREASURER | DANIEL T KILDEE, 1101 BEACH STREET, FLINT, MI, 48502 |
| GEORGIA DEPARTMENT OF REVENUE | 1800 CENTURY BLVD., ATLANTA, GA, 30345 |
| GILFORD TOWNSHIP TREASURER | 6230 GILFORD RD., FAIRGROVE, MI, 48733 |
| GOVERNMENT OF WASHINGTON DC- OFFICE OF TAX AND REVENUE | 1101 4TH STREET SW, SUITE W270, WASHINGTON, DC, 20024 |
| GRAND BLANC CHAMBER OF COMMERCE | 512 E. GRAND BLANC RD, GRAND BLANC, MI, 48439 |
| GRAND RAPIDS AREA CHAMBER OF COMMERCE | ATTN ACCOUNTS RECEIVABLE, 111 PEARL ST NW, GRAND RAPIDS, MI, 49503-2831 |
| GRAYSON COUNTY TAX | 100 W. HOUSTON, SHERMAN, TX, 75090 |
| GREATER ALEXANDRIA ECONOMIC DEVELOPMENT AUTHORITY (GAEDA) | 201 JOHNSTON ST, STE 601, ALEXANDRIA, LA, 71301 |
| GREATER BEAUMONT CHAMBER OF COMMERCE | 1110 PARK STREET, BEAUMONT, TX, 77701 |
| GREATER CHICOPEE CHAMBER OF COMMERCE | 264 EXCHANGE ST., CHICOPEE, MA, 01013 |
| GREATER LEHIGH VALLEY CHAMBER OF COMMERCE | 158A NORTHAMPTON STREET, EASTON, PA, 18042 |
| GREATER LIVINGSTON COUNTY ECONOMIC DEVELOPMENT COUNCIL | 210 WEST WATER STREET, PONTIAC, IL, 61764 |
| GREATER MACON CHAMBER OF COMMERCE | 305 COLISEUM DR.,, 31217 |
| GREATER MEMPHIS CHAMBER | 22 NORTH FRONT ST, STE 200, MEMPHIS, TN, 38103 |
| GREATER OK CITY HISPANIC CHAMBER OF COMMERCE | 3321 S. WESTERN AVENUE, OKLAHOMA CITY, OK, 73109 |
| GREATER PORT ARTHUR CHAMBER OF COMMERCE | 501 PROCTER ST, STE 300, PORT ARTHUR, TX, 77640 |
| GREATER SHREVEPORT CHAMBERS OF COMMERCE | 400 EDWARDS STREET, SHREVEPORT, LA, 71101 |
| GREATER STARKVILLE DEVELOPMENT PARTNERSHIP | 200 EAST MAIN STREET, STARKVILLE, MS, 39759 |

27

| Taxing Authority | Address |
|---|---|
| GREATER STOCKTON CHAMBER OF COMMERCE | 445 W WEBER AVE STE 220, STOCKTON, CA, 95203 |
| GREATER TOPEKA CHAMBER OF COMMERCE | 120 SW 6TH AVE, SUITE 110, TOPEKA, KS, 66603 |
| GREATER WILMINGTON CHAMBER OF COM. | ONE ESTELL LEE PLACE, WILMINGTON, NC, 28401 |
| GREEN BAY AREA CHAMBER OF COMMERCE | 300 N BROADWAY, STE 3A, GREEN BAY, WI, 54303 |
| GREENBURGH RECEIVER OF TAXES | 117 HILLSIDE AVE., GREENBURGH, NY, 10607 |
| GREENE TWP TAX COLLECTOR | 8628 WATTSBURG RD, ERIE, PA, 16509 |
| GREG D. ANDREWS | 1121 MAIN ST., COLUMBUS, MS, 39701 |
| GROVES CHAMBER OF COMMERCE | 4399 MAIN AVENUE, GROVES, TX, 77619 |
| HAB-LST | 609 WEST HAMILTON ST., SUITE 101, ALLENTOWN, PA, 18101 |
| HAMILTON COUNTY CLERK | 500 COURTHOUSE, 625 GEORGIA AVENUE, CHATTANOOGA, TN, 37402 |
| HAMILTON COUNTY TRUSTEE | 625 GEORGIE AVENUE, ROOM 210, CHATTANOOGA, TN, 37402-1494 |
| HARRIS COUNTY TOLL ROAD AUTHORITY | 7701 WILSHIRE PLACE DRIVE, HOUSTON, TX, 77040 |
| HENRY COUNTY TREASURER | 101 S MAIN STREET, NEW CASTLE, IN, 47362 |
| HERMITAGE TREASURER | 800 N. HERMITAGE ROAD, HERMITAGE, PA, 16148 |
| HIXSON UTILITY DISTRICT | 5201 HIXSON PIKE, HIXSON, TN, 37343 |
| HOKE COUNTY TAX COLLECTOR | 227 N. MAIN STREET, PO BOX 210, RAEFORD, NC, 28376 |
| HOOVER AREA CHAMBER OF COMMERCE | 1694 MONTGOMERY HIGHWAY, SUITE 108, HOOVER, AL, 35216 |
| HORRY COUNTY BUSINESS LICENSE DEPARTMENT | 211 BEATY STREET, CONWAY, SC, 29526 |
| HORRY COUNTY FARP | 1301 SECOND AVENUE, CONWAY, SC, 29526 |
| HORRY COUNTY TREASURER | 1301 SECOND AVENUE, CONWAY, SC, 29526 |
| HOWARD COUNTY TREASURER | 220 N MAIN ST, ROOM 226, KOKOMO, IN, 46901 |
| HUGHSON CHAMBER OF COMMERCE | 7018 PINE STREET, PO BOX 9, HUGHSON, CA, 95326 |
| IDAHO SECRETARY OF STATE | 700 WEST JEFFERSON STREET, ROOM E205, BOISE, ID, 83720 |
| IDAHO STATE TAX COMMISSION | 800 E PARK BLVD., #500, BOISE, ID, 83712 |
| ILLINIOS DEPARTMENT OF REVENUE | 501 S. SECOND ST., SPRINGFIELD, IL, 62756 |

28

| Taxing Authority | Address |
|---|---|
| ILLINOIS DEPARTMENT OF REVENUE | RETAILERS OCCUPATION TAX, SPRINGFIELD, IL, 62796-0001 |
| ILLINOIS OFFICE OF THE STATE FIRE MARSHALL | 1035 ADLAI STEVENSON DR., SPRINGFIELD, IL, 62703 |
| ILLINOIS SECRETARY OF STATE | 213 STATE CAPITOL, SPRINGFIELD, IL, 62756 |
| INDIANA DEPARTMENT OF REVENUE | 100 N SENATE AVE., #N248, INDIANAPOLIS, IN, 46204 |
| INDIANA SECRETARY OF STATE | 302 W. WASHINGTON STREET, ROOM E-018, INDIANAPOLIS, IN, 64141-6452 |
| INTERNAL REVENUE SERVICE | 201 W RIVER CENTER BLVD, COVINGTON, KY, 41019-0030 |
| IOWA DEPARTMENT OF REVENUE | 1305 E. WALNUT, HOOVER STATE OFFICE BUILDING, 4TH FLOOR, DES MOINES, IA, 50319 |
| IOWA SECRETARY OF STATE | 321 EAST 12TH STREET, DES MOINES, LA, 50319-0130 |
| IRVING ISD TAX OFFICE | 2621 W. AIRPORT FREEWAY , IRVING, TX, 75062 |
| ISANTI COUNTY TREASURER | 555 18TH AVE SW, CAMBRIDGE, MN, 55008-9918 |
| JACKSON COUNTY COLLECTOR | 415 E. 12TH STREET, SUITE 100, KANSAS CITY, MO, 64106 |
| JACKSON COUNTY TREASURER | 111 S. MAIN STREET, SUITE 124, BROWNSTOWN, IN, 47220 |
| JANET BUSKEY REVENUE COMMISSIONER MONTGOMERY COUNTY | 100 S LAWRENCE ST, MONTGOMERY, AL, 36104 |
| JEAN STAMBAUGH | 3204 FARMTRAIL ROAD, YORK, PA, 17406 |
| JEFFERSON CITY CHAMBER OF COMMERCE | 213 ADAMS S, JEFFERSON CITY, MO, 65101 |
| JEFFERSON COUNTY | 1149 PEARL STREET, BEAUMONT, TX, 77701 |
| JEFFERSON COUNTY TAX COLLECTOR | 101 W. BARRAQUE ST, ROOM 113, PINE BLUFF, AR, 71601 |
| JILL C. HEINDEL | 28 EAST MARKET ST. - ROOM 126, YORK, PA, 17401-1584 |
| JOHN R AMES CTA | 1201 ELM ST STE 2600, DALLAS, TX, 75270 |
| JOHNSON COUNTY MOTOR VEHICLE | 6000 LAMAR AVE, MISSION, KS, 66202 |
| JOHNSON COUNTY TREASURER | 111 S. CHERRY ST., SUITE 1500, OLATHE, KS, 66061 |
| JONES COUNTY APPRAISAL DISTRICT | 1137 E COURT PLAZA, ANSON, TX, 79501 |
| JONES COUNTY TAX COMMISSIONER | 166 INDUSTRIAL BLVD, GRAY , GA, 31032 |

29

Doc#: US1:11898394v11

| Taxing Authority | Address |
|---|---|
| JONES COUNTY/GRAY CHAMBER OF COMMERCE | 161 WEST CLINTON ST, GRAY, GA, 31032 |
| JT SMALLWOOD TAX COLLECTOR | ROOM 160 COURTHOUSE, 716 RICHARD ARRINGTON JR BLVD N, BIRMINGHAM, AL, 35203 |
| JULIAN C. WHITTINGTON, SHERIFF AND WX-OFFICIO TAX COLLECTOR | 204 BURT BOULEVARD, BENTON, LA, 71006 |
| KANSAS DEPARTMENT OF REVENUE | COMPLIANCE ENFORCEMENT, 915 SW HARRISON STREET, TOPEKA, KS, 66625-2007 |
| KENNETH L. MAUN | 2300 BLOOMDALE RD #2324, MCKINNEY, TX, 75071 |
| KENT COUNTY TREASURER | 300 MONROE AVENUE NW FL 2, GRAND RAPIDS, MI, 49503 |
| KENTUCKY DEPARTMENT OF REVENUE | 501 HIGH ST, STATION 32, FRANKFORT, KY, 40601 |
| KENTUCKY STATE TREASURER | 700 CAPITAL AVE., FRANKFORT, KY, 40602 |
| KINGFISHER COUNTY TREASURER | 101 SOUTH MAIN, ROOM 4, KINGFISHER, OK, 73750 |
| KINGSPORT CHAMBER OF COMMERCE | 400 CLINCHFIELD ST, SUITE 100, KINGSPORT, TN, 37660 |
| KNOX COUNTY CLERK | 200 SOUTH CHERRY STREET, GALESBURG, IL, 61401 |
| KNOX COUNTY TRUSTEE | 400 MAIN ST STE 418, KNOXVILLE, TN, 37902 |
| KNOXVILLE AREA CHAMBER PARTNERSHIP | 17 MARKET STREET #201, KNOXVILLE, TN, 37902 |
| LACKAWANNOCK TWP TAX COLLECTOR | 1019 MERCER-NEW WILMINGTON RD, NEW WILMINGTON, PA, 16142 |
| LAFAYETTE COUNTY COLLECTOR | 1001 MAIN STREET , LEXINGTON, MO, 64067 |
| LAFAYETTE PARISH TAX COLLECTOR | 1010 LAFAYETTE ST, LAFAYETTE, LA, 70501 |
| LANCASTER COUNTY TREASURER | 150 N QUEEN ST., LANCASTER, PA, 17603 |
| LANE COUNTY TAX COLLECTOR | 125 EAST 8TH AVENUE, EUGENE, OR, 97401 |
| LAPEER AREA CHAMBER OF COMMERCE | 108 W PARK ST, LAPEER, MI, 48446 |
| LASALLE TOWNSHIP | 4111 LAPLAISANCE RD., LASALLE, MI, 48145 |
| LEAVENWORTH COUNTY TREASURER | 300 WALNUT ST. SUITE 105, LEAVENWORTH, KS, 66048-2766 |
| LEONARD BARTOSOSIEWICZ-LUZERNE CITY & PLYMOUTH TWP | 1798 W MOUNTAIN RD, PLYMOUTH, PA, 18651 |

30

| Taxing Authority | Address |
|---|---|
| LEXINGTON-FAYETTE URBAN COUNTY GOV. | 200 E. MAIN ST., LEXINGTON, KY, 40507 |
| LITTLE ROCK REGIONAL CHAMBER OF COMMERCE | ONE CHAMBER PLAZA, LITTLE ROCK, AR, 72201 |
| LIVINGSTON COUNTY AG FAIR ASSOCIATION | 1412 S LOCUST ST , PONTIAC, IL, 61764 |
| LIVINGSTON COUNTY COLLECTOR | 700 WEBSTER STREET, SUITE 5, CHILLICOTHE, MO, 64601 |
| LIVINGSTON PARISH TAX COLLECTOR-PROPERTY | 20300 GOVERNMENT BLVD, LIVINGSTON, LA, 70754 |
| LODI DISTRICT CHAMBER OF COMMERCE | 35 SOUTH SCHOOL ST., LODI, CA, 95240 |
| LODI FIRE PREVENTION BUREAU | ONE MEMORIAL DRIVE, LODI, NJ, 07644 |
| LOIS HUNTER, CFC, TAX COLLECTOR | JEFFERSON COUNTY TAX COLLECTOR, 500 WEST WALNUT STREET, MONTICELLO, FL, 32344 |
| LOS ANGELES COUNTY TAX COLLECTOR | 225 N. HILL STREET, LOS ANGELES, CA, 90012-2798 |
| LOUDON COUNTY TRUSTEE | 101 MULBERRY STREET, SUITE 201 , LOUDON, TN, 37774 |
| LOUISIANA DEPARTMENT OF REVENUE | 617 N. THIRD STREET, BATON ROUGE, LA, 70802 |
| MACERICH VALLEY RIVER CENTER | 293 VALLEY RIVER CENTER, EUGENE, OR, 97401 |
| MACON-BIBB COUNTY INDUSTRIAL AUTHORITY | 439 MULBERRY STREET,, 31201 |
| MADISON COUNTY TAX COLLECTOR-LYNDA HALL | 100 NORTHSIDE SQUARE, HUNTSVILLE, AL, 35801-4820 |
| MAHONING COUNTY TREASURER | 120 MARKET STREET, YOUNGSTOWN, OH, 44503 |
| MAINE REVENUE SERVICES | 51 COMMERCE DR STE 10 , AUGUSTA, ME, 04330 |
| MANHEIM TOWNSHIP COMMISSIONERS | ATTN KELLY WELLS, 1840 MUNICIPAL DR, LANCASTER, PA, 17601 |
| MARILYN E. WOOD | 3925 MICHAEL BLVD., SUITE G, MOBILE, AL, 36609 |
| MARION COUNTY TREASURER | 2523 EAST HIGHWAY 76, MARION, SC, 29571 |
| MARIPOSA COUNTY TAX COLLECTOR | 4982 10TH STREET, MARIPOSA, CA, 95338 |
| MARY JANE PORTER | LINCOLN COUNTY TREASURER, 112 MAIN AVENUE SOUTH ROOM 103, FAYETTEVILLE, TN, 37334 |
| MASSACHUSETTS DEPT OF REVENUE | 200 ARLINGTON ST, CHELSEA, MA, 02150 |

31

| Taxing Authority | Address |
|---|---|
| MAUMEE CHAMBER OF COMMERCE | 605 CONANT STREET, MAUMEE, OH, 43537 |
| MCLEAN COUNTY CHAMBER OF COMMERCE | 2203 E EMPIRE ST, BLOOMINGTON, IL, 61704 |
| MCLEAN COUNTY COLLECTOR | 115 E. WASHINGTON ST, BLOOMINGTON, IL, 61701 |
| MELISSA BONNICE | TAX COLLECTOR, 768 HIGHLAND ROAD, DALTON, PA, 18414 |
| MERIDIAN CHAMBER OF COMMERCE | 215 E FRANKLIN RD, MERIDIAN, ID, 83642 |
| METROPOLITAN TRUSTEE | 700 SECOND AVENUE SOUTH, SUITE 220, NASHVILLE, TN, 37210 |
| MICHIGAN CHAMBER OF COMMERCE | 600 S WALNUT ST, LANSING, MI, 48933-2200 |
| MICHIGAN DEPARTMENT OF TREASURY | MICHIGAN DEPT OF TREASURY, DEPT 77889, DETROIT, MI, 48277-0889 |
| MICHIGAN DEPT OF STATE | ATTN ACCOUNTS PAYABLE, 7064 CROWNER DR, LANSING, MI, 48918 |
| MICHIGAN DEPT OF TREASURY | MICHIGAN DEPARTMENT OF TREASURY, LANSING, MI, 48922 |
| MIDLAND CENTRAL APPRAISAL DISTRICT | 4631 ANDREWS HWY, MIDLAND, TX, 79703 |
| MIDLAND CHAMBER OF COMMERCE | 109 N. MAIN, MIDLAND, TX, 79701 |
| MILDRED LUBA TAX COLLECTOR | 1267 SANS SOUCI PKWY, HANOVER TOWNSHIP, PA, 18706 |
| MILLBROOK AREA CHAMBER OF COMMERCE | 3453 MAIN ST, MILLBROOK, AL, 36054 |
| MINNESOTA REVENUE | MAIL STATION 1260, ST. PAUL, MN, 55145-1260 |
| MISSISSIPPI DEPARTMENT OF REVENUE | 500 CLINTON CENTER DRIVE, CLINTON, MS, 39056 |
| MISSOURI DEPARTMENT OF REVENUE | 301 W HIGH ST, ROOM 370, JEFFERSON CITY, MO, 65105 |
| MOBILE AREA CHAMBER OF COMMERECE | 451 GOVERNMENT ST, MOBILE, AL, 36602 |
| MOBILE CIVIC CENTER - CITY OF MOBILE, AL | 401 CIVIC CENTER DRIVE, MOBILE, AL, 36602 |
| MODESTO CHAMBER OF COMMERCE | 1114 J ST, MODESTO, CA, 95354 |
| MONROE CHAMBER OF COMMERCE | 1645 N DIXIE HWY # 2, MONROE, MI, 48162 |
| MONTGOMERY AREA CHAMBER OF COMMERCE | 41 COMMERCE ST, MONTGOMERY, AL, 36101 |
| MONTGOMERY COUNTY CHAMBER OF COMMERCE | 1520 NORTH FRANKLIN STREET, CHRISTIANSBURG, VA, 24073 |
| MONTGOMERY COUNTY COMMISSION | 101 S LAWRENCE ST, MONTGOMERY, AL, 36104 |

32

Doc#: US1:11898394v11

| Taxing Authority | Address |
|---|---|
| MONTGOMERY COUNTY MARYLAND | 101 MONROE STREET, 2ND FLOOR, ROCKVILLE, MD, 20850 |
| MOTOR VEHICLE REGISTRATION & DATA | P.O. BOX 751000, NEW ORLEANS, LA, 70175 |
| MOUNITEAU COUNTY | 200 E. MAIN, CALIFORNIA, MO, 65018 |
| MOUNT FOREST TOWNSHIP TREASURER | 1080 W MOUNT FOREST RD, PINCONNING, MI, 48650 |
| MUNCIEELAWARE COUNTY CHAMBER OF COMMERCE | 401 S HIGH ST, MUNCIE, IN, 47305 |
| MYRTLE BEACH, CITY OF | 937 BROADWAY STREET, MYRLTE BEACH, SC, 29578 |
| NC SECRETARY OF STATE | 2 SOUTH SALISBURY STREET, RALEIGH, NC, 27601 |
| NEBCO VFD | 14639 S WIMPY JONES RD, GARFIELD, AR, 72732 |
| NEBRASKA DEPT OF REVENUE | 301 CENTENNIAL MALL S, LINCOLN, NE, 68508 |
| NEVADA DEPARTMENT OF TAXATION | 1550 COLLEGE PARKWAY, SUITE 115, CARSON CITY, NV, 89706 |
| NEVADA SECRETARY OF STATE | 101 N CARSON STREET, SUITE 3, CARSON CITY, NV, 89701 |
| NEW HANOVER COUNTY | 230 GOVERNMENT CENTER DR, STE 195, WILMINGTON, NC, 28403 |
| NEW MEXICO DEPARTMENT OF TRANSPORTATION - AVIATION DEPARTMENT | 1120 CERRILLOS ROAD, SANTA FE, NM, 87504 |
| NEW MEXICO TAXATION AND REVENUE DEPT | 1100 SOUTH ST. FRANCIS DRIVE, SANTA FE, NM, 87504 |
| NEW ORLEANS EMERGENCY MEDICAL SERVICE | 2929 EARHART BLVD, NEW ORLEANS, LA, 70125 |
| NEW YORK STATE CORPORATE TAX | ATTN: OFFICE OF COUNSEL, BUILING 9, W A HARRIMAN CAMPUS, ALBANY, NY, 12227 |
| NEW YORK STATE DEPARTMENT OF TAXATION AND FINANCE | ATTN: OFFICE OF COUNSEL, BUILING 9, W A HARRIMAN CAMPUS, ALBANY, NY, 12227 |
| NEWARK | 33190 COLLECTION CENTER DR, CHICAGO, IL, 60693-0331 |
| NICEVILLE VALPARAISO BAY AREA CHAMBER OF COMMERCE | 1055,.JOHN SIMS PKWY E, NICEVILLE, FL, 32578-2750 |
| NICK MATRANGE LICENSE COMMISSIONER, MOBILE COUNTY | 3925-F MICHAEL BOULEVARD, MOBILE, AL, 36609 |
| NORTH CAROLINA DEPARTMENT OF REVENUE | 501 N WILMINGTON ST, RALEIGH, NC, 27604 |

33

Doc#: US1:11898394v11

| Taxing Authority | Address |
|---|---|
| NORTH CAROLINA DIVISION OF MOTOR VEHICLES | 1100 NEW BERN AVE, RALEIGH, NC, 27697 |
| NORTH CENTRAL MASSACHUSETTS CHAMBER OF | COMMERCE, 860 SOUTH ST, FITCHBURG, MA, 1420 |
| NORTH EAST AREA CHAMBER OF COMMERCE | 44 WEST MAIN ST, NORTH EAST, PA, 16428 |
| NORTH LITTLE ROCK CHAMBER OF COMMERCE | 100 MAIN ST, NORTH LITTLE ROCK, AR, 72119 |
| NORTHEAST JOHNSON CTY CHAMBER OF COMMERCE | 5800 FOXRIDGE DR STE 100, MISSION, KS, 66202 |
| NYC DEPARTMENT OF FINANCE | 345 ADAMS STREET, BROOKLYN, NY, 11201 |
| OAKDALE CHAMBER OF COMMERCE | 590 N YOSEMITE AVE, OAKDALE, CA, 95361-2732 |
| OFFICE OF THE FAYETTE COUNTY SHERIFF | 150 N. LIMESTONE, SUITE 265, LEXINGTON, KY, 40507 |
| OHIO BUREAU OF WORKERS COMPENSATION | 30 W. SPRING ST, COLUMBUS, OH, 43215 |
| OHIO CHAMBER OF COMMERCE | 230 E. TOWN ST., COLUMBUS, OH, 43215 |
| OHIO DEPARTMENT OF COMMERCE | 77 SOUTH HIGH STREET, 23RD FLOOR, COLUMBUS, OH, 43215 |
| OHIO DEPARTMENT TAXATION | 4485 NORTHLAND RIDGE BLVD., COLUMBUS, OH, 43229 |
| OHIO TREASURER OF STATE | 30 E. BROAD STREET - 9TH FLOOR, COLUMBUS, OH, 43215 |
| OKALOOSA COUNTY TAX COLLECTOR | 701 E. JOHN SIMS PARKWAY, NICEVILLE, FL, 32578 |
| OKLAHOMA COUNTY TREASURER | 320 ROBERT S. KERR AVENUE, ROOM 307, OKLAHOMA CITY, OK, 73102 |
| OKLAHOMA TAX COMMISSION | 2501 NORTH LINCOLN BOULEVARD, OKLAHOMA CITY, OK, 73194 |
| ORANGE COUNTY TAX OFFICE | 123 S 6TH STREET, ORANGE, TX, 77630 |
| ORANGE COVE IRRGATION DISTRICT | 1130 PARK BLVD, ORANGE COVE, CA, 93646 |
| OREGON DEPARTMENT OF REVENUE | 955 CENTER STREET NE, SALEM, OR, 97301-2555 |
| OREGON DEPARTMENT OF TRANSPORTATION | 355 CAPITOL STREET NE, MS 11, SALEM, OR, 97301-3871 |
| OSAGE COUNTY COLLECTOR OF REVENUE | 205 E. MAIN STREET, LINN, MO, 65051 |
| OSHKOSH CHAMBERS OF COMMERCE | 120 JACKSON STREET, OSHKOSH, WI, 54901 |
| PA DEPT OF LABOR & INDUSTRY | 651 BOAS STREET, ROOM 1700, HARRISBURG, PA, 17121 |

Doc#: US1:11898394v11

| Taxing Authority | Address |
|---|---|
| PALMERDALE FIRE DISTRICT | 5340 MILES SPRING ROAD, PINSON, AL, 35126 |
| PAOLA CHAMBER OF COMMERCE | 6 W. PEORIA STREET, PAOLA, KS, 66071 |
| PARISH OF EAST BATON ROUGE | 222 ST. LOUIS STREET, BATON ROUGE, LA, 70802 |
| PATSY SCHULTZ | 1317 EUGENE HEIMANN CIRCLE, RICHMOND, TX, 77469-3623 |
| PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD | 1666 K STREET NW, 8TH FLOOR, WASHINGTON, DC, 20006 |
| PENNSYLVANIA DEPARTMENT OF REVENUE | BUREAU OF CORP. TAXES, DEPARTMENT 280703, HARRISBURG, PA, 17128-0703 |
| PEORIA CHAMBER OF COMMERCE | 100 SW WATER ST, PEORIA, IL, 61602-1329 |
| PIMA COUNTY TREASURER | INFO TECH DEPT ATTN: CONTRACT ADMIN, 33 N STONE AVE FL 17, TUCSON, AZ, 85701 |
| POLK COUNTY TREASURER | C/O MARY MALONEY, 111 COURT AVE, DES MOINES, IA, 50309-2298 |
| PONTIAC AREA CHAMBER | 210 NORTH PLUM STREET, PONTIAC, IL, 61764 |
| POTTER COUNTY TAX ASSESSOR | 900 SOUTH POLK, SUITE 106, AMARILLO, TX, 79101 |
| PRATTVILLE AREA CHAMBER OF COMMERCE | 131 N. COURT STREET, PRATTVILLE, AL, 36067 |
| PRIDE LIMITED PARTNERSHIP | 246 COTTAGE STREET, SPRINGFIELD, MA, 01104-3540 |
| PULASKI COUNTY TREASURER | 52 W. MAIN ST. STE 100, PULASKI, VA, 24301 |
| READING SCHOOL DISTRICT | 800 WASHINGTON STREET, READING, PA, 19601 |
| REBECCA A. SCHULZE, TAX COLLECTOR | 150 LEE DRIVE, MARYSVILLE, PA, 17053 |
| REGISTRY OF MOTOR VEHICLES | 1250 ST JAMES AVE, SPRINGFIELD, MA, 01104 |
| RENO SPARKS INDIAN COLONY | 34 RESERVATION RD, RENO, NV, 89502 |
| RICHLAND COUNTY TREASURY | 2020 HAMPTON STREET, COLUMBIA, SC, 29204 |
| RICKY L.MOSES | 120 SOUTH STEWART ST., DERIDDER, LA, 70634 |
| RIPON CHAMBER OF COMMERCE | 929 W. MAIN STREET, RIPON, CA, 95366 |
| ROBERT J. HILLE, OTTAWA COUNTY TREASURER | 315 MADISON ST., ROOM 201, PORT CLINTON, OH, 43452 |
| ROBINSON LICENSE SERVICE | 901 EAST GROVE STREET, SUITE 1-A, BLOOMINGTON, IL, 61701 |

Doc#: US1:11898394v11

| Taxing Authority | Address |
|---|---|
| RUTHERFORD COUNTY TRUSTEE | 1 S PUBLIC SQUARE, MURFREESBORO, TN, 37130 |
| SAINT LANDRY PARISH SHERIFF | 117 NORTH MARKET STREET, OPELOUSAS, LA, 70570 |
| SAINT MARTIN PARISH SHERIFFS OFFICE | 400 SAINT MARTIN STREET, SAINT MARTINVILLE, LA, 70582 |
| SALINE COUNTY COLLECTOR | CHRIS VILLINES, 215 N MAIN ST, BENTON, AR, 72015-3766 |
| SALISBURY TOWNSHIP | LINDA J MINGER - TREASURER, 2900 S PIKE AVE, ALLENTOWN, PA, 18103 |
| SALT LAKE COUNTY ASSESSOR | 2001 SOUTH STATE STREET , N2-600, PO BOX 147421, SALT LAKE CITY, UT, 84114-7421 |
| SALT LAKE COUNTY TREASURER | 2001 S STATE ST STE N1200, SALT LAKE CITY, UT, 84115 |
| SAMPSON COUNTY TAX COLLECTOR | 126 WEST ELIZABETH STREET, CLINTON, NC, 23828 |
| SAN FRANCISCO PORT COMMISSION | PORT OF SAN FRANCISCO, PIER 1, SAN FRANCISCO, CA, 94111 |
| SAN FRANCISCO RECREATION AND PARK DEPT CITY AND COUNTY OF SF | 501 STANYAN STREET, GOLDEN GATE PARK, SAN FRANCISCO, CA, 94117 |
| SAN FRANCISCO TAX COLLECTOR | 1 DR. CARLTON B. GOODLETT PLACE, CITY HALL- ROOM 140, SAN FRANCISCO, CA, 94102 |
| SAN JOAQUIN COUNTY TAX COLLECTOR | 44 NORTH SAN JOAQUIN STREET, FIRST FLOOR, SUITE 150, STOCKTON, CA, 95202 |
| SAN JOAQUIN VALLEY AIR POLLUTION CONTROL DISTRICT | 1990 E GETTYSBURG AVE, FRESNO, CA, 93726-0244 |
| SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION | 4800 ENTERPRISE WAY, MODESTO, CA, 95356-8718 |
| SAN MATEO COUNTY ENVIRONMENTAL HEALTH | 2000 ALAMEDA DE LAS PULGAS, STE . 100, SAN MATEO, CA, 94403 |
| SAN MATEO COUNTY TAX COLLECTOR | 555 COUNTY CENTER, FIRST FLOOR, REDWOOD CITY, CA, 94063 |
| SANTA BARBARA COUNTY-APCD | 260 NORTH SAN ANTONIO ROAD, SUITE A, SANTA BARBARA, CA, 93110-1315 |
| SANTA CLARA COUNTY TAX COLLECTOR | 70 WEST HEDDING ST, EAST WING, 6TH FL, SAN JOSE, CA, 95110-1767 |
| SANTA FE COUNTY TREASURER | 102 GRANT AVE., SANTA FE, NM, 87501-2061 |
| SANTA ROSA COUNTY TAX COLLECTOR | 6495 CAROLINE STREET, SUITE E, MILTON, FL, 32570 |
| SAVANNAH AREA CHAMBER OF COMM. | 101 E. BAY STREET, SAVANNAH, GA, 31401 |

36

| Taxing Authority | Address |
|---|---|
| SC STATE TREASURER | 1200 SENATE STREET, WADE HAMPTON BLDG, SUITE 214, COLUMBIA, SC, 29201 |
| SEBASTIAN COUNTY TAX COLLECTOR | 35 S 6TH, ROOM 112, FORT SMITH, AR, 72902 |
| SECRETARY OF STATE | 148 STATE HOUSE STATION, AUGUSTA, ME, 04333-0148 |
| SECRETARY OF STATE ILLINOIS | 213 STATE CAPITOL, SPRINGFIELD, IL, 62756 |
| SECRETARY OF STATE RALEIGH NC | 2 SOUTH SALISBURY ST, RALEIGH, NC, 27626-0622 |
| SECRETARY OF THE COMMONWEALTH OF MASSACHUSETTS | CORPORATION DIVISION, ONE ASHBURTON PLACE, 17TH FL, BOSTON, MA, 02108 |
| SEVIER COUNTY TRUSTEES OFFICE | 125 COURT AVE RM 212W, SEVIERVILLE, TN, 37862 |
| SHAH DEVELOPMENT LLC | 2265 ROANOKE ST, CHRISTIANBURG, VA, 24073 |
| SHARON HOLLINGSWORTH POTTER C OUNTY TAX ASSESSOR | RANDALL COUNTY TAX ASESSOR, 501 16TH ST. , STE. 200, CANYON, TX, 79015 |
| SHARON HOLLINGSWORTH TAX ASSESSOR/COLLECTOR | 501 16TH ST, CANYON, TX, 79015 |
| SHAWNEE COUNTY TREASURER | 200 SE 7TH ST. ROOM 101, TOPEKA, KS, 66603 |
| SHELBY COUNTY CLERK | ATTN: WAYNE MASHBURN, COUNTY CLERK, VASCO A. SMITH, JR. COUNTY ADMINISTRATION BUILDING, 160 N MAIN STREET, MEMPHIS, TN, 38103 |
| SHELBY COUNTY TRUSTEE | 157 POPLAR AVENUE, SUITE 200, MEMPHIS, TN, 38103 |
| SHENANGO VALLEY CHAMBER OF COMMERCE | 41 CHESTNUT STREET, SHARON, PA, 16146 |
| SHERIFF AND TAX COLLECTOR TONY MANCUSO | 5400 E. BROAD ST., LAKE CHARLES, LA, 70615 |
| SIGN LANGUAGE | 600 E. OAK, FAIRBURY, IL, 61739 |
| SMG-IRVING CONVENTION CENTER | 500 W. LAS COLINAS BLVD, IRVING, TX, 75039 |
| SOLDIER FIELD | 1410 S. MUSEUM CAMPUS DRIVE, CHICAGO, IL, 60605 |
| SOUTH CAROLINA DEPARTMENT OF REVENUE | DEPARTMENT OF REVENUE CORP, COLUMBIA, SC, 29214-0101 |
| SOUTH CAROLINA DEPT OF REVENUE | OFFICE OPERATIONS, COLUMBIA, SC, 29214-0004 |
| SOUTH CAROLINA DEPT. OF REVENUE | SALES TAX RETURN, COLUMBIA, SC, 29214-0101 |

Doc#: US1:11898394v11

| Taxing Authority | Address |
|---|---|
| SOUTH CENTRAL CRIMINAL JUSTICE | 675 STATE ST., NEW HAVEN, CT, 06511 |
| ST BERNARD PARISH | 8201 W JUDGE PEREZ DRIVE, CHALMETTE, LA, 70043 |
| ST. TAMMARY PARISH TAX COLLECTOR | 701 N. COLUMBIA STREET, COVINGTON , LA, 70433 |
| STANISLAUS COUNTY SHERIFFS DEPT | 250 E HACKETT RD, MODESTO, CA, 95358 |
| STANISLAUS COUNTY TREASURER | GORDON B FORD, 1010 10TH ST STE 2500, MODESTO, CA, 95354 |
| STARK COUNTY TREASURER | ALEXANDER A. ZUMBAR, 110 CENTRAL PLAZA, SUITE 250, CANTON, OH, 44702-1141 |
| STARKVILLE-MSU RAPID TRANSIT | 95 BUCKER LANE, MISSISSIPPI STATE, MS, 39762 |
| STATE BOARD OF EQUALIZATION | 900 FRONT ST, SAN FRANCISCO, CA, 94111 |
| STATE COMPTROLLER | COMPTROLLER OF PUBLIC ACCOUNTS, 111 E. 17TH STREET, AUSTIN, TX, 78774-0100 |
| STATE CONTOLLER'S OFFICE - CALIFORNIA | 300 CAPITOL MALL, SUITE 1850, SACRAMENTO, CA, 95814 |
| STATE CORPORATION COMMISSION | TYLER BUILDING, 1300 E. MAIN ST., RICHMOND, VA, 23219 |
| STATE FAIR OF LOUISIANA | 3701 HUDSON ST, SHREVEPORT, LA, 71109 |
| STATE FIRE MARSHAL | 8181 INDEPENDENCE BLVD,, BATON ROUGE, LI, 70806 |
| STATE OF ALABAMA | 50 NORTH RIPLEY STREET , MONTGOMERY , AL, 36104 |
| STATE OF CONNECTICUT DEPT. OF LABOR | 200 FOLLY BROOK BOULEVARD, WETHERSFIELD, CT, 6109 |
| STATE OF CONNECTICUT, DEPT OF MOTOR VEHICLES | 60 STATE STREET, WETHERSFIELD, CT, 6161 |
| STATE OF LOUISIANA | DEPARTMENT OF TREASURY, 900 N. 3RD ST., 3RD FLOOR, STATE CAPITOL, BATON ROUGE, LA, 70802 |
| STATE OF MICHIGAN | MICHIGAN DEPT OF STATE, 7064 CROWNER DRIVE, LANSING, MI, 48980-0001 |
| STATE OF NEVADA DEPARTMENT OF MOTOR VEHICLES | 595 E. PLUMB LANE, RENO, NV, 89502 |
| STATE OF NEW MEXICO | OFFICE OF SECRETARY OF STATE, 325 DON GASPAR STE 300, SANTA FE, NM, 87501 |

Doc#: US1:11898394v11

| Taxing Authority | Address |
|---|---|
| STATE OF NJ-NJ DEPT OF TREASURY DIVISION OF REV | CORPORATE FILING SECTION, 33 WEST STATE STREET, 5TH FLOOR, TRENTON, NJ, 08646-0308 |
| STATE OF RHODE ISLAND | 1 CAPITOL HILL, PROVIDENCE, RI, 02908-5811 |
| STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS | CENTER GENERAL COMPLEX, CRANSTON , RI, 02920 |
| STATE OF TENNESSEE | 500 DEADERICK ST, 10TH FLOOR, NASHVILLE, TN, 37243 |
| STATE OF UTAH | TRUST LAND ADMIN, ATTN GARY BAGLEY, 675 E 500 S STE 500, SALT LAKE CITY, UT, 84102-2818 |
| STATE SECURITY & INVESTIGATION SERVICESINCV | 3 SOUTH LINDEN ST, DUQUESNE, PA, 15110 |
| STEVEN L REED, PROBATE JUDGE | MONTGOMERY COUNTY COURTHOUSE, 101 SOUTH LAWRENCE STREET, MONTGOMERY, AL, 36101-0223 |
| STOREY COUNTY ASSESSOR | 26 S B ST, DRAWER D, VIRGINIA CITY, NV, 89440 |
| SULLIVAN COUNTY EMS | 3193 HWY 126, BLOUNTVILLE, TN, 37617 |
| SULLIVAN COUNTY TRUSTEE | 3411 HIGHWAY 126, SUITE 104, BLOUNTVILLE, TN, 37617 |
| SUMMIT COUNTY TREASURER | 60 N MAIN ST, PO BOX 128, COALVILLE, UT, 84017 |
| SUMMIT TWP TAX COLLECTOR | 1754 TOWNHALL RD W, ERIE, PA, 16509 |
| SWARTZ CREEK AREA CHAMBER OF COMMERCE | 5023 HOLLAND DRIVE, SWARTZ CREEK, MI, 48473 |
| SYLVANIA AREA CHAMBER OF COMMERCE | 5632 N. MAIN STREET, SYLVANIA, OH, 43560 |
| TALX CORPORATION | 4076 PAYSPHERE CIRCLE, CHICAGO, IL, 60674 |
| TARRANT COUNTY TAX OFFICE | 100 E WEATHERFORD STREET, FORT WORTH, TX, 76196 |
| TAX ASSESSOR-COLLECTOR | 1001 PRESTON ST, HOUSTON, TX, 77002 |
| TAX OFFICE | 501 16TH ST, STE 200, CANYON, TX, 79015 |
| TEDDY J.FAUST, JR. | 1705 US HWY 31 S, BAY MINETTE, AL, 36507 |
| TENNESSEE DEPARTMENT OF REVENUE | ANDREW JACKSON STATE OFFICE, BUILDING, 500 DEADRICK ST, NASHVILLE, TN, 37242-0700 |
| TENNESSEE DEPT. OF REVENUE | ANDREW JACKSON STATE OFF BLDG, NASHVILLE, TN, 37242 |
| TERRELL COUNTY TAX COMMISSION | 499 ROUNDTREE DR SW, DAWSON, GA, 39842 |

Doc#: US1:11898394v11

| Taxing Authority | Address |
|---|---|
| TEXAS COMPTROLLER OF PUBLIC ACCOUNTS | LYNDON B JOHNSON STATE OFFICE BUILDING, 111 EAST 17TH STREET, AUSTIN, TX, 78774 |
| THE CHAMBER OF COMMERCE | 603 E MARKET ST, JOHNSON CITY, TN, 37601 |
| THE CITY OF GREEN BAY TREASURER | 100 N JEFFERSON STREET, GREEN BAY, WI, 54301-5026 |
| THE CITY OF MONTGOMERY | 300 WATER STREET, MONTGOMERY, AL, 36104 |
| TOHONO O ODHAM GAMING AUTHORITY | 7350 SOUTH NOGALES HIGHWAY, TUCSON, AZ, 85706 |
| TOOELE COUNTY ASSESSORS OFFICE | 47 S MAIN ST, ROOM # 218, TOOELE, UT, 84074 |
| TOWN CLERK RECEIVER OF TAXES AND ASSESSMENTS | ATTN JACQUELINE A FELSER, 1250 UNION RD, ROOM # 212, WEST SENECA, NY, 14224 |
| TOWN OF CHRISTIANSBURG | ATTN: VALERIE TWEEDIE (DIRECTOR OF FINANCE/TREASURER), 100 EAST MAIN STREET, CHRISTIANSBURG, VA, 24073-3029 |
| TOWN OF DEWITT | ATTN: ANGELA EPOLITO, TAX RECEIVER AND TOWN CLERK, VICTOR J VASTA RECEIVER OF TAXES, 5400 BUTTERNUT DR, EAST SYRACUSE, NY, 13057-8509 |
| TOWN OF GROTON | TAX COLLECTOR, 45 FORT HILL RD, GROTON, CT, 6340 |
| TOWN OF JOHNSTON | TAX COLLECTORS OFFICE, 1385 HARTFORD AVE, JOHNSTON, RI, 2919 |
| TOWN OF MONTPELIER | E 839 LEDVINA ROAD, LUXEMBURG, WI, 54217 |
| TOWN OF MONTVILLE | TAX COLLECTOR, 310 NORWICH NEW LONDON TPKE, UNCASVILLE, CT, 6382 |
| TOWN OF PITTSFIELD-TREASURER | 5920 TOWN HALL, SANDRA HARRIG-TREASURER, PULASKI, WI, 54162-8920 |
| TOWN OF POMPEY | ATTN: ANN CHRISTMAS, TAX COLLECTOR, KAREN M DENNIS TAX COLLECTOR, 8354 RTE 20, MANLIUS, NY, 13104 |
| TOWN OF ROSENDALE | ATTN: ROXANNE TARNOW, CLERK/TREASURER, W11324 ROSE ELD RD, RIPON, WI, 54971 |
| TOWN OF VINLAND TREASURER | 6085 COUNTY ROAD T, OSHKOSH, WI, 54904-9734 |

40

| Taxing Authority | Address |
|---|---|
| TOWN OF WESTERLY | ATTN: CATHERINE BURKE, OFFICE OF TAX COLLECTOR, 45 BROAD ST, WESTERLY, RI, 02891 |
| TOWN OF WILTON | ATTN: TAX COLLECTOR, 238 DANBURY RD, WILTON, CT, 06897 |
| TOWNSHIP OF KOCHVILLE | ATTN: LYLE BREWSTER, TOWNSHIP TREASURER, 5851 MACKINAW RD, SAGINAW, MI, 48604 |
| TRAVIS A HULSEY DIRECTOR | 50 N. RIPLEY STREET, MONTGOMERY, AL, 36104 |
| TREASURER CITY OF DETROIT | FINANCE DEPARTMENT/INCOME TAX DIVISION, COLEMAN A. YOUNG MUNICIPAL CENTER, 2 WOODWARD AVE, SUITE 130, DETROIT, MI, 48226 |
| TREASURER OF LUCAS COUNTY | ONE GOVERNMENT CENTER # 500, TOLEDO, OH, 43604-2253 |
| TREASURER TOWN OF WILTON | 238 DANBURY RD. , ATTN: TAX COLLECTOR, WILTON, CT, 6897 |
| TREASURER-TAX COLLECTOR | ATTN: HARRY E. HAGEN, 105 E. ANAPAMU ST. ROOM 109, SANTA BARBARA, CA, 93101 |
| TRUSTEE WASHINGTON COUNTY | 100 E. MAIN ST., JONESBOROUGH , TN, 37659 |
| TUOLUMME COUNTY | ATTN: SHELLEY PIECH, 2 S. GREEN ST. , SONORA , CA, 95370 |
| TURLOCK CHAMBER OF COMMERCE | 115 S. GOLDEN STATE BLVD, TURLOCK, CA, 95380 |
| UNITED STATES TREASURY | ATTN: JSP, HOFFMAN BLDG II, RM 6N53, 9301 CHAPEK ROAD, FORT BELVOIR, VA, 22060-5605 |
| URBANDALE CHAMBER OF COMMERCE | 2830 100TH ST. , SUITE 110, URBANDALE, IA, 50322 |
| USDA FOREST SERVICE | FOREST SERVICE-NATL COMM USE, 2900 NW STEWART PKWY, ROSEBURG, OR, 97471 |
| UTAH COUNTY TREASURER | ATTN: KIM JACKSON, TREASURER, 100 E CENTER STE 1200, PROVO, UT, 84606-3159 |
| UTAH STATE TAX COMMISSION | 210 N 1950 W, SALT LAKE CITY, UT, 84134-0180 |
| VENTURA COUNTY TAX COLLECTOR | 800 SOUTH VICTORIA AVENUE, VENTURA, CA, 93009-1290 |
| VERGENNES TOWNSHIP | 10381 BAILEY DR NE, LOWELL, MI, 49331 |
| VERMONT DEPARTMENT OF TAXES | COMMISSIONER KAJ SAMSON, 133 STATE STREET, MONTPELIER, VT, 05633 |

41

| Taxing Authority | Address |
|---|---|
| VILLAGE OF ASHWAUBENON | ATTN: PATRICK MOYNIHAN JR., 2155 HOLMGREN WAY, ASHWAUBENON, WI, 54304-4605 |
| VILLAGE OF BALDWINSVILLE | ATTN: ANNA CUSTER, 16 W GENESEE ST, BALDWINSVILLE, NY, 13027 |
| VIRGINIA DEPT OF TAXATION | 3610 W BROAD ST, RICHMOND, VA, 23230-4902 |
| WALTON CO TAX COMMISSIONER | 303 S HAMMOND DR STE 100, MONROE, GA, 30655 |
| WASHINGTON COUNTY CLERK | ATTN: KATHY STOREY, CLERK, 100 E. MAIN ST., JONESBOROUGH, TN, 37659 |
| WASHINGTON COUNTY TAX COLLECTOR | 280 N. COLLEGE, SUITE 202, FAYETTEVILLE, AR, 72701 |
| WASHOE COUNTY | C/O ALARM TRACKING AND BILLING, PO BOX 26364, COLORADO SPRINGS, CO, 80936 |
| WASHOE COUNTY TREASURER | ATTN: TAMMI DAVIS, 1001 E. 9TH ST, ROOM D140, RENO , NV, 89512-2845 |
| WAYNE A MELANCON | 500 NE COURT CR (COURTHOUSE, 2ND FL), CROWLEY, LA, 70527-1329 |
| WAYNE COUNTY TREASURER | ATTN: ERIC R. SABREE, 400 MONROE, GREEKTOWN, MI, 48226 |
| WEST BATON ROUGE TAX COLLECTOR | DEPARTMENT OF REVENUE & TAXATION, 883 SEVENTH STREET, PORT ALLEN, LA, 70767 |
| WESTERLY FIRE DISTRICT | 180 BEACH STREET, WESTERLY, RI, 2891 |
| WICHITA COUNTY | ATTN: TOMMY SMYTH, TAX ASSESOR COLLECTOR, 600 SCOTT AVE, SUITE 103, WICHITA FALLS, TX, 76301 |
| WILBARGER COUNTY | 1700 WILBARGER ST. RM 17, VERNON, TX, 76384 |
| WILL COUNTY COLLECTOR | 302 NORTH CHICAGO ST., JOLIET, IL, 60432-4059 |
| WILLIAM MORISON TRUSTEE | 905 GIDDINGS AVE, GRAND RAPIDS, MI, 49506 |
| WILLIAMSON COUNTY TRUSTEE | ATTN: KAREN PARIS, TRUSTEE, 1320 WEST MAIN ST., SUITE 203, FRANKLIN, TN, 37064 |
| WILLY J MARTIN JR | 5800 LOUISIANA HIGHWAY 44, CONVENT, LA, 70723 |
| WISCONSIN DEPARTMENT OF REVENUE | 2135 RIMROCK ROAD, MADISON, WI, 53713 |
| WISCONSIN DEPT. OF REVENUE | REAL ESTATE TRANSFER AUDITS, DRAWER #387, MILWAUKEE, WI, 53293-0387 |

42

Doc#: US1:11898394v11

| Taxing Authority | Address |
|---|---|
| WISCONSIN DEPT. OF TRANSPORTATION | CENTRAL OFFICE, HILL FARMS STATE TRANSPORTATION BUILDING, 4802 SHEBOYGAN AVENUE, MADISON, WI, 53705 |
| WRIGHT, RON | TARRANT COUNTY TAX ASSESSOR - COL., 100 W. WEATHERFORD, FT. WORTH, TX, 76196-0001 |
| WYTHEVILLE-WYTHE-BLAND CHAMBER OF COMMERCE | 150 EAST MONROE STREET, WYTHEVILLE, VA, 24382 |
| YOUNGSTOWN/WARREN REGIONAL CHAMBER | 11 CENTRAL SQUARE, SUITE 1600, YOUNGSTOWN, OH, 44503-1592 |
| ZEELAND TOWNSHIP | 6582 BRYON ROAD, ZEELAND, MI, 49464 |

43

Doc#: US1:11898394v11

**EXHIBIT D**

**Identities of the Members of the New Cumulus Board and
Officers of the Reorganized Debtors**

## Exhibit D

### Identities of the Members of the New Cumulus Board and
### Officers of the Reorganized Debtors

**List of Members of the New Cumulus Board and Nature of Compensation**

***Mary G. Berner*** – Ms. Berner is the President and CEO of Cumulus Media, Inc. Prior to being appointed CEO, Ms. Berner served as President and CEO of MPA – The Association of Magazine Media.  From 2007 to 2011, she served as CEO of Reader's Digest Association.  Before that, she led Fairchild Publications, Inc., first as President and CEO, and then as President of Fairchild and as an officer of Condé Nast.  She has also held leadership roles at Glamour, TV Guide, W, Women's Wear Daily, Every Day with Rachael Ray and Allrecipes.com.  Ms. Berner has served on numerous industry and not-for-profit boards.

***Andy Hobson*** – Mr. Hobson is a Partner at Innovatus Capital Partners, LLC. Prior to Innovatus, Mr. Hobson was a senior financial executive at Univision for over twenty years, ultimately becoming CFO in 2005. As the CFO, he was responsible for duties such as mergers and acquisitions, investments, debt and equity capital market transactions, research analyst and investor relations, financial planning and budgeting, treasury and capital allocation.

***David Baum*** –  Mr. Baum is a private investor and currently serves as a Special Advisor to The Golf Channel. Mr. Baum had served as President of Revolution Golf prior to its sale to The Golf Channel/NBC Sports Group in July of 2017. Mr. Baum is also a former Partner of Goldman, Sachs & Co., where he led the firm's M&A department in the Americas until 2003. Mr. Baum is a director of The Marcus Corporation, serving on Audit and Corporate Governance and Nominating Committees; and Happify, Inc, serving on the Finance Committee.

***Matthew C. Blank*** – Mr. Blank currently serves as an Advisor to Showtime Networks Inc. He previously served as the Chairman for Showtime Networks. Prior to serving as Chairman, Mr. Blank served as the CEO of Showtime Networks for twenty years, where he orchestrated the complete transition of Showtime from a second-tier brand to a top tier entertainment destination. Mr. Blank also served as a director on Geeknet's board prior to its sale to GameStop in 2015.

***Thomas H. Castro*** – Mr. Castro is the Founder and CEO of El Dorado Capital. Mr. Castro served as a director of Time Warner Cable for ten years until its recent sale to John Malone-backed Charter Communications. Mr. Castro serves on the boards of: the Texas Charter Schools Association (Chairman) in Austin; Professor Michael Porter's Institute for a Competitive Inner City in Boston; Teach for America (National) in New York City; and, Spelman College in Atlanta.

2

*Joan Hogan Gillman* – Ms. Gillman currently serves as an independent director of Transit Wireless; Interdigital Inc., serving on Audit and Finance Committees; Airgain, Inc., serving on Audit and Nominations Committees; non-executive director of Centrica PLC, serving on Nominations and Risk Committees. Ms. Gillman previously served for ten years as Executive Vice President at Time Warner Cable and COO and President of Time Warner Cable Media. Her earlier executive roles put her in the forefront of growth and innovation in new digital and platform business models.

*Brian Kushner* – Mr. Kushner is currently a Senior Managing Director at FTI Consulting and leads the Private Capital Advisory Services practice. Mr. Kushner co-leads both the Technology practice and the Aerospace and Defense practice. Mr. Kushner currently serves as a non-executive director of: Luxfer Holdings, PLC, chair of Remuneration Committee and member of the Audit Committee; Mudrick Capital Acquisition Corporation, chair of the Audit Committee; Dex Media, chair of the Audit Committee; and Zodiac Interactive, a One Equity Partners portfolio company, member of the Audit Committee and Governance Committee.

The above listed individuals will be members of the New Cumulus Board.  On and after the Effective Date, the future selection of board members and director compensation will be determined in accordance with the New Corporate Governance Documents.

### List of Officers of the Reorganized Debtors and Nature of Compensation

The existing officers of the Debtors as of the Petition Date shall remain in their current capacities as officers of the Reorganized Debtors on and after the Effective Date, subject to the ordinary rights and powers of the New Cumulus Board to remove or replace such officers in accordance with the New Corporate Governance Documents and any applicable employment agreements. The nature of compensation for such officers shall continue in such form as existing immediately prior to the Effective Date, except with respect to such officers' participation in the Management Incentive Plan that will be adopted by the New Cumulus Board as of the Effective Date.

# EXHIBIT E

## Description of Transaction Steps

**Description of Transaction Steps**

Pursuant to the First Amended Joint Plan of Reorganization of Cumulus Media Inc. ("Cumulus") and its Debtor Affiliates pursuant to Chapter 11 of the Bankruptcy Code (as amended, modified or supplemented from time to time, the "Plan"),[1] Cumulus and certain of its Affiliates intend to implement the following transactions (the "Transaction Steps") prior to or on the Effective Date.

This Description of Transaction Steps is intended only as a summary of the Transaction Steps and should be read in conjunction with the Plan. To the extent there is any inconsistency between this Description of Transaction Steps and the Plan, the Plan shall govern.

The Transaction Steps will be effectuated as follows:

**Prior to the Effective Date the following transactions will occur in the following order (unless otherwise indicated)**:

1. *Formation of Newco, Intermediate Co. and New Holdings*

   (a) A duly authorized representative of the holders of the Credit Agreement Claims (the "Incorporator") will form a new Delaware entity ("Newco") and be admitted as Newco's sole equityholder by making a nominal contribution in cash to Newco in exchange for equity in Newco;

   (b) following the formation of Newco, Newco will form a new wholly-owned Delaware entity ("Intermediate Co.") and be admitted as Intermediate Co.'s sole equityholder by contributing equity (which may consist of various classes of equity and warrants, if applicable) in Newco (the "New Common Stock") to Intermediate Co. in exchange for equity in Intermediate Co.; and

   (c) following the formation of Intermediate Co., Intermediate Co. will form a new wholly-owned Delaware entity ("New Holdings") and be admitted as New Holdings' sole equityholder by contributing the New Common Stock to New Holdings in exchange for equity in New Holdings.

2. *Corporate Conversions*

   If so determined by the Debtors in consultation with the Term Lender Group, Cumulus will cause Cumulus Media Holdings, Inc., a Delaware corporation ("Cumulus Holdings") to take, or cause to be taken, all necessary corporate action to convert one or more of the following direct or indirect wholly-owned subsidiaries of Cumulus Holdings into limited liability companies by the filing of one or more certificates of conversion

---

[1]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan.

(or their equivalents) in the applicable jurisdictions: (i) Broadcast Software International Inc., a Nevada corporation (including any successors thereto, "BSI"), (ii) Cumulus Intermediate Holdings Inc., a Delaware corporation (including any successors thereto, "Cumulus Intermediate"), (iii) Cumulus Network Holdings Inc., a Delaware corporation, (iv) Cumulus Radio Corporation, a Nevada corporation, (v) Westwood One, Inc., a Delaware corporation, (vi) Westwood One Radio Networks, Inc., a Delaware corporation, (vii) Catalyst Media, Inc. a Delaware corporation, (viii) CMP Susquehanna Radio Holdings Corp., a Delaware corporation, (ix) CMP Susquehanna Corp., a Delaware corporation, (x) Susquehanna Pfaltzgraff Co., a Delaware corporation, (xi) CMP KC Corp., a Delaware corporation, (xii) Susquehanna Media Corp., a Delaware corporation, (xiii) Susquehanna Radio Corp., a Pennsylvania corporation, (xiv) KLIF Broadcasting, Inc., a Nevada corporation, (xv) Radio Metroplex, Inc., a Nevada corporation, (xvi) KLIF Lico, Inc., a Nevada corporation and (xvii) KPLX Lico, Inc., a Nevada corporation (collectively, the "Debtor Subsidiaries").[2]

**On the Effective Date, the following transactions will occur in the following order (unless otherwise indicated)**:

3. *New Holdings Acquires Cumulus Media Holdings, Inc.'s Assets*

(a) Cumulus Holdings will transfer to New Holdings all of its assets (including 100% of the equity interests held by Cumulus Holdings in BSI[3] and 100% of the equity interests held by Cumulus Holdings in Cumulus Intermediate[4]) in exchange for the consideration set forth in paragraph 3(b), below.

(b) As consideration for the transfer of assets by Cumulus Holdings contemplated by paragraph 3(a), above, New Holdings will transfer to Cumulus Holdings (x) the New Common Stock and (y) $1,300,000,000 in principal amount of debt issued pursuant to the First Lien Exit Facility. Simultaneously therewith, the Incorporator's equity in Newco will be cancelled for no consideration.

---

[2]   If so determined by the Debtors in consolidation with the Term Lender Group, any of the Debtor Subsidiaries which are not organized under the laws of the State of Delaware may be converted into a Delaware entity.

[3]   If the transactions set forth in paragraph 2 are consummated, Broadcast Software International Inc. will have been converted into a limited liability company.

[4]   If the transactions set forth in paragraph 2 are consummated, Cumulus Intermediate Holdings Inc. will have been converted into a limited liability company.

2

4. *Transfer of New Common Stock and First Lien Exit Facility to Holders of Allowed Claims*

> The Disbursing Agent will make all distributions required under the Plan, including in respect of the New Common Stock and First Lien Exit Facility.

**Alternative Transaction**

If so determined by the Debtors in consultation with the Term Lender Group, as an alternative to the transactions contemplated by paragraphs 1 through 4 above:

(a) Cumulus will effectuate, or cause to be effectuated, the conversions contemplated by paragraph 2 above; and

(b) following the conversions contemplated by the foregoing clause (a), (i) Cumulus will contribute Interests (which may consist of various classes of equity and warrants, if applicable) in Reorganized Cumulus to Cumulus Holdings; (ii) the Disbursing Agent will make all distributions required under the Plan; and (iii) all other Interests in Cumulus will be cancelled.

**Additional Considerations**

In addition to the other transactions contemplated by this Description of Transaction Steps, Cumulus, Cumulus Holdings and Newco (if applicable) may (a) cause one or more Debtor Subsidiaries to file elections under Treasury Regulations section 301.7701-3 to change such Debtor Subsidiaries' U.S. federal income tax classification (and any analogous election under state or local tax law) and/or (b) make a joint election under section 338(h)(10) of the Tax Code with respect to one or more of the Debtor Subsidiaries (and any analogous election under state or local tax law). If, after the Effective Dave, Newco determines in its sole discretion to make, to cause a Debtor Subsidiary to make or to request that Cumulus or Cumulus Holdings make one or more elections described in the previous sentence, Cumulus and Cumulus Holdings shall cooperate with Newco and shall take any action required to make such election(s). To the extent applicable, Cumulus and Newco will file tax returns consistent with a purchase price allocation prepared by Newco.

3

## **EXHIBIT F**

### **Reorganized Debtors' Management Incentive Plan**

This <u>Exhibit F</u> includes the following documents for the Reorganized Debtors' Management Incentive Plan:

- <u>Exhibit F-1</u> Long-Term Incentive Plan

- <u>Exhibit F-2</u> Form of Restricted Stock Unit Agreement for Senior Executives

- <u>Exhibit F-3</u> Form of Restricted Stock Unit Agreement for Employee

- <u>Exhibit F-4</u> Form of Option Agreement for Senior Executives

- <u>Exhibit F-5</u> Form of Option Agreement for Employees

**<u>Exhibit F-1</u>**
**Long-Term Incentive Plan**

**CUMULUS MEDIA INC.**

**LONG-TERM INCENTIVE PLAN**

US:162101898v6

**CUMULUS MEDIA INC.**
**LONG-TERM INCENTIVE PLAN**

## I.        PURPOSE

The Cumulus Media Inc. Long-Term Incentive Plan is adopted effective _____, 2018.  The Plan is designed to attract, retain and motivate select Eligible Employees and Key Non-Employees of the Company and its Affiliates, and to reward them for making major contributions to the success of the Company and its Affiliates.  These objectives are accomplished by making long-term incentive awards under the Plan that will offer Participants an opportunity to have a greater proprietary interest in, and closer identity with, the Company and its Affiliates and their financial success.

The Awards may consist of:

1.  Incentive Options;

2.  Nonstatutory Options;

3.  Restricted Stock;

4.  Rights;

5.  Dividend Equivalents;

6.  Other Stock-Based Awards;

7.  Performance Awards; or

8.  Cash Awards;

or any combination of the foregoing, as the Committee may determine.

## II.        DEFINITIONS

**A.  Affiliate** means any individual, corporation, partnership, association, limited liability company, joint-stock company, trust, unincorporated association or other entity (other than the Company) that, for purposes of Section 424 of the Code, is a parent or subsidiary of the Company, direct or indirect.

**B.  Award** means the grant or sale to any Eligible Employee or Key Non-Employee of any form of Option, Restricted Stock, Right, Dividend Equivalent, Other Stock-Based Award, Performance Award, or Cash Award, whether granted singly, in combination, or in tandem, and pursuant to such terms, conditions, and limitations as the Committee may establish in order to fulfill the objectives of the Plan.

**C.  Award Agreement** means a written agreement entered into between the Company and a Participant under which an Award is granted and that sets forth the terms, conditions, and limitations applicable to the Award.

**D. Board** means the Board of Directors of the Company.

**E. Cash Award** means an Award of cash, subject to the requirements of Article XIII and such other restrictions not inconsistent with the Plan that the Committee deems appropriate or desirable.

**F. Cause** has the meaning set forth in Paragraph F of Article VII of this Plan.

**G. Code** means the Internal Revenue Code of 1986, as amended from time to time, or any successor statute thereto. References to any provision of the Code shall be deemed to include regulations thereunder and successor provisions and regulations thereto.

**H. Committee** means the committee to which the Board delegates the power to act under or pursuant to the provisions of the Plan, or the Board if no committee is selected. If the Board delegates powers to a committee, and if the Company is or becomes subject to Section 16 of the Exchange Act, then, if necessary for compliance therewith, such committee shall consist of not fewer than two (2) members of the Board, each member of which must be a "non-employee director," within the meaning of the applicable rules promulgated pursuant to the Exchange Act. If the Company is or becomes subject to Section 16 of the Exchange Act, no member of the Committee shall receive any Award pursuant to the Plan while serving on the Committee, unless the Board determines that the grant of such an Award satisfies the then-current Rule 16b-3 requirements under the Exchange Act.

**I. Common Stock** means the common stock of the Company.

**J. Company** means Cumulus Media Inc., a Delaware corporation, and includes any successor or assignee entity or entities into which the Company may be merged, changed, or consolidated; any entity for whose securities the securities of the Company shall be exchanged; and any assignee of or successor to substantially all of the assets of the Company.

**K. Disability or Disabled** means a permanent and total disability as defined in Section 22(e)(3) of the Code.

**L. Dividend Equivalent** means an Award subject to the requirements of Article X.

**M. Eligible Employee** means an employee of the Company or of an Affiliate who is designated by the Committee as being eligible to be granted one or more Awards under the Plan.

**N. Exchange Act** means the Securities Exchange Act of 1934, as amended from time to time, or any successor statute thereto. References to any provision of the Exchange Act shall be deemed to include rules promulgated thereunder and successor provisions and rules thereto.

**O. Fair Market Value** means, if the Shares are listed on any national securities exchange or quoted on the National Association of Securities Dealers Automated Quotation System ("**NASDAQ**"), the closing sales price, if any, on the largest such exchange or on NASDAQ, as applicable, on the valuation date, or an average of trading days not to exceed thirty (30) days following the valuation date at the Committee's discretion, or, if none, on the most recent trade date immediately prior to the valuation date provided that such trade date is no more than thirty

2

(30) days prior to the valuation date.  If the Shares are not then either listed on any such exchange or quoted on NASDAQ, or there has been no trade date within such thirty (30) day period, the fair market value shall be the mean between the average of the "Bid" and the average of the "Ask" prices, if any, as reported by the Electronic Quotation Service or OTC Markets Group, Inc. (or such equivalent reporting service), for the valuation date, or, if none, for the most recent trade date immediately prior to the valuation date provided that such trade date is no more than thirty (30) days prior to the valuation date.  If the fair market value cannot be determined under the preceding two sentences, it shall be determined in good faith by the Committee.

      **P.  Incentive Option** means an Option that, when granted, is intended to be an "incentive stock option," as defined in Section 422 of the Code.

      **Q.  Key Non-Employee** means a Non-Employee Board Member, consultant, advisor or independent contractor of the Company or of an Affiliate who is designated by the Committee as being eligible to be granted one or more Awards under the Plan.

      **R.  Non-Employee Board Member** means a director of the Company who is not an employee of the Company or any of its Affiliates.  For purposes of the Plan, a Non-Employee Board Member shall be deemed to include the employer or other designee of such Non-Employee Board Member, if the Non-Employee Board Member is required, as a condition of his or her employment, to provide that any Award granted hereunder be made to the employer or other designee.

      **S.  Nonstatutory Option** means an Option that, when granted, is not intended to be an "incentive stock option," as defined in Section 422 of the Code, or that subsequently fails to comply with the requirements of Section 422 of the Code.

      **T.  Option** means a right or option to purchase Common Stock, including Restricted Stock if the Committee so determines.

      **U.  Other Stock-Based Award** means any other Award that is valued in whole or in part based upon the Fair Market Value of Common Stock.

      **V.  Participant** means an Eligible Employee or Key Non-Employee to whom one or more Awards are granted under the Plan.

      **W. Performance Award** means an Award subject to the requirements of Article XII, and such performance conditions as the Committee deems appropriate or desirable.

      **X.  Plan** means the Cumulus Media Inc. Long-Term Incentive Plan, as amended from time to time.

      **Y.  Restricted Stock** means an Award made in Common Stock or denominated in units of Common Stock and delivered under the Plan, subject to the requirements of Article VIII, such other restrictions not inconsistent with the Plan that the Committee deems appropriate or desirable, and as awarded in accordance with the terms of the Plan.

**Z. Right** means a stock appreciation right delivered under the Plan, subject to the requirements of Article IX and as awarded in accordance with the terms of the Plan.

**AA.     Shares** means the following shares of the capital stock of the Company as to which Options or Restricted Stock have been or may be granted under the Plan and upon which Rights, units of Restricted Stock, Dividend Equivalents, or Other Stock-Based Awards may be based: treasury or authorized but unissued Common Stock of the Company, or any shares of capital stock or securities into which the Shares are changed or for which they are exchanged within the provisions of Article XVIII of the Plan.

## III.     SHARES SUBJECT TO THE PLAN

The aggregate number of Shares as to which Awards may be granted from time to time shall be _____ (_____) Shares (subject to adjustment for stock splits, stock dividends, and other adjustments described in Article XVIII hereof). The aggregate number of Shares as to which Incentive Options may be granted from time to time shall be _____ (___) Shares (subject to adjustment for stock splits, stock dividends and other adjustments described in Article XVIII hereof).

Unless otherwise approved by the Company's stockholders, the aggregate number of Shares as to which Awards may be granted in any one calendar year to any Non-Employee Board Member shall not exceed _____ (_____) Shares (subject to adjustment for stock splits, stock dividends, and other adjustments described in Article XVIII hereof).

From time to time, the Committee and/or appropriate officers of the Company shall take whatever actions are necessary to file required documents with governmental authorities and/or stock exchanges so as to make Shares available for issuance pursuant to the Plan. Shares subject to Awards that are forfeited, are terminated (or surrendered voluntarily without payment) or expire unexercised shall immediately become available for Awards. In addition, if the exercise price of any Award is satisfied by tendering Shares to the Company (by actual delivery or attestation), only the number of Shares issued net of the Shares tendered shall be deemed delivered for purposes of determining the maximum number of Shares available for Awards. Awards payable in cash shall not reduce the number of Shares available for Awards under the Plan.

## IV.     ADMINISTRATION OF THE PLAN

The Plan shall be administered by the Committee. A majority of the Committee shall constitute a quorum at any meeting thereof (including by telephone conference) and the acts of a majority of the members present, or acts approved in writing by a majority of the entire Committee without a meeting, shall be the acts of the Committee for purposes of this Plan. The Committee may authorize one or more of its members or an officer of the Company to execute and deliver documents on behalf of the Committee. A member of the Committee shall not exercise any discretion respecting Awards to himself or herself under the Plan, other than as applies to the Participants or a class of similarly situated Participants as a whole. The Board shall have the authority to remove or replace any member of, and to fill any vacancy on, the Committee upon notice to the Committee and the affected member, if any. Any member of the Committee may resign upon notice to the Board. The Committee may allocate among one or more of its members,

4

or may delegate to one or more of its agents, such duties and responsibilities as it determines. Subject to the provisions of the Plan, the Committee is authorized to:

**A.** Interpret the provisions of the Plan and any Award or Award Agreement, and make all rules and determinations that it deems necessary or advisable to the administration of the Plan;

**B.** Determine which employees of the Company or an Affiliate shall be designated as Eligible Employees and which of the Eligible Employees shall be granted Awards;

**C.** Determine the Key Non-Employees to whom Awards, other than Incentive Options for which Key Non-Employees shall not be eligible, shall be granted;

**D.** Determine whether an Option to be granted shall be an Incentive Option or Nonstatutory Option;

**E.** Determine the number of Shares for which an Option, Restricted Stock or Other Stock-Based Award shall be granted;

**F.** Determine the number of Rights, Cash Awards or Performance Awards to be granted;

**G.** Provide for the acceleration of the right to exercise or vest into any Award; and

**H.** Specify the terms, conditions, and limitations upon which Awards may be granted;

provided, however, that with respect to Incentive Options, all such interpretations, rules, determinations, terms, and conditions shall be made and prescribed in the context of preserving the tax status of the Incentive Options as "incentive stock options" within the meaning of Section 422 of the Code. Notwithstanding anything in this Plan to the contrary, no Award shall vest or become exercisable over a period of less than one (1) year unless otherwise set forth in an Award Agreement.

If permitted by applicable law, and in accordance with any such law, the Committee may delegate to the chief executive officer and to other senior officers of the Company or its Affiliates its duties under the Plan pursuant to such conditions or limitations as the Committee may establish, except that only the Committee may select, and grant Awards to, Participants who are subject to Section 16 of the Exchange Act. Any such delegations by the Committee shall be made by a majority of its members. No member of the Committee shall be liable for any action or determination made in good faith with respect to the Plan or any Award.

The Committee shall have the authority to provide in any Award Agreement for the conditions and circumstances under which Awards shall be forfeited.

Any determination made by the Committee pursuant to the provisions of the Plan shall be made in its sole discretion, and in the case of any determination relating to an Award, may be made at the time of the grant of the Award or, unless in contravention of any express term of the Plan or any Award Agreement, at any time thereafter. All decisions made by the Committee pursuant to the provisions of the Plan shall be final and binding on all persons, including the Company and the Participants. No determination shall be subject to de novo review if challenged in court.

5

## V.        ELIGIBILITY FOR PARTICIPATION

Awards may be granted under this Plan only to Eligible Employees and Key Non-Employees of the Company or its Affiliates.  The foregoing notwithstanding, each Participant receiving an Incentive Option must be an Eligible Employee of the Company or of an Affiliate at the time the Incentive Option is granted.

The Committee may, at any time and from time to time, grant one or more Awards to one or more Eligible Employees or Key Non-Employees and may designate the number of Shares, if applicable, to be subject to each Award so granted; provided, however, that no Incentive Option shall be granted after the expiration of ten (10) years from the earlier of the date of the adoption of the Plan by the Company and the approval of the Plan by the stockholders of the Company, and provided further that the Fair Market Value of the Shares (determined at the time the Option is granted) as to which Incentive Options are exercisable for the first time by any Eligible Employee during any single calendar year (under the Plan and under any other incentive stock option plan of the Company or an Affiliate) shall not exceed One Hundred Thousand Dollars ($100,000).  To the extent that the Fair Market Value of such Shares exceeds One Hundred Thousand Dollars ($100,000), the Shares subject to Option in excess of One Hundred Thousand Dollars ($100,000) shall, without further action by the Committee, automatically be converted to Nonstatutory Options.

Notwithstanding any of the foregoing provisions, (i) the Committee may authorize the grant of an Award to a person not then in the employ of, or engaged by, the Company or of an Affiliate, conditioned upon such person's becoming eligible to be granted an Award at or prior to the execution of the Award Agreement evidencing the actual grant of such Award; and (ii) if the Company is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, then the Committee may authorize the grant of an Award under this Plan to a person who resides in the State of California only if such grant meets the requirements of Section 25102(o) of the California Securities Law, to the extent applicable.

## VI.       AWARDS UNDER THIS PLAN

As the Committee may determine, the following types of Awards may be granted under the Plan on a stand-alone, combination, or tandem basis.  The Committee may from time to time grant any such Award for such consideration as the Committee deems appropriate (which amount may be less than the Fair Market Value of the Common Stock on the date of the Award), and subject to such restrictions and conditions and other terms as the Committee may specify in the Award Agreement at the time the Award is granted (including, but not limited to, continuous service with the Company or its Affiliates, achievement of specific business objectives, increases in specified indices, attainment of growth rates, and/or other measurements of Company or Affiliate performance), and subject further to the general provisions of the Plan and the specific rules set forth herein.

### A.  Incentive Option

An Incentive Option is an Award in the form of an Option that complies with the requirements of Section 422 of the Code.

6

**B.  Nonstatutory Option**

A Nonstatutory Option is an Award in the form of an Option that shall not be intended to, or has otherwise failed to, comply with the requirements of Section 422 of the Code.

**C.  Restricted Stock**

Restricted Stock is an Award in Shares of Common Stock or denominated in units of Common Stock, subject to future service and/or such other restrictions and conditions as may be established by the Committee, and as set forth in the Award Agreement, including but not limited to continuous service with the Company or its Affiliates, achievement of specific business objectives, increases in specified indices, attainment of growth rates, and/or other measurements of Company or Affiliate performance.

**D.  Stock Appreciation Right**

A stock appreciation right is an Award in the form of a Right to receive the excess of the Fair Market Value of a Share on the date the Right is exercised over the Fair Market Value of a Share on the date the Right was granted.

**E.  Dividend Equivalents**

A Dividend Equivalent is an Award in the form of, and based upon the value of, dividends on Shares.

**F.  Other Stock-Based Awards**

An Other Stock-Based Award is an Award that is valued in whole or in part by reference to, or is otherwise based upon, the Fair Market Value of Shares.

**G.  Performance Awards**

A Performance Award is an Award that is subject to performance conditions specified by the Committee, including, but not limited to, continuous service with the Company and/or its Affiliates, achievement of specific business objectives, increases in specified indices, attainment of growth rates, and/or other measurements of Company or Affiliate performance.

**H.  Cash Awards**

A Cash Award is an Award denominated in cash, with the eventual payment subject to future service and/or such other restrictions and conditions as may be established by the Committee, and as set forth in the Award Agreement.

Each Award under the Plan shall be evidenced by an Award Agreement, duly executed on behalf of the Company and by the Participant to whom such Award is granted.  Delivery of an Award Agreement to each Participant shall constitute an agreement between the Company and the Participant as to the terms and conditions of the Award.  Except for the setting of the Option price under Paragraph A of Article VII below with respect to Options granted hereunder, no Award shall

7

be granted, and no purported grant of any Award shall be effective, until such Award Agreement shall have been duly executed on behalf of the Company and by the Participant.

**VII.    TERMS AND CONDITIONS OF INCENTIVE OPTIONS AND NONSTATUTORY OPTIONS**

### A.  Option Price

In the case of an Incentive Option granted to a Participant who owns, directly or by reason of the applicable attribution rules, ten percent (10%) or less of the total combined voting power of all classes of stock of the Company, and in the case of a Nonstatutory Option, the Option price per share of the Shares covered by each such Incentive Option or Nonstatutory Option shall be not less than the Fair Market Value of the Shares on the date of the grant of the Option.  In all other cases of Incentive Options, the Option price shall be not less than one hundred ten percent (110%) of the Fair Market Value of the Shares on the date of grant.

### B.  Number of Shares

Each Option shall state the number of Shares to which it pertains.

### C.  Term of Option

Each Incentive Option shall terminate not more than ten (10) years from the date of the grant thereof, or at such earlier time as the Award Agreement may provide, and shall be subject to earlier termination as herein provided, except that if the Option price is required under Paragraph A of this Article VII to be at least one hundred ten percent (110%) of Fair Market Value, each such Incentive Option shall terminate not more than five (5) years from the date of the grant thereof, and shall be subject to earlier termination as herein provided.  The Committee shall determine at the time of grant and set forth in the applicable Award Agreement the time at which a Nonstatutory Option shall terminate.

### D.  Date of Exercise

Upon the authorization of the grant of an Option, the Committee may, subject to the provisions of Paragraph C of this Article VII, prescribe in the applicable Award Agreement the date or dates on which the Option becomes exercisable, and may provide that the Option rights become exercisable in installments over a period of years, and/or upon the attainment of stated goals.  It is expressly understood that Options hereunder shall, unless otherwise provided for in writing by the Committee, be granted in contemplation of, and earned by the Participant through the completion of, future employment or service with the Company.

### E.  Medium of Payment

The Option price shall be payable upon the exercise of the Option, as set forth in Paragraph I.  It shall be payable in such form (as permitted by Section 422 of the Code in the case of Incentive Options) as the Committee shall, either by rules promulgated pursuant to the provisions of Article IV of the Plan, or in the particular Award Agreement, provide.

8

**F. Termination of Employment**

1.   A Participant who ceases to be an employee and Key Non-Employee of the Company or of an Affiliate for any reason other than death, Disability, or termination for Cause, as defined in subparagraph (2) below, may exercise any Option granted to such Participant, to the extent that the right to purchase Shares thereunder has become exercisable by the date of such termination, but only within three (3) months (or such other period of time as the Committee may determine at the time of grant and set forth in the applicable Award Agreement, not to exceed three (3) months in the case of an Incentive Option) after such date, subject to the conditions that (i) no Option shall be exercisable after the expiration of the term of the Option and (ii) unless the Committee otherwise provides, no Option that has not become exercisable by the date of such termination shall at any time thereafter be or become exercisable. A Participant's employment shall not be deemed terminated by reason of a transfer to another employer that is the Company or an Affiliate.

2.   A Participant who ceases to be an employee or Key Non-Employee of the Company or of an Affiliate for Cause shall, upon such termination, cease to have any right to exercise any Option. For purposes of this Plan, "**Cause**" shall be as defined in any employment or other agreement between the Participant and the Company (or an Affiliate) or, if there is no such agreement or definition therein, Cause shall mean (i) a Participant's theft or embezzlement, or attempted theft or embezzlement, of money or property of the Company or of an Affiliate, a Participant's perpetration or attempted perpetration of fraud, or a Participant's participation in a fraud or attempted fraud, on the Company or an Affiliate or a Participant's unauthorized appropriation of, or a Participant's attempt to misappropriate, any tangible or intangible assets or property of the Company or an Affiliate; (ii) a Participant's commission of a felony or any other crime the commission of which results in injury to the Company or an Affiliate; (iii) the Participant's gross negligence or the Participant's willful misconduct in the performance of his or her duties to the Company and its Affiliates, or a willful failure to perform his or her duties (other than due to physical illness or incapacity); or (iv) any material violation of any material restriction to which the Participant is subject from time to time regarding the disclosure or use of confidential information of the Company or an Affiliate, client, customer, prospect, or merger or acquisition target, or regarding competition with the Company or an Affiliate pursuant to any non-competition obligations to which the Participant is subject from time to time. A Participant who ceases to be an employee or Key Non-Employee of the Company or an Affiliate for reasons other than Cause at a time when grounds for Cause exist shall be deemed terminated for Cause for purposes of the Plan. The determination of the Committee as to the existence of Cause shall be conclusive and binding upon the Participant and the Company.

3.   Except as the Committee may otherwise expressly provide or determine (consistent with Section 422 of the Code, if applicable), a Participant who is absent from work with the Company or an Affiliate because of temporary disability (any disability other than a Disability), or who is on leave of absence for any purpose permitted by the Company or by any authoritative interpretation (i.e., regulation, ruling, case law, etc.) of Section 422 of the Code, shall not, during the period of any such absence, be deemed, by virtue of such

9

absence alone, to have terminated his or her employment or relationship with the Company or with an Affiliate.  For purposes of Incentive Options, no leave of absence may exceed ninety (90) days, unless reemployment upon expiration of such leave is guaranteed by statute or contract (or the Committee approves such longer leave of absence, in which event the Incentive Option held by the Participant shall be treated for tax purposes as a Nonstatutory Option on the date that is six (6) months following the first day of such leave).

4.   Paragraph F(1) shall control and fix the rights of a Participant who ceases to be an employee and Key Non-Employee of the Company or of an Affiliate for any reason other than Disability, death, or termination for Cause, and who subsequently becomes Disabled or dies.  Nothing in Paragraphs G and H of this Article VII shall be applicable in any such case except that, in the event of such a subsequent Disability or death within the three (3) month period after the termination of employment or, if earlier, within the originally prescribed term of the Option, the Participant or the Participant's estate or personal representative may exercise the Option permitted by this Paragraph F, in the event of Disability, within twelve (12) months after the date that the Participant ceased to be an employee and Key Non-Employee of the Company or an Affiliate, or, in the event of death, within twelve (12) months after the date of such Participant's death.

### G.  Total and Permanent Disability

A Participant who ceases to be an employee and Key Non-Employee of the Company or of an Affiliate by reason of Disability may exercise any Option granted to such Participant to the extent that the right to purchase Shares thereunder has become exercisable on or before the date such Participant's service ceases.

A Disabled Participant, or his or her estate or personal representative, shall exercise such rights, if at all, only within a period of not more than twelve (12) months (or such longer period as may be set forth in the Participant's Award Agreement) after the date that the Participant's service ceases or, if earlier, within the originally prescribed term of the Option.

### H.  Death

In the event that a Participant to whom an Option has been granted ceases to be an employee and Key Non-Employee of the Company or of an Affiliate by reason of such Participant's death, such Option, to the extent that the right is exercisable but not exercised on the date of death, may be exercised by the Participant's estate or personal representative within twelve (12) months (or such longer period as may be set forth in the Participant's Award Agreement) after the date of death of such Participant or, if earlier, within the originally prescribed term of the Option, notwithstanding that the decedent might have been able to exercise the Option as to some or all of the Shares on a later date if the Participant were alive and had continued to be an employee or Key Non-Employee of the Company or of an Affiliate.

### I.  Exercise of Option and Issuance of Stock

Options shall be exercised by giving written notice to the Company.  Such written notice shall (i) be signed by the person exercising the Option, (ii) state the number of Shares with respect to which the Option is being exercised (the "**Option Shares**"), (iii) contain the warranty required

10

by Paragraph M of this Article VII, if applicable, and (iv) specify a date (other than a Saturday, Sunday or legal holiday) not more than ten (10) days after the date of such written notice, as the date on which the Option Shares will be purchased. Such tender and conveyance shall take place at the principal office of the Company during ordinary business hours, or at such other hour and place agreed upon by the Company and the person or persons exercising the Option. On the date specified in such written notice (which date may be extended by the Company in order to comply with any blackout limitations, or with laws or regulations that require the Company to take any action with respect to the Option Shares prior to the issuance thereof), the Company shall accept payment for the Option Shares in cash, by bank or certified check, by wire transfer, or by such other means as may be approved by the Committee. In the event of any failure to pay for the number of Shares specified in such written notice on the date set forth therein (or on the extended date as above provided), the right to exercise the Option shall terminate with respect to such number of Shares, but shall continue with respect to the remaining Shares covered by the Option and not yet acquired pursuant thereto.

If approved in advance by the Committee, and subject to compliance with the Sarbanes-Oxley Act of 2002 or the requirements of any applicable securities laws, payment in full or in part may also be made (i) by delivering Shares, or by attestation of Shares, that have a total Fair Market Value on the date of such delivery equal to the Option price and provided that accepting such Shares, in the sole discretion of the Committee, shall not result in any adverse accounting consequences to the Company; (ii) by the execution and delivery of a note or other evidence of indebtedness (and any security agreement thereunder) satisfactory to the Committee; (iii) by authorizing the Company to retain Shares that would otherwise be issuable upon exercise of the Option having a total Fair Market Value on the date of delivery equal to the Option price; (iv) by the delivery of cash or the extension of credit by a broker-dealer to whom the Participant has submitted a notice of exercise or otherwise indicated an intent to exercise an Option (in accordance with part 220, Chapter II, Title 12 of the Code of Federal Regulations, a so-called "cashless" exercise); or (v) by any combination of the foregoing.

### J.  Rights as a Stockholder

No Participant to whom an Option has been granted shall have rights as a stockholder with respect to any Shares covered by such Option except as to such Shares that have been registered in the Company's share register in the name of such Participant upon the due exercise of the Option and tender of the full Option price.

### K.  Assignability and Transferability of Option

Unless otherwise permitted by the Code and by Rule 16b-3 of the Exchange Act, if applicable, and approved in advance by the Committee, an Option granted to a Participant shall not be transferable by the Participant and shall be exercisable, during the Participant's lifetime, only by such Participant or, in the event of the Participant's incapacity, his guardian or legal representative. Except as otherwise permitted herein, such Option shall not be assigned, pledged, or hypothecated in any way (whether by operation of law or otherwise) and shall not be subject to execution, attachment, or similar process, and any attempted transfer, assignment, pledge, hypothecation or other disposition of any Option or of any rights granted thereunder contrary to

11

the provisions of this Paragraph K, or the levy of any attachment or similar process upon an Option or such rights, shall be null and void.

### L. Other Provisions

The Award Agreement for an Incentive Option shall contain such limitations and restrictions upon the exercise of the Option as shall be necessary in order that such Option qualifies as an "incentive stock option" within the meaning of Section 422 of the Code.

### M. Purchase for Investment

If Shares to be issued upon exercise of an Option shall not have been effectively registered under the Securities Act of 1933, as now in force or hereafter amended, the Company shall be under no obligation to issue the Shares covered by such exercise unless and until the following conditions have been fulfilled. The person who exercises such Option shall warrant to the Company that, at the time of such exercise, such person is acquiring his or her Option Shares for investment and not with a view to, or for sale in connection with, the distribution of any such Shares, and shall make such other related representations, warranties, acknowledgments, and/or affirmations, if any, as the Committee may require to comply with the requirements of the Securities Act of 1933 or an exemption from registration thereunder. In such event, the person acquiring such Shares shall be bound by the provisions of the following legend (or similar legend) which shall be endorsed upon the certificate(s) (if any) evidencing his or her Option Shares issued pursuant to such exercise.

> "The shares represented by this certificate have been acquired for investment and they may not be sold or otherwise transferred by any person, including a pledgee, in the absence of an effective registration statement for the shares under the Securities Act of 1933 or an opinion of counsel satisfactory to the Company that an exemption from registration is then available."

Without limiting the generality of the foregoing, the Company may delay issuance of the Shares until completion of any action or obtaining any consent that the Company deems necessary under any applicable law (including without limitation state securities or "blue sky" laws).

## VIII.   TERMS AND CONDITIONS OF RESTRICTED STOCK

**A.** If Shares of Restricted Stock are awarded, such Shares cannot be assigned, sold, transferred, pledged, or hypothecated prior to the lapse of the restrictions applicable thereto, and, in no event, absent Committee approval, prior to six (6) months from the date of the Award. Stock certificates issued by the Company with respect to Shares of Restricted Stock shall bear the same or similar legend as set forth in Paragraph M of Article VII.

**B.** Restricted Stock issued to a Participant under the Plan shall be governed by an Award Agreement that shall specify whether Shares of Common Stock are awarded to the Participant, or whether the Award shall be one not of Shares of Common Stock but one denominated in units of Common Stock, any consideration required therefor, and such other provisions as the Committee shall determine.

**C.**  Subject to the provisions of Paragraphs A and D hereof and the restrictions set forth in the related Award Agreement, the Participant receiving an Award of Shares of Restricted Stock shall thereupon be a stockholder with respect to all of such Shares and shall have the rights of a stockholder with respect to such Shares, including the right to vote such Shares and to receive dividends and other distributions made with respect to such Shares.  All Common Stock received by a Participant as the result of any dividend on the Shares of Restricted Stock, or as the result of any stock split, stock distribution, or combination of the Shares affecting Restricted Stock, shall be subject to the restrictions set forth in the related Award Agreement.

**D.**  Shares of Restricted Stock or units of Restricted Stock awarded to a Participant pursuant to the Plan will be forfeited, and any Shares of Restricted Stock or units of Restricted Stock sold to a Participant pursuant to the Plan may, at the Company's option, be repurchased by the Company for an amount equal to the price paid therefor, and in either case, such Shares of Restricted Stock or units of Restricted Stock shall revert to the Company, if the Company so determines in accordance with any condition set forth in the Award Agreement, or, alternatively, if the Participant's employment with the Company or its Affiliates terminates, other than for reasons set forth in Article XIV, prior to the expiration of the forfeiture or restriction provisions set forth in the Award Agreement.

**E.**  The Committee, in its discretion, shall have the power to accelerate the date on which the restrictions contained in the Award Agreement shall lapse with respect to any or all Restricted Stock awarded under the Plan.

**F.**  Any Restricted Stock denominated in units of Common Stock, if not previously forfeited, shall be payable in accordance with Article XV at the time set forth in the Award Agreement.

**G.** The Committee may prescribe in an Award Agreement such other restrictions, conditions, and terms applicable to Restricted Stock issued to a Participant under the Plan that are neither inconsistent with nor prohibited by the Plan, including, without limitation, terms providing for the vesting of the Award.

## IX.    TERMS AND CONDITIONS OF STOCK APPRECIATION RIGHTS

**A.**  Rights may be granted, if at all, either on a stand-alone basis, or in connection with another Award.  At the time of grant of a Right, the Committee shall specify the base price of Common Stock to be used in connection with the calculation described in Paragraph B below, provided that the base price shall not be less than one hundred percent (100%) of the Fair Market Value of a Share of Common Stock on the date of grant, unless approved by the Board.

**B.**  Upon exercise of a Right, which shall, absent Committee approval, be not less than six (6) months from the date of the grant, the Participant shall be entitled to receive in accordance with Article XV, and as soon as practicable after exercise, an amount equal to the excess of the Fair Market Value of one Share of Common Stock on the date of exercise over the base price specified in such Right, multiplied by the number of Shares of Common Stock then subject to the Right, or the portion thereof being exercised.

13

**C.**  Notwithstanding anything herein to the contrary, if the Award granted to a Participant allows him or her to elect to cancel all or any portion of an unexercised Option by exercising an additional or tandem Right, then the Option price per Share of Common Stock shall be used as the base price specified in Paragraph A to determine the value of the Right upon such exercise and, in the event of the exercise of such Right, the Company's obligation with respect to such Option or portion thereof shall be discharged by payment of the Right so exercised.  In the event of such a cancellation, the number of Shares as to which such Option was canceled shall become available for use under the Plan, less the number of Shares, if any, received by the Participant upon such cancellation in accordance with Article XV.

**D.**  A Right may be exercised only by the Participant (or, if applicable under Article XIV, by a legatee or legatees of such Right, or by the Participant's executors, personal representatives, or distributees).

## X.        TERMS AND CONDITIONS OF DIVIDEND EQUIVALENTS

An Award of Dividend Equivalents shall entitle the Participant to receive cash, Shares, other Awards or other property equal in value to dividends paid with respect to a specified number of Shares.  Dividend Equivalents may be awarded on a stand-alone basis or in connection with another Award.  The Committee may provide that Dividend Equivalents shall be paid or distributed when accrued or shall be deemed to have been reinvested in additional Shares, Awards or other investment vehicles, and subject to such restrictions on transferability and risks of forfeiture, as the Committee may specify.

## XI.       TERMS AND CONDITIONS OF OTHER STOCK-BASED AWARDS

Other Stock-Based Awards shall be in such form, and subject to such restrictions and conditions and other terms, as the Committee may specify in the Award Agreement at the time the Other Stock-Based Award is granted, subject to the general provisions of the Plan, including, without limitation, the right to receive, or vest with respect to, one or more Shares (or the equivalent cash value of such Shares) upon the completion of a specified period of service, the occurrence of an event and/or the attainment of performance objectives.  Other Stock-Based Awards may be granted on a stand-alone basis or in connection with any other Awards granted under the Plan.

## XII.      TERMS AND CONDITIONS OF PERFORMANCE AWARDS

**A.**  The Committee may use business criteria and/or other measures of performance as it deems appropriate in establishing any performance conditions applicable to Performance Awards (including, but not limited to, continuous service with the Company or its Affiliates, achievement of specific business objectives, increases in specified indices, attainment of growth rates, and/or other measurements of Company or Affiliate performance).

**B.**  Any Performance Award will be forfeited upon the occurrence or non-occurrence of one or more events as set forth in the applicable Award Agreement, or, alternatively, if the Participant's employment with the Company or its Affiliates terminates, other than for reasons set forth in Article XIV, prior to the expiration of the time period over which the performance conditions are to be measured.

**C.** Achievement of performance goals in respect of such Performance Awards shall be measured over such periods as may be specified by the Committee in the Award Agreement.

**D.** Settlement of Performance Awards may be in cash or Shares, or other property, in the discretion of the Committee.

## XIII.    TERMS AND CONDITIONS OF CASH AWARDS

**A.** Any Cash Award will be forfeited upon the occurrence or non-occurrence of one or more events as set forth in the applicable Award Agreement, or, alternatively, if the Participant's employment or engagement with the Company or its Affiliates terminates, other than for reasons set forth in Article XIV, prior to the attainment of any goals set forth in the Award Agreement or prior to the expiration of the forfeiture or restriction provisions set forth in the Award Agreement, whichever is applicable.

**B.** Any Cash Award, if not previously forfeited, shall be payable in accordance with Article XV on or about March 15 of the fiscal year immediately following the fiscal year during which the goals are attained, and in no event later than December 31 of such year.

**C.** The Committee may prescribe in an Award Agreement such other restrictions, conditions, and terms applicable to the Cash Awards issued to a Participant under the Plan that are neither inconsistent with nor prohibited by the Plan, including, without limitation, terms providing for a lapse of the restrictions, or a measurement of the goals, in installments.

## XIV.    TERMINATION OF EMPLOYMENT OR SERVICE

Except as may otherwise be (i) provided in Article VII for Options, (ii) provided for under the Award Agreement with respect to any Award, or (iii) permitted pursuant to Paragraphs A through C of this Article XIV (subject to the limitations under the Code for Incentive Options), if the employment or service of a Participant terminates, all then-unvested Awards held by such Participant shall be canceled immediately.

### A.  Retirement under a Company or Affiliate Retirement Plan

When a Participant's employment or service terminates as a result of retirement as defined under a Company or Affiliate tax-qualified retirement plan, the Committee may permit Awards to continue in effect beyond the date of retirement in accordance with the applicable Award Agreement, and/or the exercisability and vesting of any Award may be accelerated.

### B.  Termination in the Best Interests of the Company or an Affiliate

When a Participant's employment or service with the Company or an Affiliate terminates and, in the judgment of the chief executive officer or other senior officer designated by the Committee, the acceleration and/or continuation of outstanding Awards would be in the best interests of the Company, the Committee may (i) authorize, where appropriate, the acceleration and/or continuation of all or any part of Awards granted prior to such termination and/or (ii) permit the exercise, vesting, and payment of such Awards for such period as may be set forth in the applicable Award Agreement.

15

**C. Death or Disability of a Participant**

1.   In the event of a Participant's death, the Participant's estate or beneficiaries shall have the period ending on the earlier of (i) the expiration date specified in the Award Agreement and (ii) the expiration date specified in Paragraph F.4 or H of Article VII, as applicable, within which to receive or exercise any outstanding Awards subject to exercise that are held by the Participant under such terms as may be specified in the applicable Award Agreement.  Rights to any such outstanding Awards shall pass to beneficiaries so designated by the Participant, or if no such beneficiaries are designated, by will or the laws of descent and distribution.  Awards so passing shall be paid and/or may be exercised at such times and in such manner as if the Participant were living.

2.   If a Participant is Disabled, and subject to the limitations of Paragraph F.4 or G of Article VII, as applicable, Awards may be paid to, or exercised by, the Participant, if legally competent, or by a legally designated guardian or other representative if the Participant is legally incompetent by virtue of such Disability.

3.   Upon or after the death or Disability of a Participant, the Committee may in its sole discretion at any time (i) terminate restrictions in Award Agreements; (ii) accelerate any or all installments and rights; and/or (iii) instruct the Company to pay the total of any accelerated payments in a lump sum to the Participant or the Participant's estate, beneficiaries or representative.

## XV.   PAYMENT OF RESTRICTED STOCK, RIGHTS, OTHER STOCK-BASED AWARDS, PERFORMANCE AWARDS AND CASH AWARDS

Payment of Restricted Stock, Rights, Other Stock-Based Awards, Performance Awards and Cash Awards may be made, as the Committee shall specify in any Award Agreement, in the form of cash, Shares of Common Stock, or combinations thereof; provided, however, that a fractional Share of Common Stock shall be paid in cash equal to the corresponding fraction of the Fair Market Value of one (1) Share of Common Stock at the time of payment.

## XVI.   WITHHOLDING

Except as otherwise provided by the Committee in an Award Agreement,

**A.** the Company shall have the power and right to deduct or withhold, or require a Participant to remit to the Company, an amount sufficient to satisfy the maximum federal, state, and local taxes required or permitted by law to be withheld with respect to any grant, exercise, or payment made under or as a result of this Plan; and

**B.** in the case of payments of Awards, or upon any other taxable event hereunder, a Participant may elect, subject to the approval in advance by the Committee, to satisfy the withholding requirement, if any, in whole or in part, by having the Company withhold Shares of Common Stock that would otherwise be transferred to the Participant having a Fair Market Value, on the date the tax is to be determined, equal to such withholding obligation.  All elections shall be made in writing and signed by the Participant.

16

## XVII.    SAVINGS CLAUSE

This Plan is intended to comply in all respects with applicable law and regulations, including, (i) with respect to those Participants who are officers or directors for purposes of Section 16 of the Exchange Act, Rule 16b-3 of the Securities and Exchange Commission, if applicable, (ii) Section 402 of the Sarbanes-Oxley Act, and (iii) Code Section 409A. In no event whatsoever shall the Company be liable for any additional tax, interest or penalty that may be imposed on a Participant by Code Section 409A or damages for failing to comply with Section 409A. In case any one or more provisions of this Plan shall be held invalid, illegal, or unenforceable in any respect under applicable law and regulation (including Rule 16b-3 and Code Section 409A), the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby, and the invalid, illegal, or unenforceable provision shall be deemed null and void; however, to the extent permitted by law, any provision that could be deemed null and void shall first be construed, interpreted, or revised retroactively to permit this Plan to be construed in compliance with all applicable law (including Rule 16b-3 and Code Section 409A) so as to foster the intent of this Plan. Notwithstanding anything herein to the contrary, with respect to Participants who are officers and directors for purposes of Section 16 of the Exchange Act, if applicable, and if required to comply with rules promulgated thereunder, no grant of, or Option to purchase, Shares shall permit unrestricted ownership of Shares by the Participant for at least six (6) months from the date of grant or Option, unless the Board determines that the grant of, or Option to purchase, Shares otherwise satisfies the then-current Rule 16b-3 requirements.

## XVIII.    ADJUSTMENTS UPON CHANGES IN CAPITALIZATION; CORPORATE TRANSACTIONS

If the outstanding Shares of the Company are changed into or exchanged for a different number or kind of shares or other securities of the Company or of another entity by reason of any reorganization, merger, consolidation (or similar corporate transaction), or if a change is made to the Common Stock of the Company by reason of any recapitalization, reclassification, change in par value, stock split, reverse stock split, combination of shares or dividends payable in capital stock, or upon any extraordinary cash dividend made with respect to the Common Stock, or the like, the Company shall make adjustments to such Awards (including, by way of example and not by way of limitation, the grant of substitute Awards under the Plan or under the plan of such other entity or the suspension of the right to exercise an Award for a specified period of time in connection with a corporate transaction) as it may determine to be equitable under the circumstances, and, in addition, equitable adjustments shall be made in the number and kind of shares or securities and in the option price per share or security subject to outstanding Awards under the Plan or under the plan of such successor entity. The foregoing notwithstanding, unless the Committee determines otherwise, no such adjustment shall be made to an Option that, within the meaning of Sections 424 and 409A of the Code, as applicable, constitutes a modification, extension, or renewal of an option as to cause it to be considered as the grant of a new option.

Notwithstanding anything herein to the contrary, the Company may, in its sole discretion, accelerate the timing of the exercise provisions of any Award in the event of (i) the adoption of a plan of merger or consolidation under which a majority of the Shares of the Company would be converted into or exercised for cash or securities of any other corporation or entity, or (ii) a sale or

17

exchange of all or any portion of the Company's assets or equity securities. Alternatively, the Company may, in its sole discretion and without the consent of the Participants, provide for one or more of the following in the event of any merger, consolidation, recapitalization, sale of all or any portion of the Company's assets or capital stock, including but not limited to a "going-private" transaction: (i) the assumption of the Plan and outstanding Awards by the surviving entity or its parent; (ii) the substitution by the surviving entity or its parent of awards with substantially the same terms for such outstanding Awards; (iii) notice to the holders of vested and exercisable Options and Rights of their ability to exercise vested and exercisable Options and Rights effective contingent upon and immediately prior to such transaction followed by the cancellation of all unexercised Options and Rights (whether or not then vested and exercisable); (iv) settlement of the intrinsic value of the outstanding vested Options and Rights in cash or cash equivalents or equity followed by the cancellation of all Options and Rights  (whether or not then vested or exercisable); and (v) cancellation of all unvested or unexercisable Awards; provided, however, that in connection with an assumption or substitution of Awards under clause (i) or (ii) above, the Awards so assumed or substituted shall continue to vest or become exercisable pursuant to the terms of the original Award, except to the extent that such terms are otherwise rendered inoperative.  In connection with any such transaction, each Participant shall, to the extent so provided under the definitive transaction agreement, (i) be subject to any earn-outs, purchase price adjustments, holdbacks, escrows and other contingent payments on the terms set forth in the definitive transaction agreement, (ii) be subject to all indemnification and other obligations of the Company's equityholders in connection with such transaction, (iii) be bound by the appointment of any equityholder representative who shall represent the Company's equityholders under the definitive transaction agreement as the representative, agent, proxy, and attorney-in-fact for the Participant, with the power and authority to act on the Participant's behalf with respect to the definitive transaction agreement, and (iv) execute such additional agreements or documentation, if any, as may be required under the definitive transaction agreement to reflect the foregoing or the treatment of the Participant's Awards, including without limitation, letters of transmittal or cash-out agreements.

Upon a business combination by the Company or any of its Affiliates with any corporation or other entity through the adoption of a plan of merger or consolidation or a share exchange or through the purchase of all or substantially all of the capital stock or assets of such other corporation or entity, the Board or the Committee may, in its sole discretion, grant Options pursuant hereto to all or any persons who, on the effective date of such transaction, hold outstanding options to purchase securities of such other corporation or entity and who, on and after the effective date of such transaction, will become employees or directors of, or consultants or advisors to, the Company or its Affiliates.  The number of Shares subject to such substitute Options shall be determined in accordance with the terms of the transaction by which the business combination is effectuated.  Notwithstanding the other provisions of this Plan, the other terms of such substitute Options shall be substantially the same as or economically equivalent to the terms of the options for which such Options are substituted, all as determined by the Board or by the Committee, as the case may be.  Upon the grant of substitute Options pursuant hereto, the options to purchase securities of such other corporation or entity for which such Options are substituted shall be canceled immediately.

18

## XIX.   DISSOLUTION OR LIQUIDATION OF THE COMPANY

Upon the dissolution or liquidation of the Company other than in connection with a transaction to which Article XVIII applies, all Awards granted hereunder shall terminate and become null and void; provided, however, that if the rights of a Participant under the applicable Award have not otherwise terminated and expired, the Participant may, if the Committee, in its sole discretion, so permits, have the right immediately prior to such dissolution or liquidation to exercise any Award granted hereunder to the extent that the right thereunder has not otherwise become exercisable as of the date immediately prior to such dissolution or liquidation.

## XX.   TERMINATION OF THE PLAN

The Plan shall terminate ten (10) years from the earlier of the date of its adoption by the Board and the date of its approval by the stockholders.  The Plan may be terminated at an earlier date by vote of the stockholders or the Board; provided, however, that no termination of the Plan (whether early or pursuant to the immediately preceding sentence) shall affect any Award Agreements executed prior to the effective date of such termination.  Notwithstanding anything in this Plan to the contrary, any Options granted prior to the effective date of the Plan's termination may be exercised until the earlier of (i) the date set forth in the Award Agreement and (ii) in the case of an Incentive Option, ten (10) years from the date the Option is granted; and the provisions of the Plan with respect to the full and final authority of the Committee under the Plan shall continue to control.

## XXI.   AMENDMENT OF THE PLAN AND AWARDS

The Plan may be amended by the Board, and such amendment shall become effective upon adoption by the Board; provided, however, that any amendment shall be subject to the approval of the stockholders of the Company at or before the next annual meeting of the stockholders of the Company if such stockholder approval is required by the Code, any federal or state law or regulation, or the rules of any stock exchange or automated quotation system on which the Shares may be listed or quoted, or if the Board, in its discretion, determines to submit such changes to the Plan to its stockholders for approval.  Further, no amendment to the Plan that reduces the Option exercise price below that provided for in Article VII of the Plan shall be effective unless it is approved by the stockholders of the Company.

The Committee may amend the terms of any Award theretofore granted, prospectively or retroactively, but no such amendment to the terms of any Award or to the Plan shall (a) impair the rights of any Participant without his or her consent or (b) except for adjustments made pursuant to Article XVIII, reduce the exercise price of outstanding Options or Rights or cancel or amend outstanding Options or Rights for the purpose of repricing, replacing, or regranting such Options or Rights with an exercise price that is less than the exercise price of the original Options or Rights or cancel or amend outstanding Options or Rights with an exercise price that is greater than the Fair Market Value of a Share for the purpose of exchanging such Options or Rights for cash or any other Awards without stockholder approval.  Notwithstanding anything herein to the contrary, the Committee may amend the terms of any Award theretofore granted if the Committee, in its discretion, determines that such amendment is necessary to comply with the requirements of Section 409A of the Code, the rules of any stock exchange or automated quotation systems on

19

which the Shares may be listed or traded, or changes in tax or other applicable laws or regulatory requirements.

## XXII.   EMPLOYMENT RELATIONSHIP

Nothing herein contained shall be deemed to prevent the Company or an Affiliate from terminating the employment of a Participant, nor to prevent a Participant from terminating the Participant's employment with the Company or an Affiliate.

## XXIII.   INDEMNIFICATION OF COMMITTEE

In addition to such other rights of indemnification that they may have as directors or as members of the Committee, the members of the Committee shall, to the extent permitted by the laws of the State of Delaware, be indemnified by the Company against all reasonable expenses, including attorneys' fees, actually and reasonably incurred in connection with the defense of any action, suit or proceeding, or in connection with any appeal therein, to which they or any of them may be a party by reason of any action taken by them as directors or members of the Committee and against all amounts paid by them in settlement thereof (provided that such settlement is approved by the Board) or paid by them in satisfaction of a judgment in any such action, suit or proceeding, except in relation to matters as to which it shall be adjudged in such action, suit or proceeding that the director or Committee member is liable for gross negligence or willful misconduct in the performance of his or her duties.  To receive such indemnification, a director or Committee member must first offer in writing to the Company the opportunity, at its own expense, to defend any such action, suit or proceeding.

## XXIV.   UNFUNDED PLAN

The Plan shall be unfunded.  Although bookkeeping accounts may be established with respect to Participants who are entitled to cash, Common Stock, or rights thereto under the Plan, any such accounts shall be used merely as a bookkeeping convenience.  The Company shall not be required to segregate any assets that may at any time be represented by cash, Common Stock, or rights thereto, nor shall the Plan be construed as providing for such segregation, nor shall the Company, the Board, or the Committee be deemed to be a trustee of any cash, Common Stock, or rights thereto to be granted under the Plan.  Any liability of the Company to any Participant with respect to a grant of cash, Common Stock, or rights thereto under the Plan shall be based solely upon any contractual obligations that may be created by the Plan and any Award Agreement; no such obligation of the Company shall be deemed to be secured by any pledge or other encumbrance on any property of the Company.  Neither the Company nor the Board nor the Committee shall be required to give any security or bond for the performance of any obligation that may be created by the Plan.

## XXV.   MITIGATION OF EXCISE TAX

To the extent provided for in the Award Agreement or in any other agreement between the Company (or an Affiliate) and the Participant, if any payment or right accruing to a Participant under this Plan (without the application of this Article XXV), either alone or together with other payments or rights accruing to the Participant from the Company or an Affiliate, would constitute a "parachute payment" (as defined in Section 280G of the Code and regulations thereunder), such

20

payment or right shall be reduced to the largest amount or greatest right that will result in no portion of the amount payable or right accruing under the Plan being subject to an excise tax under Section 4999 of the Code or being disallowed as a deduction under Section 280G of the Code. The determination of whether any reduction in the rights or payments under this Plan is necessary shall be made by the Company. The Participant shall cooperate in good faith with the Company in making such determination and providing any necessary information for this purpose.

## XXVI.   EFFECTIVE DATE

This Plan shall become effective upon adoption by the Board, provided that the adoption of the Plan shall be subject to the approval of the stockholders of the Company if such stockholder approval is required by the Code, any federal or state law or regulations, or the rules of any stock exchange or automated quotation system on which the Shares may be listed or quoted, or if the Board, in its discretion, desires to submit the Plan to its stockholders for approval.

## XXVII.   RECOVERY

If the Company is or becomes subject to regulations or listing standards adopted pursuant to Section 10D of the Exchange Act, then each Award granted pursuant to the Plan, each Share acquired pursuant to the Plan, and all proceeds in respect of any such Awards or Shares shall be subject to any "clawback" or similar policy of the Company adopted pursuant to such regulations or listing standards that may be in effect from time to time, whether before or after the grant, exercise or settlement of such Awards or Shares.

## XXVIII.   FOREIGN JURISDICTIONS

To the extent that the Committee determines that the restrictions imposed by the Plan preclude the achievement of the material purposes of the Plan in jurisdictions outside the United States of America, the Committee in its discretion may modify those restrictions as it determines to be necessary or appropriate to conform to applicable requirements or practices of jurisdictions outside of the United States of America.

## XXIX.   DEFERRAL OF AWARDS

At the time of the grant of an Award, the Company may permit a Participant to elect to:

(a)     have cash that would otherwise be paid to such Participant as a result of the exercise of an Award credited to a deferred compensation account established for such Participant by the Committee as an entry on the Company's books;

(b)     have Shares that would otherwise be delivered to such Participant as a result of the exercise of an Award converted into an equal number of Rights; or

(c)     have Shares that would otherwise be delivered to such Participant as a result of the exercise of an Award converted into amounts credited to a deferred compensation account established for such Participant by the Committee as an entry on the Company's books. Such amounts shall be determined by reference to the Fair

21

Market Value of the Shares as of the date on which they would otherwise have been delivered to such Participant.

A deferred compensation account established under this Article XXIX may be credited with interest or other forms of investment return, as determined by the Committee and shall be subject to compliance with Section 409A of the Code.  A Participant for whom such an account is established shall have no rights other than those of a general creditor of the Company.  Such an account shall represent an unfunded and unsecured obligation of the Company and shall be subject to the terms and conditions of the applicable agreement between such Participant and the Company.  If the deferral of Awards is permitted or required, the Committee may establish rules, procedures and forms pertaining to such Awards, including (without limitation) the settlement of deferred compensation accounts established under this Article XXIX.

## XXX.    GOVERNING LAW

This Plan shall be governed by the laws of the State of Delaware and construed in accordance therewith.

## XXXI.    STATUTE OF LIMITATIONS

If a Participant believes that the Committee has not followed his or her directions, or the Participant believes that he or she has a claim against the Plan, the Company or the Committee under the terms of the Plan and/or any applicable Award Agreement, the Participant must file a written claim with the Committee within twenty-four (24) months after the direction was allegedly made.

Adopted this _____ day of _____ 2018.

**Exhibit F-2**
**Form of Restricted Stock Unit Agreement for Senior Executives**

<div align="center">

**CUMULUS MEDIA INC.**
**<u>RESTRICTED STOCK UNIT AGREEMENT</u>**

</div>

THIS AGREEMENT is made effective _____ __, 2018 (the "**Grant Date**"),[1] between Cumulus Media Inc., a Delaware corporation (the "**Company**"), and _____ (the "**Recipient**").

WHEREAS, the Company desires to grant to the Recipient an award denominated in units (the **"Restricted Stock Units"**) of its common capital stock (the "**Common Stock**"); and

WHEREAS, the Restricted Stock Units are being issued under and subject to the Company's Long-Term Incentive Plan (the "**Plan**"), and any terms used herein have the same meanings as under the Plan (the Recipient being referred to in the Plan as a "**Participant**").

NOW, THEREFORE, in consideration of the following mutual covenants and for other good and valuable consideration, the parties agree as follows:

**1.      GRANT OF RESTRICTED STOCK UNITS**

The Company hereby grants to the Recipient _____ Restricted Stock Units upon the terms and conditions and subject to all the limitations and restrictions set forth herein and in the Plan, which is incorporated herein by reference.  The Recipient acknowledges receipt of a copy of the Plan.  Each Restricted Stock Unit is a notional amount that represents one share of the Company's Common Stock.  Each Restricted Stock Unit constitutes the right, subject to the terms, conditions and vesting schedule of the Plan and this Agreement, to receive a distribution of one share of Common Stock.

**2.      PURCHASE PRICE**

The purchase price of the Restricted Stock Units is zero Dollars per share.

**3.      AWARDS SUBJECT TO ACCEPTANCE OF AGREEMENT.**

The Award granted hereunder shall be null and void unless the Recipient accepts this Agreement by executing it in the space provided below and returning it to the Company.

**4.      RIGHTS AS A STOCKHOLDER.**

The Recipient shall not have any rights of a stockholder as a result of receiving an Award under this Agreement, including, but not limited to, any right to vote the shares of Common Stock to be issued hereunder, unless and until (and only to the extent that) the Restricted Stock Units have vested and the shares of Common Stock thereafter distributed pursuant to Paragraphs 5 and 6 hereof.

---

[1] To be the Emergence Date.

Doc#: US1:11911018v7

**5.     VESTING OF RESTRICTED STOCK UNITS.**

Fifty percent (50%) of the Restricted Stock Units shall be designated as performance-based Restricted Stock Units (the "**Performance RSUs**"), and fifty percent (50%) shall be designated as time-based Restricted Stock Units (the "**Time-Based RSUs**").  Subject to the Plan and this Agreement, the Restricted Stock Units shall vest as follows:

(a)     Subject to the terms of Paragraph 5(c), the Performance RSUs shall vest in three substantially equal annual installments upon each of December 31, 2018, December 31, 2019, and December 31, 2020, subject to the Company's attaining or exceeding the following EBITDA (as hereinafter defined) targets for the applicable year:

| EBITDA target | Year Ending |
|---|---|
| $\geq$ $236 million | December 31, 2018 |
| $\geq$ $246 million | December 31, 2019 |
| $\geq$ $270 million | December 31, 2020 |

If less than ninety percent (90%) of the EBITDA target for a given year is attained, the Performance RSUs that were otherwise eligible to vest in respect of such year shall be forfeited in their entirety.  If at least ninety percent (90%), but less than one hundred percent (100%), of the EBITDA target for a given year is attained, then a percentage of the Performance RSUs eligible to vest in respect of such year shall become vested, with the vested percentage to be determined by linear interpolation between ninety percent (90%) attainment of EBITDA (in which case fifty percent (50%) of the Performance RSUs eligible to vest in respect of such year will vest) and one hundred percent (100%) attainment of the EBITDA targets (in which case one hundred percent (100%) of the Performance RSUs eligible to vest in respect of such year will vest).  If one hundred percent (100%) or more of the EBITDA target for a given year is attained, the Performance RSUs that were otherwise eligible to vest in respect of such year shall vest in their entirety.

For purposes of this Agreement, "**EBITDA**" shall mean the Company's earnings before interest, taxes, depreciation and amortization for a fiscal year as determined by the Committee, and as adjusted to exclude the impact of any extraordinary items as deemed appropriate by the Company.

(b)     Subject to the terms of Paragraph 5(c), thirty percent (30%) of the Time-Based RSUs shall vest on each of the first two anniversaries of the Grant Date, and an additional twenty percent (20%) shall thereafter vest on each of the third and fourth anniversaries of the Grant Date.

(c)     The Recipient must be employed by the Company at all times from the Grant Date through the applicable Vesting Date (as hereinafter defined) in order to vest in the tranche of the Performance RSUs or the Time-Based RSUs vesting as of such date.

2

(Senior Executives)

Upon a termination of the Recipient's employment with the Company for any reason or no reason, all vesting of the Time-Based RSUs, and the Performance RSUs as to which the performance year has not ended, shall cease, and any unvested Restricted Stock Units shall be forfeited; provided, that if such termination (other than an involuntary termination for Cause) occurs following the completion of a performance year, but prior to the determination of the Company's EBITDA for such year, the Performance RSUs otherwise eligible to vest in respect of such year shall remain outstanding and eligible to vest as of the date on which the Company's attainment of the EBITDA target is determined. The foregoing notwithstanding, if the Recipient's employment with the Company terminates by virtue of the Recipient's (i) termination by the Company without Cause; (ii) voluntary resignation for Good Reason; (iii) death; or (iv) Disability (a termination of employment for any of the reasons set forth in the immediately preceding subsections (i) through (iv) to be referred to herein as a "**Qualifying Termination**"), then fifty percent (50%) of the then-outstanding and unvested Restricted Stock Units shall become vested as of the date of the Qualifying Termination; provided, however, that if such Qualifying Termination occurs prior to the first anniversary of the Grant Date, then seventy-five percent (75%) of the then-outstanding and unvested Restricted Stock Units shall become vested as of the date of the Qualifying Termination.

(d)     Notwithstanding the terms of Paragraphs 5(a), (b) and (c) above, if the Recipient's services are terminated by the Company without Cause or as the result of the Recipient's voluntary resignation for Good Reason, in either instance at any time within the three (3) month period immediately preceding, or the twelve (12) month period immediately following, a Change in Control, one hundred percent (100%) of the Restricted Stock Units that are (or were) otherwise unvested as of the date the employment terminates shall thereafter become vested. For purposes of this Agreement, a "**Change in Control**" shall be deemed to occur on the earliest of (a) the purchase or other acquisition of outstanding shares of the Company's capital stock by any entity, person or group of beneficial ownership, as that term is defined in rule 13d-3 under the Securities Exchange Act of 1934 (other than the Company or one of its subsidiaries or employee benefit plans), in one or more transactions, such that the holder, as a result of such acquisition, then owns more than 50% of the outstanding capital stock of the Company entitled to vote for the election of directions ("**Voting Stock**"); (b) the completion by any entity, person, or group (other than the Company or one of its subsidiaries or employee benefit plans) of a tender offer or an exchange offer for more than 50% of the outstanding Voting Stock of the Company; and (c) the effective time of (1) a merger or consolidation of the Company with one or more corporations as a result of which the holders of the outstanding Voting Stock of the Company immediately prior to such merger or consolidation hold less than 50% of the Voting Stock of the surviving or resulting corporation immediately after such merger or consolidation, or (2) a transfer of all or substantially all of the property or assets of the Company other than to an entity of which the Company owns at least 80% of the Voting Stock, or (3) the approval by the stockholders of the Company of a liquidation or dissolution of the Company.

3

(e) For purposes of this Agreement, "**Good Reason**" shall have the meaning ascribed to such term under any employment agreement between the Recipient and the Company and, absent any such definition, Good Reason shall mean the occurrence of any of the following events without the Recipient's consent: (i) a material diminution in the Recipient's base salary; other than in connection with an across the board reduction affecting the Company's senior management team; (ii) a material diminution in the Recipient's duties, authority or responsibilities; or (iii) a change of greater than fifty (50) miles in the geographic location from which the Recipient primarily performs his or her services on behalf of the Company. The foregoing notwithstanding, no event described above shall constitute Good Reason unless (1) the Recipient gives written notice to the Company specifying the condition or event relied upon for the Good Reason termination within ninety (90) days following the initial existence of such condition or event; (2) the Company fails to cure the event or condition constituting Good Reason within thirty (30) days following receipt of the Recipient's written notice; and (3) the Recipient actually terminates his or her employment within thirty (30) days of the end of such cure period.

(f) For purposes of this Agreement, each date on which any portion of the Restricted Stock Units becomes vested pursuant to this Paragraph 5 shall be referred to as a "**Vesting Date**."

6. **SETTLEMENT OF RESTRICTED STOCK UNITS.**

Subject to the terms of the Plan and this Agreement, Restricted Stock Units shall be settled in shares of Common Stock. Certificates representing shares of Common Stock will be issued to the Recipient as soon as reasonably practicable following each Vesting Date, but in no event shall the shares be issued with respect to Performance RSUs later than the date that is two and one-half (2 ½) months following the end of the applicable performance year.

7. **WITHHOLDING TAXES.**

(a) As a condition precedent to the delivery to the Recipient of any shares of Common Stock in settlement of the Restricted Stock Units, the Recipient shall, upon request by the Company, pay to the Company such amount of cash as the Company may require under all applicable federal, state, local or other laws or regulations, to withhold and pay over as income or other withholding taxes (the "**Required Tax Payments**") with respect to the Award. If the Recipient shall fail to advance the Required Tax Payments after request by the Company, the Company may, in its discretion, deduct any Required Tax Payments from any amount then or thereafter payable by the Company to the Recipient.

(b) The Recipient may elect, subject to Company approval, to satisfy his or her obligation to advance the Required Tax Payments with respect to the Restricted Stock Unit Award by any of the following means: (1) a cash payment to the Company pursuant to Paragraph 7(a), (2) delivery (either actual delivery or by

4

attestation procedures established by the Company) to the Company of previously owned whole shares of Common Stock (that the Recipient has held for at least six months prior to the delivery of such shares or that the Recipient purchased on the open market and for which the Recipient has good title, free and clear of all liens and encumbrances) having a Fair Market Value, determined as of the date the obligation to withhold or pay taxes first arises in connection with the Award (the "**Tax Date**"), equal to the Required Tax Payments, (3) authorizing the Company to withhold from the shares of Common Stock otherwise to be delivered to the Recipient pursuant to the Award, a number of whole shares of Common Stock having a Fair Market Value, determined as of the Tax Date, equal to the Required Tax Payments, (4) a cash payment following the Recipient's sale of (or by a broker-dealer acceptable to the Company through which the Recipient has sold) a number of shares of Common Stock with respect to which the Required Tax Payments have arisen having a Fair Market Value determined as of the Tax Date equal to the Required Tax Payments, or (5) any combination of (1), (2), (3) and (4). Any fraction of a share of Common Stock which would be required to satisfy such an obligation shall be disregarded and the remaining amount due shall be paid in cash by the Recipient. No certificate representing a share of Common Stock shall be delivered until the Required Tax Payments have been satisfied in full.

8. **COMPLIANCE WITH APPLICABLE LAW.**

The Restricted Stock Unit Award is subject to the condition that if the listing, registration or qualification of the shares of Common Stock to be issued upon the vesting of the Award upon any securities exchange or under any law, or the consent or approval of any governmental body, or the taking of any other action is necessary as a condition of, or in connection with, the settlement of the Restricted Stock Units and delivery of shares hereunder, the Restricted Stock Units subject to the Award shall be settled in cash equal to the Fair Market Value of the number of shares of Common Stock otherwise deliverable in respect of the Restricted Stock Units then vesting. The Company agrees to use reasonable efforts to effect or obtain any such listing, registration, qualification, consent or approval.

9. **FORFEITURE.**

[TBD]

10. **MISCELLANEOUS PROVISIONS.**

(a)   Meaning of Certain Terms. As used herein, the term "vest" shall mean no longer subject to forfeiture (other than as provided in Paragraph 9 above).

(b)   Successors. This Agreement shall be binding upon and inure to the benefit of any successor or successors of the Company and any person or persons, who shall, upon the death of the Recipient, acquire any rights hereunder in accordance with this Agreement or the Plan.

5

(Senior Executives)

(c)   Notices.   All notices, requests or other communications provided for in this Agreement shall be made in writing either (a) by personal delivery to the party entitled thereto, (b) by facsimile with confirmation of receipt, (c) by mailing in the United States through the U.S. Postal Service, or (d) by express courier service, addressed as follows:

<div style="margin-left: 2em;">

To the Company:   Cumulus Media Inc.

_____

_____

Attention: General Counsel

To the Recipient:   _____

_____

_____

</div>

or to such other address or addresses where notice in the same manner has previously been given or to the last known address of the party entitled thereto. The notice, request or other communication shall be deemed to be received upon personal delivery, upon confirmation of receipt of facsimile transmission, or upon receipt by the party entitled thereto if by United States mail or express courier service; provided, however, that if a notice, request or other communication is not received during regular business hours, it shall be deemed to be received on the next succeeding business day of the Company.

(d)   Governing Law.   This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware.

(e)   Counterparts.   This Agreement may be executed in two counterparts each of which shall be deemed an original and both of which together shall constitute one and the same instrument.

(f)   Transfers.   The Restricted Stock Units granted hereunder shall not be transferable by the Recipient except as the Plan or this Agreement may otherwise provide.

(g)   Separability; Reformation.   It is intended that any amount payable under this Agreement will comply with Section 409A of the Code, and regulations and guidance related thereto, or will be a short-term deferral that is not subject to Section 409A of the Code, so as not to subject the Recipient to the payment of any interest or tax penalty that may be imposed under Section 409A of the Code; provided, however, that the Company shall not be responsible for any such interest and tax penalties. If any provision of this Agreement or the Plan shall be invalid or unenforceable, in whole or in part, or as applied to any circumstance, under the laws of any jurisdiction that may govern for such purpose, or if any provision of this Agreement or the Plan needs to be interpreted to comply with the requirements of Section 409A of the Code, then such provision shall be deemed to be modified or restricted, or so interpreted, to the extent and in the manner necessary to render the same valid and enforceable, or to the extent and in the manner necessary to be interpreted in compliance with such requirements of the Code, either generally or

6

(Senior Executives)

as applied to such circumstance, or shall be deemed excised from this Agreement or the Plan, as the case may require, and this Agreement or the Plan shall be construed and enforced to the maximum extent permitted by law as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.

(h)     Waiver of Jury Trial.  Each of the parties hereto hereby irrevocably waives any and all right to trial by jury of any claim or cause of action in any legal proceeding arising out of or related to this Agreement or the transactions or events contemplated hereby or any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party hereto. The parties hereto each agree that any and all such claims and causes of action shall be tried by a court trial without a jury. Each of the parties hereto further waives any right to seek to consolidate any such legal proceeding in which a jury trial has been waived with any other legal proceeding in which a jury trial cannot or has not been waived.

**IN WITNESS WHEREOF**, the Company and the Recipient have caused this Agreement to be executed on its and his or her behalf effective the day and year first above written.

**CUMULUS MEDIA INC.**                    **RECIPIENT:**

By:_____

Its: _____                    _____

7

(Senior Executives)

**Exhibit F-3**
**Form of Restricted Stock Unit Agreement for Employee**

## CUMULUS MEDIA INC.
## <u>RESTRICTED STOCK UNIT AGREEMENT</u>

THIS AGREEMENT is made effective _____ __, 2018 (the "**Grant Date**"),[1] between Cumulus Media Inc., a Delaware corporation (the "**Company**"), and _____ (the "**Recipient**").

WHEREAS, the Company desires to grant to the Recipient an award denominated in units (the **"Restricted Stock Units"**) of its common capital stock (the "**Common Stock**"); and

WHEREAS, the Restricted Stock Units are being issued under and subject to the Company's Long-Term Incentive Plan (the "**Plan**"), and any terms used herein have the same meanings as under the Plan (the Recipient being referred to in the Plan as a "**Participant**").

NOW, THEREFORE, in consideration of the following mutual covenants and for other good and valuable consideration, the parties agree as follows:

**1.    GRANT OF RESTRICTED STOCK UNITS**

The Company hereby grants to the Recipient _____ Restricted Stock Units upon the terms and conditions and subject to all the limitations and restrictions set forth herein and in the Plan, which is incorporated herein by reference.  The Recipient acknowledges receipt of a copy of the Plan.  Each Restricted Stock Unit is a notional amount that represents one share of the Company's Common Stock.  Each Restricted Stock Unit constitutes the right, subject to the terms, conditions and vesting schedule of the Plan and this Agreement, to receive a distribution of one share of Common Stock.

**2.    PURCHASE PRICE**

The purchase price of the Restricted Stock Units is zero Dollars per share.

**3.    AWARDS SUBJECT TO ACCEPTANCE OF AGREEMENT.**

The Award granted hereunder shall be null and void unless the Recipient accepts this Agreement by executing it in the space provided below and returning it to the Company.

**4.    RIGHTS AS A STOCKHOLDER.**

The Recipient shall not have any rights of a stockholder as a result of receiving an Award under this Agreement, including, but not limited to, any right to vote the shares of Common Stock to be issued hereunder, unless and until (and only to the extent that) the Restricted Stock Units have vested and the shares of Common Stock thereafter distributed pursuant to Paragraphs 5 and 6 hereof.

---

[1] To be the Emergence Date.

Doc#: US1:11911019v6

**5.    VESTING OF RESTRICTED STOCK UNITS.**

Fifty percent (50%) of the Restricted Stock Units shall be designated as performance-based Restricted Stock Units (the "**Performance RSUs**"), and fifty percent (50%) shall be designated as time-based Restricted Stock Units (the "**Time-Based RSUs**").  Subject to the Plan and this Agreement, the Restricted Stock Units shall vest as follows:

(a)    Subject to the terms of Paragraph 5(c), the Performance RSUs shall vest in three substantially equal annual installments upon each of December 31, 2018, December 31, 2019, and December 31, 2020, subject to the Company's attaining or exceeding the following EBITDA (as hereinafter defined) targets for the applicable year:

| EBITDA target | Year Ending |
|---|---|
| $\geq$ $236 million | December 31, 2018 |
| $\geq$ $246 million | December 31, 2019 |
| $\geq$ $270 million | December 31, 2020 |

If less than ninety percent (90%) of the EBITDA target for a given year is attained, the Performance RSUs that were otherwise eligible to vest in respect of such year shall be forfeited in their entirety.  If at least ninety percent (90%), but less than one hundred percent (100%), of the EBITDA target for a given year is attained, then a percentage of the Performance RSUs eligible to vest in respect of such year shall become vested, with the vested percentage to be determined by linear interpolation between ninety percent (90%) attainment of EBITDA (in which case fifty percent (50%) of the Performance RSUs eligible to vest in respect of such year will vest) and one hundred percent (100%) attainment of the EBITDA targets (in which case one hundred percent (100%) of the Performance RSUs eligible to vest in respect of such year will vest).  If one hundred percent (100%) or more of the EBITDA target for a given year is attained, the Performance RSUs that were otherwise eligible to vest in respect of such year shall vest in their entirety.

For purposes of this Agreement, "**EBITDA**" shall mean the Company's earnings before interest, taxes, depreciation and amortization for a fiscal year as determined by the Committee, and as adjusted to exclude the impact of any extraordinary items as deemed appropriate by the Company.

(b)    Subject to the terms of Paragraph 5(c), thirty percent (30%) of the Time-Based RSUs shall vest on each of the first two anniversaries of the Grant Date, and an additional twenty percent (20%) shall thereafter vest on each of the third and fourth anniversaries of the Grant Date.

(c)    The Recipient must be employed by the Company at all times from the Grant Date through the applicable Vesting Date (as hereinafter defined) in order to vest in the tranche of the Performance RSUs or the Time-Based RSUs vesting as of such date.

2

Upon a termination of the Recipient's employment with the Company for any reason or no reason, all vesting of the Time-Based RSUs, and the Performance RSUs as to which the performance year has not ended, shall cease, and any unvested Restricted Stock Units shall be forfeited; provided, that if such termination (other than an involuntary termination for Cause) occurs following the completion of a performance year, but prior to the determination of the Company's EBITDA for such year, the Performance RSUs otherwise eligible to vest in respect of such year shall remain outstanding and eligible to vest as of the date on which the Company's attainment of the EBITDA target is determined. The foregoing notwithstanding, if the Recipient's employment with the Company terminates by virtue of the Recipient's (i) termination by the Company without Cause; (ii) voluntary resignation for Good Reason; (iii) death; or (iv) Disability (a termination of employment for any of the reasons set forth in the immediately preceding subsections (i) through (iv) to be referred to herein as a "**Qualifying Termination**"), then (x) the vesting of the outstanding and unvested (if any) Time-Based RSUs shall be accelerated as of the date of the Qualifying Termination by that number of Time-Based RSUs that would otherwise have vested on the next succeeding annual Vesting Date, and (y) the Performance RSUs eligible to vest in respect of performance during the year in which the Qualifying Termination occurs (if any) shall remain outstanding and eligible to vest in respect of performance for the year of termination, and will vest based on the achievement of the applicable EBITDA target for such year.

(d)    Notwithstanding the terms of Paragraphs 5(a), (b) and (c) above, if the Recipient's services are terminated by the Company without Cause or as the result of the Recipient's voluntary resignation for Good Reason, in either instance at any time within the three (3) month period immediately preceding, or the twelve (12) month period immediately following, a Change in Control, one hundred percent (100%) of the Restricted Stock Units that are (or were) otherwise unvested as of the date the employment terminates shall thereafter become vested. For purposes of this Agreement, a "**Change in Control**" shall be deemed to occur on the earliest of (a) the purchase or other acquisition of outstanding shares of the Company's capital stock by any entity, person or group of beneficial ownership, as that term is defined in rule 13d-3 under the Securities Exchange Act of 1934 (other than the Company or one of its subsidiaries or employee benefit plans), in one or more transactions, such that the holder, as a result of such acquisition, then owns more than 50% of the outstanding capital stock of the Company entitled to vote for the election of directions ("**Voting Stock**"); (b) the completion by any entity, person, or group (other than the Company or one of its subsidiaries or employee benefit plans) of a tender offer or an exchange offer for more than 50% of the outstanding Voting Stock of the Company; and (c) the effective time of (1) a merger or consolidation of the Company with one or more corporations as a result of which the holders of the outstanding Voting Stock of the Company immediately prior to such merger or consolidation hold less than 50% of the Voting Stock of the surviving or resulting corporation immediately after such merger or consolidation, or (2) a transfer of all or substantially all of the property or assets of the Company other than to an entity

3

of which the Company owns at least 80% of the Voting Stock, or (3) the approval by the stockholders of the Company of a liquidation or dissolution of the Company.

(e)     For purposes of this Agreement, "**Good Reason**" shall have the meaning ascribed to such term under any employment agreement between the Recipient and the Company and, absent any such definition, Good Reason shall mean the occurrence of any of the following events without the Recipient's consent: (i) a material diminution in the Recipient's base salary, other than in connection with an across the board reduction affecting the Company's senior management team; (ii) a material diminution in the Recipient's duties, authority or responsibilities; or (iii) a change of greater than fifty (50) miles in the geographic location from which the Recipient primarily performs his or her services on behalf of the Company. The foregoing notwithstanding, no event described above shall constitute Good Reason unless (1) the Recipient gives written notice to the Company specifying the condition or event relied upon for the Good Reason termination within ninety (90) days following the initial existence of such condition or event; (2) the Company fails to cure the event or condition constituting Good Reason within thirty (30) days following receipt of the Recipient's written notice; and (3) the Recipient actually terminates his or her employment within thirty (30) days of the end of such cure period.

(f)     For purposes of this Agreement, each date on which any portion of the Restricted Stock Units becomes vested pursuant to this Paragraph 5 shall be referred to as a "**Vesting Date**."

## 6.     SETTLEMENT OF RESTRICTED STOCK UNITS.

Subject to the terms of the Plan and this Agreement, Restricted Stock Units shall be settled in shares of Common Stock. Certificates representing shares of Common Stock will be issued to the Recipient as soon as reasonably practicable following each Vesting Date, but in no event shall the shares be issued with respect to Performance RSUs later than the date that is two and one-half (2 ½) months following the end of the applicable performance year.

## 7.     WITHHOLDING TAXES.

(a)     As a condition precedent to the delivery to the Recipient of any shares of Common Stock in settlement of the Restricted Stock Units, the Recipient shall, upon request by the Company, pay to the Company such amount of cash as the Company may require under all applicable federal, state, local or other laws or regulations, to withhold and pay over as income or other withholding taxes (the "**Required Tax Payments**") with respect to the Award. If the Recipient shall fail to advance the Required Tax Payments after request by the Company, the Company may, in its discretion, deduct any Required Tax Payments from any amount then or thereafter payable by the Company to the Recipient.

4

(b)     The Recipient may elect, subject to Company approval, to satisfy his or her obligation to advance the Required Tax Payments with respect to the Restricted Stock Unit Award by any of the following means:  (1) a cash payment to the Company pursuant to Paragraph 7(a), (2) delivery (either actual delivery or by attestation procedures established by the Company) to the Company of previously owned whole shares of Common Stock (that the Recipient has held for at least six months prior to the delivery of such shares or that the Recipient purchased on the open market and for which the Recipient has good title, free and clear of all liens and encumbrances) having a Fair Market Value, determined as of the date the obligation to withhold or pay taxes first arises in connection with the Award (the "**Tax Date**"), equal to the Required Tax Payments, (3) authorizing the Company to withhold from the shares of Common Stock otherwise to be delivered to the Recipient pursuant to the Award, a number of whole shares of Common Stock having a Fair Market Value, determined as of the Tax Date, equal to the Required Tax Payments, (4) a cash payment following the Recipient's sale of (or by a broker-dealer acceptable to the Company through which the Recipient has sold) a number of shares of Common Stock with respect to which the Required Tax Payments have arisen having a Fair Market Value determined as of the Tax Date equal to the Required Tax Payments, or (5) any combination of (1), (2), (3) and (4).  Any fraction of a share of Common Stock which would be required to satisfy such an obligation shall be disregarded and the remaining amount due shall be paid in cash by the Recipient.  No certificate representing a share of Common Stock shall be delivered until the Required Tax Payments have been satisfied in full.

## 8.     COMPLIANCE WITH APPLICABLE LAW.

The Restricted Stock Unit Award is subject to the condition that if the listing, registration or qualification of the shares of Common Stock to be issued upon the vesting of the Award upon any securities exchange or under any law, or the consent or approval of any governmental body, or the taking of any other action is necessary as a condition of, or in connection with, the settlement of the Restricted Stock Units and delivery of shares hereunder, the Restricted Stock Units subject to the Award shall be settled in cash equal to the Fair Market Value of the number of shares of Common Stock otherwise deliverable in respect of the Restricted Stock Units then vesting.  The Company agrees to use reasonable efforts to effect or obtain any such listing, registration, qualification, consent or approval.

## 9.     FORFEITURE.

[TBD]

## 10.     MISCELLANEOUS PROVISIONS.

(a)     <u>Meaning of Certain Terms</u>.  As used herein, the term "vest" shall mean no longer subject to forfeiture (other than as provided in Paragraph 9 above).

(b)     Successors.  This Agreement shall be binding upon and inure to the benefit of any successor or successors of the Company and any person or persons, who shall, upon the death of the Recipient, acquire any rights hereunder in accordance with this Agreement or the Plan.

(c)     Notices.    All notices, requests or other communications provided for in this Agreement shall be made in writing either (a) by personal delivery to the party entitled thereto, (b) by facsimile with confirmation of receipt, (c) by mailing in the United States through the U.S. Postal Service, or (d) by express courier service, addressed as follows:

    To the Company:     Cumulus Media Inc.

    _____

    _____
    Attention: Chief Human Resources Officer

    To the Recipient:     _____

    _____

    _____

or to such other address or addresses where notice in the same manner has previously been given or to the last known address of the party entitled thereto. The notice, request or other communication shall be deemed to be received upon personal delivery, upon confirmation of receipt of facsimile transmission, or upon receipt by the party entitled thereto if by United States mail or express courier service; provided, however, that if a notice, request or other communication is not received during regular business hours, it shall be deemed to be received on the next succeeding business day of the Company.

(d)     Governing Law.  This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware.

(e)     Counterparts.  This Agreement may be executed in two counterparts each of which shall be deemed an original and both of which together shall constitute one and the same instrument.

(f)     Transfers.  The Restricted Stock Units granted hereunder shall not be transferable by the Recipient except as the Plan or this Agreement may otherwise provide.

(g)     Separability; Reformation.  It is intended that any amount payable under this Agreement will comply with Section 409A of the Code, and regulations and guidance related thereto, or will be a short-term deferral that is not subject to Section 409A of the Code, so as not to subject the Recipient to the payment of any interest or tax penalty that may be imposed under Section 409A of the Code;

6

provided, however, that the Company shall not be responsible for any such interest and tax penalties.  If any provision of this Agreement or the Plan shall be invalid or unenforceable, in whole or in part, or as applied to any circumstance, under the laws of any jurisdiction that may govern for such purpose, or if any provision of this Agreement or the Plan needs to be interpreted to comply with the requirements of Section 409A of the Code, then such provision shall be deemed to be modified or restricted, or so interpreted, to the extent and in the manner necessary to render the same valid and enforceable, or to the extent and in the manner necessary to be interpreted in compliance with such requirements of the Code, either generally or as applied to such circumstance, or shall be deemed excised from this Agreement or the Plan, as the case may require, and this Agreement or the Plan shall be construed and enforced to the maximum extent permitted by law as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.

(h)     Waiver of Jury Trial.  Each of the parties hereto hereby irrevocably waives any and all right to trial by jury of any claim or cause of action in any legal proceeding arising out of or related to this Agreement or the transactions or events contemplated hereby or any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party hereto. The parties hereto each agree that any and all such claims and causes of action shall be tried by a court trial without a jury. Each of the parties hereto further waives any right to seek to consolidate any such legal proceeding in which a jury trial has been waived with any other legal proceeding in which a jury trial cannot or has not been waived.

**IN WITNESS WHEREOF**, the Company and the Recipient have caused this Agreement to be executed on its and his or her behalf effective the day and year first above written.

**CUMULUS MEDIA INC.**                    **RECIPIENT:**

By:_____

Its: _____                    _____

7

**<u>Exhibit F-4</u>**
**Form of Option Agreement for Senior Executives**

## CUMULUS MEDIA INC.
## NONSTATUTORY STOCK OPTION AGREEMENT

THIS AGREEMENT is made this _____ day of _____, 2018 (the "**Grant Date**"),[1] between Cumulus Media Inc., a Delaware corporation (the "**Company**"), and _____ (the "**Optionee**").

WHEREAS, the Company desires to grant to the Optionee an option to purchase shares of common stock (the "**Shares**") under the Company's Long-Term Incentive Plan (the "**Plan**"); and

WHEREAS, the Company and the Optionee understand and agree that any capitalized terms used herein, if not otherwise defined, shall have the same meanings as in the Plan (the Optionee being referred to in the Plan as a "**Participant**").

NOW, THEREFORE, in consideration of the following mutual covenants and for other good and valuable consideration, the parties agree as follows:

1. **GRANT OF OPTION**

   The Company grants to the Optionee the right and option to purchase all or any part of an aggregate of _____ Shares (the "**Option**") on the terms and conditions and subject to all the limitations set forth herein and in the Plan, which is incorporated herein by reference. The Optionee acknowledges receipt of a copy of the Plan and acknowledges that the definitive records pertaining to the grant of this Option, and exercises of rights hereunder, shall be retained by the Company. The Option granted herein is intended to be a Nonstatutory Option as defined in the Plan.

2. **EXERCISE PRICE**

   The purchase price of the Shares subject to the Option shall be $___ per Share (the "**Exercise Price**"), the Fair Market Value of the Shares as of the Grant Date. The foregoing notwithstanding, the Optionee acknowledges that the Company cannot and has not guaranteed that the Internal Revenue Service ("**IRS**") will agree that the per Share Exercise Price of the Option equals or exceeds the fair market value of a Share on the Grant Date in a later determination. The Optionee agrees that if the IRS determines that the Option was granted with a per Share Exercise Price that was less than the fair market value of a Share on the Grant Date, the Optionee shall be solely responsible for any costs or tax liabilities related to such a determination.

3. **EXERCISE OF OPTION**

   Subject to the Plan and this Agreement, the Option shall vest and be exercisable as follows:

---

[1] To be the Emergence Date.

EXERCISE PERIOD

| Number of Shares | Commencement Date | Expiration Date |
| --- | --- | --- |
| 30% of the total Option Shares | 1st Anniversary of Grant Date | Five Years from Grant Date |
| An additional 30% of the total Option Shares | 2nd Anniversary of Grant Date | Five Years from Grant Date |
| An additional 20% of the total Option Shares | 3rd Anniversary of Grant Date | Five Years from Grant Date |
| Remaining 20% of the Option Shares | 4th Anniversary of Grant Date | Five Years from Grant Date |

The Optionee must be employed by the Company at all times from the Grant Date through the applicable annual vesting date set forth above in order to vest in the tranche of Option Shares vesting on such date.  Upon a termination of the Optionee's employment with the Company for any reason or no reason, all vesting of the Option shall cease.  The foregoing notwithstanding, if the Optionee's employment with the Company terminates by virtue of the Optionee's (i) termination by the Company without Cause; (ii) voluntary resignation for Good Reason; (iii) death; or (iv) Disability (a termination of employment for any of the reasons set forth in the immediately preceding subsections (i) through (iv) to be referred to herein as a "**Qualifying Termination**"), then fifty percent (50%) of the Option Shares that are otherwise unvested pursuant to the annual vesting schedule set forth above shall become vested as of the date of the Qualifying Termination; provided, however, that if the Qualifying Termination occurs prior to the first anniversary of the Grant Date, then seventy-five percent (75%) of the Option Shares that are otherwise unvested pursuant to the annual vesting schedule set forth above shall become vested as of the date of the Qualifying Termination.  Further, following a Qualifying Termination, vested Option Shares shall continue to be exercisable until the fifth (5th$^{th}$) anniversary of the Grant Date.

Notwithstanding the foregoing, if the Optionee's services are terminated by the Company without Cause or as the result of the Optionee's voluntary resignation for Good Reason, in either instance at any time within the three (3) month period immediately preceding, or the twelve (12) month period immediately following, a Change in Control, one hundred percent (100%) of the Option Shares that are (or were) otherwise unvested Shares as of the date the Optionee's employment terminates shall thereafter become vested Shares.  For purposes of this Agreement, a "**Change in Control**" shall be deemed to occur on the earliest of (a) the purchase or other acquisition of outstanding shares of the Company's capital stock by any entity, person or group of beneficial ownership, as that term is defined in rule 13d-3 under the Securities Exchange Act of 1934 (other than the Company or one of its subsidiaries or employee benefit plans), in one or more transactions, such that the holder, as a result of such acquisition, then owns more than 50% of the outstanding capital stock of the Company entitled to vote for the election of directions ("**Voting Stock**"); (b) the completion by any

(Senior Executives)                                         2

entity, person, or group (other than the Company or one of its subsidiaries or employee benefit plans) of a tender offer or an exchange offer for more than 50% of the outstanding Voting Stock of the Company; and (c) the effective time of (1) a merger or consolidation of the Company with one or more corporations as a result of which the holders of the outstanding Voting Stock of the Company immediately prior to such merger or consolidation hold less than 50% of the Voting Stock of the surviving or resulting corporation immediately after such merger or consolidation, or (2) a transfer of all or substantially all of the property or assets of the Company other than to an entity of which the Company owns at least 80% of the Voting Stock, or (3) the approval by the stockholders of the Company of a liquidation or dissolution of the Company.

For purposes of this Agreement, "**Good Reason**" shall have the meaning ascribed to such term under any employment agreement between the Optionee and the Company and, absent any such definition, Good Reason shall mean the occurrence of any of the following events without the Optionee's consent: (i) a material diminution in the Optionee's base salary, other than in connection with an across the board reduction affecting the Company's senior management team; (ii) a material diminution in the Optionee's duties, authority or responsibilities; or (iii) a change of greater than fifty (50) miles in the geographic location from which the Optionee primarily performs his or her services on behalf of the Company. The foregoing notwithstanding, no event described above shall constitute Good Reason unless (1) the Optionee gives written notice to the Company specifying the condition or event relied upon for the Good Reason termination within ninety (90) days following the initial existence of such condition or event; (2) the Company fails to cure the event or condition constituting Good Reason within thirty (30) days following receipt of the Optionee's written notice; and (3) the Optionee actually terminates his or her employment within thirty (30) days of the end of such cure period

4.    **ISSUANCE OF STOCK**

The Option may be exercised in whole or in part (to the extent that it is exercisable in accordance with its terms) by giving written notice (or any other approved form of notice) to the Company.  Such notice shall be signed by the person exercising the Option, shall state the number of Shares with respect to which the Option is being exercised, shall contain the warranty, if any, required under the Plan and shall specify a date (other than a Saturday, Sunday or legal holiday) not less than five (5) nor more than ten (10) days after the date of such written notice, as the date on which the Shares will be purchased, at the principal office of the Company during ordinary business hours, or at such other hour and place agreed upon by the Company and the person or persons exercising the Option, and shall otherwise comply with the terms and conditions of this Agreement and the Plan.  On the date specified in such written notice (which date may be extended by the Company if any law or regulation requires the Company to take any action with respect to the Option Shares prior to the issuance thereof), the Company shall accept payment for the Option Shares.

The Exercise Price shall be payable at the time of exercise as determined by the Company in its sole discretion either:

(a)    in cash, by certified check or bank check, or by wire transfer;

(b)    in whole shares of the Company's common stock (including, without limitation, by the Company delivering to the Optionee a lesser number of Shares having a Fair Market Value on the date of exercise equal to the amount by which the Fair Market Value of the Shares for which the Option is exercised exceeds the Exercise Price of such Shares), provided, however, that, (i) if the Optionee is subject to the reporting requirements of Section 16 of the Securities Exchange Act of 1934, as amended from time to time, and if such shares were granted pursuant to an option, then such option must have been granted at least six (6) months prior to the exercise of the Option hereunder, and (ii) the transfer of such shares as payment hereunder does not result in any adverse accounting consequences to the Company;

(c)    in lieu of the Optionee's being required to pay the Exercise Price in cash or another method specified in (a) or (b) above, by the Company delivering to the Optionee a lesser number of Shares determined as follows (a so-called "net" exercise):

$$IS = ES \times \left(1 - \frac{EP}{FMV}\right)$$

Where:

IS = the number of Shares to be issued upon such exercise (rounded down to a number of whole shares, with the remaining fractional Share paid in cash)

ES = the number of Shares for which this Option is exercised

EP = the Exercise Price per Share

FMV = the Fair Market Value of one Share, as determined in good faith by the Committee in its sole discretion as of the date of exercise of the Option;

(d)    through the delivery of cash  or the extension of credit by a broker-dealer to whom the Optionee has submitted notice of exercise or otherwise indicated an intent to exercise an Option (a so-called "cashless" exercise); or

(e)    in any combination of (a), (b), (c) and/or (d) above.

The Fair Market Value of any stock to be applied toward the Exercise Price shall be determined as of the date of exercise of the Option.

The Company shall pay all original issue taxes with respect to the issuance of Shares pursuant hereto and all other fees and expenses necessarily incurred by the Company in connection therewith.  The holder of this Option shall have the rights of a stockholder only with respect to those Shares covered by the Option that have been registered in the holder's name in the share register of the Company upon the due exercise of the Option.

5.    **FORFEITURE**

[TBD]

6.   **NON-ASSIGNABILITY**

This Option shall not be transferable by the Optionee and shall be exercisable only by the Optionee, except as the Plan or this Agreement may otherwise provide.

7.   **NOTICES**

All notices, requests or other communications provided for in this Agreement shall be made in writing either (a) by personal delivery to the party entitled thereto, (b) by facsimile with confirmation of receipt, (c) by mailing in the United States through the U.S. Postal Service, or (d) by express courier service, addressed as follows:

To the Company:   Cumulus Media Inc.

_____

Attention: General Counsel

To the Optionee:   _____

_____

or to such other address or addresses where notice in the same manner has previously been given or to the last known address of the party entitled thereto.  The notice, request or other communication shall be deemed to be received upon personal delivery, upon confirmation of receipt of facsimile transmission, or upon receipt by the party entitled thereto if by United States mail or express courier service; provided, however, that if a notice, request or other communication is not received during regular business hours, it shall be deemed to be received on the next succeeding business day of the Company.

8.   **GOVERNING LAW**

This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware.

(Senior Executives)                                            5

9.      **WAIVER OF JURY TRIAL**

Each of the parties hereto hereby irrevocably waives any and all right to trial by jury of any claim or cause of action in any legal proceeding arising out of or related to this Agreement or the transactions or events contemplated hereby or any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party hereto. The parties hereto each agree that any and all such claims and causes of action shall be tried by a court trial without a jury. Each of the parties hereto further waives any right to seek to consolidate any such legal proceeding in which a jury trial has been waived with any other legal proceeding in which a jury trial cannot or has not been waived.

10.      **BINDING EFFECT**

This Agreement shall (subject to the provisions of Paragraph 6 hereof) be binding upon the heirs, executors, administrators, successors and assigns of the parties hereto.

**IN WITNESS WHEREOF**, the Company and the Optionee have caused this Agreement to be executed on their behalf, by their duly authorized representatives, all on the day and year first above written.

CUMULUS MEDIA INC.                                     OPTIONEE:


By: _____          _____
Its: _____


(Senior Executives)                                 6

**Exhibit F-5**
**Form of Option Agreement for Employees**

## CUMULUS MEDIA INC.
## NONSTATUTORY STOCK OPTION AGREEMENT

THIS AGREEMENT is made this ____ day of _____, 2018 (the "**Grant Date**"),[1] between Cumulus Media Inc., a Delaware corporation (the "**Company**"), and _____ (the "**Optionee**").

WHEREAS, the Company desires to grant to the Optionee an option to purchase shares of common stock (the "**Shares**") under the Company's Long-Term Incentive Plan (the "**Plan**"); and

WHEREAS, the Company and the Optionee understand and agree that any capitalized terms used herein, if not otherwise defined, shall have the same meanings as in the Plan (the Optionee being referred to in the Plan as a "**Participant**").

NOW, THEREFORE, in consideration of the following mutual covenants and for other good and valuable consideration, the parties agree as follows:

1.   **GRANT OF OPTION**

The Company grants to the Optionee the right and option to purchase all or any part of an aggregate of _____ Shares (the "**Option**") on the terms and conditions and subject to all the limitations set forth herein and in the Plan, which is incorporated herein by reference. The Optionee acknowledges receipt of a copy of the Plan and acknowledges that the definitive records pertaining to the grant of this Option, and exercises of rights hereunder, shall be retained by the Company. The Option granted herein is intended to be a Nonstatutory Option as defined in the Plan.

2.   **EXERCISE PRICE**

The purchase price of the Shares subject to the Option shall be $__ per    Share    (the "**Exercise Price**"), the Fair Market Value of the Shares as of the Grant Date. The foregoing notwithstanding, the Optionee acknowledges that the Company cannot and has not guaranteed that the Internal Revenue Service ("**IRS**") will agree that the per Share Exercise Price of the Option equals or exceeds the fair market value of a Share on the Grant Date in a later determination. The Optionee agrees that if the IRS determines that the Option was granted with a per Share Exercise Price that was less than the fair market value of a Share on the Grant Date, the Optionee shall be solely responsible for any costs or tax liabilities related to such a determination.

3.   **EXERCISE OF OPTION**

Subject to the Plan and this Agreement, the Option shall vest and be exercisable as follows:

---

[1] To be the Emergence Date.

Doc#: US1:11911021v6

EXERCISE PERIOD

| Number of Shares | Commencement Date | Expiration Date |
| --- | --- | --- |
| 30% of the total Option Shares | 1st Anniversary of Grant Date | Five Years from Grant Date |
| An additional 30% of the total Option Shares | 2nd Anniversary of Grant Date | Five Years from Grant Date |
| An additional 20% of the total Option Shares | 3rd Anniversary of Grant Date | Five Years from Grant Date |
| Remaining 20% of the Option Shares | 4th Anniversary of Grant Date | Five Years from Grant Date |

The Optionee must be employed by the Company at all times from the Grant Date through the applicable annual vesting date set forth above in order to vest in the tranche of Option Shares vesting on such date.  Upon a termination of the Optionee's employment with the Company for any reason or no reason, all vesting of the Option shall cease.  The foregoing notwithstanding, if the Optionee's employment with the Company terminates by virtue of the Optionee's (i) termination by the Company without Cause; (ii) voluntary resignation for Good Reason; (iii) death; or (iv) Disability (a termination of employment for any of the reasons set forth in the immediately preceding subsections (i) through (iv) to be referred to herein as a "**Qualifying Termination**"), then the vesting of the Option shall be accelerated as of the date of the Qualifying Termination by that number of Option Shares that would have otherwise vested on the next succeeding annual vesting date, as if the Optionee continued to be employed through such date.

Notwithstanding the foregoing, if the Optionee's services are terminated by the Company without Cause or as the result of the Optionee's voluntary resignation for Good Reason, in either instance at any time within the three (3) month period immediately preceding, or the twelve (12) month period immediately following, a Change in Control, one hundred percent (100%) of the Option Shares that are (or were) otherwise unvested Shares as of the date the Optionee's employment terminates shall thereafter become vested Shares.  For purposes of this Agreement, a "**Change in Control**" shall be deemed to occur on the earliest of (a) the purchase or other acquisition of outstanding shares of the Company's capital stock by any entity, person or group of beneficial ownership, as that term is defined in rule 13d-3 under the Securities Exchange Act of 1934 (other than the Company or one of its subsidiaries or employee benefit plans), in one or more transactions, such that the holder, as a result of such acquisition, then owns more than 50% of the outstanding capital stock of the Company entitled to vote for the election of directions ("**Voting Stock**"); (b) the completion by any entity, person, or group (other than the Company or one of its subsidiaries or employee benefit plans) of a tender offer or an exchange offer for more than 50% of the outstanding Voting Stock of the Company; and (c) the effective time of (1) a merger or consolidation of the Company with one or more corporations as a result of which the holders of the outstanding

2

Voting Stock of the Company immediately prior to such merger or consolidation hold less than 50% of the Voting Stock of the surviving or resulting corporation immediately after such merger or consolidation, or (2) a transfer of all or substantially all of the property or assets of the Company other than to an entity of which the Company owns at least 80% of the Voting Stock, or (3) the approval by the stockholders of the Company of a liquidation or dissolution of the Company.

For purposes of this Agreement, "**Good Reason**" shall have the meaning ascribed to such term under any employment agreement between the Optionee and the Company and, absent any such definition, Good Reason shall mean the occurrence of any of the following events without the Optionee's consent: (i) a material diminution in the Optionee's base salary, other than in connection with an across the board reduction affecting the Company's senior management team; (ii) a material diminution in the Optionee's duties, authority or responsibilities; or (iii) a change of greater than fifty (50) miles in the geographic location from which the Optionee primarily performs his or her services on behalf of the Company. The foregoing notwithstanding, no event described above shall constitute Good Reason unless (1) the Optionee gives written notice to the Company specifying the condition or event relied upon for the Good Reason termination within ninety (90) days following the initial existence of such condition or event; (2) the Company fails to cure the event or condition constituting Good Reason within thirty (30) days following receipt of the Optionee's written notice; and (3) the Optionee actually terminates his or her employment within thirty (30) days of the end of such cure period

4.      **ISSUANCE OF STOCK**

The Option may be exercised in whole or in part (to the extent that it is exercisable in accordance with its terms) by giving written notice (or any other approved form of notice) to the Company.  Such notice shall be signed by the person exercising the Option, shall state the number of Shares with respect to which the Option is being exercised, shall contain the warranty, if any, required under the Plan and shall specify a date (other than a Saturday, Sunday or legal holiday) not less than five (5) nor more than ten (10) days after the date of such written notice, as the date on which the Shares will be purchased, at the principal office of the Company during ordinary business hours, or at such other hour and place agreed upon by the Company and the person or persons exercising the Option, and shall otherwise comply with the terms and conditions of this Agreement and the Plan.  On the date specified in such written notice (which date may be extended by the Company if any law or regulation requires the Company to take any action with respect to the Option Shares prior to the issuance thereof), the Company shall accept payment for the Option Shares.

The Exercise Price shall be payable at the time of exercise as determined by the Company in its sole discretion either:

(a)      in cash, by certified check or bank check, or by wire transfer;

3

(b)     in whole shares of the Company's common stock (including, without limitation, by the Company delivering to the Optionee a lesser number of Shares having a Fair Market Value on the date of exercise equal to the amount by which the Fair Market Value of the Shares for which the Option is exercised exceeds the Exercise Price of such Shares), provided, however, that, (i) if the Optionee is subject to the reporting requirements of Section 16 of the Securities Exchange Act of 1934, as amended from time to time, and if such shares were granted pursuant to an option, then such option must have been granted at least six (6) months prior to the exercise of the Option hereunder, and (ii) the transfer of such shares as payment hereunder does not result in any adverse accounting consequences to the Company;

(c)     in lieu of the Optionee's being required to pay the Exercise Price in cash or another method specified in (a) or (b) above, by the Company delivering to the Optionee a lesser number of Shares determined as follows (a so-called "net" exercise):

$$IS = ES \times \left(1 - \frac{EP}{FMV}\right)$$

Where:

IS = the number of Shares to be issued upon such exercise (rounded down to a number of whole shares, with the remaining fractional Share paid in cash)

ES = the number of Shares for which this Option is exercised

EP = the Exercise Price per Share

FMV = the Fair Market Value of one Share, as determined in good faith by the Committee in its sole discretion as of the date of exercise of the Option;

(d)     through the delivery of cash  or the extension of credit by a broker-dealer to whom the Optionee has submitted notice of exercise or otherwise indicated an intent to exercise an Option (a so-called "cashless" exercise); or

(e)     in any combination of (a), (b), (c) and/or (d) above.

The Fair Market Value of any stock to be applied toward the Exercise Price shall be determined as of the date of exercise of the Option.

The Company shall pay all original issue taxes with respect to the issuance of Shares pursuant hereto and all other fees and expenses necessarily incurred by the Company in connection therewith.  The holder of this Option shall have the rights of a stockholder only with respect to those Shares covered by the Option that have been registered in the holder's name in the share register of the Company upon the due exercise of the Option.

5.     **FORFEITURE**

[TBD]

4

6.      **NON-ASSIGNABILITY**

This Option shall not be transferable by the Optionee and shall be exercisable only by the Optionee, except as the Plan or this Agreement may otherwise provide.

7.      **NOTICES**

All notices, requests or other communications provided for in this Agreement shall be made in writing either (a) by personal delivery to the party entitled thereto, (b) by facsimile with confirmation of receipt, (c) by mailing in the United States through the U.S. Postal Service, or (d) by express courier service, addressed as follows:

> To the Company:    Cumulus Media Inc.
>
> _____
>
> _____
> Attention: General Counsel
>
> To the Optionee:    _____
>
> _____
>
> _____

or to such other address or addresses where notice in the same manner has previously been given or to the last known address of the party entitled thereto.  The notice, request or other communication shall be deemed to be received upon personal delivery, upon confirmation of receipt of facsimile transmission, or upon receipt by the party entitled thereto if by United States mail or express courier service; provided, however, that if a notice, request or other communication is not received during regular business hours, it shall be deemed to be received on the next succeeding business day of the Company.

8.      **GOVERNING LAW**

This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware.

5

9.   **WAIVER OF JURY TRIAL**

Each of the parties hereto hereby irrevocably waives any and all right to trial by jury of any claim or cause of action in any legal proceeding arising out of or related to this Agreement or the transactions or events contemplated hereby or any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party hereto. The parties hereto each agree that any and all such claims and causes of action shall be tried by a court trial without a jury. Each of the parties hereto further waives any right to seek to consolidate any such legal proceeding in which a jury trial has been waived with any other legal proceeding in which a jury trial cannot or has not been waived.

10.   **BINDING EFFECT**

This Agreement shall (subject to the provisions of Paragraph 6 hereof) be binding upon the heirs, executors, administrators, successors and assigns of the parties hereto.

**IN WITNESS WHEREOF**, the Company and the Optionee have caused this Agreement to be executed on their behalf, by their duly authorized representatives, all on the day and year first above written.

CUMULUS MEDIA INC.                                OPTIONEE:

By: _____        _____
Its: _____

6

## <u>EXHIBIT G</u>

**First Lien Exit Credit Agreement**

CREDIT AGREEMENT

among

CUMULUS MEDIA INC.,

CUMULUS MEDIA HOLDINGS INC.,
as Borrower,

CERTAIN LENDERS,

and

WILMINGTON TRUST, NATIONAL ASSOCIATION
as Administrative Agent,

Dated as of [_____], 2018

145909348v39

TABLE OF CONTENTS

Page

SECTION 1.   DEFINITIONS .................................................................................. 1
   1.1   Defined Terms ................................................................................... 1
   1.2   Other Definitional Provisions ......................................................... 34

SECTION 2.   AMOUNT AND TERMS OF THE TERM LOAN COMMITMENTS ............... 35
   2.1   Term Loans ..................................................................................... 35
   2.2   Repayment of Term Loans .............................................................. 35

SECTION 3.   [Reserved] ..................................................................................... 35

SECTION 4.   GENERAL PROVISIONS APPLICABLE TO TERM LOANS ...................... 35
   4.1   [Reserved] ....................................................................................... 35
   4.2   Repayment of Term Loans; Evidence of Debt ................................ 35
   4.3   Conversion Options ........................................................................ 36
   4.4   [Reserved] ....................................................................................... 37
   4.5   Optional Prepayments .................................................................... 37
   4.6   Mandatory Prepayments ................................................................. 37
   4.7   Interest Rates and Payment Dates .................................................. 39
   4.8   Computation of Interest and Fees .................................................. 39
   4.9   [Reserved] ....................................................................................... 40
   4.10  Certain Fees .................................................................................... 40
   4.11  [Reserved] ....................................................................................... 40
   4.12  [Reserved] ....................................................................................... 40
   4.13  [Reserved] ....................................................................................... 40
   4.14  [Reserved] ....................................................................................... 40
   4.15  Inability to Determine Interest Rate for Eurodollar Loans ............ 40
   4.16  Pro Rata Treatment and Payments ................................................. 41
   4.17  Illegality .......................................................................................... 42
   4.18  Requirements of Law ...................................................................... 43
   4.19  Indemnity ........................................................................................ 44
   4.20  Taxes ............................................................................................... 45
   4.21  [Reserved] ....................................................................................... 48
   4.22  Mitigation; Replacement of Lenders .............................................. 48
   4.23  Prepayments Below Par .................................................................. 49
   4.24  Extensions of Term Loans .............................................................. 52

SECTION 5.   REPRESENTATIONS AND WARRANTIES ............................................ 53
   5.1   Financial Condition ........................................................................ 54
   5.2   Corporate Existence; Compliance with Law .................................. 54
   5.3   Corporate Power; Authorization ..................................................... 54
   5.4   Enforceable Obligations ................................................................. 55
   5.5   No Legal Bar ................................................................................... 55
   5.6   No Material Litigation .................................................................... 55

i

5.7     Investment Company Act ................................................................ 55
5.8     Federal Regulation ......................................................................... 55
5.9     No Default or Breach ..................................................................... 55
5.10    Taxes ............................................................................................. 56
5.11    Subsidiaries; Loan Parties ............................................................. 56
5.12    Ownership of Property; Liens; Licenses ........................................ 56
5.13    Intellectual Property ...................................................................... 56
5.14    Labor Matters ................................................................................ 57
5.15    ERISA ........................................................................................... 57
5.16    Environmental Matters ................................................................... 57
5.17    Disclosure ..................................................................................... 58
5.18    Security Documents ....................................................................... 58
5.19    Solvency ........................................................................................ 59
5.20    [Reserved] ..................................................................................... 59
5.21    Patriot Act ..................................................................................... 59
5.22    Anti-Corruption Laws and Sanctions ............................................. 59
5.23    Plan Assets; Prohibited Transactions ............................................ 59

SECTION 6.    CONDITIONS PRECEDENT ......................................................... 59
6.1     Conditions Precedent to Effectiveness ........................................... 60

SECTION 7.    AFFIRMATIVE COVENANTS ....................................................... 62
7.1     Financial Statements ...................................................................... 63
7.2     Certificates; Other Information ...................................................... 64
7.3     Payment of Obligations .................................................................. 65
7.4     Conduct of Business; Maintenance of Existence; Compliance ....... 65
7.5     Maintenance of Property; Insurance ............................................... 65
7.6     Inspection of Property; Books and Records; Discussions; Annual Meetings ....... 66
7.7     Notices .......................................................................................... 66
7.8     Environmental Laws ...................................................................... 67
7.9     [Reserved] ..................................................................................... 67
7.10    Additional Loan Parties; Pledge of Stock of Additional Subsidiaries;
        Additional Collateral, etc. .............................................................. 68
7.11    Broadcast License Subsidiaries ...................................................... 69
7.12    [Reserved] ..................................................................................... 70
7.13    Ratings .......................................................................................... 70
7.14    [Reserved] ..................................................................................... 70
7.15    Anti-Corruption Laws and Sanctions ............................................. 70

SECTION 8.    NEGATIVE COVENANTS ............................................................. 70
8.1     [Reserved] ..................................................................................... 70
8.2     Indebtedness .................................................................................. 70
8.3     Limitation on Liens ........................................................................ 73
8.4     Limitation on Contingent Obligations ............................................ 76
8.5     Prohibition of Fundamental Changes .............................................. 77
8.6     Prohibition on Sale of Assets ......................................................... 77
8.7     Limitation on Investments, Loans and Advances ............................ 81

ii

8.8     Limitation on Restricted Payments ................................................................. 84
8.9     Transactions with Affiliates ........................................................................... 86
8.10    Limitation on Sales and Leasebacks ............................................................. 86
8.11    Fiscal Year ...................................................................................................... 87
8.12    Negative Pledge Clauses ................................................................................ 87
8.13    Clauses Restricting Subsidiary Distributions ................................................ 87
8.14    FCC Licenses .................................................................................................. 88
8.15    Certain Payments of Indebtedness ................................................................. 88
8.16    Amendment of Material Documents ............................................................... 89

SECTION 9.    EVENTS OF DEFAULT ................................................................... 89

SECTION 10. THE ADMINISTRATIVE AGENT ................................................... 92
10.1    Authorization and Action ............................................................................... 92
10.2    Administrative Agent's Reliance, Indemnification, Etc. ................................ 94
10.3    Posting of Communications ............................................................................ 96
10.4    The Administrative Agent Individually .......................................................... 97
10.5    Successor Administrative Agent ..................................................................... 98
10.6    Acknowledgements of Lenders ....................................................................... 99
10.7    Collateral Matters ........................................................................................... 99
10.8    Credit Bidding ................................................................................................ 100
10.9    Certain ERISA Matters ................................................................................... 101
10.10   Indemnification ............................................................................................... 103

SECTION 11. MISCELLANEOUS ......................................................................... 103
11.1    Amendments and Waivers ............................................................................... 103
11.2    Notices ............................................................................................................ 105
11.3    No Waiver; Cumulative Remedies .................................................................. 107
11.4    Survival of Representations and Warranties ................................................... 107
11.5    Payment of Expenses ...................................................................................... 107
11.6    Successors and Assigns; Participations; Purchasing Lenders ......................... 109
11.7    Adjustments; Set-off ....................................................................................... 114
11.8    Counterparts .................................................................................................... 115
11.9    Integration ....................................................................................................... 115
11.10   GOVERNING LAW; NO THIRD PARTY RIGHTS ...................................... 115
11.11   SUBMISSION TO JURISDICTION; WAIVERS ........................................... 115
11.12   Acknowledgements .......................................................................................... 116
11.13   Releases of Guarantees and Liens ................................................................... 117
11.14   [Reserved] ....................................................................................................... 117
11.15   Confidentiality ................................................................................................ 117
11.16   Usury Savings ................................................................................................. 118
11.17   Severability ..................................................................................................... 119
11.18   Patriot Act ....................................................................................................... 119
11.19   Acknowledgement and Consent to Bail-In of EEA Financial Institutions ......... 119

145909348v39

SCHEDULES:

Schedule 1.1A          Effective Date Lenders and Term Loans
Schedule 1.1B          Mortgaged Properties
Schedule 5.6           Litigation
Schedule 5.9           No Default
Schedule 5.11(a)       Domestic Subsidiaries
Schedule 5.11(b)       Foreign Subsidiaries
Schedule 5.11(c)       Loan Parties
Schedule 5.12          FCC Licenses
Schedule 5.16          Environmental Matters
Schedule 5.18          Financing Statements and Other Filings
Schedule 7.11          FCC Licenses
Schedule 8.2           Existing Indebtedness
Schedule 8.3           Existing Liens
Schedule 8.4           Existing Contingent Obligations
Schedule 8.6(g)        Stations in Trust
Schedule 8.6(y)        Permitted Dispositions
Schedule 8.7           Existing Investments, Loans and Advances
Schedule 8.9           Transactions with Affiliates

EXHIBITS:

Exhibit A              Form of Guarantee and Collateral Agreement
Exhibit B-1            Form of Parent Closing Certificate
Exhibit B-2            Form of Borrower Closing Certificate
Exhibit B-3            Form of Subsidiary Guarantor Closing Certificate
Exhibit C              Form of Conversion/Continuation Notice
Exhibit D              Form of Assignment and Assumption
Exhibit E              Forms of Exemption Certificate
Exhibit F              Form of U.S. Tax Compliance Certificates
Exhibit G              Form of Discounted Prepayment Option Notice
Exhibit H              Form of Lender Participation Notice
Exhibit I              Form of Discounted Voluntary Prepayment Notice
Exhibit J              Form of Solvency Certificate

145909348v39

CREDIT AGREEMENT (this "Agreement"), dated as of [_____], 2018, among [CUMULUS MEDIA INC., a Delaware corporation ("Parent"), CUMULUS MEDIA HOLDINGS INC., a Delaware corporation (the "Borrower"),][1] the Lenders (as hereinafter defined) from time to time party hereto and WILMINGTON TRUST, NATIONAL ASSOCIATION, as administrative agent for the Lenders.

WHEREAS, the Borrower entered into that certain Amended and Restated Credit Agreement, dated as of December 23, 2013 (the "Prepetition Credit Agreement"), with the lenders party thereto (such lenders party thereto holding term loans thereunder being referred to herein as the "Prepetition Term Lenders"), JPMorgan Chase Bank, N.A., as administrative agent, and certain other parties;

WHEREAS, on November 29, 2017, the Parent, the Borrower and certain of their subsidiaries (each, a "Chapter 11 Debtor" and collectively, the "Chapter 11 Debtors") filed voluntary petitions with the Bankruptcy Court (as hereinafter defined) for relief under Chapter 11 of the Bankruptcy Code (as hereinafter defined) (each case of a Chapter 11 Debtor, a "Case" and collectively, the "Cases");

WHEREAS, the Plan of Reorganization (as hereinafter defined) of the Chapter 11 Debtors was confirmed by the Bankruptcy Court on [_____], 2018 and will be consummated on the date hereof; and

WHEREAS, pursuant to the Plan of Reorganization, the Prepetition Term Lenders are receiving, among other things, interests in an exit term loan facility in the original aggregate principal amount of $1,300,000,000, on the terms and conditions set forth in this Agreement and the other Loan Documents.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto hereby agree as follows:

SECTION 1.    DEFINITIONS

1.1    Defined Terms. As used in this Agreement, the terms defined in the preamble or recitals hereto shall have the meanings set forth therein, and the following terms shall have the following meanings:

"ABL Facility": as defined in the definition of Permitted Revolving Credit Facility.

"ABL Priority Collateral": Collateral consisting of accounts receivable and other collateral for a receivables-based, asset-based revolving credit facility that would customarily be secured by Liens having priority over the Liens securing a senior secured term loan facility in a split collateral structure.

---

[1] The names of the Borrower and Parent to be updated once the terms of the tax restructuring are finalized, and any provisions in this Agreement that would currently restrict the tax restructuring transactions to be modified to allow the consummation thereof.

"ABR":  for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus 1/2 of 1% and (c) the Eurodollar Rate for a Eurodollar Loan with a one-month interest period commencing on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%; provided that for the purpose of this definition, the Eurodollar Rate for any day shall be based on the Eurodollar Screen Rate at approximately 11:00 a.m. London time on such day (or if such day is not a Business Day, on the immediately preceding Business Day).  Any change in the ABR due to a change in the Prime Rate, the NYFRB Rate or the Eurodollar Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate, the NYFRB Rate or the Eurodollar Rate, respectively. Notwithstanding the foregoing, ABR shall at all times not be less than 2.00%.

"ABR Loans": Term Loans whose interest rate is based on the ABR.

"Acceptable Discount": as defined in subsection 4.23.

"Acceptance Date": as defined in subsection 4.23.

"Act": as defined in subsection 11.18.

"Administrative Agent": Wilmington Trust, in its capacity as administrative agent for the Lenders hereunder, and its successors in such capacity as provided in Section 10.

"Administrative Agent's Account": the account designated from time to time in writing as the "Administrative Agent's Account" by the Administrative Agent to the other parties hereto

"Administrative Questionnaire": an Administrative Questionnaire in the form supplied from time to time by the Administrative Agent.

"Affiliate": of any Person (a) any Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, or (b) any Person who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above. For purposes of this definition, "control" of a Person shall mean the power, direct or indirect, either to (x) vote 10% or more of the securities having ordinary voting power for the election of directors of such Person, or (y) direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Agreement": as defined in the preamble hereto.

"Anti-Corruption Laws": all laws, rules, and regulations of any jurisdiction applicable to the Borrower or its Subsidiaries from time to time concerning or relating to bribery or corruption.

"Applicable Discount": as defined in subsection 4.23.

2

145909348v39

"Applicable Margin": 4.50% per annum in the case of a Eurodollar Loan or 3.50% per annum in the case of an ABR Loan. Notwithstanding the foregoing, the Applicable Margin in respect of any tranche of Extended Term Loans shall be the applicable percentages per annum set forth in the relevant Extension Offer.

"Approved Electronic Platform": as defined in subsection 10.3(a).

"Approved Fund": as defined in subsection 11.6(c).

"ASC": the FASB Accounting Standards Codification.

"Asset Sale": any sale, sale-leaseback, assignment, conveyance, transfer or other disposition by any Group Member of any of its property or assets (except sales, assignments, conveyances, transfers and other dispositions permitted by subsection 8.6 (other than clauses (e), (f), (g), (p), (w) and (y) thereof)).

"Assignee": as defined in subsection 11.6(c).

"Assignment and Assumption": an Assignment and Assumption substantially in the form of Exhibit D hereto or any other form reasonably approved by the Administrative Agent.

"Available Amount": as of any date of determination, an amount equal to the sum of:

>   (a)    $50,000,000; plus
>
>   (b)    the Cumulative Retained Excess Cash Flow Amount; plus
>
>   (c)    50% of the sum of (without duplication):
>
>> (i)    the Net Proceeds received after the Effective Date and on or prior to such date (other than any Net Proceeds applied for Investments under subsection 8.7(t), Restricted Payments under subsection 8.8(c) or subsection 8.8(h) or prepayments of Indebtedness under subsection 8.15(b)(iii) from any Capital Stock Issuance (other than any such issuance to a Group Member), including any sale of treasury Capital Stock, but excluding any issuance of Disqualified Stock; provided that the Net Proceeds thereof have been contributed by Parent in cash as common equity to the Borrower;
>>
>> (ii)    the net cash proceeds received after the Effective Date and on or prior to such date from any capital contribution to the Borrower; provided that any such capital contribution is from a Person other than a Group Member;
>>
>> (iii)    [Reserved];

3

(iv)     the net cash proceeds received after the Effective Date and on or prior to such date by the Borrower or any Subsidiary from the issuance of convertible or exchangeable debt securities that have been converted into or exchanged for Capital Stock of a Group Member (other than Disqualified Stock);

(v)     the aggregate amount received in cash or Cash Equivalents after the Effective Date and on or prior to such date by the Borrower or any Subsidiary in connection with the sale, transfer or other disposition of its ownership interest in any existing joint venture that is not a Subsidiary, in each case, to the extent of the Investment in such joint venture (with the amount of such Investment being calculated in accordance with the last sentence of subsection 8.7); and

(vi)     the aggregate amount received in cash or Cash Equivalents after the Effective Date and on or prior to such date by the Borrower or any Subsidiary in connection with the sale, transfer or other disposition to a Person (other than a Group Member) of any Investment made in reliance on subsection 8.7(r) and repurchases and redemptions (other than by a Group Member) of such Investments from the Borrower or its Subsidiaries and repayments of loans or advances (other than by a Group Member) that constitute Investments made in reliance on subsection 8.7(r); provided that such amount shall not exceed the amount of such initial Investment made in reliance on subsection 8.7(r); minus

(d)     the amount of any Investments made in reliance on subsection 8.7(r) prior to such date.

"Bail-In Action": the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation": with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code": the United States Bankruptcy Code, as now or hereafter in effect, or any successor statute.

"Bankruptcy Court": the United States Bankruptcy Court for the Southern District of New York.

"Bankruptcy Plan":  a reorganization or plan of liquidation pursuant to any Debtor Relief Laws.

"Benefit Plan": any of (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of

4

the Code to which Section 4975 of the Code applies, and (c) any Person whose assets include (for purposes of the Plan Asset Regulations  or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Benefited Lender": as defined in subsection 11.7 hereof.

"Bethesda Property": the real property owned by DC Radio Assets, LLC and located at 7115 Greentree Road, Bethesda, MD.

"Board": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower": as defined in the preamble hereto.

"Borrower Materials": as defined in subsection 10.3(g).

"Breakage Event": as defined in subsection 4.19 hereof.

"Broadcast Assets": all or substantially all the assets used and useful in the operation of a Station pursuant to an FCC License, including such FCC License.

"Broadcast Cash Flow": for any period, Consolidated EBITDA for such period plus, to the extent deducted in calculating such Consolidated EBITDA, corporate level general and administrative expenses of the Borrower and the Subsidiary Guarantors for such period (calculated in a manner consistent with the calculation of such expenses in the consolidated financial statements of the Borrower for such period).

"Broadcast License Subsidiary": a wholly-owned Subsidiary of the Borrower that (a) owns or holds no material assets other than FCC Licenses and related rights and (b) has no material liabilities other than (i) trade payables incurred in the ordinary course of business and (ii) tax liabilities, other governmental charges and other liabilities incidental to the ownership or holding of such licenses and related rights.

"Business Acquisition": any Permitted Acquisition and any other acquisition permitted under subsection 8.7 pursuant to which the Borrower or any of its Subsidiaries acquires any business, division or line of business or all or substantially all of the outstanding Capital Stock of any corporation or other entity (other than any director's qualifying shares or any options for equity interests that cannot, as a matter of law, be cancelled, redeemed or otherwise extinguished without the express agreement of the holder thereof at or prior to acquisition) or any Station and Broadcast Assets related thereto.

"Business Day": a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"Capital Expenditures": for any period, all amounts (other than those arising from the acquisition or lease of businesses and assets which are permitted by subsection 8.7)

5

which are set forth on the consolidated statement of cash flows of the Borrower for such period as "capital expenditures" in accordance with GAAP.

"Capital Lease Obligations": as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP. Notwithstanding anything else set forth herein, any lease that was or would have been treated as an operating lease under GAAP as in effect on the Effective Date that would become or be treated as a capital lease solely as a result of a change in GAAP after the Effective Date shall always be treated as an operating lease for all purposes and at all times under this Agreement.

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing; provided, that any instrument evidencing Indebtedness convertible or exchangeable for Capital Stock shall not be deemed to be Capital Stock, unless and until any such instrument is so converted or exchanged.

"Capital Stock Issuance": any issuance by Parent of its Capital Stock in a public or private offering.

"Cash Collateralize": to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the Secured Parties, as collateral for prepayment obligations, cash or deposit account balances, in each case pursuant to documentation in form and substance satisfactory to the Administrative Agent.  "Cash Collateral" shall have a meaning correlative to the foregoing.

"Case" or "Cases": as defined in the recitals hereto.

"Cash Equivalents":

(a)    United States dollars;

(b)    securities issued or directly and fully and unconditionally guaranteed or insured by the U.S. government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 24 months or less from the date of acquisition;

(c)    certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus of not less than $300,0000,000;

6

(d)      repurchase obligations for underlying securities of the types described in clauses (b) and (c) entered into with any financial institution meeting the qualifications specified in clause (c) above and in Dollars;

(e)      commercial paper rated at least P-2 by Moody's or at least A-2 by S&P and in each case maturing within 24 months after the date of creation thereof, in Dollars;

(f)      marketable short-term money market and similar securities having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 24 months after the date of creation thereof and in Dollars;

(g)      investment funds investing substantially all of their assets in securities of the types described in clauses (a) through (f) above;

(h)      readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an investment grade rating from either Moody's or S&P with maturities of 24 months or less from the date of acquisition;

(i)      Indebtedness or Preferred Stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 24 months or less from the date of acquisition and in each case in Dollars;

(j)      Investments with weighted average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's and in each case in Dollars; and

(k)      credit card receivables and debit card receivables so long as such are considered cash equivalents under GAAP and are so reflected on the Borrower's balance sheet.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than Dollars; provided that such amounts are converted into Dollars as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

"Change in Control": (a) the acquisition (whether through a merger transaction with Parent or otherwise) of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the Effective Date), of Capital Stock representing more than 50% of the aggregate ordinary active voting power represented by the issued and outstanding Capital Stock of Parent or (b) the failure of Parent to own, directly and of record, 100% of the Capital Stock of the Borrower.

7

145909348v39

"Change in Law": with respect to any Lender, the adoption of any law, rule, regulation, policy, guideline or directive (whether or not having the force of law) or any change therein or in the interpretation or application thereof by any Governmental Authority, including the issuance of any final rule, regulation or guideline by any regulatory agency having jurisdiction over such Lender or, in the case of subsection 4.18, any corporation controlling such Lender; provided however, that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Chapter 11 Debtor" or "Chapter 11 Debtors": as defined in the recitals hereto.

"Code": the Internal Revenue Code of 1986, as amended from time to time.

"Collateral": all property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document.

"Communications Act": the Communications Act of 1934, as amended, 47 U.S.C. §151 et seq.

"Connection Income Taxes": Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Current Assets": at any date, all amounts (other than cash and Cash Equivalents) that would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) (other than trade assets and barter assets) on a consolidated balance sheet of the Borrower and its Subsidiaries at such date.

"Consolidated Current Liabilities": at any date, all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) (other than trade liabilities and barter liabilities) on a consolidated balance sheet of the Borrower and its Subsidiaries at such date, but excluding the current portion of any Funded Debt of the Borrower and its Subsidiaries.

"Consolidated EBITDA": for any period of the Borrower and its Subsidiaries, the consolidated net income ((i) including net income and losses from discontinued operations, (ii) excluding all income tax expense or benefit to the extent that the effect of such item has entered into the determination of consolidated net income whether based on income, profits or capital, including federal, foreign, state, franchise, excise and similar taxes and foreign withholding taxes paid or accrued during such period, including any penalties and interest relating to any tax examinations, (iii) excluding extraordinary items, as well as unusual gains, losses and charges and gains and losses arising from the proposed or actual disposition of material assets (what constitutes material assets to be

8

145909348v39

reasonably determined by the Borrower in good faith) whether such losses or gains are classified as discontinued operations, continuing operations or extraordinary items; provided, that the aggregate amount of all cash losses or charges added back pursuant to this clause (iii) shall not exceed $20,000,000 for any four consecutive fiscal quarter period, (iv) excluding minority interest and (v) excluding to the extent reflected in the statement of consolidated net income for such period, the sum of (a) interest expense (net of interest income), including costs recognized from interest rate hedges, amortization and write offs of debt discount and debt issuance costs and commissions, discounts and other fees and charges owed with respect to letters of credit, (b) depreciation and amortization expenses whether such expenses are classified as discontinued operations or continuing operations including acceleration thereof and including the amortization of the increase in inventory, if any, resulting from the application of ASC 805, "Business Combinations" for transactions contemplated by this Agreement (including any Business Acquisitions), (c) any impairment expense or write-off with respect to goodwill, other intangible assets, long-lived asset, joint ventures, assets held for sale, variable interest entities resulting from the application of ASC 810, "Consolidation," and investment in debt and equity securities pursuant to GAAP, (d) compensation expenses arising from the sale of stock, the granting of stock options, restricted stock, restricted stock units, dividends on unvested shares, the granting of stock appreciation rights, termination of stock based rewards in connection with the Plan and similar stock based arrangements, (e) the excess of the expense in respect of post-retirement benefits and post-employment benefits accrued under ASC 715, "Compensation—Retirement Benefits" and ASC 712, "Compensation—Nonretirement Postemployment Benefits" over the cash expense in respect of such post-retirement benefits and post-employment benefits, (f) all non-cash gains or losses incurred in connection with the disposition of assets, (g) all costs relating to hedging arrangements or the unwinding of hedging arrangements, (h) other non-cash expenses or charges, including asset retirement obligations and supplemental executive retirement obligations, (i) non-recurring expenses recognized for restructuring costs, including but not limited to severance costs, relocation costs, integration and facilities costs, signing costs, retention or completion bonuses, transition costs and litigation expenses (including judgment and settlement amounts relating to any Business Acquisition), provided that any restructuring costs added back pursuant to this clause (i) (1) shall not exceed $5,000,000 in the aggregate for any four consecutive fiscal quarter period and (2) in respect of litigation expenses shall not exceed $3,000,000 in the aggregate during the term of this Agreement, (j) [reserved], (k) to the extent covered by insurance under which the insurer has been properly notified and has not denied or contested coverage, expenses with respect to liability or casualty events or business interruption, (l) all non-recurring transactional costs and any fees or expenses incurred or paid by the Borrower or any of its Subsidiaries in connection with this Agreement and the other Loan Documents, any Business Acquisition, any Investment, the disposition of material assets, the amendment or modification of any debt instrument, the incurrence of Indebtedness permitted to be incurred by this Agreement (including a refinancing thereof) and the issuance of any Capital Stock (in each case, whether or not successful) permitted to be issued by this Agreement, (m) cost-savings and synergies that are reasonably identifiable, factually supportable and projected by the Borrower in good faith to be realized as a result of mergers and other business combinations, Permitted

9

Acquisitions, divestitures, insourcing initiatives, cost savings initiatives and other similar initiatives consummated after the Effective Date, in each case permitted by this Agreement (calculated on a pro forma basis as though such costs savings and synergies had been realized on the first day of the relevant Test Period), net of the amount of actual benefits realized in respect thereof, provided that (1) actions in respect of such cost-savings and synergies have been taken and (2) the aggregate amount of cost-savings and synergies added back pursuant to this clause (m) shall not exceed $20,000,000 for any four consecutive fiscal quarter period; provided further that no cost savings and synergies shall be added back pursuant to this clause (m) to the extent duplicative of any expenses or charges otherwise added to Consolidated EBITDA, whether through a pro forma adjustment or otherwise, for such period or duplicative of amounts previously added to Consolidated EBITDA for other periods, (n) the aggregate amount of unpaid administrative costs and unpaid professional fees incurred in such period in connection with the Cases, (o) interest-equivalent costs associated with any Receivables Facility for such period, whether accounted for as interest expense or loss on the sale of receivables, in each case to the extent deducted in calculating consolidated net income for such period, and (p) any charges, expenses and write-offs deducted in calculating consolidated net income for such period for purchase accounting adjustments; provided that Consolidated EBITDA shall be decreased by the amount of any dividends or distributions made to Parent to pay expenses that otherwise would have been expenses of the Borrower; provided further that Consolidated EBITDA for any such period shall exclude the cumulative effect of changes in GAAP or accounting principle(s) subsequent to the Effective Date.

The financial results of joint ventures and variable interest entities shall be excluded in calculating "Consolidated EBITDA" except that Consolidated EBITDA for any period shall be increased by the amount of cash dividends paid by such joint ventures and variable interest entities to the Borrower or any of its wholly-owned Subsidiaries.

For the purposes of calculating Consolidated EBITDA for any Test Period pursuant to any determination (i) if at any time during such Test Period or subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, the Borrower or any Subsidiary shall have made any Material Disposition, the Consolidated EBITDA for such Test Period shall be reduced by an amount equal to the Consolidated EBITDA (if positive) attributable to the property that is the subject of such Material Disposition for such Test Period or increased by an amount equal to the Consolidated EBITDA (if negative) attributable thereto for such Test Period and (ii) if during such Test Period or subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, the Borrower or any Subsidiary shall have made a Material Acquisition, Consolidated EBITDA for such Test Period shall be calculated after giving pro forma effect thereto as if such Material Acquisition occurred on the first day of such Test Period. As used in this Agreement, "Material Acquisition" means the acquisition of any separate asset, business or lines of business for a purchase price (or in the case of a Permitted Asset Swap, the value of the assets subject to such Permitted Asset Swap) in excess of $25,000,000; and "Material Disposition" means any sale or other disposition of property or series of related

10

sales or dispositions of property that yields gross proceeds to the Borrower or any of its Subsidiaries in excess of $25,000,000.

"Consolidated First Lien Debt": at any date, Consolidated Total Indebtedness that is secured by a first priority Lien on any of the assets of the Borrower or any of its Subsidiaries.

"Consolidated First Lien Net Leverage Ratio": as of any date of determination, the ratio of (a) Consolidated First Lien Debt (provided that Indebtedness under clause (b) of the definition of Indebtedness shall only be included to the extent of any unreimbursed drawings under any letter of credit) less the aggregate amount of Unrestricted Cash up to a maximum amount of $75,000,000, in each case as of such date, to (b) Consolidated EBITDA for the Test Period most recently ended prior to such date for which financial statements have been delivered to the Administrative Agent pursuant to Section 7.1(a) or (b).

"Consolidated Total Indebtedness": as of any date of determination, all Indebtedness of the Borrower and its Subsidiaries, determined on a consolidated basis in accordance with GAAP; provided that Consolidated Total Indebtedness shall not include Indebtedness in respect of any letter of credit or bank guaranty except to the extent of any unreimbursed amounts thereunder.

"Consolidated Total Leverage Ratio": as of any date of determination, the ratio of (a) Consolidated Total Indebtedness (provided that Indebtedness under clause (b) of the definition of Indebtedness shall only be included to the extent of any unreimbursed drawings under any letter of credit) as of such date to (b) Consolidated EBITDA for the Test Period most recently ended prior to such date for which financial statements have been delivered.

"Consolidated Total Net Leverage Ratio": as of any date of determination, the ratio of

(a)     Consolidated Total Indebtedness (provided that Indebtedness under clause (b) of the definition of Indebtedness shall only be included to the extent of any unreimbursed drawings under any letter of credit) less the aggregate amount of Unrestricted Cash of the Borrower and the Subsidiary Guarantors up to a maximum amount of $75,000,000, in each case as of such date, to

(b)     Consolidated EBITDA for the Test Period most recently ended prior to such date for which financial statements have been delivered to the Administrative Agent pursuant to Section 7.1(a) or (b).

"Consolidated Working Capital": at any date, the excess of Consolidated Current Assets on such date minus Consolidated Current Liabilities on such date.

"Contingent Obligation": as to any Person, any obligation of such Person guaranteeing or in effect guaranteeing any Indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly,

11

including any obligation of such Person, whether or not contingent (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (d) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount (based on the maximum reasonably anticipated net liability in respect thereof as determined by the Borrower in good faith) of the primary obligation or portion thereof in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated net liability in respect thereof (assuming such Person is required to perform thereunder) as determined by the Borrower in good faith.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking to which such Person is a party or by which it or any of the property owned by it is bound.

"Control": the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement": with respect to any deposit account or securities account, an agreement, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, among the Administrative Agent, the financial institution or other Person at which such account is maintained and the Loan Party maintaining such account, effective to grant "control" (as defined under the applicable Uniform Commercial Code) over such account (and all assets on deposit therein or credited thereto) to the Administrative Agent, for the benefit of the Secured Parties.

"Conversion/Continuation Notice": a Conversion/Continuation Notice substantially in the form of Exhibit C.

"Cumulative Retained Excess Cash Flow Amount": at any date of determination, an amount equal to the aggregate cumulative sum of the Retained Percentage of Excess Cash Flow for the Excess Cash Flow Periods ended on or prior to such date.

"Debtor Relief Laws": the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, arrangement, compromise, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

12

"Declined Prepayment Amount": as defined in subsection 4.6(g).

"Default": any of the events specified in Section 9, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Discount Range": as defined in subsection 4.23.

"Discounted Prepayment Option Notice": as defined in subsection 4.23.

"Discounted Voluntary Prepayment": as defined in subsection 4.23.

"Discounted Voluntary Prepayment Notice": as defined in subsection 4.23.

"Disqualified Lenders": those Persons whose primary business consists of broadcasting, local media and advertising who are identified in writing by the Borrower to the Administrative Agent prior to the Effective Date, as such list may be supplemented after the Effective Date by written notice from the Borrower to the Administrative Agent. For the avoidance of doubt (i) the Administrative Agent may, and shall be permitted to, upon request, provide such list of Disqualified Lenders to the Lenders and prospective Lenders, (ii) any addition to the list of Disqualified Institutions will not become effective until three Business Days after such addition is posted to the Lenders and (iii) no retroactive disqualification of the Lenders that later become Disqualified Lenders shall be permitted.

"Disqualified Person": as defined in the definition of "Eligible Assignee".

"Disqualified Stock": with respect to any Person, any Capital Stock of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely as a result of a change of control or asset sale) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than solely as a result of a change of control or asset sale), in whole or in part, in each case prior to the date that is 180 days after the Maturity Date (or, if later, the maturity date of any Extended Term Loans); provided, however, that if such Capital Stock is issued to any plan for the benefit of employees of Parent or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by Parent or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"Divestiture Trust": a trust (a) created by or on behalf of the Borrower or any Subsidiary to hold and ultimately sell assets in conjunction with any Business Acquisition or any sale or other disposition pursuant to Section 8.6(e) or (g) hereof to ensure compliance with the Communications Act or FCC rules and policies and (b) that is independently owned and managed by a Person unaffiliated with the Borrower or any Subsidiary.

"Dollars" and "$": dollars in lawful currency of the United States of America.

13

"Domestic Subsidiary": any Subsidiary of the Borrower other than a Foreign Subsidiary.

"ECF Percentage": 75%; provided, that, with respect to any fiscal year of the Borrower, the ECF Percentage shall be reduced to 50% if the Consolidated Total Net Leverage Ratio as of the last day of such fiscal year is less than or equal to 4.50 to 1.00.

"EEA Financial Institution": (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country": any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority": any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date": the date on which each of the conditions precedent to the effectiveness of this Agreement contained in subsection 6.1 were satisfied, which date is [_____], 2018.

"Effective Date Lenders: as defined in the definition of "Lenders".

"Eligible Assignee": (a) a Lender, (b) a Lender Affiliate, (c) an Approved Fund and (d) any other Person (other than Parent or any Subsidiary thereof (except, solely in the case of an Open Market Purchase pursuant to Section 11.6(h), the Borrower)); provided that "Eligible Assignee" shall not in any event include (i) a natural person, (ii) a Disqualified Lender or (iii) any holding company, trust or investment vehicle for the primary benefit of a natural person (including relatives of such person), other than any such entity that (w) has not been formed for the primary purpose of acquiring Term Loans under this Agreement, (x) is managed by a professional adviser (other than such natural person or any such relatives) having significant experience in the business of making or purchasing commercial loans, (y) has assets of greater than $25,000,000 and (z) has significant business activities that consist of making or purchasing (by assignment as principal) commercial loans and similar extensions of credit (any of the Persons described in clauses (i) through (iii) above, a "Disqualified Person");.

"Environmental Laws": any and all applicable Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees or requirements of any Governmental Authority regulating, relating to or imposing liability or standards of conduct concerning human health or the protection of the environment, including Materials of Environmental Concern, as now or may at any time hereafter be in effect.

<div align="center">14</div>

"ERISA": the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate": any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414 of the Code.

"EU Bail-In Legislation Schedule": the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurocurrency Reserve Requirements": for any day, as applied to a Eurodollar Loan, the aggregate (without duplication) of the rates (expressed as a decimal) of reserve requirements current on such day (including basic, supplemental, marginal and emergency reserves under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto), as now and from time to time hereafter in effect, dealing with reserve requirements prescribed for Eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D of such Board) maintained by a member bank of the Federal Reserve System.

"Eurodollar Base Rate": with respect to any Eurodollar Loan for any Interest Period, the Eurodollar Screen Rate at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"Eurodollar Lending Office": the office of each Lender which shall be maintaining its Eurodollar Loans.

"Eurodollar Loans": Term Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"Eurodollar Rate": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula (rounded upward to the nearest 1/100th of 1%):

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirement}}$$

; provided that the Eurodollar Rate shall be at all times not less than 1.00%.

"Eurodollar Screen Rate": for any day and time, with respect to any Eurodollar Loans for any Interest Period, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for Dollars for a period equal in length to such Interest Period as displayed on such day and time on the applicable Bloomberg page that displays such rate (or such other commercially available source providing such quotations as may be designated by the Administrative Agent, in consultation with the Required Lenders, from time to time); provided that if the Eurodollar Screen Rate shall be less than zero, such rate shall be deemed to zero for the purposes of this Agreement.

15

"Event of Default": any of the events specified in Section 9, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Excess Cash Flow": for any fiscal year of the Borrower, the excess, if any, of (a) the sum, without duplication, of (i) consolidated net income of the Borrower for such period, adjusted to exclude any cash gains or losses attributable to any Asset Sale, (ii) the amount of all non-cash charges (including depreciation and amortization) deducted in arriving at such consolidated net income, (iii) decreases in Consolidated Working Capital for such period, and (iv) the aggregate net amount of non-cash loss on the disposition of property by the Borrower and its Subsidiaries during such period (other than sales of inventory in the ordinary course of business), to the extent deducted in arriving at such consolidated net income less (b) the sum, without duplication, of (i) the amount of all non-cash credits included in arriving at such consolidated net income, (ii) the aggregate amount actually paid by the Borrower and its Subsidiaries in cash during such period on account of Capital Expenditures, but only to the extent such cash payments were made from Internally Generated Cash, (iii) the aggregate amount of all regularly scheduled principal payments of Funded Debt (including the Term Loans) of the Borrower and its Subsidiaries made during such period from Internally Generated Cash (other than in respect of any revolving credit facility to the extent there is not an equivalent permanent reduction in commitments thereunder), (iv) increases in Consolidated Working Capital for such period, (v) the aggregate net amount of non-cash gains on the disposition of property by the Borrower and its Subsidiaries during such period (other than sales of inventory in the ordinary course of business), to the extent included in arriving at such consolidated net income, (vi) the aggregate amount actually paid by the Borrower and its Subsidiaries in cash during such period on account of professional fees that have not been deducted in the calculation of consolidated net income for such period, but only to the extent such cash payments were made from Internally Generated Cash, (vii) the aggregate amount of any premium, make-whole or penalty payments actually paid in cash by the Borrower and its Subsidiaries during such period and financed with Internally Generated Cash that are made in connection with the prepayment of Indebtedness to the extent such payments are not expensed during such period or are not deducted in calculating Consolidated Net Income; provided that amounts deducted pursuant to this clause (vii) shall not exceed $25,000,000 in the aggregate during the term of this Agreement, (viii) the aggregate amount of taxes paid in cash during such period to the extent they exceed the amount of tax expense deducted in determining consolidated net income of the Borrower for such period (provided that Excess Cash Flow shall be increased in any future period to the extent taxes causing such excess are deducted from consolidated net income of the Borrower in such future period) and (ix) to the extent not reducing consolidated net income of the Borrower for such period, the amount of administrative costs and unpaid professional fees incurred in connection with the Cases and payable in cash by the Borrower and its Subsidiaries that (x) were incurred during or prior to such period, (y) have not been paid and remain outstanding at the end of such period and (z) have not been deducted from Excess Cash Flow (or otherwise reduced Excess Cash Flow or consolidated net income) in a prior period.

"Excess Cash Flow Application Date": as defined in subsection 4.6(d).

16

"Excess Cash Flow Period": each fiscal year of the Borrower, commencing with the fiscal year ending December 31, 2018.

"Excluded Accounts":  (a) any deposit account used solely for funding payroll or segregating payroll taxes or funding other employee wage or benefit payments in the ordinary course of business, (b) any fiduciary or trust account, (c) any zero-balance or sweep account, [so long as the balance in any such account is reduced to $0 on at least a weekly basis] and (d) any other deposit account with an average monthly balance of not more than $500,000; provided, that the aggregate average monthly balance of all deposit accounts constituting Excluded Accounts under this clause (d) shall not exceed $5,000,000.

"Excluded Taxes": any of the following Taxes imposed on or with respect to the Administrative Agent or a Lender or required to be withheld or deducted from a payment to the Administrative Agent or a Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of the Administrative Agent or such Lender being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Term Loan pursuant to a Requirement of Law in effect on the date on which (i) such Lender acquires such interest in the Term Loan (other than pursuant to an assignment request by the Borrower under subsection 4.22(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to subsection 4.20, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to the Administrative Agent's or such Lender's failure to comply with subsection 4.20(g) and (d) any withholding Taxes imposed under FATCA.

"Extended Term Loans": as defined in subsection 4.24(a).

"Extension": as defined in subsection 4.24(a).

"Extension Offer": as defined in subsection 4.24(a).

"FASB": the Financial Accounting Standards Board

"FATCA": Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

17

145909348v39

"FCC": the Federal Communications Commission or any Governmental Authority succeeding to the Federal Communications Commission.

"FCC Licenses": a license issued by the FCC under Part 73 of Title 47 of the Code of Federal Regulations and held by the Borrower or any Subsidiary.

"Federal Funds Effective Rate": for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as the NYFRB shall set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate, provided that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to zero for the purposes of this Agreement.

"Fee Letter": that certain Fee Letter, dated as of the Effective Date between the Borrower and the Administrative Agent.

"Foreign Lender": any Lender that is not a U.S. Person.

"Foreign Subsidiary": any Subsidiary of the Borrower (a) which is organized under the laws of any jurisdiction outside the United States (within the meaning of Section 7701(a)(9) of the Code), or (b) whose principal assets consist of capital stock or other equity interests of one or more Persons which conduct the major portion of their business outside the United States (within the meaning of Section 7701(a)(9) of the Code).

"Funded Debt": as to any Person, all Indebtedness of such Person that matures more than one year from the date of its creation or matures within one year from such date but is renewable or extendible, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including all current maturities and current sinking fund payments in respect of such Indebtedness whether or not required to be paid within one year from the date of its creation and, in the case of the Borrower, Indebtedness in respect of the Term Loans and any Permitted Refinancings thereof.

"GAAP": generally accepted accounting principles in the United States as in effect from time to time. In the event that any "Accounting Change" (as defined below) shall occur and such change results in a material change in the method of calculation of financial covenants, standards or terms in this Agreement, then the Borrower and the Required Lenders agree, upon the request of the Borrower or the Administrative Agent, respectively, to enter into negotiations in order to amend such provisions of this Agreement so as to reflect equitably such Accounting Changes with the desired result that the criteria for evaluating the Borrower's financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made. In the event a request for an amendment has been made pursuant to the prior sentence, until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders, all financial covenants,

18

standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred. "Accounting Changes" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC.

"Governmental Authority": any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, taxing, judicial, regulatory or administrative functions of or pertaining to government (including the FCC).

"Group Members": collectively, the Borrower and any of its Subsidiaries.

"Guarantee and Collateral Agreement": the Guarantee and Collateral Agreement executed and delivered by Parent, the Borrower and each Subsidiary Guarantor, substantially in the form of Exhibit A (it being understood and agreed that, notwithstanding anything that may be to the contrary herein, the Guarantee and Collateral Agreement shall not require the pledge of (x) any of the outstanding Capital Stock of, or other equity interests in, any Subsidiary of the Borrower which is owned by a Foreign Subsidiary of the Borrower or (y) more than 66% of the outstanding voting stock of any "first tier" Foreign Subsidiary of the Borrower).

"Guarantors": as defined in the Guarantee and Collateral Agreement.

"Impacted Interest Period" as defined in the definition of "Eurodollar Base Rate."

"Indebtedness": of any Person, at any particular date, (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services (other than current trade payables or liabilities and deferred payment for services to employees or former employees incurred in the ordinary course of business and payable in accordance with customary practices and other deferred compensation arrangements), (b) obligations with respect to all letters of credit issued for the account of such Person, (c) all liabilities (other than Lease Obligations) secured by any Lien on any property owned by such Person, to the extent attributable to such Person's interest in such property, even though such Person has not assumed or become liable for the payment thereof, (d) Capital Lease Obligations of such Person, (e) all indebtedness of such Person arising under bankers' acceptance facilities, (f) all obligations of such Person in respect of Disqualified Stock and (g) for the purposes of Section 9(e) only, all obligations of such Person in respect of Swap Agreements; but, in each case, excluding (w) any net working capital adjustments or earnouts in connection with any permitted Investment under subsection 8.7 or disposition of assets permitted under subsection 8.6, (x) customer deposits and interest payable thereon in the ordinary course of business and (y) trade and other accounts and accrued expenses payable in the ordinary course of business in accordance with customary trade terms and in the case of both clauses (x) and (y) above, which are not overdue for a period of more than 90 days or, if overdue for more than 90 days, as to which a dispute exists and adequate reserves in conformity with GAAP have been established on the books of such Person and (z) Indebtedness that has been defeased

19

or satisfied and discharged in accordance with the terms of the documents governing such Indebtedness. The amount of any net obligations under any Swap Agreement on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (c) shall be deemed to be equal to the lesser of (i) the aggregate amount of the applicable liabilities and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"Indemnified Taxes": (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Insolvent" or "Insolvency": with respect to a Multiemployer Plan, the condition that such plan is insolvent within the meaning of Section 4245 of ERISA.

"Intellectual Property": the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Interest Payment Date": (a) as to any ABR Loan, the last day of each March, June, September and December to occur while such Term Loan is outstanding and the final maturity date of such Term Loan, (b) as to any Eurodollar Loan having an Interest Period of three months or less, the last day of such Interest Period, (c) as to any Eurodollar Loan having an Interest Period longer than three months, each day that is three months, or a whole multiple thereof, after the first day of such Interest Period and the last day of such Interest Period and (d) as to any Term Loan, the date of any repayment or prepayment made in respect thereof.

"Interest Period": with respect to any Eurodollar Loan:

(a)     initially, the period commencing on the date such Eurodollar Loan is deemed borrowed or the effective date of the most recent conversion or continuation of such Eurodollar Loan, as the case may be, and ending one, two, three or six months (or, if made available by all relevant Lenders, twelve months) thereafter as specified in subsection 2.1 or as selected by the Borrower in its Conversion/Continuation Notice, as the case may be, given with respect thereto; and

(b)     thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two, three or six months (or, if made available by all relevant Lenders, any period not longer than twelve months) thereafter as selected by the Borrower by irrevocable written notice to the Administrative Agent in the form of a Conversion/Continuation Notice not less than three Working Days prior to the last day of the then current Interest Period with respect to such Eurodollar Loan;

20

<u>provided</u> that the foregoing provisions relating to Interest Periods are subject to the following:

(i)    if any Interest Period would otherwise end on a day which is not a Working Day, that Interest Period shall be extended to the next succeeding Working Day, unless the result of such extension would be to carry such Interest Period into another calendar month, in which event such Interest Period shall end on the immediately preceding Working Day;

(ii)    the Borrower may not select an Interest Period that would extend beyond the Maturity Date (or, with respect to any Extended Loan, the maturity date with respect thereto), or if the Maturity Date (or maturity date with respect to any Extended Loan) shall not be a Working Day, on the next preceding Working Day;

(iii)    if the Borrower shall fail to give notice as provided above in clause (b), it shall be deemed to have selected a conversion of a Eurodollar Loan into an ABR Loan (which conversion shall occur automatically and without need for compliance with the conditions for conversion set forth in subsection 4.3);

(iv)    any Interest Period that begins on the last day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Working Day of a calendar month; and

(v)    the Borrower shall select Interest Periods so as not to require a prepayment (to the extent practicable) or a scheduled payment of a Eurodollar Loan during an Interest Period for such Eurodollar Loan.

"<u>Internally Generated Cash</u>": cash generated from the operations of the business of Borrower and its Subsidiaries; <u>provided</u> that, notwithstanding the forgoing, "Internally Generated Cash" shall not include (i) the proceeds of any long-term Indebtedness (other than revolving indebtedness), (ii) the proceeds of the issuance of any Capital Stock, (iii) the proceeds of any Reinvestment Deferred Amount or (iv) solely to the extent not increasing consolidated net income of the Borrower during the applicable period, the proceeds of any insurance, indemnification or other payments from non-Loan Party Affiliates.

"<u>Investments</u>": as defined in subsection 8.7.

"<u>IRS</u>": the U.S. Internal Revenue Service.

"<u>JV Holding Company</u>": a Subsidiary Guarantor, (i) the sole assets of which are the equity interests of one or more joint ventures and (ii) that does not have any indebtedness or material liabilities, other than the Obligations.

21

"Lease Obligations": of the Borrower and its Subsidiaries, as of the date of any determination thereof, the rental commitments of the Borrower and its Subsidiaries determined on a consolidated basis, if any, under leases for real and/or personal property (net of rental commitments from sub-leases thereof), excluding Capital Lease Obligations.

"Lender Affiliate": (a) any Affiliate of any Lender, (b) any Person that is administered or managed by any Lender and that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business and (c) with respect to any Lender which is a fund that invests in commercial loans and similar extensions of credit, any other fund that invests in commercial loans and similar extensions of credit and is managed or advised by the same investment advisor as such Lender or by an Affiliate of such Lender or investment advisor.

"Lender Participation Notice": as defined in subsection 4.23.

"Lender Party": the Administrative Agent or any Lender.

"Lenders": the financial institutions named on Schedule 1.1A (as amended or supplemented from time to time) and their respective successors and assigns as permitted hereunder and designated as holding Term Loans, each of which is referred to herein as a Lender. The financial institutions named on Schedule 1.1A on the Effective Date are holders of a Credit Agreement Claim (as defined in the Plan of Reorganization) and referred to herein as the "Effective Date Lenders"; each Effective Date Lender is deemed to be a party to this Agreement on the Effective Date.

"Lien": any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any financing lease having substantially the same economic effect as any of the foregoing).

"Liquidity": at any time, the sum of (i) the aggregate amount of unrestricted cash of the Borrower and its Subsidiaries at such time and (ii) to the extent the Borrower is a party to a Permitted Revolving Credit Facility at such time, the aggregate amount available to be borrowed (subject to any borrowing base or similar limitations at such time) by the Borrower on the undrawn commitments under such Permitted Revolving Credit Facility at such time.

"Loan Documents": the collective reference to this Agreement, the Notes, the Guarantee and Collateral Agreement, the Fee Letter, any amendment or modification entered into in connection with any Extension, the Control Agreements, any Mortgage or other security document executed and delivered pursuant to the terms of subsection 7.10, and any intercreditor agreement (including any Permitted ABL Intercreditor Agreement or any Permitted Cash Flow Revolver Intercreditor Agreement), if applicable.

<div align="center">22</div>

"Loan Parties": Parent and each of its Subsidiaries that is a party, or which at any time becomes a party, to a Loan Document.

"Material Acquisition": as defined in the definition of "Consolidated EBITDA".

"Material Adverse Effect": any event, development or circumstance that has had or could reasonably be expected to have a material adverse effect on (a) the business, results of operations, property or financial condition of the Borrower and its Subsidiaries taken as a whole or (b) the validity or enforceability of any of the Loan Documents or the rights and remedies of the Administrative Agent and the Lenders thereunder.

"Material Disposition": as defined in the definition of "Consolidated EBITDA".

"Material Real Property":  any fee interest in any real property located in the United States owned by a Loan Party and having a Real Property Value of a least $500,000.

 "Materials of Environmental Concern": any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any hazardous or toxic substances, materials or wastes, defined or regulated as such in, or which form the basis of liability under, any Environmental Law, including asbestos, polychlorinated biphenyls and urea-formaldehyde insulation, medical waste and radioactive materials.

"Maturity Date": the earlier of (i) May 15, 2022 or if such day is not a Business Day, the Business Day immediately preceding such date and (ii) any other date on which the Term Loans are accelerated pursuant to Section 9.

"Minimum Extension Condition": as defined in subsection 4.24(b).

"Minimum Tranche Amount": as defined in subsection 4.24(b).

"Moody's": Moody's Investors Service, Inc. and any successor to its rating agency business.

"Mortgaged Properties": (i) the Properties listed on Schedule 1.1B, as to which the Administrative Agent for the benefit of the Secured Parties shall be granted a Lien pursuant to the Mortgages and (ii) any other Property that is required to be subject to a Mortgage in favor of the Administrative Agent pursuant to Section 7.10(c).

"Mortgages": each of the mortgages and deeds of trust (if any) made by any Loan Party in favor of, or for the benefit of, the Administrative Agent for the benefit of the Secured Parties, each in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

"Multiemployer Plan": a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which a Loan Party or any ERISA Affiliate has (or within the past 6 years has had) an obligation to contribute pursuant to a collective bargaining agreement to which such Loan Party or ERISA Affiliate is a party.

23

145909348v39

"Net Proceeds": (a) in connection with any Asset Sale or any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received) actually received by any Group Member, net of attorneys' fees, accountants' fees, investment banking fees, amounts required to be applied to the repayment of Indebtedness secured by a Lien expressly permitted hereunder on any asset that is the subject of such Asset Sale or Recovery Event (other than any Lien pursuant to a Security Document), any reserves required to be maintained in connection therewith in accordance with GAAP and other customary fees, expenses and out-of-pocket closing costs actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account (i) any available tax credits or deductions that would not otherwise have been utilized during the taxable period during which such Asset Sale or Recovery Event occurs and (ii) any tax sharing arrangements with a Person other than Parent or any of its Subsidiaries) and (b) in connection with any issuance or sale of Capital Stock or any incurrence of Indebtedness, the proceeds thereof in the form of cash and Cash Equivalents received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"Non-Broadcast Assets": as defined in subsection 8.6(e).

"Non-Significant Subsidiary": at any time, any Subsidiary (other than any Broadcast License Subsidiary) which (i) at such time has total assets (including the total assets of any of its Subsidiaries), together with the total assets of any other Subsidiaries that are Non-Significant Subsidiaries, of less than 5% of the total assets of the Borrower and its Subsidiaries and (ii) has accrued revenues (including the accrued revenues of any of its Subsidiaries), together with the accrued revenues of any other Subsidiaries that are Non-Significant Subsidiaries, for the most recently ended twelve-month period of less than 5% of the total revenues of the Borrower and its Subsidiaries.

"Non-U.S. Lender": as defined in subsection 4.20(g).

"Notes": the collective reference to any promissory notes evidencing Term Loans.

"NYFRB": the Federal Reserve Bank of New York.

"NYFRB Rate": for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Administrative Agent from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

24

"Obligations": the unpaid principal of and interest on the Term Loans and all other obligations and liabilities of the Borrower to the Administrative Agent or any Lender (including interest accruing after the maturity of the Term Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, related to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, the Term Loans, the other Loan Documents or any other document made, delivered or given in connection therewith, whether on account of principal, interest, reimbursement obligations, other fees, indemnities, costs, expenses (including all fees and disbursements of counsel to the Administrative Agent or any Lender) or otherwise.

"Offered Loans": as defined in subsection 4.23.

"Open Market Purchase":  as defined in Section 11.6(h).

"Operating Asset": any operating asset used in the ordinary course of business of the Group Members.  For the avoidance of doubt, Operating Assets shall not include the Bethesda Property or any other owned real property.

"Other Connection Taxes": with respect to the Administrative Agent or any Lender, Taxes imposed as a result of a present or former connection between the Administrative Agent or such Lender, as applicable, and the jurisdiction imposing such Tax (other than connections arising from the Administrative Agent or such Lender, as applicable, having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Term Loan or Loan Document).

"Other Taxes": all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to subsection 4.22(b)).

"Overnight Bank Funding Rate": for any day, the rate comprised of both overnight federal funds and overnight Eurodollar borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Parent": as defined in the preamble hereto.

"Participant Register": as defined in subsection 11.6(b).

"Participants": as defined in subsection 11.6(b).

<div style="text-align:center">25</div>

145909348v39

"PBGC": the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Permitted ABL Intercreditor Agreement":  as defined in the definition of Permitted Revolving Credit Facility.

"Permitted Acquisition": any acquisition permitted by subsection 8.7(k).

"Permitted Asset Swap": as defined in subsection 8.6(q).

"Permitted Cash Flow Revolver Intercreditor Agreement":  as defined in the definition of Permitted Revolving Credit Facility.

"Permitted Refinancing": with respect to all or any portion of any Indebtedness, any modification, refinancing, refunding, renewal or extension of such Indebtedness; provided that (i) the principal amount thereof does not exceed the principal amount of the Indebtedness so modified, refinanced, refunded, renewed or extended (plus any accrued but unpaid interest, fees and redemption premiums payable by the terms of such Indebtedness thereon and reasonable expenses incurred in connection therewith), (ii) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to subsection 8.2(j), such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a weighted average life to maturity equal to or greater than the weighted average life to maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended, (iii) if the Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Obligations, such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Obligations on terms at least as favorable on the whole to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended, (iv) the terms and conditions of any such modified, refinanced, refunded, renewed or extended Indebtedness are market terms on the date of issuance (as determined in good faith by the Borrower) or are not, taken as a whole, materially more restrictive than the covenants and events of default contained in this Agreement (as determined in good faith by the Borrower), (v) such modification, refinancing, refunding, renewal or extension shall not be incurred by a Person who is not a Subsidiary Guarantor (unless such Indebtedness being refinanced was originally incurred or guaranteed by a Person who was not a Subsidiary Guarantor), (vi) at the time thereof, no Default or Event of Default shall have occurred and be continuing, (vii) to the extent that the Liens securing the Indebtedness being refinanced are subordinated to the Liens securing the Obligations, any Lien securing such refinancing Indebtedness is subordinated to the Liens securing the Obligations on terms at least as favorable (when taken as a whole) to the Lenders as those contained in the applicable subordination language (if any) for the Indebtedness being refinanced and (viii) if the Indebtedness being modified, refinanced, refunded, renewed or extended is unsecured, such modified, refinanced, refunded, renewed or extended Indebtedness shall also be unsecured.

26

"Permitted Reinvestment":  in respect of any Net Proceeds from a Reinvestment Event, the use of such Net Proceeds to acquire, improve or repair assets constituting Collateral that are useful in the business of the Borrower or any Subsidiary (including the acquisition of all of the Equity Interests in a Person owning assets constituting (or that, upon the taking of all actions required to grant a Lien in favor on the Administrative Agent in such assets, will constitute) Collateral that are useful in the business of the Borrower or any Subsidiary, so long as (i) (x) such Person becomes a Subsidiary Guarantor and (y) all actions required to be taken with respect to such Person (and the assets of, and Equity Interests in, such Person) under subsection 7.10 shall be taken substantially simultaneously with consummation of such acquisition (or such longer period of time as provided under Section 7.10 or as the Administrative Agent shall agree), (ii) such Person acquired shall not be liable for any Indebtedness except for Indebtedness permitted by subsection 8.2 and (iii) the aggregate amount of Net Proceeds applied to acquire Equity Interests does not exceed $25,000,000 in the aggregate).  For the avoidance of doubt, a Permitted Reinvestment shall not include the payment of any maintenance operating expenses of the Borrower or any Subsidiary, but shall include maintenance and other Capital Expenditures in respect of assets constituting Collateral.

"Permitted Revolving Credit Facility":  a revolving credit facility which (i) is not secured by any assets or property that is not Collateral, (ii) does not have any obligors that are not Loan Parties, (iii) if an asset-based revolving credit facility (an "ABL Facility"), is at all times subject to an intercreditor agreement which shall be customary for transactions of this type and otherwise on terms and conditions reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders) (such intercreditor agreement, a "Permitted ABL Intercreditor Agreement") pursuant to which the lenders party to any such ABL Facility (or an agent on their behalf) shall have a first Lien on the ABL Priority Collateral and, to the extent such ABL Facility is secured by Term Loan Priority Collateral, a second Lien on the Term Loan Priority Collateral and the Administrative Agent, for the benefit of the Secured Parties, shall have a first Lien on the Term Loan Priority Collateral and a second Lien on the ABL Priority Collateral and (iv) if a cash-flow revolving credit facility (a "Cash Flow Revolving Credit Facility"), is at all times subject to an intercreditor agreement which shall be customary for transactions of this type and otherwise on terms and conditions reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders) (such intercreditor agreement, a "Permitted Cash Flow Revolver Intercreditor Agreement") pursuant to which the lenders party to any such Cash Flow Revolving Credit Facility (or an agent on their behalf) shall have a Lien on the Collateral that is *pari passu* with the Lien of the Administrative Agent, for the benefit of the Secured Parties, on the Collateral.

"Person": an individual, partnership, corporation, business trust, joint stock company, trust, limited liability company, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Plan": any employee pension benefit plan (as defined in Section 3(2) of ERISA, but excluding any Multiemployer Plan) in respect of which any Loan Party or any ERISA Affiliate is, or if such Plan were terminated, would under Section 4062 or 4069 of ERISA be deemed to be, an "employer" (as defined in Section 3(5) of ERISA).

27

145909348v39

"Plan Asset Regulations": 29 CFR § 2510.3-101 *et seq.*, as modified by Section 3(42) of ERISA, as amended from time to time.

"Plan of Reorganization": the chapter 11 plan of reorganization of the Chapter 11 Debtors substantially in the form of the [Amended] Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates pursuant to Chapter 11 of the Bankruptcy Code filed on [_____], 201[_].

"Pledged Stock": as defined in the Guarantee and Collateral Agreement.

"Preferred Stock": any Capital Stock with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

"Prepetition Credit Agreement": as defined in the recitals hereto.

"Prepetition Term Lenders": as defined in the recitals hereto.

"Prime Rate": the rate of interest per annum which is identified as the "Prime Rate" and normally published in the Money Rates section of *The Wall Street Journal* (or, if such rate ceases to be so published, as quoted from such other generally available and recognizable source as the Administrative Agent may select in consultation with the Required Lenders).  Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"Prohibited Transaction": as defined in Section 406 of ERISA and Section 4975(f)(3) of the Code.

"Properties": each parcel of real property currently or previously owned or operated by any Group Member.

"Proposed Discounted Prepayment Amount": as defined in subsection 4.23.

"PTE": a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Lender": as defined in subsection 10.3(g).

"Put/Call Agreement":  the Put and Call Agreement, dated as of January 2, 2014, by and among Merlin Media, LLC, Merlin Media License, LLC, Chicago FM Radio Assets, LLC, and Radio License Holdings LLC for WLUP-FM and WIQI(FM).

"Qualifying Lender": as defined in subsection 4.23.

"Qualifying Loan": as defined in subsection 4.23.

"Rating Agencies": Moody's and S&P, or if Moody's or S&P or both shall not make a rating on the Term Loans publicly available, a nationally recognized statistical

28

rating agency or agencies, as the case may be, selected by the Borrower which shall be substituted for Moody's or S&P or both, as the case may be.

"Real Property Value": with (a) respect to any real property owned by a Loan Party on the Effective Date, the value of such real property (together with improvements thereon) on the Effective Date and (b) with respect to any real property acquired by a Loan Party after the Effective Date, the value of such real property (together with improvements thereon) at the time of the acquisition of such real property by such Loan Party, in each case as reasonably determined by the Borrower in good faith.

"Receivables Facility": any of one or more receivables financing facilities, as amended, supplemented, modified, extended, renewed, restated or refunded from time to time, the obligations of which are non-recourse (except for customary representations, warranties, covenants and indemnities made in connection with such facilities) to the Borrower and its Subsidiaries (other than one or more Receivables Subsidiaries) pursuant to which the Borrower or any Subsidiary sells its accounts receivable to either (a) a Person that is not a Subsidiary or (b) a Receivables Subsidiary that in turn funds such purchase by purporting to sell its accounts receivable to a Person that is not a Subsidiary or by borrowing from such a Person or from another Receivables Subsidiary that in turn funds itself by borrowing from such a Person.

"Receivables Subsidiary": any Subsidiary formed for the purpose of facilitating or entering into one or more Receivables Facilities, and in each case engages only in activities reasonably related or incidental thereto; provided that each Receivables Subsidiary shall at all times be 100% owned by a Loan Party.

"Recovery Event": any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of any Group Member.

"Register": as defined in subsection 11.6(d).

"Regulation U": Regulation U of the Board, as from time to time in effect.

"Reinvestment Deferred Amount": with respect to any Reinvestment Event, the aggregate Net Proceeds received by the Borrower or any Subsidiary in connection therewith that are not applied to prepay the Term Loans pursuant to subsection 4.6(b).

"Reinvestment Event": any Recovery Event or any Asset Sale consisting solely of Operating Assets, in each case in respect of which the Borrower has exercised its Reinvestment Rights in accordance with subsection 4.6(b).

"Reinvestment Prepayment Amount": with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date for a Permitted Reinvestment.

"Reinvestment Prepayment Date": with respect to any Reinvestment Event, the earlier of (a) the date occurring twelve months after such Reinvestment Event (or, if the

29

145909348v39

Borrower enters into a legally binding commitment to reinvest the Net Proceeds from such Reimbursement Event within such 12-month period, the date that is 180 days after entry into such legally binding commitment) and (b) the date on which the Borrower shall have conclusively determined not to consummate a Permitted Reinvestment with all or any portion of the relevant Reinvestment Deferred Amount.

"Reinvestment Rights": if no Event of Default has occurred and is continuing at the time of receipt of Net Proceeds of a Reinvestment Event, except as provided in subsection 8.6(e), subsection 8.6(f) or subsection 8.10, the right of the Borrower (directly or indirectly through a Subsidiary Guarantor) to use all or a specified portion of the Net Proceeds of a Recovery Event or an Asset Sale consisting solely of Operating Assets for a Permitted Reinvestment.

"Related Parties": with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Reorganization": with respect to a Multiemployer Plan, the condition that such plan is in reorganization as such term is used in Section 4241 of ERISA.

"Replaced Term Loans": as defined in subsection 11.1.

"Replacement Term Loans": as defined in subsection 11.1.

"Reportable Event": any "reportable event," as defined in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Single Employer Plan, other than those events as to which the 30-day notice period has been waived pursuant to applicable regulations as in effect on the Effective Date.

"Required Lenders": at a particular time Lenders that hold more than 50% of the aggregate then outstanding principal amount of the Term Loans.

"Requirement of Law": as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation (including Environmental Laws) or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer": the chief executive officer or the chief operating officer of the Borrower or, with respect to financial matters, the chief financial officer of the Borrower.

"Restricted Payments": as defined in subsection 8.8.

"Retained Percentage": with respect to any Excess Cash Flow Period, (a) 100% minus (b) the ECF Percentage with respect to such Excess Cash Flow Period.

30

145909348v39

"S&P": Standard & Poor's Financial Services LLC and any successor to its rating agency business.

"Sanctions": economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State.

"Sanctioned Country": at any time, a country or territory which is the subject or target of any Sanctions.

"Sanctioned Person": at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person controlled by any such Person.

"SEC": the Securities and Exchange Commission of the United State of America.

"SEC Filings": any public filings that Parent has made on form 10K, 10Q or 8K pursuant to the U.S. federal securities statutes, rules or regulations prior to the Effective Date.

"Secured Parties: as defined in the Guarantee and Collateral Agreement.

"Securitization Repurchase Obligation": any obligation of a seller of accounts receivable in a Receivables Facility to repurchase accounts receivable arising as a result of a breach of a representation, warranty, covenant or indemnity made or given in connection with a Receivables Facility, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, offset or counterclaim of any kind as a result of any action taken by any failure to take action by or any other event relating to the seller.

"Security Documents": the collective reference to the Guarantee and Collateral Agreement, the Mortgages, the Control Agreements and all other security documents hereafter delivered to the Administrative Agent granting a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"Single Employer Plan": any Plan subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA.

"Solvent": when used with respect to any Person, means that, as of any date of determination, (a) the amount of the present fair saleable value of the assets of such Person will, as of such date, exceed the amount of all liabilities of such Person, contingent or otherwise, as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will,

31

as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (d) such Person will be able to pay its debts as they mature. For purposes of this definition, (i) "debt" means liability on a "claim", (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured and (iii) "present fair saleable value" and "liabilities of such Person, contingent or otherwise" shall, in each case, be determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors.

"Station": a broadcast radio station operated pursuant to an FCC License.

"Subordinated Indebtedness": any Indebtedness of the Borrower or its Subsidiaries which is subordinated in right of payment to the Obligations.

"Subsidiary": as to any Person, a corporation, partnership or other entity of which shares of Capital Stock or other equity interests having ordinary voting power (other than Capital Stock or other equity interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, directly or indirectly, or the management of which is otherwise controlled, directly or indirectly, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantor": any Subsidiary which enters into the Guarantee and Collateral Agreement pursuant to clause (a) of subsection 6.1 or subsection 7.10(a) (it being understood and agreed that no Foreign Subsidiary, Non-Significant Subsidiary, Broadcast License Subsidiary or Receivables Subsidiary of the Borrower shall, in any case, enter into the Guarantee and Collateral Agreement pursuant to subsection 7.10(a)).

"Swap Agreement": any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any of its Subsidiaries shall be a "Swap Agreement".

"Swap Termination Value": in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements, (a) for any date on or after the date such Swap Agreements

32

have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Agreement, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Agreements (which may include a Lender or any Affiliate of a Lender).

"Taxes": all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan Priority Collateral":  any Collateral which is not ABL Priority Collateral.

"Term Loans": as defined in Section 2.1.

"Term Loan Percentage": as to any Lender, the percentage which such Lender's Term Loan constitutes of the aggregate then outstanding principal amount of Term Loans.

"Test Period"; at any time the most recent period of four consecutive fiscal quarters of the Borrower ended on or prior to such time (taken as one accounting period) in respect of which financial statements for each quarter or fiscal year in such period have been delivered pursuant to subsection 7.1(a) or 7.1(b), as applicable.

"Transactions": the entering into of the Loan Documents and the deemed borrowing of the Term Loans hereunder, the payments of fees, commissions and expenses in connection with each of the foregoing and the consummation of the Plan of Reorganization.

"Transferee": as defined in subsection 11.6(e).

"Type": as to any Term Loan, its nature as an ABR Loan or a Eurodollar Loan.

"U.S. Borrower": any Borrower that is a U.S. Person.

"U.S. Person": any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"UCC": the Uniform Commercial Code as in effect, from time to time, in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

33

145909348v39

"Unrestricted Cash" : at any time, the aggregate amount of unrestricted cash and Cash Equivalents of the Borrower and the Subsidiary Guarantors at such time that are subject to a first priority perfected Lien in favor of the Administrative Agent (or, in the event such unrestricted cash and Cash Equivalents constitute ABL Priority Collateral under an ABL Facility to which the Borrower or the applicable Subsidiary Guarantor is a party to at such time, a second priority perfected Lien in favor of the Administrative Agent).

"Wilmington Trust": Wilmington Trust, National Association, and its successors.

"Withdrawal Liability": liability to a Multiemployer Plan as a result of a complete withdrawal or a partial withdrawal from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

"Working Day": any Business Day which is a day for trading by and between banks in Dollar deposits in the interbank Eurodollar market.

"Write-Down and Conversion Powers": with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.2     Other Definitional Provisions. Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the Notes, any other Loan Document or any certificate or other document made or delivered pursuant hereto.

(a)     As used herein and in the Notes, any other Loan Document and any certificate or other document made or delivered pursuant hereto, accounting terms relating to the Borrower and its Subsidiaries not defined in subsection 1.1 and accounting terms partly defined in subsection 1.1 to the extent not defined, shall have the respective meanings given to them under GAAP. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under ASC 825 "Financial Instruments" (or any other ASC having a similar result or effect) to value any Indebtedness or other liabilities of Parent, the Borrower or any Subsidiary at "fair value", as defined therein.

(b)     The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified.

(c)     (i) The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (ii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iii) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues,

34

145909348v39

accounts, leasehold interests and contract rights, and (iv) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(d)      The meanings given to terms defined herein shall be equally applicable to the singular and plural forms of such terms.

SECTION 2.   <u>AMOUNT AND TERMS OF THE TERM LOAN COMMITMENTS</u>

2.1      <u>Term Loans</u>. Subject to the terms and conditions set forth herein and in accordance with the Plan of Reorganization, each Effective Date Lender (i) is deemed to have made, on the Effective Date, a term loan to the Borrower (each, a "<u>Term Loan</u>") in the amount set forth opposite such Effective Date Lender's name on Schedule 1.1A and (ii) is deemed to have executed and delivered, on the Effective Date, this Agreement, regardless of whether such Effective Date Lender has executed and delivered a signature page hereto. Amounts repaid or prepaid in respect of Term Loans may not be reborrowed. The Term Loans may from time to time be (a) Eurodollar Loans or (b) ABR Loans or (c) a combination thereof, as determined by the Borrower and notified to the Administrative Agent in accordance with subsection 4.3; <u>provided</u> that, on the Effective Date, the Term Loans shall be deemed made as Eurodollar Loans with an initial Interest Period of _____ months.

2.2      <u>Repayment of Term Loans</u>. The Borrower shall repay the Term Loans in consecutive quarterly installments on the last day of each calendar quarter (or, in the case of the last installment, the Maturity Date), commencing on [_____], 2018, each of which installments shall be in an aggregate principal amount equal to 0.25% of the original aggregate principal amount of the Term Loans on the Effective Date (prior to giving effect to any mandatory prepayment of the Term Loans pursuant to Section 4.6(c) on the Effective Date); <u>provided</u> that with respect to the installment payable on the Maturity Date, such installment shall be in an amount equal to the then outstanding principal amount of the Term Loans.

SECTION 3.   [Reserved]

SECTION 4.   <u>GENERAL PROVISIONS APPLICABLE TO TERM LOANS</u>

4.1      [<u>Reserved</u>].

4.2      <u>Repayment of Term Loans; Evidence of Debt</u>. (a) The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender (i) the then unpaid principal amount of the Term Loan of such Lender (other than Extended Term Loans), in accordance with the applicable amortization schedule set forth in subsection 2.2 (or the then unpaid principal amount of such Term Loans, on the date that any or all of the Term Loans become due and payable pursuant to Section 9), and (ii) the then unpaid principal amount of any Extended Term Loan of such Lender, in accordance with the amortization schedule and maturity date applicable thereto (or the then unpaid principal amount of such Extended Term Loan, on the date that any or all of the Term Loans become due and payable pursuant to Section 9). The Borrower hereby further agrees to pay interest on the unpaid principal amount of the

35

145909348v39

Term Loans from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth in subsection 4.7.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of the Borrower to such Lender resulting from each Term Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent shall maintain the Register pursuant to subsection 11.6(d), and a subaccount therein for each Lender, in which shall be recorded (i) the amount of each Term Loan made (or deemed made) hereunder, the Type thereof and each Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) both the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d)    The entries made in the Register and the accounts of each Lender maintained pursuant to subsection 4.2(b) shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that (i) the failure of any Lender or the Administrative Agent to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Term Loans made to such Borrower by such Lender in accordance with the terms of this Agreement and (ii) in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

4.3    Conversion Options. The Borrower may elect from time to time to convert Eurodollar Loans into ABR Loans by giving the Administrative Agent irrevocable written notice of such election in the form of a Conversion/Continuation Notice, to be received by the Administrative Agent prior to 12:00 Noon, New York City time, at least three Working Days prior to the proposed conversion date, provided that any such conversion of Eurodollar Loans shall only be made on the last day of an Interest Period with respect thereto. The Borrower may elect from time to time to convert all or a portion of the ABR Loans then outstanding to Eurodollar Loans by giving the Administrative Agent irrevocable written notice of such election in the form of a Conversion/Continuation Notice, to be received by the Administrative Agent prior to 12:00 Noon, New York City time, at least three Working Days prior to the proposed conversion date, specifying the Interest Period selected therefor, and, if no Event of Default has occurred and is continuing, such conversion shall be made on the requested conversion date or, if such requested conversion date is not a Working Day, on the next succeeding Working Day. Upon receipt of any Conversion/Continuation Notice pursuant to this subsection 4.3, the Administrative Agent shall promptly, but in any event by 4:00 P.M., New York City time, notify each Lender thereof. All or any part of the outstanding Term Loans may be converted as provided herein, provided that (i) partial conversions of Term Loans shall be in the aggregate principal amount of $1,000,000, or a whole multiple of $1,000,000 in excess thereof, (ii) the aggregate principal amount of the resulting Eurodollar Loans outstanding in respect of any one Interest Period shall be at least $1,000,000 or a whole multiple of $1,000,000 in excess thereof

36

and (iii) no more than seven (7) Interest Periods shall be in effect at any one time with respect to Eurodollar Loans.

4.4    [Reserved].

4.5    Optional Prepayments. (a) The Borrower may at any time and from time to time prepay Term Loans, in whole or in part, upon at least one Business Days' irrevocable written notice to the Administrative Agent in the case of ABR Loans and two Working Days' irrevocable written notice to the Administrative Agent in the case of Eurodollar Loans and specifying the date and amount of prepayment; provided that Eurodollar Loans prepaid on other than the last day of any Interest Period with respect thereto shall be prepaid subject to the provisions of subsection 4.19. Upon receipt of such notice the Administrative Agent shall promptly notify each Lender thereof. If such notice is given, the Borrower shall make such prepayment, and the payment amount specified in such notice shall be due and payable, on the date specified therein. Accrued interest on any Notes or on the amount of any Term Loans paid in full pursuant to this subsection 4.5 shall be paid on the date of such prepayment. Accrued interest on the amount of any partial prepayment shall be paid on the date of such partial prepayment. Partial prepayments shall be in an aggregate principal amount equal to the lesser of (A) $1,500,000 or a whole multiple of $1,000,000 in excess thereof and (B) the aggregate unpaid principal amount of the Term Loans, as the case may be. Any amount prepaid may not be reborrowed. Partial prepayments of the Term Loans pursuant to this subsection 4.5 shall be applied to the remaining installments of the Term Loans in inverse order of maturity.

(b)    In the event of any optional prepayment of Term Loans made on or prior to the date that is six months following the Effective Date, the Borrower shall pay to the Lenders a prepayment premium equal to 1% of the principal amount of the Term Loans so prepaid.

(c)    Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under this subsection 4.5 if such prepayment would have resulted from a refinancing of all of the Term Loans, which refinancing shall not be consummated or shall otherwise be delayed.

4.6    Mandatory Prepayments. (a) In the event of any incurrence of Indebtedness by any Group Member (other than Indebtedness of any Group Member permitted to be issued under subsection 8.2), an amount equal to 100% of the Net Proceeds of such Indebtedness incurrence shall on the date of such Indebtedness incurrence be applied to the prepayment of the Term Loans as set forth in subsection 4.6(e).

(b)    In the event of receipt by any Group Member of Net Proceeds from (i) the sale or other disposition of the Bethesda Property or (ii) any Asset Sale (other than the sale or other disposition of the Bethesda Property) or Recovery Event (in excess of $5,000,000 in the aggregate for all such Asset Sales and Recovery Events under this clause (ii) per fiscal year of the Borrower) by any Group Member, then an amount equal to 100% of the Net Proceeds from the sale or other disposition of the Bethesda Property and from any other Asset Sale or Recovery Event (in the case of Asset Sales and Recovery Events that are not a sale or other disposition of the Bethesda Property, solely with respect to the aggregate Net Proceeds from all such Asset Sales and Recovery Events in any fiscal year of the Borrower that are in excess of $5,000,000),

37

shall on the date of such receipt be applied to the prepayment of the Term Loans as set forth in subsection 4.6(e); provided that (i) in the case of Net Proceeds received solely from a Recovery Event or from an Asset Sale consisting solely of Operating Assets, the Borrower may exercise Reinvestment Rights in respect of such Net Proceeds and (ii) notwithstanding clause (i) of this proviso, on each Reinvestment Prepayment Date, an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event shall be applied toward the prepayment of the Term Loans as set forth in subsection 4.6(e).

(c)    In the event that the aggregate amount of unrestricted cash of the Borrower and its Subsidiaries on the Effective Date (net of any payments made or to be made in satisfaction of the Put/Call Agreement) exceeds $35,000,000, then such excess amount of unrestricted cash shall on the Effective Date be applied to the prepayment of the Term Loans as set forth in subsection 4.6(e).

(d)    If, for any fiscal year of the Borrower commencing with the fiscal year ending December 31, 2018, there shall be Excess Cash Flow, the Borrower shall, on the relevant Excess Cash Flow Application Date, apply toward the prepayment of the Term Loans the ECF Percentage of such Excess Cash Flow less (solely to the extent funded with Internally Generated Cash) (x) the aggregate amount of all optional prepayments of Term Loans pursuant to subsection 4.5 or subsection 4.23 made during such fiscal year (provided that with respect to any prepayment pursuant to subsection 4.23, the aggregate amount of such prepayment for purposes of this clause shall be the amount of the Borrower's cash payment in respect of such prepayment), (y) the aggregate amount of all optional repayments of revolving credit loans under a Permitted Revolving Credit Facility made during such fiscal year that are accompanied by an equivalent permanent reduction in the revolving credit commitments under such Permitted Revolving Credit Facility and (z) the aggregate amount of all Term Loans purchased by the Borrower pursuant to Open Market Purchases in accordance with subsection 11.6(h) (provided, that with respect to any Open Market Purchase consummated in accordance with Section 11.6(h), the aggregate amount of such purchase for purposes of this clause shall be the amount of the Borrower's cash payment in respect of such purchase). Each such prepayment shall be made on a date (an "Excess Cash Flow Application Date") no later than ten Business Days after the earlier of (i) the date on which the financial statements of the Borrower referred to in subsection 7.1, for the fiscal year with respect to which such prepayment is made, are required to be delivered to the Administrative Agent and (ii) the date such financial statements are actually delivered to the Administrative Agent.

(e)    Partial prepayments of the Term Loans pursuant to subsection 4.6 shall be applied to the principal repayment installments of the Term Loans in inverse order of maturity; provided that prepayments of Eurodollar Loans pursuant to this subsection 4.6, if not on the last day of the Interest Period with respect thereto, shall, at the Borrower's option, as long as no Event of Default has occurred and is continuing, be prepaid subject to the provisions of subsection 4.19 or such prepayment (after application to any ABR Loans, in the case of prepayments by the Borrower) shall be deposited with the Administrative Agent as Cash Collateral for such Eurodollar Loans on terms reasonably satisfactory to the Administrative Agent and thereafter shall be applied to the prepayment of the Eurodollar Loans on the last day of the respective Interest Periods for such Eurodollar Loans next ending most closely to the date of receipt of such Net Proceeds. After such application, unless a Default or an Event of Default

38

145909348v39

shall have occurred and be continuing, any remaining interest earned (if any) on such Cash Collateral shall be paid to the Borrower.

(f)    Except as set forth in subsection 4.19, all payments made under this subsection 4.6 will be without penalty or premium.

(g)    Notwithstanding anything to the contrary contained in this subsection 4.6, if any Lender shall notify the Administrative Agent (i) on the date of such prepayment, with respect to any prepayment under subsection 4.6(a) or (b) or (ii) at least one Business Day prior to the date of a prepayment under subsection 4.6(d) that it wishes to decline its share of such prepayment, such share (the "Declined Prepayment Amount") shall be retained by the Borrower.

(h)    The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Loans required to be made pursuant to clauses (a), (b) and (d) of this Section 4.6 at least two (2) Business Days prior to the date of such prepayment.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment.  The Administrative Agent will promptly notify each Lender of the contents of the Borrower's prepayment notice and of such Lender's ratable share of the prepayment.

4.7    Interest Rates and Payment Dates. (a) Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto on the unpaid principal amount thereof at a rate per annum equal to the Eurodollar Rate determined for such Interest Period plus the Applicable Margin.

(b)    ABR Loans shall bear interest for the period from and including the date thereof until maturity thereof on the unpaid principal amount thereof at a rate per annum equal to the ABR plus the Applicable Margin.

(c)    Upon the occurrence of an Event of Default under Section 9(f) or, at the election of the Required Lenders if all or a portion of (i) the principal amount of any of the Term Loans or (ii) any interest payable thereon, shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), any overdue amount under the Loan Documents shall, without limiting the rights of the Lenders under Section 9, bear interest at a rate per annum which is (x) in the case of overdue principal, 2% above the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this subsection or (y) in the case of overdue interest, fees and other amounts, 2% above the rate described in paragraph (b) of this subsection, in each case from the date of such nonpayment until such amount is paid in full (as well after as before judgment).

(d)    Interest shall be payable in arrears on each Interest Payment Date; provided that interest accruing pursuant to paragraph (c) of this subsection shall be payable on demand by the Administrative Agent made at the request of the Required Lenders.

4.8    Computation of Interest and Fees. (a) Interest in respect of ABR Loans at any time the ABR is calculated based on the Prime Rate and all fees hereunder shall be calculated on the basis of a 365 or 366, as the case may be, day year for the actual days elapsed. Interest in respect of Eurodollar Loans and ABR Loans at any time the ABR is not calculated

39

based on the Prime Rate shall be calculated on the basis of a 360 day year for the actual days elapsed. The Administrative Agent shall as soon as practicable notify the Borrower and the Lenders of each determination of a Eurodollar Rate. Any change in the interest rate on a Term Loan resulting from a change in the ABR shall become effective as of the opening of business on the day on which such change in the ABR becomes effective. The Administrative Agent shall as soon as practicable notify the Borrower and the Lenders of the effective date and the amount of each such change.

(b)    Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error. The Administrative Agent shall, at the written request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining the Eurodollar Rate.

4.9    [Reserved].

4.10    Certain Fees. The Borrower shall pay to the Administrative Agent, for its own account, the fees set forth in the Fee Letter at the times and in the amounts specified therein. Such fees shall be fully earned when due and shall not be refundable for any reason whatsoever and will be in addition to the reimbursement of the Agent's out-of-pocket expenses in accordance with Section 11.5.

4.11    [Reserved].

4.12    [Reserved].

4.13    [Reserved].

4.14    [Reserved].

4.15    Inability to Determine Interest Rate for Eurodollar Loans. (a) In the event that (i) the Administrative Agent shall have determined (which determination shall be conclusive and binding upon the Borrower) that by reason of circumstances affecting the interbank eurodollar market generally, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for any Interest Period (including because the Eurodollar Screen Rate is not available or published on a current basis) with respect to (x) any Eurodollar Loans that will result from the requested conversion of all or part of ABR Loans into Eurodollar Loans or (y) the continuation of any Eurodollar Loan as such for an additional Interest Period, (ii) the Required Lenders shall have determined (and notify the Administrative Agent in writing of such determination) (which determination shall be conclusive and binding upon the Borrower) that the Eurodollar Rate determined or to be determined for any Interest Period will not adequately and fairly reflect the cost to Lenders constituting the Required Lenders of maintaining their affected Eurodollar Loans during such Interest Period by reason of circumstances affecting the interbank eurodollar market generally or (iii) the Required Lenders shall have determined (and notify the Administrative Agent in writing of such determination) (which determination shall be conclusive and binding upon the Borrower) that dollar deposits in the relevant amount and for the relevant period with respect to any such Eurodollar Loan are not available to any of the Lenders in their respective Eurodollar Lending Offices' interbank eurodollar market, the Administrative Agent

40

shall forthwith give notice of such determination, confirmed in writing, to the Borrower and the Lenders at least one day prior to, as the case may be, the conversion date or the last day of such Interest Period. If such notice is given, (A) any ABR Loans that were to have been converted to Eurodollar Loans shall be continued as ABR Loans and (B) any outstanding Eurodollar Loans shall be converted, on the last day of the then current Interest Period applicable thereto, into ABR Loans. Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans shall be made and no ABR Loans shall be converted to Eurodollar Loans.

(b)    If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in clause (a)(i) have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in clause (a)(i) have not arisen but the supervisor or the administrator of the Eurodollar Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the Eurodollar Screen Rate shall no longer be used for determining interest rates for loans, then the Administrative Agent and the Borrower shall endeavor to establish an alternate rate of interest to the Eurodollar Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable (but for the avoidance of doubt, such related changes shall not include a reduction of the Applicable Margin); provided that, if such alternate rate of interest shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement. Notwithstanding anything to the contrary in subsection 11.1, such amendment shall become effective without any further action or consent of any other party to this Agreement.  Until an alternate rate of interest shall be determined in accordance with this clause (b) (but, in the case of the circumstances described in clause (ii) of the first sentence of this subsection 4.15(b), only to the extent the Eurodollar Screen Rate for such Interest Period is not available or published at such time on a current basis), (x) any requested Eurodollar Loans shall be made as ABR Loans, (y) any ABR Loans that were to have been converted to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans shall be converted, on the last day of the then current Interest Period applicable thereto, into ABR Loans.

4.16    Pro Rata Treatment and Payments. (a) Each payment by the Borrower on account of any fee hereunder (other than as set forth in subsection 4.10) shall be made pro rata according to the Term Loan Percentages of the Lenders.  Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Term Loans (other than as set forth in subsections 4.6, 4.17, 4.18 and 4.19) shall be made pro rata according to the Term Loan Percentages of the Lenders. All payments (including prepayments) to be made by the Borrower on account of principal, interest and fees shall be made without set-off or counterclaim and shall be made to the Administrative Agent, for the account of the Lenders, to the Administrative Agent's Account, in lawful money of the United States of America and in immediately available funds. The Administrative Agent shall promptly distribute such payments ratably to each Lender in like funds as received. If any payment hereunder (other than payments on Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension. If any payment on a Eurodollar Loan becomes due and payable on a day other than a Working Day,

41

the maturity thereof shall be extended to the next succeeding Working Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension unless the result of such extension would be to extend such payment into another calendar month in which event such payment shall be made on the immediately preceding Working Day.

(b)   [Reserved].

(c)   [Reserved].

(d)   All payments and prepayments (other than mandatory prepayments as set forth in subsection 4.6 and other than prepayments as set forth in subsection 4.18 with respect to increased costs) of Eurodollar Loans hereunder shall be in such amounts and be made pursuant to such elections so that, after giving effect thereto, the aggregate principal amount of all Eurodollar Loans with the same Interest Period shall not be less than $1,000,000 or a whole multiple of $1,000,000 in excess thereof.

(e)   Notwithstanding anything to the contrary contained in this subsection 4.16 or elsewhere in this Agreement, the Borrower may (i) make prepayments of Term Loans at a discount to the par value of such Term Loans and on a non pro rata basis in accordance with subsection 4.23, (ii) purchase Term Loans on a non pro rata basis pursuant to Open Market Purchases in accordance with subsection 11.6(h) and (iii) extend the final maturity of Term Loans in connection with an Extension that is permitted under subsection 4.24 without being obligated to effect such extensions on a pro rata basis among the Lenders (it being understood that no such extension (x) shall constitute a payment or prepayment of any Term Loans for purposes of this subsection or (y) shall reduce the amount of any scheduled amortization payment due under subsection 2.2, except that the amount of any scheduled amortization payment due to a Lender of Extended Term Loans may be reduced to the extent provided pursuant to the express terms of the respective Extension Offer) without giving rise to any violation of this subsection or any other provision of this Agreement. Furthermore, the Borrower may take all actions contemplated by (A) subsection 4.23 in connection with the prepayment of Term Loans at a discount to the par value of such Loans, (B) subsection 4.24 in connection with any Extension (including modifying pricing, amortization and repayments or prepayments of Extended Term Loans) and (C) subsection 11.6(h) in connection with the purchase of Term Loans on a non pro rata basis pursuant to Open Market Purchases and, in each case, such actions taken in accordance with subsection 4.23, 4.24 and 11.6, as applicable, shall be permitted hereunder, and the differing or non pro rata payments contemplated therein shall be permitted without giving rise to any violation of this subsection or any other provision of this Agreement.

4.17   Illegality. Notwithstanding any other provisions herein, if any Change in Law occurring after the date that any Person becomes a Lender party to this Agreement shall make it unlawful for such Lender to maintain Eurodollar Loans as contemplated by this Agreement, the commitment of such Lender hereunder to make Eurodollar Loans or to convert all or a portion of ABR Loans into Eurodollar Loans shall forthwith be cancelled and such Lender's Term Loans then outstanding as Eurodollar Loans, if any, shall, if required by law and if such Lender so requests in writing to the Administrative Agent and the Borrower, be converted automatically to ABR Loans on the date specified by such Lender in such request. To the extent

42

that such affected Eurodollar Loans are converted into ABR Loans, all payments of principal which would otherwise be applied to such Eurodollar Loans shall be applied instead to such Lender's ABR Loans. The Borrower hereby agrees promptly to pay any Lender, upon its demand, any additional amounts necessary to compensate such Lender for any costs incurred by such Lender in making any conversion in accordance with this subsection 4.17 including, but not limited to, any interest or fees payable by such Lender to lenders of funds obtained by it in order to make or maintain its Eurodollar Loans hereunder (such Lender's notice of such costs, as certified to the Borrower through the Administrative Agent, to be conclusive absent manifest error).

4.18    Requirements of Law. (a) In the event that, at any time after the Effective Date any Change in Law or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority:

(i)    does or shall subject the Administrative Agent or any Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

(ii)    does or shall impose, modify or hold applicable any reserve, special deposit, compulsory loan, liquidity requirement or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender which are not otherwise included in the determination of the Eurodollar Rate; or

(iii)    does or shall impose on such Lender any other condition;

and the result of any of the foregoing is to increase the cost to such Lender (or, in the case of (i), to such Lender or the Administrative Agent) of converting, renewing or maintaining advances or extensions of credit or to reduce any amount receivable hereunder, in each case, in respect of its Eurodollar Loans or, in the case of (i), any Term Loans, then, in any such case, the Borrower shall promptly pay such Lender (or, in the case of (i), such Lender or the Administrative Agent), on demand, any additional amounts necessary to compensate such Lender (or, in the case of (i), such Lender or the Administrative Agent) for such additional cost or reduced amount receivable which such Lender (or, in the case of (i), such Lender or the Administrative Agent) deems to be material as determined by such Lender (or, in the case of (i), such Lender or the Administrative Agent) with respect to such Eurodollar Loans or, in the case of (i), any Term Loans, together with interest on each such amount from the date demanded until payment in full thereof at a rate per annum equal to the ABR plus the Applicable Margin.

(b)    In the event that at any time after the Effective Date any Change in Law with respect to any Lender shall, in the opinion of such Lender, have the effect of reducing the rate of return on such Lender's capital as a consequence of the obligations of such Lender hereunder to a level below that which such Lender could have achieved but for such Change in Law (taking into account such Lender's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time following notice by such Lender to the Borrower of such Change in Law as provided in paragraph (c) of this subsection 4.18,

43

within 15 days after demand by such Lender, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender on an after-Tax basis for such reduction.

(c)  If any Lender becomes entitled to claim any additional amounts pursuant to this subsection 4.18, it shall promptly notify the Borrower through the Administrative Agent, of the event by reason of which it has become so entitled. If any Lender has notified the Borrower through the Administrative Agent of any increased costs pursuant to paragraph (a) of this subsection 4.18, the Borrower at any time thereafter may, upon at least two Working Days' notice to the Administrative Agent (which shall promptly notify the Lenders thereof), and subject to subsection 4.19, prepay or convert into ABR Loans all (but not a part) of the Eurodollar Loans then outstanding. Each Lender agrees that, upon the occurrence of any event giving rise to the operation of paragraph (a) of this subsection 4.18 or entitling a Lender to receive additional amounts under paragraph (a) or (c) of subsection 4.20 with respect to such Lender, it will, if requested by the Borrower, and to the extent permitted by law or by the relevant Governmental Authority, endeavor in good faith to avoid or minimize the increase in costs, reduction in payments, or payment of additional amounts resulting from such event (including endeavoring to change its Eurodollar Lending Office or any other lending office); provided, however, that such avoidance or minimization can be made in such a manner that such Lender, in its sole determination, suffers no economic, legal or regulatory disadvantage.

(d)  A certificate submitted by such Lender, through the Administrative Agent, to the Borrower shall be conclusive in the absence of manifest error. The covenants contained in this subsection 4.18 shall survive the termination of this Agreement and repayment of the outstanding Loans.

4.19  Indemnity. The Borrower agrees to indemnify each Lender and to hold such Lender harmless from any loss or expense which such Lender may sustain or incur as a consequence of (a) default by the Borrower in payment of the principal amount of or interest on any Eurodollar Loans of such Lender, including, but not limited to any such loss or expense arising from interest or fees payable by such Lender to lenders of funds obtained by it in order to make or maintain its Eurodollar Loans hereunder, (b) default by the Borrower in making a conversion of ABR Loans to Eurodollar Loans after the Borrower has given notice in accordance with subsection 4.3 or in continuing Eurodollar Loans for an additional Interest Period after the Borrower has given a notice in accordance with clause (b) of the definition of Interest Period, (c) default by the Borrower in making any prepayment of Eurodollar Loans after the Borrower has given a notice in accordance with subsection 4.3 or (d) a payment or prepayment of a Eurodollar Loan or conversion of any Eurodollar Loan into an ABR Loan, in either case on a day which is not the last day of an Interest Period with respect thereto (any of the events referred to in clauses (b), (c) or (d), a "Breakage Event"). In the case of a Breakage Event, such loss or expense shall include an amount equal to the excess, as reasonably determined by such Lender of (i) the cost of obtaining funds for the Eurocurrency Loan that is the subject of such Breakage Event for the period from the date of such Breakage Event to the last day of the Interest Period in effect (or that would have been in effect) for such Loan over (ii) the amount of interest likely to be realized by such Lender in redeploying the funds released or not utilized by reason of such Breakage Event for such period, but such loss or expense shall not, in any event, include any lost profit or loss of Applicable Margin. A certificate of any Lender setting forth any amount or amounts that

44

such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. This covenant shall survive termination of this Agreement and payment of the outstanding Obligations.

4.20    Taxes.

(a)    Defined Terms.  For purposes of this subsection, the term "applicable law" includes FATCA.

(b)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this subsection) the Administrative Agent or the applicable Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)    Payment of Other Taxes by Borrower.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)    Indemnification by Borrower.  The Loan Parties shall, jointly and severally, indemnify the Administrative Agent and any Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this subsection) payable or paid by the Administrative Agent or the applicable Lender or required to be withheld or deducted from a payment to the Administrative Agent or the applicable Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of subsection 11.6(b) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable

45

expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)	Evidence of Payments.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this subsection, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)	Status of Lenders.  (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (g)(ii)(A), (ii)(B) and (ii)(D) of this subsection) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)	Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Borrower,

(A) any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)	any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

46

(1)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      executed copies of IRS Form W-8ECI;

(3)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit F-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)      to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-2 or Exhibit F-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative

47

Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)     Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this subsection (including by the payment of additional amounts pursuant to this subsection), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this subsection with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     Survival.  Each party's obligations under this subsection shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, and the repayment, satisfaction or discharge of all obligations under any Loan Document.

4.21     [Reserved].

4.22     Mitigation; Replacement of Lenders. (a) If any Lender requests compensation under subsection 4.18, or if the Borrower is required to pay any additional amount

48

145909348v39

to any Lender or any Governmental Authority for the account of any Lender pursuant to subsection 4.20, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Term Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to subsection 4.18 or subsection 4.20, as applicable, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     If any Lender requests compensation under subsection 4.18, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to subsection 4.20, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in subsection 11.6), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that (A) (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld or delayed, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Term Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (iii) the Borrower or such assignee shall have paid to the Administrative Agent the processing and recordation fee specified in subsection 11.6(d) and (iv) in the case of any such assignment resulting from a claim for compensation under subsection 4.18 or payments required to be made pursuant to subsection 4.20, such assignment will result in a material reduction in such compensation or payments and (B) substantially concurrently with satisfaction of the requirements set forth in clause (A) of this proviso, such Lender shall be deemed to have assigned and delegated its interests, rights and obligations under this Agreement and such Lender shall not be required to execute the Assignment and Assumption in connection therewith. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise (including as a result of any action taken by such Lender under paragraph (a) above), the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

4.23   Prepayments Below Par. (a) Notwithstanding anything to the contrary set forth in this Agreement (including subsection 4.16(a) or 11.7(a)) or any other Loan Document, the Borrower shall have the right at any time and from time to time to prepay Term Loans to the Lenders at a discount to the par value of such Term Loans and on a non pro rata basis (each, a "Discounted Voluntary Prepayment") pursuant to the procedures described in this subsection 4.23, provided that (A) on the date of the Discounted Prepayment Option Notice and after giving effect to the Discounted Voluntary Prepayment, Liquidity shall be greater than or equal to $25,000,000, (B) the aggregate amount of Discounted Voluntary Prepayments made in any calendar year, together with aggregate amount of Open Market Purchases made in such calendar year, shall not exceed $50,000,000 in the aggregate, (C) any Discounted Voluntary Prepayment shall be offered to all Lenders of a particular tranche on a pro rata basis, (D) the Borrower shall

49

deliver to the Administrative Agent, together with each Discounted Prepayment Option Notice, a certificate of a Responsible Officer of the Borrower (1) stating that no Event of Default has occurred and is continuing or would result from the Discounted Voluntary Prepayment, (2) stating that each of the conditions to such Discounted Voluntary Prepayment contained in this subsection 4.23 has been satisfied and (3) specifying the aggregate principal amount of Term Loans to be prepaid pursuant to such Discounted Voluntary Prepayment and (E) the aggregate amount of Term Loans prepaid pursuant to this subsection 4.23 (valued at the par amount thereof) shall not exceed 50% of the initial aggregate principal amount of the Term Loans.

(b)     To the extent the Borrower seeks to make a Discounted Voluntary Prepayment, the Borrower will provide written notice to the Administrative Agent substantially in the form of Exhibit G hereto (each, a "Discounted Prepayment Option Notice") that the Borrower desires to prepay Term Loans in an aggregate principal amount specified therein by the Borrower (each, a "Proposed Discounted Prepayment Amount"), in each case at a discount to the par value of such Term Loans as specified below. The Proposed Discounted Prepayment Amount of any Term Loans shall not be less than $10,000,000 (unless otherwise agreed by the Administrative Agent). The Discounted Prepayment Option Notice shall further specify with respect to the proposed Discounted Voluntary Prepayment (A) the Proposed Discounted Prepayment Amount for Loans to be prepaid, (B) a discount range (which may be a single percentage) selected by the Borrower with respect to such proposed Discounted Voluntary Prepayment equal to a percentage of par of the principal amount of the Term Loans to be prepaid (the "Discount Range"), and (C) the date by which Lenders are required to indicate their election to participate in such proposed Discounted Voluntary Prepayment, which shall be at least five Business Days following the date of the Discounted Prepayment Option Notice (the "Acceptance Date").

(c)     Upon receipt of a Discounted Prepayment Option Notice, the Administrative Agent shall promptly notify each applicable Lender thereof. On or prior to the Acceptance Date, each such Lender may specify by written notice substantially in the form of Exhibit H hereto (each, a "Lender Participation Notice") to the Administrative Agent (A) a maximum discount to par (the "Acceptable  Discount") within the Discount Range (for example, a Lender specifying a discount to par of 20% would accept a purchase price of 80% of the par value of the Term Loans to be prepaid) and (B) a maximum principal amount (subject to rounding requirements specified by the Administrative Agent) of the Term Loans to be prepaid held by such Lender with respect to which such Lender is willing to permit a Discounted Voluntary Prepayment at the Acceptable Discount ("Offered Loans"). Based on the Acceptable Discounts and principal amounts of the Term Loans to be prepaid specified by the Lenders in the applicable Lender Participation Notice, the Administrative Agent, in consultation with the Borrower, shall determine the applicable discount for such Term Loans to be prepaid (the "Applicable Discount"), which Applicable Discount shall be (A) the percentage specified by the Borrower if the Borrower has selected a single percentage pursuant to subsection 4.23(b) for the Discounted Voluntary Prepayment or (B) otherwise, the highest Acceptable Discount at which the Borrower can pay the Proposed Discounted Prepayment Amount in full (determined by adding the principal amounts of Offered Loans commencing with the Offered Loans with the highest Acceptable Discount); provided, however, that in the event that such Proposed Discounted Prepayment Amount cannot be repaid in full at any Acceptable Discount, the Applicable Discount shall be the lowest Acceptable Discount

50

145909348v39

specified by the Lenders that is within the Discount Range. The Applicable Discount shall be applicable for all Lenders who have offered to participate in the Voluntary Discounted Prepayment and have Qualifying Loans (as defined below). Any Lender with outstanding Term Loans to be prepaid whose Lender Participation Notice is not received by the Administrative Agent by the Acceptance Date shall be deemed to have declined to accept a Discounted Voluntary Prepayment of any of its Term Loans at any discount to their par value within the Applicable Discount.

(d)     The Borrower shall make a Discounted Voluntary Prepayment by prepaying those Term Loans to be prepaid (or the respective portions thereof) offered by the Lenders ("Qualifying Lenders") that specify an Acceptable Discount that is equal to or greater than the Applicable Discount ("Qualifying Loans") at the Applicable Discount, provided that if the aggregate proceeds required to prepay all Qualifying Loans (disregarding any interest payable at such time) would exceed the amount of aggregate proceeds required to prepay the Proposed Discounted Prepayment Amount, such amounts in each case calculated by applying the Applicable Discount, the Borrower shall prepay such Qualifying Loans ratably among the Qualifying Lenders based on their respective principal amounts of such Qualifying Loans (subject to rounding requirements specified by the Administrative Agent). If the aggregate proceeds required to prepay all Qualifying Loans (disregarding any interest payable at such time) would be less than the amount of aggregate proceeds required to prepay the Proposed Discounted Prepayment Amount, such amounts in each case calculated by applying the Applicable Discount, the Borrower shall prepay all Qualifying Loans.

(e)     Each Discounted Voluntary Prepayment shall be made within five Business Days of the Acceptance Date (or such later date as the Administrative Agent shall reasonably agree, given the time required to calculate the Applicable Discount and determine the amount and holders of Qualifying Loans), without premium or penalty (and not subject to subsection 4.19), upon irrevocable notice substantially in the form of Exhibit I hereto (each a "Discounted Voluntary Prepayment Notice"), delivered to the Administrative Agent no later than 1:00 p.m. New York City Time, three Business Days prior to the date of such Discounted Voluntary Prepayment, which notice shall specify the date and amount of the Discounted Voluntary Prepayment and the Applicable Discount determined by the Administrative Agent in consultation with the Borrower. Upon receipt of any Discounted Voluntary Prepayment Notice, the Administrative Agent shall promptly notify each relevant Lender thereof. If any Discounted Voluntary Prepayment Notice is given, the amount specified in such notice shall be due and payable to the applicable Lenders, subject to the Applicable Discount on the applicable Term Loans, on the date specified therein together with accrued interest (on the par principal amount) to but not including such date on the amount prepaid. The par principal amount of each Discounted Voluntary Prepayment of a Term Loan shall be applied ratably to reduce the remaining installments of such Term Loans.

(f)     To the extent not expressly provided for herein, each Discounted Voluntary Prepayment shall be consummated pursuant to reasonable procedures (including as to timing, rounding, minimum amounts, Type and Interest Periods and calculation of Applicable Discount in accordance with subsection 4.23(c) above) established by the Administrative Agent and the Borrower.

<div align="center">51</div>

(g)      Prior to the delivery of a Discounted Voluntary Prepayment Notice, (A) upon written notice to the Administrative Agent, the Borrower may withdraw or modify its offer to make a Discounted Voluntary Prepayment pursuant to any Discounted Prepayment Option Notice and (B) no Lender may withdraw its offer to participate in a Discounted Voluntary Prepayment pursuant to any Lender Participation Notice unless the terms of such proposed Discounted Voluntary Prepayment have been modified by the Borrower after the date of such Lender Participation Notice.

(h)      Nothing in this subsection 4.23 shall require the Borrower to undertake any Discounted Voluntary Prepayment.

4.24    Extensions of Term Loans . (a) Notwithstanding anything to the contrary in this Agreement, pursuant to one or more offers (each, an "Extension Offer") made from time to time by the Borrower to all Lenders of Term Loans with a like maturity date, on a pro rata basis (based on the aggregate outstanding principal amount of the respective Term Loans with a like maturity date) and on the same terms to each such Lender, the Borrower is hereby permitted to consummate from time to time transactions with individual Lenders that accept the terms contained in such Extension Offers to extend the maturity date of each such Lender's Term Loans and otherwise modify the terms of such Term Loans pursuant to the terms of the relevant Extension Offer (including by increasing the interest rate or fees payable in respect of such Term Loans and/or modifying the amortization schedule in respect of such Lender's Term Loans) (each, an "Extension", and each group of Term Loans as so extended, as well as the original Term Loans (not so extended), being a "tranche"; any Extended Term Loans shall constitute a separate tranche of Term Loans from the tranche of Term Loans from which they were converted) so long as the following terms are satisfied: (i) no Default or Event of Default shall have occurred and be continuing at the time the offering document in respect of an Extension Offer is delivered to the Lenders, (ii) except as to interest rates, fees, amortization, final maturity date, premium, required prepayment dates and participation in prepayments (which shall, subject to immediately succeeding clauses (iii), (iv) and (v), be determined between the Borrower and set forth in the relevant Extension Offer), the Term Loans of any Lender that agrees to an extension with respect to such Term Loans extended pursuant to any Extension ("Extended Term Loans") shall have the same terms as the tranche of Term Loans subject to such Extension Offer until the maturity of such Term Loans, (iii) the final maturity date of any Extended Term Loans shall be no earlier than the then latest maturity date hereunder and the amortization schedule applicable to Term Loans pursuant to subsection 2.2 for periods prior to the Maturity Date, as applicable, may not be increased, (iv) the weighted average life of any Extended Term Loans shall be no shorter than the remaining weighted average life of the Term Loans extended thereby, (v) any Extended Term Loans may participate on a pro rata basis or a less than pro rata basis (but not greater than a pro rata basis) in any voluntary or mandatory repayments or prepayments hereunder, in each case as specified in the respective Extension Offer, (vi) if the aggregate principal amount of Term Loans (calculated on the face amount thereof) in respect of which Lenders shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of Term Loans offered to be extended by the Borrower pursuant to such Extension Offer, then the Term Loans of such Lenders shall be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Lenders have accepted such Extension Offer, (vii) all documentation in respect of such Extension shall be consistent with the foregoing, (viii) any

52

145909348v39

applicable Minimum Extension Condition shall be satisfied unless waived by the Borrower and (ix) the Minimum Tranche Amount shall be satisfied unless waived by the Administrative Agent.

(b)      With respect to all Extensions consummated by the Borrower pursuant to this subsection, (i) such Extensions shall not constitute voluntary or mandatory payments or prepayments for purposes of subsection 4.5 or 4.6 and (ii) no Extension Offer is required to be in any minimum amount or any minimum increment, provided that (x) the Borrower may at its election specify as a condition (a "Minimum Extension Condition") to consummating any such Extension that a minimum amount (to be determined and specified in the relevant Extension Offer in the Borrower's sole discretion and may be waived by the Borrower) of Term Loans of any or all applicable tranches be tendered and (y) no tranche of Extended Term Loans shall be in an amount of less than $50,000,000 (or, if less, the then aggregate outstanding amount of the Term Loans) (the "Minimum Tranche Amount"), unless such Minimum Tranche Amount is waived by the Administrative Agent. The Administrative Agent and the Lenders hereby consent to the transactions contemplated by this subsection (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Term Loans on such terms as may be set forth in the relevant Extension Offer) and hereby waive the requirements of any provision of this Agreement (including subsection 4.5 or 4.6 and 4.16(a)) or any other Loan Document that may otherwise prohibit any such Extension or any other transaction contemplated by this Section.

(c)      No consent of any Lender or the Administrative Agent shall be required to effectuate any Extension, other than the consent of each Lender agreeing to such Extension with respect to one or more of its Term Loans (or a portion thereof). All Extended Term Loans and all obligations in respect thereof shall be Obligations under this Agreement and the other Loan Documents that are secured by the Collateral on a pari passu basis with all other applicable Obligations under this Agreement and the other Loan Documents. The Lenders hereby irrevocably authorize the Administrative Agent to enter into amendments to this Agreement and the other Loan Documents with the Borrower as may be necessary in order to establish new tranches or sub-tranches in respect of Term Loans so extended and such technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such new tranches or sub-tranches, in each case on terms consistent with this subsection. Without limiting the foregoing, in connection with any Extensions the respective Loan Parties shall (at their expense) amend (and the Administrative Agent is hereby directed to amend) any Mortgage that has a maturity date prior to the then latest maturity date so that such maturity date is extended to the then latest maturity date (or such later date as may be advised by local counsel to the Administrative Agent).

(d)      In connection with any Extension, the Borrower shall provide the Administrative Agent at least 5 Business Days' (or such shorter period as may be agreed by the Administrative Agent) prior written notice thereof, and shall agree to such procedures (including regarding timing, rounding and other adjustments and to ensure reasonable administrative management of the credit facilities hereunder after such Extension), if any, as may be established by, or acceptable to, the Administrative Agent, in each case acting reasonably to accomplish the purposes of this subsection.

SECTION 5.   REPRESENTATIONS AND WARRANTIES

53

145909348v39

The Borrower hereby represents and warrants to each Lender and the Administrative Agent that:

5.1     Financial Condition. (a) (i) The audited consolidated balance sheet of Parent and its Subsidiaries at December 31, 201[7] and the related consolidated statements of operations, stockholders' equity and cash flows for the fiscal year ended on such dates, reported on by certified public accountants of nationally recognized standing and (ii) the unaudited consolidated balance sheet of Parent and its Subsidiaries at [March 31, 2017] [and June 30, 2017] and the related consolidated statements of operations and cash flows for the fiscal periods ended on such dates, fairly present in all material respects (except, with respect to interim reports, for normal year-end adjustments and the absence of footnotes) the consolidated financial position of Parent and its Subsidiaries as at such date, and the consolidated results of their operations and cash flows for the fiscal periods then ended and, in the case of the statements referred to in the foregoing clause (ii), the portion of the fiscal year through [March 31, 2017] [and June 30, 2017], as applicable, in each case, in accordance with GAAP consistently applied throughout the periods involved (except as noted therein).

(b)     No Change. Since the Effective Date, there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect.

5.2     Corporate Existence; Compliance with Law. Each Group Member (a) is a Person duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization, (b) has the requisite power and authority and the legal right to own and operate its property, to lease the property it operates and to conduct the business in which it is currently engaged, except to the extent that the failure to possess such power and authority and such legal right would not, in the aggregate, have a Material Adverse Effect, (c) is duly qualified and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, except where the failure to be so qualified would not have a Material Adverse Effect and (d) is in compliance with all applicable Requirements of Law (including occupational safety and health, health care, pension, certificate of need, the Comprehensive Environmental Response, Compensation and Liability Act, any so-called "Superfund" or "Superlien" law, or any applicable federal, state, local or other statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning, any Materials of Environmental Concern), except to the extent that the failure to comply therewith would not, in the aggregate, have a Material Adverse Effect.

5.3     Corporate Power; Authorization. (a) Each Loan Party has the requisite power and authority and the legal right to make, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrower, to obtain extensions of credit made or deemed made hereunder. Each Loan Party has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and in case of the Borrower, to authorize the extensions of credit made or deemed made hereunder on the terms and conditions of this Agreement.

(b)     No consent or authorization of, or filing with, notice to or other act by or in respect of, any Person (including any Governmental Authority) is required in connection with

54

the extensions of credit made or deemed made hereunder or with the execution, delivery, performance by any Loan Party, validity or enforceability of this Agreement or any Loan Document to the extent that it is a party thereto, or the guarantee of the Obligations pursuant to the Guarantee and Collateral Agreement, except (i) such as have been obtained or made and are in full force and effect, (ii) filings necessary to perfect Liens created under the Loan Documents and (iii) those consents, authorizations, filings and notices, the failure of which to obtain or make could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.4     Enforceable Obligations. Each of the Loan Documents has been duly executed and delivered on behalf of each Loan Party party thereto and each of such Loan Documents constitutes the legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

5.5     No Legal Bar. The execution, delivery and performance of each Loan Document and the guarantee of the Obligations pursuant to the Guarantee and Collateral Agreement will not violate any Requirement of Law or any Contractual Obligation applicable to or binding upon any Group Member or any of its properties or assets, which violations, individually or in the aggregate, would have a Material Adverse Effect, and will not result in the creation or imposition (or the obligation to create or impose) of any Lien (other than any Liens created pursuant to the Loan Documents) on any of its or their respective properties or assets.

5.6     No Material Litigation. Except as disclosed in the SEC Filings or on Schedule 5.6, no litigation or investigation known to the Borrower through receipt of written notice or proceeding of or by any Governmental Authority or any other Person is pending against any Group Member, (a) with respect to the validity, binding effect or enforceability of any Loan Document, or with respect to the Term Loans deemed made hereunder, or (b) which would have a Material Adverse Effect.

5.7     Investment Company Act. No Group Member is required to be registered as an "investment company" (as the quoted term is defined or used in the Investment Company Act of 1940, as amended).

5.8     Federal Regulation. No extensions of credit hereunder will be used for any purpose which violates, or which would be inconsistent with, the provisions of Regulation T, U or X of the Board. No Group Member is engaged or will engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under said Regulation U.

5.9     No Default or Breach. Except as set forth in the SEC Filings made prior to the Effective Date or on Schedule 5.9, no Group Member is in default or breach (i) in the payment or performance of any of its Contractual Obligations (other than Indebtedness) in any respect which would have a Material Adverse Effect, or (ii) under any condition, term or

55

requirement of any FCC License or any order, award or decree of any Governmental Authority or arbitrator binding upon or affecting it or by which any of its properties or assets may be bound or affected in any respect which would have a Material Adverse Effect.

5.10    Taxes. Each Group Member has paid all Taxes shown to be due and payable on its Tax returns or extension requests or on any assessments made against it or any of its property and all other Taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than those the amount or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided in the books of such Group Member), except any such Taxes, fees or charges, the payment of which, or the failure to pay, would not have a Material Adverse Effect; and, to the knowledge of the Borrower, no claims are being asserted with respect to any such Taxes, fees or other charges (other than those the amount or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided in the books of the applicable Group Member), except as to any such Taxes, fees or other charges, the payment of which, or the failure to pay, would not have a Material Adverse Effect.

5.11    Subsidiaries; Loan Parties. As of the Effective Date, (a) the Subsidiaries of Parent listed on Schedule 5.11(a) constitute all of the Domestic Subsidiaries of Parent, (b) the Subsidiaries listed on Schedule 5.11(b) constitute all of the Foreign Subsidiaries of Parent and (c) the Loan Parties listed on Schedule 5.11(c) constitute all of the Loan Parties. As of the Effective Date, Schedule 5.11(a) identifies all of the Broadcast License Subsidiaries.

5.12    Ownership of Property; Liens; Licenses. (a) Except as disclosed in Schedule 8.3 hereof, each Group Member has good and marketable title to, or valid and subsisting leasehold interests in, all its real property used by such Group Member in the operation of its business, and good title to all its respective other owned property, except where the failure to have such title or interest would not have a Material Adverse Effect. All such real property and other owned property is free and clear of any Liens, other than Liens permitted by subsection 8.3.

(b)    As of the Effective Date, Schedule 5.12 sets forth all FCC Licenses held by any Group Member (and the respective holders of such FCC Licenses) and all other licenses and permits issued by any Governmental Authority which are held by any Group Member that are in effect as of the Effective Date and are material to the business of the Group Members. Each of the foregoing FCC Licenses, and each other license or permit from a Governmental Authority that is material to the business of the Group Members, is valid and in full force and effect, and except as disclosed on Schedule 5.12, the Group Members are in compliance in all material respects with the terms and conditions thereof and any requirements under applicable FCC regulation.

5.13    Intellectual Property. Each Group Member owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business as currently conducted except where the failure to do so could not reasonably be expected to have a Material Adverse Effect. No claim that could reasonably be expected to have a Material Adverse Effect has been asserted and is pending by any Person challenging or questioning the use of any Intellectual Property or

56

145909348v39

the validity or effectiveness of any Intellectual Property, nor does the Borrower know of any valid basis for any such claim. The use of Intellectual Property by the Group Members does not infringe on the rights of any Person in a manner that could reasonably be expected to have a Material Adverse Effect.

5.14    Labor Matters. Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against any Group Member pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of any Group Member have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from any Group Member on account of insurance coverage, other contributions or liabilities associated with employee health and welfare benefit plans have been paid or accrued as a liability on the books of such Group Member.

5.15    ERISA. Except as would not have a Material Adverse Effect: (i) each Loan Party and each ERISA Affiliate is in compliance with the applicable provisions of ERISA and of the Code relating to Plans; (ii) no Reportable Event or non-exempt Prohibited Transaction has occurred or is reasonably expected to occur with respect to any Plan; (iii) there has been no determination that any Single Employer Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (iv) no Lien in favor of the PBGC or any Single Employer Plan has been imposed upon any Loan Party or any ERISA Affiliate that remains unsatisfied; (v) no Loan Party and no ERISA Affiliate has received from the PBGC or a plan administrator any notice relating to an intention to terminate any Single Employer Plan or to appoint a trustee to administer any Single Employer Plan under Section 4042 of ERISA; (vi) no Loan Party and no ERISA Affiliate has incurred any Withdrawal Liability that remains unsatisfied; and (vii) no Loan Party and no ERISA Affiliate has received any notice concerning the imposition of Withdrawal Liability or any determination that a Multiemployer Plan is, or is expected to be, Insolvent, in Reorganization, terminated or in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA).

5.16    Environmental Matters. (a) Except as disclosed in the SEC Filings or on Schedule 5.16, to the knowledge of the Borrower, the Properties do not contain any Materials of Environmental Concern in concentrations which constitute a violation of, or would reasonably be expected to give rise to liability under, Environmental Laws that would have a Material Adverse Effect.

(b)    The Properties and all operations at the Properties are in compliance with all applicable Environmental Laws, except for failure to be in compliance that would not have a Material Adverse Effect, and there is no contamination at, under or about the Properties that would have a Material Adverse Effect.

(c)    No Group Member has received any written notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to the Properties that would have a Material Adverse Effect, nor does the Borrower have knowledge that any such action is being contemplated, considered or threatened.

57

145909348v39

(d)      There are no judicial proceedings or governmental or administrative actions pending or threatened under any Environmental Law to which any Group Member is or will be named as a party with respect to the Properties that would have a Material Adverse Effect, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders under any Environmental Law with respect to the Properties that would have a Material Adverse Effect.

5.17    Disclosure. None of the written reports, financial statements, certificates or other written information (other than projections, budgets or other estimates or forward-looking statements or information of a general economic or industry nature or reports or studies prepared by third parties that were not expressly commissioned by a Group Member (collectively, the "Projections")), taken as a whole, furnished by or on behalf of any Group Member to the Administrative Agent or any Lender prior to the Effective Date in connection with the transactions contemplated by this Agreement or any other Loan Document or delivered hereunder or thereunder (as modified or supplemented by other information so furnished prior to the Effective Date) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to Projections, the Borrower represents only that such information was prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time such Projections were prepared, it being understood that Projections by their nature are uncertain and no assurance is given that the results reflected in such Projections will be achieved.

5.18    Security Documents. (a) The Guarantee and Collateral Agreement is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law). In the case of the Pledged Stock that are Securities (as defined in the UCC) described in the Guarantee and Collateral Agreement, when stock certificates representing such Pledged Stock are delivered to the Administrative Agent (together with a properly completed and signed stock power or endorsement), and in the case of the other Collateral in which a security interest can be perfected under the relevant UCC by filing a UCC financing statement and described in the Guarantee and Collateral Agreement, when financing statements and other filings specified on Schedule 5.18 in appropriate form are filed in the offices specified on Schedule 5.18, the Guarantee and Collateral Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof, as security for the Obligations (as defined in the Guarantee and Collateral Agreement), in each case prior and superior in right to any other Person (except, in the case of Collateral other than Pledged Stock, Liens permitted by subsection 8.3 and, in the case of Collateral consisting of Pledged Stock, inchoate Liens arising by operation of law).

(b)      Each of the Mortgages upon proper filing is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable Lien on the Mortgaged Properties described therein and proceeds thereof except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium,

58

145909348v39

or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law), and when the Mortgages are filed in the appropriate recording offices, each such Mortgage shall constitute a valid and enforceable Lien with record notice to third parties on all right, title and interest of the Loan Parties in the Mortgaged Properties and the proceeds thereof, as security for the Obligations (as defined in the relevant Mortgage), in each case prior and superior in right to any other Person (except that that the Lien created in the Mortgaged Properties may be subject to the Liens permitted by subsection 8.3).

5.19   Solvency. As of the Effective Date and after giving effect to the Transactions, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

5.20   [Reserved].

5.21   Patriot Act. To the extent applicable, each Group Member is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) the Act. No part of the proceeds of the Term Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

5.22   Anti-Corruption Laws and Sanctions. The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrower, its Subsidiaries and their respective officers and employees, and to the knowledge of the Borrower, its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects. None of (a) the Borrower, any Subsidiary or any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No transaction contemplated by the Credit Agreement will violate Anti-Corruption Laws or applicable Sanctions.

5.23   Plan Assets; Prohibited Transactions. None of the Borrower or any of its Subsidiaries is an entity deemed to hold "plan assets" (within the meaning of Plan Asset Regulations), and neither the execution, delivery  or  performance of the transactions contemplated under this Agreement, including the deemed making the Term Loans hereunder, will give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code. The representation in this section 5.23 is based on the assumption that none of the Lenders is, or is acting on behalf of, a benefit plan investor as defined in section 3(42) of ERISA.

SECTION 6.   CONDITIONS PRECEDENT

59

145909348v39

6.1     Conditions Precedent to Effectiveness. This Agreement shall become effective on the first date on which each of the following conditions is satisfied:

(a)     Credit Agreement; Guarantee and Collateral Agreement. The Administrative Agent and the Required Lenders shall have received (i) this Agreement, executed and delivered by the Administrative Agent and the Borrower and (ii) executed counterparts of the Guarantee and Collateral Agreement.

(b)     Fees. The Borrower shall have paid all fees payable on or prior to the Effective Date required by this Agreement, the Fee Letter or any other Loan Documents, including reimbursement or payment of all out-of-pocket fees and expenses (including all reasonable fees, charges and disbursements of counsel and any financial advisor) required to be reimbursed or paid by any Loan Party and all fees and expenses required to be paid hereunder or pursuant to the Fee Letter.  In the case of expenses, such expenses shall have been invoiced at least two (2) Business Days prior to the Effective Date (except as otherwise reasonably agreed by the Borrower).  In addition, the Administrative Agent shall have also received a fully executed copy of the Fee Letter.

(c)     Legal Opinion. The Administrative Agent and the Required Lenders shall have received, dated the Effective Date and addressed to the Administrative Agent and the Lenders, (i) an opinion of Paul, Weiss, Rifkind, Wharton & Garrison LLP, special counsel to the Loan Parties, and (ii) opinions of local counsel to the Loan Parties, in each case in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders. Such opinion shall also cover such other matters incident to the transactions contemplated by this Agreement as the Administrative Agent or the Required Lenders shall reasonably require.

(d)     Closing Certificates. The Administrative Agent and the Required Lenders shall have received a closing certificate of Parent, the Borrower and each Subsidiary Guarantor, dated the Effective Date, substantially in the form of Exhibits B-1, B-2 and B-3 hereto, respectively, with appropriate insertions and attachments, reasonably satisfactory in form and substance to the Administrative Agent and the Required Lenders and their counsel, executed by the Chief Executive Officer or any Vice President and the Secretary or any Assistant Secretary of Parent, the Borrower and each Subsidiary Guarantor respectively.

(e)     Organizational Documents. The Administrative Agent and the Required Lenders shall have received true and correct copies of the Certificate of Incorporation and By-laws or Operating Agreement of each Loan Party, certified as to authenticity by the Secretary or Assistant Secretary of each such Loan Party.

(f)     Corporate Documents. The Administrative Agent and the Required Lenders shall have received copies of certificates from the Secretary of State or other appropriate authority of such jurisdiction, evidencing the good standing or existence of each Loan Party in its jurisdiction of incorporation or organization.

(g)     Pledged Stock; Stock Powers; Pledged Notes. The Administrative Agent shall have (i) received the certificates representing the shares pledged pursuant to the Guarantee and Collateral Agreement, together with an undated stock power for each such certificate

60

145909348v39

executed in blank by a duly authorized officer of the pledgor thereof, and (ii) received the promissory notes pledged pursuant to the Guarantee and Collateral Agreement, endorsed in blank by a duly authorized officer of the pledgor thereof.

(h)     Filings. All necessary or advisable filings shall have been duly made or made available to the Administrative Agent or its counsel to create a perfected first priority Lien on and security interest in all Collateral in which a security interest can be perfected by filing a UCC-1 financing statement, and all such Collateral shall be free and clear of all Liens, except Liens permitted by subsection 8.3.

(i)     Lien Searches. The Administrative Agent shall have received the results of a recent Lien search with respect to each Loan Party, and such search shall reveal no Liens on any of the assets of the Loan Parties except for Liens permitted by subsection 8.3 or discharged on or prior to the Effective Date pursuant to documentation reasonably satisfactory to the Administrative Agent and the Required Lenders.

(j)     Representations and Warranties. Each of the representations and warranties made in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of the Effective Date as if made on and as of such date (unless (i) such representation or warranty is already by its terms qualified as to "materiality", "Material Adverse Effect" or similar language, in which case such representation or warranty shall be true and correct in all respects as of the Effective Date after giving effect to such qualification or (ii) such representation or warranty is stated to relate to a specific earlier date, in which case, such representations and warranties shall be true and correct in all material respects (or in all respects if such representation or warranty is already by its terms qualified as to "materiality", "Material Adverse Effect" or similar language) as of such earlier date).

(k)     No Default or Event of Default. No Default or Event of Default shall have occurred and be continuing at the time of, or after giving effect to this Agreement and the loans deemed to be made hereunder on the Effective Date.

(l)     Plan of Reorganization. The final order confirming the Plan of Reorganization, shall have been entered and shall not be subject to a stay or have been reversed, modified or amended (other than as otherwise agreed to by the Administrative Agent and the Required Lenders), all conditions precedent to the effectiveness or consummation thereof shall have been satisfied, and the Plan of Reorganization shall have been, or contemporaneously with the effectiveness of this Agreement shall be, consummated.

(m)     Corporate Ratings. The Borrower shall have used commercially reasonable efforts to maintain a corporate family and/or corporate credit rating for the Borrower and a rating for the Term Loans, in each case from each of S&P and Moody's.

(n)     Patriot Act. Before the end of the third Business Day prior to the Effective Date, the Administrative Agent and each Lender shall have received all documentation and other information, which has been requested in writing by the Administrative Agent or such Lender at least five Business Days prior to the Effective Date, required by regulatory authorities under

61

applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

(o)     Solvency Certificate. The Administrative Agent and the Required Lenders shall have received a solvency certificate in substantially the form attached hereto as Exhibit J from the Chief Financial Officer of the Borrower that shall certify as to the solvency of the Borrower and its Subsidiaries on a consolidated basis after giving effect to the Transactions.

(p)     Notes.  The Administrative Agent shall have received a Note executed by the Borrower in favor of each Lender requesting a Note.

(q)     Insurance.  The Administrative Agent shall have received evidence that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect, together with the certificates of insurance, naming the Administrative Agent, on behalf of the Lenders, as an additional insured or loss payee, as the case may be, under all insurance policies maintained with respect to the assets and properties of the Loan Parties that constitute Collateral.

(r)     Intellectual Property Security Agreements.  Patent, trademark and copyright security agreements, in form and substance reasonably satisfactory to the Required Lenders, covering the registered intellectual property listed on the applicable schedules to the Guarantee and Collateral Agreement, duly executed by the Borrower and each other Loan Party, shall have been received by the Administrative Agent.

(s)     Funds Flow.  The Administrative Agent shall have received a funds flow memorandum with respect to the transactions contemplated hereby on the Effective Date in form, scope and substance reasonably satisfactory to the Required Lenders.

(t)     Historical Financial Statements.  The Administrative Agent and the Required Lenders shall have received the financial statement referenced in Section 5.1.

(u)     Other Indebtedness.  The Required Lenders shall be reasonably satisfied that, on the Effective Date, immediately after giving effect to the consummation of the Plan of Reorganization, the making or deemed making of the Term Loans on the Effective Date and any other transactions to occur on the Effective Date, the Loan Parties and their subsidiaries shall have outstanding no indebtedness for borrowed money, other than Indebtedness outstanding under the Loan Documents and Indebtedness permitted under Section 8.2.

Without limiting the generality of the provisions of Section 10.2(b), for purposes of determining compliance with the conditions specified in this Section 6 (and irrespective of whether any Effective Date Lender has signed this Agreement), each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender, unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Effective Date specifying its objection thereto.

SECTION 7.   AFFIRMATIVE COVENANTS

<div align="center">62</div>

145909348v39

From and after the Effective Date, so long as any Term Loan or Note remains outstanding and unpaid or any other amount is owing to any Lender (other than indemnities and other contingent liabilities not then due and payable that survive repayment of the Term Loans) or the Administrative Agent hereunder, the Borrower hereby agrees that it shall, and, in the case of the agreements contained in subsections 7.3, 7.4, 7.5, 7.6, 7.7, 7.8 and 7.11 cause each of its Subsidiaries to, and Parent hereby agrees (solely with respect to subsection 7.10) that it shall and shall cause each of its Subsidiaries to:

7.1     Financial Statements. Furnish to the Administrative Agent (with sufficient copies for each Lender) or otherwise make available as described in the last sentence of subsection 7.2:

(a)     as soon as available, but in any event within 90 days after the end of each fiscal year of the Borrower, a copy of the consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related consolidated statements of operations, stockholders' equity and cash flows for such year, setting forth in each case in comparative form the figures for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by [_____] or other certified public accountants of nationally recognized standing not unacceptable to the Administrative Agent; and

(b)     as soon as available, but in any event not later than 60 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries at the end of such quarter and the related unaudited consolidated statements of operations and cash flows of the Borrower and its consolidated Subsidiaries for such applicable period and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form, the figures for the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end audit adjustments and the absence of footnotes);

all financial statements shall be prepared in reasonable detail in accordance with GAAP (provided, that interim statements may be condensed and may exclude footnote disclosure and are subject to year-end adjustment) applied consistently throughout the periods reflected therein and with prior periods (except as concurred in by such accountants or officer, as the case may be, and disclosed therein and except that interim financial statements need not be restated for changes in accounting principles which require retroactive application, and operations which have been discontinued (as defined in ASC 360, "Property, Plant and Equipment") during the current year need not be shown in interim financial statements as such either for the current period or comparable prior period).

Documents required to be delivered pursuant to this subsection 7.1 and subsection 7.2 below (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which Parent or the Borrower posts such documents, or provides a link thereto, on Parent's or the Borrower's website on the Internet at www.cumulus.com or (ii) on which such documents are posted on Parent's or the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial or public

63

third-party website or whether sponsored by the Administrative Agent (including the website of the SEC at http://www.sec.gov)); provided that (x) in each case, other than with respect to regular periodic reporting, the Borrower shall notify the Administrative Agent of the posting of any such documents and (y) in the case of documents required to be delivered pursuant to subsection 7.2, at the request of the Administrative Agent, the Borrower shall furnish to the Administrative Agent a hard copy of such document. Each Lender shall be solely responsible for timely accessing posted documents and maintaining its copies of such documents.

7.2    Certificates; Other Information. Furnish to the Administrative Agent or otherwise make available as described in the last sentence of subsection 7.2:

(a)    [reserved];

(b)    within five (5) Business Days following delivery of the financial statements referred to in subsections 7.1(a) and 7.1(b), a certificate of the Responsible Officer of the Borrower (i) stating that, to the best of such officer's knowledge, such officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate and (ii) in the case of financial statements under subsection 7.1(a), beginning with the financial statements for the fiscal year ending December 31, 2018, setting forth reasonably detailed calculations of Excess Cash Flow;

(c)    promptly upon receipt thereof, copies of all final reports submitted to the Borrower by independent certified public accountants in connection with each annual, interim or special audit of the books of the Borrower made by such accountants, including any final comment letter submitted by such accountants to management in connection with their annual audit;

(d)    promptly upon their becoming available, copies of all financial statements, reports, notices and proxy statements and all regular and periodic reports and all final registration statements and final prospectuses, if any, filed by Parent or any of its Subsidiaries with any securities exchange or with the Securities and Exchange Commission or any Governmental Authority succeeding to any of its functions;

(e)    concurrently with the delivery of the financial statements referred to in subsections 7.1(a) and 7.1(b), a management summary describing and analyzing the performance of the Borrower and its Subsidiaries during the periods covered by such financial statements; provided, however, that such management summary need not be furnished so long as Parent or the Borrower is a reporting company under the Securities Exchange Act of 1934, as amended;

(f)    concurrently with the delivery of the consolidated financial statements referred to in subsection 7.1(a), but in any event within 90 days after the beginning of each fiscal year of the Borrower to which such budget relates, an annual operating budget of the Borrower and its Subsidiaries, on a consolidated basis;

(g)    promptly following any request by the Administrative Agent or the Required Lenders (through the Administrative Agent) therefor, copies of any documents or notices described in Sections 101(k) or 101(l) of ERISA that any Loan Party or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided, that if the Loan Parties

64

or their ERISA Affiliates have not requested such documents or notices from the administrator or sponsor of an applicable Multiemployer Plan, then Borrower shall cause the Loan Parties and/or their ERISA Affiliates to promptly make a request for such documents or notices from the administrator or sponsor of such Multiemployer Plan and Borrower shall provide copies of such documents and notices promptly after receipt thereof; and

(h)       promptly, such additional financial and other information as the Administrative Agent or any Lender (through the Administrative Agent) may from time to time reasonably request.

The requirements of subsections 7.1 and 7.2 above shall be deemed to be satisfied if Parent or the Borrower shall have made such materials available to the Administrative Agent, including by electronic transmission, within the time periods specified therefor and pursuant to procedures approved by the Administrative Agent, or by filing such materials by electronic transmission with the Securities and Exchange Commission, in which case "delivery" of such statements for purposes of subsections 7.1(a) and 7.1(b) shall mean making such statements available in such fashion.

7.3       Payment of Obligations. Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all of its Tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, except (a) when the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the applicable Group Member, as the case may be and (b) to the extent the failure to pay or discharge the same could not reasonably be expected to have a Material Adverse Effect.

7.4       Conduct of Business; Maintenance of Existence; Compliance. Continue to engage in business conducted or proposed to be conducted by the Borrower and its Subsidiaries on the Effective Date or any business that is similar, reasonably related, incidental, complementary or ancillary thereto, including without limitation in broadcasting and other media businesses, and preserve, renew and keep in full force and effect its legal existence and take all reasonable action to maintain all rights, privileges, franchises, accreditations, certifications, authorizations, licenses, permits, approvals and registrations, necessary or desirable in the normal conduct of its business except for rights, privileges, franchises, accreditations, certifications, authorizations, licenses, permits, approvals and registrations the loss of which would not in the aggregate have a Material Adverse Effect, and except as otherwise permitted by this Agreement; and comply with all applicable Requirements of Law and Contractual Obligations except to the extent that the failure to comply therewith would not, in the aggregate, have a Material Adverse Effect.

7.5       Maintenance of Property; Insurance. (a) Except if the failure to do so could not reasonably be expected to result in a Material Adverse Effect, keep all property useful and necessary in its business in good working order and condition (ordinary wear and tear, casualty and condemnation excepted).

(b)       Maintain with financially sound and reputable insurance companies (provided that if any such insurance company shall at any time cease to be financially sound and

65

145909348v39

reputable, there shall be no breach of this provision in the event that the Borrower promptly (and in any event within forty-five (45) days of such date) obtains insurance from an alternative insurance carrier that is financially sound and reputable) insurance with respect to its properties in at least such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and its Subsidiaries in the same geographic locales) and against at least such risks as are customarily insured against in the same general area by companies engaged in the same or similar business.

(c)     Maintain casualty and property insurance for which the Borrower shall (i) use commercially reasonable efforts to cause such insurance to provide that no cancellation, material reduction in amount or material change in coverage thereof shall be effective until at least thirty (30) days after receipt by the Administrative Agent of written notice thereof, and (ii) name the Administrative Agent as insured party or loss payee.

(d)     Upon request by the Administrative Agent or the Required Lenders (through the Administrative Agent), the Borrower shall deliver to the Administrative Agent information in reasonable detail as to the insurance maintained by the Group Members.

7.6     <u>Inspection of Property; Books and Records; Discussions; Annual Meetings</u>. (a) Keep proper books of record and account in which full, true and correct in all material respects entries are made of all material dealings and transactions in relation to its business and activities which permit financial statements to be prepared in conformity with GAAP and all Requirements of Law; and permit representatives of the Administrative Agent (or any designee thereof) upon reasonable notice to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time during normal business hours and as often as may reasonably be desired upon reasonable notice (but no more than once per annum unless an Event of Default has occurred and is continuing), and to discuss the business, operations, properties and financial and other condition of Parent and its Subsidiaries with officers and employees thereof and with their independent certified public accountants (with, at the option of the Borrower, an officer of the Borrower present) upon reasonable advance notice to the Borrower.

(b)     Within 120 days after the end of each fiscal year of the Borrower, at the request of the Administrative Agent or the Required Lenders (through the Administrative Agent), hold a meeting at a mutually agreeable location, venue and time or, at the option of the Administrative Agent or the Required Lenders (through the Administrative Agent), by conference call (the reasonable costs of such venue or call to be paid by the Borrower) with all Lenders who choose to attend such meeting at which meeting shall be reviewed, to the extent permitted by applicable Requirements of Law (including applicable national security laws, directives, policies, rules, regulations and procedures), the financial results of the previous fiscal year and the financial condition of Parent and its Subsidiaries and the operating budget presented for the current fiscal year of the Borrower.

7.7     <u>Notices</u>. Promptly give notice to the Administrative Agent (who shall deliver to each Lender) upon a Responsible Officer obtaining knowledge of:

(a)     the occurrence of any Default or Event of Default;

<div align="center">66</div>

145909348v39

(b)      any litigation, investigation or proceeding which may exist at any time between Parent and any of its Subsidiaries and any Governmental Authority, or receipt of any notice of any environmental claim or assessment against Parent or any of its Subsidiaries by any Governmental Authority, which in any such case would reasonably be expected to have a Material Adverse Effect;

(c)      any litigation or proceeding affecting Parent or any of its Subsidiaries (i) in which more than $35,000,000 of the amount claimed is not covered by insurance or (ii) in which injunctive or similar relief is sought which if obtained would reasonably be expected to have a Material Adverse Effect;

(d)      the occurrence of any Reportable Event that, alone or together with any other Reportable Events that have occurred, would reasonably be expected to result in a Material Adverse Effect, and in addition to such notice, deliver to the Administrative Agent and each Lender whichever of the following may be applicable: (A) a certificate of the Responsible Officer of the Borrower setting forth details as to such Reportable Event and the action that the Loan Party or ERISA Affiliate proposes to take with respect thereto, together with a copy of any notice of such Reportable Event that may be required to be filed with the PBGC, or (B) any notice delivered by the PBGC in connection with such Reportable Event;

(e)      the occurrence of any event which could reasonably be expected to have a material adverse effect on the aggregate value of the Collateral or on the security interests created by the Guarantee and Collateral Agreement; and

(f)      any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this subsection 7.7 shall be accompanied by a statement of the Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and (in the cases of clauses (a) through (f)) stating what action the Borrower proposes to take with respect thereto.

7.8      Environmental Laws. Except to the extent the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)      Comply with, and take commercially reasonable steps to cause all tenants and subtenants, if any, to comply with, all applicable Environmental Laws, and obtain and comply with and maintain, and take commercially reasonable steps to cause all tenants and subtenants to obtain and comply with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws.

(b)      Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions to the extent required under Environmental Laws and promptly comply with all legally binding lawful orders and directives of all Governmental Authorities regarding Environmental Laws.

7.9      [Reserved].

67

7.10    Additional Loan Parties; Pledge of Stock of Additional Subsidiaries; Additional Collateral, etc. (a) With respect to any new wholly-owned Subsidiary of Parent (other than a Foreign Subsidiary, a Non-Significant Subsidiary, a Broadcast License Subsidiary or a Receivables Subsidiary, or any other Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent, determined in consultation with the Borrower, the burden, cost or consequences (including any material adverse tax consequences) of such Subsidiary providing a guarantee of the Obligations shall be excessive in view of the benefits to be obtained by the Lenders therefrom) created or acquired after the Effective Date (including as a result of the consummation of any Business Acquisition) (which, for purposes of this clause (a) shall include any existing wholly-owned Subsidiary that ceases to be a Foreign Subsidiary, a Non-Significant Subsidiary, a Broadcast License Subsidiary or a Receivables Subsidiary), promptly cause such Subsidiary to become a party to the Guarantee and Collateral Agreement, which shall be accompanied by such resolutions, incumbency certificates and legal opinions as are reasonably requested by the Administrative Agent or the Required Lenders.

(b)     (i) Pledge the Capital Stock, or other equity interests and intercompany indebtedness, owned by any Loan Party that is created or acquired after the Effective Date pursuant to the Guarantee and Collateral Agreement (it being understood and agreed that, notwithstanding anything that may be to the contrary herein, this subsection 7.10(b) shall not require any Loan Party to pledge more than 66% of the outstanding voting stock of any of its Foreign Subsidiaries) and (ii) with regard to any property acquired by any Loan Party after the Effective Date (other than property described in paragraphs (b)(i) or (c)) (x) execute and deliver to the Administrative Agent such amendments to the Guarantee and Collateral Agreement or such other documents as the Administrative Agent or the Required Lenders deem necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a security interest in such property in accordance with the Guarantee and Collateral Agreement and (y) take all actions necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest in such property, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be requested by the Administrative Agent or the Required Lenders.

(c)     With respect to any Material Real Property owned by any Loan Party (unless subject to a Lien permitted under subsections 8.3(f) or 8.3(h)), promptly (but in any event not later than (x) in the case of any Material Real Property existing on the Effective Date, 180 days after the Effective Date and (y) in the case of any Material Real Property acquired after the Effective Date, 90 days after the date of such acquisition, which date, in each case, may be extended by the Administrative Agent (i) execute and deliver a first priority Mortgage in favor of the Administrative Agent, for the benefit of the Secured Parties, covering such real property, (ii) if requested by the Administrative Agent or the Required Lenders, provide the Lenders with title and extended coverage insurance covering such real property in an amount at least equal to the purchase price of such real property (or such other amount as shall be reasonably specified by the Administrative Agent or the Required Lenders) as well as a current ALTA survey or the equivalent (including, without limitation, ExpressMaps) thereof, together with a surveyor's certificate, in each case, if available, (iii) deliver (A) a "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to such real property and (B) in the event such property is located in an area identified by the Federal Emergency

68

Management Agency (or any successor agency) as a special flood hazard area, deliver (x) a notice about special flood hazard area status and flood disaster assistance, duly executed by the Borrower, (y) evidence of flood insurance with a financially sound and reputable insurer, naming the Administrative Agent, as mortgagee, in an amount and otherwise in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, and (z) evidence of the payment of premiums in respect thereof in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders and (iii) if requested by the Administrative Agent or the Required Lenders, deliver to the Administrative Agent customary legal opinions, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Required Lenders; provided that, in addition to the requirements set forth in this clause (c) with respect to Material Real Properties, at all times on and after the date that is 180 days after the Effective Date, the aggregate Real Property Values of all real properties located in the United States and owned in fee by one or more Loan Parties that are not subject to Mortgages in favor of the  Administrative Agent and in which the other items specified in this clause (c) have not been provided, shall not at any time exceed $25,000,000 (it being agreed, however, that if any real property is acquired by a Loan Party after the Effective Date and as a result of such acquisition such $25,000,000 limitation is exceeded, the Loan Parties shall have 90 days after the date of such acquisition (or such later date as reasonably agreed by the Administrative Agent) to provide Mortgages and the other items specified in this clause (c) on one or more real properties that will result in the Loan Parties being in compliance with such $25,000,000 limitation).

(d)      With respect to any joint venture formed or acquired by any Loan Party after the Effective Date, pledge to the Administrative Agent, for the benefit of the Secured Parties, all the Capital Stock or other equity interests owned by any Loan Party in such joint venture pursuant to the Guarantee and Collateral Agreement; provided, that if and only if such Loan Party is not permitted to pledge such Capital Stock or other equity interests under the limited liability company agreement, limited partnership agreement, joint venture agreement, general partnership agreement or other applicable organizational documents of such joint venture, the Borrower or other applicable Loan Party shall use commercially reasonable efforts to have such Capital Stock or other equity interests held at all times by a JV Holding Company.

(e)      With respect to any deposit account (other than an Excluded Account) or securities account (x) owned or maintained by a Loan Party on the Effective Date, promptly (but in any event not later than 60 days after the Effective Date (or such later date as reasonably agreed by the Administrative Agent) or (y) opened or acquired by a Loan Party after the Effective Date (or that ceases to be an Excluded Account after the Effective Date), on or prior to the date such deposit account or securities account is opened or acquired (or ceases to be an Excluded Account), as applicable, execute and deliver to the Administrative Agent a Control Agreement with respect to such deposit account or securities account.

7.11    Broadcast License Subsidiaries. (a) Unless the Borrower shall reasonably determine with the consent of the Administrative Agent (such consent not to be unreasonably delayed, conditioned or withheld) that doing so would cause undue expense or effort for the Borrower or its Subsidiaries, and except with respect to the FCC Licenses listed on Schedule 7.11, cause all FCC Licenses for all Stations owned by the Borrower or its Subsidiaries (other than any Station which the Borrower or any Subsidiary has placed in a Divestiture Trust) to be held at all times by one or more Broadcast License Subsidiaries; provided, that with regard to

69

any FCC Licenses for Stations acquired by the Borrower or its Subsidiaries after the Effective Date, the foregoing requirement shall be deemed satisfied if such FCC Licenses are, promptly following the acquisition of the respective Stations, assigned to and subsequently held by one or more Broadcast License Subsidiaries.

(b)      Ensure that each Broadcast License Subsidiary engages only in the business of holding FCC Licenses and rights and activities related thereto.

(c)      Ensure that the property of each Broadcast License Subsidiary is not commingled with the property of Parent, the Borrower or any Subsidiary other than Broadcast License Subsidiaries or otherwise remains clearly identifiable.

(d)      Ensure that no Broadcast License Subsidiary has any Indebtedness, guarantees or other liabilities except for the liabilities expressly permitted to be incurred in accordance with the definition of "Broadcast License Subsidiary".

(e)      Ensure that no Broadcast License Subsidiary creates, incurs, assumes or suffers to exist any Liens upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except non-consensual Liens arising by operation of law.

7.12      [Reserved].

7.13      Ratings. Use commercially reasonable efforts to obtain and maintain a corporate family and/or corporate credit rating, as applicable, and ratings in respect of the Term Loans, in each case from each of S&P and Moody's.

7.14      [Reserved].

7.15      Anti-Corruption Laws and Sanctions. The Borrower will maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

SECTION 8.   NEGATIVE COVENANTS.

From and after the Effective Date, the Borrower hereby agrees that it shall not, and shall not permit any of its Subsidiaries to, directly or indirectly so long as any Term Loan or Note remains outstanding and unpaid or any other amount is owing to any Lender (other than indemnities and other contingent liabilities not then due and payable that survive repayment of the Term Loans) or the Administrative Agent hereunder:

8.1      [Reserved].

8.2      Indebtedness. Create, incur, assume or suffer to exist any Indebtedness, except:

(a)      Indebtedness of the Loan Parties under this Agreement;

145909348v39

(b)    Indebtedness of the Borrower to any Subsidiary and of any Subsidiary to any other Subsidiary; provided that (i) any such Indebtedness owed by a Loan Party to a Person that is not a Loan Party shall be unsecured and subordinated in right of payment to the payment in full of the Obligations on terms reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders) and (ii) Indebtedness of Subsidiaries that are not Subsidiary Guarantors to the Borrower or any Subsidiary Guarantor must also be permitted under subsection 8.7;

(c)    Indebtedness of the Borrower or any of its Subsidiaries in respect of any foreign currency exchange contracts, interest rate swap arrangements or other derivative contracts or transactions, other than any such contracts, arrangements or transactions entered into by the Borrower or any of its Subsidiaries for speculative purposes;

(d)    Indebtedness of the Borrower or any of its Subsidiaries consisting of reimbursement obligations under surety, indemnity, performance, release and appeal bonds, in each case required in the ordinary course of business or in connection with the enforcement of rights or claims of the Borrower and its Subsidiaries, and letters of credit obtained in support thereof in the ordinary course of business;

(e)    existing Indebtedness of the Borrower or any of its Subsidiaries listed on Schedule 8.2 hereto including any extension or renewals or refinancing thereof, provided the principal amount thereof is not increased;

(f)    (i) any Indebtedness of any Person that becomes a Subsidiary in connection with a Permitted Acquisition after the Effective Date, (ii) any Indebtedness of any Person that is assumed by a Subsidiary in connection with an acquisition of assets by such Subsidiary in connection with a Permitted Acquisition after the Effective Date, and (iii) any Permitted Refinancing in respect of any Indebtedness set forth in the immediately preceding clauses (i) and (ii); provided that (x) in the case of clauses (i) and (ii) such Indebtedness exists at the time of such Permitted Acquisition and is not created in contemplation of or in connection with such Permitted Acquisition, (y) the aggregate principal amount of all Indebtedness of Subsidiaries that are not Subsidiary Guarantors outstanding under this clause (f) shall not exceed $25,000,000 at any time and (z) no Group Member (other than such Person that becomes a Subsidiary of the Borrower or the Subsidiary, as the case may be, that so assumes such Person's Indebtedness) shall guarantee or otherwise become liable for the payment of such Indebtedness;

(g)    letters of credit of the Borrower and its Subsidiaries; provided that the aggregate face amount of such letters of credit outstanding at any time shall not exceed $20,000,000; provided further such Indebtedness, if secured, is only secured as permitted by Section 8.3(w);

(h)    [Reserved];

(i)    Indebtedness consisting of promissory notes issued by the Borrower and its Subsidiaries to current or former directors, officers, employees, members of management or consultants of such person (or their respective estate, heirs, family members, spouse or former spouse) to finance the repurchase of shares of Parent permitted by subsection 8.8;

71

(j)      (i) Indebtedness of the Borrower or any Subsidiary (including Capital Lease Obligations) incurred to finance the acquisition, construction, repair, replacement, lease or improvement of fixed or capital assets (or the purchase of the Capital Stock of any Person owning such assets) in an amount not to exceed $25,000,000 at any time outstanding; provided that such Indebtedness is incurred prior to or within 365 days after the applicable acquisition, construction, repair, replacement or improvement, (ii) Indebtedness arising out of sale-leaseback transactions permitted hereunder and (iii) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding clauses (i) and (ii);

(k)      cash management obligations and other Indebtedness of the Borrower and any Subsidiaries in respect of netting services, overdraft protections, employee credit card programs, automatic clearing house arrangements and other similar arrangements in each case in connection with deposit accounts;

(l)      unsecured Indebtedness arising from agreements of the Borrower and its Subsidiaries providing for seller financing, deferred purchase price, contingent liabilities in respect of any indemnification obligations, adjustment of purchase price or similar obligations, in each case, incurred or assumed in connection with any Business Acquisition; provided, however, that (i) such Indebtedness is not reflected on the balance sheet of the Borrower or any of its Subsidiaries prepared in accordance with GAAP (contingent obligations referred to in a footnote to financial statements and not otherwise reflected on the balance sheet will not be deemed to be reflected on such balance sheet for purposes of this clause (i)), (ii) with respect to a disposition, the maximum assumable liability in respect of all such Indebtedness shall at no time exceed the gross proceeds including non-cash proceeds (the fair market value of such non-cash proceeds being measured at the time received and without giving effect to any subsequent changes in value) actually received by the Borrower and its Subsidiaries in connection with such disposition and (iii) as of the date of incurrence of any Indebtedness under this clause (l), the Consolidated Total Net Leverage Ratio (determined (i) on a pro forma basis, after giving effect to the incurrence of such Indebtedness, and (ii) excluding the proceeds of such Indebtedness in the calculation of Unrestricted Cash) of the Borrower and the Subsidiary Guarantors as of such date) is less than or equal to 6.25 to 1.00;

(m)      Indebtedness of the Borrower or any of its Subsidiaries consisting of (i) financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(n)      Indebtedness of the Borrower or any of its Subsidiaries incurred pursuant to either (but not both) of (i) a Receivables Facility or (ii) a Permitted Revolving Credit Facility; provided that the aggregate amount of Indebtedness incurred pursuant to this clause (n) (inclusive of the unused commitments under any such Receivables Facility or Permitted Revolving Credit Facility, as applicable) shall not at any time exceed $50,000,000 at any time outstanding;

(o)      Indebtedness of the Borrower or any of its Subsidiaries secured in compliance with Section 8.3(z) in an aggregate amount outstanding not to exceed $10,000,000 at any time; and

72

(p)     other unsecured Indebtedness of the Borrower or any of its Subsidiaries in an aggregate principal amount not to exceed, at any time, the greater of (i) $50,000,000 and (ii) such amount that would not cause, after giving effect to the incurrence thereof, on a pro forma basis the Consolidated Total Leverage Ratio to exceed 5.50:1.00 as of the last day of the most recently ended fiscal quarter of the Borrower for which financial statements have been provided to the Administrative Agent pursuant to Section 7.1(a) or (b).

8.3     Limitation on Liens. Create, incur, assume or suffer to exist any Lien upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except:

(a)     Liens for Taxes, assessments or other governmental charges not yet overdue by more than 30 days or not yet payable or which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the Borrower or such Subsidiary, as the case may be, in accordance with GAAP;

(b)     carriers', warehousemen's, mechanics', landlords', materialmen's, repairmen's or other like Liens arising by operation of law, in each case in the ordinary course of business in respect of obligations which are not yet due and payable or which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the Borrower or such Subsidiary, as the case may be, in accordance with GAAP;

(c)     (i) pledges or deposits in connection with workmen's compensation, unemployment insurance and other social security legislation and/or securing liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty or liability insurance to the Borrower or any Subsidiary;

(d)     (i) easements, right-of-way, zoning, other land use regulations and similar restrictions and other similar encumbrances or title defects incurred, or leases or subleases granted to others, in the ordinary course of business, which, in the aggregate do not materially detract from the value of the property subject thereto or do not interfere with or adversely affect in any material respect the ordinary conduct of the business of the Borrower and its Subsidiaries taken as a whole and (ii) any exceptions set forth in any title policies with respect to Mortgaged Properties;

(e)     Liens pursuant to the Loan Documents;

(f)     Liens on assets of entities or Persons which become Subsidiaries of the Borrower after the Effective Date; provided that such Liens exist at the time such entities or Persons become Subsidiaries and are not created in anticipation thereof;

(g)     Liens on documents of title and the property covered thereby securing Indebtedness in respect of commercial letters of credit;

(h)     Liens securing any Indebtedness permitted under subsection 8.2(j); provided that (i) such security interests and the Indebtedness secured thereby are incurred prior to or within 365 days after such acquisition or the completion of such construction or improvement, (ii) the Indebtedness secured thereby does not exceed the cost of acquiring,

73

constructing, repairing, replacing, leasing or improving such fixed or capital assets and (iii) such security interests shall not apply to any other property or assets of the Borrower or any Subsidiary (other than proceeds and products thereof); provided, that individual financings of equipment provided by one lender may be cross-collateralized to other financings of equipment provided by such lender on customary terms;

(i)        existing Liens described in Schedule 8.3 and renewals thereof; <u>provided</u> that no such Lien is spread to cover any additional property after the Effective Date other than proceeds and products thereof and that the amount secured thereby is not increased;

(j)        Liens securing arrangements permitted by the proviso contained in subsection 8.10;

(k)        deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, licenses, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(l)        Liens securing Indebtedness owing to the Borrower or any Subsidiary Guarantor under subsection 8.2(b);

(m)        any Lien existing on any property or asset prior to the acquisition thereof by the Borrower or any Subsidiary or existing on any property or asset of any Person that becomes a Subsidiary after the Effective Date prior to the time such Person becomes a Subsidiary (including in connection with any acquisition permitted under subsection 8.7); <u>provided</u> that (i) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Subsidiary, as the case may be, (ii) such Lien shall not apply to any other property or assets of the Borrower or any Subsidiary (other than proceeds or products thereof) and other than after-acquired property subject to a Lien securing such Indebtedness, the terms of which Indebtedness require or include a pledge of after-acquired property (it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition) and (iii) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Subsidiary, as the case may be, and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

(n)        Liens securing Indebtedness incurred pursuant to Section 8.2(n) under (A) a Receivables Facility, so long as such Liens cover only accounts receivable (and deposit accounts maintained solely by the applicable Receivables Subsidiary into which collections or proceeds of such accounts receivable are deposited) and/or other assets of the applicable Receivables Subsidiary, (B) a Permitted Revolving Credit Facility that is an ABL Facility, so long as such Liens cover only assets constituting Collateral and are at all times subject to a Permitted ABL Intercreditor Agreement or (C) a Permitted Revolving Credit Facility that is a Cash Flow Revolving Credit Facility, so long as such Liens cover only assets constituting Collateral and are at all times subject to a Permitted Cash Flow Revolver Intercreditor Agreement;

<div align="center">74</div>

(o)      Liens securing any Permitted Refinancing permitted under subsection 8.2; provided that such security interests shall not apply to any property or assets that were not collateral for the Indebtedness being refinanced;

(p)      Liens securing obligations of the Borrower or any Subsidiary incurred in the ordinary course of business in an aggregate amount not to exceed $10,000,000 at any time;

(q)      Liens securing judgments for the payment of money not constituting an Event of Default under Section 9(h) so long as such Liens (to the extent covering Collateral) are junior to the Liens created pursuant to the Security Documents;

(r)      leases, licenses, subleases or sublicenses granted to others in the ordinary course of business and not interfering in any material respect with the business of the Borrower or any of its Subsidiaries;

(s)      Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, and (ii) in favor of a banking or other financial institution arising as a matter of law or granted in the ordinary course of business and under customary general terms and conditions encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry; provided that, in the case of this clause (ii), unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness for borrowed money;

(t)      Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to subsections 8.7(c), 8.7(k), 8.7(r), 8.7(t) or 8.7(u) to be applied against the purchase price for such Investment, or (ii) consisting of an agreement to dispose of any property in a disposition permitted under subsection 8.6, in each case, solely to the extent such Investment or disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(u)      purported Liens evidenced by the filing of precautionary Uniform Commercial Code financing statements relating solely to operating leases of personal property entered into by the Borrower or any of its Subsidiaries in the ordinary course of business;

(v)      any interest or title of a lessor, sublessor, licensee, sublicensee, licensor or sublicensor under any lease, sublease, license or sublicense arrangement (including software and other technology licenses) entered into by the Borrower or any of its Subsidiaries in the ordinary course of its business and which could not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect;

(w)      deposits of cash or Cash Equivalents made to the issuer or issuers of letters of credit permitted to be incurred by the Borrower or a Subsidiary thereof pursuant to Section 8.2(g) to backstop or collateralize such letters of credit; provided, that the aggregate amount of any such deposits made to the issuers of such letters of credit shall not exceed 105% of the face amount of such letters of credit;

75

(x)     Liens solely on any cash earnest money deposits made by the Borrower or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted under this Agreement;

(y)     Liens on cash or Cash Equivalents used to defease or to satisfy and discharge Indebtedness, provided that such defeasance or satisfaction and discharge is permitted hereunder; and

(z)     Liens securing Indebtedness of the Borrower or any Subsidiary incurred pursuant to subsection 8.2(o); provided, that the Liens securing such Indebtedness are subordinated to the Liens securing the Obligations pursuant to an intercreditor agreement which shall be customary for transactions of this type and otherwise on terms and conditions reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders).

8.4     Limitation on Contingent Obligations. Create, incur, assume or suffer to exist any Contingent Obligation except:

(a)     guarantees by the Borrower or any Subsidiaries of obligations to third parties made in the ordinary course of business in connection with relocation of employees of the Borrower or any of its Subsidiaries;

(b)     guarantees by the Borrower and its Subsidiaries incurred in the ordinary course of business for an aggregate amount not to exceed $30,000,000 at any one time;

(c)     existing Contingent Obligations described in Schedule 8.4 including any extensions or renewals thereof;

(d)     Contingent Obligations of the Borrower or any of its Subsidiaries in respect of any foreign currency exchange contracts, interest rate swap arrangements or other derivative contracts or transactions, other than any such contracts, arrangements or transactions entered into by the Borrower or any of its Subsidiaries for speculative purposes;

(e)     Contingent Obligations of any Subsidiary Guarantor pursuant to the Guarantee and Collateral Agreement;

(f)     guarantees by the Borrower and its Subsidiaries of (i) Indebtedness of the Borrower and its Subsidiaries permitted under subsection 8.2 (other than clause (f) thereof) and (ii) obligations (other than Indebtedness) of the Borrower and its Subsidiaries not prohibited hereunder; provided that (i) any guarantee by the Borrower or a Subsidiary of Indebtedness of a Subsidiary that is not a Subsidiary Guarantor shall only be permitted to the extent permitted by subsection 8.7(b) and (ii) with respect to any guarantee by the Borrower or a Subsidiary Guarantor, if the Indebtedness so guaranteed is subordinated in right of payment to the Obligations, such guarantee shall be subordinated in right of payment to the guarantee of the Obligations on terms at least as favorable on the whole to the Lenders as those contained in the documentation governing the Indebtedness being guaranteed;

(g)     [Reserved]; and

76

(h)      guarantees by the Borrower or any Subsidiary of Indebtedness permitted under subsection 8.2(f), so long as such guarantee is permitted by the terms of such subsection.

8.5      <u>Prohibition of Fundamental Changes</u>. Enter into any transaction of acquisition of, or merger or consolidation or amalgamation with, any other Person (including any Subsidiary or Affiliate of Parent or any of its Subsidiaries), or transfer all or substantially all of its assets to any Person that is not the Borrower or a Subsidiary Guarantor, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or engage in any business other than business conducted or proposed to be conducted by the Borrower and its Subsidiaries on the Effective Date or any business that is similar, reasonably related, incidental, complementary or ancillary thereto, including without limitation in broadcasting and other media businesses, except for (a) the transactions otherwise permitted pursuant to subsections 8.6 and 8.7; provided that the Borrower may not merge, consolidate or amalgamate with any Person unless the Borrower is the continuing or surviving Person, (b) the liquidation or dissolution of any Subsidiary if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders, (c)(i) any Subsidiary may merge, amalgamate or consolidate with or into any other Subsidiary (provided that in any such transaction involving a Subsidiary Guarantor, a Subsidiary Guarantor must be the continuing or surviving Person) and (ii) the Borrower or any Subsidiary may change its legal form if the Borrower determines in good faith that such action is in the best interest of the Borrower and its Subsidiaries and is not materially disadvantageous to the Lenders (it being understood that in the case of any change in legal form, a Subsidiary that is a Subsidiary Guarantor will remain a Subsidiary Guarantor unless such Subsidiary Guarantor is otherwise permitted to cease being a Subsidiary Guarantor hereunder) and (d) any Subsidiary may transfer or dispose of any or all of its assets to the Borrower or to another Subsidiary (upon voluntary liquidation or otherwise); provided that if the transferor in such a transaction is a Subsidiary Guarantor, then (i) the transferee or assignee must be a Subsidiary Guarantor or the Borrower or (ii) to the extent constituting an Investment, such Investment must be a permitted Investment in or Indebtedness of a Subsidiary that is not a Subsidiary Guarantor in accordance with subsections 8.2 and 8.7 respectively or pursuant to a disposition permitted by subsection 8.6.

8.6      <u>Prohibition on Sale of Assets</u>. Convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets (including receivables and leasehold interests), whether now owned or hereafter acquired except:

(a)      the sale or other disposition by the Borrower or any of its Subsidiaries of any personal property that, in the reasonable judgment of the Borrower, has become uneconomic, obsolete or worn out or no longer used or useful in the conduct of the business of the Borrower or any Subsidiaries, and which is disposed of in the ordinary course of business;

(b)      sales of inventory by the Borrower or any of its Subsidiaries made in the ordinary course of business;

(c)      any Subsidiary may sell, lease, transfer or otherwise dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower or a Subsidiary Guarantor that is a wholly-owned Domestic Subsidiary of the Borrower (including by way of merging such Subsidiary into a Subsidiary Guarantor that is a wholly-owned Domestic Subsidiary of the

77

Borrower or into the Borrower) or make any investment permitted by subsection 8.7, and any Subsidiary may sell or otherwise dispose of, or part with control of any or all of, the Capital Stock of any Subsidiary to the Borrower, to a wholly-owned Subsidiary Guarantor that is a Domestic Subsidiary of the Borrower or to any other Subsidiary to the extent such transfer constitutes an investment permitted by subsection 8.7; provided that in either case such transfer shall not cause such wholly-owned Subsidiary Guarantor that is a Domestic Subsidiary to become a Foreign Subsidiary and provided further that no such transaction may be effected if it would result in the transfer of any assets of, or any Capital Stock of, a Subsidiary to another Subsidiary whose Capital Stock has not been pledged to the Administrative Agent or which has pledged a lesser percentage of its Capital Stock to the Administrative Agent than was pledged by the transferor Subsidiary unless, in any such case, after giving effect to such transaction, the Capital Stock of such other Subsidiary is not required to be pledged under the definition of Guarantee and Collateral Agreement or under subsection 7.10(b);

(d)     any Foreign Subsidiary of the Borrower may sell, lease, transfer or otherwise dispose of any or all of its assets (upon voluntary liquidation or by merger, consolidation, transfer of assets, or otherwise) to the Borrower or a wholly-owned Subsidiary and any Foreign Subsidiary of the Borrower may sell or otherwise dispose of, or part control of any or all of, the Capital Stock of, or other equity interests in, any Foreign Subsidiary of the Borrower to a wholly-owned Subsidiary; provided that in either case such transfer shall not cause a Domestic Subsidiary to become a Foreign Subsidiary;

(e)     the sale or other disposition by the Borrower or any of its Subsidiaries of other assets consummated after the Effective Date, provided that (i) such sale or other disposition shall be made for fair value on an arm's-length basis, (ii) with respect to the sale or other disposition of Broadcast Assets, if the consideration for such sale or other disposition exceeds $10,000,000, the consideration for such sale or other disposition consists of at least 75% in cash and Cash Equivalents (provided that to the extent the consideration for all such sales or other dispositions made in reliance on this clause (e) of Broadcast Assets for which the consideration was $10,000,000 or less exceeds $50,000,000 in the aggregate, the consideration for any sale or other disposition of a Broadcast Asset made thereafter in reliance on this clause (e) shall consist of at least 75% in cash and Cash Equivalents), (iii) with respect to the sale or other disposition of assets that are not Broadcast Assets ("Non-Broadcast Assets"), to the extent the aggregate consideration for all such sales or other dispositions of Non-Broadcast Assets made in reliance on this clause (e) exceeds $25,000,000 in the aggregate, the consideration for such sale or other disposition consists of at least 75% in cash and Cash Equivalents and (iv) at any time that the Consolidated Total Leverage Ratio for the Test Period most recently ended is greater than 5.00 to 1.00 and the Borrower has sold or disposed of assets in reliance on this clause (e) and subsection 8.6(f) in excess of $500,000,000 in the aggregate, the Reinvestment Rights provided in subsection 4.6(b) shall not be available;

(f)     the one-time sale or other disposition by the Borrower or any of its Subsidiaries of a Non-Broadcast Asset, provided that (i) such sale or other disposition shall be made for fair value on an arm's-length basis, (ii) the Consolidated EBITDA of the Borrower and its Subsidiaries generated by such Non-Broadcast Asset for the Test Period most recently ended represents less than 5% of the Consolidated EBITDA of the Borrower and its Subsidiaries for such Test Period, (iii) at any time that the Consolidated Total Leverage Ratio for the Test Period

78

most recently ended is greater than 5.00 to 1.00 and the Borrower has sold or disposed of assets in reliance on this clause (f) and subsection 8.6(e) in excess of $500,000,000 in the aggregate, the Reinvestment Rights provided in subsection 4.6(b) shall not be available and (iv) substantially concurrently with the consummation of such sale or other disposition, the Borrower shall provide the Administrative Agent with a certificate of a Responsible Officer certifying that such sale or other disposition is being effected pursuant to this clause (f) and that such sale or other disposition complies with the provisions of this clause (f);

(g)     the sale or other disposition by the Borrower or any of its Subsidiaries (or a Divestiture Trust which holds assets) of (x) Stations (and related Broadcast Assets) listed on Schedule 8.6(g) or (y) Stations (and related Broadcast Assets) or other assets acquired in any acquisition permitted under subsection 8.7, in each case to the extent such sale or other disposition is required by applicable law or rule, regulation or order of the FCC; provided that (except in the case of dispositions to a Divestiture Trust) (i) any such sale or other disposition shall be made for fair value on an arms' length basis, (ii) if the consideration for such sale or other disposition exceeds $15,000,000, the consideration for such sale or other disposition consists of at least 75% in cash and Cash Equivalents, and (iii) the Net Proceeds from such sale or other disposition shall be applied in accordance with subsection 4.6;

(h)     dispositions by the Borrower or any of its Subsidiaries of past due accounts receivable in connection with the collection, write down or compromise thereof;

(i)     leases, subleases, or sublicenses of property by the Borrower or any of its Subsidiaries, and dispositions of intellectual property by the Borrower or any of its Subsidiaries in the ordinary course of business, in each case that do not materially interfere with the business of the Borrower and its Subsidiaries, and dispositions of intellectual property under a research or development agreement in which the other party receives a license to intellectual property that results from such agreement;

(j)     transfers by the Borrower or any of its Subsidiaries of property subject to any casualty event, including any condemnation, taking or similar event and any destruction, damage or any other casualty loss;

(k)     dispositions by the Borrower or any of its Subsidiaries in the ordinary course of business consisting of the abandonment of intellectual property which, in the reasonable good faith determination of the Borrower or any of its Subsidiaries, are uneconomical, negligible, obsolete or otherwise not material in the conduct of its business;

(l)     sales by the Borrower or any of its Subsidiaries of immaterial non-core assets acquired in connection with a Business Acquisition which are not used in the business of the Borrower and its Subsidiaries;

(m)     any disposition by the Borrower or any of its Subsidiaries of real property to a Governmental Authority as a result of a condemnation of such real property;

(n)     exclusive or non-exclusive licenses or similar agreements entered into by the Borrower or any of its Subsidiaries in respect of intellectual property;

<div align="center">79</div>

(o)      (i) any Non-Significant Subsidiary may sell, lease, transfer or otherwise dispose of any or all of its assets (upon voluntary liquidation or otherwise) to another Subsidiary that is not a Loan Party (including by way of merging such Non-Significant Subsidiary into another Subsidiary), (ii) any Broadcast License Subsidiary may transfer a FCC License to another Broadcast License Subsidiary, and (iii) the Borrower or any Subsidiary Guarantor may sell, lease, transfer or otherwise dispose of assets to a Subsidiary that is not a Loan Party; provided, that the aggregate fair market value (as determined in good faith by the Borrower) of all assets sold, leased, transferred or otherwise disposed of in reliance on clause (o)(iii) shall not exceed $10,000,000 in any fiscal year of the Borrower;

(p)      the sale of the Bethesda Property; provided that (i) such sale shall be made for fair value on an arm's-length basis, (ii) the consideration for such sale consists of at least 75% in cash and Cash Equivalents and (iii) the Net Proceeds from such sale shall be applied in accordance with subsection 4.6.

(q)      substantially concurrent sales, transfers and other dispositions by the Borrower or any of its Subsidiaries of business assets to the extent the assets provided by the Borrower or the applicable Subsidiary, as the case may be, are exchanged substantially simultaneously for business assets of comparable or greater usefulness to the business of the Borrower, provided that (i) no more than 30% of any consideration given by the Borrower or its Subsidiaries for such asset swap consists of cash or Cash Equivalents and (ii) the Borrower or such Subsidiary receives consideration at least equal to the fair market value (as determined in good faith by the Borrower) of the assets sold, transferred or otherwise disposed of (each such asset swap, a "Permitted Asset Swap");

(r)      to the extent constituting dispositions, mergers, consolidations and liquidations permitted by subsection 8.5, Restricted Payments permitted by subsection 8.8, Investments permitted by Section 8.7 (other than Section 8.7(i)) and Liens permitted by subsection 8.3;

(s)      dispositions by the Borrower or any of its Subsidiaries of cash and Cash Equivalents;

(t)      dispositions by the Borrower or any of its Subsidiaries of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(u)      the unwinding by the Borrower or any of its Subsidiaries of any Swap Agreement in accordance with its terms;

(v)      terminations of leases, subleases, licenses and sublicenses by the Borrower or any of its Subsidiaries in the ordinary course of business;

(w)      sale leasebacks by the Borrower or any of its Subsidiaries permitted by subsection 8.10;

80

(x)      sales, transfers and dispositions by the Borrower or any of its Subsidiaries of accounts receivable pursuant to a Receivables Facility; and

(y)      the sale by the Borrower or any of its Subsidiaries of the real property and assets listed on Schedule 8.6(y); provided that (i) such sale shall be made for fair value on an arm's-length basis, (ii) the consideration for such sale consists of at least 75% in cash and Cash Equivalents, (iii) at the time of such sale (other than any such sale made pursuant to a legally binding commitment entered into at a time when no Event of Default exists), no Event of Default shall exist or would result from such sale and (iv) the Net Proceeds from such sale shall be applied in accordance with subsection 4.6.

8.7      Limitation on Investments, Loans and Advances. Make any advance, loan, extension of credit or capital contribution to, or purchase any stock, bonds, notes, debentures or other securities of, or any assets constituting a business unit of, or make or maintain any other investment in, any Person (all of the foregoing, "Investments"), except:

(a)      (i) loans or advances by the Borrower or any of its Subsidiaries in respect of intercompany accounts attributable to the operation of the Borrower's cash management system and (ii) loans or advances by the Borrower or any of its Subsidiaries to a Subsidiary Guarantor (or a Subsidiary that would be a Subsidiary Guarantor but for the lapse of time until such Subsidiary is required to be a Subsidiary Guarantor);

(b)      Investments by the Borrower and its Subsidiaries in Subsidiaries of the Borrower that are not Subsidiary Guarantors; provided that at all times the aggregate amount of all such Investments at any time outstanding, together with any guarantees by the Borrower and its Subsidiaries of Indebtedness of a Subsidiary that is not a Subsidiary Guarantor, shall not exceed $10,000,000;

(c)      Investments by the Borrower and the Subsidiaries, not otherwise described in this subsection 8.7, in the Borrower or in Subsidiary Guarantors (or a Subsidiary that would be a Subsidiary Guarantor but for the lapse of time until such Subsidiary is required to be a Subsidiary Guarantor) that otherwise are not prohibited under the terms of this Agreement;

(d)      any Subsidiary of the Borrower may make Investments in the Borrower (by way of capital contribution or otherwise);

(e)      the Borrower and its Subsidiaries may invest in, acquire and hold (i) Cash Equivalents and cash and (ii) other cash equivalents invested in or held with any financial institutions to the extent such amounts under this clause (ii) do not exceed $5,000,000 per individual institution and $25,000,000 in the aggregate at any one time;

(f)      the Borrower or any of its Subsidiaries may make travel and entertainment advances and relocation loans in the ordinary course of business to officers, employees and agents of the Borrower or any such Subsidiary not to exceed $10,000,000 in the aggregate at any one time;

(g)      the Borrower or any of its Subsidiaries may make payroll advances in the ordinary course of business;

81

(h)      the Borrower or any of its Subsidiaries may acquire and hold receivables owing to it, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms (provided that nothing in this clause shall prevent the Borrower or any Subsidiary from offering such concessionary trade terms, or from receiving such investments or any other investments in connection with the bankruptcy or reorganization of their respective suppliers or customers or the settlement of disputes with such customers or suppliers arising in the ordinary course of business, as management deems reasonable in the circumstances);

(i)      the Borrower and its Subsidiaries may make Investments in connection with asset sales permitted by subsection 8.6(e), (f) or (g) (to the extent permitted under such subsections and Section 4.6(b)) or to which the Required Lenders consent;

(j)      existing Investments of the Borrower described in Schedule 8.7;

(k)      the Borrower and its Subsidiaries may in a single transaction or series of related transactions, make acquisitions (by merger, purchase, lease (including any lease that contains up-front payments and/or buyout options) or otherwise) of any business, division or line of business or all or substantially all of the outstanding Capital Stock of any corporation or other entity (other than any director's qualifying shares or any options for equity interests that cannot, as a matter of law, be cancelled, redeemed or otherwise extinguished without the express agreement of the holder thereof at or prior to acquisition) or any Station and Broadcast Assets related thereto as long as (i) immediately after giving effect thereto, no Default or Event of Default shall have occurred and be continuing (provided that this clause (i) shall not apply with respect to any acquisition made pursuant to a legally binding commitment entered into at a time when no Default existed or would result from the making of such acquisition), (ii) as of the date of such acquisition, the Consolidated First Lien Net Leverage Ratio (determined on a pro forma basis, after giving effect to such acquisition and any incurrence of Indebtedness in connection therewith (but excluding the proceeds of any such Indebtedness in the calculation of Unrestricted Cash)) is less than or equal to the greater of (A) the Consolidated First Lien Net Leverage Ratio as of the last day of the most recently ended fiscal quarter and (B) 5.00 to 1.00, (iii) all actions required to be taken with respect to any acquired assets or acquired or newly formed Subsidiary under subsection 7.10 shall be taken substantially simultaneously with consummation of such acquisition (or such longer period of time as provided under Section 7.10 or as the Administrative Agent shall agree), (iv) any such newly acquired Subsidiary shall not be liable for any Indebtedness except for Indebtedness permitted by subsection 8.2 and (v) with respect to any such acquisition that involves aggregate consideration in excess of $20,000,000, the Borrower has delivered to the Administrative Agent a certificate of a Responsible Officer to the effect set forth in clauses (i) through (iv) above, together with all relevant financial information for the Person or assets to be acquired; provided that the aggregate consideration (whether cash or property, as valued in good faith by the board of directors of the Borrower) given by the Borrower and its Subsidiaries for all acquisitions consummated after the Effective Date in reliance on this clause (k) shall not exceed $75,000,000;

(l)      (i) Investments by the Borrower and any Subsidiaries in any business, division, line of business or Person acquired pursuant to a Permitted Acquisition so long as the conditions to the making of any Permitted Acquisition set forth in subsection 8.7(k) are satisfied

82

mutatis mutandis  with respect to the making of such Investment and (ii) Investments of any Person in existence at the time such Person becomes a Subsidiary pursuant to a Business Acquisition (provided that such Investment was not made in connection with or anticipation of such Person becoming a Subsidiary);

(m)     the Borrower and its Subsidiaries may make loans or advances to, or acquisitions or other Investments in, other Persons (exclusive of Persons which are, or become, Foreign Subsidiaries) that constitute or are in connection with joint ventures, provided (i) the amount of such Investments shall not exceed in the aggregate $30,000,000 at any time outstanding for Investments made with cash or Cash Equivalents and $20,000,000 at any time outstanding for other Investments and (ii) any such joint venture formed or acquired after the Effective Date shall comply with Section 7.10(d);

(n)     the Borrower and its Subsidiaries may make loans or advances to, or other Investments in, or otherwise transfer funds (including by way of repayment of loans or advances) to, Foreign Subsidiaries; provided the amount of such Investments shall not exceed in the aggregate $5,000,000 at any time outstanding;

(o)     the Borrower or any of its Subsidiaries may acquire obligations of one or more directors, officers, employees, members or management or consultants of any of the Borrower or its Subsidiaries in connection with such person's acquisition of shares of the Borrower, so long as no cash is actually advanced by the Borrower or any of its Subsidiaries to such persons in connection with the acquisition of any such obligations;

(p)     the Borrower and its Subsidiaries may acquire assets constituting a Permitted Reinvestment with the Net Proceeds from Asset Sales in accordance with the reinvestment rights provided under subsection 4.6(b);

(q)     the Borrower and its Subsidiaries may acquire assets under a Permitted Asset Swap;

(r)     the Borrower and its Subsidiaries may make other Investments in an aggregate amount not to exceed the Available Amount at such time;

(s)     [Reserved];

(t)     the Borrower and its Subsidiaries may make Investments to the extent the consideration paid therefor consists solely of (i) Capital Stock, which is not Disqualified Stock, of any Subsidiary or (ii) the Net Proceeds of any substantially concurrent issuance of Capital Stock, which is not Disqualified Stock, by Parent or any Subsidiary (other than any issuance the proceeds of which have been included in the calculation of the Available Amount to the extent such proceeds have been applied pursuant to the definition of "Available Amount" to make an Investment pursuant to subsection 8.7(r), have been applied for Restricted Payments under subsection 8.8(c) or subsection 8.8(h) or have been applied for prepayments of Indebtedness under subsection 8.15(b)(iii)); provided that, (x) immediately before and after making such Investment, no Default or Event of Default shall have occurred and be continuing, (y) in the case of clause (ii) in respect of an issuance by Parent, the proceeds thereof have been contributed by

83

Parent in cash as common equity to the Borrower or such Subsidiary and (z) in the case of clause (ii), such issuance is to a Person other than a Group Member;

(u) the Borrower and its Subsidiaries may make other Investments not to exceed at any time outstanding, together with all other Investments made in reliance on this clause (u), $50,000,000; and

(v) (i) the Borrower and its Subsidiaries may (x) make Investments in a Receivables Subsidiary in connection with a Receivables Facility; provided that any such Investment in a Receivables Subsidiary is in the form of a contribution of additional accounts receivable or as customary Investments in a Receivables Subsidiary in connection with a Receivables Facility and (y) make other customary Investments in connection with a Receivables Facility and (ii) a Receivables Subsidiary may purchase accounts receivable pursuant to a Securitization Repurchase Obligation in connection with a Receivables Facility.

For purposes of calculating the amount of any Investment, such amount shall equal (x) the amount actually invested less (y) any repayments, interest, returns, profits, dividends, distributions, income and similar amounts actually received in cash from such Investment (from dispositions or otherwise) (which amount referred to in this clause (y) shall not exceed the amount of such Investment at the time such Investment was made). The amount of any consideration paid for any Investment consisting of the provision of services or the transfer of non-cash assets shall be equal to the fair market value of such services or non-cash assets, as the case may be, as determined by the Borrower in good faith.

8.8   Limitation on Restricted Payments. Declare or make any dividends or distributions on any Capital Stock of any Group Member, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, retirement or other acquisition of any Capital Stock of any Group Member, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Borrower or any of its Subsidiaries (all of the foregoing being referred to herein as "Restricted Payments"); except that:

(a) (i) any Group Member may declare or pay dividends to the Borrower or any Subsidiary Guarantor, (ii) any Group Member that is not a Loan Party may declare or pay dividends to any other Group Member that is not a Loan Party and (iii) any Subsidiary may declare and pay dividends ratably with respect to its Capital Stock;

(b) so long as no Default or Event of Default then exists or would result therefrom, the Borrower and Parent may make Restricted Payments in an amount not to exceed $10,000,000 in the aggregate in any fiscal year of the Borrower;

(c) so long as no Default or Event of Default then exists or would result therefrom, the Borrower may, or may pay dividends or make distributions to Parent to permit Parent to, purchase its common stock or common stock options from former officers or employees of any Group Member upon the death, disability or termination of employment of such officer or employee, provided, that the aggregate amount of payments made after the Effective Date under this clause (c), together with the aggregate amount of payments made after

84

the Effective Date under subsection 8.8(d), shall not exceed $5,000,000 in the aggregate in any fiscal year of the Borrower (with unused amounts in any fiscal year being carried over to succeeding fiscal years subject to a maximum (without giving effect to the following proviso) of $10,000,000 in any fiscal year of the Borrower); provided further that such amount in any fiscal year may be increased by an amount not to exceed (i) the Net Proceeds from the sale of Capital Stock (other than Disqualified Stock) of Parent to any employee, member or the board of directors or consultant of any Group Member that occurs after the Effective Date, solely to the extent such Net Proceeds (x) have been contributed by Parent in cash as common equity to the Borrower and (y) have not been (A) included in the calculation of the Available Amount and applied to make an Investment pursuant to subsection 8.7(r), (B) applied for Investments under subsection 8.7(t) or Restricted Payments under subsection 8.8(h) or (C) applied to make a prepayment of Indebtedness under subsection 8.15(b)(iii); plus (ii) the cash proceeds of key man life insurance policies received by the Borrower or its Subsidiaries after the Effective Date; less (iii) the amount of any payments previously made with the cash proceeds described in clauses (i) and (ii);

(d)    so long as no Default or Event of Default then exists or would result therefrom, the Borrower may, or may pay dividends or make distributions to Parent to permit Parent to, make payments and/or net shares under employee benefit plans to settle option price payments owed by employees and directors with respect thereto, make payments in respect of or purchase restricted stock units and similar stock based awards thereunder and to settle employees' and directors' federal, state and income tax liabilities (if any) related thereto, provided that the aggregate amount of such payments made by the Borrower under this clause (d) after the Effective Date, together with the aggregate amount of payments made under subsection 8.8(c) after the Effective Date, shall not exceed $5,000,000 in any fiscal year (with unused amounts in any fiscal year of the Borrower being carried over to succeeding fiscal years subject to a maximum of $10,000,000 in any fiscal year);

(e)    [Reserved];

(f)    so long as no Default or Event of Default then exists or would result therefrom, any Group Member may make dividends or distributions within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of this Agreement;

(g)    so long as no Default or Event of Default then exists or would result therefrom, the Borrower and its Subsidiaries may, directly (in the case of the Borrower) or indirectly (in the case of any Subsidiaries), make distributions to Parent to permit Parent to make cash payments in lieu of the issuance of fractional shares or interests in connection with the exercise of warrants, options or other rights or securities convertible into or exchangeable for Capital Stock of Parent; provided that any such cash payment shall not be for the purpose of evading the limitations of this covenant;

(h)    the Borrower may redeem, repurchase, retire or acquire any Capital Stock of Parent in exchange for, or out of the Net Proceeds of, the substantially concurrent sale or issuance (other than to any Group Member) of Capital Stock (other than any Disqualified Stock) of Parent, solely to the extent such Net Proceeds (i) have been contributed by Parent in cash as

85

145909348v39

common equity to the Borrower and (ii) have not been (A) included in the calculation of the Available Amount and applied to make an Investment pursuant to subsection 8.7(r), (B) applied for Restricted Payments under subsection 8.8(c) or applied for Investments under subsection 8.7(t) or (C) applied to a prepayment of Indebtedness under subsection 8.15(b)(iii);

(i)    [Reserved];

(j)    [Reserved]; and

(k)    the Borrower may pay dividends or make distributions to Parent to permit Parent (i) to pay corporate overhead expenses incurred in the ordinary course of business and (ii) to pay, or to distribute to Parent's direct or indirect parent, amounts required for Parent or such direct or indirect parent to pay federal, state and local income Taxes imposed directly on Parent or such direct or indirect parent, to the extent such Taxes are attributable to the income of the Borrower and its Subsidiaries (including, without limitation, by virtue of Parent or such direct or indirect parent being the common parent of a consolidated or combined Tax group of which the Borrower and/or its Subsidiaries are members); provided that the amount of any such dividends or distributions (plus any Taxes payable directly by the Borrower and its Subsidiaries) shall not exceed the amount of such Taxes that would have been payable directly by the Borrower and/or its Subsidiaries had the Borrower been the common parent of a separate Tax group that included only the Borrower and its Subsidiaries.

8.9    Transactions with Affiliates. Enter into after the Effective Date any transaction, including any purchase, sale, lease or exchange of property or the rendering of any service, with any Affiliate (other than the Borrower or any Subsidiary Guarantor) except (a) for transactions which are otherwise not prohibited under this Agreement and which are upon fair and reasonable terms no less favorable in any material respect to the Borrower or such Subsidiary than it would obtain in a hypothetical comparable arm's length transaction with a Person not an Affiliate, (b) [reserved] (c) the reasonable and customary fees payable to the directors of the Group Members and reimbursement of reasonable out-of-pocket costs of the directors of the Group Members, (d) the payment of reasonable and customary indemnities to the directors, officers and employees of the Group Members in the ordinary course of business, (e) as permitted under subsection 8.2(b), subsection 8.3(l), subsections 8.4(a) and (f), subsection 8.5 (other than clause (a) thereof), subsections 8.6(c), (d), (o) and (x), subsections 8.7(c), (d), (n), (o) and (v) and subsection 8.8 or (f) as set forth on Schedule 8.9.

8.10    Limitation on Sales and Leasebacks. Enter into any arrangement with any Person providing for the leasing by any Group Member of real or personal property which has been or is to be sold or transferred by such Group Member to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of such Group Member, provided that the Borrower or any of its Subsidiaries may enter into such arrangements covering property with an aggregate fair market value not exceeding $150,000,000 during the term of this Agreement if the Net Proceeds from such sale leaseback arrangements are applied to the prepayment of Term Loans in accordance with the provisions of subsection 4.6(b); provided that the Reinvestment Rights provided in subsection 4.6(b) shall not be available with respect to such Net Proceeds.

86

8.11     Fiscal Year. Permit the fiscal year for financial reporting purposes of the Borrower to end on a day other than December 31, unless the Borrower shall have given at least 45 days prior written notice to the Administrative Agent.

8.12     Negative Pledge Clauses. Enter into or suffer to exist or become effective any agreement that prohibits or limits (other than a dollar limit, provided that such dollar limit is sufficient in amount to allow at all times the Liens to secure the Obligations) the ability of any Group Member to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, to secure its obligations under the Loan Documents to which it is a party other than (a) this Agreement and the other Loan Documents (and any agreement governing any Permitted Refinancing in respect of the Term Loans, so long as any such prohibition or limitation contained in such refinancing agreement is not materially less favorable to the Lenders that that which exists as of the Effective Date), (b) any agreements governing any secured Indebtedness otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby), (c) an agreement prohibiting only the creation of Liens securing Subordinated Indebtedness, (d) pursuant to applicable law, (e) restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and other similar agreements entered into in the ordinary course of business (provided that such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses, or similar agreements, as the case may be), (f) any prohibition or limitation that consists of customary restrictions and conditions contained in any agreement relating to the sale or sale-leaseback of any property permitted under this Agreement, (g) documents, agreements or constituent documents governing joint ventures, (h) any agreement in effect at the time a Subsidiary becomes a Subsidiary as long as such agreement was not entered into in contemplation of such Person becoming a Subsidiary, (i) agreements permitted under subsection 8.10, (j) restrictions arising in connection with cash or other deposits permitted under subsections 8.3 and 8.7 and limited to such cash or deposits and (k) customary non-assignment provisions in contracts entered into in the ordinary course of business.

8.13     Clauses Restricting Subsidiary Distributions. Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary to (a) make Restricted Payments in respect of any Capital Stock of such Subsidiary held by, or pay any Indebtedness owed to, the Borrower or any other Subsidiary, (b) make loans or advances to, or other Investments in, the Borrower or any other Subsidiary or (c) transfer any of its assets to the Borrower or any other Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents (or any agreement governing any Permitted Refinancing in respect of the Term Loans, so long as any such restriction contained in such refinancing agreement is not materially less favorable to the Lenders that that which exists as of the Effective Date), (ii) any restrictions with respect to a Subsidiary imposed pursuant to an agreement that has been entered into in connection with the disposition of all or substantially all of the Capital Stock or all or substantially all of the assets of such Subsidiary, (iii) applicable law, (iv) restrictions in effect on the Effective Date contained in the agreements governing the Indebtedness in effect on the Effective Date and in any agreements governing any refinancing thereof if such restrictions are no more restrictive than those contained in the agreements as in effect on the Effective Date governing the Indebtedness being renewed, extended or refinanced, (v) customary non-assignment provisions with respect to

87

contracts, leases or licensing agreements entered into by the Borrower or any of its Subsidiaries, in each case entered into in the ordinary course of business, (vi) customary provisions in joint venture agreements and other similar agreements entered into in the ordinary course of business, (vii) Liens permitted under subsection 8.3 and any documents or instruments governing the terms of any Indebtedness or other obligations secured by any such Liens; provided that such prohibitions or restrictions apply only to the assets subject to such Liens; (viii) any encumbrance or restriction with respect to a Subsidiary pursuant to an agreement relating to any Capital Stock or Indebtedness incurred by such Subsidiary on or prior to the date on which such Subsidiary was acquired by the Borrower and outstanding on such date as long as such agreement was not entered into in contemplation of such Person becoming a Subsidiary, (ix) any customary restriction on cash or other deposits imposed under agreements entered into in the ordinary course of business or net worth provisions in leases and other agreements entered into in the ordinary course of business, (x) provisions with respect to dividends, the disposition or distribution of assets or property in joint venture agreements, license agreements, asset sale agreements, sale-leaseback agreements, stock sale agreements and other similar agreements entered into in the ordinary course of business; (xi) restrictions on deposits imposed under contracts entered into in the ordinary course of business; and (xii) any restrictions under any Indebtedness permitted by subsection 8.2 if such restrictions are no more restrictive to the Borrower and its Subsidiaries than those contained under this Agreement.

8.14   FCC Licenses. Cause any of the FCC Licenses to be held at any time by any Person other than the Borrower or any of its wholly-owned Subsidiaries that are Domestic Subsidiaries (with an exception for those Stations held in a Divestiture Trust pursuant to rule, regulation or order of the FCC).

8.15   Certain Payments of Indebtedness. (a) Make any payment in violation of any of the subordination provisions of any Subordinated Indebtedness or any payment of regularly scheduled interest or principal on any Subordinated Indebtedness at any time after the occurrence and during the continuation of an Event of Default under Section 9(a); or (b) make any payment or prepayment (including payments as a result of acceleration thereof) on any Subordinated Indebtedness or redeem or otherwise acquire, purchase or defease any Subordinated Indebtedness, except that (i) any Group Member may make any such payment in connection with any refinancing of any Subordinated Indebtedness permitted pursuant to the terms hereof; (ii) any Group Member may make payments in respect of any Subordinated Indebtedness so long as (x) no Default or Event of Default then exists or would result therefrom and (y) as of the date of such payment, the Consolidated First Lien Net Leverage Ratio (determined on a pro forma basis, after giving effect to the prepayment of such Indebtedness and any Indebtedness incurred in connection with such prepayment) is less than or equal to 4.00 to 1.00; (iii) any Group Member may prepay any Subordinated Indebtedness out of the Net Proceeds of the substantially concurrent sale or issuance (other than to any Group Member) of Capital Stock (other than any Disqualified Stock) of Parent, solely to the extent such Net Proceeds (x) have been contributed by Parent in cash as common equity to the Borrower and (y) have not been (1) included in the calculation of the Available Amount and applied to make an Investment pursuant to subsection 8.7(r) or (2) applied for Restricted Payments under subsection 8.8(c) or 8.8(h) or applied for Investments under subsection 8.7(t), and (iv) the Borrower and its Subsidiaries may convert or exchange all or any portion of any Subordinated Indebtedness to Capital Stock (other than Disqualified Stock) of Parent.

88

8.16     Amendment of Material Documents. Amend, modify, waive or otherwise change, or consent or agree to any material amendment, modification, waiver or other change to (a) its certificate of incorporation, by-laws or other organizational documents, (b) any indenture, credit agreement or other document entered into to evidence or govern the terms of any Indebtedness identified on Schedule 8.2 or permitted to be created, incurred or assumed pursuant to subsection 8.2 and, in each case, any indenture, credit agreement or other document entered into with respect to any extension, renewal, replacement or refinancing thereof or (c) any document entered into to evidence or govern the terms of any Preferred Stock, in each case except for any such amendment, modification or waiver that, (i) would not, in any material respect, adversely affect the interests of the Lenders and (ii) would otherwise not be prohibited hereunder.

SECTION 9.    EVENTS OF DEFAULT.

Upon the occurrence of any of the following events:

(a)     The Borrower shall fail to (i) pay any principal of any Term Loan or Note when due in accordance with the terms hereof or (ii) pay any interest on any Term Loan or any other amount payable hereunder or under the Fee Letter within three Business Days after any such interest or other amount becomes due in accordance with the terms hereof or thereof; or

(b)     Any representation or warranty made or deemed made by any Loan Party in any Loan Document or which is contained in any certificate, guarantee, document or financial or other statement furnished under or in connection with this Agreement shall prove to have been incorrect in any material respect on or as of the date made or deemed made; or

(c)     Any Loan Party shall default in the observance or performance of any agreement contained in subsection 3.3(d), 7.7(a), 7.10(c) (solely with respect to real properties owned by the Loan Parties on the Effective Date), 7.10(e) (solely with respect to deposit accounts and securities accounts maintained by the Loan Parties on the Effective Date) or Section 8 of this Agreement; or

(d)     Any Loan Party shall default in the observance or performance of (i) subsection 7.10(c) (with respect to real properties acquired by the Loan Parties after the Effective Date) or 7.10(e) (with respect to deposit accounts and securities accounts opened or acquired by a Loan Party after the Effective Date) and such default shall continue unremedied for a period of 10 days after the earlier of (x) a Responsible Officer obtaining knowledge of such default or (y) written notice thereof from the Administrative Agent to the Borrower or (ii) any other agreement contained in any Loan Document, and such default shall continue unremedied for a period of 30 days after written notice thereof from the Administrative Agent to the Borrower; or

(e)     Parent or any of its Subsidiaries shall (A) default in any payment of principal of or interest on any Indebtedness (other than the Term Loans and any intercompany debt) or in the payment of any Contingent Obligation (other than in respect of the Term Loans or any intercompany debt) in respect of Indebtedness, beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness or such Contingent Obligation was created; or (B) default in the observance or performance of any other agreement or condition

89

145909348v39

relating to any such Indebtedness or Contingent Obligation in respect of Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Contingent Obligation (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity, any applicable grace period having expired, or such Contingent Obligation to become payable, any applicable grace period having expired, <u>provided</u> that the aggregate principal amount of all such Indebtedness and Contingent Obligations (without duplication of any Indebtedness and Contingent Obligations in respect thereof) which would then become due or payable as described in this Section 9(e) would equal or exceed $35,000,000; or

(f)     (i) Parent or any of its Subsidiaries (other than any Non-Significant Subsidiary) shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or a material portion of its assets, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or Parent or any of its Subsidiaries (other than any Non-Significant Subsidiary) shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Parent or any of its Subsidiaries (other than any Non-Significant Subsidiary) any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days; or (iii) there shall be commenced against Parent or any of its Subsidiaries (other than any Non-Significant Subsidiary) any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) Parent or any of its Subsidiaries (other than any Non-Significant Subsidiary) shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) Parent or any of its Subsidiaries (other than any Non-Significant Subsidiary) shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(g)     (i) A Reportable Event shall have occurred; (ii) any Plan that is intended to be qualified under Section 401(a) of the Code shall lose its qualification; (iii) a non-exempt Prohibited Transaction shall have occurred with respect to any Plan; (iv) any Loan Party or any ERISA Affiliate shall have failed to make by its due date a required installment under Section 430(j) of the Code with respect to any Single Employer Plan or a required contribution to a Multiemployer Plan, in either case whether or not waived; (v) a determination shall have been made that any Single Employer Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (vi) any Loan Party or any ERISA Affiliate shall have incurred any liability under Title IV of ERISA with respect to the termination of any Single Employer Plan, including but not limited to the imposition of any Lien in favor of the PBGC or any Single Employer Plan; (vii) any Loan Party or any ERISA Affiliate

90

145909348v39

shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such Loan Party or ERISA Affiliate does not have reasonable grounds for contesting such Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner; or (viii) any Loan Party or any ERISA Affiliate shall have received from the sponsor of a Multiemployer Plan a determination that such Multiemployer Plan is, or is expected to be, Insolvent, in Reorganization, terminated, or in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA; and in each case in clauses (i) through (viii) above, such event or condition, together with all other such events or conditions if any, would result in a Material Adverse Effect; or

(h)    One or more judgments or decrees shall be entered against Parent or any of its Subsidiaries involving in the aggregate a liability (not paid or fully covered by insurance) of $35,000,000 or more to the extent that all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within the time required by the terms of such judgment; or

(i)    Except as contemplated by this Agreement or as provided in subsection 11.1, the guarantee contained in Section 2 of the Guarantee and Collateral Agreement shall cease, for any reason, to be in full force and effect or any Loan Party shall so assert in writing; or

(j)    Except as contemplated by this Agreement or as provided in subsection 11.1, any Grantor (as defined in the Guarantee and Collateral Agreement) shall breach any covenant or agreement contained in the Guarantee and Collateral Agreement with the effect that the Guarantee and Collateral Agreement shall cease to be in full force and effect or the Lien granted thereby shall cease to be a Lien with the priority purported to be created thereby, in each case other than with respect to items of Collateral not exceeding $2,500,000 in the aggregate or any Loan Party shall assert in writing that the Guarantee and Collateral Agreement is no longer in full force and or effect or the Lien granted by the Guarantee and Collateral Agreement is no longer of the priority purported to be created thereby; or

(k)    A Change in Control shall occur; or

(l)    The loss, revocation or suspension of, or any material impairment in the ability to use, any one or more FCC Licenses with respect to any Station of the Borrower or any Subsidiary generating collective Broadcast Cash Flow equal to or greater than 15% of the total Broadcast Cash Flow of the Borrower and the Subsidiary Guarantors;

then, and in any such event, (a) if such event is an Event of Default with respect to the Borrower specified in clause (i) or (ii) of paragraph (f) above, automatically the Term Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the Term Loans shall immediately become due and payable; and (b) if such event is any other Event of Default, so long as any such Event of Default shall be continuing, with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower declare all or a portion of the Term Loans of all Lenders hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and such Term Loans to be due and payable forthwith, whereupon the

91

same shall immediately become due and payable. Except as expressly provided above in this Section 9, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

SECTION 10. <u>THE ADMINISTRATIVE AGENT</u>

10.1    <u>Authorization and Action</u>. (a) Each Lender hereby irrevocably appoints the entity named as Administrative Agent in the heading of this Agreement and its successors and assigns to serve as the administrative agent and collateral agent under the Loan Documents and each Lender authorizes the Administrative Agent to take such actions as agent on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Administrative Agent under such agreements and to exercise such powers as are reasonably incidental thereto. Without limiting the foregoing, each Lender hereby authorizes the Administrative Agent to execute and deliver, and to perform its obligations under, each of the Loan Documents to which the Administrative Agent is a party, to exercise all rights, powers and remedies that the Administrative Agent may have under such Loan Documents.

(b)    As to any matters not expressly provided for herein and in the other Loan Documents (including enforcement or collection), the Administrative Agent shall not be required to take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the written instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, pursuant to the terms in the Loan Documents), and, unless and until revoked in writing, such instructions shall be binding upon each Lender; <u>provided</u>, however, that the Administrative Agent shall not be required to take any action that (i) the Administrative Agent in good faith believes exposes it to liability unless the Administrative Agent receives an indemnification satisfactory to it from the Lenders with respect to such action or (ii) is contrary to this Agreement or any other Loan Document or applicable law, including any action that may be in violation of the automatic stay under any requirement of law relating to bankruptcy, insolvency or reorganization or relief of debtors; <u>provided</u>, <u>further</u>, that the Administrative Agent may seek clarification or direction from the Required Lenders prior to the exercise of any such instructed action and may refrain from acting until such clarification or direction has been provided. Except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower, any Subsidiary or any Affiliate of any of the foregoing that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity. Nothing in this Agreement shall require the Administrative Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it. Notwithstanding anything herein to the contrary, in each instance where discretionary rights or powers conferred upon the Administrative Agent may be exercised or refrained from being exercised, the Administrative Agent shall have the absolute right, in its sole discretion, to consult with, or seek the affirmative or negative vote from, the Required Lenders or, if otherwise applicable, the Lenders, and it may do so pursuant to a negative notice or otherwise.

145909348v39

(c)     The Administrative Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or the other Loan Documents arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; business interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action.

(d)     The Administrative Agent shall not be (i) required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as Administrative Agent or (ii) required to take any enforcement action against a Loan Party or any other obligor outside of the United States.

(e)     In performing its functions and duties hereunder and under the other Loan Documents, the Administrative Agent is acting solely on behalf of the Lenders (except in limited circumstances expressly provided for herein relating to the maintenance of the Register), and its duties are entirely mechanical and administrative in nature. Without limiting the generality of the foregoing:

(i)     the Administrative Agent does not assume and shall not be deemed to have assumed any obligation or duty or any other relationship as the agent, fiduciary or trustee of or for any Lender or holder of any other obligation other than as expressly set forth herein and in the other Loan Documents, regardless of whether a Default or an Event of Default has occurred and is continuing (and it is understood and agreed that the use of the term "agent" (or any similar term) herein or in any other Loan Document with reference to the Administrative Agent is not intended to connote any fiduciary duty or other implied (or express) obligations arising under agency doctrine of any applicable law, and that such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties); additionally, each Lender agrees that it will not assert any claim against the Administrative Agent based on an alleged breach of fiduciary duty by the Administrative Agent in connection with this Agreement and the transactions contemplated hereby; and

(ii)     nothing in this Agreement or any Loan Document shall require the Administrative Agent to account to any Lender for any sum or the profit element of any sum received by the Administrative Agent for its own account.

(f)     The Administrative Agent may perform any of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any of their respective duties and exercise their respective rights and powers through their respective Related Parties.

The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective

93

activities pursuant to this Agreement and the other Loan Documents. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agent except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agent.

(g)     In case of the pendency of any proceeding with respect to any Loan Party under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, the Administrative Agent (irrespective of whether the principal of any Term Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(i)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Term Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim under subsections 4.7, 4.10, 4.18, 4.20 and 11.5) allowed in such judicial proceeding; and

(ii)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Lender and each other Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders or the other Secured Parties, to pay to the Administrative Agent any amount due to it, in its capacity as the Administrative Agent, under the Loan Documents (including under subsection 11.5). Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

(h)     The provisions of this Section 10.1 are solely for the benefit of the Administrative Agent and the Lenders, and, except solely to the extent of the Borrower's rights to consent pursuant to and subject to the conditions set forth in this Article, none of the Borrower or any Subsidiary shall have any rights as a third party beneficiary under any such provisions. Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the guarantees of the Obligations provided under the Loan Documents, to have agreed to the provisions of this Article.

10.2     <u>Administrative Agent's Reliance, Indemnification, Etc.</u>. (a) Neither the Administrative Agent nor any of its Related Parties shall be (i) liable for any action taken or omitted to be taken by it under or in connection with this Agreement or the other Loan Documents (x) with the consent of or at the request of the Required Lenders (or such other

94

145909348v39

number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents) or (y) in the absence of its own gross negligence or willful misconduct (such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and nonappealable judgment) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party to perform its obligations hereunder or thereunder.

(b)      The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof (stating that it is a "notice of default") is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default, (iv) the sufficiency, validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the value or the sufficiency of any Collateral or (vi) the satisfaction of any condition set forth in Section 6 or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or satisfaction of any condition that expressly refers to the matters described therein being acceptable or satisfactory to the Administrative Agent.

(c)      Without limiting the foregoing, the Administrative Agent (i) may treat the payee of any promissory note as its holder until such promissory note has been assigned in accordance with subsection 11.6, (ii) may rely on the Register to the extent set forth in subsection 11.6(d), (iii) may consult with legal counsel (including counsel to the Borrower), independent public accountants and other experts selected by it, and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts, (iv) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations made by or on behalf of any Loan Party in connection with this Agreement or any other Loan Document, (v) in determining compliance with any condition hereunder to the making of a Term Loan that by its terms must be fulfilled to the satisfaction of a Lender, may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender sufficiently in advance of the making of such Term Loan and (vi) shall be entitled to rely on, and shall incur no liability under or in respect of this Agreement or any other Loan Document by acting upon, any notice, consent, certificate or other instrument or writing (which writing may be a fax, any electronic message, Internet or intranet website posting or other distribution) or any statement made to it orally or by telephone and believed by it to be genuine and signed or sent or otherwise authenticated by the proper party or parties (whether or

95

145909348v39

not such Person in fact meets the requirements set forth in the Loan Documents for being the maker thereof).

10.3    Posting of Communications. (a) The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make any Communications available to the Lenders by posting the Communications on IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic platform chosen by the Administrative Agent to be its electronic transmission system (the "Approved Electronic Platform").

(b)    Although the Approved Electronic Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Administrative Agent from time to time (including, as of the Effective Date, a user ID/password authorization system) and the Approved Electronic Platform is secured through a per-deal authorization method whereby each user may access the Approved Electronic Platform only on a deal-by-deal basis, each of the Lenders acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution. Each of the Lenders hereby approves distribution of the Communications through the Approved Electronic Platform and understands and assumes the risks of such distribution.

(c)    THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS ARE PROVIDED "AS IS" AND "AS AVAILABLE". THE APPLICABLE PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE APPROVED ELECTRONIC PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE APPLICABLE PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE APPROVED ELECTRONIC PLATFORM. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF THEIR RESPECTIVE RELATED PARTIES (COLLECTIVELY, "APPLICABLE PARTIES") HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET OR THE APPROVED ELECTRONIC PLATFORM.

"Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed by the Administrative Agent or any Lender by means of electronic communications pursuant to this Section, including through an Approved Electronic Platform.

96

145909348v39

(d)      Each Lender agrees that notice to it (as provided in the next sentence) specifying that Communications have been posted to the Approved Electronic Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees (i) to notify the Administrative Agent in writing (which could be in the form of electronic communication) from time to time of such Lender's email address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such email address.

(e)      Each of the Lenders agrees that the Administrative Agent may, but (except as may be required by applicable law) shall not be obligated to, store the Communications on the Approved Electronic Platform in accordance with the Administrative Agent's generally applicable document retention procedures and policies.

(f)      Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

(g)      The Borrower hereby acknowledges that certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Loan Parties or their securities) (each, a "Public Lender").  The Borrower hereby agrees that so long as any Loan Party is the issuer of any outstanding debt or equity securities that are registered or issued pursuant to a private offering or is actively contemplating issuing any such securities it will use commercially reasonable efforts to identify that portion of materials and/or information provided by or on behalf of the Loan Parties  under the Loan Documents (collectively, "Borrower Materials") that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Loan Parties shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Loan Parties or their securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 11.15); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Approved Electronic Platform designated "Public Investor"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Approved Electronic Platform not designated "Public Investor." The Borrower agrees that (i) any Loan Documents and notifications of changes of terms of the Loan Documents (including term sheets) and (ii) any materials delivered pursuant to Section 7.1 will be deemed to be "public-side" Borrower Materials and may be made available to Public Lenders.

10.4   The Administrative Agent Individually. The Person serving as the Administrative Agent shall, to the extent applicable, have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender and may exercise the same as though it were not the Administrative Agent. The terms "Lenders", "Required Lenders" and any similar terms shall,

<div align="center">97</div>

unless the context clearly otherwise indicates, include, if applicable, the Administrative Agent in its individual capacity as a Lender or as one of the Required Lenders, as applicable. The Person serving as the Administrative Agent and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of banking, trust or other business with, the Borrower, any Subsidiary or any Affiliate of any of the foregoing as if such Person was not acting as the Administrative Agent and without any duty to account therefor to the Lenders.

          10.5    Successor Administrative Agent. (a) The Administrative Agent may resign at any time by giving 30 days' prior written notice thereof to the Lenders and the Borrower, and the Required Lenders may remove the Administrative Agent for any reason upon 20 days' prior written notice to the Administrative Agent and the Borrower, in each case whether or not a successor Administrative Agent has been appointed. Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Administrative Agent with the approval of the Borrower (which approval shall not be unreasonably withheld or delayed and not required if an Event of Default has occurred and is continuing). If no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Administrative Agent's giving of notice of resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be a bank with an office in New York, New York or an Affiliate of any such bank.  In either case (whether a resignation or a removal), such appointment shall be subject to the prior written approval of the Borrower (which approval may not be unreasonably withheld and shall not be required while an Event of Default has occurred and is continuing). Upon the acceptance of any appointment as Administrative Agent by a successor Administrative Agent, such successor Administrative Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring or removed Administrative Agent. Upon the acceptance of appointment as Administrative Agent by a successor Administrative Agent, the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations under this Agreement and the other Loan Documents. Prior to any Administrative Agent's resignation or removal hereunder as Administrative Agent, the retiring or removed Administrative Agent shall take such action as may be reasonably necessary to assign to the successor Administrative Agent its rights as Administrative Agent under the Loan Documents.

        (b)    Notwithstanding paragraph (a) of this Section, in the event no successor Administrative Agent shall have been so appointed and shall have accepted such appointment (x) within 30 days after the retiring Administrative Agent gives notice of its intent to resign or (y) within 20 days after the removed Administrative Agent receives notice of its removal, as applicable, the retiring Administrative Agent may give notice of the effectiveness of its resignation to the Lenders and the Borrower or the Required Lenders may give notice of the effectiveness of the removal of the Administrative Agent to the Administrative Agent and the Borrower, as applicable, whereupon, on the date of effectiveness of such resignation or removal stated in such notice, (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents; provided that, solely for purposes of maintaining any security interest granted to the Administrative Agent under any Security Document for the benefit of the Secured Parties, the retiring Administrative Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Secured

145909348v39

Parties, and continue to be entitled to the rights set forth in such Security Document and Loan Document, and, in the case of any Collateral in the possession of the Administrative Agent, shall continue to hold such Collateral, in each case solely until such time as a successor Administrative Agent is appointed and accepts such appointment in accordance with this Section (it being understood and agreed that the retiring Administrative Agent shall have no duty or obligation to take any further action under any Security Document), and (ii) the Required Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent (other than as provided in Section 4.20 and other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the effectiveness of such resignation or retirement); provided that (A) all payments required to be made hereunder or under any other Loan Document to the Administrative Agent for the account of any Person other than the Administrative Agent shall be made directly to such Person and (B) all notices and other communications required or contemplated to be given or made to the Administrative Agent shall also directly be given or made to each Lender. Following the effectiveness of the Administrative Agent's resignation or removal from its capacity as such, the provisions of this Article and subsection 11.5, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Loan Document, shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent and in respect of the matters referred to in the proviso under clause (i) above.

10.6    Acknowledgements of Lenders. (a) Each Lender represents that it is engaged in making, acquiring or holding commercial loans in the ordinary course of its business and that it has, independently and without reliance upon the Administrative Agent or any other Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender, and to make, acquire or hold Term Loans hereunder. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Borrower and its Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

(b)    Each Lender, by delivering its signature page to this Agreement on the Effective Date (or who shall otherwise be deemed to be party to this Agreement by virtue of the order of the Bankruptcy Court confirming the Plan of Reorganization), or delivering its signature page to an Assignment and Assumption or any other Loan Document pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent or the Lenders on the Effective Date.

10.7    Collateral Matters. (a) Except with respect to the exercise of setoff rights in accordance with subsection 11.7(b) or with respect to a Secured Party's right to file a proof of

99

145909348v39

claim in an insolvency proceeding, no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any guarantee of the Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent on behalf of the Secured Parties in accordance with the terms thereof.

(b)     [Reserved]

(c)     The Secured Parties irrevocably authorize the Administrative Agent, at its option and in its discretion, to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by subsection 8.3(h). The Administrative Agent shall not be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or Lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing any document, financing statement, Mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (iii) providing, maintaining, monitoring or preserving insurance on or the payment of taxes with respect to any of the Collateral.  The actions described in items (i) through (iii) shall be the sole responsibility of the Borrower.

10.8    Credit Bidding. The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent at the direction of the Required Lenders on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase). In connection with any such bid, (i) the Administrative Agent (or its sub-agents as designated) shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Administrative Agent (or its sub-agents as designated) shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall

100

provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in subsection 11.1 of this Agreement), (iv) the Administrative Agent (or its sub-agents as designated) on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Obligations which were credit bid, interests, whether as equity, partnership, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of Obligations credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Secured Parties pro rata with their original interest in such Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

10.9    Certain ERISA Matters. (a) Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of the Plan Asset Regulations) of one or more Benefit Plans in connection with the Term Loans,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Term Loans and this Agreement, and the conditions for exemptive relief thereunder are and will continue to be satisfied in connection therewith,

101

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Term Loans and this Agreement, (C) the entrance into, participation in, administration of and performance of the Term Loans and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Term Loans and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

(i)    none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Term Loans and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21, as amended from time to time) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Term Loans and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Term Loans and this Agreement is a fiduciary under ERISA or the Code, or both, with

102

respect to the Term Loans and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)      no fee or other compensation is being paid directly to the Administrative Agent or any of its Affiliates for investment advice (as opposed to other services) in connection with the Term Loans or this Agreement.

(c)      The Administrative Agent hereby informs the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Term Loans and this Agreement, (ii) may recognize a gain if it extended the Term Loans for an amount less than the amount being paid for an interest in the Term Loans by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

10.10   Indemnification.  The Lenders severally agree to indemnify the Administrative Agent in its capacity as such (to the extent not reimbursed by the Loan Parties and without limiting the obligation of the Loan Parties to do so), ratably (determined at the time such indemnity is sought) according to the respective outstanding principal amounts of the Term Loans and obligations, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever which may at any time (including at any time following the payment of the Term Loans) be imposed on, incurred by or asserted against the Administrative Agent in any way relating to or arising out of the Loan Documents or any documents contemplated by or referred to herein or the transactions contemplated hereby or any action taken or omitted by the Administrative Agent under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's gross negligence or willful misconduct.  The agreements contained in this subsection 10.10 shall survive the payment of the Notes and all other amounts payable hereunder.

SECTION 11. MISCELLANEOUS

11.1   Amendments and Waivers. No Loan Document (other than the Fee Letter) or any terms thereof may be amended, supplemented, waived or modified except in accordance with the provisions of this subsection 11.1. Except as expressly set forth in this Agreement, neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, supplemented or modified except pursuant to a document in writing entered into by the Required Lenders and the Loan Parties that are party hereto or thereto, as applicable; provided, however, that:

103

145909348v39

(a)    no such waiver and no such amendment, supplement or modification shall (i) directly or indirectly release all or substantially all of the Collateral or all or substantially all of the Guarantors from their obligations under the Guarantee and Collateral Agreement or (ii) reduce any percentage specified in the definition of Required Lenders, in each case without the written consent of all Lenders;

(b)    no such waiver and no such amendment, supplement or modification shall (i) extend the scheduled maturity of any Term Loan or scheduled installment of any Term Loan or reduce any scheduled installment of any Term Loan or reduce the principal amount thereof, or reduce the rate (provided that only the consent of the Required Lenders shall be necessary to amend the default rate provided in subsection 4.7(c) or to waive any obligation of the Borrower to pay interest at such default rate) or extend the time of payment of interest thereon, or change the method of calculating interest thereon, or reduce the amount or extend the time of payment of any fee payable to the Lenders hereunder without the consent of each Lender directly and adversely affected thereby, (ii) amend, modify or waive any provision of this subsection 11.1 or consent to the assignment or transfer by any Loan Party of any of its rights and obligations under any Loan Document without the consent of all Lenders, (iii) amend, modify or waive subsection 4.16(a) in a manner that would by its terms alter the pro rata sharing of payments required thereby or (iv) amend, modify or waive Section 6.5 of the Guarantee and Collateral Agreement with respect to the priority of payments set forth therein, in each case, without the written consent of each Lender directly and adversely affected thereby; provided, that any such waiver, amendment, supplement or modification may be made without the consent of the Required Lenders if such waiver, amendment, supplement or modification otherwise satisfies the requirements of this clause (b);

(c)    [Reserved];

(d)    no such waiver and no such amendment, supplement, modification or consent shall adversely affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document without the written consent of the Administrative Agent; and

(e)    this Agreement and the other Loan Documents may be amended solely with the consent of the Administrative Agent to establish an Extension permitted by subsection 4.24.

Any such waiver and any such amendment, supplement or modification described in this subsection 11.1 shall apply equally to each of the Lenders and shall be binding upon each Loan Party, the Lenders, the Administrative Agent and all future holders of the Term Loans. In the case of any waiver, the Borrower, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the outstanding Term Loans, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Furthermore, notwithstanding the foregoing, the Administrative Agent, with the consent of the Borrower, may amend, modify or supplement any Loan Document without the

104

145909348v39

consent of any Lender or the Required Lenders in order to correct, amend or cure any ambiguity, inconsistency or defect or correct any typographical error or other manifest error in any Loan Document.

In connection with any proposed amendment, modification, waiver or termination (a "Proposed Change") requiring the consent of all Lenders or all affected Lenders, if the consent of the Required Lenders to such Proposed Change is obtained, but the consent to such Proposed Change of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in this subsection 11.1 being referred to as a "Non-Consenting Lender"), then, the Borrower may, at its sole expense and effort, upon notice to such Non-Consenting Lender and the Administrative Agent, require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in subsection 11.6), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that (i) (a) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld or delayed, (b) such Non-Consenting Lender shall have received payment of an amount equal to the outstanding principal amount of its Term Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (c) the Borrower or such assignee shall have paid to the Administrative Agent the processing and recordation fee specified in subsection 11.6(d) and (d) such assignee has consented to the Proposed Change and (ii) substantially concurrently with satisfaction of the requirements set forth in clause (i) of this proviso, such Non-Consenting Lender shall be deemed to have assigned and delegated its interests, rights and obligations under this Agreement and such Non-Consenting Lender shall not be required to execute the Assignment and Assumption in connection therewith.

Notwithstanding the foregoing, this Agreement may be amended with the written consent of the Administrative Agent, the Borrower and the Lenders providing the relevant Replacement Term Loans (as defined below) to permit the refinancing, replacement or modification of all or any portion of the outstanding Term Loans ("Replaced Term Loans") with a replacement term loan hereunder ("Replacement Term Loans"); provided, that (a) the aggregate principal amount of such Replacement Term Loans shall not exceed the aggregate principal amount of such Replaced Term Loans, (b) the terms of Replacement Term Loans are (excluding pricing, fees, rate floors and optional prepayment or redemption terms), taken as a whole, no more favorable to the lenders providing such Replacement Term Loans than those applicable to the Replaced Term Loans (other than any covenants or other provisions applicable only to periods after the Maturity Date), (c) the maturity date of such Replacement Term Loans shall not be earlier than the maturity date of the Replaced Term Loans and (d) the weighted average life to maturity of such Replacement Term Loans shall not be shorter than the weighted average life to maturity of such Replaced Term Loans at the time of such refinancing.

11.2    Notices. All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy or electronic transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand on a Business Day during recipient's normal

<p style="text-align:center">105</p>

business hours, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when sent on a Business Day and received during recipient's normal business hours with confirmation of receipt received, addressed as follows in the case of each Loan Party and the Administrative Agent, and as set forth on its signature page hereto in the case of any Lender, or to such other address as may be hereafter notified by the respective parties hereto and any future holders of the Loans:

| | |
|---|---|
| The Borrower: | Cumulus Media Holdings Inc.<br>3280 Peachtree Road, N.W., Suite 2300<br>Atlanta, GA  30305<br>Attention: General Counsel<br>Telecopy: (404) 260-6877<br>Email: |
| In the case of the Borrower,<br>with a copy to: | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br>Attention: T. Robert Zochowski, Jr.<br>Telecopy: (212) 492-0762<br>Email: rzochowski@paulweiss.com |
| The Administrative Agent: | Wilmington Trust, National Association<br>50 South Sixth Street, Suite 1290<br>Minneapolis, MN 55402<br>Attention:  Jeffrey Rose<br>Telecopy: (612) 217-5651<br>Email: JRose@WilmingtonTrust.com |
| In the case of the Administrative Agent,<br>with a copy to: | Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, NY 10019-6099<br>Attention: Leonard Klingbaum and Jason Pearl<br>Telecopy: (212) 728-9184<br>Email: LKlingbaum@willkie.com and JPearl@willkie.com |

provided that the failure to provide the copies of notices to the Borrower provided for in this subsection 11.2 shall not result in any liability to the Administrative Agent or any Lender.

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to subsections  4.3, 4.5 and

106

4.6 unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.  All such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement) and (ii) posted to an Internet or Intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (b)(i) of notification that such notice or communication is available and identifying the website address therefor; provided that any such notice or communication described in clauses (i) or (ii) not given during the normal business hours of the recipient shall be deemed to have been given at the opening of business on the next Business Day for the recipient.

11.3    No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder or under the Loan Documents, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

11.4    Survival of Representations and Warranties. All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement, the deemed making of the Term Loans and other extensions of credit hereunder.

11.5    Payment of Expenses. The Borrower agrees:

(a)    to pay or reimburse the Administrative Agent, the Lenders and their respective Affiliates for all of their reasonable out-of-pocket costs and expenses incurred in connection with the preparation, execution and delivery of, any amendment, supplement or modification to, or any waiver of, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable fees and disbursements (including filing and recording fees and expenses) of counsel to each of the Administrative Agent and the Lenders (which shall be limited to (i) one primary counsel, one FCC counsel and, if necessary, one local counsel to the Administrative Agent in any relevant jurisdiction and expenses attributable to processing primary assignments and (ii) one primary counsel, one FCC counsel and, if necessary, one local counsel in any relevant jurisdiction to the Lenders (taken as a whole) and, solely in case of any actual or perceived conflict of interest, one additional counsel to the affected Lenders taken as a whole);

(b)    to pay or reimburse the Lenders and the Administrative Agent for all their reasonable out-of-pocket costs and expenses incurred in connection with, and to pay, indemnify, and hold the Administrative Agent and the Lenders harmless from and against any and all other

107

145909348v39

liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever arising out of or in connection with, the enforcement or preservation of any rights under any Loan Document and any such other documents or any workout or restructuring of the Loan Documents, limited in the case of legal fees and expenses to out-of-pocket costs, fees, disbursements and other charges of (i) one primary counsel, FCC counsel and one local counsel in any relevant jurisdiction for the Administrative Agent and (ii) one primary counsel, FCC counsel and one local counsel in any relevant jurisdiction for the Lenders taken as a whole (and, solely in case of any actual or perceived conflict of interest, one additional counsel to the affected Lenders taken as a whole) incurred in connection with the foregoing and in connection with advising the Administrative Agent and the Lenders with respect to their respective rights and responsibilities under this Agreement, the other Loan Documents and the documentation relating thereto.

(c)    to pay, indemnify, and to hold the Administrative Agent and each Lender harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying similar fees, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, any Loan Document and any such other documents; and

(d)    to pay, indemnify, and hold the Administrative Agent and each Lender and their respective officers, directors, employees, affiliates, advisors, controlling persons and agents (each an "Indemnitee") harmless from and against any and all other liabilities, obligations, losses, damages (including punitive damages), penalties, fines, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including reasonable experts' and consultants' fees and limited in the case of legal fees and expenses to the reasonable fees and disbursements of (i) one primary counsel, one FCC counsel and, if necessary, one local counsel in each appropriate jurisdiction for the Administrative Agent and its Related Parties (taken as a whole) and (ii) one primary counsel, one FCC counsel and one local counsel in any relevant jurisdiction for all other Indemnitees taken as a whole (and, solely in the case of any actual or perceived conflict of interest where the Indemnitee affected by such conflict of interest informs the Borrower of such conflict and thereafter retains its own counsel, of another firm of counsel for such affected Indemnitee) and third party claims for personal injury or real or personal property damage) which may be incurred by or asserted against any Indemnitee (x) arising out of or in connection with any investigation, litigation or proceeding related to this Agreement, the other Loan Documents, the Term Loans, or any of the other transactions contemplated hereby or thereby, whether or not any Indemnitee is a party thereto, (y) with respect to any environmental matters, any environmental compliance expenses and remediation expenses in connection with the presence, suspected presence, release or suspected release of any Materials of Environmental Concern in or into the air, soil, groundwater, surface water or improvements at, on, about, under, or within the Properties, or any portion thereof, or elsewhere in connection with the transportation of Materials of Environmental Concern to or from the Properties, in each case to the extent required under Environmental Laws, or (z) without limiting the generality of the foregoing, by reason of or in connection with the execution, performance, delivery, enforcement or administration, of this Agreement or the other Loan Documents (all the foregoing in this clause (d), collectively, the "indemnified liabilities"), provided that the Borrower shall have no obligation hereunder to any Indemnitee (x) with respect to indemnified

108

145909348v39

liabilities to the extent they are found by a final, non-appealable judgment of a court to arise from the gross negligence or willful misconduct of, or (other than in the case of the Administrative Agent and its Related Parties) material breach by, such Indemnitee, (y) under this subsection 11.5 for any Taxes other than Other Taxes or Taxes derived from a non-Tax claim or (z) with respect to indemnified liabilities arising out of a dispute solely between Indemnified Parties not involving an act or omission by the Borrower or any of its Affiliates (other than any such indemnified liabilities asserted against any Indemnitee in its capacity, or in fulfilling its role, as an agent or similar role for the Term Loans). All amounts due under this subsection 11.5 shall be payable not later than 10 days after written demand therefor. The agreements in this subsection 11.5 shall survive repayment of the Loans and all other amounts payable hereunder.

11.6   Successors and Assigns; Participations; Purchasing Lenders.

(a)   This Agreement shall be binding upon and inure to the benefit of Parent, the Borrower, the Lenders and the Administrative Agent, all future holders of the Term Loans, and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights and obligations hereunder except in accordance with this Section.

(b)   Any Lender may, in the ordinary course of its business and in accordance with applicable law, at any time sell to one or more banks or other financial institutions or Lender Affiliates (other than a Disqualified Person) ("Participants") participating interests in any Term Loan owing to such Lender, any Note held by such Lender or any other interest of such Lender hereunder and under the other Loan Documents. Notwithstanding anything to the contrary in the immediately preceding sentence, each Lender shall have the right to sell one or more participations in all or any part of its Term Loans or any other Obligation to one or more lenders or other Persons that provide financing to such Lender in the form of sales and repurchases of participations without having to satisfy the foregoing requirements. In the event of any such sale by a Lender of participating interests to a Participant, such Lender's obligations under this Agreement to the other parties to this Agreement shall remain unchanged, such Lender shall remain solely responsible for the performance thereof, such Lender shall remain the holder of any such Term Loan for all purposes under this Agreement and the other Loan Documents and the Borrower and the Administrative Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents. Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided, that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly and adversely affected thereby pursuant to Section 11.1(b) and (2) directly affects such Participant. The Borrower agrees that if amounts outstanding under this Agreement and the Term Loans are due and unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement and any Term Loan to the same extent as if the amount of its participating interest

109

145909348v39

were owing directly to it as a Lender under this Agreement or any Term Loan; provided that such Participant shall only be entitled to such right of setoff if it shall have agreed in the agreement pursuant to which it shall have acquired its participating interest to share with the Lenders the proceeds thereof, as provided in subsection 11.7. The Borrower also agrees that each Participant shall be entitled to the benefits of, and shall be subject to the limitations of, subsections 4.17, 4.18, 4.19 and 4.20 with respect to its participation in the Term Loans outstanding from time to time; provided that no Participant shall be entitled to receive (i) any greater amount pursuant to such subsections than the transferor Lender would have been entitled to receive in respect of the amount of the participation transferred by such transferor Lender to such Participant had no such transfer occurred or (ii) the benefits of subsection 4.20 unless such Participant complies with subsection 4.20(g) as if it were a Lender (it being understood that the documentation required under subsection 4.20(g) shall be delivered to the participating Lender). Each Lender that sells a participation, acting solely for this purpose as an agent of the Borrower, shall maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Term Loans or other obligations under this Agreement (the "Participant Register"). No Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person except to the extent such disclosure is necessary to establish that any Term Loan or Note is in registered form under Section 5f.103-1(c) of the U.S. Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender, each Loan Party and the Administrative Agent shall treat each person whose name is recorded in the Participant Register pursuant to the terms hereof as the owner of such participation for all purposes of this Agreement, notwithstanding notice to the contrary.

(c)    Any Lender may, in the ordinary course of its business and in accordance with applicable law, with the prior written consent (not to be unreasonably withheld or delayed) of:

(i)    the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of all or a portion of a Term Loan to a Lender, a Lender Affiliate or an Approved Fund;

(ii)    [Reserved]; and

(iii)    the Borrower; provided that (A) (i) no consent of the Borrower shall be required for an assignment to a Lender, a Lender Affiliate or an Approved Fund or (ii) if an Event of Default under Section 9(a) or (f) has occurred and is continuing and (B) the Borrower shall be deemed to have consented to any assignment unless the Borrower has objected thereto by written notice to the Administrative Agent within 10 Business Days after having received notice thereof,

sell to any Eligible Assignee (an "Assignee"), all or any part of its rights and obligations under this Agreement, the Notes and the other Loan Documents pursuant to an Assignment and Assumption executed by such Assignee, such assigning Lender (except as otherwise permitted by subsection 4.22 and subsection 11.1) and, to the extent their consent is required, the Borrower and the Administrative Agent, and delivered to the Administrative Agent for its acceptance and recording in the Register (as defined below); provided that (A) each such sale pursuant to this

110

subsection 11.6(c) of less than all of a Lender's rights and obligations (I) to a Person which is not then a Lender, a Lender Affiliate or an Approved Fund shall be of Term Loans of not less than $1,000,000 and (II) to a Person which is then a Lender, a Lender Affiliate or an Approved Fund may be in any amount and (B) each Assignee shall comply with the provisions of subsection 4.20 hereof; provided, further that the foregoing shall not prohibit a Lender from selling participating interests in accordance with subsection 11.6(a) in all or any portion of its Term Loans (without duplication). For purposes of clause (A) of the first proviso contained in the preceding sentence, the amount described therein shall be aggregated in respect of each Lender and its Lender Affiliates, if any. Upon such execution, delivery, acceptance and recording, from and after the effective date determined pursuant to such Assignment and Assumption, (x) the Assignee thereunder shall be a party hereto and, to the extent provided in such Assignment and Assumption, have the rights and obligations of a Lender hereunder with the Term Loans as set forth therein, and (y) the assigning Lender thereunder shall, to the extent of the interest transferred, as reflected in such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such assigning Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of subsections 4.17, 4.18, 4.19, 4.20 and 11.5). Such Assignment and Assumption shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Assignee and the resulting adjustment of Term Loan Percentages arising from the purchase by such Assignee of all or a portion of the rights and obligations of such assigning Lender under this Agreement.

Each assignee, by its execution and delivery of an Assignment and Assumption, shall be deemed to have represented to the assigning Lender and the Administrative Agent that such assignee is an Eligible Assignee. In no event shall the Administrative Agent be obligated to ascertain, monitor or inquire as to whether any prospective assignee is an Eligible Assignee or have any liability with respect to any assignment made to a Disqualified Lender or any other Person that is not an Eligible Assignee or enforcing the list of Disqualified Lenders.

If any assignment or participation is made to any Disqualified Lender, the Borrower may, at its sole expense and effort, upon notice to the applicable Disqualified Lender and the Administrative Agent, (A) in the case of outstanding Term Loans held by such Disqualified Lender, purchase or prepay such Term Loan by paying the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such Term Loans, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and/or (B) require such Disqualified Lender to assign, without recourse (in accordance with and subject to the restrictions contained in this subsection 11.6), all of its interest, rights and obligations under this Agreement to one or more Eligible Assignees at the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Lender paid to acquire such interests, rights and obligations, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder.

Notwithstanding anything to the contrary contained in this Agreement, Disqualified Lenders (A) will not (x) have the right to receive information, reports or other materials provided to Lenders by the Borrower, the Administrative Agent or any other Lender,

145909348v39

(y) attend or participate in meetings attended by the Lenders and the Administrative Agent, or (z) access any electronic site established for the Lenders or confidential communications from counsel to or financial advisors of the Administrative Agent or the Lenders and (B) (x) for purposes of any consent to any amendment, waiver or modification of, or any action under, and for the purpose of any direction to the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) under this Agreement or any other Loan Document, each Disqualified Lender will be deemed to have consented in the same proportion as the Lenders that are not Disqualified Institutions consented to such matter, and (y) for purposes of voting on any Bankruptcy Plan, each Disqualified Lender party hereto hereby agrees (1) not to vote on such Bankruptcy Plan, (2) if such Disqualified Lender does vote on such Bankruptcy Plan notwithstanding the restriction in the foregoing clause (1), such vote will be deemed not to be in good faith and shall be "designated" pursuant to Section 1126(e) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws), and such vote shall not be counted in determining whether the applicable class has accepted or rejected such Bankruptcy Plan in accordance with Section 1126(c) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws) and (3) not to contest any request by any party for a determination by the bankruptcy court (or other applicable court of competent jurisdiction) effectuating the foregoing clause (2).

For the purposes of this subsection 11.6, "Approved Fund" means any Person (other than a Disqualified Person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an affiliate of an entity that administers or manages a Lender.

(d)     The Administrative Agent acting on behalf of and as agent for the Borrower, shall maintain at the address of the Administrative Agent referred to in subsection 11.2 a copy of each Assignment and Assumption delivered to it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the principal amount (and stated interest) of Term Loans owing to each Lender. The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register as the owner of the Term Loans recorded therein for all purposes of this Agreement, notwithstanding any notice to the contrary. The Register shall be available for inspection by the Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph. Upon its receipt of an Assignment and Assumption executed by an assigning Lender, an Assignee and any other party required to executed such Assignment and Assumption pursuant to this subsection 11.6, together with payment to the Administrative Agent of a registration and processing fee of $3,500 (except that no such registration and processing fee shall be payable (x) in the case of an assignee which is already a Lender or is an Affiliate or Approved Fund of a Lender or a Person under common management with a Lender or (y) if waived by the Administrative Agent in its sole discretion), the Administrative Agent shall (i) promptly accept such Assignment and Assumption and (ii) on the effective date determined pursuant thereto, record the information contained therein in the Register and give notice of such acceptance and recordation to the Lenders and the Borrower. The Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire in which the

112

145909348v39

Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

(e)     The Borrower authorizes each Lender to disclose to any Participant or Assignee (each, a "Transferee") and any prospective Transferee or to any pledgee referred to in subsection 11.6(f) or to any direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by confidentiality provisions at least as restrictive as those of subsection 11.15) any and all financial information in such Lender's possession concerning the Borrower and its Subsidiaries which has been delivered to such Lender by or on behalf of the Borrower pursuant to this Agreement or which has been delivered to such Lender by or on behalf of the Borrower in connection with such Lender's credit evaluation of the Borrower and its Subsidiaries and Affiliates prior to becoming a party to this Agreement; provided that no such information shall be provided by any Lender to any Disqualified Lender.

(f)     For avoidance of doubt, the parties to this Agreement acknowledge that the provisions of this subsection concerning assignments of Term Loans and Notes relate only to absolute assignments and that such provisions do not prohibit assignments creating security interests, including any pledge or assignment (i) by a Lender of any Term Loan or Note to any Federal Reserve Bank or central bank having jurisdiction over such lender in accordance with applicable law and (ii) by a Lender Affiliate which is a fund to its trustee in support of its obligations to its trustee; provided that any transfer of Term Loans or Notes upon, or in lieu of, enforcement of or the exercise of remedies under any such pledge shall be treated as an assignment thereof which shall not be made without compliance with the requirements of this subsection 11.6.

(g)     The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in paragraph (f) above.

(h)     Any Lender may, so long as no Default or Event of Default has occurred and is continuing, at any time, assign all or a portion of its rights and obligations with respect to Term Loans under this Agreement to the Borrower through, notwithstanding subsection 4.16(a) or 11.7(a) or any other provision in this Agreement, an open market purchase on a non-pro rata basis (an "Open Market Purchase"); provided, that:

(i)     the principal amount of such Term Loans, along with all accrued and unpaid interest thereon, so assigned or transferred to the Borrower shall be deemed automatically cancelled and extinguished on the date of such assignment or transfer, (b) the aggregate outstanding principal amount of Term Loans of the remaining Lenders shall reflect such cancellation and extinguishing of the Term Loans then held by the Borrower and (c) the Borrower shall promptly provide written notice to the Administrative Agent of such assignment or transfer of such Term Loans, and the

113

Administrative Agent, upon receipt of such notice, shall reflect the cancellation of the applicable Term Loans in the Register;

(ii)     on the date of any Open Market Purchase and after giving effect thereto, Liquidity shall be greater than or equal to $25,000,000; and

(iii)     the aggregate amount of Open Market Purchases made in any calendar year, together with the aggregate amount of Discounted Voluntary Prepayments made in such calendar year, shall not exceed $50,000,000 in the aggregate.

11.7    Adjustments; Set-off.

(a)     Except as otherwise expressly set forth in this Agreement (including subsections 4.23, 4.24 and 11.6), if any Lender (a "Benefited Lender") shall at any time receive any payment of all or part of any of its Term Loans or interest thereon, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 9(f), or otherwise) in a greater proportion than any such payment to and collateral received by any other Lender, if any, in respect of such other Lender's Term Loans, or interest thereon, such Benefited Lender shall purchase for cash from the other Lenders such portion of each such other Lender's Term Loans or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. The Borrower agrees that each Lender so purchasing a portion of another Lender's Term Loans may exercise all rights of payment (including rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion. The Administrative Agent shall promptly give the Borrower notice of any set-off, provided that the failure to give such notice shall not affect the validity of such set-off.

(b)     Upon the occurrence of an Event of Default specified in Section 9(a) or Section 9(f), the Administrative Agent and each Lender are hereby irrevocably authorized at any time and from time to time without notice to the Borrower, any such notice being hereby waived by the Borrower, to set off and appropriate and apply any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Administrative Agent or such Lender or any of their respective Affiliates to or for the credit or the account of the Borrower or any part thereof in such amounts as the Administrative Agent or such Lender may elect, on account of the liabilities of the Borrower hereunder and under the other Loan Documents and claims of every nature and description of the Administrative Agent or such Lender against the Borrower in any currency, whether arising hereunder, or otherwise, under any other Loan Document as the Administrative Agent or such Lender may elect, whether or not the Administrative Agent or such Lender has made any demand for payment and although such liabilities and claims may be contingent or unmatured. The Administrative Agent and each Lender shall notify the Borrower (and in the case of a setoff made by a Lender, the Administrative Agent) promptly of any such setoff made by it

114

and the application made by it of the proceeds thereof, provided that the failure to give such notice shall not affect the validity of such setoff and application. The rights of the Administrative Agent and each Lender under this paragraph are in addition to other rights and remedies (including other rights of setoff) which the Administrative Agent or such Lender may have.

11.8     Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by e-mail or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

11.9     Integration. Except for matters set forth in the Fee Letter, this Agreement and the other Loan Documents represent the entire agreement of the Loan Parties, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Lender relative to the subject matter hereof or thereof not expressly set forth or referred to herein or in the other Loan Documents.

11.10   GOVERNING LAW; NO THIRD PARTY RIGHTS. (a) **THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND THE TERM LOANS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND THE TERM LOANS SHALL, EXCEPT AS OTHERWISE PROVIDED IN ANY MORTGAGE OR OTHER LOAN DOCUMENT, BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK. THIS AGREEMENT IS SOLELY FOR THE BENEFIT OF THE PARTIES HERETO AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND, EXCEPT AS SET FORTH IN SUBSECTION 11.6, NO OTHER PERSONS SHALL HAVE ANY RIGHT, BENEFIT, PRIORITY OR INTEREST UNDER, OR BECAUSE OF THE EXISTENCE OF, THIS AGREEMENT.**

(b)     **EACH OF THE LENDERS AND THE ADMINISTRATIVE AGENT HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT, NOTWITHSTANDING THE GOVERNING LAW PROVISIONS OF ANY APPLICABLE LOAN DOCUMENT, ANY CLAIMS BROUGHT AGAINST THE ADMINISTRATIVE AGENT BY ANY SECURED PARTY RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT, THE COLLATERAL OR THE CONSUMMATION OR ADMINISTRATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.**

11.11   SUBMISSION TO JURISDICTION; WAIVERS. **EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY:**

(i)     **SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS CREDIT AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, OR FOR RECOGNITION AND**

115

145909348v39

ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE EXCLUSIVE GENERAL JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN (OR IF SUCH COURT LACKS SUBJECT MATTER JURISDICTION, THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN), AND THE APPELLATE COURTS FROM ANY THEREOF;

(ii)     CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS, AND WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREES NOT TO PLEAD OR CLAIM THE SAME;

(iii)     AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS SET FORTH IN SUBSECTION 11.2 OR AT SUCH OTHER ADDRESS OF WHICH THE ADMINISTRATIVE AGENT SHALL HAVE BEEN NOTIFIED PURSUANT THERETO;

(iv)     AGREES THAT NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF THE ADMINISTRATIVE AGENT OR ANY LENDER TO SUE ANY LOAN PARTY IN ANY OTHER JURISDICTION;

(v)     WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO IN THIS SECTION ANY SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES; PROVIDED, HOWEVER, THAT NOTHING CONTAINED IN THIS CLAUSE (v) SHALL LIMIT OR IMPAIR THE BORROWER'S INDEMNIFICATION OR REIMBURSEMENT OBLIGATIONS UNDER SUBSECTION 11.5 IN RESPECT OF ANY THIRD PARTY CLAIMS ALLEGING SUCH SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES; AND

(vi)     EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO IN PARAGRAPH (a) ABOVE.

11.12   Acknowledgements. Each of Parent and the Borrower hereby acknowledges that:

(a)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

116

145909348v39

(b)     none of the Administrative Agent or any Lender has any fiduciary relationship to any Loan Party, and the relationship between the Administrative Agent and the Lenders, on the one hand, and the Loan Parties, on the other hand, is solely that of creditor and debtor; and

(c)     no joint venture exists among the Lenders or among any Loan Parties and the Lenders.

11.13    Releases of Guarantees and Liens.

(a)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by subsection 11.1) and the Administrative Agent hereby agrees to take any action requested by the Borrower having the effect of releasing or evidencing the release of any Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with subsection 11.1 or (ii) under the circumstances described in paragraph (b) below.

(b)     At such time as the Term Loans and the other obligations under the Loan Documents (other than contingent indemnity obligations not due and payable) shall have been paid in full in cash, the Collateral shall be released from the Liens created by the Guarantee and Collateral Agreement, and the Guarantee and Collateral Agreement and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent and each Loan Party under the Guarantee and Collateral Agreement shall terminate, all without delivery of any instrument or performance of any act by any Person.

11.14    [Reserved].

11.15    Confidentiality. Each of the Administrative Agent and each Lender agrees to keep confidential all Information (as defined below) provided to it by any Loan Party, the Administrative Agent or any Lender pursuant to or in connection with this Agreement; provided that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information (a) to the Administrative Agent or any other Lender, (b) subject to an agreement to comply with confidentiality provisions at least as restrictive as those of this Section, to any actual or prospective Transferee or any pledgee referred to in subsection 11.6(f) or any direct or indirect counterparty to any swap agreement (or any professional advisor to such counterparty), (c) to its Affiliates or to its employees, directors, agents, attorneys, accountants and other professional advisors or those of any of its Affiliates (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential), (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed (other than in violation of this subsection 11.15), (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment

117

portfolio in connection with ratings issued with respect to such Lender (it being understood that any rating agency to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential) or (i) in connection with the exercise of any remedy hereunder or under any other Loan Document; provided that, unless prohibited by applicable law or court order, such Lender or the Administrative Agent shall use reasonable efforts to notify the Borrower of any disclosure pursuant to clauses (d) or (e). For the purposes of this Section, "Information" means all information received from any Loan Party relating to the Borrower, its Subsidiaries or their business, other than any such information that is available to the Administrative Agent or any Lender on a non-confidential basis prior to disclosure by the Borrower and other than information pertaining to this Agreement routinely provided by arrangers to data service providers, including league table providers, that serve the lending industry.

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other Loan Documents will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities. Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

11.16  Usury Savings. Notwithstanding any other provision herein, the aggregate interest rate charged hereunder, including all charges or fees in connection therewith deemed in the nature of interest under applicable law, shall not exceed the Highest Lawful Rate (as such term is defined below). If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate (as defined below), the outstanding amount of the Term Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if and when the Term Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Borrower shall pay to the Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of the Lenders and the Borrower to conform strictly to any applicable usury laws. Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if

118

145909348v39

previously paid, shall at such Lender's option be applied to the outstanding amount of the Term Loans made hereunder or be refunded to the Borrower. As used in this paragraph, the term "Highest Lawful Rate" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to such Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

11.17   Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

11.18   Patriot Act. Each Lender that is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act") hereby notifies the Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrower and each other Loan Party, which information includes the name and address of the Borrower and each other Loan Party and other information that will allow such Lender to identify the Borrower and each other Loan Party in accordance with the Act.

11.19   Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)   the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)   the effects of any Bail-In Action on any such liability, including, if applicable:

(i)   a reduction in full or in part or cancellation of any such liability;

(ii)   a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

119

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

145909348v39

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

**BORROWER:**                        CUMULUS MEDIA HOLDINGS INC.

By: _____

Name: _____

Title: _____

121

145909348v39

**<u>PARENT</u>:**                                    CUMULUS MEDIA INC.

By: _____
Name: _____
Title: _____

145909348v39

WILMINGTON    TRUST,    NATIONAL
ASSOCIATION, as Administrative Agent

By: _____
Name: _____
Title: _____

145909348v39

**LENDERS:**

                                       _____,
as a Lender

By: _____
Name: _____
Title: _____

145909348v39

EXHIBIT F-1

[FORM OF]

## U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit Agreement dated as of [    ] (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among [   ], and each lender from time to time party thereto.

Pursuant to the provisions of subsection 4.20(g) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Term Loan(s) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. person status on IRS Form W-8BEN or IRS Form W-8BEN-E.  By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]


By:_____
Name:
Title:

Date: _____ __, 20[  ]

EXHIBIT F-2

[FORM OF]
U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)


Reference is hereby made to the Credit Agreement dated as of [    ] (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among [   ], and each lender from time to time party thereto.

Pursuant to the provisions of subsection 4.20(g) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]


By:_____
Name:
Title:

Date: _____ __, 20[  ]

145909348v39

EXHIBIT F-3

[FORM OF]

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit Agreement dated as of [    ] (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among [   ], and each lender from time to time party thereto.

Pursuant to the provisions of subsection 4.20(g) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption:  (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]


By:_____
Name:
Title:

Date: _____ __, 20[  ]


145909348v39

EXHIBIT F-4

[FORM OF]

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit Agreement dated as of [    ] (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among [    ], and each lender from time to time party thereto.

Pursuant to the provisions of subsection 4.20(g) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption:  (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]


By:_____
Name:
Title:

Date: _____ __, 20[   ]


145909348v39

## EXHIBIT H

**Warrant Agreement**

WARRANT AGREEMENT


between


CUMULUS MEDIA INC.


and


[•],
AS WARRANT AGENT


Dated as of [•], 2018

This WARRANT AGREEMENT (the "*Agreement*") is dated as of [●], 2018, between CUMULUS MEDIA INC., a Delaware corporation (the "*Company*" or "*Cumulus*"), and [●], a [●], as warrant agent (the "*Warrant Agent*").

<u>W I T N E S S E T H</u>

WHEREAS, pursuant to the Joint Plan of Reorganization of the Company and certain of its affiliates, as confirmed on [●], 2018 by order of the United States Bankruptcy Court for the Southern District of New York, as the same may be amended, modified or supplemented from time to time in accordance with the terms thereof (the "*Plan*"), the Company proposes to issue Series 1 warrants (the "*Series 1 Warrants*") and Series 2 warrants (the "*Series 2 Warrants*" and, together with the Series 1 Warrants, the "*Warrants*") entitling the holders thereof to purchase shares of the Company's class A common stock, par value $0.001 per share (the "*Class A Common Stock*") or class B common stock, par value $0.001 per share (the "*Class B Common Stock*").

WHEREAS, on the Effective Date (i) Series 1 Warrants will be issued to certain holders of Allowed Credit Agreement Claims, Allowed Senior Notes Claims and Allowed General Unsecured Claims (each as defined in the Plan, and together, the "*Claimants*") that returned ownership certifications attached to the FCC Ownership Procedures Order (the "*Plan Certifications*") by the Certification Deadline and are thus entitled to receive their pro rata distribution of Class A Common Stock and/or Class B Common Stock on the Effective Date in accordance with the Equity Allocation Mechanism; and (ii) the Series 2 Warrants will be issued to Claimants that failed to return Plan Certifications by the Certification Deadline and thus are only entitled to receive Warrants on the Effective Date under the Plan.

WHEREAS, the Warrant Agent, at the request of the Company, has agreed to act as the agent of the Company in connection with the issuance, registration, transfer, exchange, exercise and conversion of the Warrants.

WHEREAS, the Company desires to enter into this Agreement to set forth the terms and conditions of the Warrants and the rights and obligations of the Company, the Warrant Agent, the Registered Holders and the Holders.

WHEREAS, capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in the Plan.

NOW, THEREFORE, in consideration of the premises and mutual agreements set forth herein and in the Plan, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

**Section 1.1     Certain Defined Terms**.

Capitalized terms used in this Agreement shall have the following respective meanings, except as otherwise provided herein or as the context shall otherwise require:

"***100% Domestic Holder***" means a Holder that submits an Ownership Certification or Plan Certification certifying that 100% of its voting interests and equity interests are owned by U.S. Citizens or U.S. Entities (each as defined in the Ownership Certification).

"***Act***" means the Communications Act of 1934, as amended.

"***Affiliate***" means, with respect to any Person, (i) any other Person of which securities or other ownership interests representing more than fifty percent (50%) of the voting interests are, at the time such determination is being made, owned, Controlled or held, directly or indirectly, by such Person or (ii) any other Person which, at the time such determination is being made, is Controlling, Controlled by or under common Control with, such Person. As used herein, "***Control,***" whether used as a noun or verb, refers to the possession, directly or indirectly, of the power to direct, or cause the direction of, the management or policies of a Person, whether through the ownership of voting securities or otherwise.

"***Agreement***" has the meaning specified in the introduction of this Agreement.

"***Board of Directors***" means the board of directors of the Company and may include a subcommittee of the board of directors appointed by the board of directors to represent the board of directors with respect to this Agreement.

"***Book-Entry Warrants***" shall mean Warrants issued by book-entry registration in the books and records of the Warrant Agent.

"***Business Day***" means any day which is not a day on which banking institutions in New York City, New York are authorized or obligated by law or executive order to close.

"***Certificate of Incorporation***" means the [●] Certificate of Incorporation of the Company, adopted as of the Effective Date, as the same may be amended or restated from time to time.

"***Change of Control***" means the occurrence of (A) any consolidation or merger of the Company with or into any other entity, or any other corporate reorganization or transaction (including the acquisition of capital stock of the Company), whether or not the Company is a party thereto, in which the stockholders of the Company immediately prior to such consolidation, merger, reorganization or other transaction, own capital stock either (I) representing directly, or indirectly through one or more entities, less than 50% of the economic interests in or voting power of the Company or other surviving entity immediately after such consolidation, merger, reorganization or other transaction or (II) that does not directly, or indirectly through one or more entities, have the power to elect a majority of the entire board of the directors of the Company or other surviving entity immediately after such consolidation, merger, reorganization or other transaction, or (B) any transaction or series of related transactions, whether or not the Company is a party thereto, after giving effect to which in excess of 50% of the Company's voting power is owned by any Person or "group" (as such term is used in Rule 13d-5 under the Exchange Act); *provided* that any consolidation or merger effected exclusively to change the domicile of the Company or to form a holding company in which the stockholders of the Company immediately prior to such consolidation or merger own capital stock representing economic interests and

2

Doc#: US1:11847348v20

voting power with respect to such redomiciled entity or holding company in substantially the same proportions as their ownership of capital stock of the Company shall be excluded from clauses (A) and (B) above.

"***Class A Common Stock***" has the meaning specified in the Recitals of this Agreement.

"***Class B Common Stock***" has the meaning specified in the Recitals of this Agreement.

"***Common Stock***" means the Class A Common Stock and the Class B Common Stock of the Company, or shares of any class or classes resulting from any reclassification or reclassifications thereof and which have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company and which are not subject to redemption by the Company.

"***Commission***" means the Securities and Exchange Commission, or any other federal agency at the time administering the Securities Act or the Exchange Act, whichever is the relevant statute for the particular purpose.

"***Communication***" has the meaning specified in Section 9.3(a).

"***Company***" has the meaning specified in the introduction of this Agreement.

"***Declaratory Ruling***" means a declaratory ruling adopted by the FCC granting the relief requested in the Company's Petition for Declaratory Ruling.

"***Depositary***" has the meaning specified in Section 2.1.

"***Election Form***" means the election form to be used in the Exchange, which will be substantially similar to the Exercise Form, which Election Form will be attached to the Exchange Notice.

"***Exchange***" has the meaning specified in Section 3.4.

"***Exchange Ratio***" has the meaning specified in Section 3.4.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended.

"***Exchange Date***" has the meaning specified in Section 3.4.

"***Exchange Notice***" has the meaning specified in Section 3.4.

"***Exchange Period***" means the period beginning on the fifth Business Day following the date of the Exchange Notice through the Exchange Date; provided, however, that if the Company determines that the Declaratory Ruling will not permit the Company to Exchange any of the Warrants for shares of Common Stock pursuant to Section 3.4, there shall be no Exchange Period.

3

"***Exercise Form***" has the meaning specified in Section 3.3.

"***Exercise Price***" means $0.001 per share of Common Stock, which amount is not subject to adjustment.

"***Expiration Date***" means, with respect to any Warrant, [●], 2038, the twentieth anniversary of the Original Issuance Date, or, if earlier, the date of the consummation of a Change of Control pursuant to which the provisions of Section 4.1(c) apply.

"***FCC***" means the Federal Communications Commission and any successor governmental agency performing functions similar to those performed by the Federal Communications Commission on the Effective Date.

"***FCC Restrictions***" means the FCC ownership and transfer restrictions set forth in Section [●] of the Certificate of Incorporation.

"***FCC Rules***" means the decisions, rules and policies of the FCC.

"***Foreign Share Amount***" has the meaning specified in Section 3.4.

"***Global Warrant Certificate***" shall mean evidence of Warrants in the form of a global certificate registered in the name of Cede & Co., with the forms of election to exercise and of assignment printed on the reverse thereof, in substantially the form set forth in Exhibit A-2 attached hereto.

"***Governmental Authority***" means (i) any nation or government, (ii) any federal, state, county, province, city, town, municipality, local or other political subdivision thereof or thereto, (iii) any court, tribunal, department, commission, board, bureau, instrumentality, agency, council, arbitrator or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and (iv) any other governmental entity, agency or authority having or exercising jurisdiction over any relevant Person, item or matter.

"***Holders***" means the registered holders of Book-Entry Warrants in the Warrant Register and the holders of beneficial interests in a Global Warrant Certificate.

"***Laws***" means all laws, statutes, rules, regulations, ordinances, orders, writs, injunctions or decrees and other pronouncements having the effect of law of any Governmental Authority.

"***Non-100% Domestic Holder***" means any Holder that is not a 100% Domestic Holder.

"***Original Issuance Date***" means [●], 2018, the Effective Date of the Plan.

"***Ownership Certification***" means a written certification, in substantially the form attached hereto as Exhibit B, for the purpose of enabling the Company to determine (i) a Holder's potential level of direct and indirect foreign voting and equity interests in accordance with 47 U.S.C. § 310(b) of the Act, as interpreted and applied by the FCC in the FCC Rules; and

4

(ii) whether the holding of more than 4.99% of the outstanding Class A Common Stock by such certifying party would result in a violation of the FCC Rules.

"*Person*" means any individual, limited liability company, company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Authority or other entity or enterprise and shall include any successor (by merger or otherwise) of such entity.

"*Plan*" has the meaning specified in the Recitals of this Agreement.

"*Plan Certificate*" has the meaning specified in the Recitals of this Agreement.

"*Pre-Exchange Period*" means the period from the Original Issuance Date to the earlier of (i) the Exchange Date or (ii) if the Company determines that the Declaratory Ruling will not permit the Company to Exchange any of the Warrants for shares of Common Stock pursuant to Section 3.4, the date of the Exchange Notice.

"*Qualifying Non-100% Domestic Holder*" has the meaning set forth in Section 3.4.

"*Registered Holders*" means the registered holders of Book-Entry Warrants and Global Warrant Certificates in the Warrant Register.

"*Restricted Stock*" has the meaning set forth in Section 2.2.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Series 1 Warrants*" has the meaning specified in the Recitals of this Agreement.

"*Series 2 Warrants*" has the meaning specified in the Recitals of this Agreement.

"*Term Loan Holder*" means a Holder of an Allowed Credit Agreement Claim as of record as of the Distribution Record Date (as determined by the register maintained by the Credit Agreement Agent); *provided*, that the Company has verified to the Warrant Agent that such Holder appears on the register maintained by the Credit Agreement Agent.

"*Transfer*" means any voluntary or involuntary attempt to, directly or indirectly through the transfer of interests in controlled Affiliates or otherwise, sell, assign, transfer, grant a participation in, pledge or otherwise dispose of any Warrants, or the consummation of any such transaction, or taking a pledge of, any of the Warrants; *provided*, *however,* that a transaction that is a pledge shall not be deemed to be a Transfer, but a foreclosure pursuant thereto shall be deemed to be a Transfer. The term "*Transferred*" shall have a correlative meaning.

"*Transfer Notice*" means a written notice, substantially in the form of the Forms of Assignment set forth on Exhibits A-1 and A-2 attached hereto, which states (i) the name, address, facsimile number and e-mail address of the transferor and the transferee, (ii) the number of Warrants and underlying shares of Common Stock subject to the proposed Transfer and (iii) the proposed date of completion of the proposed Transfer.

5

"*Warrants*" has the meaning specified in the Recitals of this Agreement.

"*Warrant Agent*" has the meaning specified in the introduction of this Agreement.

"*Warrant Election*" has the meaning specified in Section 3.4(b).

"*Warrant Register* " has the meaning specified in Section 2.3(d).

"*Warrant Statements* " shall mean the certain statements, in substantially the form set forth in Exhibit A-1 attached hereto, issued by the Warrant Agent from time to time to the Holders of Book-Entry Warrants evidencing such book-entry position in the Warrant Register.

### Section 1.2    Interpretation.

In this Agreement, unless a clear contrary intention appears:

(a)    the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement;

(b)    reference to any gender includes each other gender and the neuter;

(c)    all terms defined in the singular shall have the same meanings in the plural and vice versa;

(d)    reference to any Person includes such Person's heirs, executors, personal representatives, administrators, successors and assigns; *provided, however,* that nothing contained in this clause (d) is intended to authorize any assignment not otherwise permitted by this Agreement;

(e)    reference to a Person in a particular capacity or capacities excludes such Person in any other capacity;

(f)    reference to any contract or agreement means such contract or agreement as amended, supplemented or modified from time to time in accordance with the terms thereof;

(g)    all references to Articles and Sections shall be deemed to be references to the Articles and Sections of this Agreement;

(h)    all references to Exhibits shall be deemed to be references to the Exhibits attached hereto which are made a part hereof and incorporated herein by reference;

(i)    the word "including" (and with correlative meaning "include") means including, without limiting the generality of any description preceding such term;

6

(j)      with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding";

(k)      the captions and headings contained in this Agreement shall not be considered or given any effect in construing the provisions hereof if any question of intent should arise;

(l)      reference to any Law means such Law as amended, modified, codified, reenacted, supplemented or superseded in whole or in part, and in effect from time to time;

(m)      where any provision of this Agreement refers to action to be taken by any Person, which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person; and

(n)      no provision of this Agreement shall be interpreted or construed against any party solely because that party or its legal representative drafted such provision.

## ARTICLE II

## ORIGINAL ISSUE OF WARRANTS

**Section 2.1      Form of Warrant**.

(a)      The Warrants to be delivered pursuant to this Agreement shall be issued, at the discretion of the Company, either (i) via book-entry registration on the books and records of the Warrant Agent and evidenced by the Warrant Statements, in substantially the form set forth in Exhibit A-1 attached hereto or (ii), after the Exchange Date, solely with respect to Series 1 Warrants, in the form of one or more Global Warrant Certificates, with the forms of election to exercise and of assignment printed on the reverse thereof, substantially in the form set forth in Exhibit A-2 attached hereto. The Warrant Statements and Global Warrant Certificates may bear such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may be required to comply with any Law or with any rules made pursuant thereto or with any rules of any securities exchange or as may, consistently herewith, be determined by the Company.

(b)      Each Series 1 Warrant shall represent the right, subject to the provisions of this Agreement and the Warrant Statement or Global Warrant Certificate, to purchase one (1) share of Class A Common Stock or Class B Common Stock (subject to adjustment as set forth in Section 4.1) at the Exercise Price.  Each Series 2 Warrant shall represent the right, subject to the provisions of this Agreement and the Warrant Statement or Global Warrant Certificate, to purchase one (1) share of Class A Common Stock or Class B Common Stock (subject to adjustment as set forth in Section 4.1) at the Exercise Price.  If the Company determines that any Series 2 Warrant submitted for exercise is not eligible to be exercised for Common Stock in accordance with Section 3.2, such Series 2 Warrant will be

7

exchanged for a Series 1 Warrant.  At the election of a Term Loan Holder on its Exercise Form or Election Form, as applicable, Common Stock issued upon exercise or exchange of the Warrants shall be issued in the form of Restricted Stock. The determination of whether a Holder is entitled to receive Class A Common Stock or Class B Common Stock upon exercise of a Warrant (and the determination of the number of Warrants exercisable for shares of Common Stock with respect to any Holder at the time of such exercise) shall be made by the Company in accordance with Section 3.2, taking into consideration the elections of such Holder on its Exercise Form.

(c)      The Global Warrant Certificates, if any, shall be deposited on or after the Exchange Date with [●] and registered in the name of Cede & Co., as the nominee of The Depository Trust Company (the "*Depositary*"). Each Global Warrant Certificate shall represent such number of outstanding Warrants as specified therein, and each shall provide that it shall represent the aggregate amount of outstanding Warrants from time to time endorsed thereon and that the aggregate amount of outstanding Warrants represented thereby may from time to time be reduced or increased, as appropriate, in accordance with the terms of this Agreement.

**Section 2.2     Legends**.

(a)      Each Warrant Statement shall bear a legend in substantially the following form prior to the end of the Exchange Period:

"THE WARRANTS REPRESENTED BY THIS STATEMENT ARE SUBJECT TO CERTAIN RESTRICTIONS ON EXERCISE, TRANSFER, SALE, ASSIGNMENT, PLEDGE, ENCUMBRANCE OR OTHER SIMILAR TRANSFER AS SET FORTH IN THE WARRANT AGREEMENT AMONG THE COMPANY AND THE WARRANT AGENT (ON BEHALF OF THE ORIGINAL HOLDERS OF THE WARRANT SHARES) (THE "WARRANT AGREEMENT"). DURING THE EXCHANGE PERIOD, THE WARRANTS (AND ANY BENEFICIAL INTERESTS THEREIN) MAY NOT BE TRANSFERRED (AS DEFINED IN THE WARRANT AGREEMENT) AND THE WARRANTS MAY NOT BE EXERCISED. COPIES OF THE WARRANT AGREEMENT MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY."

(b)      Each Global Warrant Certificate shall bear a legend in substantially the following form:

"THIS WARRANT HAS BEEN, AND THE COMMON STOCK WHICH MAY BE PURCHASED PURSUANT TO THE EXERCISE OF THIS WARRANT (THE "*WARRANT SHARES*," AND TOGETHER WITH THIS WARRANT, THE "*SECURITIES*") WILL BE, ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY REFORM ACT OF 1978, AS AMENDED (THE "*BANKRUPTCY CODE*"). THE SECURITIES MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF THE

8

Doc#: US1:11847348v20

BANKRUPTCY CODE, THEN THE SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR (2) THE COMPANY IS IN RECEIPT OF AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND ITS COUNSEL THAT SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS. THIS WARRANT MUST BE SURRENDERED TO THE COMPANY OR ITS WARRANT AGENT AS A CONDITION PRECEDENT TO THE SALE, PLEDGE OR OTHER TRANSFER OF ANY INTEREST IN ANY OF THE WARRANT SHARES REPRESENTED BY THIS WARRANT.

THE SECURITIES REPRESENTED BY THIS WARRANT ARE SUBJECT TO CERTAIN RESTRICTIONS ON EXERCISE, TRANSFER, SALE, ASSIGNMENT, PLEDGE, ENCUMBRANCE OR OTHER SIMILAR TRANSFER AS SET FORTH IN THE [●] CERTIFICATE OF INCORPORATION OF THE COMPANY AND A WARRANT AGREEMENT AMONG THE COMPANY AND THE WARRANT AGENT (ON BEHALF OF THE ORIGINAL HOLDERS OF THE WARRANT SHARES), COPIES OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY."

(c)     Each Holder and Registered Holder further acknowledges and agrees that the Common Stock issued upon exercise of the Warrant if certificated shall bear a legend substantially in the form of the second paragraph of the legend appearing above, and any other legends required by applicable federal and state securities laws, the Certificate of Incorporation of the Company or otherwise called for by this Agreement or any other agreement between the Company, on the one hand, and the Registered Holder and the Holder, on the other hand.  In addition, Term Loan Holders may elect upon the exercise or exchange of Warrants pursuant to this Agreement (on an Exercise Form or Election Form, as applicable) to receive Common Stock with restrictions on transfer as set forth in the legend below ("*Restricted Stock*"):

"THE SECURITY EVIDENCED HEREBY (THIS "*SECURITY*") MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED FOR A PERIOD OF TWO (2) CALENDAR DAYS FOLLOWING DELIVERY OF THIS SECURITY FROM THE TRANSFER AGENT DESIGNATED BY THE ISSUER OF THIS SECURITY (THE "*TRANSFER AGENT*") TO THE INITIAL HOLDER (THE "*RESTRICTED PERIOD*"). AFTER THE RESTRICTED PERIOD, THIS SECURITY MAY ONLY BE OFFERED, SOLD OR OTHERWISE TRANSFERRED FOLLOWING A REQUEST BY THE INITIAL HOLDER TO THE TRANSFER AGENT TO REMOVE THIS RESTRICTIVE LEGEND."

**Section 2.3     Execution and Delivery of Warrants**.

(a)     The Global Warrant Certificates shall be executed in the corporate name and on behalf of the Company by the Chairman of the Board, the Chief Executive Officer, the President or any one of the Senior Vice Presidents or Executive Vice Presidents of the Company and attested to by the Secretary or one of the Assistant Secretaries of the Company, either manually or by facsimile signature printed thereon. In the event that any officer of the Company whose signature shall have been placed upon any of the Global Warrant Certificates

9

Doc#: US1:11847348v20

shall cease to be such officer of the Company before countersignature by the Warrant Agent and the issuance and delivery thereof, such Global Warrant Certificates may, nevertheless, be countersigned by the Warrant Agent and issued and delivered with the same force and effect as though such person had not ceased to be such officer of the Company.

(b)     From time to time, as required by and in accordance with the terms and conditions of the Plan, the Company shall instruct the Warrant Agent, in writing, to issue to Claimants, Warrants representing such number of shares of Common Stock as determined by the Company. The Warrant Agent shall, and is hereby authorized to, countersign, issue and deliver, as applicable, Warrant Statements or Global Warrant Certificates evidencing such Warrants as and when so instructed by the Company.

(c)     The Warrant Agent is hereby authorized to countersign, issue and deliver, as applicable, Book-Entry Warrants and Global Warrant Certificates as required by Section 2.4 or Section 3.4 (in the case of a transfer or exchange), Section 3.3(c) (in the case of the exercise of less than all the Warrants represented by the surrendered Book-Entry Warrants or Global Warrant Certificate) or ARTICLE V (in the case of a lost, stolen, destroyed or mutilated Warrant Statement or Global Warrant Certificate).

(d)     Upon receipt of written instructions from the Company, Global Warrant Certificates shall be countersigned, by manual or facsimile signature, and dated the date of countersignature by the Warrant Agent and shall not be valid for any purpose unless so countersigned. A register of each series of the Warrants and of their transfer shall be maintained at the Warrant Agent's principal office by the Warrant Agent (the "Warrant Register").  The Company hereby appoints the Warrant Agent to act as the registrar with respect to the Warrants. The Warrant Register shall show the names and address of the Registered Holders of each series of the Warrants and the number of Warrants of each series owned by each Registered Holder.

(e)     The Company and the Warrant Agent may deem and treat the Registered Holder(s) of a Warrant as the absolute owner(s) thereof (notwithstanding any notation of ownership or other writing thereon made by anyone), for the purpose of any exercise thereof or any distribution to the Registered Holder(s) thereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

**Section 2.4     Certain Transfer and Exercise Restrictions**.

Subject to the requirements of this Section 2.4, Warrants are freely transferable; *provided* that if any change in federal Laws shall impose limitations on the transferability of Warrants, a Transfer shall be permitted only to the extent that such limitations have been satisfied.  Notwithstanding the foregoing, the Warrants (and any beneficial interests therein) will not be transferable during the Exchange Period, and the Warrant Agent shall not register any Transfers during the Exchange Period.

(a)     The Warrant Agent shall register in the Warrant Register transfers and exchanges of Book-Entry Warrants and Global Warrant Certificates as provided in this Agreement. The transfer and exchange of beneficial interests in Global Warrant Certificates shall

10

be affected through the Depositary, in accordance with this Agreement and the procedures of the Depositary therefor.

(b)       No Registered Holder shall effect any Transfer of all or any portion of the Warrants, unless and until (i) such Registered Holder shall have provided a Transfer Notice to the Warrant Agent and (ii) if reasonably requested by the Company, such Registered Holder shall have furnished the Company and the Warrant Agent with an opinion of counsel reasonably satisfactory to the Company that such disposition will not require registration of such Warrants (or if and when exercised, the shares of Common Stock underlying the Warrants) under the Securities Act.

(c)       Subject to Section 2.4(b), a Registered Holder may Transfer its Warrants by written application to the Warrant Agent stating the name of the proposed transferee and otherwise complying with the terms of this Agreement and all applicable Laws. No such Transfer shall be effected until, and such transferee shall succeed to the rights of a Registered Holder only upon, final acceptance and registration of the Transfer by the Warrant Agent in the Warrant Register in accordance with this Agreement. Prior to due presentation for registration of Transfer, the Company, the Warrant Agent and any agent of the Company may deem and treat the Person in whose name the Warrants are registered as the absolute owner thereof for all purposes (notwithstanding any notation of ownership or other writing thereon made by anyone), and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or an interest in any Warrants on the part of any other Person and shall not be liable for any registration of Transfer of Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary unless made with actual knowledge that a fiduciary or nominee is committing a breach of trust in requesting such registration of transfer or with such knowledge of such facts that its participation therein amounts to bad faith. When Warrant Statements or Global Warrant Certificates are presented to the Warrant Agent with a request to register the Transfer thereof or to exchange them for an equal number of Warrants of other authorized denominations, the Warrant Agent shall register the Transfer or make the exchange as requested if the requirements of this Agreement for such transaction are met. To permit registrations of Transfers and exchanges, the Company shall execute Global Warrant Certificates at the Warrant Agent's request. No service charge shall be made for any registration of Transfer or exchange of Warrants, but the Company or the Warrant Agent may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection with any registration of Transfer of Warrants.

(d)       Except as otherwise provided in this Section 2.4 or in Section 3.4, all Book-Entry Warrants and Global Warrant Certificates issued upon any registration of transfer or exchange of Warrants shall be the valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Agreement, as the Book-Entry Warrants or Global Warrant Certificates surrendered for registration of transfer or exchange.

(e)       The Board of Directors shall have the power to determine, in its sole and absolute discretion, all matters related to this Section 2.4, including matters necessary or desirable to administer or to determine compliance with this Section 2.4 and, absent manifest error, the determinations of the Board of Directors shall be final and binding on the Company, the Registered Holders and the Holders.

11

Doc#: US1:11847348v20

(f)      In the event of any purported Transfer in violation of the provisions of this Agreement, such purported Transfer shall be void and of no effect and the Warrant Agent shall not give effect to such Transfer.

(g)      Unless and until it is exchanged in whole for a Book-Entry Warrant, a Global Warrant Certificate may not be transferred as a whole except (i) with the prior written consent of the Company and (ii) by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the Depositary or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary.

(h)      If at any time, (i) the Depositary for the Global Warrant Certificates notifies the Company that the Depositary is unwilling or unable to continue as Depositary for the Global Warrant Certificates and a successor Depositary for the Global Warrant Certificates is not appointed by the Company within 90 days after delivery of such notice or (ii) the Company, in its sole discretion, notifies the Warrant Agent in writing that all Warrants shall be exclusively represented in the form of Book-Entry Warrants, then the Warrant Agent, upon written instructions signed by the Chairman of the Board, President, Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, any Senior Vice President or Executive Vice President, the Treasurer or Secretary of the Company, and all other necessary information, shall register Book-Entry Warrants in an aggregate number equal to the number of Warrants represented by the Global Warrant Certificates, in exchange for such Global Warrant Certificates in such names and in such amounts as directed by the Depositary or, in the absence of instructions from the Depositary, by the Company.

(i)      Any Holder of a beneficial interest in a Global Warrant Certificate may, upon request, exchange such beneficial interest for a Book-Entry Warrant. Upon receipt by the Warrant Agent from the Depositary or its nominee of (i) written instructions or such other form of instructions as is customary for the Depositary on behalf of any Person having a beneficial interest in a Global Warrant Certificate and (ii) all other necessary information required by the Warrant Agent, in accordance with the standing instructions and procedures existing between the Depositary and Warrant Agent; then, the Warrant Agent shall cause the number of Warrants represented by the Global Warrant Certificate to be reduced by the number of Warrants to be represented by the Book-Entry Warrant to be issued in exchange for the beneficial interest of such Person in the Global Warrant Certificate. Following such reduction, the Warrant Agent shall register in the name of the Holder the Book-Entry Warrant and deliver to said Holder a Warrant Statement. Such Book-Entry Warrant issued in exchange for a beneficial interest in a Global Warrant Certificate shall be registered in such name as the Depositary, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Warrant Agent. The Warrant Agent shall deliver such Warrant Statement to the Person in whose name such Warrants are so registered.

(j)      A Book-Entry Warrant may not be exchanged for a beneficial interest in a Global Warrant Certificate except upon satisfaction of the requirements set forth below. Upon receipt by the Warrant Agent of appropriate instruments of transfer with respect to the Book-Entry Warrant, in form satisfactory to the Warrant Agent, together with written instructions directing the Warrant Agent to make, or to direct the Depositary to make, an

12

Doc#: US1:11847348v20

endorsement on the Global Warrant Certificate to reflect an increase in the number of Warrants represented by the Global Warrant Certificate equal to the number of Warrants represented by such Book-Entry Warrant, and all other necessary information, then the Warrant Agent shall cancel such Book-Entry Warrant on the Warrant Register and cause, or direct the Depositary to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Warrant Agent, the number of Warrants represented by the Global Warrant Certificate to be increased accordingly. If no Global Warrant Certificates are then outstanding, the Company shall issue and the Warrant Agent shall either manually or by facsimile countersign a new Global Warrant Certificate representing the appropriate number of Warrants; *provided*, that the Warrant Agent shall not effect any exchanges pursuant to this Section 2.4(k) during the Pre-Exchange Period or if the Company, in its sole discretion, has notified the Warrant Agent in writing that all Warrants shall be exclusively represented in the form of Book-Entry Warrants.

(k)    At such time as all beneficial interests in Global Warrant Certificates have either been exchanged for Book-Entry Warrants, repurchased or canceled, all Global Warrant Certificates shall be returned to, or retained and canceled by, the Warrant Agent, upon written instructions from the Company satisfactory to the Warrant Agent.

**Section 2.5    Surrender and Cancellation of Warrants**.

Any Book-Entry Warrant or Global Warrant Certificate surrendered for registration of transfer, exchange or exercise of the Warrants represented thereby or pursuant to Sections 3.4, 4.1(c), 6.3 or 6.4 shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Book-Entry Warrants or Global Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly canceled by the Warrant Agent and shall not be reissued by the Company or the Warrant Agent and, except as provided in Sections 2.4 or 3.4 (in the case of a transfer or exchange), Section 3.3(c) (in the case of the exercise of less than all the Warrants represented by the surrendered Book-Entry Warrant or Global Warrant Certificate) or ARTICLE V (in the case of a lost, stolen, destroyed or mutilated Warrant Statement or Global Warrant Certificate), no Book-Entry Warrant or Global Warrant Certificate shall be issued hereunder in lieu thereof. On request of the Company, the Warrant Agent (*provided* that any retention periods established by the Commission have expired) shall destroy canceled Global Warrant Certificates held by it and shall deliver its certificates of destruction to the Company. The Warrant Agent shall destroy all canceled Global Warrant Certificates in accordance with its normal procedures, or retain such Global Warrant Certificates as may be required by applicable Laws.

**ARTICLE III**

**EXERCISE PRICE; EXERCISE AND EXCHANGE OF WARRANTS**

**Section 3.1    Exercise Price**.

(a)    Each Series 1 Book-Entry Warrant or beneficial interest in a validly-countersigned Series 1 Global Warrant Certificate shall entitle the Holder thereof, subject to the provisions of this Agreement and the Warrant Statement or Global Warrant Certificate, to purchase one (1) share of Class A Common Stock or Class B Common Stock (subject to

13

adjustment as provided in <u>Section 4.1</u>) for each Series 1 Warrant represented thereby at the Exercise Price, payable in full at the time of purchase.

(b)    Each Series 2 Book-Entry Warrant shall entitle the Holder thereof, subject to the provisions of this Agreement and the Warrant Statement, to purchase one (1) share of Class A Common Stock or Class B Common Stock (subject to adjustment as provided in <u>Section 4.1</u>) at the Exercise Price, payable in full at the time of purchase.

(c)    At the election of a Term Loan Holder on its Exercise Form or Election Form, as applicable, Common Stock issued upon exercise or exchange of the Warrants shall be issued in the form of Restricted Stock.

**Section 3.2    Exercise; Expiration Date**.

(a)    Each outstanding Warrant may be exercised on any Business Day which is on or after the Original Issuance Date and on or before the Expiration Date, but only if, in the Company's sole and absolute discretion, which shall be final, conclusive and binding, the issuance of Common Stock pursuant to the exercise of such Warrant (i) will not cause the Company to violate the Act, FCC Rules or the FCC Restrictions and (ii) is exempt from the registration requirements of the Securities Act; *provided*, that such Holder shall have completed and duly executed the Exercise Form and the Ownership Certification and delivered such documents to the Warrant Agent on a timely basis. In addition, exercise of the Warrants will be subject to the following restrictions: (i) Warrants may not be exercised during the Exchange Period; and (ii) during the Pre-Exchange Period, Series 1 Warrants may be exercised only by 100% Domestic Holders. Any Warrants not exercised by 5:00 p.m., New York City time, on the Expiration Date (or, if applicable, immediately prior to consummation of a Change of Control pursuant to <u>Section 4.1(c)</u>) shall expire and all rights thereunder and all rights in respect thereof under this Agreement shall automatically terminate at such time.

(b)    <u>Pre-Exchange Period</u>.

(i)    Prior to the Exchange Period, the Company shall issue Class A Common Stock upon exercise of Series 1 Warrants by a Holder; *provided*, that (A) the Company shall issue Class B Common Stock if the exercising Holder has elected to receive Class B Common Stock on its Exercise Form by checking the Class B Common Stock Only Election box, (B) the Company may issue Class B Common Stock in lieu of Class A Common Stock if, in the Company's sole and absolute discretion, which shall be final, conclusive and binding, the issuance of Class B Common Stock in lieu of Class A Common Stock is necessary to comply with the 4.99% Rule (as defined below), (C) the Company shall issue up to 4.99% of the outstanding Class A Common Stock to an exercising Holder and such exercising Holder shall retain its remaining Series 1 Warrants if the exercising Holder has elected the Class A Common Stock and Warrant Election on its Exercise Form, and (D) the Company shall deliver or cause to be delivered any shares of Common Stock issued upon exercise of Warrants by a Term Loan Holder in the form of Restricted Stock if such Holder has so elected on its Exercise Form. For the avoidance of doubt, the Company will limit the number of shares of Class A Common Stock issued to any Holder upon the exercise of Series 1 Warrants in order to prevent such Holder from holding in excess of 4.99% of the outstanding Class A Common Stock unless such Holder has

14

been identified on the FCC Long Form Application or the Company has determined in its sole and absolute discretion that the holding by such Holder of in excess of 4.99% of the outstanding Class A Common Stock would not violate the Act, FCC Rules or the FCC Restrictions (the "**4.99% Rule**").

(ii)    Prior to the Exchange Period, the Company shall issue Class A Common Stock upon exercise of Series 2 Warrants by a Holder; *provided*, that (A) the Company shall issue Class B Common Stock if the exercising Holder has elected to receive Class B Common Stock on its Exercise Form by checking the Class B Common Stock Only Election box, (B) the Company may issue Class B Common Stock in lieu of Class A Common Stock if, in the Company's sole and absolute discretion, which shall be final, conclusive and binding, the issuance of Class B Common Stock in lieu of Class A Common Stock is necessary to comply with the Act, FCC Rules or FCC Restrictions, including Section 310(d) of the Act, the FCC's broadcast attribution rules, rules regarding transfers of control or the 4.99% Rule, (C) the Company shall issue up to 4.99% of the outstanding Class A Common Stock to an exercising Holder and such exercising Holder shall receive Series 1 Warrants in exchange for its remaining Series 2 Warrants if the exercising Holder has elected the Class A Common Stock and Warrant Election on its Exercise Form, and (D) the Company shall deliver or cause to be delivered any shares of Common Stock issued upon exercise of Warrants by a Term Loan Holder in the form of Restricted Stock if such Holder has so elected on its Exercise Form.  To the extent that the Company determines that any Series 2 Warrant submitted by a Holder for exercise is not eligible to be exercised for Common Stock or if the Holder has elected the Class A Common Stock and Warrant Election on its Exercise Form, such ineligible Series 2 Warrant (or any remaining Series 2 Warrants in the case of a Class A Common Stock and Warrant Election) shall be exchanged for a Series 1 Warrant.

(c)    <u>Post-Exchange Date</u>.  After the Exchange Date, the Company shall issue Class A Common Stock upon exercise of Series 1 Warrants by a Holder; *provided*, that (i) the Company shall issue Class B Common Stock if the exercising Holder has elected to receive Class B Common Stock on its Exercise Form by checking the Class B Common Stock Only Election box, (ii) the Company may issue Class B Common Stock in lieu of Class A Common Stock if, in the Company's sole and absolute discretion, which shall be final, conclusive and binding, the issuance of Class B Common Stock in lieu of Class A Common Stock is necessary to comply with the Act, FCC Rules or FCC Restrictions, including Section 310(d) of the Act, the FCC's broadcast attribution rules, rules regarding transfers of control or the 4.99% Rule, (iii) the Company shall issue up to 4.99% of the outstanding Class A Common Stock to an exercising Holder and such exercising Holder shall retain its remaining Series 1 Warrants if the exercising Holder has elected the Class A Common Stock and Warrant Election on its Exercise Form, and (iv) the Company shall deliver or cause to be delivered any shares of Common Stock issued upon exercise of Warrants by a Term Loan Holder in the form of Restricted Stock if such Holder has so elected on its Exercise Form.

(d)    In connection with any exercise of Warrants, promptly following receipt by the Company of the (i) Exercise Form, (ii) Ownership Certification and (iii) Exercise Price from the Warrant Agent, the Company shall provide the Warrant Agent written instructions stating (i) the number of submitted Warrants that are permitted to be exercised and (ii) the number of shares of Class A Common Stock and/or Class B Common Stock, if any, and Series 1

15

Warrants, if any, to be issued in respect of such exercise, and instructing the Warrant Agent to deliver or cause the delivery of such securities in the manner and in accordance with the time periods described in Section 3.3.

### Section 3.3   Method of Exercise; Payment of Exercise Price.

(a)   Exercise Generally.

(i)   In the case of Persons who hold Book-Entry Warrants, all or any of the Warrants represented by such Book-Entry Warrants may be exercised prior to the Expiration Date by the Holder thereof by providing the Warrant Agent at its corporate trust office set forth in Section 9.3 (x) a written notice of the Holder's election to exercise the number of the Warrants specified therein ("*Exercise Form*") substantially in the form of Exhibit C-1 hereto and (y) the Ownership Certification, in each case fully completed and duly executed by such Holder, which exercise shall be irrevocable (subject to Section 2.4(c)). Such documents referenced above shall be accompanied by payment in full of the Exercise Price then in effect for each share of Common Stock for which such Warrant is exercised, together with any documentary, stamp or transfer tax, or other applicable tax or governmental charges.

(ii)   In the case of Persons who hold Warrants through the book-entry facilities of the Depositary or by or through Persons that are direct participants in the Depositary, all or any of the Warrants represented by such book-entry facilities may be exercised prior to the Expiration Date by the Holder thereof by providing (x) an Exercise Form to the Warrant Agent substantially in the form of Exhibit C-2 hereto (or as provided by such Holder's broker) and (y) the Ownership Certification, in each case fully completed and duly executed by such Holder, which exercise shall be irrevocable (subject to Section 2.4(c)). Such documents referenced above shall be accompanied by payment in full of the Exercise Price for each share of Common Stock for which such Warrant is exercised, together with any documentary, stamp or transfer tax, or other applicable tax or governmental charges.

(b)   Payment of the Exercise Price shall be made by the Holder by certified bank check or official bank check in New York Clearing House funds payable to the order of the Company and delivered to the Warrant Agent at the address set forth in Section 9.3(c), or in the case of a Holder of a beneficial interest in a Global Warrant Certificate to such Holder's broker. Upon the exercise of any Warrant, the Warrant Agent shall provide written notice of such exercise to the Company, including notice of the number of Series 1 Warrants or Series 2 Warrants submitted for exercise, and deliver copies of the Exercise Form and Ownership Certification and all payments received upon exercise of such Warrant to the Company in such manner as the Company shall instruct in writing.

(c)   Partial Exercise; Surrender of Warrants. A Holder may exercise all or any number of whole Warrants represented by a Book-Entry Warrant or a beneficial interest in a Global Warrant Certificate. If less than all of the Warrants represented by a Book-Entry Warrant are exercised, the Warrant Agent shall reduce the Warrant Register and such Holder's position by the whole number of Warrants duly exercised. If less than all of the Warrants represented by a beneficial interest in a Global Warrant Certificate are exercised, such Depositary records shall be reduced by the whole number of Warrants duly exercised and the

<center>16</center>

Warrant Agent and the Depositary shall make the necessary adjustments to their registries and such Global Warrant Certificate to reflect such exercise. Any Warrants surrendered for exercise shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrants surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company. The Warrant Agent shall destroy such cancelled Global Warrant Certificates and deliver its certificate of destruction to the Company, unless the Company shall otherwise direct.

(d)   Issuance of Common Stock and Series 1 Warrants, if applicable.

(i)   Upon surrender of a Book-Entry Warrant or a beneficial interest in a Global Warrant Certificate in conformity with the foregoing provisions, including without limitation Section 3.2, and payment of the Exercise Price in respect of the exercise of one or more Warrants evidenced thereby, the Warrant Agent shall, when such payment is received and subject to Section 9.2, deliver to the Company the notice of exercise received pursuant to Section 3.3(a), deliver or deposit all funds received as instructed in writing by the Company and advise the Company by telephone at the end of such day of the amount of funds so deposited to its account. The Company shall thereupon, as promptly as practicable, and in any event within five (5) Business Days after receipt by the Company of such notice of exercise, (A) execute or cause to be executed and deliver or cause to be delivered to the Holder a certificate or certificates representing the aggregate number of shares of Common Stock issuable upon such exercise, (B) if in the Company's sole discretion the shares of Common Stock are not certificated, make or cause to be made a book entry into the stock ledger of the Company for the aggregate number of shares of Common Stock issuable upon such exercise or (C) if in the Company's sole discretion the shares of Common Stock shall be represented by a global certificate held by the Depositary, issue by same-day or next-day credit to the Depositary for the account of such beneficial Holder or for the account of a participant in the Depositary the aggregate number of shares of Common Stock issuable upon such exercise, in each case, based upon the aggregate number of Warrants so exercised and determined in accordance with Section 3.3(g), and, in each case, the Company shall deliver or cause to be delivered an amount in cash in lieu of any fractional share(s), if the Company so elects pursuant to Section 4.5. Any certificate or certificates so delivered shall be, to the extent possible, in such denomination or denominations as such Holder shall request in such notice of exercise and shall be registered or otherwise placed in the name of, and delivered to, the Holder.  In addition, if any Series 1 Warrants are to be issued in connection with the exercise of Series 2 Warrants, the Company shall cause the Warrant Agent to deliver such Series 1 Warrants as promptly as practicable, and in any event within five (5) Business Days after receipt by the Company of such notice of exercise.

(ii)   Notwithstanding anything to the contrary contained herein, the Company shall not be required to issue or deliver any certificate or certificates for shares of Common Stock purchased upon the exercise of a Warrant or portion thereof, make a book entry into the stock ledger of the Company if the shares of Common Stock are not certificated or, as the case may be, issue any instructions to the Depositary, prior to fulfillment of all of the following conditions: (x) the obtaining of approval or other clearance from any state or federal governmental agency which the Company shall, in its reasonable and good faith discretion,

17

determine to be necessary or advisable and (y) the lapse of such reasonable period of time following the exercise of the Warrant as may be required by applicable Law.

(e)     Notice to Transfer Agent. Upon the exercise of any Warrant and written instruction from the Company as to the number of shares of Class A Common Stock and/or Class B Common Stock and the number of Series 1 Warrants, if applicable, deliverable in respect of such exercise, the Warrant Agent is hereby authorized and directed to notify any transfer agent of the Common Stock of the exercise of such Warrant and to take any other reasonable steps necessary to effect the exercise. Upon such notification, such transfer agent (and all such transfer agents are hereby irrevocably authorized to comply with this Section 3.3(e)) shall register on its books the necessary number of shares of Class A Common Stock and Class B Common Stock issuable upon such exercise (based upon the aggregate number of Warrants so exercised and the written instruction of the Company), determined in accordance with Section 3.3(g); *provided* that such Holder shall have complied with Section 3.3(a).

(f)     Time of Exercise. Except for exercises in connection with and conditioned upon a transaction pursuant to Section 4.1(c), any Warrant exercised hereunder shall, to the extent properly exercised and to the extent the Company has made a reasonable and good faith determination that such exercise does not violate the FCC Rules and the FCC Restrictions, be deemed to have been effected immediately prior to the close of business on the day on which the Book-Entry Warrant or beneficial interest in a Global Warrant Certificate, representing such Warrant shall have been surrendered for exercise as provided in this Section 3.3, together with any documentary, stamp or transfer tax, or other applicable tax or governmental charges. At such time, the certificates for the shares of Common Stock issuable upon such exercise as provided in Section 3.3(d) shall be deemed to have been issued, or, as the case may be, the book entry into the stock ledger of the Company or the records of the Depositary for the shares of Common Stock issuable upon such exercise as provided in Section 3.3(d) shall be deemed to have been made, and, for all purposes of this Agreement, the Holder shall, as between such Person and the Company, be deemed to be and entitled to all rights of the holder of record of such Common Stock.

(g)     Shares Issuable. The number of shares of Common Stock "obtainable upon exercise" of Warrants at any time shall be the number of shares of Common Stock for which such Warrants are then exercisable. The number of shares of Common Stock "for which each Warrant is exercisable" shall be one (1) share of Class A Common Stock or Class B Common Stock, subject to adjustment as provided in Section 4.1.  At the election of a Term Loan Holder on its Exercise Form or Election Form, as applicable, Common Stock issued upon Exercise of the Warrants shall be issued in the form of Restricted Stock.

**Section 3.4     Notice of Declaratory Ruling; Mandatory Exchange of Warrants**.

(a)     Exchange Notice. As soon as reasonably practicable, and in any event within two (2) Business Days following the Declaratory Ruling, the Company shall issue a notice to Holders describing the Declaratory Ruling (the "***Exchange Notice***"), which Exchange Notice will state:

18

(i)        the percentage of foreign ownership of the Company permitted by the Declaratory Ruling and whether all or a portion of the outstanding Warrants will be Exchanged pursuant to this Section 3.4;

(ii)       whether there will be an Exchange Period, and if so, the dates of such Exchange Period;

(iii)      the date of the Exchange of the Warrants;

(iv)      the deadline for Holders to return an Ownership Certification and an Election Form.

The Exchange Notice shall have the Ownership Certificate and Election Form attached to it. Any Exchange Notice that is delivered in the manner herein provided shall be deemed given, whether or not the Holder receives such Exchange Notice.  The failure to give, or any defect in, such Exchange Notice shall not affect the validity of the Exchange.

(b)       Exchange Forms.  On the fourteenth Business Day following the date of the Exchange Notice (the "***Exchange Date***"), the Company shall effect an automatic Exchange of all or a portion of the outstanding Warrants into Class A Common Stock, Class B Common Stock and/or Series 1 Warrants as described in Section 3.4(c) below.  By returning an Election Form within twelve (12) Business Days of the Exchange Notice, Holders may elect (i) to receive Class B Common Stock in lieu of any shares of Class A Common Stock to which such Holder would otherwise be entitled if the Holder has elected to receive Class B Common Stock on its Election Form by checking the Class B Common Stock Only Election box, (ii) to retain Series 1 Warrants (or, in the case of a Holder of Series 2 Warrants, to exchange its Series 2 Warrants for Series 1 Warrants) in lieu of any Common Stock to which such Holder would otherwise be entitled (a "***Warrant Election***"), (iii) to receive Class A Common Stock up to 4.99% of the outstanding Class A Common Stock and retain Series 1 Warrants (or, in the case of a Holder of Series 2 Warrants, to exchange its Series 2 Warrants for Series 1 Warrants) in lieu of any remaining Common Stock to which such Holder would otherwise be entitled, or (iv) solely with respect to Term Loan Holders, to receive Common Stock in the form of Restricted Stock.  If only a portion of the outstanding Warrants are to be Exchanged, any Holder (i) that has never submitted a Plan Certification or an Ownership Certification or (ii) for whom the information in the most recently submitted Ownership Certification is no longer accurate, must submit a new Ownership Certification within twelve (12) Business Days of the Exchange Notice.  The Warrant Agent shall deliver copies of each Election Form and Ownership Certification to the Company in such manner as the Company shall instruct in writing.

If any Holder of Series 2 Warrants has never submitted a Plan Certification or Ownership Certification, such Series 2 Warrants shall not be eligible to be Exchanged for Common Stock and shall be Exchanged for Series 1 Warrants on the Exchange Date.

(c)       Exchange.  On the Exchange Date, in accordance with this Section 3.4(c), the Company shall exchange (the "***Exchange***") (i) all or part of the outstanding Warrants for shares of Common Stock at an exchange ratio (the "***Exchange Ratio***") of one share of Common Stock per outstanding Warrant (as such ratio may be adjusted pursuant to Article IV)

19

and (ii) to the extent that the Company determines that any Series 1 Warrants or Series 2 Warrants may not be exchanged for Common Stock in accordance with this Section 3.4(c) or a Holder makes a Warrant Election, then such Series 1 Warrants shall remain outstanding and such Series 2 Warrants will be exchanged for an equal number of Series 1 Warrants (such transactions in clauses (i) and (ii) are collectively the "***Exchange***"). The Company shall Exchange the number of shares of Common Stock for outstanding Warrants that it determines in its sole and absolute discretion will permit the Company to comply with Section 310(b) of the Act, the Declaratory Ruling and the FCC Rules pursuant to this Section 3.4 and will determine the maximum number of shares of Common Stock that may be held by Non-100% Domestic Holders in respect of their foreign ownership (the "***Foreign Share Amount***").  If the Company determines the Foreign Share Amount will not permit all of the outstanding Warrants to be exchanged for Common Stock, then on the Exchange Date, subject to any Warrant Elections:

> (w)    each 100% Domestic Holder will have its Warrants exchanged into Common Stock;

> (x)    each Non-100% Domestic Holder who timely provides a Plan Certification or Ownership Certification (a "***Qualifying Non-100% Domestic Holder***") will have its Warrants allocable to its domestic ownership percentage exchanged into Common Stock;

> (y)    each Qualifying Non-100% Domestic Holder will have the portion of its Warrants allocable to its foreign ownership exchanged into a Common Stock on a *pro rata* basis (determined based upon the aggregate number of Warrants held by all Qualifying Non-100% Domestic Holders in respect of their foreign ownership), such that the aggregate amount of shares to be issued under this clause (y) does not cause the aggregate amount of shares of Common Stock that represent foreign ownership to exceed the Foreign Share Amount; and

> (z)    any Warrants which are not exchanged under clause (y) above, shall be exchanged for Series 1 Warrants (in the case of Series 2 Warrants) or remain outstanding (in the case of Section 1 Warrants).

> (d)    Common Stock Issuable Upon Exchange.  Subject to the limitations in Section 3.3(c) and any Warrant Election, on the Exchange Date the Company shall issue Class A Common Stock in Exchange for Warrants; *provided*, that (i) the Company shall issue Class B Common Stock if the Holder has elected to receive Class B Common Stock on its Election Form by checking the Class B Common Stock Only Election box, (ii) the Company may issue Class B Common Stock in lieu of Class A Common Stock if, in the Company's sole and absolute discretion, which shall be final, conclusive and binding, the issuance of Class B Common Stock in lieu of Class A Common Stock is necessary to comply with the Act, FCC Rules or FCC Restrictions, including Section 310(d) of the Act, the FCC's broadcast attribution rules, rules regarding transfers of control and the 4.99% Rule, (iii) the Company shall issue up to 4.99% of the outstanding Class A Common Stock and such Holder shall retain its remaining Series 1 Warrants (in the case of Series 1 Warrants) or have its remaining Series 2 Warrants exchanged for Series 1 Warrants (in the case of Series 2 Warrants)  if the exercising Holder has elected the Class A Common Stock and Warrant Election on its Election Form, (iv) the Company shall not issue any Common Stock to a Holder that has made a Warrant Election.  The Company

20

Doc#: US1:11847348v20

shall deliver or cause to be delivered any shares of Common Stock issued upon Exchange of Warrants by a Term Loan Holder in the form of Restricted Stock if such Holder has so elected on its Election Form.

(e)     Exchange Instructions. On the Exchange Date, the Company shall provide the Warrant Agent with written instructions which shall state (i) the number of Series 1 Warrants and/or Series 2 Warrants which are to be Exchanged with respect to each Holder, (ii) the number of shares of Class A Common Stock and/or Class B Common Stock to be issued with respect to such Holder's Series 1 Warrants that are to be Exchanged, if any, and (iii) the number of shares of Class A Common Stock, Class B Common Stock and or Series 1 Warrants to be Exchanged for such Holder's Series 2 Warrants, if any.  The written instructions shall direct the Warrant Agent to effect the Exchange on the Exchange Date and to deliver or cause the delivery of the applicable securities in the manner and in accordance with the time periods described in Section 3.3.  Upon receipt of the Company's written instructions, the Warrant Agent shall promptly send notice to each Holder of the number of Warrants of each series held by such Holder that are to be Exchanged and the number and type of securities to be received by such Holder as a result of the Exchange.

(f)     Fractional Shares upon Exchange. The Company shall not be required to issue fractions of shares of Common Stock or distribute certificates that evidence fractional shares of Common Stock in connection with any Exchange.  Upon any Exchange at an Exchange Ratio that otherwise would result in the issuance of a fractional share of Common Stock, the Company may, in its sole and absolute discretion, either (i)  pay an amount in cash in lieu of such fractional share or (ii) round such fraction of a share to the nearest whole number of shares in the manner set forth in Section 4.5 (except that all references to "Exercise" in such Section shall be deemed references to "Exchange").

## ARTICLE IV

## ADJUSTMENTS; DISTRIBUTIONS.

### Section 4.1     Adjustments.

The number of shares of Common Stock for which each Warrant is exercisable shall be subject to adjustment from time to time as follows:

(a)     Upon Subdivisions or Splits. If, at any time after the Original Issuance Date, the number of shares of Common Stock outstanding is increased by a distribution payable in shares of Common Stock (excluding any such distribution in accordance with Section 4.7 as in effect on the date hereof), or by a subdivision or split-up of shares of Common Stock, other than, in any such case, upon the occurrence of a Change of Control to which Section 4.1(c) applies, following the record date for the determination of holders of Common Stock entitled to receive such distribution, or in the cases of a subdivision or split-up, on the day following the effective date thereof, the number of shares of Common Stock obtainable upon exercise of the Warrants shall be increased in proportion to such increase in outstanding shares of Common Stock. The adjustment made pursuant to this Section 4.1(a) shall become effective (i) in the case of any such distribution, immediately after the close of business on the record date for the

21

determination of holders of Common Stock entitled to receive such distribution or (ii) in the case of such subdivision or split-up, at the time when such subdivision or split-up becomes effective with respect to all holders of Common Stock.

(b)     Upon Combinations or Reverse Splits. If, at any time after the Original Issuance Date, the number of shares of Common Stock outstanding is decreased by a combination or reverse split of the outstanding shares of Common Stock into a smaller number of shares of Common Stock, other than upon the occurrence of a Change of Control to which Section 4.1(c) applies, then the number of shares of Common Stock obtainable upon exercise of the Warrants immediately prior to the date of such combination or reverse split shall be decreased in proportion to such decrease in outstanding shares of Common Stock. The adjustment made pursuant to this Section 4.1(b) shall become effective at the time when such combination or reverse split becomes effective with respect to all holders of Common Stock.

(c)     Upon a Change of Control.

(i)     In the event of a Change of Control in which the only consideration payable to Holders of Common Stock is cash, each Warrant shall be deemed to be exercised immediately prior to the consummation of such Change of Control and the Holder thereof shall receive solely the cash consideration to which such Holder would have been entitled as a result of such Change of Control, less the Exercise Price, as though the Warrant had been exercised immediately prior thereto.  Upon a Change of Control in which the consideration payable to Holders of Common Stock is other than only cash, at the option of the Company in its sole discretion, each Warrant will be either (A) assumed by the party surviving such Change of Control and shall continue to be exercisable subject to the terms set forth herein for the kind and amount of consideration to which such Holder would have been entitled as a result of such Change of Control had the Warrant been exercised immediately prior thereto, or (B) if not assumed by the party surviving such Change of Control, deemed to be exercised immediately prior to the consummation of such Change of Control and the Holder thereof shall receive the consideration to which such Holder would have been entitled as a result of such Change of Control, less the Exercise Price, as though the Warrant had been exercised immediately prior thereto.

(ii)     After compliance by the Company with this Section 4.1(c), each Holder shall (A) consent to and raise no objections with respect to a Change of Control, (B) waive any dissenters rights, appraisal rights or similar rights in connection with a Change of Control (if applicable), on the terms and conditions as may be approved by the Company and (C) surrender all Book-Entry Warrants and Global Warrant Certificates to the Warrant Agent, and all such Book-Entry Warrants and Global Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company. Each Holder shall take all actions determined by the Company to be necessary or desirable in connection with the consummation of a Change of Control, including, but not limited to, the execution of such agreements and instruments and other actions necessary to provide the representations, warranties, indemnities, covenants, conditions, escrows and other provisions and agreements relating to a Change of Control (if applicable) on the terms and conditions as may be approved by the Company.

22

(d)      No Exercise Price Adjustment. The Exercise Price payable upon exercise of the Warrant is not subject to adjustment in connection with the provisions of this Section 4.1.

(e)      Treasury Shares. Shares of Common Stock at any time owned by the Company or its subsidiaries shall not be deemed to be outstanding for the purposes of any computation under this Section 4.1.

### Section 4.2    Notice of Adjustment.

Whenever the number of shares of Common Stock or other securities or property obtainable upon exercise of each Warrant is required to be adjusted pursuant to Section 4.1, the Company shall deliver to the Warrant Agent a certificate setting forth (a) the number of shares of Common Stock or other securities or property obtainable upon exercise of each Warrant and the Exercise Price therefor after such adjustment, (b) a brief statement of the facts requiring such adjustment and (c) the computation by which such adjustment was made. Such certificate shall be conclusive evidence of the correctness of such adjustment absent manifest error.  Upon receipt of such certificate, the Warrant Agent shall mail notice of the adjustment described in such certificate to each Holder at the expense of the Company; provided, that, at the Warrant Agent's discretion, such notice may be sent to the Holders of beneficial interests of a Global Warrant Certificate through the Depositary's communication system. The Warrant Agent shall be entitled to rely on such certificate and shall be under no duty or responsibility with respect to any such certificate, except to exhibit the same, from time to time, to any Holder desiring to inspect such certificate during reasonable business hours. The Warrant Agent shall not at any time be under any duty or responsibility to any Holder to determine whether any facts exist which may require any adjustment of the number of shares of Common Stock or other securities or property obtainable upon exercise of any Warrant, or with respect to the nature or extent of any such adjustment when made, or with respect to the method employed in making such adjustment, or the validity or value (or the kind or amount) of any shares of Common Stock or other securities or property that may be obtainable upon exercise of any Warrant, or to investigate or confirm whether the information contained in the above referenced certificate complies with the terms of this Agreement or any other document.

### Section 4.3    Statement on Warrants.

The form of Warrant Statement or Global Warrant Certificate need not be changed because of any adjustment made pursuant to Section 4.1(a) or Section 4.1(b), and Warrant Statements and Global Warrant Certificates issued after such adjustment may state the same number and kind of shares of Common Stock as are stated in the Warrant Statements and Global Warrant Certificates initially issued pursuant to this Agreement. The Company may, however, at any time in its sole discretion (which shall be conclusive), make any change in the form of Warrant Statement or Global Warrant Certificate that it may deem appropriate to reflect any such adjustment and that does not affect the substance thereof, and any Warrant Statement or Global Warrant Certificate thereafter issued or, as applicable, countersigned, whether in exchange or substitution for an outstanding Warrant Statement or Global Warrant Certificate or otherwise, may be in the form so changed.

Doc#: US1:11847348v20

**Section 4.4    Notice of Certain Events**.

(a)    In the event that, at any time after the date hereof and prior to 5:00 p.m., New York City time, on the Expiration Date, (i) the Company shall be subject to a Change of Control pursuant to which the provisions of Section 4.1(c) apply or (ii) the Company shall sell all or substantially all of its assets, dissolve, liquidate or wind-up its operations, then, in each such case, the Company shall cause to be mailed to the Warrant Agent and each Holder, at the earliest practicable time (and, in any event, not less than ten (10) days before any record date or, if no record date applies, before any date set for closing), notice of the date on which such Change of Control, sale, dissolution, liquidation or winding up shall take place, as the case may be; *provided*, that, at the Company's discretion, such notice may be sent to the Holders of beneficial interests of a Global Warrant Certificate through the Depositary's communication system.  Such notice shall also set forth such facts as shall indicate the effect of such action (to the extent such effect may be known at the date of such notice), if any, on the kind and amount of shares of Common Stock and other securities, money and other property deliverable upon exercise of the Warrants.  Such notice shall also specify the date, if any, as of which the holders of record of shares of Common Stock or other securities or property issuable upon exercise of the Warrants shall be entitled to exchange their interests for securities, money or other property deliverable upon such Change of Control, sale, dissolution, liquidation or winding up, as the case may be.

(b)    Notwithstanding anything in the preceding paragraph (a) to the contrary, the Company shall not be obligated to provide any material, non-public information pursuant to any notice given under this Agreement. To the extent any notice given by the Company hereunder constitutes, or contains, material, non-public information regarding the Company, the Company shall simultaneously file such notice with the Commission pursuant to a Current Report on Form 8-K.

**Section 4.5    Fractional Shares**.

Notwithstanding anything to the contrary contained in this Agreement, if the number of shares of Common Stock obtainable upon exercise of each Warrant is adjusted pursuant to the provisions of Section 4.1, the Company shall not be required to issue any fraction of a share of Common Stock upon any subsequent exercise of any Warrant. If Book-Entry Warrants or beneficial interests in Global Warrant Certificates evidencing more than one Warrant shall be surrendered for exercise at the same time by the same Holder, the number of full shares of Common Stock that shall be issuable upon such exercise thereof shall be computed on the basis of the aggregate number of Warrants so surrendered and exercised. If any fraction of a share of Common Stock would, except for the provisions of this Section 4.5, be issuable on the exercise of any Warrant (or specified portion thereof), in lieu of the issuance of such fractional share of Common Stock, the Company may, in its sole and absolute discretion, either (i) pay the Holder of such Warrant an amount in cash equal to the then fair market value per share of the Common Stock multiplied by such fraction (computed to the nearest whole cent) or (ii) round such fraction of a share to the nearest whole number of shares (where for the avoidance of doubt, 0.5 of a share shall be rounded to one (1) share). The Holders, by their acceptance of the Warrants, expressly waive their right to receive any fraction of a share of Common Stock instead of such cash or such rounding. Whenever a payment for fractional shares is to be made by the

24

Warrant Agent under any section of this Agreement, the Company shall (i) promptly prepare and deliver to the Warrant Agent a certificate setting forth in reasonable detail the facts related to such payment and the prices and/or formulas utilized in calculating such payments, and (ii) provide sufficient monies to the Warrant Agent in the form of fully collected funds to make such payments. The Warrant Agent shall be fully protected in relying upon such a certificate and shall have no duty with respect to, and shall not be deemed to have knowledge of any payment for fractional shares under any Section of this Agreement relating to the payment of fractional shares unless and until the Warrant Agent shall have received such a certificate and sufficient monies.

**Section 4.6    Concerning All Adjustments**.

Notwithstanding anything to the contrary contained in this Agreement, if an adjustment is made under any provision of ARTICLE IV on account of any event, transaction, circumstance, condition or happening, no additional adjustment shall be made under any other provision of ARTICLE IV on account of such event, transaction, circumstance, condition or happening. Unless otherwise expressly provided in this ARTICLE IV, all determinations and calculations required or permitted under this ARTICLE IV shall be made by the Company or its Board of Directors, as appropriate, and all such calculations and determinations shall be conclusive and binding in the absence of manifest error.

**Section 4.7    Distributions and Purchases**.

(a)    All distributions on and purchases of capital stock and capital stock equivalents shall be approved by the Board of Directors in its sole discretion and made in accordance with applicable Law.

(b)    To the extent there are any dividends declared or distributions made  with respect to the Class A Common Stock or Class B Common Stock, such dividends or distributions shall also be made to Holders of Warrants concurrently and on a *pro rata* basis based on their ownership of Common Stock underlying their Warrants on an as-exercised basis; *provided*, that no such distribution shall be made to Holders of Warrants if (x) an FCC Rule prohibits such distribution to Holders of Warrants or (y) the Company's FCC counsel opines that such distribution is reasonably likely to cause (i) the Company to violate any applicable FCC Rule or (ii) any such Warrant Holder to be deemed to hold an attributable interest in the Company in violation of FCC Rules.

(c)    To the extent within the control of the Company, any tender or exchange offer subject to Sections 13 or 14 of the Exchange Act for Class A Common Stock, Class B Common Stock or Warrants shall be made concurrently and on a *pro rata* basis (in the case of Holders of Warrants, based upon their ownership of Common Stock underlying their Warrants on an as-exercised basis) to all holders of Class A Common Stock, Class B Common Stock and Warrants.

(d)    Distributions to Holders of Warrants and payments to Holders of Warrants pursuant to a tender or exchange offer for Warrants subject to Sections 13 or 14 of the Exchange Act shall be made in compliance with the Act and the FCC Rules, including those provisions relating to multiple ownership and alien restrictions.

25

## ARTICLE V

## LOSS, THEFT, DESTRUCTION OR MUTILATION OF
## WARRANT STATEMENTS AND GLOBAL WARRANT CERTIFICATES

**Section 5.1    Loss, Theft, Destruction or Mutilation**.

Upon receipt by the Company and the Warrant Agent of evidence satisfactory to them of the ownership and the loss, theft, destruction or mutilation of any Warrant Statement or Global Warrant Certificate, and an indemnity bond in form and amount and with corporate surety satisfactory to them, and (in the case of mutilation) upon surrender and cancellation thereof, then, in the absence of notice to the Company or the Warrant Agent that the Warrants represented thereby have been acquired by a protected purchaser, the Company shall issue and, as applicable, the Warrant Agent shall countersign and deliver to the Holder of the lost, stolen, destroyed or mutilated Warrant Statement or Global Warrant Certificate, in exchange and substitution for or in lieu thereof, a new Warrant Statement or Global Warrant Certificate of the same tenor and representing an equivalent number of Warrants. Upon the issuance of any new Warrant Statement or Global Warrant Certificate under this ARTICLE V, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and other expenses (including the fees and expenses of the Warrant Agent) in connection therewith. The provisions of this ARTICLE V are exclusive and shall preclude (to the extent lawful) all other rights or remedies with respect to the replacement of lost, stolen, destroyed or mutilated Warrant Statements and Global Warrant Certificates.

## ARTICLE VI

## AUTHORIZATION AND RESERVATION OF COMMON STOCK;
## PURCHASE OF WARRANTS

**Section 6.1    Reservation of Authorized Common Stock**.

(a)    The Company will at all times reserve and keep available, from its authorized and unissued Common Stock solely for issuance and delivery upon the exercise of the Warrants and free of preemptive rights, such number of shares of Class A Common Stock and Class B Common Stock and other securities, cash or property as from time to time shall be issuable upon the exercise in full of all outstanding Warrants. The Company further covenants that it shall, from time to time, take all steps necessary to increase the authorized number of shares of its Class A Common Stock or Class B Common Stock if at any time the authorized number of shares of Class A Common Stock or Class B Common Stock remaining unissued would otherwise be insufficient to allow delivery of all the shares of Common Stock then deliverable upon the exercise in full of all outstanding Warrants in the form of shares of Class A Common Stock or Class B Common Stock, as applicable. The Company covenants that all shares of Common Stock issuable upon exercise of the Warrants will, upon issuance, be duly and validly issued, fully paid and nonassessable and will be free from all taxes, liens and charges in respect of the issue thereof (other than taxes in respect of any transfer occurring contemporaneously or otherwise specified herein). The Company shall take all such actions as may be necessary to ensure that all such shares of Common Stock issued pursuant to this

26

Agreement may be so issued without violation of any applicable Law or governmental regulation (except for official notice of issuance which shall be immediately delivered by the Company upon each such issuance). The Company covenants that, unless in the Company's sole discretion the shares of Common Stock are not certificated, stock certificates issued to evidence any shares of Common Stock issued upon exercise of Warrants will comply with the Delaware General Corporation Law and any other applicable Law.

(b)    The Company will at all times reserve and keep available, from its authorized and unissued Common Stock solely for issuance and delivery upon the conversion of the shares of Class B Common Stock referred to below, and free of preemptive rights, such number of shares of Class A Common Stock and other securities, cash or property as from time to time shall be issuable upon the conversion in full of all shares of Class B Common Stock issued or issuable upon the exercise of Warrants. The Company further covenants that it shall, from time to time, take all steps necessary to increase the authorized number of shares of its Class A Common Stock if at any time the authorized number of shares of Class A Common Stock remaining unissued would otherwise be insufficient to allow delivery of all the shares of Class A Common Stock then deliverable upon the conversion in full of all shares of Class B Common Stock referred to above that are outstanding or issuable upon the exercise of all outstanding Warrants. The Company covenants that all shares of Class A Common Stock issuable upon conversion of the shares of Class B Common Stock referred to above will, upon issuance, be duly and validly issued, fully paid and nonassessable and will be free from all taxes, liens and charges in respect of the issue thereof (other than taxes in respect of any transfer occurring contemporaneously or otherwise specified herein). The Company shall take all such actions as may be necessary to ensure that all such shares of Class A Common Stock may be so issued without violation of any applicable law or governmental regulation or any requirements of any domestic stock exchange upon which shares of Class A Common Stock may be listed (except for official notice of issuance which shall be immediately delivered by the Company upon each such issuance). The Company covenants that, unless in the Company's sole discretion the shares of Class A Common Stock are not certificated, the stock certificates issued to evidence any shares of Class A Common Stock issued upon conversion of shares of Class B Common Stock referred to above will comply with the Delaware General Corporation Law and any other applicable law.

### Section 6.2    Stock Exchange Listing of Class A Common Stock.

So long as any Warrants remain outstanding, the Company will use commercially reasonable efforts to take all necessary action to have the Class A Common Stock, immediately upon their issuance upon exercise of the Warrants or upon conversion of Class B Common Stock, (i) listed on a national securities exchange or (ii) if the Class A Common Stock is not eligible for listing on any national securities exchange, listed for quotation on the over-the-counter market as reported in the "pink sheets" published by Pink OTC Markets, Inc.

### Section 6.3    Purchase of Warrants by the Company.

The Company shall have the right to purchase or otherwise acquire Warrants at such times, in such manner and for such consideration as it and the relevant Holders of Warrants may deem appropriate. In the event the Company shall purchase or otherwise acquire Warrants,

27

the related Global Warrant Certificates shall thereupon be delivered to the Warrant Agent for cancellation, and the related Book-Entry Warrants shall be cancelled. Any Warrants purchased or otherwise acquired by the Company shall not be outstanding for any purpose.

## ARTICLE VII

## WARRANT HOLDERS NOT DEEMED STOCKHOLDERS

**Section 7.1     No Stockholder Rights**.

Nothing contained in this Agreement or in any of the Warrant Statements or Global Warrant Certificates shall be construed as conferring upon the Holders thereof the right to vote or to consent or to receive notice as stockholders in respect of the meetings of stockholders for the election of directors of the Company or any other matter, or any rights whatsoever as stockholders of the Company. The Warrant Agent shall have no duty to monitor or enforce compliance with this provision.

## ARTICLE VIII

## WARRANT AGENT

**Section 8.1     Appointment and Acceptance of Agency**.

The Company hereby appoints the Warrant Agent to act as agent for the Company in respect of the Warrants upon the express terms and instructions set forth in this Agreement (and no implied terms) and the Warrant Agent hereby accepts the agency established by this Agreement and agrees to perform the same on the terms and conditions herein set forth.

**Section 8.2     Correctness of Statements; Distribution of Warrants**.

The statements contained herein and in each Warrant Statement and Global Warrant Certificate shall be deemed to be statements of the Company only, and the Warrant Agent assumes no responsibility for the accuracy or correctness of any of the same or shall be required to verify the same. The Warrant Agent assumes no responsibility with respect to the distribution of the Warrants except as herein otherwise provided.

**Section 8.3     Use of Agents**.

The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys, accountants, agents or other experts, and the Warrant Agent will not be answerable or accountable for any act, default, neglect or unintentional misconduct of any such attorneys or agents or for any loss to the Company, the Registered Holders or the Holders resulting from any such act, default, neglect or unintentional misconduct provided that due care has been exercised in the selection and continued employment or engagement thereof.

28

**Section 8.4     Proof of Actions Taken**.

Whenever in the performance of its duties under this Agreement the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking, suffering or omitting to take any action hereunder, such fact or matter (unless such evidence in respect thereof be herein specifically prescribed) may, in the absence of bad faith on the part of the Warrant Agent (as determined by a final, non-appealable judgment of a court of competent jurisdiction), be deemed to be conclusively proved and established by a certificate signed by the Chairman of the Board, President, Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, any Senior Vice President or Executive Vice President, the Treasurer or Secretary of the Company and delivered to the Warrant Agent; and such certificate, in the absence of bad faith on the part of the Warrant Agent (as determined by a final, non-appealable judgment of a court of competent jurisdiction), shall be full authorization to the Warrant Agent for any action taken, suffered or omitted to be taken by it under the provisions of this Agreement in reliance upon such certificate. In the event the Warrant Agent reasonably believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the Warrant Agent hereunder, or is uncertain of any action to take hereunder, the Warrant Agent may, following prior written notice to the Company, refrain from taking any action, and shall be fully protected and shall not be liable in any way to the Company or any other person or entity for refraining from taking such action, unless the Warrant Agent receives written instructions signed by the Company which eliminate such ambiguity or uncertainty to the reasonable satisfaction of the Warrant Agent.

**Section 8.5     Compensation; Indemnity**.

The Company agrees to pay the Warrant Agent reasonable compensation for all services rendered by the Warrant Agent in the preparation, delivery, negotiation, administration and execution of this Agreement and the exercise and performance of its duties hereunder. The Company agrees to reimburse the Warrant Agent for all expenses, taxes and governmental charges and other charges of any kind and nature incurred by the Warrant Agent (including reasonable fees and expenses of the Warrant Agent's counsel and agents) in the performance of its duties under this Agreement.

The Company also covenants and agrees to indemnify and to hold the Warrant Agent harmless against any costs, expenses (including reasonable fees of its legal counsel), losses or damages, which may be paid, incurred or suffered by or to which it may become subject, arising from or out of, directly or indirectly, any claims or liability resulting from its actions as Warrant Agent pursuant hereto; *provided*, that such covenant and agreement does not extend to, and the Warrant Agent shall not be indemnified with respect to, such costs, expenses, losses and damages incurred or suffered by the Warrant Agent as a result of, or arising out of, the Warrant Agent's refusal or failure to comply with the terms of this Agreement, or which result from or arise out of the Warrant Agent's gross negligence, bad faith, or willful misconduct. Notwithstanding anything in this Agreement to the contrary, in no event shall the Warrant Agent be liable for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including lost profits), even if the Warrant Agent has been advised of the likelihood of such loss or damage and regardless of the form of the action.  The indemnity provided herein shall survive the expiration of the Warrants and the termination of this Agreement.

29

Promptly after the receipt by the Warrant Agent of notice of any demand or claim or the commencement of any action, suit, proceeding or investigation, the Warrant Agent shall, if a claim in respect thereof is to be made against the Company, promptly notify the Company thereof in writing.  The Company shall be entitled to participate at its own expense in the defense of any such claim or proceeding, and, if it so elects at any time after receipt of such notice, it may assume the defense of any suit brought to enforce any such claim or of any other legal action or proceeding.  The Company shall not be required to indemnify the Warrant Agent for any amount paid or payable by the Warrant Agent in the settlement or compromise of, or entry into any judgment with respect to, any pending or threatened action or claim in respect of which indemnification or contribution may be sought hereunder without the written consent of the Company, which consent shall not be unreasonably withheld.

### Section 8.6     Legal Proceedings.

The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more Holders shall furnish the Warrant Agent with reasonable security and indemnity satisfactory to the Warrant Agent for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity. All rights of action under this Agreement or under any of the Warrants may be enforced by the Warrant Agent without the possession of any of the Warrants or the production thereof at any trial or other proceeding relative thereto, and any such action, suit or proceeding instituted by the Warrant Agent shall be brought in its name as Warrant Agent, and any recovery of judgment shall be for the ratable benefit of the Holders, as their respective rights or interests may appear, or the Company, as applicable.

### Section 8.7     Other Transactions Involving the Company.

The Warrant Agent and any member, stockholder, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Company or become peculiarly interested in any transactions in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Agreement or such director, officer or employee. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity including acting as transfer agent or as a lender to the Company or an Affiliate thereof.

### Section 8.8     Actions as Agent.

The Warrant Agent shall act hereunder solely as agent for the Company, and its duties shall be determined solely by the express provisions of this Agreement. No implied duties or obligations shall be read into this Agreement against the Warrant Agent. The Warrant Agent shall not be liable for anything which it may do or refrain from doing in connection with this Agreement except for its own gross negligence, bad faith or willful misconduct (each as determined by a final, non-appealable judgment of a court of competent jurisdiction).

30

**Section 8.9    Liability of Warrant Agent**.

The Warrant Agent may conclusively rely upon and shall be protected by the Company and shall not incur any liability or responsibility for or in respect of any action taken, suffered or omitted to be taken by it in reliance on any Warrant Statement or Global Warrant Certificate or other securities of the Company, instrument of assignment or transfer, power of attorney, endorsement, affidavit, letter, direction, statement, notice, resolution, waiver, consent, order, certificate or other paper, document or instrument reasonably believed by it to be genuine and to have been signed, executed, sent, presented and, where necessary, verified or acknowledged, by the proper party or parties. The Warrant Agent shall not be bound by any notice or demand, or any waiver, modification, termination or revision of this Warrant Agreement or any of the terms hereof, unless evidenced by a writing between and signed by, the Company and the Warrant Agent. The Warrant Agent shall not be required to take instructions or directions except those given in accordance with this Agreement.

**Section 8.10    Validity of Agreement**.

The Warrant Agent shall not be under any responsibility in respect of the validity of this Agreement or the execution and delivery hereof (except the due execution and delivery hereof by the Warrant Agent) or in respect of the validity or execution of any Warrant (except its counter-signature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant Statement or Global Warrant Certificate; nor shall the Warrant Agent by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any underlying securities (or other equity interests) to be issued pursuant to this Agreement or any Warrant, or as to whether any underlying securities (or other equity interests) will, when issued, be validly issued, fully paid and non-assessable, or as to the Exercise Price or the number or amount of underlying securities or other securities or other property issuable upon exercise of any Warrant; nor shall it be responsible to make or liable for any adjustments required under any provision hereof, including but not limited to Article IV hereof, or responsible for the manner, method or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it by act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Common Stock to be issued pursuant to this Agreement or any Warrant or as to whether any shares of Common Stock will, when issued, be valid and fully paid and nonassessable.

**Section 8.11    Acceptance of Instructions**.

The Warrant Agent is hereby authorized and directed to accept instructions with respect to the performance of its duties hereunder from the Chairman of the Board, President, Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, any Senior Vice President or Executive Vice President or Secretary of the Company, and to apply to such officers for advice or instructions in connection with its duties, and shall not be liable for any action taken or suffered by it in accordance with instructions of any such officer or officers or for any delay in acting while waiting for those instructions.

**Section 8.12    Right to Consult and Rely Upon Counsel**.

31

Before the Warrant Agent acts or refrains from acting, it may at any time consult with legal counsel (who may be legal counsel for the Company), and the opinion or advice of such counsel shall be full and complete authorization and protection to the Warrant Agent and the Warrant Agent shall incur no liability or responsibility to the Company or to any Holder or Registered Holder for any action taken, suffered or omitted by it in accordance with the opinion or advice of such counsel.

**Section 8.13   Right to Rely Upon Orders**.

The Warrant Agent may rely conclusively and shall be protected in acting upon any order, judgment, instruction, notice, demand, certificate, statement, instrument, report or other paper or document (not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and acceptability and of information therein contained) which is believed by the Warrant Agent, to be genuine and to be signed or presented by the proper person or persons as set forth in Section 8.11.

**Section 8.14   No Additional Duties**.

The Warrant Agent shall have no duties, responsibilities or obligations as the Warrant Agent except those which are expressly set forth herein, and in any modification or amendment hereof to which the Warrant Agent has consented in writing, and no duties, responsibilities or obligations shall be implied or inferred. Without limiting the foregoing, unless otherwise expressly provided in this Agreement, the Warrant Agent shall not be subject to, nor be required to comply with, or determine if any person or entity has complied with, any other agreement between or among the parties hereto, even though references thereto may be made in this Agreement, or to comply with any notice, instruction, direction, request or other communication, paper or document other than as expressly set forth in this Agreement.

**Section 8.15   No Responsibility for Company's Breach**.

The Warrant Agent shall not be responsible for any failure of the Company to comply with any of the covenants contained in this Agreement (including, without limitation, any adjustment of the Exercise Price pursuant to Article IV hereof, the authorization or reservation of shares of Common Stock pursuant to Section 6.1 hereof, and the due execution and delivery by the Company of this Agreement or any Global Warrant Certificate) or in the Global Warrant Certificates to be complied with by the Company.

**Section 8.16   No Duty to Ensure Securities Laws Compliance**.

The Warrant Agent will not be under any duty or responsibility to insure compliance with any applicable federal or state securities laws in connection with the issuance, transfer or exchange of Global Warrant Certificates.

**Section 8.17   No Liability for Force Majeure Events**.

The Warrant Agent shall not incur any liability for not performing any act, duty, obligation or responsibility by reason of any occurrence beyond the control of the Warrant Agent (including, without limitation, any act or provision of the present or future Law or regulation or

32

Governmental Authority, any act of God, war, civil disorder or failure of any means of communication).

### Section 8.18   No Duty to Make Adjustments.

The Warrant Agent shall not at any time be under any duty or responsibility to any Holder or Registered Holder to make or cause to be made any adjustment of the Exercise Price or number of the shares of Common Stock or other securities or property deliverable as provided in this Agreement, or to determine whether any facts exist which may require any of such adjustments, or with respect to the nature or extent of any such adjustments, when made, or with respect to the method employed in making the same. The Warrant Agent shall not be accountable with respect to the validity or value or the kind or amount of any shares of Common Stock or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or with respect to whether any such shares of Common Stock or other securities will when issued be validly issued and fully paid and nonassessable, and makes no representation with respect thereto. The Warrant Agent shall not be accountable to confirm or verify the accuracy or necessity of any calculation.

### Section 8.19   Additional Assurances.

The Company agrees to perform, execute and acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments, and assurances as many reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Agreement.

### Section 8.20   Survival.

All rights and obligations contained in this Article VIII shall survive the termination of this Agreement and the resignation, replacement or removal of the Warrant Agent.**Change of Warrant Agent**.

If the Warrant Agent shall resign (such resignation to become effective not earlier than sixty (60) days after the giving of written notice thereof to the Company and the Registered Holders) or shall become incapable of acting as Warrant Agent or if the Board shall by resolution remove the Warrant Agent (such removal to become effective not earlier than thirty (30) days after the filing of a certified copy of such resolution with the Warrant Agent and the giving of written notice of such removal to the Registered Holders), the Company shall appoint a successor to the Warrant Agent. If the Company shall fail to make such appointment within a period of thirty (30) days after such removal or after it has been so notified in writing of such resignation or incapacity by the Warrant Agent or by a Registered Holder (in the case of incapacity), then any Registered Holder may apply to any court of competent jurisdiction for the appointment of a successor to the Warrant Agent. Pending appointment of a successor to the Warrant Agent, either by the Company or by such a court, the duties of the Warrant Agent shall be carried out by the Company. Any successor Warrant Agent, whether appointed by the Company or by such a court, shall be a Person, in good standing, incorporated under the Laws of any state or of the United States of America. As soon as practicable after appointment of the successor Warrant Agent, the Company shall cause written notice of the change in the Warrant

33

Agent to be given to each of the Registered Holders at such Registered Holder's address appearing on the Warrant Register and shall be given to each Holder of a beneficial interest in a Global Warrant Certificate at such Holder's address as provided by the Depositary; *provided*, that the Company may, at its discretion, alternatively send such notice to the Holders of beneficial interests of a Global Warrant Certificate through the Depositary's communication system. After appointment, the successor Warrant Agent shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named as Warrant Agent without further act or deed. The former Warrant Agent shall deliver and transfer to the successor Warrant Agent all books and records of the Company and any property at the time held by it hereunder and execute and deliver, at the expense of the Company, any further assurance, conveyance, act or deed necessary for the purpose. Failure to give any notice provided for in this <u>Section 8.21</u> or any defect therein, shall not affect the legality or validity of the removal of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

### Section 8.22    Successor Warrant Agent.

Any Person into which the Warrant Agent may be merged or with which it may be consolidated, or any Person resulting from any merger or consolidation to which the Warrant Agent shall be a party, shall be the successor Warrant Agent under this Agreement without any further act; *provided, however,* that such Person would be eligible for appointment as a successor to the Warrant Agent under the provisions of <u>Section 8.21</u>. Any such successor Warrant Agent shall promptly cause notice of its succession as Warrant Agent to be mailed to the Company and the Registered Holders, at such Warrant Agent's sole expense. If at the time such successor to the Warrant Agent shall succeed under this Agreement, any of the Global Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent; and if at that time any of the Global Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Global Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases such Global Warrant Certificates shall have the full force provided in the Global Warrant Certificates and in this Agreement.

### Section 8.23    Expenses.

All expenses incident to the Company's performance of or compliance with this Agreement will be borne by the Company, including, without limitation: (i) all expenses of printing Global Warrant Certificates; (ii) messenger and delivery services and telephone calls; (iii) all fees and disbursements of counsel for the Company; (iv) all fees and disbursements of independent certified public accountants or knowledgeable experts selected by the Company; and (v) the Company's internal expenses (including, without limitation, all salaries and expenses of their officers and employees performing legal or accounting duties).

### Section 8.24    Other.

No provision of this Agreement shall require the Warrant Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of its rights if it believes there shall be reasonable grounds for

<div align="center">34</div>

believing that repayment of such funds or adequate indemnification against such risk or liability is not reasonably assured to it.

## ARTICLE IX

## MISCELLANEOUS

### Section 9.1    Money Deposited with the Warrant Agent.

The Warrant Agent shall not be required to pay interest on any moneys deposited pursuant to the provisions of this Agreement, except such as it shall agree in writing with the Company to pay thereon. Any moneys, securities or other property which at any time shall be deposited by the Company or on its behalf with the Warrant Agent pursuant to this Agreement shall be and are hereby assigned, transferred and set over to the Warrant Agent in trust for the purpose for which such moneys, securities or other property shall have been deposited; but such moneys, securities or other property need not be segregated from other funds, securities or other property except to the extent required by Law.

### Section 9.2    Payment of Taxes.

The Company shall pay any and all taxes (other than income taxes) that may be payable in respect of the issue or delivery of shares of Common Stock on exercise of Warrants pursuant hereto. The Company shall not be required, however, to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of any certificates for shares of Common Stock or payment of cash or other property to any Recipient other than the Holder of the Warrant surrendered upon the exercise of a Warrant, and in case of such transfer or payment, the Warrant Agent and the Company shall not be required to issue or deliver any certificate or pay any cash until (a) such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Warrant Agent or the Company or (b) it has been established to the Company's satisfaction that any such tax or other charge that is or may become due has been paid. The Warrant Agent shall have no duty or obligation to take any action under any Section of this Agreement which requires the payment by a Holder or a Registered Holder of applicable taxes or charges unless and until the Warrant Agent is satisfied that all such taxes and/or charges have been paid

### Section 9.3    Notices.

(a)    Any notice, request, demand or report (each, a "*Communication*") required or permitted to be given or made by this Agreement shall be in writing.

(b)    Any Communication authorized by this Agreement to be given or made by the Warrant Agent, by any Registered Holder or by any Holder to or on the Company shall be sufficiently given or made if sent by registered or certified overnight mail or by a nationally recognized overnight delivery service for next day delivery and shall be deemed given upon receipt, or by facsimile or electronic mail, addressed (until another address is filed by the Company with the Warrant Agent) as follows:

35

Cumulus Media Inc.
3280 Peachtree Road, NW Suite 2300,
Atlanta, GA 30305
Telephone: [__]
Facsimile: [__]
Attention: [__]

With a copy to:

[__]

and

[__]

(c)        Any Communication authorized by this Agreement to be given or made by the Company, by any Registered Holder or by any Holder to or on the Warrant Agent shall be sufficiently given or made if sent by registered or certified overnight mail or by a nationally recognized overnight delivery service for next day delivery and shall be deemed given upon receipt, or by facsimile or electronic mail, addressed (until another address is filed by the Warrant Agent with the Company) as follows:

[__]
Telephone: [__]
Facsimile: [__]
Attention: [__]

With a copy to:

[__]

(d)        Any Communication authorized by this Agreement to be given or made by the Company or the Warrant Agent to any Holder or Registered Holder shall be sufficiently given or made if sent by registered or certified overnight mail, or by a nationally recognized overnight delivery service for next day delivery and shall be deemed given upon receipt, or by facsimile or electronic mail, addressed to such Holder or Registered Holder at the address of such Holder or Registered Holder as shown on the Warrant Register or at such Holder's address as provided by the Depositary, as applicable; *provided* that at the Company's discretion, such notice may be sent to the Holders of beneficial interests of a Global Warrant Certificate through the Depositary's communication system. The Company shall deliver a copy of any notice or demand it delivers to any Holder or Registered Holder to the Warrant Agent, and the Warrant Agent shall deliver a copy of any notice or demand it delivers to any Holder or Registered Holder to the Company.

**Section 9.4    Waiver of Jury Trial**.

(a)        <u>Waiver of Jury Trial</u>. EACH PARTY ACKNOWLEDGES THAT ANY DISPUTE THAT MAY ARISE OUT OF OR RELATING TO THIS AGREEMENT IS

36

LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE SUCH PARTY HEREBY EXPRESSLY WAIVES ITS RIGHT TO JURY TRIAL OF ANY DISPUTE BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OTHER AGREEMENTS RELATING HERETO OR ANY DEALINGS AMONG THEM RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY. THE SCOPE OF THIS WAIVER IS INTENDED TO ENCOMPASS ANY AND ALL ACTIONS, SUITS AND PROCEEDINGS THAT RELATE TO THE SUBJECT MATTER OF THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY REPRESENTS THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT IN THE EVENT OF ANY ACTION, SUIT OR PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) SUCH PARTY UNDERSTANDS AND WITH THE ADVICE OF COUNSEL HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (IV) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND REPRESENTATIONS IN THIS <u>SECTION 9.4</u>.

### Section 9.5    Governing Law.

This Agreement and each Warrant Statement and Global Warrant Certificate issued hereunder shall be deemed to be a contract made under the Laws of the State of New York applicable to contracts made and to be performed therein and for all purposes shall be construed in accordance with the Laws of such State without giving effect to conflict of law principles.

### Section 9.6    Binding Effect.

This Agreement shall be binding upon and inure to the benefit of the Company and the Warrant Agent and their respective successors and assigns, and the Holders and Registered Holders from time to time of the Warrants. Subject to <u>Section 3.3(e)</u>, nothing in this Agreement is intended or shall be construed to confer upon any Person, other than the Company, the Warrant Agent, Holders and Registered Holders, any right, remedy or claim under or by reason of this Agreement or any part hereof.

### Section 9.7    Counterparts.

This Agreement may be executed manually or by facsimile in any number of counterparts, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

### Section 9.8    Amendments.

(a)    The Warrant Agent may, without the consent or concurrence of the Holders or Registered Holders, enter into one or more supplemental agreements or amendments with the Company for the purpose of (i) evidencing the rights of the Holders or Registered Holders upon a Change of Control, transfer, reclassification, liquidation or dissolution under

<div align="center">37</div>

Section 4.1(c), (ii) making any changes or corrections in this Agreement that are required to cure any ambiguity, to correct or supplement any provision contained herein that may be defective or inconsistent with any other provision herein or any clerical omission or mistake or manifest error herein contained, (iii) making such other provisions in regard to matters or questions arising under this Agreement as shall not adversely affect the interest of the Holders or Registered Holders or be inconsistent with this Agreement or any supplemental agreement or amendment or (iv) adding further covenants and agreements of the Company in this Agreement or surrendering any rights or power reserved to or conferred upon the Company in this Agreement.

(b)     With the written consent of the Holders evidencing at least a majority in number of the Warrants at the time outstanding (excluding Warrants held by the Company or any of its Affiliates), the Company and the Warrant Agent may at any time and from time to time by supplemental agreement or amendment add any provisions to or change in any manner or eliminate any of the provisions of this Agreement or of any supplemental agreement or modify in any manner the rights and obligations of the Holders and the Company; *provided*, that any amendment or modification of, or waiver of rights under, this Agreement that (i) amends this Section 9.8, (ii) adversely affects a Holder or Registered Holder's right to exercise its Warrants, (iii) amends or modifies the Exercise Price, (iv) changes the Expiration Date to a date that is earlier than the Expiration Date or (v) impairs the right of any Holder or Registered Holder to receive any distribution or a security as set forth in this Agreement, shall require the consent of each Holder and Registered Holder so affected.  Notwithstanding anything to the contrary contained in this Agreement, no supplemental agreement or amendment that changes the rights and duties of the Warrant Agent under this Agreement shall be effective against the Warrant Agent without the written consent of the Warrant Agent.

### Section 9.9    Waivers.

The Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if (i) the Company has obtained the written consent of Holders evidencing a majority of the then outstanding Warrants and (ii) any consent required pursuant to Section 9.8 has been obtained.

### Section 9.10   Inspection.

The Warrant Agent shall cause a copy of this Agreement to be available at all reasonable times at the office of the Warrant Agent for inspection by any Holder or Registered Holder. The Warrant Agent may require such Holder or Registered Holder to submit its Warrant Statement, Global Warrant Certificate or evidence of a beneficial interest in a Global Warrant Certificate for inspection by the Warrant Agent.

### Section 9.11   Headings.

The descriptive headings of the several Sections of this Agreement are inserted for convenience and shall not control or affect the meaning or construction of any of the provisions hereof.

### Section 9.12   Construction.

38

This Agreement has been freely and fairly negotiated among the parties. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, the Registered Holders and the Holders and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement.

**Section 9.13   Severability**.

In the event that any one or more of the provisions, paragraphs, words, clauses, phrases or sentences contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision, paragraph, word, clause, phrase or sentence in every other respect and of the other remaining provisions, paragraphs, words, clauses, phrases or sentences hereof shall not be in any way impaired, it being intended that all rights, powers and privileges of the parties hereto shall be enforceable to the fullest extent permitted by Law; *provided*, that this Section 9.13 shall not cause this Agreement or the Warrants to differ materially from the intent of the parties as herein expressed; *provided, however*, that if such excluded or added provision shall affect the rights, immunities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to resign upon ten (10) days' written notice.

**Section 9.14   Entire Agreement**.

This Agreement and the Warrants set forth the entire agreement of the parties hereto as to the subject matter hereof and supersede all previous agreements among all or some of the parties hereto with respect thereto, whether written, oral or otherwise. In the event of any conflict, discrepancy, or ambiguity between the terms and conditions contained in this Agreement and any schedules or attachments hereto, the terms and conditions contained in this Agreement shall take precedence.

**Section 9.15   Force Majeure**.

In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

**Section 9.16   Original Issuance as Class B Common Stock**.

Notwithstanding any other provision of this Agreement or the Warrants to the contrary, prior to the issuance of any shares of Class A Common Stock upon the exercise of Warrants or upon the Exchange, an equal number of shares of Class B Common Stock are first deemed to have been issued and then automatically converted into Class A Common Stock in accordance with Section 5(e) of the Certificate of Incorporation.

Doc#: US1:11847348v20

[SIGNATURE PAGE FOLLOWS.]

40

Doc#: US1:11847348v20

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed, as of the day and year first above written.

CUMULUS MEDIA INC.


By: _____
     Name:
     Title:


[__]
As Warrant Agent


By: _____
     Name:
     Title:

[Signature Page to Warrant Agreement]

**EXHIBIT A-1**
**FORM OF WARRANT STATEMENT[1]**

**CUMULUS MEDIA INC.**

**DRS Warrant Distribution Statement**

| CUSIP Number | Account Number/Account Key |
|---|---|
|  |  |
| **Ticker Symbol** | **Investor ID** |
|  |  |
| **Issuance Date** | **Distribution** |
|  |  |

[_____]
[_____]
[_____]
[_____]

| **Cumulus Media Inc. [Series 1/Series 2] Warrants Issued To You In Book-Entry Form** |
|---|
| [_____] |

### PLEASE RETAIN THIS STATEMENT FOR YOUR RECORDS

These [Series 1/Series 2] Warrants are maintained for you under the Direct Registration System, which means they are held for you in an electronic, book-entry account maintained by [●]. Please retain this statement for your permanent record.

| **Questions? Contact [●]** |
|---|
| To access your account, use your Investor ID Number that is located in the box above on the top right hand corner of this statement. You can contact [__] in one of the following ways: |
| *By Internet*: Visit [●] for access to your account. You will be able to certify your Taxpayer Identification Number/Social Security Number, change your address or sell warrants. |

*By Phone:*

| | | *By Mail:* |
|---|---|---|
| Toll Free Number | [●] | Cumulus Media Inc. |
| Outside the U.S. (Collect) | [●] | c/o [●] |
| Hearing Impaired | [●] | [●] |
| Representatives are available [●] a.m. to [●] p.m. Eastern Time weekdays | | [●] |

### [Request for Taxpayer Identification and Certification

Our records indicate that we do not have a certified Taxpayer Identification Number ("*TIN*") on file. Without a certified TIN, we may be required by law to withhold [●]% from any future payments and any sale transaction that you request. Logon to [●] to certify your TIN or contact us by phone to request a Substitute Form W-9.]

---

[1] NTD: May be adjusted to match form of statement used by Warrant Agent.

Doc#: US1:11847348v20

SEE REVERSE SIDE FOR IMPORTANT INFORMATION

This statement is your record that the Cumulus Media Inc. [Series 1/Series 2] Warrants have been credited to your account on the books of Cumulus Media Inc. maintained by [●], under the Direct Registration System. Please verify all information on the reverse side of this statement. This statement is neither a negotiable instrument nor a security, and delivery of this statement does not itself confer any rights on the recipient. Nevertheless, it should be kept with your important documents as a record of your ownership of these securities.

**Transfer ownership of your book-entry warrants** at any time by submitting the appropriate warrant transfer documents to [●]. Visit [●]'s Investor ServiceDirect online at [●] or call [●] to obtain transfer documents.

**[Transfer of your book-entry warrants to your broker can be accomplished in one of two ways:**

(1)     The fastest and easiest way is to provide your broker with your Account Key at [●], your Taxpayer Identification Number (TIN) and your account registration information, and request that your broker initiate an electronic transfer of your warrants, or

(2)     Obtain a "Broker-Dealer Authorization Form" by visiting [●] or by calling [●].]

The Warrant Agreement, dated [●], 2018 (the "*Warrant Agreement*"), between Cumulus Media Inc. (the "*Company*") and [●], LLC, as Warrant Agent (the "*Warrant Agent*"), is incorporated by reference into and made a part of this statement, and this statement is qualified in its entirety by reference to the Warrant Agreement. A copy of the Warrant Agreement may be inspected at the Warrant Agent's office [●] and is also available on the Company's website at [●]. All capitalized terms used but not defined herein shall have the meanings assigned to them in the Warrant Agreement.

Subject to the provisions of the Warrant Agreement, [Series 1]/[Series 2] Book-Entry Warrants may be exercised to purchase Common Stock (subject to adjustment as provided in Section 4.1 of the Warrant Agreement, the "*Warrant Shares*") from the Company from the Effective Date through 5:00 p.m. New York City time on [●], 2038 (the "*Expiration Date*"), at an exercise price of $0.001 per whole share (the "*Exercise Price*") multiplied by the number of Warrant Shares set forth above (the "*Exercise Amount*"). At the election of a Term Loan Holder on its Exercise Form or Election Form, as applicable, Common Stock issued upon exercise or exchange of the Warrants shall be issued in the form of Restricted Stock.  In addition, a Holder may elect on its Exercise Form (i) to receive Class B Common Stock by checking the Class B Common Stock Only Election box, (ii) to receive up to 4.99% of the outstanding Class A Common Stock and [receive Series 1 Warrants in exchange for its remaining Series 2 Warrants]/[retain its Series 1 Warrants] if the exercising Holder has elected the Class A Common Stock and Warrant Election, and (iii) solely with respect to Term Loan Holders, receive any Common Stock issuable to it as Restricted Stock. The number of shares of Common Stock purchasable upon exercise of the Warrants is subject to adjustment upon the occurrence of certain events as set forth in the Warrant Agreement.  Subject to the terms and conditions set forth in the Warrant Agreement, each Holder of a Book-Entry Warrant may exercise such Book-Entry Warrant, in whole or from

Doc#: US1:11847348v20

time to time in part, by: (1) providing a properly completed and duly executed (a) exercise form for the election to exercise such Book-Entry Warrants (the "*Exercise Form*") and (b) written certification as set forth in the Warrant Agreement for the purpose of enabling the Company to determine (i) a Holder's potential level of direct and indirect voting and equity interests in accordance with 47 U.S.C. § 310(b) of the Act, as interpreted and applied by the FCC in the FCC Rules; and (ii) whether the holding of more than 4.99% of the outstanding Class A Common Stock by such certifying party would result in a violation of the FCC Rules (the "*Ownership Certification*") to the Warrant Agent in accordance with the instructions below, no later than 5:00 p.m., New York City time, on the Expiration Date, and (2) paying the applicable Exercise Amount to the Warrant Agent.  Following submission of the forms described in the preceding sentence, the Company will review your forms to determine the maximum number of Warrants you are able to exercise, if any, pursuant to the certain restrictions on exercise of the Warrants and ownership of the Common Stock described in the Warrant Agreement and the Certificate of Incorporation, as each may be amended from time to time.  Following this review and written instruction from the Company, the Warrant Agent shall deliver or cause to be delivered to you Class A Common Stock, Class B Common Stock and/or Series 1 Warrants, in such amounts as the Company determines, in its sole and absolute discretion, are in accordance with the terms set forth in the Warrant Agreement.

The Company shall not be required to issue any fraction of a share of its capital stock in connection with the exercise of Warrants. All shares of capital stock issuable upon conversion of more than one Warrant by a holder thereof shall be aggregated for purposes of determining whether the conversion would result in the issuance of any fractional share. If, after the aforementioned aggregation, the conversion would result in the issuance of any fractional share, the Company may, in lieu of issuing any fractional share, (i) pay the holder of such Warrant an amount in cash equal to the then fair market value per share of the Common Stock, as determined by the Board of Directors, multiplied by such fraction (computed to the nearest whole cent) or (ii) round such fraction of a share to the nearest whole number of shares. For the avoidance of doubt, 0.5 of a share shall be rounded to one (1) share.

THE WARRANTS REPRESENTED BY THIS STATEMENT ARE SUBJECT TO CERTAIN RESTRICTIONS ON EXERCISE, TRANSFER, SALE, ASSIGNMENT, PLEDGE, ENCUMBRANCE OR OTHER SIMILAR TRANSFER AS SET FORTH IN THE WARRANT AGREEMENT AMONG THE COMPANY AND THE WARRANT AGENT (ON BEHALF OF THE ORIGINAL HOLDERS OF THE WARRANT SHARES) (THE "WARRANT AGREEMENT"). DURING THE EXCHANGE PERIOD, THE WARRANTS (AND ANY BENEFICIAL INTERESTS THEREIN) MAY NOT BE TRANSFERRED (AS DEFINED IN THE WARRANT AGREEMENT) AND THE WARRANTS MAY NOT BE EXERCISED. COPIES OF THE WARRANT AGREEMENT MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY.

Doc#: US1:11847348v20

## [FORM OF ASSIGNMENT]

FOR VALUE RECEIVED, the undersigned registered holder of the Book-Entry Warrant hereby sells, assigns and transfers unto the Assignee(s) named below (including the undersigned with respect to any Warrants constituting a part of the Warrants evidenced by the Warrant Statement not being assigned hereby) all of the rights of the undersigned under the Book-Entry Warrant, with respect to the whole number of [Series 1/Series 2] Warrants set forth below:

_____
Name(s) of Assignee(s):

_____
Address:

_____
No. of [Series 1/Series 2] Warrants:

Please insert social security or other identifying number of assignee(s):

_____

and does hereby irrevocably constitute and appoint _____

the undersigned's attorney to make such transfer on the books of _____

maintained for such purposes, with full power of substitution in the premises.

_____
Dated

_____
(Signature of Owner)

_____
(Street Address)

_____
(City) (State) (Zip Code)

_____
Signature Guaranteed By[2]

_____

[2]   The Holder's signature must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

Exhibit A-1 Page 4

**EXHIBIT A-2**

**FORM OF FACE OF GLOBAL WARRANT CERTIFICATE
CUMULUS MEDIA INC.**

No. 1

Cusip Number: [●]

Zero Warrants

**WARRANTS TO PURCHASE CLASS A COMMON STOCK OR CLASS B COMMON
STOCK**

**VOID AFTER 5:00 P.M., NEW YORK CITY TIME, ON [●], 2038**

This Global Warrant Certificate is held by The Depository Trust Company (the "*Depositary*") or its nominee in custody for the benefit of the beneficial owners hereof, and is not transferable to any Person under any circumstances except that (i) this Global Warrant Certificate may be exchanged in whole but not in part pursuant to Section 2.4 of the Warrant Agreement dated as of [●], 2018, by and between the Company and the Warrant Agent (the "*Warrant Agreement*"), (ii) this Global Warrant Certificate may be delivered to the Warrant Agent for cancellation pursuant to Section 2.4 of the Warrant Agreement and (iii) this Global Warrant Certificate may be transferred to a successor Depositary with the prior written consent of the Company.

Unless this Global Warrant Certificate is presented by an authorized representative of the Depositary to the Company or the Warrant Agent for registration of transfer, exchange or payment and any certificate issued is registered in the name of Cede & Co., or such other entity as is requested by an authorized representative of the Depositary (and any payment hereon is made to Cede & Co. or to such other entity as is requested by an authorized representative of the Depositary), any transfer, pledge or other use hereof for value or otherwise by or to any Person is wrongful because the registered owner hereof, Cede & Co., has an interest herein.

Transfers of this Global Warrant Certificate shall be limited to transfers in whole, but not in part, to nominees of the Depositary or to a successor thereof or such successor's nominee, and transfers of portions of this Global Warrant Certificate shall be limited to transfers made in accordance with the restrictions set forth in the Warrant Agreement.

No registration or transfer of the securities issuable pursuant to the Warrant will be recorded on the books of the Company until the provisions set forth in the Warrant Agreement have been complied with.

In the event of any conflict or inconsistency between this Global Warrant Certificate and the Warrant Agreement, the Warrant Agreement shall control.

THIS WARRANT HAS BEEN, AND THE COMMON STOCK WHICH MAY BE PURCHASED PURSUANT TO THE EXERCISE OF THIS WARRANT (THE "*WARRANT SHARES*," AND TOGETHER WITH THIS WARRANT, THE "*SECURITIES*") WILL BE,

ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY REFORM ACT OF 1978, AS AMENDED (THE "**BANKRUPTCY CODE**"). THE SECURITIES MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE, THEN THE SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR (2) THE COMPANY IS IN RECEIPT OF AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND ITS COUNSEL THAT SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS. THIS WARRANT MUST BE SURRENDERED TO THE COMPANY OR ITS TRANSFER AGENT AS A CONDITION PRECEDENT TO THE SALE, PLEDGE OR OTHER TRANSFER OF ANY INTEREST IN ANY OF THE WARRANT SHARES REPRESENTED BY THIS WARRANT.

THE SECURITIES REPRESENTED BY THIS WARRANT ARE SUBJECT TO CERTAIN RESTRICTIONS ON EXERCISE, TRANSFER, SALE, ASSIGNMENT, PLEDGE, ENCUMBRANCE OR OTHER SIMILAR TRANSFER AS SET FORTH IN THE CERTIFICATE OF INCORPORATION OF THE COMPANY AND A WARRANT AGREEMENT AMONG THE COMPANY AND THE WARRANT AGENT (ON BEHALF OF THE ORIGINAL HOLDERS OF THE WARRANT SHARES), COPIES OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY.

<div align="center">

THIS WARRANT WILL BE VOID IF NOT EXERCISED PRIOR
TO 5:00 P.M., NEW YORK CITY TIME, ON [●], 2038

**WARRANT TO PURCHASE ONE SHARE OF CLASS A COMMON STOCK OR CLASS B COMMON STOCK OF**

**CUMULUS MEDIA INC. FOR EACH WARRANT HELD**

**CUMULUS MEDIA INC.**

CUSIP #: [●]
DISTRIBUTION DATE: **[●], 2018**

</div>

This certifies that, for value received, Cede & Co., and its registered assigns (collectively, the "**Registered Holder**"), is entitled to purchase from Cumulus Media Inc., a corporation incorporated under the laws of the State of Delaware (the "**Company**"), subject to the terms and conditions hereof, at any time before 5:00 p.m., New York time, on [●], 2038, the number of fully paid and non-assessable shares of Class A Common Stock or Class B Common Stock of the Company set forth above at the Exercise Price (as defined in the Warrant

<div align="center">

Exhibit A-2 Page 2

</div>

Agreement). The Exercise Price and the number and kind of shares purchasable hereunder are subject to adjustment from time to time as provided in Article IV of the Warrant Agreement. The Exercise Price shall be $0.001.

This Global Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

IN WITNESS WHEREOF, this Warrant has been duly executed by the Company as of the [●] day of [●], 2018.

CUMULUS MEDIA INC.

By: _____

Print Name: _____

Title: _____

Attest: _____
Secretary

[●]
as Warrant Agent

By: _____
    Name:
    Title:

Address of Registered Holder for Notices (until changed in accordance with this Warrant):

_____

_____

_____

_____

_____

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS GLOBAL WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF. SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

Doc#: US1:11847348v20

## FORM OF REVERSE OF GLOBAL WARRANT CERTIFICATE

The Warrant evidenced by this Warrant Certificate is a part of a duly authorized issue of Warrants to purchase shares of Common Stock issued pursuant to the Warrant Agreement, a copy of which may be inspected at the Warrant Agent's office designated for such purpose. The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the Warrants. All capitalized terms used on the face of this Warrant herein but not defined that are defined in the Warrant Agreement shall have the meanings assigned to them therein.

Upon due presentment for registration of transfer of the Warrant at the office of the Warrant Agent designated for such purpose, a new Warrant Certificate or Warrant Certificates of like tenor and evidencing in the aggregate a like number of Warrants shall be issued to the transferee in exchange for this Warrant Certificate, subject to the limitations provided in the Warrant Agreement, without charge except for any applicable tax or other charge.

The Company shall not be required to issue fractions of Warrant Shares or any certificates that evidence fractional Warrant Shares.

No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

This Warrant does not entitle the Registered Holder to any of the rights of a stockholder of the Company.

The Company and Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

Doc#: US1:11847348v20

**FORM OF ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned registered holder of the Global Warrant Certificate hereby sells, assigns and transfers unto the Assignee(s) named below (including the undersigned with respect to any Warrants constituting a part of the Warrants evidenced by the Global Warrant Certificate not being assigned hereby) all of the rights of the undersigned under the Global Warrant Certificate, with respect to the whole number of Warrants set forth below:

_____

Name(s) of Assignee(s):

_____

Address:

_____

No. of Warrants:

Please insert social security or other identifying number of assignee(s):

_____

and does hereby irrevocably constitute and appoint _____

the undersigned's attorney to make such transfer on the books of _____

maintained for such purposes, with full power of substitution in the premises.

_____

Dated

_____

(Signature of Owner)

_____

(Street Address)

_____

(City) (State) (Zip Code)

_____

Signature Guaranteed By[1]

---

[1]    The Holder's signature must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

Exhibit A-2 Page 5

**EXHIBIT B**
**FORM OF OWNERSHIP CERTIFICATION**

**MEDIA OWNERSHIP CERTIFICATION**

*HOLDERS ONLY NEED TO COMPLETE THIS MEDIA OWNERSHIP CERTIFICATION IF THEY INTEND TO OR WILL HOLD 5% OR MORE OF THE COMPANY'S CLASS A COMMON STOCK.  IF THAT IS NOT THE CASE, PLEASE SKIP THIS SECTION AND MOVE TO THE FOREIGN OWNERSHIP CERTIFICATION SECTION.*

1. Type of entity of Holder (*e.g.*, corporation, general partnership, limited partnership, limited liability company):

   _____

2. If the Holder is a *general partnership*:

   - For each general partner, complete Attachment A.

3. If the Holder is a *limited partnership*:

   - Is the limited partnership structured to insulate some or all of the limited partners in accordance with the FCC's insulation requirements?

     o If so, complete Attachment A only for each general partner and each uninsulated limited partner.

     o If not, complete Attachment A for each general partner and each limited partner.

4. If the Holder is a *limited liability company*:

   - Is the limited liability company structured to insulate some or all of the members in accordance with the FCC's insulation requirements?

     o If so, complete Attachment A only for each uninsulated member.

     o If not, complete Attachment A for each member.

5. If the Holder is a *corporation* or other entity:

   - For each officer, director and shareholder holding 5% or more of the issued and outstanding voting stock of the Holder, complete Attachment A.

Exhibit A-2 Page 1

Doc#: US1:11847348v20

6.   Does the Holder or any of the persons listed on Attachment A serve as an officer or director of any broadcast radio stations?  Or serve as an officer or director of any entity that has an interest in any broadcast radio stations?

     [   ] Yes          [   ] No

     If "yes," please describe in an attachment.

7.   Does the Holder or any of the persons or entities listed on Attachment A hold, directly or indirectly, any voting or non-voting equity interest in any broadcast radio stations?

     [   ] Yes          [   ] No

     If "yes," please describe in an attachment.

8.   Does the Holder or any of the persons or entities listed on Attachment A have any other interests, direct or indirect (including an interest in a local marketing, time brokerage or joint sales agreement) that allows them to own, operate, or control any broadcast radio stations?

     [   ] Yes          [   ] No

     If "yes," please describe in an attachment.

9.   Does the Holder or any of the persons or entities listed on Attachment A hold any debt or equity interest in any entity which is an attributable owner of a radio station where such interest exceeds 33% of the total asset value of such entity?

     [   ] Yes          [   ] No

     If "yes," please describe in an attachment

10.  Does the Holder or any of the persons or entities listed on Attachment A have any interest in or connection with an FCC application that was or is the subject of unresolved character issues?

     [   ] Yes          [   ] No

     If "yes," please describe in an attachment.

11.  Is the Holder or any of the persons or entities listed in Attachment A subject to final adverse findings by any court or administrative body in a civil or criminal proceeding brought under the provisions of any law related to any of the following:  (i) any felony; (ii) mass media-related antitrust or unfair competition; (iii) fraudulent statements to another governmental unit; or (iv) discrimination.

     [   ] Yes          [   ] No

     If "yes," please describe in an attachment.

Exhibit A-2 Page 2

12.    Is the Holder or any of the persons or entities listed in Attachment A subject to denial of federal benefits pursuant to Section 5301 of the Anti-Drug Abuse Act of 1988, 21 USC § 862?

[   ] Yes          [   ] No

If "yes," please describe in an attachment.

Doc#: US1:11847348v20

## ATTACHMENT A

| NAME | ADDRESS | CITIZENSHIP | STATUS (*E.G.*, OFFICER, DIRECTOR, SHAREHOLDER) | PERCENTAGE VOTING INTEREST | PERCENTAGE EQUITY INTEREST |
|------|---------|-------------|------------------------------------------------|----------------------------|----------------------------|
|      |         |             |                                                |                            |                            |
|      |         |             |                                                |                            |                            |
|      |         |             |                                                |                            |                            |
|      |         |             |                                                |                            |                            |
|      |         |             |                                                |                            |                            |
|      |         |             |                                                |                            |                            |
|      |         |             |                                                |                            |                            |
|      |         |             |                                                |                            |                            |
|      |         |             |                                                |                            |                            |
|      |         |             |                                                |                            |                            |
|      |         |             |                                                |                            |                            |
|      |         |             |                                                |                            |                            |
|      |         |             |                                                |                            |                            |
|      |         |             |                                                |                            |                            |

Doc#: US1:11847348v17

| | | | | | |
|---|---|---|---|---|---|

## FOREIGN OWNERSHIP CERTIFICATION

**ALL HOLDERS MUST COMPLETE <u>EITHER</u> QUESTION 1 OR QUESTION 2 OF THIS SECTION.  SINGLE ENTITIES** SHOULD COMPLETE QUESTION 1; MULTIPLE ENTITIES PROVIDING A SINGLE RESPONSE (SUCH AS A GROUP OF FUNDS WITH A COMMON INVESTMENT MANAGER) SHOULD COMPLETE QUESTION 2.

1.      **Individual Foreign Ownership Certification**

This Individual Foreign Ownership Certification is being on behalf of _____, the Holder.

**Complete the following, providing information for the Holder:**

a.      **State or Country of Incorporation/Organization** – The Holder is organized under the laws of:

☐      State or territory of the United States: _____.

☐      Other: _____.

*If your answer is "Other," you may skip to the Certification because entities organized under the laws of a country other than the United States will be deemed to be 100% foreign for purposes of the FCC's foreign ownership limitations.*

b.      **Foreign Equity and Voting Percentages** – Complete one of the following:

☐      Foreign entities or foreign individuals hold, in the aggregate, the percentages of equity and voting interests in the Holder reported below:

Foreign Equity Percentage: _____%

Foreign Voting Percentage: _____%.

☐      I am unable to certify the exact percentage of the foreign equity interest and/or the foreign voting interest in the Holder; however, I hereby certify that the aggregate percentage(s) of such foreign interests are no higher than the maximum percentage(s) reported below:

Maximum Foreign Equity Percentage: _____%

Maximum Foreign Voting Percentage: _____%.

Doc#: US1:11847348v17

☐      I am unable to certify the percentage of the foreign equity interest and/or foreign voting interest in the Holder.**

**If a Holder is unable to certify its foreign equity and foreign voting interests, such interests will be deemed to be 100% foreign for purposes of determining the number of shares of Common Stock and Warrants that the Holder will receive.

*If you have completed Question 1 of this Section III, you should not complete Question 2 and you should proceed to the Certification.*

2.      **Consolidated Foreign Ownership Certification**

This Consolidated Foreign Ownership Certification is being made on behalf of (a) the following Holders:

_____
_____
_____
_____
_____

and (b) the following parent entity or affiliated investment manager of each of the above-listed Holders ("Certifying Parent"):

_____.

Certifying Parent certifies that (a) Certifying Parent directly or indirectly controls each of the Holders; (b) for purposes of the assessment of compliance with Section 310(b) of the Communications Act, the consolidated information provided below has been aggregated in accordance with the FCC rules; and (c) Certifying Parent will ensure that the Warrants and Common Stock will be held directly or indirectly by Holders indicated on this Certification and that the distribution of the Warrants and Common Stock among the members of the consolidated certification group will not cause the aggregate foreign ownership and foreign voting rights of the consolidated certification group to exceed the aggregate foreign ownership and voting percentages certified below for the consolidated certification group.

☐      Foreign entities or foreign individuals hold, in the aggregate, the percentages of equity and voting interests in the consolidated certification group reported below:

Foreign Equity Percentage: _____%

Foreign Voting Percentage: _____%.

☐      I am unable to certify the exact percentage of the foreign equity interest and/or the foreign voting interest in the consolidated certification group; however, I hereby certify

Exhibit B - Page 3

Doc#: US1:11847348v17

that the aggregate percentage(s) of such foreign interests are no higher than the maximum percentage(s) reported below:

Maximum Foreign Equity Percentage: _____%

Maximum Foreign Voting Percentage: _____%.

☐    I am unable to certify the percentage of the foreign equity interest and/or foreign voting interest in the consolidated certification group.**

**If a consolidated certification group is unable to certify its foreign equity or voting interests, such interests will be deemed to be 100% foreign for purposes of determining the number of shares of Common Stock and Warrants that the members of the group will receive on the Effective Date.

**Please provide the Foreign Equity Percentages and Foreign Voting Percentages for each individual member of the consolidated certification group:**

|  | Holder 1 | Holder 2 | Holder 3 |
|---|---|---|---|
| **Name** |  |  |  |
| **State or Country of Incorporation/ Organization**\*\* |  |  |  |
| **Foreign Equity Percentage** |  |  |  |
| **Foreign Voting Percentage** |  |  |  |
| **OR** |  |  |  |
| **Maximum Foreign Equity Percentage** |  |  |  |
| **Maximum Foreign Voting Percentage** |  |  |  |
| **Unable to Certify**\*\*\* |  |  |  |

**If an entity is organized under the laws of a country other than the United States, you need not supply foreign equity or voting percentages, because such entities will be deemed to be 100% foreign for purposes of the FCC's foreign ownership limitations.

Exhibit B - Page 4

Doc#: US1:11847348v17

\*\*\* If a Holder is unable to certify its foreign equity and foreign voting interests, such interests will be deemed to be 100% foreign for purposes of determining the number of shares of Common Stock and Warrants that the Holder will receive.

**PLEASE REPORT ANY ADDITIONAL HOLDERS ON A SEPARATE ATTACHMENT.**

The Holder acknowledges that the Company may decline to honor a requested exercise if it has a reasonable basis to believe, based on the most recent information available to it, that the exercise would cause the Company to be in violation of 47 U.S.C. § 310(b) or FCC rules; *provided* that the Company shall not be required to monitor the alien ownership among its stockholders more often than required by federal communications law.

By: _____
Sign

_____
Print Name

Title: _____

Entity: _____

Date: _____

Doc#: US1:11847348v17

**EXHIBIT C-1**

**EXERCISE FORM FOR REGISTERED HOLDERS
HOLDING BOOK-ENTRY WARRANTS**

(To be executed upon exercise of Warrant)

The undersigned hereby irrevocably elects to exercise the right, represented by the Book-Entry Warrants, to purchase Common Stock and herewith tenders payment for ___ of the shares of Common Stock to the order of _____ in the amount of $___ in accordance with the terms of the Warrant Agreement and this Warrant.

☐ **Restricted Stock Election.** The undersigned elects to receive any Common Stock issued upon exercise of the Warrants in the form of Restricted Stock. *This election is available for Term Loan Holders only.*

☐ **Class B Common Stock Only Election.** The undersigned elects to receive Common Stock issued upon exercise of the Warrants in the form of Class B Common Stock only.

☐ **Class A Common Stock and Warrant Election.** The undersigned elects to receive Common Stock issued upon exercise of the Warrants in the form of up to 4.99% of the outstanding Class A Common Stock and to retain its remaining Series 1 Warrants (in the case of Series 1 Warrants) or have its remaining Series 2 Warrants exchanged for Series 1 Warrants (in the case of Series 2 Warrants).

The undersigned requests that statement(s) representing the Common Stock (and any Warrants issued in the event of partial exercise) be delivered as follows:

Name _____

Address_____

_____
Delivery Address (if different)

_____

_____

If said number of shares shall not be all the shares purchasable under the within Warrant Statement, the undersigned requests that a new Book-Entry Warrant representing the balance of such Warrants shall be registered, with the appropriate Warrant Statement delivered as follows:

Exhibit C-1 Page 1

Doc#: US1:11847348v17

Name _____

Address _____

_____

Delivery Address (if different)

_____

_____

Signature _____

_____
Social Security or Other Taxpayer
Identification Number of Holder

Note: If the statement representing the Common Stock or any Book-Entry Warrants representing Warrants not exercised is to be registered in a name other than that in which the Book-Entry Warrants are registered, the signature of the holder hereof must be guaranteed. SIGNATURE GUARANTEED BY:

_____

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

Exhibit C-1 Page 2

Doc#: US1:11847348v17

<u>Exercise Form and Ownership Certification</u>
<u>Must be delivered to the Warrant Agent as follows:</u>

| *By Mail:* | *For Information, Call:* | *By Overnight Courier:* |
|---|---|---|
| [●] | [●] | [●] |

Exhibit C-1 Page 3

Doc#: US1:11847348v17

**EXHIBIT C-2**
**EXERCISE FORM FOR BENEFICIAL HOLDERS**
**HOLDING WARRANTS THROUGH THE DEPOSITORY TRUST COMPANY**

TO BE COMPLETED BY DIRECT PARTICIPANT
IN THE DEPOSITORY TRUST COMPANY

(To be executed upon exercise of Warrant)

The undersigned hereby irrevocably elects to exercise the right, represented by _____ Warrants held for its benefit through the book-entry facilities of Depository Trust Company (the "***Depositary***"), to purchase Common Stock and herewith tenders payment for _____ of the shares of Common Stock to the order of _____ in the amount of $_____ in accordance with the terms of the Warrant Agreement and this Warrant.

The undersigned requests that the Common Stock issuable upon exercise of the Warrants be in registered form in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below; *provided*, that if the shares of Common Stock are evidenced by global securities, the shares of Common Stock shall be registered in the name of the Depositary or its nominee.

☐    **Restricted Stock Election.**  The undersigned elects to receive any Common Stock issued upon exercise of the Warrants in the form Restricted Stock. *This election is available for Term Loan Holders only.*

☐    **Class B Common Stock Only Election.**  The undersigned elects to receive Common Stock issued upon exercise of the Warrants in the form of Class B Common Stock only.

☐    **Class A Common Stock and Warrant Election.**  The undersigned elects to receive Common Stock issued upon exercise of the Warrants in the form of up to 4.99% of the outstanding Class A Common Stock and to retain its remaining Series 1 Warrants.

Dated:

NOTE: THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON THE EXPIRATION DATE. THE WARRANT AGENT SHALL NOTIFY YOU (THROUGH THE CLEARING SYSTEM) OF (1) THE WARRANT AGENT'S ACCOUNT AT THE DEPOSITARY TO WHICH YOU MUST DELIVER YOUR WARRANTS ON THE EXERCISE DATE AND (2) THE ADDRESS, PHONE NUMBER AND FACSIMILE NUMBER WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

NAME OF DIRECT PARTICIPANT IN THE DEPOSITARY: (PLEASE PRINT)

ADDRESS:

CONTACT NAME:

Exhibit C-2 Page 1

Doc#: US1:11847348v20

ADDRESS:

TELEPHONE (INCLUDING INTERNATIONAL CODE):

FAX (INCLUDING INTERNATIONAL CODE):

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE):

ACCOUNT FROM WHICH WARRANTS ARE BEING DELIVERED:

DEPOSITARY ACCOUNT NO.

WARRANT EXERCISE NOTICES WILL ONLY BE VALID IF DELIVERED IN ACCORDANCE WITH THE INSTRUCTIONS SET FORTH IN THIS NOTIFICATION (OR AS OTHERWISE DIRECTED), MARKED TO THE ATTENTION OF "WARRANT EXERCISE".

WARRANT HOLDER DELIVERING WARRANTS, IF OTHER THAN THE DIRECT DEPOSITARY PARTICIPANT DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME: _____
     (PLEASE PRINT)

CONTACT NAME:

TELEPHONE (INCLUDING INTERNATIONAL CODE):

FAX (INCLUDING INTERNATIONAL CODE):

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER
(IF APPLICABLE):

ACCOUNT TO WHICH THE SHARES OF COMMON STOCK ARE TO BE CREDITED:

DEPOSITARY ACCOUNT NO.

FILL IN FOR DELIVERY OF THE COMMON STOCK, IF OTHER THAN TO THE PERSON DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME: _____
     (PLEASE PRINT)

ADDRESS:_____

CONTACT NAME: _____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

Exhibit C-2 Page 2

Doc#: US1:11847348v20

FAX (INCLUDING INTERNATIONAL CODE): _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER
(IF APPLICABLE): _____

NUMBER OF WARRANTS BEING EXERCISED: _____

(ONLY ONE EXERCISE PER WARRANT EXERCISE NOTICE)

Signature: _____

Name: _____

Capacity in which Signing: _____

SIGNATURE GUARANTEED BY: _____

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

Exhibit C-2 Page 3

## EXHIBIT I

**Equity Allocation Mechanism**

### EQUITY ALLOCATION MECHANISM

The allocation of Plan consideration to Holders of Allowed Credit Agreement Claims, Allowed Senior Notes Claims, and Allowed General Unsecured Claims, as of the Effective Date, will include distributing Class A Common Stock, Class B Common Stock and, only in the case of Allowed Credit Agreement Claims, Restricted Stock (collectively, the "*Stock*"), and Special Warrants, in accordance with the mechanism set forth below.[1]

**GENERAL:**

1. *Ownership Certification*.  In order to be eligible to receive a distribution of Stock on the Effective Date, each eligible Holder shall provide an Ownership Certification by the Certification Deadline.

2. *Definitions*. (a) An "*Ownership Certification*" means a written certification, in the form attached to the FCC Ownership Procedures Order, which shall be sufficient to enable the Debtors, in consultation with the Term Lender Group, or Reorganized Cumulus, as applicable, to determine (x) the extent to which direct and indirect voting and equity interests of the certifying party are held by non-U.S. Persons, as determined under section 310(b) of the Communications Act and the FCC rules, and (y) whether the holding of more than 4.99% of the Class A Common Stock by the certifying party would result in a violation of FCC ownership rules or be inconsistent with the FCC Approval; *provided*, *however*, that a Holder may elect not to provide the information in clause (y), and any Ownership Certification without the information in clause (y) shall not prohibit a Holder from receiving up to 4.99% of the Class A Common Stock to the extent otherwise entitled thereto pursuant to this Equity Allocation Mechanism; and (b) the "*Certification Deadline*" means the deadline set forth in the FCC Ownership Procedures Order for returning Ownership Certifications.

3. *Attributable Interests*.  Subject in all respects to the foreign-ownership limitations discussed below, under FCC rules, an owner of equity in a corporation which controls FCC broadcast licenses may be deemed "attributable" if it owns, directly or indirectly, 5% or more of the voting equity of such corporation.  The distribution of Stock to a Holder of an Allowed Credit Agreement Claim, Allowed Senior Notes Claim or Allowed General Unsecured Claim may be in the form of more than 4.99% of the outstanding Class A Common Stock when the shares of Class A Common Stock are issued on and as of the Effective Date, only if such Holder is identified on the FCC Long Form Application (as the same may be amended from time to time) pursuant to which FCC Approval is granted as the holder of an attributable interest in Reorganized Cumulus.  If such Holder elects not to be deemed to hold an "attributable" interest in Reorganized Cumulus, then such Holder shall be issued up to 4.99% of the outstanding Class A Common Stock when all shares of

---

[1] For the avoidance of doubt, the procedures set forth in this Equity Allocation Mechanism shall not impact the issuance of securities or other instruments under the Management Incentive Plan, which issuance shall be governed by the terms of the Management Incentive Plan.

Class A Common Stock are issued on and as of the Effective Date, with any remaining distribution in the form of Class B Common Stock.

4.   ***Restricted Stock***.  A Holder of an Allowed Credit Agreement Claim may elect on its Ownership Certification to receive its Class A Common Stock or Class B Common Stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification.  Shares of Restricted Stock may not be offered, sold or otherwise transferred until after two (2) calendar days following delivery of the Restricted Stock from the transfer agent designated by the Debtors (the "*Transfer Agent*") to such Holder of the Allowed Credit Agreement Claim (each such period, a "*Restricted Period*").  After the expiration of a Restricted Period, the initial Holder of such shares may make a request to the Transfer Agent to remove the restrictive legend set forth on such shares (the "*Restrictive Legend*"). Upon receipt of any such request, the Transfer Agent will remove the Restrictive Legend. Following the expiration of each applicable Restricted Period and the removal of the Restrictive Legend, the shares of Restricted Stock may be offered, sold or otherwise transferred, subject to the same restrictions on transfer as the New Securities provided herein and in the Disclosure Statement.  In accordance with the above, each share of Restricted Stock will bear a legend to substantially the following effect:

> "THE SECURITY EVIDENCED HEREBY (THIS "*SECURITY*") MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED FOR A PERIOD OF TWO (2) CALENDAR DAYS FOLLOWING DELIVERY OF THIS SECURITY FROM THE TRANSFER AGENT DESIGNATED BY THE ISSUER OF THIS SECURITY (THE "*TRANSFER AGENT*") TO THE INITIAL HOLDER (THE "*RESTRICTED PERIOD*").  AFTER THE RESTRICTED PERIOD, THIS SECURITY MAY ONLY BE OFFERED, SOLD OR OTHERWISE TRANSFERRED FOLLOWING A REQUEST BY THE INITIAL HOLDER TO THE TRANSFER AGENT TO REMOVE THIS RESTRICTIVE LEGEND."

**ALLOCATION OF NEW SECURITIES:**

The distribution of Stock and Special Warrants made on and as of the Effective Date shall be as follows:

1.   First, the (i) Term Loan Lender Equity Distribution shall be deemed made Pro Rata among the Holders of Allowed Credit Agreement Claims; and (ii) the Unsecured Creditor Equity Distribution shall be deemed made Pro Rata among Holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims; *provided*, *however*, that each of the Term Loan Lender Equity Distribution and the Unsecured Creditor Equity Distribution shall be deemed to have been made initially in the form of Special Warrants issued as of the Effective Date.

2.   Second:

(a) Each deemed Holder of Special Warrants that (i) has timely delivered an Ownership Certification as set forth herein and in the FCC Ownership Procedures Order; and (ii) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is 0%, shall be deemed to have exercised its Special Warrants as of the Effective Date to the fullest extent possible in the form of Class B Common Stock; *provided*, that any Holder who has not checked the Class B Election box on the Ownership Certification shall be further deemed as of the Effective Date to have immediately exchanged such shares of Class B Common Stock for a like number of shares of Class A Common Stock; *provided*, *further*, that, for any Holder of Class B Common Stock that would be entitled to exchange its shares for more than 4.99% of the outstanding Class A Common Stock when all shares of Class A Common Stock are issued on and as of the Effective Date, the number of shares of Class B Common Stock exchanged by such Holder for shares of Class A Common Stock shall be limited so that such Holder receives shares of Class A Common Stock constituting no more than 4.99% of the total outstanding Class A Common Stock issued unless the Debtors, in consultation with the Term Lender Group, or Reorganized Cumulus, as applicable, shall have determined that the exchange into shares of Class A Common Stock constituting more than 4.99% of the total outstanding Class A Common Stock issued would not result in a violation of FCC ownership rules or be inconsistent with the FCC Approval (such proviso, the "*4.99% Rule*"); *provided*, *however*, that in connection with the distribution of Class A Common Stock or Class B Common Stock to Holders of Allowed Credit Agreement Claims, such Holders may elect to receive such stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification.

(b) Each deemed Holder of Special Warrants that (i) has timely delivered an Ownership Certification as set forth herein and in the FCC Ownership Procedures Order; and (ii) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is greater than 0% (each a "*Non-U.S. Holder*," and collectively, the "*Non-U.S. Holders*"), shall be deemed to have exercised its Special Warrants, pro rata among all such Non-U.S. Holders, to receive Class B Common Stock, in an amount, assuming all Holders of Special Warrants that have not timely delivered an Ownership Certification are 100% foreign-owned Non-U.S. Holders, of shares that causes the aggregate alien ownership (on an equity and on a voting basis) of Stock to equal, at most, twenty-two and one half percent (22.50%); *provided*, that such allocation to Non-U.S. Holders shall be made on a proportional basis taking into account the number of Special Warrants held by the Non-U.S. Holders and each such Holder's contribution of alien ownership to the aggregate amount of alien ownership of Stock as of the Effective Date (*e.g.*, assuming all Special Warrants are not exercisable on the Effective Date, a Non-U.S. Holder with a 1.0% alien ownership will be deemed to have exercised more Special Warrants into Stock than a Non-U.S. Holder with an equivalent amount of Special Warrants but a

3

20% alien ownership); *provided further*, that any Holder who has not checked the Class B Election box on the Ownership Certification shall be further deemed to have immediately exchanged such shares of Class B Common Stock for a like number of shares of Class A Common Stock, subject in all respects to the 4.99% Rule; *provided*, *however*, that in connection with the distribution of Class A Common Stock or Class B Common Stock to Holders of Allowed Credit Agreement Claims, such Holders may elect to receive such stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification.

(c) Each deemed Holder of Special Warrants that has not timely delivered an Ownership Certification as set forth herein and in the FCC Ownership Procedures Order shall not be deemed to have exercised any Special Warrants as of the Effective Date; *provided*, *however*, that if such Holder properly completes and delivers an Ownership Certification to Reorganized Cumulus at any time after the Certification Deadline, and upon confirmation from Reorganized Cumulus that such Ownership Certification is satisfactory, if such Holder (i) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is 0%, then its equity allocation shall be distributed in the manner set forth in Section 2(a) herein; or (ii) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is greater than 0%, then its equity allocation shall be distributed in the manner set forth in Section 2(b) herein, all subject to any limitations on stock ownership set forth in the Certificate of Incorporation of Reorganized Cumulus.

3. ***Holder Elections***.    Notwithstanding anything to the contrary herein, a Holder of an Allowed Credit Agreement Claim, Allowed Senior Notes Claim, or Allowed General Unsecured Claim may, by making the appropriate election on the Ownership Certification, receive its Term Loan Lender Equity Distribution or Unsecured Creditor Equity Distribution, as the case may be, (i) entirely in the form of Special Warrants and shall not be deemed to have exercised any Special Warrants, (ii) in Special Warrants deemed to have been exercised for Class B Common Stock to the extent such Holder's portion of the Term Loan Lender Equity Distribution or Unsecured Creditor Equity Distribution would consist of New Common Stock pursuant to Section 2 above, with any remaining Special Warrants not being deemed exercised, or (iii) in Special Warrants deemed to have been exercised for Class A Common Stock to the extent such Holder's portion of the Term Loan Lender Equity Distribution or Unsecured Creditor Equity Distribution would consist of New Common Stock pursuant to Section 2 above, up to 4.99% of the outstanding Class A Common Stock when all shares of Class A Common Stock are issued on and as of the Effective Date, with any remaining Special Warrants not being deemed exercised, all of which elections are expressly subject to Section 5 below.

4. ***Trading Deadlines and Tendering of Senior Notes***.  Holders of Senior Notes Claims shall be required to tender their Senior Notes into the Automated Tender Offer Program ("*ATOP*") system of Depository Trust Company as set forth in the FCC Ownership Procedures Order (the "*Trading Deadline*").  The positions of such Holders in the Senior Notes will be segregated through ATOP and such Holders thereafter will be unable to trade

4

their Senior Notes Claims.  Holders of Credit Agreement Claims will also be unable to trade their Credit Agreement Claims after the Trading Deadline.

5.  ***FCC Limits on Ownership***.  Notwithstanding anything else herein, nothing in this Equity Allocation Mechanism shall (i) permit any Holder to hold more than 4.99% of the outstanding Class A Common Stock on or after the Effective Date unless the Debtors, in consultation with the Term Lender Group, or Reorganized Cumulus, as applicable, shall have determined that such ownership will not cause a violation of FCC ownership rules or be inconsistent with the FCC Approval, or (ii) cause Reorganized Cumulus to exceed an aggregate alien ownership percentage (on an equity or on a voting basis) of twenty-two and one half percent (22.50%) in the Stock prior to the Declaratory Ruling.  Any distribution in contravention of the preceding sentence shall be adjusted to the minimum extent necessary to comply with those limitations.  In determining whether any Holder would hold more than 4.99% of the outstanding Class A Common Stock on or after the Effective Date, such Holder will be attributed with any stock held by another Holder under common management or that otherwise would be aggregated under the FCC's ownership attribution rules.

6.  ***Post-Effective Date Allowed General Unsecured Claims.***  Pursuant to and in accordance with <u>Article VII.F</u> of the Plan, the Reorganized Debtors shall withhold a reserve of Special Warrants to pay Holders of Disputed Claims that are General Unsecured Claims that may become Allowed Claims pursuant to the terms of the Plan.  If a General Unsecured Claim is not Allowed as of the Effective Date and becomes an Allowed General Unsecured Claim after the Effective Date, and the Holder of such Allowed General Unsecured Claim has timely delivered an Ownership Certification as set forth in the FCC Ownership Procedures Order, if such Holder (i) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is 0%, then its equity allocation shall be distributed in the manner set forth in Section 2(a) herein; or (ii) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is greater than 0%, then its equity allocation shall be distributed in the manner set forth in Section 2(b) herein, all subject to any limitations on stock ownership set forth in the Certificate of Incorporation of Reorganized Cumulus.

**POST-DECLARATORY RULING REALLOCATION OF NEW SECURITIES:**

Subject to the terms of the Warrant Agreement, after the Declaratory Ruling, any exercise or deemed exercise of the Special Warrants as a result of the Declaratory Ruling shall be made as follows:

1.  ***100% Foreign Ownership***.  If the FCC adopts a Declaratory Ruling allowing 100% foreign ownership of Reorganized Cumulus, then Non-U.S. Holders shall be deemed to have exercised their Special Warrants to the fullest extent possible for the corresponding number of shares of Class B Common Stock; *provided*, that any Holder who had not checked the Class B Election box on the Ownership Certification shall be further deemed to have immediately exchanged such shares of Class B Common Stock for a like number of shares of Class A Common Stock, subject in all respects to the 4.99% Rule; *provided*, *however*, that in connection with the distribution of Class A Common Stock or Class B Common

Stock to Holders of Allowed Credit Agreement Claims, such Holders may have elected to receive such stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification.

2. ***Foreign Ownership Between 25% and 100%***.  If the FCC adopts a Declaratory Ruling allowing foreign ownership of Reorganized Cumulus between twenty-five percent (25%) and one hundred percent (100%) (the "*Partial Declaratory Ruling Percentage*"), then, each Non-U.S. Holder of Special Warrants that has timely delivered an Ownership Certification in accordance with the Plan and the Warrant Agreement, shall be deemed to have exercised its Special Warrants, pro rata among all such Non-U.S. Holders (*i.e.*, calculated with the denominator as the number of Special Warrants held by Non-U.S. Holders who timely provide an Ownership Certification), to receive Class B Common Stock, in an amount of shares that causes the aggregate alien ownership of Stock to equal, at most, the Partial Declaratory Ruling Percentage; *provided*, that any Holder who had not checked the Class B Election box on the Ownership Certification shall be further deemed to have immediately exchanged such shares of Class B Common Stock for a like number of shares of Class A Common Stock, subject in all respects to the 4.99% Rule; *provided, however*, that in connection with the distribution of Class A Common Stock or Class B Common Stock to Holders of Allowed Credit Agreement Claims, such Holders may have elected to receive such stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification.  For the avoidance of doubt, any Non-U.S. Holder that does not timely provide its Ownership Certification in accordance with the Plan and the Warrant Agreement shall retain its Special Warrants, and such Special Warrants shall not be deemed exercised into Class A Common Stock and/or Class B Common Stock pursuant to this Section 2.

3. ***Foreign Ownership Under 25%***.  If the FCC does not adopt the Declaratory Ruling, then Non-U.S. Holders cannot elect to convert their Special Warrants into Stock and must either hold such Special Warrants or transfer them.

<div align="center">**EQUITY ALLOCATION MECHANISM**</div>

The allocation of Plan consideration to Holders of Allowed Credit Agreement Claims, Allowed Senior Notes Claims, and Allowed General Unsecured Claims, as of the Effective Date, will include distributing Class A Common Stock, Class B Common Stock and, only in the case of Allowed Credit Agreement Claims, Restricted Stock (collectively, the "*Stock*"), and Special Warrants, in accordance with the mechanism set forth below.[1]

**GENERAL:**

1.  *Ownership Certification*.  In order to be eligible to receive a distribution of Stock on the Effective Date, each eligible Holder shall provide an Ownership Certification by the Certification Deadline.

2.  *Definitions*. (a) An "*Ownership Certification*" means a written certification, in the form attached to the FCC Ownership Procedures Order, which shall be sufficient to enable the Debtors, in consultation with the Term Lender Group, or Reorganized Cumulus, as applicable, to determine (x) the extent to which direct and indirect voting and equity interests of the certifying party are held by non-U.S. Persons, as determined under section 310(b) of the Communications Act and the FCC rules, and (y) whether the holding of more than 4.99% of the Class A Common Stock by the certifying party would result in a violation of FCC ownership rules or be inconsistent with the FCC Approval; ***provided, however, that a Holder may elect not to provide the information in clause (y), and any Ownership Certification without the information in clause (y) shall not prohibit a Holder from receiving up to 4.99% of the Class A Common Stock to the extent otherwise entitled thereto pursuant to this Equity Allocation Mechanism;*** and (b) the "*Certification Deadline*" means the deadline set forth in the FCC Ownership Procedures Order for returning Ownership Certifications.

3.  *Attributable Interests*.  Subject in all respects to the foreign-ownership limitations discussed below, under FCC rules, an owner of equity in a corporation which controls FCC  broadcast licenses may be deemed "attributable" if it owns, directly or indirectly, 5% or more of the voting equity of such corporation.  The distribution of Stock to a Holder of an Allowed Credit Agreement Claim, Allowed Senior Notes Claim or Allowed General Unsecured Claim may be in the form of more than 4.99% of the outstanding Class A Common Stock when the shares of Class A Common Stock are issued on and as of the Effective Date, only if such Holder is identified on the FCC Long Form Application (as the same may be amended from time to time) pursuant to which FCC Approval is granted as the holder of an attributable interest in Reorganized Cumulus.  If such Holder elects not to be deemed to hold an "attributable" interest in Reorganized Cumulus, then such Holder shall be issued up to 4.99% of the outstanding Class A Common Stock when all shares of Class A Common

---

[1] For the avoidance of doubt, the procedures set forth in this Equity Allocation Mechanism shall not impact the issuance of securities or other instruments under the Management Incentive Plan, which issuance shall be governed by the terms of the Management Incentive Plan.

Stock are issued on and as of the Effective Date, with any remaining distribution in the form of Class B Common Stock.

4. ***Restricted Stock***.  A Holder of an Allowed Credit Agreement Claim may elect on its Ownership Certification to receive its Class A Common Stock or Class B Common Stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification.  Shares of Restricted Stock may not be offered, sold or otherwise transferred until after two (2) calendar days following delivery of the Restricted Stock from the transfer agent designated by the Debtors (the "*Transfer Agent*") to such Holder of the Allowed Credit Agreement Claim (each such period, a "*Restricted Period*").  After the expiration of a Restricted Period, the initial Holder of such shares may make a request to the Transfer Agent to remove the restrictive legend set forth on such shares (the "*Restrictive Legend*").  Upon receipt of any such request, the Transfer Agent will remove the Restrictive Legend.  Following the expiration of each applicable Restricted Period and the removal of the Restrictive Legend, the shares of Restricted Stock may be offered, sold or otherwise transferred, subject to the same restrictions on transfer as the New Securities provided herein and in the Disclosure Statement.  In accordance with the above, each share of Restricted Stock will bear a legend to substantially the following effect:

> "THE SECURITY EVIDENCED HEREBY (THIS "*SECURITY*") MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED FOR A PERIOD OF TWO (2) CALENDAR DAYS FOLLOWING DELIVERY OF THIS SECURITY FROM THE TRANSFER AGENT DESIGNATED BY THE ISSUER OF THIS SECURITY (THE "*TRANSFER AGENT*") TO THE INITIAL HOLDER (THE "*RESTRICTED PERIOD*").  AFTER THE RESTRICTED PERIOD, THIS SECURITY MAY ONLY BE OFFERED, SOLD OR OTHERWISE TRANSFERRED FOLLOWING A REQUEST BY THE INITIAL HOLDER TO THE TRANSFER AGENT TO REMOVE THIS RESTRICTIVE LEGEND."

**ALLOCATION OF NEW SECURITIES:**

The distribution of Stock and Special Warrants made on and as of the Effective Date shall be as follows:

1. First, the (i) Term Loan Lender Equity Distribution shall be deemed made Pro Rata among the Holders of Allowed Credit Agreement Claims; and (ii) the Unsecured Creditor Equity Distribution shall be deemed made Pro Rata among Holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims; *provided*, *however*, that each of the Term Loan Lender Equity Distribution and the Unsecured Creditor Equity Distribution shall be deemed to have been made initially in the form of Special Warrants issued as of the Effective Date.

2

2.   Second:

(A)   Each deemed Holder of Special Warrants that (i) has timely delivered an Ownership Certification as set forth **herein and** in the FCC Ownership Procedures Order; and (ii) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is 0%, shall be deemed to have exercised its Special Warrants as of the Effective Date to the fullest extent possible in the form of Class B Common Stock; *provided*, that any Holder who has not checked the Class B Election box on the Ownership Certification shall be further deemed as of the Effective Date to have immediately exchanged such shares of Class B Common Stock for a like number of shares of Class A Common Stock; *provided*, *further*, that, for any Holder of Class B Common Stock that would be entitled to exchange its shares for more than 4.99% of the outstanding Class A Common Stock when all shares of Class A Common Stock are issued on and as of the Effective Date, the number of shares of Class B Common Stock exchanged by such Holder for shares of Class A Common Stock shall be limited so that such Holder receives shares of Class A Common Stock constituting no more than 4.99% of the total outstanding Class A Common Stock issued unless the Debtors, in consultation with the Term Lender Group, or Reorganized Cumulus, as applicable, shall have determined that the exchange into shares of Class A Common Stock constituting more than 4.99% of the total outstanding Class A Common Stock issued would not result in a violation of FCC ownership rules or be inconsistent with the FCC Approval (such proviso, the "*4.99% Rule*"); *provided*, *however*, that in connection with the distribution of Class A Common Stock or Class B Common Stock to Holders of Allowed Credit Agreement Claims, such Holders may elect to receive such stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification.

(B)   Each deemed Holder of Special Warrants that (i) has timely delivered an Ownership Certification as set forth **herein and** in the FCC Ownership Procedures Order; and (ii) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is greater than 0% (each a "*Non-U.S. Holder*," and collectively, the "*Non-U.S. Holders*"), shall be deemed to have exercised its Special Warrants, ~~Pro Rata~~**pro rata** among all such Non-U.S. Holders, to receive Class B Common Stock, in an amount, assuming all Holders of Special Warrants that have not timely delivered an Ownership Certification are 100% foreign-owned Non-U.S. Holders, of shares that causes the aggregate alien ownership **(on an equity and on a voting basis)** of Stock to equal, at most, twenty-two and one half percent (22.50%); *provided***, that such allocation to Non-U.S. Holders shall be made on a proportional basis taking into account the number of Special Warrants held by the Non-U.S. Holders and each such Holder's contribution of alien ownership to the aggregate amount of alien ownership of Stock as of the Effective Date (*e.g.*, assuming all Special Warrants are not exercisable on the Effective Date, a Non-U.S. Holder with a 1.0% alien ownership will be deemed to have exercised more**

3

**Special Warrants into Stock than a Non-U.S. Holder with an equivalent amount of Special Warrants but a 20% alien ownership);** *provided further*, that any Holder who has not checked the Class B Election box on the Ownership Certification shall be further deemed to have immediately exchanged such shares of Class B Common Stock for a like number of shares of Class A Common Stock, subject in all respects to the 4.99% Rule; *provided*, *however*, that in connection with the distribution of Class A Common Stock or Class B Common Stock to Holders of Allowed Credit Agreement Claims, such Holders may elect to receive such stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification.

(C) Each deemed Holder of Special Warrants that has not timely delivered an Ownership Certification as set forth **herein and** in the FCC Ownership Procedures Order shall not be deemed to have exercised any Special Warrants as of the Effective Date; *provided*, *however*, that if such Holder properly completes and delivers an Ownership Certification to Reorganized Cumulus at any time after the ~~Effective Date~~**Certification Deadline**, and upon confirmation from Reorganized Cumulus that such Ownership Certification is satisfactory, if such Holder (i) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is 0%, then its equity allocation shall be distributed in the manner set forth in Section 2(a) herein; or (ii) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is greater than 0%, then its equity allocation shall be distributed in the manner set forth in Section 2(b) herein, all subject to any limitations on stock ownership set forth in the Certificate of Incorporation of Reorganized Cumulus.

3. ~~*Non-Exercise of Special Warrants*~~*Holder Elections*.   Notwithstanding anything to the contrary herein, a Holder of an Allowed Credit Agreement Claim, Allowed Senior Notes Claim, or Allowed General Unsecured Claim may, by making the appropriate election on the Ownership Certification, receive its Term Loan Lender Equity Distribution or Unsecured Creditor Equity Distribution, as the case may be, **(i)** entirely in the form of Special Warrants and shall not be deemed to have exercised any Special Warrants~~.~~**, (ii) in Special Warrants deemed to have been exercised for Class B Common Stock to the extent such Holder's portion of the Term Loan Lender Equity Distribution or Unsecured Creditor Equity Distribution would consist of New Common Stock pursuant to Section 2 above, with any remaining Special Warrants not being deemed exercised, or (iii) in Special Warrants deemed to have been exercised for Class A Common Stock to the extent such Holder's portion of the Term Loan Lender Equity Distribution or Unsecured Creditor Equity Distribution would consist of New Common Stock pursuant to Section 2 above, up to 4.99% of the outstanding Class A Common Stock when all shares of Class A Common Stock are issued on and as of the Effective Date, with any remaining Special Warrants not being deemed exercised, all of which elections are expressly subject to Section 5 below.**

4. ***Trading Deadlines and Tendering of Senior Notes***.   Holders of Senior Notes Claims shall be required to tender their Senior Notes into the Automated Tender Offer Program

4

("*ATOP*") system of Depository Trust Company as set forth in the FCC Ownership Procedures Order (the "*Trading Deadline*").  The positions of such Holders in the Senior Notes will be segregated through ATOP and such Holders thereafter will be unable to trade their Senior Notes Claims.  Holders of Credit Agreement Claims will also be unable to trade their Credit Agreement Claims after the Trading Deadline.

5. *FCC Limits on Ownership*.  Notwithstanding anything else herein, nothing in this Equity Allocation Mechanism shall (i) permit any Holder to hold more than 4.99% of the outstanding Class A Common Stock on or after the Effective Date unless the Debtors, in consultation with the Term Lender Group, or Reorganized Cumulus, as applicable, shall have determined that such ownership will not cause a violation of FCC ownership rules or be inconsistent with the FCC Approval, or (ii) cause Reorganized Cumulus to exceed an aggregate alien ownership percentage **(on an equity or on a voting basis)** of twenty-two and one half percent (22.50%) in the Stock prior to the Declaratory Ruling.  Any distribution in contravention of the preceding sentence shall be adjusted to the minimum extent necessary to comply with those limitations.  In determining whether any Holder would hold more than 4.99% of the outstanding Class A Common Stock on or after the Effective Date, such Holder will be attributed with any stock held by another Holder under common management or that otherwise would be aggregated under the FCC's ownership attribution rules.

6. *Post-Effective Date Allowed General Unsecured Claims.*  Pursuant to and in accordance with Article VII.F of the Plan, the Reorganized Debtors shall withhold a reserve of Special Warrants to pay Holders of Disputed Claims that are General Unsecured Claims that may become Allowed Claims pursuant to the terms of the Plan.  If a General Unsecured Claim is not Allowed as of the Effective Date and becomes an Allowed General Unsecured Claim after the Effective Date, and the Holder of such Allowed General Unsecured Claim has timely delivered an Ownership Certification as set forth in the FCC Ownership Procedures Order, if such Holder (i) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is 0%, then its equity allocation shall be distributed in the manner set forth in Section 2(a) herein; or (ii) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is greater than 0%, then its equity allocation shall be distributed in the manner set forth in Section 2(b) herein, all subject to any limitations on stock ownership set forth in the Certificate of Incorporation of Reorganized Cumulus.

~~POST-EFFECTIVE DATE~~**POST-DECLARATORY RULING** REALLOCATION OF NEW SECURITIES:

~~After the Effective Date~~**Subject to the terms of the Warrant Agreement, after the Declaratory Ruling**, any exercise or deemed exercise of the Special Warrants as a result of the Declaratory Ruling shall be made as follows:

1. *100% Foreign Ownership*.  If the FCC adopts a Declaratory Ruling allowing 100% foreign ownership of Reorganized Cumulus, then Non-U.S. Holders shall be deemed to have exercised their Special Warrants to the fullest extent possible for the corresponding number of shares of Class B Common Stock; *provided*, that any Holder who had not checked the Class B Election box on the Ownership Certification shall be further deemed to have immediately exchanged such shares of Class B Common Stock for a like number of shares of

5

Class A Common Stock, subject in all respects to the 4.99% Rule; *provided*, *however*, that in connection with the distribution of Class A Common Stock or Class B Common Stock to Holders of Allowed Credit Agreement Claims, such Holders may have elected to receive such stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification.

2. ***Foreign Ownership Between 25% and 100%***.  If the FCC adopts a Declaratory Ruling allowing foreign ownership of Reorganized Cumulus between twenty-five percent (25%) and one hundred percent (100%) (the "*Partial Declaratory Ruling Percentage*"), then**,** each Non-U.S. Holder **of Special Warrants that has timely delivered an Ownership Certification in accordance with the Plan and the Warrant Agreement,** shall be deemed to have exercised its Special Warrants, ~~Pro Rata~~**pro rata** among all such Non-U.S. Holders **(*i.e.*, calculated with the denominator as the number of Special Warrants held by Non-U.S. Holders who timely provide an Ownership Certification)**, to receive Class B Common Stock, in an amount of shares that causes the aggregate alien ownership of Stock to equal, at most, the Partial Declaratory Ruling Percentage; *provided*, that any Holder who had not checked the Class B Election box on the Ownership Certification shall be further deemed to have immediately exchanged such shares of Class B Common Stock for a like number of shares of Class A Common Stock, subject in all respects to the 4.99% Rule; *provided*, *however*, that in connection with the distribution of Class A Common Stock or Class B Common Stock to Holders of Allowed Credit Agreement Claims, such Holders may have elected to receive such stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification.  **For the avoidance of doubt, any Non-U.S. Holder that does not timely provide its Ownership Certification in accordance with the Plan and the Warrant Agreement shall retain its Special Warrants, and such Special Warrants shall not be deemed exercised into Class A Common Stock and/or Class B Common Stock pursuant to this Section 2.**

3. ***Foreign Ownership Under 25%***.  If the FCC does not adopt the Declaratory Ruling, then Non-U.S. Holders cannot elect to convert their Special Warrants into Stock and must either hold such Special Warrants or transfer them.

6

| Summary report: Litéra® Change-Pro 10.0.0.27 Document comparison done on 3/16/2018 7:39:42 PM | |
|---|---|
| **Style name:** PW Basic | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://US/US1/11801421/9 | |
| **Modified DMS:** iw://US/US1/11801421/14 | |
| **Changes:** | |
| **Add** | 21 |
| Delete | 7 |
| Move From | 2 |
| **Move To** | 2 |
| **Table Insert** | 0 |
| Table Delete | 0 |
| **Table moves to** | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 32 |