MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
Dennis F. Dunne
Samuel A. Khalil
28 Liberty Street
New York, New York 10005
Telephone: (212) 530-5226
Facsimile: (212) 530-5219

MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
Andrew M. Leblanc
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile: (202) 835-7586

*Counsel for Ad Hoc Cross-Holder Committee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                             :
In re:                                                       :        Chapter 11
                                                             :
CUMULUS MEDIA INC., *et al.*,                                :        Case No. 17-13381 (SCC)
                                                             :
          Debtors.[1]                                        :        (Jointly Administered)
                                                             :
-------------------------------------------------------------x

**OBJECTION OF *AD HOC* CROSS-HOLDER COMMITTEE TO FIRST AMENDED**
**JOINT PLAN OF REORGANIZATION OF CUMULUS MEDIA INC. AND ITS DEBTOR**
**AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

The *ad hoc* committee of certain beneficial holders of Term Loan debt and Senior Notes

(the "Ad Hoc Cross-Holder Committee")[2] hereby files this objection to confirmation of the *First*

---

[1]   The last four digits of Cumulus Media Inc.'s tax identification number are 9663. Because of the large number of Debtors in these jointly administered cases, a complete list of the Debtors and the last four digits of their respective federal tax identification numbers is not provided herein. Such list may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/cumulus. The location of the Debtors' service address is: 3280 Peachtree Road, NW, Suite 2200, Atlanta, Georgia 30305.

[2]   The Ad Hoc Cross-Holder Committee consists of Brigade Capital Management, LP and Capital Research Management Company and their respective affiliates. *See Second Supplemental Verified Statement of Ad Hoc Cross-Holder Committee Pursuant to Bankruptcy Rule 2019* (to filed contemporaneously herewith) ("Ad Hoc Cross-Holder Committee's 2019").

*Amended Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 418] (the "Plan").[3]

## PRELIMINARY STATEMENT

1.      The Debtors' proposed Plan cannot be confirmed for at least two reasons.  First, the Debtors have grossly underestimated their value in an attempt to deliver a controlling equity share to their preferred new owners, the Term Loan Lenders.  Second, the Plan would distribute the 16.5% of the equity they are leaving for unsecured creditors (which they claim to be a "gift" to which the unsecured creditors are not entitled) in a way that fundamentally violates the Bankruptcy Code's distribution scheme.  The Plan cannot be confirmed without resolving these two fatal flaws.

2.      As has been clear from the outset of these cases, there is a wide dispute between the parties with respect to valuation.  After months of pre-petition negotiations that pitted the unsecured creditors against the Term Loan Lenders, with both offering feasible alternatives, the Debtors elected to go with the Term Loan Lenders' proposal, which used a lower valuation than the proposal of the Senior Noteholders.  But that decision did not change facts—the value of the Debtors' assets did not change because of their choice to team up with the Term Loan Lenders—and the feasible plan of the Senior Noteholders implied a value far greater than what the Debtors now say they are worth.  So the Debtors and their experts are now faced with advancing and attempting to defend a far lower valuation than they were prepared to defend if they agreed to a plan with the Senior Noteholders.

3.      The valuation that the Debtors have advanced is fundamentally flawed and cannot be credited.  In summary form, it ignores substantial pockets of value, uses flawed methodologies

---

[3]      Capitalized terms used but not defined herein have the meanings given to them in the Plan or, if not defined therein, in the Disclosure Statement.

and unsupportable assumptions, and reaches a conclusion that is clearly drawn to satisfy their Plan sponsors, with the side benefit that it reprices the equity that will be made available for management to a far lower value. It undervalues the Debtors by hundreds of millions of dollars. The failure of their valuation means that the Debtors' prepetition Term Loan Lenders—who will own 83.5% of the equity in the reorganized Company under the terms of the Plan—will end up with consideration that greatly exceeds the full face value of their claims, while unsecured creditors recover on only a fraction of their claims. That the Plan effectively provides for the Term Loan Lenders to receive a distribution in excess of a 100% recovery, while unsecured creditors receive between 6.7% and 13.7%, is in blatant contravention of the "fair and equitable" requirement under section 1129(b) of the Bankruptcy Code. The Plan therefore is not confirmable in its current form. The Court will hear far more about valuation at the confirmation hearing than can be restated in this brief given that the Debtors' valuation expert was deposed less than 24 hours before this brief was due to be filed.

