AKIN GUMP STRAUSS HAUER & FELD LLP
Michael S. Stamer
Abid Qureshi
Meredith A. Lahaie
Sean E. O'Donnell
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
mstamer@akingump.com
aqureshi@akingump.com
mlahaie@akingump.com
sodonnell@akingump.com

Kate Doorley
1333 New Hampshire Avenue, N.W.
Washington, DC 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
kdoorley@akingump.com

*Counsel to the Official Committee of*
*Unsecured Creditors of Cumulus Media Inc., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| CUMULUS MEDIA INC., *et al.*, | : | Case No. 17-13381 (SCC) |
| | : | |
| Debtors.[1] | : | (Jointly Administered) |
| | : | |

---------------------------------------------------------------x

**OBJECTION OF THE OFFICIAL COMMITTEE TO CONFIRMATION OF THE FIRST
AMENDED JOINT PLAN OF REORGANIZATION OF CUMULUS MEDIA INC.**

---

[1] The last four digits of Cumulus Media Inc.'s tax identification number are 9663. Because of the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/cumulus. The location of the Debtors' service address is: 3280 Peachtree Road, N.W., Suite 2200, Atlanta, Georgia 30305.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................................1

BACKGROUND .....................................................................................................................7
    A.    The Debtors' Outstanding Indebtedness and Capital Structure ................7
    B.    The Prepetition Negotiations ...........................................................................8
    C.    The RSA, Plan and Disclosure Statement......................................................10
    D.    Expert Reports Regarding Valuation ..............................................................11

I.    **The Plan Violates the Absolute Priority Rule and Cannot Be
Confirmed Under Bankruptcy Code Section 1129(b)**.......................................12
    A.    Applicable Legal Standard................................................................................12
    B.    The Plan Materially Undervalues the Debtors...............................................14
        i.    *Courts Recognize Certain Valuation Methodologies as
Proper* ..................................................................................................14
            a.    Going Concern Valuations for Reorganized Debtors
Must Be Based on Projected Future Earnings ...............14
            b.    The Court Must Determine Whether the Valuation
Experts Correctly Applied Accepted Valuation
Methodologies.................................................................15
        ii.    *The Moelis Report Accurately Estimates the Debtors' TEV* ...................16
            a.    The Moelis Valuation Is the Result of Careful
Analysis and the Application of Industry-Specific
Accepted Valuation Methods ........................................16
            b.    Moelis Used the Debtors' Own Assumptions ...............17
            c.    The Debtors' ███████████████████
████ Have Substantial Intrinsic Value ........................18
               *1.* ████████████████████████
██████████████████████████
██████████████████████████
██████████████████████████
████████████████ ....................................19
               *2.* ████████████████████████
██████████████████ ....................................26
               *3.* ████████████████████
████████ ....................................28
            d.    Moelis's Valuation Methodologies for Cash
Generating Assets..........................................................30
               *1.*    *Comparable Companies Analysis* .....................30
               *2.*    *Precedent Transactions Analysis* ......................33
               *3.*    *DCF Analysis* ...................................................34
            e.    The Appropriate TEV Range for the Debtors is
$2.1-$2.4 Billion ..........................................................37

iii.    *The PJT Valuation Suffers from Numerous Infirmities* ..............................37

a.    The PJT Report Does Not Account For Cash at
Emergence or █████████████████ and
Tower Assets that Can Generate Cash Flows—an
Error Valued at up to $430 Million ...............................................38

b.    PJT Fails to Use Post-Emergence Cash Flow in Its
Comparable Companies Analysis—an Error Valued
at up to $90 Million..........................................................................40

c.    PJT's Publicly-Traded Comparable Companies
Analysis is Flawed in Two Other Respects.....................................42

1.    *PJT's Analysis is Tainted by its Inclusion of
a Noncomparable Company and Exclusion
of a Highly-Comparable One*...........................................43

2.    *PJT's Analysis Is Marred by Factual and
Methodological Errors*.....................................................46

d.    PJT's Precedent Transactions Analysis is Flawed ........................51

e.    PJT's Discounted Cash Flow Analysis is Premised
on Flawed Assumptions ..................................................................54

f.    PJT Improperly Introduces and Relies on
Misleading Valuation Concepts .....................................................57

g.    Management's ████████████████
████ Does Not Support the PJT Valuation ..............................60

C.    The Value That the Term Loan Lenders Are Receiving in Excess of
the Value of the Term Loan Lenders' Collateral Should Inure to the
Benefit of Unsecured Creditors ....................................................................64

**II.    The Plan Releases Are Overly Broad** ........................................................................66

**III.    Additional Reasons the Plan Should Not Be Confirmed** .............................................69

RESERVATION OF RIGHTS .................................................................................................71

CONCLUSION.........................................................................................................................72

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
    364 B.R. 518 (Bankr. S.D.N.Y. 2007) ........................................................................62

*In re Brewery Park Assocs., L.P.*,
    2011 WL 1980289 (Bankr. E.D. Pa. Apr. 29, 2011) ...................................................11

*In re Bush Indus., Inc.*,
    315 B.R. 292 (Bankr. W.D.N.Y. 2004) ..................................................................13, 40

*In re Charter Commc'ns*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ........................................................................10

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) ..................................................................11, 12

*Cobalt Operating, LLC v. James Crystal Enters., LLC*,
    2007 WL 2142926 (Del. Ch. July 20, 2007) ...............................................................21

*Consol. Rock Prods. Co. v. Du Bois*,
    312 U.S. 510 (1941) ...............................................................................................12, 40

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D. Del. 2004) ................................................13, 18, 19, 26

*Cumulus Media Holdings Inc. v. JPMorgan Chase Bank, N.A.*,
    2017 WL 1367233 (S.D.N.Y. Mar. 31, 2017) ..............................................................8

*In re Drexel Burnham Lambert Grp., Inc.*,
    960 F.2d 285 (2d Cir. 1992) ........................................................................................62

*In re Duplan Corp.*,
    9 B.R. 921 (S.D.N.Y. 1980) ........................................................................................40

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) ..................................................................11, 13, 60

*In re Genco Shipping & Trading Ltd.*,
    509 B.R. 455 (Bankr. S.D.N.Y. 2014) ........................................................................58

*In re Genco Shipping & Trading Ltd.*,
    513 B.R. 233 (Bankr. S.D.N.Y. 2014) ........................................................................12

i

*In re Genesis Health Ventures, Inc.*,
   266 B.R. 591 (Bankr. D. Del. 2001) ...................................................10, 11

*In re Granite Broad. Corp.*,
   369 B.R. 120 (Bankr. S.D.N.Y. 2007) ...................................................11

*MacArthur Co. v. Johns-Manville Corp.*,
   837 F.2d 89 (2d Cir. 1988) ...................................................63

*In re Marriage of House*,
   274 P.3d 46 (Kan. Ct. App. 2012) ...................................................21

*In re Metromedia Fiber Network, Inc.*,
   416 F.3d 136 (2d Cir. 2005) ...................................................4, 62

*In re Mirant Corp.*,
   334 B.R. 800 (Bankr. N.D. Tex. 2005) ...................................................12, 13, 58

*In re Nellson Nutraceutical, Inc.*,
   2007 WL 201134 (Bankr. D. Del. Jan. 18, 2007) ...................................................12, 26, 41

*In re NextWave Pers. Commc'ns, Inc.*,
   200 F.3d 43 (2d Cir. 1999) ...................................................19

*Pasquale Cartalemi v. Karta Corp. (In re Karta Corp.)*,
   342 B.R. 45 (S.D.N.Y. 2006) ...................................................62, 63

*Peltz v. Hatten*,
   279 B.R. 710 (D. Del. 2002) ...................................................13

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc., v. Anderson*,
   390 U.S. 414 (1968) ...................................................40

*In re Reading Broad., Inc.*,
   2008 WL 2705547 (Bankr. E.D. Pa. July 8, 2008) ...................................................20

*In re Spansion, Inc.*,
   426 B.R. 114 (Bankr. D. Del. 2010) ...................................................58

**Statutes**

Bankruptcy Code Chapter 11 ................................................... *passim*

Bankruptcy Code section 1102 ...................................................5

Bankruptcy Code sections 1107 and 1108 ...................................................5

Bankruptcy Code section 1129 ...................................................1, 3, 10

Bankruptcy Code Section 1129(b)..............................................................................10, 11, 40, 61

**Other Authorities**

Jerilyn J. Castillo & Peter J. McAniff, THE PRACTITIONER'S GUIDE TO
INVESTMENT BANKING, MERGERS & ACQUISITIONS, CORPORATE FINANCE
141(Circinus Bus. Press 2007).............................................................................................46

Martin Cave & William Webb, SPECTRUM MANAGEMENT: USING THE AIRWAVES
FOR MAXIMUM SOCIAL AND ECONOMIC BENEFIT, Section 1.2 (Cambridge
Univ. Press 2015)...................................................................................................................19

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Cumulus Media Inc., *et al*., (collectively, the "<u>Debtors</u>"), by and through its counsel, hereby submits this objection (the "<u>Objection</u>") to confirmation of the *First Amended Joint Plan of Reorganization of Cumulus Media Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 446] (the "<u>Plan</u>"), and respectfully represents as follows:[2]

## **PRELIMINARY STATEMENT**

1.      For over 16 months, the Debtors and their management team have been in search of a successful restructuring outcome.  Beginning with an ill-fated exchange offer in 2016, the Debtors negotiated first with one lender group and then another, unable to obtain consensus over a plan that would achieve the substantial deleveraging desired by management.  Indeed, the company was in discussions with an ad hoc group of unsecured noteholders immediately before commencing these chapter 11 cases with respect to the terms of a restructuring that would have ***reinstated $1.729 billion*** in term loan indebtedness and provided significant value to unsecured creditors.  Now, less than three months later, the Debtors seek confirmation of a Plan premised on a valuation midpoint of ***just $1.675 billion***.  While the Debtors' stated desire to deleverage is admirable, their willingness to achieve this result on the backs of unsecured creditors is not.  The Plan inappropriately and impermissibly deprives unsecured creditors of value to which they are entitled under the absolute priority rule while simultaneously rewarding—indeed, overpaying— the Term Loan Lenders (as defined herein) for their support.  Accordingly, and for the reasons that follow, the Plan cannot be confirmed as a matter of law.

2.      ***First*** and foremost, the Plan materially undervalues the Debtors' total enterprise value ("<u>TEV</u>") and overpays holders of claims under the Term Loan Credit Agreement in

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them elsewhere in this pleading or the Plan, as applicable.

violation of Bankruptcy Code section 1129.   The Plan, and the distributions contemplated

thereunder, is predicated on a TEV range of $1.575 to $1.775 billion, with a mid-point value of

$1.675 billion, as set forth in the PJT Report.   In order to evaluate the propriety of the proposed

distributions under the Plan, Moelis conducted an independent valuation (the "Moelis

Valuation") and carefully analyzed the valuation contained in the PJT Report (the "PJT

Valuation").    In determining TEV, Moelis and PJT each used the three commonly-accepted

valuation methodologies to value the Debtors' businesses, (i) a comparable companies analysis,

(ii) a precedent transactions analysis, and (iii) a discounted cash flow analysis, but there are

material differences between the valuations produced by each.  The Moelis Valuation was largely

informed by the extensive radio industry expertise of its testifying expert, John Momtazee—

expertise that the Debtors' own expert, James Baird of PJT, irrefutably lacks.  This difference in

radio industry expertise contributed to materially different outcomes in each of the Moelis Report

and the PJT Report.   For example, because each of the three traditional methodologies are

dependent upon cash flow metrics, Moelis determined that it was necessary to separately value

the Debtors' ███████████████████████████████████████

██████████████████████████████████ based upon their

intrinsic value, also commonly known in the radio industry ██████████.   Properly valued in

accordance with widely-accepted industry practice, these assets contribute between $200 and

$300 million to the Debtors' TEV—which is simply not accounted for in the PJT Valuation.

Moelis concluded that the value range for the Debtors is between $2.1 and $2.4 billion, with a

midpoint valuation of $2.25 billion.   This value range far exceeds the artificially low range

reflected in the flawed PJT Report.

    3.      These errors, and their impact on value, can briefly be summarized as follows:

| Error | Description | Impact of Correction on TEV |
|---|---|---|
| PJT's analysis disregards cash at emergence as well ███████ and tower assets that can generate cash flows | • PJT's valuation analysis disregards cash at emergence and fails to account for ████████████████ as well as the Debtors' tower portfolio.<br>• Moelis corrected these flawed assumptions and attributed fair value to the Debtors' ███████████. | $320-$430 mm increase |
| PJT fails to use post-emergence cash flows | • The PJT Report fails to account for quantifiable and material cost-savings that have been or will be obtained during these cases, including savings from the rejection or negotiation of contracts.<br>• Moelis has accounted for these cost-savings, increasing the Debtors' trailing EBITDA by approximately 6%. | $70-$90 mm increase |
| PJT bases its valuation on inappropriate "comparable" companies, makes computational errors in its comparable companies analysis and uses erroneously low EBITDA multiples | • Townsquare Media is erroneously included as a comparable company despite the fact that over 30% of Townsquare's revenue comes from its entertainment segment – a wholly distinct and unrelated business line from radio broadcasting and on that is valued at a significant discount.<br>• PJT omitted Beasley Media Group (trading at 9.8x), which scored better on PJT's own comparability analysis chart than Townsquare.<br>• Minimum cash levels were improperly added back to the TEV of certain comparable companies, thereby lowering the corresponding trade multiples.<br>• PJT overstates the synergies that comparable company Entercom will likely be able to achieve as a result of its recent merger with CBS, thereby depressing the Entercom multiple.<br>• Even though PJT excluded Beasley from its comparable companies set, it erred in calculating Beasley's trailing EBITDA multiple by including tower sale proceeds meant for shareholders.<br>• PJT committed additional errors in its analysis of two companies that should also be included in the comparable companies set—Saga and Salem—improperly undervaluing the companies and depressing TEV.<br>• Moelis chose Entercom, Beasley, Salem and Saga as its sets of comparables. | $155-$245 mm increase |
| PJT uses flawed precedent transaction analysis that includes incorrect multiples, errors in annual cost savings from actual contractual rejections and negotiations, and errors in EBITDA figures | • PJT analyzed precedent transaction multiples on a synergized LTM EBITDA basis, contrary to accepted industry practice of using unsynergized BCF multiples and additionally incorrectly utilized a "buyer's multiple" instead of a "seller's multiple."<br>• PJT improperly excluded $20 million in transaction proceeds from the Beasley/Greater Media transaction. | $355-$465 mm increase |
| PJT uses incorrect assumptions in the DCF analysis | • PJT's projected sharp decline in the Debtors' terminal growth rate conflicts with management's forecasted trend of cash flow growth and also implies a terminal value multiple of 5.4x to 5.9x EBITDA, which is inconsistent | $155-$545 mm increase |

| Error | Description | Impact of Correction on TEV |
|---|---|---|
| | with the current market.<br>• The long-term cash tax benefits from the Debtors' reorganization are excluded, despite the Debtors' tax advisors identifying the present value of such ███████<br>███████ | |

Although the value ranges implicated by PJT's flawed methodology are substantial, the Court need only find that the Debtors' true TEV exceeds $1.786 billion, which is *just $11 million above* the high end of PJT's valuation, to render the Plan unconfirmable as a matter of law.

