**HEARING DATE AND TIME:** January 16, 2019, at 10:00 a.m. (prevailing Eastern Time)
**OBJECTION DEADLINE:** January 9, 2019, at 4:00 p.m. (prevailing Eastern Time)

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Tel: 212-373-3000
Fax: 212-757-3990
Paul M. Basta
Lewis R. Clayton
Jacob A. Adlerstein
Claudia R. Tobler

*Counsel for the Reorganized Debtor and Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
In re:                                              :        **Chapter 11**
                                                    :
**CM WIND DOWN TOPCO INC.,**                        :        **Case No. 17-13381 (SCC)**
                                                    :
        **Reorganized Debtor.**[1]                  :
                                                    :
                                                    :
------------------------------------------------------------------x

### NOTICE OF FILING OF MOTION OF THE REORGANIZED DEBTOR AND DEFENDANTS TO (I) ENJOIN PLAINTIFFS AND THEIR COUNSEL FROM CONTINUING TO PROSECUTE ACTIONS IN VIOLATION OF PLAN RELEASES, EXCULPATION, AND INJUNCTION PROVISIONS, AND (II) HOLD PLAINTIFFS AND THEIR COUNSEL IN CONTEMPT FOR VIOLATION OF PLAN RELEASES, EXCULPATION, AND INJUNCTION PROVISIONS

        **PLEASE TAKE NOTICE** that CM Wind Down Topco Inc. (formerly known as Cumulus Media Inc.) (the "Reorganized Debtor"), on behalf of itself and its affiliates that were formerly debtors in the above captioned case (each such affiliate, a "Former Debtor" and collectively, together with the Reorganized Debtor, the "Reorganized Company"), and Mary Berner, Jeffrey Marcus, Brian Cassidy, Ross Oliver, and Crestview Partners, L.P. (collectively, the "Defendants"), filed the *Motion of the Reorganized Debtor and Defendants to (I) Enjoin Plaintiffs and Their Counsel from Continuing to Prosecute Actions in Violation of Plan Releases, Exculpation, and Injunction Provisions, and (II) Hold Plaintiffs and Their Counsel in Contempt for Violation of Plan Releases, Exculpation, and Injunction Provisions* [ECF No. __] (the "Motion").

---

[1]    The last four digits of the Reorganized Debtor's tax identification number are 9663. The location of the Reorganized Debtor's service address is: 3280 Peachtree Road, N.W., Suite 220, Atlanta, Georgia 30305.

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in Room 623 of the United States Bankruptcy Court, One Bowling Green, New York, New York 10004 on **January 16, 2019 at 10:00 A.M.** (prevailing Eastern Time), or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that any objection ("Objection") to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the *Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 Implementing Certain Notice and Case Management Procedures* [ECF No. 73] (the "Case Management Order") and shall be filed with the Bankruptcy Court (a) by registered users of the Bankruptcy Court's case filing system, electronically in accordance with General Order M–399 (which can be found at http://www.nysb.uscourts.gov) and (b) by all other parties-in-interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers as set forth in the Case Management Order), in accordance with the customary practices of the Bankruptcy Court and General Order M–399, to the extent applicable, and served so as to be actually received no later than **January 9, 2019 at 4:00 p.m. (EST)** (the "Objection Deadline") on: (i) counsel to the Reorganized Debtor and Defendants; (ii) the Office of the United States Trustee for the Southern District of New York; and (iii) the other Core Parties as defined in the Case Management Order.

**PLEASE TAKE FURTHER NOTICE** that the hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates in open court at the hearing.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Epiq Bankruptcy Solutions at https://dm.epiq11.com/#/case/CUI/info. You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fee set forth therein.

*[Remainder of page intentionally left blank]*

2

**PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and served with respect to the Motion, the Reorganized Debtor and Defendants may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered with no further notice or opportunity to be heard.

Dated: December 21, 2018
New York, New York

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

*/s/ Paul M. Basta*
Paul M. Basta
Lewis R. Clayton
Jacob A. Adlerstein
Claudia R. Tobler

1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
pbasta@paulweiss.com
lclayton@paulweiss.com
jadlerstein@paulweiss.com
ctobler@paulweiss.com

*Counsel for the Reorganized Debtor and Defendants*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Tel: 212-373-3000
Fax: 212-757-3990
Paul M. Basta
Lewis R. Clayton
Jacob A. Adlerstein
Claudia R. Tobler

*Counsel for the Reorganized Debtor and Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
In re:                                      :    Chapter 11
                                            :
CM WIND DOWN TOPCO INC.                      :    Case No. 17-13381 (SCC)
                                            :
            Reorganized Debtor.¹            :
                                            :
-------------------------------------------------------------------x
```

**MOTION OF THE REORGANIZED DEBTOR AND DEFENDANTS TO**
**(I) ENJOIN PLAINTIFFS AND THEIR COUNSEL FROM CONTINUING**
**TO PROSECUTE ACTIONS IN VIOLATION OF PLAN RELEASES,**
**EXCULPATION, AND INJUNCTION PROVISIONS, AND (II) HOLD**
**PLAINTIFFS AND THEIR COUNSEL IN CONTEMPT FOR VIOLATION**
**OF PLAN RELEASES, EXCULPATION, AND INJUNCTION PROVISIONS**

CM Wind Down Topco Inc. (formerly known as Cumulus Media Inc.) (the

"Reorganized Debtor"), on behalf of itself and its affiliates that were formerly debtors in the

above-captioned case (each such affiliate, a "Former Debtor" and collectively, together with the

Reorganized Debtor, the "Reorganized Company"), and Mary Berner, Jeffrey Marcus, Brian

Cassidy, Ross Oliver, and Crestview Partners, L.P. (collectively, the "Defendants"), by and

through their undersigned counsel, hereby submit this motion (the "Motion") for entry of an

---

¹ The last four digits of the Reorganized Debtor's tax identification number are 9663. The location of the
Reorganized Debtor's service address is: 3280 Peachtree Road, N.W., Suite 2200, Atlanta, Georgia 30305.

order, substantially in the form attached hereto as **Exhibit A**, (i) permanently enjoining EJS Investment Holdings, LLC, WGH Communications, Inc., and Eric J. Steinmann (collectively, the "Plaintiffs") and their counsel from continuing to prosecute the Actions (as defined below), or filing any further actions barred by the release, exculpation, and/or injunction provisions of the Reorganized Company's confirmed Plan and Confirmation Order (both as defined below); (ii) compelling the dismissal of the Actions with prejudice; (iii) holding Plaintiffs and their counsel in contempt for violating the release, exculpation, and injunction provisions of the Plan and Confirmation Order; and (iv) awarding damages as appropriate.

In support of this Motion, the Reorganized Debtor and Defendants respectfully represent as follows:

## Preliminary Statement

1.      This Court should enforce its Confirmation Order to prevent Plaintiffs from continuing to violate the release, exculpation, and injunction provisions of the Reorganized Company's confirmed Plan and Confirmation Order by irresponsibly filing and pursuing frivolous litigation against released and exculpated parties, in direct contravention of this Court's express findings.

2.      As explained below, the Reorganized Company's confirmed Plan and this Court's Confirmation Order:  (a) expressly released all claims (including derivative claims) held by the Debtors, as well as all claims held by numerous third parties, related to or arising from the Debtors' restructuring, including the claims asserted in the Actions; (b) exculpated third parties, including all Defendants, from liability for any such claims; and (c) permanently enjoined and precluded the commencement or continuation of any action or proceeding related to claims that have been released, discharged, or are subject to exculpation.

2

3.      In flagrant violation of these provisions of the Plan and Confirmation Order, Plaintiffs have purported to file two lawsuits (the "Actions") in the Superior Court of Fulton County, Georgia (the "Georgia Superior Court") against Defendants Mary Berner, Jeffrey Marcus, Brian Cassidy, Ross Oliver, and Crestview Partners, L.P.  The two Actions involve substantially similar complaints (the "Complaints").  Both Actions expressly challenge the Debtors' restructuring, asserting purported claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, and conspiracy against Defendants – all premised on allegations about Defendants' conduct leading up to the Debtors' filing for Chapter 11 protection.

4.      The Actions are exactly the types of hindsight claims challenging a restructuring that were expressly released, exculpated and enjoined more than six months ago in the Plan and the final, non-appealable Confirmation Order.  Plaintiffs' irresponsible and false allegations are a blatant collateral attack on this Court's findings in the Confirmation Order. Indeed, the Actions are merely Plaintiffs' fourth frivolous attempt to interfere with the Plan and Confirmation Order and re-litigate this Court's findings.

5.      First, as the Court will recall, Plaintiff WGH Communications, Inc. ("WGH") filed an untimely objection to Plan confirmation on substantially the same grounds asserted in the Actions, and that objection was expressly overruled when no one argued on WGH's behalf at the confirmation hearing.  Second, after this Court confirmed the Plan, WGH filed an untimely (and frivolous) appeal of the Confirmation Order, which WGH withdrew after counsel to the Reorganized Company advised WGH's counsel that the purported appeal was untimely and could result in sanctions.  Third, WGH filed a frivolous objection (also rejected) to the Federal Communications Commission's approval of a change of control transaction in a

further attempt to block implementation of the Plan. Most recently, Plaintiffs filed the Actions. Plaintiffs are (1) WGH, (2) EJS Investment Holdings, LLC ("EJS"), which appears to be related to WGH, and (3) Eric J. Steinmann, an individual who appears to own and/or control WGH and EJS. Plaintiffs' demonstrated pattern of frivolous and vexatious conduct confirms that this Court should enforce the injunction and other provisions of the Plan and Confirmation Order and sanction Plaintiffs and their counsel.

6.      In light of the injunction and other provisions set forth in the Plan and Confirmation Order that clearly bar Plaintiffs' claims, on December 19, 2018, Defendants removed the Actions from Georgia Superior Court to the Bankruptcy Court for the Northern District of Georgia (the "Georgia Bankruptcy Court") and made clear in their removal filings that all of Plaintiffs' purported claims were released, subject to exculpation, and violate the injunction provisions in the Plan and Confirmation Order. Nonetheless, Plaintiffs have not withdrawn the Actions.

7.      As a result, the Reorganized Debtor and Defendants have no option but to move this Court to enforce the release, exculpation and injunction provisions of the Plan and Confirmation Order, to hold Plaintiffs and their counsel in contempt, and to award appropriate damages. This Court should enforce its own orders, enjoin prosecution of the Actions, and sanction Plaintiffs and their counsel for their knowing and willful violations of the Plan and Confirmation Order.

**Jurisdiction and Venue**

8.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.) from the United States District Court for the Southern District of New York. The Reorganized Debtor and

Defendants confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with

this Motion, to the extent that it is later determined that the Court, absent consent of the parties,

cannot enter final orders or judgments in connection herewith consistent with Article III of the

United States Constitution.

9.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a

core proceeding pursuant to 28 U.S.C. § 157(b).

10.    The statutory predicates for the relief requested herein are sections 105,

524(a), and 1141 of title 11 of the United States Code (the "Bankruptcy Code") and Bankruptcy

Rules 3020(d) and 9020.

### Background

#### A.  The Chapter 11 Cases

11.    On November 29, 2017, each of the Reorganized Debtor and the Former

Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the

"Chapter 11 Cases").

12.    On March 7, 2018—the deadline by which non-governmental claimants

were required to file a proof of claim—WGH filed a claim for $5,050,000.00 on the basis of the

7.75% Senior Notes. [Claim No. 25-1.]

13.    The deadline for objecting to confirmation of the Plan was March 23,

2018. [ECF No. 416.] Nearly a week after this deadline expired, on March 29, 2018, WGH filed

an untimely objection to confirmation on substantially the same grounds as the claims asserted in

the Actions. [ECF No. 604.]

14.    Specifically, in its untimely objection to confirmation, WGH asserted that

the Plan (1) did not satisfy section 1129(a)(1) of the Bankruptcy Code, (2) was not proposed in

good faith, (3) contravened section 1129(a)(5) of the Bankruptcy Code and potentially the business

judgment rule, and (4) included overly broad release, exculpation and injunction provisions.  Among

other things, WGH's objection repeatedly alleged that the Debtors filed the Chapter 11 Cases,

rather than continuing to pursue an out-of-court restructuring, because Cumulus's management

"acted in a manner designed to enhance their compensation package rather than promote the

interests of creditors and equity holders."[2]

15.    After notice and an opportunity to appear, no one argued on WGH's

behalf at the confirmation hearing, and this Court expressly overruled WGH's objection to Plan

confirmation.  April 12, 2018 Tr. at 8:20–22 ("I'm not going to hear the objection of WGH.").

16.    On May 10, 2018, the Court entered the *Findings of Fact, Conclusions of

Law, and Order Confirming the Debtors' First Amended Joint Plan of Reorganization* (the

"Confirmation Order") [ECF No. 769] and the *First Amended Joint Plan of Reorganization of

Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*

(the "Plan")[3] [ECF No. 446] went effective on June 4, 2018 (the "Effective Date").  Notice of the

Effective Date was served and published in accordance with the Confirmation Order.  *See Notice

of (I) Entry of Order Confirming the Debtors' First Amended Joint Chapter 11 Plan of

Reorganization, (II) Occurrence of Effective Date, and (III) Certain Bar Dates* [ECF No. 821.]

---

[2]    [ECF No. 604 ¶ 3; *see also id.* ¶¶ 11 (". . . WGH believes that Management, who sought excessive compensation in this case, acted in their own interests by failing to restructure outside of Chapter 11."), 15 ("[T]he decision of Management to invoke the costly process of Chapter 11 rather than restructure outside of Chapter 11 strongly suggests that they chose a path to enhance their own personal financial interests rather than those of creditors and equity holders.  The overly broad Exculpation provisions in the Plan also suggests [sic] that Management is placing their own interests above those of the Debtors and other interested parties."), 32 ("[T]he Debtors, led by Management with selfish interests, are acting in a manner designed to enhance themselves financially rather than an [sic] equitable restructuring plan.").]

[3]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

17.     As further explained below, included in the Plan and Confirmation Order are broad (and typical) release and exculpation provisions, as well as a permanent injunction against prosecuting claims that are discharged, released, or are subject to exculpation under the Plan and Confirmation Order.  Excerpts of the relevant sections from the Plan and Confirmation Order are collectively attached hereto as **Exhibit B**.

18.     Importantly, in the Confirmation Order this Court made explicit factual findings that contradict the assertions WGH made in its untimely Plan objection.  This Court expressly found that the Plan was "negotiated in good faith and at arm's length."  Confirmation Order ¶ 39.  The Court further found that the Debtor and third-party releases "are an integral and necessary part of the Plan and represent a valid exercise of the Debtors' business judgment," were provided in exchange for good and valuable consideration by the Released Parties, reflected a "good-faith compromise and settlement" of the released claims, were "in the best interests of the Debtors and all Holders of Claims and Interests," were "fair, equitable, and reasonable," were "given and made after due notice and opportunity for hearing," and barred the assertions of any released claim against any of the Released Parties. *Id.* ¶ 50.  In addition, the exculpation and injunction provisions were found to be "essential to the Plan," appropriately tailored, and necessary to preserve and enforce the Plan's release and exculpation provisions. *Id.* ¶¶ 51–52.  The injunction provisions, in particular, were an "essential means of implementing the Plan," an "integral element of the transactions incorporated into the Plan," "confer material benefits on, and are in the best interests of, the Debtors, the Estates, and their creditors," and are "important to the overall objectives of the Plan," consistent with the Bankruptcy Code and other applicable law, and supported by the record. *Id.* ¶ 53.

19.    In the Confirmation Order, this Court expressly retained jurisdiction over the Chapter 11 Cases, "and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including the matters set forth in Article XI of the Plan." *Id.* ¶ 54.  Article XI of the Plan provides that after the Effective Date, this Court shall retain jurisdiction to (among other things) "resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the . . . discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII and enter such order as may be necessary or appropriate to implement such releases, injunctions and other provisions."  Plan, Article XI ¶ 12.

## B.    WGH Files an Untimely and Meritless Appeal of the Confirmation Order, Then Seeks to Interfere with Cumulus's FCC Proceedings

20.    The Confirmation Order was entered on May 10, 2018, and under Bankruptcy Rule 8002(a), the fourteen-day period to appeal the Confirmation Order, which is "jurisdictional" in nature, *In re Siemon*, 421 F.3d 167, 169 (2d Cir. 2005), expired on May 24, 2018.  No party appealed on or before May 24, 2018, and the Confirmation Order became final and non-appealable on that date.

21.    On May 25, 2018, however, WGH filed an untimely (and frivolous) appeal of the Confirmation Order.  [ECF No. 809.]

22.    On June 15, 2018, after the Reorganized Company's counsel notified WGH's counsel that the purported appeal was untimely and could result in sanctions, in the letter attached hereto as **<u>Exhibit C</u>**, WGH withdrew its purported appeal of the Confirmation Order. [ECF No. 848.]

23.    Having failed to prevent Plan confirmation, WGH next sought to block implementation of the Plan by filing a frivolous objection to a necessary regulatory approval—

the Federal Communications Commission's approval of a change of control transaction for the Reorganized Debtors. The FCC properly denied the objection.[4]

### C. Plaintiffs Flagrantly Violate the Plan and Confirmation Order by Filing the Frivolous Actions in Georgia Superior Court

24.     On November 2, 2018, Plaintiffs filed the two Actions against Defendants in Georgia Superior Court. One Action was filed against Defendants by Plaintiffs WGH and EJS and styled *EJS Investment Holdings, LLC and WGH Communications, Inc.* v. *Mary Berner, et al.*, Case No. 2018-cv-312575; the complaint is attached hereto as **Exhibit D**. The second Action was filed against Defendants by Eric J. Steinmann, an individual who appears to own and/or control WGH and EJS, and styled *Eric J. Steinmann* v. *Berner*, et al., No. 2018-cv-312580; the complaint is attached hereto as **Exhibit E**.

25.     Plaintiffs WGH and EJS purport to have held unsecured debt issued by Cumulus Media Inc. ("Cumulus"), and Plaintiff Eric J. Steinmann purports to have owned shares of Cumulus. (Ex. D ¶ 13; Ex. E ¶ 8.)

26.     Plaintiffs allege that Defendant Berner was Cumulus's President and CEO and a director on its board; that Defendants Marcus, Cassidy and Oliver also served as Cumulus directors; and that Defendants Marcus, Cassidy and Oliver "were employees of and held partnership interests in" Defendant Crestview Partners, L.P., a private equity firm. (Ex. D ¶¶ 9–12; Ex. E ¶¶ 9–13.)

27.     In the Complaints, Plaintiffs acknowledge that Cumulus was "in financial distress before the Chapter 11 filings, but allege that "formal bankruptcy" was "unnecessary, or premature at the very least." (Ex. D ¶ 50; Ex. E ¶ 51.) Plaintiffs allege that Defendants used

---

[4]    Memorandum Opinion and Order by the Chief of the Audio Division, Media Bureau, Federal Communications Commission, released June 1, 2018 (DA 18-568).

"elaborate steps and machinations ultimately designed" to enrich themselves to Plaintiffs'

detriment, and that "Defendants' secretive scheme was successful" when the Debtors entered

into the Restructuring Support Agreement and filed for Chapter 11 protection in November 2017

(Ex. D ¶¶ 27, 32, 33; Ex. E ¶¶ 23, 48.)

        28.    Among other things, Plaintiffs allege that Defendants suffered from

"conflicts of interest" because Defendant Crestview Partners, L.P. was allegedly in

"simultaneous negotiations with secured creditor Voya to purchase Voya's annuities and

insurance business" (Ex. E ¶ 31; *see also* Ex. D ¶ 36), and because Defendant Berner was

allegedly "kept as CEO and received generous stock holdings in the restructured Cumulus . . . in

exchange for pushing through an unnecessary bankruptcy plan" (Ex. E ¶ 35; *see also* Ex. D ¶¶

46–47.)  Plaintiffs further allege that Defendants Berner and Marcus were "pretending to

continue to negotiate in good faith with the bondholders to avoid bankruptcy," but "instead

began secret negotiations with Voya and other secured creditors to file for Chapter 11

bankruptcy protection" that resulted in the Restructuring Support Agreement with "very

favorable terms and outcomes for Defendants Crestview and Berner." (Ex. E ¶ 48; *see also* Ex.

D ¶ 33.)  Plaintiffs allege that filing the Chapter 11 Cases was an "unreasonable business

decision" and not in the best interests of Plaintiffs.  (Ex. E ¶ 38; *see also* Ex. D ¶ 53.)

        29.    Based on the foregoing, the Actions assert purported claims for breach of

fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, and conspiracy,

and seek (among other relief) damages for the "value of [Plaintiffs'] ownership in Cumulus . . .

prior to the initiations of schemes and fraudulent activities described" in the Complaints.  (Ex. D

at 17; Ex. E at 16.)  These claims are a flagrant attempt to launch a collateral attack on the

explicit findings made by this Court in the Confirmation Order.

30.    On December 19, 2018, Defendants removed the Actions to the Georgia Bankruptcy Court.  Defendants' notices of removal (attached hereto as **Exhibits F and G**) specifically explained that Plaintiffs' purported claims are barred by the release and exculpation provisions of the Plan and Confirmation Order, that Plaintiffs are expressly enjoined from commencing or pursuing such claims, and that Plaintiffs' purported claims are barred by collateral estoppel.

31.    In addition, on December 17, 2018, before filing this Motion, counsel for the Reorganized Debtor and Defendants advised Plaintiffs' counsel that unless they agreed to dismiss the Actions with prejudice by the morning of Friday, December 21, the Reorganized Debtor and Defendants would file the instant Motion to enjoin the Actions and seek sanctions.

32.    As of today, Plaintiffs have not agreed to dismiss the Actions.  Instead of promptly making a decision whether to dismiss, on the morning of December 21, Plaintiffs' counsel advised that Plaintiffs have retained a new lawyer.  This behavior underscores why injunctive relief and sanctions are warranted to put an end to Plaintiffs' gamesmanship and continued abuse of the judicial process.

## Relief Requested

33.    By this Motion, the Reorganized Debtor and Defendants seek entry of an order (i) permanently enjoining Plaintiffs and their counsel from continuing to prosecute the Actions, or filing any further actions barred by the release, exculpation, and/or injunction provisions of the Plan and Confirmation Order; (ii) compelling the dismissal of the Actions with prejudice; (iii) holding the Plaintiffs and their counsel in contempt for violating the release, exculpation, and injunction provisions of the Plan and Confirmation Order; and (iv) awarding damages as appropriate.

**Basis for Relief**

I.    The Court Should Enforce the Injunction and Other Provisions against Plaintiffs and Their Counsel

34.    The Court should enter a permanent injunction and related relief to enforce the Plan and Confirmation Order's release, exculpation, and injunction provisions, which plainly bar the filing or continued prosecution of the Actions (or any further actions Plaintiffs or their counsel may file in connection with the Chapter 11 Cases).

35.    *First*, Plaintiffs' purported claims are in reality derivative claims that were held by the Debtors, and such claims were expressly released in the Plan and Confirmation Order.

36.    Plaintiffs' allegations that officers and/or directors of Cumulus breached fiduciary duties in connection with the Chapter 11 Cases, and that Plaintiffs were purportedly injured in their capacity as alleged holders of Cumulus debt and equity, are plainly derivative, not direct, because they allege breaches of duties owed to Cumulus and seek to recover for alleged harms to Cumulus.  *See, e.g.*, *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 556 (Bankr. S.D.N.Y.), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016) ("New York courts and courts applying New York law have held, consistent with Delaware law, that claims for breach of fiduciary duties owed to creditors when a company is in the zone of insolvency are 'derivative of claims of breach of fiduciary duty to the company itself'") (citations omitted); *N. Am. Catholic Educ. Programming Found., Inc.* v. *Gheewalla*, 930 A.2d 92, 103 (Del. 2007) (creditors of insolvent corporation "have no right to assert direct claims for breach of fiduciary duty against corporate directors"); *Quadrant Str. Prods. Co.* v. *Vertin*, 102 A.3d 155, 176 (Del. Ch. 2014) (noting that "[c]reditors of a solvent corporation have no right to assert direct claims for breach of fiduciary duty either").

12

37.    As a result, Plaintiffs' purported claims were held by the Debtors and could only be brought as derivative claims on their behalf.  Such claims are expressly barred because the Debtors have expressly released all of their claims against Released Parties, including all derivative claims, in the Plan.[5]

38.    Specifically, the Debtors' release includes "any derivative Claims asserted or assertable on behalf of a Debtor or a Reorganized Debtor . . . based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or any other transaction relating to any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan, the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, the restructuring of Claims and Interests before or during the Chapter 11 Cases, [or] the negotiation, formulation or preparation of the

---

[5]    Similar broad (and typical) releases are regularly granted and enforced.  *See, e.g.*, *In re CGG Holding (U.S.) Inc.*, Case No. 17-11637 (MG) (Bankr. S.D.N.Y. October 16, 2017), [ECF No. 337] (finding the debtor releases "in the best interests of the estates"); *In re RFID Corp.*, Case No. 17-10870 (JLG) (Bankr. S.D.N.Y. Aug. 31, 2017), [ECF No. 544] (finding the debtor releases "integral and necessary" and a valid exercise of the debtors' business judgment); *In re Sunedison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. July 28, 2017), [ECF No. 3735] (approving releases by the debtors where the releases were a product of good faith, arm's-length negotiations); *In re BCBG Max Azria Glob. Holdings, LLC*, Case No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 26, 2017), [ECF No. 591] (approving debtor releases for parties that participated in the debtors' restructuring); *In re Sabine Oil & Gas Corp.*, Case No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 27, 2016), [ECF No. 1359] (finding where the released parties "provided substantial consideration in exchange for the [] [r]elease," debtor releases were valid exercise of business judgment and in the best interest of the estates); *In re Fairway Grp. Holdings Corp.*, Case No. 16-11241 (MEW) (Bankr. S.D.N.Y. June 8, 2016) [ECF No. 156] (approving the release provisions of the plan as fair, equitable, reasonable and in the best interest of the estates where such releases included debtors and non-debtors involved in the implementation of the plan); *In re Residential Capital, LLC*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013), [ECF No. 6065] (same); and *In re FGIC Corp.*, Case No. 10-14215 (SMB) (Bankr. S.D.N.Y. Apr. 23, 2012), [ECF No. 314] (same).

Plan, the Plan Supplement, the Restructuring Transactions, the Restructuring Support Agreement" (among other things).  Plan, Article VIII(D); Confirmation Order ¶ 50.

39.    The Debtors' release applies to all Released Parties, which include Defendants in the Actions.  The "Released Parties" in the Plan are defined to include (among others) the Debtors, the "Consenting Equityholders" (defined to include the "Holders of Interest in Cumulus party to the Restructuring Support Agreement," Plan ¶ 35), their current and former "Affiliates," and such parties' and their Affiliates' "officers, managers, directors, . . . principals, members, employees," and "partners."  Plan ¶ 128.  Defendants Berner, Marcus, Cassidy and Oliver are Released Parties because they were, as Plaintiffs allege, officers and/or directors of Cumulus, as noted above.  The remaining Defendant, Crestview Partners, L.P., is also a Released Party because one of its affiliates was a Consenting Equityholder (as a party to the Restructuring Support Agreement), and as Plaintiffs allege, Crestview Partners, L.P. held equity in Cumulus (Ex. D ¶ 44; Ex. E ¶ 37.)

40.    The Court approved the Debtor release with the benefit of a robust evidentiary record.  Specifically, the propriety of the Debtor release was the subject of an exhaustive review and investigation by a review committee (the "Review Committee") comprised of a Cumulus independent director, D.J. (Jan) Baker.  The Review Committee, with the assistance of its independent counsel, Young Conaway Stargatt & Taylor, LLP, collected thousands of pages of documents and conducted interviews, and its counsel provided the Review Committee a written legal analysis assessing potential claims that might be asserted by Cumulus, including potential claims for breach of fiduciary duty (the same claims Plaintiffs assert in the Actions).  Based on the foregoing, the Review Committee did not identify any claims that seemed likely to be successful or produce a material recovery for the Debtors and recommended

14

to the Debtors' Restructuring Committee that it was in the best interest of the company to grant the Debtor release. [ECF No. 654 (Baker Decl.) ¶¶ 9, 11.] The Review Committee also identified a number of significant benefits the Debtors would obtain from the Debtor release, most notably as a result of the restructuring transactions associated with the Plan and the Restructuring Support Agreement, of which the Debtor release is an integral component. *Id.* ¶ 15. Finally, the Review Committee identified the significant contributions made by the release beneficiaries (including the Defendants) as further support for the releases. *Id.* ¶¶ 16, 18.

41.    The Debtors' release is subject to a narrow exception for claims "related to any act or omission that is determined by a final Order to have constituted . . . willful misconduct." Plaintiffs, however, do not sufficiently plead willful misconduct. Nor could they, as Plaintiffs are estopped from asserting willful misconduct (or any other exception to the release) in respect of the alleged claims they have identified for at least three reasons. *First*, Plaintiffs are bound by this Court's explicit findings in the Confirmation Order, including the findings of good faith and sound business judgment. *Second*, Plaintiffs are also estopped because WGH's objection to confirmation—which specifically challenged good faith and the scope of the Plan's releases, exculpation and injunctive provisions, as noted above—was expressly overruled in the Confirmation Order. Therefore, any such claims are barred by collateral estoppel. *See, e.g.*, *Boguslavsky* v. *Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (collateral estoppel bars party from relitigating issue where (1) identical issue was raised in prior proceeding, (2) issue was actually litigated and decided in previous proceeding, (3) party had a full and fair opportunity to litigate the issue, and (4) resolution of issue was necessary to support valid and final judgment on merits); *In re Hertz*, 38 B.R. 215, 219 n.5 (Bankr. S.D.N.Y. 1984) (declining to entertain objection to confirmed plan that was rejected at confirmation hearing).

*Third*, Plaintiffs are estopped because this Court expressly retained jurisdiction over the Chapter 11 Cases, "and all matters arising out of, or related to, the Chapter 11 Cases and the Plan," Confirmation Order ¶ 54, barring any collateral attack on the Plan or Confirmation Order in a different court.

42.    Thus, Plaintiffs' purported claims are derivative claims held by the Debtors.  Those claims have been expressly released in the Plan and Confirmation Order and cannot be pursued.

43.    *Second*, to the extent any of Plaintiffs' claims could be characterized as direct claims, they are also barred by the Plan's separate third-party release, which was given by the "Releasing Parties," defined to include (among others) all "Holders of Claims and Interests entitled to vote on the Plan" who did not opt out of the "Third-Party Release."  Plan ¶ 129. Plaintiffs are such Holders of Claims and Interests (Ex. D ¶ 13 ("EJS and WGH were holders of non-secured bonds in Cumulus"); Ex. E ¶ 8 ("Mr. Steinmann owned shares of Cumulus Media, Inc.")).[6]

44.    Similar to the Debtors' release, the third-party release applies to all claims of any form "based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or any other transaction relating to any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or any Interest that is affected by or classified in the Plan, the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, the restructuring of Claims and Interests before or during the Chapter 11 Cases, [or] the

negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Restructuring Support Agreement" (among other things).    Plan, Article VIII(E); Confirmation Order ¶ 50.

45.    In addition to being barred by the Debtors' release, Plaintiffs' purported claims—which expressly challenge the Debtors' restructuring, the entry of the Restructuring Support Agreement, and the filing of the Chapter 11 Cases—are subject to the broad third-party release and cannot be pursued.  Again, Plaintiffs are estopped from asserting any exception to the release given the explicit findings of good faith, sound business judgment, and other issues in the Confirmation Order.

46.    *Third*, the Plan and Confirmation Order expressly "release[] and exculpate[]" Defendants from all liability for Exculpated Causes of Action, including the purported claims asserted in the Actions, absent a final, non-appealable determination of actual fraud, gross negligence, or willful misconduct.  Plan, Article VIII(G); Confirmation Order ¶ 51.[7]

---

[6]    Defendants are not aware that any of the Plaintiffs have opted out of the third-party release.

[7]    Similar exculpation provisions are regularly approved.  *See, e.g.*, *In re Eastman Kodak Co.*, No. 12-10202 (Bankr. S.D.N.Y. Aug. 23, 2013) [ECF No. 4966] (overruling U.S. Trustee objection to exculpation of both estate fiduciaries and non-fiduciaries from liability for "any prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, the chapter 11 cases"); *In re Neff Corp.*, No. 10-12610 (Bankr. S.D.N.Y. Sept. 20, 2010) [ECF No. 451] (estate and non-estate fiduciaries "shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating . . . the Plan"); *In re Charter Commc'ns, Inc.*, No. 09-11435 (Bankr. S.D.N.Y. Nov. 17, 2009) [ECF No. 921] (approving exculpation of estate fiduciaries and non-fiduciaries for "any pre-petition or post-petition act taken or omitted to be taken in connection with, or related to . . . the restructuring of the Company"); *In re Cengage Learning, Inc.*, No. 13-44106 (ESS) (Bankr. E.D.N.Y. Mar. 14, 2014) [ECF No. 1225] (approving exculpation provision for estate fiduciaries and nonfiduciaries for "any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, implementing, or consummating the Plan"); *Residential Capital*, No. 12-12020 [ECF No. 6066] (approving exculpation of certain prepetition lenders); *In re Almatis, B.V.*, No. 10-12308 (Bankr. S.D.N.Y. Sept. 20, 2010) [ECF No. 444] (approving exculpation of debtors' prepetition lenders and holders of senior secured notes for both pre- and post-petition conduct).

47.    The exculpation provision applies to Exculpated Parties, which include the Debtors, the "Consenting Equityholders" (defined to include the "Holders of Interest in Cumulus party to the Restructuring Support Agreement," Plan ¶ 35), their current and former "Affiliates," and such parties' and their Affiliates' "officers, managers, directors, . . . principals, members, employees," and "partners."  Plan ¶ 67.  Defendants Berner, Marcus, Cassidy and Oliver are Exculpated Parties because they were, as Plaintiffs allege, officers and/or directors of Cumulus, a Debtor.  Defendant Crestview Partners, L.P. is also an Exculpated Party because one of its affiliates was a Consenting Equityholder (as a party to the Restructuring Support Agreement), and, as the complaint alleges, Crestview Partners, L.P. held equity in Cumulus (Ex. D ¶ 37.)

48.    Exculpated Causes of Action include any claims or causes of action "related to any act or omission derived from, based upon, related to, or arising from the Debtors' in or out-of-court restructuring efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, solicitation or Filing of the Disclosure Statement, the Plan (including any term sheets related thereto), or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the funding of this Plan, the occurrence of the Effective Date, the administration of this Plan or the property to be distributed under this Plan, the pursuit of Confirmation or Consummation, and the administration and implementation of the Plan . . . ."  Plan ¶ 66.  Again, Plaintiffs are estopped from asserting any exception to the exculpation provision given the explicit findings of good faith, sound business judgment, and other issues in the Confirmation Order.

49.    The Plan's exculpation provision is intended to protect against exactly the type of claims Plaintiffs have asserted in the Actions:  hindsight collateral attacks on estate fiduciaries and other parties who have helped to facilitate the Debtors' reorganization through

participating in negotiations relating to the Restructuring Support Agreement and the Plan. *See, e.g.*, *In re Bearing Point, Inc.*, 453 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decision makers.").

50.    Plaintiffs' purported claims—which expressly challenge the Debtors' restructuring—are therefore exculpated under the Plan and Confirmation Order, and for this additional reason Plaintiffs should be enjoined from pursuing the Actions.

51.    *Fourth*, Plaintiffs have already been expressly enjoined from commencing or pursuing the Actions.    The Plan and Confirmation Order "permanently enjoined and precluded" the commencement or continuation of "any action or other proceeding of any kind on account of or in connection with or with respect to" claims or causes of action that have been released, are discharged, or are subject to exculpation under the terms of the Plan and Confirmation Order.  Plan, Article VIII(H); Confirmation Order ¶¶ 52–53.

52.    As explained above, the purported claims asserted in the Actions are released and subject to exculpation under the Plan and Confirmation Order.  As a result, by filing the Actions, Plaintiffs and their counsel flagrantly violated the existing injunction, warranting sanctions (as discussed below).  This Court should enforce the Plan and Confirmation Order by enjoining Plaintiffs' continued prosecution of the Actions and compelling the dismissal of the Actions with prejudice.  *See, e.g.*, *In re U.S.H. Corp. of New York*, 280 B.R. 330, 338–39 (Bankr. S.D.N.Y. 2002) (affirming the bankruptcy court's power to enforce its own confirmation order and enforce injunctive provisions against parties bringing state court action); *In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 54 (S.D.N.Y. 2003) ("the Second Circuit, courts in this District,

and courts in other circuits have 'con-strued [§ 105] liberally to enjoin suits that might impede

the reorganization process,' and embraced the use of § 105 without proof of all four factors

normally required for injunctions, such as inadequate remedy at law or irreparable harm")

(internal citation omitted).

53.    In sum, the Plan and Confirmation Order expressly release all of the

purported claims asserted in the Actions, exculpate Defendants with respect to such claims, and

enjoin Plaintiffs from filing or prosecuting those claims, and Plaintiffs are also estopped from

asserting those claims or attempting to invoke any exception to these provisions.

54.    This Court has the authority to enforce its own orders, *see, e.g.*, 11 U.S.C.

§ 105(a) (bankruptcy court authorized to "issue any order, process, or judgment that is necessary

or appropriate to carry out the provisions" of the Bankruptcy Code) and that authority should be

exercised here.    Courts in this district routinely enforce release, exculpation and injunction

provisions like those in the Plan and Confirmation Order. *See, e.g.*, *In re Residential Capital,

LLC*, 508 B.R. 838, 848–50 (Bankr. S.D.N.Y. 2014) (enforcing non-debtor release and injunctive

provisions of plan against creditor); *In re Charter Commc'ns*, Case No. 09-11435 (Bankr.

S.D.N.Y. Feb. 8, 2010) [ECF No. 1149] (same); *In re Relativity Fashion, LLC*, 2018 WL

2938516 (Bankr. S.D.N.Y. June 7, 2018) (same); *In re Caribbean Petroleum Corp.*, 512 B.R.

774 (Bankr. D. Del. 2014) (same).

55.    This Court should enforce the Plan and Confirmation Order to (a) enjoin

Plaintiffs and their counsel from continuing to prosecute the Actions, or filing any further actions

that are barred by the Plan and Confirmation Order, and (b) compel the dismissal of the Actions

with prejudice.

II.    The Court Should Hold the Plaintiffs and Their Counsel in Contempt and Award the Reorganized Debtor and Defendants Their Reasonable Attorneys' Fees and Expenses

56.    The Court also has the authority to hold parties and their counsel in contempt (and impose appropriate sanctions) for violations of the Confirmation Order and the Plan.  *See, e.g.*, *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 230 (2d Cir. 1991) ("A bankruptcy court may impose sanctions pursuant to 28 U.S.C. § 1927 if it finds that '[an] attorney's actions are so completely without merit as to require the conclusion that they must have been taken for some improper purpose such as delay.") (citing *Oliveri* v. *Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986)); *In re Gorshtein*, 285 B.R. 118, 124 (Bankr. S.D.N.Y. 2002) (granting sanctions pursuant to 11 U.S.C. § 105(a)); *Torres* v. *Chase Bank USA, N.A. (In re Torres)*, 367 B.R. 478, 490 (Bankr. S.D.N.Y. 2007) (stating that "compensatory damages, in addition to coercive sanctions, may be awarded as a sanction for civil contempt if a party willfully violates a section 524(a)(2) injunction.") (citation omitted); *In re Cruz*, 254 B.R. 801, 816 (Bankr. S.D.N.Y. 2000) ("A finding of civil contempt can entitle the aggrieved party to be compensated for all expenses, including attorneys' fees.") (citation omitted); *see also* 11 U.S.C. § 105(a); Bankruptcy Rule 9020.

57.    A finding of contempt is appropriate when the movant demonstrates that the offending party had knowledge of the court's order, but willfully violated it.  *See, e.g., In re Torres,* 367 B.R. at 490 (contempt finding appropriate where "offending entity had knowledge of the discharge and willfully violated it by continuing with the activity complained of."); *see also In re Cont'l Airlines, Inc.,* 236 B.R. 318, 330 (Bankr. D. Del. 1999), *aff'd sub nom. In re Cont'l Airlines,* No. 90-932, 2000 WL 1425751 (D. Del. Sept. 12, 2000), *aff'd sub nom. In re Cont'l Airlines, Inc.,* 279 F.3d 226 (3d Cir. 2002) (holding that civil contempt sanctions require that "(1)

a valid order of the court must exist; (2) the person to be charged with contempt must have actual

knowledge of the order; and (3) the person must have disobeyed the order.") (citations omitted).

58.    It is beyond question that Plaintiffs had knowledge of, and violated, the

injunction and other Plan and Confirmation Order provisions.  Indeed, Plaintiff WGH expressly

challenged the Plan's release and injunction provisions [ECF No. 604] prior to Plan

confirmation, and its objection was overruled, as noted above.  WGH also purported to appeal

the Confirmation Order, which was attached to its Notice of Appeal.  [ECF No. 809.]  In

addition, Defendants' notices of removal with respect to the Actions, filed on December 19,

2018, specifically advised Plaintiffs and their current counsel that Plaintiffs' purported claims are

barred by the release and exculpation provisions of the Plan and Confirmation Order, and that

Plaintiffs are expressly enjoined and estopped from commencing or pursuing such claims, but

Plaintiffs did not withdraw the Actions.

59.    Thus, by filing and maintaining the Actions, Plaintiffs and their counsel

knowingly and willfully violated the injunction and ignored the release and exculpation

provisions of the Plan and Confirmation Order.

60.    The Reorganized Debtor respectfully requests that Plaintiffs and their

counsel be found in contempt and ordered to pay as sanctions the Reorganized Debtor's and

Defendants' reasonable attorneys' fees and expenses for (a) removing the Actions from Georgia

Superior Court, and (b) filing and prosecuting this Motion.

## Notice

61.    The Reorganized Debtor and Defendants will provide notice of this

Motion to (i) the Plaintiffs and (ii) the Core Parties, each as defined and set forth in the *Order

Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 Implementing

Certain Notice and Case Management Procedures* [ECF No. 73].  The Reorganized Debtor and

Defendants submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

### No Prior Request

62.    The Reorganized Debtor and Defendants have not made any previous application for the relief requested herein to this or any other court.

[*Remainder of page intentionally left blank*]

## Conclusion

WHEREFORE, the Reorganized Debtor and Defendants respectfully request that the

Court enter the proposed order, attached hereto as **Exhibit A**, granting the relief requested herein

and such other relief as the Court deems appropriate under the circumstances.

Dated: December 21, 2018
       New York, New York

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

*/s/ Paul M. Basta*
Paul M. Basta
Lewis R. Clayton
Jacob A. Adlerstein
Claudia R. Tobler

1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
pbasta@paulweiss.com
lclayton@paulweiss.com
jadlerstein@paulweiss.com
ctobler@paulweiss.com

*Counsel for the Reorganized Debtor and Defendants*

**Exhibit A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------x
In re:                                              :          Chapter 11
                                                    :
CM WIND DOWN TOPCO INC.                             :          Case No. 17-13381 (SCC)
                                                    :
          Reorganized Debtor.[1]                    :
                                                    :
--------------------------------------------------------------------x

## ORDER (I) ENJOINING PLAINTIFFS AND THEIR COUNSEL FROM CONTINUING TO PROSECUTE ACTIONS IN VIOLATION OF PLAN RELEASES, EXCULPATION, AND INJUNCTION PROVISIONS, AND (II) HOLDING PLAINTIFFS AND THEIR COUNSEL IN CONTEMPT FOR VIOLATION <u>OF PLAN RELEASES, EXCULPATION, AND INJUNCTION PROVISIONS</u>

Upon the Motion [ECF No. __] (the "<u>Motion</u>")[2] of the above-captioned debtor (the

"<u>Reorganized Debtor</u>"), on behalf of itself and its affiliates that were former debtors in the

above-captioned case (each such affiliate, a "<u>Former Debtor</u>" and together with the Reorganized

Debtor, the "<u>Reorganized Company</u>"), and Mary Berner, Jeffrey Marcus, Brian Cassidy, Ross

Oliver, and Crestview Partners, L.P. (collectively, "<u>Defendants</u>"), and pursuant to sections

105(a), 524, 1141, and 1142 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), and

Rules 3020(d) and 9020 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy</u>

<u>Rules</u>"); and the Court having jurisdiction to consider the Motion and the relief requested therein

in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference*

*M-431*, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

---

[1]   The last four digits of the Reorganized Debtor's tax identification number are 9663.  The location of the
      Reorganized Debtor's service address is: 3280 Peachtree Road, N.W., Suite 2200, Atlanta, Georgia 30305.

[2]   Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided; and the Court having found and determined that the relief

sought in the Motion is in the best interests of the Reorganized Company, its former estates,

creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion

establish just cause for the relief granted herein; and upon all of the proceedings had before this

Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY

ORDERED THAT:

1.    The Motion is granted as set forth herein.

2.    EJS Investment Holdings, LLC, WGH Communications, Inc., and Eric J.

Steinmann (together, the "Plaintiffs") and their counsel are permanently enjoined from (a)

continuing to prosecute the actions originally styled *EJS Investment Holdings, LLC and WGH*

*Communications, Inc.* v. *Mary Berner, et al.*, Case No. 2018-cv-312575 (Georgia Superior

Court, Fulton County), and *Eric J. Steinmann* v. *Berner*, et al., No. 2018-cv-312580 (Georgia

Superior Court, Fulton County) (together, the "Actions"), and (b) filing any other actions barred

by the release, exculpation, and/or injunction provisions of the Plan and Confirmation Order.

3.    The Bankruptcy Court for the Northern District of Georgia, or Superior Court of

Fulton County, Georgia after any remand, is instructed to dismiss the Actions with prejudice.

4.    Plaintiffs and their counsel are held in contempt for violating the release,

exculpation, and injunction provisions of the Plan and Confirmation Order, and shall pay the

Reorganized Debtor's and Defendants' reasonable attorneys' fees and expenses incurred in

connection with removing the Actions and with prosecuting the Motion, and shall immediately

pay such fees and expenses upon receipt of invoices evidencing such amounts from counsel to

the Reorganized Debtor and the Defendants.  To the extent the parties are unable to agree upon

such fees and expenses, the Reorganized Debtor and Defendants may submit them to the Court

for determination and approval.

5.     The terms and conditions of this Order shall be immediately effective and

enforceable upon entry of this Order.

6.     The Reorganized Debtor, Defendants and the Clerk of this Court are authorized to

take all actions necessary or appropriate to give effect to this Order.

7.     This Court shall retain jurisdiction to hear and determine all matters arising from

or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2019                              _____
New York, New York                               THE HONORABLE SHELLEY C. CHAPMAN
                                                 UNITED STATES BANKRUPTCY JUDGE

# Exhibit B

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Tel: 212-373-3000
Fax: 212-757-3990
Paul M. Basta
Lewis R. Clayton
Jacob A. Adlerstein
Claudia R. Tobler

*Counsel for Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | ) ) **Chapter 11** |
| **CUMULUS MEDIA INC.**, *et al.*, | ) ) ) **Case No. 17-13381 (SCC)** |
| **Debtors.** [1] | ) ) **(Jointly Administered)** |

**FIRST AMENDED JOINT PLAN OF REORGANIZATION OF CUMULUS MEDIA INC.
AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]   The last four digits of Cumulus Media Inc.'s tax identification number are 9663.  Because of the large number of Debtors in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/cumulus.  The location of the Debtors' service address is: 3280 Peachtree Road, N.W., Suite 2200, Atlanta, Georgia 30305.

30.    *"Communications Act"* means Chapter 5 of Title 47 of the United States Code, 47 U.S.C. § 151 *et seq.*, as amended.

31.    *"Confirmation"* means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

32.    *"Confirmation Date"* means the date upon which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

33.    *"Confirmation Hearing"* means the confirmation hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

34.    *"Confirmation Order"* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the transactions contemplated thereby.

35.    *"Consenting Equityholders"* means, collectively, the Holders of Interests in Cumulus party to the Restructuring Support Agreement.

36.    *"Consenting Term Loan Lenders"* means, collectively, the Term Loan Lenders party to the Restructuring Support Agreement.

37.    *"Consummation"* means the occurrence of the Effective Date.

38.    *"Convenience Claim"* means a General Unsecured Claim that is either (a) in an amount that is equal to or less than $20,000 or (b) in an amount that is greater than $20,000, but with respect to which the Holder of such General Unsecured Claim voluntarily and irrevocably reduces the aggregate amount of such Claim to $20,000 pursuant to a valid election by the Holder of such General Unsecured Claim made on its Ballot on or before the Plan Voting Deadline.

39.    *"Convenience Class Cap"* means $2 million in the aggregate or such greater amount that is subject to the prior written consent of the Term Lender Group.

40.    *"Credit Agreement"* means that certain Amended and Restated Credit Agreement, dated as of December 23, 2013, among Cumulus, Cumulus Media Holdings Inc., as borrower, certain lenders party thereto, the Credit Agreement Agent, and certain other agents party thereto.

41.    *"Credit Agreement Agent"* means JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the Credit Agreement (or any successor to JPMorgan Chase Bank, N.A., in such capacity).

42.    *"Credit Agreement Claim"* means any Claim against any Debtor derived from, based upon, relating to, or arising from the Credit Agreement or the related Loan Documents (as defined in the Credit Agreement).

43.    *"Credit Documents"* means, collectively, the (a) Credit Agreement, (b) each security agreement, guaranty, pledge agreement, mortgage, and any other document entered into pursuant to or in connection with the Credit Agreement, and (c) each other agreement that creates or purports to create or perfect a Lien or security interest in favor of the Credit Agreement Agent and/or the Term Loan Lenders.

44.    *"Cumulus"* means Cumulus Media Inc.

4

56.    *"Disclosure Statement Order"* means the *Order Approving (A) the Adequacy of the Disclosure Statement; (B) Solicitation and Notice Procedures with Respect to Confirmation of the Joint Plan of Reorganization of Cumulus Media Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code; (C) the Form of Ballots and Notices in Connection Therewith; (D) the Scheduling of Certain Dates with Respect Thereto; and (E) Related Relief* [Docket No. 416].

57.    *"Disputed"* means, with respect to a Claim against any Debtor, (a) any Claim, proof of which was timely and properly Filed, which is disputed under Article VII of this Plan or as to which the Debtors or any other party in interest have interposed and not withdrawn an objection or request for estimation (pursuant to Article VII of this Plan or otherwise) that has not been determined by a Final Order, (b) any Claim, proof of which was required to be Filed by order of the Bankruptcy Court but as to which a Proof of Claim was not timely or properly Filed, (c) any Claim that is listed in the Schedules as unliquidated, contingent, or disputed, or (d) any Claim that is otherwise disputed by any of the Debtors, the Reorganized Debtors or any other party in interest, which dispute has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court.  For the avoidance of doubt, if no Proof of Claim has been Filed by the applicable Claims Bar Date and the Claim is not listed on the Schedules or has been or hereafter is listed on the Schedules as $0, disputed, contingent, or unliquidated, such Claim shall be Disallowed and shall be expunged from the Claims Register without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

58.    *"Disputed Claim Reserve"* means the reserve of Special Warrants created pursuant to Article VII.F. of this Plan.

59.    *"Distribution Record Date"* means the Confirmation Date or such later date as agreed to by the Reorganized Debtors and the Term Lender Group in their sole and absolute discretion; *provided*, *however*, that no distribution record date shall apply to the Senior Notes or any other publicly-held Securities.

60.    *"DTC"* means the Depository Trust Company.

61.    *"Effective Date"* means the first Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been satisfied or waived pursuant to Article IX.A and Article IX.B, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

62.    *"Employee Obligations"* means the Debtors' written contracts, agreements, policies, programs and plans for, among other things, compensation, reimbursement, indemnity, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, including in the event of a change of control after the Effective Date, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the directors, officers and employees of any of the Debtors who served in such capacity at any time (including any compensation programs approved by the Bankruptcy Court).

63.    *"Entity"* means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

64.    *"Estate"* means, as to each Debtor, the estate created for such Debtor by section 541 of the Bankruptcy Code.

65.    *"Equity Allocation Mechanism"* means the methodology for allocating the New Securities among the Holders of Allowed Credit Agreement Claims, Allowed Senior Notes Claims, and Allowed General Unsecured Claims, set forth on Exhibit A hereto.

66.    *"Exculpated Causes of Action"* means any Causes of Action or Claim related to any act or omission derived from, based upon, related to, or arising from the Debtors' in or out-of-court restructuring efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, solicitation or Filing of the Disclosure Statement, the Plan (including any term sheets related thereto), or any contract, instrument, release, or other

agreement or document created or entered into in connection with any of the foregoing, the funding of this Plan, the occurrence of the Effective Date, the administration of this Plan or the property to be distributed under this Plan, the pursuit of Confirmation or Consummation, and the administration and implementation of the Plan, including (a) the New Corporate Governance Documents, (b) the First Lien Exit Facility, (c) the New Revolving Credit Facility (if any), (d) the Restructuring Transactions, (e) the Restructuring Support Agreement, (f) the issuance of the New Securities (g) the Management Incentive Plan, and (g) the distribution of property under the Plan or any other agreement under the Plan; *provided*, that the Exculpated Parties shall be entitled, in all respects, to reasonably rely upon the advice of counsel with respect to the foregoing.

67.     "*Exculpated Party*" means each of:  (a) the Debtors, (b) the Reorganized Debtors, (c) the Consenting Term Loan Lenders, (d) the Consenting Equityholders, (e) the Credit Agreement Agent, (f) with respect to each of the foregoing Entities in clauses (a) through (e), the manager, management company, or investment advisor of any of the foregoing, and each of such Entities' respective current and former Affiliates, predecessors, successors, assigns, subsidiaries, managed accounts or funds, and (g) with respect to each of the foregoing Entities (a) through (f), such Entities' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

68.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

69.     "*Federal Judgment Rate*" means the interest rate applicable to a judgment entered on the Petition Date that is subject to section 1961 of the Judicial Code, as determined in accordance with that statute.

70.     "*FCC*" means the Federal Communications Commission, including any official bureau or division thereof acting on delegated authority, and any successor governmental agency performing functions similar to those performed by the Federal Communications Commission on the Effective Date.

71.     "*FCC Applications*" means collectively, each application, petition, or other request filed with the FCC in connection with this restructuring and the Plan.

72.     "*FCC Approval*" means the FCC's grant of the FCC Long Form Application.

73.     "*FCC Licenses*" means broadcasting and other licenses, authorizations, waivers and permits that are issued from time to time by the FCC.

74.     "*FCC Long Form Application*" means the applications filed with the FCC seeking FCC consent to the Transfer of Control.

75.     "*FCC Ownership Procedures Order*" means an order to be entered by the Bankruptcy Court establishing procedures for, among other things, completion and submission of the Ownership Certification.

76.     "*File," "Filed,"* or *"Filing"* means file, filed, or filing with the Bankruptcy Court, the Clerk of the Bankruptcy Court, or any of its or their authorized designees in the Chapter 11 Cases, including with respect to a Proof of Claim, the Voting and Claims Agent.

77.     "*Final Order*" means an order, ruling or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court), which has not been reversed, stayed, modified, amended or vacated, and as to which (a) the time to appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or

7

128.    *"Released Party"* means each of:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Term Loan Lenders; (d) the Credit Agreement Agent; (e) the Consenting Equityholders; (f) the Committee; (g) each of the members of the Committee; (h) the Senior Notes Indenture Trustee; (i) with respect to each of the foregoing Entities in clauses (a) through (h), each of such Entity's respective current and former Affiliates, predecessors, successors, assigns, subsidiaries, managed accounts or funds; and (j) with respect to each of the foregoing Entities in clauses (a) through (i), such Entities' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, management companies, investment advisors, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided*, that any Holder of a Claim or Interest that elects to opt-out of the Third-Party Release shall not constitute a Released Party (even if for any reason otherwise entitled).

129.    *"Releasing Parties"* means each of: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Term Loan Lenders; (d) the Credit Agreement Agent; (e) the Consenting Equityholders; (f) the Committee; (g) each of the members of the Committee; (h) the Senior Notes Indenture Trustee; (i) all Holders of Claims and Interests that are deemed Unimpaired and presumed to accept the Plan and do not elect to opt-out of the Third-Party Release; (j) all Holders of Claims and Interests who vote to accept the Plan; (k) all Holders of Claims and Interests entitled to vote on the Plan who abstain from voting on the Plan and do not elect on their Ballot to opt-out of the Third-Party Release; (l) all Holders of Claims and Interests entitled to vote on the Plan who vote to reject the Plan but do not elect on their Ballot to opt-out of the Third-Party Release; (m) all other Holders of Claims and Interests who are deemed to reject the Plan and do not elect to opt-out of the Third-Party Release; (n) with respect to each of the foregoing Entities in clauses (a) through (m), each of such Entity's respective current and former Affiliates, predecessors, successors, assigns, subsidiaries, managed accounts or funds; and (o) with respect to each of the foregoing Entities in clauses (a) through (n), such Entities' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, management companies, investment advisors, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

130.    *"Reorganized Debtors"* means (a) the Debtors, or any successor or assignee thereto, by merger, consolidation, or otherwise, on or after the Effective Date, and (b) to the extent not already encompassed by clause (a), Reorganized Cumulus and any newly formed subsidiaries thereof, on or after the Effective Date.

131.    *"Reorganized Cumulus"* means either (a) Cumulus or any successor thereto, as reorganized pursuant to and under the Plan, or (b) a new corporation or limited liability company that may be formed or caused to be formed by the Debtors, the Restructuring Support Parties or a designee thereof to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Securities to be distributed pursuant to the Plan, in each case, on and after the Effective Date.

132.    *"Restricted Stock"* means shares of New Common Stock that are subject to temporary restrictions prohibiting certain transfers of such shares, and prohibiting the trading of such shares, on any national securities exchange.

133.    *"Restricted Stock Election"* means an election made by a Holder of an Allowed Credit Agreement Claim on the Ownership Certification that such Holder elects to receive its New Common Stock in the form of Restricted Stock.

134.    *"Restructuring Support Agreement"* means that certain Restructuring Support Agreement, dated as of November 29, 2017, by Cumulus on behalf of itself and each of its direct and indirect subsidiaries, and, as applicable, the Consenting Term Loan Lenders and the Consenting Equityholders (as amended, supplemented or modified from time to time, including all exhibits thereto).

135.    *"Restructuring Support Parties"* means those parties who are signatories to the Restructuring Support Agreement, other than the Debtors.

12

on account of such Allowed Claim unless required under applicable bankruptcy law or as otherwise provided in Article III.B.

F.    *Reserve of Special Warrants.*

On the Effective Date (or as soon thereafter as is reasonably practicable), the Reorganized Debtors shall create the Disputed Claim Reserve to pay Holders of Disputed Claims that are General Unsecured Claims that may become Allowed Claims pursuant to the terms of the Plan, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing the Disputed Claim Reserve and for maximum distribution purposes, to be the lesser of (a) the asserted amount of the Disputed Claim Filed with the Bankruptcy Court, or (if no Proof of Claim was Filed) listed by the Debtors in the Schedules, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, or (c) the amount otherwise agreed to by the Reorganized Debtors and the Holder of such Disputed Claim for Disputed Claim Reserve purposes.   Special Warrants reserved under this paragraph F shall remain unissued unless and until issued in satisfaction of a Disputed Claim that becomes an Allowed Claim and shall therefore be disregarded in both the numerator and denominator in the calculation of any vote by shareholders of Reorganized Cumulus under any New Corporate Governance Documents.  Any distribution on account of a Disputed Claim that becomes an Allowed General Unsecured Claim after the Effective Date shall be made solely in the form of Special Warrants that are distributed from the Disputed Claim Reserve.

G.    *No Interest.*

Unless otherwise expressly provided by section 506(b) of the Bankruptcy Code or as specifically provided for herein or by order of the Bankruptcy Court (including the Cash Collateral Order), postpetition interest shall not accrue or be paid on Claims against any of the Debtors, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim; *provided*, *however*, that nothing in this Article VII.G shall limit any rights of any Governmental Unit to interest under sections 503, 506(b), 1129(a)(9)(A) or 1129(a)(9)(C) of the Bankruptcy Code or as otherwise provided under applicable law.

**ARTICLE VIII.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

A.    *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.    *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order or in any contract, instrument, or other agreement or document created pursuant to the Plan, including the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan shall be in

complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.      *Release of Liens.*

**Except as otherwise specifically provided in the Plan, the First Lien Exit Facility Documents or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, on the Effective Date all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. In addition, the Credit Agreement Agent shall, at the Debtors' or Reorganized Debtors', as applicable, expense (and with no representation or warranty, or recourse to, the Credit Agreement Agent, any Term Loan Lender or any of their affiliates, officers, directors, employees, agents or counsel) execute and deliver all documents reasonably requested by the Debtors, the Reorganized Debtors, the First Lien Exit Facility Agent, or the New Revolving Credit Facility Agent (if any) to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

D.      *Releases by the Debtors.*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, the Released Parties shall hereby be expressly, unconditionally, irrevocably, generally, individually and collectively released, acquitted, and discharged by the Debtors, the Reorganized Debtors, and the Estates, each on behalf of itself and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, from any and all actions, Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of a Debtor or Reorganized Debtor, any Claims or Causes of Action asserted on behalf of any Holder of any Claim or Interest or other Entity or that any Holder of a Claim or Interest or other Entity would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, for violations of federal or state laws or otherwise, by statute or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that the Debtors, the Reorganized Debtors, or their Estates (whether individually**

42

or collectively) ever had, now has, or hereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or any other transaction relating to any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan, the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Restructuring Support Agreement, the Disclosure Statement, the First Lien Exit Facility Documents, the New Revolving Credit Facility Documents (if any), or, in each case, related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence, taking place on or before the Effective Date related or relating to any of the foregoing; *provided, however*, that except as expressly provided under the Plan, the foregoing releases shall not release Claims related to any act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence or willful misconduct. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date rights or obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and shall not result in a release of any of the Debtors' or Reorganized Debtors' assumed indemnification obligations as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) essential to the Confirmation of the Plan; (2) an exercise of the Debtors' business judgment; (3) in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Debtor Release; (5) in the best interests of the Debtors and all holders of Claims and Interests; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Debtors, the Reorganized Debtors, and the Estates and each of their current and former Affiliates, and such Entities' and their current and former Affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such asserting any Claim or Cause of Action released pursuant to the Debtor Release.

Nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

E.      *Releases by the Releasing Parties.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Effective Date, each of the Releasing Parties shall be deemed to have expressly, conclusively, absolutely, unconditionally, irrevocably, generally, individually and collectively, released, acquitted, and discharged the Released Parties from any and all actions, Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of a Debtor or Reorganized Debtor, any Claims or Causes of Action asserted on behalf of any Holder of any Claim or any Interest or other Entity or that any Holder of a Claim or an Interest or other Entity would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, for violations of federal or state laws or otherwise, by statute or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that such Releasing Party (whether individually or collectively) ever had, now has, or hereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or any other transaction relating to any Security of the

43

Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or any Interest that is affected by or classified in the Plan, the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Restructuring Support Agreement, the Disclosure Statement, the First Lien Exit Facility Documents, the New Revolving Credit Facility Documents (if any), or, in each case, related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence, taking place on or before the Effective Date related or relating to any of the foregoing; *provided, however*, that except as expressly provided under the Plan, the foregoing releases shall not release Claims related to any act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence or willful misconduct; *provided*, *further*, that any Holder of a Claim or an Interest that elects to opt-out of the releases contained in this paragraph shall not constitute a Released Party (even if for any reason otherwise entitled) and no Restructuring Support Party shall be entitled to opt-out of the releases contained in this paragraph for so long as the Restructuring Support Agreement remains in full force and effect as to such Restructuring Support Party. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date rights or obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and shall not result in a release of any of the Debtors' or Reorganized Debtors' assumed indemnification obligations as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) essential to the Confirmation of the Plan; (2) given in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (3) a good faith settlement and compromise of the Claims released by the Third-Party Release; (4) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

Nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

F.      *Regulatory Activities*.

Notwithstanding anything to the contrary herein, nothing in the Plan or Confirmation Order is intended to affect the police or regulatory activities of Governmental Units or other governmental agencies.

G.      *Exculpation*.

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any (i) Exculpated Causes of Action and (ii) obligation, Cause of Action, or liability for any Exculpated Causes of Action; *provided, however*, that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence, or willful misconduct; *provided further*, *however*, that the foregoing shall not be deemed to release, affect, or limit any post-Effective Date rights or obligations of the Exculpated Parties under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

44

Nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

*H.      Injunction.*

Except as otherwise expressly provided in the Plan, the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Persons and Entities that have held, hold, or may hold Claims, Interests, Causes of Action or liabilities that have been released pursuant to <u>Article VIII.D</u> or <u>Article VIII.E</u> of the Plan, are discharged pursuant to <u>Article VIII.B</u> of the Plan, or are subject to exculpation pursuant to <u>Article VIII.G</u> of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Persons and Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (iii) creating, perfecting, or enforcing any Lien, Claim or encumbrance of any kind against such Persons or Entities or the property or the estates of such Persons or Entities, as applicable, on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Persons or Entities or against the property of such Persons or Entities, as applicable, on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; and (v) commencing or continuing in any manner any action or other proceeding of any kind against such Persons or Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities released, settled or compromised pursuant to the Plan; *provided*, that nothing contained herein shall preclude a Person or Entity from obtaining benefits directly and expressly provided to such Person or Entity pursuant to the terms of the Plan; *provided, further*, that nothing contained herein shall be construed to prevent any Person or Entity from defending against claims objections or collection actions whether by asserting a right of setoff or otherwise to the extent permitted by law.

*I.      Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

*J.      Recoupment.*

In no event shall any Holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

*K.      Protection Against Discriminatory Treatment.*

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, all Entities, including Governmental Units shall not discriminate against any Reorganized Debtor, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | **Chapter 11** |
| **CUMULUS MEDIA INC.,** *et al.*, | **Case No. 17-13381 (SCC)** |
| **Debtors.**[1] | **(Jointly Administered)** |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE DEBTORS' FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), having: [2]

a.    commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on November 29, 2017 (the "Petition Date");

b.    continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

c.    filed, on December 9, 2017, (i) the *Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 92], which plan and related documents were subsequently amended, and (ii) the *Disclosure Statement for Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 91], which disclosure statement and related documents were subsequently amended;

---

[1]    The last four digits of Cumulus Media Inc.'s tax identification number are 9663. Because of the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/cumulus. The location of the Debtors' service address is: 3280 Peachtree Road, N.W., Suite 2200, Atlanta, Georgia 30305.

[2]    Unless otherwise noted, capitalized terms not defined in this *Findings of Fact, Conclusions of Law, and Order Confirming Debtors' First Amended Joint Chapter 11 Plan of Reorganization* (this "Confirmation Order") shall have the meanings ascribed to them in the Plan (as defined herein). The rules of interpretation set forth in Article I.B of the Plan shall apply to this Confirmation Order.

Holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

**J.**    **Objections.**

10.    To the extent that any objections, reservations of rights, statements, or joinders to Confirmation have not been resolved, withdrawn, waived, or settled prior to entry of this Confirmation Order or otherwise resolved herein or as stated on the record of the Confirmation Hearing, they are hereby overruled on the merits based on the record before this Bankruptcy Court.

**K.**    **Burden of Proof.**

11.    The Debtors, as the proponents of the Plan, have met their burden of proving the elements of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.

**L.**    **Bankruptcy Rule 3016.**

12.    The Plan is dated and identifies the Debtors as the Plan proponents, thereby satisfying Bankruptcy Rule 3016(a).  The filing of the Disclosure Statement satisfied Bankruptcy Rule 3016(b).

**M.**    **Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1)).**

13.    The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

   a.    Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).  As required by section 1123(a)(1), in addition to Administrative Claims (including Accrued Professional Compensation Claims) and Priority Tax Claims, which need not be classified, Article III of the Plan designates 10 Classes of Claims and Interests.  As required by section 1122(a) of the Bankruptcy Code, the Claims and Interests placed in each Class are substantially similar to other Claims and Interests, as the case may be, in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Interests. Thus, the Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

b.  <u>Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>.  Article III of the Plan specifies that Classes 1, 2, 7, and 9 are Unimpaired under the Plan, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

c.  <u>Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3))</u>.  Article III of the Plan sets forth the treatment of Classes 3–6, 8, and 10, which are the Impaired Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

d.  <u>No Discrimination (11 U.S.C. § 1123(a)(4))</u>.  Article III of the Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class except to the extent that a Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

e.  <u>Implementation of the Plan (11 U.S.C. § 1123(a)(5))</u>.  The Plan and the various documents included in the Plan Supplement provide adequate and proper means for implementation of the Plan, including, without limitation: (i) the consummation of the Restructuring Transactions (including the Description of Transaction Steps set forth in the Plan Supplement); (ii) the New Corporate Governance Documents; (iii) the issuance of the New Securities; (iv) the cancellation of certain existing agreements, obligations, instruments, and Interests; (v) the entry into the First Lien Exit Facility; (vi) the entry into the Equity and Asset Transfer Agreement and related documents; (vii) the continued vesting of the assets of the Debtors' Estates in the Reorganized Debtors; and (viii) the execution, delivery, filing, or recording of all contracts, instruments, releases, and other agreements or documents in furtherance of the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code.

f.  <u>Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6))</u>.  The New Corporate Governance Documents prohibit the issuance of non-voting securities to the extent required to comply with section 1123(a)(6) of the Bankruptcy Code.  As such, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

g.  <u>Designation of Directors and Officers (11 U.S.C. § 1123(a)(7))</u>.  The Reorganized Debtors' initial directors and officers are set forth in the Plan Supplement and, to the extent not known, will be determined in accordance with the New Corporate Governance Documents, which is consistent with the interests of creditors, equity holders and public policy, and satisfies section 1123(a)(7) of the Bankruptcy Code.

h.  <u>Additional Plan Provisions (11 U.S.C. § 1123(b))</u>.  The additional provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code and, therefore, are consistent with section 1123(b) of the Bankruptcy Code.

(i)  <u>Impairment/Unimpairment of Any Class of Claims or Interests (11 U.S.C. § 1123(b)(1))</u>.  Pursuant to the Plan, Classes 1, 2, 7, and 9 are Unimpaired,

10

and Classes 3–6, 8 and 10 are Impaired, as contemplated by section 1123(b)(1) of the Bankruptcy Code.

(ii)     <u>Assumption and Rejection of Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2))</u>.  Article V of the Plan provides for the assumption of the Debtors' Executory Contracts and Unexpired Leases as of the Effective Date unless such Executory Contract or Unexpired Lease: (A) was previously rejected; (B) expired or terminated pursuant to its own terms; (C) is the subject of a notice of rejection or motion to reject that is pending on the Effective Date; or (D) was identified on the Schedule of Rejected Executory Contracts and Unexpired Leases.

(iii)    <u>Retention of Claims (11 U.S.C. § 1123(b)(3))</u>.  In accordance with section 1123(b)(3) of the Bankruptcy Code, Article IV.S of the Plan provides that, subject in all respects to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

(iv)    <u>Compromise and Settlement (11 U.S.C. § 1123(b)(3))</u>.  In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good-faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that all Holders of Claims or Interests may have with respect to any Allowed Claim or Interest or any distribution to be made on account thereof.  Such compromise and settlement is fair, equitable, and reasonable and in the best interests of the Debtors and their Estates.  In addition, for the reasons set forth on the record at the Confirmation Hearing, the Plan, as modified by this Confirmation Order, constitutes a good faith compromise and settlement of all issues relating to the alleged substantive consolidation of the Debtors' Estates and any alleged improper "gifting" as they relate to distributions to Holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims (the "<u>Intercreditor Distribution Settlement</u>").

(v)     <u>Other Appropriate Provisions (11 U.S.C. § 1123(b)(6))</u>.  The Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including, without limitation, provisions for (A) distributions to Holders of Claims, (B) resolution of Disputed Claims, (C) allowance of certain Claims, (D) the assumption of certain Indemnification Provisions, (E) releases by the Debtors of certain parties, (F) releases by certain third parties, (G) exculpations of certain parties, and

(H) retention of Bankruptcy Court jurisdiction, thereby satisfying the requirements of section 1123(b)(6).

i.      Cure of Defaults (11 U.S.C. § 1123(d)). Article V.C of the Plan provides for the satisfaction of Cure Claims associated with each Executory Contract and Unexpired Lease to be assumed (or assumed and assigned) in accordance with section 365(b)(1) of the Bankruptcy Code. The cure amount identified in the Cure Notice distributed to the applicable counterparty represents the amount, if any, that the Debtors shall pay in full and complete satisfaction of such Cure Claim. Any disputed cure amounts will be determined in accordance with the procedures set forth in Article V.C of the Plan, and applicable bankruptcy and nonbankruptcy law. As such, the Plan provides that the Debtors will cure, or provide adequate assurance that the Debtors will promptly cure, defaults with respect to assumed Executory Contracts and Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code. Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

## N.      The Debtors' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2)).

14.      The Debtors have complied with the applicable provisions of the Bankruptcy Code, as required by section 1129(a)(2) of the Bankruptcy Code. Specifically:

a.      the Debtors are eligible debtors under section 109 of the Bankruptcy Code and are proper proponents of the Plan under section 1121(a) of the Bankruptcy Code;

b.      the Debtors have complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Bankruptcy Court; and

c.      the Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules in transmitting the Confirmation Materials and related notices and in soliciting and tabulating the votes on the Plan.

## O.      Good Faith (11 U.S.C. § 1129(a)(3)).

15.      The Debtors have proposed the Plan (including the Plan Documents (as defined herein) and all other documents necessary to effectuate the Plan) in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases and the formulation of the Plan. The Debtors' good faith is evident from the facts and record of the Chapter 11 Cases,

the Disclosure Statement, and the record of the Confirmation Hearing.  The Plan was proposed

with the legitimate and honest purpose of maximizing the value of the Debtors' Estates and to

effectuate a successful reorganization of the Debtors.  The Plan was the product of extensive

negotiations conducted at arm's length among the Debtors and certain of their key stakeholders.

Further, the Plan's classification, indemnification, settlement, discharge, exculpation, release, and

injunction provisions have been negotiated in good faith and at arm's length, are consistent with

sections 105, 1122, 1123(b)(6), 1129, and 1142 of the Bankruptcy Code, and are each necessary

for the Debtors' successful reorganization.  Accordingly, the requirements of section 1129(a)(3)

of the Bankruptcy Code are satisfied.

16.     The Plan gives effect to many of the Debtors' restructuring initiatives, including

implementing a value maximizing restructuring transaction.   Therefore, the Plan has been

proposed in good faith to achieve a result consistent with the objectives and purposes of the

Bankruptcy Code and the Debtors (and all of their respective officers, managers, directors, agents,

independent contractors, financial advisors, consultants, attorneys, employees, partners, Affiliates,

and representatives) have been, are, and will continue to act in good faith within the meaning of

sections 1125(e) and 1126(e) the Bankruptcy Code if they proceed to: (a) consummate the Plan

and the Restructuring Transactions and the agreements, settlements, transactions, and transfers

contemplated thereby; and (b) take the actions authorized and directed or contemplated by this

Confirmation Order.

**P.      Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).**

17.     Any payment made or to be made by the Debtors, or by a person issuing securities

or acquiring property under the Plan, for services or for costs and expenses in connection with the

Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been

approved by, or is subject to the approval of, the Bankruptcy Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

**Q.     Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).**

18.     The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code.  The identities of the Reorganized Debtors' directors and officers were disclosed in the Plan Supplement.  To the extent that such directors and officers are insiders, the nature of their compensation has been disclosed to the extent known and reasonably practicable.

**R.     No Rate Changes (11 U.S.C. § 1129(a)(6)).**

19.     Section 1129(a)(6) of the Bankruptcy Code is satisfied because the Plan does not provide for any rate changes over which a governmental regulatory commission has jurisdiction.

**S.     Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).**

20.     Each Holder of an Impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

21.     The liquidation analysis attached as **Exhibit D** to the Disclosure Statement (the "Liquidation Analysis") and the other evidence related thereto in support of the Plan that was proffered or adduced at or prior to the Confirmation Hearing or in the Confirmation Declarations: (a) are reasonable, persuasive, credible, and accurate as of the dates such analyses or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that Holders of Allowed Claims or Interests in every Class will recover as much or more under the Plan on account of such Claim or Interest, as of the Effective Date, than the amount such Holder would receive if

14

the Bankruptcy Code, the Bankruptcy Rules or the Local Rules.  Any state or local business or

operating license transferred, sold, vested, or otherwise conveyed from a Debtor to a Reorganized

Debtor shall be deemed valid and enforceable by the applicable Reorganized Debtor without the

need of any corporate, governmental authority, or further court approval.

**JJ.**    **Management Incentive Plan.**

41.    The Debtors have provided sufficient and adequate notice of the terms of the

Management Incentive Plan.  The terms and conditions of the Management Incentive Plan have

been negotiated in good faith and at arm's length with the Term Lender Group.  The Management

Incentive Plan is an essential element of the Plan, and the terms of the Management Incentive Plan

and the awards contemplated therein are fair and reasonable.

**KK.**    **Approval of the First Lien Exit Facility.**

42.    The First Lien Exit Facility is an essential element of the Plan, is necessary for

Confirmation and the consummation of the Plan, and is critical to the overall success and feasibility

of the Plan.  Entry into the First Lien Exit Credit Agreement and the other First Lien Exit Facility

Documents is in the best interests of the Debtors, their Estates, and all Holders of Claims or

Interests.  The Debtors have exercised reasonable business judgment in determining to enter into

the First Lien Exit Credit Agreement and the other First Lien Exit Facility Documents and have

provided sufficient and adequate notice of the material terms of the First Lien Exit Facility, which

material terms were filed as part of the Plan Supplement.  The terms and conditions of the First

Lien Exit Facility are fair and reasonable, and the First Lien Exit Facility was negotiated in good

faith and at arm's length.  The Debtors are authorized, without further approval of the Bankruptcy

Court or any other party, to execute and deliver all agreements, documents, instruments, and

certificates related thereto and perform their obligations thereunder.

45.     Each New Security issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the New Securities referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

46.     In respect of the Term Loan Lender Equity Distribution and the Unsecured Creditor Equity Distribution, if a Holder of Allowed Credit Agreement Claims, Allowed Senior Notes Claims or Allowed General Unsecured Claims holds its Allowed Claim in multiple managed funds and/or investment vehicles (such entities, the "Funds"), then it will receive its allocation of Class A Common Stock, Class B Common Stock, and Special Warrants, as applicable, Pro Rata across such Funds and in accordance with the terms of the Plan and the Equity Allocation Mechanism; *provided*, *however*, that, if an allocation other than Pro Rata across the Funds is requested, such Holder shall give notice to the Debtors, the Reorganized Debtors, and/or the Disbursing Agent (or their respective representatives or assigns) no later than five (5) Business Days after the Confirmation Date specifying its requested allocation of New Securities amongst its Funds.  The Disbursing Agent (and any other applicable agents or representatives of the Debtors and Reorganized Debtors) shall use commercially reasonable efforts to assist such Holder in allocating its New Securities across such Funds in such manner, which allocation shall otherwise be subject to the terms of the Plan and the Equity Allocation Mechanism.

**MM.   Executory Contracts and Unexpired Leases.**

47.     The Debtors have exercised sound business judgment in determining whether to assume, assume and assign, or reject each of their Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, Article V of the Plan, and as set

forth in the Plan Supplement.  Except as set forth herein and/or in separate orders entered by the

Bankruptcy Court relating to assumption of Executory Contracts or Unexpired Leases, the Debtors

have cured or provided adequate assurances that the Debtors will cure defaults (if any) under or

relating to each Executory Contract or Unexpired Lease assumed under the Plan.

48.     Nothing in the Plan or the Confirmation Order shall prevent a party to an Executory

Contract or Unexpired Lease rejected pursuant to the Plan from filing a Proof of Claim based on

such rejection by the later of (i) the applicable Claims Bar Date, and (ii) thirty (30) days after

notice of such rejection is served on the applicable claimant.  Nothing in the Plan or this

Confirmation Order shall prevent a party to an Executory Contract or Unexpired Lease assumed

pursuant to the Plan, or otherwise, from continuing to prosecute an objection to the cure amount

related to such assumed Executory Contract or Unexpired Lease if such objection was timely filed

on or before at least seven days prior to the Confirmation Hearing, but not resolved before the

Effective Date.

## NN.    Discharge, Compromise, Settlement, Release, Exculpation, and Injunction Provisions.

49.     The Bankruptcy Court has jurisdiction under sections 1334(a) and (b) of title 28 of

the United States Code to approve the discharge, compromises, settlements, releases, exculpations,

and injunctions set forth in Article VIII of the Plan.  Sections 105(a) and 1123(b) of the Bankruptcy

Code permit issuance of the injunctions and approval of the releases, exculpations, and injunctions

set forth in Article VIII of the Plan.  Based upon the record of the Chapter 11 Cases and the

evidence proffered or adduced at the Confirmation Hearing, the Bankruptcy Court finds that the

discharge, compromises, settlements, releases, exculpations, and injunctions set forth in Article

VIII of the Plan are consistent with the Bankruptcy Code and applicable law.  Further, the

discharge, compromises, settlements, releases, exculpations, and injunctions contained in Article

VIII of the Plan are integral components of the Plan. The discharge, compromises, settlements, releases, exculpations, and injunctions set forth in Article VIII of the Plan are hereby approved and authorized in their entirety.

**OO.  Debtor Release; Third-Party Release.**

50.    The releases described in Articles VIII.D and VIII.E of the Plan are an integral and necessary part of the Plan and represent a valid exercise of the Debtors' business judgment. For the reasons set forth on the record of the Chapter 11 Cases and the evidence proffered or adduced at the Confirmation Hearing, including the Plan embodied therein, the releases provided for in the Plan are in the best interests of the estates. The releases described in Articles VIII.D and VIII.E of the Plan are: (a) in exchange for good and valuable consideration provided by the Released Parties; (b) a good-faith compromise and settlement of the Claims and Causes of Action released by the Debtors and the Releasing Parties; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or any Holder of a Claim or Interest that would have been legally entitled to assert any Claim or Cause of Action on behalf of any of the Debtors or the Estates or any Releasing Party, as applicable, from asserting any Claim or Cause of Action released by the releases described in Articles VIII.D and VIII.E of the Plan against any of the Released Parties.

**PP.  Exculpation.**

51.    The exculpation provisions set forth in Article VIII.G of the Plan are essential to the Plan. The record in the Chapter 11 Cases fully supports the exculpation provisions, and the exculpation provisions set forth in Article VIII.G of the Plan are appropriately tailored to protect the Exculpated Parties from inappropriate litigation and to exclude actions determined by Final Order to have constituted actual fraud, gross negligence, or willful misconduct.

**QQ.**  **Injunction.**

52.  The injunction provisions set forth in Article VIII.H of the Plan are essential to the Plan; are necessary to preserve and enforce the releases set forth in Articles VIII.B, VIII.D and VIII.E of the Plan, the exculpation provisions in Article VIII.G of the Plan, and the compromises and settlements implemented under the Plan; and are narrowly tailored to achieve that purpose.

53.  The injunction provisions set forth in Article VIII.H the Plan: (a) are within the jurisdiction of this Bankruptcy Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) are an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code; (c) are an integral element of the transactions incorporated into the Plan; (d) confer material benefits on, and are in the best interests of, the Debtors, the Estates, and their creditors; (e) are important to the overall objectives of the Plan to finally resolve all Claims or Causes of Action among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors; and (f) are consistent with sections 105, 1123, and 1129 of the Bankruptcy Code, other provisions of the Bankruptcy Code, and other applicable law.  The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the injunction provisions set forth in Article VIII.H of the Plan.

**RR.**  **Retention of Jurisdiction.**

54.  Except as otherwise provided in the Plan, any of the Plan Documents or this Confirmation Order, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including the matters set forth in Article XI of the Plan.

**SS.**  **Reports.**

55.  After the Effective Date, the Reorganized Debtors shall have no obligation to file with the Bankruptcy Court or serve on any parties reports that the Debtors were obligated to file

# Exhibit C

# LAW OFFICE OF CHARLES A. HIGGS
## 115 E. 23rd Street, 3rd FL
## New York, NY 10010
## (917) 673-3768
### Charles@FreshStartEsq.com

Re: 17-13381-scc
    In re: Cumulus Media

June 15, 2018

      Please allow this letter to serve as notice that WGH Communications ("WGH") hereby withdraws the following documents that were filed on behalf of WGH in the above captioned case:

**Docket # 809: Notice of Appeal**
**Docket # 839: Designation of Contents (Statement of Issues and Designation of Record); and**
**Docket # 842: Designation of Contents (First Amended Statement of Issues and First Amended Designation of Record)**

      Sincerely,

      /s/ Charles A. Higgs

# Exhibit D

Fulton County Superior Court
***EFILED***LW
Date: 11/2/2018 3:31 PM
Cathelene Robinson, Clerk



# IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA
### 136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303
## SUMMONS

EJS Investment Holdings, LLC and ) Case
) No.: **2018CV312575**
WGH Communications, Inc. )
**Plaintiff,** )
)
**vs.** )
)
Mary G. Berner, Jeffery Marcus, Brian Cassidy, )
) SERVED _____ 1:20 p. M On 11/26/20 18
Ross Oliver and Crestview Partners, LP ) OFFICE OF THE SHERIFF PALM BEACH COUNTY, FL
**Defendant** ) Ds. Q ID 7168
) DEPUTY SHERIFF                    I.D. NO.

TO THE ABOVE NAMED DEFENDANT(S): Jeffery Marcus, 1075 N. Ocean Blvd., Palm Beach, FL 33480

You are hereby summoned and required to file electronically with the Clerk of said Court at **https://efilega.tylerhost.net/ofsweb** and serve upon plaintiff's attorney, whose name and address is:

Lindsey L. Hobbs, Esq.
Wise & Reeves, P.C.
625 S. Gay St., Ste. 160
Knoxville, TN 37902

An answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed within five (5) business days of such service. Then time to answer shall not commence until such proof of service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This ___**11/2/2018**___ day of _____, 20 _____

Honorable Cathelene "Tina" Robinson
Clerk of Superior Court
By _____
Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you _____, 20_____

_____
Deputy Sherriff

Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used

Fulton County Superior Court
***EFILED***LW
Date: 11/2/2018 3:31 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| EJS INVESTMENT HOLDINGS, LLC, and WGH COMMUNICATIONS, INC., ) ) ) ) | |
| Plaintiffs, ) | Civil Action No. **2018CV312575** |
| v. ) | |
| ) | |
| MARY G. BERNER, an individual, JEFFERY MARCUS, an individual, BRIAN CASSIDY, an individual, ROSS OLIVER, an individual and CRESTVIEW PARTNERS, LP, ) ) ) ) ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

**COMES NOW**, EJS Investment Holdings, LLC ("EJS") and WGH Communications, Inc. ("WGH") (hereinafter collectively referred to as "Plaintiffs"), and file this, their Complaint, against the Defendants Mary G. Berner, Jeffery Marcus, Brian Cassidy, Ross Oliver, and Crestview Partners, L.P., for breach of fiduciary duty, unjust enrichment, conspiracy, and aiding and abetting breach of fiduciary duty, all arising from their actions in dealing with Plaintiffs. In support of the same, Plaintiffs show the Court as follows:

### PARTIES

1.     EJS Investment Holdings, LLC ("EJS") is a Florida limited liability company with a principal place of business at 10110 Leisure Lane South, Jacksonville, FL 32256.

2.     WGH Communications, Inc. ("WGH") is a Delaware Corporation with a principal place of business at 703 Pier Ave. B, Hermosa Beach, California.

3.    Upon information and belief, Defendant Mary G. Berner is an individual residing in Fulton County, Georgia. Defendant Berner may be served with process at 3280 Peachtree Road NE, Suite 2300, Atlanta, Georgia 30305.

4.    Upon information and belief, Defendant Jeffery A. Marcus is an individual residing in Palm Beach County, Florida. Defendant Marcus may be served with process at 1075 N. Ocean Blvd, Palm Beach, FL.

5.    Upon information and belief, Defendant Brian P. Cassidy is an individual residing in New York County, New York. Defendant Cassidy may be served with process at 590 Madison Avenue, New York, NY.

6.    Upon information and belief, Defendant Ross Oliver is an individual residing in New York County, New York. Defendant Oliver may be served with process at 667 Madison Avenue, New York, NY.

7.    Upon information and belief, Defendant Crestview Partners, LP ("Crestview") is an entity headquartered in New York, New York. Crestview Partners is a private equity firm focusing on leveraged buyout and distressed for control investments in the media industry.

8.    This Court has jurisdiction over the parties in this matter pursuant to O.C.G.A. §9-10-91. Venue is proper in this Court based on O.C.G.A. §9-10-93.

## STATEMENT OF FACTS

9.    At all times relevant to this Complaint, Defendant Berner was the President, Chief Executive Officer, and a Director on the Board of Directors (the "Board") of Cumulus Media, Inc. ("Cumulus").

10.    At all times relevant to this Complaint, Defendant Marcus was a Director and the Non-Executive Chairman on the Board.

2

11.     At all times relevant to this Complaint, Defendant Cassidy and Oliver served as Directors on the Board.

12.     At all times relevant to this Complaint, Defendants Marcus, Oliver and Cassidy were employees of and held partnership interests in Crestview, a private equity firm with approximately thirty employees.

13.     EJS and WGH were holders of non-secured bonds in Cumulus.

14.     By early 2017, Cumulus was facing financial difficulty, but had options for managing its debt, making all creditors whole, and maintaining a viable and ongoing enterprise.

15.     Plaintiffs were actively negotiating with Cumulus management, including the Defendants, to reduce Cumulus's debt load and place it on a path that is financially secure and indefinitely sustainable.

16.     EJS and WGH proposed a viable plan for out-of-court restructuring of debt to Cumulus management, including Defendants.

17.     At the time, Cumulus' largest debt was a Term Loan held by multiple creditors, including Voya Financial, Inc. ("Voya") and JP Morgan Chase Bank ("JP Morgan"). In 2017, the Term Loan had an outstanding balance of approximately $1,729,000,000, which was not due until December 2020, with an interest rate of 4.25%.

18.     In addition, there were approximately $600,000,000 in outstanding bonds, including Plaintiffs', which were receiving interest payments at an interest rate of 7.75%.

19.     For payment of these debts, Cumulus held in escrow proceeds from the sale of real property located in Washington D.C., that was expected to reduce the Term Loan to $1,650,000,000, and with Cumulus' projected revenue of $1,133,000,000 in 2017 and $1,172,000,000 in 2018, and an estimated earnings before interest, tax, depreciation and amortization of $215,000,000 in 2017

3

and $235,000,000 in 2018, conservative projections suggested that the Term Loan could be paid down by an additional $200,000,000 to $1,450,000,000 by or before 2019.

20.    In addition, in 2017, the bondholders, including Plaintiffs, offered to Cumulus an advantageous exchange whereby the bondholders would equitize their bonds to free up the 7.75% interest payments that was otherwise payable to the Bondholders, which in turn, would free up an additional $200,000,000 to allow Cumulus to further deleverage their larger Term Loan before the balance was due.

21.    Negotiations ensued between the bondholders and Cumulus' leadership to implement this plan. During the negotiations, the bondholders agreed, among other things, to forego the interest payments due and owing during that time in exchange for equity.

22.    In addition to removing approximately $600,000,000 in debt from Cumulus' books by equitizing the bonds and freeing up a minimum of $200,000,000 in interest payments to pay down the Term Loan, the bondholders' offer had the added benefit of streamlining Cumulus' debt profile, leaving the Term Loan as the only outstanding material debt obligation. All Parties believed that this would have made Cumulus even more attractive to potential financiers or investors by December 2020.

23.    As a final piece of their offer, the bondholders included an attractive Management Incentive Plan ("MIP") in their offer, which included a management equity package and other terms favorable to Defendants Berner and Marcus. The MIP was developed after the bondholders commissioned a market study of MIP's typical in similar other transactions. With this information, the bondholders offered Defendants a MIP that was on the high side of the fair market value typical for those cases where, as here, the goal was to incentivize management personnel that were not funding any portion of the deleveraging efforts themselves.

4

24.     While the bondholders' offer had significant advantages to Cumulus, Defendant Berner was not satisfied with the MIP compensation that was offered to her personally. Defendants demanded approximately double the bondholders' offer, despite knowing that the bondholders' offer was based on sound market information.

25.     During or after a series of failed efforts to convince the bondholders to double their MIP offer, Defendants Berner, Marcus, Oliver and Cassidy decided to change tactics and began to develop a scheme by which they could ultimately utilize their leadership positions at Cumulus to benefit themselves to the detriment of the bondholders.

26.     Defendants maintained a posture of negotiating with Plaintiffs, but at the same time were devising an unnecessary bankruptcy plan, including a side deal with creditors of Cumulus, Voya and JP Morgan, that benefitted Defendants and, in turn, directly benefitted Voya and JP Morgan.

27.     Defendants' scheme involved a series of elaborate steps and machinations ultimately designed to benefit and enrich Defendants Berner, Marcus, Oliver, Cassidy, and Crestview, to the detriment of Plaintiffs and other bondholders.

28.     Among other things, Defendants Berner, Marcus, Cassidy and Oliver:

    a.     Identified those members of the Cumulus Board of Directors that could be controlled and formed a restructuring committee that excluded one or more Directors to function as a "shadow board" designed to implement Defendants' directives;

    b.     Directly thwarted a large shareholder's efforts to raise and infuse an additional $200,000,000 of capital into Cumulus to further pay down the Term Loan;

5

c.  Instituted a "poison pill" resolution on June 5, 2017 to prevent Cumulus from accepting any further cash infusions to assist with the debt reduction. Instituting a poison pill while in need of cash infusion is not in the best interest of creditors and decreases the number of options available to solve Cumulus' debt crisis. It did guarantee maintaining control by Crestview and Defendant Berner during the six months needed to carry out a plan of Cumulus filing bankruptcy to the benefit of defendants;

d.  Discontinued monthly calls and limited information provided to certain shareholders and certain Directors;

e.  Intentionally limited the information included in shadow board meeting minutes and limiting access to related information;

f.  Began to hold regular Board of Director meetings and dinners without notice to one or more of the Directors; and

g.  Began to secretly shop Cumulus to owners of the Term Loan, seeking a creditor that would agree to their outlandish MIP demand and pay them more personally in exchange for more favorable terms for that creditor.

29.  Defendants devised a side deal with Voya and JP Morgan in which a Crestview subsidiary would purchase a large portion of Voya's business and take it public, thus benefitting Crestview. In exchange, the Crestview board members and Defendant Berner would file bankruptcy on behalf of Cumulus and push a plan that would significantly enrich Voya and JP Morgan.

30.  To allow sufficient time for Defendants to develop and implement their scheme, Defendants Berner and Marcus continued to pretend to negotiate with the bondholders and, among other things, insisted on a series of negotiation and non-disclosure agreements -- and multiple

6

extension thereto -- the effect of which was two-fold: 1) this kept the bondholders negotiating in good faith, who were not suspicious, and were not made privy to the secret, parallel negotiations going on to their detriment, and 2) Cumulus was not required to pay the interest payments to the bondholders that would have become due during this time, thereby increasing the funds available to Defendants to sweeten the pot for other creditors more willing to meet their personal demands.

31.    Indeed, as late as November 24, 2017, Defendants Berner, Cassidy, Oliver and Marcus sent a Term Sheet to the bondholders that requested MIP terms double the offer the bondholders had made to them consistent with market analysis.

32.    On or about November 29, 2017, at the direction of Defendants, Cumulus, filed a Chapter 11 Voluntary Petition for Non-Individual bankruptcy in the Southern District of New York (Manhattan), Bankruptcy Petition No: 17-13381-scc.  A true and correct copy of the Bankruptcy Petition is attached hereto as **Exhibit A**.

33.    Defendants' secretive scheme was successful.  While pretending to continue to negotiate in good faith with the bondholders to avoid bankruptcy, Defendants Berner, Marcus, Oliver and Cassidy instead began secret negotiations to file a Chapter 11 bankruptcy, crafting a Restructuring Support Agreement ("RSA") that resulted in very favorable terms for JP Morgan, Voya and Defendant Berner; all to the detriment of the Bondholders, who were left with pennies on the dollar for their investment. The RSA is complex, well thought out and was unlikely drafted in the five days between the increased MIP demand sent to bondholders on November 24, 2017 and the filing with the bankruptcy court on November 29, 2017.  A copy of the RSA is attached hereto as **Exhibit B**.

34.    The RSA included the following provisions:

      a.    Reduction of the Term Loan balance from $1,730,000,000 to $1,300,000,000.

7

b.  Granting Voya and JP Morgan 82.5% of the restructured Cumulus stock in exchange for reducing debt by $429,000,000.

c.  The bondholders were given only 16.5% of the restructured Cumulus stock in exchange for approximately $600,000,000 in bond debt. This was diluted by 10% equity going to Defendant Berner and other Cumulus senior management.

d.  Cumulus shareholders received nothing, and their shares were cancelled.

35.   In December 2017, mere weeks after the Cumulus bankruptcy petition, Crestview announced the purchase of an insurance and annuities business from Voya. A true and correct copy of the December 21, 2017 press release is attached hereto as **Exhibit C**.

36.   The deal for Crestview to purchase the Voya insurance and annuities business through a Crestview subsidiary and to take that subsidiary public using JP Morgan's services was being negotiated prior to and during the time at which a bankruptcy filing and bankruptcy plan were developed for Cumulus by Crestview and Defendants Marcus, Oliver and Cassidy.

37.   Crestview lost $23,000,000 in equity in the old Cumulus, but gained significantly more from Cumulus's restructuring through its business dealings with Cumulus creditor Voya and its acquisition of Voya's insurance and annuities business.

38.   Crestview was in negotiations with Voya to purchase its annuities business at the time of the Cumulus Media negotiations with creditors to avoid bankruptcy.

39.   On May 1, 2018, the Bankruptcy Court approved Cumulus's restructuring plan, which provided Plaintiffs with cents on the dollar in return for their bonds.

40.   The value of the restructured Cumulus as it exited bankruptcy protection is at least $1,200,000,000. A copy of the Debt Wire Summary of the RSA is attached hereto as **Exhibit D**.

8

41.     The deal between Crestview and Voya was finalized on June 1, 2018, almost exactly the same time Cumulus exited bankruptcy. A true and correct copy of the June 1, 2018 press release is attached hereto as **Exhibit E**.

42.     JP Morgan served as book running manager, and helped Crestview take a Crestview wholly owned subsidiary, public on February 7, 2018. A true and correct copy of the February 7, 2018 press release is attached hereto as **Exhibit F**.

43.     Both Voya and JP Morgan profited heavily from the Cumulus bankruptcy plan proposed by Defendants Marcus, Oliver, Berner and Cassidy.   Voya reported that the largest portion of their second quarter 2018 growth was due to the restructured Cumulus.

44.     The Cumulus bankruptcy further created a $500,000,000 windfall to secured creditors, including Voya, and JP Morgan.

45.     Likewise, Crestview was able to obtain a lucrative annuities and insurance business and make easy and fast money from taking it public afterwards.

46.     The Cumulus restructuring further benefitted Defendant Berner, allowing her to maintain her job as Cumulus Chief Executive Officer, and providing her with immediate stock ownership in the restructured Cumulus. *See* **Exhibits G and H**.

47.     Defendant Berner received a guaranteed lucrative management package and continued seat on the Cumulus Board of Directors following bankruptcy in exchange for her cooperation and vote to push through the bankruptcy deal that benefitted Voya and JP Morgan.  If nothing else, the guarantee of continued employment and a lucrative compensation package through and after a bankruptcy created a clear conflict of interest for Defendant Berner.

48.     The Cumulus restructuring also allowed Defendants Oliver, Cassidy and Marcus to make money several ways through self-interested deals with long term lenders Voya and JP

9

Morgan. Defendants Marcus, Oliver and Cassidy had a conflict of interest as employees and interest-holders in Crestview while also serving on the Cumulus Board.

49.    Defendants Marcus, Oliver and Cassidy promoted a bankruptcy restructuring plan that benefitted Crestview, Voya, and JP Morgan.

50.    While Cumulus was admittedly in financial distress, the situation was not beyond hope and formal bankruptcy was unnecessary, or premature at the very least.  Not only were there several advantageous options for private Cumulus restructuring and deleveraging, Cumulus was not in default of any payment obligations as the balance on the Term Loan would not come due for more than three years, in December 2020.

51.    Upon information and belief, most of the meetings, dinners, telephone conferences, and conduct alleged herein occurred in or around Fulton County, Georgia, and much of it at Cumulus's headquarters, located at 3280 Peachtree Road NE, Suite 2300, Atlanta, Georgia 30305.

## FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duty – Trust Fund Doctrine)

### (Against Defendant Berner)

52.    Plaintiffs incorporate paragraphs 1 through 51 of the Complaint as if fully set forth herein.

53.    Although Cumulus was in financial trouble, filing bankruptcy was unnecessary and not in the best interest of all creditors and shareholders.

54.    Defendant Berner owed a fiduciary duty to Plaintiffs to protect Cumulus' assets, holding them in trust, and to manage the assets of Cumulus for the benefit of its creditors, including Plaintiffs.

10

55.    This duty included the obligation for Defendant Berner to refrain from schemes or devices designed to benefit Defendant Berner to the detriment of one or more of Cumulus' creditors.

56.    Defendant Berner breached her duty to Plaintiffs by intentionally engaging in schemes and devices designed to prefer and favor her own interest over those of Plaintiffs.

57.    Defendant Berner helped pass a "poison pill" that would maintain board control with the Crestview Partners and prevent influx of capital to help the struggling company manage debt.

58.    Defendant Berner supported the Crestview Partners bankruptcy scheme in return for continued employment and a grant of new stock to replace her stock holdings lost in the bankruptcy.

59.    Defendant Berner did in fact receive a lucrative financial compensation and guaranteed continued future employment through her breach of duty to Plaintiffs and other bond holders.

60.    Plaintiffs EJS Investment Holdings, LLC and WGH Communications, Inc. have been damaged by Defendant Berner's breach of duty.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty – Trust Fund Doctrine)

### (Against Defendants Marcus, Oliver and Cassidy)

61.    Plaintiffs incorporate paragraphs 1 through 60 of the Complaint as if fully set forth herein.

62.    Defendants Marcus, Oliver and Cassidy owed a fiduciary duty to Plaintiffs to protect Cumulus' assets, holding them in trust, and to manage the assets of Cumulus for the benefit of its creditors, including Plaintiffs.

63.     This duty included the obligation for Defendants Marcus, Oliver and Cassidy to refrain from schemes or devices designed to benefit Defendants Marcus, Oliver Cassidy and Crestview to the detriment of one or more of Cumulus' creditors.

64.     Defendants Marcus, Cassidy and Oliver breached their duty to Plaintiffs by intentionally engaging in schemes and devices designed to prefer and favor their own interest over those of Plaintiffs.

65.     Defendants Marcus, Cassidy and Oliver devised and worked to institute a "poison pill' that would maintain board control with the Crestview and prevent influx of capital to help the struggling company manage debt.

66.     Defendants Cassidy Marcus and Oliver profited through their conflicted dealings with Voya and JP Morgan while leading Cumulus into bankruptcy. Voya and JP Morgan profited greatly from the Cumulus bankruptcy. In return, Defendants Cassidy, Marcus and Oliver were rewarded through Voya selling its annuities business to one Crestview Partners subsidiary and Voya naming a second Crestview Partners subsidiary as the manager of numerous Voya funds. JP Morgan helped orchestrate an initial stock option for a Crestview Partners subsidiary while the Bankruptcy was going forward.

67.     Plaintiffs EJS Investment Holdings, LLC and WGH Communications, Inc. have been damaged by Defendant Marcus' breach of duty.

## THIRD CAUSE OF ACTION

### (Unjust Enrichment)

68.     Plaintiff incorporates paragraphs 1 through 67 of the Complaint as if fully set forth herein.

69.    Defendants Berner, Oliver, Cassidy and Marcus had a responsibility as Directors of Cumulus Media, Inc. to protect the interests of bondholders of Cumulus Media, Inc.

70.    Defendants Berner, Oliver, Cassidy and Marcus chose a business plan that would be detrimental to bond holders and shareholders and beneficial to their own Crestview Partners LP subsidiaries.

71.    Defendant Berner chose a business plan that was beneficial to her interests of receiving continued employment and equity in a restructured Cumulus to replace any equity lost in bankruptcy.

72.    Defendants Berner, Oliver, Cassidy and Marcus acted in an unreasonable business fashion for the purpose of increasing their own compensation and ownership value at the expense of Plaintiffs ownership interests in Cumulus Media, Inc. debt. Defendants Oliver, Cassidy and Marcus also acted to benefit themselves through favorable purchase terms of annuity and insurance business from Voya, management of funds marketed by Voya and favorable IPO offering terms from JP Morgan..

73.    Defendant Berner was unjustly enriched in the form of increased ownership through board of director and management compensation which granted her securities in the restructured Cumulus.

74.    Defendants Oliver Cassidy and Marcus were unjustly enriched through ownership of a subsidiary holding an interest Cumulus secured debt, favorable purchase terms of those assets, favorable finance terms in purchasing those assets and favorable terms in taking those assets public. While they lost as shareholders, their gains as future owner and the benefits to secured creditors greatly offset the small loss of Cumulus equity.

13

75.    The Cumulus bankruptcy was not necessary as evidenced by Defendants' negotiations with Plaintiffs to continue the original Cumulus operation. However, the bankruptcy restructuring was a tool to benefit Defendants.

76.    Defendants did in fact benefit from the unnecessary bankruptcy restructuring through side deals with Voya and JP Morgan.

77.    Debt owed to Plaintiffs was taken from Plaintiffs without adequate compensation and converted and held as assets of Defendants.

78.    Holding of the value of this bondholder debt is an unjust enrichment of defendants.

## FOURTH CAUSE OF ACTION

### (Conspiracy)

79.    Plaintiff incorporates paragraphs 1 through 78 of the Complaint as if fully set forth herein.

80.    Defendants Cassidy, Berner, Oliver and Marcus planned to shirk their fiduciary duty to bondholder interests in Cumulus Media, Inc. for their own personal benefit.

81.    Defendants Cassidy, Berner, Oliver and Marcus agreed upon the objective of diminishing bondholder interests through filing an unnecessary and unreasonable bankruptcy action while negotiating with two major secured creditors for benefit to themselves.

82.    Defendants Cassidy, Berner, Oliver and Marcus used conflict of interest as an excuse to isolate and exclude a dissenting board member, John Dickey, while a clear conflict of interest and self-dealing motivated their own actions.

14

83.    By excluding other board members and creating a shadow board to put the company through a bankruptcy beneficial to themselves, Defendants Berner, Oliver, Cassidy and Marcus did in fact breach a duty to owners of Cumulus Media, Inc. debt and furthered their own objectives.

84.    Plaintiffs' ownership interests in Cumulus Media Inc. debt were eliminated without adequate compensation by the acts of the Defendants and furtherance of this conspiracy between Defendants.

## FIFTH CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty)

### (Against Defendant Mary Berner)

85.    Plaintiffs incorporates paragraphs 1 through 84 of the Complaint as if fully set forth herein.

86.    Defendants Cassidy, Oliver and Marcus planned to breach their fiduciary duty to bondholder interests in Cumulus Media, Inc. for their own personal benefit.

87.    Defendants Cassidy, Oliver and Marcus needed cooperation from one other board member to carry out their plan to breach fiduciary duty to bondholders.

88.    Defendants Cassidy, Oliver and Marcus had a fiduciary duty to creditors of the financially distressed Cumulus Media, Inc.

89.    Filing an unnecessary bankruptcy with a restructuring plan that diminished bondholder interests is a breach of fiduciary duty to bondholders.

90.    Defendant Berner agreed to assist in the objective of diminishing bondholder interests through filing an unnecessary and unreasonable bankruptcy action while negotiating with two major secured creditors for benefit other defendants.

15

91.    Defendant Berner assisted other defendants in participation in the shadow board which stalled negotiations with bondholders for Crestview Partners LP to put in place a profitable side deal.

92.    Defendant Berner assisted other defendants in filing an unnecessary bankruptcy which benefitted Voya and JP Morgan in return for favorable treatment to Crestview Partners and Crestview Partners subsidiaries.

93.    Defendant Berner assisted other defendants in these schemes in exchange for a valuable ongoing compensation package and promise of equity in the restructured Cumulus to offset any equity losses in the old Cumulus.

94.    Defendant Berner's actions in filing an unnecessary bankruptcy were wrongful conduct and improper actions.

95.    Defendant Berner had knowledge Defendants Oliver, Cassidy and Marcus owed a fiduciary duty to bond holders, including Plaintiffs.

96.    Defendants Oliver, Cassidy and Marcus could not have procured the wrongful bankruptcy and breach of duty associated with the restructuring plan without the assistance of Defendant Berner.

97.    Defendant Berner's assistance was purposeful, intentional and knowing that the bankruptcy would harm Plaintiffs.

98.    Defendant Berner's assistance was the cause and proximate cause of damage to Plaintiffs.

99.    Plaintiffs were in fact injured when Plaintiffs' ownership interests in Cumulus Media Inc. debt were eliminated without adequate compensation by the acts of the Defendants and including the assistance of Defendant Berner.

WHEREFORE Plaintiffs pray for the following relief:

A.    That summons and process be issued requiring these defendants to appear as
provided by law to answer the allegations of this Complaint;

B.    That all issues triable be determined by a jury;

C.    That Plaintiffs be awarded the value of their ownership in Cumulus Media, Inc. debt
prior to the initiation of Defendants' schemes and fraudulent activities described
herein, including attorneys' fees and expenses, in an amount proven at trial and
determined by the enlightened conscience of a jury;

D.    The Plaintiffs be awarded punitive damages against Defendants in amounts to be
determined by the enlightened conscience of a jury;

E.    That Plaintiffs have and recover all damages to which they are entitled under
Georgia law; and

F.    That Plaintiffs have all such other and further relief as this Court deems just and
appropriate.


Respectfully Submitted this 1st day of November, 2018.


WISE & REEVES, P.C.

BY: /s/ Lindsey L. Hobbs
Lindsey L. Hobbs, Ga Bar # 940347
Two Centre Square, Ste 160
625 S. Gay Street
Knoxville, TN 37902
(865) 544-1199
lindsey@wiseandreeves.com
Attorney for Plaintiff


17

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

_Southern District of New York_
(State)

Case number *(if known)*: _____    Chapter **11**

☐ Check if this is an
amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

04/16

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | |
|---|---|
| 1.  Debtor's Name | Cumulus Media Inc. |

| | |
|---|---|
| 2.  All other names debtor used in the last 8 years<br><br>Include any assumed names, trade names, and *doing business as* names | None. |

| | |
|---|---|
| 3.  Debtor's federal Employer Identification Number (EIN) | 36-4159663 |

4.  Debtor's address

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| 3280 Peachtree Road, NW<br>Number        Street | Number        Street |
| Suite 2200 | P.O. Box |
| Atlanta, Georgia 30305<br>City            State        Zip Code | City                State    Zip Code |
| | **Location of principal assets, if different from principal place of business** |
| Fulton County<br>County | Number        Street |
| | City                State    Zip Code |

| | |
|---|---|
| 5.  Debtor's website (URL) | www.cumulus.com |

| | |
|---|---|
| 6.  Type of debtor | ☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))<br><br>☐ Partnership (excluding LLP)<br><br>☐ Other. Specify: _____ |

EXHIBIT A

| Debtor | Cumulus Media Inc. | | Case number *(if known)* | |
|---|---|---|---|---|
| | Name | | | |

**7.  Describe debtor's business**

A. *Check One:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☒ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

**5151**

**8.  Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check One:*

☐ Chapter 7

☐ Chapter 9

☒ Chapter 11.  *Check all that apply:*

☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,566,050 (amount subject to adjustment on 4/01/19 and every 3 years after that).

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).  If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☒ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934.  File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9.  Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☒ No

☐ Yes.    District _____ When MM/DD/YYYY   Case number _____

District _____ When MM/DD/YYYY   Case number _____

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases.  If more than 1, attach a separate list.

☐ No

☒ Yes.    Debtor  **See Rider 1**    Relationship  **Affiliate**

District  **Southern District of New York**    When  **11/29/2017**
MM / DD / YYYY

Case number, if known _____

EXHIBIT A

| Debtor | Cumulus Media Inc. | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

**11. Why is the case filed in *this* district?**

*Check all that apply:*

☐ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☒ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No.  To the best of the Debtor's knowledge, the Debtor does not own or have possession of any property that presents an imminent or immediate hazard to the health and safety of the general public.

☐ Yes.  Answer below for each property that needs immediate attention.  Attach additional sheets if needed.

**Why does the property need immediate attention?** *(Check all that apply.)*

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other

**Where is the property?**

| | Number | Street |
|---|---|---|
| | | |
| | City | State    Zip Code |

**Is the property insured?**

☐ No

☐ Yes.    Insurance agency _____

Contact name _____

Phone _____

---

### Statistical and administrative information

**13. Debtor's estimation of available funds**

*Check one:*

☒ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

*Presented on a consolidated basis*

| | | | |
|---|---|---|---|
| ☐ 1-49 | ☐ 1,000-5,000 | ☒ 25,001-50,000 | |
| ☐ 50-99 | ☐ 5,001-10,000 | ☐ 50,001-100,000 | |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 | |
| ☐ 200-999 | | | |

**15. Estimated assets**

*Presented on a consolidated basis*

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☒ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

---

Official Form 201          Voluntary Petition for Non-Individuals Filing for Bankruptcy          page 3

**EXHIBIT A**

| Debtor | Cumulus Media Inc. | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

| **16. Estimated liabilities** | ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
|---|---|---|---|
| | ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☒ $1,000,000,001-$10 billion |
| *Presented on a* | ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| *consolidated basis* | ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

### Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on     **11/29/2017**
                MM/ DD / YYYY

**x**    _/s/ Richard Denning_                    **Richard Denning**
Signature of authorized representative of debtor    Printed name

Title    **Senior Vice President and General Counsel**

**18. Signature of attorney**    **x**    _/s/ Paul M. Basta_        Date    **11/29/2017**
Signature of attorney for debtor                            MM/ DD/YYYY

**Paul M. Basta**
Printed name

**Paul, Weiss, Rifkind Wharton & Garrison LLP**
Firm name

**1285 Avenue of the Americas**
Number                Street

**New York**                            **New York**    **10019-6064**
City                                State        ZIP Code

**(212) 373-3000**                        **pbasta@paulweiss.com**
Contact phone                            Email address

**2568046**                        **New York**
Bar number                        State

EXHIBIT A

| Fill in this information to identify the case: |
|---|

United States Bankruptcy Court for the :

**Southern District of New York**
_____
(State)

Case number *(if known)*: _____    Chapter **11**

☐ Check if this is an
amended filing

### Rider 1
### Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor

On the date hereof, each of the entities listed below (collectively, the "Debtors") filed a petition in the United States Bankruptcy Court for the Southern District of New York for relief under chapter 11 of title 11 of the United States Code.  The Debtors have moved for joint administration of these cases under the case number assigned to the chapter 11 case of Cumulus Media Inc.

- Cumulus Media Inc.
- Atlanta Radio, LLC
- Broadcast Software International
- Catalyst Media, Inc.
- Chicago FM Radio Assets, LLC
- Chicago Radio Assets, LLC
- CMI Receivables Funding LLC
- CMP Susquehanna Corp.
- CMP KC Corp.
- CMP Susquehanna Radio Holdings Corp.
- Consolidated IP Company LLC
- Cumulus Broadcasting LLC
- Cumulus Intermediate Holdings Inc.
- Cumulus Media Holdings Inc.
- Cumulus Network Holdings Inc.
- Cumulus Radio Corporation
- DC Radio Assets, LLC
- Detroit Radio, LLC
- Dial Communications Global Media, LLC
- IncentRev-Radio Half Off, LLC
- IncentRev LLC
- KLIF Broadcasting, Inc.
- KLOS-FM Radio Assets, LLC
- LA Radio, LLC
- Minneapolis Radio Assets, LLC
- NY Radio Assets, LLC
- Radio Assets, LLC
- Radio Metroplex, Inc.
- Radio Networks, LLC
- San Francisco Radio Assets, LLC
- Susquehanna Media Co.
- Susquehanna Pfaltzgraff Co.
- Susquehanna Radio Corp.
- WBAP - KSCS Assets, LLC
- Westwood One, Inc.
- Westwood One Radio Networks, Inc.
- WPLJ Radio, LLC

EXHIBIT A

Fill in this information to identify the case:

Debtor name _Cumulus Media Inc._

United States Bankruptcy Court for the: _Southern_ District of _New York_

Case number (if known): _____

☐ Check if this is an amended filing

## Official Form 204

## Chapter 11 or Chapter 9 Cases: Consolidated List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | U.S. BANK NATIONAL ASSOCIATION ACCOUNT MANAGER — CUMULUS MEDIA 1349 WEST PEACHTREE STREET SUITE 1050 ATLANTA, GA 30309 | WILLIAM ECHOLS Fax: (404) 898-8844 Email: WILLIAM.ECHOLS@USBANK.COM | 7.75% Senior Notes | | | | $637,314,000 |
| 2 | NIELSEN AUDIO, INC 9705 PATUXENT WOODS DRIVE COLUMBIA, MD 21046 | SEAN R. CREAMER CEO Phone: (410) 312-8000 Fax: (410) 312-8607 | Trade Debt | | | | $6,653,543 |
| 3 | BROADCASTERS GENERAL STORE INC 2480 SE 52ND STREET OCALA, FL 34480 | KERSTIN KERRY CEO Phone: (352) 622-7700 Fax: (352) 629-7000 | Trade Debt | | | | $967,596 |
| 4 | BROADCAST MUSIC, INC. 10 MUSIC SQUARE EAST NASHVILLE, TN 37203-4399 | MICHAEL O'NEILL PRESIDENT & CEO Phone: (615) 401-2000 Email: NASHVILLE@BMI.COM | Trade Debt | | | | $789,812 |
| 5 | IGT MEDIA HOLDINGS, INC. 21 SE 1ST AVENUE MIAMI, FL 33131 | MARK MECHANIC COO Phone: (305) 573-2800 Fax: (305) 573-2120 | Trade Debt | | | | $286,299 |
| 6 | KESN OPERATING, LTD. 400 E. LAS COLINAS BLVD. STE 1033 IRVING, TX 75039 | JOHN HARE PRESIDENT | Trade Debt | | | | $273,333 |
| 7 | LIVE NATION 9348 CIVIC CENTER DR. BEVERLY HILLS, CA 90210 | MICHAEL RAPINO PRESIDENT, CEO & DIR Phone: (310) 867-7000 Fax: (302) 636-5454 | Trade Debt | | | | $238,652 |

EXHIBIT A

17-13381-scc Doc 1 Filed 11/29/17 Entered 11/29/17 19:05:18 Main Document
Pg 7 of 20

Debtor Cumulus Media Inc. Case Number (if known)
Name

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 8 | ENTICENT, LLC DBA TRITON DIGITAL<br>15303 VENTURA BLVD., STE 1500<br>SHERMAN OAKS, CA 91403 | NEAL SCHORE<br>CEO<br><br>Phone: (514) 448-4037<br>Email: HELP@TRITONDIGITAL.COM | Trade Debt | | | | $198,255 |
| 9 | OAKLAND RAIDERS<br>1220 HARBOR BAY PKWY<br>ALAMEDA, CA 94502 | MARK DAVIS<br>OWNER<br><br>Phone: (510) 864-5000<br>Email: FEEDBACK@RAIDERS.COM | Trade Debt | | | | $190,000 |
| 10 | CNN, INC.<br>1 CNN CENTER<br>ATLANTA, GA 30348 | JEFF ZUCKER<br>PRESIDENT<br><br>Phone: (404) 827-1700 | Trade Debt | | | | $161,057 |
| 11 | MERLIN MEDIA, LLC<br>222 MERCHANDISE MART PLZ<br>SUITE 230<br>CHICAGO, IL 60654 | RANDY MICHAELS<br>CEO<br><br>Phone: (312) 245-1200 | Trade Debt | | | | $144,772 |
| 12 | BAKER INTERACTIVE SERVICES, LLC<br>2195 N. NORCROSS TUCKER ROAD<br>NORCROSS, GA 30071 | KEITH HICKS III<br>MEMBER<br><br>Phone: (770) 441-2000<br>Fax: (770) 449-7719<br>Email: SALES@BAKERAUDIOVISUAL.COM | Trade Debt | | | | $102,831 |
| 13 | NAVINT PARTNERS, LLC<br>104 WEST 40TH STREET<br>4TH FLOOR<br>NEW YORK, NY 10018 | MR. JIM MARTINDALE<br>MANAGING PARTNER AND CEO<br><br>Phone: (914) 393-3397 | Trade Debt | | | | $87,040 |
| 14 | MICHAEL CRONIN ACOUSTIC CONSTRUCTION LLC<br>2500 BARTON AVENUE<br>NASHVILLE, TN 37212 | MICHAEL CRONIN<br>OWNER<br><br>Phone: (615) 473-7778 | Trade Debt | | | | $60,961 |
| 15 | MUSICTOGO LLC<br>ONE STAMFORD PLACE<br>263 TRESSER BLVD<br>9TH FLOOR<br>STAMFORD, CT 06901 | | Trade Debt | | | | $58,889 |
| 16 | COURTSIDE, LLC<br>335 N MAPLE DR.<br>BEVERLY HILLS, CA 90210 | NORMAN PATTIZ<br>CEO<br><br>Phone: (310) 858-0888<br>Fax: (310) 858-9710 | Trade Debt | | | | $56,090 |
| 17 | ALSTON & BIRD LLP<br>ONE ATLANTIC CENTER<br>1201 WEST PEACHTREE STREET<br>ATLANTA, GA 30309-3424 | BRENDA C. MARTIN<br>DIRECTOR OF CLIENT FINANCIAL SERVICES<br><br>Phone: (404) 881-7000<br>Fax: (404) 253-8689<br>Email: BRENDA.MARTIN@ALSTON.COM | Trade Debt | | | | $52,817 |

17-13381-scc    Doc 1    Filed 11/29/17    Entered 11/29/17 19:05:18    Main Document
Pg 8 of 20

| Debtor | Cumulus Media Inc | | | | | Case Number (if known) | | | |
| | Name | | | | | | | | |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
|---|---|---|---|---|---|---|---|
| 18 | ACT 1 SYSTEMS, INC. 21031 VENTURA BLVD SUITE 1020 WOODLAND HILLS, CA 91364 | ROBERT FITE & ERIC ROSENBERG  Phone: (818) 347-6400 Fax: (818) 346-2023 Email: RFITE@ACT1SYSTEMS.COM; ERIC@ACT1SYSTEMS.COM | Trade Debt | | | | $45,728 |
| 19 | GATESAIR, INC. 5300 KINGS ISLAND DR SUITE 101 MASON, OH 45040 | BRUDE SWAIL CEO  Phone: (800) 622-0022 Fax: (513) 459-3796 Email: INFORMATION@GATESAIR.COM | Trade Debt | | | | $45,596 |
| 20 | CAITLIN FERRARI, ALYSSA U., MARIA P., AND MELISSA M. ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED Index No. 804125/2014  JACLYN S. AND GINA B. Index No. 804088/2014  C/O DOLCE PANEPINTO, P.C 1260 DELAWARE AVENUE BUFFALO, NEW YORK 14209  C/O THE MARLBOROUGH LAW FIRM, P.C. 445 BROAD HOLLOW ROAD, SUITE 400 MELVILLE, NY 11747  C/O LEVI & KORSINSKY, LLP 30 BROAD STREET, 24TH FLOOR NEW YORK, NY 10004 | ATTN: SEAN E. COONEY, ESQ. Phone: (716) 852-1888   ATTN: CHRISTOPHER MARLBOROUGH, ESQ. Phone: (212) 991-8960   Phone: (212) 363-7500 | Litigation | Contingent, Unliquidated & Disputed | | | Undetermined |

11/29/2017

EXHIBIT A          Page - 3

Fill in this information to identify the case and this filing:

Debtor Name        **Cumulus Media Inc.**

United States Bankruptcy Court for the:        **Southern District of New York**

(State)

Case number (If known):

# Official Form 202
## Declaration Under Penalty of Perjury for Non-Individual Debtors        12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐    *Schedule A/B: Assets-Real and Personal Property (Official Form 206A/B)*

☐    *Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)*

☐    *Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)*

☐    *Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)*

☐    *Schedule H: Codebtors (Official Form 206H)*

☐    *Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)*

☐    Amended Schedule

☐    *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (Official Form 204)*

☒    Other document that requires a declaration_____ **List of Creditors Who Have the 20 Largest Unsecured Claims**_____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on

| **11/29/2017** | ☒ | **/s/ Richard Denning** |
|---|---|---|
| MM/ DD/YYYY | | Signature of individual signing on behalf of debtor |
| | | **Richard Denning** |
| | | Printed name |
| | | **Senior Vice President and General Counsel** |
| | | Position or relationship to debtor |

Official Form 202        **Declaration Under Penalty of Perjury for Non-Individual Debtors**

EXHIBIT A

EXECUTED VERSION

## RESOLUTIONS OF THE SPECIAL RESTRUCTURING COMMITTEE
## OF THE BOARD OF DIRECTORS OF
## CUMULUS MEDIA INC.

November 29, 2017

WHEREAS, at a meeting of the Board of Directors (the "Board") of Cumulus Media Inc., a Delaware corporation (the "Company"), held on July 6, 2017, the Board resolved to form a special restructuring committee (the "Committee") to act for and on behalf of the Board, and to exercise all of the authority and powers of the Board, in connection with the restructuring process in which the Company is currently engaged;

WHEREAS, the Board appointed Jeffrey Marcus, Mary Berner, Ralph Everett, Ross Oliver, Jan Baker and Jill Bright to the Committee;

The undersigned, being all of the members of the Committee, hereby take the following actions and adopt the following resolutions by written consent pursuant to Sections 3.1, 3.12 and 3.13 of the Company's By-Laws (as amended, the "By-Laws") and Section 141(f) of the Delaware General Corporation Law (the "DGCL"):

### CHAPTER 11 FILING

WHEREAS, the Committee considered presentations by the management and the Company's financial and legal advisors, regarding the financial situation of the Company, the strategic alternatives available to them, and the effect of the foregoing on the Company's businesses; and

WHEREAS, the Committee has had the opportunity to consult with the management and the Company's financial and legal advisors, and fully consider each of the strategic alternatives available to the Company.

NOW, THEREFORE, BE IT:

RESOLVED, that in the judgment of the Committee, it is desirable and in the best interests of the Company, its creditors, and other parties in interest, that the Company shall be, and hereby is, authorized to file or cause to be filed the voluntary petition for relief (the "Petition") and commence a case (the "Chapter 11 Case") under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and

RESOLVED, that any duly appointed officers of the Company (collectively, including, but not limited to, the Chief Executive Officer, the Chief Financial Officer and the General

EXHIBIT A

Counsel, the "<u>Authorized Officers</u>"), acting alone or with one or more other Authorized Officers be, and each of them hereby is, authorized, empowered, and directed to execute and file on behalf of the Company (i) to execute and verify the Petition as well as all other ancillary documents, and to cause the Petition to be filed with the Bankruptcy Court, and to make or cause to be made prior to the execution thereof any modifications to the Petition or ancillary documents and (ii) to execute, verify and file or cause to be filed all of the petitions, schedules, lists, and other motions, objections, replies, applications, papers, or documents, and to take any and all action that they deem necessary or proper to obtain such relief, including, without limitation, any action necessary or proper to maintain the ordinary course operation of the Company's businesses or to assist the Company in the Chapter 11 Case and in carrying out its duties under the provisions of the Bankruptcy Code.

## CASH COLLATERAL

WHEREAS, the Company will obtain benefits from its use of collateral, including cash collateral, as that term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), which is security for certain prepetition secured lenders (collectively, the "Secured Lenders") party to that certain Amended and Restated Credit Agreement, dated as of December 23, 2013, among the Company and Cumulus Media Holdings Inc., as borrower, certain lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, and certain guarantors thereto (the "Credit Agreement"), as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time.

NOW, THEREFORE, BE IT:

RESOLVED, that the Authorized Officers be, and hereby are, authorized, empowered and directed in the name of, and on behalf of, the Company to seek authorization to approval of the use of cash collateral pursuant to a postpetition cash collateral order in interim and final form, and any Authorized Officer be, and hereby is, authorized, empowered, and directed to negotiate, execute, and deliver any and all agreements, instruments, or documents, by or on behalf of the Company, necessary to implement the cash collateral, including providing for adequate protection to the Secured Lenders in accordance with section 363 of the Bankruptcy Code, as well as any additional or further agreements for and the use of cash collateral in connection with the Company's Chapter 11 Case, which agreements may require each Subsidiary to grant adequate protection to each Company's Secured Lenders and each other agreement, instrument, or document to be executed and delivered in

2

EXHIBIT A

connection therewith, by or on behalf of the Company pursuant thereto or in connection therewith, all with such changes therein and additions thereto as any Authorized Officer approves, such approval to be conclusively evidenced by the taking of such action or by the execution and delivery thereof.

## RESTRUCTURING SUPPORT AGREEMENT

WHEREAS, in connection with the Chapter 11 Case, the Company has negotiated a restructuring support agreement in form and substance generally similar to that certain restructuring support agreement attached as **Exhibit A** (the "Restructuring Support Agreement"), by and among the Company, on behalf of itself and each of its direct and indirect subsidiaries, certain Secured Lenders and certain holders of equity in the Company.

NOW, THEREFORE, BE IT:

RESOLVED, that the Company authorizes and directs the Authorized Officers of the Company to take all actions (including, without limitation, to negotiate and execute any agreements, documents and certificates) necessary to enter into the Restructuring Support Agreement and to consummate the transactions contemplated thereby in connection with the Chapter 11 Case and that each Subsidiary's performance of its obligations under the Restructuring Support Agreement hereby is, in all respects, authorized and approved.

## RETENTION OF PROFESSIONALS

RESOLVED, that each of the Authorized Officers be, and hereby is, authorized and directed to employ the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, as general bankruptcy counsel, to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance the Company's rights and obligations, including filing any motions, objections, replies, applications, or pleadings; and in connection therewith, each of the Authorized Officers, with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of Paul, Weiss, Rifkind, Wharton & Garrison LLP;

RESOLVED, that each of the Authorized Officers be, and hereby is, authorized and directed to employ the firm of PJT Partners LP, as investment banker, to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and

3

EXHIBIT A

to take any and all actions to advance the Company's rights and obligations; and in connection therewith, each of the Authorized Officers is, with power of delegation, hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of PJT Partners LP;

RESOLVED, that each of the Authorized Officers be, and hereby is, authorized and directed to employ the firm of Alvarez & Marsal North America, LLC, as restructuring advisor, to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance each of the Company's rights and obligations; and in connection therewith, each of the Authorized Officers is, with power of delegation, hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of Alvarez & Marsal North America, LLC;

RESOLVED, that each of the Authorized Officers be, and hereby is, authorized and directed to employ the firm of Epiq Bankruptcy Solutions, LLC as notice, claims, and balloting agent to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance the Company's rights and obligations; and in connection therewith, each of the Authorized Officers, with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of Epiq Bankruptcy Solutions, LLC;

RESOLVED, that each of the Authorized Officers be, and hereby is, authorized and directed to employ any other professionals to assist the Company in carrying out its duties under the Bankruptcy Code; and in connection therewith, each of the Authorized Officers, with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of any other professionals as necessary; and

RESOLVED, that each of the Authorized Officers be, and hereby is, with power of delegation, authorized, empowered, and directed to execute and file all petitions, schedules, motions, objections, replies, applications, pleadings, lists, and other papers and, in connection therewith, to employ and retain all assistance by legal counsel, accountants, investment bankers, financial advisors,

4

EXHIBIT A

restructuring advisors, and other professionals and to take and perform any and all further acts and deeds that each of the Authorized Officers deem necessary, proper, or desirable in connection with the Company's Chapter 11 case, with a view to the successful prosecution of the case.

## GENERAL

RESOLVED, that in addition to the specific authorizations heretofore conferred upon the Authorized Officers, each of the Authorized Officers (and their designees and delegates) be, and hereby is, authorized and empowered, in the name of and on behalf of the Company, to (a) take such further actions and execute and deliver such certificates, instruments, guaranties, notices and documents as may be required or as such officer may deem necessary, advisable or proper to carry out the intent and purpose of the foregoing resolutions, including the execution and delivery of any security agreements, pledges, financing statements and the like, (b) perform the obligations of the Company under the Bankruptcy Code, with all such actions to be performed in such manner, and all such certificates, instruments, guaranties, notices and documents to be executed and delivered in such form, as the officer performing or executing the same shall approve, and the performance or execution thereof by such officer shall be conclusive evidence of the approval thereof by such officer and by the Company and (c) pay fees and expenses in connection with the transactions contemplated by the foregoing resolutions;

RESOLVED, that the Committee has received sufficient notice of the actions and transactions relating to the matters contemplated by the foregoing resolutions, as may be required by the organizational documents of the Company, or hereby waives any right to have received such notice;

RESOLVED, that all acts, actions, and transactions relating to the matters contemplated by the foregoing resolutions done in the name of and on behalf of the Company, which acts would have been approved by the foregoing resolutions except that such acts were taken before the adoption of these resolutions, are hereby in all respects approved and ratified as the true acts and deeds of the Company with the same force and effect as if each such act, transaction, agreement, or certificate has been specifically authorized in advance by resolution of the Committee;

RESOLVED, that each of the Authorized Officers (and their designees and delegates) be, and hereby is, authorized and empowered to take all actions or to not take any action in the name

5

EXHIBIT A

of the Company with respect to the transactions contemplated by these resolutions hereunder as the sole shareholder, partner, member, managing member, or manager of each direct subsidiary of the Company, in each case, as such Authorized Officer shall deem necessary or desirable in such Authorized Officers' reasonable business judgment as may be necessary or convenient to effectuate the purposes of the transactions contemplated herein;

RESOLVED, that in connection with the transactions contemplated by the preceding resolutions, each Authorized Officer be, and each of them individually hereby is, authorized, in the name and on behalf of the Company, to certify these resolutions and any more formal or detailed resolutions as such officer may deem necessary, appropriate or desirable to effectuate the intent of the foregoing resolutions; and that thereupon such resolutions shall be deemed adopted as and for the resolutions of the Committee as if set forth at length herein;

FURTHER RESOLVED, that this consent may be executed in any number of counterparts, each of which shall be deemed to be an original, and such counterparts shall constitute but one and the same consent;

FURTHER RESOLVED, that facsimile or photostatic copies of signatures to this consent shall be deemed to be originals and may be relied on to the same extent as the originals; and

FURTHER RESOLVED, that the actions taken by this written consent shall have the same force and effect as if taken at a meeting of the Committee duly called and constituted pursuant to the By-Laws and the laws of the State of Delaware.

\*        \*        \*        \*        \*

EXHIBIT A

IN WITNESS WHEREOF, the undersigned has executed this Consent as of the date above first written.

_____
Mary G. Berner

_____
Jill Bright

_____
Ralph B. Everett

_____
Jeffrey A. Marcus

_____
Ross A. Oliver

_____
Jan Baker

*[Signature Page to Cumulus Media Inc. Written Consent]*

EXHIBIT A

IN WITNESS WHEREOF, the undersigned has executed this Consent as of the date above first written.

_____

Mary G. Berner

_____

Jill Bright

_____

Ralph B. Everett

_____

Jeffrey A. Marcus

_____

Ross A. Oliver

_____

Jan Baker

*[Signature Page to Cumulus Media Inc. Written Consent]*

EXHIBIT A

IN WITNESS WHEREOF, the undersigned has executed this Consent as of the date above first written.

_____
Mary G. Berner

_____
Jill Bright

_____
Ralph B. Everett

_____
Jeffrey A. Marcus

_____
Ross A. Oliver

_____
Jan Baker

*[Signature Page to Cumulus Media Inc. Written Consent]*

EXHIBIT A

IN WITNESS WHEREOF, the undersigned has executed this Consent as of the date above first written.

_____
Mary G. Berner


_____
Jill Bright


_____
Ralph B. Everett


_____
Jeffrey A. Marcus


_____
Ross A. Oliver


_____
Jan Baker


[*Signature Page to Cumulus Media Inc. Written Consent*]


EXHIBIT A

IN WITNESS WHEREOF, the undersigned has executed this Consent as of the date above first written.

_____
Mary G. Berner

_____
Jill Bright

_____
Ralph B. Everett

_____
Jeffrey A. Marcus

_____
Ross A. Oliver

*David J. Baker*
_____
Jan Baker

*[Signature Page to Cumulus Media Inc. Written Consent]*

EXHIBIT A

Exhibit 2.1

EX-2.1

10/15/2018

EX-2.1 2 d595577dex21.htm EX-2.1

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Tel: 212-373-3000
Fax: 212-757-3990
Paul M. Basta
Lewis R. Clayton
Jacob A. Adlerstein
Claudia R. Tobler

*Counsel for Debtors and
Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| CUMULUS MEDIA INC., *et al.*, | Case No. 17-13381 (SCC) |
| **Debtors.** [1] | (Jointly Administered) |

**FIRST AMENDED JOINT PLAN OF REORGANIZATION OF CUMULUS MEDIA INC.
AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1] The last four digits of Cumulus Media Inc.'s tax identification number are 9663. Because of the large number of Debtors in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/cumulus. The location of the Debtors' service address is: 3280 Peachtree Road, N.W., Suite 2200, Atlanta, Georgia 30305.

EXHIBIT B

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW |  | 1 |
| A. | Defined Terms | 1 |
| B. | Rules of Interpretation | 15 |
| C. | Computation of Time | 15 |
| D. | Governing Law | 15 |
| E. | Reference to Monetary Figures | 16 |
| F. | Reference to the Debtors or the Reorganized Debtors | 16 |
| ARTICLE II. ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS |  | 16 |
| A. | Administrative Claims | 16 |
| B. | Professional Compensation | 16 |
| C. | Priority Tax Claims | 17 |
| D. | Statutory Fees | 18 |
| ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS |  | 18 |
| A. | Classification of Claims and Interests | 18 |
| B. | Summary of Classification | 18 |
| C. | Treatment of Claims and Interests | 19 |
| D. | Voting of Claims | 23 |
| E. | No Substantive Consolidation | 23 |
| F. | Acceptance by Impaired Classes | 23 |
| G. | Special Provision Governing Claims | 23 |
| H. | Elimination of Vacant Classes | 23 |
| I. | Consensual Confirmation | 24 |
| J. | Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code | 24 |
| K. | Controversy Concerning Impairment or Classification | 24 |
| L. | Subordinated Claims | 24 |
| ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN |  | 24 |
| A. | Sources of Consideration for Plan Distributions | 24 |
| B. | First Lien Exit Facility | 25 |
| C. | New Revolving Credit Facility | 25 |
| D. | Issuance and Distribution of New Securities | 25 |
| E. | Settlement of Claims and Interests | 26 |
| F. | Restructuring Transactions | 26 |
| G. | Corporate Existence | 26 |
| H. | FCC Licenses | 26 |
| I. | Vesting of Assets in the Reorganized Debtors | 27 |
| J. | Cancellation of Existing Indebtedness and Securities | 27 |
| K. | Corporate Action | 28 |
| L. | New Certificates of Incorporation and New By-Laws | 28 |
| M. | Directors and Officers of the Reorganized Debtors | 28 |
| N. | Employee Obligations | 29 |
| O. | Effectuating Documents; Further Transactions | 29 |
| P. | Management Incentive Plan | 29 |

EX-2.1

| | | |
|---|---|---|
| Q. | Exemption from Certain Taxes and Fees | 29 |
| R. | Indemnification Provisions | 30 |
| S. | Preservation of Causes of Action | 30 |

ARTICLE V: TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | | 30

| | | |
|---|---|---|
| A. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 30 |
| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 31 |
| C. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 31 |
| D. | Certain Customer Agreements | 32 |
| E. | Insurance Policies | 32 |
| F. | Indemnification Provisions | 33 |
| G. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 33 |
| H. | Reservation of Rights | 33 |
| I. | Nonoccurrence of Effective Date | 33 |
| J. | Contracts and Leases Entered Into After the Petition Date | 33 |

ARTICLE VI: PROVISIONS GOVERNING DISTRIBUTIONS | | 34

| | | |
|---|---|---|
| A. | Timing and Calculation of Amounts to Be Distributed | 34 |
| B. | Distributions on Account of Obligations of Multiple Debtors | 34 |
| C. | Disbursing Agent | 34 |
| D. | Rights and Powers of Disbursing Agent | 34 |
| E. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 35 |
| F. | Manner of Payment | 36 |
| G. | Section 1145 Exemption | 36 |
| H. | Compliance with Tax Requirements | 37 |
| I. | Allocations | 37 |
| J. | Setoffs and Recoupment | 37 |
| K. | Claims Paid or Payable by Third Parties | 38 |
| L. | Foreign Current Exchange Rate | 38 |

ARTICLE VII: PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS | | 39

| | | |
|---|---|---|
| A. | Resolution of Disputed Claims | 39 |
| B. | Disallowance of Claims | 40 |
| C. | Amendments to Proofs of Claim | 40 |
| D. | No Distributions Pending Allowance | 40 |
| E. | Distributions After Allowance | 40 |
| F. | Reserve of Special Warrants | 41 |
| G. | No Interest | 41 |

ARTICLE VIII: SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS | | 41

| | | |
|---|---|---|
| A. | Compromise and Settlement of Claims, Interests, and Controversies | 41 |
| B. | Discharge of Claims and Termination of Interests | 41 |
| C. | Release of Liens | 42 |
| D. | Releases by the Debtors | 42 |
| E. | Releases by the Releasing Parties | 43 |
| F. | Regulatory Activities | 44 |
| G. | Exculpation | 44 |
| H. | Injunction | 44 |
| I. | Term of Injunctions or Stays | 45 |
| J. | Recoupment | 45 |
| K. | Protection Against Discriminatory Treatment | 45 |

EXHIBIT B

EX-2.1

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ... 46

A.    Conditions Precedent to the Effective Date ... 46
B.    Waiver of Conditions ... 46
C.    Effect of Failure of Conditions ... 47

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ... 47

A.    Modification and Amendments ... 47
B.    Effect of Confirmation on Modifications ... 47
C.    Revocation or Withdrawal of Plan ... 47

ARTICLE XI. RETENTION OF JURISDICTION ... 48

ARTICLE XII. MISCELLANEOUS PROVISIONS ... 50

A.    Immediate Binding Effect ... 50
B.    Substantial Consummation ... 50
C.    Further Assurances ... 50
D.    Statutory Committee and Cessation of Fee and Expense Payment ... 50
E.    Reservation of Rights ... 50
F.    Successors and Assigns ... 50
G.    Notices ... 51
H.    Entire Agreement ... 52
I.    Exhibits ... 52
J.    Severability of Plan Provisions ... 52
K.    Votes Solicited in Good Faith ... 52
L.    Closing of Chapter 11 Cases ... 53
M.    Conflicts ... 53

EXHIBIT B

EX-2.1

## INTRODUCTION

Cumulus Media Inc. ("Cumulus") and its debtor affiliates, as debtors and debtors in possession, propose this joint plan of reorganization (the "Plan") for the resolution of the Claims against and Interests in each of the Debtors pursuant to chapter 11 of the Bankruptcy Code.

Pursuant to section 1125(b) of the Bankruptcy Code, votes to accept or reject a plan of reorganization cannot be solicited from holders of claims or interests entitled to vote on a plan until a disclosure statement has been approved by a bankruptcy court and distributed to such holders. On February 2, 2018, the Bankruptcy Court entered the Disclosure Statement Order that, among other things, approved the Disclosure Statement, set voting procedures, and scheduled the Confirmation Hearing.

HOLDERS OF CLAIMS AND INTERESTS SHOULD REFER TO THE DISCLOSURE STATEMENT FOR A DISCUSSION OF THE DEBTORS' HISTORY, BUSINESS, ASSETS, RESULTS OF OPERATIONS, HISTORICAL FINANCIAL INFORMATION AND PROJECTIONS OF FUTURE OPERATIONS, AS WELL AS A SUMMARY AND DESCRIPTION OF THIS PLAN.

## ARTICLE I.
### DEFINED TERMS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms.*

As used in this Plan, capitalized terms have the meanings ascribed to them below.

1.    "*Accrued Professional Compensation Claims*" means, at any given time, all Claims against any Debtor for accrued, contingent, and/or unpaid fees and expenses (including success fees) that are allowable before the Effective Date by any retained Professional in the Chapter 11 Cases that the Bankruptcy Court has not denied by Final Order, in all cases to the extent that any such fees and expenses (a) have not been previously paid (regardless of whether a fee application has been Filed for any such amount) and (b) have not been applied against any retainer that has been provided to such Professional, in each case in accordance with the Interim Compensation Order. To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses (whether or not paid pursuant to an order granting interim allowance), then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation Claims.

2.    "*Administrative Claim*" means a Claim against any Debtor for costs and expenses of administration of the Chapter 11 Cases arising on or prior to the Effective Date and Allowed pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business; (b) Allowed Accrued Professional Compensation Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

3.    "*Administrative Claims Bar Date*" means the date that is thirty (30) calendar days after the Effective Date.

4.    "*Administrative Claims Objection Deadline*" means the date that is seventy-five (75) calendar days after the Effective Date.

5.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

6.    "*Allowed*" means, when used in reference to a Claim, all or that portion, as applicable, of any Claim against any Debtor that (i) has been listed in the Schedules (as such Schedules may be amended by the Debtors from time to time) as liquidated in amount and not disputed or contingent, and for which no contrary or

EXHIBIT B

EX-2.1

superseding Proof of Claim has been timely Filed or that the Debtors do not timely object to in accordance with Article VII of the Plan, (ii) has been expressly allowed by Final Order or under the Plan, (iii) has been compromised, settled or otherwise resolved pursuant to Article VII of the Plan, the Bankruptcy Rules, Local Rules, another Final Order of the Bankruptcy Court, or (iv) is evidenced by a Proof of Claim Filed by the Claims Bar Date or (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim is not or shall not be required to be Filed) that the Debtors or any other party in interest do not timely object to in accordance with Article VII of the Plan, *provided, however,* that Claims allowed solely for the purpose of voting to accept or reject the Plan shall not be considered "Allowed" for any other purpose under the Plan or otherwise, except if and to the extent otherwise determined to be Allowed as provided herein. Unless otherwise specified under the Plan, under the Bankruptcy Code, by order of the Bankruptcy Court or as otherwise agreed by the Debtors, Allowed Claims shall not, for any purpose under the Plan, include any interest, costs, fees or charges on such Claims from and after the Petition Date, and no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor. For the avoidance of doubt, (x) a Proof of Claim Filed after the Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim and (y) a Disputed Claim shall not become an Allowed Claim unless as otherwise provided for in the Plan. "Allow" and "Allowing" shall have correlative meanings.

7.    *"Avoidance Actions"* means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by any of the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law.

8.    *"Ballot"* means the form or forms distributed to certain Holders of Claims entitled to vote on the Plan by which such parties may indicate acceptance or rejection of the Plan, which shall be subject to the rights of the Term Lender Group set forth in the Restructuring Support Agreement (including any and all exhibits thereto).

9.    *"Bankruptcy Code"* means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

10.    *"Bankruptcy Court"* means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of any withdrawal of the reference under section 157(d) of the Judicial Code, the United States District Court for the Southern District of New York.

11.    *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

12.    *"Business Day"* means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

13.    *"Case Management Procedures"* means the procedures pursuant to the *Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 Implementing Certain Notice and Case Management Procedures* [Docket No. 73].

14.    *"Cash"* means the legal tender of the United States of America.

15.    *"Cash Collateral Order"* means the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 363(c)(2), and 507 (1) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Secured Parties, and (III) Granting Related Relief,* entered on December 21, 2017 [Docket No. 164].

16.    *"Cause of Action"* means, without limitation, any action, Claim, cause of action, controversy, demand, right, right of setoff, cross claim, counterclaim, recoupment, claim for breach of duty imposed by law or in equity, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense,

2

EXHIBIT B

offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured, or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, under the Bankruptcy Code or applicable nonbankruptcy law, or pursuant to any other theory of law.

17.    "*Chapter 11 Cases*" means the jointly administered chapter 11 cases Filed for the Debtors in the Bankruptcy Court and currently styled *In re Cumulus Media Inc.*, Case No. 17-13381 (SCC) (Jointly Administered)

18.    "*Claim*" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code.

19.    "*Claims and Interests*" means Claims against, and Interests in, any Debtor.

20.    "*Claims Bar Date*" means the date by which a Proof of Claim must be or must have been Filed, as established by (a) the Claims Bar Date Order, or (b) any other Final Order of the Bankruptcy Court, as applicable.

21.    "*Claims Bar Date Order*" means an order to be entered by the Bankruptcy Court, establishing the Claims Bar Date.

22.    "*Claims Objection Deadline*" means the deadline for objecting to a Claim against any Debtor, which shall be on the date that is the later of (a) 180 calendar days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to such Claims.

23.    "*Claims or Interests*" means Claims against, or Interests in, any Debtor.

24.    "*Claims Register*" means the official register of Claims against the Debtors maintained by the Voting and Claims Agent;

25.    "*Class*" means a class of Claims or Interests as set forth in Article III pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

26.    "*Class A Common Stock*" means the class A common stock, par value $.001 per share, of Reorganized Cumulus issued on the Effective Date, or upon exercise of the Special Warrants, which for the avoidance of doubt may include Restricted Stock.

27.    "*Class B Common Stock*" means the limited voting class B common stock, par value $.001 per share, of Reorganized Cumulus issued on the Effective Date, or upon exercise of the Special Warrants, which for the avoidance of doubt may include Restricted Stock, the terms of which Class B Common Stock will provide that it may be converted at the election of the Holder into Class A Common Stock on a one for one basis (subject to adjustment for stock splits, combinations, dividends or distributions with respect to the Class A Common Stock), subject to a determination by Reorganized Cumulus that such conversion would not result in a violation of the Communications Act or FCC rules and any necessary FCC approval.

28.    "*Class B Election*" means an election made by a Holder of an Allowed Credit Agreement Claim, Allowed Senior Notes Claim or Allowed General Unsecured Claim on the Ownership Certification that such Holder elects to receive Class B Common Stock in lieu of Class A Common Stock.

29.    "*Committee*" means the statutory committee of unsecured creditors of the Debtors, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on December 11, 2017, the membership of which may be reconstituted from time to time.

3

EX-2.1

30.  *"Communications Act"* means Chapter 5 of Title 47 of the United States Code, 47 U.S.C. § 151 *et seq.*, as amended.

31.  *"Confirmation"* means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

32.  *"Confirmation Date"* means the date upon which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

33.  *"Confirmation Hearing"* means the confirmation hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

34.  *"Confirmation Order"* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the transactions contemplated thereby.

35.  *"Consenting Equityholders"* means, collectively, the Holders of Interests in Cumulus party to the Restructuring Support Agreement.

36.  *"Consenting Term Loan Lenders"* means, collectively, the Term Loan Lenders party to the Restructuring Support Agreement.

37.  *"Consummation"* means the occurrence of the Effective Date.

38.  *"Convenience Claim"* means a General Unsecured Claim that is either (a) in an amount that is equal to or less than $20,000 or (b) in an amount that is greater than $20,000, but with respect to which the Holder of such General Unsecured Claim voluntarily and irrevocably reduces the aggregate amount of such Claim to $20,000 pursuant to a valid election by the Holder of such General Unsecured Claim made on its Ballot on or before the Plan Voting Deadline.

39.  *"Convenience Class Cap"* means $2 million in the aggregate or such greater amount that is subject to the prior written consent of the Term Lender Group.

40.  *"Credit Agreement"* means that certain Amended and Restated Credit Agreement, dated as of December 23, 2013, among Cumulus, Cumulus Media Holdings Inc., as borrower, certain lenders party thereto, the Credit Agreement Agent, and certain other agents party thereto.

41.  *"Credit Agreement Agent"* means JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the Credit Agreement (or any successor to JPMorgan Chase Bank, N.A., in such capacity).

42.  *"Credit Agreement Claim"* means any Claim against any Debtor derived from, based upon, relating to, or arising from the Credit Agreement or the related Loan Documents (as defined in the Credit Agreement).

43.  *"Credit Documents"* means, collectively, the (a) Credit Agreement, (b) each security agreement, guaranty, pledge agreement, mortgage, and any other document entered into pursuant to or in connection with the Credit Agreement, and (c) each other agreement that creates or purports to create or perfect a Lien or security interest in favor of the Credit Agreement Agent and/or the Term Loan Lenders.

44.  *"Cumulus"* means Cumulus Media Inc.

4

EXHIBIT B

45. "*Cure Claim*" means a Claim against any Debtor based upon such Debtor's monetary default under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed or assumed and assigned by such Debtor or Reorganized Debtor, as applicable, pursuant to section 365 of the Bankruptcy Code.

46. "*Cure Notice*" means a notice of a proposed amount of Cash to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include the amount of Cure Claim (if any) to be paid in connection therewith.

47. "*Debtor*" means one of the Debtors, in its individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

48. "*Debtor Release*" means the releases set forth in Article VIII.D of the Plan.

49. "*Debtors*" means, collectively: Cumulus Media Inc., Cumulus Media Holdings Inc., Consolidated IP Company LLC, Broadcast Software International, Incentrev-Radio Half Off, LLC, Cumulus Intermediate Holdings Inc., Incentrev LLC, Cumulus Network Holdings Inc., Cumulus Radio Corporation, LA Radio, LLC, KLOS-FM Radio Assets, LLC, Detroit Radio, LLC, DC Radio Assets, LLC, Chicago FM Radio Assets, LLC, Chicago Radio Assets, LLC, Atlanta Radio, LLC, Minneapolis Radio Assets, LLC, NY Radio Assets, LLC, Radio Assets LLC, San Francisco Radio Assets, LLC, WBAP-KSCS Assets, LLC, WPLJ Radio, LLC, Westwood One, Inc., CMP Susquehanna Radio Holdings Corp., Cumulus Broadcasting LLC, Dial Communications Global Media, LLC, Radio Networks, Inc., Westwood One Radio Networks, Inc., CMP Susquehanna Corp., Catalyst Media, Inc., CMI Receivables Funding LLC, Susquehanna Pfaltzgraff Co., CMP KC Corp., Susquehanna Media Co., Susquehanna Radio Corp., KLIF Broadcasting, Inc., and Radio Metroplex, Inc.

50. "*Debtors' Case Information Website*" means http://dm.epiq11.com/cumulus.

51. "*Declaratory Ruling*" means a declaratory ruling adopted by the FCC granting the relief requested in the Petition for Declaratory Ruling

52. "*Description of Transaction Steps*" means the description of the Restructuring Transactions as set forth in the Plan Supplement.

53. "*Disallowed*" means, with reference to any Claim or a portion of a Claim against any Debtor that (a) has been disallowed by a Final Order of the Bankruptcy Court, (b) has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as $0, contingent, disputed, or unliquidated and as to which no Proof of Claim has been Filed by the applicable Claims Bar Date or deemed timely Filed pursuant to any Final Order of the Bankruptcy Court, (c) has been agreed to by the Holder of such Claim and the applicable Debtor to be equal to $0 or to be expunged, (d) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any Proof of Claim, or (e) has not been listed by such Debtor on the Schedules and as to which no Proof of Claim has been Filed by the applicable Claims Bar Date or deemed timely or properly Filed pursuant to any Final Order of the Bankruptcy Court. In each case a Disallowed Claim is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

54. "*Disbursing Agent*" means the Reorganized Debtors or the Entity selected by the Reorganized Debtors to make or facilitate distributions contemplated under the Plan.

55. "*Disclosure Statement*" means the disclosure statement related to the Plan, including all exhibits and schedules thereto and references therein, which shall be subject to the rights of the Debtors and the Term Lender Group set forth in the Restructuring Support Agreement (including any and all exhibits thereto), as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

5

EX-2.1

EXHIBIT B

https://www.sec.gov/Archives/edgar/data/1058623/000119312518183509/d5955777dex21.htm     9/65

56. *"Disclosure Statement Order"* means the Order Approving (A) the Adequacy of the Disclosure Statement; (B) Solicitation and Notice Procedures with Respect to Confirmation of the Joint Plan of Reorganization of Cumulus Media Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code; (C) the Form of Ballots and Notices in Connection Therewith; (D) the Scheduling of Certain Dates with Respect Thereto; and (E) Related Relief [Docket No. 416].

57. *"Disputed"* means, with respect to a Claim against any Debtor, (a) any Claim, proof of which was timely and properly Filed, which is disputed under Article VII of this Plan or as to which the Debtors or any other party in interest have interposed and not withdrawn an objection or request for estimation (pursuant to Article VII of this Plan or otherwise) that has not been determined by a Final Order, (b) any Claim, proof of which was required to be Filed by order of the Bankruptcy Court but as to which a Proof of Claim was not timely or properly Filed, (c) any Claim that is listed in the Schedules as unliquidated, contingent, or disputed, or (d) any Claim that is otherwise disputed by any of the Debtors, the Reorganized Debtors or any other party in interest, which dispute has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court. For the avoidance of doubt, if no Proof of Claim has been Filed by the applicable Claims Bar Date and the Claim is not listed on the Schedules as $0, disputed, contingent, or unliquidated, such Claim shall be Disallowed and shall be expunged from the Claims Register without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

58. *"Disputed Claim Reserve"* means the reserve of Special Warrants created pursuant to Article VII.E of this Plan.

59. *"Distribution Record Date"* means the Confirmation Date or such later date as agreed to by the Reorganized Debtors and the Term Lender Group in their sole and absolute discretion; *provided, however,* that no distribution record date shall apply to the Senior Notes or any other publicly-held Securities.

60. *"DTC"* means the Depository Trust Company.

61. *"Effective Date"* means the first Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been satisfied or waived pursuant to Article IX.A and Article IX.B, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

62. *"Employee Obligations"* means the Debtors' written contracts, agreements, policies, programs and plans for, among other things, compensation, reimbursement, indemnity, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, including in the event of a change of control after the Effective Date, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the directors, officers and employees of any of the Debtors who served in such capacity at any time (including any compensation programs approved by the Bankruptcy Court).

63. *"Entity"* means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

64. *"Estate"* means, as to each Debtor, the estate created for such Debtor by section 541 of the Bankruptcy Code.

65. *"Equity Allocation Mechanism"* means the methodology for allocating the New Securities among the Holders of Allowed Credit Agreement Claims, Allowed Senior Notes Claims, and Allowed General Unsecured Claims, set forth on Exhibit A hereto.

66. *"Excul[pated] Causes of Action"* means any Causes of Action or Claim related to any act or omission derived from, based upon, related to, or arising from the Debtors' in or out-of-court restructuring efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, solicitation or Filing of the Disclosure Statement, the Plan (including any term sheets related thereto), or any contract, instrument, release, or other

6

EXHIBIT B

EX-2.1

agreement or document created or entered into in connection with any of the foregoing, the funding of this Plan, the occurrence of the Effective Date, the administration of this Plan, the pursuit of Confirmation or Consummation, and the administration and implementation of the Plan, including (a) the New Corporate Governance Documents, (b) the First Lien Exit Facility, (c) the New Revolving Credit Facility (if any), (d) the Restructuring Transactions, (e) the Restructuring Support Agreement, (f) the issuance of the New Securities (g) the Management Incentive Plan, and (g) the distribution of property under the Plan or any other agreement under the Plan; *provided*, that the Exculpated Parties shall be entitled, in all respects, to reasonably rely upon the advice of counsel with respect to the foregoing.

67.    "*Exculpated Party*" means each of: (a) the Debtors, (b) the Reorganized Debtors, (c) the Consenting Term Loan Lenders, (d) the Consenting Equity holders, (e) the Credit Agreement Agent, (f) with respect to each of the foregoing Entities in clauses (a) through (e), the manager, management company, or investment advisor of any of the foregoing, and each of such Entities' respective current and former Affiliates, predecessors, successors, assigns, subsidiaries, managed accounts or funds, and (g) with respect to each of the foregoing Entities (a) through (f), such Entities' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

68.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

69.    "*Federal Judgment Rate*" means the interest rate applicable to a judgment entered on the Petition Date that is subject to section 1961 of the Judicial Code, as determined in accordance with that statute.

70.    "*FCC*" means the Federal Communications Commission, including any official bureau or division thereof acting on delegated authority, and any successor governmental agency performing functions similar to those performed by the Federal Communications Commission on the Effective Date.

71.    "*FCC Applications*" means collectively, each application, petition, or other request filed with the FCC in connection with this restructuring and the Plan.

72.    "*FCC Approval*" means the FCC's grant of the FCC Long Form Application.

73.    "*FCC Licenses*" means broadcasting and other licenses, authorizations, waivers and permits that are issued from time to time by the FCC.

74.    "*FCC Long Form Application*" means the applications filed with the FCC seeking FCC consent to the Transfer of Control.

75.    "*FCC Ownership Procedures Order*" means an order to be entered by the Bankruptcy Court establishing procedures for, among other things, completion and submission of the Ownership Certification.

76.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court, the Clerk of the Bankruptcy Court, or any of its or their authorized designees in the Chapter 11 Cases, including with respect to a Proof of Claim, the Voting and Claims Agent.

77.    "*Final Order*" means an order, ruling or judgment of the Bankruptcy Court (or any other court of competent jurisdiction entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court), which has not been reversed, stayed, modified, amended or vacated, and as to which (a) the time to appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order, ruling or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or

7

EXHIBIT B

EX-2.1

certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been granted, or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

78.    "*First Lien Exit Credit Agreement*" means the credit agreement evidencing the First Lien Exit Facility.

79.    "*First Lien Exit Facility*" means the new first lien term loan facility to be entered into by the Reorganized Debtors on the terms consistent with those set forth in the First Lien Exit Facility Term Sheet.

80.    "*First Lien Exit Facility Agent*" means JPMorgan Chase Bank, N.A., or another financial institution, in its capacity as administrative agent under the First Lien Exit Facility.

81.    "*First Lien Exit Facility Term Sheet*" means the term sheet attached as Annex B to the Restructuring Term Sheet setting forth the material terms and conditions of the First Lien Exit Facility.

82.    "*First Lien Exit Facility Documents*" means the First Lien Exit Credit Agreement and each guarantee, security agreement, deed of trust, mortgage, or other documents and agreements entered into in connection with the First Lien Exit Facility.

83.    "*General Unsecured Claim*" means any Unsecured Claim against the Debtors that is not (a) an Administrative Claim, (b) a Priority Tax Claim, (c) a Priority Non-Tax Claim, (d) an Accrued Professional Compensation Claim, (e) a Credit Agreement Claim, (f) a Senior Notes Claim, (g) a Convenience Claim, (h) a Subordinated Claim, or (i) an Intercompany Claim, or is otherwise determined by the Bankruptcy Court to be a General Unsecured Claim.

84.    "*Governmental Unit*" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

85.    "*Holder*" means an Entity holding a Claim or Interest.

86.    "*Indemnification Provisions*" means each of the Debtors' indemnification provisions currently in place as of the Petition Date, whether in the Debtors' by-laws, certificates of incorporation, other formation documents, board resolutions, or in the contracts of the current and former directors, officers, managers, employees, attorneys, other professionals, and agents of the Debtors.

87.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

88.    "*Intercompany Claim*" means any Claim held by a Debtor or a wholly-owned subsidiary of a Debtor against a Debtor.

89.    "*Intercompany Interest*" means an Interest held by a Debtor in another Debtor or Debtor Affiliate.

90.    "*Interests*" means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto, whether or not fully-vested or vesting in the future, that existed immediately before the Effective Date.

8

EXHIBIT B

12/65

EX-2.1

91.  *"Interim Compensation Order"* means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* entered on December 21, 2017 [Docket No. 161].

92.  *"Judicial Code"* means title 28 of the United States Code, 28 U.S.C. §§ 1-5001.

93.  *"Lien"* means a lien as defined in section 101(37) of the Bankruptcy Code.

94.  *"Local Rules"* means the Local Rules of the United States Bankruptcy Court for the Southern District of New York.

95.  *"Management Employment Agreements"* means those management employment agreements by and between any Debtor and such Debtor's employees existing and effective as of the Petition Date.

96.  *"Management Incentive Plan"* means that certain management incentive plan of the Reorganized Debtors to be in effect on and after the Effective Date, which is consistent in all respects with the Management Incentive Plan term sheet attached as Annex C to the Restructuring Term Sheet, the material terms of which shall be set forth in the Plan Supplement.

97.  *"Merlin Claims"* means all Claims against the Debtors arising under, relating to, or in connection with that certain Put and Call Agreement, dated as of January 2, 2014, by and among Merlin Media, LLC, Merlin Media License, LLC, Chicago FM Radio Assets, LLC, and Radio License Holdings LLC for WLUP-FM and WIQI(FM), which Claims shall be deemed Subordinated Claims unless they are otherwise Allowed as General Unsecured Claims, whether by Bankruptcy Court order or otherwise.

98.  *"New Boards"* means, collectively, the New Cumulus Board and the New Subsidiary Boards, as initially established on the Effective Date in accordance with the terms of the Plan and the applicable New Corporate Governance Documents, the selection of which shall be consistent in all material respects with the Restructuring Term Sheet.

99.  *"New By-Laws"* means the form of the by-laws or the limited liability company agreements, as applicable, of each of the Reorganized Debtors effective on and after the Effective Date, each substantially in the form included in the Plan Supplement, and each of which shall be consistent in all material respects with the Restructuring Term Sheet.

100.  *"New Certificates of Incorporation"* means the form of the certificates of incorporation or the certificates of formation, as applicable, of each of the Reorganized Debtors, effective on and after the Effective Date, each substantially in the form included in the Plan Supplement, and each of which shall be consistent in all material respects with the Restructuring Term Sheet.

101.  *"New Common Stock"* means, collectively, the Class A Common Stock and the Class B Common Stock.

102.  *"New Corporate Governance Documents"* means, as applicable, the New Certificates of Incorporation, the New By-Laws, or such other applicable formation documents of each of the Reorganized Debtors, including the New Shareholders' Agreement, if any, effective on and after the Effective Date, each in form and substance satisfactory to each of the Debtors and the Term Lender Group, and each consistent in all material respects with the Restructuring Term Sheet.

103.  *"New Cumulus Board"* means the initial board of directors of Reorganized Cumulus on the Effective Date, as set forth in the Plan Supplement, the selection of which shall be consistent in all material respects with the Restructuring Term Sheet.

9

EXHIBIT B

EX-2.1

104. *"New Revolving Credit Facility"* means a new asset-based or other revolving credit facility to be provided to the Reorganized Debtors under the New Revolving Credit Facility Agreement and other New Revolving Credit Facility Documents, consistent in all material respects with the Restructuring Term Sheet.

105. *"New Revolving Credit Facility Agent"* means a financial institution in its capacity as administrative agent, collateral agent, and/or issuing bank under the New Revolving Credit Facility.

106. *"New Revolving Credit Facility Agreement"* means the credit agreement governing the New Revolving Credit Facility, consistent in all material respects with the Restructuring Term Sheet.

107. *"New Revolving Credit Facility Documents"* means, collectively, the New Revolving Credit Facility Agreement and any amendments, restatements, modifications, or supplements thereto, as well as any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, modifications, or supplements of any of the foregoing) related to or executed in connection with the New Revolving Credit Facility Agreement, consistent in all material respects with the Restructuring Term Sheet.

108. *"New Shareholders' Agreement"* means that certain shareholders' agreement, if any, effective as of the Effective Date, addressing certain matters relating to New Common Stock, a form of which will be included in the Plan Supplement, which shall be consistent in all material respects with the Restructuring Term Sheet.

109. *"New Subsidiary Boards"* means, with respect to each of the Reorganized Debtors other than Reorganized Cumulus, the initial board of directors, board of managers, or member, as the case may be, of each such Reorganized Debtor as set forth in the Plan Supplement each of which shall be acceptable to the Term Lender Group.

110. *"New Securities"* means, collectively, the New Common Stock and the Special Warrants.

111. *"Opt-Out Forms"* means election forms distributed to Holders of Claims or Interests, as applicable, in Classes 1, 2, 8 and 10, for such Holders to complete if they elect not to grant the Third-Party Release.

112. *"Other Secured Claim"* means any Secured Claim that is not a Credit Agreement Claim.

113. *"Ownership Certification"* means a written certification, in the form attached to the FCC Ownership Procedures Order, which shall be sufficient to enable the Debtors, in consultation with the Term Lender Group, or Reorganized Cumulus, as applicable, to determine (x) the extent to which direct and indirect voting and equity interests of the certifying party are held by non-U.S. Persons, as determined under section 310(b) of the Communications Act and the FCC rules, and (y) whether the holding of more than 4.99% of the Class A Common Stock by the certifying party would result in a violation of FCC ownership rules or be inconsistent with the FCC Approval.

114. *"Person"* means a person as such term is defined in section 101(41) of the Bankruptcy Code.

115. *"Petition Date"* means November 29, 2017, the date on which each of the Debtors commenced its respective Chapter 11 Case.

116. *"Petition for Declaratory Ruling"* means a filing with the FCC by Cumulus pursuant to 47 C.F.R. § 1.5000 for Reorganized Cumulus to exceed the 25% indirect foreign ownership benchmark in 47 U.S.C. § 310(b)(4).

117. *"Plan"* means this *First Amended Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented from time to time), including the Plan Supplement and all exhibits, supplements, appendices and schedules thereto, which are incorporated herein by reference.

10

EXHIBIT B

EX-2.1

118.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, which shall be subject to the rights of the Debtors and the Term Lender Group set forth in the Restructuring Support Agreement (including any and all exhibits thereto), and solely with respect to the rights of the Debtors and the First Lien Exit Credit Agreement, reasonably acceptable to the First Lien Exit Facility Agent, to be Filed by the Debtors no later than five (5) calendar days before the Plan Voting Deadline, and as may be amended, modified, or supplemented from time to time in accordance with the terms hereof, the Restructuring Support Agreement, the Bankruptcy Code, and the Bankruptcy Rules, including the following: (a) the New Corporate Governance Documents for the Reorganized Debtors; (b) the Schedule of Rejected Executory Contracts and Unexpired Leases; (c) a list of retained Causes of Action; (d) the members of the New Cumulus Board; (e) the Description of Transaction Steps; (f) the documents needed to effectuate the Management Incentive Plan; (g) the First Lien Exit Credit Agreement; (h) the New Revolving Credit Facility Agreement (if any); and (i) the Special Warrants (and the underlying Warrant Agreement). Any reference to the Plan Supplement in this Plan shall include each of the documents identified in (a) through (i) above. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with Article X.A of the Plan, and the Reorganized Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement in accordance with applicable law, subject in all respects to the rights of the Term Lender Group set forth in the Restructuring Support Agreement.

119.    "*Plan Voting Deadline*" means the date set by the Bankruptcy Court in the Disclosure Statement Order by which Ballots and Opt-Out Forms must be received by the Voting and Claims Agent.

120.    "*Priority Non-Tax Claims*" means any Claim against any Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

121.    "*Priority Tax Claims*" means any Claim against any Debtor of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

122.    "*Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 330, 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

123.    "*Professional/Fee Escrow Account*" means an account, which may be interest-bearing, funded by the Debtors with Cash on or prior to the Effective Date in an amount equal to the Professional Fee Escrow Amount.

124.    "*Professional Fee Escrow Amount*" means the aggregate amount of Accrued Professional Compensation Claims and other unpaid fees and expenses that Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B of the Plan.

125.    "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

126.    "*Pro Rata*" means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Interests, as applicable, in that Class, or the proportion of the Allowed Claims and Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Interest under the Plan.

127.    "*Reinstated*" means, with respect to any Claim or Interest, the treatment provided for in section 1124 of the Bankruptcy Code.

11

EXHIBIT B

15/65

EX-2.1

128. "*Released Party*" means each of: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Term Loan Lenders; (d) the Credit Agreement Agent; (e) the Consenting Equityholders; (f) the Committee; (g) each of the members of the Committee; (h) the Senior Notes Indenture Trustee; (i) with respect to each of the foregoing Entities in clauses (a) through (h), each of such Entity's respective current and former Affiliates, predecessors, successors, assigns, subsidiaries, managed accounts or funds; and (j) with respect to each of the foregoing Entities in clauses (a) through (i), such Entities' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, management companies, investment advisors, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided, that* any Holder of a Claim or Interest that elects to opt-out of the Third-Party Release shall not constitute a Released Party (even if for any reason otherwise entitled).

129. "*Releasing Parties*" means each of: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Term Loan Lenders; (d) the Credit Agreement Agent; (e) the Consenting Equityholders; (f) the Committee; (g) each of the members of the Committee; (h) the Senior Notes Indenture Trustee; (i) all Holders of Claims and Interests that are deemed Unimpaired and presumed to accept the Plan and do not elect to opt-out of the Third-Party Release; (j) all Holders of Claims and Interests entitled to vote on the Plan who abstain from voting on the Plan and do not elect on their Ballot to opt-out of the Third-Party Release; (k) all Holders of Claims and Interests entitled to vote on the Plan who vote to reject the Plan but do not elect on their Ballot to opt-out of the Third-Party Release; (m) all other Holders of Claims and Interests who are deemed to reject the Plan and do not elect to opt-out of the Third-Party Release; (n) with respect to each of the foregoing Entities in clauses (a) through (m), each of such Entity's respective current and former Affiliates, predecessors, successors, assigns, subsidiaries, managed accounts or funds; and (o) with respect to each of the foregoing Entities in clauses (a) through (n), such Entities' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, management companies, investment advisors, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

130. "*Reorganized Debtors*" means (a) the Debtors, or any successor or assignee thereto, by merger, consolidation, or otherwise, on or after the Effective Date, and (b) to the extent not already encompassed by clause (a), Reorganized Cumulus and any newly formed subsidiaries thereof, on or after the Effective Date.

131. "*Reorganized Cumulus*" means either (a) Cumulus or any successor thereto, as reorganized pursuant to and under the Plan, or (b) a new corporation or limited liability company that may be formed or caused to be formed by the Debtors, the Restructuring Support Parties or a designee thereof to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Securities to be distributed pursuant to the Plan, in each case, on and after the Effective Date.

132. "*Restricted Stock*" means shares of New Common Stock that are subject to temporary restrictions prohibiting certain transfers of such shares, and prohibiting the trading of such shares, on any national securities exchange.

133. "*Restricted Stock Election*" means an election made by a Holder of an Allowed Credit Agreement Claim on the Ownership Certification that such Holder elects to receive its New Common Stock in the form of Restricted Stock.

134. "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of November 29, 2017, by Cumulus on behalf of itself and each of its direct and indirect subsidiaries, and, as applicable, the Consenting Term Loan Lenders and the Consenting Equityholders (as amended, supplemented or modified from time to time, including all exhibits thereto).

135. "*Restructuring Support Parties*" means those parties who are signatories to the Restructuring Support Agreement, other than the Debtors.

12

EX-2.1

136.   *"Restructuring Term Sheet"* means the Restructuring Term Sheet, dated as of November 29, 2017, attached as Exhibit A to the Restructuring Support Agreement (as amended, supplemented or modified from time to time, including all annexes thereto).

137.   *"Restructuring Transactions"* means, collectively, one or more transactions pursuant to section 1123 of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law, (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, (d) all transactions necessary to provide for the purchase of substantially all of the assets of, or interests in, any of the Debtors by Reorganized Cumulus or one or more Entities to be wholly-owned by Reorganized Cumulus, which purchase may be structured as a taxable transaction for U.S. federal income tax purposes; (e) the filing of any required FCC Applications; and (f) all other actions that the Debtors or Reorganized Debtors, as applicable, on the one hand, and the Term Lender Group, on the other hand, determine to be necessary or appropriate, including filings or recordings that may be required by applicable law, subject to the terms and conditions of the Restructuring Support Agreement. The Restructuring Transactions may include one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations or other transactions as may be determined by the Debtors or Reorganized Debtors, in consultation with the Term Lender Group, to be necessary or appropriate to effectuate the Plan, and may include, among other things, the dissolution of CMI Receivables Funding LLC on or after the Effective Date; *provided*, that, in all cases the Restructuring Transactions shall be subject to the terms and conditions of the Restructuring Support Agreement (including any and all exhibits thereto).

138.   *"Schedule of Rejected Executory Contracts and Unexpired Leases"* means the schedule (as may be amended) as determined by the Debtors or the Reorganized Debtors, with the consent of the Term Lender Group, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be rejected by the Debtors pursuant to the provisions of Article V of the Plan, and included in the Plan Supplement.

139.   *"Schedules"* means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

140.   *"Secured"* means when referring to a Claim against any Debtor: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) Allowed as such pursuant to the Plan.

141.   *"Securities Act"* means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, together with the rules and regulations promulgated thereunder.

142.   *"Security"* means a security as defined in section 2(a)(1) of the Securities Act.

143.   *"Senior Notes"* means those certain 7.75% notes due 2019 that were issued pursuant to the Senior Notes Indenture.

144.   *"Senior Notes Claim"* means any Claim against any Debtor derived from, based upon, relating to, or arising from the Senior Notes Indenture.

13

EX-2.1

145.  "*Senior Notes Indenture*" means that certain indenture, dated as of May 13, 2011, by and among Cumulus Media Holdings Inc., the guarantors named therein, and the Senior Notes Indenture Trustee (as amended, modified, or supplemented from time to time).

146.  "*Senior Notes Indenture Trustee*" means U.S. Bank National Association, in its capacity as trustee, transfer agent, registrar, authentication agent, and paying agent under the Senior Notes Indenture.

147.  "*Special Warrant*" means a 20-year warrant issued by Reorganized Cumulus, with a nominal exercise price, to purchase Class A Common Stock or Class B Common Stock, the terms of which will provide that it will not be exercisable unless such exercise otherwise complies with applicable law, the form of which warrant is reasonably acceptable to the Debtors and the Term Lender Group.

148.  "*Subordinated Claim*" means any Claim against any Debtor that is subordinated under section 510 of the Bankruptcy Code.

149.  "*Term Lender Group*" has the meaning set forth in the Restructuring Term Sheet.

150.  "*Term Loan Lender Equity Distribution*" means a distribution of Class A Common Stock, Class B Common Stock and/or Special Warrants to purchase shares of Class A Common Stock or Class B Common Stock, which New Common Stock (inclusive of the shares that may be exercised in connection with the Special Warrants) will constitute, in the aggregate, 83.5% of all of the issued and outstanding New Common Stock issued on the Effective Date, subject to dilution by the Management Incentive Plan, and to be allocated among the Holders of Allowed Credit Agreement Claims pursuant to, and subject to the terms and conditions of, the Equity Allocation Mechanism.

151.  "*Term Loan Lenders*" means the lenders from time to time party to the Credit Agreement.

152.  "*Third-Party Release*" means the releases set forth in Article VIII.E of the Plan.

153.  "*Transfer of Control*" means the transfer of control of the FCC Licenses held by any of the subsidiaries of Cumulus as a result of the issuance of the New Common Stock to the Holders of Allowed Credit Agreement Claims, Allowed Senior Notes Claims, and Allowed General Unsecured Claims.

154.  "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

155.  "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

156.  "*Unsecured Claim*" means any Claim against any of the Debtors that is neither Secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court.

157.  "*Unsecured Creditor Equity Distribution*" means a distribution of Class A Common Stock, Class B Common Stock and/or Special Warrants to purchase shares of Class A Common Stock or Class B Common Stock, which New Common Stock (inclusive of the shares that may be exercised in connection with the Special Warrants) will constitute, in the aggregate, 16.5% of all of the issued and outstanding New Common Stock issued on the Effective Date, subject to dilution by the Management Incentive Plan, and to be allocated among the Holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims pursuant to, and subject to the terms and conditions of, the Equity Allocation Mechanism.

158.  "*U.S. Trustee*" means the United States Trustee for the Southern District of New York.

159.  "*Voting and Claims Agent*" means Epiq Bankruptcy Solutions, LLC, in its capacity as notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases on the terms of an order or orders of the Bankruptcy Court.

14

EXHIBIT B

EX-2.1

160.  "*Warrant Agreement*" means the form of warrant agreement governing the Special Warrants, which form shall be reasonably acceptable to the Debtors and the Term Lender Group.

### B.   *Rules of Interpretation.*

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order, and such interpretation shall be binding; (9) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) any undefined term used herein that is defined in the Bankruptcy Code shall have the meaning ascribed to such term in the Bankruptcy Code; (15) unless otherwise specified herein, whenever the words "include," "includes," or "including" are used in the Plan, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import; and (16) unless otherwise specified herein, references from or through any date mean from and including or through and including.

### C.   *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If any payment, distribution, act or deadline under this Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

### D.   *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), *provided, however,* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

15

**EXHIBIT B**

EX-2.1

*E.    Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

*F.    Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

*A.    Administrative Claims.*

1.    Administrative Claims.

Except with respect to Administrative Claims that are Accrued Professional Compensation Claims, and except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Holder, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the later of: (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is practicable; *provided, however*, that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in the ordinary course of business (or as otherwise approved by the Bankruptcy Court) in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

A notice setting forth the Administrative Claims Bar Date will be (i) Filed on the Bankruptcy Court's docket and served with the notice of entry of the Confirmation Order; and (ii) posted on the Debtors' Case Information Website. No other notice of the Administrative Claims Bar Date will be provided. Except as otherwise provided in this Article II.A, requests for payment of Administrative Claims that accrued on or before the Effective Date (other than Accrued Professional Compensation Claims) must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or the Reorganized Debtors or their respective property and such Administrative Claims shall be deemed discharged as of the Effective Date. If for any reason any such Administrative Claim is incapable of being forever barred and discharged, then the Holder of such Claim shall not have recourse to any property of the Reorganized Debtors to be distributed pursuant to the Plan. Objections to such requests for payment of an Administrative Claim, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than the Administrative Claims Objection Deadline.

*B.    Professional Compensation.*

1.    Professional Fee Escrow Account.

As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtors shall establish the Professional Fee Escrow Account. The Debtors shall fund the

16

## EXHIBIT B

Professional Fee Escrow Account with Cash in the amount of the aggregate Professional Fee Escrow Amount for all Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be property of the Debtors' Estates, subject to the release of Cash to the Reorganized Debtors from the Professional Fee Escrow Account in accordance with Article II.B.2 herein.

2.  Final Fee Applications and Payment of Accrued Professional Compensation Claims.

All final requests for payment of Accrued Professional Compensation Claims shall be Filed no later than sixty (60) calendar days after the Effective Date. Such requests shall be Filed with the Bankruptcy Court and served as required by the Interim Compensation Order and the Case Management Procedures, as applicable. The objection deadline relating to a final fee application shall be 4:00 p.m. (prevailing Eastern time) on the date that is thirty (30) calendar days after the filing of such final fee application. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any applicable Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court. The Allowed amount of Accrued Professional Compensation Claims owing to the Professionals, after taking into account any prior payments, shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account promptly following the date when such Claims are Allowed by a Final Order. To the extent that funds held in the Professional Fee Escrow Account are unable to satisfy the Allowed amount of Accrued Professional Compensation Claims owing to the Professionals, the Reorganized Debtors shall pay such amounts within seven (7) Business Days of entry of the order approving such Accrued Professional Compensation Claims. After all Allowed Accrued Professional Compensation Claims have been paid in full, the escrow agent shall promptly return any amounts remaining in the Professional Fee Escrow Account to the Reorganized Debtors.

3.  Professional Fee Escrow Amount.

The Professionals shall estimate their Accrued Professional Compensation Claims before and as of the Effective Date, taking into account any prior payments, and shall deliver such estimate to the Debtors no later than five (5) Business Days prior to the anticipated Effective Date, as shall be indicated by the Debtors to such Professionals in writing so as to reasonably practicable following Confirmation of the Plan; provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by such estimates. If a Professional does not provide an estimate, the Debtors may estimate a reasonable amount of unbilled fees and expenses of such Professional, taking into account any prior payments; provided, however, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional. The total amount so estimated shall comprise the Professional Fee Escrow Amount.

4.  Post-Confirmation Date Fees and Expenses.

From and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the legal, professional, or other fees and expenses of Professionals that have been formally retained in accordance with sections 327, 363, or 1103 of the Bankruptcy Code before the Confirmation Date. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.  Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, settlement, release, and discharge of each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, in the discretion of the applicable Debtor or Reorganized Debtor, with the reasonable consent of the Term Lender Group, one of the following treatments: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate determined under applicable nonbankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code, payable on or as soon as practicable following the Effective Date; (2) Cash in

17

EX-2.1

an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, plus interest at the rate determined under applicable nonbankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such Holder and the Debtors, in consultation with the Term Lender Group, or otherwise determined by an order of the Bankruptcy Court.

D.    *Statutory Fees.*

Notwithstanding anything to the contrary contained herein, on the Effective Date, the Debtors shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation. Thereafter, each applicable Reorganized Debtor shall pay all U.S. Trustee fees due and owing under section 1930 of the Judicial Code in the ordinary course until the earlier of (i) the entry of a final decree closing the applicable Reorganized Debtor's Chapter 11 Case, or (ii) the Bankruptcy Court enters an order converting or dismissing the applicable Reorganized Debtor's Chapter 11 Case. Any deadline for filing Administrative Claims or Accrued Professional Compensation Claims shall not apply to U.S. Trustee fees.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.    *Classification of Claims and Interests.*

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests. All Claims and Interests, except for Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim against a Debtor also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied before the Effective Date. With respect to the treatment of all Claims and Interests as set forth in Article III.C hereof, the consent rights of the Term Lender Group to settle or otherwise compromise Claims are as set forth in the Restructuring Support Agreement.

B.    *Summary of Classification.*

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.H hereof.

18

**EXHIBIT B**

https://www.sec.gov/Archives/edgar/data/1058623/000119312518183509/d595577dex21.htm

10/15/2018

EX-2.1

The following chart summarizes the classification of Claims and Interests pursuant to the Plan.[2]

| Class | Claim/Interest | Status | Voting Rights |
| --- | --- | --- | --- |
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Credit Agreement Claims | Impaired | Entitled to Vote |
| 4 | Convenience Claims | Impaired | Entitled to Vote |
| 5 | Senior Notes Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired/Impaired | Deemed to Accept or Reject |
| 8 | Subordinated Claims | Impaired | Deemed to Reject |
| 9 | Intercompany Interests | Unimpaired/Impaired | Deemed to Accept or Reject |
| 10 | Interests in Cumulus | Impaired | Deemed to Reject |

C.   *Treatment of Claims and Interests.*

To the extent a Class contains Allowed Claims or Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

1.   Class 1 - Priority Non-Tax Claims.

   (a)   *Classification:* Class 1 consists of all Priority Non-Tax Claims.

   (b)   *Treatment:* Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, settlement, compromise, release and discharge of each Allowed Priority Non-Tax Claim, each Holder of an Allowed Priority Non-Tax Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, in the discretion of the applicable Debtor or Reorganized Debtor, with the consent of the Term Lender Group, either:

   (i)   payment in full in Cash; or

   (ii)   Reinstatement of such Allowed Priority Non-Tax Claim.

   (c)   *Voting:* Class 1 is Unimpaired by the Plan, and each Holder of a Class 1 Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

2.   Class 2 - Other Secured Claims.

   (a)   *Classification:* Class 2 consists of all Other Secured Claims.

   (b)   *Treatment:* Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed

2   The information in the table is provided in summary form and is qualified in its entirety by Article III.C hereof.

19

EXHIBIT B

23/65

EX-2.1

Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, in the discretion of the applicable Debtor or Reorganized Debtor, with the consent of the Term Lender Group, either:

(i)    payment in full in Cash;

(ii)    Reinstatement of such Allowed Other Secured Claim; or

(iii)    delivery of the collateral securing any such Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code.

(c)    *Voting*: Class 2 is Unimpaired by the Plan, and each Holder of a Class 2 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 - Credit Agreement Claims.

(a)    *Classification*: Class 3 consists of all Credit Agreement Claims.

(b)    *Allowance*: On the Effective Date, the Credit Agreement Claims shall be Allowed in the aggregate principal amount of $1,728,614,099.90, plus accrued and unpaid interest on such principal amount through the Petition Date and other amounts due and owing pursuant to the Credit Agreement and orders of the Bankruptcy Court, including such other amounts required to be paid as adequate protection under the Cash Collateral Order through and including the Effective Date, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, crossclaims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

(c)    *Treatment*: Except to the extent that a Holder of an Allowed Credit Agreement Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Credit Agreement Claim, each Holder of an Allowed Credit Agreement Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, its Pro Rata share of and interest in (i) the First Lien Exit Facility, and (ii) the Term Loan Lender Equity Distribution; *provided*, that the Debtors and the Term Lender Group may determine, in their reasonable discretion, to provide, at the election of a Holder of an Allowed Credit Agreement Claim, that such Holder may elect to receive its Pro Rata share of the Term Loan Lender Equity Distribution in the form of Restricted Stock issued in an amount of value equal to the Pro Rata share of the Term Loan Lender Equity Distribution such Holder would otherwise receive pursuant to this section; *provided, further*, and notwithstanding anything herein to the contrary, that the distribution of the Term Loan Lender Equity Distribution shall be made pursuant to, and subject to the terms and conditions of, the Equity Allocation Mechanism.

(d)    *Voting*: Class 3 is Impaired. Therefore, Holders of Class 3 Credit Agreement Claims are entitled to vote to accept or reject the Plan.

20

EXHIBIT B

4.   Class 4 – Convenience Claims.

(a)   *Classification*: Class 4 consists of all Convenience Claims.

(b)   *Treatment*: Except to the extent that a Holder of an Allowed Convenience Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Convenience Claim, each Holder of an Allowed Convenience Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, Cash in an amount equal to 100% of the Allowed Convenience Claim; *provided*, that Cash distributions to Holders of Allowed Convenience Claims shall not, in the aggregate, exceed the Convenience Class Cap without the prior written consent of the Term Lender Group; *provided, further*, that if the aggregate amount of Allowed Convenience Claims exceeds the Convenience Class Cap and the Term Lender Group does not consent to an increase in the Convenience Class Cap, then each Holder of an Allowed Convenience Claim shall receive Cash in an amount equal to its Pro Rata share of the Convenience Class Cap.

(c)   *Voting*: Class 4 is Impaired. Therefore, Holders of Class 4 Convenience Claims are entitled to vote to accept or reject the Plan. Notwithstanding the foregoing, if the aggregate Allowed amount of all Allowed Convenience Claims is less than or equal to the Convenience Class Cap, then the Debtors reserve the right to assert that the Holders of Class 4 Convenience Claims are Unimpaired.

5.   Class 5 – Senior Notes Claims.

(a)   *Classification*: Class 5 consists of all Senior Notes Claims.

(b)   *Allowance*: On the Effective Date, the Senior Notes Claims shall be Allowed in the aggregate principal amount of $610 million, (i) plus accrued and unpaid interest on such principal amount through the Petition Date, plus (ii) if Allowed by Final Order other than the Confirmation Order, accrued and unpaid interest (but excluding any amounts included in clause (ii)), premiums, fees and costs and expenses, including, without limitation, attorney's fees, trustee's fees, and other professional fees and disbursements, and other obligations, in each case, solely to the extent owing under the Senior Notes Indenture.

(c)   *Treatment*: Except to the extent that a Holder of an Allowed Senior Notes Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Senior Notes Claim, each Holder of an Allowed Senior Notes Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, its Pro Rata share of the Unsecured Creditor Equity Distribution. The Unsecured Creditor Equity Distribution shall be allocated Pro Rata to Holders of Allowed Claims in Classes 5 and 6, and notwithstanding anything in the Plan to the contrary, shall be made pursuant to, and subject to the terms and conditions of, the Equity Allocation Mechanism.

(d)   *Voting*: Class 5 is Impaired. Therefore, Holders of Class 5 Senior Notes Claims are entitled to vote to accept or reject the Plan.

6.   Class 6 – General Unsecured Claims.

(a)   *Classification*: Class 6 consists of all General Unsecured Claims.

21

EX-2.1

(b)    *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, its Pro Rata share of the Unsecured Creditor Equity Distribution. The Unsecured Creditor Equity Distribution shall be allocated Pro Rata to Holders of Allowed Claims in Classes 5 and 6, and notwithstanding anything in the Plan to the contrary, shall be made pursuant to, and subject to the terms and conditions of, the Equity Allocation Mechanism.

(c)    *Voting*: Class 6 is Impaired. Therefore, Holders of Class 6 General Unsecured Claims are entitled to vote to accept or reject the Plan.

7.    Class 7 - Intercompany Claims.

(a)    *Classification*: Class 7 consists of all Intercompany Claims.

(b)    *Treatment*: On the Effective Date or as soon as reasonably practicable thereafter, Allowed Intercompany Claims shall be, at the option of the Debtors or the Reorganized Debtors, as applicable, with the reasonable consent of the Term Lender Group, either (i) Reinstated as of the Effective Date, or (ii) cancelled without any distribution on account of such Intercompany Claims.

(c)    *Voting*: Class 7 is Unimpaired or Impaired by the Plan, and each Holder of a Class 7 Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 7 Intercompany Claims are not entitled to vote to accept or reject the Plan.

8.    Class 8 - Subordinated Claims.

(a)    *Classification*: Class 8 consists of all Subordinated Claims.

(b)    *Treatment*: Subordinated Claims shall be subordinated to all other Claims against the Debtors, shall receive no distributions on account of such Subordinated Claims, and shall be discharged.

(c)    *Voting*: Class 8 is Impaired by the Plan, and each Holder of a Class 8 Subordinated Claim is conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 8 Subordinated Claims are not entitled to vote to accept or reject the Plan.

9.    Class 9 - Intercompany Interests.

(a)    *Classification*: Class 9 consists of all Intercompany Interests.

(b)    *Treatment*: To preserve the Debtors' corporate structure, on the Effective Date, or as soon thereafter as reasonably practicable, all Intercompany Interests shall be, at the option of the Debtors or the Reorganized Debtors, as applicable, with the reasonable consent of the Term Lender Group, either (i) Reinstated as of the Effective Date, or (ii) cancelled without any distribution on account of such Intercompany Interests.

22

EXHIBIT B

EX-2.1

(c)    *Voting:* Class 9 is Unimpaired or Impaired by the Plan, and each Holder of a Class 9 Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 9 Intercompany Interests are not entitled to vote to accept or reject the Plan.

10.    Class 10 - Interests in Cumulus.

(a)    *Classification:* Class 10 consists of all Interests in Cumulus.

(b)    *Treatment:* On the Effective Date, all Interests in Cumulus shall be cancelled without any distribution on account of such Interests in Cumulus.

(c)    *Voting:* Class 10 is Impaired by the Plan, and each Holder of a Class 10 Interest in Cumulus is conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 10 Interests in Cumulus are not entitled to vote to accept or reject the Plan.

D.    *Voting of Claims.*

Each Holder of a Claim in an Impaired Class that is entitled to vote on the Plan as of the record date for voting on the Plan pursuant to Article III hereof shall be entitled to vote to accept or reject the Plan as provided in the Disclosure Statement Order or any other order of the Bankruptcy Court.

E.    *No Substantive Consolidation.*

Although the Plan is presented as a joint plan of reorganization, this Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason. Nothing in this Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor.

F.    *Acceptance by Impaired Classes.*

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if Holders of at least two-thirds in dollar amount and more than one-half in number of the Claims of such Class entitled to vote that actually vote on the Plan have voted to accept the Plan. Credit Agreement Claims (Class 3), Senior Notes Claims (Class 5), and General Unsecured Claims (Class 6) are Impaired, and the votes of Holders of Claims in such Classes will be solicited. If a Class contains Holders of Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

G.    *Special Provision Governing Claims.*

Except as specifically provided in the Plan, nothing in the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Claims, including legal and equitable defenses to or setoffs or recoupments against, any such Claims.

H.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, with respect to any Debtor, does not have a Holder of an Allowed Claim or Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court solely for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan with respect to such Debtor for purposes of (i) voting to accept or reject the Plan and (ii) determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

23

EXHIBIT B

27/65

I.    *Consensual Confirmation.*

The Plan shall be deemed a separate chapter 11 plan for each Debtor. To the extent that there is no rejecting Class of Claims in the chapter 11 plan of any Debtor, such Debtor shall seek Confirmation of its plan pursuant to section 1129(a) of the Bankruptcy Code.

J.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims.

K.    *Controversy Concerning Impairment or Classification.*

If a controversy arises as to whether any Claims or Interests or any Class of Claims or Interests is Impaired or is properly classified under the Plan, the Bankruptcy Court shall, after notice and a hearing, resolve such controversy on or before the Confirmation Date.

L.    *Subordinated Claims.*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

ARTICLE IV.
MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Sources of Consideration for Plan Distributions.*

The Reorganized Debtors shall fund distributions under the Plan, as applicable with the First Lien Exit Facility, the New Revolving Credit Facility (if any), the New Securities, and other Cash of the Debtors, including Cash from business operations, which shall be sufficient to make the other required payments on or after the Effective Date under the Plan and provide the Reorganized Debtors with working capital necessary to run their business. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance; *provided*, *that*, to the extent that a term of the Plan conflicts with the term of any such instruments or other documents, the terms of this Plan shall govern.

For the avoidance of doubt, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan, subject in all respects to the terms of the First Lien Exit Facility and the New Revolving Credit Facility, if any. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

24

B.    *First Lien Exit Facility.*

On the Effective Date, the Reorganized Debtors shall enter into the First Lien Exit Facility, the terms of which will be set forth in the First Lien Exit Facility Documents. All Holders of Allowed Claims entitled to distribution hereunder shall be deemed to be a party to, and bound by, the First Lien Exit Facility Agreement, regardless of whether such Holder has executed a signature page thereto. Confirmation of the Plan shall be deemed approval of the First Lien Exit Facility and the First Lien Exit Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, and authorization of the Reorganized Debtors to enter into and execute the First Lien Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the First Lien Exit Facility. On the Effective Date, all of the Liens and security interests to be granted in accordance with the First Lien Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the First Lien Exit Facility Documents, (c) shall be deemed perfected on the Effective Date, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and the Reorganized Debtors shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

C.    *New Revolving Credit Facility.*

On the Effective Date, the Reorganized Debtors shall be authorized, but not directed, to enter into the New Revolving Credit Facility (if any), the terms of which will be set forth in the New Revolving Credit Facility Documents (if any). Confirmation of the Plan shall be deemed approval of the New Revolving Credit Facility and the New Revolving Credit Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, and authorization of the Reorganized Debtors to enter into and execute the New Revolving Credit Facility Documents (if any) and such other documents as may be required to effectuate the treatment afforded by any such New Revolving Credit Facility. On the Effective Date, if the Reorganized Debtors have obtained a New Revolving Credit Facility, all of the Liens and security interests to be granted in accordance with the New Revolving Credit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Revolving Credit Facility Documents, (c) shall be deemed perfected on the Effective Date, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and the Reorganized Debtors shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

D.    *Issuance and Distribution of New Securities.*

On the Effective Date, or as soon as reasonably practicable thereafter, subject to Article IV.H, the New Securities shall be distributed to (a) Holders of Allowed Claims in Class 3, (b) Holders of Allowed Claims in Class 5, and (c) Holders of Allowed Claims in Class 6, and if applicable. In each case, such New Securities shall be subject to dilution by any New Common Stock issued pursuant to the Management Incentive Plan. All Holders of

EXHIBIT B

https://www.sec.gov/Archives/edgar/data/1058623/000119312518183050/d595577dex21.htm

EX-2.1

Allowed Credit Agreement Claims, Allowed Senior Notes Claims and Allowed General Unsecured Claims entitled to distribution hereunder shall be deemed to be a party to, and bound by, the New Shareholders' Agreement, if any, regardless of whether such Holder has executed a signature page thereto. The allocation of New Securities among the Holders of Allowed Credit Agreement Claims, Allowed Senior Notes Claims, and Allowed General Unsecured Claims shall be made in accordance with the Equity Allocation Mechanism. The issuance of the New Common Stock by Reorganized Cumulus, including options, stock appreciation rights, restricted stock units, or other equity awards, if any, in connection with the Management Incentive Plan, is authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

All of the New Securities issued pursuant to the Plan and section 1145 of the Bankruptcy Code shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Securities under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

E.   *Settlement of Claims and Interests.*

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the distributions, releases, and other benefits provided under the Plan, the Plan constitutes a good faith compromise and settlement of any and all Claims and Interests and controversies resolved pursuant to the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and within the range of reasonableness.

F.   *Restructuring Transactions.*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors may take any and all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

G.   *Corporate Existence.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a Reorganized Debtor and as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation or governing documents) in effect before the Effective Date, except to the extent such certificate of incorporation and by-laws (or other analogous formation or governing documents) are amended by the Plan or otherwise amended in accordance with applicable law. To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state or federal law).

H.   *FCC Licenses.*

The required FCC Applications shall be filed, as promptly as practicable, including the FCC Long Form Application and the Petition for Declaratory Ruling. After such filing is made, any person who thereafter acquires a Credit Agreement Claim, a Senior Notes Claim, or a General Unsecured Claim may be issued Special Warrants in lieu of any New Common Stock that would otherwise be issued to such Person under the Plan. In addition, the Debtors may, in their sole discretion, request that the Bankruptcy Court implement restrictions on trading of Claims and Interests that might adversely affect the FCC Approval process. The Debtors shall request that the FCC process the FCC Long Form Application separate and apart from the Petition for Declaratory Ruling. Regardless of whether the FCC consents to the request for separate processing, the Debtors shall diligently prosecute the FCC Applications

26

EXHIBIT B

and shall promptly provide such additional documents or information requested by the FCC in connection with its review of the FCC Applications. In the event the FCC Approval is obtained while the Petition for Declaratory Ruling remains pending, the Debtors (or Reorganized Debtors, as applicable) shall continue to diligently prosecute the Petition for Declaratory Ruling.

*I.     Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, the Plan Supplement or the Confirmation Order, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property (including all interests, rights, and privileges related thereto) in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan, including Interests held by the Debtors in any non-Debtor Affiliates, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, encumbrances, or other interests, except for Liens securing the First Lien Exit Facility, the New Revolving Credit Facility (if any) and any Other Secured Claims that are Reinstated pursuant to the Plan. On and after the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or the Local Rules.

*J.     Cancellation of Existing Indebtedness and Securities.*

Except as otherwise expressly provided in the Plan, on the Effective Date, (i) the Credit Documents, the Senior Notes Indenture, the Interests in the Debtors and all notes, bonds, agreements, instruments and other documents evidencing or creating any indebtedness or obligation of the Debtors related to the Credit Documents, the Senior Notes Indenture or any Interest in the Debtors (collectively, the "Cancelled Debt and Equity Documentation") shall be deemed cancelled, discharged, and of no force or effect, and (ii) the obligations of the Debtors under or in respect of the Credit Documents, the Senior Notes Indenture, the Interests in the Debtors and all other Cancelled Debt and Equity Documentation shall be discharged. The Holders of or parties to the Credit Documents, the Senior Notes Indenture, and such other Cancelled Debt and Equity Documentation will have no rights arising from or related to the Credit Documents, the Senior Notes Indenture and such other Cancelled Debt and Equity Documentation; provided, that notwithstanding Confirmation or the occurrence of the Effective Date, any such Credit Document, Senior Notes Indenture or other Cancelled Debt and Equity Documentation that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of (i) enabling Holders of Allowed Claims to receive distributions under the Plan as provided herein, and allowing each of the Credit Agreement Agent and the Senior Notes Indenture Trustee to make or direct the distributions in accordance with the Plan as provided herein, (ii) allowing the Senior Notes Indenture Trustee to enforce its rights, claims, and interests vis-à-vis any parties other than the Released Parties or any of their respective property or assets; (iii) preserving any rights of the Senior Notes Indenture Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders of Allowed Senior Notes Claims under the Senior Notes Indenture, including any rights to priority of payment and/or to exercise the Senior Notes Indenture Trustee charging lien, (iv) allowing the Senior Notes Indenture Trustee to enforce any obligations owed to it under the Plan; (v) allowing the Senior Notes Indenture Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; and (vi) permitting the Senior Notes Indenture Trustee to perform any functions that are necessary to effectuate the foregoing; provided, further, that section 10.7 of the Credit Agreement shall continue in effect solely as between the Term Loan Lenders and the Credit Agreement Agent, and not, for the avoidance of doubt, as to any Debtor, Reorganized Debtor or any of their respective property or assets.

Except for the foregoing, the Senior Notes Indenture Trustee and its agents shall be relieved of all further duties and responsibilities related to the Senior Notes Indenture and the Plan, except with respect to such other rights and obligations of the Senior Notes Indenture Trustee that, pursuant to the Senior Notes Indenture, survive the termination of such indenture; Subsequent to the performance by the Senior Notes Indenture Trustee of its obligations pursuant to the Plan, the Senior Notes Indenture Trustee and its agents shall be relieved of all further duties and responsibilities related to the Senior Notes Indenture.

27

K.    *Corporate Action.*

On the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (1) execution and entry into the First Lien Exit Facility, (2) execution and entry into the New Revolving Credit Facility (if any); (3) approval of and entry into the New Corporate Governance Documents; (4) issuance and distribution of the New Securities; (5) selection of the directors and officers for the Reorganized Debtors; (6) implementation of the Restructuring Transactions contemplated by this Plan; (7) adoption of the Management Incentive Plan; (8) adoption or assumption, if and as applicable, of the Management Employment Agreements; and (9) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, or officers of the Debtors or the Reorganized Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors (as applicable) shall be authorized to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Corporate Governance Documents, the First Lien Exit Facility Documents, including the First Lien Exit Credit Agreement, the New Revolving Credit Facility Documents (if any), including the New Revolving Credit Facility Agreement, and any and all related and ancillary agreements, documents, and filings, the New Securities and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV shall be effective notwithstanding any requirements under non-bankruptcy law.

L.    *New Certificates of Incorporation and New By-Laws.*

On or promptly after the Effective Date, the Reorganized Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states of incorporation in accordance with the corporate laws of such respective states of incorporation or formation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Certificates of Incorporation will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Certificates of Incorporation and New By-Laws.

M.    *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the boards of directors of each Debtor shall expire, and the New Cumulus Board and the New Subsidiary Boards, as well as the officers of each of the Reorganized Debtors, shall be appointed in accordance with the New Certificates of Incorporation and New By-Laws of each Reorganized Debtor.

The New Cumulus Board shall be composed of seven members, which shall consist of Reorganized Cumulus' President and Chief Executive Officer and six directors chosen by the Term Lender Group on the terms set forth in the Restructuring Support Agreement. The initial directors of the New Cumulus Board as of the Effective Date shall be set forth in the Plan Supplement. The initial term of the New Cumulus Board will be through the date of the 2019 annual meeting of Cumulus. The New Subsidiary Boards shall be as set forth in the Plan Supplement.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of any Person proposed to serve on the initial New Cumulus Board and the New Subsidiary Boards, as well as those Persons that will serve as an officer of any of the Reorganized Debtors. To the extent any such director or officer is an "insider" as such term is defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Certificates of Incorporation, New By-Laws, and other constituent documents of the Reorganized Debtors.

28

EX-2.1

EXHIBIT B

EX-2.1

*N.     Employee Obligations.*

Except as expressly otherwise provided in the Plan or the Plan Supplement, the Reorganized Debtors shall honor the Employee Obligations (i) existing and effective as of the Petition Date, (ii) that were incurred or entered into in the ordinary course of business prior to the Effective Date, and (iii) as otherwise approved by the Bankruptcy Court prior to the Effective Date, as may be amended by agreement between the beneficiaries of such Employee Obligations, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand. To the extent that any of the Employee Obligations are executory contracts, pursuant to sections 365 and 1123 of the Bankruptcy Code, each of them will be deemed assumed as of the Effective Date and assigned to the Reorganized Debtors. For the avoidance of doubt, the foregoing shall not (i) limit, diminish, or otherwise alter the Debtors' or the Reorganized Debtors', as applicable, defenses, Claims, Causes of Action, or other rights with respect to the Employee Obligations; or (ii) impair the rights of the Debtors or Reorganized Debtors, as applicable, to implement the Management Incentive Plan, in accordance with its terms and conditions and to determine the Employee Obligations of the Reorganized Debtors in accordance with their applicable terms and conditions on or after the Effective Date, in each case consistent with the Plan.

*O.     Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors and the officers and members of the New Boards, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan, the Restructuring Transactions, the New Corporate Governance Documents, the First Lien Exit Credit Agreement, the New Revolving Credit Facility Agreement (if any) and the Securities issued pursuant to the Plan, including the New Common Stock and Special Warrants, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

*P.     Management Incentive Plan.*

On and after the Effective Date, the Reorganized Debtors will implement the Management Incentive Plan, pursuant to which certain officers, directors, and employees of the Reorganized Debtors will be granted awards on terms to be disclosed in the Plan Supplement.

*Q.     Exemption from Certain Taxes and Fees.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax, document recording tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, Lien, or other security interest; (2) the making or assignment of any lease or sublease; (3) any Restructuring Transaction authorized by the Plan; and (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan.

29

EXHIBIT B

33/65

R.    Indemnification Provisions.

On and as of the Effective Date, the Indemnification Provisions shall be deemed assumed and irrevocable and will remain in full force and effect and survive the effectiveness of the Plan unimpaired and unaffected, and each of the Reorganized Debtors' New Certificates of Incorporation, New By-Laws, or similar organizational documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, officers, employees, agents, managers, attorneys, and other professionals, and such current and former directors, officers, and managers' respective Affiliates at least to the same extent as such documents of each of the respective Debtors on the Petition Date but in no event greater than as permitted by law, against any Claims or Causes of Action, provided, that the Reorganized Debtors shall not indemnify any such Person for any Claims or Causes of Action arising out of or related to any act or omission that is a criminal act or constitutes actual fraud, gross negligence or willful misconduct or for which indemnification is not permissible under law. None of the Reorganized Debtors shall amend and/or restate its respective New Certificate of Incorporation, New By-Laws, or similar organizational documents before, on or after the Effective Date to terminate, reduce, discharge, impair or adversely affect in any way (i) any of the Reorganized Debtors' obligations referred to in the immediately preceding sentence or (ii) the rights of such current and former directors, officers, employees, agents, managers, attorneys, and other professionals, and such current and former directors, officers, and managers' respective Affiliates referred to in the immediately preceding sentence. Notwithstanding anything to the contrary in Article VIII.D and Article VIII.E, the Debtors' current and former officers' and directors' rights to indemnification are preserved to the extent set forth herein.

S.    Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of this Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. For the avoidance of doubt, the preservation of Causes of Action described in the preceding sentence includes, but is not limited to, the Debtors' (1) right to object to Administrative Claims, (2) right to object to other Claims, and (3) right to subordinate Claims. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors in their respective discretion. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in Article VIII of the Plan.

The Reorganized Debtors reserve and shall retain the applicable Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action except as otherwise expressly provided in the Plan and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

ARTICLE V.
TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases will be deemed assumed as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that: (1) previously were assumed or rejected by the Debtors; (2) are identified on the Schedule of Rejected Executory

30

Contracts and Unexpired Leases; or (3) are the subject of a notice of rejection or motion to reject such Executory Contracts or Unexpired Leases as applicable, that is pending on the Effective Date, regardless of whether the rejected effective date of such rejection is on or after the Effective Date. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assumptions and assignments and the rejection of the Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions or notices to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date or such later date as provided in this Article V.A, shall revest in and be fully enforceable by the Debtors or the Reorganized Debtors, as applicable, in accordance with such Executory Contract and/or Unexpired Lease's terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including, without limitation, any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases, including by way of adding or removing a particular Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases, at any time through and including forty-five (45) calendar days after the Effective Date.

*B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Proofs of Claim with respect to Claims against any Debtor arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court or the Voting and Claims Agent by the later of (i) the applicable Claims Bar Date, and (ii) thirty (30) calendar days after notice of such rejection is served on the applicable claimant. Any Claims against any Debtor arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be automatically Disallowed, forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim against any Debtor arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, including any Claims against any Debtor listed on the Schedules as unliquidated, contingent or disputed. Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any cure amount has been fully paid or for any 50 cures pursuant to this Article V, shall be deemed Disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

*C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under any Executory Contract and Unexpired Lease to be assumed shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code by payment of the default amount in Cash on the Effective Date or as soon as reasonably practicable thereafter, with such default amount being $0.00 if no amount is listed in the Cure Notice, subject to the limitations described below, or on such other terms as the party to such Executory Contract or Unexpired Lease may otherwise agree, in the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future

31

EXHIBIT B

performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, if required, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall only be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or by mutual agreement between the Debtors or the Reorganized Debtors, as applicable, and the applicable counterparty.

At least fourteen (14) calendar days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed amounts of Cure Claims to the applicable Executory Contract or Unexpired Lease counterparties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served, and actually received by the Debtors, the Term Lender Group and the U.S. Trustee at least seven (7) calendar days before the Confirmation Hearing. Any such objection to the assumption of an Executory Contract or Unexpired Lease shall be heard by the Bankruptcy Court on or before the Effective Date, unless a later date is agreed between the Debtors or the Reorganized Debtors, on the one hand, and the counterparty to the Executory Contract or Unexpired Lease, on the other hand, or by order of the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount shall be deemed to have assented to such assumption and/or cure amount; *provided, however, that*, subject to Article X.A, the Debtors or the Reorganized Debtors, as applicable, shall have the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases, as applicable, as identified in the Plan Supplement, through and including forty-five (45) calendar days after the Effective Date.

In any case, if the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors or Reorganized Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and cured shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.   *Certain Customer Agreements.*

To the extent that the Debtors (i) are party to any ordinary course contract, terms and conditions, insertion order or similar agreement (whether written or oral) providing for the sale by the Debtors of advertising time to a customer and (ii) such agreement (A) has not been previously rejected or assumed by order of the Bankruptcy Court, (B) is not subject to a motion to reject filed on or prior to the Effective Date, (C) is not listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, and (D) has not been designated for rejection in accordance with this Article V, such contract (including any modifications, amendments, supplements, restatements or other related agreements), purchase order or similar agreement will be deemed assumed by the applicable Debtor(s) or Reorganized Debtor(s), as applicable, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Unless otherwise provided in the applicable Cure Notice, the cure amount to be paid in connection with the assumption of such a customer contract shall be $0.00.

E.   *Insurance Policies.*

All of the Debtors' insurance policies, including any directors' and officers' insurance policies, and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto. In addition, on and after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce, limit or restrict the coverage under any of the directors' and officers' insurance policies with respect to conduct occurring prior thereto, and all directors and officers of the

32

Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such directors' and officers' insurance policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date. Notwithstanding anything to the contrary in Article VIII.D and Article VIII.E, all of the Debtors' current and former officers' and directors' rights as beneficiaries of such insurance policies are preserved to the extent set forth herein.

F.    *Indemnification Provisions.*

Except as otherwise provided in the Plan, on and as of the Effective Date, any of the Debtors' indemnification rights with respect to any contract or agreement that is the subject of or related to any litigation against the Debtors or Reorganized Debtors, as applicable, shall be assumed by the Reorganized Debtors and otherwise remain unaffected by the Chapter 11 Cases.

G.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan or by separate order of the Bankruptcy Court, each Executory Contract or Unexpired Lease that is assumed, whether or not such Executory Contract or Unexpired Lease relates to the use, acquisition or occupancy of real property, shall include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affect such Executory Contract or Unexpired Lease, and (ii) all Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated pursuant to an order of the Bankruptcy Court or under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases and actions taken in accordance therewith (i) shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims against any Debtor that may arise in connection therewith, (ii) are not and do not create postpetition contracts or leases, (iii) do not elevate to administrative expense priority any Claims of the counterparties to such Executory Contracts and Unexpired Leases against any of the Debtors, and (iv) do not entitle any Entity to a Claim against any of the Debtors under any section of the Bankruptcy Code on account of the difference between the terms of any prepetition Executory Contracts or Unexpired Leases and subsequent modifications, amendments, supplements or restatements.

H.    *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If, prior to the Effective Date, there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or Reorganized Debtors, as applicable, shall have forty-five (45) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

I.    *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

J.    *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor

33

EXHIBIT B

EX-2.1

liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that had not been rejected as of the date of Confirmation will survive and remain obligations of the applicable Reorganized Debtor.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim), or, in each case, as soon as reasonably practicable thereafter, each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims (which will only be made if and when they become Allowed Claims) shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise expressly provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. The Debtors shall have no obligation to recognize any transfer of Claims against any Debtor or privately held Interests occurring on or after the Distribution Record Date. Distributions to Holders of Claims or Interests related to public Securities shall be made to such Holders in exchange for such Securities, which shall be deemed cancelled as of the Effective Date.

B.      *Distributions on Account of Obligations of Multiple Debtors.*

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan. Any such Claims against any Debtor shall receive the treatment set forth in Article III of the Plan. Any such Claims shall be released and discharged pursuant to Article VIII of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code; *provided*, that, for the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay U.S. Trustee fees until such time as a particular Chapter 11 Case is closed, dismissed, or converted.

C.      *Disbursing Agent.*

Except as otherwise provided in the Plan, distributions under the Plan shall be made by the Disbursing Agent on the Effective Date or as soon as reasonably practicable thereafter. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

D.      *Rights and Powers of Disbursing Agent.*

1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

34

EXHIBIT B

38/65

E.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.    Delivery of Distributions.

(a)    Delivery of Distributions to Holders of Allowed Credit Agreement Claims.

Except as otherwise provided in the Plan, all distributions under the Plan to Holders of Allowed Credit Agreement Claims shall be made by the Reorganized Debtors or the Credit Agreement Agent to the Holders of Allowed Credit Agreement Claims of record as of the Distribution Record Date (as determined by the register maintained by the Credit Agreement Agent).

(b)    Delivery of Distributions to Senior Notes Indenture Trustee.

Except as otherwise reasonably requested by the Senior Notes Indenture Trustee, all distributions under the Plan to Holders of Allowed Senior Notes Claims shall be made to, or by the Disbursing Agent at the reasonable direction of, the Senior Notes Indenture Trustee. As soon as practicable in accordance with the requirements set forth in Article VI, the Senior Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Senior Notes Claims, subject to the Senior Notes Indenture Trustee charging lien, and regardless of whether such distributions are made by the Senior Notes Indenture Trustee, the Disbursing Agent at the reasonable direction of the Senior Notes Indenture Trustee or by some other Person in accordance with Article VI.I.(b), the Senior Notes Indenture Trustee charging lien shall attach to the property to be distributed to the Holders of Allowed Senior Notes Claims in the same manner as if such distributions were made through the Senior Notes Indenture Trustee. The Senior Notes Indenture Trustee shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and the Debtors or Reorganized Debtors, as applicable, shall use commercially reasonable efforts to (i) seek the cooperation of DTC with respect to the cancellation of the Senior Notes as of the Effective Date; and (ii) seek the cooperation of the relevant bank and broker participants in the DTC system to facilitate delivery of the distribution directly to the relevant beneficial owners as soon as practicable after the Effective Date.

(c)    Delivery of Distributions in General.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims (other than Holders of Credit Agreement Claims or Senior Notes Claims) or Interests shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors: (1) to the signatory set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address), (2) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors after the date of any related Proof of Claim, (3) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors have not received a written notice of a change of address, or (4) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, the Disbursing Agent, the Credit Agreement Agent, and the Senior Notes Indenture Trustee, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan, except in the event of gross negligence or willful misconduct, as determined by a Final Order of a court of competent jurisdiction.

2.    Minimum Distributions.

No partial distributions or payments of fractions of New Securities shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim or Interest, as applicable, would otherwise result in the issuance of a number of New Securities that is not a

35

EX-2.1

whole number, the actual distribution of New Securities shall be rounded as follows: (i) fractions of greater than one-half (1/2) shall be rounded to the next higher whole number and (ii) fractions of one-half (1/2) or less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefor.

Notwithstanding any other provision of the Plan, no Cash payment valued at less than $100.00, in the reasonable discretion of the Disbursing Agent and the Reorganized Debtors, shall be made to a Holder of an Allowed Claim on account of such Allowed Claim. Such Allowed Claims to which this limitation applies shall be discharged and its Holder forever barred from asserting that Claim against the Reorganized Debtors or their property.

3.   Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided, however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the later of (i) the Effective Date and (ii) the date of the distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

Checks issued on account of Allowed Claims shall be null and void if not negotiated within 180 calendar days from and after the date of issuance thereof. Requests for reissuance of any check must be made directly and in writing to the Disbursing Agent by the Holder of the relevant Allowed Claim within the 180-calendar day period. After such date, the relevant Allowed Claim (and any Claim for reissuance of the original check) shall be automatically discharged and forever barred, and such funds shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary).

4.   Reserve.

In making any distribution in respect of Allowed Claims, the Reorganized Debtors shall reserve an appropriate and adequate amount of Cash on account of any unresolved Disputed Claims that if Allowed would be payable in Cash.

E.   *Manner of Payment.*

1.   All distributions of New Securities under the Plan shall be made by the Disbursing Agent on behalf of Reorganized Cumulus.

2.   All distributions of Cash under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor (or Debtors).

3.   At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

G.   *Section 1145 Exemption.*

Pursuant to section 1145 of the Bankruptcy Code, the issuance of the New Securities by Reorganized Cumulus as contemplated by this Plan (including the issuance of New Common Stock upon exercise of the Special Warrants and Class A Common Stock upon conversion of Class B Common Stock) is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution or sale of Securities. The New Securities issued by Reorganized Cumulus pursuant to section 1145 of the Bankruptcy Code (a) are not "restricted securities" as defined in Rule 144(a) (3) under the Securities Act, and (b) are freely tradable and transferable by any initial

36

EXHIBIT B

recipient thereof that (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within ninety (90) calendar days of such transfer, (iii) has not acquired the New Securities from an "affiliate" within one year of such transfer and (iv) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code; *provided*, that transfer of the New Securities may be restricted by the Communications Act and the rules of the FCC, the New Corporate Governance Documents, the Warrant Agreement, and with respect to the Restricted Stock, the terms thereof.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Securities through the facilities of the DTC, Euroclear or Clearstream, the Reorganized Debtors need not provide any further evidence other than this Plan or the Confirmation Order with respect to the treatment of transfers, exercise, removal of restrictions, or conversion of New Securities under applicable U.S. federal, state or local securities laws.

The DTC, Euroclear or Clearstream shall be required to accept and conclusively rely upon this Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Securities are exempt from registration and/or eligible for DTC, Euroclear or Clearstream book-entry delivery, settlement and depository services.

Notwithstanding anything to the contrary in this Plan, no Entity (including, for the avoidance of doubt, the DTC, Euroclear or Clearstream) may require a legal opinion regarding the validity of any transaction contemplated by this Plan, including, for the avoidance of doubt, whether the New Common Stock and Special Warrants (and New Common Stock issuable upon exercise of the Special Warrants) are exempt from registration and/or eligible for DTC, Euroclear or Clearstream book-entry delivery, settlement and depository services.

H.   *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information, documentation, and certifications necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable or appropriate. All Persons holding Claims against any Debtor shall be required to provide any information necessary for the Reorganized Debtors to comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit. The Reorganized Debtors reserve the right to allocate any distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit on account of such distribution.

I.   *Allocations.*

Except as otherwise required by law (as reasonably determined by the Reorganized Debtors), distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remaining portion of such Allowed Claim, if any.

J.   *Setoffs and Recoupment.*

Other than as expressly set forth in the Plan with respect to the Allowed Credit Agreement Claims, the Debtors or the Reorganized Debtors may, but shall not be required to, setoff against or recoup any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any claims, rights, and

37

EX-2.1

Causes of Action of any nature whatsoever that the Debtors or the Reorganized Debtors, as applicable, may have against the Holder of such Allowed Claim pursuant to the Bankruptcy Code or applicable nonbankruptcy law, to the extent that such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (pursuant to the Plan or otherwise; *provided, however*, that the failure of the Debtors or the Reorganized Debtors, as applicable, to do so shall not constitute a waiver, abandonment or release by the Debtors or the Reorganized Debtors of any such Claim they may have against the Holder of such Claim.

K. *Claims Paid or Payable by Third Parties.*

1. Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce a Claim against any Debtor, and such Claim (or portion thereof) shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor, as applicable. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and also receives payment from a party that is not a Debtor or a Reorganized Debtor, as applicable, on account of such Claim, such Holder shall, within two (2) weeks of receipt of such payment, repay or return the distribution to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2. Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim against any Debtor, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3. Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Reorganized Debtors, or any Entity may hold against any other Entity, including insurers, under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

L. *Foreign Current Exchange Rate.*

As of the Effective Date, any Claim asserted in a currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate on the Petition Date, as quoted at 4:00 p.m. (prevailing Eastern time), midrange spot rate of exchange for the applicable currency as published in the Wall Street Journal, National Edition, on the day after the Petition Date.

38

EXHIBIT B

EX-2.1

## ARTICLE VII.
### PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

4.  *Resolution of Disputed Claims.*

1.  Allowance of Claims.

After the Effective Date, each of the Debtors and the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim against any Debtor shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

2.  Claims and Interests Administration Responsibilities.

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors (or any authorized agent or assignee thereof) shall have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims against any of the Debtors; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

3.  Estimation of Claims.

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim against any Debtor that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed, contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim; *provided, however,* that such limitation shall not apply to Claims against any of the Debtors requested by the Debtors to be estimated for voting purposes only.

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims against any of the Debtors may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4.  Adjustment to Claims Without Objection.

Any Claim against any Debtor that has been paid or satisfied, or any Claim against any Debtor that has been amended or superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may, in accordance with the Bankruptcy Code and Bankruptcy Rules, be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

39

## EXHIBIT B

5.  Time to File Objections to Claims

Any objections to Claims against any of the Debtors shall be Filed on or before the Claims Objection Deadline.

*B.  Disallowance of Claims.*

Any Claims against any of the Debtors held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors. Subject in all respects to Article IV.B, all Proofs of Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed any and all Proofs of Claim filed after the applicable Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Filed Claim has been deemed timely Filed by a Final Order.**

*C.  Amendments to Proofs of Claim.*

A Claim against any Debtor may be amended before the Confirmation Date only as agreed upon by the Debtors and the Holder of such Claim or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules, the Local Rules or applicable nonbankruptcy law. On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court and the Reorganized Debtors, and any such new or amended Proof of Claim Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court; *provided, however,* that the foregoing shall not apply to Administrative Claims or Accrued Professional Compensation Claims.

*D.  No Distributions Pending Allowance.*

Notwithstanding anything to the contrary herein, if any portion of a Claim against any Debtor is Disputed, or if an objection to a Claim against any Debtor or portion thereof is Filed as set forth in this Article VII, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

*E.  Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Allowed Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Allowed Claim, without any interest, dividends, or accruals to be paid on account of such Allowed Claim unless required under applicable bankruptcy law or as otherwise provided in Article III.B.

40

EXHIBIT B

F.  *Reserve of Special Warrants.*

On the Effective Date (or as soon thereafter as is reasonably practicable), the Reorganized Debtors shall create the Disputed Claim Reserve to pay Holders of Disputed Claims that are General Unsecured Claims that may become Allowed Claims pursuant to the terms of the Plan, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing the Disputed Claim Reserve and for maximum distribution purposes, to be the lesser of (a) the asserted amount of the Disputed Claim Filed with the Bankruptcy Court, or (if no Proof of Claim was Filed) listed by the Debtors in the Schedules, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, or (c) the amount otherwise agreed to by the Reorganized Debtors and the Holder of such Disputed Claim for Disputed Claim Reserve purposes. Special Warrants reserved under this paragraph F shall remain unissued unless and until issued in satisfaction of a Disputed Claim that becomes an Allowed Claim and shall therefore be disregarded in both the numerator and denominator in the calculation of any vote by shareholders of Reorganized Cumulus under any New Corporate Governance Documents. Any distribution on account of a Disputed Claim that becomes an Allowed General Unsecured Claim after the Effective Date shall be made solely in the form of Special Warrants that are distributed from the Disputed Claim Reserve.

G.  *No Interest.*

Unless otherwise expressly provided by section 506(b) of the Bankruptcy Code or as specifically provided for herein or by order of the Bankruptcy Court (including the Cash Collateral Order), postpetition interest shall not accrue or be paid on Claims against any of the Debtors, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim. *provided, however,* that nothing in this Article VII.G shall limit any rights of any Governmental Unit to interest under sections 503, 506(b), 1129(a)(9)(A) or 1129(a)(9)(C) of the Bankruptcy Code or as otherwise provided for under applicable law.

# ARTICLE VIII.
# SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.  *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.  *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order or in any contract, instrument, or other agreement or document created pursuant to the Plan, including the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan shall be in

41

EXHIBIT B

EX-2.1

complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.    *Release of Liens.*

Except as otherwise specifically provided in the Plan, the First Lien Exit Facility Documents or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, on the Effective Date all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. In addition, the Credit Agreement Agent shall, at the Debtors' or Reorganized Debtors', as applicable, expense (and with no representation or warranty, or recourse to, the Credit Agreement Agent, any Term Loan Lender or any of their affiliates, officers, directors, employees, agents or counsel) execute and deliver all documents reasonably requested by the Debtors, the Reorganized Debtors, the First Lien Exit Facility Agent, or the New Revolving Credit Facility Agent (if any) to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

D.    *Release by the Debtors.*

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, the Released Parties shall hereby be expressly, unconditionally, irrevocably, generally, individually and collectively released, acquitted, and discharged by the Debtors, the Reorganized Debtors, and the Estates, each on behalf of itself and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, from any and all actions, Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of a Debtor or Reorganized Debtor, any Claims or Causes of Action asserted on behalf of any Holder of any Claim or Interest or other Entity or that any Holder of a Claim or Interest or other Entity would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, for violations of federal or state laws or otherwise, by statute or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that the Debtors, the Reorganized Debtors, or their Estates (whether individually

42

EXHIBIT B

EX-2.1

or collectively ever had, now has, or hereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or any other transaction relating to any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan, the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Restructuring Support Agreement, the Disclosure Statement, the First Lien Exit Facility Documents, the New Revolving Credit Facility Documents (if any), or, in each case, related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence, taking place on or before the Effective Date related or relating to any of the foregoing; *provided, however,* that except as expressly provided under the Plan, the foregoing releases shall not release any Claims related to any act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence or willful misconduct. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date rights or obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and shall not result in a release of any of the Debtors' or Reorganized Debtors' assumed indemnification obligations as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) essential to the Confirmation of the Plan; (2) an exercise of the Debtors' business judgment; (3) in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Debtor Release; (5) in the best interests of the Debtors and all holders of Claims and Interests; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Debtors, the Reorganized Debtors, and the Estates and each of their current and former Affiliates, and such Entities' and their current and former Affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such asserting any Claim or Cause of Action released pursuant to the Debtor Release.

Nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

E.    *Release by the Releasing Parties.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Effective Date, each of the Releasing Parties shall be deemed to have expressly, conclusively, absolutely, unconditionally, irrevocably, generally, individually and collectively, released, acquitted, and discharged the Released Parties from any and all actions, Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of a Debtor or Reorganized Debtor, any Claims or Causes of Action asserted on behalf of any Holder of any Claim or any Interest or other Entity or that any Holder of a Claim or an Interest or other Entity would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, for violations of federal or state laws or otherwise, by statute or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that such Releasing Party (whether individually or collectively) ever had, now has, or hereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the transaction relating to any Security of the

43

EXHIBIT B

Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or any Interest that is affected by or classified in the Plan, the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Restructuring Support Agreement, the Disclosure Statement, the First Lien Exit Facility Documents, the New Revolving Credit Facility Documents (if any), or, in each case, related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence, taking place on or before the Effective Date related or relating to any of the foregoing; *provided, however,* that except as expressly provided under the Plan, the foregoing releases shall not release Claims related to any act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence or willful misconduct; *provided, further,* that any Holder of a Claim or an Interest that elects to opt-out of the releases contained in this paragraph shall not constitute a Released Party (even if for any reason otherwise entitled) and no Restructuring Support Party shall be entitled to opt-out of the releases contained in this paragraph for so long as the Restructuring Support Agreement remains in full force and effect as to such Restructuring Support Party. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date rights or obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and shall not result in a release of any of the Debtors' or Reorganized Debtors' assumed indemnification obligations as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) essential to the Confirmation of the Plan; (2) given in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (3) a good faith settlement and compromise of the Claims released by the Third-Party Release; (4) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

Nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

F.    *Regulatory Activities.*

Notwithstanding anything to the contrary herein, nothing in the Plan or Confirmation Order is intended to affect the police or regulatory activities of Governmental Units or other governmental agencies.

G.    *Exculpation.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any (i) Exculpated Causes of Action and (ii) obligation, Cause of Action, or liability for any Exculpated Causes of Action; *provided, however,* that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence, or willful misconduct; *provided further, however,* that the foregoing shall not be deemed to release, affect, or limit any post-Effective Date rights or obligations of the Exculpated Parties under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

44

Nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

H.  *Injunctions.*

Except as otherwise expressly provided in the Plan, the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Persons and Entities that have held, hold, or may hold Claims, Interests, Causes of Action or liabilities that have been released pursuant to Article VIII.D or Article VIII.F of the Plan, are discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.G of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Persons and Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (iii) creating, perfecting, or enforcing any Lien, Claim or encumbrance of any kind against such Persons or Entities or the property or the estates of such Persons or Entities, as applicable, on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Persons or Entities or against the property of such Persons or Entities, as applicable, on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; and (v) commencing or continuing in any manner any action or other proceeding of any kind against such Persons or Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities released, settled or compromised pursuant to the Plan; *provided, further,* that nothing contained herein shall preclude a Person or Entity from obtaining benefits directly and expressly provided to such Person or Entity pursuant to the terms of the Plan; *provided, further,* that nothing contained herein shall be construed to prevent any Person or Entity from defending against claims objections or collection actions whether by asserting a right of setoff or otherwise to the extent permitted by law.

I.  *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.  *Recoupment.*

In no event shall any Holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.  *Protection Against Discriminatory Treatment.*

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, all Entities, including Governmental Units shall not discriminate against any Reorganized Debtor, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because such Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

45

EXHIBIT B

EX-2.1

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to the Effective Date.*

It is a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B

1.    The Bankruptcy Court shall have entered the Confirmation Order, which order shall be in form and substance satisfactory to the Debtors and the Term Lender Group.

2.    The Debtors shall have paid the reasonable and documented fees and out-of-pocket expenses of (i) the Credit Agreement Agent (including one counsel to the Credit Agreement Agent), and ii) Arnold & Porter Kaye Scholer LLP, FTI Consulting Inc., Fortgang Consulting, LLC and Aboise & Associates, LLC in accordance with the Restructuring Support Agreement.

3.    All of the conditions precedent set forth in the First Lien Exit Credit Agreement shall have been satisfied or waived pursuant to the terms of the First Lien Exit Credit Agreement, and the First Lien Exit Credit Agreement shall have been executed.

4.    The Professional Fee Escrow Account shall have been established and funded.

5.    The Restructuring Support Agreement shall not have been terminated as to all parties thereto.

6.    All actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws.

7.    All governmental and material third-party approvals and consents, including Bankruptcy Court approval, that are necessary to implement the Restructuring Transactions shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions.

8.    The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, waivers or other documents that are necessary to implement and effectuate the Plan and reasonable evidence thereof has been delivered to the Term Lender Group.

9.    The FCC Approval shall have been obtained.

10.    Any amendments, modifications or supplements to the Plan (including the Plan Supplement) shall be reasonably acceptable to the Debtors and the Term Lender Group.

11.    Each of the New By-Laws and New Certificates of Incorporation will be in full force and effect as of the Effective Date.

12.    The Effective Date shall be no later than one-hundred eighty (180) calendar days after the Petition Date, or such later date to which the Term Lender Group agrees in writing.

B.    *Waiver of Conditions.*

The conditions to Consummation set forth in Article IX.A may be waived by the Debtors with the prior written consent of the Term Lender Group (not to be unreasonably withheld) and, with respect to conditions related to the Professional Fee Escrow Account, the beneficiaries of the Professional Fee Escrow Account, without notice,

46

EXHIBIT B

50/65

10/15/2018

EX-2.1

leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan. The failure of the Debtors or the Term Lender Group to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

C.     *Effect of Failure of Conditions.*

If Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims, Causes of Action or Interests; (ii) prejudice in any manner the rights of such Debtor, any Holder, any Person, or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder, any Person, or any other Entity.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.     *Modification and Amendments.*

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors reserve the right to modify the Plan (including the Plan Supplement), without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date; *provided*, that any such modification shall be reasonably acceptable to the Term Lender Group. After the Confirmation Date and before substantial consummation of the Plan, the Debtors may initiate proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and intent of the Plan.

After the Confirmation Date, but before the Effective Date, the Debtors, with the consent of the Term Lender Group (not to be unreasonably withheld), may make appropriate technical adjustments and modifications to the Plan (including the Plan Supplement) without further order or approval of the Bankruptcy Court; *provided*, that such adjustments and modifications do not materially and adversely affect the treatment of Holders of Claims or Interests.

B.     *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.     *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then, absent further order of the Bankruptcy Court: (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Classes of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, any Person, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder, any Person, or any other Entity.

47

EXHIBIT B

EX-2.1

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, except as set forth in the Plan, the Bankruptcy Court shall retain exclusive jurisdiction, to the fullest extent permissible under law, over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.  Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.  decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.  resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable, and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under an Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.  ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.  adjudicate, decide, or resolve any motions, adversary proceedings, applications, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor, or the Estates that may be pending on the Effective Date;

6.  adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.  adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.  enter and implement such orders as may be necessary or appropriate to construe, execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

9.  enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.  resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.  issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity or Person with Consummation or enforcement of the Plan;

12.  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

48

EXHIBIT B

13.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.K.1;

14.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.    determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the New Corporate Governance Documents, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement; provided, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court;

16.    adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.    consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in the Plan, the Disclosure Statement, or any Bankruptcy Court order, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

18.    determine requests for the payment of Claims against any of the Debtors entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, including disputes arising in connection with the implementation of the agreements, documents, or instruments executed in connection with the Plan;

20.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, 511, and 1146 of the Bankruptcy Code;

21.    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases with respect to any Person or Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Person or Entity's rights arising from or obligations incurred in connection with the Plan;

22.    hear any other matter not inconsistent with the Bankruptcy Code; and

23.    enter an order or final decree concluding or closing any of the Chapter 11 Cases.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

49

EXHIBIT B

EX-2.1

## ARTICLE XII.
### MISCELLANEOUS PROVISIONS

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against the Debtors that arose prior to the Effective Date.

A.    *Immediate Binding Effect.*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors and each of their respective heirs executors, administrators, successors and assigns.

B.    *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

C.    *Further Assurances.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Reorganized Debtors, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

D.    *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, the Committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the Committee on and after the Effective Date.

E.    *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor or any other Entity with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or other Entity before the Effective Date.

F.    *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, receiver, trustee, successor, assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of such Entity.

50

EXHIBIT B

10/15/2018                                                                                                    EX-2.1

G.      *Notices.*

To be effective, all notices, requests, and demands to or upon the Debtors, the Committee, the U.S. Trustee, or the Term Lender Group, as applicable, must be in writing (including by facsimile transmission), and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the following:

If to the Debtors:

Cumulus Media Inc.
3280 Peachtree Road, N.W., Suite 2200
Atlanta, Georgia 30305
Attention:   John Abbot
             Richard A. Denning
E-mail: john.abbot@cumulus.com
        richard.denning@cumulus.com

With copies to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Facsimile: (212) 757-3990
Attention:   Paul M. Basta
             Lewis R. Clayton
             Jacob A. Adlerstein
             Claudia R. Tobler
E-mail:   pbasta@paulweiss.com
          lclayton@paulweiss.com
          jadlerstein@paulweiss.com
          ctobler@paulweiss.com

If to the U.S. Trustee:

Office of the United States Trustee
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, NY 10045
Attention:   Paul Schwartzberg
             Greg M. Zipes
E-mail:   Paul.Schwartzberg@usdoj.gov
          Greg.Zipes@usdoj.gov

If to the Term Lender Group:

Arnold & Porter Kaye Scholer LLP
70 West Madison Street, Suite 4200
Chicago, Illinois 60602-4321
Facsimile: (312) 583-2360
Attention:   Michael B. Solow
             Michael D. Messersmith
             Seth J. Kleinman
E-mail:   michael.solow@apks.com
          michael.messersmith@apks.com
          seth.kleinman@apks.com

51

**If to the Committee:**

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Facsimile: (212) 872-1002
Attention: Michael S. Stamer
 Abid Qureshi
 Meredith A. Lahaie
E-mail: mstamer@akingump.com
 aqureshi@akingump.com
 mlahaie@akingump.com

After the Effective Date, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, an Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.    *Entire Agreement.*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and the Plan Supplement.

I.    *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' Case Information Website at http://dm.epiq11.com/cumulus or the Bankruptcy Court's website at http://www.nysb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

J.    *Severability of Plan Provisions.*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors in consultation with the Restructuring Support Parties, shall have the power to alter and interpret such term or provision such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, the Plan Supplement, the New Corporate Governance Documents, the First Lien Exit Facility Documents, and the New Revolving Credit Facility Documents (if any), as any of such documents may have been altered or interpreted in accordance with the foregoing, are: (i) valid and enforceable pursuant to their terms; (ii) integral to the Plan and may not be deleted or modified without the consent of the parties thereto; and (iii) non-severable and mutually dependent.

K.    *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and other applicable law, and pursuant to sections 1125(e), 1125(g), and 1126(b) of the Bankruptcy Code, the Debtors, the Restructuring Support Parties, and each of

52

EX-2.1

their respective Affiliates, and each of their and their Affiliates' agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys, in each case solely in their respective capacities as such, will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of New Securities offered and sold under the Plan and any previous plan and, therefore, no such parties, individuals, or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the New Securities offered and sold under the Plan or any previous plan.

L.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

M.      *Conflicts.*

To the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other document referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with the Confirmation Order, the Confirmation Order shall govern and control. Moreover, to the extent that any provision of the Restructuring Support Agreement conflicts with or is in any way inconsistent with the Plan, the Plan shall govern and control in all respects.

*[Remainder of page intentionally left blank]*

53

EXHIBIT B

57/65

EX-2.1

Dated: February 12, 2018

CUMULUS MEDIA INC.
on behalf of itself and each of its Debtor affiliates

*s/ John Abbot*

John Abbot
Executive Vice President, Treasurer, and Chief Financial Officer

54

EXHIBIT B

58/65

EXHIBIT B

EX-2.1

Exhibit A

Equity Allocation Mechanism

EX-2.1

## EQUITY ALLOCATION MECHANISM

The allocation of Plan consideration to Holders of Allowed Credit Agreement Claims, Allowed Senior Notes Claims, and Allowed General Unsecured Claims, as of the Effective Date, will include distributing Class A Common Stock, Class B Common Stock and, only in the case of Allowed Credit Agreement Claims, Restricted Stock (collectively, the "*Stock*"), and Special Warrants, in accordance with the mechanism set forth below.[1]

**General:**

1.   *Ownership Certification.* In order to be eligible to receive a distribution of Stock on the Effective Date, each eligible Holder shall provide an Ownership Certification by the Certification Deadline.

2.   *Definitions.* (a) An "*Ownership Certification*" means a written certification, in the form attached to the FCC Ownership Procedures Order, which shall be sufficient to enable the Debtors, in consultation with the Term Lender Group, or Reorganized Cumulus, as applicable, to determine (x) the extent to which direct and indirect voting and equity interests of the certifying party are held by non-U.S. Persons, as determined under section 310(b) of the Communications Act and the FCC rules, and (y) whether the holding of more than 4.99% of the Class A Common Stock by the certifying party would result in a violation of FCC ownership rules or be inconsistent with the FCC Approval; *provided, however,* that a Holder may elect not to provide the information in clause (y), and any Ownership Certification without the information in clause (y) shall not prohibit a Holder from receiving up to 4.99% of the Class A Common Stock to the extent otherwise entitled thereto pursuant to this Equity Allocation Mechanism; and (b) the "*Certification Deadline*" means the deadline set forth in the FCC Ownership Procedures Order for returning Ownership Certifications.

3.   *Attributable Interests.* Subject in all respects to the foreign-ownership limitations discussed below, under FCC rules, an owner of equity in a corporation which controls FCC broadcast licenses may be deemed "attributable" if it owns, directly or indirectly, 5% or more of the voting equity of such corporation. The distribution of Stock to a Holder of an Allowed Credit Agreement Claim, Allowed Senior Notes Claim or Allowed General Unsecured Claim may be in the form of more than 4.99% of the outstanding Class A Common Stock when the shares of Class A Common Stock are issued on and as of the Effective Date, only if such Holder is identified on the FCC Long Form Application (as the same may be amended from time to time) pursuant to which FCC Approval is granted as the holder of an attributable interest in Reorganized Cumulus. If such Holder elects not to be deemed to hold an "attributable" interest in Reorganized Cumulus, then such Holder shall be issued up to 4.99% of the outstanding Class A Common Stock when all shares of Class A Common Stock are issued on and as of the Effective Date, with any remaining distribution in the form of Class B Common Stock.

---

[1]   For the avoidance of doubt, the procedures set forth in this Equity Allocation Mechanism shall not impact the issuance of securities or other instruments under the Management Incentive Plan, which issuance shall be governed by the terms of the Management Incentive Plan.

EXHIBIT B

4.    *Restricted Stock.* A Holder of an Allowed Credit Agreement Claim may elect on its Ownership Certification to receive its Class A Common Stock or Class B Common Stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification. Shares of Restricted Stock may not be offered, sold or otherwise transferred until after two (2) calendar days following delivery of the Restricted Stock from the transfer agent designated by the Debtors (the "*Transfer Agent*") to such Holder of the Allowed Credit Agreement Claim (each such period, a "*Restricted Period*"). After the expiration of a Restricted Period, the initial Holder of such shares may make a request to the Transfer Agent to remove the restrictive legend set forth on such shares (the "*Restrictive Legend*"). Upon receipt of any such request, the Transfer Agent will remove the Restrictive Legend. Following the expiration of each applicable Restricted Period and the removal of the Restrictive Legend, the shares of Restricted Stock may be offered, sold or otherwise transferred, subject to the same restrictions on transfer as the New Securities provided herein and in the Disclosure Statement. In accordance with the above, each share of Restricted Stock will bear a legend to substantially the following effect:

"THE SECURITY EVIDENCED HEREBY (THIS "*SECURITY*") MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED FOR A PERIOD OF TWO (2) CALENDAR DAYS FOLLOWING DELIVERY OF THIS SECURITY FROM THE TRANSFER AGENT DESIGNATED BY THE ISSUER OF THIS SECURITY (THE "*TRANSFER AGENT*") TO THE INITIAL HOLDER (THE "*RESTRICTED PERIOD*"). AFTER THE RESTRICTED PERIOD, THIS SECURITY MAY ONLY BE OFFERED, SOLD OR OTHERWISE TRANSFERRED FOLLOWING A REQUEST BY THE INITIAL HOLDER TO THE TRANSFER AGENT TO REMOVE THIS RESTRICTIVE LEGEND."

**Allocation of New Securities:**

The distribution of New Securities made on and as of the Effective Date shall be as follows:

1.    First, the (i) Term Loan Lender Equity Distribution shall be deemed made Pro Rata among the Holders of Allowed Credit Agreement Claims; and (ii) the Unsecured Creditor Equity Distribution shall be deemed made Pro Rata among Holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims; *provided, however,* that each of the Term Loan Lender Equity Distribution and the Unsecured Creditor Equity Distribution shall be deemed to have been made initially in the form of Special Warrants issued as of the Effective Date.

2

EX-2.1

2.    Second

(a)    Each deemed Holder of Special Warrants that (i) has timely delivered an Ownership Certification as set forth herein and in the FCC Ownership Procedures Order, and (ii) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is 0%, shall be deemed to have exercised its Special Warrants as of the Effective Date to the fullest extent possible in the form of Class B Common Stock; *provided*, that any Holder who has not checked the Class B Election box on the Ownership Certification shall be further deemed as of the Effective Date to have immediately exchanged such shares of Class B Common Stock for a like number of shares of Class A Common Stock, *provided, further*, that, for any Holder of Class B Common Stock that would be entitled to exchange its shares for more than 4.99% of the outstanding Class A Common Stock when all shares of Class A Common Stock are issued on and as of the Effective Date, the number of shares of Class B Common Stock exchanged by such Holder for shares of Class A Common Stock shall be limited so that such Holder receives shares of Class A Common Stock constituting no more than 4.99% of the total outstanding Class A Common Stock issued unless the Debtors, in consultation with the Term Leader Group, or Reorganized Cumulus, as applicable, shall have determined that the exchange into shares of Class A Common Stock constituting more than 4.99% of the total outstanding Class A Common Stock issued would not result in a violation of FCC ownership rules or be inconsistent with the FCC Approval (such proviso, the *"4.99% Rule"*), *provided, however*, that in connection with the distribution of Class A Common Stock or Class B Common Stock to Holders of Allowed Credit Agreement Claims, such Holders may elect to receive such stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification.

(b)    Each deemed Holder of Special Warrants that (i) has timely delivered an Ownership Certification as set forth herein and in the FCC Ownership Procedures Order, and (ii) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is greater than 0% (each a *"Non-U.S. Holder,"* and collectively, the *"Non-U.S. Holders"*), shall be deemed to have exercised its Special Warrants, pro rata among all such Non-U.S. Holders, to receive Class B Common Stock, in an amount, assuming all Holders of Special Warrants that have not timely delivered an Ownership Certification are 100% foreign-owned Non-U.S. Holders, of shares that causes the aggregate alien ownership (on an equity and on a voting basis) of Stock to equal, at most, twenty-two and one half percent (22.50%), *provided*, that such allocation to Non-U.S. Holders shall be made on a proportional basis taking into account the number of Special Warrants held by the Non-U.S. Holders and each such Holder's contribution of alien ownership to the aggregate amount of alien ownership of Stock as of the Effective Date (e.g., assuming all Special Warrants are not exercisable on the Effective Date, a Non-U.S. Holder with a 1.0% alien ownership will be deemed to have exercised more Special Warrants into Stock than a Non-U.S. Holder with an equivalent amount of Special Warrants but a

3

EXHIBIT B

62/65

EX-2.1

20% alien ownership); *provided further*, that any Holder who has not checked the Class B Election box on the Ownership Certification shall be further deemed to have immediately exchanged such shares of Class B Common Stock for a like number of shares of Class A Common Stock, subject in all respects to the 4.99% Rule; *provided, however*, that in connection with the distribution of Class A Common Stock or Class B Common Stock to Holders of Allowed Credit Agreement Claims, such Holders may elect to receive such stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification.

(c)    Each deemed Holder of Special Warrants that has not timely delivered an Ownership Certification as set forth herein and in the FCC Ownership Procedures Order shall not be deemed to have exercised any Special Warrants as of the Effective Date; *provided, however*, that if such Holder properly completes and delivers an Ownership Certification to Reorganized Cumulus at any time after the Certification Deadline, and upon confirmation from Reorganized Cumulus that such Ownership Certification is satisfactory, if such Holder (i) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is 0%, then its equity allocation shall be distributed after the Effective Date in the manner set forth in Section 2(a) herein; or (ii) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is greater than 0%, then its equity allocation shall be distributed after the Effective Date in the manner set forth in Section 2(b) herein, all subject to any limitations on stock ownership set forth in the Certificate of Incorporation of Reorganized Cumulus.

3.    *Holder Elections.* Notwithstanding anything to the contrary herein, a Holder of an Allowed Credit Agreement Claim, Allowed Senior Notes Claim, or Allowed General Unsecured Claim may, by making the appropriate election on the Ownership Certification, receive its Term Loan Lender Equity Distribution or Unsecured Creditor Equity Distribution, as the case may be, (i) entirely in the form of Special Warrants and shall not be deemed to have exercised any Special Warrants, (ii) in Special Warrants deemed to have been exercised for Class B Common Stock to the extent such Holder's portion of the Term Loan Lender Equity Distribution or Unsecured Creditor Equity Distribution would consist of New Common Stock pursuant to Section 2 above, with any remaining Special Warrants not being deemed exercised, or (iii) in Special Warrants deemed to have been exercised for Class A Common Stock to the extent such Holder's portion of the Term Loan Lender Equity Distribution or Unsecured Creditor Equity Distribution would consist of New Common Stock pursuant to Section 2 above, up to 4.99% of the outstanding Class A Common Stock when all shares of Class A Common Stock are issued on and as of the Effective Date, with any remaining Special Warrants not being deemed exercised, all of which elections are expressly subject to Section 5 below.

4.    *Trading Deadlines and Tendering of Senior Notes.* Holders of Senior Notes Claims shall be required to tender their Senior Notes into the Automated Tender Offer Program ("*ATOP*") system of Depository Trust Company as set forth in the FCC Ownership Procedures Order (the "*Trading Deadline*"). The positions of such Holders in the Senior

4

EXHIBIT B

EX-2.1

5. Notes will be segregated through ATOP and such Holders thereafter will be unable to trade their Senior Notes Claims. Distributions on account of Allowed Credit Agreement Claims will be made based on the Credit Agreement Agent's register as of the Distribution Record Date and trades not reflected on such register shall not be recognized for purposes of distributions under the Plan.

5. *FCC Limits on Ownership.* Notwithstanding anything else herein, nothing in this Equity Allocation Mechanism shall (i) permit any Holder to hold more than 4.99% of the outstanding Class A Common Stock on or after the Effective Date unless the Debtors, in consultation with the Term Lender Group, or Reorganized Cumulus, as applicable, shall have determined that such ownership will not cause a violation of FCC ownership rules or be inconsistent with the FCC Approval, or (ii) cause Reorganized Cumulus to exceed an aggregate alien ownership percentage (on an equity or on a voting basis) of twenty-two and one half percent (22.50%) in the Stock prior to the Declaratory Ruling. Any distribution in contravention of the preceding sentence shall be adjusted to the minimum extent necessary to comply with those limitations. In determining whether any Holder would hold more than 4.99% of the outstanding Class A Common Stock on or after the Effective Date, such Holder will be attributed with any stock held by another Holder under common management or that otherwise would be aggregated under the FCC's ownership attribution rules.

6. *Post-Effective Date Allowed General Unsecured Claims.* Pursuant to and in accordance with Article VII.F of the Plan, the Reorganized Debtors shall withhold a reserve of Special Warrants to pay Holders of Disputed Claims that are General Unsecured Claims that may become Allowed Claims pursuant to the terms of the Plan. If a General Unsecured Claim is not Allowed as of the Effective Date and becomes an Allowed General Unsecured Claim after the Effective Date, and the Holder of such Allowed General Unsecured Claim has timely delivered an Ownership Certification as set forth in the FCC Ownership Procedures Order, if such Holder (i) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is 0%, then its equity allocation shall be distributed in the manner set forth in Section 2(a) herein; or (ii) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is greater than 0%, then its equity allocation shall be distributed in the manner set forth in Section 2(b) herein, all subject to any limitations on stock ownership set forth in the Certificate of Incorporation of Reorganized Cumulus.

**POST-DECLARATORY RULING REALLOCATION OF NEW SECURITIES:**

Subject to the terms of the Warrant Agreement, after the Declaratory Ruling, any exercise or deemed exercise of the Special Warrants as a result of the Declaratory Ruling shall be made as follows:

1. *100% Foreign Ownership.* If the FCC adopts a Declaratory Ruling allowing 100% foreign ownership of Reorganized Cumulus, then Non-U.S. Holders shall be deemed to have exercised their Special Warrants to the fullest extent possible for the corresponding number of shares of Class B Common Stock; *provided,* that any Holder who had not checked the Class B Election box on the Ownership Certification shall be further deemed to have

5

EXHIBIT B

EX-2.1

immediately exchanged such shares of Class B Common Stock for a like number of shares of Class A Common Stock, subject in all respects to the 4.99% Rule; *provided, however*, that in connection with the distribution of Class A Common Stock or Class B Common Stock to Holders of Allowed Credit Agreement Claims, such Holders may have elected to receive such stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification.

2.     *Foreign Ownership Between 25% and 100%.* If the FCC adopts a Declaratory Ruling allowing foreign ownership of Reorganized Cumulus between twenty-five percent (25%) and one hundred percent (100%) (the "*Partial Declaratory Ruling Percentage*"), then, each Non-U.S. Holder of Special Warrants that has timely delivered an Ownership Certification in accordance with the Plan and the Warrant Agreement, shall be deemed to have exercised its Special Warrants, pro rata among all such Non-U.S. Holders (*i.e.*, calculated with the denominator as the number of Special Warrants held by Non-U.S. Holders who timely provide an Ownership Certification), to receive Class B Common Stock, in an amount of shares that causes the aggregate alien ownership (on an equity and on a voting basis) of Stock to equal, at most, the Partial Declaratory Ruling Percentage; *provided*, that any Holder who had not checked the Class B Election box on the Ownership Certification shall be further deemed to have immediately exchanged such shares of Class B Common Stock for a like number of shares of Class A Common Stock, subject in all respects to the 4.99% Rule; *provided, however*, that in connection with the distribution of Class A Common Stock to Holders of Allowed Credit Agreement Claims, such Holders may have elected to receive such stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification. For the avoidance of doubt, any Non-U.S. Holder that does not timely provide its Ownership Certification in accordance with the Plan and the Warrant Agreement shall retain its Special Warrants, and such Special Warrants shall not be deemed exercised into Class A Common Stock and/or Class B Common Stock pursuant to this Section 2;

3.     *Foreign Ownership Under 25%.* If the FCC does not grant the Declaratory Ruling so as to permit foreign ownership of Reorganized Cumulus to exceed 25%, then Non-U.S. Holders cannot elect to convert their Special Warrants into Stock and must either hold such Special Warrants or transfer them.

6

EXHIBIT B

  

### Investor Group to Acquire Voya's Closed Block Variable Annuity Business

*--Consortium Led by Apollo, Crestview Partners, and*
*Reverence Capital Partners to Form Industry Solution for Variable Annuities--*

New York, December 21, 2017 – An investor group led by affiliates of Apollo Global Management, LLC (together with its consolidated subsidiaries, "Apollo") (NYSE: APO), Crestview Partners ("Crestview"), and Reverence Capital Partners ("Reverence"), today announced they have entered into a definitive agreement to acquire Voya Financial, Inc.'s ("Voya") (NYSE: VOYA) Closed Block Variable Annuity business (the "CBVA Business"). The investment will be made through a newly formed standalone entity ("Venerable Holdings, Inc." or "Venerable"). The proposed transaction, which is expected to close in the second or third quarter of 2018, is subject to regulatory approvals and other customary closing conditions. Apollo, Crestview, and Reverence will own equal stakes in Venerable, and Athene Holding Ltd. ("Athene") (NYSE: ATH) and Voya will also acquire minority positions in Venerable.

The investors in Venerable are all well-established strategic investors with significant regulatory credibility and experience in successfully building and growing insurance businesses with patient, long-term capital. Upon closing of the transaction, Venerable will be conservatively capitalized to CTE 98+. The investors in Venerable believe it is advantageous that the CBVA Business will operate as a private company, with a hedging strategy that will focus on the economic and regulatory stability of the underlying assets and statutory capital strength rather than reducing GAAP earnings volatility. In connection with the transaction, Voya Investment Management will become Venerable's preferred asset management partner. Voya has substantial heritage and knowledge in this area and will manage the assets of the CBVA Business as well as the assets from future acquisitions of closed block variable annuities by Venerable.

Apollo, Crestview and Reverence said, "We are attracted to Voya's CBVA Business due to the strength of the team and platform, and the structure and stability of the underlying assets. We believe blocks such as the CBVA Business are best owned through private ownership. In addition, we believe success in variable annuities is primarily calibrated with effective risk management, which is Venerable's most significant core competency. With a sole focus on variable annuities and support from an outstanding group of strategic investors, Venerable is uniquely positioned to serve as a leading industry solution for the consolidation of variable annuity blocks and the creation of long-term economic value."

In connection with the transaction that is being announced today, Athene has signed a definitive agreement to reinsure approximately $19 billion of Voya's fixed and fixed indexed annuities, which will be administered by Venerable, and Athene Asset Management will provide asset management services for these fixed annuities. In addition, Athene will be Venerable's strategic partner for fixed annuity blocks as opportunities arise going forward.

The senior leadership team of the current CBVA Business, including Patrick Lusk, David Wiland, and Timothy Brown, will remain in place at Venerable and will continue to perform the same

EXHIBIT C

functions. Venerable will also establish a core group of employees exclusively focused on risk management and operational efficiency.

Venerable's headquarters will remain in the CBVA Business's current headquarters in West Chester, Pennsylvania, and the CBVA Business's existing U.S. operations will be consolidated in Des Moines, Iowa. Over time, as Venerable acquires additional variable annuity portfolios, it expects to build a meaningful presence in Des Moines and establish a center of excellence for variable annuities.

Barclays is serving as financial advisor and Sidley Austin LLP is serving as legal counsel to Venerable in connection with this transaction.

### About Apollo Global Management

Apollo is a leading global alternative investment manager with offices in New York, Los Angeles, Houston, Chicago, St. Louis, Bethesda, Toronto, London, Frankfurt, Madrid, Luxembourg, Mumbai, Delhi, Singapore, Hong Kong and Shanghai. Apollo had assets under management (AUM) of approximately $242 billion as of September 30, 2017 in private equity, credit and real assets funds invested across a core group of nine industries where Apollo has considerable knowledge and resources. For more information about Apollo, please visit www.agm.com.

### About Crestview Partners

Founded in 2004, Crestview Partners is a value-oriented private equity firm focused on the middle market. The firm is based in New York and manages funds with over $7 billion of aggregate capital commitments. The firm is led by a group of partners who have complementary experience and distinguished backgrounds in private equity, finance, operations and management. Crestview has senior investment professionals focused on sourcing and managing investments in each of the specialty areas of the firm: energy, financial services, industrials and media. For more information: www.crestview.com.

### About Reverence Capital Partners

Reverence Capital Partners is a private investment firm focused on thematic investing in leading global, middle-market Financial Services businesses through control and influence oriented investments in 5 sectors: (1) Depositories and Finance Companies, (2) Asset and Wealth Management, (3) Insurance, (4) Capital Markets and (5) Financial Technology/Payments. The firm was founded in 2013, by Milton Berlinski, Peter Aberg and Alex Chulack, after distinguished careers advising and investing in a broad array of financial services businesses. The Partners collectively bring over 90 years of advisory and investing experience across a wide range of financial services sectors.

### Forward Looking Statements

This press release may contain forward looking statements that are within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. These statements include, but are not limited to, discussions related to Apollo's expectations regarding the performance of its business, its liquidity and capital resources and the other non-historical statements in the discussion and analysis. These forward-looking statements are based on management's beliefs, as well as assumptions made by, and information currently available to, management. When used in this press release, the words "believe," "anticipate,"

EXHIBIT C

"estimate," "expect," "intend" and similar expressions are intended to identify forward-looking statements. Although management believes that the expectations reflected in these forward looking statements are reasonable, it can give no assurance that these expectations will prove to have been correct. These statements are subject to certain risks, uncertainties and assumptions, including risks relating to our dependence on certain key personnel, our ability to raise new private equity, credit or real estate funds, market conditions, generally, our ability to manage our growth, fund performance, changes in our regulatory environment and tax status, the variability of our revenues, net income and cash flow, our use of leverage to finance our businesses and investments by our funds and litigation risks, among others. We believe these factors include but are not limited to those described under the section entitled "Risk Factors" in Apollo's annual report on Form 10-K filed with the Securities and Exchange Commission (the "SEC") on February 13, 2017, as such factors may be updated from time to time in our periodic filings with the SEC, which are accessible on the SEC's website at www.sec.gov. These factors should not be construed as exhaustive and should be read in conjunction with the other cautionary statements that are included in this press release and in other filings. We undertake no obligation to publicly update or review any forward-looking statements, whether as a result of new information, future developments or otherwise, except as required by applicable law. This press release does not constitute an offer of any Apollo fund.

## Contact Information

### *Apollo*

For investor inquiries regarding Apollo:

Gary M. Stein
Head of Corporate Communications
Apollo Global Management, LLC
212-822-0467
gstein@apollolp.com

Noah Gunn
Investor Relations Manager
Apollo Global Management, LLC
212-822-0540
ngunn@apollolp.com

For media inquiries regarding Apollo:

Charles Zehren
Rubenstein Associates, Inc. for Apollo Global Management, LLC
(212) 843-8590
czehren@rubenstein.com

### *Crestview*

Jeffrey Taufield/Daniel Yunger
Kekst and Company
212-521-4800
jeffrey.taufield@kekst.com/daniel.yunger@kekst.com

EXHIBIT C

*Reverence*

Milton Berlinski
Co-Founder and Managing Partner
Reverence Capital Partners
212-804-8022
milton.berlinski@reverencecapital.com

4

EXHIBIT C

10/15/2018

Acuris Debtwire
An Acuris company

(https://acuris.com)

Request a free trial

Login to Debtwire

MENU

(/info/trying-
solve-
enigma-
bdc-
valuation-
middle-
market-
memo)

# CASE PROFILE: Cumulus Media RSA hands 83.5% of equity to TL holders

30 November' 2017

[f] (/#facebook)  [y] (/#twitter)  [in] (/#linkedin)  [✉] (/#email)

Radio broadcasting company **Cumulus Media** filed for Chapter 11 protection last night (29 November) with a restructuring support agreement (RSA) in hand. The RSA would give 83.5% of the company's reorganized equity to its holders of its term loan, and the proposal is backed by holders of about 69% of those lenders. Holders of a USD 610m 7.75% senior note due 2019 would get 16.5% of the new stock.

Along with the consenting term loan lenders, shareholder Crestview Radio Investors also supports the RSA. Cumulus is not currently seeking approval to use debtor-in-possession (DIP) financing, but is asking the court to authorize the use of cash collateral. A first-day hearing is scheduled for Friday (1 December) at 12:30pm ET in the US Bankruptcy Court for the Southern District of New York.

| FIRST DAY STATS | | | | | | |
|---|---|---|---|---|---|---|
| Court | Judge | Petition Date | Case Number | First Day Hearing | Debtor Entities | Assets (USD) | Liabilities (USD) |
| SDNY | Shelley C. Chapman | 29 November 2017 | 17-13381 | 1 December at 12:30 p.m. (EST) | 37 | 1bn—10bn | 1bn—10bn |

content/live/document-repository/document/ryhQ5Tplz)

(https://cdn.mmgcache.net/editorial-

CLICK HERE (http://www.debtwire.com/dockets/cases/?ysb=1-17-bk-13381) to view all **Cumulus Media** Chapter 11 filings on **Debtwire Dockets.**

### The company

Cumulus radio broadcasting reaches 245m people every week through radio stations it owns and operates, according to a first-day declaration from John Abbot, the company's CFO and executive vice president.

EXHIBIT D

10/15/2018

CASE PROFILE: Cumulus Media RSA hands 83.5% of equity to TL holders | Debtwire

MENU

Acuris Debtwire
An Acuris company
(https://acuris.com)

Request a free trial          Login to Debtwire

Cumulus Media Inc.
Structure Chart



(https://cdn.mmgcache.net/editorial-
content/live/document-repository/document/3yyVeRotz)

The company divides its operations into two segments. The radio station segment owns and operates 446 radio stations across the country. Cumulus's **Westwood One** brand runs its radio network segment, which syndicates content and services to about 8,000 other radio station affiliates.

The company-owned radio stations serve 90 different markets located across 36 states and Washington, DC, Abbot said. In addition, Westwood One is one of the largest radio networks in the country by number of station affiliates. It produces, syndicates and distributes owned-content and services, as well as content and services produced by partnering with third parties. Westwood One sells its content to station affiliates in exchange for commercial air time, which it in turn sells to national advertisers.

Abbot said Cumulus and other radio broadcasting companies derive their primary revenue by selling advertising time to local, regional and national spot advertisers. Radio networks like the Westwood One division derive revenue from the sale of advertising time primarily to national network advertisers. Given audience variety and low advertising rates compared to other media, Abbot said radio is considered a cost-effective, efficient means of reaching specifically identified demographic groups -- especially since many radio stations are classified into specific genres like country, rock, oldies, or news and talk.

Cumulus does generate revenue from non-broadcast sources as well, Abbot said. The other revenue outlets include events and digital sources - such as advertising from Cumulus's digital streaming programing, website ads, podcast ads, and the sale of third-party digital products and services.

As of 31 December 2016, Cumulus employed about 5,479 people, with 250 of those being covered under collective bargaining agreements. In 2016, Cumulus generated operating revenues of USD 1.1bn.

**The debt**

On 23 December 2013, Cumulus entered into an amended credit agreement with lenders and agents for an initial USD 2bn term loan, maturing in December 2020, and a revolving facility maturing in December 2018, under which USD 200m was available to borrow. USD 1.7bn is outstanding as of the petition date on the term loan, according to the first-day declaration. There are no amounts due under the revolving facility.

EXHIBIT D

https://www.debtwire.com/info/case-profile-cumulus-media-rsa-hands-835-equity-tl-holders

2/11

10/15/2018

CASE PROFILE: Cumulus Media RSA hands 83.5% of equity to TL holders | Debtwire

MENU

Request a free trial

Login to Debtwire

(https://acy/info/m)

### CAPITAL STRUCTURE (USDm) at 29 November 2017

| | Coupon | Maturity | Face Amount Outstanding | Adjustments | Pro Forma |
|---|---|---|---|---|---|
| USD 200m Revolving Credit Facility | L+3.25% | 29-Dec-18 | | | |
| USD 2bn Term Loan | L+3.25% | 23-Oct-20 | 1,729 | (1,729) | - |
| Accrued and Unpaid Interest (as of 29 November) | | | 6 | (6) | - |
| First Lien Term Loan Exit Facility | L+4.50% | 15-May-22 | - | 1,300 | 1,300 |
| **Cumulus Media Secured Debt** | | | **1,735** | **(435)** | **1,300** |
| USD 610m 7.75% Senior Unsecured Notes | 7.750% | 01-May-19 | 610 | (610) | - |
| Accrued and Unpaid Interest (as of 29 November) | | | 27 | (27) | - |
| **Cumulus Media Unsecured Debt** | | | **637** | **(637)** | **-** |
| **Total Consolidated Debt** | | | **2,372** | **(1,072)** | **1,300** |

repository/document/?1cxyRTlz)

(https://cdn.mmgcache.net/editorial-content/live/document-

The company issued its 7.75% senior notes due 2019 on 13 May 2011. Abbot said the proceeds were used to repay USD 575.8m under a term loan from a prior credit agreement. On 16 September 2011, Cumulus entered into an indenture governing the notes. The noteholders have a USD 637.3m listed unsecured claim.

EXHIBIT D

10/15/2018

CASE PROFILE: Cumulus Media RSA hands 83.5% of equity to TL holders | Debtwire

MENU

Login to Debtwire

a free trial

## TOP 20 UNSECURED CREDITORS

| | Unsecured Creditor | Contact Information | Nature of Claim | Claim Amount (USD) |
|---|---|---|---|---|
| 1. | US BANK NATIONAL ASSOCIATION | WILLIAM ECHOLS / Fax: (404) 898-6844<br>Email: WILLIAM.ECHOLS@USBANK.COM | 7.75% Senior Notes | 637,314,000 |
| 2. | NIELSEN AUDIO, INC. | SEAN R. CREAMER CEO / Phone: (410) 312-8000<br>Fax: (410) 312-8607 | Trade Debt | 6,653,543 |
| 3. | BROADCASTERS GENERAL STORE INC | KERSTIN KERRY CEO / Phone: (352) 622-7700<br>Fax: (352) 629-7000 | Trade Debt | 967,596 |
| 4. | BROADCAST MUSIC, INC. | MICHAEL O'NEILL, PRESIDENT & CEO / Phone: (615) 401-2000<br>Email: NASHVILLE@BMI.COM. | Trade Debt | 789,812 |
| 5. | IGT MEDIA HOLDINGS, INC. | MARK MECHANIC, COO / Phone: (305) 573-2800<br>Fax: (305) 573-2120 | Trade Debt | 286,299 |
| 6. | KESN OPERATING, LTD. | JOHN HARE, PRESIDENT | Trade Debt | 273,333 |
| 7. | LIVE NATION | MICHAEL RAPINO, PRESIDENT, CEO & DIR.<br>Phone: (310) 867-7000 / Fax: (302) 636-5454 | Trade Debt | 238,652 |
| 8. | ENTICENT, LLC DBA TRITON DIGITAL | NEAL SCHORE, CEO / Phone: (514) 448-4037<br>Email: HELP@TRITONDIGITAL.COM | Trade Debt | 198,255 |
| 9. | OAKLAND RAIDERS | MARK DAVIS, OWNER / Phone: (510) 864-5000<br>Email: FEEDBACK@RAIDERS.COM | Trade Debt | 190,000 |
| 10. | CNN, INC. | JEFF ZUCKER, PRESIDENT / Phone: (404) 827-1700 | Trade Debt | 161,067 |
| 11. | MERLIN MEDIA, LLC | RANDY MICHAELS, CEO / Phone: (312) 245-1000 | Trade Debt | 144,772 |
| 12. | BAKER INTERACTIVE SERVICES, LLC | KEITH HICKS III, MEMBER / Phone: (770) 441-2000<br>Fax: (770) 449-7719 / Email: SALES@BAKERAUDIOVISUAL.COM | Trade Debt | 102,831 |
| 13. | NAVINT PARTNERS LLC | MR. JIM MARTINDALE, MANAGING PARTNER AND CEO<br>Phone: (914) 992-3397 | Trade Debt | 87,040 |
| 14. | MICHAEL CRONIN ACOUSTIC CONSTRUCTION LLC | MICHAEL CRONIN, OWNER / Phone: (615) 473-7778 | Trade Debt | 60,961 |
| 15. | MUSICTOGO LLC | | Trade Debt | 58,889 |
| 16. | COURTSIDE, LLC | NORMAN PATTIZ, CEO / Phone: (310) 858-0886<br>Fax: (310) 858-9710 | Trade Debt | 56,090 |
| 17. | ALSTON & BIRD LLP | BRENDA C. MARTIN, DIRECTOR OF CLIENT FINANCIAL SER-<br>VICES / Fax: (404) 253-8459<br>Phone: (404) 881-7000 / Email: BRENDA.MARTIN@ALSTON.COM | Trade Debt | 52,817 |
| 18. | ACT 1 SYSTEMS, INC. | ROBERT FITE & ERIC ROSENBERG / Phone: (818) 347-6400<br>Email: RFITE@ACT1SYSTEMS.COM ERIC@ACT1SYSTEMS.COM | Trade Debt | 45,728 |
| 19. | GATESAIR, INC. | BRUDE SWAIL CEO<br>Phone: (800) 622-0022 / Email: INFORMATION@GATESAIR.COM | Trade Debt | 45,596 |
| 20. | CATLIN FERRARI, ALYSSA U., MA-RIA P., AND MELISSA M. ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED | ATTN: SEAN E. COONEY, ESQ. / Phone: (716) 852-1886<br>ATTN: CHRISTOPHER MARLBOROUGH ESQ.<br>Phone: (212) 991-8960 / Phone: (212) 363-7500 | Litigation | Undetermined |

Source: Voluntary Chapter 11 Petition

(https://cdn.mmgcache.net/editorial-

content/live/document-repository/document/SkvFcpagz)

Cumulus also previously had an accounts receivable securitization facility with Wells Fargo Capital Finance, but at the end of 2015 and 2016 there were no amounts outstanding. The facility was terminated on 28 November of this year.

As of 13 November, there were 1,027 holders of Cumulus's Class A common stock and one holder of its Class C common stock. No Class B stock was issued or is outstanding.

**The descent**

Between 1998 and 2013, Cumulus completed about USD 5bn worth of acquisitions to grow both its radio network and radio station businesses. Its largest acquisition was **Citadel Broadcasting** in 2011.

EXHIBIT D

4/11

10/15/2018

MENU

5/11

# Acuris Debtwire

(https://acuris.com)

develop the necessary management and technology infrastructure to integrate the assets and support and management decisions ended up being "erroneous," he added. Additionally, Abbot noted that management decisions failed to achieve desired results, so the company didn't reach cash flow projections it had made to support paying for the acquisitions, particularly Citadel and then **Dial Global** – now known as the Westwood One business – in 2013.

Abbot said underperformance resulted in leverage levels significantly in excess of original projections. This issue caused the company's performance to falter so much that from 2012 on, it faced declining year-over-year ratings, revenue, and EBITDA, according to court documents.

In addition to Cumulus's historical underperformance, advertiser and listener demand "for radio overall has been negatively impacted by content and advertising opportunities in growing digital streaming and web-based digital formats," Abbot said. The shift has resulted in declines in radio industry revenue and listenership, he added.

As a result of industry pressures, coupled with the high acquisition prices and resulting poor performance, Cumulus found itself with an excess of debt relative to its earnings and "rapidly" faced approaching maturities on funded debt, Abbot said.

## Restructuring talks

In 2015, Cumulus began to consider balance sheet restructuring options to address maturities under its credit agreement and indenture, according to court documents. On 7 December 2016, the company announced it had entered into a refinancing support agreement with holders of about 57.3% of its outstanding senior notes in contemplation of a private exchange offer. The offer would refinance the notes, reduce outstanding principal on funded debt, and address upcoming maturities, court papers showed.

Cumulus launched the offer on 12 December 2016. At the same time, the company filed a complaint in the US District Court for the Southern District of New York against the administrative agent under its existing credit agreement seeking a declaratory judgment that the company was authorized to proceed with its refinancing. Cumulus also asked the court to require the agent to comply with contractual obligations to consent. On 24 February of this year, the court denied the motion for summary judgment. Subsequently, Cumulus terminated its private exchange and refinancing support agreement on 10 March.

Cumulus then began negotiations for a potential restructuring with advisors to ad hoc groups of its term loan lenders and holders of the senior notes. The lenders on the term loan ad hoc committee are: Eaton Vance Management; Franklin Mutual Advisers; Highland Capital Management; JP Morgan Chase Bank; Silver Point Finance; Voya Investment Management; Beach Point Capital Management; Symphony Asset Management; and Nuveen Fund Advisors.

The noteholder ad hoc group includes Angelo, Gordon & Co.; Brigade Capital Management; Capital Research and Management; Greywolf Capital Management; and Waddell & Reed Investment Management.

In September of this year, Cumulus executed non-disclosure agreements with members of the groups to further negotiations. On September 26, along with restructuring advisors, it held separate meetings with the noteholders and the term loan lenders. At the meetings, Cumulus presented the framework for a restructuring proposal. Each ad hoc group presented the company with their own initial restructuring proposal during the first week of October.

Abbot said Cumulus continued to negotiate terms with each of its creditor constituencies during October to reach a deal. By the end of the month, the company's negotiations with the ad hoc noteholder group had produced a "general alignment" on terms for an out-of-court restructuring and if that failed, a potential in-court restructuring, Abbot said. The proposed terms included reinstating the term loan and equitizing the senior notes. At the same time, Cumulus was also making progress in its negotiations with the ad hoc lender group.

On 30 October, the board of directors authorized Cumulus to forego a USD 23.6m interest payment on its senior notes due 1 November and enter a 30-day grace period.

## The RSA and Chapter 11 case

On 29 November, Cumulus entered into its RSA backed by consenting term loan lenders holding about 69% of the loans and filed for bankruptcy on the same day. Under the proposed treatment, the term loan lenders would get a USD 1.3bn first lien term loan and 83.5% of the company's reorganized equity.

**EXHIBIT D**

10/15/2018

CASE PROFILE: Cumulus Media RSA hands 83.5% of equity to TL holders | Debtwire

Login to Debtwire

Request a free trial

MENU

(https://acuris.com)

## NEW FIRST LIEN DEBT TERM SHEET

| | |
|---|---|
| Borrower | Reorganized Cumulus |
| Guarantors | The direct parent of Reorganized Cumulus and all present and future wholly-owned subsidiaries of the Parent (subject to exceptions that are substantially consistent with those set forth in the Existing Credit Agreement, excluding any exception for Unrestricted Subsidiaries) |
| Amount | USD 1.3bn |
| Admin Agent | JPMorgan Chase Bank |
| Interest Rate | LIBOR+4.5% (1% LIBOR floor) or ABR+3.5% (2% ABR floor) |
| Maturity Date | 15 May 2022 |
| Amortization | 1% of the aggregate outstanding principal amount of the New First Lien Debt as of the Effective Date shall be payable annually to be repaid in equal quarterly installments. |
| Security | First priority security interests in all the assets of the Borrower and the Guarantors in a manner substantially consistent with the Existing Credit Agreement (subject to certain exceptions) |

Source: RSA

(https://cdn.nmgcache.net/editorial-content/live/document-

repository/document/ryXvca6gG)

The senior noteholders, along with other general unsecured creditors, would get a pro rata share of 16.5% of new common stock, subject to dilution from a post-emergence management incentive program. Current equity holders would be wiped out.

EXHIBIT D

10/15/2018

CASE PROFILE: Cumulus Media RSA hands 83.5% of equity to TL holders | Debtwire

MENU

Login to Debtwire

Request a free trial

Ac___
(https://acu___m)    ___    Class

| | PROPOSED PLAN DISTRIBUTIONS (USD) |
|---|---|
| | Proposed Recoveries / Plan Treatment |
| Administrative<br>Priority Tax<br>Other Priority Claims<br>Other Secured Claims | Either (a) reinstated, (b) receive cash equal to the full amount of its claim, or (c) delivery of the collateral security (for other secured claims). |
| Term Loan Claims | USD 1.3bn if new first lien term loans and 83.5% of reorganized equity.<br>~ There could be an alternate bundling of securities to account for CLO funds holding term loan claims |
| Convenience Claims | Cash in an amount equal to 100% of the allowed claim, though total cash distributions are not to exceed USD 2m without lender consent.<br>Convenience claims = USD 20,000 GUC claim or less |
| Senior Notes Claims | 16.5% of reorganized equity |
| GUCs | Pro rata share in the Unsecured Equity Recovery Pool |
| Section 510(b) Claims | The Section 510(b) Claims shall be subordinated to all other claims against the Company, receive no distribution and be discharged. |
| Cumulus Interests | Cancelled and receive no distributions |
| Intercompany Claims | Either (a) reinstated or (b) discharged without any distribution. |
| Intercompany Interests | Either (a) reinstated or (b) cancelled without any distribution. |
| | OTHER KEY TERMS |
| ABL/Revolving Facility | Reorganized Cumulus can enter into a new USD 50m:<br>• revolving credit facility or a receivable securitization facility, subject to a borrowing base consisting of accounts receivable, or<br>• revolving loan facility secured by substantially all of the Reorganized Cumulus's assets on a pari passu basis with the New First Lien Debt.<br>The facility will be undrawn as of the effective date. |
| Board of Directors | The Board of Directors will consist of Mary Berner, as President and Chief Executive Officer of the Company, and six directors chosen by the Term Lender Group |

Source: RSA

(https://cdn.mmgcache.net/editorial-content/live/document-

repository/document/?IKd9ppeG)

EXHIBIT D

10/15/2018

CASE PROFILE: Cumulus Media RSA hands 83.5% of equity to TL holders | Debtwire

Login to Debtwire        Request a free trial        MENU

Acuris

(https://acuris.com/)

**MANAGEMENT INCENTIVE PLAN**

| Incentive Equity Pool | • 10% of common stock reserved for members of the board and senior management<br>  • 9.25% allocated for senior management ("Management Pool")<br>  • 0.75% allocated for board members ("Board Pool") |
|---|---|
| Grants | **Emergence Grants**<br>• 55% of the Management Pool will be allocated at Emergence<br>• Each grant will be 50% in restricted stock units and 50% in five (5) year stock options priced at a per share value equating to USD 513.8m equity value.<br>**Post-Emergence Grants**<br>• Remaining 45% of Management pool to be allocated post-emergence in the form of equity-base awards |
| Board Pool | Issued as RSUs and/or Options allocated evenly among non-executive board members (though non-executive Chairman may receive up to a double allocation). |
| 2018 Incentive Cash Compensation | Management agrees to tie target 2018 incentive cash compensation to USD 236m of EBITDA for 2018. |
| Vesting | **Normal Vesting**<br>• 50% of the RSUs will vest in ratable installments on 12/31/18, 12/31/19 and 12/31/20 based upon achieving the target EBITDA of USD 236m, USD246m and USD 270m, respectively, with 50% of each installment vesting on such date based upon achieving between 90% and 100% of the target EBITDA for such year.<br>• 50% of the RSUs and 100% of the Options will vest in ratable installments on the first four (4) anniversaries of the Emergence Date on the following schedule: 30%/30%/20%/20%.<br>**Accelerated Vesting**<br>• For termination without cause, the Executive will become vested in an additional tranche of the Executive's unvested Emergence Grant as if the Executive's employment continued for one additional year following the Qualifying Termination date.<br>• For change of control: 100% of the Executive's unvested RSUs and Options will accelerate and vest if terminated within 3 months or within 12 months following a change of control. |

Source: RSA

(https://cdn.mmgcache.net/editorial-content/live/document-
repository/document/ryMZ5aagM)

The RSA requires Cumulus to complete its restructuring within 180 days. The company has to file a plan and disclosure statement by 8 December. Cumulus has to get disclosure statement approval by at least 28 February 2018 and plan confirmation by 27 April 2018. Plan emergence must occur by 29 May under the RSA.

| MILESTONES | |
|---|---|
| Entry of interim cash collateral order | 2 December |
| File plan and disclosure statement | 8 December |
| Entry of final cash collateral order | 29 December |
| Entry of disclosure statement order | 27 February |
| Entry of confirmation order | 27 April 2018 |
| Plan effective date | 28 May 2018 |

Source: RSA

(https://cdn.mmgcache.net/editorial-content/live/document-
repository/document/HkrI9I6pxz)

At the company's hearing on Friday, it will seek approval of first-day motions, including authority to use its cash collateral. Cumulus's other proposed motions seek approval to pay employees, honor prepetition obligations to on-air radio talent, and pay utilities, among other things.

**EXHIBIT D**

8/11

10/15/2018

CASE PROFILE: Cumulus Media RSA hands 83.5% of equity to TL holders | Debtwire

MENU

Request a free trial

Login to Debtwire

EXHIBIT D

(https://acquire...)

## MATERIAL CASH COLLATERAL TERMS

| | |
|---|---|
| **Entities with interest in the Cash Collateral** | The secured parties |
| **Use of Cash Collateral** | (i) costs of administering chapter 11, including adequate protection payments; (ii) any court-authorized payments; (iii) working capital and CapEx; (iv) funding the Carve-Out; and (v) other general corporate purposes. |
| **Amount** | The cash collateral includes all of the debtors' cash (other than cash securing certain L/C reimbursement obligations) and all cash proceeds of the collateral. |
| **Adequate Protection** | **Adequate Protection Liens:**<br>To the extent of any diminution in value of the collateral and subject only to the Carve-Out and Permitted Prior Liens:<br>• First-priority liens on all of the Debtors' rights in tangible and intangible assets, including the Collateral and unencumbered property (including avoidance action proceeds after entry of final CC order).<br>• Junior liens on all tangible and intangible assets that are subject to valid and unavoidable liens (either perfected pre-petition or post-petition in accordance with Bankruptcy Code section 546(b).<br>**Superpriority Claims:**<br>• Allowed superpriority administrative expense claims pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code.<br>**Adequate Protection Payments:**<br>• Professional fees and expenses of the lender group and admin agent;<br>• All accrued and unpaid interest and L/C fees owed through the petition date; and<br>• Interest payments at non-default rate (Eurodollar Rate + 3.25%, subject to 1% floor"). |
| **Carve Out** | USD 4m |
| **Investigation Budget / Challenge Period** | Investigation Budget: USD 75,000 for UCC<br>Challenge Period: 60 days from entry of final CC order |

Source: Cash Collateral Motion

(https://cdn.mmgcache.net/editorial-content/live/document-

repository/document/rJ8Sc6TeG)

The advisors

https://www.debtwire.com/info/case-profile-cumulus-media-rsa-hands-835-equity-tl-holders

10/15/2018

CASE PROFILE: Cumulus Media RSA hands 83.5% of equity to TL holders | Debtwire

Acuris (https://acuris.com)

MENU

Login to Debtwire

...uest a free trial

## KNOWN ADVISORS

| Party | Legal | Financial | Other |
|---|---|---|---|
| Debtors | Paul, Weiss, Rifkind, Wharton & Garrison* / Paul Basta | Lewis R. Clayton / Jacob A. Adlerstein| Claudia R. Tobler / Kirkland & Ellis* / Nicole L. Greenblatt, P.C. | Alice Nordzinger / Robert A. Britton| Benjamin M. Rhode | Alvarez & Marsal North America (restructuring advisor) / PJT Partners* (investment banker) | Epiq Bankruptcy Solutions (claims agent) |
| Ad Hoc Lender Group | Arnold & Porter Kaye Scholer* / Michael B. Solow | Seth J. Kleinman / Sarah Gryll | Michael O. Messersmith | FTI Consulting Inc.* / Fortgang Consulting / Aloise & Associates | Members / Eaton Vance Management and Boston Management & Research* / Franklin Mutual Advisers / Highland Capital Management / JPMorgan Chase Bank, N.A. / Silver Point Finance / Symphony Asset Management and Nuveen Fund Advisors* / Voya Investment Management Co. / Beach Point Capital Management |
| Ad Hoc Senior Noteholder Group | Akin Gump Strauss Hauer & Feld* | Houlihan Lokey* | Members / Angelo, Gordon & Co. / Brigade Capital Management / Capital Research and Management Co.* / Greywolf Capital Management / Waddell & Reed Investment Management Co. |
| JPMorgan Chase Bank (Loan Agent) | Simpson Thacher & Bartlett | | |
| U.S. Bank (Indenture Trustee) | Kelley Drye & Warren / James S. Carr | Benjamin D. Feder | | |
| Consenting Equity Holders | | | Crestview Radio Investors / Lewis W. Dickey, Jr. / John W. Dickey / Michael W. Dickey / Lewis W. Dickey, Sr. / DJBC, LLC |

Source: Court Documents; *Debtwire sourced mandates.

(https://cdn.mmgcache.net/editorial-
content/live/document-repository/yqVqTlxz)

CLICK HERE [http://www.debtwire.com/document-repository/document/B7ZHsq6xGi] to view the Chapter 11 petition.
CLICK HERE [http://www.debtwire.com/document-repository/document/kjrAs66lJz] to view the RSA.
CLICK HERE [http://www.debtwire.com/document-repository/document/HkQsiTaez] to view the first-day declaration.
CLICK HERE [http://www.debtwire.com/document-repository/document/HkQQa6lM] to view the cash collateral motion.
CLICK HERE [http://www.debtwire.com/companies/view/prime-592724] to view All Intelligence for Cumulus Media.

**Products**
Debtwire
Xtract Research
Creditflux

**What We Do**
What is Debtwire
How can we help
Take a look around

**News & Events**
Debtwire Exclusives
Publications
Events
Partnerships

**About**
Careers
Contact

https://www.debtwire.com/info/case-profile-cumulus-media-rsa-hands-835-equity-tl-holders

EXHIBIT D

10/11

10/15/2018

CASE PROFILE: Cumulus Media RSA hands 83.5% of equity to TL holders | Debtwire

△ Acu**Debtwire**
(https://acp(ifit**o**pm)     An Acuris company                    Login to Debtwire     Request a free trial                              MENU

△ **Acuris**
(https://www.acuris.com/)

## Fixed Income

▷ Debtwire
An Acuris company

▷ Xtract Research
An Acuris company

▷ Creditflux
An Acuris company

## Transactions & Infrastructure

△ Mergermarket
An Acuris company

△ Unquote
An Acuris company

△ AVCJ
An Acuris company

△ Activistmonitor
An Acuris company

△ Inframation
An Acuris company

## Compliance

▽ Hedge Fund Law Report
An Acuris company

▽ Anti-Corruption Report
An Acuris company

▽ Cybersecurity Law Report
An Acuris company

▽ Wealthmonitor
An Acuris company

▽ **Acuris Risk Intelligence**

▽ Capital Profile
An Acuris company

## Equities

▷ Dealreporter
An Acuris company

▷ PaRR
An Acuris company

▷ TIM
An Acuris company

## Research

▷ Acuris Studios
An Acuris company

▷ Perfect Information
An Acuris company

Terms of Use · Privacy Notice · Group Disclaimer · Policies

All content © Mergermarket Limited 2018 (03879547 UK).

**EXHIBIT D**

11/11

# Venerable Holdings Completes Acquisition from Voya Financial

### *Former Voya Closed Block Variable Annuity Business Launches Today as Standalone Company*

**June 1, 2018**

WEST CHESTER, PA – Venerable Holdings, Inc. ("Venerable") today announced the completion of its acquisition of Voya Financial, Inc.'s ("Voya") (NYSE: VOYA) Closed Block Variable Annuity (CBVA) business. As announced in December 2017, Voya has divested its CBVA business to Venerable, a private company established to serve as a leading industry solution for the consolidation of closed variable annuity blocks. Venerable was created by a consortium of investors led by affiliates of Apollo Global Management, LLC (NYSE: APO), Crestview Partners, Reverence Capital Partners, and Athene Holding Ltd. ("Athene") (NYSE: ATH). Voya also owns a minority position in Venerable.

"This transaction demonstrates our strong belief in the attractiveness of the annuity business and the substantial growth opportunity it represents," stated David Marcinek, Chairman and Senior Managing Director, Venerable Holdings, Inc. "As a focused, standalone business, Venerable is well-positioned to deliver best in class service to our policyholders, solutions to the annuity industry and strong financial value to our investors."

"We now begin our journey with an experienced and talented team of professionals, well-prepared to meet our financial and business goals," said Patrick Lusk, President and CEO of VIAC, the operating company for Venerable. "Through our investment partners, we have a solid financial foundation, and we are committed to pursuing steady long-term growth."

In connection with the transaction that was completed today, Athene will reinsure approximately $19 billion of Voya's fixed and fixed indexed annuities from Venerable and Voya, all of which will be administered by Venerable, and Athene Asset Management will provide asset management services for these fixed annuities. Voya Investment Management will serve as the preferred asset management partner for Venerable's variable annuities.

Barclays served as financial advisor and Sidley Austin, LLP served as legal counsel to Venerable in connection with this transaction.

EXHIBIT E

***About Venerable***

*Venerable is a privately held company with business operations based in West Chester, Pennsylvania and Des Moines, Iowa. Venerable owns and manages the legacy variable annuity business acquired from Voya Financial, Inc. Created by an investor group led by affiliates of Apollo Global Management, LLC, Crestview Partners, Reverence Capital Partners, and Athene Holding, Ltd., Venerable is an emerging business with well-established, strategic investors, experienced in successfully building and growing insurance businesses with patient, long-term capital. For more information, please visit www.venerableannuity.com.*

**Contact:**
Allison Proud, 610-425-4269
Corporate Communications
Allison.Proud@venerableannuity.com

EXHIBIT E

# Press Releases

## VICTORY CAPITAL ANNOUNCES PRICING OF INITIAL PUBLIC OFFERING

February 7, 2018 at 7:32 PM EST

CLEVELAND--(BUSINESS WIRE (https://www.businesswire.com/))--Victory Capital Holdings, Inc. ("Victory Capital") today announced the pricing of its initial public offering of 11,700,000 shares of its Class A common stock at a public offering price of $13.00 per share. The shares are expected to begin trading on the Nasdaq Global Select Market on February 8, 2018, under the ticker symbol "VCTR".

Additionally, Victory Capital has granted the underwriters a 30-day option to purchase up to an additional 1,755,000 shares of its Class A common stock at the initial public offering price, less underwriting discounts and commissions. The offering is expected to close on or about February 12, 2018, subject to customary closing conditions.

J.P. Morgan, BofA Merrill Lynch and Morgan Stanley are serving as joint lead book-running managers and as representatives of the underwriters for the offering. Barclays, Goldman Sachs & Co. LLC and RBC Capital Markets are also acting as joint book-running managers for the offering. Keefe, Bruyette & Woods, A Stifel Company, William Blair and Sandler O'Neill + Partners, L.P. are acting as co-managers for the offering.

A registration statement relating to these securities was filed with and has been declared effective by the U.S. Securities and Exchange Commission ("SEC"). The offering will be made only by means of a prospectus. Copies of the final prospectus related to the offering may be obtained, when available, from J.P. Morgan, c/o Broadridge Financial Solutions, 1155 Long Island Avenue, Edgewood, NY 11717, or by calling toll-free at (866) 803 9204; BofA Merrill Lynch, Attention: Prospectus Department, 200 North College Street, 3rd Floor, Charlotte, NC 28255-0001, or via email: dg.prospectus_requests@baml.com (mailto:dg.prospectus_requests@baml.com); or Morgan Stanley & Co. LLC, Attention: Prospectus Department, 180 Varick Street, 2nd Floor, New York, New York 10014.

This press release does not constitute an offer to sell or a solicitation of an offer to buy, nor shall there be a sale of these securities in any state or jurisdiction in which such an offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such state or jurisdiction.

## ABOUT VICTORY CAPITAL

Victory Capital is an integrated multi-boutique asset management firm, headquartered in Cleveland, Ohio. As of December 31, 2017, the firm had approximately $61.8 billion in assets under management and advisement. Victory Capital provides institutions, financial advisors and retirement platforms with a variety of asset classes and investment vehicles, including separately managed accounts, collective trusts, mutual funds, ETFs and UMA/SMA vehicles.

## FORWARD-LOOKING STATEMENTS

This press release may contain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These statements may include, without limitation, any statements preceded

EXHIBIT F

by, followed by or including words such as "target," "believe," "expect," "aim," "intend," "may," "anticipate," "assume," "budget," "continue," "estimate," "future," "objective," "outlook," "plan," "potential," "predict," "project," "will," "can have," "likely," "should," "would," "could" and other words and terms of similar meaning or the negative thereof. Such forward-looking statements involve known and unknown risks, uncertainties and other important factors beyond Victory Capital's control, as discussed in Victory Capital's filings with the SEC, that could cause Victory Capital's actual results, performance or achievements to be materially different from the expected results, performance or achievements expressed or implied by such forward-looking statements. Such forward-looking statements are based on numerous assumptions regarding Victory Capital's present and future business strategies and the environment in which it will operate in the future. Any forward-looking statement made in this press release speaks only as of the date hereof. Except as required by law, Victory Capital assumes no obligation to update these forward-looking statements, or to update the reasons actual results could differ materially from those anticipated in the forward-looking statements, even if new information becomes available in the future.

## Contacts

For Victory Capital Holdings, Inc.
Tricia Ross, 310-622-8226
tross@finprofiles.com (mailto:tross@finprofiles.com)



**PRINT PAGE**



**EMAIL PAGE**



**RSS FEEDS**



**EMAIL ALERTS**



**SEARCH**

Copyright Victory Capital Management Inc. ©2018

EXHIBIT F

# Cumulus' Top Trio Snags Big Bonus Checks

By Adam Jacobson – May 1, 2018



**Cumulus Media**, one of the two biggest radio companies in the U.S. — each of which are seeking Chapter 11 reorganization — has supplied the **SEC** with full details on its executive compensation for 2017.

With that, the take-home pay for President/CEO **Mary Berner**, EVP/Treasurer and CFO **John Abbot**, and SVP/General Counsel **Richard Denning** has been revealed. Each saw big bumps thanks to bonus payments awarded, based on the company's performance.

For Ms. Berner, her base salary stayed put in 2017, from 2016. This was $1.45 million.

But, her 2017 bonus was enormous compared to the one she obtained in 2016: it was exactly $3,800,101. Along with "other compensation" totaling $4,943, Berner earned a total $5,250,101 in 2017 — up from $2,537,500 in 2016.

Berner's current employment agreement was codified on Oct. 26, 2017 and runs through Sept. 29, 2018. Her base salary is "subject to increase."

At the same time, Abbott saw his base salary jump from $375,000 to $750,000, while his 2017 bonus came in at $1,495,661. Add in $2,250 in "other compensation," and he took home $2,250,604 in 2017. That's up from $987,653 in 2016.

Abbott's employment agreement was also finalized in late October 2017, and runs through Oct. 13, 2018.

For Denning, a slight adjustment in his base salary was seen, rising to $550,000 from $520,833. The big payday came by way of a bonus, too. His 2017 bonus was $896,765. With Cumulus-paid life and disability insurance premiums and company contributions to his 401(k) plan account totaling $10,124, Denning's total earnings in 2017 are $1,446,765.

That's up from $692,841 in 2016.

Denning has an employment agreement with Cumulus through Nov. 29, 2018, also agreed to in late October 2017.

The bonus payments are tied to Cumulus' QIP and "SIP" incentive programs — approved by **Shelley Chapman**, Judge for the U.S. Bankruptcy Court for the Southern District of New York.

Cumulus' Quarterly Incentive Plan is the QIP. This is the QIP. This was first revealed on May 18, 2017 in an SEC filing. This move saw Cumulus' Board of Director shift from an annual to a quarterly compensation plan for 2017. Additionally, the board adopted a supplemental incentive plan for 2017, the so-called SIP. This was done after being instructed to do so by the board's Compensation Committee and the committee's independent compensation consultant.

Cumulus' SIP was adopted to, among other things, "further align key senior operating executives' interests with those of stakeholders in light of the decline in value of outstanding equity awards."

Get the top Radio and TV News delivered to your inbox each afternoon.    Sign Me Up!

EXHIBIT G

10/15/2018

1/2

### Adam Jacobson

Adam R. Jacobson is a veteran radio industry journalist and advertising industry analyst with general, multicultural and Hispanic market expertise. From 1996 to 2006 he served as an editor at Radio & Records.

**You do not have permission to view the comments.**

Get the top Radio and TV News delivered to your inbox each afternoon.    Sign Me Up!

EXHIBIT G

EXHIBIT H

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

## FORM 8-K

---

**CURRENT REPORT**
Pursuant to Section 13 or 15(d)
of the Securities Exchange Act of 1934

Date of report (Date of earliest event reported): June 4, 2018

---

# CUMULUS MEDIA INC.
(Exact name of registrant as specified in its charter)

---

| | | |
|---|---|---|
| Delaware | 001-38108 | 82-5134717 |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS employer Identification No.) |

**3280 Peachtree Road, N.W., Suite 2200, Atlanta, GA**     30305
(Address of principal executive offices)     (Zip Code)

Registrant's telephone number, including area code (404) 949-0700

n/a
(Former name or former address, if changed since last report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

10/15/2018                                                                                                    Form 8-K12G3

## Explanatory Note

Cumulus Media Inc. (the "Company") filed a Form 8-K with the Securities and Exchange Commission on June 4, 2018 (the "Original Form 8-K"). The Company is refiling the Original Form 8-K solely to update the EDGAR submission code associated therewith. Except for such update, none of the information in the Original Form 8-K is being updated to reflect intervening facts or events.

As previously disclosed, on November 29, 2017, CM Wind Down Topco Inc. (f/k/a Cumulus Media Inc.) a Delaware corporation ("Old Cumulus"), and certain of its direct and indirect subsidiaries (collectively with Old Cumulus, the "Debtors"), filed voluntary petitions for relief under Chapter 11 of Title 11 of the U.S. Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The Debtors' Chapter 11 cases (the "Chapter 11 Cases") were jointly administered under the caption <u>In re: Cumulus Media Inc., et al.</u>, Case No. 17-13381.

On May 10, 2018, the Bankruptcy Court entered the *Findings of Fact, Conclusions of Law and Order Confirming the Debtors' First Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 769] (the "Confirmation Order"), which confirmed the *First Amended Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 446] (the "Plan"), as modified by the Confirmation Order.

On June 4, 2018 (the "Effective Date"), Old Cumulus satisfied the conditions to effectiveness of the Plan set forth in the Confirmation Order and in the Plan, the Plan became effective in accordance with its terms and Old Cumulus and the other Debtors emerged from Chapter 11. All capitalized terms used herein but not otherwise defined in this Current Report on Form 8-K have the meanings set forth in the Plan.

The foregoing description of the Confirmation Order and the Plan does not purport to be complete and is qualified in its entirety by reference to the full text of each of the Confirmation Order and the Plan, copies of which are attached as Exhibit 99.1 and Exhibit 2.1, respectively, to this Current Report on Form 8-K and are incorporated by reference herein.

In connection with the satisfaction of the conditions to effectiveness as set forth in the Confirmation Order and in the Plan, Old Cumulus completed a series of internal reorganization transactions pursuant to which it transferred all of its remaining assets to an indirectly wholly owned subsidiary of reorganized Cumulus Media Inc. (f/k/a CM Emergence Newco Inc.), a Delaware corporation ("Cumulus" or the "Company"), prior to winding down its business.

This Current Report on Form 8-K is being filed by the Company as the initial report of the Company to the Securities and Exchange Commission (the "Commission") and as notice that the Company is the successor issuer to Old Cumulus under Rule 12g-3 under the Securities Exchange Act of 1934 (the "Exchange Act"). As a result, the shares of the Company's Class A common stock, par value $0.0000001 per share ("Class A common stock"), are deemed to be registered under Section 12(g) of the Exchange Act. The Company is thereby subject to the informational requirements of the Exchange Act, and the rules and regulations promulgated thereunder, and in accordance therewith will file reports and other information with the Commission. The first periodic report to be filed by the Company with the Commission will be its Quarterly Report on Form 10-Q for the period ending June 30, 2018.

On June 4, 2018, the Company issued a press release announcing the effectiveness of the Plan. A copy of the press release is included as Exhibit 99.2 to this Current Report on Form 8-K and is incorporated by reference herein.

## Item 1.01      Entry into a Material Definitive Agreement

### Credit Agreement

On the Effective Date, Cumulus Media New Holdings Inc., a Delaware corporation ("Holdings") and an indirectly wholly-owned subsidiary of the Company, and certain of the Company's other subsidiaries, entered into a Credit Agreement (the "Credit Agreement") with Wilmington Trust, National Association, as administrative agent (the "Agent"), and holders of claims with respect to Old Cumulus' previous term loan credit facility under the Cancelled Credit Agreement (as defined below), as term loan lenders. Pursuant to the Credit Agreement, the lenders party thereto are deemed to have provided Holdings and its subsidiaries that are party thereto as co-borrowers with a $1.3 billion senior secured term loan credit facility (the loan thereunder, the "Term Loan").

EXHIBIT H

Form 8-K12G3

Amounts outstanding under the Credit Agreement bear interest at a per annum rate equal to (i) the Alternative Base Rate (as defined below) plus an applicable margin of 3.50%, subject to an Alternative Base Rate floor of 2.00%, or (ii) the London Inter-bank Offered Rate ("LIBOR") plus an applicable margin of 4.50%, subject to a LIBOR floor of 1.00%. The Alternative Base Rate is defined, for any day, as the per annum rate equal to the highest of (i) the Federal Funds Rate, as published by the Federal Reserve Bank of New York, plus 1/2 of 1.0%, (ii) the rate identified as the "Prime Rate" and normally published in the Money Rates section of the *Wall Street Journal*, and (iii) one-month LIBOR plus 1.0%.

Amounts outstanding under the Term Loan amortize in equal quarterly installments of 0.25% of the original principal amount of the Term Loan with the balance payable on the maturity date. The maturity date of the Credit Agreement is May 15, 2022.

The Credit Agreement contains representations, covenants and events of default that are customary for financing transactions of this nature. Events of default in the Credit Agreement include, among others: (a) the failure to pay when due the obligations owing thereunder; (b) the failure to perform (and not timely remedy, if applicable) certain covenants; (c) certain defaults and accelerations under other indebtedness, (d) the occurrence of bankruptcy or insolvency events; (e) certain judgments against Holdings or any of its subsidiaries; (f) the loss, revocation or suspension of, or any material impairment in the ability to use, any one or more of, any material Federal Communications Commission (the "FCC") licenses; (g) any representation or warranty made, or report, certificate or financial statement delivered, to the lenders subsequently proven to have been incorrect in any material respect; and (h) the occurrence of a Change in Control (as defined in Credit Agreement). Upon the occurrence of an event of default, the Agent may, with the consent of, or upon the request of, the required lenders, accelerate the Term Loan and exercise any of its rights as a secured party under the Credit Agreement and the ancillary loan documents provided, that in the case of certain bankruptcy or insolvency events with respect to a borrower, the Term Loan will automatically accelerate.

The Credit Agreement does not contain any financial maintenance covenants. The Credit Agreement provides that Holdings will be permitted to enter into either a revolving credit facility or receivables facility providing commitments of up to $50.0 million, subject to certain conditions.

The borrowers may elect, at their option, to prepay amounts outstanding under the Credit Agreement without premium or penalty (except that any prepayment during the period of six months following the closing of the Credit Agreement would require a premium equal to 1.00% of the prepaid principal amount). The borrowers may be required to make mandatory prepayments of the Term Loan upon the occurrence of specified events as set forth in the Credit Agreement, including upon the sale of certain assets and from Excess Cash Flow (as defined in the Credit Agreement).

Amounts outstanding under the Credit Agreement are guaranteed by Cumulus Media Intermediate Inc. ("Intermediate Holdings"), which is a subsidiary of the Company, and the present and future wholly-owned subsidiaries of Holdings that are not borrowers thereunder, subject to certain exceptions as set forth in the Credit Agreement (the "Guarantors") and secured by a security interest in substantially all of the assets of Holdings, the subsidiaries of Holdings party to the Credit Agreement as borrowers, and the Guarantors.

Some of the lenders and the Agent under the Credit Agreement, or their affiliates, have had in the past, and may have, in the future, various relationships with the Company involving the provision of financial or other advisory services, including cash management, investment banking and brokerage services. These lenders and the Agent, or their respective affiliates, have received, and may in the future receive, customary fees for those services.

The foregoing description of the Credit Agreement does not purport to be complete and is qualified in its entirety by the full text of the Form of Credit Agreement, a copy of which is included as Exhibit 10.1 to this Current Report on Form 8-K and is incorporated by reference herein.

-3-

EXHIBIT H

Form 8-K12G3

## Warrant Agreement

On the Effective Date, the Company entered into a warrant agreement (the "Warrant Agreement") with Computershare Inc., a Delaware corporation, and its wholly-owned subsidiary, Computershare Trust Company, N.A., a federally chartered trust company, as warrant agent. In accordance with the Plan and pursuant to the Warrant Agreement, on the Effective Date, the Company (i) issued 3,016,853 Series 1 warrants (the "Series 1 warrants") to purchase shares of Class A common stock or the Company's Class B common stock, par value $0.0000001 per share ("Class B common stock" and, together with the Class A common stock, the "common stock") on a one-to-one basis at an exercise price of $0.0000001 per share, to claimants that returned ownership certifications required by the Plan ("Plan Certifications") by the Certification Deadline and (ii) issued or will issue 712,756 Series 2 warrants (the "Series 2 warrants" and together with the Series 1 warrants, the "Warrants") to purchase shares of Class A common stock or Class B common stock on a one-to-one basis at an exercise price of $0.0000001 per share, to claimants that failed to return Plan Certifications by the Certification Deadline. The Series 2 Warrants may only be exercised for the type and amount of equity that the holder would have been entitled to receive on the Effective Date had it timely submitted its Plan Certification. The Warrants have a twenty-year term and will expire on June 4, 2038.

The number of shares of common stock for which a Warrant is exercisable is subject to adjustment from time to time upon the occurrence of specified events, including: (1) the subdivision or combination of the common stock into a greater or lesser number of shares (2) upon a reclassification or recapitalization of the Company in which holders of common stock are entitled to receive cash, stock or securities in exchange for common stock and (3) a Change of Control (as defined in the Warrant Agreement).

The Company will apply for a declaratory ruling from the FCC to increase the level of foreign ownership of the Company that is permitted under applicable FCC rules. Pursuant to the Warrant Agreement, upon receipt of the declaratory ruling from the FCC, the Company is required to exchange common stock for outstanding Warrants to the extent permitted by the declaratory ruling, subject to proration among the holders of Warrants as set forth therein. If the declaratory ruling will not allow the Company to exchange for common stock all of the outstanding Warrants, then, in addition to proration among holders, all remaining Series 2 warrants will be mandatorily exchanged for Series 1 warrants.

The foregoing description of the Warrant Agreement does not purport to be complete and is qualified in its entirety by reference to the full text of the Warrant Agreement, which includes the form of certificate representing the Warrants, a copy of which is included as Exhibit 10.2 to this Current Report on Form 8-K and is incorporated by reference herein.

## Item 1.02    Termination of a Material Definitive Agreement

### Cancellation of Certain Prepetition Obligations

In connection with the effectiveness of and pursuant to the terms of the Plan, on the Effective Date, the obligations of Old Cumulus and its subsidiaries under the following agreements were satisfied and discharged:

* Amended and Restated Credit Agreement, dated as of December 23, 2013, by and among Cumulus Media Inc., Cumulus Media Holdings Inc., as Borrower, certain lenders, JPMorgan Chase Bank, N.A., as administrative agent, Royal Bank of Canada and Macquarie Capital (USA) Inc., as co-syndication agents, and Credit Suisse AG, Cayman Islands Branch, Fifth Third Bank, Goldman Sachs Bank USA and ING Capital LLC, as co-documentation agents (the "Canceled Credit Agreement");

* Indenture, dated as of May 13, 2011, among Cumulus Media Inc., the Guarantors named therein and U.S. Bank National Association, as Trustee, as supplemented; and

* Rights Agreement, dated as of June 5, 2017, between Cumulus Media Inc. and Computershare Trust Company, N.A., as Rights Agent (the "Rights Agreement");

-4-

EXHIBIT H

Form 8-K12G3

**Cancellation of Prior Equity Securities**

In accordance with the Plan, each share of Old Cumulus' Class A common stock, par value $0.01 per share (the "old Class A common stock"), Class B common stock, par value $0.01 per share (the "old Class B common stock"), and Class C common stock, par value $0.01 per share (together with the old Class A common stock and the old Class B common stock, the "old common stock") outstanding prior to the Effective Date, including all options, warrants or other rights, including rights issued under the Rights Agreement, to purchase such old common stock, were extinguished, canceled and discharged, and each such share, option or warrant has no further force or effect. Furthermore, all of Old Cumulus' equity award agreements under prior incentive plans, and the awards granted pursuant thereto, were extinguished, canceled and discharged and have no further force or effect.

**Item 2.03        Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant**

The information contained in Item 1.01 above under the sub-heading "Credit Agreement" is incorporated by reference into this Item 2.03.

**Item 3.02        Unregistered Sales of Equity Securities**

On the Effective Date, in connection with the Company's emergence from Chapter 11 and in reliance on the exemption from registration requirements of the Securities Act of 1933, as amended (the "Securities Act") provided by Section 1145 of the Bankruptcy Code, the Company issued or will issue a total of 11,052,211 shares of Class A common stock, 5,218,209 shares of Class B common stock, 3,016,883 Series 1 warrants and 712,736 Series 2 warrants to holders of Allowed Credit Agreement Claims, Allowed Senior Notes Claims and Allowed General Unsecured Claims, collectively.

Any shares of Class A common stock or Class B common stock issued pursuant to the exercise of Series 1 warrants or Series 2 warrants will similarly be issued pursuant to the exemption from registration provided by Section 1145 of the Bankruptcy Code.

The information contained in Item 1.01 of this Current Report on Form 8-K under the sub-heading "Warrant Agreement" is incorporated by reference into this Item 3.02.

**Item 3.03        Material Modification to Rights of Security Holders**

The information contained in the Explanatory Note, Item 1.02 above and Item 5.03 below is incorporated by reference into this Item 3.03.

**Item 5.01        Changes in Control of Registrant**

The information set forth in the Explanatory Note and Item 5.02 under the subheading "Board of Directors" is incorporated by reference into this Item 5.01.

**Item 5.02        Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers**

**Board of Directors**

In accordance with the Plan, on the Effective Date, Jeffrey Marcus, Jan Baker, Jill Bright, John W. Dickey, Ralph B. Everett and Ross Oliver ceased to be members of Old Cumulus' board of directors. Also in accordance with the Plan, on the Effective Date, the Company's board of directors (the "Board") is comprised of seven members, consisting of Mary G. Berner, the Company's President and Chief Executive Officer, and the following six independent directors selected by the Term Lender Group.

-5-

EXHIBIT H

Form 8-K12G3

*David M. Baum*, age 53, has served as the President of Baum Media Group, LLC, an investment and consulting firm, since February 2005. From March 2013 to July 2017, Mr. Baum also served as the President of Revolution Golf, a digital media company, where he maintained responsibility for its overall strategy and operations. Prior to founding Baum Media Group, Mr. Baum served for over 18 years in various roles at Goldman, Sachs & Co., an investment bank, retiring in 2003 as a partner and Managing Director of the Mergers and Acquisitions department. Mr. Baum serves on the board of directors of the Marcus Corporation.

*Matthew C. Blank*, age 67, has served as an advisor to Showtime Networks Inc., a premium television network, since 2017. Before taking his most recent role, he served as Chairman of Showtime from 2016 to 2017 and Chief Executive Officer of Showtime from 1995 to 2015. Prior to his service at Showtime, Mr. Blank served for over 12 years in various roles at Home Box Office, Inc., a premium television network, leaving HBO as its Senior Vice President of Consumer Marketing. Mr. Blank served on the board of directors of Geeknet, Inc. from 2010 to 2015. Mr. Blank serves as a director of Creative Coalition and PENCIL Public Education Needs Civic Involvement in Learning and is a board member of The Cable Center. He is a Trustee of the Harlem Children's Zone and the American Museum of the Moving Image.

*Thomas H. Castro*, age 63, has served as the President and Chief Executive Officer of El Dorado Capital, LLC, a private equity investment firm, since December 2008. He is also the founder of IMB Development Corporation, a private equity investment firm, and has served as its Managing Director since January 2012. Previously, he was the co-founder and Chief Executive Officer of Border Media Partners, LLC, a radio broadcasting company that primarily targets Hispanic listeners in Texas, from 2002 to 2007 and its Vice Chairman through 2008. Prior to that, Mr. Castro owned and operated other radio stations and founded a company that exported oil field equipment to Mexico. Mr. Castro served on the board of directors of Time Warner Cable, Inc. from 2006 to 2016.

*Joan Hogan Gillman*, age 55, served as Executive Vice President of Time Warner Cable, Inc., a media, telecom and cable company, and Chief Operating Officer of its Time Warner Cable Media division, for which she maintained financial responsibility, from September 2006 to June 2016. Prior to her service at Time Warner Cable, Ms. Hogan Gillman served in senior executive roles at OpenTV Corporation, a television and advertising software company; British Interactive Broadcasting Holdings Limited, a provider of interactive services for U.K. digital television; and Physicians' Online Inc., an online billing solution for physicians. Ms. Hogan Gillman currently serves on the board of directors of Arqgan, Inc., Centrica PLC and InterDigital, Inc. Ms. Hogan Gillman also serves the Chairman of the board of directors of the Jesuit Volunteer Group and is a committee member of Transit Wireless.

*Andrew W. Hobson*, age 56, has served as a Partner and the Chief Financial Officer of Innovatus Capital Partners, LLC, a private investment firm, since January 2016. From 1994 to 2015, Mr. Hobson served in various roles at Univision Communications Inc., a media company, including Senior Executive Vice President and Chief Financial Officer from October 2007 through February 2015, during which time he was responsible for all financial aspects of the company. Prior to his employment at Univision, Mr. Hobson served as a Principal at Chartwell Partners LLC from 1990 to 1994.

*Brian G. Kushner*, age 59, has served as Senior Managing Director in the Corporate Finance practice of the FTI Consulting, Inc., a global business management consulting firm, since 2009. Prior to joining FTI Consulting, Dr. Kushner served as the President and Chief Executive Officer of Sage Telecom, a telecommunications company and, before Sage, as President and Chief Executive Officer of Pacific Crossing Limited, a trans-Pacific telecommunications company. Early in his career, Dr. Kushner co-founded CXO, L.L.C., a bankruptcy/debtor advisory and interim management firm, which was ultimately sold to FTI Consulting. He currently serves on the board of directors of Dex Media, Inc., Mudrick Capital Acquisition Corporation and Zodiac Interactive. He has previously served on the board of directors of Luxfer Holdings PLC, Pacific Crossing Limited, Damovo Group, Everyware Global, Inc. (now The Oneida Group), DLN Holdings, LLC and Caribbean Asset Holdings LLC.

All directors serve on the Board for a term ending at the annual meeting following the meeting at which the director was elected. The current class of directors will be subject to reelection at the Company's next annual meeting.

The Board's audit committee currently consists of Brian G. Kushner (chair), Thomas H. Castro and Andrew W. Hobson. The Board's compensation committee currently consists of David M. Baum (chair), Matthew C. Blank and Joan Hogan Gillman. The Board's nominating committee consists of Joan Hogan Gillman (chair), Matthew C. Blank and David M. Baum.

-6-

EXHIBIT H

Form 8-K12G3

### Indemnification Agreements

In accordance with the Plan, the Board has approved a form of indemnification agreement (the "Indemnification Agreement") to be entered into by members of the Board and the Company's executive officers. The Indemnification Agreement provides for the mandatory advancement and reimbursement of reasonable expenses (subject to limited exceptions) incurred by indemnitees in various legal proceedings in which they may be involved by reason of their service as directors or officers, as applicable, as permitted by Delaware law, the Charter and the By-laws (each as defined below). Each of the Company's executive officers and directors has entered or will enter into an Indemnification Agreement. In addition, pursuant to the terms of the Plan, the indemnification obligations of Old Cumulus remain in full force and effect.

The foregoing description of the Indemnification Agreement does not purport to be complete and is qualified in its entirety by reference to the full text of the Form of Indemnification Agreement, a copy of which is included as Exhibit 10.3 to this Current Report on Form 8-K and incorporated by reference herein.

### Long-Term Incentive Compensation Plan

In accordance with the Plan and the approval of the Board, the Cumulus Media Inc. Long-Term Incentive Plan (the "Incentive Plan") became effective as of the Effective Date. The Incentive Plan is intended to, among other things, help attract, motivate and retain key employees and directors and to reward them for making major contributions to the success of the Company. The Incentive Plan permits awards to be made to consultants or to employees, directors, or consultants of an affiliate of the Company.

Unless otherwise determined by the Board, the Board's compensation committee will administer the Incentive Plan. The Incentive Plan generally provides for the following types of awards:

- stock options (including incentive options and nonstatutory options);
- restricted stock;
- stock appreciation rights;
- dividend equivalents;
- other stock-based awards;
- performance awards; and
- cash awards.

The aggregate number of shares of Class A common stock reserved for issuance pursuant to the Incentive Plan is 2,222,223, representing 10% of the outstanding common stock and warrants of the Company as of the Effective Date, on a fully diluted basis. Awards can be made under the Incentive Plan for a period of ten years from June 4, 2018, subject to the right of the stockholders and the Board to terminate the Incentive Plan at any time.

The foregoing description of the Incentive Plan does not purport to be complete and is qualified in its entirety by reference to the full text of the Incentive Plan, a copy of which is included as Exhibit 10.4 to this Current Report on Form 8-K and incorporated by reference herein.

### Grant of Equity Awards

On the Effective Date and pursuant to the Plan, the Company granted 565,277 restricted stock units ("RSUs") and 565,277 stock options ("Options") under the Incentive Plan and the terms of the relevant restricted stock unit agreements (the "Restricted Stock Unit Agreements") and stock option agreements (the "Option Agreements"), as applicable, to certain employees, including its executive officers (collectively, "Management"), representing an aggregate of 1,130,554 shares of Class A common stock (collectively, the "Management Emergence Awards").

-7-

# EXHIBIT H

Form 8-K12G3

Fifty percent (50%) of the RSUs granted to Management vest ratably on each of December 31, 2018, 2019 and 2020, subject to certain performance-based criteria. Of the remaining fifty percent (50%) of the RSUs and one hundred percent (100%) of the Options granted to Management, 30% will vest on each of the first two anniversaries of the Effective Date, and 20% will vest on each of the third and fourth anniversaries of the Effective Date. The vesting of each of the Management Emergence Awards is also subject to, among other things, each such employee's continued employment with the Company.

If an employee's employment is terminated by the Company or its subsidiaries without Cause, by the employee for Good Reason (each, as defined in the award agreement) or due to a termination of employment with the Company or its subsidiaries by reason of death or Disability (as defined in the award agreement), such employee will become vested in an additional tranche of the unvested Management Emergence Awards as if the employee's employment continued for one (1) additional year following the qualifying termination date; provided, that with respect to the Chief Executive Officer and Chief Financial Officer, (i) an amount equal to 50% of the unvested components of the Management Emergence Awards will accelerate and vest (75% if such termination occurs on or before the first (1st) anniversary of the Effective Date) and (ii) vested Options will remain outstanding until the expiration date of such Option. If an employee's employment is terminated by the Company or its subsidiaries without Cause or by the employee for Good Reason, in either instance at any time within the three month period immediately preceding, or the twelve month period immediately following, a Change in Control (as defined in the award agreement), such employee will become vested in all unvested Management Emergence Awards.

In addition, on the Effective Date and pursuant to the Plan, the Company granted each non-employee director 5,402 (10,804 for Mr. Hobson) RSUs and 2,701 (5,402 for Mr. Hobson) Options under the Incentive Plan and the terms of the relevant Restricted Stock Unit Agreements and Option Agreements, as applicable, representing an aggregate of 56,721 shares of Class A common stock (the "Director Emergence Awards"). The RSUs and Options granted to each non-employee director vest in four equal installments on the last day of each calendar quarter, commencing with the calendar quarter in which the grant occurs. The vesting of each of the Director Emergence Awards is also subject to, among other things, each such non-employee director's continued role as a director with the Company. Upon a Change in Control, all unvested Director Emergence Awards will fully vest.

The foregoing description of the Restricted Stock Unit Agreements and Option Agreements does not purport to be complete and is qualified in its entirety by reference to the full text of the Form of Restricted Stock Unit Agreements and the full text of the Form of Option Agreements, copies of which are included as Exhibits 10.5, 10.6 and 10.7, and 10.8, 10.9 and 10.10, respectively, to this Current Report on Form 8-K and incorporated by reference herein.

**Item 5.03        Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year**

Pursuant to the Plan, the Company amended and restated its certificate of incorporation (the "Charter") and bylaws (the "Bylaws"), each of which became effective on the Effective Date. The Charter authorizes the Company to issue up to 100,000,000 shares of Class A common stock and 100,000,000 shares of Class B common stock. The Charter also authorizes the Company to issue up to 100,000,000 shares of preferred stock, par value $0.0000001 per share ("preferred stock"), of none which were issued pursuant to the Plan.

**Description of Capital Stock**

*Authorized Capital*

The Company has the authority to issue a total of 100,000,000 shares of Class A common stock, 100,000,000 shares of Class B common stock and 100,000,000 shares of preferred stock.

*Voting Rights*

Subject to any voting rights granted to preferred stock that may be outstanding from time to time, each share of the Company's Class A common stock shall be entitled to one vote per share on each matter submitted to a vote of the Company's stockholders. Except as provided below and as otherwise required by the Charter, Bylaws or by applicable law, the holders of Class A common stock shall vote together as one class on all matters submitted to a vote of stockholders generally (or if any holders of shares of preferred stock are entitled to vote together with the holders of common stock, as a single class with such holders of shares of preferred stock).

-8-

https://www.sec.gov/Archives/edgar/data/1058623/000119312518191739/d59509l1d8k12g3.htm

**EXHIBIT H**

8/12

Holders of Class B common stock are generally not entitled to vote such shares on matters submitted to a vote of the Company's stockholders. Notwithstanding the foregoing, holders of Class B common stock are entitled to one vote per share of Class B common stock, voting as a separate class, on any proposed amendment or modification of any specific rights or obligations that affect holders of Class B common stock and that do not similarly affect the rights or obligations of the holders of Class A common stock. In addition, holders of Class B common stock are entitled to one vote per share of Class B common stock, voting together with the holders of Class A common stock, on each of the following matters, if and only if any such matter is submitted to a vote of the stockholders (provided that the Company may take action on any of the following without a vote of the stockholders to the extent permitted by law):

a) the retention or dismissal of outside auditors by the Company;

b) any dividends or distributions to the stockholders of the Company;

c) any material sale of assets, recapitalization, merger, business combination, consolidation, exchange of stock or other similar reorganization involving the Company or any of its subsidiaries;

d) the adoption of any new or amended Charter;

e) other than in connection with any management equity or similar plan adopted by the Board, any authorization or issuance of equity interests, or any security or instrument convertible into or exchangeable for equity interests, in the Company or any of its subsidiaries; and

f) the liquidation of the Company or any of its subsidiaries.

The Charter and Bylaws do not provide for cumulative voting. The holders of a plurality of the shares of common stock entitled to vote and present in person or represented by proxy at any meeting at which a quorum is present called for the purpose of electing directors will be entitled to elect the directors of the Company. The holders of a majority of the shares of common stock issued and outstanding and entitled to vote, and present in person or represented by proxy, will constitute a quorum for the transaction of business at all meetings of the stockholders.

All directors will be elected annually commencing at the Company's next annual meeting of stockholders.

*Dividend Rights*

Subject to the preferences applicable to any preferred stock outstanding at any time, if any, the holders of shares of common stock shall be entitled to receive such dividends and other distributions in cash, property or shares of stock as may be declared thereon by the Board from time to time out of the assets or funds legally available; except that in the case of dividends or other distributions payable on the Class A common stock or Class B common stock in shares of such stock, including distributions pursuant to stock splits or dividends, only Class A common stock will be distributed with respect to Class A common stock and only Class B common stock will be distributed with respect to Class B common stock. In no event will any of the Class A common stock or Class B common stock be split, divided or combined unless each other class is proportionately split, divided or combined.

*Preferred Stock*

As of the date hereof, no shares of preferred stock are outstanding. The Charter provides that the Board may, by resolution, establish one or more classes or series of preferred stock having the number of shares and relative voting rights, designations and other rights, preferences, and limitations as may be fixed by them without further stockholder approval. The holders of any such preferred stock may be entitled to preferences over holders of common stock with respect to dividends, or upon a liquidation, dissolution, or the Company's winding up, in such amounts as are established by the resolutions of the Board approving the issuance of such shares.

The issuance of preferred stock may have the effect of delaying, deferring or preventing a change in control of the Company without further action by the holders and may adversely affect voting and other rights of holders of common stock. In addition, the issuance of preferred stock, while providing desirable flexibility in connection with

-2-

Form 8-K12G3

possible acquisitions and other corporate purposes, could make it more difficult for a third party to acquire a majority of the outstanding shares of common stock. The Charter provides that the Board may not issue any preferred stock (or the purpose of implementing any shareholder rights plan unless within one hundred and twenty (120) days thereof such shareholder rights plan shall have been ratified by the affirmative vote of at least a majority of the total voting power of the outstanding shares of common stock entitled to vote on such matters (voting as a class).

*Conversion of Class B Common Stock*

The Class B common stock is convertible at any time, or from time to time, at the option of the holders (provided that the prior consent of any governmental authority required to make such conversion lawful shall have been obtained and a determination by the Company has been made that the applicable holder does not have an attributable interest in another entity that would cause the Company to violate applicable law) into Class A common stock on a share-for-share basis.

*No Preemptive Rights*

No holder of common stock has any preemptive right to subscribe for any shares of the Company's capital stock issuable in the future.

*Liquidation Rights*

If the Company is liquidated (either partially or completely), dissolved or wound up, whether voluntarily or involuntarily, the holders of common stock shall be entitled to share ratably in the Company's net assets remaining after payment of all liquidation preferences, if any, applicable to any outstanding preferred stock.

*Action by Written Consent*

The Charter provides that all actions of the stockholders must be taken at an annual or special meeting and may not be taken by written consent without a meeting.

*Delaware Anti-Takeover Law*

The Company is not subject to Section 203 of the General Corporation Law of the State of Delaware.

*Transfer Agent and Registrar*

The transfer agent for the Company's common stock is Computershare Trust Company, N.A.

*Listing of Common Stock*

The Class A common stock is quoted on the OTC Pink Tier under the symbol "CMIA." The Company has applied to list its Class A common stock on the NASDAQ Stock Market LLC under the symbol "CMLS." No assurances can be provided that the Company's application will be approved, or the timing thereof.

This description is qualified in its entirety by the full text of the Charter and Bylaws, copies of which are included as Exhibits 3.1 and 3.2, respectively, to this Current Report on Form 8-K and incorporated by reference herein.

-10-

EXHIBIT H

10/15/2018

Form 8-K12G3

## Item 9.01    Financial Statements and Exhibits

(d) Exhibits.

| Exhibit Number | Description |
|---|---|
| 2.1 | First Amended Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 3.1 | Amended and Restated Certificate of Incorporation of Cumulus Media Inc. (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 3.2 | Amended and Restated Bylaws of Cumulus Media Inc. (incorporated by reference to Exhibit 3.2 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 4.1 | Form of Global Warrant Certificate (incorporated by reference to Exhibit A-2 to Exhibit 10.2 hereto) |
| 10.1 | Form of Credit Agreement dated as of June 4, 2018 among Holdings, as borrower, the subsidiaries of Holdings party thereto as borrowers, Intermediate Holdings as guarantor, Wilmington Trust, National Association, as Administrative Agent, and the other lenders party thereto (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 10.2 | Warrant Agreement, dated as of June 4, 2018, among the Company, Computershare Inc. and Computershare Trust Company, N.A. (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 10.3 | Form of Indemnification Agreement (incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 10.4 | Cumulus Media Inc. Long-Term Incentive Plan (incorporated by reference to Exhibit 10.4 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 10.5 | Form of Restricted Stock Unit Agreement (Non-Senior Executive) (incorporated by reference to Exhibit 10.5 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 10.6 | Form of Restricted Stock Unit Agreement (Senior Executive) (incorporated by reference to Exhibit 10.6 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 10.7 | Form of Restricted Stock Unit Agreement (Director) (incorporated by reference to Exhibit 10.7 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 10.8 | Form of Stock Option Agreement (Non-Senior Executive) (incorporated by reference to Exhibit 10.8 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 10.9 | Form of Stock Option Agreement (Senior Executive) (incorporated by reference to Exhibit 10.9 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 10.10 | Form of Stock Option Agreement (Director) (incorporated by reference to Exhibit 10.10 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 99.1 | Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' First Amended Joint Chapter 11 Plan of Reorganization (incorporated by reference to Exhibit 99.1 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 99.2 | Press release dated June 4, 2018 (incorporated by reference to Exhibit 99.2 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |

-11-

EXHIBIT H

10/15/2018

Form 8-K12G3

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

CUMULUS MEDIA INC.

June 13, 2018

By:  /s/ Richard S. Denning
     Name: Richard S. Denning
     Title:  Senior Vice President, General Counsel and Secretary

-12-

EXHIBIT H

12/12

# Exhibit E



Fulton County Superior Court
***EFILED***LW
Date: 11/2/2018 3:47 PM
Cathelene Robinson, Clerk



# IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA
### 136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303
## SUMMONS

Eric J. Steinmann

) Case
) No.:    **2018CV312580**
)
)
**Plaintiff,**
)
vs.
)
Mary G. Berner, **Jeffery Marcus**, Brian Cassidy,
)
)   SERVED _____ 1:20 ̇ ̇ M On 11/26/20 18
Ross Oliver and Crestview Partners, LP
)   OFFICE OF THE SHERIFF PALM BEACH COUNTY, FL
**Defendant**
)   Dc. 017168
)   DEPUTY SHERIFF                      I.D. NO.
)
)

TO THE ABOVE NAMED DEFENDANT(S): Jeffery Marcus, 1075 N. Ocean Blvd., Palm Beach, FL 33480

You are hereby summoned and required to file electronically with the Clerk of said Court at **https://efilega.tylerhost.net/ofsweb** and serve upon plaintiff's attorney, whose name and address is:

Lindsey L. Hobbs, Esq.
Wise & Reeves, P.C.
625 S. Gay St., Ste. 160
Knoxville, TN 37902

An answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed within five (5) business days of such service. Then time to answer shall not commence until such proof of service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This ___**11/2/2018**___ day of _____, 20 ____

Honorable Cathelene "Tina" Robinson
Clerk of Superior Court
By _____
Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you _____, 20_____

_____
Deputy Sherriff

Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used

Fulton County Superior Court
***EFILED***LW
Date: 11/2/2018 3:47 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| ERIC J. STEINMANN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. **2018CV312580** |
| | ) | |
| v. | ) | |
| | ) | Complaint |
| MARY G. BERNER, an individual, | ) | JURY TRIAL REQUESTED |
| CRESTVIEW PARTNERS, LP, | ) | |
| JEFFREY MARCUS, an individual, | ) | |
| BRIAN P. CASSIDY, an individual, | ) | |
| and ROSS OLIVER, an individual, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW Plaintiff Eric J. Steinmann, and file this, his Complaint against the Defendants Mary G. Berner, Jeffrey Marcus, Brian Cassidy, Ross Oliver, and Crestview Partners, LP for breach of fiduciary duty, unjust enrichment, and conspiracy, all arising from their actions in dealing with Plaintiffs. In support of the same, Plaintiffs show the Court as follows:

## PARTIES

1.    Plaintiff Eric Steinmann is an individual residing in Duval County Florida.

2.    Upon information and belief, Defendant Mary G. Berner is an individual residing in Fulton County, Georgia. Defendant Berner may be served with process at 3280 Peachtree Road NE, Suite 2300, Atlanta, Georgia 30305.

3.    Upon information and belief, Defendant Jeffery A. Marcus is an individual residing in Palm Beach County, Florida. Defendant Marcus may be served with process at 1075 N. Ocean Blvd, Palm Beach, FL.

1

4.    Upon information and belief, Defendant Brian P. Cassidy is an individual residing in New York County, New York. Defendant Cassidy may be served with process at 590 Madison Avenue, New York, NY.

5.    Upon information and belief, Defendant Ross Oliver is an individual residing in New York County, New York. Defendant Oliver may be served with process at 667 Madison Avenue, New York, NY.

6.    Upon information and belief, Defendant Crestview Partners, LP ("Crestview") is an entity headquartered in New York, New York. Crestview Partners is a private equity firm focusing on leveraged buyout and distressed for control investments in the media industry.

7.    This Court has jurisdiction over the parties in this matter pursuant to O.C.G.A. §9-10-91. Venue is proper in this Court based on O.C.G.A. §9-10-93.

## STATEMENT OF FACTS

8.    Mr. Steinmann owned shares of Cumulus Media, Inc. ("Cumulus")

9.    At all times relevant to this Complaint, Defendant Berner was the President, Chief Executive officer, and a Director on the Board of Directors (the "Board") of Cumulus.

10.    At all times relevant to this Complaint, Defendant Marcus was a Director and the Non-Executive Chairman of the Board of Cumulus.

11.    At all times relevant to this Complaint, Defendant Cassidy served on the Board.

12.    At all times relevant to this Complaint, Defendant Oliver served on the Board.

13.    At all times relevant to this Complaint, Defendants Marcus, Oliver and Cassidy were employed by and had partnership interests in Crestview.

2

14.    In 2015 Defendant Berner was selected and hired as CEO of Cumulus at the request and
        urging of Defendants Marcus and Cassidy. Defendant Berner was CEO of Readers Digest
        when it underwent a restructuring bankruptcy. Defendant Berner was partially selected by
        other Defendants due to her expertise in navigating a company through restructuring.

15.    By early 2017, Cumulus was facing financial difficulty, but had options for managing its
        debt, making all creditors whole, and maintaining a viable and ongoing enterprise.

16.    In 2017, Cumulus' largest debt was a Term Loan held by multiple creditors, including Voya
        funds managed by Crestview. In 2017, the Term Loan had an outstanding balance of
        approximately $1,729,000,000, which was not due until December 2020, with an interest
        rate at Libor + 3.25%, which resulted in a rate of 4.25% in 2017. Ample time existed to
        negotiate with creditors and restructure this debt without bankruptcy.

17.    In addition, there were approximately $600,000,000 in bonds outstanding, including
        Plaintiff's, which were receiving interest payments at an interest rate of 7.75%.
        Bondholders offered to forego interest in exchange for equity. This would provide an
        additional $200,000,000 to further deleverage their larger Term Loan before the balance
        was due.

18.    In addition to removing approximately $600,000,000 in debt from Cumulus' books by
        equitizing the bonds and freeing up a minimum of $200,000,000 in interest payments to pay
        down the Term Loan, the bondholder's offer had the added benefit of streamlining
        Cumulus's debt profile, leaving only the Term Loan as the outstanding material debt
        obligation. All Parties believed that this would have made Cumulus even more attractive to
        potential financiers or investors by December 2020.

3

19.  For payment of these debts, Cumulus held in escrow proceeds from the sale of real property located in Washington D.C., that was expected to reduce the Term Loan to $1,650,000,000, and with Cumulus' projected revenue of $1,133,000,000 in 2017 and $1,172,000,000 in 2018, and an estimated earnings before interest, tax, depreciation and amortization of $215,000,000 in 2017 and $235,000,000 in 2018, conservative projections suggested that the Term Loan could be paid down by an additional $200,000,000 to $1,450,000,000 by or before 2019.

20.  As a final piece of their offer, the bondholders included an attractive Management Incentive Plan ("MIP") in their offer which included a management equity package and other terms favorable to Defendant Berner.  The offered MIP was on the high side of the fair market value typical for those cases where, as here, the goal was to incentivize management personnel that were not funding any portion of the deleveraging efforts themselves.

21.  Defendants were not satisfied with the MIP compensation that was offered.  They demanded approximately double the bondholders' offer for management compensation, despite knowing that the bondholders' offer was based on sound market information.

22.  Before and during negotiations with creditors, Defendants Crestview, Berner, Cassidy, Oliver and Marcus developed a scheme by which they could ultimately utilize their leadership positions at Cumulus to benefit themselves to the detriment of the Plaintiff's ownership interest.

23.  This scheme involved a series of elaborate steps and machinations ultimately designed to benefit and enrich Defendants Crestview, Cassidy, Oliver, Berner and Marcus personally, to the detriment of Plaintiff.  Among other things, Defendants Crestview Cassidy, Oliver, Berner and Marcus:

a. Identified those members of the Board that could be controlled and those that could not, and formed a restructuring committee that excluded one or more Board members and began to function as a "shadow board" designed to implement Defendants' directives;

b. Directly thwarted a large shareholder's efforts to raise and infuse an additional $200,000,000 of capital into Cumulus to further pay down the Term Loan;

c. Instituted a "poison pill" resolution to prevent Cumulus from accepting any further cash infusions to assist with the debt reduction;

d. Discontinued monthly calls and limited information provided to certain shareholders and certain Board members;

e. Intentionally limited the information included in shadow board meeting minutes and limiting access to related information;

f. Began to hold regular Board meetings and dinners without notice to one or more of the Board members;

g. Began to secretly shop Cumulus to owners of the Term Loan, seeking a creditor that would agree to their outlandish MIP demand and pay them more personally in exchange for more favorable terms for that creditor; and

h. Devised a plan to enter bankruptcy as a means of carrying out a corporate raid in which both Defendant Berner and the Crestview defendants profited.

24. In their efforts to control the Board, Defendant Marcus, along with Defendant Cassidy and Berner, attempted to remove or run off several members of the Board, including Ralph Everett. When this failed, Defendants Marcus, Cassidy and Berner established a committee to run Cumulus as a shadow board, excluding several directors from this committee.

5

25.    Defendants alleged conflicts of interest to isolate other Board members for their actions in raising capital for the Company. These allegations of conflict of interest were manufactured for convenience and for Defendants to gain a controlling vote of Cumulus

26.    Crestview, the company owned by and employing Defendants Marcus, Cassidy and Oliver, was involved in management of assets for a secured creditor of Cumulus. Crestview was also involved in the purchase of a large portion of a Cumulus creditor's, Voya Financial, Inc. ("Voya"), assets during all relevant times of this complaint.

27.    The self-interest and self-dealings of the Defendants are a true conflict of interest rather than one manufactured for convenience.

28.    Defendants Cassidy and Marcus executed the filings for Cumulus to enter bankruptcy.

29.    Defendant Cassidy was replaced by Ralph Oliver on the Board on or about March 20, 2017.

30.    Cumulus Media entered bankruptcy on November 30, 2017 and emerged from Bankruptcy in June 2018. A true and correct copy of the Cumulus bankruptcy petition is attached hereto as **Exhibit A.**

31.    Upon information and belief, Crestview benefitted from the bankruptcy plan of Cumulus due to simultaneous negotiations with secured creditor Voya to purchase Voya's annuities and insurance business. A copy of the December 21, 2017 press release is attached hereto as **Exhibit B**.

32.    The negotiations to purchase business from a Voya secured creditor was a conflict of interest for Defendants Oliver, Cassidy and Marcus.

33.    Upon information and belief, Defendants benefitted from the Cumulus bankruptcy through management services provided by Crestview subsidiary Victory Capital Management. *See* **Exhibit C** (showing Voya funds managed by Crestview subsidiary).

6

34.  This management of assets for a Cumulus secured creditor was a conflict of interest for Defendants Marcus, Oliver and Cassidy.

35.  In the bankruptcy plan put forth by Defendants, Defendant Berner was kept as CEO and provided generous stock holdings in the restructured Cumulus to replace those cancelled in the Cumulus bankruptcy. Defendant Berner accepted this offer in exchange for pushing through an unnecessary bankruptcy plan that would strip Plaintiff of his stock holdings while Defendants would profit. *See* **Exhibit D** Grant of Equity Awards.

36.  This guarantee of future income and stock holdings was a conflict of interest for Defendant Berner.

37.  Plaintiff received nothing and his ownership extinguished due to self-interested acts of Defendants.

38.  The bankruptcy was an unreasonable business decision and not in the best interest of Plaintiff's ownership interests in Cumulus.

39.  Crestview negotiated with creditors prior to bankruptcy, specifically seeking higher compensation for management of the company (including Defendants) going forward.

40.  Creditors offered an alternative to filing bankruptcy in which bondholders of Cumulus would release some debt and defer other debt to allow Cumulus to march forward with a viable turnaround strategy.

41.  Requesting higher management fees in the alternative of declaring bankruptcy shows Defendants deemed bankruptcy as unnecessary.

42.  Bankruptcy was not a necessary action, but one in which the Defendants benefitted heavily at the expense of shareholders.

7

43.    Crestview was simultaneously negotiating a deal to purchase a large portion of Cumulus creditor Voya's business and did in fact complete this purchase shortly after the filing of the Cumulus bankruptcy.

44.    Crestview lost $23,000,000 of equity in the Cumulus as a result of the restructuring, but gained a significantly more valuable asset and benefit through its business dealings with Voya, including acquisition of Voya's insurance and annuities business.

45.    The Bankruptcy plan involved giving 82.5% of equity in the restructured Cumulus to secured creditors in exchange for a $429,000,000 reduction in secured debt. *See* **Exhibit E**, Bankruptcy Restructuring Settlement Agreement.

46.    The bankruptcy plan created a windfall to secured creditors, including Voya, from which Crestview took over the annuities and insurance business and managed assets that included Cumulus secured credit. *See* Exhibits B and C.

47.    Voya reported that the largest portion of their second quarter 2018 growth was due to the restructured Cumulus.

48.    The secretive scheme was successful. While pretending to continue to negotiate in good faith with the bondholders to avoid bankruptcy, Defendants Berner and Marcus instead began secret negotiations with Voya and other secured creditors to file for Chapter 11 bankruptcy protection, crafted a Restructuring Support Agreement ("RSA") that resulted in very favorable terms and outcomes for Defendants Crestview and Berner.

49.    The RSA awarded the following to Term Loan Holders:

a.    Debt to Term Loan Holders is reduced from $1,730,000,000 to $1,300,000,000.

b.    83.5% of the stock of the restructured company is provided to Term Loan holders in exchange for reducing debt by $429,000,000.

8

The Restructuring Settlement Agreement awarded the bond holders 16.5% of the equity in the new company in exchange for approximately $600 million in bond debt.

Shareholders of Cumulus received nothing and their shares were cancelled.

To facilitate sufficient time to allow Defendants to develop and implement their scheme, Defendants Cassidy, Oliver, Berner and Marcus continued to pretend to negotiate with the Bondholders and, among other things, insisted on a series of negotiation and non-disclosure agreements -- and multiple extensions thereto -- the effect of which was three-fold: 1) this kept the Bondholders negotiating in good faith, who were not suspicious, and were not made privy to the secret, parallel negotiations going on to their detriment;   2) Cumulus was not required to pay the interest payments to the Bondholders that would have become due during this time, thereby increasing the funds available to Defendants to sweeten the pot for the creditors, including Voya; 3) to buy time to make sure the Crestview deal with Voya would become a reality and the bankruptcy would in fact benefit Crestview more than its losses through ownership interests; and 4) allow Crestview Partners and associated Defendants to profit through Voya fund management.

Indeed, as late as November 24, 2017, just days before filing bankruptcy,  Defendants Berner and Marcus sent a Term Sheet to the Bondholders that requested MIP terms in the offer the Bondholders had made to them be double the fair market value.

On or about November 29, 2017, at the direction of Defendants Cassidy, Oliver, Berner, Marcus, and others, Cumulus Media, Inc., filed its Chapter 11 Voluntary Petition for Non-Individual bankruptcy in the Southern District of New York (Manhattan), Bankruptcy Petition No: 17-13381-scc.  Filings with the Bankruptcy Court were signed by Defendants Cassidy and Marcus despite Defendant Cassidy resigning from the board in March 2017.

9

50. The possibility of Cumulus becoming insolvent at some future time purely speculative. Preliminary negotiations and the thought that long term debt could not be renegotiated is also speculative and premature on a debt not due for at least three years.

51. The situation was such that a well-managed Cumulus could negotiate solutions to meet its obligations in the near term and continue to remain solvent indefinitely. A formal bankruptcy three years prior to the due date on a loan was unnecessary, or premature at the very least.

52. Not only were there several advantageous options for private Cumulus restructuring and deleveraging, Cumulus was not in default of any payment obligations as the balance on the Term Loan would not come due for more than three years.

53. In May 2018, the Bankruptcy Court approved a restructuring plan which provided Plaintiff with nothing in return for his ownership share of the company.

54. Upon information and belief, most of the meetings, dinners, telephone conferences, and conduct alleged herein occurred in or near Fulton County, Georgia, and much of it as Cumulus Media, Inc.'s headquarters located at 3280 Peachtree Road NE, Suite 2300, Atlanta, GA 30305.

55. Defendants Marcus, Cassidy, Oliver, Crestview and Berner were shareholders in the pre-bankruptcy Cumulus Media. Crestview was the largest shareholder in Cumulus. A derivative action by shareholders would directly benefit Defendants. For this reason, a derivative action is not proper pursuant to Georgia Law.

10

## FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duty)

56.   Plaintiff incorporates paragraphs 1 through 56 of the Complaint as if fully set forth herein.

57.   By 2017, Cumulus Media was in negotiations with bond holders for a solution which would protect the interests of creditors, bondholders and shareholders, while placing Cumulus Media in a competitive and attractive position moving forward.

58.   Defendants Berner, Cassidy, Oliver and Marcus, as members of the board of directors, owed a fiduciary duty to Plaintiff to protect Plaintiff's ownership interests, and to manage the assets of Cumulus for the benefit of its shareholders while meeting obligations to creditors.

59.   This duty included the obligation for Defendants Berner, Cassidy, Oliver and Marcus to refrain from schemes or devices designed to benefit Defendants Berner, Cassidy, Oliver and Marcus to the detriment of other ownership interests in Cumulus.

60.   Defendants Berner, Cassidy, Oliver and Marcus breached their duty to Plaintiff by intentionally engaging in schemes and devices designed to prefer and favor their own interest over those of Plaintiff's. Specifically, Defendant's entered an unnecessary bankruptcy for the purpose of trading $23,000,000 in distressed stock for ownership in a company with less debt burden and a better profit in the management of that ownership.

61.   Defendants placed the interests in profit of their own subsidiaries over the interests of owners of the Cumulus and Cumulus, itself.

62.   Defendants devised a scheme that would take the ownership interests of Plaintiff and give it to their own subsidiaries and other creditors.

63.   The RSA resulted in a large windfall for the Defendants' subsidiaries and other creditors.

11

64.    Plaintiff Mr. Steinmann has been damaged by Defendant Berner's and Defendants Crestview Partners LLC, Oliver, Cassidy and Marcus' breach of duty.

## SECOND CAUSE OF ACTION

### (Unjust Enrichment)

65.    Plaintiff incorporates paragraphs 1 through 64 of the Complaint as if fully set forth herein.

66.    Defendants Berner, Oliver, Cassidy and Marcus had a responsibility as Directors of Cumulus to protect the interests of shareholders of Cumulus.

67.    Defendants Berner, Oliver, Cassidy and Marcus chose a business plan that would be detrimental to bond holders and shareholders and beneficial to their own subsidiaries, or beneficial to their own employment and stock holdings in Cumulus..

68.    Because Defendants, Berner, Oliver, Cassidy and Marcus are owners and/or represent specific majority owners in Cumulus, a derivative action would result in injustice as it would benefit the wrongdoers.

69.    Defendants Berner, Oliver, Cassidy and Marcus acted in an unreasonable business fashion for the purpose of increasing their own compensation and ownership value at the expense of Plaintiff Steinmann's ownership interests in Cumulus.

70.    Defendants Oliver, Cassidy and Marcus also acted to benefit themselves through favorable purchase terms of annuity and insurance business from a long-term creditor and management of assets comprised of Cumulus secured credit.

71.    Defendant Berner was unjustly enriched in the form of increased ownership through board of director and management grant of equity in the restructured corporation.

12

72.     Defendants Oliver Cassidy and Marcus were unjustly enriched through ownership of a
subsidiary holding Cumulus secured debt and favorable purchase terms of those assets.
While they lost as shareholders, their gains as future owner and benefits to a secured creditor
greatly offset the small loss of Cumulus equity.

73.     The bankruptcy was not necessary as evidenced by Defendants' negotiations to continue the
original Cumulus operation, but benefitted Defendants.

74.     Defendants did in fact benefit from the unnecessary bankruptcy restructuring.

75.     Equity was taken from Plaintiff without compensation and is held by Defendants.

76.     Holding of this equity is an unjust enrichment of defendants.

## THIRD CAUSE OF ACTION

### (Conspiracy)

77.     Plaintiff incorporates paragraphs 1 through 76 of the Complaint as if fully set forth herein.

78.     Defendants Cassidy, Berner, Oliver and Marcus planned to shirk their fiduciary duty to
other ownership interests in Cumulus for their own personal benefit.

79.     Defendants Crestview, Cassidy, Berner, Oliver and Marcus agreed upon the objective of
deleting other ownership interests through filing an unnecessary and unreasonable
bankruptcy action while negotiating with and managing funds of a major creditor for benefit
to themselves.

80.     Defendants Crestview, Cassidy, Berner, Oliver and Marcus used conflict of interest as an
excuse to isolate and exclude other board members while a clear conflict of interest and self-
dealing motivated their own actions.

13

81.    By excluding other Board members and creating a shadow board to put the company through

a bankruptcy beneficial to themselves, Defendants Berner, Oliver, Cassidy and Marcus did

in fact breach a duty to Plaintiff Steinmann and further their own objectives.

82.    Plaintiff Steinmann's ownership interests were eliminated without compensation by the acts

of the Defendants and furtherance of this conspiracy between Defendants.


## FOURTH CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty)

### (Against Defendant Mary Berner)


83.    Plaintiff incorporates paragraphs 1 through 82 of the Complaint as if fully set forth herein.

84.    Defendants Cassidy, Oliver and Marcus planned to shirk their fiduciary duty to Plaintiff for

their own personal benefit.

85.    Defendants Cassidy, Oliver and Marcus needed cooperation from one other Board member

to carry out their plan to breach fiduciary duty to Plaintiff.

86.    Defendants Cassidy, Oliver and Marcus as Board members had a fiduciary duty to equity

owners Cumulus.

87.    Filing an unnecessary bankruptcy with a restructuring plan that extinguished equity interest

is a breach of fiduciary duty to Plaintiff.

88.    Defendant Berner agreed to assist in the objective of eliminating Plaintiff's equity interest

through filing an unnecessary and unreasonable bankruptcy action while negotiating with

two major secured creditors for benefit of other defendants.

14

89. Defendant Berner assisted her co-Defendants by participation in the shadow board which stalled negotiations with creditors. This allowed correct timing for Crestview to put in place a profitable side deal purchase from Voya.

90. Crestview negotiated with JP Morgan (another Cumulus secured creditor) to take a Crestview subsidiary public.

91. Defendant Berner assisted her co-Defendants in filing an unnecessary bankruptcy which benefitted Voya and JP Morgan in return for favorable treatment to Crestview and Crestview subsidiaries.

92. Defendant Berner assisted her co-Defendants in these schemes in exchange for a valuable ongoing compensation package and promise of equity in the restructured Cumulus to offset her equity losses in the old Cumulus.

93. Defendant Berner's actions in filing an unnecessary bankruptcy to benefit conflicted Defendants were wrongful conduct and improper actions.

94. Defendant Berner had knowledge Defendants Oliver, Cassidy and Marcus owed a fiduciary duty to equity interest holders, including Plaintiff.

95. Defendants Oliver, Cassidy and Marcus could not have procured the wrongful bankruptcy and breach of duty associated with the restructuring plan without the assistance of Defendant Berner.

96. Defendant Berner's assistance was purposeful, intentional and knowing that the bankruptcy would harm Plaintiff.

97. Defendant Berner's assistance was the cause and proximate cause of damage to Plaintiff.

98.     Plaintiff was in fact injured when Plaintiff's ownership interests in Cumulus Media Inc. was
        eliminated without adequate compensation by the acts of the Defendants and including the
        assistance of Defendant Berner.


**WHEREFORE** Plaintiff prays for the following relief:

1.  That summons and process be issued requiring these defendants to appear as provided
    by law to answer the allegations of this Complaint;

2.  That all triable issues be determined by a jury;

3.  That Plaintiff recover from Defendants the value of his ownership in Cumulus Media,
    Inc. prior to the initiations of schemes and fraudulent activities described herein;

4.  That Plaintiff recover from Defendants attorneys' fees, costs of Court, litigation
    expenses and other associated costs;

5.  That the amount of all such compensatory damages shall be proven at trial and
    determined by the enlightened conscience of a jury;

6.  The Plaintiff recovers punitive damages against Defendants in amounts to be determined
    by the enlightened conscience of a jury;

7.  That Plaintiff has and recover all damages to which they are entitled under Georgia law;
    and

8.  That Plaintiff has all such other and further relief as this Court deems just and
    appropriate.

Respectfully Submitted this 2nd day of November, 2018.

WISE & REEVES, P.C.

BY:/s/ Lindsey L. Hobbs
    Lindsey L. Hobbs, Ga Bar # 940347
    Two Centre Square, Ste 160
    625 S. Gay Street
    Knoxville, TN 37902
    (865) 544-1199
    lindsey@wiseandreeves.com
    Attorney for Plaintiff

# Exhibit F

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| EJS INVESTMENT HOLDINGS, LLC and WGH COMMUNICATIONS, INC., | ) ) ) | CIVIL ACTION FILE |
| | ) | No. _____ |
| Plaintiffs, | ) ) ) | Removed from the State Court of Fulton County, Georgia: |
| | ) | 2018-cv-312575 |
| v. | ) ) | |
| MARY G. BERNER, JEFFERY MARCUS, BRIAN CASSIDY, ROSS OLIVER AND CRESTVIEW PARTNERS, LP, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## <u>NOTICE OF REMOVAL</u>

Pursuant to 28 U.S.C. §§ 1452 and 1334, Defendants Mary Berner, Jeffrey Marcus, Brian Cassidy, Ross Oliver, and Crestview Partners, L.P. (collectively, "<u>Defendants</u>"), by and through their undersigned attorneys, hereby file this Notice of Removal and remove the above-captioned civil action, and all claims and causes of action therein, from the Superior Court of Fulton County, Georgia, to the United States Bankruptcy Court for the Northern District of Georgia. As the requisite "short and plain statement of the grounds for removal," 28 U.S.C. § 1446(a), Defendants state as follows:

1.      On November 2, 2018, Plaintiffs filed an action in the Superior Court of Fulton County, Georgia, bearing the caption *EJS Investment Holdings, LLC and WGH Communications, Inc.* v. *Mary Berner, et al.*, Case No. 2018-cv-312575 (the "<u>Action</u>"). As required by 28 U.S.C. § 1446(a), all process, pleadings, and orders served on Defendants in the Action to date are attached hereto as **<u>Exhibit A</u>**.

2.      Defendant Jeffrey Marcus first received the summons and complaint on November 26, 2018, when it was served on Jeffrey Marcus, and the remaining

Defendants first received the complaint on or after November 26, 2018.

3.      This Notice of Removal is being filed within 30 days after receipt by Defendants of a copy of the summons and complaint, and is therefore timely filed under 28 U.S.C. § 1446(b) and Bankruptcy Rule 9027(a)(3).

4.      The Action is removable because it arises under Title 11 of the United States Code and is related to the bankruptcy proceeding *In re CM Wind Down Topco Inc.*, No. 17-13381 (SCC), a case under Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "Cumulus Bankruptcy"). As explained below, the Action purports to assert claims that are derivative claims that were held by the debtors in the Cumulus Bankruptcy.  The purported claims were expressly released and are subject to exculpation, and Plaintiffs are enjoined from commencing or pursuing those claims, under the Plan and Confirmation Order (as defined below) entered in the Cumulus Bankruptcy.  As such, the Action necessarily calls for the interpretation of the confirmed Plan and implicates its administration and execution.  Because the Action "aris[es] under" Title 11 of the United States Code, and is "related to" a case under Title 11 of the United States Code, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 1452, and the Action is removable.

5.      As background, on November 29, 2017, Cumulus Media Inc. (now known as CM Wind Down Topco Inc.) and certain of its affiliates (together, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  Cumulus is a leader in the radio broadcasting industry, with more than 400 owned and operated stations around the U.S.

6.      On May 10, 2018, the Court in the Cumulus Bankruptcy entered the *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' First Amended Joint Plan of Reorganization* (the "Confirmation Order") [ECF No. 769], and the *First Amended Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor*

*Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") [ECF No. 446] went effective on June 4, 2018 (the "Effective Date"). Notice of the Effective Date was served and published in accordance with the Confirmation Order. *See Notice of (I) Entry of Order Confirming the Debtors' First Amended Joint Chapter 11 Plan of Reorganization, (II) Occurrence of Effective Date, and (III) Certain Bar Dates* [ECF No. 821].

7.      As further explained below, included in the Plan and Confirmation Order are broad (and typical) release and exculpation provisions, and a permanent injunction against prosecuting claims that are released or exculpated pursuant to the Plan. Excerpts of the relevant sections from the Plan and Confirmation Order are collectively attached hereto as **Exhibit B**.

8.      In addition, the Bankruptcy Court for the Southern District of New York expressly retained jurisdiction over the Cumulus Bankruptcy, "and all matters arising out of, or related to, the [Cumulus Bankruptcy] and the Plan." Confirmation Order ¶ 54.

9.      Plaintiffs EJS Investment Holdings, LLC and WGH Communications, Inc. (together, "Plaintiffs") purport to have held unsecured debt issued by Cumulus Media Inc. ("Cumulus").

10.     The Action is not the first time Plaintiff WGH Communications, Inc. ("WGH") has attempted to thwart the success of the Cumulus Bankruptcy.[1]  Nearly a week after the deadline for filing objections, WGH filed its objection to the Plan's confirmation on substantially the same grounds as the claims asserted in the Action. [ECF No. 604]. WGH cursorily asserted that the Plan (1) did not satisfy Section 1129(a)(1) of the Bankruptcy Code, (2) was not proposed in good faith, (3) contravened Section 1129(a)(5) of the Bankruptcy Code and potentially the business judgment rule, and (4) included overly broad release, exculpation and injunction provisions. Among other

---

[1] WGH was an active participant in the Cumulus bankruptcy. It filed a claim for $5,050,000.00 on the basis of the 7.75% Senior Notes on March 7, 2018.

things, WGH repeatedly alleged that the Debtors filed the Cumulus Bankruptcy, rather
than continuing to pursue an out-of-court restructuring, because Cumulus's management
"acted in a manner designed to enhance their compensation package rather than promote
the interests of creditors and equity holders." [ECF No. 604 ¶ 3; *see also id.* ¶¶ 11 (". . .
WGH believes that Management, who sought excessive compensation in this case, acted
in their own interests by failing to restructure outside of Chapter 11."), 15 ("[T]he
decision of Management to invoke the costly process of Chapter 11 rather than
restructure outside of Chapter 11 strongly suggests that they chose a path to enhance their
own personal financial interests rather than those of creditors and equity holders. The
overly broad Exculpation provisions in the Plan also suggests [sic] that Management is
placing their own interests above those of the Debtors and other interested parties."), 32
("[T]he Debtors, led by Management with selfish interests, are acting in a manner
designed to enhance themselves financially rather than an [sic] equitable restructuring
plan.").]

11. All of WGH's untimely objections were expressly overruled by
Bankruptcy Judge Shelley Chapman when, after notice and an opportunity to appear, no
one argued on WGH's behalf at the confirmation hearing. April 12, 2018 Tr. at 8:20–22
("I'm not going to hear the objection of WGH."); Confirmation Order ¶ 10 ("To the
extent that any objections, reservations of rights, statements, or joinders to Confirmation
have not been resolved, withdrawn, waived, or settled prior to entry of this Confirmation
Order or otherwise resolved herein or as stated on the record of the Confirmation
Hearing, they are hereby overruled on the merits based on the record before this
Bankruptcy Court.").

12. In addition to generally overruling any outstanding objections in its
Confirmation Order, the Court's explicit factual findings contradict the assertions WGH
made in its untimely objection. The Court determined that the Debtors complied with
Section 1129(a)(1), proposed the Plan in good faith, complied with Section 1129(a)(5),

4

exercised sound business judgment, and that the discharge, compromises, settlements, releases, exculpations, and injunctions set forth in Article VIII of the Plan were consistent with the Bankruptcy Code and applicable law. Confirmation Order ¶¶ 13, 15–16, 18, 42, 47, 49–50.

13.     Following confirmation of the Plan on May 10, 2018, on May 25, 2018, WGH filed a plainly untimely (and frivolous) appeal, again seeking to challenge the Plan's validity. [ECF 809.] The appeal was untimely because it was filed after the expiration of the fourteen-day appeal period under Bankruptcy Rule 8002(a). After Cumulus's counsel notified WGL's counsel that the appeal was untimely, WGH voluntarily withdrew it. [ECF 848].

14.     In their latest frivolous tactic, on November 2, 2018, Plaintiffs filed the Action against Defendants in Georgia Superior Court. (On the same day, Eric J. Steinmann, an individual who appears to own or control Plaintiffs in the Action, separately filed a nearly identical action against Defendants in Georgia Superior Court, styled *Eric J. Steinmann* v. *Berner*, et al., No. 2018-cv-312580, which Defendants are simultaneously removing to this Court.)

15.     In their complaint in the Action, Plaintiffs allege that Defendant Berner was Cumulus's President and CEO and a director on its board; that Defendants Marcus, Cassidy and Oliver also served as Cumulus directors; and that Defendants Marcus, Cassidy and Oliver "were employees of and held partnership interests in" Crestview Partners, L.P., a private equity firm. (Compl. ¶¶ 9-12.)

16.     The complaint expressly challenges the Debtors' restructuring and the Cumulus Bankruptcy, asserting purported claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, and conspiracy, all premised on allegations about Defendants' conduct leading up to the Debtors' filing for Chapter 11 protection. Plaintiffs allege that Defendants used "elaborate steps and machinations ultimately designed" to enrich themselves to Plaintiffs' detriment, and that "Defendants'

secretive scheme was successful" when the Debtors entered a Restructuring Support Agreement and filed the Cumulus Bankruptcy (Compl. ¶¶ 27, 32, 33). The complaint acknowledges that Cumulus was "in financial distress before the Chapter 11 filings, but claims "formal bankruptcy was unnecessary, or premature at the very least." (Compl. ¶ 50.)

17. The Action both arises under Title 11 of the United States Code and relates to the Cumulus Bankruptcy (a case under Title 11 of the United States Code) because it purports to assert claims that are derivative claims that were held by the Debtors in the Cumulus Bankruptcy, and because the claims in the Action were released and are subject to exculpation, and Plaintiffs are enjoined from commencing or pursuing those claims, under the Plan and Confirmation Order. As such, the Action necessarily calls for the interpretation of the confirmed Plan and implicates its administration and execution, and the Action is removable to this Court. The claims are an attempt to launch a collateral attack on the explicit findings made by the Bankruptcy Court.

18. *First*, Plaintiffs' purported claims are in reality derivative claims that were held by the Debtors. Plaintiffs' allegations that officers and/or directors of Cumulus breached fiduciary duties in connection with the Cumulus Bankruptcy, and that Plaintiffs were purportedly injured in their capacity as alleged holders of Cumulus debt, are plainly derivative, not direct. *See, e.g.*, *N. Am. Catholic Educ. Programming Found., Inc.* v. *Gheewalla*, 930 A.2d 92, 103 (Del. 2007) (creditors of insolvent corporation "have no right to assert direct claims for breach of fiduciary duty against corporate directors"); *Quadrant Str. Prods. Co.* v. *Vertin*, 102 A.3d 155, 176 (Del. Ch. 2014) (noting that "[c]reditors of a solvent corporation have no right to assert direct claims for breach of fiduciary duty either"). These purported derivative claims were held by the Debtors and could only be brought on their behalf, and therefore arise under Title 11 of the United States Code and support removal.

19. *Second*, the purported claims asserted in the Action were expressly

released in the Plan and Confirmation Order.

20.    To the extent Plaintiffs' claims are derivative claims that were held by the Debtors, the Debtors have expressly released all such claims in the Plan.  The Debtors' release expressly includes "any derivative Claims asserted or assertable on behalf of a Debtor or a Reorganized Debtor . . . based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or any other transaction relating to any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or any Interest that is affected by or classified in the Plan, the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, the restructuring of Claims and Interests before or during the Chapter 11 Cases, [or] the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Restructuring Support Agreement" (among other things).  Plan, Article VIII(D); Confirmation Order ¶ 50.

21.    The Debtors' release applies to all "Released Parties," defined to include (among others) the Debtors, the "Consenting Equityholders" (defined to include the "Holders of Interest in Cumulus party to the Restructuring Support Agreement," Plan ¶ 35), their current and former "Affiliates," and such parties' and their Affiliates' "officers, managers, directors, . . . principals, members, employees," and "partners."  Plan ¶ 128.  As explained above, the complaint in the Action alleges that Defendants Berner, Marcus, Cassidy and Oliver were officers and/or directors of Cumulus, a Debtor; the remaining Defendant, Crestview Partners, L.P., is also a Released Party because one of its affiliates was a Consenting Equityholder (as a party to the Restructuring Support Agreement), and the complaint alleges that Crestview Partners, L.P. held equity in Cumulus (Compl. ¶ 37).

22.    Thus, Plaintiffs' purported claims—which expressly challenge the Debtors' restructuring, the entry of the Restructuring Support Agreement, and the

Cumulus Bankruptcy—fall within the Debtors' broad release. The Debtors' release excludes claims "related to any act or omission that is determined by a final Order to have constituted . . . willful misconduct." The Complaint, however, does not sufficiently plead willful misconduct. Moreover, Plaintiffs are estopped from asserting any such claim (or any other exception to the release) because of the explicit findings of good faith, sound business judgment, and other issues in the Confirmation Order. Therefore, any such claims are barred by collateral estoppel.

23. The Plan also contains a separate third-party release given by the "Releasing Parties," defined to include (among others) all "Holders of Claims and Interests entitled to vote on the Plan" who did not opt out of the "Third-Party Release." Plan ¶ 129. This release similarly applies to all claims of any form "based on or relating to" or "in any manner arising from, in whole or in part," the Debtors' restructuring, the Cumulus Bankruptcy, "the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or any other transaction relating to any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or any Interest that is affected by or classified in the Plan, the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, the restructuring of Claims and Interests before or during the Chapter 11 Cases, [or] the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Restructuring Support Agreement" (among other things). Plan, Article VIII(E); Confirmation Order ¶ 50. Again, Plaintiffs' purported claims—which expressly challenge the Debtors' restructuring, the entry of the Restructuring Support Agreement, and the Cumulus Bankruptcy—fall within this broad third-party release, and Plaintiffs are estopped from asserting any exception to the release given the explicit findings of good faith, sound business judgment, and other issues in the Confirmation Order.

24. *Third*, the Plan and Confirmation Order expressly "release[] and

exculpate[]" Defendants from all liability for Exculpated Causes of Action, including the purported claims at issue here.  Plan, Article VIII(G); Confirmation Order ¶ 51.

25.     The exculpation provision applies to Exculpated Parties, which include the Debtors, the "Consenting Equityholders" (defined to include the "Holders of Interest in Cumulus party to the Restructuring Support Agreement," Plan ¶ 35), their current and former "Affiliates," and such parties' and their Affiliates' "officers, managers, directors, . . . principals, members, employees," and "partners."  Plan ¶ 67.  As explained above, the complaint in the Action alleges that Defendants Berner, Marcus, Cassidy and Oliver were officers and/or directors of Cumulus, a Debtor; Defendant Crestview Partners, L.P. is also an Exculpated Party because one of its affiliates was a Consenting Equityholder (as a party to the Restructuring Support Agreement), and the complaint alleges that Crestview Partners, L.P. held equity in Cumulus (Compl. ¶ 37).

26.     Exculpated Causes of Action include any claims or causes of action "related to any act or omission derived from, based upon, related to, or arising from the Debtors' in or out-of-court restructuring efforts, the [Cumulus Bankruptcy], formulation, preparation, dissemination, negotiation, solicitation or Filing of the Disclosure Statement, the Plan (including any term sheets related thereto), or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the funding of this Plan, the occurrence of the Effective Date, the administration of this Plan or the property to be distributed under this Plan, the pursuit of Confirmation or Consummation, and the administration and implementation of the Plan . . . ."  Plan ¶ 66.

27.     Plaintiffs' purported claims—which expressly challenge the Debtors' restructuring and the Cumulus Bankruptcy—are therefore exculpated under the Plan and Confirmation Order.  Again, Plaintiffs are estopped from asserting any exception to the exculpation provision given the explicit findings of good faith, sound business judgment, and other issues in the Confirmation Order.

28.     *Fourth*, Plaintiffs have been enjoined from commencing or pursuing the Action.  The Plan and Confirmation Order "permanently enjoined and precluded" the commencement or continuation of "any action or other proceeding of any kind on account of or in connection with or with respect to" claims or causes of action that have been released, are discharged, or are subject to exculpation under the terms of the Plan and Confirmation Order.  Plan, Article VIII(H); Confirmation Order ¶¶ 52-53.

29.     Thus, Plaintiffs have been enjoined by the Bankruptcy Court for the Southern District of New York from commencing or pursuing the Action.

30.     The Action is removable because Plaintiffs' purported claims are in reality derivative claims that were held by the Debtors, and because the purported claims (and Defendants' anticipated defenses to those claims) necessarily call for the interpretation of the confirmed Plan and affect its administration and execution, as explained above.  *See, e.g.*, *In re Hillsborough Holdings Corp.*, 267 B.R. 882, 889 (Bankr. M.D. Fla. 2001) (denying remand and granting summary judgment for defendants where "Defendants' affirmative defense that the liability from this adversary proceeding has already been discharged calls for interpretation of the plan and application of the bankruptcy laws"); *see also Alderwoods Grp., Inc. v. Garcia*, 682 F.3d 958, 969 (11th Cir. 2012) ("When, in a Chapter 11 case, a bankruptcy court issues an order confirming a reorganization plan, that court retains postconfirmation jurisdiction to complete any action pertinent to the plan," and the "bankruptcy court that confirms a reorganization plan thus enters an injunctive order—the confirmation order, see 11 U.S.C. §§ 524, 1141—the violation of which it can sanction.") (internal quotation marks omitted).  Further, Plaintiffs' purported claims relate directly to substantive rights created by the Bankruptcy Code, and could only arise from the circumstances presented by the Debtors' Chapter 11 filings.

31.     If Plaintiffs do not promptly dismiss the Action with prejudice, Defendants intend to move before the United States Bankruptcy Court for the Southern District of New York for a further order enjoining the Action and awarding damages and

other relief, and/or to move before this Court to transfer venue of this Action to the United States Bankruptcy Court for the Southern District of New York.

32.    Defendants consent to the entry of a final order by this Bankruptcy Court to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

33.    Direct removal to this Bankruptcy Court is appropriate under Bankruptcy Rule 9027(a)(1), which states that removal shall be filed with the clerk for the district and division within which the Action is pending, and Bankruptcy Rule 9001(3) defines the clerk as the bankruptcy clerk.

34.    Written notice of the filing of this Notice of Removal will be given to the adverse parties and Georgia Superior Court as required by 28 U.S.C. § 1446(d) and Bankruptcy Rule 9027(a)(3).

Dated: December 19, 2018
    Atlanta, Georgia

**WARGO & FRENCH, LLP**
*Local Counsel to Defendants*
999 Peachtree Street, NE
26th Floor
Atlanta, GA 30309
Telephone: 404-858-1500

By: /s/ *David Pernini*
    David Pernini, Esq.
    Georgia Bar No.: 572399
    dpernini@wargofrench.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta, Esq.
Lewis R. Clayton, Esq.
Jacob A. Adlerstein, Esq.
Claudia R. Tobler, Esq.

1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
pbasta@paulweiss.com
lclayton@paulweiss.com
jadlerstein@paulweiss.com
ctobler@paulweiss.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 19, 2018 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that a true and correct copy of the foregoing is being served on December 18, 2018 by transmission of Notice of Electronic Filing generated by CM/ECF on all counsel of record who are authorized to receive electronically Notices of Electronic Filing in this proceeding.

By: /s/ *David Pernini*
    David Pernini
    Georgia Bar No. 572399

# SERVICE LIST

Lindsey L. Hobbs, Esq,
Wise & Reeves, P.C.
Two Centre Square, Suite 160
625 S. Gay Street
Knoxville, TN 37902
lindsey@wiseandreeves.com
*Counsel for Plaintiff*

# Exhibit A

Fulton County Superior Court
***EFILED***LW
Date: 11/2/2018 3:31 PM
Cathelene Robinson, Clerk



## IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA
### 136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303
### SUMMONS

EJS Investment Holdings, LLC and

WGH Communications, Inc.

**Plaintiff,**

vs.

Mary G. Berner, Jeffery Marcus, Brian Cassidy,

Ross Oliver and Crestview Partners, LP

**Defendant**

) Case
) No.: **2018CV312575**
)
)
)
)
)
)
)
)
)    SERVED _____ 1:20 p. M On 11/26/20 18
)    OFFICE OF THE SHERIFF PALM BEACH COUNTY, FL
)    DS-Q D 7168
)    DEPUTY SHERIFF                    I.D. NO.
)
)
)

TO THE ABOVE NAMED DEFENDANT(S): Jeffery Marcus, 1075 N. Ocean Blvd., Palm Beach, FL 33480

You are hereby summoned and required to file electronically with the Clerk of said Court at

https://efilega.tylerhost.net/ofsweb and serve upon plaintiff's attorney, whose name and address is:

Lindsey L. Hobbs, Esq.
Wise & Reeves, P.C.
625 S. Gay St., Ste. 160
Knoxville, TN 37902

An answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed within five (5) business days of such service. Then time to answer shall not commence until such proof of service has been filed. IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

This ___11/2/2018___ day of _____, 20 ____

Honorable Cathelene "Tina" Robinson
Clerk of Superior Court
By _____
                    Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you _____, 20____

_____
Deputy Sherriff

Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used

Fulton County Superior Court
***EFILED***LW
Date: 11/2/2018 3:31 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| EJS INVESTMENT HOLDINGS, LLC, and WGH COMMUNICATIONS, INC., | ) )  ) |
| Plaintiffs, | )  Civil Action No. **2018CV312575** |
| v. | ) ) |
| MARY G. BERNER, an individual, JEFFERY MARCUS, an individual, BRIAN CASSIDY, an individual, ROSS OLIVER, an individual and CRESTVIEW PARTNERS, LP, | ) ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT

**COMES NOW**, EJS Investment Holdings, LLC ("EJS") and WGH Communications, Inc. ("WGH") (hereinafter collectively referred to as "Plaintiffs"), and file this, their Complaint, against the Defendants Mary G. Berner, Jeffery Marcus, Brian Cassidy, Ross Oliver, and Crestview Partners, L.P., for breach of fiduciary duty, unjust enrichment, conspiracy, and aiding and abetting breach of fiduciary duty, all arising from their actions in dealing with Plaintiffs. In support of the same, Plaintiffs show the Court as follows:

### PARTIES

1.     EJS Investment Holdings, LLC ("EJS") is a Florida limited liability company with a principal place of business at 10110 Leisure Lane South, Jacksonville, FL 32256.

2.     WGH Communications, Inc. ("WGH") is a Delaware Corporation with a principal place of business at 703 Pier Ave. B, Hermosa Beach, California.

1

3.      Upon information and belief, Defendant Mary G. Berner is an individual residing in Fulton County, Georgia. Defendant Berner may be served with process at 3280 Peachtree Road NE, Suite 2300, Atlanta, Georgia 30305.

4.      Upon information and belief, Defendant Jeffery A. Marcus is an individual residing in Palm Beach County, Florida. Defendant Marcus may be served with process at 1075 N. Ocean Blvd, Palm Beach, FL.

5.      Upon information and belief, Defendant Brian P. Cassidy is an individual residing in New York County, New York. Defendant Cassidy may be served with process at 590 Madison Avenue, New York, NY.

6.      Upon information and belief, Defendant Ross Oliver is an individual residing in New York County, New York. Defendant Oliver may be served with process at 667 Madison Avenue, New York, NY.

7.      Upon information and belief, Defendant Crestview Partners, LP ("Crestview") is an entity headquartered in New York, New York. Crestview Partners is a private equity firm focusing on leveraged buyout and distressed for control investments in the media industry.

8.      This Court has jurisdiction over the parties in this matter pursuant to O.C.G.A. §9-10-91. Venue is proper in this Court based on O.C.G.A. §9-10-93.

**STATEMENT OF FACTS**

9.      At all times relevant to this Complaint, Defendant Berner was the President, Chief Executive Officer, and a Director on the Board of Directors (the "Board") of Cumulus Media, Inc. ("Cumulus").

10.     At all times relevant to this Complaint, Defendant Marcus was a Director and the Non-Executive Chairman on the Board.

2

11. At all times relevant to this Complaint, Defendant Cassidy and Oliver served as Directors on the Board.

12. At all times relevant to this Complaint, Defendants Marcus, Oliver and Cassidy were employees of and held partnership interests in Crestview, a private equity firm with approximately thirty employees.

13. EJS and WGH were holders of non-secured bonds in Cumulus.

14. By early 2017, Cumulus was facing financial difficulty, but had options for managing its debt, making all creditors whole, and maintaining a viable and ongoing enterprise.

15. Plaintiffs were actively negotiating with Cumulus management, including the Defendants, to reduce Cumulus's debt load and place it on a path that is financially secure and indefinitely sustainable.

16. EJS and WGH proposed a viable plan for out-of-court restructuring of debt to Cumulus management, including Defendants.

17. At the time, Cumulus' largest debt was a Term Loan held by multiple creditors, including Voya Financial, Inc. ("Voya") and JP Morgan Chase Bank ("JP Morgan"). In 2017, the Term Loan had an outstanding balance of approximately $1,729,000,000, which was not due until December 2020, with an interest rate of 4.25%.

18. In addition, there were approximately $600,000,000 in outstanding bonds, including Plaintiffs', which were receiving interest payments at an interest rate of 7.75%.

19. For payment of these debts, Cumulus held in escrow proceeds from the sale of real property located in Washington D.C., that was expected to reduce the Term Loan to $1,650,000,000, and with Cumulus' projected revenue of $1,133,000,000 in 2017 and $1,172,000,000 in 2018, and an estimated earnings before interest, tax, depreciation and amortization of $215,000,000 in 2017

3

and $235,000,000 in 2018, conservative projections suggested that the Term Loan could be paid down by an additional $200,000,000 to $1,450,000,000 by or before 2019.

20.     In addition, in 2017, the bondholders, including Plaintiffs, offered to Cumulus an advantageous exchange whereby the bondholders would equitize their bonds to free up the 7.75% interest payments that was otherwise payable to the Bondholders, which in turn, would free up an additional $200,000,000 to allow Cumulus to further deleverage their larger Term Loan before the balance was due.

21.     Negotiations ensued between the bondholders and Cumulus' leadership to implement this plan.  During the negotiations, the bondholders agreed, among other things, to forego the interest payments due and owing during that time in exchange for equity.

22.     In addition to removing approximately $600,000,000 in debt from Cumulus' books by equitizing the bonds and freeing up a minimum of $200,000,000 in interest payments to pay down the Term Loan, the bondholders' offer had the added benefit of streamlining Cumulus' debt profile, leaving the Term Loan as the only outstanding material debt obligation.  All Parties believed that this would have made Cumulus even more attractive to potential financiers or investors by December 2020.

23.     As a final piece of their offer, the bondholders included an attractive Management Incentive Plan ("MIP") in their offer, which included a management equity package and other terms favorable to Defendants Berner and Marcus.  The MIP was developed after the bondholders commissioned a market study of MIP's typical in similar other transactions.  With this information, the bondholders offered Defendants a MIP that was on the high side of the fair market value typical for those cases where, as here, the goal was to incentivize management personnel that were not funding any portion of the deleveraging efforts themselves.

4

24.     While the bondholders' offer had significant advantages to Cumulus, Defendant Berner was not satisfied with the MIP compensation that was offered to her personally. Defendants demanded approximately double the bondholders' offer, despite knowing that the bondholders' offer was based on sound market information.

25.     During or after a series of failed efforts to convince the bondholders to double their MIP offer, Defendants Berner, Marcus, Oliver and Cassidy decided to change tactics and began to develop a scheme by which they could ultimately utilize their leadership positions at Cumulus to benefit themselves to the detriment of the bondholders.

26.     Defendants maintained a posture of negotiating with Plaintiffs, but at the same time were devising an unnecessary bankruptcy plan, including a side deal with creditors of Cumulus, Voya and JP Morgan, that benefitted Defendants and, in turn, directly benefitted Voya and JP Morgan.

27.     Defendants' scheme involved a series of elaborate steps and machinations ultimately designed to benefit and enrich Defendants Berner, Marcus, Oliver, Cassidy, and Crestview, to the detriment of Plaintiffs and other bondholders.

28.     Among other things, Defendants Berner, Marcus, Cassidy and Oliver:

    a.  Identified those members of the Cumulus Board of Directors that could be controlled and formed a restructuring committee that excluded one or more Directors to function as a "shadow board" designed to implement Defendants' directives;

    b.  Directly thwarted a large shareholder's efforts to raise and infuse an additional $200,000,000 of capital into Cumulus to further pay down the Term Loan;

5

    c.  Instituted a "poison pill" resolution on June 5, 2017 to prevent Cumulus from accepting any further cash infusions to assist with the debt reduction. Instituting a poison pill while in need of cash infusion is not in the best interest of creditors and decreases the number of options available to solve Cumulus' debt crisis. It did guarantee maintaining control by Crestview and Defendant Berner during the six months needed to carry out a plan of Cumulus filing bankruptcy to the benefit of defendants;

    d.  Discontinued monthly calls and limited information provided to certain shareholders and certain Directors;

    e.  Intentionally limited the information included in shadow board meeting minutes and limiting access to related information;

    f.  Began to hold regular Board of Director meetings and dinners without notice to one or more of the Directors; and

    g.  Began to secretly shop Cumulus to owners of the Term Loan, seeking a creditor that would agree to their outlandish MIP demand and pay them more personally in exchange for more favorable terms for that creditor.

29.    Defendants devised a side deal with Voya and JP Morgan in which a Crestview subsidiary would purchase a large portion of Voya's business and take it public, thus benefitting Crestview. In exchange, the Crestview board members and Defendant Berner would file bankruptcy on behalf of Cumulus and push a plan that would significantly enrich Voya and JP Morgan.

30.    To allow sufficient time for Defendants to develop and implement their scheme, Defendants Berner and Marcus continued to pretend to negotiate with the bondholders and, among other things, insisted on a series of negotiation and non-disclosure agreements -- and multiple

6

extension thereto -- the effect of which was two-fold: 1) this kept the bondholders negotiating in good faith, who were not suspicious, and were not made privy to the secret, parallel negotiations going on to their detriment, and 2) Cumulus was not required to pay the interest payments to the bondholders that would have become due during this time, thereby increasing the funds available to Defendants to sweeten the pot for other creditors more willing to meet their personal demands.

31.     Indeed, as late as November 24, 2017, Defendants Berner, Cassidy, Oliver and Marcus sent a Term Sheet to the bondholders that requested MIP terms double the offer the bondholders had made to them consistent with market analysis.

32.     On or about November 29, 2017, at the direction of Defendants, Cumulus, filed a Chapter 11 Voluntary Petition for Non-Individual bankruptcy in the Southern District of New York (Manhattan), Bankruptcy Petition No: 17-13381-scc.  A true and correct copy of the Bankruptcy Petition is attached hereto as **Exhibit A**.

33.     Defendants' secretive scheme was successful.  While pretending to continue to negotiate in good faith with the bondholders to avoid bankruptcy, Defendants Berner, Marcus, Oliver and Cassidy instead began secret negotiations to file a Chapter 11 bankruptcy, crafting a Restructuring Support Agreement ("RSA") that resulted in very favorable terms for JP Morgan, Voya and Defendant Berner; all to the detriment of the Bondholders, who were left with pennies on the dollar for their investment. The RSA is complex, well thought out and was unlikely drafted in the five days between the increased MIP demand sent to bondholders on November 24, 2017 and the filing with the bankruptcy court on November 29, 2017.  A copy of the RSA is attached hereto as **Exhibit B**.

34.     The RSA included the following provisions:

    a.   Reduction of the Term Loan balance from $1,730,000,000 to $1,300,000,000.

7

     b.   Granting Voya and JP Morgan 82.5% of the restructured Cumulus stock in exchange for reducing debt by $429,000,000.

     c.   The bondholders were given only 16.5% of the restructured Cumulus stock in exchange for approximately $600,000,000 in bond debt. This was diluted by 10% equity going to Defendant Berner and other Cumulus senior management.

     d.   Cumulus shareholders received nothing, and their shares were cancelled.

35. In December 2017, mere weeks after the Cumulus bankruptcy petition, Crestview announced the purchase of an insurance and annuities business from Voya. A true and correct copy of the December 21, 2017 press release is attached hereto as **Exhibit C**.

36. The deal for Crestview to purchase the Voya insurance and annuities business through a Crestview subsidiary and to take that subsidiary public using JP Morgan's services was being negotiated prior to and during the time at which a bankruptcy filing and bankruptcy plan were developed for Cumulus by Crestview and Defendants Marcus, Oliver and Cassidy.

37. Crestview lost $23,000,000 in equity in the old Cumulus, but gained significantly more from Cumulus's restructuring through its business dealings with Cumulus creditor Voya and its acquisition of Voya's insurance and annuities business.

38. Crestview was in negotiations with Voya to purchase its annuities business at the time of the Cumulus Media negotiations with creditors to avoid bankruptcy.

39. On May 1, 2018, the Bankruptcy Court approved Cumulus's restructuring plan, which provided Plaintiffs with cents on the dollar in return for their bonds.

40. The value of the restructured Cumulus as it exited bankruptcy protection is at least $1,200,000,000. A copy of the Debt Wire Summary of the RSA is attached hereto as **Exhibit D**.

8

41. The deal between Crestview and Voya was finalized on June 1, 2018, almost exactly the same time Cumulus exited bankruptcy. A true and correct copy of the June 1, 2018 press release is attached hereto as **Exhibit E**.

42. JP Morgan served as book running manager, and helped Crestview take a Crestview wholly owned subsidiary, public on February 7, 2018. A true and correct copy of the February 7, 2018 press release is attached hereto as **Exhibit F**.

43. Both Voya and JP Morgan profited heavily from the Cumulus bankruptcy plan proposed by Defendants Marcus, Oliver, Berner and Cassidy. Voya reported that the largest portion of their second quarter 2018 growth was due to the restructured Cumulus.

44. The Cumulus bankruptcy further created a $500,000,000 windfall to secured creditors, including Voya, and JP Morgan.

45. Likewise, Crestview was able to obtain a lucrative annuities and insurance business and make easy and fast money from taking it public afterwards.

46. The Cumulus restructuring further benefitted Defendant Berner, allowing her to maintain her job as Cumulus Chief Executive Officer, and providing her with immediate stock ownership in the restructured Cumulus. *See* **Exhibits G and H**.

47. Defendant Berner received a guaranteed lucrative management package and continued seat on the Cumulus Board of Directors following bankruptcy in exchange for her cooperation and vote to push through the bankruptcy deal that benefitted Voya and JP Morgan. If nothing else, the guarantee of continued employment and a lucrative compensation package through and after a bankruptcy created a clear conflict of interest for Defendant Berner.

48. The Cumulus restructuring also allowed Defendants Oliver, Cassidy and Marcus to make money several ways through self-interested deals with long term lenders Voya and JP

9

Morgan. Defendants Marcus, Oliver and Cassidy had a conflict of interest as employees and interest-holders in Crestview while also serving on the Cumulus Board.

49.     Defendants Marcus, Oliver and Cassidy promoted a bankruptcy restructuring plan that benefitted Crestview, Voya, and JP Morgan.

50.     While Cumulus was admittedly in financial distress, the situation was not beyond hope and formal bankruptcy was unnecessary, or premature at the very least.  Not only were there several advantageous options for private Cumulus restructuring and deleveraging, Cumulus was not in default of any payment obligations as the balance on the Term Loan would not come due for more than three years, in December 2020.

51.     Upon information and belief, most of the meetings, dinners, telephone conferences, and conduct alleged herein occurred in or around Fulton County, Georgia, and much of it at Cumulus's headquarters, located at 3280 Peachtree Road NE, Suite 2300, Atlanta, Georgia 30305.

## FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duty – Trust Fund Doctrine)

### (Against Defendant Berner)

52.     Plaintiffs incorporate paragraphs 1 through 51 of the Complaint as if fully set forth herein.

53.     Although Cumulus was in financial trouble, filing bankruptcy was unnecessary and not in the best interest of all creditors and shareholders.

54.     Defendant Berner owed a fiduciary duty to Plaintiffs to protect Cumulus' assets, holding them in trust, and to manage the assets of Cumulus for the benefit of its creditors, including Plaintiffs.

10

55.     This duty included the obligation for Defendant Berner to refrain from schemes or devices designed to benefit Defendant Berner to the detriment of one or more of Cumulus' creditors.

56.     Defendant Berner breached her duty to Plaintiffs by intentionally engaging in schemes and devices designed to prefer and favor her own interest over those of Plaintiffs.

57.     Defendant Berner helped pass a "poison pill" that would maintain board control with the Crestview Partners and prevent influx of capital to help the struggling company manage debt.

58.     Defendant Berner supported the Crestview Partners bankruptcy scheme in return for continued employment and a grant of new stock to replace her stock holdings lost in the bankruptcy.

59.     Defendant Berner did in fact receive a lucrative financial compensation and guaranteed continued future employment through her breach of duty to Plaintiffs and other bond holders.

60.     Plaintiffs EJS Investment Holdings, LLC and WGH Communications, Inc. have been damaged by Defendant Berner's breach of duty.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty – Trust Fund Doctrine)

### (Against Defendants Marcus, Oliver and Cassidy)

61.     Plaintiffs incorporate paragraphs 1 through 60 of the Complaint as if fully set forth herein.

62.     Defendants Marcus, Oliver and Cassidy owed a fiduciary duty to Plaintiffs to protect Cumulus' assets, holding them in trust, and to manage the assets of Cumulus for the benefit of its creditors, including Plaintiffs.

11

63. This duty included the obligation for Defendants Marcus, Oliver and Cassidy to refrain from schemes or devices designed to benefit Defendants Marcus, Oliver Cassidy and Crestview to the detriment of one or more of Cumulus' creditors.

64. Defendants Marcus, Cassidy and Oliver breached their duty to Plaintiffs by intentionally engaging in schemes and devices designed to prefer and favor their own interest over those of Plaintiffs.

65. Defendants Marcus, Cassidy and Oliver devised and worked to institute a "poison pill' that would maintain board control with the Crestview and prevent influx of capital to help the struggling company manage debt.

66. Defendants Cassidy Marcus and Oliver profited through their conflicted dealings with Voya and JP Morgan while leading Cumulus into bankruptcy. Voya and JP Morgan profited greatly from the Cumulus bankruptcy. In return, Defendants Cassidy, Marcus and Oliver were rewarded through Voya selling its annuities business to one Crestview Partners subsidiary and Voya naming a second Crestview Partners subsidiary as the manager of numerous Voya funds. JP Morgan helped orchestrate an initial stock option for a Crestview Partners subsidiary while the Bankruptcy was going forward.

67. Plaintiffs EJS Investment Holdings, LLC and WGH Communications, Inc. have been damaged by Defendant Marcus' breach of duty.

### THIRD CAUSE OF ACTION

### (Unjust Enrichment)

68. Plaintiff incorporates paragraphs 1 through 67 of the Complaint as if fully set forth herein.

12

69.    Defendants Berner, Oliver, Cassidy and Marcus had a responsibility as Directors of Cumulus Media, Inc. to protect the interests of bondholders of Cumulus Media, Inc.

70.    Defendants Berner, Oliver, Cassidy and Marcus chose a business plan that would be detrimental to bond holders and shareholders and beneficial to their own Crestview Partners LP subsidiaries.

71.    Defendant Berner chose a business plan that was beneficial to her interests of receiving continued employment and equity in a restructured Cumulus to replace any equity lost in bankruptcy.

72.    Defendants Berner, Oliver, Cassidy and Marcus acted in an unreasonable business fashion for the purpose of increasing their own compensation and ownership value at the expense of Plaintiffs ownership interests in Cumulus Media, Inc. debt. Defendants Oliver, Cassidy and Marcus also acted to benefit themselves through favorable purchase terms of annuity and insurance business from Voya, management of funds marketed by Voya and favorable IPO offering terms from JP Morgan..

73.    Defendant Berner was unjustly enriched in the form of increased ownership through board of director and management compensation which granted her securities in the restructured Cumulus.

74.    Defendants Oliver Cassidy and Marcus were unjustly enriched through ownership of a subsidiary holding an interest Cumulus secured debt, favorable purchase terms of those assets, favorable finance terms in purchasing those assets and favorable terms in taking those assets public. While they lost as shareholders, their gains as future owner and the benefits to secured creditors greatly offset the small loss of Cumulus equity.

13

75. The Cumulus bankruptcy was not necessary as evidenced by Defendants' negotiations with Plaintiffs to continue the original Cumulus operation. However, the bankruptcy restructuring was a tool to benefit Defendants.

76. Defendants did in fact benefit from the unnecessary bankruptcy restructuring through side deals with Voya and JP Morgan.

77. Debt owed to Plaintiffs was taken from Plaintiffs without adequate compensation and converted and held as assets of Defendants.

78. Holding of the value of this bondholder debt is an unjust enrichment of defendants.

## FOURTH CAUSE OF ACTION

### (Conspiracy)

79. Plaintiff incorporates paragraphs 1 through 78 of the Complaint as if fully set forth herein.

80. Defendants Cassidy, Berner, Oliver and Marcus planned to shirk their fiduciary duty to bondholder interests in Cumulus Media, Inc. for their own personal benefit.

81. Defendants Cassidy, Berner, Oliver and Marcus agreed upon the objective of diminishing bondholder interests through filing an unnecessary and unreasonable bankruptcy action while negotiating with two major secured creditors for benefit to themselves.

82. Defendants Cassidy, Berner, Oliver and Marcus used conflict of interest as an excuse to isolate and exclude a dissenting board member, John Dickey, while a clear conflict of interest and self-dealing motivated their own actions.

14

83.     By excluding other board members and creating a shadow board to put the company through a bankruptcy beneficial to themselves, Defendants Berner, Oliver, Cassidy and Marcus did in fact breach a duty to owners of Cumulus Media, Inc. debt and furthered their own objectives.

84.     Plaintiffs' ownership interests in Cumulus Media Inc. debt were eliminated without adequate compensation by the acts of the Defendants and furtherance of this conspiracy between Defendants.

## FIFTH CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty)

### (Against Defendant Mary Berner)

85.     Plaintiffs incorporates paragraphs 1 through 84 of the Complaint as if fully set forth herein.

86.     Defendants Cassidy, Oliver and Marcus planned to breach their fiduciary duty to bondholder interests in Cumulus Media, Inc. for their own personal benefit.

87.     Defendants Cassidy, Oliver and Marcus needed cooperation from one other board member to carry out their plan to breach fiduciary duty to bondholders.

88.     Defendants Cassidy, Oliver and Marcus had a fiduciary duty to creditors of the financially distressed Cumulus Media, Inc.

89.     Filing an unnecessary bankruptcy with a restructuring plan that diminished bondholder interests is a breach of fiduciary duty to bondholders.

90.     Defendant Berner agreed to assist in the objective of diminishing bondholder interests through filing an unnecessary and unreasonable bankruptcy action while negotiating with two major secured creditors for benefit other defendants.

15

91.     Defendant Berner assisted other defendants in participation in the shadow board which stalled negotiations with bondholders for Crestview Partners LP to put in place a profitable side deal.

92.     Defendant Berner assisted other defendants in filing an unnecessary bankruptcy which benefitted Voya and JP Morgan in return for favorable treatment to Crestview Partners and Crestview Partners subsidiaries.

93.     Defendant Berner assisted other defendants in these schemes in exchange for a valuable ongoing compensation package and promise of equity in the restructured Cumulus to offset any equity losses in the old Cumulus.

94.     Defendant Berner's actions in filing an unnecessary bankruptcy were wrongful conduct and improper actions.

95.     Defendant Berner had knowledge Defendants Oliver, Cassidy and Marcus owed a fiduciary duty to bond holders, including Plaintiffs.

96.     Defendants Oliver, Cassidy and Marcus could not have procured the wrongful bankruptcy and breach of duty associated with the restructuring plan without the assistance of Defendant Berner.

97.     Defendant Berner's assistance was purposeful, intentional and knowing that the bankruptcy would harm Plaintiffs.

98.     Defendant Berner's assistance was the cause and proximate cause of damage to Plaintiffs.

99.     Plaintiffs were in fact injured when Plaintiffs' ownership interests in Cumulus Media Inc. debt were eliminated without adequate compensation by the acts of the Defendants and including the assistance of Defendant Berner.

16

WHEREFORE Plaintiffs pray for the following relief:

A.  That summons and process be issued requiring these defendants to appear as provided by law to answer the allegations of this Complaint;

B.  That all issues triable be determined by a jury;

C.  That Plaintiffs be awarded the value of their ownership in Cumulus Media, Inc. debt prior to the initiation of Defendants' schemes and fraudulent activities described herein, including attorneys' fees and expenses, in an amount proven at trial and determined by the enlightened conscience of a jury;

D.  The Plaintiffs be awarded punitive damages against Defendants in amounts to be determined by the enlightened conscience of a jury;

E.  That Plaintiffs have and recover all damages to which they are entitled under Georgia law; and

F.  That Plaintiffs have all such other and further relief as this Court deems just and appropriate.

Respectfully Submitted this 1st day of November, 2018.

WISE & REEVES, P.C.

BY: /s/ Lindsey L. Hobbs
  Lindsey L. Hobbs, Ga Bar # 940347
  Two Centre Square, Ste 160
  625 S. Gay Street
  Knoxville, TN 37902
  (865) 544-1199
  lindsey@wiseandreeves.com
  Attorney for Plaintiff

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

**Southern District of New York**

(State)

Case number *(if known)*: _____ Chapter **11**

☐ Check if this is an
amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy    04/16

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | | | |
|---|---|---|---|
| 1. | Debtor's Name | **Cumulus Media Inc.** | |

**2. All other names debtor used in the last 8 years**

Include any assumed names, trade names, and *doing business as* names

**None.**

**3. Debtor's federal Employer Identification Number (EIN)**    **36-4159663**

**4. Debtor's address**

**Principal place of business**

**3280 Peachtree Road, NW**
Number        Street

**Suite 2200**

**Atlanta, Georgia 30305**
City                State        Zip Code

**Fulton County**
County

**Mailing address, if different from principal place of business**

Number        Street

P.O. Box

City                State        Zip Code

**Location of principal assets, if different from principal place of business**

Number        Street

City                State        Zip Code

**5. Debtor's website (URL)**    **www.cumulus.com**

**6. Type of debtor**

☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____

---

Official Form 201            Voluntary Petition for Non-Individuals Filing for Bankruptcy            page 1

**EXHIBIT A**

| Debtor | Cumulus Media Inc. | | Case number *(if known)* | |
|---|---|---|---|---|
| | Name | | | |

**7. Describe debtor's business**

A. *Check One:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☒ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

__5151__

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check One:*

☐ Chapter 7

☐ Chapter 9

☒ Chapter 11. *Check all that apply:*

    ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,566,050 (amount subject to adjustment on 4/01/19 and every 3 years after that).

    ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

    ☐ A plan is being filed with this petition.

    ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

    ☒ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

    ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☒ No

☐ Yes. District _____ When MM/DD/YYYY Case number _____

    District _____ When MM/DD/YYYY Case number _____

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☐ No

☒ Yes. Debtor __See Rider 1__ Relationship __Affiliate__

    District __Southern District of New York__ When __11/29/2017__ MM / DD / YYYY

    Case number, if known _____

EXHIBIT A

| Debtor | Cumulus Media Inc. | | Case number (if known) | |
| | Name | | | |

**11. Why is the case filed in this district?**

*Check all that apply:*

☐ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☒ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No. To the best of the Debtor's knowledge, the Debtor does not own or have possession of any property that presents an imminent or immediate hazard to the health and safety of the general public.

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?**

| | Number | Street |
| --- | --- | --- |
| | _____ | |
| | City | State | Zip Code |

**Is the property insured?**

☐ No

☐ Yes.   Insurance agency   _____

Contact name   _____

Phone   _____

---

**Statistical and administrative information**

**13. Debtor's estimation of available funds**

*Check one:*

☒ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

*Presented on a consolidated basis*

☐ 1-49
☐ 50-99
☐ 100-199
☐ 200-999

☐ 1,000-5,000
☐ 5,001-10,000
☐ 10,001-25,000

☒ 25,001-50,000
☐ 50,001-100,000
☐ More than 100,000

**15. Estimated assets**

*Presented on a consolidated basis*

☐ $0-$50,000
☐ $50,001-$100,000
☐ $100,001-$500,000
☐ $500,001-$1 million

☐ $1,000,001-$10 million
☐ $10,000,001-$50 million
☐ $50,000,001-$100 million
☐ $100,000,001-$500 million

☐ $500,000,001-$1 billion
☒ $1,000,000,001-$10 billion
☐ $10,000,000,001-$50 billion
☐ More than $50 billion

---

Official Form 201          Voluntary Petition for Non-Individuals Filing for Bankruptcy          page 3

**EXHIBIT A**

| Debtor | Cumulus Media Inc. | | Case number *(if known)* | |
|---|---|---|---|---|
| | Name | | | |

**16. Estimated liabilities**

*Presented on a consolidated basis*

- ☐ $0-$50,000
- ☐ $50,001-$100,000
- ☐ $100,001-$500,000
- ☐ $500,001-$1 million
- ☐ $1,000,001-$10 million
- ☐ $10,000,001-$50 million
- ☐ $50,000,001-$100 million
- ☐ $100,000,001-$500 million
- ☐ $500,000,001-$1 billion
- ☒ $1,000,000,001-$10 billion
- ☐ $10,000,000,001-$50 billion
- ☐ More than $50 billion

---

### Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **11/29/2017**
     MM/ DD /YYYY

**✗**   */s/ Richard Denning*      **Richard Denning**
Signature of authorized representative of debtor      Printed name

Title   **Senior Vice President and General Counsel**

**18. Signature of attorney**

**✗**   */s/ Paul M. Basta*     Date   **11/29/2017**
Signature of attorney for debtor      MM/ DD/YYYY

**Paul M. Basta**
Printed name

**Paul, Weiss, Rifkind Wharton & Garrison LLP**
Firm name

**1285 Avenue of the Americas**
Number      Street

**New York**      **New York**    **10019-6064**
City      State    ZIP Code

**(212) 373-3000**      **pbasta@paulweiss.com**
Contact phone      Email address

**2568046**      **New York**
Bar number      State

---

EXHIBIT A

<table>
<tr><td colspan="2" style="background:black;color:white">Fill in this information to identify the case:</td></tr>
</table>

United States Bankruptcy Court for the :

**Southern District of New York**
_____
(State)

Case number *(if known)*: _____    Chapter  **11**

☐ Check if this is an
amended filing

### Rider 1
### Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor

On the date hereof, each of the entities listed below (collectively, the "Debtors") filed a petition in the United States Bankruptcy Court for the Southern District of New York for relief under chapter 11 of title 11 of the United States Code.  The Debtors have moved for joint administration of these cases under the case number assigned to the chapter 11 case of Cumulus Media Inc.

- Cumulus Media Inc.
- Atlanta Radio, LLC
- Broadcast Software International
- Catalyst Media, Inc.
- Chicago FM Radio Assets, LLC
- Chicago Radio Assets, LLC
- CMI Receivables Funding LLC
- CMP Susquehanna Corp.
- CMP KC Corp.
- CMP Susquehanna Radio Holdings Corp.
- Consolidated IP Company LLC
- Cumulus Broadcasting LLC
- Cumulus Intermediate Holdings Inc.
- Cumulus Media Holdings Inc.
- Cumulus Network Holdings Inc.
- Cumulus Radio Corporation
- DC Radio Assets, LLC
- Detroit Radio, LLC
- Dial Communications Global Media, LLC
- IncentRev-Radio Half Off, LLC
- IncentRev LLC
- KLIF Broadcasting, Inc.
- KLOS-FM Radio Assets, LLC
- LA Radio, LLC
- Minneapolis Radio Assets, LLC
- NY Radio Assets, LLC
- Radio Assets, LLC
- Radio Metroplex, Inc.
- Radio Networks, LLC
- San Francisco Radio Assets, LLC
- Susquehanna Media Co.
- Susquehanna Pfaltzgraff Co.
- Susquehanna Radio Corp.
- WBAP - KSCS Assets, LLC
- Westwood One, Inc.
- Westwood One Radio Networks, Inc.
- WPLJ Radio, LLC

EXHIBIT A

Fill in this information to identify the case:

Debtor name __Cumulus Media Inc.__

United States Bankruptcy Court for the: __Southern__ District of __New York__

Case number (if known): _____

☐ Check if this is an amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: Consolidated List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, disputed | Amount of unsecured claim |||
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | U.S. BANK NATIONAL ASSOCIATION ACCOUNT MANAGER — CUMULUS MEDIA 1349 WEST PEACHTREE STREET SUITE 1050 ATLANTA, GA 30309 | WILLIAM ECHOLS Fax: (404) 898-8844 Email: WILLIAM.ECHOLS@USBANK.COM | 7.75% Senior Notes | | | | $637,314,000 |
| 2 | NIELSEN AUDIO, INC 9705 PATUXENT WOODS DRIVE COLUMBIA, MD 21046 | SEAN R. CREAMER CEO Phone (410) 312-8000 Fax (410) 312-8607 | Trade Debt | | | | $6,653,543 |
| 3 | BROADCASTERS GENERAL STORE INC 2480 SE 52ND STREET OCALA, FL 34480 | KERSTIN KERRY CEO Phone (352) 622-7700 Fax: (352) 629-7000 | Trade Debt | | | | $967,596 |
| 4 | BROADCAST MUSIC, INC. 10 MUSIC SQUARE EAST NASHVILLE, TN 37203-4399 | MICHAEL O'NEILL PRESIDENT & CEO Phone: (615) 401-2000 Email: NASHVILLE@BMI.COM | Trade Debt | | | | $789,812 |
| 5 | IGT MEDIA HOLDINGS, INC. 21 SE 1ST AVENUE MIAMI, FL 33131 | MARK MECHANIC COO Phone (305) 573-2800 Fax: (305) 573-2120 | Trade Debt | | | | $286,299 |
| 6 | KESN OPERATING, LTD. 400 E. LAS COLINAS BLVD. STE 1033 IRVING, TX 75039 | JOHN HARE PRESIDENT | Trade Debt | | | | $273,333 |
| 7 | LIVE NATION 9348 CIVIC CENTER DR. BEVERLY HILLS, CA 90210 | MICHAEL RAPINO PRESIDENT, CEO & DIR Phone (310) 867-7000 Fax: (302) 636-5454 | Trade Debt | | | | $238,652 |

EXHIBIT A

| Debtor | Cumulus Media Inc |  |  |  |  | Case Number (if known) |  |  |
|---|---|---|---|---|---|---|---|---|
| | Name | | | | | | | |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, disputed | Amount of unsecured claim — If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 8 | ENTICENT, LLC DBA TRITON DIGITAL 15303 VENTURA BLVD., STE 1500 SHERMAN OAKS, CA 91403 | NEAL SCHORE CEO<br><br>Phone: (514) 448-4037 Email: HELP@TRITONDIGITAL.COM | Trade Debt | | | | $198,255 |
| 9 | OAKLAND RAIDERS 1220 HARBOR BAY PKWY ALAMEDA, CA 94502 | MARK DAVIS OWNER<br><br>Phone: (510) 864-5000 Email: FEEDBACK@RAIDERS.COM | Trade Debt | | | | $190,000 |
| 10 | CNN, INC. 1 CNN CENTER ATLANTA, GA 30348 | JEFF ZUCKER PRESIDENT<br><br>Phone: (404) 827-1700 | Trade Debt | | | | $161,057 |
| 11 | MERLIN MEDIA, LLC 222 MERCHANDISE MART PLZ SUITE 230 CHICAGO, IL 60654 | RANDY MICHAELS CEO<br><br>Phone: (312) 245-1200 | Trade Debt | | | | $144,772 |
| 12 | BAKER INTERACTIVE SERVICES, LLC 2195 N. NORCROSS TUCKER ROAD NORCROSS, GA 30071 | KEITH HICKS III MEMBER<br><br>Phone: (770) 441-2000 Fax: (770) 449-7719 Email: SALES@BAKERAUDIOVISUAL.COM | Trade Debt | | | | $102,831 |
| 13 | NAVINT PARTNERS, LLC 104 WEST 40TH STREET 4TH FLOOR NEW YORK, NY 10018 | MR. JIM MARTINDALE MANAGING PARTNER AND CEO<br><br>Phone: (914) 393-3397 | Trade Debt | | | | $87,040 |
| 14 | MICHAEL CRONIN ACOUSTIC CONSTRUCTION LLC 2500 BARTON AVENUE NASHVILLE, TN 37212 | MICHAEL CRONIN OWNER<br><br>Phone: (615) 473-7778 | Trade Debt | | | | $60,961 |
| 15 | MUSICTOGO LLC ONE STAMFORD PLACE 263 TRESSER BLVD 9TH FLOOR STAMFORD, CT 06901 | | Trade Debt | | | | $58,889 |
| 16 | COURTSIDE, LLC 335 N MAPLE DR. BEVERLY HILLS, CA 90210 | NORMAN PATTIZ CEO<br><br>Phone: (310) 858-0888 Fax: (310) 858-9710 | Trade Debt | | | | $56,090 |
| 17 | ALSTON & BIRD LLP ONE ATLANTIC CENTER 1201 WEST PEACHTREE STREET ATLANTA, GA 30309-3424 | BRENDA C. MARTIN DIRECTOR OF CLIENT FINANCIAL SERVICES<br><br>Phone: (404) 881-7000 Fax: (404) 253-8689 Email: BRENDA.MARTIN@ALSTON.COM | Trade Debt | | | | $52,817 |

11/29/2017

EXHIBIT A

Debtor ___Cumulus Media Inc._____     Case Number (if known) _____
        Name

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 18 | ACT 1 SYSTEMS, INC. 21031 VENTURA BLVD SUITE 1020 WOODLAND HILLS, CA 91364 | ROBERT FITE & ERIC ROSENBERG  Phone: (818) 347-6400 Fax: (818) 346-2023 Email: RFITE@ACT1SYSTEMS.COM; ERIC@ACT1SYSTEMS.COM | Trade Debt | | | | $45,728 |
| 19 | GATESAIR, INC. 5300 KINGS ISLAND DR SUITE 101 MASON, OH 45040 | BRUDE SWAIL CEO  Phone: (800) 622-0022 Fax: (513) 459-3796 Email: INFORMATION@GATESAIR.COM | Trade Debt | | | | $45,596 |
| 20 | CAITLIN FERRARI, ALYSSA U., MARIA P., AND MELISSA M. ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED Index No. 804125/2014  JACLYN S. AND GINA B. Index No. 804088/2014  C/O DOLCE PANEPINTO, P.C 1260 DELAWARE AVENUE BUFFALO, NEW YORK 14209  C/O THE MARLBOROUGH LAW FIRM, P.C. 445 BROAD HOLLOW ROAD, SUITE 400 MELVILLE, NY 11747  C/O LEVI & KORSINSKY, LLP 30 BROAD STREET, 24TH FLOOR NEW YORK, NY 10004 | ATTN: SEAN E. COONEY, ESQ. Phone: (716) 852-1888   ATTN: CHRISTOPHER MARLBOROUGH, ESQ. Phone: (212) 991-8960   Phone: (212) 363-7500 | Litigation | Contingent, Unliquidated & Disputed | | | Undetermined |

11/29/2017                                                                              EXHIBIT A        Page - 3

**Fill in this information to identify the case and this filing:**

| | |
|---|---|
| Debtor Name | **Cumulus Media Inc.** |
| United States Bankruptcy Court for the: | **Southern District of New York** |
| | (State) |
| Case number (If known): | |

## Official Form 202
## Declaration Under Penalty of Perjury for Non-Individual Debtors   12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐   *Schedule A/B: Assets-Real and Personal Property (Official Form 206A/B)*

☐   *Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)*

☐   *Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)*

☐   *Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)*

☐   *Schedule H: Codebtors (Official Form 206H)*

☐   *Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)*

☐   Amended Schedule

☐   *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (Official Form 204)*

☒   Other document that requires a declaration_____**List of Creditors Who Have the 20 Largest Unsecured Claims**_____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on

| **11/29/2017** | ☒   */s/ Richard Denning* |
|---|---|
| MM/ DD/YYYY | Signature of individual signing on behalf of debtor |
| | **Richard Denning** |
| | Printed name |
| | **Senior Vice President and General Counsel** |
| | Position or relationship to debtor |

Official Form 202        **Declaration Under Penalty of Perjury for Non-Individual Debtors**

EXHIBIT A

EXECUTED VERSION

**RESOLUTIONS OF THE SPECIAL RESTRUCTURING COMMITTEE**
**OF THE BOARD OF DIRECTORS OF**
**CUMULUS MEDIA INC.**

November 29, 2017

WHEREAS, at a meeting of the Board of Directors (the "Board") of Cumulus Media Inc., a Delaware corporation (the "Company"), held on July 6, 2017, the Board resolved to form a special restructuring committee (the "Committee") to act for and on behalf of the Board, and to exercise all of the authority and powers of the Board, in connection with the restructuring process in which the Company is currently engaged;

WHEREAS, the Board appointed Jeffrey Marcus, Mary Berner, Ralph Everett, Ross Oliver, Jan Baker and Jill Bright to the Committee;

The undersigned, being all of the members of the Committee, hereby take the following actions and adopt the following resolutions by written consent pursuant to Sections 3.1, 3.12 and 3.13 of the Company's By-Laws (as amended, the "By-Laws") and Section 141(f) of the Delaware General Corporation Law (the "DGCL"):

**CHAPTER 11 FILING**

WHEREAS, the Committee considered presentations by the management and the Company's financial and legal advisors, regarding the financial situation of the Company, the strategic alternatives available to them, and the effect of the foregoing on the Company's businesses; and

WHEREAS, the Committee has had the opportunity to consult with the management and the Company's financial and legal advisors, and fully consider each of the strategic alternatives available to the Company.

NOW, THEREFORE, BE IT:

RESOLVED, that in the judgment of the Committee, it is desirable and in the best interests of the Company, its creditors, and other parties in interest, that the Company shall be, and hereby is, authorized to file or cause to be filed the voluntary petition for relief (the "Petition") and commence a case (the "Chapter 11 Case") under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and

RESOLVED, that any duly appointed officers of the Company (collectively, including, but not limited to, the Chief Executive Officer, the Chief Financial Officer and the General

EXHIBIT A

Counsel, the "Authorized Officers"), acting alone or with one or more other Authorized Officers be, and each of them hereby is, authorized, empowered, and directed to execute and file on behalf of the Company (i) to execute and verify the Petition as well as all other ancillary documents, and to cause the Petition to be filed with the Bankruptcy Court, and to make or cause to be made prior to the execution thereof any modifications to the Petition or ancillary documents and (ii) to execute, verify and file or cause to be filed all of the petitions, schedules, lists, and other motions, objections, replies, applications, papers, or documents, and to take any and all action that they deem necessary or proper to obtain such relief, including, without limitation, any action necessary or proper to maintain the ordinary course operation of the Company's businesses or to assist the Company in the Chapter 11 Case and in carrying out its duties under the provisions of the Bankruptcy Code.

## CASH COLLATERAL

WHEREAS, the Company will obtain benefits from its use of collateral, including cash collateral, as that term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), which is security for certain prepetition secured lenders (collectively, the "Secured Lenders") party to  that certain Amended and Restated Credit Agreement, dated as of December 23, 2013, among the Company and Cumulus Media Holdings Inc., as borrower, certain lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, and certain guarantors thereto (the "Credit Agreement"), as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time.

NOW, THEREFORE, BE IT:

RESOLVED, that the Authorized Officers be, and hereby are, authorized, empowered and directed in the name of, and on behalf of, the Company to seek authorization to approval of the use of cash collateral pursuant to a postpetition cash collateral order in interim and final form, and any Authorized Officer be, and hereby is, authorized, empowered, and directed to negotiate, execute, and deliver any and all agreements, instruments, or documents, by or on behalf of the Company, necessary to implement the cash collateral, including providing for adequate protection to the Secured Lenders in accordance with section 363 of the Bankruptcy Code, as well as any additional or further agreements for and the use of cash collateral in connection with the Company's Chapter 11 Case, which agreements may require each Subsidiary to grant adequate protection to each Company's Secured Lenders and each other agreement, instrument, or document to be executed and delivered in

2

EXHIBIT A

connection therewith, by or on behalf of the Company pursuant thereto or in connection therewith, all with such changes therein and additions thereto as any Authorized Officer approves, such approval to be conclusively evidenced by the taking of such action or by the execution and delivery thereof.

## RESTRUCTURING SUPPORT AGREEMENT

WHEREAS, in connection with the Chapter 11 Case, the Company has negotiated a restructuring support agreement in form and substance generally similar to that certain restructuring support agreement attached as **Exhibit A** (the "Restructuring Support Agreement"), by and among the Company, on behalf of itself and each of its direct and indirect subsidiaries, certain Secured Lenders and certain holders of equity in the Company.

NOW, THEREFORE, BE IT:

RESOLVED, that the Company authorizes and directs the Authorized Officers of the Company to take all actions (including, without limitation, to negotiate and execute any agreements, documents and certificates) necessary to enter into the Restructuring Support Agreement and to consummate the transactions contemplated thereby in connection with the Chapter 11 Case and that each Subsidiary's performance of its obligations under the Restructuring Support Agreement hereby is, in all respects, authorized and approved.

## RETENTION OF PROFESSIONALS

RESOLVED, that each of the Authorized Officers be, and hereby is, authorized and directed to employ the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, as general bankruptcy counsel, to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance the Company's rights and obligations, including filing any motions, objections, replies, applications, or pleadings; and in connection therewith, each of the Authorized Officers, with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of Paul, Weiss, Rifkind, Wharton & Garrison LLP;

RESOLVED, that each of the Authorized Officers be, and hereby is, authorized and directed to employ the firm of PJT Partners LP, as investment banker, to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and

3

EXHIBIT A

to take any and all actions to advance the Company's rights and obligations; and in connection therewith, each of the Authorized Officers is, with power of delegation, hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of PJT Partners LP;

RESOLVED, that each of the Authorized Officers be, and hereby is, authorized and directed to employ the firm of Alvarez & Marsal North America, LLC, as restructuring advisor, to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance each of the Company's rights and obligations; and in connection therewith, each of the Authorized Officers is, with power of delegation, hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of Alvarez & Marsal North America, LLC;

RESOLVED, that each of the Authorized Officers be, and hereby is, authorized and directed to employ the firm of Epiq Bankruptcy Solutions, LLC as notice, claims, and balloting agent to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance the Company's rights and obligations; and in connection therewith, each of the Authorized Officers, with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of Epiq Bankruptcy Solutions, LLC;

RESOLVED, that each of the Authorized Officers be, and hereby is, authorized and directed to employ any other professionals to assist the Company in carrying out its duties under the Bankruptcy Code; and in connection therewith, each of the Authorized Officers, with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of any other professionals as necessary; and

RESOLVED, that each of the Authorized Officers be, and hereby is, with power of delegation, authorized, empowered, and directed to execute and file all petitions, schedules, motions, objections, replies, applications, pleadings, lists, and other papers and, in connection therewith, to employ and retain all assistance by legal counsel, accountants, investment bankers, financial advisors,

4

EXHIBIT A

restructuring advisors, and other professionals and to take and perform any and all further acts and deeds that each of the Authorized Officers deem necessary, proper, or desirable in connection with the Company's Chapter 11 case, with a view to the successful prosecution of the case.

## GENERAL

RESOLVED, that in addition to the specific authorizations heretofore conferred upon the Authorized Officers, each of the Authorized Officers (and their designees and delegates) be, and hereby is, authorized and empowered, in the name of and on behalf of the Company, to (a) take such further actions and execute and deliver such certificates, instruments, guaranties, notices and documents as may be required or as such officer may deem necessary, advisable or proper to carry out the intent and purpose of the foregoing resolutions, including the execution and delivery of any security agreements, pledges, financing statements and the like, (b) perform the obligations of the Company under the Bankruptcy Code, with all such actions to be performed in such manner, and all such certificates, instruments, guaranties, notices and documents to be executed and delivered in such form, as the officer performing or executing the same shall approve, and the performance or execution thereof by such officer shall be conclusive evidence of the approval thereof by such officer and by the Company and (c) pay fees and expenses in connection with the transactions contemplated by the foregoing resolutions;

RESOLVED, that the Committee has received sufficient notice of the actions and transactions relating to the matters contemplated by the foregoing resolutions, as may be required by the organizational documents of the Company, or hereby waives any right to have received such notice;

RESOLVED, that all acts, actions, and transactions relating to the matters contemplated by the foregoing resolutions done in the name of and on behalf of the Company, which acts would have been approved by the foregoing resolutions except that such acts were taken before the adoption of these resolutions, are hereby in all respects approved and ratified as the true acts and deeds of the Company with the same force and effect as if each such act, transaction, agreement, or certificate has been specifically authorized in advance by resolution of the Committee;

RESOLVED, that each of the Authorized Officers (and their designees and delegates) be, and hereby is, authorized and empowered to take all actions or to not take any action in the name

5

EXHIBIT A

of the Company with respect to the transactions contemplated by these resolutions hereunder as the sole shareholder, partner, member, managing member, or manager of each direct subsidiary of the Company, in each case, as such Authorized Officer shall deem necessary or desirable in such Authorized Officers' reasonable business judgment as may be necessary or convenient to effectuate the purposes of the transactions contemplated herein;

RESOLVED, that in connection with the transactions contemplated by the preceding resolutions, each Authorized Officer be, and each of them individually hereby is, authorized, in the name and on behalf of the Company, to certify these resolutions and any more formal or detailed resolutions as such officer may deem necessary, appropriate or desirable to effectuate the intent of the foregoing resolutions; and that thereupon such resolutions shall be deemed adopted as and for the resolutions of the Committee as if set forth at length herein;

FURTHER RESOLVED, that this consent may be executed in any number of counterparts, each of which shall be deemed to be an original, and such counterparts shall constitute but one and the same consent;

FURTHER RESOLVED, that facsimile or photostatic copies of signatures to this consent shall be deemed to be originals and may be relied on to the same extent as the originals; and

FURTHER RESOLVED, that the actions taken by this written consent shall have the same force and effect as if taken at a meeting of the Committee duly called and constituted pursuant to the By-Laws and the laws of the State of Delaware.

<p align="center">*       *       *       *       *</p>

EXHIBIT A

IN WITNESS WHEREOF, the undersigned has executed this Consent as of the date above first written.

_____
Mary G. Berner

_____
Jill Bright

_____
Ralph B. Everett

_____
Jeffrey A. Marcus

_____
Ross A. Oliver

_____
Jan Baker

*[Signature Page to Cumulus Media Inc. Written Consent]*

EXHIBIT A

IN WITNESS WHEREOF, the undersigned has executed this Consent as of the date above first written.

_____
Mary G. Berner

_____
Jill Bright

_____
Ralph B. Everett

_____
Jeffrey A. Marcus

_____
Ross A. Oliver

_____
Jan Baker

*[Signature Page to Cumulus Media Inc. Written Consent]*

EXHIBIT A

IN WITNESS WHEREOF, the undersigned has executed this Consent as of the date above first written.

_____
Mary G. Berner

_____
Jill Bright

_____
Ralph B. Everett

_____
Jeffrey A. Marcus

_____
Ross A. Oliver

_____
Jan Baker

[Signature Page to Cumulus Media Inc. Written Consent]

EXHIBIT A

IN WITNESS WHEREOF, the undersigned has executed this Consent as of the date above first written.

_____
Mary G. Berner

_____
Jill Bright

_____
Ralph B. Everett

_____
Jeffrey A. Marcus

_____
Ross A. Oliver

_____
Jan Baker

*[Signature Page to Cumulus Media Inc. Written Consent]*

EXHIBIT A

IN WITNESS WHEREOF, the undersigned has executed this Consent as of the date above first written.

_____

Mary G. Berner

_____

Jill Bright

_____

Ralph B. Everett

_____

Jeffrey A. Marcus

_____

Ross A. Oliver

*David J. Baker*

_____

Jan Baker

*[Signature Page to Cumulus Media Inc. Written Consent]*

EXHIBIT A

EX-2.1

EX-2.1 2 d595577dex21.htm EX-2.1

Exhibit 2.1

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Tel: 212-373-3000
Fax: 212-757-3990
Paul M. Basta
Lewis R. Clayton
Jacob A. Adlerstein
Claudia R. Tobler

*Counsel for Debtors and*
*Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re:** | Chapter 11 |
| **CUMULUS MEDIA INC.,** *et al.,* | Case No. 17-13381 (SCC) |
| **Debtors.** [1] | (Jointly Administered) |

**FIRST AMENDED JOINT PLAN OF REORGANIZATION OF CUMULUS MEDIA INC.
AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]  The last four digits of Cumulus Media Inc.'s tax identification number are 9663. Because of the large number of Debtors in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/cumulus. The location of the Debtors' service address is  3280 Peachtree Road, N.W., Suite 2200, Atlanta, Georgia 30305.

EXHIBIT B

EX-2.1

## TABLE OF CONTENTS

|  | | Page |
|---|---|---|
| ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW | | 1 |
| A. | Defined Terms | 15 |
| B. | Rules of Interpretation | 15 |
| C. | Computation of Time | 15 |
| D. | Governing Law | 16 |
| E. | Reference to Monetary Figures | 16 |
| F. | Reference to the Debtors or the Reorganized Debtors | 16 |
| ARTICLE II. ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS | | 16 |
| A. | Administrative Claims | 16 |
| B. | Professional Compensation | 16 |
| C. | Priority Tax Claims | 17 |
| D. | Statutory Fees | 18 |
| ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS | | 18 |
| A. | Classification of Claims and Interests | 18 |
| B. | Summary of Classification | 18 |
| C. | Treatment of Claims and Interests | 19 |
| D. | Voting of Claims | 23 |
| E. | No Substantive Consolidation | 23 |
| F. | Acceptance by Impaired Classes | 23 |
| G. | Special Provision Governing Claims | 23 |
| H. | Elimination of Vacant Classes | 23 |
| I. | Consensual Confirmation | 24 |
| J. | Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code | 24 |
| K. | Controversy Concerning Impairment or Classification | 24 |
| L. | Subordinated Claims | 24 |
| ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN | | 24 |
| A. | Sources of Consideration for Plan Distributions | 24 |
| B. | First Lien Exit Facility | 25 |
| C. | New Revolving Credit Facility | 25 |
| D. | Issuance and Distribution of New Securities | 25 |
| E. | Settlement of Claims and Interests | 26 |
| F. | Restructuring Transactions | 26 |
| G. | Corporate Existence | 26 |
| H. | FCC Licenses | 26 |
| I. | Vesting of Assets in the Reorganized Debtors | 27 |
| J. | Cancellation of Existing Indebtedness and Securities | 27 |
| K. | Corporate Action | 27 |
| L. | New Certificates of Incorporation and New By-Laws | 28 |
| M. | Directors and Officers of the Reorganized Debtors | 28 |
| N. | Employee Obligations | 28 |
| O. | Effectuating Documents; Further Transactions | 29 |
| P. | Management Incentive Plan | 29 |

EXHIBIT B

| | | |
|---|---|---|
| Q. | Exemption from Certain Taxes and Fees | 29 |
| R. | Indemnification Provisions | 30 |
| S. | Preservation of Causes of Action | 30 |

ARTICLE V: TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES  30

| | | |
|---|---|---|
| A. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 31 |
| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 31 |
| C. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 31 |
| D. | Certain Customer Agreements | 32 |
| E. | Insurance Policies | 32 |
| F. | Indemnification Provisions | 33 |
| G. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 33 |
| H. | Reservation of Rights | 33 |
| I. | Nonoccurrence of Effective Date | 33 |
| J. | Contracts and Leases Entered Into After the Petition Date | 33 |

ARTICLE VI: PROVISIONS GOVERNING DISTRIBUTIONS  34

| | | |
|---|---|---|
| A. | Timing and Calculation of Amounts to Be Distributed | 34 |
| B. | Distributions on Account of Obligations of Multiple Debtors | 34 |
| C. | Disbursing Agent | 34 |
| D. | Rights and Powers of Disbursing Agent | 34 |
| E. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 35 |
| F. | Manner of Payment | 36 |
| G. | Section 1145 Exemption | 36 |
| H. | Compliance with Tax Requirements | 37 |
| I. | Allocations | 37 |
| J. | Setoffs and Recoupment | 37 |
| K. | Claims Paid or Payable by Third Parties | 38 |
| L. | Foreign Current Exchange Rate | 38 |

ARTICLE VII: PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS  39

| | | |
|---|---|---|
| A. | Resolution of Disputed Claims | 39 |
| B. | Disallowance of Claims | 40 |
| C. | Amendments to Proofs of Claim | 40 |
| D. | No Distributions Pending Allowance | 40 |
| E. | Distributions After Allowance | 40 |
| F. | Reserve of Special Warrants | 41 |
| G. | No Interest | 41 |

ARTICLE VIII: SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS  41

| | | |
|---|---|---|
| A. | Compromise and Settlement of Claims, Interests, and Controversies | 41 |
| B. | Discharge of Claims and Termination of Interests | 41 |
| C. | Release of Liens | 42 |
| D. | Releases by the Debtors | 42 |
| E. | Releases by the Releasing Parties | 43 |
| F. | Regulatory Activities | 44 |
| G. | Exculpation | 44 |
| H. | Injunction | 44 |
| I. | Term of Injunctions or Stays | 45 |
| J. | Recoupment | 45 |
| K. | Protection Against Discriminatory Treatment | 45 |

EXHIBIT B

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN                                    46

  A.   Conditions Precedent to the Effective Date                                          46
  B.   Waiver of Conditions                                                               46
  C.   Effect of Failure of Conditions                                                    47

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN                                  47

  A.   Modification and Amendments                                                        47
  B.   Effect of Confirmation on Modifications                                            47
  C.   Revocation or Withdrawal of Plan                                                   47

ARTICLE XI. RETENTION OF JURISDICTION                                                           48

ARTICLE XII. MISCELLANEOUS PROVISIONS                                                           50

  A.   Immediate Binding Effect                                                           50
  B.   Substantial Consummation                                                           50
  C.   Further Assurances                                                                 50
  D.   Statutory Committee and Cessation of Fee and Expense Payment                        50
  E.   Reservation of Rights                                                              50
  F.   Successors and Assigns                                                             50
  G.   Notices                                                                            51
  H.   Entire Agreement                                                                   52
  I.   Exhibits                                                                           52
  J.   Severability of Plan Provisions                                                    52
  K.   Votes Solicited in Good Faith                                                      52
  L.   Closing of Chapter 11 Cases                                                        53
  M.   Conflicts                                                                          53

EXHIBIT B

EX-2.1

## INTRODUCTION

Cumulus Media Inc. ("Cumulus") and its debtor affiliates, as debtors and debtors in possession, propose this joint plan of reorganization (the "Plan") for the resolution of the Claims against and Interests in each of the Debtors pursuant to chapter 11 of the Bankruptcy Code.

Pursuant to section 1125(b) of the Bankruptcy Code, votes to accept or reject a plan of reorganization cannot be solicited from holders of claims or interests entitled to vote on a plan until a disclosure statement has been approved by a bankruptcy court and distributed to such holders. On February 2, 2018, the Bankruptcy Court entered the Disclosure Statement Order that, among other things, approved the Disclosure Statement, set voting procedures, and scheduled the Confirmation Hearing.

**HOLDERS OF CLAIMS AND INTERESTS SHOULD REFER TO THE DISCLOSURE STATEMENT FOR A DISCUSSION OF THE DEBTORS' HISTORY, BUSINESS, ASSETS, RESULTS OF OPERATIONS, HISTORICAL FINANCIAL INFORMATION AND PROJECTIONS OF FUTURE OPERATIONS, AS WELL AS A SUMMARY AND DESCRIPTION OF THIS PLAN.**

### ARTICLE I.
### DEFINED TERMS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms.*

As used in this Plan, capitalized terms have the meanings ascribed to them below.

1.    "*Accrued Professional Compensation Claims*" means, at any given time, all Claims against any Debtor for accrued, contingent, and/or unpaid fees and expenses (including success fees) that are allowable before the Effective Date by any retained Professional in the Chapter 11 Cases that the Bankruptcy Court has not denied by Final Order, in all cases to the extent that any such fees and expenses (a) have not been previously paid (regardless of whether a fee application has been Filed for any such amount) and (b) have not been applied against any retainer that has been provided to such Professional, in each case in accordance with the Interim Compensation Order. To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses (whether or not paid pursuant to an order granting interim allowance), then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation Claims.

2.    "*Administrative Claim*" means a Claim against any Debtor for costs and expenses of administration of the Chapter 11 Cases arising on or prior to the Effective Date and Allowed pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business; (b) Allowed Accrued Professional Compensation Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

3.    "*Administrative Claims Bar Date*" means the date that is thirty (30) calendar days after the Effective Date.

4.    "*Administrative Claims Objection Deadline*" means the date that is seventy-five (75) calendar days after the Effective Date.

5.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

6.    "*Allowed*" means, when used in reference to a Claim, all or that portion, as applicable, of any Claim against any Debtor that (i) has been listed in the Schedules (as such Schedules may be amended by the Debtors from time to time) as liquidated in amount and not disputed or contingent, and for which no party contrary or

EXHIBIT B

superseding Proof of Claim has been timely Filed or that the Debtors do not timely object to in accordance with Article VII of the Plan, (ii) has been expressly allowed by Final Order or under the Plan, (iii) has been compromised, settled or otherwise resolved pursuant to Article VII of the Plan, the Bankruptcy Rules, Local Rules, another Final Order of the Bankruptcy Court, or (iv) is evidenced by a Proof of Claim Filed by the Claims Bar Date or (for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim is not or shall not be required to be Filed) that the Debtors or any other party in interest do not timely object to in accordance with Article VII of the Plan; *provided, however,* that Claims allowed solely for the purpose of voting to accept or reject the Plan shall not be considered "Allowed" for any other purpose under the Plan or otherwise, except if and to the extent otherwise determined to be Allowed as provided herein. Unless otherwise specified under the Plan, under the Bankruptcy Code, by order of the Bankruptcy Court or as otherwise agreed by the Debtors, Allowed Claims shall not, for any purpose under the Plan, include any interest, costs, fees or charges on such Claims from and after the Petition Date, and no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor. For the avoidance of doubt, (x) a Proof of Claim Filed after the Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim and (y) a Disputed Claim shall not become an Allowed Claim unless as otherwise provided for in the Plan. "Allow" and "Allowing" shall have correlative meanings.

7.   "*Avoidance Actions*" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by any of the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law.

8.   "*Ballot*" means the form or forms distributed to certain Holders of Claims entitled to vote on the Plan by which such parties may indicate acceptance or rejection of the Plan, which shall be subject to the rights of the Term Lender Group set forth in the Restructuring Support Agreement (including any and all exhibits thereto).

9.   "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

10.   "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of any withdrawal of the reference under section 157(d) of the Judicial Code, the United States District Court for the Southern District of New York.

11.   "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

12.   "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

13.   "*Case Management Procedures*" means the procedures pursuant to the *Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 Implementing Certain Notice and Case Management Procedures* [Docket No. 73].

14.   "*Cash*" means the legal tender of the United States of America.

15.   "*Cash Collateral Order*" means the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 363(c)(2), and 507 (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Secured Parties, and (III) Granting Related Relief,* entered on December 21, 2017 [Docket No. 164].

16.   "*Cause of Action*" means, without limitation, any action, Claim, cause of action, controversy, demand, right, right of setoff, cross claim, counterclaim, recoupment, claim for breach of duty imposed by law or in equity, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense,

2

EXHIBIT B

offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured, or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, under the Bankruptcy Code or applicable nonbankruptcy law, or pursuant to any other theory of law.

17. *"Chapter 11 Cases"* means the jointly administered chapter 11 cases Filed for the Debtors in the Bankruptcy Court and currently styled *In re Cumulus Media Inc.*, Case No. 17-13381 (SCC) (Jointly Administered)

18. *"Claim"* means any claim, as such term is defined in section 101(5) of the Bankruptcy Code.

19. *"Claims and Interests"* means Claims against, and Interests in, any Debtor.

20. *"Claims Bar Date"* means the date by which a Proof of Claim must be or must have been Filed, as established by (a) the Claims Bar Date Order, or (b) any other Final Order of the Bankruptcy Court, as applicable.

21. *"Claims Bar Date Order"* means an order to be entered by the Bankruptcy Court, establishing the Claims Bar Date.

22. *"Claims Objection Deadline"* means the deadline for objecting to a Claim against any Debtor, which shall be on the date that is the later of (a) 180 calendar days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to such Claims.

23. *"Claims or Interests"* means Claims against, or Interests in, any Debtor.

24. *"Claims Register"* means the official register of Claims against the Debtors maintained by the Voting and Claims Agent.

25. *"Class"* means a class of Claims or Interests as set forth in Article III pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

26. *"Class A Common Stock"* means the class A common stock, par value $.001 per share, of Reorganized Cumulus issued on the Effective Date, or upon exercise of the Special Warrants, which for the avoidance of doubt may include Restricted Stock.

27. *"Class B Common Stock"* means the limited voting class B common stock, par value $.001 per share, of Reorganized Cumulus issued on the Effective Date, or upon exercise of the Special Warrants, which for the avoidance of doubt may include Restricted Stock, the terms of which Class B Common Stock will provide that it may be converted at the election of the Holder into Class A Common Stock on a one for one basis (subject to adjustment for stock splits, combinations, dividends or distributions with respect to the Class A Common Stock), subject to a determination by Reorganized Cumulus that such conversion would not result in a violation of the Communications Act or FCC rules and any necessary FCC approval.

28. *"Class B Election"* means an election made by a Holder of an Allowed Credit Agreement Claim, Allowed Senior Notes Claim or Allowed General Unsecured Claim on the Ownership Certification that such Holder elects to receive Class B Common Stock in lieu of Class A Common Stock.

29. *"Committee"* means the statutory committee of unsecured creditors of the Debtors, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on December 11, 2017, the membership of which may be reconstituted from time to time.

3

EXHIBIT B

EX-2.1

30. "*Communications Act*" means Chapter 5 of Title 47 of the United States Code, 47 U.S.C. § 151 *et seq.*, as amended.

31. "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

32. "*Confirmation Date*" means the date upon which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

33. "*Confirmation Hearing*" means the confirmation hearing held by the Bankruptcy Court pursuant to section 1129 of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

34. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the transactions contemplated thereby.

35. "*Consenting Equityholders*" means, collectively, the Holders of Interests in Cumulus party to the Restructuring Support Agreement.

36. "*Consenting Term Loan Lenders*" means, collectively, the Term Loan Lenders party to the Restructuring Support Agreement.

37. "*Consummation*" means the occurrence of the Effective Date.

38. "*Convenience Claim*" means a General Unsecured Claim that is either (a) in an amount that is equal to or less than $20,000 or (b) in an amount that is greater than $20,000, but with respect to which the Holder of such General Unsecured Claim voluntarily and irrevocably reduces the aggregate amount of such Claim to $20,000 pursuant to a valid election by the Holder of such General Unsecured Claim made on its Ballot on or before the Plan Voting Deadline.

39. "*Convenience Class Cap*" means $2 million in the aggregate or such greater amount that is subject to the prior written consent of the Term Lender Group.

40. "*Credit Agreement*" means that certain Amended and Restated Credit Agreement, dated as of December 23, 2013, among Cumulus, Cumulus Media Holdings Inc., as borrower, certain lenders party thereto, the Credit Agreement Agent, and certain other agents party thereto.

41. "*Credit Agreement Agent*" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the Credit Agreement (or any successor to JPMorgan Chase Bank, N.A., in such capacity).

42. "*Credit Agreement Claim*" means any Claim against any Debtor derived from, based upon, relating to, or arising from the Credit Agreement or the related Loan Documents (as defined in the Credit Agreement).

43. "*Credit Documents*" means, collectively, the (a) Credit Agreement, (b) each security agreement, guaranty, pledge agreement, mortgage, and any other document entered into pursuant to or in connection with the Credit Agreement, and (c) each other agreement that creates or purports to create or perfect a Lien or security interest in favor of the Credit Agreement Agent and/or the Term Loan Lenders.

44. "*Cumulus*" means Cumulus Media Inc.

4

8/65

EXHIBIT B

45. "*Cure Claim*" means a Claim against any Debtor based upon such Debtor's monetary default under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed or assumed and assigned by such Debtor or Reorganized Debtor, as applicable, pursuant to section 365 of the Bankruptcy Code.

46. "*Cure Notice*" means a notice of a proposed amount of Cash to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include the amount of Cure Claim (if any) to be paid in connection therewith.

47. "*Debtor*" means one of the Debtors, in its individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

48. "*Debtor Release*" means the releases set forth in Article VIII.D of the Plan.

49. "*Debtors*" means, collectively: Cumulus Media Inc., Cumulus Media Holdings Inc., Consolidated IP Company LLC, Broadcast Software International, Incentrev-Radio Half Off, LLC, Cumulus Intermediate Holdings Inc., Incentrev LLC, Cumulus Network Holdings Inc., Cumulus Radio Corporation; LA Radio, LLC; KLOS-FM Radio Assets, LLC; Detroit Radio, LLC; DC Radio Assets, LLC; Chicago FM Radio Assets, LLC; Chicago Radio Assets, LLC; Atlanta Radio, LLC; Minneapolis Radio Assets, LLC; NY Radio Assets, LLC; Radio Assets, LLC; San Francisco Radio Assets, LLC; WBAP-KSCS Assets, LLC; WPLJ Radio, LLC; Westwood One, Inc.; CMP Susquehanna Radio Holdings Corp., Cumulus Broadcasting LLC, Dial Communications Global Media, LLC, Radio Networks, Inc.; CMP Susquehanna Corp., Catalyst Media, Inc.; CMI Receivables Funding LLC, Susquehanna Pfaltzgraff Co., CMP KC Corp., Susquehanna Media Co., Susquehanna Radio Corp., KLIF Broadcasting, Inc., and Radio Metroplex, Inc.

50. "*Debtors' Case Information Website*" means http://dm.epiq11.com/cumulus.

51. "*Declaratory Ruling*" means a declaratory ruling adopted by the FCC granting the relief requested in the Petition for Declaratory Ruling.

52. "*Description of Transaction Steps*" means the description of the Restructuring Transactions as set forth in the Plan Supplement.

53. "*Disallowed*" means, with reference to any Claim or a portion of a Claim, any Claim against any Debtor that (a) has been disallowed by a Final Order of the Bankruptcy Court, (b) has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as $0, contingent, disputed, or unliquidated and as to which no Proof of Claim has been Filed by the applicable Claims Bar Date or deemed timely Filed pursuant to any Final Order of the Bankruptcy Court, (c) has been agreed to by the Holder of such Claim and the applicable Debtor to be equal to $0 or to be expunged, (d) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any Proof of Claim, or (e) has not been listed by such Debtor on the Schedules and as to which no Proof of Claim has been Filed by the applicable Claims Bar Date or deemed timely or properly Filed pursuant to any Final Order of the Bankruptcy Court. In each case a Disallowed Claim is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

54. "*Disbursing Agent*" means the Reorganized Debtors or the Entity or Entities selected by the Reorganized Debtors to make or facilitate distributions contemplated under the Plan.

55. "*Disclosure Statement*" means the disclosure statement related to the Plan, including all exhibits and schedules thereto and references therein, which shall be subject to the rights of the Debtors and the Term Lender Group set forth in the Restructuring Support Agreement (including any and all exhibits thereto), as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

5

EXHIBIT B

56. "*Disclosure Statement Order*" means the Order Approving (A) the Adequacy of the Disclosure Statement; (B) Solicitation and Notice Procedures with Respect to Confirmation of the Joint Plan of Reorganization of Cumulus Media Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code; (C) the Form of Ballots and Notices in Connection Therewith; (D) the Scheduling of Certain Dates with Respect Thereto; and (E) Related Relief [Docket No. 416].

57. "*Disputed*" means, with respect to a Claim against any Debtor, (a) any Claim, proof of which was timely and properly Filed, which is disputed under Article VII of this Plan or as to which the Debtors or any other party in interest have interposed and not withdrawn an objection or request for estimation (pursuant to Article VII of this Plan or otherwise) that has not been determined by a Final Order, (b) any Claim, proof of which was required to be Filed by order of the Bankruptcy Court but as to which a Proof of Claim was not timely or properly Filed, (c) any Claim that is listed in the Schedules as unliquidated, contingent, or disputed, or (d) any Claim that is otherwise disputed by any of the Debtors, the Reorganized Debtors or any other party in interest, which dispute has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court. For the avoidance of doubt, if no Proof of Claim has been Filed by the applicable Claims Bar Date and the Claim is not listed on the Schedules or has been or hereafter is listed on the Schedules as $0, disputed, contingent, or unliquidated, such Claim shall be Disallowed and shall be expunged from the Claims Register without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

58. "*Disputed Claim Reserve*" means the reserve of Special Warrants created pursuant to Article VII.E of this Plan.

59. "*Distribution Record Date*" means the Confirmation Date or such later date as agreed to by the Reorganized Debtors and the Term Lender Group in their sole and absolute discretion; *provided, however,* that no distribution record date shall apply to the Senior Notes or any other publicly-held Securities.

60. "*DTC*" means the Depository Trust Company.

61. "*Effective Date*" means the first Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been satisfied or waived pursuant to Article IX.A and Article IX.B, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

62. "*Employee Obligations*" means the Debtors' written contracts, agreements, policies, programs and plans for, among other things, compensation, reimbursement, indemnity, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, including in the event of a change of control after the Effective Date, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the directors, officers and employees of any of the Debtors who served in such capacity at any time (including any compensation programs approved by the Bankruptcy Court).

63. "*Entity*" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

64. "*Estate*" means, as to each Debtor, the estate created for such Debtor by section 541 of the Bankruptcy Code.

65. "*Equity Allocation Mechanism*" means the methodology for allocating the New Securities among the Holders of Allowed Credit Agreement Claims, Allowed Senior Notes Claims, and Allowed General Unsecured Claims, set forth on Exhibit A hereto.

66. "*Exculpated Causes of Action*" means any Causes of Action or Claim related to any act or omission derived from, based upon, related to, or arising from the Debtors' in or out-of-court restructuring efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, solicitation or Filing of the Disclosure Statement, the Plan (including any term sheets related thereto), or any contract, instrument, release, or other

6

agreement or document created or entered into in connection with any of the foregoing, the funding of this Plan, the occurrence of the Effective Date, the administration of this Plan, the distribution of property to be distributed under this Plan, the pursuit of Confirmation or Consummation, and the administration and implementation of the Plan, including (a) the New Corporate Governance Documents, (b) the First Lien Exit Facility, (c) the New Revolving Credit Facility (if any), (d) the Restructuring Transactions, (e) the Restructuring Support Agreement, (f) the issuance of the New Securities (g) the Management Incentive Plan, and (g) the distribution of property under the Plan or any other agreement under the Plan; *provided*, that the Exculpated Parties shall be entitled, in all respects, to reasonably rely upon the advice of counsel with respect to the foregoing.

67. "*Exculpated Party*" means each of: (a) the Debtors, (b) the Reorganized Debtors, (c) the Consenting Term Loan Lenders, (d) the Consenting Equity holders, (e) the Credit Agreement Agent, (f) with respect to each of the foregoing Entities in clauses (a) through (e), the manager, management company, or investment advisor of any of the foregoing, and each of such Entities' respective current and former Affiliates, predecessors, successors, assigns, subsidiaries, managed accounts or funds, and (g) with respect to each of the foregoing Entities (a) through (f), such Entities' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

68. "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

69. "*Federal Judgment Rate*" means the interest rate applicable to a judgment entered on the Petition Date that is subject to section 1961 of the Judicial Code, as determined in accordance with that statute.

70. "*FCC*" means the Federal Communications Commission, including any official bureau or division thereof acting on delegated authority, and any successor governmental agency performing functions similar to those performed by the Federal Communications Commission on the Effective Date.

71. "*FCC Applications*" means collectively, each application, petition, or other request filed with the FCC in connection with this restructuring and the Plan.

72. "*FCC Approval*" means the FCC's grant of the FCC Long Form Application.

73. "*FCC Licenses*" means broadcasting and other licenses, authorizations, waivers and permits that are issued from time to time by the FCC.

74. "*FCC Long Form Application*" means the applications filed with the FCC seeking FCC consent to the Transfer of Control.

75. "*FCC Ownership Procedures Order*" means an order to be entered by the Bankruptcy Court establishing procedures for, among other things, completion and submission of the Ownership Certification.

76. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court, the Clerk of the Bankruptcy Court, or any of its or their authorized designees in the Chapter 11 Cases, including with respect to a Proof of Claim, the Voting and Claims Agent.

77. "*Final Order*" means an order, ruling or judgment of the Bankruptcy Court (or any other court of competent jurisdiction entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court), which has not been reversed, stayed, modified, amended or vacated, and as to which (a) the time to appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order, ruling or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or

7

certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

78. *"First Lien Exit Credit Agreement"* means the credit agreement evidencing the First Lien Exit Facility.

79. *"First Lien Exit Facility"* means the new first lien term loan facility to be entered into by the Reorganized Debtors on the terms consistent with those set forth in the First Lien Exit Facility Term Sheet.

80. *"First Lien Exit Facility Agent"* means JPMorgan Chase Bank, N.A., or another financial institution, in its capacity as administrative agent under the First Lien Exit Facility.

81. *"First Lien Exit Facility Term Sheet"* means the term sheet attached as <u>Annex B</u> to the Restructuring Term Sheet setting forth the material terms and conditions of the First Lien Exit Facility.

82. *"First Lien Exit Facility Documents"* means the First Lien Exit Credit Agreement and each guarantee, security agreement, deed of trust, mortgage, or other documents and agreements entered into in connection with the First Lien Exit Facility.

83. *"General Unsecured Claim"* means any Unsecured Claim against the Debtors that is not (a) an Administrative Claim, (b) a Priority Tax Claim, (c) a Priority Non-Tax Claim, (d) an Accrued Professional Compensation Claim, (e) a Credit Agreement Claim, (f) a Senior Notes Claim, (g) a Convenience Claim, (h) a Subordinated Claim, or (i) an Intercompany Claim, or is otherwise determined by the Bankruptcy Court to be a General Unsecured Claim.

84. *"Governmental Unit"* means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

85. *"Holder"* means an Entity holding a Claim or Interest.

86. *"Indemnification Provisions"* means each of the Debtors' indemnification provisions currently in place as of the Petition Date, whether in the Debtors' by-laws, certificates of incorporation, other formation documents, board resolutions, or in the contracts of the current and former directors, officers, managers, employees, attorneys, other professionals, and agents of the Debtors.

87. *"Impaired"* means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

88. *"Intercompany Claim"* means any Claim held by a Debtor or a wholly-owned subsidiary of a Debtor against a Debtor.

89. *"Intercompany Interest"* means an Interest held by a Debtor in another Debtor or Debtor Affiliate.

90. *"Interests"* means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto, whether or not fully-vested or vesting in the future, that existed immediately before the Effective Date.

8

EX-2.1

91.    "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* entered on December 21, 2017 [Docket No. 161].

92.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1-5001.

93.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

94.    "*Local Rules*" means the Local Rules of the United States Bankruptcy Court for the Southern District of New York.

95.    "*Management Employment Agreements*" means those management employment agreements by and between any Debtor and such Debtor's employees existing and effective as of the Petition Date.

96.    "*Management Incentive Plan*" means that certain management incentive plan of the Reorganized Debtors to be in effect on and after the Effective Date, which is consistent in all respects with the Management Incentive Plan term sheet attached as Annex C to the Restructuring Term Sheet, the material terms of which shall be set forth in the Plan Supplement.

97.    "*Merlin Claims*" means all Claims against the Debtors arising under, relating to, or in connection with that certain Put and Call Agreement, dated as of January 2, 2014, by and among Merlin Media, LLC, Merlin Media License, LLC, Chicago FM Radio Assets, LLC, and Radio License Holdings LLC for WLUP-FM and WIQI(FM), which Claims shall be deemed Subordinated Claims unless they are otherwise Allowed as General Unsecured Claims, whether by Bankruptcy Court order or otherwise.

98.    "*New Boards*" means, collectively, the New Cumulus Board and the New Subsidiary Boards, as initially established on the Effective Date in accordance with the terms of the Plan and the applicable New Corporate Governance Documents, the selection of which shall be consistent in all material respects with the Restructuring Term Sheet.

99.    "*New By-Laws*" means the form of the by-laws or the limited liability company agreements, as applicable, of each of the Reorganized Debtors effective on and after the Effective Date, each substantially in the form included in the Plan Supplement, and each of which shall be consistent in all material respects with the Restructuring Term Sheet.

100.    "*New Certificates of Incorporation*" means the form of the certificates of incorporation or the certificates of formation, as applicable, of each of the Reorganized Debtors, effective on and after the Effective Date, each substantially in the form included in the Plan Supplement, and each of which shall be consistent in all material respects with the Restructuring Term Sheet.

101.    "*New Common Stock*" means, collectively, the Class A Common Stock and the Class B Common Stock.

102.    "*New Corporate Governance Documents*" means, as applicable, the New Certificates of Incorporation, the New By-Laws, or such other applicable formation documents of each of the Reorganized Debtors, including the New Shareholders' Agreement, if any, effective on and after the Effective Date, each in form and substance satisfactory to each of the Debtors and the Term Lender Group, and each consistent in all material respects with the Restructuring Term Sheet.

103.    "*New Cumulus Board*" means the initial board of directors of Reorganized Cumulus on the Effective Date, as set forth in the Plan Supplement, the selection of which shall be consistent in all material respects with the Restructuring Term Sheet.

9

EXHIBIT B

104.    "*New Revolving Credit Facility*" means a new asset-based or other revolving credit facility to be provided to the Reorganized Debtors under the New Revolving Credit Facility Agreement and other New Revolving Credit Facility Documents, consistent in all material respects with the Restructuring Term Sheet.

105.    "*New Revolving Credit Facility Agent*" means a financial institution in its capacity as administrative agent, collateral agent, and/or issuing bank under the New Revolving Credit Facility.

106.    "*New Revolving Credit Facility Agreement*" means the credit agreement governing the New Revolving Credit Facility, consistent in all material respects with the Restructuring Term Sheet.

107.    "*New Revolving Credit Facility Documents*" means, collectively, the New Revolving Credit Facility Agreement and any amendments, restatements, modifications, or supplements thereto, as well as any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, modifications, or supplements of any of the foregoing) related to or executed in connection with the New Revolving Credit Facility Agreement, consistent in all material respects with the Restructuring Term Sheet.

108.    "*New Shareholders' Agreement*" means that certain shareholders' agreement, if any, effective as of the Effective Date, addressing certain matters relating to New Common Stock, a form of which will be included in the Plan Supplement, which shall be consistent in all material respects with the Restructuring Term Sheet.

109.    "*New Subsidiary Boards*" means, with respect to each of the Reorganized Debtors other than Reorganized Cumulus, the initial board of directors, board of managers, or member, as the case may be, of each such Reorganized Debtor as set forth in the Plan Supplement each of which shall be acceptable to the Term Lender Group.

110.    "*New Securities*" means, collectively, the New Common Stock and the Special Warrants.

111.    "*Opt-Out Forms*" means election forms distributed to Holders of Claims or Interests, as applicable, in Classes 1, 2, 8 and 10, for such Holders to complete if they elect not to grant the Third-Party Release.

112.    "*Other Secured Claim*" means any Secured Claim that is not a Credit Agreement Claim.

113.    "*Ownership Certification*" means a written certification, in the form attached to the FCC Ownership Procedures Order, which shall be sufficient to enable the Debtors, in consultation with the Term Lender Group, or Reorganized Cumulus, as applicable, to determine (x) the extent to which direct and indirect voting and equity interests of the certifying party are held by non-U.S. Persons, as determined under section 310(b) of the Communications Act and the FCC rules, and (y) whether the holding of more than 4.99% of the Class A Common Stock by the certifying party would result in a violation of FCC ownership rules or be inconsistent with the FCC Approval.

114.    "*Person*" means a person as such term is defined in section 101(41) of the Bankruptcy Code.

115.    "*Petition Date*" means November 29, 2017, the date on which each of the Debtors commenced its respective Chapter 11 Case.

116.    "*Petition for Declaratory Ruling*" means a filing with the FCC by Cumulus pursuant to 47 C.F.R. § 1.5000 for Reorganized Cumulus to exceed the 25% indirect foreign ownership benchmark in 47 U.S.C. § 310(b)(4).

117.    "*Plan*" means this *First Amended Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented from time to time), including the Plan Supplement and all exhibits, supplements, appendices and schedules thereto, which are incorporated herein by reference.

10

EXHIBIT B

118. *"Plan Supplement"* means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, which shall be subject to the rights of the Debtors and the Term Lender Group set forth in the Restructuring Support Agreement (including any and all exhibits thereto), and solely with respect to the First Lien Exit Credit Agreement, reasonably acceptable to the First Lien Exit Facility Agent, to be Filed by the Debtors no later than five (5) calendar days before the Plan Voting Deadline, and as may be amended, modified, or supplemented from time to time in accordance with the terms hereof, the Restructuring Support Agreement, the Bankruptcy Code, and the Bankruptcy Rules, including the following: (a) the New Corporate Governance Documents for the Reorganized Debtors; (b) the Schedule of Rejected Executory Contracts and Unexpired Leases; (c) a list of retained Causes of Action; (d) the members of the New Cumulus Board; (e) the Description of Transaction Steps; (f) the documents needed to effectuate the Management Incentive Plan; (g) the First Lien Exit Credit Agreement; (h) the New Revolving Credit Facility Agreement (if any); and (i) the Special Warrants (and the underlying Warrant Agreement). Any reference to the Plan Supplement in this Plan shall include each of the documents identified in (a) through (i) above. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with Article X.A of the Plan, and the Reorganized Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement in accordance with applicable law, subject in all respects to the rights of the Term Lender Group set forth in the Restructuring Support Agreement.

119. *"Plan Voting Deadline"* means the date set by the Bankruptcy Court in the Disclosure Statement Order by which Ballots and Opt-Out Forms must be received by the Voting and Claims Agent.

120. *"Priority Non-Tax Claims"* means any Claim against any Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

121. *"Priority Tax Claims"* means any Claim against any Debtor of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

122. *"Professional"* means an Entity (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

123. *"Professional/Fee Escrow Account"* means an account, which may be interest-bearing, funded by the Debtors with Cash on or prior to the Effective Date in an amount equal to the Professional Fee Escrow Amount.

124. *"Professional Fee Escrow Amount"* means the aggregate amount of Accrued Professional Compensation Claims and other unpaid fees and expenses that Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B of the Plan.

125. *"Proof of Claim"* means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

126. *"Pro Rata"* means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Interests, as applicable, in that Class, or the proportion of the Allowed Claims or Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Interest under the Plan.

127. *"Reinstated"* means, with respect to any Claim or Interest, the treatment provided for in section 1124 of the Bankruptcy Code.

11

128.    "*Released Party*" means each of: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Term Loan Lenders; (d) the Credit Agreement Agent; (e) the Consenting Equityholders; (f) the Committee; (g) each of the members of the Committee; (h) the Senior Notes Indenture Trustee; (i) with respect to each of the foregoing Entities in clauses (a) through (h), each of such Entity's respective current and former Affiliates, predecessors, successors, assigns, subsidiaries, managed accounts or funds; and (j) with respect to each of the foregoing Entities in clauses (a) through (i), such Entities' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, management companies, investment advisors, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, *provided, that* any Holder of a Claim or Interest that elects to opt-out of the Third-Party Release shall not constitute a Released Party (even if for any reason otherwise entitled).

129.    "*Releasing Parties*" means each of: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Term Loan Lenders; (d) the Credit Agreement Agent; (e) the Consenting Equityholders; (f) the Committee; (g) each of the members of the Committee; (h) the Senior Notes Indenture Trustee; (i) all Holders of Claims and Interests that are deemed Unimpaired and presumed to accept the Plan and do not elect to opt-out of the Third-Party Release; (j) all Holders of Claims and Interests with vote to accept the Plan; (k) all Holders of Claims and Interests entitled to vote on the Plan who abstain from voting on the Plan and do not elect on their Ballot to opt-out of the Third-Party Release; (l) all Holders of Claims and Interests entitled to vote on the Plan who vote to reject the Plan but do not elect on their Ballot to opt-out of the Third-Party Release; (m) all other Holders of Claims and Interests who are deemed to reject the Plan and do not elect to opt-out of the Third-Party Release; (n) with respect to each of the foregoing Entities in clauses (a) through (m), each of such Entity's respective current and former Affiliates, predecessors, successors, assigns, subsidiaries, managed accounts or funds; and (o) with respect to each of the foregoing Entities in clauses (a) through (n), such Entities' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, management companies, investment advisors, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

130.    "*Reorganized Debtors*" means (a) the Debtors, or any successor or assignee thereto, by merger, consolidation, or otherwise, on or after the Effective Date, and (b) to the extent not already encompassed by clause (a), Reorganized Cumulus and any newly formed subsidiaries thereof, on or after the Effective Date.

131.    "*Reorganized Cumulus*" means either (a) Cumulus or any successor thereto, as reorganized pursuant to and under the Plan, or (b) a new corporation or limited liability company that may be formed or caused to be formed by the Debtors, the Restructuring Support Parties or a designee thereof to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Securities to be distributed pursuant to the Plan, in each case, on and after the Effective Date.

132.    "*Restricted Stock*" means shares of New Common Stock that are subject to temporary restrictions prohibiting certain transfers of such shares, and prohibiting the trading of such shares, on any national securities exchange.

133.    "*Restricted Stock Election*" means an election made by a Holder of an Allowed Credit Agreement Claim on the Ownership Certification that such Holder elects to receive its New Common Stock in the form of Restricted Stock.

134.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of November 29, 2017, by Cumulus on behalf of itself and each of its direct and indirect subsidiaries, and, as applicable, the Consenting Term Loan Lenders and the Consenting Equityholders (as amended, supplemented or modified from time to time, including all exhibits thereto).

135.    "*Restructuring Support Parties*" means those parties who are signatories to the Restructuring Support Agreement, other than the Debtors.

12

EXHIBIT B

EX-2.1

136. "*Restructuring Term Sheet*" means the Restructuring Term Sheet, dated as of November 29, 2017, attached as Exhibit A to the Restructuring Support Agreement (as amended, supplemented or modified from time to time, including all annexes thereto).

137. "*Restructuring Transactions*" means, collectively, one or more transactions pursuant to section 1123 of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, (d) all transactions necessary to provide for the purchase of substantially all of the assets of, or Interests in, any of the Debtors by Reorganized Cumulus or one or more Entities to be wholly-owned by Reorganized Cumulus, which purchase may be structured as a taxable transaction for U.S. federal income tax purposes; (e) the filing of any required FCC Applications; and (f) all other actions that the Debtors or Reorganized Debtors, as applicable, on the one hand, and the Term Lender Group, on the other hand, determine to be necessary or appropriate, including filings or recordings that may be required by applicable law, subject to the terms and conditions of the Restructuring Support Agreement. The Restructuring Transactions may include one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations or other transactions as may be determined by the Debtors or Reorganized Debtors, in consultation with the Term Lender Group, to be necessary or appropriate to effectuate the Plan, and may include, among other things, the dissolution of CMI Receivables Funding LLC on or after the Effective Date; *provided*, that, in all cases the Restructuring Transactions shall be subject to the terms and conditions of the Restructuring Support Agreement (including any and all exhibits thereto).

138. "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (as may be amended) as determined by the Debtors or the Reorganized Debtors, with the consent of the Term Lender Group, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be rejected by the Debtors pursuant to the provisions of Article V of the Plan, and included in the Plan Supplement.

139. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

140. "*Secured*" means when referring to a Claim against any Debtor: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) Allowed as such pursuant to the Plan.

141. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, together with the rules and regulations promulgated thereunder.

142. "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

143. "*Senior Notes*" means those certain 7.75% notes due 2019 that were issued pursuant to the Senior Notes Indenture.

144. "*Senior Notes Claim*" means any Claim against any Debtor derived from, based upon, relating to, or arising from the Senior Notes Indenture.

13

EXHIBIT B

17-13381-scc    Doc 1084    Filed 12/21/18    Entered 12/21/18 19:03:32    Main Document
- Complaint    Pg 283 of 446

145.  *"Senior Notes Indenture"* means that certain indenture, dated as of May 13, 2011, by and among Cumulus Media Holdings Inc., the guarantors named therein, and the Senior Notes Indenture Trustee (as amended, modified, or supplemented from time to time).

146.  *"Senior Notes Indenture Trustee"* means U.S. Bank National Association, in its capacity as trustee, transfer agent, registrar, authentication agent, and paying agent under the Senior Notes Indenture.

147.  *"Special Warrant"* means a 20-year warrant issued by Reorganized Cumulus, with a nominal exercise price, to purchase Class A Common Stock or Class B Common Stock, the terms of which will provide that it will not be exercisable unless such exercise otherwise complies with applicable law, the form of which warrant is reasonably acceptable to the Debtors and the Term Lender Group.

148.  *"Subordinated Claim"* means any Claim against any Debtor that is subordinated under section 510 of the Bankruptcy Code.

149.  *"Term Lender Group"* has the meaning set forth in the Restructuring Term Sheet.

150.  *"Term Loan Lender Equity Distribution"* means a distribution of Class A Common Stock, Class B Common Stock and/or Special Warrants to purchase shares of Class A Common Stock or Class B Common Stock, which New Common Stock (inclusive of the shares that may be exercised in connection with the Special Warrants) will constitute, in the aggregate, 83.5% of all of the issued and outstanding New Common Stock issued on the Effective Date, subject to dilution by the Management Incentive Plan, and to be allocated among the Holders of Allowed Credit Agreement Claims pursuant to, and subject to the terms and conditions of, the Equity Allocation Mechanism.

151.  *"Term Loan Lenders"* means the lenders from time to time party to the Credit Agreement.

152.  *"Third-Party Release"* means the releases set forth in Article VIII.E of the Plan.

153.  *"Transfer of Control"* means the transfer of control of the FCC Licenses held by any of the subsidiaries of Cumulus as a result of the issuance of the New Common Stock to the Holders of Allowed Credit Agreement Claims, Allowed Senior Notes Claims, and Allowed General Unsecured Claims.

154.  *"Unexpired Lease"* means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

155.  *"Unimpaired"* means, with respect to a Class of Claims or Interests, a Claim or Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

156.  *"Unsecured Claim"* means any Claim against any of the Debtors that is neither Secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court.

157.  *"Unsecured Creditor Equity Distribution"* means a distribution of Class A Common Stock, Class B Common Stock and/or Special Warrants to purchase shares of Class A Common Stock or Class B Common Stock, which New Common Stock (inclusive of the shares that may be exercised in connection with the Special Warrants) will constitute, in the aggregate, 16.5% of all of the issued and outstanding New Common Stock issued on the Effective Date, subject to dilution by the Management Incentive Plan, and to be allocated among the Holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims pursuant to, and subject to the terms and conditions of, the Equity Allocation Mechanism.

158.  *"U.S. Trustee"* means the United States Trustee for the Southern District of New York.

159.  *"Voting and Claims Agent"* means Epiq Bankruptcy Solutions, LLC, in its capacity as notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases on the terms of an order or orders of the Bankruptcy Court.

14

EXHIBIT B

160. "*Warrant Agreement*" means the form of warrant agreement governing the Special Warrants, which form shall be reasonably acceptable to the Debtors and the Term Lender Group.

### B. *Rules of Interpretation.*

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order, and such interpretation shall be binding; (9) subject to the provisions of any contract, certificate of incorporation, by law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as applicable to the Chapter 11 Cases, unless otherwise stated; (14) any undefined term used herein that is defined in the Bankruptcy Code shall have the meaning ascribed to such term in the Bankruptcy Code; (15) unless otherwise specified herein, whenever the words "include," "includes," or "including" are used in the Plan, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import; and (16) unless otherwise specified herein, references from or through any date mean from and including or through and including.

### C. *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If any payment, distribution, act or deadline under this Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

### D. *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), *provided, however,* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

15

EXHIBIT B

*E.* *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

*F.* *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

*A.* *Administrative Claims.*

1. Administrative Claims.

Except with respect to Administrative Claims that are Accrued Professional Compensation Claims, and except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Holder, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the later of: (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is practicable; *provided, however*, that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in the ordinary course of business (or as otherwise approved by the Bankruptcy Court) in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

A notice setting forth the Administrative Claims Bar Date will be (i) Filed on the Bankruptcy Court's docket and served with the notice of entry of the Confirmation Order; and (ii) posted on the Debtors' Case Information Website. No other notice of the Administrative Claims Bar Date will be provided. Except as otherwise provided in this Article II.A, requests for payment of Administrative Claims that accrued on or before the Effective Date (other than Accrued Professional Compensation Claims) must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or the Reorganized Debtors or their respective property and such Administrative Claims shall be deemed discharged as of the Effective Date. If for any reason any such Administrative Claim is incapable of being forever barred and discharged, then the Holder of such Claim shall not have recourse to any property of the Reorganized Debtors to be distributed pursuant to the Plan. Objections to such requests for payment of an Administrative Claim, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than the Administrative Claims Objection Deadline.

*B.* *Professional Compensation.*

1. Professional Fee Escrow Account.

As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtors shall establish the Professional Fee Escrow Account. The Debtors shall fund the

16

EXHIBIT B

Professional Fee Escrow Account with Cash in the amount of the aggregate Professional Fee Escrow Amount for all Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be property of the Debtors' Estates, subject to the release of Cash to the Reorganized Debtors from the Professional Fee Escrow Account in accordance with <u>Article II.B.2</u> herein.

2. Final Fee Applications and Payment of Accrued Professional Compensation Claims.

All final requests for payment of Accrued Professional Compensation Claims shall be Filed no later than sixty (60) calendar days after the Effective Date. Such requests shall be Filed with the Bankruptcy Court and served as required by the Interim Compensation Order and the Case Management Procedures, as applicable. The objection deadline relating to a final fee application shall be 4:00 p.m. (prevailing Eastern time) on the date that is thirty (30) calendar days after the filing of such final fee application. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any applicable Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court. The Allowed amount of Accrued Professional Compensation Claims owing to the Professionals, after taking into account any prior payments, shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account promptly following the date when such Claims are Allowed by a Final Order. To the extent that funds held in the Professional Fee Escrow Account are unable to satisfy the Allowed amount of Accrued Professional Compensation Claims owing to the Professionals, the Reorganized Debtors shall pay such amounts within seven (7) Business Days of entry of the order approving such Accrued Professional Compensation Claims. After all Allowed Accrued Professional Compensation Claims have been paid in full, the escrow agent shall promptly return any amounts remaining in the Professional Fee Escrow Account to the Reorganized Debtors.

3. Professional Fee Escrow Amount.

The Professionals shall estimate their Accrued Professional Compensation Claims before and as of the Effective Date, taking into account any prior payments, and shall deliver such estimate to the Debtors no later than five (5) Business Days prior to the anticipated Effective Date, as shall be indicated by the Debtors to such Professionals in writing as soon as reasonably practicable following Confirmation of the Plan; *provided, however,* that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by such estimates. If a Professional does not provide an estimate, the Debtors may estimate a reasonable amount of unbilled fees and expenses of such Professional, taking into account any prior payments; *provided, however,* that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional. The total amount so estimated shall comprise the Professional Fee Escrow Amount.

4. Post-Confirmation Date Fees and Expenses.

From and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the legal, professional, or other fees and expenses of Professionals that have been formally retained in accordance with sections 327, 363, or 1103 of the Bankruptcy Code before the Confirmation Date. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C. *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, settlement, release, and discharge of each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, in the discretion of the applicable Debtor or Reorganized Debtor, with the reasonable consent of the Term Lender Group, one of the following treatments: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate determined under applicable nonbankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code, payable on or as soon as practicable following the Effective Date; (2) Cash in

17

an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, plus interest at the rate determined under applicable nonbankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such Holder and the Debtors, in consultation with the Term Lender Group, or otherwise determined by an order of the Bankruptcy Court.

D. *Statutory Fees.*

Notwithstanding anything to the contrary contained herein, on the Effective Date, the Debtors shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation. Thereafter, each applicable Reorganized Debtor shall pay all U.S. Trustee fees due and owing under section 1930 of the Judicial Code in the ordinary course until the earlier of (i) the entry of a final decree closing the applicable Reorganized Debtor's Chapter 11 Case, or (ii) the Bankruptcy Court enters an order converting or dismissing the applicable Reorganized Debtor's Chapter 11 Case. Any deadline for filing Administrative Claims or Accrued Professional Compensation Claims shall not apply to U.S. Trustee fees.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A. *Classification of Claims and Interests.*

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests. All Claims and Interests, except for Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim against a Debtor also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied before the Effective Date. With respect to the treatment of all Claims and Interests as set forth in Article III.C hereof, the consent rights of the Term Lender Group to settle or otherwise compromise Claims are as set forth in the Restructuring Support Agreement.

B. *Summary of Classification.*

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.H hereof.

18

EX-2.1

The following chart summarizes the classification of Claims and Interests pursuant to the Plan.[2]

| Class | Claim/Interest | Status | Voting Rights |
| --- | --- | --- | --- |
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Credit Agreement Claims | Impaired | Entitled to Vote |
| 4 | Convenience Claims | Impaired | Entitled to Vote |
| 5 | Senior Notes Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired/Impaired | Deemed to Accept or Reject |
| 8 | Subordinated Claims | Impaired | Deemed to Reject |
| 9 | Intercompany Interests | Unimpaired/Impaired | Deemed to Accept or Reject |
| 10 | Interests in Cumulus | Impaired | Deemed to Reject |

C. *Treatment of Claims and Interests.*

To the extent a Class contains Allowed Claims or Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

1. Class 1 - Priority Non-Tax Claims.

  (a) *Classification*: Class 1 consists of all Priority Non-Tax Claims.

  (b) *Treatment*: Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, settlement, compromise, release and discharge of each Allowed Priority Non-Tax Claim, each Holder of an Allowed Priority Non-Tax Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, in the discretion of the applicable Debtor or Reorganized Debtor, with the consent of the Term Lender Group, either:

    (i) payment in full in Cash; or

    (ii) Reinstatement of such Allowed Priority Non-Tax Claim.

  (c) *Voting*: Class 1 is Unimpaired by the Plan, and each Holder of a Class 1 Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

2. Class 2 - Other Secured Claims.

  (a) *Classification*: Class 2 consists of all Other Secured Claims.

  (b) *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed

[2] The information in the table is provided in summary form and is qualified in its entirety by Article III.C hereof.

19

EXHIBIT B

Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, in the discretion of the applicable Debtor or Reorganized Debtor, with the consent of the Term Lender Group, either:

    (i)    payment in full in Cash;

    (ii)    Reinstatement of such Allowed Other Secured Claim; or

    (iii)    delivery of the collateral securing any such Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code.

    (c)    *Voting:* Class 2 is Unimpaired by the Plan, and each Holder of a Class 2 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 - Credit Agreement Claims.

    (a)    *Classification:* Class 3 consists of all Credit Agreement Claims.

    (b)    *Allowance:* On the Effective Date, the Credit Agreement Claims shall be Allowed in the aggregate principal amount of $1, 728,614,099.90, plus accrued and unpaid interest on such principal amount through the Petition Date and other amounts due and owing pursuant to the Credit Agreement and orders of the Bankruptcy Court, including such other amounts required to be paid as adequate protection under the Cash Collateral Order through and including the Effective Date, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, crossclaims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

    (c)    *Treatment:* Except to the extent that a Holder of an Allowed Credit Agreement Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Credit Agreement Claim, each Holder of an Allowed Credit Agreement Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, its Pro Rata share of and interest in (i) the First Lien Exit Facility, and (ii) the Term Loan Lender Equity Distribution, *provided*, that the Debtors and the Term Lender Group may determine, in their reasonable discretion, to provide, at the election of a Holder of an Allowed Credit Agreement Claim, that such Holder may elect to receive its Pro Rata share of the Term Loan Lender Equity Distribution in the form of Restricted Stock issued in an amount of value equal to the Pro Rata share of the Term Loan Lender Equity Distribution such Holder would otherwise receive pursuant to this section, *provided, further,* and notwithstanding anything herein to the contrary, that the distribution of the Term Loan Lender Equity Distribution shall be made pursuant to, and subject to the terms and conditions of, the Equity Allocation Mechanism.

    (d)    *Voting:* Class 3 is Impaired. Therefore, Holders of Class 3 Credit Agreement Claims are entitled to vote to accept or reject the Plan.

20

EXHIBIT B

24/65

4. Class 4 - Convenience Claims.

  (a)  *Classification*: Class 4 consists of all Convenience Claims.

  (b)  *Treatment*: Except to the extent that a Holder of an Allowed Convenience Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Convenience Claim, each Holder of an Allowed Convenience Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, Cash in an amount equal to 100% of the Allowed Convenience Claim; *provided*, that Cash distributions to Holders of Allowed Convenience Claims shall not, in the aggregate, exceed the Convenience Class Cap without the prior written consent of the Term Lender Group; *provided, further*, that if the aggregate amount of Allowed Convenience Claims exceeds the Convenience Class Cap and the Term Lender Group does not consent to an increase in the Convenience Class Cap, then each Holder of an Allowed Convenience Claim shall receive Cash in an amount equal to its Pro Rata share of the Convenience Class Cap.

  (c)  *Voting*: Class 4 is Impaired. Therefore, Holders of Class 4 Convenience Claims are entitled to vote to accept or reject the Plan. Notwithstanding the foregoing, if the aggregate Allowed amount of all Allowed Convenience Claims is less than or equal to the Convenience Class Cap, then the Debtors reserve the right to assert that the Holders of Class 4 Convenience Claims are Unimpaired.

5. Class 5 - Senior Notes Claims.

  (a)  *Classification*: Class 5 consists of all Senior Notes Claims.

  (b)  *Allowance*: On the Effective Date, the Senior Notes Claims shall be Allowed in the aggregate principal amount of $610 million, (i) plus accrued and unpaid interest on such principal amount through the Petition Date, plus (ii) if Allowed by Final Order other than the Confirmation Order, accrued and unpaid interest (but excluding any amounts included in clause (ii)), premiums, fees and costs and expenses, including, without limitation, attorney's fees, trustee's fees, and other professional fees and disbursements, and other obligations, in each case, solely to the extent owing under the Senior Notes Indenture.

  (c)  *Treatment*: Except to the extent that a Holder of an Allowed Senior Notes Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Senior Notes Claim, each Holder of an Allowed Senior Notes Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, its Pro Rata share of the Unsecured Creditor Equity Distribution. The Unsecured Creditor Equity Distribution shall be allocated Pro Rata to Holders of Allowed Claims in Classes 5 and 6, and notwithstanding anything in the Plan to the contrary, shall be made pursuant to, and subject to the terms and conditions of, the Equity Allocation Mechanism.

  (d)  *Voting*: Class 5 is Impaired. Therefore, Holders of Class 5 Senior Notes Claims are entitled to vote to accept or reject the Plan.

6. Class 6 - General Unsecured Claims.

  (a)  *Classification*: Class 6 consists of all General Unsecured Claims.

21

EX-2.1

EXHIBIT B

EX-2.1

(b) *Treatment:* Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, settlement, compromise, settlement, release, and discharge of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, its Pro Rata share of the Unsecured Creditor Equity Distribution. The Unsecured Creditor Equity Distribution shall be allocated Pro Rata to Holders of Allowed Claims in Classes 5 and 6, and notwithstanding anything in the Plan to the contrary, shall be made pursuant to, and subject to the terms and conditions of, the Equity Allocation Mechanism.

(c) *Voting:* Class 6 is Impaired. Therefore, Holders of Class 6 General Unsecured Claims are entitled to vote to accept or reject the Plan.

7. **Class 7 - Intercompany Claims.**

(a) *Classification:* Class 7 consists of all Intercompany Claims.

(b) *Treatment:* On the Effective Date or as soon as reasonably practicable thereafter, Allowed Intercompany Claims shall be, at the option of the Debtors or the Reorganized Debtors, as applicable, with the reasonable consent of the Term Lender Group, either (i) Reinstated as of the Effective Date, or (ii) cancelled without any distribution on account of such Intercompany Claims.

(c) *Voting:* Class 7 is Unimpaired or Impaired by the Plan, and each Holder of a Class 7 Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 7 Intercompany Claims are not entitled to vote to accept or reject the Plan.

8. **Class 8 - Subordinated Claims.**

(a) *Classification:* Class 8 consists of all Subordinated Claims.

(b) *Treatment:* Subordinated Claims shall be subordinated to all other Claims against the Debtors, shall receive no distributions on account of such Subordinated Claims, and shall be discharged.

(c) *Voting:* Class 8 is Impaired by the Plan, and each Holder of a Class 8 Subordinated Claim is conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 8 Subordinated Claims are not entitled to vote to accept or reject the Plan.

9. **Class 9 - Intercompany Interests.**

(a) *Classification:* Class 9 consists of all Intercompany Interests.

(b) *Treatment:* To preserve the Debtors' corporate structure, on the Effective Date, or as soon thereafter as reasonably practicable, all Intercompany Interests shall be, at the option of the Debtors or the Reorganized Debtors, as applicable, with the reasonable consent of the Term Lender Group, either (i) Reinstated as of the Effective Date, or (ii) cancelled without any distribution on account of such Intercompany Interests.

22

EXHIBIT B

EX-2.1

(c)     *Voting:* Class 9 is Unimpaired or Impaired by the Plan, and each Holder of a Class 9 Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 9 Intercompany Interests are not entitled to vote to accept or reject the Plan.

10.     Class 10 - Interests in Cumulus.

(a)     *Classification:* Class 10 consists of all Interests in Cumulus.

(b)     *Treatment:* On the Effective Date, all Interests in Cumulus shall be cancelled without any distribution on account of such Interests in Cumulus.

(c)     *Voting:* Class 10 is Impaired by the Plan, and each Holder of a Class 10 Interest in Cumulus is conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 10 Interests in Cumulus are not entitled to vote to accept or reject the Plan.

D.     *Voting of Claims.*

Each Holder of a Claim in an Impaired Class that is entitled to vote on the Plan pursuant to Article III hereof shall be entitled to vote to accept or reject the Plan as provided in the Disclosure Statement Order or any other order of the Bankruptcy Court.

E.     *No Substantive Consolidation.*

Although the Plan is presented as a joint plan of reorganization, this Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason. Nothing in this Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor.

F.     *Acceptance by Impaired Classes.*

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if Holders of at least two-thirds in dollar amount and more than one-half in number of the Claims of such Class entitled to vote that actually vote on the Plan have voted to accept the Plan. Credit Agreement Claims (Class 3), Convenience Claims (Class 3), Senior Notes Claims (Class 5), and General Unsecured Claims (Class 6) are Impaired, and the votes of Holders of Claims in such Classes will be solicited. If a Class contains Holders of Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

G.     *Special Provision Governing Claims.*

Except as specifically provided in the Plan, nothing in the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Claims, including legal and equitable defenses to or setoffs or recoupments against, any such Claims.

H.     *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, with respect to any Debtor, does not have a Holder of an Allowed Claim or Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court solely for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan with respect to such Debtor for purposes of (i) voting to accept or reject the Plan and (ii) determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

23

EXHIBIT B

EX-2.1

*I. Consensual Confirmation.*

The Plan shall be deemed a separate chapter 11 plan for each Debtor. To the extent that there is no rejecting Class of Claims in the chapter 11 plan of any Debtor, such Debtor shall seek Confirmation of its plan pursuant to section 1129(a) of the Bankruptcy Code.

*J. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims.

*K. Controversy Concerning Impairment or Classification.*

If a controversy arises as to whether any Claims or Interests or any Class of Claims or Interests is Impaired or is properly classified under the Plan, the Bankruptcy Court shall, after notice and a hearing, resolve such controversy on or before the Confirmation Date.

*L. Subordinated Claims.*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

*A. Sources of Consideration for Plan Distributions.*

The Reorganized Debtors shall fund distributions under the Plan, as applicable with the First Lien Exit Facility, the New Revolving Credit Facility (if any), the New Securities, and other Cash of the Debtors, including Cash from business operations, which shall be sufficient to make the other required payments on or after the Effective Date under the Plan and provide the Reorganized Debtors with working capital necessary to run their business. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance; *provided*, that, to the extent that a term of the Plan conflicts with the term of any such instruments or other documents, the terms of this Plan shall govern.

For the avoidance of doubt, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan, subject in all respects to the terms of the First Lien Exit Facility and the New Revolving Credit Facility, if any. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

24

10/15/2018

*B. First Lien Exit Facility.*

On the Effective Date, the Reorganized Debtors shall enter into the First Lien Exit Facility, the terms of which will be set forth in the First Lien Exit Facility Documents. All Holders of Allowed Credit Agreement Claims entitled to distribution hereunder shall be deemed to be a party to, and bound by, the First Lien Exit Facility Agreement, regardless of whether such Holder has executed a signature page thereto. Confirmation of the Plan shall be deemed approval of the First Lien Exit Facility and the First Lien Exit Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, and authorization of the Reorganized Debtors to enter into and execute the First Lien Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the First Lien Exit Facility. On the Effective Date, all of the Liens and security interests to be granted in accordance with the First Lien Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the First Lien Exit Facility Documents, (c) shall be deemed perfected on the Effective Date, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and the Reorganized Debtors shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

*C. New Revolving Credit Facility.*

On the Effective Date, the Reorganized Debtors shall be authorized, but not directed, to enter into the New Revolving Credit Facility (if any), the terms of which will be set forth in the New Revolving Credit Facility Documents (if any). Confirmation of the Plan shall be deemed approval of the New Revolving Credit Facility and the New Revolving Credit Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, and authorization of the Reorganized Debtors to enter into and execute the New Revolving Credit Facility Documents (if any) and such other documents as may be required to effectuate the treatment afforded by any such New Revolving Credit Facility. On the Effective Date, if the Reorganized Debtors have obtained a New Revolving Credit Facility, all of the Liens and security interests to be granted in accordance with the New Revolving Credit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Revolving Credit Facility Documents, (c) shall be deemed perfected on the Effective Date, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry, of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and the Reorganized Debtors shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

*D. Issuance and Distribution of New Securities.*

On the Effective Date, or as soon as reasonably practicable thereafter, subject to Article IV.H, the New Securities shall be distributed to (a) Holders of Allowed Claims in Class 3, (b) Holders of Allowed Claims in Class 5, and (c) Holders of Allowed Claims in Class 6, as and if applicable. In each case, such New Securities shall be subject to dilution by any New Common Stock issued pursuant to the Management Incentive Plan. All Holders of

25

EX-2.1

EXHIBIT B

EX-2.1

Allowed Credit Agreement Claims, Allowed Senior Notes Claims and Allowed General Unsecured Claims entitled to distribution hereunder shall be deemed to be a party to, and bound by, the New Shareholders' Agreement, if any, regardless of whether such Holder has executed a signature page thereto. The allocation of New Securities among the Holders of Allowed Credit Agreement Claims, Allowed Senior Notes Claims, and Allowed General Unsecured Claims shall be made in accordance with the Equity Allocation Mechanism. The issuance of the New Common Stock by Reorganized Cumulus, including options, stock appreciation rights, restricted stock units, or other equity awards, if any, in connection with the Management Incentive Plan, is authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

All of the New Securities issued pursuant to the Plan and section 1145 of the Bankruptcy Code shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Securities under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

E.    *Settlement of Claims and Interests.*

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the distributions, releases, and other benefits provided under the Plan, the Plan constitutes a good faith compromise and settlement of any and all Claims and Interests and controversies resolved pursuant to the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and within the range of reasonableness.

F.    *Restructuring Transactions.*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors may take any and all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

G.    *Corporate Existence.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a Reorganized Debtor and as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation or governing documents) in effect before the Effective Date, except to the extent such certificate of incorporation and by-laws (or other analogous formation or governing documents) are amended by the Plan or otherwise amended in accordance with applicable law. To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state or federal law).

H.    *FCC Licenses.*

The required FCC Applications shall be filed, as promptly as practicable, including the FCC Long Form Application and the Petition for Declaratory Ruling. After such filing is made, any person who thereafter acquires a Credit Agreement Claim, a Senior Notes Claim, or a General Unsecured Claim may be issued Special Warrants in lieu of any New Common Stock that would otherwise be issued to such Person under the Plan. In addition, the Debtors may, in their sole discretion, request that the Bankruptcy Court implement restrictions on trading of Claims and Interests that might adversely affect the FCC Approval process. The Debtors shall request that the FCC process the FCC Long Form Application separate and apart from the Petition for Declaratory Ruling. Regardless of whether the FCC consents to the request for separate processing, the Debtors shall diligently prosecute the FCC Applications

26

and shall promptly provide such additional documents or information requested by the FCC in connection with its review of the FCC Applications. In the event the FCC Approval is obtained while the Petition for Declaratory Ruling remains pending, the Debtors (or Reorganized Debtors, as applicable) shall continue to diligently prosecute the Petition for Declaratory Ruling.

*i.       Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, the Plan Supplement or the Confirmation Order, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property (including all interests, rights, and privileges related thereto) in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan, including Interests held by the Debtors in any non-Debtor Affiliates, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, encumbrances, or other interests, except for Liens securing the First Lien Exit Facility, the New Revolving Credit Facility (if any) and any Other Secured Claims that are Reinstated pursuant to the Plan. On and after the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or the Local Rules.

*j.       Cancellation of Existing Indebtedness and Securities.*

Except as otherwise expressly provided in the Plan, on the Effective Date, the Senior Notes Indenture, the Interests in the Debtors and all notes, bonds, agreements, instruments and other documents evidencing or creating any indebtedness or obligation of the Debtors related to the Credit Documents, the Senior Notes Indenture or any Interest in the Debtors (collectively, the "Cancelled Debt and Equity Documentation") shall be deemed cancelled, discharged, and of no force or effect, and (i) the obligations of the Debtors under or in respect of the Credit Documents, the Senior Notes Indenture, the Interests in the Debtors and all other Cancelled Debt and Equity Documentation shall be discharged. The Holders of or parties to the Credit Documents, the Senior Notes Indenture, and such other Cancelled Debt and Equity Documentation will have no rights arising from or related to the Credit Documents, the Senior Notes Indenture and such other Cancelled Debt and Equity Documentation; provided, that notwithstanding Confirmation or the occurrence of the Effective Date, any such Credit Document, Senior Notes Indenture or other Cancelled Debt and Equity Documentation that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of (i) enabling Holders of Allowed Claims to receive distributions under the Plan as provided herein, and allowing each of the Credit Agreement Agent and the Senior Notes Indenture Trustee to make or direct the distributions in accordance with the Plan as provided herein, (ii) allowing the Senior Notes Indenture Trustee to enforce its rights, claims, and interests vis-à-vis any parties other than the Released Parties or any of their respective property or assets; (iii) preserving any rights of the Senior Notes Indenture Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders of Allowed Senior Notes Claims under the Senior Notes Indenture, including any rights to priority of payment and/or to exercise the Senior Notes Indenture Trustee charging lien; (iv) allowing the Senior Notes Indenture Trustee to enforce any obligations owed to it under the Plan; (v) allowing the Senior Notes Indenture Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; and (vi) permitting the Senior Notes Indenture Trustee to perform any functions that are necessary to effectuate the foregoing; provided, further, that section 10.7 of the Credit Agreement shall continue in effect solely as between the Term Loan Lenders and the Credit Agreement Agent, and not, for the avoidance of doubt, as to any Debtor, Reorganized Debtor or any of their respective property or assets.

Except for the foregoing, the Senior Notes Indenture Trustee and its agents shall be relieved of all further duties and responsibilities related to the Senior Notes Indenture and the Plan, except with respect to such other rights and obligations of the Senior Notes Indenture Trustee that, pursuant to the Senior Notes Indenture, survive the termination of such indenture. Subsequent to the performance by the Senior Notes Indenture Trustee of its obligations pursuant to the Plan, the Senior Notes Indenture Trustee and its agents shall be relieved of all further duties and responsibilities related to the Senior Notes Indenture.

27

EXHIBIT B

K. *Corporate Action.*

On the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (1) execution and entry into the First Lien Exit Facility, (2) execution and entry into the New Revolving Credit Facility (if any); (3) approval of and entry into the New Corporate Governance Documents; (4) issuance and distribution of the New Securities; (5) selection of the directors and officers for the Reorganized Debtors; (6) implementation of the Restructuring Transactions contemplated by this Plan; (7) adoption of the Management Incentive Plan; (8) adoption or assumption, if and as applicable, of the Management Employment Agreements; and (9) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, or officers of the Debtors or the Reorganized Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors (is applicable) shall be authorized to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Corporate Governance Documents, the First Lien Exit Facility Documents, including the First Lien Exit Credit Agreement, the New Revolving Credit Facility Documents (if any), including the New Revolving Credit Facility Agreement, and any and all related and ancillary agreements, documents, and filings, the New Securities and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV shall be effective notwithstanding any requirements under non-bankruptcy law.

L. *New Certificates of Incorporation and New By-Laws.*

On or promptly after the Effective Date, the Reorganized Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states of incorporation in accordance with the corporate laws of such respective states of incorporation or formation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Certificates of Incorporation will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Certificates of Incorporation and New By-Laws.

M. *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the boards of directors of each Debtor shall expire, and the New Cumulus Board and the New Subsidiary Boards, as well as the officers of each of the Reorganized Debtors, shall be appointed in accordance with the New Certificates of Incorporation and New By-Laws of each Reorganized Debtor.

The New Cumulus Board shall be composed of seven members, which shall consist of Reorganized Cumulus' President and Chief Executive Officer and six directors chosen by the Term Lender Group on the terms set forth in the Restructuring Support Agreement. The initial directors of the New Cumulus Board as of the Effective Date shall be set forth in the Plan Supplement. The initial term of the New Cumulus Board will be through the date of the 2019 annual meeting of Cumulus. The New Subsidiary Boards shall be as set forth in the Plan Supplement.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of any Person proposed to serve on the initial New Cumulus Board and the New Subsidiary Boards, as well as those Persons that will serve as an officer of any of the Reorganized Debtors. To the extent any such director or officer is an "insider" as such term is defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Certificates of Incorporation, New By-Laws, and other constituent documents of the Reorganized Debtors.

28

EXHIBIT B

### N. Employee Obligations

Except as expressly otherwise provided in the Plan or the Plan Supplement, the Reorganized Debtors shall honor the Employee Obligations (i) existing and effective as of the Petition Date, (ii) that were incurred or entered into in the ordinary course of business prior to the Effective Date, and (iii) as otherwise approved by the Bankruptcy Court prior to the Effective Date, as may be amended by agreement between the beneficiaries of such Employee Obligations, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand. To the extent that any of the Employee Obligations are executory contracts, pursuant to sections 365 and 1123 of the Bankruptcy Code, each of them will be deemed assumed as of the Effective Date and assigned to the Reorganized Debtors. For the avoidance of doubt, the foregoing shall not (i) limit, diminish, or otherwise alter the Debtors' or the Reorganized Debtors', as applicable, defenses, Claims, Causes of Action, or other rights with respect to the Employee Obligations, or (ii) impair the rights of the Debtors or Reorganized Debtors, as applicable, to implement the Management Incentive Plan in accordance with its terms and conditions and to determine the Employee Obligations of the Reorganized Debtors in accordance with their applicable terms and conditions on or after the Effective Date, in each case consistent with the Plan.

### O. Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors and the officers and members of the New Boards, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan, the Restructuring Transactions, the New Corporate Governance Documents, the First Lien Exit Credit Agreement, the New Revolving Credit Facility Agreement (if any) and the Securities issued pursuant to the Plan, including the New Common Stock and Special Warrants, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

### P. Management Incentive Plan.

On and after the Effective Date, the Reorganized Debtors will implement the Management Incentive Plan, pursuant to which certain officers, directors, and employees of the Reorganized Debtors will be granted awards on terms to be disclosed in the Plan Supplement.

### Q. Exemption from Certain Taxes and Fees.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax, document recording tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and to the extent the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, Lien, or other security interest, (2) the making or assignment of any lease or sublease, (3) any Restructuring Transaction authorized by the Plan, and (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan.

29

EXHIBIT B

*R.*    *Indemnification Provisions.*

On and as of the Effective Date, the Indemnification Provisions shall be deemed assumed and irrevocable and will remain in full force and effect and survive the effectiveness of the Plan unimpaired and unaffected, and each of the Reorganized Debtors' New Certificates of Incorporation, New By-Laws, or similar organizational documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, employees, agents, managers, attorneys, and other professionals, and such current and former directors, officers, and managers' respective Affiliates at least to the same extent as such documents of each of the respective Debtors on the Petition Date but in no event greater than as permitted by law, against any Claims or Causes of Action, *provided, that* the Reorganized Debtors shall not indemnify any such Person for any Claims or Causes of Action arising out of or related to any act or omission that is a criminal act or constitutes actual fraud, gross negligence or willful misconduct or for which indemnification is not permissible under law. None of the Reorganized Debtors shall amend and/or restate its respective New Certificate of Incorporation, New By-Laws, or similar organizational documents before, on or after the Effective Date to terminate, reduce, discharge, impair or adversely affect in any way (i) any of the Reorganized Debtors' obligations referred to in the immediately preceding sentence or (ii) the rights of such current and former directors, officers, employees, agents, managers, attorneys, and other professionals, and such current and former directors, officers, and managers' respective Affiliates referred to in the immediately preceding sentence. Notwithstanding anything to the contrary in <u>Article VIII.D</u> and <u>Article VIII.E</u>, the Debtors' current and former officers' and directors' rights to indemnification are preserved to the extent set forth herein.

*S.*    *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to <u>Article VIII</u> of this Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. For the avoidance of doubt, the preservation of Causes of Action described in the preceding sentence includes, but is not limited to, the Debtors' (1) right to object to Administrative Claims, (2) right to object to other Claims, and (3) right to subordinate Claims. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors in their respective discretion. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in <u>Article VIII</u> of the Plan.

The Reorganized Debtors reserve and shall retain the applicable Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action except as otherwise expressly provided in the Plan and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.*    *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases will be deemed assumed as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that: (1) previously were assumed or rejected by the Debtors; (2) are identified on the Schedule of Rejected Executory

30

**EXHIBIT B**

Contracts and Unexpired Leases; or (3) are the subject of a notice of rejection or motion to reject such Executory Contracts or Unexpired Leases, as applicable, that is pending on the Effective Date, regardless of whether the requested effective date of such rejection is on or after the Effective Date. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assumptions and the rejection of the Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions or notices to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date or such later date as provided in this Article V.A, shall revest in and be fully enforceable by the Debtors or the Reorganized Debtors, as applicable, in accordance with such Executory Contract and/or Unexpired Lease's terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including, without limitation, any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases, including by way of adding or removing a particular Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases, at any time through and including forty-five (45) calendar days after the Effective Date.

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Proofs of Claim with respect to Claims against any Debtor arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court or the Voting and Claims Agent by the later of (i) the applicable Claims Bar Date, and (ii) thirty (30) calendar days after notice of such rejection is served on the applicable claimant. Any Claims against any Debtor arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be automatically Disallowed, forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim against any Debtor arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released and discharged, including any Claims against any Debtor listed on the Schedules as unliquidated, contingent or disputed. Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any cure amount has been fully paid or for any $0 cures pursuant to this Article V, shall be deemed Disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under any Executory Contract and Unexpired Lease to be assumed shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code by payment of the default amount in Cash on the Effective Date or as soon as reasonably practicable thereafter, with such default amount being $0.00 if no amount is listed in the Cure Notice, subject to the limitations described below, or on such other terms as the party to such Executory Contract or Unexpired Lease may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future

31

EXHIBIT B

EX-2.1

performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, if required, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall only be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or by mutual agreement between the Debtors or the Reorganized Debtors, as applicable, and the applicable counterparty.

At least fourteen (14) calendar days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed amounts of Cure Claims to the applicable Executory Contract or Unexpired Lease counterparties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served, and actually received by the Debtors, the Term Lender Group and the U.S. Trustee at least seven (7) calendar days before the Confirmation Hearing. Any such objection to the assumption of an Executory Contract or Unexpired Lease shall be heard by the Bankruptcy Court on or before the Effective Date, unless a later date is agreed between the Debtors or the Reorganized Debtors, on the one hand, and the counterparty to the Executory Contract or Unexpired Lease, on the other hand, or by order of the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption and/or cure amount; *provided, however*, that, subject to Article X.A, the Debtors or the Reorganized Debtors, as applicable, shall have the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases, as applicable, as identified in the Plan Supplement, through and including forty-five (45) calendar days after the Effective Date.

In any case, if the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors or Reorganized Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and cured shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### D. *Certain Customer Agreements.*

To the extent that the Debtors (i) are party to any ordinary course contract, terms and conditions, insertion order or similar agreement (whether written or oral) providing for the sale by the Debtors of advertising time to a customer and (ii) such agreement (A) has not been previously rejected or assumed by order of the Bankruptcy Court, (B) is not subject to a motion to reject filed on or prior to the Effective Date, (C) is not listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, and (D) has not been designated for rejection in accordance with this Article V, such contract (including any modifications, amendments, supplements, restatements or other related agreements), purchase order or similar agreement will be deemed assumed by the applicable Debtor(s) or Reorganized Debtor(s), as applicable, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Unless otherwise provided in the applicable Cure Notice, the cure amount to be paid in connection with the assumption of such a customer contract shall be $0.00.

### E. *Insurance Policies.*

All of the Debtors' insurance policies, including any directors' and officers' insurance policies, and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto. In addition, on and after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce, limit or restrict the coverage under any of the directors' and officers' insurance policies with respect to conduct occurring prior thereto, and all directors and officers of the

32

Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such directors' and officers' insurance policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date. Notwithstanding anything to the contrary in Article VIII.D and Article VIII.E, all of the Debtors' current and former officers' and directors' rights as beneficiaries of such insurance policies are preserved to the extent set forth herein.

### F.   Indemnification Provisions.

Except as otherwise provided in the Plan, on and as of the Effective Date, any of the Debtors' indemnification rights with respect to any contract or agreement that is the subject of or related to any litigation against the Debtors or Reorganized Debtors, as applicable, shall be assumed by the Reorganized Debtors and otherwise remain unaffected by the Chapter 11 Cases.

### G.   Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided in the Plan or by separate order of the Bankruptcy Court, each Executory Contract or Unexpired Lease that is assumed, whether or not such Executory Contract or Unexpired Lease relates to the use, acquisition or occupancy of real property, shall include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affect such Executory Contract or Unexpired Lease, and (ii) all Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated pursuant to an order of the Bankruptcy Court or under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases and actions taken in accordance therewith (i) shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims against any Debtor that may arise in connection therewith, (ii) are not and do not create postpetition contracts or leases, (iii) do not elevate to administrative expense priority any Claims of the counterparties to such Executory Contracts and Unexpired Leases against any of the Debtors, and (iv) do not entitle any Entity to a Claim against any of the Debtors under any section of the Bankruptcy Code on account of the difference between the terms of any prepetition Executory Contracts or Unexpired Leases and subsequent modifications, amendments, supplements or restatements.

### H.   Reservation of Rights.

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If, prior to the Effective Date, there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or Reorganized Debtors, as applicable, shall have forty-five (45) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### I.   Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### J.   Contracts and Leases Entered Into After the Petition Date.

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor

33

**EXHIBIT B**

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

*A.    Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim), or, in each case, as soon as reasonably practicable thereafter, each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims (which will only be made if and when they become Allowed Claims) shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise expressly provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. The Debtors shall have no obligation to recognize any transfer of Claims against any Debtor or privately held Interests occurring on or after the Distribution Record Date. Distributions to Holders of Claims or Interests related to public Securities shall be made to such Holders in exchange for such Securities, which shall be deemed cancelled as of the Effective Date.

*B.    Distributions on Account of Obligations of Multiple Debtors.*

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan. Any such Claims against any Debtor shall receive the treatment set forth in Article III of the Plan. Any such Claims shall be released and discharged pursuant to Article VIII of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code; *provided*, that, for the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay U.S. Trustee fees until such time as a particular Chapter 11 Case is closed, dismissed, or converted.

*C.    Disbursing Agent.*

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent on the Effective Date or as soon as reasonably practicable thereafter. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

*D.    Rights and Powers of Disbursing Agent.*

1.    Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.    Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

34

EXHIBIT B

*E.    Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

### 1.    Delivery of Distributions.

#### (a)    Delivery of Distributions to Holders of Allowed Credit Agreement Claims.

Except as otherwise provided in the Plan, all distributions under the Plan to Holders of Allowed Credit Agreement Claims shall be made by the Reorganized Debtors or the Credit Agreement Agent to the Holders of Allowed Credit Agreement Claims of record as of the Distribution Record Date (as determined by the register maintained by the Credit Agreement Agent).

#### (b)    Delivery of Distributions to Senior Notes Indenture Trustee.

Except as otherwise reasonably requested by the Senior Notes Indenture Trustee, all distributions under the Plan to Holders of Allowed Senior Notes Claims shall be made to, or by the Disbursing Agent at the reasonable direction of, the Senior Notes Indenture Trustee. As soon as practicable in accordance with the requirements set forth in Article VI, the Senior Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Senior Notes Claims, subject to the Senior Notes Indenture Trustee charging lien, and regardless of whether such distributions are made by the Senior Notes Indenture Trustee, the Disbursing Agent at the reasonable direction of the Senior Notes Indenture Trustee or by some other Person in accordance with Article VI.E.1(b), the Senior Notes Indenture Trustee charging lien shall attach to the property to be distributed to the Holders of Allowed Senior Notes Claims in the same manner as if such distributions were made through the Senior Notes Indenture Trustee. The Senior Notes Indenture Trustee shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and the Debtors or Reorganized Debtors, as applicable, shall use commercially reasonable efforts to (i) seek the cooperation of DTC with respect to the cancellation of the Senior Notes as of the Effective Date; and (ii) seek the cooperation of the relevant bank and broker participants in the DTC system to facilitate delivery of the distribution directly to the relevant beneficial owners as soon as practicable after the Effective Date.

#### (c)    Delivery of Distributions in General.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims (other than Holders of Credit Agreement Claims or Senior Notes Claims) or Interests shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors: (1) to the signatory set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (2) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors after the date of any related Proof of Claim; (3) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors have not received a written notice of a change of address; or (4) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, the Disbursing Agent, the Credit Agreement Agent, and the Senior Notes Indenture Trustee, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan, except in the event of gross negligence or willful misconduct, as determined by a Final Order of a court of competent jurisdiction.

### 2.    Minimum Distributions.

No partial distributions or payments of fractions of New Securities shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim or Interest, as applicable, would otherwise result in the issuance of a number of New Securities that is not a

35

EX-2.1

whole number; the actual distribution of New Securities shall be rounded as follows: (i) fractions of greater than one-half (1/2) shall be rounded to the next higher whole number and (ii) fractions of one-half (1/2) or less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefor.

Notwithstanding any other provision of the Plan, no Cash payment valued at less than $100.00, in the reasonable discretion of the Disbursing Agent and the Reorganized Debtors, shall be made to a Holder of an Allowed Claim on account of such Allowed Claim. Such Allowed Claims to which this limitation applies shall be discharged and its Holder forever barred from asserting that Claim against the Reorganized Debtors or their property.

3. Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder; at which time such distribution shall be made to such Holder without interest; *provided, however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the later of (i) the Effective Date and (ii) the date of the distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

Checks issued on account of Allowed Claims shall be null and void if not negotiated within 180 calendar days from and after the date of issuance thereof. Requests for reissuance of any check must be made directly and in writing to the Disbursing Agent by the Holder of the relevant Allowed Claim within the 180-calendar day period. After such date, the relevant Allowed Claim (and any Claim for reissuance of the original check) shall be automatically discharged and forever barred, and such funds shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary).

4. Reserve.

In making any distribution in respect of Allowed Claims, the Reorganized Debtors shall reserve an appropriate and adequate amount of Cash on account of any unresolved Disputed Claims that if Allowed would be payable in Cash.

E. *Manner of Payment.*

1. All distributions of New Securities under the Plan shall be made by the Disbursing Agent on behalf of Reorganized Cumulus.

2. All distributions of Cash under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor (or Debtors).

3. At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

G. *Section 1145 Exemption.*

Pursuant to section 1145 of the Bankruptcy Code, the issuance of the New Securities by Reorganized Cumulus as contemplated by this Plan (including the issuance of New Common Stock upon exercise of the Special Warrants and Class A Common Stock upon conversion of Class B Common Stock) is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution or sale of Securities. The New Securities issued by Reorganized Cumulus pursuant to section 1145 of the Bankruptcy Code (a) are not "restricted securities" as defined in Rule 144(a) (3) under the Securities Act, and (b) are freely tradable and transferable by any initial

36

EX-2.1

recipient thereof that (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within the prior ninety (90) calendar days of such transfer, (iii) has not acquired the New Securities from an "affiliate" within one year of such transfer and (iv) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code; provided, that transfer of the New Securities may be restricted by the Communications Act and the rules of the FCC, the New Corporate Governance Documents, the Warrant Agreement, and with respect to the Restricted Stock, the terms thereof.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Securities through the facilities of the DTC, Euroclear or Clearstream, the Reorganized Debtors need not provide any further evidence other than this Plan or the Confirmation Order with respect to the treatment of transfers: exercise, removal of restrictions, or conversion of New Securities under applicable U.S. federal, state or local securities laws.

The DTC, Euroclear or Clearstream shall be required to accept and conclusively rely upon this Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Securities are exempt from registration and/or eligible for DTC, Euroclear or Clearstream book-entry delivery, settlement and depository services.

Notwithstanding anything to the contrary in this Plan, no Entity (including, for the avoidance of doubt, the DTC, Euroclear or Clearstream) may require a legal opinion regarding the validity of any transaction contemplated by this Plan, including, for the avoidance of doubt, whether the New Common Stock and Special Warrants (and New Common Stock issuable upon exercise of the Special Warrants) are exempt from registration and/or eligible for DTC, Euroclear or Clearstream book-entry delivery, settlement and depository services.

*H.*     *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information, documentation, and certifications necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable or appropriate. All Persons holding Claims against any Debtor shall be required to provide any information necessary for the Reorganized Debtors to comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit. The Reorganized Debtors reserve the right to allocate any distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit on account of such distribution.

*I.*     *Allocations.*

Except as otherwise required by law (as reasonably determined by the Reorganized Debtors), distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remaining portion of such Allowed Claim, if any.

*J.*     *Setoffs and Recoupment.*

Other than as expressly set forth in the Plan with respect to the Allowed Credit Agreement Claims, the Debtors or the Reorganized Debtors may, but shall not be required to, setoff against or recoup any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any claims, rights, and

37

Causes of Action of any nature whatsoever that the Debtors or the Reorganized Debtors, as applicable, may have against the Holder of such Allowed Claim pursuant to the Bankruptcy Code or applicable nonbankruptcy law, to the extent that such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (pursuant to the Plan or otherwise); *provided, however*, that the failure of the Debtors or the Reorganized Debtors, as applicable, to do so shall not constitute a waiver, abandonment or release by the Debtors or the Reorganized Debtors of any such Claim they may have against the Holder of such Claim.

K.      *Claims Paid or Payable by Third Parties.*

        1.      Claims Paid by Third Parties.

        The Debtors or the Reorganized Debtors, as applicable, shall reduce a Claim against any Debtor, and such Claim (or portion thereof) shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor, as applicable. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and also receives payment from a party that is not a Debtor or a Reorganized Debtor, as applicable, on account of such Claim, such Holder shall, within two (2) weeks of receipt of such payment, repay or return the distribution to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

        2.      Claims Payable by Third Parties.

        No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim against any Debtor, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

        3.      Applicability of Insurance Policies.

        Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Reorganized Debtors, or any Entity may hold against any other Entity, including insurers, under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

L.      *Foreign Current Exchange Rate.*

        As of the Effective Date, any Claim asserted in a currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate on the Petition Date, as quoted at 4:00 p.m. (prevailing Eastern time), midrange spot rate of exchange for the applicable currency as published in the Wall Street Journal, National Edition, on the day after the Petition Date.

38

4. *Resolution of Disputed Claims.*

1. Allowance of Claims.

After the Effective Date, each of the Debtors and the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim against any Debtor shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

2. Claims and Interests Administration Responsibilities.

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors (or any authorized agent or assignee thereof) shall have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims against any of the Debtors; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

3. Estimation of Claims.

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim against any Debtor that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed, contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim; *provided, however,* that such limitation shall not apply to Claims against any of the Debtors requested by the Debtors to be estimated for voting purposes only).

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek reconsideration on or before twenty-one (21) calendar days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims against any of the Debtors may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4. Adjustment to Claims Without Objection.

Any Claim against any Debtor that has been paid or satisfied, or any Claim against any Debtor that has been amended or superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may, in accordance with the Bankruptcy Code and Bankruptcy Rules, be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

39

ARTICLE VII.
PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED, AND DISPUTED CLAIMS

5. Time to File Objections to Claims

Any objections to Claims against any of the Debtors shall be Filed on or before the Claims Objection Deadline.

*B.    Disallowance of Claims.*

Any Claims against any of the Debtors held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors. Subject in all respects to Article IV.B, all Proofs of Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed any and all Proofs of Claim filed after the applicable Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Filed Claim has been deemed timely Filed by a Final Order.**

*C.    Amendments to Proofs of Claim.*

A Claim against any Debtor may be amended before the Confirmation Date only as agreed upon by the Debtors and the Holder of such Claim or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules, the Local Rules or applicable nonbankruptcy law. On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court and the Reorganized Debtors, and any such new or amended Proof of Claim Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court; *provided, however,* that the foregoing shall not apply to Administrative Claims or Accrued Professional Compensation Claims.

*D.    No Distributions Pending Allowance.*

Notwithstanding anything to the contrary herein, if any portion of a Claim against any Debtor is Disputed, or if an objection to a Claim against any Debtor or portion thereof is Filed as set forth in this Article VII, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

*E.    Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Allowed Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Allowed Claim, without any interest, dividends, or accruals to be paid on account of such Allowed Claim unless required under applicable bankruptcy law or as otherwise provided in Article III.B.

40

EXHIBIT B

EX-2.1

*F.*   *Reserve of Special Warrants.*

On the Effective Date (or as soon thereafter as is reasonably practicable), the Reorganized Debtors shall create the Disputed Claim Reserve to pay Holders of Disputed Claims that are General Unsecured Claims that may become Allowed Claims pursuant to the terms of the Plan, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing the Disputed Claim Reserve and for maximum distribution purposes, to be the lesser of (a) the asserted amount of the Disputed Claim Filed with the Bankruptcy Court or (if no Proof of Claim was Filed) listed by the Debtors in the Schedules, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, or (c) the amount otherwise agreed to by the Reorganized Debtors and the Holder of such Disputed Claim for Disputed Claim Reserve purposes. Special Warrants reserved under this paragraph F shall remain unissued unless and until issued in satisfaction of a Disputed Claim that becomes an Allowed Claim and shall therefore be disregarded in both the numerator and denominator in the calculation of any vote by shareholders of Reorganized Cumulus under any New Corporate Governance Documents. Any distribution on account of a Disputed Claim that becomes an Allowed General Unsecured Claim after the Effective Date shall be made solely in the form of Special Warrants that are distributed from the Disputed Claim Reserve.

*G.*   *No Interest.*

Unless otherwise expressly provided by section 506(b) of the Bankruptcy Code or as specifically provided for herein or by order of the Bankruptcy Court (including the Cash Collateral Order), postpetition interest shall not accrue or be paid on Claims against any of the Debtors, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim; *provided, however,* that nothing in this Article VIII.G shall limit any rights of any Governmental Unit to interest under sections 503, 506(b), 1129(a)(9)(A) or 1129(a)(9)(C) of the Bankruptcy Code or as otherwise provided for under applicable law.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

*A.*   *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

*B.*   *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order or in any contract, instrument, or other agreement or document created pursuant to the Plan, including the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan shall be in

41

complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.   *Release of Liens.*

Except as otherwise specifically provided in the Plan, the First Lien Exit Facility Documents or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, on the Effective Date all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. In addition, the Credit Agreement Agent shall, at the Debtors' or Reorganized Debtors', as applicable, expense (and with no representation or warranty, or recourse to, the Credit Agreement Agent, any Term Loan Lender or any of their affiliates, officers, directors, employees, agents or counsel) execute and deliver all documents reasonably requested by the Debtors, the Reorganized Debtors, the First Lien Exit Facility Agent, or the New Revolving Credit Facility Agent (if any) to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

D.   *Releases by the Debtors.*

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, the Released Parties shall hereby be expressly, unconditionally, irrevocably, generally, individually and collectively released, acquitted, and discharged by the Debtors, the Reorganized Debtors, and the Estates, each on behalf of itself and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, from any and all actions, Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of a Debtor or Reorganized Debtor, any Claims or Causes of Action asserted on behalf of any Holder of any Claim or Interest or other Entity or that any Holder of a Claim or Interest or other Entity would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, for violations of federal or state laws or otherwise, by statute or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that the Debtors, the Reorganized Debtors, or their Estates (whether individually

42

or collectively ever had, now has, or hereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or any other transaction relating to any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan, the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Restructuring Support Agreement, the Disclosure Statement, the First Lien Exit Facility Documents, the New Revolving Credit Facility Documents (if any), or, in each case, related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence, taking place on or before the Effective Date related or relating to any of the foregoing; *provided, however*, that except as expressly provided under the Plan, the foregoing releases shall not release any Claims related to any act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence or willful misconduct. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date rights or obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and shall not result in a release of any of the Debtors' or Reorganized Debtors' assumed indemnification obligations as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) essential to the Confirmation of the Plan; (2) an exercise of the Debtors' business judgment; (3) in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Debtor Release; (5) in the best interests of the Debtors and all holders of Claims and Interests; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Debtors, the Reorganized Debtors, and the Estates and each of their current and former Affiliates, and such Entities' and their current and former Affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such asserting any Claim or Cause of Action released pursuant to the Debtor Release.

Nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

E. *Release by the Releasing Parties.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Effective Date, each of the Releasing Parties shall be deemed to have expressly, conclusively, absolutely, unconditionally, irrevocably, generally, individually and collectively, released, acquitted, and discharged the Released Parties from any and all actions, Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of a Debtor or Reorganized Debtor, any Claims or Causes of Action asserted on behalf of any Holder of any Claim or any Interest or other Entity or that any Holder of a Claim or an Interest or other Entity would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, for violations of federal or state laws or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or after-ego theories of liability, contribution, indemnification, joint liability or otherwise that such Releasing Party (whether individually or collectively) ever had, now has, or hereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or any other transaction relating to any Security of the

43

Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or any Interest that is affected by or classified in the Plan, the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Restructuring Support Agreement, the Disclosure Statement, the First Lien Exit Facility Documents, the New Revolving Credit Facility Documents (if any), or, in each case, related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence, taking place on or before the Effective Date related or relating to any of the foregoing; *provided, however,* that except as expressly provided under the Plan, the foregoing releases shall not release Claims related to any act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence or willful misconduct; *provided, further,* that any Holder of a Claim or an Interest that elects to opt-out of the releases contained in this paragraph shall not constitute a Released Party (even if for any reason otherwise entitled) and no Restructuring Support Party shall be entitled to opt-out of the releases contained in this paragraph for so long as the Restructuring Support Agreement remains in full force and effect as to such Restructuring Support Party. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date rights or obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and shall not result in a release of any of the Debtors' or Reorganized Debtors' assumed indemnification obligations as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) essential to the Confirmation of the Plan; (2) given in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (3) a good faith settlement and compromise of the Claims released by the Third-Party Release; (4) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

Nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

F.    *Regulatory Activities.*

Notwithstanding anything to the contrary herein, nothing in the Plan or Confirmation Order is intended to affect the police or regulatory activities of Governmental Units or other governmental agencies.

G.    *Exculpation.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any (i) Exculpated Causes of Action and (ii) obligation, Cause of Action, or liability for any Exculpated Causes of Action; *provided, however,* that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence, or willful misconduct; *provided further, however,* that the foregoing shall not be deemed to release, affect, or limit any post-Effective Date rights or obligations of the Exculpated Parties under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

44

EXHIBIT B

EX-2.1

10/15/2018

Nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

### H. *Injunctions.*

Except as otherwise expressly provided in the Plan, the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Persons and Entities that have held, hold, or may hold Claims, Interests, Causes of Action or liabilities that have been released pursuant to Article VIII.D or Article VIII.E of the Plan, are discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.G of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities: (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Persons and Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (iii) creating, perfecting, or enforcing any Lien, Claim or encumbrance of any kind against such Persons or Entities or the property or the estates of such Persons or Entities, as applicable, on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Persons or Entities or against the property of such Persons or Entities, as applicable, on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; and (v) commencing or continuing in any manner any action or other proceeding of any kind against such Persons or Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities released, settled or compromised pursuant to the Plan; *provided*, that nothing contained herein shall preclude a Person or Entity from obtaining benefits directly and expressly provided to such Person or Entity pursuant to the terms of the Plan; *provided, further*, that nothing contained herein shall be construed to prevent any Person or Entity from defending against claims objections or collection actions whether by asserting a right of setoff or otherwise to the extent permitted by law.

### I. *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### J. *Recoupment.*

In no event shall any Holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

### K. *Protection Against Discriminatory Treatment.*

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, all Entities, including Governmental Units shall not discriminate against any Reorganized Debtor, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant on, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

45

EXHIBIT B

## ARTICLE IX.
### CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A. *Conditions Precedent to the Effective Date.*

It is a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B

    1.    The Bankruptcy Court shall have entered the Confirmation Order, which order shall be in form and substance satisfactory to the Debtors and the Term Lender Group.

    2.    The Debtors shall have paid the reasonable and documented fees and out-of-pocket expenses of (i) the Credit Agreement Agent (including one counsel to the Credit Agreement Agent), and ii) Arnold & Porter Kaye Scholer LLP, FTI Consulting Inc., Fortgang Consulting, LLC and Aloise & Associates, LLC in accordance with the Restructuring Support Agreement.

    3.    All of the conditions precedent set forth in the First Lien Exit Credit Agreement shall have been satisfied or waived pursuant to the terms of the First Lien Exit Credit Agreement, and the First Lien Exit Credit Agreement shall have been executed.

    4.    The Professional Fee Escrow Account shall have been established and funded.

    5.    The Restructuring Support Agreement shall not have been terminated as to all parties thereto.

    6.    All actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws.

    7.    All governmental and material third-party approvals and consents, including Bankruptcy Court approval, that are necessary to implement the Restructuring Transactions shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions.

    8.    The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, waivers or other documents that are necessary to implement and effectuate the Plan and reasonable evidence thereof has been delivered to the Term Lender Group.

    9.    The FCC Approval shall have been obtained.

    10.    Any amendments, modifications or supplements to the Plan (including the Plan Supplement) shall be reasonably acceptable to the Debtors and the Term Lender Group.

    11.    Each of the New By-Laws and New Certificates of Incorporation will be in full force and effect as of the Effective Date.

    12.    The Effective Date shall be no later than one-hundred eighty (180) calendar days after the Petition Date, or such later date to which the Term Lender Group agrees in writing.

B. *Waiver of Conditions.*

    The conditions to Consummation set forth in Article IX.A may be waived by the Debtors with the prior written consent of the Term Lender Group (not to be unreasonably withheld) and, with respect to conditions related to the Professional Fee Escrow Account, the beneficiaries of the Professional Fee Escrow Account, without notice,

EXHIBIT B

Case 1:18-05641 Doc 1-1 Filed 12/19/18 Entered 12/19/18 12:31:25 Desc Exhibit A - Complaint Page 16 of 137

leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan. The failure of the Debtors or the Term Lender Group to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

C. *Effect of Failure of Conditions.*

If Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims, Causes of Action or Interests; (ii) prejudice in any manner the rights of such Debtor, any Holder, any Person, or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder, any Person, or any other Entity.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A. *Modification and Amendments.*

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors reserve the right to modify the Plan (including the Plan Supplement), without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date; *provided*, that any such modification shall be reasonably acceptable to the Term Lender Group. After the Confirmation Date and before substantial consummation of the Plan, the Debtors may initiate proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and intent of the Plan.

After the Confirmation Date, but before the Effective Date, the Debtors, with the consent of the Term Lender Group (not to be unreasonably withheld), may make appropriate technical adjustments and modifications to the Plan (including the Plan Supplement) without further order or approval of the Bankruptcy Court; *provided*, that such adjustments and modifications do not materially and adversely affect the treatment of Holders of Claims or Interests.

B. *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C. *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then, absent further order of the Bankruptcy Court: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Classes of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, any Person, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder, any Person, or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, except as set forth in the Plan, the Bankruptcy Court shall retain exclusive jurisdiction, to the fullest extent permissible under law, over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable, and to hear, determine and, if necessary, liquidate, any Claims against any of the Debtors arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4. ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, applications, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor, or the Estates that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any and all matters related to Causes of Action;

7. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8. enter and implement such orders as may be necessary or appropriate to construe, execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

9. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity or Person with Consummation or enforcement of the Plan;

12. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

48

EX-2.1

13.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.K.1.;

14.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.    determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the New Corporate Governance Documents, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement; *provided*, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court;

16.    adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.    consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in the Plan, the Disclosure Statement, or any Bankruptcy Court order, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

18.    determine requests for the payment of Claims against any of the Debtors entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, including disputes arising in connection with the implementation of the agreements, documents, or instruments executed in connection with the Plan;

20.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, 511, and 1146 of the Bankruptcy Code;

21.    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases with respect to any Person or Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Person or Entity's rights arising from or obligations incurred in connection with the Plan;

22.    hear any other matter not inconsistent with the Bankruptcy Code; and

23.    enter an order or final decree concluding or closing any of the Chapter 11 Cases.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

49

EXHIBIT B

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against the Debtors that arose prior to the Effective Date.

A.    *Immediate Binding Effect.*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors and each of their respective heirs executors, administrators, successors and assigns.

B.    *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

C.    *Further Assurances.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Reorganized Debtors, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

D.    *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, the Committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the Committee on and after the Effective Date.

E.    *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor or any other Entity with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or other Entity before the Effective Date.

F.    *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, receiver, trustee, successor, assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of such Entity.

50

EXHIBIT B

EX-2.1

G. *Notices.*

To be effective, all notices, requests, and demands to or upon the Debtors, the Committee, the U.S. Trustee, or the Term Lender Group, as applicable, must be in writing (including by facsimile transmission), and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the following:

If to the Debtors:

Cumulus Media Inc.
3280 Peachtree Road, N.W., Suite 2200
Atlanta, Georgia 30305
Attention: John Abbot
            Richard A. Denning
E-mail: john.abbot@cumulus.com
        richard.denning@cumulus.com

With copies to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Facsimile: (212) 757-3990
Attention: Paul M. Basta
            Lewis R. Clayton
            Jacob A. Adlerstein
            Claudia R. Tobler
E-mail: pbasta@paulweiss.com
        lclayton@paulweiss.com
        jadlerstein@paulweiss.com
        ctobler@paulweiss.com

If to the U.S. Trustee:

Office of the United States Trustee
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, NY 10045
Attention: Paul Schwartzberg
            Greg M. Zipes
E-mail: Paul.Schwartzberg@usdoj.gov
        Greg.Zipes@usdoj.gov

If to the Term Lender Group:

Arnold & Porter Kaye Scholer LLP
70 West Madison Street, Suite 4200
Chicago, Illinois 60602-4321
Facsimile: (312) 583-2360
Attention: Michael B. Solow
            Michael D. Messersmith
            Seth J. Kleinman
E-mail: michael.solow@apks.com
        michael.messersmith@apks.com
        seth.kleinman@apks.com

51

EXHIBIT B

If to the Committee:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Facsimile: (212) 872-1002
Attention: Michael S. Stamer
Abid Qureshi
Meredith A. Lahaie
E-mail: mstamer@akingump.com
aqureshi@akingump.com
mlahaie@akingump.com

After the Effective Date, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, an Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.   *Entire Agreement.*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and the Plan Supplement.

I.   *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' Case Information Website at http://dm.epiq11.com/cumulus or the Bankruptcy Court's website at http://www.nysb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

J.   *Severability of Plan Provisions.*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors in consultation with the Restructuring Support Parties, shall have the power to alter and interpret such term or provision such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, the Plan Supplement, the New Corporate Governance Documents, the First Lien Exit Facility Documents, and the New Revolving Credit Facility Documents (if any), as any of such documents may have been altered or interpreted in accordance with the foregoing, are: (1) valid and enforceable pursuant to their terms; (ii) integral to the Plan and may not be deleted or modified without the consent of the parties thereto; and (iii) non-severable and mutually dependent.

K.   *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and other applicable law, and pursuant to sections 1125(e), 1125(g), and 1126(b) of the Bankruptcy Code, the Debtors, the Restructuring Support Parties, and each of

52

EXHIBIT B

their respective Affiliates, and each of their and their Affiliates' agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys, in each case solely in their respective capacities as such, will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of New Securities offered and sold under the Plan and any previous plan and, therefore, no such parties, individuals, or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the New Securities offered and sold under the Plan or any previous plan.

L.    *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

M.    *Conflicts.*

To the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other document referenced in the Plan or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with the Confirmation Order, the Confirmation Order shall govern and control. Moreover, to the extent that any provision of the Restructuring Support Agreement conflicts with or is in any way inconsistent with the Plan, the Plan shall govern and control in all respects.

*[Remainder of page intentionally left blank]*

53

EXHIBIT B

57/65

https://www.sec.gov/Archives/edgar/data/1058623/000119312518183509/d595577dex21.htm

Dated: February 12, 2018

EX-2.1

CUMULUS MEDIA INC.
on behalf of itself and each of its Debtor affiliates

*s/ John Abbot*

John Abbot
Executive Vice President, Treasurer, and Chief Financial Officer

54

EXHIBIT B

EX-2.1

Exhibit A

Equity Allocation Mechanism

EXHIBIT B

59/65

https://www.sec.gov/Archives/edgar/data/1058623/000119312518183509/d59557dex21.htm

EX-2.1

## EQUITY ALLOCATION MECHANISM

The allocation of Plan consideration to Holders of Allowed Credit Agreement Claims, Allowed Senior Notes Claims, and Allowed General Unsecured Claims, as of the Effective Date, will include distributing Class A Common Stock, Class B Common Stock and, only in the case of Allowed Credit Agreement Claims, Restricted Stock (collectively, the "*Stock*"), and Special Warrants, in accordance with the mechanism set forth below.[1]

**General:**

1. *Ownership Certification.* In order to be eligible to receive a distribution of Stock on the Effective Date, each eligible Holder shall provide an Ownership Certification by the Certification Deadline.

2. *Definitions.* (a) An "*Ownership Certification*" means a written certification, in the form attached to the FCC Ownership Procedures Order, which shall be sufficient to enable the Debtors, in consultation with the Term Lender Group, or Reorganized Cumulus, as applicable, to determine (x) the extent to which direct and indirect voting and equity interests of the certifying party are held by non-U.S. Persons, as determined under section 310(b) of the Communications Act and the FCC rules, and (y) whether the holding of more than 4.99% of the Class A Common Stock by the certifying party would result in a violation of FCC ownership rules or be inconsistent with the FCC Approval; *provided, however,* that a Holder may elect not to provide the information in clause (y), and any Ownership Certification without the information in clause (y) shall not prohibit a Holder from receiving up to 4.99% of the Class A Common Stock to the extent otherwise entitled thereto pursuant to this Equity Allocation Mechanism; and (b) the "*Certification Deadline*" means the deadline set forth in the FCC Ownership Procedures Order for returning Ownership Certifications.

3. *Attributable Interests.* Subject in all respects to the foreign-ownership limitations discussed below, under FCC rules, an owner of equity in a corporation which controls FCC broadcast licenses may be deemed "attributable" if it owns, directly or indirectly, 5% or more of the voting equity of such corporation. The distribution of Stock to a Holder of an Allowed Credit Agreement Claim, Allowed Senior Notes Claim or Allowed General Unsecured Claim may be in the form of more than 4.99% of the outstanding Class A Common Stock when the shares of Class A Common Stock are issued on and as of the Effective Date, only if such Holder is identified on the FCC Long-Form Application (as the same may be amended from time to time) pursuant to which FCC Approval is granted as the holder of an attributable interest in Reorganized Cumulus. If such Holder elects not to be deemed to hold an "attributable" interest in Reorganized Cumulus, then such Holder shall be issued up to 4.99% of the outstanding Class A Common Stock when all shares of Class A Common Stock are issued on and as of the Effective Date, with any remaining distribution in the form of Class B Common Stock.

---

[1] For the avoidance of doubt, the procedures set forth in this Equity Allocation Mechanism shall not impact the issuance of securities or other instruments under the Management Incentive Plan, which issuance shall be governed by the terms of the Management Incentive Plan.

**EXHIBIT B**

4. ***Restricted Stock***. A Holder of an Allowed Credit Agreement Claim may elect on its Ownership Certification to receive its Class A Common Stock or Class B Common Stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification. Shares of Restricted Stock may not be offered, sold or otherwise transferred until after two (2) calendar days following delivery of the Restricted Stock from the transfer agent designated by the Debtors (the "*Transfer Agent*") to such Holder of the Allowed Credit Agreement Claim (each such period, a "*Restricted Period*"). After the expiration of a Restricted Period, the initial Holder of such shares may make a request to the Transfer Agent to remove the restrictive legend set forth on such shares (the "*Restrictive Legend*"). Upon receipt of any such request, the Transfer Agent will remove the Restrictive Legend. Following the expiration of each applicable Restricted Period and the removal of the Restrictive Legend, the shares of Restricted Stock may be offered, sold or otherwise transferred, subject to the same restrictions on transfer as the New Securities provided herein and in the Disclosure Statement. In accordance with the above, each share of Restricted Stock will bear a legend to substantially the following effect:

> "THE SECURITY EVIDENCED HEREBY (THIS "*SECURITY*") MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED FOR A PERIOD OF TWO (2) CALENDAR DAYS FOLLOWING DELIVERY OF THIS SECURITY FROM THE TRANSFER AGENT DESIGNATED BY THE ISSUER OF THIS SECURITY (THE "*TRANSFER AGENT*") TO THE INITIAL HOLDER (THE "*RESTRICTED PERIOD*"). AFTER THE RESTRICTED PERIOD, THIS SECURITY MAY ONLY BE OFFERED, SOLD OR OTHERWISE TRANSFERRED FOLLOWING A REQUEST BY THE INITIAL HOLDER TO THE TRANSFER AGENT TO REMOVE THIS RESTRICTIVE LEGEND."

**Allocation of New Securities:**

The distribution of Stock and Special Warrants made on and as of the Effective Date shall be as follows:

1. First, the (i) Term Loan Lender Equity Distribution shall be deemed made Pro Rata among the Holders of Allowed Credit Agreement Claims; and (ii) the Unsecured Creditor Equity Distribution shall be deemed made Pro Rata among Holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims; *provided*, *however*, that each of the Term Loan Lender Equity Distribution and the Unsecured Creditor Equity Distribution shall be deemed to have been made initially in the form of Special Warrants issued as of the Effective Date.

EXHIBIT B

2.  Second

(a)  Each deemed Holder of Special Warrants that (i) has timely delivered an Ownership Certification as set forth herein and in the FCC Ownership Procedures Order, and (ii) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is 0%, shall be deemed to have exercised its Special Warrants as of the Effective Date to the fullest extent possible in the form of Class B Common Stock; *provided*, that any Holder who has not checked the Class B Election box on the Ownership Certification shall be further deemed as of the Effective Date to have immediately exchanged such shares of Class B Common Stock for a like number of shares of Class A Common Stock; *provided, further*, that, for any Holder of Class B Common Stock that would be entitled to exchange its shares for more than 4.99% of the outstanding Class A Common Stock when all shares of Class A Common Stock are issued on and as of the Effective Date, the number of shares of Class B Common Stock exchanged by such Holder for shares of Class A Common Stock shall be limited so that such Holder receives shares of Class A Common Stock constituting no more than 4.99% of the total outstanding Class A Common Stock issued unless the Debtors, in consultation with the Term Loan Lender Group, or Reorganized Cumulus, as applicable, shall have determined that the exchange into shares of Class A Common Stock constituting more than 4.99% of the total outstanding Class A Common Stock issued would not result in a violation of FCC ownership rules or be inconsistent with the FCC Approval (such proviso, the "*4.99% Rule*"), *provided, however*, that in connection with the distribution of Class A Common Stock or Class B Common Stock to Holders of Allowed Credit Agreement Claims, such Holders may elect to receive such stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification.

(b)  Each deemed Holder of Special Warrants that (i) has timely delivered an Ownership Certification as set forth herein and in the FCC Ownership Procedures Order, and (ii) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is greater than 0% (each a "*Non-U.S. Holder*," and collectively, the "*Non-U.S. Holders*"), shall be deemed to have exercised its Special Warrants, pro rata among all such Non-U.S. Holders, to receive Class B Common Stock, in an amount, assuming all Holders of Special Warrants that have not timely delivered an Ownership Certification are 100% foreign-owned Non-U.S. Holders, of shares that causes the aggregate alien ownership (on an equity and on a voting basis) of Stock to equal, at most, twenty-two and one half percent (22.50%); *provided*, that such allocation to Non-U.S. Holders shall be made on a proportional basis taking into account the number of Special Warrants held by the Non-U.S. Holders and each such Holder's contribution of alien ownership to the aggregate amount of alien ownership of Stock as of the Effective Date (e.g., assuming all Special Warrants are not exercisable on the Effective Date, a Non-U.S. Holder with a 1.0% alien ownership will be deemed to have exercised more Special Warrants into Stock than a Non-U.S. Holder with an equivalent amount of Special Warrants but a

3

EX-2.1

20% alien ownership); *provided further*, that any Holder who has not checked the Class B Election box on the Ownership Certification shall be further deemed to have immediately exchanged such shares of Class B Common Stock for a like number of shares of Class A Common Stock, subject in all respects to the 4.99% Rule; *provided, however*, that in connection with the distribution of Class A Common Stock or Class B Common Stock to Holders of Allowed Credit Agreement Claims, such Holders may elect to receive such stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification.

(c) Each deemed Holder of Special Warrants that has not timely delivered an Ownership Certification as set forth herein and in the FCC Ownership Procedures Order shall not be deemed to have exercised any Special Warrants as of the Effective Date; *provided, however*, that if such Holder properly completes and delivers an Ownership Certification to Reorganized Cumulus at any time after the Certification Deadline, and upon confirmation from Reorganized Cumulus that such Ownership Certification is satisfactory, if such Holder (i) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is 0%, then its equity allocation shall be distributed after the Effective Date in the manner set forth in Section 2(a) herein; or (ii) has provided certification therein that its alien ownership as calculated in accordance with FCC rules, is greater than 0%, then its equity allocation shall be distributed after the Effective Date in the manner set forth in Section 2(b) herein, all subject to any limitations on stock ownership set forth in the Certificate of Incorporation of Reorganized Cumulus.

3. *Holder Elections*. Notwithstanding anything to the contrary herein, a Holder of an Allowed Credit Agreement Claim, Allowed Senior Notes Claim, or Allowed General Unsecured Claim may, by making the appropriate election on the Ownership Certification, receive its Term Loan Lender Equity Distribution or Unsecured Creditor Equity Distribution, as the case may be, (i) entirely in the form of Special Warrants and shall not be deemed to have exercised any Special Warrants, (ii) in Special Warrants deemed to have been exercised for Class B Common Stock to the extent such Holder's portion of the Term Loan Lender Equity Distribution or Unsecured Creditor Equity Distribution would consist of New Common Stock pursuant to Section 2 above, with any remaining Special Warrants not being deemed exercised, or (iii) in Special Warrants deemed to have been exercised for Class A Common Stock to the extent such Holder's portion of the Term Loan Lender Equity Distribution or Unsecured Creditor Equity Distribution would consist of New Common Stock pursuant to Section 2 above, up to 4.99% of the outstanding Class A Common Stock when all shares of Class A Common Stock are issued on and as of the Effective Date, with any remaining Special Warrants not being deemed exercised, all of which elections are expressly subject to Section 5 below.

4. *Trading Deadlines and Tendering of Senior Notes*. Holders of Senior Notes Claims shall be required to tender their Senior Notes into the Automated Tender Offer Program ("*ATOP*") system of Depository Trust Company as set forth in the FCC Ownership Procedures Order (the "*Trading Deadline*"). The positions of such Holders in the Senior

4

EXHIBIT B

EX-2.1

Notes will be segregated through ATOP and such Holders thereafter will be unable to trade their Senior Notes Claims. Distributions on account of Allowed Credit Agreement Claims will be made based on the Credit Agreement Agent's register as of the Distribution Record Date and trades not reflected on such register shall not be recognized for purposes of distributions under the Plan.

5.   *FCC Limits on Ownership.* Notwithstanding anything else herein, nothing in this Equity Allocation Mechanism shall (i) permit any Holder to hold more than 4.99% of the outstanding Class A Common Stock on or after the Effective Date unless the Debtors, in consultation with the Term Lender Group, or Reorganized Cumulus, as applicable, shall have determined that such ownership will not cause a violation of FCC ownership rules or be inconsistent with the FCC Approval, or (ii) cause Reorganized Cumulus to exceed an aggregate alien ownership percentage (on an equity or on a voting basis) of twenty-two and one half percent (22.50%) in the Stock prior to the Declaratory Ruling. Any distribution in contravention of the preceding sentence shall be adjusted to the minimum extent necessary to comply with those limitations. In determining whether any Holder would hold more than 4.99% of the outstanding Class A Common Stock on or after the Effective Date, such Holder will be attributed with any stock held by another Holder under common management or that otherwise would be aggregated under the FCC's ownership attribution rules.

6.   *Post-Effective Date Allowed General Unsecured Claims.* Pursuant to and in accordance with Article VII.E of the Plan, the Reorganized Debtors shall withhold a reserve of Special Warrants to pay Holders of Disputed Claims that are General Unsecured Claims that may become Allowed Claims pursuant to the terms of the Plan. If a General Unsecured Claim is not Allowed as of the Effective Date and becomes an Allowed General Unsecured Claim after the Effective Date, and the Holder of such Allowed General Unsecured Claim has timely delivered an Ownership Certification as set forth in the FCC Ownership Procedures Order, if such Holder (i) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is 0%, then its equity allocation shall be distributed in the manner set forth in Section 2(a) herein; or (ii) has provided certification therein that its alien ownership, as calculated in accordance with FCC rules, is greater than 0%, then its equity allocation shall be distributed in the manner set forth in Section 2(b) herein, all subject to any limitations on stock ownership set forth in the Certificate of Incorporation of Reorganized Cumulus.

## POST-DECLARATORY RULING REALLOCATION OF NEW SECURITIES:

Subject to the terms of the Warrant Agreement, after the Declaratory Ruling, any exercise or deemed exercise of the Special Warrants as a result of the Declaratory Ruling shall be made as follows:

1.   *100% Foreign Ownership.* If the FCC adopts a Declaratory Ruling allowing 100% foreign ownership of Reorganized Cumulus, then Non-U.S. Holders shall be deemed to have exercised their Special Warrants to the fullest extent possible for the corresponding number of shares of Class B Common Stock; *provided,* that any Holder who had not checked the Class B Election box on the Ownership Certification shall be further deemed to have

5

EXHIBIT B

  

immediately exchanged such shares of Class B Common Stock for a like number of shares of Class A Common Stock, subject in all respects to the 4.99% Rule; *provided, however*, that in connection with the distribution of Class A Common Stock or Class B Common Stock to Holders of Allowed Credit Agreement Claims, such Holders may have elected to receive such stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification.

2. ***Foreign Ownership Between 25% and 100%***. If the FCC adopts a Declaratory Ruling allowing foreign ownership of Reorganized Cumulus between twenty-five percent (25%) and one hundred percent (100%) (the "*Partial Declaratory Ruling Percentage*"), then, each Non-U.S. Holder of Special Warrants that has timely delivered an Ownership Certification in accordance with the Plan and the Warrant Agreement, shall be deemed to have exercised its Special Warrants, pro rata among all such Non-U.S. Holders (*i.e.*, calculated with the denominator as the number of Special Warrants held by Non-U.S. Holders who timely provide an Ownership Certification), to receive Class B Common Stock, in an amount of shares that causes the aggregate alien ownership (on an equity and on a voting basis) of Stock to equal, at most, the Partial Declaratory Ruling Percentage; *provided*, that any Holder who had not checked the Class B Election box on the Ownership Certification shall be further deemed to have immediately exchanged such shares of Class B Common Stock for a like number of shares of Class A Common Stock, subject in all respects to the 4.99% Rule; *provided, however*, that in connection with the distribution of Class A Common Stock or Class B Common Stock to Holders of Allowed Credit Agreement Claims, such Holders may have elected to receive such stock as Restricted Stock by checking the Restricted Stock Election box on the Ownership Certification. For the avoidance of doubt, any Non-U.S. Holder that does not timely provide its Ownership Certification in accordance with the Plan and the Warrant Agreement shall retain its Special Warrants, and such Special Warrants shall not be deemed exercised into Class A Common Stock and/or Class B Common Stock pursuant to this Section 2.

3. ***Foreign Ownership Under 25%***. If the FCC does not grant the Declaratory Ruling so as to permit foreign ownership of Reorganized Cumulus to exceed 25%, then Non-U.S. Holders cannot elect to convert their Special Warrants into Stock and must either hold such Special Warrants or transfer them.

### Investor Group to Acquire Voya's Closed Block Variable Annuity Business

*--Consortium Led by Apollo, Crestview Partners, and*
*Reverence Capital Partners to Form Industry Solution for Variable Annuities--*

New York, December 21, 2017 – An investor group led by affiliates of Apollo Global Management, LLC (together with its consolidated subsidiaries, "Apollo") (NYSE: APO), Crestview Partners ("Crestview"), and Reverence Capital Partners ("Reverence"), today announced they have entered into a definitive agreement to acquire Voya Financial, Inc.'s ("Voya") (NYSE: VOYA) Closed Block Variable Annuity business (the "CBVA Business"). The investment will be made through a newly formed standalone entity ("Venerable Holdings, Inc." or "Venerable"). The proposed transaction, which is expected to close in the second or third quarter of 2018, is subject to regulatory approvals and other customary closing conditions. Apollo, Crestview, and Reverence will own equal stakes in Venerable, and Athene Holding Ltd. ("Athene") (NYSE: ATH) and Voya will also acquire minority positions in Venerable.

The investors in Venerable are all well-established strategic investors with significant regulatory credibility and experience in successfully building and growing insurance businesses with patient, long-term capital. Upon closing of the transaction, Venerable will be conservatively capitalized to CTE 98+. The investors in Venerable believe it is advantageous that the CBVA Business will operate as a private company, with a hedging strategy that will focus on the economic and regulatory stability of the underlying assets and statutory capital strength rather than reducing GAAP earnings volatility. In connection with the transaction, Voya Investment Management will become Venerable's preferred asset management partner. Voya has substantial heritage and knowledge in this area and will manage the assets of the CBVA Business as well as the assets from future acquisitions of closed block variable annuities by Venerable.

Apollo, Crestview and Reverence said, "We are attracted to Voya's CBVA Business due to the strength of the team and platform, and the structure and stability of the underlying assets. We believe blocks such as the CBVA Business are best owned through private ownership. In addition, we believe success in variable annuities is primarily calibrated with effective risk management, which is Venerable's most significant core competency. With a sole focus on variable annuities and support from an outstanding group of strategic investors, Venerable is uniquely positioned to serve as a leading industry solution for the consolidation of variable annuity blocks and the creation of long-term economic value."

In connection with the transaction that is being announced today, Athene has signed a definitive agreement to reinsure approximately $19 billion of Voya's fixed and fixed indexed annuities, which will be administered by Venerable, and Athene Asset Management will provide asset management services for these fixed annuities. In addition, Athene will be Venerable's strategic partner for fixed annuity blocks as opportunities arise going forward.

The senior leadership team of the current CBVA Business, including Patrick Lusk, David Wiland, and Timothy Brown, will remain in place at Venerable and will continue to perform the same

EXHIBIT C

functions. Venerable will also establish a core group of employees exclusively focused on risk management and operational efficiency.

Venerable's headquarters will remain in the CBVA Business's current headquarters in West Chester, Pennsylvania, and the CBVA Business's existing U.S. operations will be consolidated in Des Moines, Iowa. Over time, as Venerable acquires additional variable annuity portfolios, it expects to build a meaningful presence in Des Moines and establish a center of excellence for variable annuities.

Barclays is serving as financial advisor and Sidley Austin LLP is serving as legal counsel to Venerable in connection with this transaction.

**About Apollo Global Management**

Apollo is a leading global alternative investment manager with offices in New York, Los Angeles, Houston, Chicago, St. Louis, Bethesda, Toronto, London, Frankfurt, Madrid, Luxembourg, Mumbai, Delhi, Singapore, Hong Kong and Shanghai. Apollo had assets under management (AUM) of approximately $242 billion as of September 30, 2017 in private equity, credit and real assets funds invested across a core group of nine industries where Apollo has considerable knowledge and resources. For more information about Apollo, please visit www.agm.com.

**About Crestview Partners**

Founded in 2004, Crestview Partners is a value-oriented private equity firm focused on the middle market. The firm is based in New York and manages funds with over $7 billion of aggregate capital commitments. The firm is led by a group of partners who have complementary experience and distinguished backgrounds in private equity, finance, operations and management. Crestview has senior investment professionals focused on sourcing and managing investments in each of the specialty areas of the firm: energy, financial services, industrials and media. For more information: www.crestview.com.

**About Reverence Capital Partners**

Reverence Capital Partners is a private investment firm focused on thematic investing in leading global, middle-market Financial Services businesses through control and influence oriented investments in 5 sectors: (1) Depositories and Finance Companies, (2) Asset and Wealth Management, (3) Insurance, (4) Capital Markets and (5) Financial Technology/Payments. The firm was founded in 2013, by Milton Berlinski, Peter Aberg and Alex Chulack, after distinguished careers advising and investing in a broad array of financial services businesses. The Partners collectively bring over 90 years of advisory and investing experience across a wide range of financial services sectors.

**Forward Looking Statements**

This press release may contain forward looking statements that are within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. These statements include, but are not limited to, discussions related to Apollo's expectations regarding the performance of its business, its liquidity and capital resources and the other non-historical statements in the discussion and analysis. These forward-looking statements are based on management's beliefs, as well as assumptions made by, and information currently available to, management. When used in this press release, the words "believe," "anticipate,"

EXHIBIT C

"estimate," "expect," "intend" and similar expressions are intended to identify forward-looking statements. Although management believes that the expectations reflected in these forward looking statements are reasonable, it can give no assurance that these expectations will prove to have been correct. These statements are subject to certain risks, uncertainties and assumptions, including risks relating to our dependence on certain key personnel, our ability to raise new private equity, credit or real estate funds, market conditions, generally, our ability to manage our growth, fund performance, changes in our regulatory environment and tax status, the variability of our revenues, net income and cash flow, our use of leverage to finance our businesses and investments by our funds and litigation risks, among others. We believe these factors include but are not limited to those described under the section entitled "Risk Factors" in Apollo's annual report on Form 10-K filed with the Securities and Exchange Commission (the "SEC") on February 13, 2017, as such factors may be updated from time to time in our periodic filings with the SEC, which are accessible on the SEC's website at www.sec.gov. These factors should not be construed as exhaustive and should be read in conjunction with the other cautionary statements that are included in this press release and in other filings. We undertake no obligation to publicly update or review any forward-looking statements, whether as a result of new information, future developments or otherwise, except as required by applicable law. This press release does not constitute an offer of any Apollo fund.

## Contact Information

*Apollo*

For investor inquiries regarding Apollo:

Gary M. Stein
Head of Corporate Communications
Apollo Global Management, LLC
212-822-0467
gstein@apollolp.com

Noah Gunn
Investor Relations Manager
Apollo Global Management, LLC
212-822-0540
ngunn@apollolp.com

For media inquiries regarding Apollo:

Charles Zehren
Rubenstein Associates, Inc. for Apollo Global Management, LLC
(212) 843-8590
czehren@rubenstein.com

*Crestview*

Jeffrey Taufield/Daniel Yunger
Kekst and Company
212-521-4800
jeffrey.taufield@kekst.com/daniel.yunger@kekst.com

3

EXHIBIT C

*Reverence*

Milton Berlinski
Co-Founder and Managing Partner
Reverence Capital Partners
212-804-8022
milton.berlinski@reverencecapital.com

4

EXHIBIT C

Request a free trial     Login to Debtwire

MENU

Acuris Debtwire
An Acuris company

(https://acu.com)

(/info/trying-
solve-
enigma-
bdc-
valuation-
middle-
market-
memo)

# CASE PROFILE: Cumulus Media RSA hands 83.5% of equity to TL holders

30 November 2017

(#facebook) (#twitter) (#linkedin) (#email)

Radio broadcasting company **Cumulus Media** filed for Chapter 11 protection last night (29 November) with a restructuring support agreement (RSA) in hand. The RSA would give 83.5% of the company's reorganized equity to its holders of its term loan, and the proposal is backed by holders of about 69% of those lenders. Holders of a USD 610m 7.75% senior note due 2019 would get 16.5% of the new stock.

Along with the consenting term loan lenders, shareholder Crestview Radio Investors also supports the RSA. Cumulus is not currently seeking approval to use debtor-in-possession (DIP) financing, but is asking the court to authorize the use of cash collateral. A first-day hearing is scheduled for Friday (1 December) at 12:30pm ET in the US Bankruptcy Court for the Southern District of New York,

| | | | FIRST DAY STATS | | | | |
|---|---|---|---|---|---|---|---|
| Court | Judge | Petition Date | Case Number | First Day Hearing | Debtor Entities | Assets (USD) | Liabilities (USD) |
| SDNY | Shelley C. Chapman | 29 November 2017 | 17-13381 | 1 December at 12:30 p.m. (EST) | 37 | 1bn—10bn | 1bn—10bn |

CLICK HERE (http://www.debtwire.com/dockets/cases/?ysb=1-17-bk-13381) to view all **Cumulus Media** Chapter 11 filings on **Debtwire Dockets**.

content/live/document-repository/document/ryhQ57plz)

(https://cdn.mmgache.net/editorial-

## The company

Cumulus radio broadcasting reaches 245m people every week through radio stations it owns and operates, according to a first-day declaration from John Abbot, the company's CFO and executive vice president.

10/15/2018
CASE PROFILE: Cumulus Media RSA hands 83.5% of equity to TL holders | Debtwire

Acuris Debtwire
An Acuris company
(https://acuris.com)

Cumulus Media Inc.
Structure Chart



(https://cdn.mmgcache.net/editorial-content/live/document-repository/document/SyyVeRolz)

The company divides its operations into two segments. The radio station segment owns and operates 446 radio stations across the country. Cumulus's **Westwood One** brand runs its radio network segment, which syndicates content and services to about 8,000 other radio station affiliates.

The company-owned radio stations serve 90 different markets located across 36 states and Washington, DC, Abbot said. In addition, Westwood One is one of the largest radio networks in the country by number of station affiliates. It produces, syndicates and distributes owned-content and services, as well as content and services produced by partnering with third parties. Westwood One sells its content to station affiliates in exchange for commercial air time, which it in turn sells to national advertisers.

Abbot said Cumulus and other radio broadcasting companies derive their primary revenue by selling advertising time to local, regional and national spot advertisers. Radio networks like the Westwood One division derive revenue from the sale of advertising time primarily to national network advertisers. Given audience variety and low advertising rates compared to other media, Abbot said radio is considered a cost-effective, efficient means of reaching specifically identified demographic groups – especially since many radio stations are classified into specific genres like country, rock, oldies, or news and talk.

Cumulus does generate revenue from non-broadcast sources as well, Abbot said. The other revenue outlets include events and digital sources – such as advertising from Cumulus's digital streaming programing, website ads, podcast ads, and the sale of third-party digital products and services.

As of 31 December 2016, Cumulus employed about 5,479 people. In 2016, Cumulus generated operating revenues of USD 1.1bn.

**The debt**

On 23 December 2013, Cumulus entered into an amended credit agreement with lenders and agents for an initial USD 2bn term loan, maturing in December 2020, and a revolving facility maturing in December 2018, under which USD 200m was available to borrow. USD 1.7bn is outstanding as of the petition date on the term loan, according to the first-day declaration. There are no amounts due under the revolving facility.

EXHIBIT D

MENU

Login to Debtwire

Request a free trial

A Acuris Debtwire
(https://acuris.com)
(https://www.debtwire.com)

## CAPITAL STRUCTURE (USDm) at 29 November 2017

| | Coupon | Maturity | Face Amount Outstanding | Adjustments | Pro Forma |
|---|---|---|---|---|---|
| USD 200m Revolving Credit Facility | L+3.25% | 29-Dec-18 | | | |
| USD 2bn Term Loan | L+3.25% | 23-Oct-20 | 1,729 | (1,729) | - |
| Accrued and Unpaid Interest (as of 29 November) | | | 6 | (6) | - |
| First Lien Term Loan Exit Facility | L+4.50% | 13-May-22 | - | 1,300 | 1,300 |
| **Cumulus Media Secured Debt** | | | **1,735** | **(435)** | **1,300** |
| USD 610m 7.75% Senior Unsecured Notes | 7.750% | 01-May-19 | 610 | (610) | - |
| Accrued and Unpaid Interest (as of 29 November) | | | 27 | (27) | - |
| **Cumulus Media Unsecured Debt** | | | **637** | **(637)** | **-** |
| **Total Consolidated Debt** | | | **2,372** | **(1,072)** | **1,300** |

(https://cdn.mmgcache.net/editorial-content/live/document-repository/document/?!cxy.RTIz)

The company issued its 7.75% senior notes due 2019 on 13 May 2011. Abbot said the proceeds were used to repay USD 575.8m under a term loan from a prior credit agreement. On 16 September 2011, Cumulus entered into an indenture governing the notes. The noteholders have a USD 637.3m listed unsecured claim.

EXHIBIT D

10/15/2018

CASE PROFILE: Cumulus Media RSA hands 83.5% of equity to TL holders | Debtwire

Acquire Debtwire
(https://acq/info.com)   Login to Debtwire   a free trial

MENU

## TOP 20 UNSECURED CREDITORS

| Name of Creditor | Contact Information | Nature of Claim | Claim Amount (USD) |
|---|---|---|---|
| 1. US BANK NATIONAL ASSOCIATION | WILLIAM ECHOLS / Fax: (404) 898-8844 Email: WILLIAM.ECHOLS@USBANK.COM | 7.75% Senior Notes | 637,314,000 |
| 2. NIELSEN AUDIO, INC. | SEAN R. CREAMER CEO / Phone: (410) 312-8000 Fax: (410) 312-8607 | Trade Debt | 6,653,543 |
| 3. BROADCASTERS GENERAL STORE INC | KERSTIN KERRY CEO / Phone: (352) 622-7700 Fax: (352) 629-7000 | Trade Debt | 967,596 |
| 4. BROADCAST MUSIC, INC. | MICHAEL O'NEILL, PRESIDENT & CEO / Phone: (615) 401-2000 Email: NASHVILLE@BMI.COM | Trade Debt | 789,812 |
| 5. IGT MEDIA HOLDINGS, INC. | MARK MECHANIC, COO / Phone: (305) 573-2800 Fax: (305) 573-2120 | Trade Debt | 286,299 |
| 6. KESN OPERATING, LTD. | JOHN HARE, PRESIDENT | Trade Debt | 273,333 |
| 7. LIVE NATION | MICHAEL RAPINO, PRESIDENT, CEO & DIR. Phone: (310) 867-7000 / Fax: (302) 636-5454 | Trade Debt | 238,652 |
| 8. ENTICENT, LLC DBA TRITON DIGITAL | NEAL SCHORE, CEO / Phone: (514) 448-4037 Email: HELP@TRITONDIGITAL.COM | Trade Debt | 198,255 |
| 9. OAKLAND RAIDERS | MARK DAVIS, OWNER / Phone: (510) 864-5000 Email: FEEDBACK@RAIDERS.COM | Trade Debt | 190,000 |
| 10. CNN, INC. | JEFF ZUCKER, PRESIDENT / Phone: (404) 827-1700 | Trade Debt | 161,057 |
| 11. MERLIN MEDIA, LLC | RANDY MICHAELS, CEO / Phone: (312) 245-1200 | Trade Debt | 144,772 |
| 12. BAKER INTERACTIVE SERVICES, LLC | KEITH HICKS III, MEMBER / Phone: (770) 441-2000 Fax: (770) 449-7719 / Email: SALES@BAKERAUDIOVISUAL.COM | Trade Debt | 102,831 |
| 13. NAVINT PARTNERS, LLC | MR. JIM MARTINDALE, MANAGING PARTNER AND CEO Phone: (914) 393-3397 | Trade Debt | 87,040 |
| 14. MICHAEL CRONIN ACOUSTIC CONSTRUCTION LLC | MICHAEL CRONIN, OWNER / Phone: (615) 473-7778 | Trade Debt | 60,961 |
| 15. MUSICTOGO LLC | | Trade Debt | 58,889 |
| 16. COURTSIDE, LLC | NORMAN PATTIZ, CEO / Phone: (310) 858-0886 Fax: (310) 858-9710 | Trade Debt | 56,090 |
| 17. ALSTON & BIRD LLP | BRENDA C. MARTIN, DIRECTOR OF CLIENT FINANCIAL SERVICES / Fax: (404) 253-8499 Phone: (404) 881-7000 / Email: BRENDA.MARTIN@ALSTON.COM | Trade Debt | 52,817 |
| 18. ACT 1 SYSTEMS, INC. | ROBERT FITE & ERIC ROSENBERG / Phone: (818) 347-6400 Email: RFITE@ACT1SYSTEMS.COM; ERIC@ACT1SYSTEMS.COM | Trade Debt | 45,728 |
| 19. GATESAIR, INC. | BRUCE SWAIL, CEO Phone: (800) 622-0022 / Email: INFORMATION@GATESAIR.COM | Trade Debt | 45,596 |
| 20. CAITLIN FERRARI, ALYSSA U, MA-RIA P., AND MELISSA M. ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED | ATTN: SEAN E. COONEY, ESQ. / Phone: (716) 852-1886 ATTN: CHRISTOPHER MARLBOROUGH, ESQ. Phone: (212) 991-8960 / Phone: (212) 363-7500 | Litigation | Undetermined |

*Source: Voluntary Chapter 11 Petition*

(https://cdn.mmgcache.net/editorial-

content/live/document-repository/document/SxvFcpagz)

Cumulus also previously had an accounts receivable securitization facility with Wells Fargo Capital Finance, but at the end of 2015 and 2016 there were no amounts outstanding. The facility was terminated on 28 November of this year.

As of 13 November, there were 1,027 holders of Cumulus's Class A common stock and one holder of its Class C common stock. No Class B stock was issued or is outstanding.

### The descent

Between 1998 and 2013, Cumulus completed about USD 5bn worth of acquisitions to grow both its radio network and radio station businesses. Its largest acquisition was Citadel Broadcasting in 2011.

EXHIBIT D

4/11

MENU

## Acct Debtwire

(https://acp) Rights to projections ended up being "erroneous," he added. Additionally, Abbot noted that management decisions failed to achieve desired results, so the company didn't reach cash flow projections it had made to support paying for the acquisitions, particularly Citadel and then Dial Global – now known as the Westwood One business – in 2013.

...Request a free trial to develop the necessary management and technology infrastructure to integrate the assets and support and manage its expanded portfolio, Abbot said. Certain...

Abbot said underperformance resulted in leverage levels significantly in excess of original projections. This issue caused the company's performance to falter so much that from 2012 on, it faced declining year-over-year ratings, revenue, and EBITDA, according to court documents.

In addition to Cumulus's historical underperformance, advertiser and listener demand for radio overall has been negatively impacted by content and advertising opportunities in growing digital streaming and web-based digital formats, Abbot said. The shift has resulted in declines in radio industry revenue and listenership, he added.

As a result of industry pressures, coupled with the high acquisition prices and resulting poor performance, Cumulus found itself with an excess of debt relative to its earnings and "rapidly" faced approaching maturities on funded debt, Abbot said.

### Restructuring talks

In 2015, Cumulus began to consider balance sheet restructuring options to address maturities under its credit agreement and indenture, according to court documents. On 7 December 2016, the company announced it had entered into a refinancing support agreement with holders of about 57.3% of its outstanding senior notes in contemplation of a private exchange offer. The offer would refinance the notes, reduce outstanding principal on funded debt, and address upcoming maturities, court papers showed.

Cumulus launched the offer on 12 December 2016. At the same time, the company filed a complaint in the US District Court for the Southern District of New York against the administrative agent under its existing credit agreement seeking a declaratory judgment that the company was authorized to proceed with its refinancing. Cumulus also asked the court to require the agent to comply with contractual obligations to consent. On 24 February of this year, the court denied the motion for summary judgment. Subsequently, Cumulus terminated its private exchange and refinancing support agreement on 10 March.

Cumulus then began negotiations for a potential restructuring with advisors to ad hoc groups of its term loan lenders and holders of the senior notes. The lenders on the term loan ad hoc committee are: Eaton Vance Management; Franklin Mutual Advisers; Highland Capital Management; JP Morgan Chase Bank; Silver Point Finance; Voya Investment Management; Beach Point Capital Management; Symphony Asset Management; and Nuveen Fund Advisors.

The noteholder ad hoc group includes Angelo, Gordon & Co.; Brigade Capital Management; Capital Research and Management; Greywolf Capital Management; and Waddell & Reed Investment Management.

In September of this year, Cumulus executed non-disclosure agreements with members of the groups to further negotiations. On September 26, along with restructuring advisors, it held separate meetings with the noteholders and the term loan lenders. At the meetings, Cumulus presented the framework for a restructuring proposal. Each ad hoc group presented the company with their own initial restructuring proposal during the first week of October.

Abbot said Cumulus continued to negotiate terms with each of its creditor constituencies during October to reach a deal. By the end of the month, the company's negotiations with the ad hoc noteholder group had produced a "general alignment" on terms for an out-of-court restructuring and if that failed, a potential in-court restructuring, Abbot said. The proposed terms included reinstating the term loan and equitizing the senior notes. At the same time, Cumulus was also making progress in its negotiations with the ad hoc lender group.

On 30 October, the board of directors authorized Cumulus to forego a USD 23.6m interest payment on its senior notes due 1 November and enter a 30-day grace period.

### The RSA and Chapter 11 case

On 29 November, Cumulus entered into its RSA backed by consenting term loan lenders holding about 69% of the loans and filed for bankruptcy on the same day. Under the proposed treatment, the term loan lenders would get a USD 1.3bn first lien term loan and 83.5% of the company's reorganized equity.

Login to Debtwire

Request a free trial

MENU

A Ac_____
(https://acuris.com)

## NEW FIRST LIEN DEBT TERM SHEET

| | |
|---|---|
| Borrower | Reorganized Cumulus |
| Guarantors | The direct parent of Reorganized Cumulus and all present and future wholly-owned subsidiaries of the Parent (subject to exceptions that are substantially consistent with those set forth in the Existing Credit Agreement, excluding any exception for Unrestricted Subsidiaries) |
| Amount | USD 1.3bn |
| Admin Agent | JPMorgan Chase Bank |
| Interest Rate | LIBOR +4.5% (1% LIBOR floor) or ABR +3.5% (2% ABR floor) |
| Maturity Date | 15 May 2022 |
| Amortization | 1% of the aggregate outstanding principal amount of the New First Lien Debt as of the Effective Date shall be payable annually to be repaid in equal quarterly installments. |
| Security | First priority security interests in all the assets of the Borrower and the Guarantors in a manner substantially consistent with the Existing Credit Agreement (subject to certain exceptions) |

Source: RSA

(https://cdn.mmgcache.net/editorial-content/live/document-

repository/document/ryXvca8gG)

The senior noteholders, along with other general unsecured creditors, would get a pro rata share of 16.5% of new common stock, subject to dilution from a post-emergence management incentive program. Current equity holders would be wiped out.

EXHIBIT D

6/11

## PROPOSED PLAN DISTRIBUTIONS (USD)

| Class | Proposed Recoveries / Plan Treatment |
|---|---|
| Administrative Priority Tax Other Priority Claims Other Secured Claims | Either (a) reinstated, (b) receive cash equal to the full amount of its claim, or (c) delivery of the collateral security (for other secured claims). |
| Term Loan Claims | USD 1.3bn if new first lien term loans and 83.5% of reorganized equity. - There could be an alternate bundling of securities to account for CLO funds holding term loan claims |
| Convenience Claims | Cash in an amount equal to 100% of the allowed claim, though total cash distributions are not to exceed USD 2m without lender consent. Convenience claims = USD 20,000 GUC claim or less |
| Senior Notes Claims | 16.5% of reorganized equity |
| GUCs | Pro rata share in the Unsecured Equity Recovery Pool |
| Section 510(b) Claims | The Section 510(b) Claims shall be subordinated to all other claims against the Company, receive no distribution and be discharged. |
| Cumulus Interests | Cancelled and receive no distributions |
| Intercompany Claims | Either (a) reinstated or (b) discharged without any distribution. |
| Intercompany Interests | Either (a) reinstated or (b) cancelled without any distribution. |

## OTHER KEY TERMS

| | |
|---|---|
| ABL/Revolving Facility | Reorganized Cumulus can enter into a new USD 50m: <br> • revolving credit facility or a receivable securitization facility, subject to a borrowing base consisting of accounts receivable, or <br> • revolving loan facility secured by substantially all of the Reorganized Cumulus's assets on a pari passu basis with the New First Lien Debt. <br> The facility will be undrawn as of the effective date. |
| Board of Directors | The Board of Directors will consist of Mary Berner, as President and Chief Executive Officer of the Company, and six directors chosen by the Term Lender Group |

Source: RSA

(https://cdn.mmgcache.net/editorial-content/live/document-

repository/document/rIKd9p.peG)

10/15/2018

CASE PROFILE: Cumulus Media RSA hands 83.5% of equity to TL holders | Debtwire

(https://acuris.com)
Login to Debtwire    Request a free trial    MENU

## MANAGEMENT INCENTIVE PLAN

| Incentive Equity Pool | 10% of common stock reserved for members of the board and senior management<br><br>• 9.25% allocated for senior management ("Management Pool")<br>• 0.75% allocated for board members ("Board Pool") |
|---|---|
| Grants | **Emergence Grants**<br>• 55% of the Management Pool will be allocated at Emergence<br>• Each grant will be 50% in restricted stock units and 50% in five (5) year stock options priced at a per share value equating to USD 513.8m equity value.<br>**Post-Emergence Grants**<br>• Remaining 45% of Management pool to be allocated post-emergence in the form of equity-base awards |
| Board Pool | Issued as RSUs and/or Options allocated evenly among non-executive board members (though non-executive Chairman may receive up to a double allocation). |
| 2018 Incentive Cash Compensation | Management agrees to tie target 2018 incentive cash compensation to USD 236m of EBITDA for 2018. |
| Vesting | **Normal Vesting**<br>• 50% of the RSUs will vest in ratable installments on 12/31/18, 12/31/19 and 12/31/20 based upon achieving the target EBITDA of USD 236m, USD246m, and USD 270m, respectively, with 50% of each installment vesting on such date based upon achieving between 90% and 100% of the target EBITDA for such year.<br>• 50% of the RSUs and 100% of the Options will vest in ratable installments on the first four (4) anniversaries of the Emergence Date on the following schedule: 30%/30%/20%/20%.<br>**Accelerated Vesting**<br>• For termination without cause: the Executive will become vested in an additional tranche of the Executive's unvested Emergence Grant as if the Executive's employment continued for one additional year following the Qualifying Termination date.<br>• For change of control: 100% of the Executive's unvested RSUs and Options will accelerate and vest. If terminated within 3 months or within 12 months following a change of control. |

*Source: RSA*

repository/document/ryMZ5aagM)

The RSA requires Cumulus to complete its restructuring within 180 days. The company has to file a plan and disclosure statement by 8 December. Cumulus has to get disclosure statement approval by at least 28 February 2018 and plan confirmation by 27 April 2018. Plan emergence must occur by 29 May under the RSA.

## MILESTONES

| | |
|---|---|
| Entry of interim cash collateral order | 2 December |
| File plan and disclosure statement | 8 December |
| Entry of final cash collateral order | 29 December |
| Entry of disclosure statement order | 27 February |
| Entry of confirmation order | 27 April 2018 |
| Plan effective date | 28 May 2018 |

*Source: RSA*

repository/document/Hkrl96pxz)

At the company's hearing on Friday, it will seek approval of first-day motions, including authority to use its cash collateral. Cumulus's other proposed motions seek approval to pay employees, honor prepetition obligations to on-air radio talent, and pay utilities, among other things.

(https://cdn.mmgcache.net/editorial-content/live/document-

(https://cdn.mmgcache.net/editorial-content/live/document-

EXHIBIT D

8/11

10/15/2018

CASE PROFILE: Cumulus Media RSA hands 83.5% of equity to TL holders | Debtwire

Request a free trial    Login to Debtwire    MENU

(https://acq/info/)

## MATERIAL CASH COLLATERAL TERMS

| | |
|---|---|
| Entities with interest in the Cash Collateral | The secured parties |
| Use of Cash Collateral | (i) costs of administering chapter 11, including adequate protection payments; (ii) any court-authorized payments; (iii) working capital and CapEx; (iv) funding the Carve-Out; and (v) other general corporate purposes. |
| Amount | The cash collateral includes all of the debtors' cash (other than cash securing certain L/C reimbursement obligations) and all cash proceeds of the collateral. |
| Adequate Protection | **Adequate Protection Liens:**<br>To the extent of any diminution in value of the collateral and subject only to the Carve-Out and Permitted Prior Liens:<br>• First-priority liens on all of the Debtors' rights in tangible and intangible assets, including the Collateral and unencumbered property (including avoidance action proceeds after entry of final CC order).<br>• Junior liens on all tangible and intangible assets that are subject to valid and unavoidable liens (either perfected pre-petition or post-petition in accordance with Bankruptcy Code section 546(b).<br><br>**Superpriority Claims:**<br>• Allowed superpriority administrative expense claims pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code.<br><br>**Adequate Protection Payments:**<br>• Professional fees and expenses of the lender group and admin agent;<br>• All accrued and unpaid interest and L/C fees owed through the petition date; and<br>• Interest payments at non-default rate (Eurodollar Rate + 3.25%, subject to 1% floor"). |
| Carve Out | USD 4m |
| Investigation Budget / Challenge Period | Investigation Budget: USD 75,000 for UCC<br>Challenge Period: 60 days from entry of final CC order |

*Source: Cash Collateral Motion*

(https://cdn.mmgcache.net/editorial-content/live/document-

repository/document/rJ8Sc6TeG)

**The advisors**

EXHIBIT D

Δ Acu
(https://acu.info.com)

MENU

Login to Debtwire

uest a free trial

## KNOWN ADVISORS

| Party | Legal | Financial | Other |
|---|---|---|---|
| Debtors | Paul, Weiss, Rifkind, Wharton & Garrison* Paul Basta | Lewis R. Clayton Jacob A. Adlerstein | Claudia R. Tobler Nicole L. Greenblatt, P.C. | Alice Nofzinger Robert A. Britton | Benjamin M. Rhode | Alvarez & Marsal North America (restructuring advisor) PJT Partners* (investment banker) | Epiq Bankruptcy Solutions (claims agent) |
| Ad Hoc Lender Group | Arnold & Porter Kaye Scholer* Michael B. Solow | Seth J. Kleinman Sarah Gryll | Michael D. Messersmith | FTI Consulting Inc.* Fortgang Consulting Aloise & Associates | Members Eaton Vance Management and Boston Management & Research* Franklin Mutual Advisers Highland Capital Management JPMorgan Chase Bank, N.A. Silver Point Finance Symphony Asset Management and Nuveen Fund Advisors* Voya Investment Management Co. Beach Point Capital Management |
| Ad Hoc Senior Noteholder Group | Akin Gump Strauss Hauer & Feld* | Houlihan Lokey* | Members Angelo, Gordon & Co. Brigade Capital Management Capital Research and Management Co.* Greywolf Capital Management Waddell & Reed Investment Management Co. |
| JPMorgan Chase Bank (Loan Agent) | Simpson Thacher & Bartlett | | |
| U.S. Bank (Indenture Trustee) | Kelley Drye & Warren James S. Carr | Benjamin D. Feder | | |
| Consenting Equity Holders | | | Crestview Radio Investors Lewis W. Dickey, Jr. John W. Dickey Michael W. Dickey Lewis W. Dickey, Sr. DDBC, LLC |

Source Court Documents: *Debtwire sourced mandates.

(https://cdn.mmgcache.net/editorial-

content/live/document-repository/document/ytVqITkz)

CLICK HERE (http://www.debtwire.com/document-repository/document/B17HsbBxG) to view the Chapter 11 petition.
CLICK HERE (http://www.debtwire.com/document-repository/document/krA66l8z) to view the RSA.
CLICK HERE (http://www.debtwire.com/document-repository/document/HK3sTazz) to view the first-day declaration.
CLICK HERE (http://www.debtwire.com/document-repository/document/Hk2OcpBlM) to view the cash collateral motion.
CLICK HERE (http://www.debtwire.com/companies/view/prime-52274) to view All Intelligence for Cumulus Media.

## Products
Debtwire
Xtract Research
Creditflux

## What We Do
What is Debtwire
How can we help
Take a look around

## News & Events
Debtwire Exclusives
Publications
Events
Partnerships

## About
Careers
Contact

in

EXHIBIT D

CASE PROFILE: Cumulus Media RSA hands 83.5% of equity to TL holders | Debtwire

Request a free trial          Login to Debtwire          MENU

## AcuriDebtwire
An Acuris company
(https://acuris.com/)

## Acuris
(https://www.acuris.com/)

### Fixed Income

⋗ Debtwire
An Acuris company

⋗ Xtract Research
An Acuris company

⋗ Creditflux
An Acuris company

### Transactions & Infrastructure

⋖ Mergermarket
An Acuris company

⋖ Unquote
An Acuris company

⋖ AVCJ
An Acuris company

⋖ Activistmonitor
An Acuris company

⋖ Inframation
An Acuris company

### Equities

⋗ Dealreporter
An Acuris company

⋗ PaRR
An Acuris company

⋗ TIM
An Acuris company

### Research

⋗ Acuris Studios

⋗ Perfect Information
An Acuris company

### Compliance

⊓ Hedge Fund Law Report
An Acuris company

⊓ Anti-Corruption Report
An Acuris company

⊓ Cybersecurity Law Report
An Acuris company

⊽ Wealthmonitor
An Acuris company

⊽ Acuris Risk Intelligence

⊓ Capital Profile
An Acuris company

All content © Mergermarket Limited 2018 (03879547 UK).

Terms of Use    Privacy Notice    Group Disclaimer    Policies

EXHIBIT D

11/11

# Venerable Holdings Completes Acquisition from Voya Financial

### *Former Voya Closed Block Variable Annuity Business Launches Today as Standalone Company*

**June 1, 2018**

WEST CHESTER, PA – Venerable Holdings, Inc. ("Venerable") today announced the completion of its acquisition of Voya Financial, Inc.'s ("Voya") (NYSE: VOYA) Closed Block Variable Annuity (CBVA) business. As announced in December 2017, Voya has divested its CBVA business to Venerable, a private company established to serve as a leading industry solution for the consolidation of closed variable annuity blocks. Venerable was created by a consortium of investors led by affiliates of Apollo Global Management, LLC (NYSE: APO), Crestview Partners, Reverence Capital Partners, and Athene Holding Ltd. ("Athene") (NYSE: ATH). Voya also owns a minority position in Venerable.

"This transaction demonstrates our strong belief in the attractiveness of the annuity business and the substantial growth opportunity it represents," stated David Marcinek, Chairman and Senior Managing Director, Venerable Holdings, Inc. "As a focused, standalone business, Venerable is well-positioned to deliver best in class service to our policyholders, solutions to the annuity industry and strong financial value to our investors."

"We now begin our journey with an experienced and talented team of professionals, well-prepared to meet our financial and business goals," said Patrick Lusk, President and CEO of VIAC, the operating company for Venerable. "Through our investment partners, we have a solid financial foundation, and we are committed to pursuing steady long-term growth."

In connection with the transaction that was completed today, Athene will reinsure approximately $19 billion of Voya's fixed and fixed indexed annuities from Venerable and Voya, all of which will be administered by Venerable, and Athene Asset Management will provide asset management services for these fixed annuities. Voya Investment Management will serve as the preferred asset management partner for Venerable's variable annuities.

Barclays served as financial advisor and Sidley Austin, LLP served as legal counsel to Venerable in connection with this transaction.

EXHIBIT E

*About Venerable*

*Venerable is a privately held company with business operations based in West Chester, Pennsylvania and Des Moines, Iowa. Venerable owns and manages the legacy variable annuity business acquired from Voya Financial, Inc. Created by an investor group led by affiliates of Apollo Global Management, LLC, Crestview Partners, Reverence Capital Partners, and Athene Holding, Ltd., Venerable is an emerging business with well-established, strategic investors, experienced in successfully building and growing insurance businesses with patient, long-term capital. For more information, please visit www.venerableannuity.com.*

**Contact:**

Allison Proud, 610-425-4269

Corporate Communications

Allison.Proud@venerableannuity.com

EXHIBIT E

2/7/2018                    Victory Capital Announces Pricing of Initial Public Offering | Victory Capital

# Press Releases

# VICTORY CAPITAL ANNOUNCES PRICING OF INITIAL PUBLIC OFFERING

February 7, 2018 at 7:32 PM EST

CLEVELAND--(BUSINESS WIRE (https://www.businesswire.com/))--Victory Capital Holdings, Inc. ("Victory Capital") today announced the pricing of its initial public offering of 11,700,000 shares of its Class A common stock at a public offering price of $13.00 per share. The shares are expected to begin trading on the Nasdaq Global Select Market on February 8, 2018, under the ticker symbol "VCTR".

Additionally, Victory Capital has granted the underwriters a 30-day option to purchase up to an additional 1,755,000 shares of its Class A common stock at the initial public offering price, less underwriting discounts and commissions. The offering is expected to close on or about February 12, 2018, subject to customary closing conditions.

J.P. Morgan, BofA Merrill Lynch and Morgan Stanley are serving as joint lead book-running managers and as representatives of the underwriters for the offering. Barclays, Goldman Sachs & Co. LLC and RBC Capital Markets are also acting as joint book-running managers for the offering. Keefe, Bruyette & Woods, A Stifel Company, William Blair and Sandler O'Neill + Partners, L.P. are acting as co-managers for the offering.

A registration statement relating to these securities was filed with and has been declared effective by the U.S. Securities and Exchange Commission ("SEC"). The offering will be made only by means of a prospectus. Copies of the final prospectus related to the offering may be obtained, when available, from J.P. Morgan, c/o Broadridge Financial Solutions, 1155 Long Island Avenue, Edgewood, NY 11717, or by calling toll-free at (866) 803 9204; BofA Merrill Lynch, Attention: Prospectus Department, 200 North College Street, 3rd Floor, Charlotte, NC 28255-0001, or via email: dg.prospectus_requests@baml.com (mailto:dg.prospectus_requests@baml.com); or Morgan Stanley & Co. LLC, Attention: Prospectus Department, 180 Varick Street, 2nd Floor, New York, New York 10014.

This press release does not constitute an offer to sell or a solicitation of an offer to buy, nor shall there be a sale of these securities in any state or jurisdiction in which such an offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such state or jurisdiction.

## ABOUT VICTORY CAPITAL

Victory Capital is an integrated multi-boutique asset management firm, headquartered in Cleveland, Ohio. As of December 31, 2017, the firm had approximately $61.8 billion in assets under management and advisement. Victory Capital provides institutions, financial advisors and retirement platforms with a variety of asset classes and investment vehicles, including separately managed accounts, collective trusts, mutual funds, ETFs and UMA/SMA vehicles.

## FORWARD-LOOKING STATEMENTS

This press release may contain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These statements may include, without limitation, any statements preceded

EXHIBIT F

by, followed by or including words such as "target," "believe," "expect," "aim," "intend," "may," "anticipate," "assume," "budget," "continue," "estimate," "future," "objective," "outlook," "plan," "potential," "predict," "project," "will," "can have," "likely," "should," "would," "could" and other words and terms of similar meaning or the negative thereof. Such forward-looking statements involve known and unknown risks, uncertainties and other important factors beyond Victory Capital's control, as discussed in Victory Capital's filings with the SEC, that could cause Victory Capital's actual results, performance or achievements to be materially different from the expected results, performance or achievements expressed or implied by such forward-looking statements. Such forward-looking statements are based on numerous assumptions regarding Victory Capital's present and future business strategies and the environment in which it will operate in the future. Any forward-looking statement made in this press release speaks only as of the date hereof. Except as required by law, Victory Capital assumes no obligation to update these forward-looking statements, or to update the reasons actual results could differ materially from those anticipated in the forward-looking statements, even if new information becomes available in the future.

## Contacts

For Victory Capital Holdings, Inc.
Tricia Ross, 310-622-8226
tross@finprofiles.com (mailto:tross@finprofiles.com)



**PRINT PAGE**



**EMAIL PAGE**



**RSS FEEDS**



**EMAIL ALERTS**



**SEARCH**

Copyright Victory Capital Management Inc. ©2018

EXHIBIT F

EXHIBIT G

Cumulus' Top Trio Snags Big Bonus Checks | Radio & Television Business Report

# Cumulus' Top Trio Snags Big Bonus Checks

By Adam Jacobson – May 1, 2018



**Cumulus Media**, one of the two biggest radio companies in the U.S. — each of which are seeking Chapter 11 reorganization — has supplied the **SEC** with full details on its executive compensation for 2017.

With that, the take-home pay for President/CEO **Mary Berner**, EVP/Treasurer and CFO **John Abbot**, and SVP/General Counsel **Richard Denning** has been revealed. Each saw big bumps thanks to bonus payments awarded, based on the company's performance.

For Ms. Berner, her base salary stayed put in 2017, from 2016. This was $1.45 million.

But, her 2017 bonus was enormous compared to the one she obtained in 2016; it was exactly $3,800,101. Along with "other compensation" totaling $4,943, Berner earned a total $5,250,101 in 2017 — up from $2,537,500 in 2016.

Berner's current employment agreement was codified on Oct. 26, 2017 and runs through Sept. 29, 2018. Her base salary is "subject to increase."

At the same time, Abbott saw his base salary jump from $375,000 to $750,000, while his 2017 bonus came in at $1,495,661. Add in $2,250 in "other compensation," and he took home $2,250,604 in 2017. That's up from $987,653 in 2016.

Abbott's employment agreement was also finalized in late October 2017, and runs through Oct. 13, 2018.

For Denning, a slight adjustment in his base salary was seen, rising to $350,000 from $320,833. The big payday came by way of a bonus, too. His 2017 bonus was $896,765. With Cumulus-paid life and disability insurance premiums and company contributions to his 401(k) plan account totaling $10,124, Denning's total earnings in 2017 are $1,446,765.

That's up from $692,841 in 2016.

Denning has an employment agreement with Cumulus through Nov. 29, 2018, also agreed to in late October 2017.

**The bonus payments are tied to Cumulus' QIP" and "SIP" incentive programs — approved by Shelley Chapman**, Judge for the U.S. Bankruptcy Court for the Southern District of New York.

Cumulus' Quarterly Incentive Plan is the QIP. This was first revealed on May 18, 2017 in an SEC filing. This move saw Cumulus' Board of Director shift from an annual to a quarterly compensation plan for 2017. Additionally, the board adopted a supplemental incentive plan for 2017, the so-called SIP. This was done after being instructed to do so by the board's Compensation Committee and the committee's independent compensation consultant.

Cumulus' SIP was adopted to, among other things, "further align key senior operating executives' interests with those of stakeholders in light of the decline in value of outstanding equity awards."

Get the top Radio and TV News delivered to your inbox each afternoon.  [Sign Me Up!]

1/2

Cumulus' Top Trio Snags Big Bonus Checks | Radio & Television Business Report

**Adam Jacobson**

Adam R. Jacobson is a veteran radio industry journalist and advertising industry analyst with general, multicultural and Hispanic market expertise. From 1996 to 2006 he served as an editor at Radio & Records.

**You do not have permission to view the comments.**

Get the top Radio and TV News delivered to your inbox each afternoon.    Sign Me Up!

EXHIBIT G

2/2

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

# FORM 8-K

---

**CURRENT REPORT**
Pursuant to Section 13 or 15(d)
of the Securities Exchange Act of 1934

Date of report (Date of earliest event reported): **June 4, 2018**

# CUMULUS MEDIA INC.
(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **001-38108** | **82-5134717** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS employer Identification No.) |

**3280 Peachtree Road, N.W., Suite 2200, Atlanta, GA**
(Address of principal executive offices)

**30305**
(Zip Code)

Registrant's telephone number, including area code **(404) 949-0700**

**n/a**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**EXHIBIT H**

---

---

---

---

Amounts outstanding under the Credit Agreement bear interest at a per annum rate equal to (i) the Alternative Base Rate (as defined below) plus an applicable margin of 3.50%, subject to an Alternative Base Rate floor of 2.00%, or (ii) the London Inter-bank Offered Rate ("LIBOR") plus an applicable margin of 4.50%, subject to a LIBOR floor of 1.00%. The Alternative Base Rate is defined, for any day, as the per annum rate equal to the highest of (i) the Federal Funds Rate, as published by the Federal Reserve Bank of New York, plus 1/2 of 1.0%, (ii) the rate identified as the "Prime Rate" and normally published in the Money Rates section of the *Wall Street Journal*, and (iii) one-month LIBOR plus 1.0%.

Amounts outstanding under the Term Loan amortize in equal quarterly installments of 0.25% of the original principal amount of the Term Loan with the balance payable on the maturity date. The maturity date of the Credit Agreement is May 15, 2022.

The Credit Agreement contains representations, covenants and events of default that are customary for financing transactions of this nature. Events of default in the Credit Agreement include, among others: (a) the failure to pay when due the obligations owing thereunder; (b) the failure to perform (and not timely remedy, if applicable) certain covenants; (c) certain defaults and accelerations under other indebtedness; (d) the occurrence of bankruptcy or insolvency events; (e) certain judgments against Holdings or any of its subsidiaries; (f) the loss, revocation or suspension of, or any material impairment in the ability to use, any one or more of, any material Federal Communications Commission (the "FCC") licenses; (g) any representation or warranty made, or report, certificate or financial statement delivered, to the lenders subsequently proven to have been incorrect in any material respect; and (h) the occurrence of a Change in Control (as defined in Credit Agreement). Upon the occurrence of an event of default, the Agent may, with the consent of, or upon the request of, the required lenders, accelerate the Term Loan and exercise any of its rights as a secured party under the Credit Agreement and the ancillary loan documents, provided, that in the case of certain bankruptcy or insolvency events with respect to a borrower, the Term Loan will automatically accelerate.

The Credit Agreement does not contain any financial maintenance covenants. The Credit Agreement provides that Holdings will be permitted to enter into either a revolving credit facility or receivables facility providing commitments of up to $50.0 million, subject to certain conditions.

The borrowers may elect, at their option, to prepay amounts outstanding under the Credit Agreement without premium or penalty (except that any prepayment during the period of six months following the closing of the Credit Agreement would require a premium equal to 1.00% of the prepaid principal amount). The borrowers may be required to make mandatory prepayments of the Term Loan upon the occurrence of specified events as set forth in the Credit Agreement, including upon the sale of certain assets and from Excess Cash Flow (as defined in the Credit Agreement).

Amounts outstanding under the Credit Agreement are guaranteed by Cumulus Media Intermediate Inc. ("Intermediate Holdings"), which is a subsidiary of the Company, and the present and future wholly-owned subsidiaries of Holdings that are not borrowers thereunder, subject to certain exceptions as set forth in the Credit Agreement (the "Guarantors") and secured by a security interest in substantially all of the assets of Holdings, the subsidiaries of Holdings party to the Credit Agreement as borrowers, and the Guarantors.

Some of the lenders and the Agent under the Credit Agreement, or their affiliates, have had in the past, and may have, in the future, various relationships with the Company involving the provision of financial or other advisory services, including cash management, investment banking and brokerage services. These lenders and the Agent, or their respective affiliates, have received, and may in the future receive, customary fees for those services.

The foregoing description of the Credit Agreement does not purport to be complete and is qualified in its entirety by the full text of the Form of Credit Agreement, a copy of which is included as Exhibit 10.1 to this Current Report on Form 8-K and is incorporated by reference herein.

-3-

EXHIBIT H

**Warrant Agreement**

On the Effective Date, the Company entered into a warrant agreement (the "Warrant Agreement") with Computershare Inc., a Delaware corporation, and its wholly-owned subsidiary, Computershare Trust Company, N.A., a federally chartered trust company, as warrant agent. In accordance with the Plan and pursuant to the Warrant Agreement, on the Effective Date, the Company (i) issued 3,016,853 Series 1 warrants (the "Series 1 warrants") to purchase shares of Class A common stock or the Company's Class B common stock, par value $0.0000001 per share (the "Class B common stock" and, together with the Class A common stock, the "common stock") on a one-for-one basis at an exercise price of $0.0000001 per share, to claimants that returned ownership certifications required by the Plan ("Plan Certifications") by the Certification Deadline and (ii) issued or will issue 712,756 Series 2 warrants (the "Series 2 warrants" and, together with the Series 1 warrants, the "Warrants") to purchase shares of Class A common stock or Class B common stock on a one-for-one basis at an exercise price of $0.0000001 per share, to claimants that failed to return Plan Certifications by the Certification Deadline. The Series 2 Warrants may only be exercised for the type and amount of equity that the holder would have been entitled to receive on the Effective Date had it timely submitted its Plan Certification. The Warrants have a twenty year term and will expire on June 4, 2038.

The number of shares of common stock for which a Warrant is exercisable is subject to adjustment from time to time upon the occurrence of specified events, including: (1) the subdivision or combination of the common stock into a greater or lesser number of shares (2) upon a reclassification or recapitalization of the Company in which holders of common stock are entitled to receive cash, stock or securities in exchange for common stock and (3) a Change of Control (as defined in the Warrant Agreement).

The Company will apply for a declaratory ruling from the FCC to increase the level of foreign ownership of the Company that is permitted under applicable FCC rules. Pursuant to the Warrant Agreement, upon receipt of the declaratory ruling from the FCC, the Company is required to exchange common stock for outstanding Warrants to the extent permitted by the declaratory ruling, subject to proration among the holders of Warrants as set forth therein. If the declaratory ruling will not allow the Company to exchange for common stock all of the outstanding Warrants, then, in addition to proration among holders, all remaining Series 2 warrants will be mandatorily exchanged for Series 1 warrants.

The foregoing description of the Warrant Agreement does not purport to be complete and is qualified in its entirety by reference to the full text of the Warrant Agreement, which includes the form of certificate representing the Warrants, a copy of which is included as Exhibit 10.2 to this Current Report on Form 8-K and is incorporated by reference herein.

**Item 1.02        Termination of a Material Definitive Agreement**

**Cancellation of Certain Prepetition Obligations**

In connection with the effectiveness of and pursuant to the terms of the Plan, on the Effective Date, the obligations of Old Cumulus and its subsidiaries under the following agreements were satisfied and discharged:

- Amended and Restated Credit Agreement, dated as of December 23, 2013, by and among Cumulus Media Inc., Cumulus Media Holdings Inc., as Borrower, certain lenders, JPMorgan Chase Bank, N.A., as administrative agent, Royal Bank of Canada and Macquarie Capital (USA) Inc., as co-syndication agents, and Credit Suisse AG, Cayman Islands Branch, Fifth Third Bank, Goldman Sachs Bank USA and ING Capital LLC, as co-documentation agents (the "Canceled Credit Agreement");

- Indenture, dated as of May 13, 2011, among Cumulus Media Inc., the Guarantors named therein and U.S. Bank National Association, as Trustee, as supplemented; and

- Rights Agreement, dated as of June 5, 2017, between Cumulus Media Inc. and Computershare Trust Company, N.A., as Rights Agent (the "Rights Agreement").

-4-

EXHIBIT H

Cancellation of Prior Equity Securities

In accordance with the Plan, each share of Old Cumulus' Class A common stock, par value $0.01 per share (the "old Class A common stock"), Class B common stock, par value $0.01 per share (the "old Class B common stock"), and Class C common stock, par value $0.01 per share (together with the old Class A common stock and the old Class B common stock, the "old common stock") outstanding prior to the Effective Date, including all options, warrants or other rights, including rights issued under the Rights Agreement, to purchase such old common stock, were extinguished, cancelled and discharged, and each such share, option or warrant has no further force or effect. Furthermore, all of Old Cumulus' equity award agreements under prior incentive plans, and the awards granted pursuant thereto, were extinguished, cancelled and discharged and have no further force or effect.

**Item 2.03    Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant**

The information contained in Item 1.01 above under the sub-heading "Credit Agreement" is incorporated by reference into this Item 2.03.

**Item 3.02    Unregistered Sales of Equity Securities**

On the Effective Date, in connection with the Company's emergence from Chapter 11 and in reliance on the exemption from registration requirements of the Securities Act of 1933, as amended (the "Securities Act") provided by Section 1145 of the Bankruptcy Code, the Company issued or will issue a total of 11,052,211 shares of Class A common stock, 5,218,209 shares of Class B common stock, 3,016,883 Series 1 warrants and 712,736 Series 2 warrants to holders of Allowed Credit Agreement Claims, Allowed Senior Notes Claims and Allowed General Unsecured Claims, collectively.

Any shares of Class A common stock or Class B common stock issued pursuant to the exercise of Series 1 warrants or Series 2 warrants will similarly be issued pursuant to the exemption from registration provided by Section 1145 of the Bankruptcy Code.

The information contained in Item 1.01 of this Current Report on Form 8-K under the sub-heading "Warrant Agreement" is incorporated by reference into this Item 3.02.

**Item 3.03    Material Modification to Rights of Security Holders**

The information contained in the Explanatory Note, Item 1.02 above and Item 5.03 below under the subheading "Board of Directors" is incorporated by reference into this Item 3.03.

**Item 5.01    Changes in Control of Registrant**

The information set forth in the Explanatory Note and Item 5.02 under the subheading "Board of Directors" is incorporated by reference into this Item 5.01.

**Item 5.02    Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers**

**Board of Directors**

In accordance with the Plan, on the Effective Date, Jeffrey Marcus, Jan Baker, Jill Bright, John W. Dickey, Ralph B. Everett and Ross Oliver ceased to be members of Old Cumulus' board of directors. Also in accordance with the Plan, on the Effective Date, the Company's board of directors (the "Board") is comprised of seven members, consisting of Mary G. Berner, the Company's President and Chief Executive Officer, and the following six independent directors selected by the Term Lender Group.

-5-

EXHIBIT H

*David M. Baum*, age 53, has served as the President of Baum Media Group, LLC, an investment and consulting firm, since February 2005. From March 2013 to July 2017, Mr. Baum also served as the President of Revolution Golf, a digital media company, where he maintained responsibility for its overall strategy and operations. Prior to founding Baum Media Group, Mr. Baum served for over 18 years in various roles at Goldman, Sachs & Co., an investment bank, retiring in 2003 as a partner and Managing Director of the Mergers and Acquisitions department. Mr. Baum serves on the board of directors of the Marcus Corporation.

*Matthew C. Blank*, age 67, has served as an advisor to Showtime Networks Inc., a premium television network, since 2017. Before taking his most recent role, he served as Chairman of Showtime from 2016 to 2017 and Chief Executive Officer of Showtime from 1995 to 2015. Prior to his service at Showtime, Mr. Blank served for over 12 years in various roles at Home Box Office, Inc., a premium television network, leaving HBO as its Senior Vice President of Consumer Marketing. Mr. Blank served on the board of directors of Geeknet, Inc. from 2010 to 2015. Mr. Blank serves as a director of Creative Coalition and PENCIL Public Education Needs Civic Involvement in Learning and is a board member of The Cable Center. He is a Trustee of the Harlem Children's Zone and the American Museum of the Moving Image.

*Thomas H. Castro*, age 63, has served as the President and Chief Executive Officer of El Dorado Capital, LLC, a private equity investment firm, since December 2008. He is also the founder of IMB Development Corporation, a private equity investment firm, and has served as its Managing Director since January 2012. Previously, he was the co-founder and Chief Executive Officer of Border Media Partners, LLC, a radio broadcasting company that primarily targets Hispanic listeners in Texas, from 2002 to 2007 and as its Vice Chairman through 2008. Prior to that, Mr. Castro owned and operated other radio stations and founded a company that exported oil field equipment to Mexico. Mr. Castro served on the board of directors of Time Warner Cable, Inc. from 2006 to 2016.

*Joan Hogan Gillman*, age 55, served as Executive Vice President of Time Warner Cable, Inc., a media, telecom and cable company, and Chief Operating Officer of its Time Warner Cable Media division, for which she maintained financial responsibility, from September 2006 to June 2016. Prior to her service at Time Warner Cable, Ms. Hogan Gillman served in senior executive roles at OpenTV Corporation, a television and advertising software company, British Interactive Broadcasting Holdings Limited, a provider of interactive services for U.K. digital television, and Physicians' Online Inc., an online billing solution for physicians. Ms. Hogan Gillman currently serves on the board of directors of Arigan, Inc., Centrica PLC and InterDigital, Inc. Ms. Hogan Gillman also serves the Chairman of the board of directors of the Jesuit Volunteer Group and is a committee member of Transit Wireless.

*Andrew W. Hobson*, age 56, has served as a Partner and the Chief Financial Officer of Innovatus Capital Partners, LLC, a private investment firm, since January 2016. From 1994 to 2015, Mr. Hobson served in various roles at Univision Communications Inc., a media company, including Senior Executive Vice President and Chief Financial Officer from October 2007 through February 2015, during which time he was responsible for all financial aspects of the company. Prior to his employment at Univision, Mr. Hobson served as a Principal at Chartwell Partners LLC from 1990 to 1994.

*Brian G. Kushner*, age 59, has served as Senior Managing Director in the Corporate Finance practice of FTI Consulting, Inc., a global business management consulting firm, since 2009. Prior to joining FTI Consulting, Dr. Kushner served as the President and Chief Executive Officer of Sage Telecom, a telecommunications company and, before Sage, as President and Chief Executive Officer of Pacific Crossing Limited, a trans-Pacific telecommunications company. Early in his career, Dr. Kushner co-founded CXO, L.L.C, a bankruptcy debtor advisory and interim management firm, which was ultimately sold to FTI Consulting. He currently serves on the board of directors of Dex Media, Inc., Mudrick Capital Acquisition Corporation and Zodiac Interactive. He has previously served on the board of directors of Luxfer Holdings PLC, Pacific Crossing Limited, Damovo Group, Everyware Global, Inc. (now The Oneida Group), DLN Holdings, LLC and Caribbean Asset Holdings LLC.

All directors serve on the Board for a term ending at the annual meeting following the meeting at which the director was elected. The current class of directors will be subject to reelection at the Company's next annual meeting.

The Board's audit committee currently consists of Brian G. Kushner (chair), Thomas H. Castro and Andrew W. Hobson. The Board's compensation committee currently consists of David M. Baum (chair), Matthew C. Blank and Joan Hogan Gillman. The Board's nominating committee consists of Joan Hogan Gillman (chair), Matthew C. Blank (chair) and David M. Baum.

**EXHIBIT H**

## Indemnification Agreements

There are no transactions in which any member of the Board has an interest that requires disclosure under Item 404(a) of Regulation S-K under the Securities Act.

In accordance with the Plan, the Board has approved a form of indemnification agreement (the "Indemnification Agreement") to be entered into by members of the Board and the Company's executive officers. The Indemnification Agreement provides for the mandatory advancement and reimbursement of reasonable expenses (subject to limited exceptions) incurred by indemnitees in various legal proceedings in which they may be involved by reason of their service as directors or officers, as applicable, as permitted by Delaware law, the Charter and the Bylaws (each as defined below). Each of the Company's executive officers and directors has entered or will enter into an Indemnification Agreement. In addition, pursuant to the terms of the Plan, the indemnification obligations of Old Cumulus remain in full force and effect.

The foregoing description of the Indemnification Agreement does not purport to be complete and is qualified in its entirety by reference to the full text of the Form of Indemnification Agreement, a copy of which is included as Exhibit 10.3 to this Current Report on Form 8-K and incorporated by reference herein.

## Long-Term Incentive Compensation Plan

In accordance with the Plan and the approval of the Board, the Cumulus Media Inc. Long-Term Incentive Plan (the "Incentive Plan") became effective as of the Effective Date. The Incentive Plan is intended to, among other things, help attract, motivate and retain key employees and directors and to reward them for making major contributions to the success of the Company. The Incentive Plan permits awards to be made to consultants or to employees, directors, or consultants of an affiliate of the Company.

Unless otherwise determined by the Board, the Board's compensation committee will administer the Incentive Plan. The Incentive Plan generally provides for the following types of awards:

* stock options (including incentive options and nonstatutory options);
* restricted stock;
* stock appreciation rights;
* dividend equivalents;
* other stock based awards;
* performance awards; and
* cash awards.

The aggregate number of shares of Class A common stock reserved for issuance pursuant to the Incentive Plan is 2,222,223, representing 10% of the outstanding common stock and warrants of the Company as of the Effective Date, on a fully diluted basis. Awards can be made under the Incentive Plan for a period of ten years from June 4, 2018, subject to the right of the stockholders and the Board to terminate the Incentive Plan at any time.

The foregoing description of the Incentive Plan does not purport to be complete and is qualified in its entirety by reference to the full text of the Incentive Plan, a copy of which is included as Exhibit 10.4 to this Current Report on Form 8-K and incorporated by reference herein.

## Grant of Equity Awards

On the Effective Date and pursuant to the Plan, the Company granted 565,277 restricted stock units ("RSUs") and 565,277 stock options ("Options") under the Incentive Plan and the terms of the relevant restricted stock unit agreements (the "Restricted Stock Unit Agreements") and stock option agreements (the "Option Agreements"), as applicable, to certain employees, including its executive officers (collectively, "Management"), representing an aggregate of 1,130,554 shares of Class A common stock (collectively, the "Management Emergence Awards").

-7-

EXHIBIT H

Fifty percent (50%) of the RSUs granted to Management vest ratably on each of December 31, 2018, 2019 and 2020, subject to certain performance-based criteria. Of the remaining fifty percent (50%) of the RSUs and one hundred percent (100%) of the Options granted to Management, 30% will vest on each of the first two anniversaries of the Effective Date, and 20% will vest on each of the third and fourth anniversaries of the Effective Date. The vesting of each of the Management Emergence Awards is also subject to, among other things, each such employee's continued employment with the Company.

If an employee's employment is terminated by the Company or its subsidiaries without Cause, by the employee for Good Reason (each, as defined in the award agreement) or due to a termination of employment with the Company or its subsidiaries by reason of death or Disability (as defined in the award agreement), such employee will become vested in an additional tranche of the unvested Management Emergence Awards as if the employee's employment continued for one (1) additional year following the qualifying termination date; provided, that with respect to the Chief Executive Officer and Chief Financial Officer, (i) an amount equal to 50% of the unvested components of the Management Emergence Awards will accelerate and vest (75% if such termination occurs on or before the first (1st) anniversary of the Effective Date) and (ii) vested Options will remain outstanding until the expiration date of such Option. If an employee's employment is terminated by the Company or its subsidiaries without Cause or by the employee for Good Reason, in other instance at any time within the three month period immediately preceding, or the twelve month period immediately following, a Change in Control (as defined in the award agreement), such employee will become vested in all unvested Management Emergence Awards.

In addition, on the Effective Date and pursuant to the Plan, the Company granted each non-employee director 5,402 (10,804 for Mr. Hobson) RSUs and 2,701 (5,402 for Mr. Hobson) Options under the Incentive Plan and the terms of the relevant Restricted Stock Unit Agreements and Option Agreements, as applicable, representing an aggregate of 56,721 shares of Class A common stock (the "Director Emergence Awards"). The RSUs and Options granted to each non-employee director vest in four equal installments on the last day of each calendar quarter, commencing with the calendar quarter in which the grant occurs. The vesting of each of the Director Emergence Awards is also subject to, among other things, each such non-employee director's continued role as a director with the Company. Upon a Change in Control, all unvested Director Emergence Awards will fully vest.

The foregoing description of the Restricted Stock Unit Agreements and Option Agreements does not purport to be complete and is qualified in its entirety by reference to the full text of the Form of Restricted Stock Unit Agreements and the full text of the Form of Option Agreements, copies of which are included as Exhibits 10.5, 10, 6 and 10.7, and 10.8, 10.9 and 10.10, respectively, to this Current Report on Form 8-K and incorporated by reference herein.

**Item 5.03**  **Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year**

Pursuant to the Plan, the Company amended and restated its certificate of incorporation (the "Charter") and bylaws (the "Bylaws"), each of which became effective on the Effective Date. The Charter authorizes the Company to issue up to 100,000,000 shares of Class A common stock and 100,000,000 shares of Class B common stock. The Charter also authorizes the Company to issue up to 100,000,000 shares of preferred stock, par value $0.0000001 per share ("preferred stock"), of none which were issued pursuant to the Plan.

**Description of Capital Stock**

*Authorized Capital*

The Company has the authority to issue a total of 100,000,000 shares of Class A common stock, 100,000,000 shares of Class B common stock and 100,000,000 shares of preferred stock.

*Voting Rights*

Subject to any voting rights granted to preferred stock that may be outstanding from time to time, each share of the Company's Class A common stock shall be entitled to one vote per share on each matter submitted to a vote of the Company's stockholders. Except as provided below and as otherwise required by the Charter, Bylaws or by applicable law, the holders of Class A common stock shall vote together as one class on all matters submitted to a vote of stockholders generally (or if any holders of shares of preferred stock are entitled to vote together with the holders of common stock, as a single class with such holders of shares of preferred stock).

-8-

EXHIBIT H

Holders of Class B common stock are generally not entitled to vote such shares on matters submitted to a vote of the Company's stockholders. Notwithstanding the foregoing, holders of Class B common stock are entitled to one vote per share of Class B common stock, voting as a separate class, on any proposed amendment or modification of any specific rights or obligations that affect holders of Class B common stock and that do not similarly affect the rights or obligations of the holders of Class A common stock. In addition, holders of Class B common stock are entitled to one vote per share of Class B common stock, voting together with the holders of Class A common stock, on each of the following matters, if and only if any such matter is submitted to a vote of the stockholders (provided that the Company may take action on any of the following without a vote of the stockholders to the extent permitted by law):

a) the retention or dismissal of outside auditors by the Company;

b) any dividends or distributions to the stockholders of the Company;

c) any material sale of assets, recapitalization, merger, business combination, consolidation, exchange of stock or other similar reorganization involving the Company or any of its subsidiaries;

d) the adoption of any new or amended Charter;

e) other than in connection with any management equity or similar plan adopted by the Board, any authorization or issuance of equity interests, or any security or instrument convertible into or exchangeable for equity interests, in the Company or any of its subsidiaries; and

f) the liquidation of the Company or any of its subsidiaries.

The Charter and Bylaws do not provide for cumulative voting. The holders of a plurality of the shares of common stock entitled to vote and present in person or represented by proxy at any meeting at which a quorum is present called for the purpose of electing directors will be entitled to elect the directors of the Company. The holders of a majority of the shares of common stock issued and outstanding and entitled to vote, and present in person or represented by proxy, will constitute a quorum for the transaction of business at all meetings of the stockholders.

All directors will be elected annually commencing at the Company's next annual meeting of stockholders.

*Dividend Rights*

Subject to the preferences applicable to any preferred stock outstanding at any time, if any, the holders of shares of common stock shall be entitled to receive such dividends and other distributions in cash, property or shares of stock as may be declared thereon by the Board from time to time out of the assets or funds legally available; except that in the case of dividends or other distributions payable on the Class A common stock or Class B common stock in shares of such stock, including distributions pursuant to stock splits or dividends, only Class A common stock will be distributed with respect to Class A common stock and only Class B common stock will be distributed with respect to Class B common stock. In no event will any of the Class A common stock or Class B common stock be split, divided or combined unless each other class is proportionately split, divided or combined.

*Preferred Stock*

As of the date hereof, no shares of preferred stock are outstanding. The Charter provides that the Board may, by resolution, establish one or more classes or series of preferred stock having the number of shares and relative voting rights, designations and other rights, preferences, and limitations as may be fixed by them without further stockholder approval. The holders of any such preferred stock may be entitled to preferences over holders of common stock with respect to dividends, or upon a liquidation, dissolution, or the Company's winding up, in such amounts as are established by the resolutions of the Board approving the issuance of such shares.

The issuance of preferred stock may have the effect of delaying, deferring or preventing a change in control of the Company without further action by the holders and may adversely affect voting and other rights of holders of common stock. In addition, the issuance of preferred stock, while providing desirable flexibility in connection with

-9-

EXHIBIT H

*Conversion of Class B Common Stock*

The Class B common stock is convertible at any time, or from time to time, at the option of the holders (provided that the prior consent of any governmental authority required to make such conversion lawful shall have been obtained and a determination by the Company has been made that the applicable holder does not have an attributable interest in another entity that would cause the Company to violate applicable law) into Class A common stock on a share-for-share basis.

*No Preemptive Rights*

No holder of common stock has any preemptive right to subscribe for any shares of the Company's capital stock issuable in the future.

*Liquidation Rights*

If the Company is liquidated (either partially or completely), dissolved or wound up, whether voluntarily or involuntarily, the holders of common stock shall be entitled to share ratably in the Company's net assets remaining after payment of all liquidation preferences, if any, applicable to any outstanding preferred stock.

*Action by Written Consent*

The Charter provides that all actions of the stockholders must be taken at an annual or special meeting and may not be taken by written consent without a meeting.

*Delaware Anti-Takeover Law*

The Company is not subject to Section 203 of the General Corporation Law of the State of Delaware.

*Transfer Agent and Registrar*

The transfer agent for the Company's common stock is Computershare Trust Company, N.A.

*Listing of Common Stock*

The Class A common stock is quoted on the OTC Pink Tier under the symbol "CMIA." The Company has applied to list its Class A common stock on the NASDAQ Stock Market LLC under the symbol "CMLS." No assurances can be provided that the Company's application will be approved, or the timing thereof.

This description is qualified in its entirety by the full text of the Charter and Bylaws, copies of which are included as Exhibits 3.1 and 3.2, respectively, to this Current Report on Form 8-K and incorporated by reference herein.

-10-

EXHIBIT H

10/12

10/15/2018

Form 8-K12G3

**Item 9.01**     Financial Statements and Exhibits

(d) Exhibits

| Exhibit Number | Description |
|---|---|
| 2.1 | First Amended Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 3.1 | Amended and Restated Certificate of Incorporation of Cumulus Media Inc. (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 3.2 | Amended and Restated Bylaws of Cumulus Media Inc. (incorporated by reference to Exhibit 3.2 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 4.1 | Form of Global Warrant Certificate (incorporated by reference to Exhibit A-2 to Exhibit 10.2 hereto) |
| 10.1 | Form of Credit Agreement dated as of June 4, 2018 among Holdings, as borrower, the subsidiaries party thereto as borrowers, Intermediate Holdings as guarantor, Wilmington Trust, National Association, as Administrative Agent, and the other lenders party thereto (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 10.2 | Warrant Agreement, dated as of June 4, 2018, among the Company, Computershare Inc. and Computershare Trust Company, N.A. (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 10.3 | Form of Indemnification Agreement (incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 10.4 | Cumulus Media Inc. Long-Term Incentive Plan (incorporated by reference to Exhibit 10.4 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 10.5 | Form of Restricted Stock Unit Agreement (Non-Senior Executive) (incorporated by reference to Exhibit 10.5 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 10.6 | Form of Restricted Stock Unit Agreement (Senior Executive) (incorporated by reference to Exhibit 10.6 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 10.7 | Form of Restricted Stock Unit Agreement (Director) (incorporated by reference to Exhibit 10.7 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 10.8 | Form of Stock Option Agreement (Non-Senior Executive) (incorporated by reference to Exhibit 10.8 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 10.9 | Form of Stock Option Agreement (Senior Executive) (incorporated by reference to Exhibit 10.9 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 10.10 | Form of Stock Option Agreement (Director) (incorporated by reference to Exhibit 10.10 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 99.1 | Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' First Amended Joint Chapter 11 Plan of Reorganization (incorporated by reference to Exhibit 99.1 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |
| 99.2 | Press release dated June 4, 2018 (incorporated by reference to Exhibit 99.2 to the Company's Current Report on Form 8-K filed with the SEC on June 4, 2018) |

-11-

EXHIBIT H

11/12

Form 8-K12G3

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

CUMULUS MEDIA INC.

June 13, 2018

By:  /s/ Richard S. Denning
Name: Richard S. Denning
Title: Senior Vice President, General Counsel and Secretary

-12-

EXHIBIT H

# Exhibit B

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Tel: 212-373-3000
Fax: 212-757-3990
Paul M. Basta
Lewis R. Clayton
Jacob A. Adlerstein
Claudia R. Tobler

*Counsel for Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **CUMULUS MEDIA INC.,** *et al.*, | **Case No. 17-13381 (SCC)** |
| **Debtors.** [1] | **(Jointly Administered)** |

**FIRST AMENDED JOINT PLAN OF REORGANIZATION OF CUMULUS MEDIA INC.
AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]  The last four digits of Cumulus Media Inc.'s tax identification number are 9663.  Because of the large number of Debtors in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/cumulus.  The location of the Debtors' service address is: 3280 Peachtree Road, N.W., Suite 2200, Atlanta, Georgia 30305.

30. "*Communications Act*" means Chapter 5 of Title 47 of the United States Code, 47 U.S.C. § 151 *et seq.*, as amended.

31. "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

32. "*Confirmation Date*" means the date upon which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

33. "*Confirmation Hearing*" means the confirmation hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

34. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the transactions contemplated thereby.

35. "*Consenting Equityholders*" means, collectively, the Holders of Interests in Cumulus party to the Restructuring Support Agreement.

36. "*Consenting Term Loan Lenders*" means, collectively, the Term Loan Lenders party to the Restructuring Support Agreement.

37. "*Consummation*" means the occurrence of the Effective Date.

38. "*Convenience Claim*" means a General Unsecured Claim that is either (a) in an amount that is equal to or less than $20,000 or (b) in an amount that is greater than $20,000, but with respect to which the Holder of such General Unsecured Claim voluntarily and irrevocably reduces the aggregate amount of such Claim to $20,000 pursuant to a valid election by the Holder of such General Unsecured Claim made on its Ballot on or before the Plan Voting Deadline.

39. "*Convenience Class Cap*" means $2 million in the aggregate or such greater amount that is subject to the prior written consent of the Term Lender Group.

40. "*Credit Agreement*" means that certain Amended and Restated Credit Agreement, dated as of December 23, 2013, among Cumulus, Cumulus Media Holdings Inc., as borrower, certain lenders party thereto, the Credit Agreement Agent, and certain other agents party thereto.

41. "*Credit Agreement Agent*" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the Credit Agreement (or any successor to JPMorgan Chase Bank, N.A., in such capacity).

42. "*Credit Agreement Claim*" means any Claim against any Debtor derived from, based upon, relating to, or arising from the Credit Agreement or the related Loan Documents (as defined in the Credit Agreement).

43. "*Credit Documents*" means, collectively, the (a) Credit Agreement, (b) each security agreement, guaranty, pledge agreement, mortgage, and any other document entered into pursuant to or in connection with the Credit Agreement, and (c) each other agreement that creates or purports to create or perfect a Lien or security interest in favor of the Credit Agreement Agent and/or the Term Loan Lenders.

44. "*Cumulus*" means Cumulus Media Inc.

4

56. *"Disclosure Statement Order"* means the *Order Approving (A) the Adequacy of the Disclosure Statement; (B) Solicitation and Notice Procedures with Respect to Confirmation of the Joint Plan of Reorganization of Cumulus Media Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code; (C) the Form of Ballots and Notices in Connection Therewith; (D) the Scheduling of Certain Dates with Respect Thereto; and (E) Related Relief* [Docket No. 416].

57. *"Disputed"* means, with respect to a Claim against any Debtor, (a) any Claim, proof of which was timely and properly Filed, which is disputed under Article VII of this Plan or as to which the Debtors or any other party in interest have interposed and not withdrawn an objection or request for estimation (pursuant to Article VII of this Plan or otherwise) that has not been determined by a Final Order, (b) any Claim, proof of which was required to be Filed by order of the Bankruptcy Court but as to which a Proof of Claim was not timely or properly Filed, (c) any Claim that is listed in the Schedules as unliquidated, contingent, or disputed, or (d) any Claim that is otherwise disputed by any of the Debtors, the Reorganized Debtors or any other party in interest, which dispute has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court.  For the avoidance of doubt, if no Proof of Claim has been Filed by the applicable Claims Bar Date and the Claim is not listed on the Schedules or has been or hereafter is listed on the Schedules as $0, disputed, contingent, or unliquidated, such Claim shall be Disallowed and shall be expunged from the Claims Register without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

58. *"Disputed Claim Reserve"* means the reserve of Special Warrants created pursuant to Article VII.F. of this Plan.

59. *"Distribution Record Date"* means the Confirmation Date or such later date as agreed to by the Reorganized Debtors and the Term Lender Group in their sole and absolute discretion; *provided*, *however*, that no distribution record date shall apply to the Senior Notes or any other publicly-held Securities.

60. *"DTC"* means the Depository Trust Company.

61. *"Effective Date"* means the first Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been satisfied or waived pursuant to Article IX.A and Article IX.B, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

62. *"Employee Obligations"* means the Debtors' written contracts, agreements, policies, programs and plans for, among other things, compensation, reimbursement, indemnity, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, including in the event of a change of control after the Effective Date, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the directors, officers and employees of any of the Debtors who served in such capacity at any time (including any compensation programs approved by the Bankruptcy Court).

63. *"Entity"* means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

64. *"Estate"* means, as to each Debtor, the estate created for such Debtor by section 541 of the Bankruptcy Code.

65. *"Equity Allocation Mechanism"* means the methodology for allocating the New Securities among the Holders of Allowed Credit Agreement Claims, Allowed Senior Notes Claims, and Allowed General Unsecured Claims, set forth on Exhibit A hereto.

66. *"Exculpated Causes of Action"* means any Causes of Action or Claim related to any act or omission derived from, based upon, related to, or arising from the Debtors' in or out-of-court restructuring efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, solicitation or Filing of the Disclosure Statement, the Plan (including any term sheets related thereto), or any contract, instrument, release, or other

agreement or document created or entered into in connection with any of the foregoing, the funding of this Plan, the occurrence of the Effective Date, the administration of this Plan or the property to be distributed under this Plan, the pursuit of Confirmation or Consummation, and the administration and implementation of the Plan, including (a) the New Corporate Governance Documents, (b) the First Lien Exit Facility, (c) the New Revolving Credit Facility (if any), (d) the Restructuring Transactions, (e) the Restructuring Support Agreement, (f) the issuance of the New Securities (g) the Management Incentive Plan, and (g) the distribution of property under the Plan or any other agreement under the Plan; *provided*, that the Exculpated Parties shall be entitled, in all respects, to reasonably rely upon the advice of counsel with respect to the foregoing.

67.     "*Exculpated Party*" means each of:  (a) the Debtors, (b) the Reorganized Debtors, (c) the Consenting Term Loan Lenders, (d) the Consenting Equityholders, (e) the Credit Agreement Agent, (f) with respect to each of the foregoing Entities in clauses (a) through (e), the manager, management company, or investment advisor of any of the foregoing, and each of such Entities' respective current and former Affiliates, predecessors, successors, assigns, subsidiaries, managed accounts or funds, and (g) with respect to each of the foregoing Entities (a) through (f), such Entities' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

68.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

69.     "*Federal Judgment Rate*" means the interest rate applicable to a judgment entered on the Petition Date that is subject to section 1961 of the Judicial Code, as determined in accordance with that statute.

70.     "*FCC*" means the Federal Communications Commission, including any official bureau or division thereof acting on delegated authority, and any successor governmental agency performing functions similar to those performed by the Federal Communications Commission on the Effective Date.

71.     "*FCC Applications*" means collectively, each application, petition, or other request filed with the FCC in connection with this restructuring and the Plan.

72.     "*FCC Approval*" means the FCC's grant of the FCC Long Form Application.

73.     "*FCC Licenses*" means broadcasting and other licenses, authorizations, waivers and permits that are issued from time to time by the FCC.

74.     "*FCC Long Form Application*" means the applications filed with the FCC seeking FCC consent to the Transfer of Control.

75.     "*FCC Ownership Procedures Order*" means an order to be entered by the Bankruptcy Court establishing procedures for, among other things, completion and submission of the Ownership Certification.

76.     "*File," "Filed,"* or "*Filing*" means file, filed, or filing with the Bankruptcy Court, the Clerk of the Bankruptcy Court, or any of its or their authorized designees in the Chapter 11 Cases, including with respect to a Proof of Claim, the Voting and Claims Agent.

77.     "*Final Order*" means an order, ruling or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court), which has not been reversed, stayed, modified, amended or vacated, and as to which (a) the time to appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or

128.  *"Released Party"* means each of:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Term Loan Lenders; (d) the Credit Agreement Agent; (e) the Consenting Equityholders; (f) the Committee; (g) each of the members of the Committee; (h) the Senior Notes Indenture Trustee; (i) with respect to each of the foregoing Entities in clauses (a) through (h), each of such Entity's respective current and former Affiliates, predecessors, successors, assigns, subsidiaries, managed accounts or funds; and (j) with respect to each of the foregoing Entities in clauses (a) through (i), such Entities' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, management companies, investment advisors, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided*, that any Holder of a Claim or Interest that elects to opt-out of the Third-Party Release shall not constitute a Released Party (even if for any reason otherwise entitled).

129.  *"Releasing Parties"* means each of: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Term Loan Lenders; (d) the Credit Agreement Agent; (e) the Consenting Equityholders; (f) the Committee; (g) each of the members of the Committee; (h) the Senior Notes Indenture Trustee; (i) all Holders of Claims and Interests that are deemed Unimpaired and presumed to accept the Plan and do not elect to opt-out of the Third-Party Release; (j) all Holders of Claims and Interests who vote to accept the Plan; (k) all Holders of Claims and Interests entitled to vote on the Plan who abstain from voting on the Plan and do not elect on their Ballot to opt-out of the Third-Party Release; (l) all Holders of Claims and Interests entitled to vote on the Plan who vote to reject the Plan but do not elect on their Ballot to opt-out of the Third-Party Release; (m) all other Holders of Claims and Interests who are deemed to reject the Plan and do not elect to opt-out of the Third-Party Release; (n) with respect to each of the foregoing Entities in clauses (a) through (m), each of such Entity's respective current and former Affiliates, predecessors, successors, assigns, subsidiaries, managed accounts or funds; and (o) with respect to each of the foregoing Entities in clauses (a) through (n), such Entities' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, management companies, investment advisors, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

130.  *"Reorganized Debtors"* means (a) the Debtors, or any successor or assignee thereto, by merger, consolidation, or otherwise, on or after the Effective Date, and (b) to the extent not already encompassed by clause (a), Reorganized Cumulus and any newly formed subsidiaries thereof, on or after the Effective Date.

131.  *"Reorganized Cumulus"* means either (a) Cumulus or any successor thereto, as reorganized pursuant to and under the Plan, or (b) a new corporation or limited liability company that may be formed or caused to be formed by the Debtors, the Restructuring Support Parties or a designee thereof to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Securities to be distributed pursuant to the Plan, in each case, on and after the Effective Date.

132.  *"Restricted Stock"* means shares of New Common Stock that are subject to temporary restrictions prohibiting certain transfers of such shares, and prohibiting the trading of such shares, on any national securities exchange.

133.  *"Restricted Stock Election"* means an election made by a Holder of an Allowed Credit Agreement Claim on the Ownership Certification that such Holder elects to receive its New Common Stock in the form of Restricted Stock.

134.  *"Restructuring Support Agreement"* means that certain Restructuring Support Agreement, dated as of November 29, 2017, by Cumulus on behalf of itself and each of its direct and indirect subsidiaries, and, as applicable, the Consenting Term Loan Lenders and the Consenting Equityholders (as amended, supplemented or modified from time to time, including all exhibits thereto).

135.  *"Restructuring Support Parties"* means those parties who are signatories to the Restructuring Support Agreement, other than the Debtors.

12

on account of such Allowed Claim unless required under applicable bankruptcy law or as otherwise provided in Article III.B.

F.    *Reserve of Special Warrants.*

On the Effective Date (or as soon thereafter as is reasonably practicable), the Reorganized Debtors shall create the Disputed Claim Reserve to pay Holders of Disputed Claims that are General Unsecured Claims that may become Allowed Claims pursuant to the terms of the Plan, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing the Disputed Claim Reserve and for maximum distribution purposes, to be the lesser of (a) the asserted amount of the Disputed Claim Filed with the Bankruptcy Court, or (if no Proof of Claim was Filed) listed by the Debtors in the Schedules, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, or (c) the amount otherwise agreed to by the Reorganized Debtors and the Holder of such Disputed Claim for Claim Reserve purposes. Special Warrants reserved under this paragraph F shall remain unissued unless and until issued in satisfaction of a Disputed Claim that becomes an Allowed Claim and shall therefore be disregarded in both the numerator and denominator in the calculation of any vote by shareholders of Reorganized Cumulus under any New Corporate Governance Documents. Any distribution on account of a Disputed Claim that becomes an Allowed General Unsecured Claim after the Effective Date shall be made solely in the form of Special Warrants that are distributed from the Disputed Claim Reserve.

G.    *No Interest.*

Unless otherwise expressly provided by section 506(b) of the Bankruptcy Code or as specifically provided for herein or by order of the Bankruptcy Court (including the Cash Collateral Order), postpetition interest shall not accrue or be paid on Claims against any of the Debtors, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim; *provided*, *however*, that nothing in this Article VII.G shall limit any rights of any Governmental Unit to interest under sections 503, 506(b), 1129(a)(9)(A) or 1129(a)(9)(C) of the Bankruptcy Code or as otherwise provided for under applicable law.

## ARTICLE VIII.
### SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.    *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order or in any contract, instrument, or other agreement or document created pursuant to the Plan, including the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan shall be in

41

complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.      *Release of Liens.*

**Except as otherwise specifically provided in the Plan, the First Lien Exit Facility Documents or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, on the Effective Date all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. In addition, the Credit Agreement Agent shall, at the Debtors' or Reorganized Debtors', as applicable, expense (and with no representation or warranty, or recourse to, the Credit Agreement Agent, any Term Loan Lender or any of their affiliates, officers, directors, employees, agents or counsel) execute and deliver all documents reasonably requested by the Debtors, the Reorganized Debtors, the First Lien Exit Facility Agent, or the New Revolving Credit Facility Agent (if any) to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

D.      *Releases by the Debtors.*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, the Released Parties shall hereby be expressly, unconditionally, irrevocably, generally, individually and collectively released, acquitted, and discharged by the Debtors, the Reorganized Debtors, and the Estates, each on behalf of itself and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, from any and all actions, Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of a Debtor or Reorganized Debtor, any Claims or Causes of Action asserted on behalf of any Holder of any Claim or Interest or other Entity or that any Holder of a Claim or Interest or other Entity would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, for violations of federal or state laws or otherwise, by statute or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that the Debtors, the Reorganized Debtors, or their Estates (whether individually**

42

or collectively) ever had, now has, or hereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or any other transaction relating to any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan, the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Restructuring Support Agreement, the Disclosure Statement, the First Lien Exit Facility Documents, the New Revolving Credit Facility Documents (if any), or, in each case, related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence, taking place on or before the Effective Date related or relating to any of the foregoing; *provided, however*, that except as expressly provided under the Plan, the foregoing releases shall not release Claims related to any act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence or willful misconduct. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date rights or obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and shall not result in a release of any of the Debtors' or Reorganized Debtors' assumed indemnification obligations as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) essential to the Confirmation of the Plan; (2) an exercise of the Debtors' business judgment; (3) in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Debtor Release; (5) in the best interests of the Debtors and all holders of Claims and Interests; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Debtors, the Reorganized Debtors, and the Estates and each of their current and former Affiliates, and such Entities' and their current and former Affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such asserting any Claim or Cause of Action released pursuant to the Debtor Release.

Nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

E.      *Releases by the Releasing Parties.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Effective Date, each of the Releasing Parties shall be deemed to have expressly, conclusively, absolutely, unconditionally, irrevocably, generally, individually and collectively, released, acquitted, and discharged the Released Parties from any and all actions, Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of a Debtor or Reorganized Debtor, any Claims or Causes of Action asserted on behalf of any Holder of any Claim or any Interest or other Entity or that any Holder of a Claim or an Interest or other Entity would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, for violations of federal or state laws or otherwise, by statute or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that such Releasing Party (whether individually or collectively) ever had, now has, or hereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or any other transaction relating to any Security of the

Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or any Interest that is affected by or classified in the Plan, the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Restructuring Support Agreement, the Disclosure Statement, the First Lien Exit Facility Documents, the New Revolving Credit Facility Documents (if any), or, in each case, related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence, taking place on or before the Effective Date related or relating to any of the foregoing; *provided, however*, that except as expressly provided under the Plan, the foregoing releases shall not release Claims related to any act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence or willful misconduct; *provided*, *further*, that any Holder of a Claim or an Interest that elects to opt-out of the releases contained in this paragraph shall not constitute a Released Party (even if for any reason otherwise entitled) and no Restructuring Support Party shall be entitled to opt-out of the releases contained in this paragraph for so long as the Restructuring Support Agreement remains in full force and effect as to such Restructuring Support Party.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date rights or obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and shall not result in a release of any of the Debtors' or Reorganized Debtors' assumed indemnification obligations as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (1) essential to the Confirmation of the Plan; (2) given in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (3) a good faith settlement and compromise of the Claims released by the Third-Party Release; (4) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

Nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

F.      *Regulatory Activities*.

Notwithstanding anything to the contrary herein, nothing in the Plan or Confirmation Order is intended to affect the police or regulatory activities of Governmental Units or other governmental agencies.

G.      *Exculpation*.

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any (i) Exculpated Causes of Action and (ii) obligation, Cause of Action, or liability for any Exculpated Causes of Action; *provided, however*, that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence, or willful misconduct; *provided further*, *however*, that the foregoing shall not be deemed to release, affect, or limit any post-Effective Date rights or obligations of the Exculpated Parties under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

44

Nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

H.      *Injunction.*

Except as otherwise expressly provided in the Plan, the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Persons and Entities that have held, hold, or may hold Claims, Interests, Causes of Action or liabilities that have been released pursuant to <u>Article VIII.D</u> or <u>Article VIII.E</u> of the Plan, are discharged pursuant to <u>Article VIII.B</u> of the Plan, or are subject to exculpation pursuant to <u>Article VIII.G</u> of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Persons and Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (iii) creating, perfecting, or enforcing any Lien, Claim or encumbrance of any kind against such Persons or Entities or the property or the estates of such Persons or Entities, as applicable, on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Persons or Entities or against the property of such Persons or Entities, as applicable, on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; and (v) commencing or continuing in any manner any action or other proceeding of any kind against such Persons or Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities released, settled or compromised pursuant to the Plan; *provided*, that nothing contained herein shall preclude a Person or Entity from obtaining benefits directly and expressly provided to such Person or Entity pursuant to the terms of the Plan; *provided, further,* that nothing contained herein shall be construed to prevent any Person or Entity from defending against claims objections or collection actions whether by asserting a right of setoff or otherwise to the extent permitted by law.

I.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.      *Recoupment.*

In no event shall any Holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.      *Protection Against Discriminatory Treatment.*

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, all Entities, including Governmental Units shall not discriminate against any Reorganized Debtor, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CUMULUS MEDIA INC., *et al.*, | Case No. 17-13381 (SCC) |
| Debtors.[1] | (Jointly Administered) |

**FINDINGS OF FACT,**
**CONCLUSIONS OF LAW, AND**
**ORDER CONFIRMING THE DEBTORS' FIRST**
**AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"),

having: [2]

    a.    commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on November 29, 2017 (the "Petition Date");

    b.    continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

    c.    filed, on December 9, 2017, (i) the *Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 92], which plan and related documents were subsequently amended, and (ii) the *Disclosure Statement for Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 91], which disclosure statement and related documents were subsequently amended;

---

[1]    The last four digits of Cumulus Media Inc.'s tax identification number are 9663. Because of the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/cumulus. The location of the Debtors' service address is: 3280 Peachtree Road, N.W., Suite 2200, Atlanta, Georgia 30305.

[2]    Unless otherwise noted, capitalized terms not defined in this *Findings of Fact, Conclusions of Law, and Order Confirming Debtors' First Amended Joint Chapter 11 Plan of Reorganization* (this "Confirmation Order") shall have the meanings ascribed to them in the Plan (as defined herein). The rules of interpretation set forth in Article I.B of the Plan shall apply to this Confirmation Order.

Holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

**J.**      **Objections.**

10.      To the extent that any objections, reservations of rights, statements, or joinders to Confirmation have not been resolved, withdrawn, waived, or settled prior to entry of this Confirmation Order or otherwise resolved herein or as stated on the record of the Confirmation Hearing, they are hereby overruled on the merits based on the record before this Bankruptcy Court.

**K.**      **Burden of Proof.**

11.      The Debtors, as the proponents of the Plan, have met their burden of proving the elements of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.

**L.**      **Bankruptcy Rule 3016.**

12.      The Plan is dated and identifies the Debtors as the Plan proponents, thereby satisfying Bankruptcy Rule 3016(a).  The filing of the Disclosure Statement satisfied Bankruptcy Rule 3016(b).

**M.**      **Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1)).**

13.      The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

      a.      Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).  As required by section 1123(a)(1), in addition to Administrative Claims (including Accrued Professional Compensation Claims) and Priority Tax Claims, which need not be classified, Article III of the Plan designates 10 Classes of Claims and Interests.  As required by section 1122(a) of the Bankruptcy Code, the Claims and Interests placed in each Class are substantially similar to other Claims and Interests, as the case may be, in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Interests.  Thus, the Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

b.   Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2)).  Article III of the Plan specifies that Classes 1, 2, 7, and 9 are Unimpaired under the Plan, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

c.   Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).  Article III of the Plan sets forth the treatment of Classes 3–6, 8, and 10, which are the Impaired Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

d.   No Discrimination (11 U.S.C. § 1123(a)(4)).  Article III of the Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class except to the extent that a Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

e.   Implementation of the Plan (11 U.S.C. § 1123(a)(5)).  The Plan and the various documents included in the Plan Supplement provide adequate and proper means for implementation of the Plan, including, without limitation: (i) the consummation of the Restructuring Transactions (including the Description of Transaction Steps set forth in the Plan Supplement); (ii) the New Corporate Governance Documents; (iii) the issuance of the New Securities; (iv) the cancellation of certain existing agreements, obligations, instruments, and Interests; (v) the entry into the First Lien Exit Facility; (vi) the entry into the Equity and Asset Transfer Agreement and related documents; (vii) the continued vesting of the assets of the Debtors' Estates in the Reorganized Debtors; and (viii) the execution, delivery, filing, or recording of all contracts, instruments, releases, and other agreements or documents in furtherance of the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code.

f.   Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).  The New Corporate Governance Documents prohibit the issuance of non-voting securities to the extent required to comply with section 1123(a)(6) of the Bankruptcy Code.  As such, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

g.   Designation of Directors and Officers (11 U.S.C. § 1123(a)(7)).  The Reorganized Debtors' initial directors and officers are set forth in the Plan Supplement and, to the extent not known, will be determined in accordance with the New Corporate Governance Documents, which is consistent with the interests of creditors, equity holders and public policy, and satisfies section 1123(a)(7) of the Bankruptcy Code.

h.   Additional Plan Provisions (11 U.S.C. § 1123(b)).  The additional provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code and, therefore, are consistent with section 1123(b) of the Bankruptcy Code.

(i)   Impairment/Unimpairment of Any Class of Claims or Interests (11 U.S.C. § 1123(b)(1)).  Pursuant to the Plan, Classes 1, 2, 7, and 9 are Unimpaired,

and Classes 3–6, 8 and 10 are Impaired, as contemplated by section 1123(b)(1) of the Bankruptcy Code.

(ii) <u>Assumption and Rejection of Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2))</u>. Article V of the Plan provides for the assumption of the Debtors' Executory Contracts and Unexpired Leases as of the Effective Date unless such Executory Contract or Unexpired Lease: (A) was previously rejected; (B) expired or terminated pursuant to its own terms; (C) is the subject of a notice of rejection or motion to reject that is pending on the Effective Date; or (D) was identified on the Schedule of Rejected Executory Contracts and Unexpired Leases.

(iii) <u>Retention of Claims (11 U.S.C. § 1123(b)(3))</u>. In accordance with section 1123(b)(3) of the Bankruptcy Code, Article IV.S of the Plan provides that, subject in all respects to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

(iv) <u>Compromise and Settlement (11 U.S.C. § 1123(b)(3))</u>. In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good-faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that all Holders of Claims or Interests may have with respect to any Allowed Claim or Interest or any distribution to be made on account thereof. Such compromise and settlement is fair, equitable, and reasonable and in the best interests of the Debtors and their Estates. In addition, for the reasons set forth on the record at the Confirmation Hearing, the Plan, as modified by this Confirmation Order, constitutes a good faith compromise and settlement of all issues relating to the alleged substantive consolidation of the Debtors' Estates and any alleged improper "gifting" as they relate to distributions to Holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims (the "<u>Intercreditor Distribution Settlement</u>").

(v) <u>Other Appropriate Provisions (11 U.S.C. § 1123(b)(6))</u>. The Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including, without limitation, provisions for (A) distributions to Holders of Claims, (B) resolution of Disputed Claims, (C) allowance of certain Claims, (D) the assumption of certain Indemnification Provisions, (E) releases by the Debtors of certain parties, (F) releases by certain third parties, (G) exculpations of certain parties, and

11

(H) retention of Bankruptcy Court jurisdiction, thereby satisfying the requirements of section 1123(b)(6).

i.    <u>Cure of Defaults (11 U.S.C. § 1123(d))</u>.  Article V.C of the Plan provides for the satisfaction of Cure Claims associated with each Executory Contract and Unexpired Lease to be assumed (or assumed and assigned) in accordance with section 365(b)(1) of the Bankruptcy Code.  The cure amount identified in the Cure Notice distributed to the applicable counterparty represents the amount, if any, that the Debtors shall pay in full and complete satisfaction of such Cure Claim.  Any disputed cure amounts will be determined in accordance with the procedures set forth in Article V.C of the Plan, and applicable bankruptcy and nonbankruptcy law.  As such, the Plan provides that the Debtors will cure, or provide adequate assurance that the Debtors will promptly cure, defaults with respect to assumed Executory Contracts and Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code.  Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

**N.    <u>The Debtors' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2)).</u>**

14.    The Debtors have complied with the applicable provisions of the Bankruptcy Code, as required by section 1129(a)(2) of the Bankruptcy Code.  Specifically:

a.    the Debtors are eligible debtors under section 109 of the Bankruptcy Code and are proper proponents of the Plan under section 1121(a) of the Bankruptcy Code;

b.    the Debtors have complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Bankruptcy Court; and

c.    the Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules in transmitting the Confirmation Materials and related notices and in soliciting and tabulating the votes on the Plan.

**O.    <u>Good Faith (11 U.S.C. § 1129(a)(3)).</u>**

15.    The Debtors have proposed the Plan (including the Plan Documents (as defined herein) and all other documents necessary to effectuate the Plan) in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases and the formulation of the Plan.  The Debtors' good faith is evident from the facts and record of the Chapter 11 Cases,

the Disclosure Statement, and the record of the Confirmation Hearing. The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates and to effectuate a successful reorganization of the Debtors. The Plan was the product of extensive negotiations conducted at arm's length among the Debtors and certain of their key stakeholders. Further, the Plan's classification, indemnification, settlement, discharge, exculpation, release, and injunction provisions have been negotiated in good faith and at arm's length, are consistent with sections 105, 1122, 1123(b)(6), 1129, and 1142 of the Bankruptcy Code, and are each necessary for the Debtors' successful reorganization. Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

16. The Plan gives effect to many of the Debtors' restructuring initiatives, including implementing a value maximizing restructuring transaction. Therefore, the Plan has been proposed in good faith to achieve a result consistent with the objectives and purposes of the Bankruptcy Code and the Debtors (and all of their respective officers, managers, directors, agents, independent contractors, financial advisors, consultants, attorneys, employees, partners, Affiliates, and representatives) have been, are, and will continue to act in good faith within the meaning of sections 1125(e) and 1126(e) the Bankruptcy Code if they proceed to: (a) consummate the Plan and the Restructuring Transactions and the agreements, settlements, transactions, and transfers contemplated thereby; and (b) take the actions authorized and directed or contemplated by this Confirmation Order.

**P.**     **Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).**

17. Any payment made or to be made by the Debtors, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been

approved by, or is subject to the approval of, the Bankruptcy Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

**Q.**      **Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).**

18.      The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code. The identities of the Reorganized Debtors' directors and officers were disclosed in the Plan Supplement. To the extent that such directors and officers are insiders, the nature of their compensation has been disclosed to the extent known and reasonably practicable.

**R.**      **No Rate Changes (11 U.S.C. § 1129(a)(6)).**

19.      Section 1129(a)(6) of the Bankruptcy Code is satisfied because the Plan does not provide for any rate changes over which a governmental regulatory commission has jurisdiction.

**S.**      **Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).**

20.      Each Holder of an Impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

21.      The liquidation analysis attached as **Exhibit D** to the Disclosure Statement (the "Liquidation Analysis") and the other evidence related thereto in support of the Plan that was proffered or adduced at or prior to the Confirmation Hearing or in the Confirmation Declarations: (a) are reasonable, persuasive, credible, and accurate as of the dates such analyses or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that Holders of Allowed Claims or Interests in every Class will recover as much or more under the Plan on account of such Claim or Interest, as of the Effective Date, than the amount such Holder would receive if

the Bankruptcy Code, the Bankruptcy Rules or the Local Rules.  Any state or local business or operating license transferred, sold, vested, or otherwise conveyed from a Debtor to a Reorganized Debtor shall be deemed valid and enforceable by the applicable Reorganized Debtor without the need of any corporate, governmental authority, or further court approval.

**JJ.**     **Management Incentive Plan.**

41.     The Debtors have provided sufficient and adequate notice of the terms of the Management Incentive Plan.  The terms and conditions of the Management Incentive Plan have been negotiated in good faith and at arm's length with the Term Lender Group.  The Management Incentive Plan is an essential element of the Plan, and the terms of the Management Incentive Plan and the awards contemplated therein are fair and reasonable.

**KK.**     **Approval of the First Lien Exit Facility.**

42.     The First Lien Exit Facility is an essential element of the Plan, is necessary for Confirmation and the consummation of the Plan, and is critical to the overall success and feasibility of the Plan.  Entry into the First Lien Exit Credit Agreement and the other First Lien Exit Facility Documents is in the best interests of the Debtors, their Estates, and all Holders of Claims or Interests.  The Debtors have exercised reasonable business judgment in determining to enter into the First Lien Exit Credit Agreement and the other First Lien Exit Facility Documents and have provided sufficient and adequate notice of the material terms of the First Lien Exit Facility, which material terms were filed as part of the Plan Supplement.  The terms and conditions of the First Lien Exit Facility are fair and reasonable, and the First Lien Exit Facility was negotiated in good faith and at arm's length.  The Debtors are authorized, without further approval of the Bankruptcy Court or any other party, to execute and deliver all agreements, documents, instruments, and certificates related thereto and perform their obligations thereunder.

45.     Each New Security issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the New Securities referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

46.     In respect of the Term Loan Lender Equity Distribution and the Unsecured Creditor Equity Distribution, if a Holder of Allowed Credit Agreement Claims, Allowed Senior Notes Claims or Allowed General Unsecured Claims holds its Allowed Claim in multiple managed funds and/or investment vehicles (such entities, the "Funds"), then it will receive its allocation of Class A Common Stock, Class B Common Stock, and Special Warrants, as applicable, Pro Rata across such Funds and in accordance with the terms of the Plan and the Equity Allocation Mechanism; *provided*, *however*, that, if an allocation other than Pro Rata across the Funds is requested, such Holder shall give notice to the Debtors, the Reorganized Debtors, and/or the Disbursing Agent (or their respective representatives or assigns) no later than five (5) Business Days after the Confirmation Date specifying its requested allocation of New Securities amongst its Funds.  The Disbursing Agent (and any other applicable agents or representatives of the Debtors and Reorganized Debtors) shall use commercially reasonable efforts to assist such Holder in allocating its New Securities across such Funds in such manner, which allocation shall otherwise be subject to the terms of the Plan and the Equity Allocation Mechanism.

**MM.    Executory Contracts and Unexpired Leases.**

47.     The Debtors have exercised sound business judgment in determining whether to assume, assume and assign, or reject each of their Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, Article V of the Plan, and as set

forth in the Plan Supplement. Except as set forth herein and/or in separate orders entered by the Bankruptcy Court relating to assumption of Executory Contracts or Unexpired Leases, the Debtors have cured or provided adequate assurances that the Debtors will cure defaults (if any) under or relating to each Executory Contract or Unexpired Lease assumed under the Plan.

48. Nothing in the Plan or the Confirmation Order shall prevent a party to an Executory Contract or Unexpired Lease rejected pursuant to the Plan from filing a Proof of Claim based on such rejection by the later of (i) the applicable Claims Bar Date, and (ii) thirty (30) days after notice of such rejection is served on the applicable claimant. Nothing in the Plan or this Confirmation Order shall prevent a party to an Executory Contract or Unexpired Lease assumed pursuant to the Plan, or otherwise, from continuing to prosecute an objection to the cure amount related to such assumed Executory Contract or Unexpired Lease if such objection was timely filed on or before at least seven days prior to the Confirmation Hearing, but not resolved before the Effective Date.

**NN.** **Discharge, Compromise, Settlement, Release, Exculpation, and Injunction Provisions.**

49. The Bankruptcy Court has jurisdiction under sections 1334(a) and (b) of title 28 of the United States Code to approve the discharge, compromises, settlements, releases, exculpations, and injunctions set forth in Article VIII of the Plan. Sections 105(a) and 1123(b) of the Bankruptcy Code permit issuance of the injunctions and approval of the releases, exculpations, and injunctions set forth in Article VIII of the Plan. Based upon the record of the Chapter 11 Cases and the evidence proffered or adduced at the Confirmation Hearing, the Bankruptcy Court finds that the discharge, compromises, settlements, releases, exculpations, and injunctions set forth in Article VIII of the Plan are consistent with the Bankruptcy Code and applicable law. Further, the discharge, compromises, settlements, releases, exculpations, and injunctions contained in Article

23

VIII of the Plan are integral components of the Plan. The discharge, compromises, settlements, releases, exculpations, and injunctions set forth in Article VIII of the Plan are hereby approved and authorized in their entirety.

**OO.**     **Debtor Release; Third-Party Release.**

50.     The releases described in Articles VIII.D and VIII.E of the Plan are an integral and necessary part of the Plan and represent a valid exercise of the Debtors' business judgment. For the reasons set forth on the record of the Chapter 11 Cases and the evidence proffered or adduced at the Confirmation Hearing, including the Plan embodied therein, the releases provided for in the Plan are in the best interests of the estates. The releases described in Articles VIII.D and VIII.E of the Plan are: (a) in exchange for good and valuable consideration provided by the Released Parties; (b) a good-faith compromise and settlement of the Claims and Causes of Action released by the Debtors and the Releasing Parties; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or any Holder of a Claim or Interest that would have been legally entitled to assert any Claim or Cause of Action on behalf of any of the Debtors or the Estates or any Releasing Party, as applicable, from asserting any Claim or Cause of Action released by the releases described in Articles VIII.D and VIII.E of the Plan against any of the Released Parties.

**PP.**     **Exculpation.**

51.     The exculpation provisions set forth in Article VIII.G of the Plan are essential to the Plan. The record in the Chapter 11 Cases fully supports the exculpation provisions, and the exculpation provisions set forth in Article VIII.G of the Plan are appropriately tailored to protect the Exculpated Parties from inappropriate litigation and to exclude actions determined by Final Order to have constituted actual fraud, gross negligence, or willful misconduct.

## QQ. **Injunction.**

52.    The injunction provisions set forth in Article VIII.H of the Plan are essential to the Plan; are necessary to preserve and enforce the releases set forth in Articles VIII.B, VIII.D and VIII.E of the Plan, the exculpation provisions in Article VIII.G of the Plan, and the compromises and settlements implemented under the Plan; and are narrowly tailored to achieve that purpose.

53.    The injunction provisions set forth in Article VIII.H the Plan: (a) are within the jurisdiction of this Bankruptcy Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) are an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code; (c) are an integral element of the transactions incorporated into the Plan; (d) confer material benefits on, and are in the best interests of, the Debtors, the Estates, and their creditors; (e) are important to the overall objectives of the Plan to finally resolve all Claims or Causes of Action among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors; and (f) are consistent with sections 105, 1123, and 1129 of the Bankruptcy Code, other provisions of the Bankruptcy Code, and other applicable law.  The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the injunction provisions set forth in Article VIII.H of the Plan.

## RR. **Retention of Jurisdiction.**

54.    Except as otherwise provided in the Plan, any of the Plan Documents or this Confirmation Order, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including the matters set forth in Article XI of the Plan.

## SS. **Reports.**

55.    After the Effective Date, the Reorganized Debtors shall have no obligation to file with the Bankruptcy Court or serve on any parties reports that the Debtors were obligated to file

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>EJS Investment Holdings, LLC<br>WGH Communications, Inc. | DEFENDANTS<br>Mary G. Berner, Jeffery Marcus, Brian Cassidy,<br>Ross Oliver, and Crestview Partners, LP |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Lindsey L. Hobbs, Wise & Reeves, P.C., Two Centre Square,<br>Ste 160, 625 S. Gay Street, Knoxville, TN 37902, (865) 544-1199 | ATTORNEYS (If Known)<br>David M. Pernini, Wargo French, 999 Peachtree Street, NE,<br>Atlanta, GA  30309, (404) 853-1520 |
| PARTY (Check One Box Only)<br>☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor       ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor       ☒ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
The complaint asserts purported claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, and conspiracy, premised on allegations about Defendants' conduct leading up to the Debtors' filing for Chapter 11 protection.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
   (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☒ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court
   if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☒ Check if a jury trial is demanded in complaint | Demand $  Unknown |
| Other Relief Sought | |

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>In re CM Wind Down Topco Inc. | BANKRUPTCY CASE NO.<br>17-13381 (SCC) | |
| DISTRICT IN WHICH CASE IS PENDING<br>Bankruptcy Court for the Southern District of New York | DIVISION OFFICE | NAME OF JUDGE<br>Chapman |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF<br><br>Eric J. Steinmann | DEFENDANT<br>Mary G. Berner, Jeffery Marcus, Brian Cassidy, Ross Oliver, and Crestview Partners, LP | ADVERSARY |
| DISTRICT IN WHICH ADVERSARY IS PENDING<br>Bankruptcy Court for the Northern District of Georgia | DIVISION OFFICE<br>Atlanta | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ David Pernini<br><br><br> | | |
| DATE<br>December 19, 2018 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>David Pernini | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# Exhibit G

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| ERIC J. STEINMANN, | ) | CIVIL ACTION FILE |
| | ) | |
| Plaintiff, | ) | No. _____ |
| | ) | |
| | ) | Removed from the State Court of Fulton |
| v. | ) | County, Georgia: |
| | ) | 2018-cv-312580 |
| MARY G. BERNER, JEFFERY | ) | |
| MARCUS, BRIAN CASSIDY, | ) | |
| ROSS OLIVER AND CRESTVIEW | ) | |
| PARTNERS, LP, | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1452 and 1334, Defendants Mary Berner, Jeffrey
Marcus, Brian Cassidy, Ross Oliver, and Crestview Partners, L.P. (collectively,
"Defendants"), by and through their undersigned attorneys, hereby file this Notice of
Removal and remove the above-captioned civil action, and all claims and causes of action
therein, from the Superior Court of Fulton County, Georgia, to the United States
Bankruptcy Court for the Northern District of Georgia.  As the requisite "short and plain
statement of the grounds for removal," 28 U.S.C. § 1446(a), Defendants state as follows:

1.       On November 2, 2018, Plaintiff filed an action in the Superior Court of
Fulton County, Georgia, bearing the caption *Eric Steinmann* v. *Mary Berner, et al.*, Case
No. 2018-cv-312580 (the "Action").  As required by 28 U.S.C. § 1446(a), all process,
pleadings, and orders served on Defendants in the Action to date are attached hereto as
**Exhibit A**.

2.       Defendant Jeffrey Marcus first received the summons and complaint on
November 26, 2018, when it was served on Jeffrey Marcus, and the remaining
Defendants first received the complaint on or after November 26, 2018.

3.      This Notice of Removal is being filed within 30 days after receipt by Defendants of a copy of the summons and complaint, and is therefore timely filed under 28 U.S.C. § 1446(b) and Bankruptcy Rule 9027(a)(3).

4.      The Action is removable because it arises under Title 11 of the United States Code and is related to the bankruptcy proceeding *In re CM Wind Down Topco Inc.*, No. 17-13381 (SCC), a case under Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "Cumulus Bankruptcy"). As explained below, the Action purports to assert claims that are derivative claims that were held by the debtors in the Cumulus Bankruptcy. The purported claims were expressly released and are subject to exculpation, and Plaintiff is enjoined from commencing or pursuing those claims, under the Plan and Confirmation Order (as defined below) entered in the Cumulus Bankruptcy. As such, the Action necessarily calls for the interpretation of the confirmed Plan and implicates its administration and execution. Because the Action "aris[es] under" Title 11 of the United States Code, and is "related to" a case under Title 11 of the United States Code, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 1452, and the Action is removable.

5.      As background, on November 29, 2017, Cumulus Media Inc. (now known as CM Wind Down Topco Inc.) and certain of its affiliates (together, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. Cumulus is a leader in the radio broadcasting industry, with more than 400 owned and operated stations around the U.S.

6.      On May 10, 2018, the Court in the Cumulus Bankruptcy entered the *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' First Amended Joint Plan of Reorganization* (the "Confirmation Order") [ECF No. 769], and the *First Amended Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") [ECF No. 446]

went effective on June 4, 2018 (the "Effective Date"). Notice of the Effective Date was served and published in accordance with the Confirmation Order. *See Notice of (I) Entry of Order Confirming the Debtors' First Amended Joint Chapter 11 Plan of Reorganization, (II) Occurrence of Effective Date, and (III) Certain Bar Dates* [ECF No. 821].

7.      As further explained below, included in the Plan and Confirmation Order are broad (and typical) release and exculpation provisions, and a permanent injunction against prosecuting claims that are released or exculpated pursuant to the Plan. Excerpts of the relevant sections from the Plan and Confirmation Order are collectively attached hereto as **Exhibit B**.

8.      In addition, the Bankruptcy Court for the Southern District of New York expressly retained jurisdiction over the Cumulus Bankruptcy, "and all matters arising out of, or related to, the [Cumulus Bankruptcy] and the Plan." Confirmation Order ¶ 54.

9.      Plaintiff Eric Steinmann purports to have owned shares of Cumulus Media Inc. ("Cumulus"). (Compl. ¶ 8.)

10.      The Action is simply another iteration of an action filed on the same date, *EJS Investment Holdings, LLC and WGH Communications, Inc.* v. *Mary Berner, et al.*, Case No. 2018-cv-312575, and the latest in a string of attempts by Plaintiff, through his affiliated entities, to thwart the success of the Cumulus Bankruptcy.[1] Nearly a week after the deadline for filing objections, WGH filed its objection to the Plan's confirmation on substantially the same grounds as the claims asserted in the Action. [ECF No. 604]. WGH cursorily asserted that the Plan (1) did not satisfy Section 1129(a)(1) of the Bankruptcy Code, (2) was not proposed in good faith in violation of Section 1129(a)(3), (3) contravened Section 1129(a)(5) of the Bankruptcy Code and potentially the business judgment rule, and (4) included overly broad release, exculpation and injunction provisions.

---

[1] WGH was an active participant in the Cumulus bankruptcy. It filed a claim for $5,050,000.00 on the basis of the 7.75% Senior Notes on March 7, 2018. [Claim No. 25-1.]

Among other things, WGH repeatedly alleged that the Debtors filed the Cumulus
Bankruptcy, rather than continuing to pursue an out-of-court restructuring, because
Cumulus's management "acted in a manner designed to enhance their compensation
package rather than promote the interests of creditors and equity holders." [ECF No. 604
¶ 3; *see also id.* ¶¶ 11 (". . . WGH believes that Management, who sought excessive
compensation in this case, acted in their own interests by failing to restructure outside of
Chapter 11."), 15 ("[T]he decision of Management to invoke the costly process of
Chapter 11 rather than restructure outside of Chapter 11 strongly suggests that they chose
a path to enhance their own personal financial interests rather than those of creditors and
equity holders.  The overly broad Exculpation provisions in the Plan also suggests [sic]
that Management is placing their own interests above those of the Debtors and other
interested parties."), 32 ("[T]he Debtors, led by Management with selfish interests, are
acting in a manner designed to enhance themselves financially rather than an [sic]
equitable restructuring plan.").]

11.    All of WGH's untimely objections were expressly overruled by
Bankruptcy Judge Shelley Chapman when, after notice and an opportunity to appear, no
one argued on WGH's behalf at the confirmation hearing.  April 12, 2018 Tr. at 8:20–22
("I'm not going to hear the objection of WGH."); Confirmation Order ¶ 10 ("To the
extent that any objections, reservations of rights, statements, or joinders to Confirmation
have not been resolved, withdrawn, waived, or settled prior to entry of this Confirmation
Order or otherwise resolved herein or as stated on the record of the Confirmation
Hearing, they are hereby overruled on the merits based on the record before this
Bankruptcy Court.").

12.    In addition to generally overruling any outstanding objections in its
Confirmation Order, the Court's explicit factual findings contradict the assertions WGH
made in its untimely objection.  The Court determined that the Debtors complied with
Section 1129(a)(1), proposed the Plan in good faith as required by Section 1129(a)(3),

4

complied with Section 1129(a)(5), exercised sound business judgment, and that the discharge, compromises, settlements, releases, exculpations, and injunctions set forth in Article VIII of the Plan were consistent with the Bankruptcy Code and applicable law. Confirmation Order ¶¶ 13, 15–16, 18, 42, 47, 49–50.

13.     Following confirmation of the Plan on May 10, 2018, on May 25, 2018, WGH filed a plainly untimely (and frivolous) appeal, again seeking to challenge the Plan's validity.  [ECF 809.]  The appeal was untimely because it was filed after the expiration of the fourteen-day appeal period under Bankruptcy Rule 8002(a).  After Cumulus's counsel notified WGL's counsel that the appeal was untimely, WGH voluntarily withdrew it. [ECF 848].

14.     In his latest frivolous tactic, on November 2, 2018, Plaintiff filed the Action against Defendants in Georgia Superior Court.  (On the same day, WGH and EJS Investment Holdings, LLC separately filed a nearly identical action against Defendants in Georgia Superior Court, styled *EJS Investment Holdings, LLC and WGH Communications, Inc.* v. *Mary Berner, et al.*, Case No. 2018-cv-312575, which Defendants are simultaneously removing to this Court.)

15.     In his complaint in the Action, Plaintiff alleges that Defendant Berner was Cumulus's President and CEO and a director on its board; that Defendants Marcus, Cassidy and Oliver also served as Cumulus directors; and that Defendants Marcus, Cassidy and Oliver "were employees of and held partnership interests in" Crestview Partners, L.P., a private equity firm.  (Compl. ¶¶ 9–13.)

16.     The complaint expressly challenges the Debtors' restructuring and the Cumulus Bankruptcy, asserting purported claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, and conspiracy, all premised on allegations about Defendants' conduct leading up to the Debtors' filing for Chapter 11 protection.  Plaintiff alleges that Defendants used "elaborate steps and machinations" to enrich themselves to Plaintiff's detriment.  (Compl. ¶ 23.)  The complaint speculates that

5

"a formal bankruptcy . . . was unnecessary, or premature at the very least." (Compl. ¶ 51.)

17.     The Action both arises under Title 11 of the United States Code and relates to the Cumulus Bankruptcy (a case under Title 11 of the United States Code) because it purports to assert claims that are derivative claims that were held by the Debtors in the Cumulus Bankruptcy, and because the claims in the Action were released and are subject to exculpation, and Plaintiff is enjoined from commencing or pursuing those claims, under the Plan and Confirmation Order. As such, the Action necessarily calls for the interpretation of the confirmed Plan and implicates its administration and execution, and the Action is removable to this Court. The claims are an attempt to launch a collateral attack on the explicit findings made by the Bankruptcy Court.

18.     *First*, Plaintiff's purported claims are in reality derivative claims that were held by the Debtors. Plaintiff's allegations that officers and/or directors of Cumulus breached fiduciary duties in connection with the Cumulus Bankruptcy, and that Plaintiff was purportedly injured in his capacity as an alleged Cumulus shareholder, are plainly derivative, not direct, because they allege breaches of duties owed to Cumulus and seek to recover for alleged harms to Cumulus. These purported derivative claims were held by the Debtors and could only be brought on their behalf, and therefore arise under Title 11 of the United States Code and support removal.

19.     *Second*, the purported claims asserted in the Action were expressly released in the Plan and Confirmation Order.

20.     To the extent Plaintiff's claims are derivative claims that were held by the Debtors, the Debtors have expressly released all such claims in the Plan. The Debtors' release expressly includes "any derivative Claims asserted or assertable on behalf of a Debtor or a Reorganized Debtor . . . based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or

6

any other transaction relating to any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or any Interest that is affected by or classified in the Plan, the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, the restructuring of Claims and Interests before or during the Chapter 11 Cases, [or] the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Restructuring Support Agreement" (among other things). Plan, Article VIII(D); Confirmation Order ¶ 50.

21. The Debtors' release applies to all "Released Parties," defined to include (among others) the Debtors, the "Consenting Equityholders" (defined to include the "Holders of Interest in Cumulus party to the Restructuring Support Agreement," Plan ¶ 35), their current and former "Affiliates," and such parties' and their Affiliates' "officers, managers, directors, . . . principals, members, employees," and "partners." Plan ¶ 128. As explained above, the complaint in the Action alleges that Defendants Berner, Marcus, Cassidy and Oliver were officers and/or directors of Cumulus, a Debtor; the remaining Defendant, Crestview Partners, L.P., is also a Released Party because one of its affiliates was a Consenting Equityholder (as a party to the Restructuring Support Agreement), and the complaint alleges that Crestview Partners, L.P. held equity in Cumulus (Compl. ¶ 44).

22. Thus, Plaintiff's purported claims—which expressly challenge the Debtors' restructuring, the entry of the Restructuring Support Agreement, and the Cumulus Bankruptcy—fall within the Debtors' broad release. The Debtors' release excludes claims "related to any act or omission that is determined by a final Order to have constituted . . . willful misconduct." The Complaint, however, does not sufficiently plead willful misconduct. Moreover, Plaintiff is estopped from asserting willful misconduct (or any other exception to the release) because of the explicit findings of good faith, sound business judgment, and other issues in the Confirmation Order. Therefore, any such claims are barred by collateral estoppel.

23.     The Plan also contains a separate third-party release given by the "Releasing Parties," defined to include (among others) all "Holders of Claims and Interests entitled to vote on the Plan" who did not opt out of the "Third-Party Release." Plan ¶ 129.  This release similarly applies to all claims of any form "based on or relating to" or "in any manner arising from, in whole or in part," the Debtors' restructuring, the Cumulus Bankruptcy, "the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or any other transaction relating to any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or any Interest that is affected by or classified in the Plan, the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, the restructuring of Claims and Interests before or during the Chapter 11 Cases, [or] the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Restructuring Support Agreement" (among other things).  Plan, Article VIII(E); Confirmation Order ¶ 50.  Again, Plaintiff's purported claims—which expressly challenge the Debtors' restructuring, the entry of the Restructuring Support Agreement, and the Cumulus Bankruptcy—fall within this broad third-party release, and Plaintiff is estopped from asserting any exception to the release given the explicit findings of good faith, sound business judgment, and other issues in the Confirmation Order.

24.     *Third*, the Plan and Confirmation Order expressly "release[] and exculpate[]" Defendants from all liability for Exculpated Causes of Action, including the purported claims at issue here.  Plan, Article VIII(G); Confirmation Order ¶ 51.

25.     The exculpation provision applies to Exculpated Parties, which include the Debtors, the "Consenting Equityholders" (defined to include the "Holders of Interest in Cumulus party to the Restructuring Support Agreement," Plan ¶ 35), their current and former "Affiliates," and such parties' and their Affiliates' "officers, managers, directors, . . . principals, members, employees," and "partners."  Plan ¶ 67.  As explained

8

above, the complaint in the Action alleges that Defendants Berner, Marcus, Cassidy and Oliver were officers and/or directors of Cumulus, a Debtor; Defendant Crestview Partners, L.P. is also an Exculpated Party because one of its affiliates was a Consenting Equityholder (as a party to the Restructuring Support Agreement), and the complaint alleges that Crestview Partners, L.P. held equity in Cumulus (Compl. ¶ 44).

26. Exculpated Causes of Action include any claims or causes of action "related to any act or omission derived from, based upon, related to, or arising from the Debtors' in or out-of-court restructuring efforts, the [Cumulus Bankruptcy], formulation, preparation, dissemination, negotiation, solicitation or Filing of the Disclosure Statement, the Plan (including any term sheets related thereto), or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the funding of this Plan, the occurrence of the Effective Date, the administration of this Plan or the property to be distributed under this Plan, the pursuit of Confirmation or Consummation, and the administration and implementation of the Plan . . . ."  Plan ¶ 66.

27. Plaintiff's purported claims—which expressly challenge the Debtors' restructuring and the Cumulus Bankruptcy—are therefore exculpated under the Plan and Confirmation Order.  Again, Plaintiff is estopped from asserting any exception to the exculpation provision given the explicit findings of good faith, sound business judgment, and other issues in the Confirmation Order.

28. *Fourth*, Plaintiff has been enjoined from commencing or pursuing the Action.  The Plan and Confirmation Order "permanently enjoined and precluded" the commencement or continuation of "any action or other proceeding of any kind on account of or in connection with or with respect to" claims or causes of action that have been released, are discharged, or are subject to exculpation under the terms of the Plan and Confirmation Order.  Plan, Article VIII(H); Confirmation Order ¶¶ 52–53.

29. Thus, Plaintiff has been enjoined by the Bankruptcy Court for the

Southern District of New York from commencing or pursuing the Action.

30.     The Action is removable because Plaintiff's purported claims are in reality derivative claims that were held by the Debtors, and because the purported claims (and Defendants' anticipated defenses to those claims) necessarily call for the interpretation of the confirmed Plan and affect its administration and execution, as explained above. *See, e.g.*, *In re Hillsborough Holdings Corp.*, 267 B.R. 882, 889 (Bankr. M.D. Fla. 2001) (denying remand and granting summary judgment for defendants where "Defendants' affirmative defense that the liability from this adversary proceeding has already been discharged calls for interpretation of the plan and application of the bankruptcy laws"); *see also Alderwoods Grp., Inc. v. Garcia*, 682 F.3d 958, 969–70 (11th Cir. 2012) ("When, in a Chapter 11 case, a bankruptcy court issues an order confirming a reorganization plan, that court retains postconfirmation jurisdiction to complete any action pertinent to the plan," and the "bankruptcy court that confirms a reorganization plan thus enters an injunctive order—the confirmation order, see 11 U.S.C. §§ 524, 1141—the violation of which it can sanction.") (internal quotation marks omitted). Further, Plaintiff's purported claims relate directly to substantive rights created by the Bankruptcy Code, and could only arise from the circumstances presented by the Debtors' Chapter 11 filings.

31.     If Plaintiff does not promptly dismiss the Action with prejudice, Defendants intend to move before the United States Bankruptcy Court for the Southern District of New York for a further order enjoining the Action and awarding damages and other relief, and/or to move before this Court to transfer venue of this Action to the United States Bankruptcy Court for the Southern District of New York.

32.     Defendants consent to the entry of a final order by this Bankruptcy Court to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

33.     Direct removal to this Bankruptcy Court is appropriate under Bankruptcy Rule 9027(a)(1), which states that removal shall be filed with the clerk for the district and division within which the Action is pending, and Bankruptcy Rule 9001(3) defines the clerk as the bankruptcy clerk.

34.     Written notice of the filing of this Notice of Removal will be given to the adverse parties and Georgia Superior Court as required by 28 U.S.C. § 1446(d) and Bankruptcy Rule 9027(a)(3).

Dated: December 19, 2018
        Atlanta, Georgia

**WARGO & FRENCH, LLP**
*Local Counsel to Defendants*
999 Peachtree Street, NE
26th Floor
Atlanta, GA 30309
Telephone:  404-858-1500

By: /s/ *David Pernini*
    David Pernini, Esq.
    Georgia Bar No.: 572399
    dpernini@wargofrench.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta, Esq.
Lewis R. Clayton, Esq.
Jacob A. Adlerstein, Esq.
Claudia R. Tobler, Esq.

1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
pbasta@paulweiss.com
lclayton@paulweiss.com
jadlerstein@paulweiss.com
ctobler@paulweiss.com

*Counsel for Defendants*

11

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 19, 2018 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that a true and correct copy of the foregoing is being served on December 18, 2018 by transmission of Notice of Electronic Filing generated by CM/ECF on all counsel of record who are authorized to receive electronically Notices of Electronic Filing in this proceeding.

By: /s/ *David Pernini*
David Pernini
Georgia Bar No. 572399

## SERVICE LIST

Lindsey L. Hobbs, Esq,
Wise & Reeves, P.C.
Two Centre Square, Suite 160
625 S. Gay Street
Knoxville, TN 37902
lindsey@wiseandreeves.com
*Counsel for Plaintiff*

# Exhibit A

Fulton County Superior Court
***EFILED***LW
Date: 11/2/2018 3:47 PM
Cathelene Robinson, Clerk

# IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA
## 136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303
### SUMMONS

Eric J. Steinmann

) Case
) No.: **2018CV312580**
)
**Plaintiff,**
)
vs.
)
Mary G. Berner, Jeffery Marcus, Brian Cassidy,
)
SERVED _____ 1:20 p.m. On 11/24/20 18
OFFICE OF THE SHERIFF PALM BEACH COUNTY, FL
Ross Oliver and Crestview Partners, LP
) DC. 7168
**Defendant**
) DEPUTY SHERIFF _____ I.D. NO.
)
)
)

TO THE ABOVE NAMED DEFENDANT(S): Jeffery Marcus, 1075 N. Ocean Blvd., Palm Beach, FL 33480

You are hereby summoned and required to file electronically with the Clerk of said Court at **https://efilega.tylerhost.net/ofsweb** and serve upon plaintiff's attorney, whose name and address is:

Lindsey L. Hobbs, Esq.
Wise & Reeves, P.C.
625 S. Gay St., Ste. 160
Knoxville, TN 37902

An answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed within five (5) business days of such service. Then time to answer shall not commence until such proof of service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This _____ **11/2/2018** _____ day of _____, 20 _____

Honorable Cathelene "Tina" Robinson
Clerk of Superior Court
By _____
Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you _____, 20 _____

_____
Deputy Sherriff

Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used

Fulton County Superior Court
***EFILED***LW
Date: 11/2/2018 3:47 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| ERIC J. STEINMANN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. **2018CV312580** |
| | ) | |
| v. | ) | |
| | ) | Complaint |
| MARY G. BERNER, an individual, | ) | JURY TRIAL REQUESTED |
| CRESTVIEW PARTNERS, LP, | ) | |
| JEFFREY MARCUS, an individual, | ) | |
| BRIAN P. CASSIDY, an individual, | ) | |
| and ROSS OLIVER, an individual, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW Plaintiff Eric J. Steinmann, and file this, his Complaint against the Defendants Mary G. Berner, Jeffrey Marcus, Brian Cassidy, Ross Oliver, and Crestview Partners, LP for breach of fiduciary duty, unjust enrichment, and conspiracy, all arising from their actions in dealing with Plaintiffs. In support of the same, Plaintiffs show the Court as follows:

## PARTIES

1. Plaintiff Eric Steinmann is an individual residing in Duval County Florida.

2. Upon information and belief, Defendant Mary G. Berner is an individual residing in Fulton County, Georgia. Defendant Berner may be served with process at 3280 Peachtree Road NE, Suite 2300, Atlanta, Georgia 30305.

3. Upon information and belief, Defendant Jeffery A. Marcus is an individual residing in Palm Beach County, Florida. Defendant Marcus may be served with process at 1075 N. Ocean Blvd, Palm Beach, FL.

1

4.  Upon information and belief, Defendant Brian P. Cassidy is an individual residing in New York County, New York. Defendant Cassidy may be served with process at 590 Madison Avenue, New York, NY.

5.  Upon information and belief, Defendant Ross Oliver is an individual residing in New York County, New York. Defendant Oliver may be served with process at 667 Madison Avenue, New York, NY.

6.  Upon information and belief, Defendant Crestview Partners, LP ("Crestview") is an entity headquartered in New York, New York. Crestview Partners is a private equity firm focusing on leveraged buyout and distressed for control investments in the media industry.

7.  This Court has jurisdiction over the parties in this matter pursuant to O.C.G.A. §9-10-91. Venue is proper in this Court based on O.C.G.A. §9-10-93.

### STATEMENT OF FACTS

8.  Mr. Steinmann owned shares of Cumulus Media, Inc. ("Cumulus")

9.  At all times relevant to this Complaint, Defendant Berner was the President, Chief Executive officer, and a Director on the Board of Directors (the "Board") of Cumulus.

10. At all times relevant to this Complaint, Defendant Marcus was a Director and the Non-Executive Chairman of the Board of Cumulus.

11. At all times relevant to this Complaint, Defendant Cassidy served on the Board.

12. At all times relevant to this Complaint, Defendant Oliver served on the Board.

13. At all times relevant to this Complaint, Defendants Marcus, Oliver and Cassidy were employed by and had partnership interests in Crestview.

2

14.    In 2015 Defendant Berner was selected and hired as CEO of Cumulus at the request and urging of Defendants Marcus and Cassidy. Defendant Berner was CEO of Readers Digest when it underwent a restructuring bankruptcy. Defendant Berner was partially selected by other Defendants due to her expertise in navigating a company through restructuring.

15.    By early 2017, Cumulus was facing financial difficulty, but had options for managing its debt, making all creditors whole, and maintaining a viable and ongoing enterprise.

16.    In 2017, Cumulus' largest debt was a Term Loan held by multiple creditors, including Voya funds managed by Crestview. In 2017, the Term Loan had an outstanding balance of approximately $1,729,000,000, which was not due until December 2020, with an interest rate at Libor + 3.25%, which resulted in a rate of 4.25% in 2017. Ample time existed to negotiate with creditors and restructure this debt without bankruptcy.

17.    In addition, there were approximately $600,000,000 in bonds outstanding, including Plaintiff's, which were receiving interest payments at an interest rate of 7.75%. Bondholders offered to forego interest in exchange for equity. This would provide an additional $200,000,000 to further deleverage their larger Term Loan before the balance was due.

18.    In addition to removing approximately $600,000,000 in debt from Cumulus' books by equitizing the bonds and freeing up a minimum of $200,000,000 in interest payments to pay down the Term Loan, the bondholder's offer had the added benefit of streamlining Cumulus's debt profile, leaving only the Term Loan as the outstanding material debt obligation. All Parties believed that this would have made Cumulus even more attractive to potential financiers or investors by December 2020.

3

19.     For payment of these debts, Cumulus held in escrow proceeds from the sale of real property located in Washington D.C., that was expected to reduce the Term Loan to $1,650,000,000, and with Cumulus' projected revenue of $1,133,000,000 in 2017 and $1,172,000,000 in 2018, and an estimated earnings before interest, tax, depreciation and amortization of $215,000,000 in 2017 and $235,000,000 in 2018, conservative projections suggested that the Term Loan could be paid down by an additional $200,000,000 to $1,450,000,000 by or before 2019.

20.     As a final piece of their offer, the bondholders included an attractive Management Incentive Plan ("MIP") in their offer which included a management equity package and other terms favorable to Defendant Berner.  The offered MIP was on the high side of the fair market value typical for those cases where, as here, the goal was to incentivize management personnel that were not funding any portion of the deleveraging efforts themselves.

21.     Defendants were not satisfied with the MIP compensation that was offered.  They demanded approximately double the bondholders' offer for management compensation, despite knowing that the bondholders' offer was based on sound market information.

22.     Before and during negotiations with creditors, Defendants Crestview, Berner, Cassidy, Oliver and Marcus developed a scheme by which they could ultimately utilize their leadership positions at Cumulus to benefit themselves to the detriment of the Plaintiff's ownership interest.

23.     This scheme involved a series of elaborate steps and machinations ultimately designed to benefit and enrich Defendants Crestview, Cassidy, Oliver, Berner and Marcus personally, to the detriment of Plaintiff.  Among other things, Defendants Crestview Cassidy, Oliver, Berner and Marcus:

4

a. Identified those members of the Board that could be controlled and those that could not, and formed a restructuring committee that excluded one or more Board members and began to function as a "shadow board" designed to implement Defendants' directives;

b. Directly thwarted a large shareholder's efforts to raise and infuse an additional $200,000,000 of capital into Cumulus to further pay down the Term Loan;

c. Instituted a "poison pill" resolution to prevent Cumulus from accepting any further cash infusions to assist with the debt reduction;

d. Discontinued monthly calls and limited information provided to certain shareholders and certain Board members;

e. Intentionally limited the information included in shadow board meeting minutes and limiting access to related information;

f. Began to hold regular Board meetings and dinners without notice to one or more of the Board members;

g. Began to secretly shop Cumulus to owners of the Term Loan, seeking a creditor that would agree to their outlandish MIP demand and pay them more personally in exchange for more favorable terms for that creditor; and

h. Devised a plan to enter bankruptcy as a means of carrying out a corporate raid in which both Defendant Berner and the Crestview defendants profited.

24. In their efforts to control the Board, Defendant Marcus, along with Defendant Cassidy and Berner, attempted to remove or run off several members of the Board, including Ralph Everett. When this failed, Defendants Marcus, Cassidy and Berner established a committee to run Cumulus as a shadow board, excluding several directors from this committee.

5

25. Defendants alleged conflicts of interest to isolate other Board members for their actions in raising capital for the Company. These allegations of conflict of interest were manufactured for convenience and for Defendants to gain a controlling vote of Cumulus

26. Crestview, the company owned by and employing Defendants Marcus, Cassidy and Oliver, was involved in management of assets for a secured creditor of Cumulus. Crestview was also involved in the purchase of a large portion of a Cumulus creditor's, Voya Financial, Inc. ("Voya"), assets during all relevant times of this complaint.

27. The self-interest and self-dealings of the Defendants are a true conflict of interest rather than one manufactured for convenience.

28. Defendants Cassidy and Marcus executed the filings for Cumulus to enter bankruptcy.

29. Defendant Cassidy was replaced by Ralph Oliver on the Board on or about March 20, 2017.

30. Cumulus Media entered bankruptcy on November 30, 2017 and emerged from Bankruptcy in June 2018. A true and correct copy of the Cumulus bankruptcy petition is attached hereto as **Exhibit A.**

31. Upon information and belief, Crestview benefitted from the bankruptcy plan of Cumulus due to simultaneous negotiations with secured creditor Voya to purchase Voya's annuities and insurance business. A copy of the December 21, 2017 press release is attached hereto as **Exhibit B**.

32. The negotiations to purchase business from a Voya secured creditor was a conflict of interest for Defendants Oliver, Cassidy and Marcus.

33. Upon information and belief, Defendants benefitted from the Cumulus bankruptcy through management services provided by Crestview subsidiary Victory Capital Management. *See* **Exhibit C** (showing Voya funds managed by Crestview subsidiary).

6

34.  This management of assets for a Cumulus secured creditor was a conflict of interest for Defendants Marcus, Oliver and Cassidy.

35.  In the bankruptcy plan put forth by Defendants, Defendant Berner was kept as CEO and provided generous stock holdings in the restructured Cumulus to replace those cancelled in the Cumulus bankruptcy. Defendant Berner accepted this offer in exchange for pushing through an unnecessary bankruptcy plan that would strip Plaintiff of his stock holdings while Defendants would profit. *See* **Exhibit D** Grant of Equity Awards.

36.  This guarantee of future income and stock holdings was a conflict of interest for Defendant Berner.

37.  Plaintiff received nothing and his ownership extinguished due to self-interested acts of Defendants.

38.  The bankruptcy was an unreasonable business decision and not in the best interest of Plaintiff's ownership interests in Cumulus.

39.  Crestview negotiated with creditors prior to bankruptcy, specifically seeking higher compensation for management of the company (including Defendants) going forward.

40.  Creditors offered an alternative to filing bankruptcy in which bondholders of Cumulus would release some debt and defer other debt to allow Cumulus to march forward with a viable turnaround strategy.

41.  Requesting higher management fees in the alternative of declaring bankruptcy shows Defendants deemed bankruptcy as unnecessary.

42.  Bankruptcy was not a necessary action, but one in which the Defendants benefitted heavily at the expense of shareholders.

43. Crestview was simultaneously negotiating a deal to purchase a large portion of Cumulus creditor Voya's business and did in fact complete this purchase shortly after the filing of the Cumulus bankruptcy.

44. Crestview lost $23,000,000 of equity in the Cumulus as a result of the restructuring, but gained a significantly more valuable asset and benefit through its business dealings with Voya, including acquisition of Voya's insurance and annuities business.

45. The Bankruptcy plan involved giving 82.5% of equity in the restructured Cumulus to secured creditors in exchange for a $429,000,000 reduction in secured debt. *See* **Exhibit E**, Bankruptcy Restructuring Settlement Agreement.

46. The bankruptcy plan created a windfall to secured creditors, including Voya, from which Crestview took over the annuities and insurance business and managed assets that included Cumulus secured credit. *See* Exhibits B and C.

47. Voya reported that the largest portion of their second quarter 2018 growth was due to the restructured Cumulus.

48. The secretive scheme was successful. While pretending to continue to negotiate in good faith with the bondholders to avoid bankruptcy, Defendants Berner and Marcus instead began secret negotiations with Voya and other secured creditors to file for Chapter 11 bankruptcy protection, crafted a Restructuring Support Agreement ("RSA") that resulted in very favorable terms and outcomes for Defendants Crestview and Berner.

49. The RSA awarded the following to Term Loan Holders:

   a. Debt to Term Loan Holders is reduced from $1,730,000,000 to $1,300,000,000.

   b. 83.5% of the stock of the restructured company is provided to Term Loan holders in exchange for reducing debt by $429,000,000.

8

The Restructuring Settlement Agreement awarded the bond holders 16.5% of the equity in the new company in exchange for approximately $600 million in bond debt.

Shareholders of Cumulus received nothing and their shares were cancelled.

To facilitate sufficient time to allow Defendants to develop and implement their scheme, Defendants Cassidy, Oliver, Berner and Marcus continued to pretend to negotiate with the Bondholders and, among other things, insisted on a series of negotiation and non-disclosure agreements -- and multiple extensions thereto -- the effect of which was three-fold: 1) this kept the Bondholders negotiating in good faith, who were not suspicious, and were not made privy to the secret, parallel negotiations going on to their detriment; 2) Cumulus was not required to pay the interest payments to the Bondholders that would have become due during this time, thereby increasing the funds available to Defendants to sweeten the pot for the creditors, including Voya; 3) to buy time to make sure the Crestview deal with Voya would become a reality and the bankruptcy would in fact benefit Crestview more than its losses through ownership interests; and 4) allow Crestview Partners and associated Defendants to profit through Voya fund management.

Indeed, as late as November 24, 2017, just days before filing bankruptcy, Defendants Berner and Marcus sent a Term Sheet to the Bondholders that requested MIP terms in the offer the Bondholders had made to them be double the fair market value.

On or about November 29, 2017, at the direction of Defendants Cassidy, Oliver, Berner, Marcus, and others, Cumulus Media, Inc., filed its Chapter 11 Voluntary Petition for Non-Individual bankruptcy in the Southern District of New York (Manhattan), Bankruptcy Petition No: 17-13381-scc. Filings with the Bankruptcy Court were signed by Defendants Cassidy and Marcus despite Defendant Cassidy resigning from the board in March 2017.

9

50.    The possibility of Cumulus becoming insolvent at some future time purely speculative. Preliminary negotiations and the thought that long term debt could not be renegotiated is also speculative and premature on a debt not due for at least three years.

51.    The situation was such that a well-managed Cumulus could negotiate solutions to meet its obligations in the near term and continue to remain solvent indefinitely. A formal bankruptcy three years prior to the due date on a loan was unnecessary, or premature at the very least.

52.    Not only were there several advantageous options for private Cumulus restructuring and deleveraging, Cumulus was not in default of any payment obligations as the balance on the Term Loan would not come due for more than three years.

53.    In May 2018, the Bankruptcy Court approved a restructuring plan which provided Plaintiff with nothing in return for his ownership share of the company.

54.    Upon information and belief, most of the meetings, dinners, telephone conferences, and conduct alleged herein occurred in or near Fulton County, Georgia, and much of it as Cumulus Media, Inc.'s headquarters located at 3280 Peachtree Road NE, Suite 2300, Atlanta, GA 30305.

55.    Defendants Marcus, Cassidy, Oliver, Crestview and Berner were shareholders in the pre-bankruptcy Cumulus Media. Crestview was the largest shareholder in Cumulus. A derivative action by shareholders would directly benefit Defendants. For this reason, a derivative action is not proper pursuant to Georgia Law.

## FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duty)

56.    Plaintiff incorporates paragraphs 1 through 56 of the Complaint as if fully set forth herein.

57.    By 2017, Cumulus Media was in negotiations with bond holders for a solution which would protect the interests of creditors, bondholders and shareholders, while placing Cumulus Media in a competitive and attractive position moving forward.

58.    Defendants Berner, Cassidy, Oliver and Marcus, as members of the board of directors, owed a fiduciary duty to Plaintiff to protect Plaintiff's ownership interests, and to manage the assets of Cumulus for the benefit of its shareholders while meeting obligations to creditors.

59.    This duty included the obligation for Defendants Berner, Cassidy, Oliver and Marcus to refrain from schemes or devices designed to benefit Defendants Berner, Cassidy, Oliver and Marcus to the detriment of other ownership interests in Cumulus.

60.    Defendants Berner, Cassidy, Oliver and Marcus breached their duty to Plaintiff by intentionally engaging in schemes and devices designed to prefer and favor their own interest over those of Plaintiff's. Specifically, Defendant's entered an unnecessary bankruptcy for the purpose of trading $23,000,000 in distressed stock for ownership in a company with less debt burden and a better profit in the management of that ownership.

61.    Defendants placed the interests in profit of their own subsidiaries over the interests of owners of the Cumulus and Cumulus, itself.

62.    Defendants devised a scheme that would take the ownership interests of Plaintiff and give it to their own subsidiaries and other creditors.

63.    The RSA resulted in a large windfall for the Defendants' subsidiaries and other creditors.

11

64.     Plaintiff Mr. Steinmann has been damaged by Defendant Berner's and Defendants Crestview Partners LLC, Oliver, Cassidy and Marcus' breach of duty.

## SECOND CAUSE OF ACTION

### (Unjust Enrichment)

65.     Plaintiff incorporates paragraphs 1 through 64 of the Complaint as if fully set forth herein.

66.     Defendants Berner, Oliver, Cassidy and Marcus had a responsibility as Directors of Cumulus to protect the interests of shareholders of Cumulus.

67.     Defendants Berner, Oliver, Cassidy and Marcus chose a business plan that would be detrimental to bond holders and shareholders and beneficial to their own subsidiaries, or beneficial to their own employment and stock holdings in Cumulus..

68.     Because Defendants, Berner, Oliver, Cassidy and Marcus are owners and/or represent specific majority owners in Cumulus, a derivative action would result in injustice as it would benefit the wrongdoers.

69.     Defendants Berner, Oliver, Cassidy and Marcus acted in an unreasonable business fashion for the purpose of increasing their own compensation and ownership value at the expense of Plaintiff Steinmann's ownership interests in Cumulus.

70.     Defendants Oliver, Cassidy and Marcus also acted to benefit themselves through favorable purchase terms of annuity and insurance business from a long-term creditor and management of assets comprised of Cumulus secured credit.

71.     Defendant Berner was unjustly enriched in the form of increased ownership through board of director and management grant of equity in the restructured corporation.

12

72. Defendants Oliver Cassidy and Marcus were unjustly enriched through ownership of a subsidiary holding Cumulus secured debt and favorable purchase terms of those assets. While they lost as shareholders, their gains as future owner and benefits to a secured creditor greatly offset the small loss of Cumulus equity.

73. The bankruptcy was not necessary as evidenced by Defendants' negotiations to continue the original Cumulus operation, but benefitted Defendants.

74. Defendants did in fact benefit from the unnecessary bankruptcy restructuring.

75. Equity was taken from Plaintiff without compensation and is held by Defendants.

76. Holding of this equity is an unjust enrichment of defendants.

**THIRD CAUSE OF ACTION**

**(Conspiracy)**

77. Plaintiff incorporates paragraphs 1 through 76 of the Complaint as if fully set forth herein.

78. Defendants Cassidy, Berner, Oliver and Marcus planned to shirk their fiduciary duty to other ownership interests in Cumulus for their own personal benefit.

79. Defendants Crestview, Cassidy, Berner, Oliver and Marcus agreed upon the objective of deleting other ownership interests through filing an unnecessary and unreasonable bankruptcy action while negotiating with and managing funds of a major creditor for benefit to themselves.

80. Defendants Crestview, Cassidy, Berner, Oliver and Marcus used conflict of interest as an excuse to isolate and exclude other board members while a clear conflict of interest and self-dealing motivated their own actions.

13

81.  By excluding other Board members and creating a shadow board to put the company through a bankruptcy beneficial to themselves, Defendants Berner, Oliver, Cassidy and Marcus did in fact breach a duty to Plaintiff Steinmann and further their own objectives.

82.  Plaintiff Steinmann's ownership interests were eliminated without compensation by the acts of the Defendants and furtherance of this conspiracy between Defendants.

## FOURTH CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty)

### (Against Defendant Mary Berner)

83.  Plaintiff incorporates paragraphs 1 through 82 of the Complaint as if fully set forth herein.

84.  Defendants Cassidy, Oliver and Marcus planned to shirk their fiduciary duty to Plaintiff for their own personal benefit.

85.  Defendants Cassidy, Oliver and Marcus needed cooperation from one other Board member to carry out their plan to breach fiduciary duty to Plaintiff.

86.  Defendants Cassidy, Oliver and Marcus as Board members had a fiduciary duty to equity owners Cumulus.

87.  Filing an unnecessary bankruptcy with a restructuring plan that extinguished equity interest is a breach of fiduciary duty to Plaintiff.

88.  Defendant Berner agreed to assist in the objective of eliminating Plaintiff's equity interest through filing an unnecessary and unreasonable bankruptcy action while negotiating with two major secured creditors for benefit of other defendants.

14

89.     Defendant Berner assisted her co-Defendants by participation in the shadow board which stalled negotiations with creditors. This allowed correct timing for Crestview to put in place a profitable side deal purchase from Voya.

90.     Crestview negotiated with JP Morgan (another Cumulus secured creditor) to take a Crestview subsidiary public.

91.     Defendant Berner assisted her co-Defendants in filing an unnecessary bankruptcy which benefitted Voya and JP Morgan in return for favorable treatment to Crestview and Crestview subsidiaries.

92.     Defendant Berner assisted her co-Defendants in these schemes in exchange for a valuable ongoing compensation package and promise of equity in the restructured Cumulus to offset her equity losses in the old Cumulus.

93.     Defendant Berner's actions in filing an unnecessary bankruptcy to benefit conflicted Defendants were wrongful conduct and improper actions.

94.     Defendant Berner had knowledge Defendants Oliver, Cassidy and Marcus owed a fiduciary duty to equity interest holders, including Plaintiff.

95.     Defendants Oliver, Cassidy and Marcus could not have procured the wrongful bankruptcy and breach of duty associated with the restructuring plan without the assistance of Defendant Berner.

96.     Defendant Berner's assistance was purposeful, intentional and knowing that the bankruptcy would harm Plaintiff.

97.     Defendant Berner's assistance was the cause and proximate cause of damage to Plaintiff.

15

98.     Plaintiff was in fact injured when Plaintiff's ownership interests in Cumulus Media Inc. was
        eliminated without adequate compensation by the acts of the Defendants and including the
        assistance of Defendant Berner.


**WHEREFORE** Plaintiff prays for the following relief:

1.  That summons and process be issued requiring these defendants to appear as provided
    by law to answer the allegations of this Complaint;

2.  That all triable issues be determined by a jury;

3.  That Plaintiff recover from Defendants the value of his ownership in Cumulus Media,
    Inc. prior to the initiations of schemes and fraudulent activities described herein;

4.  That Plaintiff recover from Defendants attorneys' fees, costs of Court, litigation
    expenses and other associated costs;

5.  That the amount of all such compensatory damages shall be proven at trial and
    determined by the enlightened conscience of a jury;

6.  The Plaintiff recovers punitive damages against Defendants in amounts to be determined
    by the enlightened conscience of a jury;

7.  That Plaintiff has and recover all damages to which they are entitled under Georgia law;
    and

8.  That Plaintiff has all such other and further relief as this Court deems just and
    appropriate.

16

Respectfully Submitted this 2nd day of November, 2018.

WISE & REEVES, P.C.

BY:/s/ Lindsey L. Hobbs
   Lindsey L. Hobbs, Ga Bar # 940347
   Two Centre Square, Ste 160
   625 S. Gay Street
   Knoxville, TN 37902
   (865) 544-1199
   lindsey@wiseandreeves.com
   Attorney for Plaintiff

# Exhibit B

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Tel: 212-373-3000
Fax: 212-757-3990
Paul M. Basta
Lewis R. Clayton
Jacob A. Adlerstein
Claudia R. Tobler

*Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **CUMULUS MEDIA INC.,** *et al.*, | **Case No. 17-13381 (SCC)** |
| **Debtors.** [1] | **(Jointly Administered)** |

**FIRST AMENDED JOINT PLAN OF REORGANIZATION OF CUMULUS MEDIA INC.**
**AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]     The last four digits of Cumulus Media Inc.'s tax identification number are 9663.  Because of the large number of Debtors in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/cumulus.  The location of the Debtors' service address is: 3280 Peachtree Road, N.W., Suite 2200, Atlanta, Georgia 30305.

30.     "*Communications Act*" means Chapter 5 of Title 47 of the United States Code, 47 U.S.C. § 151 *et seq.*, as amended.

31.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

32.     "*Confirmation Date*" means the date upon which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

33.     "*Confirmation Hearing*" means the confirmation hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

34.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the transactions contemplated thereby.

35.     "*Consenting Equityholders*" means, collectively, the Holders of Interests in Cumulus party to the Restructuring Support Agreement.

36.     "*Consenting Term Loan Lenders*" means, collectively, the Term Loan Lenders party to the Restructuring Support Agreement.

37.     "*Consummation*" means the occurrence of the Effective Date.

38.     "*Convenience Claim*" means a General Unsecured Claim that is either (a) in an amount that is equal to or less than $20,000 or (b) in an amount that is greater than $20,000, but with respect to which the Holder of such General Unsecured Claim voluntarily and irrevocably reduces the aggregate amount of such Claim to $20,000 pursuant to a valid election by the Holder of such General Unsecured Claim made on its Ballot on or before the Plan Voting Deadline.

39.     "*Convenience Class Cap*" means $2 million in the aggregate or such greater amount that is subject to the prior written consent of the Term Lender Group.

40.     "*Credit Agreement*" means that certain Amended and Restated Credit Agreement, dated as of December 23, 2013, among Cumulus, Cumulus Media Holdings Inc., as borrower, certain lenders party thereto, the Credit Agreement Agent, and certain other agents party thereto.

41.     "*Credit Agreement Agent*" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the Credit Agreement (or any successor to JPMorgan Chase Bank, N.A., in such capacity).

42.      "*Credit Agreement Claim*" means any Claim against any Debtor derived from, based upon, relating to, or arising from the Credit Agreement or the related Loan Documents (as defined in the Credit Agreement).

43.     "*Credit Documents*" means, collectively, the (a) Credit Agreement, (b) each security agreement, guaranty, pledge agreement, mortgage, and any other document entered into pursuant to or in connection with the Credit Agreement, and (c) each other agreement that creates or purports to create or perfect a Lien or security interest in favor of the Credit Agreement Agent and/or the Term Loan Lenders.

44.     "*Cumulus*" means Cumulus Media Inc.

56.     *"Disclosure Statement Order"* means the *Order Approving (A) the Adequacy of the Disclosure Statement; (B) Solicitation and Notice Procedures with Respect to Confirmation of the Joint Plan of Reorganization of Cumulus Media Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code; (C) the Form of Ballots and Notices in Connection Therewith; (D) the Scheduling of Certain Dates with Respect Thereto; and (E) Related Relief* [Docket No. 416].

57.     *"Disputed"* means, with respect to a Claim against any Debtor, (a) any Claim, proof of which was timely and properly Filed, which is disputed under Article VII of this Plan or as to which the Debtors or any other party in interest have interposed and not withdrawn an objection or request for estimation (pursuant to Article VII of this Plan or otherwise) that has not been determined by a Final Order, (b) any Claim, proof of which was required to be Filed by order of the Bankruptcy Court but as to which a Proof of Claim was not timely or properly Filed, (c) any Claim that is listed in the Schedules as unliquidated, contingent, or disputed, or (d) any Claim that is otherwise disputed by any of the Debtors, the Reorganized Debtors or any other party in interest, which dispute has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court.  For the avoidance of doubt, if no Proof of Claim has been Filed by the applicable Claims Bar Date and the Claim is not listed on the Schedules or has been or hereafter is listed on the Schedules as $0, disputed, contingent, or unliquidated, such Claim shall be Disallowed and shall be expunged from the Claims Register without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

58.     *"Disputed Claim Reserve"* means the reserve of Special Warrants created pursuant to Article VII.F. of this Plan.

59.     *"Distribution Record Date"* means the Confirmation Date or such later date as agreed to by the Reorganized Debtors and the Term Lender Group in their sole and absolute discretion; *provided*, *however*, that no distribution record date shall apply to the Senior Notes or any other publicly-held Securities.

60.     *"DTC"* means the Depository Trust Company.

61.     *"Effective Date"* means the first Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been satisfied or waived pursuant to Article IX.A and Article IX.B, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

62.     *"Employee Obligations"* means the Debtors' written contracts, agreements, policies, programs and plans for, among other things, compensation, reimbursement, indemnity, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, including in the event of a change of control after the Effective Date, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the directors, officers and employees of any of the Debtors who served in such capacity at any time (including any compensation programs approved by the Bankruptcy Court).

63.     *"Entity"* means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

64.     *"Estate"* means, as to each Debtor, the estate created for such Debtor by section 541 of the Bankruptcy Code.

65.     *"Equity Allocation Mechanism"* means the methodology for allocating the New Securities among the Holders of Allowed Credit Agreement Claims, Allowed Senior Notes Claims, and Allowed General Unsecured Claims, set forth on Exhibit A hereto.

66.     *"Exculpated Causes of Action"* means any Causes of Action or Claim related to any act or omission derived from, based upon, related to, or arising from the Debtors' in or out-of-court restructuring efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, solicitation or Filing of the Disclosure Statement, the Plan (including any term sheets related thereto), or any contract, instrument, release, or other

agreement or document created or entered into in connection with any of the foregoing, the funding of this Plan, the occurrence of the Effective Date, the administration of this Plan or the property to be distributed under this Plan, the pursuit of Confirmation or Consummation, and the administration and implementation of the Plan, including (a) the New Corporate Governance Documents, (b) the First Lien Exit Facility, (c) the New Revolving Credit Facility (if any), (d) the Restructuring Transactions, (e) the Restructuring Support Agreement, (f) the issuance of the New Securities (g) the Management Incentive Plan, and (g) the distribution of property under the Plan or any other agreement under the Plan; *provided*, that the Exculpated Parties shall be entitled, in all respects, to reasonably rely upon the advice of counsel with respect to the foregoing.

67.      "*Exculpated Party*" means each of:  (a) the Debtors, (b) the Reorganized Debtors, (c) the Consenting Term Loan Lenders, (d) the Consenting Equityholders, (e) the Credit Agreement Agent, (f) with respect to each of the foregoing Entities in clauses (a) through (e), the manager, management company, or investment advisor of any of the foregoing, and each of such Entities' respective current and former Affiliates, predecessors, successors, assigns, subsidiaries, managed accounts or funds, and (g) with respect to each of the foregoing Entities (a) through (f), such Entities' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

68.      "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

69.      "*Federal Judgment Rate*" means the interest rate applicable to a judgment entered on the Petition Date that is subject to section 1961 of the Judicial Code, as determined in accordance with that statute.

70.      "*FCC*" means the Federal Communications Commission, including any official bureau or division thereof acting on delegated authority, and any successor governmental agency performing functions similar to those performed by the Federal Communications Commission on the Effective Date.

71.      "*FCC Applications*" means collectively, each application, petition, or other request filed with the FCC in connection with this restructuring and the Plan.

72.      "*FCC Approval*" means the FCC's grant of the FCC Long Form Application.

73.      "*FCC Licenses*" means broadcasting and other licenses, authorizations, waivers and permits that are issued from time to time by the FCC.

74.      "*FCC Long Form Application*" means the applications filed with the FCC seeking FCC consent to the Transfer of Control.

75.      "*FCC Ownership Procedures Order*" means an order to be entered by the Bankruptcy Court establishing procedures for, among other things, completion and submission of the Ownership Certification.

76.      "*File,*" "*Filed,*" or "*Filing*" means file, filed, or filing with the Bankruptcy Court, the Clerk of the Bankruptcy Court, or any of its or their authorized designees in the Chapter 11 Cases, including with respect to a Proof of Claim, the Voting and Claims Agent.

77.      "*Final Order*" means an order, ruling or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court), which has not been reversed, stayed, modified, amended or vacated, and as to which (a) the time to appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or

128. *"Released Party"* means each of: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Term Loan Lenders; (d) the Credit Agreement Agent; (e) the Consenting Equityholders; (f) the Committee; (g) each of the members of the Committee; (h) the Senior Notes Indenture Trustee; (i) with respect to each of the foregoing Entities in clauses (a) through (h), each of such Entity's respective current and former Affiliates, predecessors, successors, assigns, subsidiaries, managed accounts or funds; and (j) with respect to each of the foregoing Entities in clauses (a) through (i), such Entities' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, management companies, investment advisors, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided*, that any Holder of a Claim or Interest that elects to opt-out of the Third-Party Release shall not constitute a Released Party (even if for any reason otherwise entitled).

129. *"Releasing Parties"* means each of: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Term Loan Lenders; (d) the Credit Agreement Agent; (e) the Consenting Equityholders; (f) the Committee; (g) each of the members of the Committee; (h) the Senior Notes Indenture Trustee; (i) all Holders of Claims and Interests that are deemed Unimpaired and presumed to accept the Plan and do not elect to opt-out of the Third-Party Release; (j) all Holders of Claims and Interests who vote to accept the Plan; (k) all Holders of Claims and Interests entitled to vote on the Plan who abstain from voting on the Plan and do not elect on their Ballot to opt-out of the Third-Party Release; (l) all Holders of Claims and Interests entitled to vote on the Plan who vote to reject the Plan but do not elect on their Ballot to opt-out of the Third-Party Release; (m) all other Holders of Claims and Interests who are deemed to reject the Plan and do not elect to opt-out of the Third-Party Release; (n) with respect to each of the foregoing Entities in clauses (a) through (m), each of such Entity's respective current and former Affiliates, predecessors, successors, assigns, subsidiaries, managed accounts or funds; and (o) with respect to each of the foregoing Entities in clauses (a) through (n), such Entities' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, management companies, investment advisors, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

130. *"Reorganized Debtors"* means (a) the Debtors, or any successor or assignee thereto, by merger, consolidation, or otherwise, on or after the Effective Date, and (b) to the extent not already encompassed by clause (a), Reorganized Cumulus and any newly formed subsidiaries thereof, on or after the Effective Date.

131. *"Reorganized Cumulus"* means either (a) Cumulus or any successor thereto, as reorganized pursuant to and under the Plan, or (b) a new corporation or limited liability company that may be formed or caused to be formed by the Debtors, the Restructuring Support Parties or a designee thereof to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Securities to be distributed pursuant to the Plan, in each case, on and after the Effective Date.

132. *"Restricted Stock"* means shares of New Common Stock that are subject to temporary restrictions prohibiting certain transfers of such shares, and prohibiting the trading of such shares, on any national securities exchange.

133. *"Restricted Stock Election"* means an election made by a Holder of an Allowed Credit Agreement Claim on the Ownership Certification that such Holder elects to receive its New Common Stock in the form of Restricted Stock.

134. *"Restructuring Support Agreement"* means that certain Restructuring Support Agreement, dated as of November 29, 2017, by Cumulus on behalf of itself and each of its direct and indirect subsidiaries, and, as applicable, the Consenting Term Loan Lenders and the Consenting Equityholders (as amended, supplemented or modified from time to time, including all exhibits thereto).

135. *"Restructuring Support Parties"* means those parties who are signatories to the Restructuring Support Agreement, other than the Debtors.

on account of such Allowed Claim unless required under applicable bankruptcy law or as otherwise provided in Article III.B.

F.    *Reserve of Special Warrants.*

On the Effective Date (or as soon thereafter as is reasonably practicable), the Reorganized Debtors shall create the Disputed Claim Reserve to pay Holders of Disputed Claims that are General Unsecured Claims that may become Allowed Claims pursuant to the terms of the Plan, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing the Disputed Claim Reserve and for maximum distribution purposes, to be the lesser of (a) the asserted amount of the Disputed Claim Filed with the Bankruptcy Court, or (if no Proof of Claim was Filed) listed by the Debtors in the Schedules, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, or (c) the amount otherwise agreed to by the Reorganized Debtors and the Holder of such Disputed Claim for Disputed Claim Reserve purposes. Special Warrants reserved under this paragraph F shall remain unissued unless and until issued in satisfaction of a Disputed Claim that becomes an Allowed Claim and shall therefore be disregarded in both the numerator and denominator in the calculation of any vote by shareholders of Reorganized Cumulus under any New Corporate Governance Documents. Any distribution on account of a Disputed Claim that becomes an Allowed General Unsecured Claim after the Effective Date shall be made solely in the form of Special Warrants that are distributed from the Disputed Claim Reserve.

G.    *No Interest.*

Unless otherwise expressly provided by section 506(b) of the Bankruptcy Code or as specifically provided for herein or by order of the Bankruptcy Court (including the Cash Collateral Order), postpetition interest shall not accrue or be paid on Claims against any of the Debtors, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim; *provided, however,* that nothing in this Article VII.G shall limit any rights of any Governmental Unit to interest under sections 503, 506(b), 1129(a)(9)(A) or 1129(a)(9)(C) of the Bankruptcy Code or as otherwise provided for under applicable law.

### ARTICLE VIII.
### SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.    *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order or in any contract, instrument, or other agreement or document created pursuant to the Plan, including the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan shall be in

complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.    *Release of Liens.*

**Except as otherwise specifically provided in the Plan, the First Lien Exit Facility Documents or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, on the Effective Date all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. In addition, the Credit Agreement Agent shall, at the Debtors' or Reorganized Debtors', as applicable, expense (and with no representation or warranty, or recourse to, the Credit Agreement Agent, any Term Loan Lender or any of their affiliates, officers, directors, employees, agents or counsel) execute and deliver all documents reasonably requested by the Debtors, the Reorganized Debtors, the First Lien Exit Facility Agent, or the New Revolving Credit Facility Agent (if any) to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

D.    *Releases by the Debtors.*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, the Released Parties shall hereby be expressly, unconditionally, irrevocably, generally, individually and collectively released, acquitted, and discharged by the Debtors, the Reorganized Debtors, and the Estates, each on behalf of itself and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, from any and all actions, Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of a Debtor or Reorganized Debtor, any Claims or Causes of Action asserted on behalf of any Holder of any Claim or Interest or other Entity or that any Holder of a Claim or Interest or other Entity would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, for violations of federal or state laws or otherwise, by statute or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that the Debtors, the Reorganized Debtors, or their Estates (whether individually**

or collectively) ever had, now has, or hereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or any other transaction relating to any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan, the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Restructuring Support Agreement, the Disclosure Statement, the First Lien Exit Facility Documents, the New Revolving Credit Facility Documents (if any), or, in each case, related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence, taking place on or before the Effective Date related or relating to any of the foregoing; *provided, however*, that except as expressly provided under the Plan, the foregoing releases shall not release Claims related to any act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence or willful misconduct. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date rights or obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and shall not result in a release of any of the Debtors' or Reorganized Debtors' assumed indemnification obligations as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) essential to the Confirmation of the Plan; (2) an exercise of the Debtors' business judgment; (3) in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Debtor Release; (5) in the best interests of the Debtors and all holders of Claims and Interests; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Debtors, the Reorganized Debtors, and the Estates and each of their current and former Affiliates, and such Entities' and their current and former Affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such asserting any Claim or Cause of Action released pursuant to the Debtor Release.

Nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

E.      *Releases by the Releasing Parties.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Effective Date, each of the Releasing Parties shall be deemed to have expressly, conclusively, absolutely, unconditionally, irrevocably, generally, individually and collectively, released, acquitted, and discharged the Released Parties from any and all actions, Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of a Debtor or Reorganized Debtor, any Claims or Causes of Action asserted on behalf of any Holder of any Claim or any Interest or other Entity or that any Holder of a Claim or an Interest or other Entity would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, for violations of federal or state laws or otherwise, by statute or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that such Releasing Party (whether individually or collectively) ever had, now has, or hereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or any other transaction relating to any Security of the

Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or any Interest that is affected by or classified in the Plan, the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Restructuring Support Agreement, the Disclosure Statement, the First Lien Exit Facility Documents, the New Revolving Credit Facility Documents (if any), or, in each case, related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence, taking place on or before the Effective Date related or relating to any of the foregoing; *provided, however*, that except as expressly provided under the Plan, the foregoing releases shall not release Claims related to any act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence or willful misconduct; *provided*, *further*, that any Holder of a Claim or an Interest that elects to opt-out of the releases contained in this paragraph shall not constitute a Released Party (even if for any reason otherwise entitled) and no Restructuring Support Party shall be entitled to opt-out of the releases contained in this paragraph for so long as the Restructuring Support Agreement remains in full force and effect as to such Restructuring Support Party.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date rights or obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and shall not result in a release of any of the Debtors' or Reorganized Debtors' assumed indemnification obligations as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (1) essential to the Confirmation of the Plan; (2) given in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (3) a good faith settlement and compromise of the Claims released by the Third-Party Release; (4) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

Nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

F.      *Regulatory Activities*.

Notwithstanding anything to the contrary herein, nothing in the Plan or Confirmation Order is intended to affect the police or regulatory activities of Governmental Units or other governmental agencies.

G.      *Exculpation*.

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any (i) Exculpated Causes of Action and (ii) obligation, Cause of Action, or liability for any Exculpated Causes of Action; *provided, however*, that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence, or willful misconduct; *provided further*, *however*, that the foregoing shall not be deemed to release, affect, or limit any post-Effective Date rights or obligations of the Exculpated Parties under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

H.     *Injunction.*

**Except as otherwise expressly provided in the Plan, the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Persons and Entities that have held, hold, or may hold Claims, Interests, Causes of Action or liabilities that have been released pursuant to Article VIII.D or Article VIII.E of the Plan, are discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.G of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Persons and Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (iii) creating, perfecting, or enforcing any Lien, Claim or encumbrance of any kind against such Persons or Entities or the property or the estates of such Persons or Entities, as applicable, on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Persons or Entities or against the property of such Persons or Entities, as applicable, on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; and (v) commencing or continuing in any manner any action or other proceeding of any kind against such Persons or Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities released, settled or compromised pursuant to the Plan; *provided*, that nothing contained herein shall preclude a Person or Entity from obtaining benefits directly and expressly provided to such Person or Entity pursuant to the terms of the Plan; *provided, further*, that nothing contained herein shall be construed to prevent any Person or Entity from defending against claims objections or collection actions whether by asserting a right of setoff or otherwise to the extent permitted by law.**

I.     *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.     *Recoupment.*

In no event shall any Holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.     *Protection Against Discriminatory Treatment.*

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, all Entities, including Governmental Units shall not discriminate against any Reorganized Debtor, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| CUMULUS MEDIA INC., *et al.*, | Case No. 17-13381 (SCC) |
| Debtors.[1] | (Jointly Administered) |

## FINDINGS OF FACT,
## CONCLUSIONS OF LAW, AND
## ORDER CONFIRMING THE DEBTORS' FIRST
## AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

The above-captioned debtors and debtors in possession (collectively, the "Debtors"),

having: [2]

a.  commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on November 29, 2017 (the "Petition Date");

b.  continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

c.  filed, on December 9, 2017, (i) the *Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 92], which plan and related documents were subsequently amended, and (ii) the *Disclosure Statement for Joint Plan of Reorganization of Cumulus Media Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 91], which disclosure statement and related documents were subsequently amended;

---

[1]  The last four digits of Cumulus Media Inc.'s tax identification number are 9663. Because of the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/cumulus. The location of the Debtors' service address is: 3280 Peachtree Road, N.W., Suite 2200, Atlanta, Georgia 30305.

[2]  Unless otherwise noted, capitalized terms not defined in this *Findings of Fact, Conclusions of Law, and Order Confirming Debtors' First Amended Joint Chapter 11 Plan of Reorganization* (this "Confirmation Order") shall have the meanings ascribed to them in the Plan (as defined herein). The rules of interpretation set forth in Article I.B of the Plan shall apply to this Confirmation Order.

Holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

**J.     Objections.**

10.     To the extent that any objections, reservations of rights, statements, or joinders to Confirmation have not been resolved, withdrawn, waived, or settled prior to entry of this Confirmation Order or otherwise resolved herein or as stated on the record of the Confirmation Hearing, they are hereby overruled on the merits based on the record before this Bankruptcy Court.

**K.     Burden of Proof.**

11.     The Debtors, as the proponents of the Plan, have met their burden of proving the elements of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.

**L.     Bankruptcy Rule 3016.**

12.     The Plan is dated and identifies the Debtors as the Plan proponents, thereby satisfying Bankruptcy Rule 3016(a).  The filing of the Disclosure Statement satisfied Bankruptcy Rule 3016(b).

**M.     Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1)).**

13.     The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

a.     Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).  As required by section 1123(a)(1), in addition to Administrative Claims (including Accrued Professional Compensation Claims) and Priority Tax Claims, which need not be classified, Article III of the Plan designates 10 Classes of Claims and Interests.  As required by section 1122(a) of the Bankruptcy Code, the Claims and Interests placed in each Class are substantially similar to other Claims and Interests, as the case may be, in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Interests.  Thus, the Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

b.    Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2)).  Article III of the Plan specifies that Classes 1, 2, 7, and 9 are Unimpaired under the Plan, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

c.    Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).  Article III of the Plan sets forth the treatment of Classes 3–6, 8, and 10, which are the Impaired Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

d.    No Discrimination (11 U.S.C. § 1123(a)(4)).  Article III of the Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class except to the extent that a Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

e.    Implementation of the Plan (11 U.S.C. § 1123(a)(5)).  The Plan and the various documents included in the Plan Supplement provide adequate and proper means for implementation of the Plan, including, without limitation: (i) the consummation of the Restructuring Transactions (including the Description of Transaction Steps set forth in the Plan Supplement); (ii) the New Corporate Governance Documents; (iii) the issuance of the New Securities; (iv) the cancellation of certain existing agreements, obligations, instruments, and Interests; (v) the entry into the First Lien Exit Facility; (vi) the entry into the Equity and Asset Transfer Agreement and related documents; (vii) the continued vesting of the assets of the Debtors' Estates in the Reorganized Debtors; and (viii) the execution, delivery, filing, or recording of all contracts, instruments, releases, and other agreements or documents in furtherance of the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code.

f.    Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).  The New Corporate Governance Documents prohibit the issuance of non-voting securities to the extent required to comply with section 1123(a)(6) of the Bankruptcy Code.  As such, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

g.    Designation of Directors and Officers (11 U.S.C. § 1123(a)(7)).  The Reorganized Debtors' initial directors and officers are set forth in the Plan Supplement and, to the extent not known, will be determined in accordance with the New Corporate Governance Documents, which is consistent with the interests of creditors, equity holders and public policy, and satisfies section 1123(a)(7) of the Bankruptcy Code.

h.    Additional Plan Provisions (11 U.S.C. § 1123(b)).  The additional provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code and, therefore, are consistent with section 1123(b) of the Bankruptcy Code.

(i)    Impairment/Unimpairment of Any Class of Claims or Interests (11 U.S.C. § 1123(b)(1)).  Pursuant to the Plan, Classes 1, 2, 7, and 9 are Unimpaired,

and Classes 3–6, 8 and 10 are Impaired, as contemplated by section 1123(b)(1) of the Bankruptcy Code.

(ii)   <u>Assumption and Rejection of Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2))</u>.  Article V of the Plan provides for the assumption of the Debtors' Executory Contracts and Unexpired Leases as of the Effective Date unless such Executory Contract or Unexpired Lease: (A) was previously rejected; (B) expired or terminated pursuant to its own terms; (C) is the subject of a notice of rejection or motion to reject that is pending on the Effective Date; or (D) was identified on the Schedule of Rejected Executory Contracts and Unexpired Leases.

(iii)   <u>Retention of Claims (11 U.S.C. § 1123(b)(3))</u>.  In accordance with section 1123(b)(3) of the Bankruptcy Code, Article IV.S of the Plan provides that, subject in all respects to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

(iv)   <u>Compromise and Settlement (11 U.S.C. § 1123(b)(3))</u>.  In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good-faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that all Holders of Claims or Interests may have with respect to any Allowed Claim or Interest or any distribution to be made on account thereof.  Such compromise and settlement is fair, equitable, and reasonable and in the best interests of the Debtors and their Estates.  In addition, for the reasons set forth on the record at the Confirmation Hearing, the Plan, as modified by this Confirmation Order, constitutes a good faith compromise and settlement of all issues relating to the alleged substantive consolidation of the Debtors' Estates and any alleged improper "gifting" as they relate to distributions to Holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims (the "<u>Intercreditor Distribution Settlement</u>").

(v)   <u>Other Appropriate Provisions (11 U.S.C. § 1123(b)(6))</u>.  The Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including, without limitation, provisions for (A) distributions to Holders of Claims, (B) resolution of Disputed Claims, (C) allowance of certain Claims, (D) the assumption of certain Indemnification Provisions, (E) releases by the Debtors of certain parties, (F) releases by certain third parties, (G) exculpations of certain parties, and

(H) retention of Bankruptcy Court jurisdiction, thereby satisfying the requirements of section 1123(b)(6).

i.  Cure of Defaults (11 U.S.C. § 1123(d)).  Article V.C of the Plan provides for the satisfaction of Cure Claims associated with each Executory Contract and Unexpired Lease to be assumed (or assumed and assigned) in accordance with section 365(b)(1) of the Bankruptcy Code.  The cure amount identified in the Cure Notice distributed to the applicable counterparty represents the amount, if any, that the Debtors shall pay in full and complete satisfaction of such Cure Claim.  Any disputed cure amounts will be determined in accordance with the procedures set forth in Article V.C of the Plan, and applicable bankruptcy and nonbankruptcy law. As such, the Plan provides that the Debtors will cure, or provide adequate assurance that the Debtors will promptly cure, defaults with respect to assumed Executory Contracts and Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code.  Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

## N.  The Debtors' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2)).

14.  The Debtors have complied with the applicable provisions of the Bankruptcy Code, as required by section 1129(a)(2) of the Bankruptcy Code.  Specifically:

a.  the Debtors are eligible debtors under section 109 of the Bankruptcy Code and are proper proponents of the Plan under section 1121(a) of the Bankruptcy Code;

b.  the Debtors have complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Bankruptcy Court; and

c.  the Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules in transmitting the Confirmation Materials and related notices and in soliciting and tabulating the votes on the Plan.

## O.  Good Faith (11 U.S.C. § 1129(a)(3)).

15.  The Debtors have proposed the Plan (including the Plan Documents (as defined herein) and all other documents necessary to effectuate the Plan) in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases and the formulation of the Plan.  The Debtors' good faith is evident from the facts and record of the Chapter 11 Cases,

the Disclosure Statement, and the record of the Confirmation Hearing. The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates and to effectuate a successful reorganization of the Debtors. The Plan was the product of extensive negotiations conducted at arm's length among the Debtors and certain of their key stakeholders. Further, the Plan's classification, indemnification, settlement, discharge, exculpation, release, and injunction provisions have been negotiated in good faith and at arm's length, are consistent with sections 105, 1122, 1123(b)(6), 1129, and 1142 of the Bankruptcy Code, and are each necessary for the Debtors' successful reorganization. Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

16. The Plan gives effect to many of the Debtors' restructuring initiatives, including implementing a value maximizing restructuring transaction. Therefore, the Plan has been proposed in good faith to achieve a result consistent with the objectives and purposes of the Bankruptcy Code and the Debtors (and all of their respective officers, managers, directors, agents, independent contractors, financial advisors, consultants, attorneys, employees, partners, Affiliates, and representatives) have been, are, and will continue to act in good faith within the meaning of sections 1125(e) and 1126(e) the Bankruptcy Code if they proceed to: (a) consummate the Plan and the Restructuring Transactions and the agreements, settlements, transactions, and transfers contemplated thereby; and (b) take the actions authorized and directed or contemplated by this Confirmation Order.

P.    **Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).**

17. Any payment made or to be made by the Debtors, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been

approved by, or is subject to the approval of, the Bankruptcy Court as reasonable, thereby

satisfying section 1129(a)(4) of the Bankruptcy Code.

**Q.      Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).**

18.      The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code.  The

identities of the Reorganized Debtors' directors and officers were disclosed in the Plan

Supplement.  To the extent that such directors and officers are insiders, the nature of their

compensation has been disclosed to the extent known and reasonably practicable.

**R.      No Rate Changes (11 U.S.C. § 1129(a)(6)).**

19.      Section 1129(a)(6) of the Bankruptcy Code is satisfied because the Plan does not

provide for any rate changes over which a governmental regulatory commission has jurisdiction.

**S.      Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).**

20.      Each Holder of an Impaired Claim or Interest either has accepted the Plan or will

receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of

the Effective Date, that is not less than the amount that such Holder would receive or retain if the

Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

21.      The liquidation analysis attached as **Exhibit D** to the Disclosure Statement (the

"Liquidation Analysis") and the other evidence related thereto in support of the Plan that was

proffered or adduced at or prior to the Confirmation Hearing or in the Confirmation Declarations:

(a) are reasonable, persuasive, credible, and accurate as of the dates such analyses or evidence was

prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and

assumptions; (c) have not been controverted by other evidence; and (d) establish that Holders of

Allowed Claims or Interests in every Class will recover as much or more under the Plan on account

of such Claim or Interest, as of the Effective Date, than the amount such Holder would receive if

the Bankruptcy Code, the Bankruptcy Rules or the Local Rules. Any state or local business or operating license transferred, sold, vested, or otherwise conveyed from a Debtor to a Reorganized Debtor shall be deemed valid and enforceable by the applicable Reorganized Debtor without the need of any corporate, governmental authority, or further court approval.

**JJ.** **Management Incentive Plan.**

41. The Debtors have provided sufficient and adequate notice of the terms of the Management Incentive Plan. The terms and conditions of the Management Incentive Plan have been negotiated in good faith and at arm's length with the Term Lender Group. The Management Incentive Plan is an essential element of the Plan, and the terms of the Management Incentive Plan and the awards contemplated therein are fair and reasonable.

**KK.** **Approval of the First Lien Exit Facility.**

42. The First Lien Exit Facility is an essential element of the Plan, is necessary for Confirmation and the consummation of the Plan, and is critical to the overall success and feasibility of the Plan. Entry into the First Lien Exit Credit Agreement and the other First Lien Exit Facility Documents is in the best interests of the Debtors, their Estates, and all Holders of Claims or Interests. The Debtors have exercised reasonable business judgment in determining to enter into the First Lien Exit Credit Agreement and the other First Lien Exit Facility Documents and have provided sufficient and adequate notice of the material terms of the First Lien Exit Facility, which material terms were filed as part of the Plan Supplement. The terms and conditions of the First Lien Exit Facility are fair and reasonable, and the First Lien Exit Facility was negotiated in good faith and at arm's length. The Debtors are authorized, without further approval of the Bankruptcy Court or any other party, to execute and deliver all agreements, documents, instruments, and certificates related thereto and perform their obligations thereunder.

45. Each New Security issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Securities referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

46. In respect of the Term Loan Lender Equity Distribution and the Unsecured Creditor Equity Distribution, if a Holder of Allowed Credit Agreement Claims, Allowed Senior Notes Claims or Allowed General Unsecured Claims holds its Allowed Claim in multiple managed funds and/or investment vehicles (such entities, the "Funds"), then it will receive its allocation of Class A Common Stock, Class B Common Stock, and Special Warrants, as applicable, Pro Rata across such Funds and in accordance with the terms of the Plan and the Equity Allocation Mechanism; *provided*, *however*, that, if an allocation other than Pro Rata across the Funds is requested, such Holder shall give notice to the Debtors, the Reorganized Debtors, and/or the Disbursing Agent (or their respective representatives or assigns) no later than five (5) Business Days after the Confirmation Date specifying its requested allocation of New Securities amongst its Funds. The Disbursing Agent (and any other applicable agents or representatives of the Debtors and Reorganized Debtors) shall use commercially reasonable efforts to assist such Holder in allocating its New Securities across such Funds in such manner, which allocation shall otherwise be subject to the terms of the Plan and the Equity Allocation Mechanism.

**MM.** **Executory Contracts and Unexpired Leases.**

47. The Debtors have exercised sound business judgment in determining whether to assume, assume and assign, or reject each of their Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, Article V of the Plan, and as set

forth in the Plan Supplement. Except as set forth herein and/or in separate orders entered by the Bankruptcy Court relating to assumption of Executory Contracts or Unexpired Leases, the Debtors have cured or provided adequate assurances that the Debtors will cure defaults (if any) under or relating to each Executory Contract or Unexpired Lease assumed under the Plan.

48.     Nothing in the Plan or the Confirmation Order shall prevent a party to an Executory Contract or Unexpired Lease rejected pursuant to the Plan from filing a Proof of Claim based on such rejection by the later of (i) the applicable Claims Bar Date, and (ii) thirty (30) days after notice of such rejection is served on the applicable claimant. Nothing in the Plan or this Confirmation Order shall prevent a party to an Executory Contract or Unexpired Lease assumed pursuant to the Plan, or otherwise, from continuing to prosecute an objection to the cure amount related to such assumed Executory Contract or Unexpired Lease if such objection was timely filed on or before at least seven days prior to the Confirmation Hearing, but not resolved before the Effective Date.

**NN.     Discharge, Compromise, Settlement, Release, Exculpation, and Injunction Provisions.**

49.     The Bankruptcy Court has jurisdiction under sections 1334(a) and (b) of title 28 of the United States Code to approve the discharge, compromises, settlements, releases, exculpations, and injunctions set forth in Article VIII of the Plan. Sections 105(a) and 1123(b) of the Bankruptcy Code permit issuance of the injunctions and approval of the releases, exculpations, and injunctions set forth in Article VIII of the Plan. Based upon the record of the Chapter 11 Cases and the evidence proffered or adduced at the Confirmation Hearing, the Bankruptcy Court finds that the discharge, compromises, settlements, releases, exculpations, and injunctions set forth in Article VIII of the Plan are consistent with the Bankruptcy Code and applicable law. Further, the discharge, compromises, settlements, releases, exculpations, and injunctions contained in Article

VIII of the Plan are integral components of the Plan.  The discharge, compromises, settlements, releases, exculpations, and injunctions set forth in Article VIII of the Plan are hereby approved and authorized in their entirety.

**OO.    Debtor Release; Third-Party Release.**

50.    The releases described in Articles VIII.D and VIII.E of the Plan are an integral and necessary part of the Plan and represent a valid exercise of the Debtors' business judgment.  For the reasons set forth on the record of the Chapter 11 Cases and the evidence proffered or adduced at the Confirmation Hearing, including the Plan embodied therein, the releases provided for in the Plan are in the best interests of the estates.  The releases described in Articles VIII.D and VIII.E of the Plan are: (a) in exchange for good and valuable consideration provided by the Released Parties; (b) a good-faith compromise and settlement of the Claims and Causes of Action released by the Debtors and the Releasing Parties; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or any Holder of a Claim or Interest that would have been legally entitled to assert any Claim or Cause of Action on behalf of any of the Debtors or the Estates or any Releasing Party, as applicable, from asserting any Claim or Cause of Action released by the releases described in Articles VIII.D and VIII.E of the Plan against any of the Released Parties.

**PP.    Exculpation.**

51.    The exculpation provisions set forth in Article VIII.G of the Plan are essential to the Plan.  The record in the Chapter 11 Cases fully supports the exculpation provisions, and the exculpation provisions set forth in Article VIII.G of the Plan are appropriately tailored to protect the Exculpated Parties from inappropriate litigation and to exclude actions determined by Final Order to have constituted actual fraud, gross negligence, or willful misconduct.

QQ.     **Injunction.**

52.     The injunction provisions set forth in Article VIII.H of the Plan are essential to the

Plan; are necessary to preserve and enforce the releases set forth in Articles VIII.B, VIII.D and

VIII.E of the Plan, the exculpation provisions in Article VIII.G of the Plan, and the compromises

and settlements implemented under the Plan; and are narrowly tailored to achieve that purpose.

53.     The injunction provisions set forth in Article VIII.H the Plan: (a) are within the

jurisdiction of this Bankruptcy Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) are

an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy

Code; (c) are an integral element of the transactions incorporated into the Plan; (d) confer material

benefits on, and are in the best interests of, the Debtors, the Estates, and their creditors; (e) are

important to the overall objectives of the Plan to finally resolve all Claims or Causes of Action

among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors; and

(f) are consistent with sections 105, 1123, and 1129 of the Bankruptcy Code, other provisions of

the Bankruptcy Code, and other applicable law.  The record of the Confirmation Hearing and the

Chapter 11 Cases is sufficient to support the injunction provisions set forth in Article VIII.H of

the Plan.

RR.     **Retention of Jurisdiction.**

54.     Except as otherwise provided in the Plan, any of the Plan Documents or this

Confirmation Order, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and

all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including the matters

set forth in Article XI of the Plan.

SS.     **Reports.**

55.     After the Effective Date, the Reorganized Debtors shall have no obligation to file

with the Bankruptcy Court or serve on any parties reports that the Debtors were obligated to file

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Eric J. Steinmann | DEFENDANTS<br>Mary G. Berner, Jeffery Marcus, Brian Cassidy,<br>Ross Oliver, and Crestview Partners, LP |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Lindsey L. Hobbs, Wise & Reeves, P.C., Two Centre Square,<br>Ste 160, 625 S. Gay Street, Knoxville, TN 37902, (865) 544-1199 | ATTORNEYS (If Known)<br>David M. Pernini, Wargo French, 999 Peachtree Street, NE,<br>Atlanta, GA  30309, (404) 853-1520 |

| PARTY (Check One Box Only)<br>☐ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor      ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor      ☒ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
The complaint asserts purported claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, and conspiracy, premised on allegations about Defendants' conduct leading up to the Debtors' filing for Chapter 11 protection.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
     (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☒ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court
     if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☒ Check if a jury trial is demanded in complaint | Demand $  Unknown |
| Other Relief Sought | |

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>In re CM Wind Down Topco Inc. | BANKRUPTCY CASE NO.<br>17-13381 (SCC) | |
| DISTRICT IN WHICH CASE IS PENDING<br>Bankruptcy Court for the Southern District of New York | DIVISION OFFICE | NAME OF JUDGE<br>Chapman |

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF<br><br>EJS Investment Holdings, LLC and WGH Communications, Inc. | DEFENDANT<br>Mary G. Berner, Jeffery Marcus, Brian Cassidy, Ross Oliver, and Crestview Partners, LP | ADVERSARY |
| DISTRICT IN WHICH ADVERSARY IS PENDING<br>Bankruptcy Court for the Northern District of Georgia | DIVISION OFFICE<br>Atlanta | NAME OF JUDGE |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | |
|---|---|
| <br>/s/ David Pernini<br><br> | |
| DATE<br><br>December 19, 2018 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>David Pernini |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.