4.        Second, in violation of black letter law in this Circuit, the Debtors' proposed Plan does not respect the differing legal rights amongst the various classes of unsecured creditors. The Plan provides for *identical distributions* to both holders of Senior Notes Claims on the one hand, and holders of General Unsecured Claims on the other, despite the fact that the former have claims against 36 of the 37 Debtors while the latter typically have claims only against a single Debtor. This distribution scheme (a) completely ignores the Senior Notes claimants' rights to recover at nearly every Debtor, (b) provides holders of General Unsecured Claims with the ability to recover from the assets of Debtors against whom they do not have claims, (c) contravenes Second Circuit case law requiring plans of reorganization to respect creditors' relative distribution rights, and (d) results in the *de facto* substantive consolidation of the Debtors' estates without any legal or practical

justification for doing so.  Indeed, because of this improper consolidation, General Unsecured Creditors of subsidiary Debtors who themselves have no value will recover on their claims, while the Senior Noteholders with claims at those same entities will not recover anything.  It is no answer to say that this is all a "gift" or a "tip" and can be doled out as the Debtors deem fit.  For the foregoing reasons, confirmation of the proposed Plan must be denied.

5.    The Ad Hoc Cross-Over Committee also joins in the similar arguments of the Official Committee of Unsecured Creditors ("UCC") with respect to the infirmities in the Plan and the issues raised herein.[4]

## RELEVANT BACKGROUND

6.    As of the Petition Date, approximately $1.735 billion of Term Loan debt was outstanding (inclusive of accrued and unpaid interest), and approximately $637.3 million was outstanding under the Senior Notes (inclusive of accrued and unpaid interest).  *Declaration of John F. Abbot in Support of Chapter 11 Petitions and First Day Motions* [ECF No. 17] (the "First Day Declaration") at ¶ 37.  Members of the Ad Hoc Cross-Holder Committee, in the aggregate, hold over $225 million in outstanding principal amount of the Senior Notes (*i.e.*, more than 33% of the amount of the Allowed Class 5 Claims) as well as Term Loan debt.  *See* Ad Hoc Cross-Holder Committee's 2019.

---

[4]    The Ad Hoc Cross-Holder Committee joins the UCC in its objections concerning the Warrant Agreement, and raises the following additional objections: the Warrant Agreement (i) does not provide sufficient notice to holders regarding the possibility of exercise, nor does it provide for the automatic exercise of warrants when permitted under FCC rules, (ii) should contain anti-dilution protections in the case of (a) a reclassification or recapitalization by the reorganized Debtors, or (b) a distribution/dividend that the warrant holders cannot participate in because such distribution/dividend to the holder would result in a violation of FCC rules, (iii) provides that the warrants expire after 20 years, which term should be extended, and (iv) lacks protections for warrant holders if there is a spin-off in which the holders cannot participate.

7.      On December 12, 2016, the Debtors launched a private exchange offer for the Senior Notes (the "Exchange Offer"). *See* First Day Declaration at ¶ 64.   The enterprise valuation underlying the Exchange Offer was at least $2.115 billion.[5]

8.      Shortly before the Petition Date, in September and October of 2017, the Debtors engaged in negotiations with the since-disbanded Ad Hoc Senior Noteholder Group.  The members of the Ad Hoc Cross-Holder Committee were formerly members of the Ad Hoc Senior Noteholder Group and participated in these negotiations.   As the Debtors acknowledge, toward the conclusion of these negotiations, the Debtors and the Ad Hoc Senior Noteholder Group were in "general alignment" regarding a restructuring whereby (i) more than $1.7 billion of the Term Loan debt would be reinstated and (ii) the holders of the Senior Notes would receive between 97% and 100% of the equity of the reorganized enterprise.  *See* Disclosure Statement at 29; *see also* Cumulus Media Inc., Current Report (Form 8-K) (Nov. 13, 2017).   The Debtors believed this to be a viable reorganization plan that they concluded would result in a feasible reorganized company.   This construct clearly indicates that both parties believed the Debtors' enterprise value to be meaningfully greater than $1.7 billion (the outstanding amount of the Term Loan debt) only a few months ago.

9.      The Consenting Term Loan Lenders, however, preferred to receive equity in exchange for their Term Loan debt and succeeded in convincing the Debtors to break off negotiations with the Ad Hoc Senior Noteholder Group and enter into the Restructuring Support Agreement with them instead.

---

[5]     The Debtors' estimated enterprise value at the time of the Exchange Offer was at least $2.115 billion because the Exchange Offer would have resulted in the Debtors taking on secured debt that, when added to its then existing secured debt, would have been at least $2.115 billion.  As of December 2016, the Debtors had $1.810 billion outstanding under the Term Loan and the Exchange Offer contemplated an additional $305 million of secured indebtedness.  *See* Cumulus Media Inc., Annual Report (Form 10-K) (March 16, 2017); *see also* Cumulus Media Inc., Current Report (Form 8-K) (Dec. 7, 2016).