4.      Indeed, application of an appropriate TEV (*i.e.*, the $2.25 billion midpoint of the Moelis Valuation) to the Plan demonstrates that holders of Term Loan Credit Agreement Claims are receiving far more than payment in full on account of their secured claims in violation of the absolute priority rule. The Plan proposes to distribute the following to holders of Term Loan Credit Agreement Claims: (i) New Term Loans in the amount of $1.3 billion and (ii) a distribution of 83.5% of the New Common Stock. This proposed distribution would result in the Term Loan Lenders receiving approximately *$300-$550* million more than the total amount of the Term Loan Credit Agreement Claims, value to which the Unsecured Creditors of these estates are entitled as a matter of law in accordance with section 1129 of the Bankruptcy Code. The Plan is, therefore, patently unconfirmable.

5.      *Second*, the Plan is also unconfirmable because it includes broad, unnecessary and nonconsensual third party releases. Third party releases "[are] proper only in rare cases," and "[n]o case has tolerated releases absent the finding of circumstances that may be characterized as unique." *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005). Given that the Debtors have not demonstrated the unique circumstances required by

courts in the Second Circuit, the Plan should not be confirmed.  Alternatively, the Court should strike the third-party release provisions in the Plan.

6.      ***Finally***, the Committee has identified a number of other issues that must be addressed before the Plan can be confirmed:

- The Plan does not provide for the existence of the Committee post-confirmation. The Committee should continue post-confirmation and should be charged with pursuing any existing Avoidance Actions, the proceeds of which should inure to the Debtors' unsecured creditors.  The Committee should also continue for any appeals that it might be a party to.  Further, so long as the Committee is in existence, the Debtors or Reorganized Debtors, as applicable, should be required to continue paying the professional fees incurred by the Committee's advisors.

- Under the Plan, the Reorganized Debtors (*i.e.* the Term Loan Lenders) retain, and have the ability (but are not required) to prosecute retained Causes of Action, including Avoidance Actions.  Given that such Causes of Action are not the Term Loan Lenders' collateral (although the proceeds thereof are subject to adequate protection liens of the Term Loan Lenders to the extent of any diminution in value of the Term Lender Collateral), the Causes of Action should be put into a trust for the benefit of unsecured creditors with the trust to be administered, as noted above, by the Committee.

- The Plan currently contemplates that holders of General Unsecured Claims and holders of Senior Notes Claims will share 16.5% of the New Common Stock *pro rata*, thus it is unclear how any distributions will be made to Unsecured Creditors unless and until all Unsecured Claims are reconciled and any disputes resolved. Given that there is no dispute as to the amount of Senior Note Claims, the Plan should be modified to provide that holders of such claims and holders of any other claims allowed as of the Effective Date will receive an immediate distribution upon the Effective Date.

- The Plan inappropriately provides the same distribution to all unsecured creditors notwithstanding the fact that unsecured creditors have varying legal rights.  For example, certain unsecured creditors (including the holders of Senior Notes) have guarantee claims assertable against all or substantially all of the Debtors, whereas other unsecured creditors have claims solely assertable against a single Debtor. The Plan should be modified to classify and treat unsecured creditors in accordance with their relative priorities and legal entitlements.

- The Plan currently provides for the creation of a class of "Convenience Claims." Pursuant to the Plan, holders of Convenience Class Claims will receive payment

in full on account of such claims. Such treatment should be revised to reflect that Unsecured Creditors in the Convenience Class will receive a percentage recovery in line with the recovery of all other Unsecured Creditors (*i.e.*, if Unsecured Creditors are determined to be entitled to a 40% recovery, Convenience Class claimants should similarly receive a 40% recovery).

- The Plan should provide for the payment of the reasonable fees and expenses incurred by the Senior Notes Indenture Trustee. As noted in the *Objection of U.S. Bank National Association, as Indenture Trustee, to First Amended Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates* [ECF No. 578], the failure of the Debtors to provide under the Plan for the payment in cash of the Senior Notes Indenture Trustee's fees and expenses (without reduction to recoveries of the holders of Senior Notes Claims) means that the Plan distributions allocable to holders of Senior Notes Claims will be indefinitely delayed due to the need to segregate such distributions pending a precise determination of the value per share of the New Common Stock, so that the precise number of shares necessary to compensate the Senior Notes Indenture Trustee can be ascertained.

- A number of the corporate documents filed in connection with the Plan Supplement contain inappropriate provisions designed, once again, to benefit the Term Loan Lenders at the expense of Unsecured Creditors. The Committee has preliminarily identified the following areas of concern:

  o The Committee is concerned that the Preferred Stock Certificate currently allows the Reorganized Debtors (or the Term Loan Lenders) to issue unlimited preferred stock without stockholder approval. Such actions could allow for dilution of the fraction of equity being distributed to Unsecured Creditors.

  o The Warrant Agreement currently includes a provision whereby the warrant holders are deemed to consent to a change of control and to waive any dissenters' rights or appraisal rights. These provisions should be deleted.

  o The Warrant Agreement also currently provides that the Warrant Agent may, without holder consent, amend or supplement the Warrant Agreement with the Reorganized Debtors to cure any ambiguity or to make certain changes. These provisions should be deleted as they provide the Reorganized Debtors with too much latitude and room for interpretation.

7. For the foregoing reasons, each as set forth in greater detail below, the Plan cannot be confirmed.

6

## BACKGROUND

8.    On November 29, 2017 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and properties as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.  No trustee or examiner has been appointed in these chapter 11 cases.

9.    On December 11, 2017, the United States Trustee for Region 2 appointed the Committee pursuant to Bankruptcy Code section 1102 [ECF No. 96].  The Committee consists of the following entities: (i) Enticent, LLC dba Triton Digital; (ii) U.S. Bank National Association; (iii) AG Super Fund, LP; (iv) Ivy High Income Fund; (v) EJS Investment Holdings LLC; (vi) Screen Actors Guild – American Federation of Television and Radio Artists; and (vii) Caitlin Ferrari.

10.    Also on December 11, 2017, the Committee selected Akin Gump Strauss Hauer & Feld LLP as counsel.  On December 12, 2017, the Committee selected Moelis & Company LLC ("Moelis") as its financial advisor and investment banker.  John Momtazee, Moelis's testifying expert, has significant experience in the radio broadcasting industry and has been involved in every major transaction involving Cumulus Media over the last decade.  *See* Moelis Report at 6-7.  Indeed, Mr. Momtazee is a professional advisor in the broadcasting industry who has personally executed over $50 billion in transactions over the past two decades.  On February 14, 2018, the Committee selected Media Services Group, Inc. ("Media Services") to provide expert services related to valuing the Debtors' portfolio of broadcast towers.

### A.    The Debtors' Outstanding Indebtedness and Capital Structure

11.    As described in greater detail in the *Declaration of John F. Abbot in Support of Chapter 11 Petitions and First Day Motions* [ECF No. 17] (the "First Day Declaration") and the

7

*Disclosure Statement for First Amended Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 447] (the "Disclosure Statement"), the Debtors state that they had secured debt under that certain Amended and Restated Credit Agreement (the "Term Loan Credit Agreement"), among Cumulus Media Inc. ("Cumulus"), Cumulus Media Holdings, Inc. ("Holdings"), as borrower, and certain guarantors consisting of a $2.025 billion term loan facility maturing in December 2020 and a revolving credit facility maturing in December 2018, under which $200 million in revolving loans was available.  As of the Petition Date, approximately $1.735 billion (the "Term Loan Debt" and the obligees thereunder, including the relevant agents, the "Term Loan Lenders") was outstanding under the Term Loan Credit Agreement and no amounts were outstanding under the revolving credit facility.

12.    The Debtors also had approximately $610 million of unsecured notes outstanding as of the Petition Date (the "Senior Notes") issued by Holdings pursuant to that certain indenture, dated as of May 13, 2011, by and among Cumulus, Holdings, as issuer, and U.S. Bank National Association as trustee and as amended by that certain First Supplemental Indenture, dated as of September 16, 2011, that certain Second Supplemental Indenture, dated as of October 16, 2011, that certain Third Supplemental Indenture, dated as of October 17, 2011, and that certain Fourth Supplemental Indenture, dated as of December 23, 2013.  Cumulus and each existing and future domestic restricted subsidiary that guarantees Cumulus's indebtedness, Holdings' indebtedness, or indebtedness of Cumulus's subsidiary guarantors (other than Cumulus's subsidiaries that hold the licenses for the radio stations) also guarantee the Senior Notes.

B.    **The Prepetition Negotiations**

13.    In early 2016, the Debtors began discussions with the Term Loan Lenders and the holders of Senior Notes regarding the terms of a balance sheet restructuring or recapitalization

8

that might be implemented outside of a chapter 11 proceeding. Following months of negotiations (and an unsuccessful attempt to reach consensus with the Term Loan Lenders), the Debtors and a now-defunct ad hoc group of holders of Senior Notes (the "Ad Hoc Noteholder Group") reached agreement on the terms of an out-of-court exchange transaction (the "Exchange Transaction") in the fall of 2016. Pursuant to the proposed Exchange Transaction, the Senior Notes were to be exchanged for trust certificates with a face amount equal to 50% of the sum of the principal amount of Senior Notes tendered and 33.3% of the common equity of the Debtors. The holders of Senior Notes would also participate in a new revolving credit facility that would "prime" the Term Loan Debt while leaving the Term Loan Credit Agreement unaltered. Prior to launching the Exchange Transaction, the Debtors sought a declaratory judgment that the terms of the transaction complied with various provisions in the Term Loan Credit Agreement. The United States District Court for the Southern District of New York found that the proposed Exchange Transaction violated certain provisions in the Term Loan Credit Agreement (*Cumulus Media Holdings Inc. v. JPMorgan Chase Bank, N.A.*, No. 16 Civ 9591 (KPF), 2017 WL 1367233 (S.D.N.Y. Mar. 31, 2017)), and the Debtors subsequently abandoned the Exchange Transaction in January 2017.

14.    The Debtors and the Ad Hoc Group of Noteholders continued to discuss potential restructuring transactions throughout 2017. As recently as early November 2017, the Debtors were negotiating a potential restructuring transaction with the Ad Hoc Group of Noteholders, which transaction contemplated the reinstatement of the Term Loan Debt. Indeed, the last term sheet received from the Debtors contemplated both (i) an out-of-court transaction pursuant to which the Term Loan Debt would be unaltered and left in place and the holders of Senior Notes would receive 97% of the equity in the reorganized entity and (ii) an in-court transaction

pursuant to which the Term Loan Debt would be reinstated and the holders of Senior Notes would receive 100% of the equity in the reorganized entity. On November 13, 2017, the members of Ad Hoc Group of Noteholders were cleansed under their existing nondisclosure agreements with the Debtors, at which time it became apparently that the Debtors intended to pursue a transaction with the Term Loan Lenders that the Ad Hoc Group of Noteholders would not support.[3]

### C.    The RSA, Plan and Disclosure Statement

15.    As described in the First Day Declaration, the Debtors commenced these chapter 11 cases following the execution of a Restructuring Support Agreement on November 29, 2017 (the "RSA"). The RSA is supported by Term Loan Lenders holding approximately 69% of the debt outstanding under the Term Loan Credit Agreement. *See* First Day Declaration, ¶ 70.

16.    On December 9, 2017, consistent with the restructuring transaction described in the RSA, the Debtors filed the initial versions of the Plan and Disclosure Statement. On February 2, 2018, the Court entered an order approving the adequacy of the Disclosure Statement and authorizing the Debtors to solicit votes to accept or reject the Plan [ECF No. 416].

17.    The Plan provides that claims against the Debtors will be treated as follows:

- (i) the Term Loan Lenders will receive their *pro rata* share of (a) $1.3 billion in principal amount of new first lien term loans (the "New Term Loans") and (b) 83.5% of the equity in the reorganized Debtors (the "New Common Stock");

- (ii) Holders of general unsecured claims ("General Unsecured Claims"), including Senior Notes claims (the "Senior Notes Claims", and collectively with the General Unsecured Claims, the "Unsecured Claims"), will receive their *pro rata* share of 16.5% of the equity in the reorganized Debtors; and

- (iii) existing equity will be cancelled; *provided, however*, that at the reorganized Debtors' election, Intercompany Interests may be reinstated.

---

[3] Throughout these prepetition plan negotiations, the Debtors touted their financial performance, including their successful implementation of their business plan.

10

18.     The hearing to consider confirmation of the Plan is scheduled to commence on April 12, 2018.

**D.     Expert Reports Regarding Valuation**

19.     On March 12, 2018, the Debtors served expert reports prepared by (i) the Debtors' financial advisor, PJT Partners LP ("PJT") with respect to the Debtors' TEV (the "PJT Report") and (ii) Bishop Cheen with respect to the current state of the radio industry (the "Cheen Report"). The PJT Report employed three valuation methodologies: (i) a comparable companies analysis; (ii) a precedent transactions analysis; and (iii) a discounted cash flow analysis. The PJT Report estimates the mid-point of the Debtors' TEV at $1.675 billion. The Cheen Report discusses alleged challenges facing the radio industry, but ultimately concludes that the Debtors will be able to achieve the targets set forth in their business plan.

20.     Also on March 12, 2018, the Committee served its expert reports prepared by (i) Moelis with respect to the Debtors' TEV (the "Moelis Report") and (ii) Media Services Group, Inc. with respect to the value of the Debtors' tower assets (the "Media Services Report"). The Moelis Report employs the same three valuation methodologies as the PJT Report: (i) a comparable companies analysis; (ii) a precedent transactions analysis; and (iii) a discounted cash flow analysis. In performing its valuation, Moelis considered the intrinsic value of certain of the Debtors' assets that generate negative or minimal cash flows, which assets would otherwise be undervalued by the rote application of traditional valuation methodologies. The Moelis Report estimates the mid-point of the Debtors' TEV at approximately $2.25 billion. The Moelis Report also incorporates the conclusions reached by Media Services with respect to he Debtors' tower assets.

21.     On March 19, 2018, the Debtors and the Committee exchanged rebuttal expert reports.  Fact witness depositions related to questions of valuation took place in March 2018 and expert witness depositions occurred on March 22, 2018 and the week of March 26, 2018.

**OBJECTION**

22.     The Plan does not satisfy the requirements for confirmation set forth in the Bankruptcy Code and thus cannot be confirmed as a matter of law for the following reasons.  *First*, the Plan cannot be confirmed because it violates the absolute priority rule.  The Debtors' Plan is based on a valuation that materially undervalues the Debtors' TEV and therefore provides the Term Loan Lenders with more than payment in full on account of the Credit Agreement Claims.  *Second*, the third party releases are non-consensual and overly broad.  *Third*, the Plan suffers from a number of other infirmities that must be remedied before a confirmation order is entered in these cases.