10.     The Plan incorporates the terms set forth in the Restructuring Support Agreement. In pertinent part, it provides that holders of the Term Loan debt (Class 3) will receive their Pro Rata share of (i) $1.3 billion of new debt under the First Lien Exit Facility and (ii) 83.5% of the New Common Stock (subject to dilution on account of the Management Incentive Plan).  Plan at Art. III. § C.3.  According to the Disclosure Statement, these distributions provide holders of the Term Loan debt with a recovery between 87.3% and 97.8% of their allowed claims.  Disclosure Statement at 11.  This recovery is premised on the valuation performed by the Debtors' financial advisor, which estimates the Debtors' enterprise value to be between $1.5 and $1.7 billion[6]—well below the valuations underlying both the Exchange Offer launched by the Debtors in December 2016 and the "general alignment" reached between the Debtors and the Ad Hoc Senior Noteholder Group during their prepetition negotiations in November 2017.

11.     The holders of Senior Notes Claims (Class 5) and General Unsecured Claims (Class 6) will share, Pro Rata, the remaining 16.5% of the New Common Stock (subject to dilution on account of the Management Incentive Plan), Plan at Art. III. §§ C.5, C.6, which the Debtors value to be between 6.7% and 13.7% of their allowed claims, Disclosure Statement at 12-13.

## ARGUMENT

### I.     THE PLAN CANNOT BE CONFIRMED UNDER SECTION 1129(B) OF THE BANKRUPTCY CODE BECAUSE IT IS NOT "FAIR AND EQUITABLE"

12.     As the proponents of the Plan, the Debtors bear the burden of establishing by a preponderance of the evidence that the Plan meets the requirements of Section 1129 of the Bankruptcy Code.  *See In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 241 (Bankr. S.D.N.Y. 2014).  Under Section 1129(a)(8), a plan shall be confirmed only if each class of claims or interests

---

[6]    This range is exclusive of $75 million of sale proceeds that the Debtors anticipate they will receive from the sale of certain land in the Debtors' Washington, D.C. market.  *See* Disclosure Statement at 25.

has accepted the plan or is not impaired under the plan.  Under Section 1129(b), a plan may be confirmed over the objections of an impaired class only if the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting class.

13.    It is "undisputed that the 'fair and equitable' requirement encompasses a rule that a senior class cannot receive more than full compensation for its claims." *In re Chemtura Corp.*, 439 B.R. 561, 592 (Bankr. S.D.N.Y. 2010); *In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to the junior class of debt or equity, as the case may be."); 124 Cong. Rec. 32,407, 34,006 (1978) ("fair and equitable" includes the requirement that "no senior class receives more than 100 percent of the amount of its claims").

14.    Therefore, a court may not confirm a plan "if a plan undervalues a debtor and therefore would have resulted in paying senior creditors more than full compensation for their allowed claims." *Chemtura*, 439 B.R. at 592; *see generally In re Exide Techs.*, 303 B.R. 48 (D. Del. 2003) (denying confirmation due to low valuation because, *inter alia*, debtor could not meet requirements of Section 1129(b)).  A "determination of the Debtor's value directly impacts the issues of whether the proposed plan is 'fair and equitable,' as required by 11 U.S.C. § 1129(b)." *Exide Techs.*, 303 B.R. at 60-61.

15.    As set forth below, the Debtors cannot satisfy their burden under Section 1129 of the Bankruptcy Code because the Plan materially undervalues the Debtors' total enterprise value by assuming a range of $1.5 to $1.7 billion.  The Plan is not "fair and equitable" to the members of the Ad Hoc Cross-Holder Committee and other holders of Senior Notes, and thus, it may not be confirmed over the objections of the holders.

**A.    The Term Loan Holders Will Receive More than 100% Recovery on Their
Claims Under the Plan**

16.    As a matter of law, the Plan cannot be confirmed unless the Debtors meet their

burden to demonstrate that their total enterprise value is below $1.821 billion.  The Term Loan

Lenders, who have $1.735 billion in claims, stand to receive $1.3 billion of new debt and their *pro*

*rata* share of 83.5% of New Common Stock, which the Debtors value at $435 million value.  *See*

Plan at Art. III. § C.3.  Holders of Senior Notes and General Unsecured Creditors will receive their

*pro rata* share of 16.5% of New Common Stock with an $86 million value (which, together with

the Term Loan holders' $1.3 billion of new debt and $435 million of New Common Stock, totals

$1.821 billion).  The evidence at the Confirmation Hearing will show, however, that the Debtors'

total enterprise value exceeds $1.821 billion and, therefore, the Term Loan Lenders' distribution of

83.5% of New Common Stock exceeds 100% of their allowed pre-petition claims.