**I.     The Plan Violates the Absolute Priority Rule and Cannot Be Confirmed Under Bankruptcy Code Section 1129(b)**

**A.     Applicable Legal Standard**

23.     The Plan cannot be confirmed because it is neither fair nor equitable.  For a plan to be confirmed, the debtor bears the burden of establishing, by a preponderance of the evidence, that the plan satisfies each of the requirements of Bankruptcy Code section 1129.  *See, e.g.*, *In re Charter Commc'ns*, 419 B.R. 221, 243 (Bankr. S.D.N.Y. 2009) (finding that the debtor bears the burden of establishing compliance with each component of section 1129); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 616 n.23 (Bankr. D. Del. 2001) (same) (citing *In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1165 n.26 (5th Cir. 1993)).  If the debtor meets its burden of proof with respect to each requirement of section 1129 (except section 1129(a)(8)) and at least one impaired class votes to accept the plan, the plan may nevertheless be confirmed pursuant to section

12

1129(b) if the plan (i) does not discriminate unfairly and (ii) is fair and equitable with respect to each impaired class that has rejected the plan.  11 U.S.C. § 1129(b).  The Committee anticipates that Class 5 (Senior Notes Claims) and Class 6 (General Unsecured Claims) will reject the Plan. Accordingly, the Plan cannot be confirmed unless the Debtors can demonstrate that the Plan does not discriminate unfairly and is fair and equitable with respect to holders of Senior Notes Claims and General Unsecured Claims.

24.    Specifically, Bankruptcy Code section 1129(b)(2)(B)(ii) contains the absolute priority rule, which provides that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . . ."  11 U.S.C. § 1129(b)(2)(B)(ii).  A corollary to the absolute priority rule is that a plan is not "fair and equitable" under Bankruptcy Code section 1129(b) if it provides senior creditors with more than payment in full on account of their claims to the detriment of a junior class.  *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003); *see also In re Genesis Health Ventures, Inc.*, 266 B.R. at 612; *In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to junior classes of debt or equity, as the case may be.").

25.    Accordingly, a plan is not fair and equitable, and, therefore, cannot be confirmed, if the plan is based on an artificially low valuation of the debtor's assets and, thus, overcompensates senior creditors to the detriment of junior creditors.  *See In re Chemtura Corp.*, 439 B.R. 561, 592 (Bankr. S.D.N.Y. 2010) ("Courts will deny confirmation if a plan undervalues a debtor and therefore would have resulted in paying senior creditors more than full compensation for their allowed claims."); *In re Brewery Park Assocs., L.P.*, No. 10-11555, 2011

13

WL 1980289, at *14 (Bankr. E.D. Pa. Apr. 29, 2011) (denying confirmation of a plan that would

have overpaid secured claims to the detriment of junior classes because the plan was not fair and

equitable under section 1129(b)); *In re Exide Techs.*, 303 B.R. at 77-78 (denying confirmation of

a plan premised on a low valuation of the debtors' enterprise because, *inter alia*, the debtors

could not establish that the requirements of Bankruptcy Code section 1129(b) were satisfied).

26.    The Plan violates the absolute priority rule and cannot be confirmed because it

significantly undervalues the Debtors' businesses and provides the Term Loan Lenders with

approximately $300 to $550 million in value to which they are not entitled.

### B.    The Plan Materially Undervalues the Debtors

#### i.    *Courts Recognize Certain Valuation Methodologies as Proper*

##### a.    Going Concern Valuations for Reorganized Debtors Must Be Based on Projected Future Earnings

27.    When determining the value of a reorganized debtor, courts generally rely on

expert opinion using a combination of the following three valuation methodologies that each

focus on such debtor's earnings capacity: (i) a comparable company analysis; (ii) a precedent

transactions analysis; and (iii) a discounted cash flow analysis ("DCF").    *See Consol. Rock*

*Prods. Co. v. Du Bois*, 312 U.S. 510, 526 (1941) ("The criterion of earning capacity is the

essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or

disaster, and if the allocation of securities among the various claimants is to be fair and

equitable."); s*ee also*, *In re Chemtura Corp.*, 439 B.R. 561, 573 (Bankr. S.D.N.Y. 2010)

(analyzing discounted cash flow, comparable companies and precedent transaction methods and

referring to these methods as "standard valuation methodologies"); *In re Genco Shipping &*

*Trading Ltd.*, 513 B.R. 233, 242-43 (Bankr. S.D.N.Y. 2014) (describing discounted cash flow,

comparable  companies  and  precedent  transaction  methodologies  as  the  "three  main

methodologies commonly used to determine reorganization value"); *In re Nellson Nutraceutical, Inc.*, No. 06-10072 (CSS), 2007 WL 201134 (Bankr. D. Del. Jan. 18, 2007) (applying comparable company, precedent transaction, and discounted cash flow analyses); *In re Mirant Corp.*, 334 B.R. 800 (Bankr. N.D. Tex. 2005) (applying comparable company and discounted cash flow analysis); *In re Bush Indus., Inc.,* 315 B.R. 292 (Bankr. W.D.N.Y. 2004) (applying comparable company, precedent transaction, and discounted cash flow analysis); *In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004) (same); *In re Exide Techs.*, 303 B.R. 48 (Bankr. D. Del. 2003) (applying comparable company and discounted cash flow analysis).

b.      The Court Must Determine Whether the Valuation Experts
         Correctly Applied Accepted Valuation Methodologies

28.     Once a court has determined that an expert is utilizing an accepted valuation methodology, it must then examine whether the expert applied it correctly.  To conduct this analysis, the court must first determine whether the "inputs" and assumptions selected by the expert are sound, supported by evidence, and applied in a manner consistent with the applicable valuation methodology.  *See, e.g.*, *In re Mirant Corp.*, 334 B.R. at 838 n.134 ("The court must rely on experts in deciding methodology for valuation (though it must use its own judgment in fitting the evidence with the methodology).").  Indeed, it is widely recognized that "the output of financial valuation models are driven by their inputs, many of which are subjective in nature." *Peltz v. Hatten*, 279 B.R. 710, 737-38 (D. Del. 2002).  Yet, it is equally clear that "[a]lthough valuations are subjective, there are proper and improper methods of performing a valuation."  *In re Coram Healthcare*, 315 B.R. at 339.  Applying the foregoing to the facts of this case, the Court should conclude that the inputs and assumptions utilized in the Moelis Report are more accurate and reliable than those used in the PJT Report, and that the midpoint of the Moelis Valuation is an accurate estimate of the Debtors' true TEV.

15

       ii.     *The Moelis Report Accurately Estimates the Debtors' TEV*

       a.     The Moelis Valuation Is the Result of Careful Analysis and the Application of Industry-Specific Accepted Valuation Methods

29.      Moelis uses the same three valuation methodologies as PJT to derive the most accurate estimate of the Debtors' total enterprise value: (i) an analysis of comparable publicly-traded companies that uses a cash flow multiple based on the comparable companies' 2017 and 2018 EBITDA[4]; (ii) an analysis of relevant precedent transactions that uses a trailing broadcast cash flow ("BCF") multiple; and (iii) a DCF analysis.  For each of the three accepted valuation methodologies employed in its report, Moelis separately values the Debtors' cash-flow generating assets ████████████████████████████, the latter of which have substantial intrinsic value that cannot be ascertained by applying market multiples or discounting projected cash flows.  Most significantly, Moelis ascribes material value to ████████████ ████████████████████████████████████████████████████ ████████████████████████████    ████████████████████ ████████████████████████████████████████████████████ ████████████████████████████    After performing its analysis and, importantly, accounting for the value attributable to the ████████████████████████ ██████ and cash at emergence, Moelis concludes that the Debtors' TEV range is $2.1 to $2.4 billion, with a midpoint of $2.25 billion.  The value ranges generated by each of the three methodologies are reflected in the chart below, and the following sections address the inputs and assumptions employed by Moelis to reach its ultimate valuation conclusion.

---

[4] EBITDA has been adjusted to reflect Moelis's treatment of stock-based compensation and certain local marketing agreements as described on page 6 of the Rebuttal Report of John Momtazee.



*See* Moelis Report at 16.

        b.      <u>Moelis Used the Debtors' Own Assumptions</u>

    30.    In performing its valuation, Moelis used the Debtors' own forecasts and projections.[5] These financials are displayed in the following table:



---

[5] Specifically, Moelis uses the Debtors' 2018 budget to derive 2017 pro forma and 2018 estimated EBITDA and derives projected EBITDA figures for 2019 and 2020 from the Debtors' lender model dated February 1, 2018.

*See* Moelis Report at 19.  Moelis also adopts the Debtors' assumed market revenue growth rate of negative 1% in all radio markets, consistent with the Debtors' assumption in their 2018 Budget.[6]  In addition, Moelis did not make any adjustments to the Debtors' business plan.

31.    Finally, Moelis also uses the Debtors' assumptions regarding market share gains. The Debtors expect to capture additional market share from 2017-2020, including share gains in Portable People Meter (PPM) markets, 4-book markets, and 2-book and unrated markets.[7]  Like the Debtors' management team, Moelis assumes for purposes of valuing the Debtors that the negative market revenue growth rate will be more than offset by projected market share gains from 2017-2020.

          c.      <u>The Debtors' Low or Non-Cash Flow Generating Assets Have Substantial Intrinsic Value</u>

32.    Moelis attributed significant value to the Debtors' non-cash flow producing assets, and it did so without applying the cash-flow based metrics necessitated by the three valuation methodologies otherwise applied in its report.  Accounting for the value ███████ ███████████████████████ is common in the radio industry, and is referred to as ██████████ ████████ must be taken into account when valuing the Debtors ██████████ ████████████████████████████████████████████████████████ ██████████████████ Accordingly, this Objection will first provide a brief overview of the methodology employed by Moelis to value the ████████████████████████████ ██████ before addressing Moelis's application of the three standard valuation methodologies.



---

[6] It is important to note that this growth assumption is conservative relative to industry reports, which project on average growth of positive 0.1%.  *See* Moelis Report at 81.

[7] The Debtors' have a presence in numerous radio markets, and broadly categorize these markets into four categories: PPM; 4-book markets; 2-book markets; and unrated markets.  The categories are based on ratings measures.  PPM markets are measured by a Portable People Meter, which measures what people in the vicinity of the meter are listening to.  For the non-PPM markets, 4-book markets have ratings updates quarterly, while 2-book markets have ratings updates released two times per year.  Unrated markets are not covered by Nielsen or any other ratings agency.

*1.* ███████████████████████████

*Routinely Sell for Amounts Greater than What Their*
██████████████████████████████████

*Multiple Valuation Alone*

33.    ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

- **EMF/Merlin.** In March 2018, Christian broadcaster Education Media Foundation ("EMF") announced that it had entered into an agreement to purchase WLUP-FM (97.9) in Chicago from Merlin Media for $21.5 million;

- **Entercom/EMF.** In September 2017, Entercom Communications ("Entercom") divested KSWD in Los Angeles to the non-profit EMF with two other stations and translators for $57.5 million;

- **Cumulus/Family Stations.** In October 2012, Cumulus acquired WFME in New York from Family Stations, a Christian organization, in exchange for WDNY-FM and up to $50 million in cash; and

- **Emmis/Disney (ESPN Radio).** In April 2012, Emmis agreed to lease the 98.7 FM KISS frequency in New York to Disney (ESPN Radio) for 12 years under a local marketing agreement (an "LMA"), where the total deal value, including the loan proceeds and intellectual property payment, was $96.0 million.

*See* Moelis Report at 15.  Based on this well-documented industry behavior, █████████████

██████████████████████████████████████████████████

34.    ████████████████████████████████████████████

the intrinsic asset value of such stations because the buyers can rebrand or reformat the stations

in accordance with a new business model or cash generation profile, thereby generating attractive

cash flows and yields on the assets.  *Id.* at 14.  For example, in the EMF/Merlin transaction

referenced above, EMF discontinued WLUP's current programming—"The Loop"—and placed

its syndicated contemporary Christian "K-Love" format on the station shortly after closing the

deal. *Id*. at 15.  Similarly, in the Entercom/EMF deal, Entercom divested KSWD to EMF, after which EMF converted the station from a classic rock format to a contemporary Christian music format as part of its K-Love network and changed KSWD's call sign to KKLQ, completely disregarding the station's prior business model. *Id.*  Finally, in the Emmis/Disney transaction, Emmis (i) leased the 98.7 KISS FM frequency to Disney (ESPN Radio) under a local marketing agreement for twelve years, (ii) sold the intellectual property of KISS FM—an adult contemporary music station—to a competitor for $10 million plus quarterly earn-out payments, and then (iii) reformatted the station from adult contemporary music to sports. *See id.*; *see also* Current Report of Emmis Comms. Corp. on Form 8-K (Filed Apr. 26, 2012) (detailing transaction).

35.    A buyer will also consider the value of the radio wave frequencies associated with a target station when considering an acquisition.  Because these FCC-licensed bands of radio wave frequencies are scarce and heavily regulated, they have inherent value as a resource in short supply ████████████████████████████████████████

██████ [8] *See id.*; *see also In re NextWave Pers. Commc'ns, Inc.*, 200 F.3d 43, 50 (2d Cir. 1999) ("The scarcity of radio frequencies therefore required a regulatory mechanism to divide the electromagnetic spectrum and assign specific frequencies to specific users."); *NextWave*, 200 F.3d at 52 ("Instead, [the FTC] was told to auction licenses to the highest bidder because such a system was thought likely to promote the development of new technologies and encourage efficient use of the spectrum, while simultaneously recouping some of the value of the spectrum for the public."); *see also* Martin Cave & William Webb, SPECTRUM MANAGEMENT: USING THE

---

[8] The FCC set maximum radio station ownership levels for any company. ██████████████
██████████████████████████████████████████████

AIRWAVES FOR MAXIMUM SOCIAL AND ECONOMIC BENEFIT, Section 1.2: *Why Spectrum Needs Managing* (Cambridge Univ. Press 2015) (discussing the "scarcity value of spectrum").

36.     As evidenced by the transactions cited above, the owners  through a typical M&A process targeted towards industry participants. As further explained in the Moelis Report, owners can also achieve incremental or accretive value ▆▆▆▆▆▆▆▆▆▆ through, among others, the following methods:

- *Accretive acquisitions* to build out clusters. Acquiring radio station operations within the same market allows operators to develop "clusters" of similar operating assets, with similar formats or diversified brands and programming, within a centralized operation, sharing management resources, sales teams, physical facilities, offices and other fixed cost resources;

- 

- *Station level sharing agreements*, such as local marketing agreements (LMAs), in which an owner of an FCC license contracts with another operator to manage, program, or lease air-time allowing for overhead savings for both parties; joint sale agreements (JSAs), which enable a station operator to achieve economies of scale by combining a local sales force with that of another established operator to save costs and resources associated with driving local direct sales revenue and calling upon local advertisers in exchange for a fee or shared commissions; and shared services agreements (SSAs), which allow an operator to realize in-market synergies of scale by acting like part of a highly-clustered station group, via having another operator leverage its existing in-market station operations, personnel, and business infrastructure to manage several business, finance, accounting, and other back-office functions in exchange for a management fee; and

- *Management agreements/JVs*, which are used to achieve synergies and involve either one operator managing another operator's entity to realize both corporate and station-level synergies or are shared equity ownerships

in a central entity that own or manage multiple stations within a market as a way of unlocking in-market synergies, and realizing value through sharing both equity returns and risk. *See* Moelis Report at 25-26.