17.    Courts routinely recognize three standard valuation methodologies for purposes of

calculating enterprise value: (i) the discounted cash flow ("DCF") methodology, (ii) the comparable

company methodology, and (iii) the precedent transaction methodology.  *See, e.g.*, *Chemtura*, 439

B.R. at 573.  For the Debtors, more weight should be placed on the comparable public company

methodology because limited precedent transactions are available and the narrow time period for

the Debtors' financial projections limits the effectiveness of DCF methodology.  *See* Moelis Report

(Mar. 12, 2018) at 50.[7]

18.    The appropriate value range for the reorganized Debtors' total enterprise value is

$2.1 to $2.4 billion, with a midpoint of $2.25 billion.  *See* Moelis Report at 16.  Moelis & Company,

the financial advisor to the UCC, has significant experience in the radio broadcasting industry and

---

[7]    The Moelis Report and the Moelis Rebuttal Report (Mar. 19, 2018) will be filed as exhibits to the UCC's
objection to the Plan.

has been involved in every major transaction involving Cumulus Media over the last decade.  *See Moelis Report* at 6-7.  Specifically, John Momtazee, the UCC's expert witness, is a professional advisor in the broadcasting industry who has personally executed over $50 billion in transactions over the past two decades.  *See Granite Broad.*, 369 B.R. at 142 (approving of findings by a valuation expert "who has spent her entire career as an analyst and deal-maker in the broadcast industry").

19.    The Debtors, on the other hand, through James Baird of PJT Partners, value the Debtors at only $1.5 to $1.7 billion, with a midpoint of $1.6 billion.  *See* Disclosure Report at 25.[8] Unlike Mr. Momtazee, who has decades of experience with transactions in the broadcasting industry, the Debtors' expert witness identifies a single prior experience with a broadcasting company (which is in connection with a company, iHeartMedia, that filed for bankruptcy only this month).  Mr. Baird's lack of industry experience is evident in his expert reports, resulting in fundamental flaws in the valuation of the reorganized Debtors as a going concern.  The analysis below highlights the most critical issues with the Debtors' valuation, but the errors are countless and will be demonstrated at the Confirmation Hearing.  *See generally* Moelis Rebuttal Report (Mar. 19, 2018).

**B.    In All Valuation Methodologies, the Debtors Fail to Include the Incremental Value of Their Assets and Available Cash upon Emergence**

20.    The Debtors undervalue the reorganized Company because their valuation methodologies are incomplete.  In each of their valuation methods, the Debtors fail to acknowledge the significant, inherent value ███████████ towers because their valuation experts do not

---

[8]    The Debtors also rely on an expert report by Bishop Cheen, an independent media consultant.  As described in the Moelis Rebuttal Report, Mr. Cheen's testimony does not impact the parties' respective valuations because the industry data cited in his expert report is already incorporated in trading prices that affect market multiples.  *See* Moelis Rebuttal Report at 14–15.  Mr. Cheen's report "has no bearing on valuation."  *Id.* at 8.

understand common practices in the broadcasting industry.  Together with contract rejection savings and the proceeds of the anticipated Washington, D.C. land sale, the Debtors exclude *at least $375 million* from the Debtors' total enterprise value as a result of these oversights alone.

21.    First, the Debtors overlook a staggering *$200 to $300 million* of value by incorrectly attributing negligible or even negative value to ████████████████████████████ ██████████████████████████ should not be valued based on today's levels of broadcast cash flows because they have intrinsic value through their licenses, towers, studios, real estate, etc.  It is a common practice in the industry to ██████████████████████ based on the inherent value of their assets rather than current cash flows.  There are "well-established" methods in the industry for radio station operators ██████████████████ ████████████████████████████████████████████ ████████████ another operator, establishing station level sharing agreement with another operator, or achieving synergies through a management agreement or joint venture with another operator.  *See* Moelis Report at 25–26.

22.    In fact, the Debtors will not disagree that Moelis' analysis of precedent transactions within a particular radio station market is an effective method of valuing a particular market. Instead, the Debtors merely pick at the Moelis analysis for selecting the incorrect markets for analysis and failing to consider the time and expense of █████████████████, even though the Debtors' experts know that valuing an asset through precedent transactions does not require the calculation of expenses and risks for an ████████████.

23.    ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

24.     Second, the Debtors disregard *$45 to $55 million* of incremental value from the Debtors' portfolio of towers.  The Debtors failed even to consider the possibility that their tower portfolio may have intrinsic value, without meaningfully affecting their going concern value.  A third-party tower appraiser, Media Services Group, reviewed the Debtors' tower portfolio and estimated an asset value of approximately $134 million for a subset of 130 towers.  *See* Media Services Group Report at 8.  The value of the tower portfolio is based on the highest and best use of the assets, which is a sale leaseback to the reorganized Debtors from a specialized tower company.  *See* Moelis Report at 75.  The incremental value of the sale leaseback of the tower portfolio to the Debtors' enterprise value is $45 to $55 million, *id*., which is not already captured in the applicable of market values used in the each valuation method.