37.     Indeed, courts have routinely recognized that experts may ███████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████    *See In re Reading Broad., Inc.*, No. 05-26563BIF, 2008 WL 2705547, at

*5 (Bankr. E.D. Pa. July 8, 2008) (both parties' experts ████████████████████    where

"the station equals the value of its license and physical assets"); *Cobalt Operating, LLC v. James

Crystal Enters., LLC*, No. CIV.A. 714-VCS, 2007 WL 2142926, at *26 n.56 (Del. Ch. July 20,

2007), *judgment entered*, No. 714-N, 2007 WL 3326119 (Del. Ch. Aug. 15, 2007), and *aff'd*, 945

A.2d 594 (Del. 2008) (valuation expert who used a cash flow multiple to value radio station also

used a "comparable sales analysis" and █████████████████████████████████████

███████████████████████████████████████████████████████████████████████

stations in the relevant market"); *In re Marriage of House*, 274 P.3d 46 (Kan. Ct. App. 2012)

(sale of radio station to Disney affiliate was █████████████████████████████████

███████████████████████████████████████████████████████████████████████

█████████████████████

38.     ███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

█████████████████████████████

██████████████████████████████

█████████████████████████████████████████████████████



39.     Indeed, Mr. Cheen recently acknowledged that the GTCR's contemporaneous sale

of WLUP-FM in Chicago for $21.5 million was attributable to ████████████████

had nothing to do with the station's brand.



**A.  It has nothing to do with the brand.**
Q.   Of the station. 

**A.  I[t] has to do with the license, the oligopoly.  It's a licensed
monopoly, in that you can't decide to go to Chicago and open
up a radio station.**

. . .



*See* Tr. of Deposition of Bishop ("Cheen Deposition Tr.") at 275:12-24; 276:2-13.

40.    This testimony is consistent with a recent report co-authored by Mr. Cheen in

which he acknowledges the

depending on demand:



*See* Cheen Deposition Tr. 137:24-25; 138; 139:2-11.

41.    Finally, the Debtors' own valuation expert, Mr. Baird, confirmed that a station in a

███████████████████████████████████████████████████████████. The

testimony below relates to the above-referenced WLUP transaction in Chicago:

Q.    So if you wanted look at it from the seller's perspective in
terms



*See* Tr. of Deposition of James Baird ("Baird Tr.") 178:12-179:13.

42.    The Debtors own a significant number of ████████████████████████

███████ with substantial intrinsic or stick value predicated on, among other things, the following

facts:

- 

- 

- ██████████████████████████ assets also have associated high-quality radio-wave frequencies which, as stated above, also have substantial value given market location, applicable FCC regulations and the scarce nature of radio waves.

By contrast, PJT's failure to account for these important assets contributes to its artificially low TEV for the Debtors' businesses.

43.    PJT argues in its rebuttal report that Moelis's analysis is flawed because the Debtors' ████████████████████████████████ This criticism misinterprets Moelis's analysis. The conclusions set forth in the Moelis Report are not premised upon a particular transaction occurring in the near future, and the occurrence of any such transaction is not a necessary predicate to the Moelis Report's overall value conclusion. As stated above, these ████████████████████████ have inherent asset value beyond whatever ██████████████████████████████—and the Moelis Report is consistent with standard radio industry practice in this regard.

2.    *Moelis Uses the Correct Approach to Value the Debtors'* ████████████████████

44.    Moelis uses two valuation methodologies to determine the value of these ████ ████████████████: (i) an assessment of precedent transactions based on value per ████████████████ and (ii) a synergized cash flow ("SCF") analysis, which reflects a potential strategic partner's ability to access synergies in a larger cluster of station assets in a given market. The precedent transactions that Moelis considered in its analysis demonstrate how

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

As part of its precedent transaction analysis, Moelis took into account station/signal characteristics including location, height above average terrain, wattage, signal contours and population reach.  Moelis identified relevant FM and AM precedent transactions ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████  This step was appropriate because the intrinsic value of the Debtors' radio assets is both substantial and ████████████████████

██████████████████████████

45.    █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████

46.    Application of these two methodologies yields a value range of approximately

*$200 to $300 million* ██████████████████████████████████████████████

████████



*3.* ████████████████████████████

47.    ████████████████████████████████████████

████████████████████    For example, the Debtors' tower portfolio ████████████

█████████████████████████████████████████████████████████

████████████████    A third party appraiser that specializes in tower valuation has concluded,

however, that the asset value of a subset of the Debtors' towers is approximately $134 million.

*See* Media Services Report at 39.  The Moelis Report concludes that considering the highest and

best use of the tower assets, as owned by a specialized tower company and leased back to the

Debtors, would contribute an estimated $45 to $55 million of *incremental* value to the total

enterprise.  This incremental intrinsic value must also be included in order to reach a proper

valuation of the Debtors' enterprise.

48.     Anticipated cash proceeds and cash projected on the balance sheet at emergence must also be included in any valuation.  The Debtors' own projections reflect that they will emerge from bankruptcy with $35 million in cash.[9]  Further, and as noted in the Disclosure Statement, the Debtors anticipate receiving $75 million in net proceeds from the sale of certain real property in Washington D.C.  It is a matter of standard valuation practice to include such amounts in any enterprise valuation.  *See Nellson*, 2007 WL 201134, at *32 (holding that "[a] proper calculation of a company's enterprise value should include cash and other assets, the value of which is not captured in performing standard methodologies"); *Coram Healthcare*, 315 B.R. at 341 (stating that proper valuation for purposes of confirmation must take into account all elements of value, including cash on hands).  The Moelis Report correctly accounts for such incremental sources of enterprise value.  The PJT Report accounts for the $75 million of proceeds from the sale of property in Washington D.C., albeit in a footnote, implying that PJT's valuation range is actually $1.575 billion to $1.775 billion, with a midpoint of $1.675 billion. *See* PJT Report at 60.

49.     When properly valued, the low or non-cash flow generating assets contribute between ***$355 and $465 million*** to the Debtors' enterprise value, which assets include the following:

- approximately $200-$300 million ████████████████████████

- approximately $75 million in net proceeds from a Washington D.C. real estate parcel, which is being held for sale under contract;

---

[9] In the Moelis Report and the Rebuttal Report of John Momtazee, Moelis assumed that there would be $75 million of restricted cash on the balance sheet on emergence based on the February 23, 2018 cash forecast made available to Moelis at the time the Moelis Report was prepared.  In the PJT Rebuttal Report, PJT cited a March 15, 2018 Alvarez & Marsal report (never produced to Moelis) that discloses for the first time that there were additional restructuring expenses that would reduce estimated cash at emergence to approximately $35 million.  The change from $75 million to $35 million of estimated cash at emergence is immaterial to the Moelis Valuation and does not change the methodologies or conclusions contained in the Moelis Report.

- approximately $35 million in projected cash at emergence; and

- approximately $45-$55 million in incremental value from the intrinsic asset value of the Debtors' tower portfolio.

    d.    <u>Moelis's Valuation Methodologies for Cash Generating Assets</u>

50.    Having established the intrinsic value of the Debtors' ███████████ ███████████ Moelis next applied the three standard valuation methodologies to value the Debtors' cash generating assets: (i) a comparable companies analysis; (ii) a precedent transactions analysis; and (iii) a DCF analysis. Each of the valuation methodologies used in Moelis's report is described in detail below.

*1.    Comparable Companies Analysis*

51.    The comparable company analysis is a market-based valuation methodology used to estimate TEV based upon how the stock market values companies comparable to the debtor. By calculating the trading multiples of comparable public companies using performance metrics such as EBITDA, the comparable company analysis reflects actual market valuations and is therefore generally accepted as a reliable indicator of the subject company's TEV.

52.    The comparable company analysis proceeds in three steps. First, appropriate inputs must be determined including the (i) identification of comparable companies, (ii) selection of relevant performance metrics, and (iii) selection of the relevant time period. Second, a multiple must be derived by comparing the total enterprise value of each comparable company to the selected performance metric (*i.e.*, revenue or EBITDA). Third, a TEV for the subject company is generated by applying the market multiple to the selected performance metric.

53.    Moelis's comparable companies analysis began with a careful selection of relevant comparable companies. Based on a number of factors, including minimum market capitalization, comparable business mix, operations in the United States, and current non-

30

distressed status, Moelis ultimately chose Entercom, Beasley, Salem, and Saga as its set of comparables.  *See* Moelis Report at 53.  Moelis *excluded* iHeart, as an inappropriate comparable despite the fact that it trades at a materially higher 9.0x multiple.[10]  *Id.*  Moelis then compiled the financial data for each of the comparable companies to determine their multiples for 2017 and 2018 estimated EBITDA.  *Id.* at 54.

54.    Additionally, and as reflected in the chart below,[11] Moelis determined that the Debtors should trade at a multiple of no less than the average multiple of the peer set for, among others, the following reasons:

- the Debtors' management team expects the business to gain market share against and outperform their industry peers;

- the Debtors are substantially larger than their average competitor and therefore should trade at a premium;

- the Debtors' ██████████████████████████, which leads to greater cash flow conversion for the Debtors and their shareholders; and

- the comparable companies all have supervoting stock and thus trade at a discount due to the lack of control given to equity.  The Debtors do not have supervoting stock.

---

[10] PJT includes iHeart as a comparable company, but then subjectively discounts the multiple from 9.0x back to "around 8 times" and then further subjectively reduces its effect on the Cumulus comps, noting "[Cumulus is] not iHeart."  See Baird Tr. 211:3-11.

[11] The chart below has not been updated to reflect the updated cash figures as discussed herein.  This recently received information does not impact the Moelis Valuation or the conclusions contained in the Moelis Report.

| ($ in millions) | 2017 Revenue | 2017-2018 Revenue Growth | 2018 Effective Tax Rate | TEV / EBITDA Multiple | | Supervoting Stock |
| | | | | 2017E | 2018E | |
|---|---|---|---|---|---|---|
| Beasley Broadcast Group [1] | $251 | na [2] | 28.0% | 10.3x | 10.3x | Y |
| Entercom Communications [3] | 1,521 | 0.8% | 21.0%[4] | 8.2x | 7.9x | Y |
| Saga Communications [5] | 124 | na [2] | 29.5% | 7.7x | 7.7x | Y |
| Salem Media Group | 266 | 3.5% | na | 7.6x | 7.2x | Y |
| Average [6] | $540 | 2.2% | 26.2% | 8.4x | 8.3x | |
| Median [6] | $258 | 2.2% | 28.0% | 7.9x | 7.8x | |
| Cumulus Media | $1,112 | 3.0% | nm [7] | | | N |

1. Beasley 2018E EBITDA is per Moelis estimates, see page 57
2. Not shown given lack of research coverage
3. Entercom multiples shown with EBITDA values 50% of assumed realized cost synergies
4. Represents Federal tax rate per Entercom Q4 2017 Earnings Call on 3/8/2018; Company stated its blended tax rate would be "in the low-20s" but did not guide to a specific number
5. Saga 2018E EBITDA is per Moelis estimates, see page 59
6. Average and median calculated using Beasley, Entercom with 50% Synergies, Saga, and Salem values
7. Per Lender Model v2 dated February 1, 2018, Company assumes NOLs are created post emergence in 2018 due to the depreciation and amortization expenses created from the emergence transaction, which is being treated primarily as an asset sale, leading to negative EBIT in 2018 – this creates $80.1mm of NOLs by end of FY2018; Company's model assumes no projected Federal cash taxes in 2018, $3.3mm in 2019 and $16.5mm in 2020; Company's model assumes State tax of $6.8mm in 2018, $8.4mm in 2019 and $10.0mm in 2020

*Id.* at 55.  Accordingly, Moelis selected a multiple range for the Debtors of 7.5x to 8.5x 2017 pro forma EBITDA and 7.25x to 8.25x 2018 pro forma EBITDA.  *Id.*  Finally, Moelis applied these multiples to the 2017 and 2018 pro forma adjusted EBITDA of the Debtors' cash flowing assets, which were $224 million and $231 million respectively.  *Id.* at 60.  This yielded a 2017 value range of approximately $1.7 billion to $1.9 billion and a 2018 value range of approximately $1.7 billion to $1.9 billion.  *Id.*  Moelis then added the value of the Debtors' low or non-cash generating assets to these ranges, as well as the value of the cash projected to be on the Debtors' books at emergence.  This calculation resulted in an approximate TEV range of $2.1 billion to $2.4 billion, as shown in the table below:



### 2.    *Precedent Transactions Analysis*

55.    The precedent transaction methodology provides a valuation range based on an analysis of relevant transactions involving businesses with operations and financial characteristics comparable to the Debtors.

56.    Moelis began its precedent transactions analysis by selecting relevant precedent transactions.    *See* Moelis Report at 63.    Moelis considered select M&A transactions consummated after January 1, 2016 with a transaction value greater than $75 million.    *Id.*    These criteria yielded four transactions.    Moelis next determined that two of the four transactions were the most relevant based on the Debtors' operating and financial profile: (i) Entercom's merger with CBS and (ii) Beasley's merger with Greater Media, as reflected in the chart below.

## Selected M&A Transactions

M O E L I S  &  C O M P A N Y

Select M&A transactions since January 1, 2016 with transaction value greater than $75 million

| Date | Acquiror | Seller | Markets | Implied TEV | Implied TEV / LTM BCF [3] | AM / FM |
|------|----------|--------|---------|-------------|---------------------------|---------|
| 05/09/17 | Meruelo Group | Emmis Communications Corp. | Los Angeles | $83 | 12.9x | 0 AM / 1 FM |
| 02/02/17 | Entercom Communications Corp. | CBS Broadcasting, Inc. | 19 Total: New York, Los Angeles, Chicago etc. | 2,850 | 7.4x | 22 AM / 64 FM |
| 02/02/17 | iHeart, Beasley, Bonneville, EMF | Entercom Divestitures | 7 Total: Los Angeles, San Francisco, Boston, etc. | 265 | 9.8x | 4 AM / 15 FM |
| 07/19/16 | Beasley Broadcast Group, Inc. | Greater Media, Inc. | 7 total: Boston, Charlotte, Detroit, Philadelphia, etc. | 240 | 8.1x | 3 AM / 18 FM |
| Mean | | | | | 9.6x | |
| Median | | | | | 9.0x | |

Source:    Company Filings
Note:    Red boxed transactions are most applicable
1.    Despite the use of EBITDA in publicly traded comparable companies, the radio broadcast industry uses broadcast cash flow for M&A transactions, which excludes corporate expenses

*Id.* at 64.  Moelis concluded, based on publicly available company financials—all primary source materials—that the correct trailing BCF multiples for each target were 7.4x (CBS Radio) and 8.1x (Greater Media).  *Id.*  Based on these BCF multiples, Moelis selected a multiple range of 7.0x to 8.0x trailing BCF and applied that range to the Debtors' 2017 pro forma BCF from cash flowing assets of $262 million.  *Id.* at 64, 67.  The resulting value range for the Debtors' cash flowing assets is approximately $1.85 billion to $2.1 billion.  Moelis Report at 67.  To this range, Moelis then added the value of the Debtors' non-cash producing assets and the value of the cash projected to be on the Debtors' books at emergence, yielding an approximate TEV range of $2.25 billion to $2.6 billion.  *Id.* at 49, 67.