25.     Third, the Debtors' comparable company and precedent transaction valuations fail to capture ███████████████ in incremental value from that will be realized by the Debtors through contract rejection or renegotiation. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████    Finally, the Debtors' valuation excludes **$75 million** in the value from the anticipated sale of land in Washington, D.C.

26.    In all, the Debtors' failure to assess the intrinsic value of its ████████████ and tower portfolios and failure to account for additional cash available through the bankruptcy process leaves a **total of at least $375 million** on the table.  This $375 million is absent from the total enterprise value calculated by the Debtors through each of its valuation methodologies, which as discussed further below, already suffer from fundamental flaws.

### C.    The Debtors' Comparable Companies Analysis Is Fundamentally Flawed Through the Selection of Inappropriate Companies

27.    The Debtors' selection of companies for its comparable company analysis demonstrates, at best, a lack of industry expertise, and at worst, cherry-picking of companies to drive down the Debtors' valuation.  The Debtors rely on iHeartMedia, Entercom Corp., and Townsquare Media as comparable public companies to establish a 7.0x to 7.5x multiple of total enterprise value ("TEV") over last twelve months ("LTM") EBITDA.  But iHeartMedia, which has filed for bankruptcy since the date of the Debtors' expert report, is trading at distressed levels, which renders its TEV as an inappropriate comparable for a going concern valuation of the reorganized Debtors.  *See* Moelis Report at 53.

28.    Further, the Debtors improperly select TownSquare Media, a company whose business mix differs significantly from the Debtors', but somehow exclude the more similar Beasley Broadcast Group.  Over 30% of Townsquare's revenue comes from its live entertainment segment, which is not only entirely different from Cumulus' broadcast business, but also drags down Townsquare's EBITDA multiple as a result of weak projections from that segment.  *See* Moelis Rebuttal Report at 17.  The Debtors' inclusion of Townsquare in its valuation analysis coupled with

the failure to adjust the EBITDA multiple to remove the live entertainment segment results in an artificially low valuation. *Id.* Meanwhile, the Debtors acknowledge that Beasley's business mix and recently developing events business are similar to Cumulus. Even though Beasley and TownSquare are similarly sized companies, *see* Moelis Rebuttal Report at 18, the Debtors curiously selected the less similar company.[9] In order to justify their selection, the Debtors cite to the ownership structure and geographical location of Beasley's stations—factors that they did not previously identify as relevant when selecting their comparable companies—to exclude the inconveniently valuable Beasley multiples.

29.    For the single company upon which the Debtors and Moelis agree, Entercom Communications, the Debtors suppress the TEV/LTM EBITDA multiple by attributing value to the entirety of Entercom's projected $100 million in synergies following its merger with CBS Radio. At best, the market typically gives a company 50% credit for its projected synergies. *See* Moelis Report at 54; Moelis Rebuttal Report at 21. By overestimating Entercom's EBITDA by $50 million, the Debtors understate their overall comparable company valuation by $65 million. *See* Moelis Rebuttal Report at 20 (explaining that adjusting Entercom's EBITDA increases its TEV/LTM EBITDA multiple by 0.9x, which in turn increases the overall comparable companies multiple by 0.3x).

### D.    The Debtors' Precedent Transaction Analysis Suffers from the Erroneous Application of Buyer's Multiples and Incorrect Transaction Pricing

30.    The Debtors' most costly mistakes in their precedent transactions valuation are their reliance on the "buyer's multiple" for consummated transactions—which is not the accepted practice—and their use of the incorrect transaction value for Greater Media, which suppresses

---

[9]    To make matters worse, the Debtors' TEV/LTM EBITDA multiple of 9.8x for Beasley is incorrect because it fails to adjust appropriately for the value of a tower sale from the merger with Greater Media. *See* Moelis Rebuttal Report at 22.

Debtors' valuation by *$370 to $485 million*. *See* Moelis Rebuttal Report at 25–26 (also noting Debtors' improper use of EBITDA rather than broadcast cash flow ("BCF") multiples, among other errors). As explained by Moelis, the accepted practice in a precedent transaction analysis is to calculate a valuation multiple based on the "seller's multiple"—i.e., the LTM broadcast cash flow of the target company *before* including the value of synergies achieved from the acquisition. *Id.* at 26. Indeed, to compound their errors the Debtors apply the synergized "buyer's multiple" to the Debtors' EBITDA (which does not include any synergies from a potential acquirer), resulting in an "apples to oranges" comparison between the Debtors and the target companies of precedent transaction. *Id.*

31. A simplified illustration of this error makes plain the fatal nature of the flaw. If a target company has broadcast cash flow of $10 million and sold for $100 million, it would have traded for a 10x multiple and that should be used to compare to Cumulus' BCF. Instead, the Debtors' valuation effectively states that if the purchaser of the target said that it was going to realize $10 million in synergies after buying the target, the increase to its BCF would be $20 million and it was therefore buying target at a 5x multiple ($100 million/$20 million). The Debtors then used the 5x multiple to value Cumulus' current BCF. This is simply bad math and wrong.