### 3.    DCF Analysis

57.    Finally, Moelis performed a DCF analysis to estimate the Debtors' TEV.  The DCF methodology estimates TEV based on the net present value of a debtor's projected unlevered free cash flows.  The first step in performing a DCF analysis typically requires projecting the debtor's cash flows through a particular projection period, which is generally until the debtor reaches a point of stable growth.  Next, the applicable discount rate is calculated

utilizing the weighted average cost of capital ("WACC").  The WACC represents the returns that investors would demand from an investment in the company's debt and equity, blended at the company's relative debt to equity ratio.  Finally, a terminal value, representing the value of the debtor's cash flows beyond the projection period, is calculated using one of two generally accepted valuation techniques: (i) the terminal multiple method (the "Terminal Multiple Method") and (ii) the perpetuity growth rate method (the "Perpetuity Growth Method").

58.    Moelis's DCF analysis is based on the Debtors' projected performance from June 2018 through December 2020.  Specifically, Moelis's DCF analysis is based on the unlevered free cash flows Moelis derived from management's projections with certain critical adjustments: (i) cash flows begin on the assumed emergence date; (ii) Merlin assets were removed from cash flow; (iii) EBITDA reflects contract rejection and renegotiation outcomes; and (iv) non-cash flow generating assets were excluded, ████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████

59.    Several other key assumptions and methodological choices factored into Moelis's DCF analysis.  First, Moelis used its set of publicly-traded comparable companies to determine a WACC for the Debtors of between 9.5% and 10.5%.  Second, the Debtors' annual free cash flows and terminal values were discounted to the emergence date using the mid-period convention,[12] and were therefore adjusted for unlevered cash flows beginning post-emergence.

---

[12] When discounting five years of cash flows, one can discount them by one year, two years, three years, four years, and five years, respectively, which is called "end-period" or full-year convention.  Conversely, one can discount cash flows by 0.5 years, 1.5 years, 2.5 years, 3.5 year, and 4.5 years, which is known as "mid-point convention."

Third, Moelis used the Perpetuity Growth Method to calculate terminal value, starting with average 2020 free cash flow and assuming a terminal growth rate range of *negative* 1.0% to 1.0% assuming free cash flow decline in line with, and proportionate to, management's outlook for long-term industry revenue growth on the low end and industry research's estimated revenue growth on the high end.  Fourth, Moelis assumed the use of NOLs during the projection period based on management-provided tax projections. Moelis used an effective tax rate based on management's projections, and a terminal value effective tax rate of 26.7%. *Id.* at 69.  Based on these assumptions and choices, Moelis calculated the following unlevered free cash flow through the projection period:



*Id.* at 70.  Using the WACC and terminal growth rate ranges described above, Moelis then calculated the value of the Debtors' cash-flowing assets. *Id.* Moelis calculated the value of the Debtors' cash-flow producing assets under its DCF analysis to be approximately $1.7 billion to $2.2 billion. *Id.* at 72.  Moelis then ████████████████████████████████

---

Mid-point convention is more applicable for the radio industry because it assumes that cash is coming in evenly throughout a year instead of all at the end of the year.

this range, as well as the value of the cash projected to be on the Debtors' books at emergence. This resulted in an approximate TEV range of $2.1 billion to $2.7 billion.  *Id.* at 49, 72.

> e.    <u>The Appropriate TEV Range for the Debtors is $2.1-$2.4 Billion</u>

60.    Based on the foregoing analyses, Moelis estimated that the appropriate value range for the Debtors is between $2.1 and $2.4 billion. Of this amount, between $355 and $465

██████████████████████████████████████████████

████████████████████████  Each of the valuation methodologies outlined in the Moelis Report as applied to the cash-flowing assets—public company comparables, precedent transactions, and DCF—yields a slightly different valuation range:

- Public Comparable Companies range: $2.1-$2.4 billion

- Precedent Transaction range: $2.25-$2.6 billion

- DCF range: $2.1-$2.7 billion

In its judgment, Moelis relied most heavily on the comparable companies analysis, which reflects recent market data and operating performance.  Lesser weight was attributed to (i) the precedent transaction analysis given the limited number of recent transactions and (ii) the DCF analysis given the short duration of the projection period.  Based on its judgment, Moelis calculated a TEV range for the Debtors of $2.1-$2.4 billion, with a midpoint of $2.25 billion.

> *iii.*    <u>*The PJT Valuation Suffers from Numerous Infirmities*</u>

61.    As stated above, the Debtors cannot satisfy their burden to establish that the Plan is fair and equitable because the Plan proposes to overcompensate the Term Loan Lenders at the expense of Unsecured Creditors.  This inequitable and impermissible result arises from the Debtors' adoption of the erroneous and unjustifiably low valuation contained in the PJT Report.

62.    The PJT Report significantly undervalues the Debtors as a going concern. Specifically, the PJT Report:

- disregards nearly half a billion dollars of intrinsic value attributable to assets that have the capacity to generate significant future cash flows;

- fails to use post-emergence cash flows to value the Debtors;

- bases its valuation on publicly-traded companies that are not appropriate "comparables";

- contains computational errors, particularly in its precedent transactions analysis;

- uses incorrect assumptions in the DCF analysis; and

- relies on misleading valuation concepts.

These errors and omissions result in a valuation that is $525 to $625 million lower than the valuation produced by Moelis—an unsurprising result given PJT's apparent directive to produce a value range that supports the artificially low recoveries provided to holders of Unsecured Claims under the Plan. Each infirmity in the PJT Report is addressed in detail below.

    a.    <u>The PJT Report Does Not Account For Cash at Emergence or the Intrinsic Value of Station and Tower Assets that Can Generate Cash Flows—an Error Valued at up to $430 Million</u>

63.    The PJT Report wholly disregards—and attributes no value to—assets likely worth in excess of $400 million. As discussed above, ██████████████████ and real estate assets—██████████████████████████—have material intrinsic value.[13] Yet PJT's valuation methodologies, which are based solely on cash flow multiples and a DCF analysis, effectively ascribe *no value* to the Debtors' ██████████████████ or their real estate assets.

64.    The PJT Report fails to account for the intrinsic value of numerous stations ████ ████████████████████████████████████████████████████████████████████

---

[13] *See* Moelis Report at 27.

████████████████████████████████████████████████████████

████████████████████████████████████████████████

65.     Just as the PJT Report fails to account for the intrinsic value of ███████████

███████████████████████, the PJT Report also fails to account for any of the incremental value

of the towers in the Debtors' portfolio.  PJT values these towers only for the cash flows they

generate, ignoring their fundamental intrinsic value.  Accordingly, PJT has further undervalued

the Debtors' low or non-cash flow generating assets by an additional $45-$55 million.  *See*

Rebuttal Report of John Momtazee at 34.

66.     Finally, PJT has failed to account for the value of the cash that the Debtors

themselves have projected they will hold at emergence.  The Debtors' own projections reflect

that they will emerge from bankruptcy with $35 million in cash.  Although the Moelis Report

correctly accounts for the value of this cash, PJT maintains—wrongly—that trading multiples for

comparable companies should be calculated based on the assumption of a minimum amount of

cash on the balance sheet, and PJT subsequently assumes $35 million of minimum cash.  While

PJT's assumption is incorrect as a matter of standard valuation practice, even if the Court were to

accept this assumption, there should still be value ascribed to any cash in excess of PJT's

assumed minimum cash balance of $35 million.  *See id.* at 34.

67.     If PJT's flawed assumptions and inputs were to be corrected, and fair value

ascribed to the Debtors' ██████████████████████ as is reflected in the Moelis Report, the

PJT Valuation would increase by ***$330 to $430 million***.  *See* Rebuttal Report of John Momtazee

at 34.  This correction must be performed in order to ensure that the Debtors' assets are being

valued in accordance with well-documented industry practice and the views of the Debtors' own

testifying experts and CFO, and to ensure an appropriate allocation of value to the Debtors'

unsecured creditors as is required by the absolute priority rule.

> b.    PJT Fails to Use Post-Emergence Cash Flow in Its Comparable
> Companies Analysis—an Error Valued at up to $90 Million

68.    PJT uses the wrong measure of EBITDA in its comparable companies analysis.

Critically, when valuing a business based on multiples of EBITDA, steady-state EBITDA (*i.e.*,

EBITDA that is reflective of the company's long-term prospects) must be used:

> To build a forward looking multiple, choose a forecast year for EBITDA that best
> represents the long-term prospects of the business. In periods of stable growth
> and profitability, next year's estimate will suffice. For companies generating
> extraordinary earnings (either too high or too low) or for companies whose
> performance is expected to change, use projections further out.

*See* Valuation: Measuring and Managing the Value of Companies, McKinsey & Company, p.

312. PJT failed to follow this well-established principle.

69.    Tying a company's value to its long-term prospects or prospective earning

capacity is "essential . . . if the enterprise is to be freed from the heavy hand of past errors,

miscalculations or disaster, and if the allocation of securities among the various claimants is to

be fair and equitable." *Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 526 (1941) (citations

omitted). Beginning with the Supreme Court's decision in *Consolidated Rock*, courts have

consistently held that valuations in chapter 11 should reflect a debtor's post-emergence earnings

capacity and future ability to generate free cash flow. *See id.* at 525; *see also Protective Comm.

for Indep. Stockholders of TMT Trailer Ferry, Inc., v. Anderson*, 390 U.S. 414, 442 n.20 (1968);

*In re Bush Indus., Inc.*, 315 B.R. at 299 ("For purposes of the cram down provisions of 11 U.S.C.

§ 1129(b), the debtor must demonstrate its present value as a reorganized entity . . . .

Accordingly, the appropriate valuation of Bush Industries is to be grounded upon its earning

capacity as a reorganized entity."); *In re Duplan Corp.*, 9 B.R. 921, 925 (S.D.N.Y. 1980) ("The

value of a business is based on expectations of profits. To arrive at the value of a debtor's business, prospective earnings are capitalized at an appropriate rate.") (internal citations omitted); *In re Nellson Nutraceutical, Inc.*, 2007 WL 201134, at *28 ("Consolidated Rock establishes that the key criteria in valuing a company should be that company's 'earning capacity' rather than its market value during bankruptcy, because, among other things, being in bankruptcy will harm that market value."). Accordingly, a comparable company valuation is flawed where, as is the case in the PJT Report, the EBITDA multiples do not properly capture or reflect a debtor's future earning capacity.

70.    By applying a trailing last-twelve-month EBITDA figure of $221 million as of April 30, 2018 in its comparable company analysis, the PJT Report fails to account for quantifiable and material cost-savings that have been or will be obtained during (and as a result of) these cases. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████.[14]  Indeed, the $221 million EBITDA figure was merely an estimate of April 2018 LTM EBITDA based on the Debtors' April 2017 model,[15] and was derived using a generic assumption of cost savings. In order to properly account for the Debtors' prospective earning capacity consistent with the case law cited above, PJT's outdated assumptions must be updated.

71.    The following chart is illustrative of the Debtors' actual and projected cost-savings:

---

[14] ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

[15] *See* Rebuttal Report of John Momtazee at 16.

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████

    c.    <u>PJT's Publicly-Traded Comparable Companies Analysis is Flawed in Two Other Respects</u>

72.    PJT makes two serious errors in its comparable companies analysis that undermine its value conclusions as to the Debtors.  First, PJT's selection of publicly-traded comparable companies is flawed.  Second, PJT's comparable companies analysis contains methodological and factual errors and omissions that artificially decrease its overall value conclusion.  Specifically, and as discussed below, PJT arbitrarily and improperly added back multiple cash levels (purported minimum cash levels) to the TEV of certain companies, thereby artificially raising the trading multiples instead of separately valuing cash and its equivalents.  For certain of the companies, PJT also failed to accurately account for synergies and transaction

---

[16] Moreover, PJT's failure to use actual cost-savings is compounded by the fact that the estimates used by PJT are nearly a year old.

details, and relied on incorrect third-party data instead of primary sources, which also resulted in erroneously low EBITDA multiples. The collective impact of these errors reduces the Debtors' TEV by approximately $155 to $245 million when compared to the valuation set forth in the Moelis Report, excluding the incremental value of non-cash flowing assets. *See* Rebuttal of John Momtazee at 5. These errors are addressed in detail below.

> 1.    *PJT's Analysis is Tainted by its Inclusion of a Noncomparable Company and Exclusion of a Highly-Comparable One*

73.    PJT's comparable company analysis is flawed because PJT was both over- and under-inclusive in selecting comparable companies. As a general matter, comparable companies should operate in the same industry as the target company. Notwithstanding the foregoing, PJT selected Townsquare Media as a comparable company despite the fact that over 30% of Townsquare's revenue comes from its entertainment segment—a business line wholly distinct from and unrelated to radio broadcasting. Cumulus, on the other hand, is a pure-play radio broadcaster. In addition, the implied EBITDA multiple for Townsquare's entertainment segment is 3.6 turns lower than the implied EBITDA multiple for Townsquare's radio segment per Townsquare equity research, as reproduced below. The chart below illustrates how Townsquare's sizable entertainment segment negatively impacts its enterprise-wide EBITDA multiple.

TOWNSQUARE SUM OF THE PARTS VALUATION

| Stephens Equity Research | | | |
|---|---|---|---|
| $ mil.<br>Segment | Adj. EBITDA<br>2017/18E | Multiple | Value |
| Local (Radio Segment) | $119.3 | 8.0x | $954.4 |
| Entertainment | 9.7 | 4.4x | 43.0 |
| Corporate | (25.4) | 8.0x | (203.5) |
| Consolidated | $103.6 | 7.7x | $793.9 |

| Adj. to Townsquare to Remove Entertainment Segment | | | |
|---|---|---|---|
| Segment | 2017/18E | Multiple | Value |
| Consolidated | $103.6 | 7.7x | $793.9 |
| Less: Entertainment | (9.7) | 4.4x | (43.0) |
| Townsquare Radio | $93.9 | 8.0x | $750.9 |

- Excluding Townsquare from PJT's comp set would move both the mean and median of the Indicative Comparables to 8.0x TEV / LTM EBITDA
  — This change would increase PJT's median by 0.7x
- Illustrative value implication at revised range: +$155mm

*See* Rebuttal Report of John Momtazee at 17.  Excluding Townsquare from PJT's set of comparable companies would increase the mean and media EBITDA multiples of the comparable companies to 8.0x trailing EBITDA—and increase the Debtors' enterprise value by approximately $155 million.  *See* Rebuttal Report of John Momtazee at 17.