32. Further, the Debtors incorrectly remove $20 million of transaction value from their analysis of precedent transaction of Greater Media's acquisition by Beasley Broadcast Group. *See* Moelis Rebuttal Report at 27 (explaining that the Debtors incorrectly removed an estimated $20 million from tower sale proceeds from the transaction). By adjusting the transaction value from $220 million to $240 million *and* adopting the accepted seller's multiple (without synergies), the Debtors' median transaction multiple for this valuation method increases by 2.4x. *Id.*

### E.    The Debtors' Unjustifiable Terminal Growth Rate Improperly Suppresses the Value of their DCF Calculation

33.    The Debtors' discounted cash flow analysis undervalues the reorganized Debtors by ***$400 to $700 million*** by improperly using a terminal growth rate of ██████████  This error is completely inconsistent with logic, management's projections, the current market, and considerations of future operational changes.  Management's projected cash flows, which underlie both the Debtors' and Moelis' DCF calculations, estimate increasing revenue and EBITDA through 2020 in spite of a projected negative 1% overall industry decline in revenue.  This includes growth in revenue of 3.4% and in EBITDA of 9.5% in 2020. ████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████  And the consequence of this flawed assumption cannot be overstated.  The terminal value represents approximately 75% of the Debtors' concluded value—this unsupported assumption is the key determinant of that valuation methodology.

34.    The appropriate terminal growth rate, applied by Moelis, is a very conservative negative 1% based on management's projection in the business plan and industry projections.  *See* Moelis Report at 69; Moelis Rebuttal Report at 14.  The most widely accepted industry research estimates slightly positive growth for the next five years: BIA/Kelsey estimates 0.9% growth, SNL Kagan estimates 0.4%, and PwC estimates 0.4%.  *See* Moelis Rebuttal Report at 14.  Even the less-commonly cited Morgan Stanley, which projects negative 2.0% growth, does not approach the Debtors' terminal growth rate of ██████████  By applying Moelis' more reliable (and still very

conservative) terminal growth rate of negative 1%, the reorganized Debtors realize incremental value of $400 to $700 million.

35.    Consistent with the foregoing, the evidence at the Confirmation Hearing will show that the Debtors have committed fundamental errors in each of their valuation methodologies for calculating their total enterprise value as a going concern.  Further, the Debtors fail to account for the incremental value of their portfolio towers ███████████, as well as other cash value available upon emergence from bankruptcy.  As noted above, the Debtors' expert's deposition will conclude less than 24 hours before this brief is filed.  As such, more will be adduced at the confirmation hearing, but it is clear even before that deposition is conducted that the Debtors will fail to carry their burden to demonstrate that their total enterprise value is below $1.821 billion, with Moelis' valuation range of $2.1 to $2.4 being both more reliable and consistent with industry practice.  At this valuation, the Plan cannot be confirmed as a matter of law because the Term Loan holders will receive more than 100% recovery on their claims in violation of section 1129(b) of the Bankruptcy Code.

## II.    THE PLAN IMPROPERLY IGNORES THE RELATIVE DISTRIBUTION RIGHTS OF UNSECURED CREDITORS

36.    While "gifting" under a plan of reorganization may be permissible under certain circumstances, Second Circuit case law is clear that such a gift cannot circumvent the relative rights of creditors receiving distributions as set forth in the Bankruptcy Code and applicable law.

37.    Remarkably, however, the Debtors' proposed Plan arbitrarily provides for identical recoveries for both the holders of Senior Notes Claims and the holders of General Unsecured Claims: a Pro Rata share of 16.5% of reorganized Cumulus, which is purportedly being "gifted" to unsecured creditors.  The proposed recoveries to both classes are the same, but their relative rights are not: each holder of Senior Notes Claims has claims against 36 of the 37 Debtors, while each

holder of General Unsecured Claims typically only has a claim against a single Debtor.  The Plan thus ignores the rights of the holders of Senior Notes Claims under applicable law to recover from the estates of virtually all of the Debtors—rights that the holders of General Unsecured Claims simply do not possess.

38.     Because the proposed "gift" of equity under the Plan and the corresponding distribution scheme are contrary to the Bankruptcy Code and applicable law, and for the additional reasons described below, the Plan must be amended to reflect the differing distribution rights of the holders of the Senior Notes Claims relative to the holders of the General Unsecured Claims.