74.   Although it included Townsquare as a comparable company, PJT excluded Beasley.  Beasley has a more appropriate business mix and events presence than Townsquare, making Beasley a far more appropriate comparable.  The chart below, which was adapted from the PJT Report, illustrates why Beasley should have been included, and Townsquare excluded, from PJT's comparable company analysis:

| | Size | Business Mix | Station Mix | Network Presence | Digital Presence[3] | Events Presence[1] |
|---|---|---|---|---|---|---|
| Cumulus | › 445 stations in the U.S. › Approx. $1 billion in revenue › Stations present on a national scale | › Primarily terrestrial radio broadcasting and network radio | › Diversified across various station formats › Present in a variety of large and small markets | › Network business in addition to station group operations | › Digital business in early stages, achieving less than 5% of total revenue | › Events business in early stages, achieving less than 5% of total revenue |
| iHeartMedia | ✔ | ✔ | ✔ | ✔ | ✘ | ✘ |
| CBS / Entercom | ✔ | ✔ | — | ✔ | — | — |
| Townsquare | — | — | — | ✘ | — | ✘ |
| Beasley | ✘ | ✔ | — | ✘ | — | ✔ |

| Legend: | ✔ = More Relevant | — = Neutral | ✘ = Less Relevant |
|---|---|---|---|

*See* Rebuttal Report of John Momtazee at 18.   As shown in the chart above, Beasley is comparable to the Debtors on 33% of the relevant metrics, whereas Townsquare is comparable on *none* of them.[17]

75.    Although PJT found that Beasley was less suitable than Townsquare on the size metric, the enterprise values of Beasley and Townsquare are similar—$518 million and $728 million respectively—and both are within 25% - 30% of the Debtors' size.  By omitting Beasley from its comparable company analysis, PJT excluded the comparable company with the highest trading multiple and artificially reduced the average multiple—and ultimately the Debtors' TEV. Had PJT included Beasley as a comparable company, *and continued to include the non-comparable Townsquare*, the mean and median trailing EBITDA multiples would have increased to 8.4x and 8.2x respectively, resulting in a $200 million increase in the Debtors' enterprise value.  *See id.* at 18.

---

[17] The PJT Report also improperly excludes Salem and Saga from its comparable companies analysis.  Despite certain differences, Salem is primarily a radio broadcaster and should be included.  Saga is also a pure-play radio broadcaster, and accordingly is a fair comparable for Cumulus even though Cumulus is a larger company.  The PJT Report also erroneously includes iHeartMedia as a comparable company, which is not appropriate because iHeart trades at distressed levels.  However, the exclusion of Beasley and the inclusion of Townsquare are the most significant errors in PJT's comparable companies analysis.

45

2.    *PJT's Analysis Is Marred by Factual and Methodological Errors*

76.    The PJT Report also contains numerous methodological and factual errors in its analysis of the comparable companies that undermine its conclusions.  For example, PJT selects Entercom, which recently completed a transaction with CBS that was projected to result in certain cost synergies, as a comparable company.  However, PJT aggressively credits the full amount of announced synergies that Entercom estimates it will be able to achieve as a result of the transaction.  While Moelis has adopted the market view that Entercom will achieve approximately 50% of the projected $110 million in synergies,[18] PJT gives Entercom credit for the full $100 million.[19]  The chart below illustrates the impact on Entercom's EBITDA multiple if a reasonable estimate (*i.e.*, 20%) of cost synergies is used:

---

[18] In its 2016 10-K, Entercom itself acknowledged uncertainty regarding the synergies.  The 10-K states "it may not be possible to realize the full benefits of the increased sales volume and other benefits, including the expected synergies, that we anticipate to result from the Merger, or realize these benefits within the time frame that is expected. For example, the elimination of duplicative costs may not be possible or may take longer than anticipated, or the benefits from the Merger may be offset by costs incurred or delays in integrating the companies."  Moreover, the current trading price of Entercom, as of the date of Mr. Momtazee's rebuttal report, was $10, less than the $15 target price estimated in a recent Wells Fargo research report that gives Entercom full credit for the potential synergies. The market's discount suggests skepticism that Entercom will achieve all of its synergies.

[19] PJT gives full credit to the dated $100 million synergy estimate and also uses an outdated EBITDA estimate for Entercom that is $2 million higher than Entercom's actual, reported 2017 EBITDA.

| ($ in millions) | PJT Original | Corrections | Corrected |
|---|---|---|---|
| Market Cap | $1,406 | | $1,406 |
| Debt | 1,873 | | 1,873 |
| Cash | (34) | | (34) |
| Min. Cash | 34 | | 34 |
| **TEV** | **$3,279** | | **$3,279** |
| EBITDA [1] | 468 | (52) | 416 |
| **TEV / LTM EBITDA** | **7.0x** | | **7.9x** |

+0.9x

1.    Moelis correction represents $50mm adjustment of synergies plus $2mm EBITDA reduction
when updating PJT's 2017E estimated figure for the Company's reported 2017 Actual, as
disclosed in November 2017 Company Presentation

*See* Rebuttal Report of John Momtazee at 20.  As shown above, the implementation of a more
reasonable assumption of cost synergies results in a trailing EBITDA multiple of 7.9x for
Entercom, rather than the 7.0x multiple used by PJT.  This increase would result in a
corresponding increase in average trading multiples of approximately 0.3x, which in turn would
add an additional $65 million to the Debtors' enterprise value.  *See id.* at 20.

77.    PJT also erred in calculating Beasley's trailing EBITDA multiple, even as it
excluded Beasley from its comparable companies set.[20]  Specifically, PJT added the proceeds of
the sale of Greater Media's towers to Beasley—which were estimated to be worth $28 million—
to the cash deducted to obtain Beasley's TEV.  PJT's pro forma adjustment was improper.  Per
the merger agreement governing the sale of the Greater Media towers, all of the net cash from

[20] On July 19, 2016, Beasley entered into a definitive agreement to acquire Greater Media, a pure-play radio
broadcasting business, for $239.9 million in a cash and stock transaction—approximately $100 million of the
purchase price was in cash, with an additional approximately $25 million in stock and assumption of approximately
$82 million of Greater Media's outstanding indebtedness.  In November 2016, Beasley completed its acquisition of
Greater Media.  Through this transaction, Beasley added additional stations in the Philadelphia and Boston markets
and expanded the company into Detroit and three New Jersey markets.  Beasley estimated that it would achieve
$14.6 million in net cost synergies through the acquisition, $9.2 million of which were station-level synergies.
Under the terms of the transaction, Greater Media shareholders also received the net proceeds—approximately $28
million (as of Q4 2017)—from the post-acquisition sale of certain of Beasley's tower assets.

47

the proceeds of the tower sale belonged to Greater Media's shareholders and therefore should not have been added to Beasley's TEV.  *See id.* at 22, citing Merger Agreement dated July 20, 2016. If the post-sale cash balance is corrected to remove the tower proceeds, Beasley's TEV increases from $513 million to $535 million, and the trailing EBITDA multiple increases from 9.8x to 10.3x as shown below.

### MOELIS CORRECTIONS - BEASLEY

| ($ in millions) | PJT Original | Corrections | Corrected |
|---|---|---|---|
| Market Cap [2] | $322 | ($5) | $316 |
| Debt | 225 | | 225 |
| Cash [3] | (42) | 28 | (14) |
| Min. Cash | 8 | | 8 |
| **TEV** | **$513** | | **$535** |
| EBITDA | 52 | | 52 |
| **TEV / LTM EBITDA** | **9.8x** | | **10.3x** |

+0.5x

2.    Moelis correction represents value of 470,480 shares to be returned to Beasley by Greater Media former stockholders and cancelled in first quarter of 2018 as an adjustment to the sale of Greater Media tower assets

3.    Moelis correction represents removal of $28mm tower sale proceeds from cash balance

*See* Rebuttal Report of John Momtazee at 22.  Because Beasley should be considered a comparable company for the reasons already stated, this increase would further raise the average trailing EBITDA multiple range for the set of public comparable companies, which in turn would be applied to the Debtors' EBITDA under this methodology.

78.    PJT committed additional errors in its analysis of two companies that should also be included in the comparable companies set—Saga and Salem.[21]  PJT either uses incorrect

---

[21] Similar to Beasley, while PJT did not include Saga or Salem as "comparable" companies, it nonetheless calculated multiples for each.  As discussed above, Beasley, Saga and Salem should all be included as comparable companies, and the exclusion of these comparable companies from the PJT Report, in addition to the methodological and factual errors contained in the PJT Report, accounts for a significant portion of the TEV delta between the PJT Report and the Moelis Report.

financial data or incorrectly applies the financial data, resulting in each comparable being improperly undervalued and its trailing EBITDA multiple artificially lowered. For Saga, PJT relies on incorrect third-party data instead of primary sources, which resulted in a lower valuation. Specifically, PJT used a third-party data source, Capital IQ, which had not been updated with the latest balance sheet data. *See id.* at 23. As a result, PJT used a dated cash balance, from September 2017, despite having used Saga's debt balance from post-Q4 2017 earnings and Saga's annual EBITDA for 2017. Specifically, the PJT Report uses certain annual or year-end financials in computing Saga's multiple, but also uses a cash balance from September of the same year in calculating the multiple. PJT's error in mixing and matching financial data from different time periods (*i.e.*, data from year-end 2014/Q4 2017, and Q3 2017) resulted in the loss of a full multiple turn of value—a 6.1x trailing EBITDA multiple as opposed to a 7.1x multiple—as shown below.

### MOELIS CORRECTIONS - SAGA

| ($ in millions) | PJT Original | Corrections | Corrected |
|---|---|---|---|
| Market Cap | $225 | | $225 |
| Debt | 25 | | 25 |
| Cash [1] | (81) | 28 | (53) |
| Min. Cash | 4 | | 4 |
| **TEV** | **$173** | | **$201** |
| EBITDA | 28 | | 28 |
| **TEV / LTM EBITDA** | **6.1x** | | **7.1x** |

+1.0x

1.    Moelis correction represents $28mm decrease of cash balance from 2017 Q3 to 2017 Q4 to reflect year end balance of $53mm

*See* Rebuttal Report of John Momtazee at 23.

79.    For Salem, the PJT Report both (i) uses the company's available financial data incorrectly and (ii) simply ignores relevant financial data.  PJT derived the value of Salem's debt by using the market value of Salem's 6.75% senior secured notes, which trade at 96 cents on the dollar, rather than the par value of that debt.  *See* PJT Report at 44.  This decision was improper because Salem is not distressed, nor is its debt trading at distressed levels.  Since Salem is a financially healthy company, its noteholders should expect to collect principal in full, and thus, the aggregate principal value of the 6.75% senior secured notes should be reflected in Salem's TEV.  In addition, the PJT Report simply ignores the outstanding amount of Salem's ABL facility, despite the fact that the loan facility was disclosed in Salem's quarterly report for Q3 2017.  When Salem's debt is correctly accounted for, its trailing EBITDA multiple increases from 8.2x to 8.6x as shown in the table below.

### MOELIS CORRECTIONS - SALEM

| ($ in millions) | PJT Original | Corrections | Corrected |
|---|---|---|---|
| Market Cap | $105 | | $105 |
| Debt [3] | 246 | 16 | 262 |
| Cash | (0) | | (0) |
| Min. Cash | 0 | | 0 |
| **TEV** | **$350** | | **$367** |
| EBITDA | 43 | | 43 |
| **TEV / LTM EBITDA** | **8.2x** | | **8.6x** |

+0.4x

3.    Moelis correction represents removal of $9mm of adjustment to book value of Senior Secured Notes and additional $7mm borrowings outstanding under ABL Facility

80.    These errors result in each of the impacted companies—Entercom, Beasley, Saga, and Salem—having erroneously low EBITDA multiples.  After correcting the EBITDA multiples, the applicable multiple range increases from 7.0x-7.5x to 7.5x-8.5x.  *See* Rebuttal

Report of John Momtazee at 6.  Once the set of comparable companies is reconstituted and the correct EBITDA and multiple range is applied to the Debtors' EBITDA-generating operating assets, the Debtors' enterprise value increases by $155 million to $245 million.  *See* Rebuttal Report of John Momtazee at 6.

81.    Having established the proper universe of comparable companies, Moelis next analyzed the certain methodological and factual errors committed by PJT when calculating multiples for such comparable companies.  These errors include:

- PJT improperly assumed minimum cash levels for certain comparable companies, thereby increasing the corresponding trading multiples.

- PJT determined this minimum cash adjustment by calculating the Debtors' minimum cash balance of $35 million as a percentage of the Debtors' revenue.[22]

- PJT then used the cash level it developed for the Debtors to estimate, as a percentage of revenue, the minimum cash balance for the comparable company.

Taken as a whole, these errors render PJT's comparable companies analysis unreliable and artificially depressed.

d.    PJT's Precedent Transactions Analysis is Flawed

82.    PJT's precedent transactions analysis is also riddled with errors.  These errors include the following:

- use of incorrect multiples;

- failure to account for annual cost savings from actual contract rejections and renegotiations; and

- use of incorrect EBITDA figures.

---

[22] PJT's decision to estimate a minimum cash balance as a percentage of revenue is particularly egregious in that it runs counter to well-established industry practice (*see* The Practitioner's Guide to Investment Banking, Mergers & Acquisitions, Corporate Finance (Castillo and McAniff) pg. 141) and defies logic.  Each of the radio companies in question has a revolving credit line on its balance sheet.  Based on the fact that these companies clearly have access to short-term liquidity through revolving credit facilities, PJT's assumption of minimum cash requirements is erroneous.  This flawed assumption artificially inflates the average EBITDA multiple applicable to the Debtors.

Taken as a whole, these computational and analytical errors reduce the Debtors' TEV by ***$355 to $465 million***. *See* Rebuttal Report of John Momtazee at 25.

83.     The most significant error contained in the PJT precedent transaction analysis arises from the fact that PJT analyzed precedent transaction multiples on a synergized LTM EBITDA basis, contrary to accepted industry practice of using unsynergized BCF multiples.[23] Additionally, PJT has incorrectly utilized a "buyer's multiple" when it should have used a "seller's multiple."  The buyer's multiple includes synergies which result in the calculation of a lower target multiple, and represent the expected post-acquisition value to a buyer.  Because the objective of any precedent transaction valuation is to determine the target value at the time of the transaction—as opposed to the synergized post-acquisition value that a buyer might be able to achieve in the future—a "seller's multiple," which excludes these synergies, is used in the industry for valuation purposes.  The use of a buyer's precedent multiple materially understates the precedent transaction multiple, and when applied to the Debtors' standalone cash flow (whether EBITDA or BCF), materially understates the Debtors' TEV.  These errors impact PJT's valuation of the Entercom/CBS Radio and Beasley/Greater Media precedent transactions, which in turn impact (and reduce) PJT's valuation of the Debtors.  *See* Rebuttal Report of John Momtazee at 26-27.

---

[23] The reasons the radio broadcasting industry uses BCF and excludes synergies are explained in detail in the Rebuttal Report of John Momtazee, but in short, the rationale may be explained as follows:

- BCF is used in lieu of EBITDA because the former excludes corporate expenses, and it is important—and accepted practice—to value radio stations independent of the corporate infrastructure in which the valued stations exist.