**A.      The Senior Notes Claims Have Greater Rights of Distribution than the General Unsecured Claims**

39.     While Cumulus Media Holdings Inc. is the issuer of the Senior Notes, First Day Declaration at ¶ 46, each of the other thirty-seven (37) Debtors except for CMI Receivables Funding LLC ("CMI Receivables") have guaranteed the issuer's obligations under the Senior Notes.  *See* Exhibit B to the First Day Declaration; *see also* First Day Declaration at ¶¶ 32, 48.  Accordingly, the holders of the Senior Notes have claims against *each Debtor* aside from CMI Receivables.  In contrast, the holders of allowed General Unsecured Claims presumably have claims against only the particular Debtor(s) with which they had conducted or are conducting business.

40.     By way of example, one general unsecured claimants—the National Academy of Recording Arts—has asserted claims for approximately $1.8 million solely against Debtor Westwood One, Inc.  Claim No. 379.  This claimant has not asserted claims against any other Debtor.  The holders of Senior Notes Claims, on the other hand, have asserted guaranty claims against Westwood One, Inc.—as well as all of its subsidiaries and nearly all of its affiliated Debtors.  The Plan ignores this.  Instead, the Plan proposes identical distributions to both holders of Senior

Notes Claims and claimants such as the National Academy of Recording Arts,[10] ignoring the fact that the holders of Senior Notes Claims have claims against the assets of 36 different Debtors while many general unsecured claimants have claims only against the assets of a single Debtor, which may or may not have assets available for distribution.

41.    The holders of Senior Notes Claims are superior in their relative distribution rights to holders of General Unsecured Claims simply by having claims against Debtors that the holders of General Unsecured Claims do not.   Nonetheless, the Plan ignores the differing obligors and distribution rights of the holders of the Senior Notes Claims, eliminates all guarantees of the Senior Notes, and improperly treats all Claims in Classes 5 and 6 as asserted against one undifferentiated estate.  *See In re Tribune Co.*, 464 B.R. 126, 182 (Bankr. D. Del. 2011) ("In the absence of substantive consolidation, entity separateness is fundamental.").  For these reasons, as discussed further below, Second Circuit case law requires that the Plan's proposed Unsecured Creditor Equity Distribution be revised to take these factors into account.

## B.    The Second Circuit Explicitly Requires Gifts Made Under a Plan to Comply with the Bankruptcy Code

42.    The Debtors readily admit that the Unsecured Creditor Equity Distribution effectively was a negotiated give-up from the Term Loan Lenders to unsecured creditors.  *See* Zelin Dep. 289:6–12 (March 5, 2018) ("I don't want to use the word 'gift.'  But it is, then, the product of a negotiation between the term lenders, the Noteholders, and the Company as to what value we would want to, or what we would support being allocated to Unsecured Creditors . . . .").  This "gift," however, does not differentiate between the Senior Notes Claims and the General Unsecured Claims—two separate classes of unsecured claims with vastly different recovery rights against the

---

[10]    This is merely one example of the inequities of the Plan: there are many other such claimants.

Debtors.  Instead, the Plan provides claimants in both classes with the same Pro Rata share of the Unsecured Creditor Equity Distribution.

43.    While gifting may be permitted in certain circumstances, the Second Circuit has made it clear that gifts made under a plan of reorganization must adhere to the distribution mechanics set forth in the Bankruptcy Code and respect each class's relative distribution rights.  In *DBSD*, an unsecured creditor, Sprint Nextel Corporation, objected to the confirmation of the debtors' plan under which unsecured creditors would recover between 4% and 46% of their original claims, but the existing equity holder would receive shares and warrants in the reorganized debtor.  *See In re DBSD North America, Inc.*, 634 F.3d 79 (2d Cir. 2011).  The bankruptcy court confirmed the plan over Sprint's objections and held that the existing shareholder's receipt of shares and warrants as a "gift" from the holders of the second lien debt, who were senior to Sprint in priority and were themselves not receiving the full value of their claims, was not a violation of the absolute priority rule because the second lien debt holders may "voluntarily offer a portion of their recovered property to junior stakeholders."  *Id*. at 87.

44.    On appeal, the Second Circuit held that the bankruptcy court erred in confirming the plan because the absolute priority rule "provides clear statutory support to reject gifting in this case . . . ."  *Id.* at 98.  In interpreting the absolute priority rule, the Second Circuit relied on the Supreme Court's holdings in *203 North LaSalle* and *Ahlers*, which "indicate a preference for reading the [absolute priority] rule strictly."  *Id*. at 97 (citing *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 449 (1999); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207 (1988)).  The court also stated that Congress "did not create any exception for 'gifts' like the one at issue here."  *Id*. at 100–01 (citing H.R. Rep. 95–595, 1978 U.S.C.C.A.N. 5963, 6372 (1977) (noting that the absolute priority rule was "designed to prevent a senior class from giving

up consideration to a junior class unless every intermediate class consents, is paid in full, or is unimpaired")). Finally, the Court recognized that, "in this case, the secured creditors could have demanded a plan in which they received all of the reorganized corporation, but, having chosen not to, they may not surrender part of the value of the estate for distribution to the stockholder, as a gift." *Id*. at 99 (citation and internal quotations omitted).