84.    Correcting PJT's valuation of the target in the Entercom/CBS Radio transaction, by (i) using BCF instead of EBITDA and excluding synergies, and (ii) using the seller's multiple instead of the buyer's multiple, results in an implied multiple that is 0.6x higher:

|  | PJT | Adjustment | Accepted Practice / Moelis |
|---|---|---|---|
| LTM BCF | $395 | ($10) | $385 |
| Synergies Adjustment | 25 | (25) | 0 |
| LTM Adjusted BCF | $420 | ($35) | $385 |
| Transaction Value | 2,861 | (11) | 2,850 |
| **Implied Multiple** | 6.8x | 0.6x | 7.4x |

*See* Rebuttal Report of John Momtazee at 26.  This increase in the Entercom/CBS Radio multiple raises the mean and median multiples for PJT's precedent transactions analysis to 7.1x trailing EBITDA, an increase in the median multiple of 0.3x.  The corresponding increase in the median multiple would result in an approximately $62 million increase in the Debtors' TEV.

85.    PJT's valuation of the Beasley/Greater Media transaction also improperly included synergies by using the buyer's multiple instead of the seller's multiple.  PJT also improperly excluded $20 million in transaction proceeds.  These errors are reflected in the chart below.

| *($ in millions)* | PJT | Adjustment | Accepted Practice / Moelis (BCF) |
|---|---|---|---|
| LTM BCF | $30 | $0 | $30 |
| Synergies Adjustment | 9 | (9) | 0 |
| LTM Adjusted BCF | $39 | ($9) | $30 |
| Transaction Value | 220 | 20 | 240 |
| **Implied Multiple** | 5.7x | 2.3x | 8.0x |

*See* Rebuttal Report of John Momtazee at 27.  PJT's exclusion of approximately $20 million in transaction proceeds appears to have resulted from PJT's misunderstanding of the terms of the Beasley/Greater Media transaction.   Despite the fact that Beasley/Greater Media disclosed

approximately $240 million of transaction value, PJT erroneously removed the $20 million of proceeds obtained from the sale of Greater Media's tower assets. When these two errors are corrected, the implied multiple of the Beasley/Greater Media transaction increases from 5.7x to 8.0x, an increase of 2.3x. This increase would raise the mean and median multiples for PJT's precedent transactions analysis to 9.3x trailing EBITDA, which in turn would increase the Debtors' TEV by approximately $540 million without accounting for any other variables.

86.    As noted above, PJT compounded its errors in calculating the transaction proceeds by applying a synergized buyer's multiple instead of the unsynergized seller's multiple to unsynergized EBITDA figures. Stated differently, PJT applied synergized multiples to unsynergized cash flow figures, an internally inconsistent "apples-to-oranges" mismatch.[24] The correct methodology would be to apply an unsynergized multiple to unsynergized cash flows (BCF). Correcting for the mistakes made by PJT in its precedent transactions analysis could increase the Debtors' TEV by $370 to $485 million, depending on how various inputs are weighted and applied. *See* Rebuttal Report of John Momtazee at 25.

e.    PJT's Discounted Cash Flow Analysis is Premised on Flawed Assumptions

87.    PJT's DCF analysis is flawed for at least two reasons. First, PJT adopted a terminal growth rate that is inconsistent with the Debtors' projections. Second, PJT excluded the value of tax write-up benefits. These errors reduced the Debtors' TEV by $155 to $545 million:

---

[24] To conduct a correct analysis, PJT could have applied a synergized "buyer's multiple" to synergized cash flow figures, or it could have applied an unsynergized "seller's multiple" to unsynergized cash flow figures. By incorrectly matching synergized multiples with unsynergized cash flows, the PJT Report contains calculations that are artificially low.

| TOPIC | PJT | Moelis | Valuation Δ |
|---|---|---|---|
| Terminal Growth | *Negative 4.0% to Negative 3.0%* | *Negative 1.0% to 1.0%* | $400 to $700 *Valuation Difference* |
| Tax | $ -- | Varies | At least $57 *Valuation Difference* |
| Other Assumptions | Varies | Varies | Varies |
| **Discounted Cash Flow Range** | **$1,550 to $1,650** | **$1,705 to $2,195** | **$155 to $545** |

*See* Rebuttal Report of John Momtazee at 29.

88.    The most significant error in PJT's DCF analysis is its incorrect terminal growth rate assumption.  Although PJT accepts the Debtors' plan for a 9.5% EBITDA growth rate in 2020, ████████████████████████████████████████████████████████████

████████████████████████████████████████████    *See* Rebuttal Report of John Momtazee at 30.

89.    PJT's projected sharp decline in the Debtors' terminal growth rate conflicts with management's forecasted trend of cash flow growth.  It also implies a terminal value multiple of 5.4x to 5.9x EBITDA, which is roughly 1.6x *below* PJT's own stated comparable companies' valuation range.  ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████    The adoption of a more reasonable, yet still conservative,

terminal growth rate of *negative* 1% to positive 1%, as Moelis has done, would result in an incremental increase in the Debtors' estimated TEV of $400 million to $700 million.



*See* Rebuttal Report of John Momtazee at 31.

90.    The PJT Report also undervalues the Debtors by at least $57 million because it fails to take into account any of the long-term cash tax benefits that result from the Debtors' reorganization as described by the Debtors' own tax advisors (KPMG).    Specifically, the Debtors' tax advisors have assumed a step-up in basis, ██████████████████████████ ██████████████████████████████.    Rather than consider the advice of KPMG, PJT instead utilized its own tax structure and estimates in its base case DCF analysis. █

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████



*See* Rebuttal Report of John Momtazee at 32.

91. <span style="background-color:black;color:black">████████████████████████████████████████</span>

<span style="background-color:black;color:black">████████████████████████</span>. This value should be accounted for fully in any defensible DCF model, and should not be arbitrarily discounted by half or ignored altogether as PJT has done.

      f.   <u>PJT Improperly Introduces and Relies on Misleading Valuation Concepts</u>

92.   Finally, PJT includes in its report certain unorthodox valuation methodologies that are neither valid nor accepted. These methodologies include improperly valuing the Debtors based on (i) the trading price of the Debtors' debt, (ii) unsolicited buyout proposals, and (iii) offers made during negotiations with noteholders. None of these valuation methodologies provide the support that PJT seeks for its artificially low valuation of the Debtors for the reasons set forth below.

93.     Courts have held that analyzing the trading price of a debtor's securities is an improper valuation methodology. *See, e.g. In re Mirant Corp.*, 334 B.R. 800, 832-33 (Bankr. N.D. Tex. 2005) (rejecting trading price of debt as a measure of valuation and noting that market prices reflect a discount for the risks of a chapter 11 case); *In re Spansion, Inc.*, 426 B.R. 114 (Bankr. D. Del. 2010) (rejecting trading price as evidence of value); *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 469 (Bankr. S.D.N.Y. 2014) (noting that "trading prices are not necessarily a reliable measure of intrinsic value for a variety of reasons").   In addition to the foregoing, there are a number of considerations that render trading prices irrelevant to the Court's determination here, which considerations include the following:

- institutionally-limited demand for distressed debt that puts pressure on market prices;
- lack of an active investor relations team;
- a discounted price owing to the uncertainty and risks associated with bankruptcy; and
- the inapplicability of the efficient market hypothesis to distressed securities.

*See* Rebuttal Report of John Momtazee at 35.

94.     The TEVs implied by two unsolicited and unconsummated proposals █████████ ████████████████ similarly do not present a reliable means of determining value.  ██████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
██████████████████████

95.     Finally, while the PJT Report references a proposal received from the Term Loan Lenders on October 1, 2017 and argues that the rejection of that proposal by the Ad Hoc

Noteholder Group implies a TEV for the Debtors of less than $1.858 billion, the Debtors opportunistically omit several other proposals that they received, negotiated and, in at least one instance, sought to implement prepetition, all of which implied much higher TEVs than that contained in the PJT Report.  First, on July 1, 2016, the Debtors and the Ad Hoc Noteholder Group agreed to the terms of an out-of-court exchange pursuant to which the Senior Notes would be exchanged for trust certificates with a face amount equal to 50% of the sum of the principal amount of the Senior Notes that were exchanged and 33.3% of the common equity of the Debtors.  In November 2016, the Debtors' then-financial advisor calculated an implied enterprise value based on that transaction of $2.339 billion.   This transaction ultimately was not consummated after the United States District Court for the Southern District of New York found that the proposed transaction violated certain provisions in the Term Loan Credit Agreement.  Second, management appeared eager to embrace a TEV within the range of the Moelis Valuation as recently as early November 2017.  Specifically, and as testified to by Mr. Zelin, the Debtors' management viewed the reinstatement plan proposed by the Ad Hoc Group of Noteholders as a "viable alternative" which the company was "prepared to move forward with" as late as November 2017.  Tr. of Deposition of Steven Zelin ("Zelin Tr.") at 233:2-16.  The amount of term loans to be reinstated under the Ad Hoc Group of Noteholders' reinstatement plan was up to $1.729 billion.  Zelin Tr. at 233:17-21.  Moreover, the reinstatement plan contemplated a significant distribution to holders of Senior Notes of 100% of the New Common Stock (subject to dilution on account of a heavily-negotiated management incentive plan).  As Mr. Zelin observed, this suggests an implied TEV greater than $1.729 billion, absent a finding that the value of the debt was less than its face amount.  *See* Zelin Tr. At 233:17-234:5.  In light of the Debtors' position that the reinstatement of up to $1.729 billion in debt on the company's balance

59

sheet would be a "conceivable outcome" Zelin Tr. at 179:20-22, it is striking that in a matter of months, the Debtors' management team has come to believe—and asks the Court to find—that the midpoint TEV of these businesses is less than the debt it was willing to reinstate under the noteholders' plan, and considerably less than the value implied by the prior noteholder exchange offer.

g. ████████████████████

96.     During the weeks leading up to confirmation, the Debtors and their management

████████████████████████████████████

████████████████████████████ Prior

to the Petition Date, and while the Debtors were negotiating potential out-of-court restructuring options with their creditors, the Debtors' management team projected optimism and confidence about the company's prospects. The Debtors' current management assumed their roles in 2016, and soon thereafter implemented a number of initiatives meant to remedy the alleged value degradation caused by prior management. This management team, led by CEO Mary Berner, repeatedly touted the success of the Debtors' turnaround initiatives in 2017, and in the days and weeks leading up to the Petition Date.

97.     For example, on an earnings call for the second quarter of 2017, Ms. Berner noted that the prior quarter had "represented a *financial inflection point in our turnaround plan*. And today, we're reporting second quarter results that provide *further evidence that we've turned the corner as we grew total revenue 1.2% over last year and delivered an increase in adjusted EBITDA for the first time in over 3 years*." *See* Cumulus Q2 2017 Earnings Conference Call, Aug. 14, 2017.

60

98.    This optimism was voiced again on an earnings call for the third quarter of 2017—less than a month before the Petition Date—during which Ms. Berner expressed her optimism in the Debtors' ability to effectuate a turnaround and prevail against industry headwinds:

> *In the face of continued negative industry pressures, these results underscore the fact that our turnaround plan is taking hold, and we are encouraged by the operating and financial momentum in both our station group and Westwood One business segments.*

*See* Cumulus Q3 2017 Earnings Conference Call, Nov. 9, 2017.  Ms. Berner also confirmed management's expectations that the Debtors' outperformance would continue and growth opportunities would arise from management's strategy in the long term:

> *Our foundational initiatives, ratings, culture, operational blocking and tackling, and sales execution continue to contribute meaningfully to performance and going forward we expect more through them.  As well as new strategies that will further our turnaround effort and provide opportunities for growth over the longer term.*

*Id.*  Finally, Ms. Berner indicated that management's optimism about the Debtors' prospects was not merely the hopeful musings of management, but rather was informed by *seven straight quarters* of rating share growth and *five straight quarters* of revenue market share gains:

> Once again our ability to improve our relative ratings coupled with a substantially more stable and engaged work force is allowing us to beat the market.  In fact this quarter marks the *seventh straight quarter of rating share growth and also the fifth quarter in a row of revenue market share gains*.  Our initiatives to expand our revenue sources of the Station Group are also taking hold.  *Id.*

99.    Other company insiders and advisors, including Steven Zelin of PJT and CFO John Abbot, reluctantly admitted during their depositions that the Debtors had previously achieved a significant measure of success.  For example, Mr. Zelin testified at his deposition that PJT's own reports showed that the Debtors were capturing radio market share from their competitors, and doing so in a way that marked a positive shift from prior performance:

> Q.    So Cumulus is essentially getting a bigger slice of the pie in market share relative to prior performance?
>
> **A.    It's getting a bigger slice of the pie relative to where it had been recently. That's not to suggest that it is – well, the answer to that question is yes. It is getting a bigger slice of the pie, yes**.

Zelin Tr. at 96:23-97:6.  Mr. Zelin also testified that "[t]here is some digital revenue in the business today, but it's expected to grow meaningfully," *see* Zelin Tr. at 119:5-7, and that "Cumulus has plans in place to attempt to recapture market share" Zelin Tr. at 131:3-7.

100.    Similarly, Mr. Abbot testified at his deposition that the Debtors were obtaining a "larger slice of the pie" despite industry headwinds:

> Q.    And notwithstanding the national market shrinking, that the – that the Cumulus revenue attributable to the national market was growing?
>
> **A.    Correct.**
>
> Q.    They were getting a larger – Cumulus is getting a larger slice of the pie?
>
> **A.    Correct.**

Abbot Tr. at 55:18-55:25; *see also id.* ("Q.  So we talked already about the national record.  A. Yes. Q. The national revenue— A. Yes. Q. —decline? A. Yes. Q. Et. cetera.  On the local radio industry side, that pie is shrinking? A. Uh-huh. Q. Right? A. Yes. Q. And Cumulus's slice of the pie is also growing, correct? A. Correct. Q. Meaning that the Cumulus competitors in the local markets are losing market share to Cumulus right? A. Correct.").

101.    ████████████████████████████████████████

████████████████████████████████████████

██████████████████████    The Debtors' business plan, however, assumes a growth rate of negative 1% through the forecasted period of 2017 through 2020.  The plan was finalized in the middle of 2017.  As illustrated below, the industry growth rate was tracking materially lower than negative 1% at the time that the business plan was developed.



YTD Cumulative Industry Growth (Ex-Political) - YOY

MOELIS & COMPANY

PJT informs Cumulus Board that it views the business plan as credible.

■ Market Actual (Ex-Political)    ■ Business Plan Estimate

Source:   Miller Kaplan

102.    Management was aware of these industry trends when it completed its business plan.  Indeed, the Debtors regularly track this information using industry reports from Miller Kaplan in the ordinary course.  Yet the Debtors' CFO testified at his deposition that, based solely on the fact that the industry was declining at a rate greater than negative 1%, he is now less confident about the achievability of the plan.[25]  Mr. Abbot was unable to quantify his diminished confidence and his inability to do so is not surprising.