45.    Here, as in *DBSD*, the Debtors and their secured creditors are not free to "gift" distributions to junior creditors as they see fit. Just as the Debtors must respect the absolute priority rule, they similarly may not disregard each class's relative distribution rights unless such affected class "consents, is paid in full, or is unimpaired." *Id*. at 100–01. Since the holders of Senior Notes Claims have not consented, nor have they been paid in full, any distributions under the Plan must comply with the distribution rights set forth in the Bankruptcy Code and by applicable law. *See also In re Armstrong World Indus., Inc.*, 432 F.3d 507, 513–14 (3d Cir. 2005) (holding that plan violated absolute priority rule, and that creditors are not "generally free to do whatever they wish with the bankruptcy proceeds they receive [and] must also be guided by the statutory prohibitions of the absolute priority rule . . . .").

46.    The fact that the Plan provides for identical distributions to General Unsecured Claims and Senior Notes Claims is also indicative of the Debtors' attempts to improperly garner support from creditors. When a debtor separately classifies unsecured claims, it "must adduce credible proof of a legitimate reason for separate classification . . . ." *In re Boston Post Road Ltd. P'Ship*, 21 F.3d 477, 483 (2d Cir. 1994). Here, the Debtors have provided no such proof.

47.    The General Unsecured Claims and Senior Notes Claims have vastly different rights of recovery and legal rights against each of the Debtors—certainly a valid reason for the Debtors to classify those claims into separate classes. But those differing legal rights are not reflected in

the Debtors' classification scheme because the Debtors propose to provide *identical distributions* to both classes.  Thus, the Debtors have not adduced any justification for separate classification, other than for the implicit purpose of engendering a broader consensus for the Plan by providing gratuitous consideration to the holders of General Unsecured Claims in Class 6.  The Debtors' motivation in classifying the two classes separately is therefore improper.

### C.    The Plan Provides for the *De Facto* Substantive Consolidation of the Debtors' Estates

48.    The Second Circuit, just like all other courts, has stressed that the drastic equitable remedy of substantive consolidation must be used "sparingly" because of "the dangers in forcing creditors of one debtor to share on a parity with creditors of a less solvent debtor."  *Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518–19 (2d Cir. 1988).  Indeed, "creditors who make loans on the basis of the financial status of a separate entity expect to be able to look to the assets of their particular borrower for satisfaction of that loan."  *Id.* at 518.

49.    The Debtors maintain that the Plan does not substantively consolidate the Debtors' estates and do not assert any legal ability to do so.  *See* Plan Art. III.E ("Although the Plan is presented as a joint plan of reorganization, this Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason."); Zelin Dep. 286:19–287:13, 297:15–24 (March 5, 2018) ("This not about sub[stantive] con[solidation] It's about a negotiated outcome and based upon value this a reasonable approach to take.").  Despite the Debtors' statements, however, the Plan effectively provides for the *de facto* substantive consolidation of the Debtors' estates (except for CMI Receivables) with respect to the Unsecured Creditor Equity Distribution for the reasons discussed above.

50.    To justify substantive consolidation, the plan sponsor bears the heavy burden of showing either that (i) creditors dealt with the entities to be consolidated as a single economic unit, and did not rely on their separate identity in extending credit; or (ii) the affairs of the entities to be consolidated are so entangled that consolidation will benefit all creditors.  *Augie/Restivo*, 860 F.2d at 518–19.  The Debtors have not proven, nor have they attempted to prove, facts to support either of these circumstances.  For these reasons, the Court must deny confirmation of the Plan as drafted until the Debtors have revised the Plan and Equity Allocation Mechanism to provide distributions in accordance with each unsecured creditor's relative distribution rights.

## **CONCLUSION**

Based on all of the foregoing, the Ad Hoc Cross-Holder Committee objects to confirmation of the Plan.

Dated: March 28, 2018
New York, New York

By:    /s/ Dennis F. Dunne
MILBANK, TWEED, HADLEY & McCLOY LLP
Dennis F. Dunne
Samuel A. Khalil
28 Liberty Street
New York, New York 10005
Telephone:  (212) 530-5226
Facsimile: (212) 530-5219
Email: ddunne@milbank.com
          skhalil@milbank.com

- and -

MILBANK, TWEED, HADLEY & McCLOY LLP
Andrew M. Leblanc
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7574
Facsimile: (202) 263-7574
Email: aleblanc@milbank.com

*Counsel for Ad Hoc Cross-Holder Committee*