---

[25] Mr. Abbot was the first witness to testify about the Debtors' business plan.  Not surprisingly, the other members of the Debtors' management followed a similar script during their depositions.  And on March 26, 2018, Mr. Baird of PJT similarly testified that 2017 industry performance is the only reason he believes the business plan is more challenging today than when it was created in mid-2017.

103.     Given the historical industry performance when the business plan was developed, which was tracking far lower than negative 1% for 2017, it is simply not credible to feign surprise or to use these trends as a basis to try and support PJT's lowball valuation—particularly because the Debtors outperformed their plan for 2017:

> Q.     And notwithstanding that the market declined greater than what you anticipated, where did you end up year-end for 2017 on EBITDA?
> **A.     The books are not closed, but approximately right now our – our forecast, if you will, is probably 217, 218.**
> Q.     So you beat your projections?
> **A.     We did.**
> Q.     Okay. Notwithstanding that the market shrunk at a greater percentage than what you were expecting?
> **A.     Correct.**

Abbot Tr. at 170:22-171:10.  In fact, during her deposition, Ms. Berner confirmed her belief that the Debtors will still achieve their business plan.  *See* Tr. of Deposition of Mary Berner ("Berner Tr.") at 146:11-18 ("Q. Do you think the Board expects you to achieve your business plan? A. Our—my current Board? Q. Yes.  A. Yes.  Q. Do you intend to achieve the business plan?  A. Yes.").  Indeed, it is telling that, despite the recent pessimism that management has projected, the Debtors have not amended their business plan or financial forecasts *in any way*.

**C.     The Value That the Term Loan Lenders Are Receiving in Excess of the Value of the Term Loan Lenders' Collateral Should Inure to the Benefit of Unsecured Creditors**

104.     As set forth at length above, a plan cannot be confirmed under Bankruptcy Code section 1129 if it violates the absolute priority rule.  The absolute priority rule prevents a class of creditors from receiving more than payment in full on account of their claims, and requires that any excess value be distributed to junior classes.  Here, if the Court finds that the Debtors' TEV exceeds $1.786 billion, which is ***just $11 million*** above the high-end of the PJT Valuation range, the Term Loan Lenders would receive payment in full on account of the Term Loan Claims.  For

the reasons set forth at length herein, the PJT Valuation is unreliable, inaccurate, and indefensible. By contrast, the Moelis Report is methodologically sound and comports with industry practice. Accordingly, the Court should find that the midpoint of the Moelis Valuation represents the true value of the Debtors' businesses.

105.    As demonstrated in the chart below, even if the Court were to adopt the lowest end of the Moelis Valuation, the Term Loan Lenders are being overpaid. At the midpoint level, the Term Loan Lenders are being overpaid by approximately $387 million.

| | Equity Value | | |
|---|---|---|---|
| ($ in millions) | Low | Midpoint | High |
| Total Enterprise Value | $2,100.0 | $2,250.0 | $2,400.0 |
| Less: Debt | (1,300.0) | (1,300.0) | (1,300.0) |
| Plus: Cash | 35.0 | 35.0 | 35.0 |
| Equity Value | $835.0 | $985.0 | $1,135.0 |

| | TL Recovery | | |
|---|---|---|---|
| ($ in millions) | Low | Midpoint | High |
| Debt | $1,300.0 | $1,300.0 | $1,300.0 |
| Plus: 83.5% Equity | 697.2 | 822.5 | 947.7 |
| Total Recovery | $1,997.2 | $2,122.5 | $2,247.7 |
| Term Loan Claim | $1,735.3 | $1,735.3 | $1,735.3 |
| Recovery Exceeds Claim by: | $262.0 | $387.2 | $512.5 |

Because the Moelis Valuation represents the true TEV of the Debtors' businesses, the Plan as currently proposed would provide the Term Loan Lenders with more than payment in full. Accordingly, the Plan must fail.

## II.     **The Plan Releases Are Overly Broad**

106.     The Plan provides for the global release of a multitude of participants in these chapter 11 cases—the "Released Parties"[26]—from claims of the Debtors and third parties.  These broad and unnecessary releases render the Plan unconfirmable under Second Circuit law.

107.     In the Second Circuit, a chapter 11 plan may only release nondebtors from liability when the injunction supporting such releases "plays an important part in the debtors' reorganization plan," *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992), or when the release is consensual.  *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) ("Nondebtor releases may also be tolerated if the affected creditors consent.").  Third party releases "[are] proper only in rare cases," and "[n]o case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique."  *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 141-42; *see also In re Adelphia Commc'ns Corp.*, 364 B.R. 518, 529 (Bankr. S.D.N.Y. 2007) (applying *Metromedia* and stating that "the applicable law authorizing the approval of . . . third party releases has become increasingly restrictive, and now permits such relief only under limited circumstances—most significantly, where they are critical to the reorganization of the debtor.").  Third party releases must bear "a reasonable relationship to the protection of the estate" and be narrowly tailored so as to "go no further than necessary to protect those interests."  *Pasquale Cartalemi v. Karta Corp. (In re Karta Corp.)*, 342 B.R. 45, 47 (S.D.N.Y. 2006); *see also In re Metromedia*, 416 F.3d at 142

---

[26] The Plan defines Released Party as each of: "(a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Term Loan Lenders; (d) the Credit Agreement Agent; (e) the Consenting Equityholders; (f) the Committee; (g) each of the members of the Committee; (h) the Senior Notes Indenture Trustee; (i) with respect to each of the foregoing Entities in clauses (a) through (h), each of such Entity's respective current and former Affiliates, predecessors, successor, assigns, subsidiaries, managed accounts or funds; and (j) with respect to each of the foregoing Entities in clauses (a) through (i), such Entities' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, management companies, investment advisors, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such . . ." *See* Plan § 1.128.

66

(noting that overly broad releases are disfavored for their "potential for abuse" by insiders of the debtor).

108.    Indeed, courts within the Second Circuit have approved nondebtor releases only under limited circumstances such as where: (i) the estate received substantial financial consideration, *see In re Drexel Burnham*, 960 F.2d at 293, and the released parties "conditioned their substantial financial participation in the reorganization on protection from lawsuits arising out of their bankruptcy-related activities," *In re Karta Corp.*, 342 B.R. at 56; (ii) enjoined claims were "channeled" to a settlement fund rather than extinguished, *see MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93-94 (2d Cir. 1988); (iii) the plan otherwise provided for the full payment of the enjoined claims, *id.*; or (iv) the release was consensual.

109.    Here, the Plan provides that each Releasing Party, unless such party opts out, shall be deemed to have released the Released Parties from any and all claims that such Releasing Party ever:

> had, now has, or hereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or any other transaction relating to any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or any Interest that is affected by or classified in the Plan, the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, Restructuring Transactions, the Restructuring Support Agreement, the Disclosure Statement, the First Lien Exit Facility Documents, the New Revolving Credit Facility Documents (if any), or in each case, related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence, taking place on or before the Effective date related or relating to any of the foregoing. . .

*See* Plan Article VIII.E. As presently constructed, a holder of a Claim or Interest is automatically bound by the third party releases unless they affirmatively act, and even a claim or interest holder

67

who abstains from voting on the Plan is still deemed to have consented to the Plan's release provisions.

110.    By making the releases applicable without the affirmative consent of the affected parties (*i.e.*, "opting-in"), the releases are not consensual.  Despite this non-consensual release, the Debtors have never explained why the releases are critical to the Debtors' reorganization. Further, nothing in the Plan or Disclosure Statement establishes the type of unique circumstances that would justify third party releases.  Indeed, the Plan simply provides that:

> Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) essential to the Confirmation of the Plan, (2) given in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (3) a good faith settlement and compromise of the Claims released by the Third-Party Release; (4) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

See Plan, Article VIII.E.  Similarly, the Disclosure Statement provides only that "The Debtors have concluded that the Third-Party Release in the Plan is justified in light of the facts and circumstances of these Chapter 11 Cases" *see* Disclosure Statement, p. 66 and that "the Debtors are prepared to demonstrate at the Confirmation Hearing that the Plan's release, injunction, and exculpation provisions comply with controlling Second Circuit standards."  *See* Disclosure Statement, p. 74.  However, merely stating that the Debtors are prepared to demonstrate that the releases satisfy the applicable standards is not sufficient to satisfy the Second Circuit's strict requirements.  The Debtors have put forth no evidence that the estates received any financial benefit in exchange for the release, no settlement fund has been established, and unsecured claims are certainly not being paid in full.  Moreover, the list of released parties includes

68

numerous parties who may never have played a role in the restructuring such as affiliates, subsidiaries, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and representatives of Released Parties.  *See* Plan §1.128.

111.    For the reasons stated above, the Court should not approve the releases in the Plan.  Alternatively, the releases should be appropriately modified consistent with the law in this Circuit.

## III.    Additional Reasons the Plan Should Not Be Confirmed

112.    The Plan contains numerous other infirmities that must be addressed in connection with confirmation, including, among others:

- The Plan does not provide for the existence of the Committee post-confirmation. The Committee should continue post-confirmation and should be charged with pursuing any existing Avoidance Actions, the proceeds of which should inure to the Debtors' unsecured creditors.  The Committee should also continue for any appeals that it might be a party to.  Further, so long as the Committee is in existence, the Debtors or Reorganized Debtors, as applicable, should be required to continue paying the professional fees incurred by the Committee's advisors.

- Under the Plan, the Reorganized Debtors (*i.e.*, the Term Loan Lenders) retain, and have the ability (but are not required) to prosecute retained Causes of Action, including Avoidance Actions.  Given that such Causes of Action are not the Term Loan Lenders' collateral (although the proceeds thereof are subject to adequate protection liens of the Term Loan Lenders to the extent of any diminution in value of the Term Lender Collateral), the Causes of Action should be put into a trust for the benefit of unsecured creditors with the trust to be administered, as noted above, by the Committee.

- The Plan currently contemplates that holders of General Unsecured Claims and holders of Senior Notes Claims will share 16.5% of the New Common Stock *pro rata*, thus it is unclear how any distributions will be made to Unsecured Creditors unless and until all Unsecured Claims are reconciled and any disputes resolved. Given that there is no dispute as to the amount of Senior Note Claims, the Plan should be modified to provide that holders of such claims and holders of any other claims allowed as of the Effective Date will receive an immediate distribution upon the Effective Date.

- The Plan inappropriately provides the same distribution to all unsecured creditors notwithstanding the fact that unsecured creditors have varying legal rights. For example, certain unsecured creditors (including the holders of Senior Notes) have guarantee claims assertable against all or substantially all of the Debtors, whereas other unsecured creditors have claims solely assertable against a single Debtor. The Plan should be modified to classify and treat unsecured creditors in accordance with their relative priorities and legal entitlements.

- The Plan currently provides for the creation of a class of "Convenience Claims." Pursuant to the Plan, holders of Convenience Class Claims will receive payment in full on account of such claims. Such treatment should be revised to reflect that Unsecured Creditors in the Convenience Class will receive a percentage recovery in line with the recovery of all other Unsecured Creditors (*i.e.*, if Unsecured Creditors are determined to be entitled to a 40% recovery, Convenience Class claimants should similarly receive a 40% recovery).

- The Plan should provide for the payment of the reasonable fees and expenses incurred by the Senior Notes Indenture Trustee. As noted in the *Objection of U.S. Bank National Association, as Indenture Trustee, to First Amended Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates* [ECF No. 578], the failure of the Debtors to provide under the Plan for the payment in cash of the Senior Notes Indenture Trustee's fees and expenses (without reduction to recoveries of the holders of Senior Notes Claims) means that the Plan distributions allocable to holders of Senior Notes Claims will be indefinitely delayed due to the need to segregate such distributions pending a precise determination of the value per share of the New Common Stock, so that the precise number of shares necessary to compensate the Senior Notes Indenture Trustee can be ascertained. The Committee proposes adding the following language to the Plan:

  Without any further notice to or action, order, or approval of the Bankruptcy Court, on the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall pay in Cash all reasonable and documented unpaid Senior Notes Indenture Trustee Fees and Expenses that are required to be paid under the Senior Notes Indenture, without the need for the Senior Notes Indenture Trustee to file fee applications with the Bankruptcy Court and without reduction to recoveries of the Holders of Allowed Senior Notes Claims. From and after the Effective Date, the Reorganized Debtors shall pay in Cash all reasonable and documented Senior Notes Indenture Trustee Fees and Expenses, including, without limitation, all Senior Notes Indenture Trustee Fees and Expenses incurred in connection with distributions made pursuant to the Plan or the cancellation and discharge of the Senior Notes Indenture. Nothing herein shall in any way affect or diminish the right of the Senior Notes Indenture Trustee to exercise the Senior Notes Indenture Trustee Charging Lien against distributions to Holders of Allowed Senior Notes

Claims with respect to any unpaid Senior Notes Indenture Trustee Fees and Expenses.

- A number of the corporate documents filed in connection with the Plan Supplement contain inappropriate provisions designed, once again, to benefit the Term Loan Lenders at the expense of Unsecured Creditors.  These documents should not be approved in their current forms.  The Committee has preliminarily identified the following areas of concern:

  o The Committee is concerned that the Preferred Stock Certificate currently allows the Reorganized Debtors (or the Term Loan Lenders) to issue unlimited preferred stock without stockholder approval.  Such actions could allow for dilution of the fraction of equity being distributed to Unsecured Creditors.

  o The Warrant Agreement currently includes a provision whereby the warrant holders are deemed to consent to a change of control and to waive any dissenters' rights or appraisal rights.  These provisions should be deleted.

  o The Warrant Agreement also currently provides that the Warrant Agent may, without holder consent, amend or supplement the Warrant Agreement with the Reorganized Debtors to cure any ambiguity or to make certain changes.  These provisions should be deleted as they provide the Reorganized Debtors with too much latitude and room for interpretation.

## **RESERVATION OF RIGHTS**

113.    This Objection is submitted without prejudice to, and with a full and express reservation of, the Committee's rights to supplement and amend this Objection to introduce evidence at any hearing relating to this Objection, and further object to the Plan or any other plan of reorganization proposed in these Chapter 11 Cases on any and all grounds.

71

## CONCLUSION

WHEREFORE, the Committee requests that the Court (i) deny confirmation of the Plan and (ii) provide the Committee such other and further relief as the Court may deem just, proper and equitable.

Dated: March 28, 2018    AKIN GUMP STRAUSS HAUER & FELD LLP

        */s/* Michael S. Stamer

        Michael S. Stamer
        Abid Qureshi
        Meredith A. Lahaie
        Sean E. O'Donnell
        One Bryant Park
        New York, New York 10036
        Tel:  (212) 872-1000
        Fax:  (212) 872-1002
        Email: mstamer@akingump.com
          aqureshi@akingump.com
          mlahaie@akingump.com
          sodonnell@akingump.com

        Kate Doorley
        1333 New Hampshire Avenue, N.W.
        Washington, DC 20036
        Tel:  (202) 887-4000
        Fax:  (202) 887-4288
        Email: kdoorley@akingump.com

        *Counsel to the Official Committee of Unsecured Creditors*
        *of Cumulus Media Inc. et al.*